# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

April 13, 2020

**BY ECF**

The Honorable Judge Lewis J. Liman
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

RE:   **United States v. Lawrence Ray**
          **20 Cr. 110 (LJL)**

Honorable Judge Liman:

Lawrence Ray respectfully moves the Court for an order granting his release from the Metropolitan Correctional Center (MCC) or, in the alternative, a bail hearing to be held this week. The COVID-19 pandemic constitutes information that was not known to Mr. Ray at the time of his original bail hearing, warranting reconsideration of the Court's decision to detain Mr. Ray pending trial.[1]

> We are in the midst of an unprecedented pandemic. COVID-19 has paralyzed
> the entire world. The disease has spread exponentially, shutting down schools,
> jobs, professional sports seasons, and life as we know it. It may kill 200,000
> Americans and infect millions more. At this point, there is no approved cure,
> treatment, or vaccine to prevent it.[2]

In the days following Mr. Ray's March 2, 2020 bail hearing, COVID-19, a new strain of the coronavirus, began to ravage the nation.[3] This global pandemic has spurred a public health

---

[1] *See* 18 U.S.C. § 3142(f); *United States v. Ramos*, No. 18-CR-30009-FDS, 2020 WL 1478307, at *1 (D. Mass. Mar. 26, 2020) ("[T]he court finds that the circumstances of the COVID-19 pandemic diminish the risk that Mr. Ramos will flee pending trial, and that his continued detention poses a risk of danger to himself and others such that pretrial release is warranted….").

[2] *United States v. Rodriguez*, No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020) (granting defendant's compassionate release application).

[3] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (Mar. 11, 2020), at https://bit.ly/2W8dwpS.

crisis frequently likened to war. As a sixty year old diabetic, "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic" threatens Mr. Ray's physical health and his ability to prepare a defense for trial.[4] Mr. Ray must be immediately released from the MCC.

In light of the novel coronavirus, the following conditions will reasonably assure Mr. Ray's appearance in court and the safety of the community:

1. A personal recognizance bond in the amount of $100,000, to be signed by Mr. Ray and two financially responsible persons;
2. Pretrial Services supervision as directed by the Pretrial Services Office;
3. Travel restricted to the Southern District of New York, the Eastern District of New York and the District of New Jersey;
4. Surrender all passports and other travel documents and make no applications for new or replacement documents;
5. Home detention at Mr. Ray's birth father's home in Staten Island enforced by electronic monitoring;
6. Access to a phone and computer with the following restrictions: (i) computer to be used only for work-related purposes and to review discovery in this case; (ii) phone to be used only to make and receive calls to and from defense counsel and phone numbers agreed to by the Government;
7. No contact, outside the presence of counsel, with any witnesses to the case or alleged co-conspirators.

## I.   Background

On February 11, 2020, Mr. Ray was arrested for allegations stemming from a salacious April 2019 New York Magazine article.[5] That day, he was presented on an Indictment before Magistrate Judge Robert W. Lehrburger and represented by the Federal Defenders of New York, Inc. Mr. Ray reserved his bail application without prejudice to make a motion at a later date. The following day, Mr. Ray appeared before Your Honor for arraignment on the Indictment and entered a plea of not guilty.

On February 26, 2020, the Court held a status conference. During the conference, defense counsel raised concerns about the lack of medical care afforded to Mr. Ray at the Metropolitan Correctional Center. Counsel requested that the Court issue a medical order mandating that Mr. Ray receive appropriate care for any and all medical concerns that arise while Mr. Ray is incarcerated, noting that Mr. Ray is diabetic. The Court declined to issue such a broad medical order. Instead, the Court issued an order directing the MCC to provide Mr. Ray with medical attention and treatment for diabetes.

---

[4] *United States v. Stephens*, 15-CR-95 (AJN) (Mar. 19, 2020) (finding the coronavirus generally to be an appropriate ground for reconsideration of bail conditions); *see* 18 U.S.C. § 3142(g)(3)(A) & (i).

[5] Ezra Marcus & James D. Walsh, "The Stolen Kids of Sarah Lawrence," New York Magazine (Apr. 29, 2019), at https://www.thecut.com/2020/02/larry-ray-sarah-lawrence-students.html.

During the February 26, 2020 conference, the Government discussed discovery. Reporting that it had produced limited discovery to the defense on February 19, 2020—primarily search warrant applications and some returns—the Government noted that it would not produce additional discovery absent a protective order. The Court ordered the parties to submit a proposed protective order by March 4, 2020 and set a ten-week deadline for the Government to complete its discovery production. The Court referred appointment of counsel and Mr. Ray's bail application to Magistrate Court. The matter was adjourned for another status conference on March 19, 2020.

On March 2, 2020, Magistrate Judge Kevin N. Fox formally appointed the Federal Defenders of New York, Inc. as counsel for Mr. Ray and held a contested bail hearing. Magistrate Judge Fox ordered Mr. Ray's continued pretrial detention.[6]

That day, the Government submitted a joint proposed protective order to govern discovery in this case. The Court issued the protective order the following day. The protective order states, in relevant part, "disclosure material designated by the Government as 'sensitive disclosure material' may *not* be disclosed to the defendant outside the presence of counsel and/or paralegals and legal assistants, and if the defendant is detained he may not retain any paper or electronic copies of sensitive disclosure material in his cell."[7] To date, the Government has made three discovery productions to the defense in addition to its February 19, 2020 production. Collectively, the Government's discovery productions contain more than one million pages of documents and include audio/video recordings, photographs, and materials marked "sensitive" under the Court's protective order.[8]

On March 13, 2020, the Bureau of Prisons closed its doors to all visitors—including legal visits—for thirty days, citing public health concerns caused by the coronavirus. To date, the MCC remains closed, and there is no date on which it promises to reopen.

On March 16, 2020, the Government, with the defense's consent, filed a letter motion requesting the Court to adjourn the March 19, 2020 status conference for one month. The letter noted, "Counsel for both parties have been advised to work remotely where possible, and to seek adjournments of nonessential court appearances in light of current guidance from public health officials."[9] The case was rescheduled for April 22, 2020 at 2PM in light of COVID-19.

## II.     The Bail Reform Act governs Mr. Ray's bail motion.

The Bail Reform Act contemplates reopening a bail hearing "before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community."[10]

---

[6] *See* Exhibit A, March 2, 2020 Transcript.
[7] ECF Doc. No. 12 at ¶ 6(a) (Mar. 3, 2020) (emphasis in original).
[8] *See* ECF Doc. No. 14 (Mar. 16, 2020) (describing the Government's production to date).
[9] *Id.*
[10] 18 U.S.C. § 3142(f)(2).

