# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
In re:                             :
                                      Docket #1:20-cr-00110-
 UNITED STATES OF AMERICA,         : LJL All Defendants

                  Plaintiff,       :

  - against -                      :

 RAY, LAWRENCE,                    : New York, New York
                                     March 2, 2020
                  Defendant.       :

----------------------------------- : BAIL HEARING
```

PROCEEDINGS BEFORE
THE HONORABLE JUDGE KEVIN N. FOX,
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:          UNITED STATES ATTORNEY'S OFFICE
                        BY:  DANIELLE R. SASSOON, ESQ.
                        One St. Andrew's Plaza
                        New York, New York 10007
                        212-637-1115

For the Defendant:      FEDERAL DEFENDERS OF NEW YORK INC.
                        BY:  MARNE L. LENOX, ESQ.
                             PEGGY CROSS-GOLDENBERG, ESQ.
                        52 Duane Street - 10th Floor
                        New York, NY 10007
                        212-417-8721

Transcription Service:  Carole Ludwig, *Transcription Services*
                        155 East Fourth Street, #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None | | | | |

```
 1                        PROCEEDINGS                    3

 2              THE CLERK:  United States v. Lawrence Ray.

 3              Counsel, please state your name for the record.

 4         MS. DANIELLE SASSOON:  Good morning, your Honor.

 5  Danielle Sassoon for the United States.  I'm joined here by

 6  Special Agent Kelly Maguire of the FBI and William Coleman,

 7  a paralegal in our office.

 8              KEVIN N. FOX (THE COURT):  Good morning to all of

 9  you.

10              MS. MARNE LENOX:  Good morning, your Honor.  For

11  Lawrence Ray, Federal Defenders by Marne Lenox.  And I'm

12  joined at counsel table by my colleague, Peggy Cross-

13  Goldenberg.

14              THE COURT:  Good morning to all of you.

15              And this is scheduled for a bail hearing.  Are

16  both parties ready to proceed?

17              MS. SASSOON:  Yes, your Honor.  It's my

18  understanding this has also been referred for formal

19  appointment of counsel.  Federal Defenders has not been

20  formally appointed yet, and the defendant has yet to submit

21  a Financial Affidavit.

22              THE COURT:  I have a Financial Affidavit from

23  defendant.

24              MS. SASSOON:  Yes, your Honor.

25              THE COURT:  Mr. Ray, I want to show you a
```

```
 1                        PROCEEDINGS              4

 2  document which is labeled Financial Affidavit.  Do you

 3  recognize the document, sir?

 4            MR. LAWRENCE RAY (THE DEFENDANT):  Yes.

 5            THE COURT:  Would you raise your right hand,

 6  please?  Do you swear or affirm that the statements

 7  contained in this Financial Affidavit are true statements

 8  and that your true signature appears at the bottom of the

 9  affidavit?

10            THE DEFENDANT:  Yes, your Honor.

11            THE COURT:  All right.  Based upon the

12  information you've provided through the affidavit, it

13  appears to me you have the means to retain counsel.  So

14  it's been made clear to me that since the time of your

15  arrest and today you've not been able to retain counsel, so

16  I'm going to appoint the Federal Defenders of New York to

17  represent you and require you to pay for their services.

18            If you have made false statements through the

19  affidavit, you may expose yourself to a new charge in

20  connection with the false statements.  If your financial

21  circumstances change, you should advise the Court of your

22  changed financial circumstances.

23            MS. LENOX:  Your Honor, I'm sorry, Mr. Ray is

24  having a difficult time hearing you.  So Mr. Ray is just

25  going to switch seats with Ms. Cross-Goldenberg.
```

```
 1                         PROCEEDINGS                    5

 2              THE COURT:  The docket sheet reflects that when

 3    Mr. Ray was presented, he consented to being detained with

 4    the proviso that he could make an application to have his

 5    bail status revisited.  So I am prepared now to hear what

 6    his application is with respect to bail.

 7              MS. LENOX:  Your Honor, we believe there are

 8    conditions that can be set that would reasonably assure

 9    both the safety of the community and that would assure that

10    Mr. Ray does not pose a risk of flight.

11              THE COURT:  Are you going to enlighten me about

12    what these conditions are?

13              MS. LENOX:  I can, your Honor.  It is the

14    prosecution's burden, and so I'm happy to put forth what

15    the conditions are, with the understanding that the

16    prosecution would then have to make their arguments first.

17              THE COURT:  The application was made by the

18    defendant to have his bail conditions revisited.  That's

19    what brings us here today.

20              MS. LENOX:  Yes.

21              THE COURT:  So I'm here to hear his application.

22    What is his application for bail?

23              MS. LENOX:  His application is as follows.  A

24    $100,000 bond that would be cosigned by two financially

25    responsible persons; his travel would be restricted to the
```

```
 1                       PROCEEDINGS                 6
 2  Eastern District of New York, the Southern District of New
 3  York, and the District of New Jersey.  He does not have a
 4  passport, but he would surrender any and all travel
 5  documents, with an agreement that he would make no new
 6  travel applications while the case is pending.  He would be
 7  subject to home detention with electronic monitoring.  He
 8  would have access to his phone and computer but with
 9  restrictions.  The computer could be used only for work-
10  related purposes and to review discovery in this case.  And
11  the phone could only be used to make and receive calls to
12  and from defense counsel and to phone numbers that are
13  agreed upon by the government; and that Mr. Ray would have
14  no contact outside of the presence of counsel with any
15  witnesses to the case or any alleged co-conspirators.
16             THE COURT:  Anything else?
17             MS. LENOX:  Those are the conditions, your Honor.
18  Would you like me to make my arguments now or --
19             THE COURT:  That's why we're here.
20             MS. LENOX:  Okay.  All right, your Honor, in this
21  case we do believe that there is evidence to rebut the
22  presumption that Mr. Ray poses a risk of flight.  This case
23  is based largely and was ignited based upon a New York
24  Magazine article from April 2019, April of last year, that
25  was published and that Mr. Ray was aware of.  At that time,
```

```
 1                          PROCEEDINGS                    7

 2   based on those allegations, it was highly probable that a

 3   criminal case would follow.  Yet, Mr. Ray remained where he

 4   was, in New Jersey.  For the entirety of the last year and

 5   for years before that, Mr. Ray has lived in the same home

 6   with the same individuals.  Despite the salacious story and

 7   the accusations that were lodged against him in that story,

 8   he did not attempt to run; he did not flee.  He could have

 9   easily at that point tried to go somewhere else to avoid

10   what was clearly going to be a criminal case, but he

11   didn't; he stayed.

12           And that's because the last thing that Mr. Ray

13   wants to do is to run away from this.  Given the false and

14   sensational stories that have been littered across multiple

15   media outlets over the past year, Mr. Ray has every

16   intention of telling his side of the story.  He wants to

17   fight these charges.  In fact, before last year, Mr. Ray

18   sent letters to the U.S. Attorney's Office, to the

19   Manhattan District Attorney's Office, asking that they

20   investigate allegations that are part and parcel of the

21   case that he now faces here in federal court.  Mr. Ray will

22   not hide; he wants to fight these charges, and he wants to

23   tell his side of the story.

24           Now,  my understanding is that the government's

25   primary arguments about Mr. Ray risk of flight are going to
```

PROCEEDINGS                8

1

2  be based on things that happened more than ten years ago.

3  And the accusation against Mr. Ray and allegations that he

4  is a risk of flight are going to be based largely from a

5  2005 divorce case that sprouted a lot of what we are here

6  for today.  The government has presented to your Honor in

7  an exhibit a Use of Force report that I believe that the

8  government will rely on in order to make an argument that

9  Mr. Ray poses a risk of flight.  In anticipation of that

10  argument,  your Honor, I just want to point out a few

11  things about that Use of Force report.  That report was

12  made 13 years ago by the U.S. marshals after they broke

13  Mr. Ray's wrist.  Surely if Mr. Ray and his then 17-year-

14  old, almost 18-year-old daughter were to present their side

15  of what happened on that day, it would look a lot different

16  than the Use of Force report that the marshals authored 13

17  years ago.  I'm certain that Mr. Ray and his daughter would

18  have characterized that incident quite differently.  And

19  it's also important to note that Mr. Ray's older daughter

20  at the time, who's alleged to have been with him during the

21  time of the Use of Force report, she was a month shy of

22  turning 18 years old.  She wasn't a child; she was nearly a

23  legal adult at the time.

24          Now, I know that the Pretrial Services Report

25  flagged a number of issues regarding Mr. Ray's potential

```
 1                         PROCEEDINGS                      9
 2  risk of flight.  One of those was Mr. Ray's history of
 3  international travel.  So I want to speak to that for a
 4  moment.  As I noted earlier, Mr. Ray, and as he reported to
 5  Pretrial Services, does not have a passport.  His last
 6  foreign travel was roughly 20 years ago.  He hasn't been
 7  outside of the country since.  And, in fact, Mr. Ray has
 8  spent his entire life living in the New York and New Jersey
 9  areas.  He was born in New York; he currently resides in
10  New Jersey, and those are the two places where he has lived
11  his entire life.
12            Now, Pretrial Services also flagged that Mr. Ray
13  is a risk of flight because they say he does not have
14  strong community ties.  And, your Honor, I would argue that
15  Mr. Ray does in fact have strong community ties.  His
16  father and stepmother, his birth father and stepmother are
17  here in the audience today to support Mr. Ray.  They were
18  present -- well, Mr. Ray's father was present in court at
19  his last court date last week.  And I speak to him more
20  than once a day and have ever since Mr. Ray was arrested.
21  Also in court for Mr. Ray today is another friend of his
22  who is here and who can act as a suretor on his behalf
23  along with his birth father and stepmother.  Mr. Ray also
24  has multiple friends who have been contacting me for the
25  past two weeks since Mr. Ray was arrested.  These friends
```

PROCEEDINGS                    10

1

2    live in the New York and New Jersey area, and they have

3    showed nothing but their full support of Mr. Ray.

4           Now, another reason why Pretrial Services has said

5    that Mr. Ray poses a risk of flight is that Pretrial

6    Services has noted that Mr. Ray uses an alias.  In his

7    indictment he's listed as both Lawrence Ray and Lawrence

8    Greco.  Your Honor, it's important to note that Lawrence

9    Greco is Mr. Ray's birth name.  It's the same name that

10   his birth father, who's sitting in the audience today,

11   has.  Mr. Ray was living for some time with his birth

12   mother and his stepfather and so changed his name to

13   reflect the last name of his stepfather.  This is not an

14   alias; this is Mr. Ray's name.

15          Now, finally, the Pretrial Services Report

16   indicates that Mr. Ray poses a risk of flight because he

17   doesn't have verifiable employment.  And I just want to

18   note, your Honor, that while Mr. Ray may not have your

19   prototypical nine-to-five job, he has been working for the

20   past several years buying and selling domain names as an

21   entrepreneur.  The fact that he doesn't have a typical

22   employer or a steady paycheck should not preclude him from

23   being released.

24          Now, your Honor, I want to next turn to danger

25   to the community.  I do believe that there is evidence that

1                              PROCEEDINGS                    11

2    would rebut the presumption that Mr. Ray poses a danger to

3    the community.   The fact that the government has waited so

4    long to bring charges against Mr. Ray not only undermines

5    their argument that he poses a risk of flight, but it also

6    belies the conclusion that Mr. Ray is a danger to the

7    community.

8              As I noted earlier, the allegations that ignited

9    this case came to light in April 2019, nearly a year ago.

10   By July of 2019, as indicated by search warrant affidavits

11   that the government has turned over to the defense, the

12   government has spoken to at least one witness, Female

13   Victim 1, several times and deemed that the witness's

14   allegations against Mr. Ray, allegations that support the

15   sex trafficking charge and the forced labor charge in the

16   indictment, credible and corroborated by evidence.   So

17   they knew this in July of 2019; yet, the government did

18   not arrest Mr. Ray in July of 2019.   They didn't arrest

19   Mr. Ray in August or September.   Instead, the government

20   continued its investigation, secretly applying for search

21   warrants to unearth additional information to use against

22   Mr. Ray in a potential criminal case.   Now, these search

23   warrant applications indicated that the government had

24   probable cause to believe that Mr. Ray committed at least

25   some of the offenses that are contained within the