Generally, the Bail Reform Act permits the Court to detain an individual before trial only upon a showing by the Government "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."[11] Because of the nature of the charges in this case, there is a rebuttable presumption that no such conditions exist.[12]

Nevertheless, the Government retains the burden of persuasion.[13] For the Court to detain Mr. Ray, the Government must prove by clear and convincing evidence that he is a danger to the community or establish by a preponderance of the evidence that he is a flight risk.[14] "To find danger to the community under this standard of proof requires that the evidence support such a conclusion with a high degree of certainty."[15] In a presumption case, "the defendant bears a limited burden of production—not a burden of persuasion—to rebut the presumption by coming forward with evidence that he does not pose a danger to the community or a flight risk."[16]

To determine whether to release or detain an individual pretrial, the Court should consider the factors enumerated in 18 U.S.C. § 3142:

> These factors include (1) "the nature and circumstances of the offense charged;" (2) "the weight of the evidence against the person;" (3) "the history and characteristics of the person" including, among other factors, family ties, employment, financial resources, past conduct, criminal history, and whether the person was on release pending trial; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."[17]

Separately, under certain circumstances, the Bail Reform Act contemplates the temporary release of an individual who had been ordered detained. When an individual is detained, the Bail Reform Act "permit[s] the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be *necessary for preparation of the person's defense or for another compelling reason*."[18]

As detailed below, there is no greater necessity for the preparation of a "person's defense" than access to counsel. And there is no more "compelling reason" than a person's physical health.

---

[11] 18 U.S.C. § 3142(e)(1); *United States v. Paulino*, 335 F. Supp. 600, 609 (S.D.N.Y. 2018) (discussing in detail the history of the Bail Reform Act).

[12] 18 U.S.C. § 3142(e)(3). Mr. Ray is charged with, *inter alia*, one count of Sex Trafficking in violation of 18 U.S.C. § 1591. He is not charged with any offense involving minors.

[13] *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985); *United States v. Paulino*, 335 F. Supp. 3d 600, 610 (S.D.N.Y. 2018).

[14] *Chimurenga*, 760 F.2d at 405; *Paulino*, 335 F. Supp. 3d at 610.

[15] *Chimurenga*, 760 F.2d at 405.

[16] *Paulino*, 335 F. Supp. 3d at 610 (internal quotation marks omitted), citing *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011).

[17] *Paulino*, 335 F. Supp. 3d at 610.

[18] 18 U.S.C. § 3142(i) (emphasis added).

### III.   The COVID-19 outbreak compels Lawrence Ray's release from the Metropolitan Correctional Center.

There can be no question that the declaration of COVID-19 as a global pandemic and the subsequent shuttering of the MCC to all visitors for thirty days in the days following Mr. Ray's original bail constitutes "information [] that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of [Mr. Ray] as required and the safety of any other person and the community."[19] As Judge Nathan declared when pioneering the release of defendants from Bureau of Prisons facilities in recent weeks, "[a] comprehensive view of the danger the Defendant poses to the community requires considering all factors," including COVID-19.[20]

In the days following March 2, 2020, when Mr. Ray was ordered detained, the world changed immeasurably. On March 11, 2020, the World Health Organization classified COVID-19, a new strain of coronavirus, as a global pandemic.[21] Governor Andrew Cuomo declared a State of Emergency in New York, and on March 20, 2020, the governor directed all non-essential workers to work from home and required individuals to maintain six feet of distance between each other.[22] Also on March 20, 2020, the Federal Emergency Management Agency (FEMA) declared New York State "a major disaster."[23]

The exponential rate of coronavirus infection is unparalleled. The first case of COVID-19 in New York State was announced on March 1, 2020. To date, the state has amassed 188,694 confirmed cases of the virus, with nearly 10,000 deaths.[24] In New York City, there are over 100,000 positive cases and more than 6,000 deaths resulting from the virus.[25] New York has more

---

[19] 18 U.S.C. § 3142(f)(2).

[20] *United States v. Stephens*, No. 15-CR-95 (AJN), 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) (reversing prior detention order and granting defendant's release "in light of circumstances that have changed since the March 6 hearing"). *See also* 18 U.S.C. § 3142(g)(3)(A) (directing courts to consider an individual's "physical health" when determining whether the person poses a danger to the community); *United States v. Raihan*, 20-CR-68 (BMC) (JO) (E.D.N.Y. Mar. 12, 2020) (denying the Government's remand application and finding that increasing the population at the Metropolitan Detention Center could present a "danger to the community"); *United States v. Santiago Ramos*, 20-CR-04 (ER) (S.D.N.Y. Mar. 19, 2020) (setting bail conditions for formerly detained defendant in light of coronavirus).

[21] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (Mar. 11, 2020), at https://bit.ly/2W8dwpS.

[22] *At Novel Coronavirus Briefing, Governor Cuomo Declares State of Emergency to Contain Spread of Virus*, New York State (Mar. 11, 2020) *at* https://on.ny.gov/2TKzIoz; *NYS on PAUSE Extended*, New York State Department of Health (Apr. 11, 2020), at https://coronavirus.health.ny.gov/home.

[23] President Donald J. Trump Approves Major Disaster Declaration for New York, FEMA (Mar. 20, 2020), at https://www.fema.gov/news-release/2020/03/20/president-donald-j-trump-approves-major-disaster-declaration-new-york.

[24] *Novel Coronavirus (COVID-19),* New York State Department of Health (last accessed Apr. 12, 2020), at https://on.ny.gov/2vfFQvy (updating regularly).

[25] *Coronavirus*, New York City Health (last accessed Apr. 12, 2020), at

confirmed cases of coronavirus than any other state in the country. As of March 22, 2020, New York had 5% of coronavirus cases globally.[26] And the majority of those cases are in New York City, making it an epicenter of the pandemic.[27]

Inmates at the Metropolitan Correctional Center—a massive pretrial detention facility housing more than 700 people—are at serious risk of contracting the virus.[28] "Courts have [ ] recognized this health risk to be particularly acute—and of constitutional significance—for inmates who are elderly or have underlying illnesses."[29] The serious medical concern posed by COVID-19 constitutes a "compelling reason" to release a previously detained individual.[30]

The current public health crisis and its effect on Mr. Ray weigh heavily in favor of Mr. Ray's release.

### a. Lawrence Ray, a sixty-year-old diabetic, is at high risk for serious health complications if infected with COVID-19.