```
 1                        PROCEEDINGS                    12
```

```
 2  indictment in July of 2019, seven months before he was
```

```
 3  arrested.  And, certainly, based on some of the
```

```
 4  information that was sought and gathered pursuant to the
```

```
 5  search warrants that were executed in the summer and the
```

```
 6  fall of 2019, the government knew where Mr. Ray was to
```

```
 7  effect an arrest.  A search warrant for Mr. Ray's
```

```
 8  cellphone location information was issued in July of 2019.
```

```
 9  So if the government truly believed that Mr. Ray posed a
```

```
10  danger to the community, they could have arrested him and
```

```
11  they could have sought his detention months ago.  But they
```

```
12  didn't.  They waited for months.  And now they claim that
```

```
13  he is a danger if he is not behind bars.
```

```
14          But there's no reason to suggest that Mr. Ray
```

```
15  poses a danger either to the community at large or to
```

```
16  specific individuals.  This case is primarily about a
```

```
17  handful of students, people now adults, who graduated from
```

```
18  college seven years ago.  They're now in their late
```

```
19  twenties.  The witnesses and alleged victims of this case
```

```
20  are individuals who Mr. Ray met at least ten years ago.
```

```
21  As far as we know, there are no new accusations or
```

```
22  allegations of any conduct from any new individuals who
```

```
23  Mr. Ray met in the last ten years.  And there's no reason
```

```
24  to believe that the individuals who are cited in the
```

```
25  indictment are at any risk of harm.
```

```
 1                        PROCEEDINGS                    13

 2          The primary complainant in this case, Female

 3   Victim 1, Mr. Ray has not had contact with her since April

 4   of 2019.  He doesn't know where she lives; he doesn't know

 5   her phone number.  He hasn't been in contact with her at

 6   all in nearly a year.  The same goes for the individual

 7   who is listed as Male Victim 1 in the indictment, except

 8   Mr. Ray has not had contact with that person since 2013,

 9   roughly seven years ago.  He doesn't know where this

10   person lives, doesn't have his cellphone number.

11          Now, to the extent that the government claims

12   that Mr. Ray poses a danger to the two women who he was

13   with at the time that he was arrested two weeks ago, that

14   concern also rings hollow because the government has

15   known, since at least July of 2019, that Mr. Ray was

16   likely living with those individuals, and they did nothing

17   to intervene or to protect these so-called victims for

18   many months following.  And we know they knew this based

19   on a search warrant application that the government turned

20   over, an application that was for a search warrant issued

21   in July of 2019.

22          Now, if it is the case that your Honor is

23   concerned about the well-being of these alleged victims,

24   this can be addressed with an order of the Court directing

25   that Mr. Ray not have contact with any of the alleged
```

1                          PROCEEDINGS                    14

2    victims or witnesses to this case, including the two women

3    who were present for his arrest.

4              Your Honor, given these arguments and the

5    conditions set forth earlier, I do believe that there are

6    conditions that can be met that will ensure both the

7    safety of the community and to ensure that Mr. Ray returns

8    to court to fight these allegations.

9              THE COURT:  Thank you.

10             I'll hear the government in connection with the

11   defendant's application for bail.

12             MS. SASSOON:  Yes, your Honor.

13             Before I proceed, I would ask, if your Honor is

14   willing, for defense counsel to clarify the location of the

15   home detention because in the government's view, that's

16   central to the bail application, given that the defendant

17   was arrested at a residence where two women whom he was

18   abusing were living.  And so the government plans to

19   address all of the arguments made by defense counsel, but

20   central to the bail application is the home detention of

21   the defendant.  And so it's certainly relevant what home

22   that would be.

23             THE COURT:  Is the home that's listed in the

24   Pretrial Services Report the home to which Mr. Ray would

25   return if he's released on bail conditions?

```
 1                          PROCEEDINGS                    15
 2              MS. LENOX:  No.  If released on bail conditions,
 3   Mr. Ray could live in one of two locations.  He could
 4   reside with his birth father in New York City, or he could
 5   reside with a friend of his in New Jersey.  Both of those
 6   individuals are here, present in court today, and both are
 7   willing to house Mr. Ray while this case is pending.
 8              THE COURT:  And where in New York City is the
 9   birth father's home, and where in New Jersey is the
10   friend's home?
11              MS. LENOX:  The friend's home is in Piscataway,
12   New Jersey; the birth father's home is in Staten Island,
13   New York City.
14              THE COURT:  Thank you.
15              MS. SASSOON:  Your Honor, we are seeking detention
16   based on risk of flight and danger to the community.  There
17   are four offenses charged in the indictment that make this
18   a presumption case, meaning because the defendant is charged
19   with sex trafficking, forced labor, forced labor trafficking
20   and forced labor conspiracy, that means that under the law
21   it is presumed that no condition or combination of
22   conditions will reasonably assure his appearance and assure
23   the safety of the community.  The defense cannot overcome
24   that presumption.
25              All of the bail factors here support detention,
```

and I'll walk through all of them in detail.  As I'll

explain in a moment, this is an extremely serious offense,

and the strength of the evidence is overwhelming precisely

because the government spent months accumulating that

evidence to make sure that it was overwhelming.  And those

factors alone support detention.  The defendant's

characteristics also support detention.  He is a felon.  He

has a conviction for bail jumping.  He has a history of

defying law enforcement, of suborning perjury and of

intimidating and threatening victims and potential witnesses

in this case and in other cases.  His ties to this community

are not strong other than his control and influence over

some of his victims whose safety and well-being will be

placed in danger if he is released under the proposed

conditions.  Given the defendant's history, as I'll get

into, there's also a substantiated and real concern of

witness tampering if he is released, regardless of what

conditions are put in place.  The defendant simply cannot

demonstrate that there are any conditions that could be

crafted here that would assure the safety of the community

and his appearance.

          So let me start with the nature and circumstances

of the offense.  These charges are extremely serious.

There is a nine-count indictment, including, as I

1                              PROCEEDINGS                        17

2  mentioned, several presumption charges and a sex-

3  trafficking charge that carries a 15-year mandatory

4  minimum.  The indictment goes into detail about the nature

5  of the crimes.  And I'm sure the parties are familiar with

6  it, but in brief, starting about a decade ago, the

7  defendant targeted a group of college students who were his

8  daughter's roommates.  He moved into their on-campus

9  housing, and he lived with them in an apartment in

10 Manhattan.

11          At first he earned their trust, portraying himself

12 as a father figure to these vulnerable individuals,

13 providing them counseling.  Over time he turned the tables.

14 He used that trust to exploit and abuse these young people.

15 He made false accusations against them, including that they

16 had poisoned him and damaged his property.  And to extract

17 false confessions from these individuals, he interrogated

18 them, including with hours-long interrogations that

19 sometimes involved physical abuse and sexual humiliation.

20 He deprived them of sleep, of food.  He belittled and

21 humiliated them.  And over time he extracted false

22 confessions in writing from these victims and over video,

23 and he essentially broke their spirits.  Through these

24 interrogations the defendant transitioned to extortion; and

25 as alleged in the indictment, he extorted well over $1

PROCEEDINGS                    18

1
2   million from these victims, who did not have substantial
3   means, and he resorted to getting money from their parents,
4   who similarly did not have substantial means.

5          The sex trafficking also involved substantial
6   profits.  The indictment alleges that the defendant
7   collected at least half a million dollars in sex-
8   trafficking proceeds.  New developments in our
9   investigation show that it was well over $1 million in
10  prostitution profits taken by the defendant through his
11  coercive tactics.

12         This course of conduct lasted a decade.  It
13  continued through the date of arrest, where two women, whom
14  he abused, were found living with him in his home.  The
15  conduct here is serious not only because of the nature of
16  the crimes he's charged with but the vulnerability of his
17  victims.  Many were college students and teenagers when he
18  first targeted them.  The conduct is also particularly
19  insidious and dangerous because these weren't just
20  teenagers; they were his daughter's friends and roommates.
21  The defendant exploited a trust inherent in his authority
22  as the parent of the victim's friend.  He targeted these
23  victims not only for money but for sexual exploitation.
24  Our investigation has revealed that the defendant was
25  physically abusive toward these college students.  He had

PROCEEDINGS                    19

1
2   sex with more than one of them.  He created sexually
3   explicit videos which he used to control and humiliate his
4   victims.  And he kept sexually explicit material of his
5   sex-trafficking victim, including to control, coerce and
6   humiliate her.
7           Now I'll turn to the weight of the evidence, which
8   again is a product of investigating this case for several
9   months.  Over the course of those months the government was
10  actively investigating and gathering evidence, including
11  interviewing more than a dozen witnesses who described the
12  conduct alleged in the indictment, corroborating the
13  physical abuse, the threats of force, the sexual grooming
14  and the humiliation.  That testimony is corroborated by
15  emails and iCloud evidence, which is voluminous and which
16  the government has substantially reviewed.  Subpoena
17  returns, including financial records, which took time to
18  analyze, that corroborate over $1 million in criminal
19  proceeds and money laundering.  Tax records showing the
20  defendant's failure to report any income, even though,
21  according now to defense counsel, he has employment.  And
22  medical records that corroborate Ray's cycle of abuse of
23  these young victims.  Numerous warrants were executed,
24  including of email accounts used by Ray.  Those email
25  accounts also corroborate the witness testimony.  They

1                          PROCEEDINGS                    20

2  show the accusations, the confessions, the abuse and the

3  mental suffering of the defendant's victims.   Numerous

4  iCloud accounts, including iCloud videos that show the

5  interrogations and the sexual grooming and iCloud videos

6  that corroborate the forced labor that took place

7  primarily in North Carolina, where the defendant through

8  his coercive tactics had many of these victims perform

9  manual labor under punishing conditions and for no pay.

10  And, finally, the premises search warrant, which only

11  turned up more evidence of the defendant's danger to the

12  community -- and I'll get into that in a moment.

13          But first let me talk about the defendant's post-

14  arrest at the time he was arrested.   He gave a Mirandized

15  post-arrest statement, which was not recorded, but I'm

16  referencing now a detailed report prepared following that

17  post-arrest.   First, during that post-arrest, the

18  defendant told a number of lies.   He lied that he had no

19  sexual contact with his daughter's roommates.   He lied

20  that he did not commit any violence against them.   He lied

21  that he did not film any of them engaging in sexual

22  activity.   That is all demonstrably false based on the

23  iCloud evidence alone.   But the defendant also made a

24  number of admissions during this post-arrest statement.

25  He admitted that he stayed overnight at the college dorm.