The coronavirus can take a shocking toll on even the healthiest among us.[31] For the elderly and those with underlying health conditions or compromised immune systems, it can be deadly.[32]

_____

https://www1.nyc.gov/site/doh/covid/covid-19-data.page (updating regularly).

[26] *Coronavirus Live Updates*, The New York Times (Mar. 22, 2020) at https://www.nytimes.com/2020/03/22/world/coronavirus-updates-world-usa.html.

[27] *Coronavirus in N.Y.C.: Region Is Now an Epicenter of the Pandemic*, The New York Times (Mar. 23, 2020), at https://www.nytimes.com/2020/03/22/nyregion/Coronavirus-new-York-epicenter.html?action=click&module=Spotlight&pgtype=Homepage.

[28] *See* Exhibit B, Affidavit of Jonathan Giftos, M.D. (detailing the impact of the conditions at the Metropolitan Correctional Center on the facility's ability to manage COVID-19).

[29] *Basank v. Decker*, No. 20 CIV. 2518 (AT), 2020 WL 1481503, at *4 (S.D.N.Y. Mar. 26, 2020).

[30] *See United States v. Perez*, No. 19 Cr. 297 (PAE), 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (granting pretrial release in light of coronavirus); *United States v. Chandler*, No. 1:19-CR-867 (PAC), 2020 WL 1528120, at *3 (S.D.N.Y. Mar. 31, 2020) (granting defendant's motion for pretrial release under 18 U.S.C. § 3142(i) for lack of access to counsel and in light of the compelling circumstances of the coronavirus pandemic).

[31] An otherwise healthy twenty-six-year-old penned a cautionary tale about her coronavirus infection. "After I was admitted [to the hospital], I was told that there was a thirty-year-old in the next room who was also otherwise healthy, but who had also experienced serious trouble breathing. The hospital staff told me that more and more patients my age were showing up at the E.R." Fiona Lowenstein, "I'm 26. Coronavirus Sent Me to the Hospital," The New York Times (Mar. 26, 2020), at https://www.nytimes.com/2020/03/23/opinion/coronavirus-young-people.html?referringSource=articleShare. A seemingly healthy thirty-three-year-old male with coronavirus described going to the emergency room where he was placed on an oxygen machine because he couldn't breathe. *See* Michael Waters, "5 people on what it feels like to have Covid-19," Vox (Mar. 28, 2020), at https://www.vox.com/first-person/2020/3/28/21197480/coronavirus-symptoms-covid-19.

[32] *Basank v. Decker*, No. 20 CIV. 2518 (AT), 2020 WL 1481503, at *9 (S.D.N.Y. Mar. 26, 2020) ("The Court takes judicial notice that, for people of advanced age, with underlying health

As a sixty-year-old man with diabetes, Mr. Ray faces a high risk for serious health complications should he become infected with coronavirus.[33] Residing at the MCC exacerbates this risk.

The Centers for Disease Control and Prevention (CDC) advises that "older adults and people of any age who have serious underlying medical conditions might be at higher risk for severe illness from COVID-19."[34] Diabetes is among the most common underlying health conditions for individuals hospitalized with severe COVID-19 disease.[35] Because diabetes weakens the immune system, "[p]eople with diabetes are more prone to infections, and if they have infections, they're more prone to poor outcomes."[36] For those who are incarcerated, the risks are even more severe. As one court recognized,

> For Mr. Rodriguez, nothing could be more extraordinary and compelling than this pandemic. Early research shows that diabetes patients, like Mr. Rodriguez, have mortality rates that are more than twice as high as overall mortality rates. One recent report revealed: "Among 784 patients with diabetes, half were hospitalized, including 148 (18.8%) in intensive care. That compares with 2.2% of those with no underlying conditions needing ICU treatment." These statistics—which focus on the non-prison population—become even more concerning when considered in the prison context. Prisons are tinderboxes for infectious disease.[37]

On March 19, 2020, the Committee on the Judiciary of the United States House of Representatives urged Attorney General William Barr to "aggressively address the COVID-19 threat" lest federal correctional facilities "become epicenters of the COVID-19 pandemic."[38] The Committee urged "[l]ine lawyers" not to "reflexively seek[ ] detention in court" but rather "take into consideration whether the person is pregnant, whether they are 50 years old or older, and

---

problems, or both, COVID-19 causes severe medical conditions and has increased lethality.").

[33] *See generally* Exhibit C, Lawrence Ray Medical Records.

[34] *People Who Are at Higher Risk for Severe Illness*, Centers for Disease Control and Prevention (Apr. 9, 2020), at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

[35] *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019*, Centers for Disease Control and Prevention Morbidity and Mortality Weekly Report (Apr. 8, 2020), at https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6915e3-H.pdf ("Among patients aged 50–64 years, obesity was most prevalent [underlying condition], followed by hypertension and diabetes mellitus.").

[36] Erika Edwards, "Man hospitalized with covid-19 learns he also has diabetes. Why that's dangerous," NBC News (Apr. 10, 2020), at https://www.nbcnews.com/health/health-news/man-hospitalized-covid-19-learns-he-also-has-diabetes-why-n1180026 (internal quotation marks omitted).

[37] *United States v. Rodriguez*, No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020) (granting defendant's compassionate release application).

[38] Exhibit D, March 19, 2020 Letter of the U.S. House of Representatives, Committee on the Judiciary to Attorney General William P. Barr.

whether they suffer from chronic illnesses such as asthma, cancer, heart disease, lung disease, diabetes, HIV, or other diseases that make them vulnerable to COVID-19 infection."[39]

As a member of the vulnerable population at the MCC, Mr. Ray's health has already suffered. On March 30, 2020, defense counsel received a call from Mr. Ray's father, Lawrence Grecco, who expressed concern about his son's physical health. Specifically, Mr. Grecco stated that Mr. Ray reported that he lost consciousness in his cell after experiencing head pain. Counsel immediately contacted the Legal Department at the MCC, providing Mr. Grecco's account of Mr. Ray's health, and requesting an update on Mr. Ray's physical condition. The following day, defense counsel spoke with Bureau of Prisons attorney Nicole McFarland. Ms. McFarland stated that Mr. Ray complained about shooting pain down his leg and was offered medication to manage the pain. Mr. Ray's vital signs were checked and his temperature and blood pressure were within normal limits. But, Ms. McFarland cautioned, Mr. Ray's blood glucose levels were high.[40] This is consistent with Mr. Ray's diabetes diagnosis. It also signifies Mr. Ray's higher risk for hospitalization if he contracts COVID-19.