```
 1                        PROCEEDINGS                    21
 2  He admitted that some of the students stayed with him in
 3  his Manhattan apartment.  He admitted that he would accuse
 4  and question the students about property damages and ask
 5  for repayment.  He admitted that he took possession of
 6  journals and diaries belonging to the victims.  And our
 7  investigation has shown that he used that to extort the
 8  victims.  He admitted that several of the victims
 9  performed unpaid manual labor in North Carolina, just as
10  alleged in the indictment.  He even admitted that one
11  female victim worked as a prostitute and that he took
12  thousands of dollars of her proceeds as supposed repayment
13  for damages and poisoning.  He admitted that he did not
14  have a bank account and used the bank accounts of two
15  other women to deposit his criminal proceeds,
16  corroborating the money-laundering charge in the
17  indictments.  And he also admitted that he had some
18  victims make payments to GoDaddy on his behalf, again
19  corroborating the money laundering.
20            In the search of the house where the defendant
21  was living the government found incriminating ledgers
22  which documented the criminal proceeds.  For example,
23  there was a typed spreadsheet labeled 2017 Pickups with
24  the word "repair" in parentheticals.  Witnesses have
25  described "repairs" as the word that the defendant used to
```

PROCEEDINGS                    22

1

2   demand repayment of damages from his victims.   This

3   particular spreadsheet it's very clear documents the

4   "repair pickups" that Ray and his associates made from the

5   female victim who they were sex-trafficking.   And the

6   government knows this because the dates and amounts of the

7   pickups match up with text messages with that female

8   victim and with deposits made into the bank accounts that

9   Ray was controlling.

10          Now, for 2017, this typed-up ledger shows that

11  in 2017 alone, the defendant collected over $700,000 of

12  prostitution proceeds.   A handwritten ledger found in the

13  house for 2018 shows that for 2018 alone there was over $1

14  million in pickups.   So let me pause there.   These are

15  sex-trafficking proceeds from a single female victim.   And

16  you also see the escalation in the amount of money over

17  time:   700,000 in 2017; 1 million, more than 1 million in

18  2018.   And that is consistent with what our investigation

19  has revealed, which is that the defendant's pressure and

20  coercive tactics and violence mounted over the course of

21  the sex-trafficking to the point where the victim was

22  seeing more and more clients to the amount of $1 million,

23  which is an astonishing figure.

24          In this search the government also recovered

25  journals belonging to victims in this case, which again

corroborates witness testimony that the defendant would

pressure victims to write confessions and private thoughts

in these journals and then take them and use those

journals against the victims.

So in light of the strength of the government's

evidence and the substantial period of jail time that the

defendant would face if he is convicted, that alone

indicates there's a risk of flight here, particularly

given the defendant's assets.  As he admitted to Pretrial

Services and as our investigation has shown, he has a lot

of money tied up in a domain business which he uses to buy

and sell domains.  Our investigation has revealed that one

of the hosting services he uses for this business is based

in the Cayman Islands.  And in reference to this New York

Magazine article that defense counsel has mentioned,

according to that article, the defendant told New York

Magazine that that business was worth more than $28

million.  So he has the means to flee.

Now I'll turn to the history and characteristics

of this defendant.  And many of those characteristics

indicate why he's both a risk of flight and a danger.  He

has a criminal record.  He was previously convicted in

EDNY for securities fraud.  And in the course of his

encounters with the judicial system, it is clear that he

```
 1                        PROCEEDINGS              24
 2   has no respect for the judicial process.  He has previous
 3   convictions for various child custody-related crimes which
 4   took place while he was on supervised release, including
 5   taking and detaining a minor child and contempt for
 6   violating a judicial order.  His conduct on supervised
 7   release is telling.  Among his violations was failure to
 8   report to his probation officer.  And during that time he
 9   was convicted for bail jumping.  Defense counsel tried to
10   minimize this by saying it took place a long time ago, but
11   it actually took place in close proximity to when the
12   crimes charged here began, and that was the defendant's --
13   that was the last time this defendant was under
14   supervision by the court system.  So his last encounter
15   here involved failure to report, a conviction for bail
16   jumping, disappearing with one of his children when there
17   was a custody order for him to turn her over.
18              And turning to the Use of Force report, it is
19   not my understanding of that report that what triggered
20   the defendant's resistance to arrest was having his wrist
21   broken.  His wrist was broken at the end of this encounter
22   where the marshals came to arrest the defendant on a
23   violation of federal supervised release.  He had already
24   jumped bail and was in violation of the child custody
25   proceedings.  He resisted arrest to the point of using his
```

1

2   own daughter as a human shield; and whether she was 17, 18

3   or 25, I don't think anything justifies that conduct.  And

4   as a consequence of that, in order to eventually restrain

5   him, his wrist was broken.

6         Again, his ties to the community are not strong.

7   The ties here are to the victims and his criminal

8   associates.  Our investigation has revealed that the

9   defendant has far greater ties to his stepfather, who

10  lives in North Carolina, than to his birth parents.  The

11  person he has called his wife, including to Pretrial

12  Services, is one of his victims.  And his supposed

13  employment, which defense counsel claims shows he's not a

14  risk of flight, was actually part of his criminal

15  enterprise and was part of the money-laundering operation

16  here.  And it can be operated from a laptop, meaning the

17  defendant could flee to the Cayman Islands and still

18  operate his domain business.  There's no meaningful reason

19  for him to stay here and every incentive to flee.

20        And with respect to the proposal that he live

21  with his parents, our investigation has shown that the

22  defendant was exploiting his victims, including to assist

23  his parents with their financial situation.  We have

24  emails showing the victims helping the defendant's birth

25  father with his bills.  And we also, although defense

PROCEEDINGS                    26

1

2  counsel has not identified the name of this friend who

3  lives in New Jersey, the government suspects that it's a

4  friend who is on substantial email traffic with the

5  defendant and his victims.  And so that would not be a

6  safe and appropriate place for him to go.

7          Regardless, whether he's on home detention or

8  not, whether there's some measure put in place supposedly

9  restricting his ability to communicate, he will pose a

10 serious danger to the community if he's released.  And

11 that's because of the nature of his offenses and the

12 strength of the evidence -- and I've talked about that.  But

13 above and beyond that, there's a serious danger here that is

14 two-fold.  One is the danger to the safety and well-being of

15 the victims -- and I'll talk about that.  And the other is a

16 substantiated risk of witness tampering -- and I'll talk

17 about that, too.

18          So first, witness safety.  The government had a

19 sense of the danger that the defendant posed to the

20 community during its investigation, but the evidence of that

21 is far more significant after his arrest and what we learned

22 about his current situation when we arrested the defendant.

23 During the investigation the government learned of some

24 victims who had escaped the defendant's control, who had

25 placed distance between themselves and the defendant and

PROCEEDINGS                    27

who had some support system in place for their protection.
But at the time the defendant was arrested, it became clear
that there were other victims who were still very much
under the defendant's control at the time of his arrest.
Two women were living with the defendant when he was
arrested.  Both are women he exploited and abused for
years, including physical abuse and sexual exploitation.

When the defendant was arrested the defendant
told Pretrial Services -- and this is in the report -- that
he had become the guardian of one of those women, who was
his daughter's college roommate.  In his post-arrest
statement, he described himself as a father figure to this
woman.  Well, what did being a guardian or father figure
mean to the defendant?  When he was arrested, he was in bed
with this woman.  Video evidence from the iCloud confirms
that Ray sexually groomed her and that he directed her to
engage in sex acts with a number of different men while he
filmed it.  This is the woman the defendant described
effectively as a daughter and who is certainly young enough
to be his daughter.  And that is only the tip of the
iceberg.

There are many other reasons to have serious
concerns about the safety and well-being of the two women
who were living with him at the time of his arrest.  The

PROCEEDINGS                         28

1

2  government submitted two videos as exhibits to the Court

3  which we request to be filed under seal due to the

4  sensitive nature of those videos and the discernible

5  identity of the women in those videos.  Without revealing

6  their identities, one video shows the type of verbal abuse

7  that Ray inflicted on these women, calling one of them a

8  criminal and threatening to take her to the police while

9  she sobs.  The other shows the type of physical abuse

10  typical of Ray that's described by several of our

11  witnesses; several different victims experienced this over

12  time.  And that video shows Ray grabbing one of these women

13  by the hair, forcefully jerking her head back and forth

14  before shoving her out of the house, all while berating

15  her.  This is not isolated.  It is emblematic of the abuse

16  that our witnesses describe and that our investigation has

17  corroborated.

18          The stakes here are very high.  Ray's arrest

19  rescued these women from a dangerous and abusive situation

20  that had lasted about a decade.  As detailed in the

21  indictment, that abuse was psychological and not just

22  physical, and it has been longstanding.  Journals recovered

23  from the house show the level of despair and the amount of

24  control that Ray exerted over their lives.  At the time of

25  the arrest there was a lock on the refrigerator door,

PROCEEDINGS                    29

1
2  corroborating that Ray controlled his victims' access to
3  food the same way he did during the period of forced labor
4  in North Carolina, as our witnesses have told us.   The
5  recovery of these women is likely to be a long road in
6  light of the extreme psychological damage that the
7  defendant has inflicted and the degree to which he alienated
8  victims from other support systems like their real families
9  and even from reality, including convincing them that they
10 are worthless and that they have been poisoned themselves.
11 If Ray is released, it will jeopardize that recovery and
12 place them in harm's way.

13         That's not even to mention the real risk of
14 witness tampering here.   The defendant has an alarming
15 history of obstruction and manipulation of witnesses.
16 Several witnesses have described how he suborned perjury in
17 an eviction proceeding involving his landlord of the
18 Manhattan apartment described in the indictment.   Ray
19 pressured several victims to give false testimony in those
20 court proceedings, including to testify falsely that they
21 were in a conspiracy against him masterminded by Bernie
22 Kerik.   Ray has also pressured witnesses to provide false
23 information to law enforcement.   Most shocking of all,
24 during his child custody battle, Ray coerced his children to
25 say that they were sexually abused by their mother in an

```
 1                        PROCEEDINGS                    30
 2   effort to win that custody dispute.  He made an audio
 3   recording of the false account of his young daughter and
 4   submitted it to the authorities, and he convinced his other
 5   daughter of the same damaging lies.  Trained professionals
 6   and the judge concluded that this information was false and
 7   implanted by the defendant.  This shows that the defendant
 8   will stop at nothing to prevail in a court proceeding, even
 9   if it involves witness tampering and causing severe
10   emotional and psychological trauma to those witnesses, even
11   if those witnesses are his own children or family members.
12            Central to the defendant's crimes here was
13   intimidation of victims, blackmail and persuading victims to
14   make false statements.  Our investigation has shown 52 email
15   addresses linked to the defendant's phone number, including
16   email accounts he opened in his victims' names.  He also
17   created domains in his victims' names, including sites set
18   up to extort his female victim and humiliate her.  This is
19   part of the defendant's playbook.  New York Magazine
20   reported that during the custody dispute with his ex-wife
21   that I just described, the defendant created websites and
22   posted graphic accusations of child abuse against his ex-
23   wife and her family.  His email and the iCloud accounts show
24   that after the New York Magazine article was published, the
25   defendant was on a campaign to discredit and defame
```

1                        PROCEEDINGS                    31

2  suspected sources of the article, as well as the authors of

3  the article themselves.  For example, we found one dossier

4  that he put together on one of the authors of that article.

5            Now, defense counsel said that the fact that the

6  article was published in April and the defendant is still

7  here is an indication that he's not a flight risk.  The

8  government strongly disagrees with that.  The article did

9  not lay out the elements of a federal crime, and it was

10  clear that the defendant's tactic instead was to intimidate

11  witnesses and try to discredit the article, which he had

12  reason to think he could do, given his success in getting

13  people to say false things over the past ten years.

14            And although defense counsel claims that the

15  defendant has not had contact with any of his victims during

16  that time, that is not true.  The government, for example,

17  has a text message sent by one of Ray's associates to that

18  female victim.  And I'll read a portion of that text

19  message.  "You poisoned me, and your history of hurting

20  innocent people is finally coming back to you.  Your actions

21  are not evil; they are vile.  You are vile.  You poisoned

22  five innocent people but claim you are the victim, that it

23  was you who experienced violence at the hand of any one of

24  the people that you victimized.  The sheer length and over-

25  indulgence and languid hyperbole, which read like one of

PROCEEDINGS                          32

your conference papers, made it clear that you were the

perpetrator of the New York Magazine article.  Another

spineless attempt to evade accountability for trying to

murder five people.  Accountability for your actions is

beyond your control, and I am personally ensuring that you

are prosecuted to the fullest extent for your crimes.  The

fact that you've told me that you've poisoned some of your

clients is only further confirmation that you belong in

prison."  Then it makes reference to someone by name --

"has a right to know the truth and I will see that she does.

I know that all of your victims will breathe a sigh of

relief when you are put right where you belong.  You will be

the same in prison as you are now, a fat, lonely nobody who

lives to serve the needs of others.  You're not evil; you

are a criminal.  The next time I see you, you will be in a

jumpsuit, you and you alone."  So the idea that the

defendant saw this article get published and was prepared to

face the consequences of his actions is very far from the

truth.  Instead, this article did nothing to deter him from

continuing his abuse of his victims, from intimidating

potential witnesses and making threats.

          And defense counsel did not share the proposed

conditions with me in advance of the bail arguments, so I

did not have a chance to talk to Pretrial Services about it,

```
 1                        PROCEEDINGS                    33

 2   but the proposed condition of limiting contact and limiting

 3   use of a phone I think is far-fetched and difficult to

 4   implement, given the control that Ray has over other people

 5   to do his bidding and his relentlessness in intimidating

 6   witnesses.