The substandard medical care at the MCC is alarming, but foreseeable. In ordinary times, the MCC repeatedly fails to adequately address even routine medical conditions. In times of crisis, the medical care at the facility has halted entirely.[1] This is true now. Mr. Ray's MCC medical records reflect that on March 31, 2020, a day after he passed out, he was "waiting for an assessment for chronic care clinic," but "routine visits are postponed due to COVID 19 outbreak."[1] The Court simply cannot rely on the MCC to provide Mr. Ray with the medical attention he requires—and which is his constitutional right.

Other courts have recognized the grave risk coronavirus poses to an individual similarly situated to Mr. Ray. "[I]t is not possible for a medically vulnerable inmate such as Mr. Ramos to isolate himself in this institutional setting as recommended by the CDC. … [D]etaining Mr. Ramos in an institutional setting in close quarters with others poses a very serious risk to his health that the court should, and is, taking into consideration."[41]

Mr. Ray's age and medical condition, in combination with the environment at the MCC, discussed below, counsel in favor of Mr. Ray's release.

### b. The Metropolitan Correctional Center is ill-equipped to manage the coronavirus: There are already at least four known cases of COVID-19 at the facility and countless others are symptomatic.

Nationwide, COVID-19 has paralyzed the Bureau of Prisons and plagued its population.

---

[39] *Id.*

[40] *See* Exhibit C, Lawrence Ray Medical Records at 31.

[41] *United States v. Ramos*, No. 18-CR-30009-FDS, 2020 WL 1478307, at *1–2 (D. Mass. March 26, 2020) (granting defendant's motion for pretrial release in view of the coronavirus); *see also United States v. Fellela*, No. 3:19-CR-79 (JAM), 2020 WL 1457877, at *1 (D. Conn. Mar. 20, 2020) ("Fellela is 62 years old, weighs 300 pounds, and is afflicted with diabetes among several other ailments. His age, physical, and medical condition make him within the highest risk group of death if he were to become infected with the COVID-19 virus.").

To date, eight BOP inmates have lost their lives to the coronavirus.[42] At the Metropolitan Correctional Center, where Lawrence Ray is housed, six inmates were tested for coronavirus; of those, five tested positive.[43] Put differently, 83% of MCC inmates tested were confirmed to have contracted the virus. In addition, twelve MCC employees have tested positive for COVID-19.[44]

These figures reflect those reported on the Bureau of Prisons website. However, these statistics represent only positive lab tests.[45] They do not tell the full story. The Bureau of Prisons reportedly also tracks "open" cases, defined as "suspected, presumed positive, or clinically confirmed" cases of COVID-19.[46] These numbers are wildly different than those conveyed on the Bureau's website. The BOP reported to Congress that as of April 7, 2020, there were 456 people in isolation; in other words, 456 individuals in BOP custody are presumptively positive for COVID-19. Further, the Bureau reported that 3,850 inmates are in quarantine.[47] This signifies that, at minimum, 3,850 people in BOP facilities are suspected of having been exposed to the coronavirus. At bottom, the inconsistent data suggests the Bureau of Prisons is publicly undercounting inmates who are infected with and exposed to COVID-19. The true number of individuals in BOP facilities battling coronavirus likely exceeds the reported figures.

This is wholly unsurprising. Conditions of pretrial confinement create the ideal environment for the transmission of coronavirus. Correctional facilities "are petri dishes for contagious respiratory illnesses."[48] Indeed, "prisoners and jail inmates are more likely than the general population to report experiencing infectious diseases, indicating that these individuals face a heightened risk during this pandemic."[49] Despite this, "[e]xperts agree that pretrial detention facilities are poorly equipped to manage a crisis resulting from this potentially deadly, highly contagious novel coronavirus within their walls. By design, jails are not medical facilities."[50]

Given what we know about COVID-19, the BOP's quest to contain the infection seems

---

[42] *COVID-19 Coronavirus*, Bureau of Prisons (last accessed Apr. 12, 2020), at https://www.bop.gov/coronavirus/ (updating regularly).

[43] *See* Exhibit E, April 9, 2020 Letter to Chief Judge Roslynn R. Mauskopf.

[44] *Id.*

[45] *See* Exhibit F, BOP-Reported Positive Tests for COVID-19 Nationwide (summarizing BOP data in charts and graphs).

[46] Information and Statistics that BOP Provided to Congress (April 7, 2020).

[47] *Id.*

[48] *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration. *See also* Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8): 1047-1055, at https://doi.org/10.1086/521910.

[49] *United States v. Kennedy*, No. 18-20315, 2020 WL 1493481, at *1–2 (E.D. Mich. Mar. 27, 2020), *reconsideration denied*, No. 18-20315, 2020 WL 1547878 (E.D. Mich. Apr. 1, 2020) (ruling "the COVID-19 pandemic constitutes an independent compelling reason to temporarily release [Defendant] from custody" under 18 U.S.C. § 3142(i)(4) and finding "temporary release is necessary for Defendant to prepare his pre-sentencing defense").

[50] *United States v. Davis*, No. ELH-20-09, 2020 WL 1529158, at *5 (D. Md. Mar. 30, 2020) (ordering defendant's release in a presumption case in light of COVID-19).

futile. Coronavirus is highly contagious. On average, one person with the coronavirus will infect between two to three other individuals.[51] In correctional facilities, the rate of infection is even greater. Public health experts agree that incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[52]

The soaring rate of infection at Rikers Island is illustrative. On March 20, 2020, the New York City Department of Correction announced that one inmate and seven staff members in the city jails had been diagnosed with coronavirus.[53] One day later, on March 21, 2020, it became clear that no fewer than 38 people have tested positive.[54] The cases are not abating. As of April 8, 2020, "288 inmates, 488 correction staff and 78 health care workers had tested positive for the virus. Seven jail employees had died, and 11 percent of the city's 11,500 correction officers had self-quarantined."[55] The chairwoman of the New York City Board of Correction urged, "Fewer people in the jails will save lives and minimize transmission among people in custody as well as staff. Failure to drastically reduce the jail population threatens to overwhelm the City jails' healthcare system as well as its basic operations."[56]

In an effort to stem transmission of the coronavirus within federal correctional facilities, on March 13, 2020, the Bureau of Prisons announced a thirty-day suspension of all visits to its jails and prisons. More recently, the MCC has implemented coronavirus screening protocols for staff and new inmates, which involves taking the temperature of each person entering the facility and having them complete a screening form.[57] But these policies are cold comfort in the face of a highly contagious virus that infected individuals may transmit while asymptomatic. "[T]here is no way to stop the daily flow of guards, teachers, food service and healthcare workers. Someone is certain to bring the virus in and take it back out while they are asymptomatic."[58] As Judge Brody in the Eastern District of Pennsylvania recognized, the Bureau of Prison's assurances that it "can protect inmates ring hollow given that these measures have already failed to prevent transmission

---

[51] *The average coronavirus patient infects at least 2 others, suggesting the virus is far more contagious than flu*, Business Insider (Mar. 17, 2020), at https://www.businessinsider.com/coronavirus-contagious-r-naught-average-patient-spread-2020-3.