 7            And on this topic of home confinement I want to

 8   emphasize one other thing, which is in a case like this

 9   that's really not going to defuse the danger the defendant

10   poses here, this is a ten-year crime that went undetected

11   for a long time.  And what was the defendant's base of

12   operations?  It was his home.  When he was living at Sarah

13   Lawrence, it was the dorm.  When he was abusing the victim

14   in Manhattan, it was in the Manhattan apartment.  When he

15   was committing forced labor, it was at a private property in

16   North Carolina.  When he was abusing the two victims that he

17   was found with at the time of arrest, the locus of the

18   criminal activity was the home.  And there is case law in

19   this circuit that recognizes the danger posed by leaders

20   like the defendant that cannot easily be addressed by bail

21   conditions where somebody has the control to extort victims,

22   issue threats, even from the comfort of their own home,

23   which is where he was already conducting his criminal

24   activity.

25            For all of these reasons, the defense cannot
```

1          PROCEEDINGS                    34

2  overcome its burden here, and detention is appropriate.

3          THE COURT:  Thank you.

4          Ms. Lenox, do you want to be heard further in

5  connection with your application?

6          MS. LENOX:  Yes.  Thank you.

7          Your Honor, the text message that the prosecution

8  just read, let's be clear, that did not come directly from

9  Mr. Ray.  That came from a person who the prosecution is

10 saying is an associate of Mr. Ray.  And that goes to the

11 heart of what the government wants us to believe here, which

12 is that Mr. Ray has been controlling the minds and lives of

13 everyone who has been in his life for the past ten years.

14         The government has said that Mr. Ray doesn't have

15 strong community ties essentially because anyone in his

16 orbit has been influenced by him.  That is simply untrue and

17 an unfair characterization.  The government is essentially

18 saying that none of these individuals have any free will of

19 their own and that Mr. Ray is responsible for any vile or

20 potentially criminal act that other individuals who are

21 kind of in contact with him for the past ten years have

22 done.

23         And, your Honor, the government spent a lot of

24 time talking about the strength of its case.  And I just

25 want to point out a few things about the witnesses in this

1                          PROCEEDINGS                      35

2   case.  Let's begin with the alleged Female Victim 1, the

3   individual whose allegations underline the sex-trafficking

4   charge in this case.  First of all, her accusations are the

5   only accusations that Mr. Ray has engaged in sex

6   trafficking.  This is a person who according to the search

7   warrant applications that were made by the prosecution, this

8   is a person who was using illegal drugs and who suffered

9   from mental-health issues long before ever having met

10  Mr. Ray.  This is a person who was hospitalized for a

11  semester in college having nothing to do with Mr. Ray.  This

12  is a person whose own friends and family would concede that

13  she is prone to hyperbole and exaggeration as an attention-

14  seeking mechanism.  That's Female Victim 1.  This is also a

15  person who, despite the four years of alleged prostitution

16  that she's now claiming that Mr. Ray forced her into,

17  magically managed to escape, as the prosecution would call

18  it, from Mr. Ray a year ago, after the New York Magazine

19  article was written.

20          Now, the second primary witness in this case is a

21  man who has questionable motives.  This is a man who is a

22  storyteller by trade, a person who after graduating from

23  Sarah Lawrence went on to earn his MFA in writing.  This is

24  a person who recently sold a memoir about his alleged

25  experiences with Mr. Ray to a book publisher, a person who

1                              PROCEEDINGS                    36

2   is represented by a literary agent and also represented by

3   an agent for film and television production.  This is a

4   person with questionable motives who has reason to

5   exaggerate what happened over the course of the last ten

6   years.  It's also a person who has not been involved in

7   Mr. Ray's life whatsoever for the past seven years.  These

8   are the two primary sources of information upon which the

9   prosecution has relied both in their search warrant

10  applications and in the indictment.

11          Now, the prosecution is now saying that the

12  witnesses who testified under oath in open court while

13  Mr. Ray was not present in the courtroom, that testified to

14  a set of circumstances and facts that are wholly different

15  from those contained in the indictment, had suborned perjury

16  at Mr. Ray's urging.  Mr. Ray simply cannot be held

17  responsible for every single piece of information, every

18  single act that individuals do, that individuals who he has

19  come across in his life have done over the past ten years.

20          Now, the government has put a lot of emphasis on

21  the alleged assets that Mr. Ray has in order to make the

22  argument that, if he was released, he would pose a risk of

23  flight.  In reality that's simply not the case.  Mr. Ray has

24  been losing money every single day by not being present to

25  renew his domain names in the portfolio that he has.  The

1                              PROCEEDINGS                      37

2  way that it works is that every year a certain -- a domain

3  name comes up for renewal and was to pay a certain amount to

4  hold onto that domain name.  In order to hold onto all of

5  the domain names in Mr. Ray's portfolio, it requires that he

6  actually be there and he actually do work.  He only earns

7  money if he's able to sell domain names, and that depends in

8  large part on whether there's a market for them.  So while

9  the value of his portfolio may seem high, it's not actually

10 liquid; it's not cash that he has access to.  And, again,

11 Mr. Ray doesn't have any bank accounts whatsoever.  He has

12 no travel documents whatsoever.  He has no means of actually

13 leaving this country.

14           I would also note that in conversations with the

15 prosecution they haven't indicated that while they have not

16 frozen Mr. Ray's assets at this point, likely largely

17 because he doesn't have access to them while incarcerated,

18 that it is possible that, should he be released, they would

19 consider freezing his assets.  So all of the money that the

20 government is referring to that Mr. Ray would have access

21 to if released may not actually be there and, I would

22 argue, your Honor, isn't actually there in the first place.

23           Your Honor, the so-called admissions that the

24 prosecution has said that Mr. Ray made in his post-arrest

25 statement, they're not criminal.  These are admissions that

PROCEEDINGS                    38

1

2  become criminal only insofar as you connect all of the dots

3  and all of the pieces in the prosecution's story.  But

4  importantly, your Honor, this post-arrest statement was not

5  recorded.  That is contrary to any other federal case that

6  would come before this Court.  As a matter of procedure,

7  agents record post-arrest statements.  But in this case,

8  Mr. Ray's statement was not recorded.  I think that is

9  highly important to the extent that the prosecution relies

10  on those post-arrest, so-called admissions to use against

11  Mr. Ray in this proceeding.

12        Now, the prosecution has talked about

13  substantiated witness tampering.  I just want to make clear

14  that in this case it doesn't sound as though there are any

15  instances where Mr. Ray has tried to tamper with witnesses

16  since this case has begun himself.  To the extent that

17  other individuals have threatened individuals who are

18  alleged victims in this case, that is not coming from

19  Mr. Ray.

20        Now, your Honor, the prosecution references an

21  instance -- the prosecution references Mr. Ray's

22  convictions.  I would say that the Eastern District of New

23  York federal case that the prosecution referenced, a

24  federal felony conviction, he does have that.  It's 20

25  years old.  And while Mr. Ray does have other convictions

PROCEEDINGS                           39

1

2  as well, they're all at least ten years old, and they all

3  stem from a child custody dispute that arose from a very

4  nasty divorce proceeding and involved allegations that were

5  substantiated by the Department of Youth and Family

6  Services in New Jersey that Mr. Ray's older daughter had

7  been abused by her mother.  So to the extent that Mr. Ray

8  was trying to interfere with child custody, it was in the

9  name of protection of his oldest daughter, who was very

10 vocal at the time and continues to be about the abuse that

11 she suffered at the hands of both her mother and in the

12 various agencies that DYFS had placed her in after removing

13 her from the home.

14          Just one moment, your Honor?

15          Finally, just with respect to the videos that the

16 prosecution has referenced, I just want to make note that

17 defense counsel received these videos late in the afternoon

18 on Friday.  Mr. Ray having -- being housed at the MCC and

19 the MCC having been on lockdown since Friday, was not able

20 to review those videos.  No legal visits have been allowed

21 on Friday, there were no legal visits allowed this whole

22 weekend, and we did not have a chance to see Mr. Ray or

23 speak with him until this morning right before court.  So

24 to the extent that the prosecution relies on these videos,

25 I would just say, your Honor, it's important that you know

PROCEEDINGS                    40

1

2    that Mr. Ray has not been able to review that evidence.

3    And so we do not know the context in which those videos

4    were taken.

5              THE COURT:  Do you want to postpone the

6    proceeding so that you can review the videos with him?

7              MS. LENOX:  Just one moment, your Honor?

8              No, your Honor.  Thank you.

9              Your Honor, given all of this, I do believe that

10   we have rebutted the presumption that Mr. Ray is a danger

11   to the community and that Mr. Ray is a risk of flight, and

12   I would ask that you release him on the conditions that we

13   laid out at the start.

14             Thank you.

15             THE COURT:  Thank you.

16             Ms. Lenox, when you indicated that your client

17   had changed his birth name and had taken on the name of

18   his stepfather, did he legally change his name from Greco

19   to Ray?

20             MS. LENOX:  Yes, your Honor.  He was adopted.

21             MS. SASSOON:  Your Honor, may I just say

22   something very brief?  Defense counsel in response

23   maligned some of the government's witnesses.  As I've

24   already laid out in the bail argument, the information

25   from these witnesses, of which there are well more than

1                          PROCEEDINGS                    41

2   two, is corroborated not only by the different witness

3   accounts but also by email evidence, iCloud evidence,

4   documentary evidence including financial records, the

5   ledgers found in the home on which there was no comment

6   from defense counsel, and videos such as those submitted,

7   which the government submits speak for themselves.

8              Thank you.

9              THE COURT:  Ms. Lenox, in your recitation you

10  indicated that the Court could issue orders barring your

11  client from having contact with the victims.  The Pretrial

12  Services Report indicates that -- orders a protection hat

13  to be issued against your client previously.  What, if

14  anything, can you tell me about those orders of

15  protection?

16             MS. LENOX:  So there are two individuals that

17  there were orders of protection issued on behalf of by

18  courts in New Jersey, I believe.  One of those individuals

19  is Mr. Ray's ex-wife.  And the orders of protection that

20  were issued against him I can assure you from having

21  reviewed records of the divorce proceeding and records

22  that stemmed from other court custody issues beyond the

23  divorce proceeding, that those orders of protection went

24  both ways.  So  my understanding from reading all of the

25  court documents is that on the night that -- well, there

PROCEEDINGS                            42

1
2  was an incident in 2005 when the police were called and
3  Mr. Ray's older daughter made abuse allegations against
4  Mr. Ray's ex-wife.   Mr. Ray then asked for an order of
5  protection against his ex-wife, and she in turn asked for an
6  order of protection against him.  My understanding is that
7  those orders of protection went back and forth for a while.
8  And so to the extent that she had one against him, he also
9  had orders of protection against her.  And there was a
10 divorce proceeding and custody hearings at which courts had
11 to determine who orders of protection should be issued in
12 favor of.  And there are certainly instances where Mr. Ray
13 was issued orders of protection against his ex-wife.
14         The second individual, I believe that stems from a
15 domestic violence dispute involving a different woman.  And
16 those were criminal court allegations.  My understanding is
17 that that case has been dismissed and sealed, and so the
18 order of protection that stemmed from that case, it was
19 also -- it was also dismissed.
20         THE COURT:  Were there any allegations that your
21 client violated any of the orders of protection issued
22 against him?
23         MS. LENOX:  I can't speak to that directly.  I
24 don't believe there are allegations that he violated the
25 order of protection with respect to the woman who was not

1                          PROCEEDINGS                    43

2  his ex-wife.  With respect to the woman who is his ex-wife,

3  I do not know specifically if there are allegations that he

4  violated that order of protection, although I'm sure the

5  government would be happy to chime in if I am wrong about

6  that.

7          MS. SASSOON:  What I do know is that the

8  defendant violated a New Jersey court order prohibiting

9  contact with the defendant's two daughters when he abducted

10 his older daughter from a New Jersey child welfare facility.

11 And that's in one of the documents the government submitted

12 to the Court.

13         MS. LENOX:  And I would just note, your Honor, for

14 the record that that older daughter was, I believe, 17 years

15 old at the time, had been living in various Department of

16 Youth and Family Services shelters and did not want to live

17 in those shelters and also refused to return to live with

18 her mother.

19         MS. SASSOON:  And this was in the context of the

20 defendant falsely convincing her that she had been abused by

21 the mother.

22         MS. LENOX:  I'm sorry, your Honor, I just have to

23 note that DYFS did substantiate at least one allegation of

24 abuse and that as a result of the older daughter's

25 allegations of abuse there was, at the very least, a

1                              PROCEEDINGS                    44

2   criminal investigation into his daughter's mother.

3              THE COURT:  Ms. Sassoon, the ledger that you -- or

4   ledgers that you indicated were recovered from Mr. Ray's

5   home, are the ledgers in handwriting?

6              MS. SASSOON:  The 2017 pickup repair ledger is

7   typed, and I can hand up a copy to your Honor.  And that's

8   the one with a total of over $700,000.  And the 2018 total

9   is handwritten.

10             THE COURT:  Whose handwriting is it?

11             MS. SASSOON:  It is not the handwriting of the

12  defendant; it is the handwriting of a woman, based on our

13  investigation, we know that the defendant directed this

14  woman to participate in the sex trafficking including by

15  picking up the money on his behalf.  And these handwritten

16  ledgers which we've seen on the iCloud and which were

17  recovered from the home indicate in some of the drafts of

18  the ledger who was doing the money pickup, and sometimes it

19  was the defendant and sometimes it was this associate.

20             THE COURT:  And the typewritten ledger, who typed

21  the ledger?

22             MS. SASSOON:  That is less clear.  But, again,

23  this was on the premises where the defendant was living with

24  the two women.

25             MS. LENOX:  And to be clear, your Honor, the

PROCEEDINGS                    45

1

2    premises at which Mr. Ray was living, there was another man

3    who owned the home who also lived there, along with the two

4    women who were present for Mr. Ray's arrest.

5            MS. SASSOON:   It is clear from our investigation

6    that he was not involved in the sex trafficking.

7            And I'll just note, beyond information from the

8    female victim about the nature of these pickups and what's

9    shown in the ledgers that corroborate that, we have another

10   witness who can corroborate that the defendant would direct

11   his associate to go pick up the money, and it would be

12   brought back and delivered to the defendant.   The primary

13   beneficiary of all this money was the defendant, his domain

14   business.   And he operated primarily in cash and through his

15   domain business precisely to try to avoid detection from law

16   enforcement.

17           THE COURT:   Since it's alleged he has no bank

18   accounts and that these transactions are in cash, how do you

19   link all these funds, first in excess of 700,000 in 2017 and

20   then in excess of 1 million in 2018, all to Mr. Ray?

21           MS. SASSOON:   Yes, your Honor.   Basically what our

22   investigation has shown about how the sex trafficking

23   operated and how the proceeds were transferred -- this is

24   based on analysis of bank records as well as witness

25   information -- is that the female victim would engage in

1                              PROCEEDINGS                    46

2  prostitution and then transfer nearly all of the proceeds to

3  Ray either by giving him or his female associate the money

4  in cash or making wire transfers to the female associate's

5  bank account.  So when the cash was picked up, it would be

6  deposited into the bank accounts of one of these two women

7  and then withdrawn, provided to Ray, sometimes through

8  prepaid credit cards, sometimes through payments to his

9  GoDaddy business.  And our investigation has shown payments

10  to the GoDaddy business, including from the female victim

11  and these other women who were doing banking on behalf of

12  Ray.

13          So, again, he would get the money in cash.

14  Sometimes he would keep the cash; sometimes it would be

15  funneled through the female associate's bank accounts.  We

16  have call recordings with the banks, between the banks and

17  one of these women; and it's clear he's in the background,

18  sometimes directing her what to do about the money.  The

19  email accounts show that he's the one effectively

20  controlling the money.  So, for example, from these two bank

21  accounts there were often wire transfers to family members

22  of Ray's.  Text messages and emails show these family

23  members contacting the women and saying, "Tell Dad to send

24  me money," or I need money from the defendant.  And then the

25  defendant would direct these women to make the transfers.