[52] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (Mar. 2, 2020), at https://bit.ly/2W9V6oS.

[53] *38 positive for coronavirus in NYC jails, including Rikers*, ABC News (Mar. 21, 2020), at https://abcnews.go.com/US/wireStory/38-positive-coronavirus-nyc-jails-including-rikers-69731911.

[54] *Id.*

[55] Jan Ransom, "Jailed on a Minor Parole Violation, He Caught the Virus and Died," The New York Times (Apr. 9, 2020), at https://www.nytimes.com/2020/04/09/nyregion/rikers-coronavirus-deaths-parolees.html.

[56] *See* Exhibit G, March 21, 2020 Letter of the Board of Correction of the City of New York.

[57] *See* Exhibit E, April 9, 2020 Letter to Chief Judge Roslynn R. Mauskopf.

[58] *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration.

of the disease" at the facility where Mr. Ray is housed.[59]

Because there is currently no vaccine or cure for COVID-19, the primary focus is on preventing the spread of the virus. To prevent new infections, the Centers for Disease Control and Prevention strongly recommends the following actions: thorough and frequent handwashing, cleaning surfaces with Environmental Protection Agency approved disinfectants, keeping at least six feet of space between people, and social distancing.[60]

But the MCC simply cannot employ even the most basic CDC recommendations for preventing the spread of coronavirus. Maintaining six feet of distance from other inmates is impossible in a correctional facility where most individuals, including Lawrence Ray, are double-bunked, sharing a toilet and sink with their cellmate and a common shower with at least sixteen other people. Because the commissary is currently closed, the bar of soap that is provided to inmates must be used not only for handwashing, but also for showers and washing clothing; no one is allowed to purchase additional soap.

In addition to unhygienic living conditions, frequent movement between units at the MCC over the past several weeks promises to aid the spread of the virus. In New York City jails, where there have been at least 38 confirmed cases of coronavirus, the Board of Correction chairwoman stated, "It is likely that these people have been in hundreds of housing areas and common areas over recent weeks and have been in close contact with many other people in custody and staff."[61] The MCC has encountered the same obstacle to cabining the spread. For eight days at the end of February through the beginning of March, the MCC was on total lockdown. During that period, inmates report that they were frequently shuttled among various housing units as officers searched for a loaded gun. This movement undoubtedly facilitated infection at the MCC.

The MCC's solution to curtailing all visits for thirty days—providing additional phone minutes at no charge—presents yet another public health hurdle. The MCC has given each inmate an additional 200 phone minutes, bringing the monthly total to 500 minutes. But with the extra phone time comes swarms of crowds. The phones frequently remain in constant use and are poorly cleaned, creating more opportunity to spread infection.

The exceptional risk the coronavirus poses to incarcerated individuals has compelled courts in the Southern District of New York and across the country to release previously detained individuals.[62] Judge Torres recently observed, "The nature of detention facilities makes exposure

---

[59] *United States v. Rodriguez*, No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *8 (E.D. Pa. Apr. 1, 2020).

[60] Exhibit B, Affidavit of Jonathan Giftos, M.D.

[61] *38 positive for coronavirus in NYC jails, including Rikers*, ABC News (Mar. 21, 2020), at https://abcnews.go.com/US/wireStory/38-positive-coronavirus-nyc-jails-including-rikers-69731911.

[62] *Josefina Coronel, et al., Petitioners-Plaintiffs, v. Thomas Decker, et al., Respondents-Defendants. Additional Party Names: Jose Madrid, Jose Otero, Juan Morocho Sumba, Miguel Miranda*, No. 20-CV-2472 (AJN), 2020 WL 1487274, at *4 (S.D.N.Y. Mar. 27, 2020). *See, e.g.*, *United States v. Stephens*, No. 15-cr-95 (AJN), 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) ("[I]nmates may be at a heightened risk of contracting COVID-19 should an outbreak

and spread of the virus particularly harmful."[63] Quoting a physician "who has worked extensively on infectious disease treatment and prevention in the context of jails and prisons," Judge Torres recognized that "the risk of COVID-19 to people held in New York-area detention centers…is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected."[64] The Third Circuit has also weighed in, noting, "It goes without saying that prisons generally are crowded spaces and therefore are less than conducive to the practice of social distancing. During this rapidly evolving public health emergency, there are many valid concerns about the possibility of contagion in prisons."[65]

Other New York courts have similarly granted relief because of the threat coronavirus poses in correctional facilities. In *United States v. Juan Plasencia*, because of the COVID-19 pandemic, the Court released Mr. Plasencia.[66] Like Mr. Ray, Mr. Plasencia's initial application for bail, before the coronavirus outbreak, was denied. As another example, on March 23, 2020, Judge Rakoff denied the Government's request to detain a defendant, Johansi Lopez, *after* he pled guilty to conspiracy to commit Hobbs Act Robbery, attempted Hobbs Act Robbery, and use of a firearm in relation to a drug trafficking crime. The Court found that "the coronavirus situation does create, on its own, an exceptional circumstance possibility," noting, "the number of [coronavirus cases] has been increasing by a substantial percentage each day."[67] The Court asserted that "the Bureau of Prisons is not really equipped to deal with this in anything like the way one would ideally want."[68]

---

develop."); *United States v. Garlock*, 18-cr-418, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) ("By now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided. Several recent court rulings have explained the health risks—to inmates, guards, and the community at large—created by large prison populations. The chaos has already begun inside federal prisons ...."). (citations omitted); *United States v. Fellela*, No. 3:19-CR-79 (JAM), 2020 WL 1457877, at *1 (D. Conn. Mar. 20, 2020) ("All levels of government nationwide have recently taken drastic measures in light of the COVID-19 pandemic to promote "social distancing" and to prohibit the congregation of large numbers of people with one another. But, as is true for most jails and prisons, the conditions of confinement at Wyatt are not compatible with these safeguards.").