```
 1                         PROCEEDINGS                    47
 2              And so, again, he was shielding himself from
 3  accountability by performing his banking through these
 4  women, but he's the one who ultimately controlled the money,
 5  the access to the money, sending the money to other people,
 6  using the money.  All of our witnesses describe how he -- or
 7  several witnesses describe how he would go around with a
 8  backpack full of cash and that he avoided using banking.
 9  But between the bank account records, the witness testimony,
10  the bank call recordings, the ledgers and the emails, we
11  feel very confident that he is the ultimate beneficiary of
12  the money.
13              And I'll just give one illustrative example.
14  We've been able to match up some entries on the ledger that
15  say pickup, the date and the amount, to text messages with
16  one of Ray's associates and the female victim, coordinating
17  the pickup of roughly that amount of money on those dates
18  from hotels as a result of prostitution proceeds.
19              THE COURT:  In connection with this morning's
20  proceeding, Mr. Ray, an application has been made not only
21  by your counsel for bail conditions to be fashioned to
22  permit you to be at liberty pending the resolution of the
23  criminal action brought against you in this district, but an
24  application has been made by the government that you be
25  detained without bail because you present as a risk of
```

1                        PROCEEDINGS                    48

2  flight and as a danger to the community or a person in the

3  community.  When an application is made that a person be

4  detained without bail, 18 USC §3142 requires that the

5  Court consider several factors, among them the nature of

6  the charged offenses, whether a crime of violence is

7  alleged or the offenses involve a controlled substance or

8  in some circumstances a terrorist-like conduct.  The

9  background of the accused is to be considered, his or her

10  ties to the community, family ties, prior criminal history

11  if any; whether at the time of the charged offense the

12  accused is under the supervision of a parole or probation

13  entity is to be considered.  The strength of the evidence

14  against the accused is also a factor to be considered.

15            In the instant case there is a presumption that

16  there are no conditions that could be fashioned to permit

17  you to be at liberty pending the disposition of the

18  criminal action.  The information proffered during this

19  proceeding suggests that your ties are to a community in

20  New Jersey.  You have family ties; that is demonstrated by

21  the presence of family members in court and friends in

22  court for you today.  You have a prior criminal history.

23  During the time that you were serving a sentence of

24  supervised release it is alleged that you violated the

25  terms and conditions of that supervised release, and that

1                          PROCEEDINGS                    49

2    is recounted in the Pretrial Services Report that was

3    prepared preparatory to today's proceeding.  The nature of

4    some of the charges made against you have violent

5    underpinnings.  It has been represented that orders of

6    protection have been issued against you and in some

7    circumstances in favor of you.  The Pretrial Services

8    Report, which is not corroborated, indicates that you are

9    employed, self-employed; and it has been represented to me

10   that the substance of your business is acquiring domain

11   names and, I guess, selling same.  The government has

12   proffered that there are witnesses who will testify to

13   abusive conduct alleged to have been performed by you and

14   that endangered persons who were associated with you, some

15   of whom lived with you for a period of time, including at or

16   about the time of your arrest.

17            Your counsel has urged that conditions can be

18   fashioned to permit you to be at liberty, including home

19   detention; restrictions on your access to electronic devices

20   and means; that you be monitored electronically; and that

21   your travel be limited to three judicial districts; and also

22   that a personal recognizance bond for $100,000 be issued

23   with co-signers on the bond who would be pledging, if they

24   were to sign the bond, that they would be watchful over you

25   and ensure that you appear in court whenever you are

```
 1                         PROCEEDINGS                    50
 2  directed to do so.
 3          Based upon all of the information that has been
 4  presented to me, both through the Pretrial Services Report
 5  and in the arguments for and against allowing you to be at
 6  liberty under bail conditions, I am not persuaded that there
 7  are conditions that could be fashioned to permit you to be
 8  at liberty that would safeguard the community from danger
 9  and ensure that you not flee.  The proffers made by the
10  prosecution present clear and convincing evidence to me that
11  detention is warranted in this case.  So I'm going to deny
12  the application made by your counsel that bail conditions be
13  fashioned to permit you to be at liberty, and I'm going to
14  grant the application made by the government that you be
15  detained without bail.
16          Is there anything else that we need to address
17  today?
18          MS. LENOX:  No, your Honor.
19          MS. SASSOON:  No.  Thank you, your Honor.
20          (Whereupon, the matter is adjourned.)
21
22
23
24
25
```

1                                                              51

2

3                         C E R T I F I C A T E

4

5          I, Carole Ludwig, certify that the foregoing

6    transcript of proceedings in the case of USA v. Lawrence

7    Ray, Docket #20-cr-00110-LJL All Defendants, was prepared

8    using digital transcription software and is a true and

9    accurate record of the proceedings.

10

11

12

13   Signature_____

14                       Carole Ludwig

15   Date:     March 4, 2020

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                  :
                                                                  :
                                                                  :
APPLICATION OF VULNERABLE                                         :
                                                                  :
INMATE FOR RELEASE FROM MCC                                       :
                                                                  :       AFFIDAVIT OF JONATHAN
                                                                  :       GIFTOS, M.D.
                                                                  :
                                                                  :
                                                                  :
                                                                  :
                                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
```

I, Jonathan Giftos, hereby affirm as follows:

1.      I am a doctor duly licensed to practice medicine in the State of New York. I am board certified in internal medicine and addiction medicine.

2.      I am currently the Medical Director, Addiction Medicine & Drug User Health at Project Renewal and a Clinical Assistant Professor in the Department of Medicine at Albert Einstein College of Medicine.  I was previously the Clinical Director of Substance Use Treatment for NYC Health & Hospitals, Division of Correctional Health Services at Rikers Island. In that capacity, I was responsible for the diversion, harm reduction, treatment and reentry services for incarcerated patients with substance use disorders. I further served as the medical director of the Key Extended Entry Program (KEEP), the nation's oldest and largest jail-based opioid treatment program that provides methadone and buprenorphine to incarcerated patients with opioid use disorders. I successfully led an effort to remove non-clinical barriers to opioid treatment program enrollment in 2017, which dramatically expanded treatment access from 25% to over 80%, while also reducing post-release mortality for people with opioid use disorder.

3.      I have extensive experience working with vulnerable populations such as the incarcerated and those experiencing homelessness.

4.      I submit this affidavit in support of vulnerable defendants' (as defined by the CDC) Motion for Temporary Release from Custody during the COVID-19 pandemic.