[63] *Basank v. Decker*, No. 20 CIV. 2518 (AT), 2020 WL 1481503, at *3 (S.D.N.Y. Mar. 26, 2020).

[64] *Basank v. Decker*, No. 20 CIV. 2518 (AT), 2020 WL 1481503, at *3 (S.D.N.Y. Mar. 26, 2020) (internal citation and quotation marks omitted).

[65] *United States v. Roeder*, No. 20-1682, 2020 WL 1545872, at *2 (3d Cir. Apr. 1, 2020) (reversing the District Court's denial of defendant's motion to postpone his self-surrender date in light of the coronavirus pandemic).

[66] 20 Mj. 205 (SJB) (E.D.N.Y. Mar. 23, 2020). *See also, e.g.*, *United States v. Eli*, 20 Cr. 50 (RJD) (RER) (E.D.N.Y. March 24, 2020) (granting defendant's temporary release because of COVID-19 risk over Government objection where defendant is charged with multiple robberies involving guns and drugs); *United States v. Brandon*, 19 Cr. 644 (GBD) (Mar. 19, 2020) (releasing defendant over Government objection because of coronavirus risk following guilty plea for escape from federal custody).

[67] *United States v. Lopez*, 19 Cr. 323 (JSR) (S.D.N.Y. Mar. 23, 2020).

[68] *Id.*

In the throes of this public health crisis, the Court must release Lawrence Ray to protect his physical health.

## IV.    The coronavirus outbreak mitigates any potential risk of flight.

The Government cannot prove by a preponderance of the evidence that there are no conditions that can be set to reasonably assure Lawrence Ray's appearance in court.

Mr. Ray's original bail hearing occurred one day after the first confirmed case of COVID-19 in New York State. We inhabited a different world then. Following the diagnosis, Governor Andrew Cuomo, now famous for his daily briefings ringing the coronavirus alarm bells, assured New Yorkers, "there's no reason for concern."[69] On March 2, 2020, the day of Mr. Ray's bail hearing, Governor Cuomo doubled down on his remarks, insisting "we don't even think it's going to be as bad as it was in other countries."[70] Today, New York State has more confirmed coronavirus cases than any other *country*.[71]

Courts in districts with far fewer confirmed COVID-19 cases than New York have recognized that "the pandemic changes the calculus" concerning an individual's risk of flight.[72] In *United States v. Ramos*, for instance, the court found that the defendant "cannot travel without a significant risk of exposure to the virus with the potentially severe health consequences that would follow, and therefore cannot readily flee the district."[73] The court in *United States v. Fellela* echoed, "Flight would be enormously more risky and complicated in light of the travel and commercial restrictions brought on by the COVID-19 virus."[74] This rationale applies with equal force to Mr. Ray. Certainly, the coronavirus dampens any argument that Mr. Ray would attempt to flee to evade the charges in this case. It is simply too dangerous.

To be clear, Mr. Ray has never had any intention of running from this case. Quite the opposite. Given the false and sensational tales haunting Mr. Ray, he wants nothing more than the opportunity to tell his side of the story. This case finally gives him that chance. Mr. Ray has every intention of fighting the allegations against him.

Indeed, Mr. Ray had the chance to run. And he didn't take it. The New York Magazine article that spurred the criminal investigation into Lawrence Ray was published in April 2019. Given the press attention the article garnered, it was apparent that Mr. Ray would inevitably

---

[69] Joseph Goldstein and Jeffrey McKinley, "Coronavirus in N.Y.: Manhattan Woman Is First Confirmed Case in State," The New York Times (Mar. 1, 2020), at https://www.nytimes.com/2020/03/01/nyregion/new-york-coronvirus-confirmed.html?action=click&module=RelatedLinks&pgtype=Article.

[70] J. David Goodman, "How Delays and Unheeded Warnings Hindered New York's Virus Fight," The New York Times (Apr. 7, 2020), at https://www.nytimes.com/2020/04/08/nyregion/new-york-coronavirus-response-delays.html.

[71] *Id.*

[72] *United States v. Ramos,* 2020 U.S. Dist. LEXIS 52586 (D. Mass. March 26, 2020) (granting defendant's motion for pretrial release in view of the coronavirus).

[73] *Id.*

[74] *United States v. Fellela,* 2020 U.S. Dist. LEXIS 49198 (D. Conn. March 20, 2020) (granting defendant's motion for release post-plea in view of the coronavirus).

become the subject of a criminal investigation. The fact that Mr. Ray currently stands accused of the charges in the indictment comes as no surprise to anyone who read the New York Magazine article, including Mr. Ray. If he wanted to escape these charges, he could have fled months ago, long before he was arrested and charged. But he didn't. Mr. Ray was arrested in the very home in New Jersey where he had been living for the past four years.

Indeed, Mr. Ray has never lived anywhere other than New Jersey and New York. From 2000 through 2007, Mr. Ray lived at the same address in Warren, New Jersey.[75] Mr. Ray then resided at the same address in New York City for five years before moving to the home where he was ultimately arrested in Piscataway, New Jersey. Mr. Ray's world exists primarily in the New York City area. This is where he lives and works as a self-employed entrepreneur. Mr. Ray does not have any existing international ties and it has been at least twenty years since Mr. Ray last traveled internationally. Currently, Mr. Ray has neither the ability nor the intention to travel outside of the District, let alone the country.

Lawrence Ray was born and raised in the New York City area. He shares his birth name, Lawrence Grecco, with his birth father. As a child, Mr. Ray's parents divorced and his mother remarried a man with the last name Ray. Lawrence Ray's stepfather adopted him, and Lawrence Grecco changed his name to Lawrence Ray. Mr. Ray maintains a close relationship with his birth father, Lawrence Grecco, who resides with his wife, Mr. Ray's stepmother, in Staten Island.

Mr. Ray has also fostered close relationships with friends in the area. His longtime friend, attorney Glenn Ripa, resides in the New York City area, as do other close friends whom he has known for more than twenty years. While living in New Jersey with a friend for a number of years, Mr. Ray fostered relationships with his neighbors. Defense counsel has spoken directly with one of Mr. Ray's neighbors who has ventured to court in support of Mr. Ray and describes him as "a very generous man." Indeed, since the inception of Mr. Ray's case, defense counsel has been contacted by an array of individuals offering support for Mr. Ray.

"[I]t would be difficult in these times for [Mr. Ray] to avail himself of transportation away from New York City, where in any event he is a lifelong resident with strong family ties."[76] Mr. Ray has no desire or intent to flee. There is every reason to believe Mr. Ray will appear in court if released on bail.