## I.      Coronavirus Epidemic in New York City

5.      On March 11, 2020, the World Health Organization declared that the rapidly spreading outbreak of COVID-19, a respiratory illness caused by a novel coronavirus, is a pandemic, announcing that the virus is both highly contagious and deadly.[1]  To date, the virus is known to spread from person-to-person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects.[2]  The CDC also warns of "community spread" where the virus spreads easily and sustainably within a community where the source of the infection is unknown.[3]  Experts are still learning how it spreads.

6.      As of March 18, 2020, novel coronavirus has infected over 193,475 people, leading to 7,864 deaths worldwide.[4]  In the United States, there are at least 5,881 confirmed cases and there have been at least 107 deaths.[5] There are confirmed coronavirus cases in every state, the District of Columbia, Puerto Rico, Guam, and the U.S. Virgin Islands.

---

[1]  World Health Organization, Media Briefing on March 11, 2020:
https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[2] Centers for Disease Control and Prevention, Coronavirus Disease 2019: *How it Spreads,*
https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html

[3] *Id.*

[4]  *Novel Coronavirus Situation Dashboard*,  World Health Organization
https://experience.arcgis.com/experience/685d0ace521648f8a5beeeee1b9125cd.

[5] *Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (March 18, 2020), *at*
https://nyti.ms/2U4kmud (updating regularly).

7.      Governor Cuomo declared a State of Emergency in New York State on March 7, 2020.  Mayor De Blasio declared a State of Emergency in New York City on March 12, 2020.  As of March 18, 2020, there are 2,382 positive cases in New York State with 1,339 of those cases being in New York City.[6]  Among the positive cases in New York City are a number of people who work in courthouses, law enforcement, legal offices, and the medical field, increasing the likelihood of exposure to and by inmates: a security officer and an agent in the U.S. Attorney's Office, SDNY;[7] a NYC Department of Corrections investigator (who has died from the virus);[8] a lawyer with an office in Midtown Manhattan (and his wife and son);[9] a healthcare worker in Manhattan; an attorney and legal intern in local New York State courts; and an attorney at the Brooklyn Supreme Court.[10]

8.      There is currently no vaccine or cure.  The primary focus is on preventing the spread of the virus at this juncture.  To prevent new infections, the Centers for Disease Control and Prevention strongly recommend the following actions: thorough and frequent handwashing, cleaning surfaces with EPA approved disinfectants, keeping at least 6 feet of space between people,

---

[6] *Information on Novel Coronavirus,* New York Department of Health, https://www.health.ny.gov/diseases/communicable/coronavirus (last visited March 17, 2020).

[7] Email Communication with Edward Tyrrell, U.S. Attorney's Office, SDNY (March 14, 2020).

[8] *NYC Corrections Officer Dies of Coronavirus*, https://www.pix11.com/news/coronavirus/nyc-correction-officer-dies-of-coronavirus

[9] *Midtown Lawyer, Family and Friends Test Positive,* https://www.nbcnewyork.com/news/local/nyc-attorney-in-critical-condition-city-works-to-trace-movements-awaits-more-tests/2311723/

[10] *Information about Coronavirus and New York State Courts*, https://www.nycourts.gov/whatsnew/covid.shtml; *see also Two People with Coronavirus were in Manhattan and Brooklyn Courts, https://twnews.us/us-news/two-people-with-coronavirus-were-in-manhattan-brooklyn-courts.*

and avoiding group settings.[11]  Social distancing has also been encouraged to slow the rate of COVID-19 infections so that hospitals have the resources to address infected individuals with urgent medical needs.[12] The President's *Coronavirus Guidelines for America*, to slow the spread of the coronavirus, warns that social gatherings in groups of more than 10 people should be avoided.[13]  In correctional settings, such sanitation, social distancing, and self-quarantining measures are nearly impossible especially when inmates are routinely shackled and escorted with other prisoners.[14]

**Certain Identifiable Populations Are Far More Vulnerable To COVID-19 Than The Population At Large Is.**

9.      The Centers for Disease Control have identified two groups of people at higher risk of contracting and succumbing to COVID-19: adults over 60 years old and people with chronic medical conditions.[15]

10.     COVID-19 is more dangerous to persons in these high-risk groups than to the general population.  Older people who contract COVID-19 are more likely to die than people under the age of 60.  In a February 29th WHO-China Joint Mission Report, the preliminary mortality rate analyses showed that individuals age  60-69 had an overall  3.6% mortality rate and those 70-79

---

[11]  *How to Protect Yourself*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prepare/prevention.html.

[12]  *Coronavirus, Social Distancing, and Self-Quarantine*, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-social-distancing-and-self-quarantine.

[13] *The President's Coronavirus Guidelines for America*, https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf.

[14] *See We Are Not a Hospital: A Prison Braces for the Coronavirus*, New York Times, March 18, 2020, https://www.nytimes.com/2020/03/17/us/coronavirus-prisons-jails.html.

[15] *If You Are at Higher Risk*, Centers for Disease Control and Prevention, https://tinyurl.com/vtbebzc; *see also Report of the WHO-China Joint Mission on Coronavirus Disease (COVID-19)*, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf at 12.

years old had an 8% mortality rate.[16]  For individuals 40 years and younger, the mortality rate was as low as .2%.  It has been found that older people diagnosed with COVID-19 are more likely to be very sick and require hospitalization to survive because the acute symptoms include respiratory distress, cardiac injury, arrhythmia, septic shock, liver dysfunction, kidney injury and multi-organ failure.  Access to a mechanical ventilator is often required.  People with chronic medical conditions (no matter their age) are also at significantly greater risk from COVID-19 because their already-weakened systems are less able to fight the virus. These chronic medical conditions include lung disease, cancer, heart failure, cerebrovascular disease, renal disease, liver disease, diabetes, immunocompromising conditions, and pregnancy.  Those with pre-existing medical conditions have a higher probability of death if infected. The WHO-China Joint Mission Report provides that the mortality rate for those with cardiovascular disease was 13.2%, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer.[17]

In a March 17th *Washington Post* article tracking the 100 United States COVID-19 deaths, it is reported that many of the fatalities had underlying medical conditions, which made it harder for their bodies to fight off COVID-19.  And nearly all — about 85 percent — were older than 60; about 45 percent were older than 80.[18]

**Correctional Settings Increase The Risk Of Transmission**

11.     Correctional settings increase the risk of contracting an infectious disease, like COVID-19, due to the high numbers of people with chronic, often untreated, illnesses housed in a

---

[16] *Age, Sex, Existing Conditions of COVID-19 Cases and Deaths* Chart, https://www.worldometers.info/coronavirus/coronavirus-age-sex-demographics/ (data analysis based on WHO-China Joint Mission Report, *supra*).

[17] *Report of the WHO-China Joint Mission on Coronavirus Disease (COVID-19),* https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf at 12.

[18] *U.S. Coronavirus Death Toll Reaches 100*, The Washington Post, March 17, 2020, at https://www.washingtonpost.com/national/us-coronavirus-death-toll-reaches-100/2020/03/17/f8d770c2-67a8-11ea-b313-df458622c2cc_story.html.

setting with minimal levels of sanitation, limited access to personal hygiene, limited access to medical care, and no possibility of staying at a distance from others.  Correctional facilities house large groups of inmates together, and move inmates in groups to eat, do recreation, and go to court. They frequently have insufficient medical care for the population, and, in times of crisis, even those medical staff cease coming to the facility.  Hot water, soap and paper towels are frequently in limited supply.  Inmates, rather than professional cleaners, are responsible for cleaning the facilities and often not given appropriate supplies.  This means there are more people who are susceptible to getting infected all congregated together in a context in which fighting the spread of an infection is nearly impossible.

12.    Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[19]

13.    Inmates in New York City have already begun to test positive for COVID-19.[20] An inmate at Rikers and an inmate at Nassau County Correctional Facility (which houses both state and federal pre-trial detainees) tested positive this week.[21]  A corrections officer at Rikers has also tested positive.[22]

---

[19] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) *at* https://bit.ly/2TNcNZY.

[20] *Rikers Island Inmate Tests Positive for Coronavirus, in a First for New York City*, New York Magazine (March 18, 2020).

[21] *Id.*; *Nassau County Jail Inmate Tests Positive*, https://www.pix11.com/news/coronavirus/inmate-at-nassau-county-jail-long-island-tests-positive-for-coronavirus-officials.

[22] *Rikers Island Inmate Tests Positive for Coronavirus, in a First for New York City*, New York Magazine (March 18, 2020).

**Specific Conditions At MCC New York**

14.     Based on my understanding of the specific conditions at the federal pre-trial detention center in Manhattan ("MCC") as contained in published reports and communicated to me by Deirdre D. von Dornum, Attorney-in-Charge of the Federal Defenders of New York, these conditions pose heightened risks to already vulnerable inmates of contracting the novel coronavirus and of developing acute symptoms from the virus.

15.     The size of the population and the conditions of confinement at MCC increase the risk of infection substantially, because it is impossible for inmates to maintain a 6-foot distance from others, to avoid large groups, or to implement sufficient hand-washing and sanitization of surfaces.

a.     Approximately 750 inmates are held at the MCC, at least 10% of whom (and likely a higher percentage) fall into the high risk groups identified by the CDC.[23]  The facility was designed to hold only 474 inmates.[24]

b.     New inmates arrive at MCC from all over the world each week.  The pace of new incarcerations has not slowed despite the coronavirus.  These new inmates, who have been living in the community as coronavirus spreads, are screened only for fever and recent travel to designated hotspot countries before joining the general population of inmates.[25]

c.     Correctional officers who live in New York, New Jersey, and Pennsylvania come in and out of the facility each day without medical screening.[26]  Significantly, in a March

---

[23] Statement of Warden Licon-Vitale (March 12, 2020) (approximately 10% of inmates at MCC are high-risk for COVID-19 within the CDC's definition).

[24] *The Real Scandal at the MCC*, The Atlantic (Aug. 16, 2019).
[25] *Id.*

[26] *Id.*

18th CDC report, an epidemiological investigation revealed that coronavirus-infected staff members contributed to the outbreak in a nursing home facility with ineffective infection control and prevention and staff members working in multiple facilities.[27] The Seattle nursing home outbreak demonstrates that individuals with underlying health conditions and advanced age, in a shared location, are at a high risk of death, especially when resources and staffing become inadequate.[28]

d.   Male inmates in the general population at MCC are housed either in small two-man cells (originally designed for single occupancy) with a single shared toilet and sink or in large open dormitory units housing approximately 30 inmates with shared toilets and sinks. The windows in the cells do not open.  Recreation on the roof is available for at most one hour a day.  In the wake of a recent lockdown preceding the COVID-19 lockdown, one of only two toilets on a dormitory unit was broken, leaving over 25 men to share a single toilet and two sinks.

e.   There is a small unit for approximately 30 female inmates, who are housed in two-woman cells with a shared sink and toilet.  No outside recreation is available to female inmates at MCC.  The windows on the unit do not open.   Several of the female inmates have chronic medical conditions.

f.   During the preceding lockdown, the MCC housing units were not cleaned for two weeks because the inmates, who are responsible for cleaning the institution, were locked in their cells.[29]   In addition, there was no laundry available, and inmates were forced to

---

[27] *COVID-19 in a Long-term Care Facility—King County Washington, February 27-March 9, 2020*, https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6912e1-H.pdf.