## V.      The Sixth Amendment demands Mr. Ray's release.

The Sixth Amendment right to the effective assistance of counsel is the cornerstone of our adversarial system of criminal justice.[77] Yet Mr. Ray has been denied this fundamental right. The current public health crisis poses an obstacle to the preparation of Mr. Ray's defense and therefore

---

[75] Mr. Ray was incarcerated in New Jersey from 2007 to 2010.

[76] *United States v. Lopez*, No. 19CR116KMWJLC, 2020 WL 1678806, at *2 (S.D.N.Y. Apr. 6, 2020) (releasing defendant post-plea, presentence, over Government objection, in light of dangers of coronavirus, noting "these are not ordinary circumstances").

[77] *Strickland v. Washington*, 466 U.S. 668, 680 (1984) (emphasis added), citing *McMann v. Richardson*, 397 U.S. 759, 771, n. 14 (1970) ("It has long been recognized that the right to counsel is the right to the effective assistance of counsel.").

justifies his release under 18 U.S.C. § 3142(i).[78]

"The right to consult with legal counsel about being released on bond, entering a plea, negotiating and accepting a plea agreement, going to trial, testifying at trial, locating trial witnesses, and other decisions confronting the detained suspect, whose innocence is presumed, is a right inextricably linked to the legitimacy of our criminal justice system." *Federal Defenders of New York, Inc. v. Bureau of Prisons*, Docket No. 19-1778 (2d. Cir. Mar. 20, 2020). In recognition of this vital right, BOP regulations instruct that detention center wardens "*shall provide* the opportunity for pretrial inmate-attorney visits on a seven-days-a-week basis." 28 C.F.R. § 551.1 17(a) (emphasis added).

A detention facility violates the Sixth Amendment when it "unreasonabl[y] interfere[s] with the accused person's ability to consult counsel." *Benjamin v. Fraser*, 264 F.3d 175, 185 (2d Cir. 2001). Unreasonable interference requires a showing far less alarming than the one present here. In *Benjamin,* the Second Circuit held that New York City correctional facilities violated the right to counsel when defense attorneys "routinely face[d] unpredictable, substantial delays in meeting with clients" and were "forced to wait between 45 minutes and two hours, or even substantially longer, after arriving at a facility to see a client." 264 F.3d at 179. These circumstances, where the Second Circuit refused to dissolve a consent decree providing judicial supervision of legal visitation in City correctional facilities, are far less jarring than those Mr. Ray has been forced to endure.

For over a month, Mr. Ray has borne a near complete disruption of his right to counsel. On February 27, 2020, the MCC entirely shut its doors to legal and social visitation for eight straight days. During that time, Mr. Ray was confined to a single jail cell 24 hours a day. He, like all inmates, was denied phone calls to his attorney and lacked computer access for more than a week.[79]

In all of March, there was a brief, three-day window during which counsel could communicate with clients in person at the MCC. On March 10, 2020, the MCC reopened for counsel visits. The following day, defense counsel visited Mr. Ray in person at the MCC. On Friday, March 13, in response to the public health crisis posed by COVID-19, the BOP issued a notice that all visits in all federal correctional facilities—including legal visits—would be suspended for at least 30 days.

This is inconsistent with the constitutional right to counsel. In *Wolfish v. Levi*, the Second Circuit held that the MCC "severely constrained" an inmate's "access to legal counsel" where dedicated attorney visiting hours were limited to two hours a day, and most attorney visits were "made in the general visiting rooms during visiting hours thereby entailing long delays, limiting

---

[78] *See United States v. Stephens*, 15-CR-95 (AJN) (Mar. 19, 2020) (concluding that in light of changed circumstances, Mr. Stephens does not pose a danger to the community and releasing the defendant).

[79] Mr. Ray was produced to Magistrate Court on March 2, 2020 for a bail hearing. Immediately before the hearing, Mr. Ray consulted with defense counsel in the pens in the courtroom. Mr. Ray also spoke with counsel in the Marshals' cellblock in the courthouse after the hearing concluded.

the attorney's time with his client, and totally vitiating confidentiality."[80] These conditions pale in comparison to Mr. Ray's lack of access to counsel. Over the past six weeks, Mr. Ray has only been afforded one proper legal visit at the MCC. As Judge Crotty recently recognized in his March 31, 2020 order granting pretrial release for a previously detained individual, access to counsel "seems unlikely to improve in the near future."[81]

In lieu of visits, defense counsel has repeatedly attempted to speak with Mr. Ray over the phone. On March 25, 2020, defense counsel emailed the MCC Legal Department to request a phone call with Mr. Ray. That email went unanswered. On March 29, 2020, defense counsel renewed the request for a legal call. The MCC did not reply. The following day, defense counsel received a call from Mr. Ray's father, Lawrence Grecco, who reported that his son was experiencing pain and had recently lost consciousness while in custody. Upon receiving the call, counsel immediately followed up with the MCC to inquire about Mr. Ray's medical care and renew the request to speak with him. On April 1, 2020, defense counsel again emailed the MCC requesting to speak with Mr. Ray. Later that day, still with no response to any of the prior emails and without advance notice to counsel, the MCC facilitated a legal call for Mr. Ray. Defense counsel missed the call, but managed to schedule a call with Mr. Ray for 9AM the following morning, on April 2, 2020. More than a week after the initial request for a legal call, counsel was finally able to speak with Mr. Ray.

Not only did it take eight days and four requests before Mr. Ray was able to speak with his lawyers, the conditions of the phone call violated Mr. Ray's constitutional right to counsel. In *United States v. Rodriguez*, the Western District of New York held that with respect to an accused's need to consult with counsel, "Section 3142(i)(3) reaches above the minimum" standards set by the Sixth Amendment.[82] The subsection's plain text "mandates the removal of any impediment to 'private consultations' [between attorney and client] that are qualitatively and quantitatively 'reasonable.'"[83] In contravention of Mr. Ray's constitutional rights, the April 2, 2020 legal call with Mr. Ray was not privileged. Mr. Ray was given the phone to speak with his lawyers in his cell, with his cellmate present. As a result, Mr. Ray spent much of the call whispering and avoiding discussion of certain topics, including defense strategy. The call ended abruptly after thirty minutes, when a correction officer ordered Mr. Ray to hang up the phone.

On top of his inability to meaningfully communicate with counsel, Mr. Ray has suffered a complete incapacity to review discovery. Mr. Ray's case is governed by a protective order. This order states that "disclosure material designated by the Government as 'sensitive disclosure material' may *not* be disclosed to the defendant outside the presence of counsel and/or paralegals and legal assistants, and if the defendant is detained he may not retain any paper or electronic

---

[80] 573 F.2d 118, 133 (2d Cir. 1978), *rev'd on other grounds*, 441 U.S. 520 (1979).