[28] *Id.*

[29] Statement of Warden Licon-Vitale at SDNY Meeting on BOP and Coronavirus (March 12, 2020).

sleep on the same sheets and wear dirty clothes for the entire period.[30]  Female inmates who were menstruating were denied sanitary napkins or other feminine hygiene items and forced to wear a single pair of underwear for the entire two week period.

g.  No hand sanitizer is currently available to inmates at MCC.[31]

h. Tissues are not readily available.  Inmates use toilet paper to blow their noses.  Each inmate is provided only one roll of toilet paper per week.

i.    Each inmate is given one small bar of soap a week, at most[32].  Access to additional soap is limited to those inmates who have sufficient commissary funds to purchase it, and dependent on the commissary being open; it is routinely closed during lockdowns.[33]

j.    Inmates prepare all inmate meals and this meal preparation, with the exception of kosher and halal meals, is performed in a single kitchen.

k.    Inmates eat meals in large groups.

l.    Inmates are responsible for sanitizing the housing unit common areas, and frequently lack adequate cleaning supplies to do so.

m.    Inmates have not been informed of the symptoms of COVID-19, or of how to prevent the spread of the infection.

---

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.*

n.  The facility has not informed the inmate population of what the protocol will be for symptomatic inmates;[34] absent a transparent protocol, inmates in correctional settings often fear they will be confined in solitary if they volunteer that they are symptomatic.

16.     Inmates at MCC who do contract COVID-19 are at higher risk for developing acute symptoms than if they were in the community, because MCC lacks the medical resources to care for symptomatic inmates.

    a.    There is no separate medical unit or facility for ill inmates.[35]  Unlike many Federal Correctional Institutions and even Rikers' Island, MCC has no physical space in which an ill inmate can convalesce that is separate from other inmates, warm, clean and has access to fresh water and regular hand-washing.

    b.    On weekdays, there are only two doctors regularly available at MCC to care for all 750 inmates.  Even this highly limited number is likely to decrease as doctors themselves go into quarantine.  Neither of these doctors specialize in infectious diseases.

    c.    There are no doctors at MCC on weekends or evenings.

    d.    People who contract COVID-19 can deteriorate rapidly, even before a test result can be received.  They need constant monitoring. Most people in the higher risk categories will require more advanced support: positive pressure ventilation, and in extreme cases, extracorporeal mechanical

---

[34] *Id.*

[35] *Id.*

oxygenation. Such care requires specialized equipment in limited supply

as well as an entire team of specialized care providers.   MCC has neither

specialized equipment nor specialized care providers.

17.     MCC is already short-staffed.[36]  This staffing shortage will only increase as

employees need to stay home to care for children whose schools are closed, elderly family

members, and other personal health situations.  With fewer staff, correctional officers are less able

to monitor inmates' health.

**Reducing Population Size At Specific Correctional Facilities Is A Crucial Public Health Measure**

18.     Every effort should be made to reduce chances of exposure to the novel

coronavirus; however, given the proximity and high number of inmates, correctional staff, and

healthcare workers at pre-trial detention facilities, it will be extremely difficult to sustain such

efforts. Therefore, it is an urgent priority to reduce the number of people in detention facilities

during this national public health emergency.


I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

Dated: March 18 , 2020
        Brooklyn, New York

_____
Dr. Jonathan Giftos

---

[36] *Id.*

# EXHIBIT C

**REDACTED**

# EXHIBIT D

JERROLD NADLER, New York
CHAIRMAN

JIM JORDAN, Ohio
RANKING MINORITY MEMBER

# U.S. House of Representatives
## Committee on the Judiciary
### Washington, DC 20515–6216
#### One Hundred Sixteenth Congress

March 19, 2020

The Honorable William P. Barr
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Dear Attorney General Barr:

We are writing to follow up on Chairman Nadler's letter of March 12, 2020 asking a series of questions about any measures taken by the Bureau of Prisons (BOP) and the U.S. Marshals Service (USMS) to respond to the COVID-19 pandemic. We write to reiterate the need to receive answers to these questions, as it is critical that we learn how BOP and the USMS are handling the COVID-19 crisis, both in protecting the employees of these agencies and the individuals held in their custody. We expect to hear from you on these matters, in short order.

We write now to underscore several points also made in that letter, as it has become even more evident, given the President's national emergency declaration, that these issues need to be addressed immediately. The BOP currently imprisons 175,000 people in about 100 facilities throughout the country. Data from 2019 indicates that the USMS is responsible for about an additional 75,000 people who are incarcerated pretrial, many in local jail or private contract facilities. Given these numbers, it is incontrovertible that, if the Department of Justice (DOJ) does not act aggressively to address the COVID-19 threat, federal jails and prisons could quickly become epicenters of the COVID-19 pandemic.

With large numbers of people living in close proximity to one another, many of them elderly or living with chronic diseases, DOJ must act now to save lives. Accordingly, we urge you to put in place measures to ensure that both the flow of prisoners into federal facilities is slowed significantly and that prisoners who can and should be released are released forthwith. We cannot wait any longer to take action.

We have learned that, in spite of the recent national emergency declaration and the fact that state and local prosecutorial agencies and courts across the country have made adjustments to their charging policies and are releasing prisoners who are at high risk of getting sick, it appears that it is "business as usual" in many U.S. Attorney's offices. If true, this is deeply distressing. We welcome any information showing that the Department of Justice is issuing guidance to U.S. Attorney's offices and to the BOP and USMS indicating that the Department

takes seriously the threat posed by COVID-19 to the health and welfare of inmates in the U.S. government's care, as well as to the health and welfare of federal correctional employees.

In this regard, we expect that BOP and the USMS are already implementing some baseline public health measures, such as carrying out comprehensive sanitation and cleaning of facilities (including visitation areas), and putting in place other safety measures, such as designating separate bathrooms for individuals with symptoms of COVID-19. We also expect that BOP and the USMS will enact comprehensive testing procedures as soon as tests are made available. We trust that BOP and the USMS are already making available to inmates and corrections officers Centers for Disease Control and Prevention (CDC)-recommended hand sanitizer, adequate soap, and personal protective equipment. We expect that BOP and the USMS are following CDC guidelines for workplaces, including that staff and visitors stay home if they are sick, follow proper coughing, sneezing, and handwashing recommendations, and execute routine environmental cleaning. We also expect that the BOP and facilities under contract with the USMS will follow proper isolation policies and not use extended solitary confinement as a substitute for providing proper medical care. Indeed, BOP and the USMS should work to release all incarcerated people who test positive for COVID-19 to an external healthcare facility to receive care.

During this national emergency, DOJ should be doing all it can to increase social distancing and decrease movement to prevent further proliferation of COVID-19. This means that the Department must limit the number of inmates being brought into the system. Law enforcement agents and line attorneys should be given guidance to desist from making arrests, except where an arrest is the only way to stop a specific and substantial risk that the person will cause bodily injury or use violent force against the person of another. The Department should issue guidance to U.S. Attorney's offices to refrain from pursuing probation, supervised release, and pretrial release revocations as much as possible, and only focus on those which are immediately essential to address. Pending warrants should be recalled, in all but exceptional cases, in favor of summons; arrests on technical supervision violations should be barred. Line lawyers should not be reflexively seeking detention in court, but should give serious consideration to whether the person they seek to detain poses a risk of serious injury to a reasonably identifiable person. They should also take into consideration whether the person is pregnant, whether they are 50 years old or older, and whether they suffer from chronic illnesses such as asthma, cancer, heart disease, lung disease, diabetes, HIV, or other diseases that make them vulnerable to COVID-19 infection.

DOJ and BOP must also do all they can to release as many people as possible who are currently behind bars and at risk of getting sick. Pursuant to 18 U.S.C. 3582(c)(1)(A), the Director of the Bureau of Prisons may move the court to reduce an inmate's term of imprisonment for "extraordinary and compelling reasons." We urge you to use this existing authority and consider moving courts to release federal inmates who are vulnerable to COVID-19 (for instance, persons who are pregnant, who are 50 years old and older, and who suffer from chronic illnesses like asthma, cancer, heart disease, lung disease, diabetes, HIV, or other diseases that make them vulnerable to COVID-19 infection). In addition, the BOP should immediately

reassess, under 18 U.S.C. 3621(b), every person with 36 months or less remaining on their sentence to determine if they can serve the last year of their sentence in community corrections and home confinement, rather than in a correctional institution.  DOJ should use all available powers and authorities, including executive clemency, commutation, furlough, compassionate release, and parole, to reduce the number of federal prisoners in jails, prisons, and other community-release-based programs housing large numbers of people.  Where possible, DOJ should create new emergency mechanisms to reduce imprisoned and incarcerated populations.

Finally, DOJ must make every effort to provide for transparency and communication. We urge you to release information about the number of COVID-19 cases that exist in BOP and USMS contract facilities, that you provide prompt and accurate information about any fatalities from COVID-19, and that BOP and the USMS provide regular, timely, and up-to-date information to attorneys and families of those in custody who are ill with COVID-19.  Moreover, DOJ must ensure that inmates are able to communicate with their loved ones and with their attorneys during these difficult times.  One way to ensure this, in addition to maintaining family visitation wherever possible, would be to provide free telephone, video, and e-mail communication, as well as full access to postal services, particularly in places where in-person visits are curtailed or restricted because of COVID-19.  At all times, DOJ must also guarantee that the attorney-client privilege is preserved and respected and that attorneys are able to maintain in-person visits with their clients wherever possible, as well as confidential telephone calls and video teleconferencing where available.

Please confirm that each of the measures discussed above is being implemented and, if not, why not.  In addition, if there are other measures to address COVID-19 that the Department is considering and undertaking, besides those we have outlined here, please communicate them to us.  We look forward to working together to help alleviate this crisis.

Sincerely,

Jerroll Nadler

Karen Bass

Jerrold Nadler
Chairman

Karen Bass
Chair, Subcommittee on Crime,
Terrorism, and Homeland Security

cc:   Jim Jordan, Ranking Member
      John Ratcliffe, Ranking Member
      Subcommittee on Crime, Terrorism,
      and Homeland Security

# EXHIBIT E



**U.S. DEPARTMENT OF JUSTICE**
**Federal Bureau of Prisons**
*Metropolitan Correctional Center*

*150 Park Row*
*New York, New York 10007*

April 9, 2020

The Honorable Roslynn R. Mauskopf
Chief Judge
United States District Judge Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY  11201

Re:      **Administrative Order** No. 2020-14

Dear Judge Mauskopf:

The Court has ORDERED that the MDC and MCC respond to concerns about the institutions' response to the COVID-19 pandemic.  Specifically, the Court asked about protocols for screening and testing inmates, staff and others entering or leaving each facility; the number of inmates tested and the number of positive tests, the number of staff and/or others testing positive; and all efforts undertaken to mitigate the spread of COVID-19 both generally and in response to any symptomatic inmate(s) and/or positive test(s).

Staff have been tasked with screening each and every staff member who walks in the door at both facilities. Specifically, a temperature is being taken and the staff member is asked to fill out a screening form. If the staff member has a fever or answers yes to any of the questions, a medical professional can deny entry to the institution.

Medical staff are also screening new inmate arrivals to the institution the same way. Specifically, staff who are conducting the screening are to wear appropriate personal protective equipment (PPE) in accordance with guidance promulgated by the Center for Disease Control (CDC).
Inmates with a temperature greater than or equal to 100.4 degrees, or overt respiratory symptoms are placed in isolation. New arrivals with a temperature of less than 100.4 degrees are placed in quarantine for fourteen days as a precautionary measure. Inmates leaving either BOP facility are also screened.

Any inmate currently in BOP custody who presents with COVID-19 like symptoms is assessed by the institution health services staff. An inmate exhibiting symptoms consistent with COVID- 19 will be placed in isolation. The remainder of the inmates on his or her unit will be quarantined to ensure additional inmates do not develop symptoms. The inmates' medical isolation will be evaluated by medical staff at least twice a day, and the inmates on a medically quarantined unit will have their temperature checked twice a day.

The Honorable Roslynn R. Mauskopf
April 9, 2020
Page 2

Currently, the BOP has enacted a national 14-day action plan to increase social distancing in the facilities. Specifically, inmates in every institution will be secured in their assigned cells. At MDC and MCC, the inmates will be released from their cells 3 days per week in order to shower, use the phones, and utilize the TRULINCs system. This will be done in small groups and social distancing has been encouraged. The national action plan will not, however, affect the provision of legal phone calls. Inmates will still be taken out of their cells for legal phone calls.