[81] *United States v. Chandler*, No. 1:19-CR-867 (PAC), 2020 WL 1528120, at *3 (S.D.N.Y. Mar. 31, 2020) (granting defendant's motion for pretrial release under 18 U.S.C. § 3142(i) for lack of access to counsel and in light of the compelling circumstances of the coronavirus pandemic).

[82] 2014 WL 4094561, at *4 (W.D.N.Y. 2014) (Scott, M.J.).

[83] *Id.*; *cf. Falcon v. U.S. Bureau of Prisons*, 52 F.3d 137, 139 (7th Cir. 1995) ("Section 3142(i)(3) is designed to protect a defendant's Sixth Amendment right to counsel, and if that right is being infringed, [the court] has the statutory authority to protect [defendant's] access to counsel.").

copies of sensitive disclosure material in his cell."[84]

The majority of the material disclosed to the defense to date has been marked "sensitive" by the Government. For instance, on March 9, the Government provided reports of redacted interviews with witnesses that were marked sensitive. On March 16, 2020, the Government disclosed the email accounts of four different witnesses, and ten email accounts belonging to a fifth witness, all of which were marked "sensitive."

Reviewing these documents with Mr. Ray during the pandemic is impossible. The protective order precludes Mr. Ray, who is currently incarcerated at the MCC, from reviewing any "sensitive" documents without counsel. Yet the MCC closed its doors to all visitors on March 13, 2020, and they have remained closed since. Given the unprecedented nature of this global pandemic, there is no telling when defense counsel will next be able to visit Mr. Ray in person to discuss his case and review discovery.

"[T]he obstacles the current public health crisis poses to the preparation of the Defendant's defense constitute a compelling reason [to release Mr. Ray] under 18 U.S.C. § 3142(i)."[85] To date, the Government has made four different discovery productions to the defense. The largest production, made on March 16, 2020, spans over one million pages comprising over five hundred thousand different documents and includes both "sensitive" and non-sensitive materials. While Mr. Ray is permitted to access non-sensitive materials while incarcerated, these documents are virtually impossible for Mr. Ray to review at the MCC under the current circumstances. This volume of documents requires a computer for review. But in an effort to contain the spread of COVID-19, the MCC has discontinued access to the law library, where Mr. Ray would ordinarily review non-sensitive discovery.

Simply put, Mr. Ray cannot effectively prepare for trial if he remains incarcerated during the COVID-19 outbreak. Over the past few weeks, courts in the Southern District of New York have continuously released defendants whose Sixth Amendment rights have been eviscerated by the coronavirus. In *United States v. Hudson*, recognizing that "[a] complete cessation of visits at this critical time of preparation would make it impossible to adequately prepare for trial," Chief Judge McMahon granted an application for bail based on compelling reasons related to the current health crisis.[86] In *United States v. Chandler*, Judge Crotty recognized, "The extraordinary burdens imposed by the coronavirus pandemic, in conjunction with Chandler's right to prepare for his defense, certainly constitute a 'compelling reason' that permits this Court to order the temporary

---

[84] ECF Doc. No. 15, Protective Order at ¶ 6(a).

[85] *United States v. Stephens*, 15-CR-95 (AJN) (Mar. 19, 2020) (releasing the defendant concluding that in light of changed circumstances, Mr. Stephens does not pose a danger to the community).

[86] 19-CR-496 (CM) (Mar. 13, 2020) (granting defendant's request for release after denying the request five days earlier); *see also United States v. Perez*, 19-CR-297 (PAE) (Mar. 19, 2020) (concluding "compelling reasons exist for temporary release of the defendant from custody during the current public health crisis").

release of Chandler pursuant to 18 U.S.C. § 3142(i)."[87]

The conditions of confinement at the MCC have gutted Lawrence Ray's Sixth Amendment right to the effective assistance of counsel.[88] Until he is released, Mr. Ray will continue to suffer violations of his constitutional rights.

## VI.    Conclusion

The Court cannot ignore the restriction of Mr. Ray's constitutional right to counsel and the substantial threat that incarceration poses to Mr. Ray's physical well-being. "The hazards of a pandemic are immediate and dire, and still the rights of criminal defendants who are subject to the weight of federal power are always a special concern of the judiciary."[89]

As the Second Circuit recently opined, "the careful balancing of needs and rights that [ ] emergencies require is likely not best achieved by protracted and contentious litigation after the fact, and certainly not at the appellate level. It requires real-time, comprehensive solutions, reached in cooperative institutional discussions." *Federal Defenders of New York, Inc. v. Bureau of Prisons*, Docket No. 19-1778 (2d. Cir. Mar. 20, 2020) ("direct[ing] the District Court [to help] ensure that the Federal Defenders have meaningful, continuous access to their clients either in person or by remote access pending adjudication of [legal claims against the MDC, including Sixth Amendment violations] as these claims may be amended to address similar issues of access [to counsel] arising during the current public health emergency [COVID-19]").

Mr. Ray remains innocent until proven guilty. This extraordinary moment requires judicial intervention to safeguard Mr. Ray's constitutional rights. Accordingly, we respectfully request that the Court issue an order releasing Lawrence Ray on bail. In the alternative, we respectfully request a bail hearing this week for Mr. Ray.

Thank you for your consideration of this matter.

Respectfully submitted,

*/s/ Marne L. Lenox*
Marne L. Lenox
Assistant Federal Defender
(212) 417-8721

---

[87] *United States v. Chandler*, No. 1:19-CR-867 (PAC), 2020 WL 1528120, at *2 (S.D.N.Y. Mar. 31, 2020) (granting bail application, pursuant to 18 U.S.C. § 3142(i), of defendant charged with being a felon in possession of a firearm).

[88] *Contra* Exhibit C, March 19, 2020 Letter of the U.S. House of Representatives, Committee on the Judiciary to Attorney General William P. Barr ("At all times, DOJ must also guarantee that the attorney-client privilege is preserved and respected and that attorneys are able to maintain in-person visits with their clients wherever possible, as well as confidential telephone calls and video teleconferencing where available.").

[89] *Id.*

Peggy Cross-Goldenberg
Supervising Trial Attorney and Director of Training
(212) 417-8732

cc:    Danielle Sassoon, Assistant U.S. Attorney (by e-mail)
       Lindsey Keenan, Assistant U.S. Attorney (by e-mail)