Inmate orderlies are cleaning the common areas of all housing units, and inmates have been instructed to continue to wipe down and sanitize their living quarters.

MCC and MDC unit team staff and officers are available to the inmate population to address any and all issues, including medical concerns, property concerns, and/or food related requests. Unit team staff are providing legal calls to attorneys. Any inmate can also request medical care from health services providers when they make rounds on the housing units.

With regard to the numbers as of April 9, 2020 for MDC:

Inmates tested: 11
Inmates positive: 3
Staff Positive: 9

With regard to the numbers as of April 9, 2020 for MCC:

Inmates tested: 6
Inmates positive: 5
Staff Positive: 12

Respectfully submitted,


s/


M. Licon-Vitale Warden
MCC New York


s/


D. Edge Warden
MDC Brooklyn

# EXHIBIT F

## BOP-Reported Positive Tests for COVID-19 Nationwide[1]

| Date | Number of Positive Inmates | Number of Positive Staff | Number of Inmate Deaths |
|------|------|------|------|
| 3/19/2020 | 0 | 0 | 0 |
| 3/20/2020 | 0 | 2 | 0 |
| 3/21/2020 | 1 | 2 | 0 |
| 3/22/2020 | 1 | 2 | 0 |
| 3/23/2020 | 3 | 3 | 0 |
| 3/24/2020 | 6 | 3 | 0 |
| 3/25/2020 | 6 | 3 | 0 |
| 3/26/2020 | 10 | 8 | 0 |
| 3/27/2020 | 14 | 13 | 0 |
| 3/28/2020 | 19 | 19 | 1 |
| 3/29/2020 | 19 | 19 | 1 |
| 3/30/2020 | 28 | 24 | 1 |
| 3/31/2020 | 29 | 30 | 1 |
| 4/1/2020 | 57 | 37 | 3 |
| 4/2/2020 | 75 | 39 | 6 |
| 4/3/2020 | 91 | 50 | 7 |
| 4/4/2020 | 120 | 54 | 8 |
| 4/5/2020 | 138 | 59 | 8 |
| 4/6/2020 | 195 | 63 | 8 |
| 4/7/2020 | 241 | 72 | 8 |
| 4/8/2020 | 272 | 105 | 8 |
| 4/9/2020 | 283 | 125 | 8 |
| 4/10/2020 | 318 | 163 | 9 |
| 4/11/2020 | 335 | 185 | 9 |
| 4/12/2020 | 352 | 189 | 10 |

[1] Numbers obtained from www.bop.gov/coronavirus on a daily basis. There is good reason to believe that the numbers reported by the BOP understate the actual number of tested-positive cases. *Compare* M. Licon-Vitale, MCC Ward, and D. Edge, MDC Warden, *Response to EDNY Administrative Order 2020-14* (Apr. 7, 2020) *at* https://www.nyed.uscourts.gov/pub/bop/MDC_20200407_042057.pdf (3 positive inmates at MDC Brooklyn) *with COVID-19 Cases* Federal Bureau of Prisons (Apr. 7, 2020) *at* www.bop.gov/coronavirus (2 positive inmates at MDC Brooklyn).





BOP-Reported Positive Tests for COVID-19 Nationwide
400
350
300
250
200
150
100
50
0
3/19/2020
3/20/2020
3/21/2020
3/22/2020
3/23/2020
3/24/2020
3/25/2020
3/26/2020
3/27/2020
3/28/2020
3/29/2020
3/30/2020
3/31/2020
4/1/2020
4/2/2020
4/3/2020
4/4/2020
4/5/2020
4/6/2020
4/7/2020
4/8/2020
4/9/2020
4/10/2020
4/11/2020
4/12/2020
Number of Positive Inmates
Number of Positive Staff
Number of Inmate Deaths

BOP-Reported Positive Tests for COVID-19 Nationwide
400
350
300
250
200
150
100
50
0
3/19/2020
3/20/2020
3/21/2020
3/22/2020
3/23/2020
3/24/2020
3/25/2020
3/26/2020
3/27/2020
3/28/2020
3/29/2020
3/30/2020
3/31/2020
4/1/2020
4/2/2020
4/3/2020
4/4/2020
4/5/2020
4/6/2020
4/7/2020
4/8/2020
4/9/2020
4/10/2020
4/11/2020
4/12/2020
Number of Positive Inmates
Number of Positive Staff
Number of Inmate Deaths

Percentage of Increase of Infected BOP People (Inmates and Staff)

Since 3/20/2020[2]

| Date | Number of BOP Cases[3] | BOP Percentage Increase Since 3/20/2020 | National Percentage Increase Since 3/20/2020 | Number of National Cases |
|------|------|------|------|------|
| 3/20/2020 | 2 | 0% | 0% | 18,747 |
| 3/21/2020 | 3 | 50% | 31% | 24,583 |
| 3/23/2020 | 6 | 200% | 135% | 44,183 |
| 3/24/2020 | 9 | 350% | 190% | 54,453 |
| 3/26/2020 | 18 | 800% | 355% | 85,356 |
| 3/27/2020 | 27 | 1250% | 451% | 103,321 |
| 3/29/2020 | 38 | 1800% | 651% | 140,904 |
| 3/30/2020 | 52 | 2500% | 772% | 163,539 |
| 3/31/2020 | 59 | 2850% | 892% | 186,101 |
| 4/1/2020 | 94 | 4600% | 1036% | 213,144 |
| 4/2/2020 | 114 | 5600% | 1176% | 239,279 |
| 4/3/2020 | 141 | 6950% | 1379% | 277,205 |
| 4/4/2020 | 174 | 8600% | 1526% | 304,826 |
| 4/5/2020 | 197 | 9750% | 1665% | 330,891 |
| 4/6/2020 | 259 | 12850% | 1897% | 374,329 |
| 4/7/2020 | 313 | 15550% | 1963% | 386,800 |
| 4/8/2020 | 377 | 18750% | 2140% | 419,975 |
| 4/9/2020 | 408 | 20300% | 2349% | 459,165 |
| 4/10/2020 | 481 | 23950% | 2527% | 492,416 |
| 4/11/2020 | 520 | 25900% | 2708% | 526,396 |
| 4/12/2020 | 541 | 26950% | 2856% | 554,226 |

[2] National numbers obtained from www.cdc.gov and https://coronavirus.jhu.edu/map.html
[3] Includes the number of both BOP inmates and staff who have tested positive for COVID-19



# EXHIBIT G

Jacqueline Sherman, Interim Chair
Stanley Richards, Vice-Chair
Robert L. Cohen, M.D.
Felipe Franco
Jennifer Jones Austin
James Perrino
Michael J. Regan
Steven M. Safyer, M.D.

Margaret Egan
Executive Director



**BOARD OF CORRECTION**
**CITY OF NEW YORK**
1 CENTRE STREET, RM 2213
NEW YORK, NY 10007
212 669-7900 (Office)
212 669-7980 (Fax)

March 21, 2020

| Darcel Clark | Eric Gonzalez | Melinda Katz |
| Bronx District Attorney | Brooklyn District Attorney | Queens District Attorney |

Michael McMahon
Staten Island District
Attorney

Cyrus Vance
Manhattan District Attorney

Janet DiFiore
Chief Judge of the Court of
Appeals and of the State of
New York

Anthony Annucci
Acting Commissioner, NYS
Department of Corrections
and Community Supervision

Cynthia Brann
Commissioner, NYC
Department of Correction

<u>VIA EMAIL</u>

Dear New York City's Criminal Justice Leaders:

The New York City jails are facing a crisis as COVID-19 continues its march through the City. We write to urge you to act to (1) immediately remove from jail all people at high risk of dying of COVID-19 infection and (2) rapidly decrease the jail population.

Staff of the Department of Correction (DOC) and Correctional Health Services (CHS) are doing heroic work to keep people in custody and staff safe and healthy. The Board of Correction, the independent oversight agency for the City's jails, has closely monitored Rikers Island and the borough jails for over sixty years. From this experience, we know that DOC's and CHS's best efforts will not be enough to prevent viral transmission in the jails. Their work must be supplemented by bold and urgent action from the City's District Attorneys, New York State judges, New York State Department of Corrections and Community Supervision (DOCCS), and DOC's utilization of its executive release authority. Fewer people in the jails will save lives and minimize transmission among people in custody as well as staff.  Failure to drastically reduce the jail population threatens to overwhelm the City jails' healthcare system as well its basic operations.

Over the past six days, we have learned that at least twelve DOC employees, five CHS employees, and twenty-one people in custody have tested positive for the virus. There are more than 58 individuals currently being monitored in the contagious disease and quarantine units (up from 26 people on March 17). It is likely these people have been in hundreds of housing areas and common areas over recent weeks and have been in close contact with many other people in custody and staff. Given the nature of jails (e.g. dense housing areas and structural barriers to social distancing, hygiene, and sanitation), the number of patients diagnosed with COVID-19 is certain to rise exponentially. The best path forward to protecting the community of people housed and working in the jails is to rapidly decrease the number of people housed and working in them.

Mayor de Blasio announced on March 19 that the NYPD and Mayor's Office of Criminal Justice (MOCJ) had identified 40 people for release from custody, pending approval of the District Attorneys' Offices and the courts. This number is far from sufficient to protect against the rapid spread of coronavirus in the jails.

We urge you to follow your colleagues in Los Angeles County (CA), San Francisco (CA), Cook County (IL), Autauga County (AL), Augusta County (VA), Allegheny County (PA), Hamilton County (OH), Harris County (TX), Travis County (TX), and Cuyahoga County (OH), and take action now to release people from City jails.  As further detailed below, this immediate reduction should prioritize the release of people who are at higher risk from infection such as those over 50 or with underlying health conditions. Additionally, you must safely release other people in jail to decrease the overall population; this process should begin with people detained for administrative reasons (including failure to appear and parole violations) and people serving "City Sentences" (sentences of one year or less). The process should continue to identify all other people who can be released. DOC and CHS should provide discharge planning to all people you release, including COVID screening, connection to health and mental health services, and support with housing, as necessary.

**People over 50 years old**
The morbidity rates for COVID-19 accelerate with age, with older people being the least likely to recover from complications of the virus. There are currently 906 people in DOC custody who are over age 50. Older adults in custody have an average of between three and four medical diagnoses each, and each of them takes between six and seven medications. Of the 906 older adults in custody today, 189 are being detained on technical parole violations. Another 74 older adults are City-Sentenced, serving one year or less for low-level offenses.

**People with underlying health conditions**
People with underlying health conditions, including lung disease, heart disease, diabetes, cancer, or a weakened immune system, are especially at risk of dying from COVID-19. As of today, there are 62 people in the infirmary at North Infirmary Command on Rikers Island. They are housed there because they require a higher level of medical care. Twelve of them are technical parole violators and six are City-Sentenced. In addition, there are eight women currently in the infirmary at the Rose M. Singer Center, three of whom are in custody on technical parole violations.

**People detained for administrative reasons**

There are currently 666 people in custody being held solely for a technical violation of parole, including failure to make curfew, missing a meeting with a parole officer, or testing positive for drugs. There are an additional 811 people detained on an open case and a technical parole violation who also should be reviewed for immediate release.

**People serving city sentences**

There are currently 551 people in DOC custody who are serving a City Sentence of under one year for low-level offenses. The Mayor must use his executive powers to release these people.

New York must replicate the bold and urgent action it has taken in other areas to stem the tide of COVID-19 in the jails. The Board strongly urges you to take urgent action today to drastically reduce the NYC jail population using the guidelines above.

Sincerely,

Jacqueline Sherman
Interim Chair

3