

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 15, 2020

**BY ECF**

The Honorable Lewis J. Liman
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, N.Y. 10007

> Re:  *United States v. Lawrence Ray*, **20 Cr. 110 (LJL)**

Dear Judge Liman:

The Government writes to oppose defendant Lawrence Ray's motion for bail.  (Dkt. No. 17.)  The defendant's reliance on the current health crisis to secure his release should be rejected. Just over a month ago, the defendant was detained based on a showing that he is a danger to the community and a risk of flight.  That has not changed.  While the defendant unpersuasively argues that he is no longer a risk of flight, he does not even head fake at arguing that he is no longer a danger to the community.  That is because the evidence of the danger he poses is overwhelming. The defendant's crimes involved sex trafficking, violence, psychological abuse, and intimidation. The defendant's victims remain vulnerable and would be placed at significant risk if he is released. He is not a first-time offender, but a convicted felon with a history of flouting supervision and resisting law enforcement.  The COVID-19 outbreak and the defendant's specific health conditions do not change the calculus or outweigh the factors that supported the defendant's detention in the first instance.  Accordingly, the defendant's motion should be denied.

### I.      Background

Ray was arrested on February 11, 2020, and charged with extortion conspiracy and extortion, in violation of 18 U.S.C. § 1951, sex trafficking, in violation of 18 U.S.C. § 1951, forced labor, in violation of 18 U.S.C. § 1589, forced labor trafficking, in violation of 18 U.S.C. § 1590, forced labor conspiracy, in violation of 18 U.S.C. § 1594, two counts of using interstate commerce to promote unlawful activity, in violation of 18 U.S.C. § 1952, and money laundering, in violation of 18 U.S.C. § 1956.

As set forth in the Indictment, the defendant targeted a group of college students and others for indoctrination and criminal exploitation.  He subjected his victims to sexual and psychological manipulation and physical abuse.  He extracted false confessions from his victims that they had caused harm and damage to him and his associates, and leveraged those false confessions to extort money, to force some of the victims to perform unpaid manual labor, and to cause one the female

April 15, 2020
Page 2

victims to engage in commercial sex acts for his financial benefit.  The Government's investigation, including evidence recovered in the search of Ray's residence, shows that Ray obtained millions of dollars of illegal criminal proceeds from these crimes, including well over a million dollar from the sex trafficking alone.

The defendant made a bail application on March 2, 2020 before U.S. Magistrate Judge Nathaniel Fox and was detained based on both danger to the community and risk of flight.  He did not appeal that ruling.  Since Ray's arrest, the Government has been producing discovery on a rolling basis.  The Government's discovery deadline is May 6, 2020.  The Court has not yet set a motions schedule or a trial date.

## II.      Legal Standard

Under the Bail Reform Act, a pre-trial defendant shall be detained pending trial if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e)(1).  The Government bears the burden of proof as to risk of flight by a preponderance of the evidence, and as to danger to the community by clear and convincing evidence.  18 U.S.C. § 3142(f); *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007).  Where, as here, the charges include sex trafficking and forced labor, a rebuttable presumption arises that there are no conditions that will reasonably assure the defendant's appearance and the safety of the community.  18 U.S.C. § 3142(e)(3).  To determine whether the defendant has rebutted the presumptions of dangerousness and flight, the Court must consider the four factors set forth in 18 U.S.C. § 3142(g): the nature and circumstances of the crime charged; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics, such as his family ties, employment, community ties, and past conduct; and (4) the nature and seriousness of the danger to the community or to an individual that the defendant's release would present.  *See United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001).

When a defendant has been ordered detained pending trial, the "judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of the United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."  18 U.S.C. § 3142(i).  Courts in this District and elsewhere have recognized, in the course of deciding bail applications based on the current pandemic, that the determination of whether there is a "compelling reason" for a defendant's release under this provision requires the court to "balance the reasons advanced for such release against the risks [of danger to the community and/or flight] that were previously identified and resulted in an order of detention.  In turn, whether temporary release under § 3142(i) is proper requires the individualized analysis of the facts of each case." *United States v. Chambers*, No. 20 Cr. 135 (JMF), Dkt. No. 70 (S.D.N.Y. Mar. 31, 2020) (Furman, J.); *see also, e.g.*, *United States v. Conley*, No. 19 Cr. 131 (PAE), Dkt. No. 366 (S.D.N.Y. Mar. 31, 2020) (Engelmayer, J.); *United States v. Gumora*, No. 20 Cr. 144 (VSB), Dkt. No. 30 (S.D.N.Y. April 14, 2020) (Broderick, J.) (collecting cases).

Furthermore, courts have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where otherwise detention would

April 15, 2020
Page 3

be warranted.  *United States v. Wages*, 271 F. App'x 726, 728 (10th Cir. 2008); *see also United States v. Hunter*, No. 13 Cr. 521 (LTS), 2014 WL 6632965, at *2 (S.D.N.Y. Nov. 24, 2014) (noting that appropriate bail considerations must "implicate the core issues of flight risk and danger to the community"); *United States v. Nelson*, No. 18 Cr. 044 (RJA) (HKS), 2018 WL 2928034, at *4 (W.D.N.Y. June 12, 2018) (reasoning that while "[t]he Court is sympathetic" to the defendant's poor health and "understands that it is more difficult for the Defendant to obtain appropriate medical treatment in prison," "[t]he Court is not persuaded that the Defendant's poor health has any significant bearing on the potential danger his release would pose").[1]

### III.  Discussion

#### A.  The Defendant is a Danger to the Community and a Risk of Flight

The defendant should not be released because he cannot rebut the presumption that he is a danger to the community and a risk of flight, as Judge Fox found on March 2, 2020.  As the Government laid out in detail at the March 2, 2020 hearing, all of the bail factors under Section 3142 support detention.  *See* March 2, 2020 Hearing Transcript, Ray Exhibit A at 16.  The nature of the charges are extremely serious and the criminal conduct lasted nearly a decade, from when several of the defendant's victims were in college up until the date of Ray's arrest.  *Id.* at 17-19.  The evidence is overwhelming and includes documentary and video evidence of the defendant's crimes, including audio and video of his physical and verbal abuse, and financial records and ledgers documenting his illicit proceeds.  *Id.* at 19-23.  The defendant is a convicted felon with a history of jumping bail and defying supervision.  *Id.*at 23-24.  He has a history of suborning perjury and of intimidating and threatening victims and potential witnesses.  *Id.* at 29-32.  The evidence establishes that he exercised an extreme level of physical and emotional control over his victims that would place them in danger if he is released.  *Id.* at 27.  The Government will not belabor the points, which are set forth in the transcript from the original bail hearing.  *See* Ray Exhibit A.  It is unnecessary to do so because the defendant does not contest in his current application that he is a danger to the community.  That is fatal to this motion.  The defendant's individual circumstances during the present pandemic, discussed further below, cannot overcome the serious and unique danger he poses to the community, including to the victims who were still in his grip on the date of his arrest.

---

[1]   For example, in a case where a defendant's medical condition warranted pretrial release from detention, the defendant faced a terminal illness, could only receive necessary life-prolonging treatment if released, and was awaiting trial.  *See United States v. Scarpa*, 815 F. Supp. 88, 89 (E.D.N.Y. 1993), supplemented (Mar. 5, 1993).  In *Scarpa*, the defendant was granted pretrial release when it was found that he was terminally ill with AIDS and his medical condition could not be managed appropriately by prison medical facilities. The court noted that the defendant could receive "necessary and humane treatment *only* under care of his physician," and had "entered the final stages of this fatal illness."  *Id.* (emphasis added).  Even in those extreme circumstances— where the defendant's illness had actually manifested—release was conditioned on the defendant's "confine[ment] to Beekman Hospital under the 24-hour guard of the United States Marshal's Service at [defendant's] own expense."  *Id.* at 89, 92.  *Scarpa* demonstrates why the current situation does not even begin to approach the types of extraordinary circumstances that warrant relief.

April 15, 2020
Page 4

The defendant does assert that he is not a flight risk, and that the pandemic reduces any perceived risk of flight.  But the pandemic does not mitigate the defendant's substantial risk of flight.  He is facing overwhelming evidence on very serious charges that carry a mandatory minimum of fifteen years imprisonment.  He has a proven track record of flight and noncompliance with supervision.  Following his conviction for securities fraud in the Eastern District of New York, the defendant violated the conditions of his supervised release, including by committing several state offenses in the context of a child custody dispute, among them taking and detaining a minor child and jumping bail.  The defendant was convicted of bail jumping in 2010 shortly before beginning the offense conduct at issue here.  *Id.* at 23-24.

In his present application, the defendant argues that the COVID-19 outbreak diminishes any potential flight risk because it would be dangerous to flee. Dkt. No. 17 at 13.  On the contrary, releasing the defendant now carries even greater risks.  The defendant has a history of flouting the rules.  He will be even more difficult to control at present.  Given the current unprecedented circumstances caused by COVID-19, the ability of the Pretrial Services Office to effectively supervise the defendant if released is likely to be curtailed as officers' ability to travel and visit in person with the defendant would be limited, giving him greater opportunity to flee or to intimidate witnesses. When the defendant last violated his supervised release and jumped bail, he resisted arrest by the marshals, using his daughter as a human shield.  *Id.* at 24-25.  Such antics are dangerous in normal circumstances.  During this pandemic, anything resembling that behavior would place the safety of pretrial services officers and law enforcement at even greater risk.  *See, e.g.*, *United States v. Brown*, No. 19 Cr. 792 (S.D.N.Y. April 6, 2020) Dkt. No. 20 at 5 (Swain, J.) (defendant's "fear of life-threatening contagion does not address sufficiently the very serious issue of the danger he poses to the community . . . Supervision and policing resources are particularly strained during the current pandemic conditions, heightening the importance of protection of the community from persons and circumstances that pose documented threats.").

Because the defendant remains a clear risk of flight and a danger to the safety of the community, this Court should order the defendant's continued detention.

### B.  The Defendant Cannot Demonstrate Exceptional Reasons for His Release

The defendant's release is also not appropriate because he has: (1) failed to present an appropriate person into whose custody he will be released and (2) failed to establish that his release is supported by exceptional circumstances.  Neither the conditions at MCC generally, nor the defendant's personal circumstances specifically, constitute exceptional circumstances for release.

### a.  The Defendant's Temporary Release Proposal is Noncompliant With the Statute

As discussed above, Section 3142(i) allows for temporary release under narrow, extraordinary circumstances and only into the "custody of a United States marshal or another appropriate person." 18 U.S.C. § 3142(i). The defendant proposes a typical bail package and does not explain how his father would be an "appropriate person" into whose custody he will be released.  *See* Dkt. No. 58, at 2, *United States v. Steward*, No. 20 Cr. 52 (DLC) (S.D.N.Y. Mar.

April 15, 2020
Page 5

26, 2020) (denying motion for temporary release, in part, because defendant failed to identify an appropriate person into whose custody the defendant would be released).  Although there is little precedent construing the term "another appropriate person," principles of statutory construction suggest that it should be limited to persons similar to a United States marshal—namely, other law enforcement officers or similar guards.  *See Yates v. United States*, 574 U.S. 528, 544-45 (2015) (describing canons of *noscitur a sociis*, which provides that "a word is known by the company it keeps," and *ejusdem generis*, which provides that "where general words follow specific words in a statutory enumeration, the general words are usually construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words"); *cf. United States v. Scarpa*, 815 F. Supp. 88, 89 (E.D.N.Y. 1993), supplemented (Mar. 5, 1993) (releasing terminally ill defendant "on condition that he be confined to Beekman Hospital under the 24–hour guard of the United States Marshal's Service at his own expense").  At the very least, the defendant does not explain how his elderly parents are equipped to properly supervise him.  Accordingly, the defendant's motion should be denied on this basis alone.

### b.  The BOP Is Capable of Protecting the Health and Safety of Its Inmates

The defendant argues that he should be released due to COVID-19 and the conditions at the MCC.  That argument relies on a number of speculative possibilities regarding the defendant's likelihood of contracting COVID-19, and the purported failure of the MCC to contain COVID-19.  These arguments do not outweigh the substantial risks of danger to the community and of flight that would result from release.  As of April 15, 2020, only five inmates at MCC have tested positive for the virus, and those inmates have been quarantined in isolation.

The BOP generally, and the MCC specifically, is prepared to handle the risks presented by COVID-19.  As Judge Castel and other judges of this Court have recently recognized when addressing similar bail motions, the question is whether BOP is taking appropriate precautions to protect its prisoners, not whether BOP can guarantee a prisoner will not fall ill from the pandemic:

> The question is posed as whether the defendant will be safe in the custody of the U.S. Marshals and the Bureau of Prisons. I'm not sure that that's the question. Even in taking into account the safety issue, the reality is that New York is plagued with an ever-growing number of COVID-19 cases. . . . And so you are not safe if you are out on bail. You are not safe if you are in the MCC. So the question is not are the U.S. Marshal Service and the Bureau of Prisons the guarantors of the safety of this defendant from COVID-19. That's not the standard. The reality is they are not the guarantors, nor is the mayor and Governor of the State of New York or President of the United States the guarantor of the safety of the people on the streets of Manhattan. The Bureau of Prisons and the MCC are taking serious precautions, including the quarantine announced today, to keep people as safe as possible in the environment.

*United States v. Lewis*, No. 20 Cr. 234 (LAP), Apr. 1, 2020 Tr. at 18-19 (S.D.N.Y. Apr. 1, 2020) (Castel, J., sitting in Part I) (denying bail on dangerousness grounds for defendant suffering from

April 15, 2020
Page 6

multiple sclerosis); *see also United States v. Marte*, No. 19 Cr. 795 (SHS) (S.D.N.Y. Apr. 1, 2020) (denying bail application for 42-year old defendant without a "special condition making him substantially vulnerable to COVID-19" because "the pandemic alone, which is affecting the community in its entirety, is not a compelling reason warranting release at this time").

The BOP is meeting its obligations.  It has implemented national measures to mitigate the spread of COVID-19 within prisons.  *See Federal Bureau of Prisons COVID-19 Action Plan*, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp.  Since at least October 2012, BOP has had a Pandemic Influenza Plan in place. *See BOP Health Management Resources*, available at https://www.bop.gov/resources/health_care_mngmt.jsp. [2]  Moreover, beginning approximately two months ago, in January 2020, BOP began to plan specifically for coronavirus/COVID-19 to ensure the health and safety of inmates and BOP personnel.  *See Federal Bureau of Prisons COVID-19 Action Plan*, available at https://www.bop.gov/resources /news/20200313_covid- 19.jsp.  As part of its Phase One response to coronavirus/COVID-19, BOP began to study "where the infection was occurring and best practices to mitigate transmission." *Id*.  In addition, BOP stood up "an agency task force" to study and coordinate its response to coronavirus/COVID-19, including using "subject-matter experts both internal and external to the agency including guidance and directives from the [World Health Organization (WHO)], the [Centers for Disease Control and Prevention (CDC)], the Office of Personnel Management (OPM), the Department of Justice (DOJ) and the Office of the Vice President. BOP's planning is structured using the Incident Command System (ICS) framework." *Id.*

On March 13, 2020, the BOP, in coordination with the Department of Justice and the White House, implemented its Phase Two response "in order to mitigate the spread of COVID-19, acknowledging the United States will have more confirmed cases in the coming weeks and also noting that the population density of prisons creates a risk of infection and transmission for inmates and staff." *Id*.

BOP's national measures are intended to "ensure the continued effective operations of the federal prison system and to ensure that staff remain healthy and available for duty." *Id.*  For example, BOP (a) suspended social visits for 30 days (but increased inmates' access to telephone calls); (b) suspended legal visits for 30 days (with case-by-case accommodations); (c) suspended inmates' movement for 30 days (with case-by-case exceptions, including for medical treatment); (d) suspended official staff travel for 30 days; (e) suspended staff training for 30 days; (f) restricted contractor access to BOP facilities to only those performing essential services, such as medical treatment; (g) suspended volunteer visits for 30 days; (h) suspended tours for 30 days; and (i) generally "implement[ed] nationwide modified operations to maximize social distancing and limit group gatherings in [its] facilities." *Id.*

---

[2] *See also Module 1: Surveillance and Infection Control*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf; *Module 2: Antiviral Medications and Vaccines*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_2.pdf; *Module 3: Health Care Delivery*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_3.pdf; *Module 4: Care for the Deceased*, available at https://www.bop.gov /resources/pdfs/pan_flu_module_4.pdf.

April 15, 2020
Page 7

As part of the BOP's inmate screening process, (i) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms"; (ii) "[a]symptomatic inmates with exposure risk factors are quarantined"; and (iii) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols." *Id.* Additionally, contrary to the defendant's assertions in his letter, staff members and contractors are screened upon entry to BOP facilities, which entails taking each individual's temperature, asking each individual a series of health-related questions, and denying entrance to the institution by anyone that poses a health risk. Inmates exhibiting flu-like symptoms are separated from the general population and tested for COVID-19 in accordance with local health authority protocols.

These and other measures—including the distribution of soap and other hygiene items to inmates within the MCC—were outlined in a March 18, 2020 letter from the BOP to Chief Judge Colleen McMahon in response to questions regarding the MCC's institutional responses to COVID-19, and are updated weekly in the BOP's filings on the publicly accessible website for the Eastern District of New York. Furthermore, with respect to the small number of inmates at MCC who have tested positive for COVID-19—as of April 15, 2020, just five inmates—the Government understands that the facility has taken responsive steps, including appropriately quarantining and cleaning the unit where the inmates resided, moving the inmate out of the unit where he was previously housed, and conducting a medical assessment of all inmates in that unit, which will be repeated regularly to monitor those inmates and identify those who may require medical attention. As detailed above, the MCC's swift action in taking appropriate mitigating measures, further undermine the defendant's claims that the MCC is ill-prepared to manage COVID-19. Indeed, with almost 200,000 cases in the state of New York, and new cases increasing at an exponential rate, the virus appears to be spreading much faster outside the prison walls than inside the MCC.

Subsequent Phases of the BOP's response plan have since been implemented. On April 1, 2020, the BOP announced implementation of Phase 5 of its response protocols, which involves a mandatory 14-day quarantine lockdown of all inmates across the BOP system.[3]

### c. The Defendant's Health Conditions Do Not Support His Release

Beyond his general argument that incarceration at the MCC poses a higher risk of contracting COVID-19, the defendant argues that he in particular should be released because he has diabetes. His specific medical conditions do not rise to the level of an exceptional reason for bail, on a temporary basis or otherwise. *Id.* § 3145(c). Courts have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where otherwise detention would be warranted. *United States v. Wages*, 271 F. App'x 726, 728 (10th Cir. 2008)

First, as discussed above, the BOP has instituted numerous measures to help guard against the risks posed by COVID-19. Notwithstanding the measures described above, the MCC will not be completely immune to a virus that is projected to infect 40 to 80 percent of the overall

---

[3]   *See* https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp.

April 15, 2020
Page 8

population of the United States.[4]  To date, the Government is aware of five confirmed cases of COVID-19 among MCC inmates; it is possible that there will be additional cases in the coming weeks and months.  However, given the measures that the BOP has implemented and the inherently isolated, controlled nature of the prison environment, there is no reason to believe that the defendant is at materially greater risk from COVID-19 at the MCC than he would be if released.  Thus, while undoubtedly the defendant is at risk of infection at the MCC, that would clearly also be the case upon his release, and even if it could be determined with any degree of certainty that he was marginally *more* at risk at the MCC, that marginal difference in risk would not warrant release.

Furthermore, although the defendant identifies diabetes as a medical condition he suffers from, he does not provide information as to the severity of that condition and the treatment he is receiving.  Diabetes is unfortunately widespread, with approximately 34 million Americans suffering from diabetes.[5] The risk posed to the defendant turns on the severity of the defendant's conditions, which he does not describe.  Several judges in this District have already denied bail applications where the defendant identified diabetes as a risk factor for complications from COVID-19.  *See United States v. Ramirez*, No. 19 Cr. 395 (S.D.N.Y. April 1, 2020) (Castel, J.) (defendant in his 50s with diabetes); *United States v. Pichardo*, No. 19 Cr. 271 (S.D.N.Y. April 7, 2020) (Seibel, J.) (defendant in his 30s with diabetes); *United States v. Brown*, No. 19 Cr. 792 (S.D.N.Y. April 6, 2020) (Swain, J.), Dkt. 20 (defendant in late 40s with hypertension, diabetes, asthma, and enlarged prostate).

Beyond diabetes, the defendant points to a recent incident where he complained of pain in his leg.  Dkt. No. 17 at 16.  After this alleged incident, the defendant's vitals signs, temperature, and blood pressure were all within normal limits.  This does not tip the scale, particularly where this defendant has a history of fabricating illness.   The Government's evidence will show that the defendant falsely accused several individuals of poisoning him throughout the time period relevant to the Indictment.  Medical records produced in discovery show that the defendant went to the hospital in 2014 complaining of being poisoned;

As the defendant acknowledges, he sought a blanket medical order at the February 26, 2020 conference, which the Court denied.  When pressed for more details about the defendant's medical conditions, defense counsel ultimately identified diabetes as the defendant's sole medical condition for which he needed medical attention.  That is consistent with the information provided by the defendant at the time of arrest.  As reflected in a law enforcement report produced to defense counsel, on the date of the defendant's arrest, law enforcement agents asked the defendant several times if he required any daily or immediate medical attention, to which

---

[4]   *See* Transcript of March 22, 2020 Remarks of Governor Andrew Cuomo, https://www.governor.ny.gov/news/video-audio-photos-rush-transcript-governor-cuomo-calls-covid-19-pandemic-challenge-generation.

[5]   *See* https://www.cdc.gov/diabetes/library/features/diabetes-stat-report.html.

April 15, 2020
Page 9

he responded "no" several times.  He also did not identify any prescription medications that would be relevant to the analysis here.

By pointing out the generalized nature of the defendant's claims regarding his health and COVID-19, the Government in no way intends to trivialize diabetes.  But whether temporary release is warranted for a particular defendant for health reasons requires a showing that the defendant's actual, existing health issues cannot adequately be addressed absent release.  The defendant has not made such a showing.  There is not enough information in the submission to conclude that the proposed residence would be appreciably safer than the MCC.  The social distancing and quarantine measures, if any, that the defendant's parents are taking is not clear.  And if anything, the defendant poses a potential risk of exposure to his parents, who are substantially older and likely at even greater risk for complications from COVID-19.

Even if it were the case—though it is not—that a generalized risk of exposure to COVID-19 and the defendants health conditions presented "compelling reasons" for temporary release, that would not mandate release.  Section 3142(i) provides that the court "may" authorize temporary release, not that it must.  In making that discretionary determination, the court must "balance the reasons advanced for such release against the risks that were previously identified and resulted in an order of detention." *Chambers*, 2020 WL 1530746, at *1.  Here, that balance emphatically favors detention, in light of the danger to the community that would be presented by the defendant's release, as well as the defendant's risk of flight.

The defendant describes Judge Nathan as "pioneering" the release of detained defendants based on COVID-19, but her March 19, 2020 decision in *United States v. Stephens*, No. 15 Cr. 95-51 (AJN), Dkt. No. 2798, was premised on a combination of factors not present in this case, including the need to facilitate the defendant's preparation with defense counsel for an imminent hearing, and the fact that the primary evidence the Government relied upon to establish that the defendant had possessed a firearm and posed a danger to the community was "undermined by new information not available to either party at the time of the [earlier detention] hearing." *Id*. at 2.  In fact, Judge Nathan's order expressly avoided reaching the primary ground on which this defendant seeks temporary release—that is, the conditions in the relevant prison facility.  Judge Nathan made no ruling whatsoever as to whether temporary release was warranted because of "the current public health crisis itself." *Stephens* at 6 n.3; *see also id*. ("The Court need not decide this additional factor here because its determination that release is necessary for the preparation of the Defendant's defense is sufficient under § 3142(i).").  Neither of the factors on which Judge Nathan based her ruling is present here.  No new facts are alleged, and there is no imminent hearing or trial.[6]

_____

[6] The defendant also cites Magistrate Judge James Orenstein's March 12, 2020 denial of a motion to detain a defendant in *United States v. Raihan*, No. 20 Cr. 68 (E.D.N.Y.), but that case is also not on point.  The court's ruling was based, in part, on a finding that remanding that defendant—who had previously been out on bail—into federal detention would potentially pose a danger to other inmates and the staff.  (*See id*. Mar. 12, 2020 Tr. (Dkt. No. 20) at 10, 12).  The defendant in this case has been in custody since his arrest in mid-February and his continued incarceration at the MCC therefore poses no risk to the MCC community.  In any event, the *Raihan* case is a clear demonstration of the risks posed by granting release to defendants who otherwise should be

April 15, 2020
Page 10

Rather, with some exceptions based on circumstances not present here, the judges of this District have been rejecting applications for release based on assertions about the hypothetical risks of COVID-19, including in cases involving defendants with underlying health conditions like diabetes, asthma, or worse. *See, e.g.*, *United States v. Matias*, No. 20 Cr. 40 (LTS) (S.D.N.Y. Apr. 9, 2020) (Swain, J.) (denying bail application based on COVID-19 of MCC inmate charged with narcotics trafficking and Section 924(c) offenses, finding defendant had failed to rebut presumption that he posed a danger to the community and that COVID-19 did not support temporary release under Section 3142(i)); *United States v. Fernandez-Rodriguez*, No. 20 Cr. 43 (GBD) (S.D.N.Y. Apr. 8, 2020) (Daniels, J.) (denying pretrial bail for MCC inmate with asthma); *United States v. Dixon*, No. 20 Cr. 88 (DLC), Dkt. No. 17 (S.D.N.Y. Apr. 7, 2020) (Cote, J.) (denying bail application by inmate at MDC with asthma); *United States v. Tiffany Days*, No. 19 Cr. 619 (CM) (S.D.N.Y. Apr. 7, 2020) (McMahon, C.J.) (denying bail application of inmate with asthma charged with narcotics trafficking); *United States v. Edwin Alamo, Jr.*, No. 19 Cr. 640 (RMB) (S.D.N.Y. Apr. 7, 2020) (Berman, J.) (denying MCC inmate's bail application based on COVID-19); *United States v. Irizarry*, No. 19 Cr. 913 (SHS) (S.D.N.Y. Apr. 3, 2020) (Stein, J.) (denying pretrial bail for MCC inmate with asthma in light of dangerousness of alleged drug and firearms offenses and history of failure to appear in court); *United States v. Velez*, No. 19 Cr. 862 (VEC) (S.D.N.Y. Apr. 2, 2020) (Caproni, J.) (denying pretrial bail for gang member who suffered pancreatitis and respiratory issues); *United States v. Lewis*, No. 20 Cr. 234 (LAP) (S.D.N.Y. Apr. 1, 2020) (Castel, J., sitting in Part I) (denying bail application by inmate with multiple sclerosis in light of serious risk of danger to the community posed by alleged drug trafficking conduct and prior drug trafficking conviction); *United States v. Irizarry*, No. 19 Cr. 913 (SHS) (S.D.N.Y. Apr. 3, 2020) (Stein, J.) (denying bail application by inmate at MCC with asthma in light of dangerousness of alleged drug and firearms offenses and history of failure to appear in court); *United States v. Conley*, No. 19 Cr. 131 (S.D.N.Y. Mar. 31, 2020) (Engelmayer, J.) (denying bail application by inmate at MCC on high-risk list with asthma, partial lung removal, diabetes, high blood pressure, and hypertension in light of serious risk of danger to community); *United States v. Chambers*, No. 20 Cr. 135 (S.D.N.Y. Mar. 31, 2020) (Furman, J.) (denying bail application by inmate with asthma in light of serious risk of danger to the community); *United States v. Wade*, 19 Cr. 875 (S.D.N.Y. Mar. 27, 2020), Dkt. No. 32 (Swain, J.) (denying bail application for inmate detained in MCC who suffers from asthma and finding that the defendant "clearly presents a danger to the public that is neither negated nor overcome by the COVID-19 risk"); *United States v. Ayala*, 19 Cr. 403 (S.D.N.Y. Mar. 27, 2020) (Pauley, J.) (denying bail application for inmate at MDC on high-risk list with asthma and HIV in light of serious danger to community); *United States v. Bradley*, No. 19 Cr. 632 (S.D.N.Y. Mar. 25, 2020) (Daniels, J.) (denying bail application by inmate detained in MCC on controlled substances and firearm charges who had recently experienced a stroke and had high blood pressure); *United States v. Rivera*, No. 20 Cr. 6 (S.D.N.Y. Mar. 25, 2020) (Rakoff, J.) (denying bail application by inmate detained in MCC on controlled substance charge who had a childhood history of asthma); *United States v. White*, No. 19 Cr. 536 (S.D.N.Y. Mar. 25, 2020) (Castel, J.) (denying bail application by inmate detained at Valhalla on controlled substance and Hobbs Act charges with history of whooping cough); *United States v. Alvarez*, No. 19 Cr. 622 (S.D.N.Y. Mar. 24, 2020) (Cote, J.), Dkt. No. 17 (denying bail application

---

detained: Raihan immediately cut off his ankle bracelet, was re-apprehended, and was ordered remanded the next day. (*See id.* Dkt. Nos. 21, 22).

April 15, 2020
Page 11

by inmate detained in MCC on controlled substances charges who had been diagnosed with Hepatitis B); *United States v. Acosta*, No. 19 Cr. 848 (S.D.N.Y. Mar. 25, 2020), Dkt. No. 14 (Buchwald, J.) (denying bail application by inmate detained in MCC that "reli[ed] mainly on a form letter proffering general reasons to release inmates because of the spread of the COVID-19 virus).

These decisions strongly support similarly rejecting the bail application of the defendant in this case.

### d. **The Sixth Amendment Does Not Require Release**

The defendant's final argument, that the Sixth Amendment "demands" the defendant's release, Dkt. No. 17 at 14, is similarly meritless whether treated as a standalone claim (which would be procedurally improper),[7] or as part of the bail analysis.

Construed as an argument under Section 3142(i), the defendant's argument fails. The measures taken to date by BOP are constitutionally sound in light of the threat to institutional security posed by COVID-19. In *Bell v. Wolfish*, 441 U.S. 520, 547 (1979), the Supreme Court noted that "even when an institutional restriction infringes a specific constitutional guarantee . . . the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." Here, the institutional restrictions must be balanced against the need to safeguard institutional security and protect the defendant and other inmates from exposure to COVID-19. The measures taken to date by the MCC are neither arbitrary nor unreasonable viewed against the threat to institutional security posed by COVID-19. They are also precisely the type of measures MCC must take in such circumstances. The Supreme Court directly recognized that those administering prison facilities must be unconstrained in their ability

---

[7] To the extent the defendant is claiming that his conditions of confinement violate the Sixth Amendment, he must challenge those conditions through a petition for a writ of habeas corpus under 28 U.S.C. § 2241. Such a petition carries, among other things, an administrative exhaustion requirement. *Carmona v. U.S. Bureau of Prisons*, 243 F.3d 629, 634 (2d Cir. 2001); *accord Atkinson v. Linaweaver*, No. 13 Civ. 2790 (JMF), 2013 WL 5477576, at *1 (S.D.N.Y. Oct. 2, 2013). The exhaustion requirement serves a number of interests, including (1) permitting those with expertise in prison administration to attempt to resolve issues in the first instance, and (2) developing a record that permits meaningful review in those instances where judicial involvement is ultimately required. *See Beharry v. Ashcroft*, 329 F.3d 51, 62 (2d Cir. 2003) (the exhaustion requirement "protect[s] the authority of administrative agencies, limit[s] interference in agency affairs, develop[s] the factual record to make judicial review more efficient, and resolv[es] issues to render judicial review unnecessary."). Failure to exhaust "constitutes a procedural default that bars judicial review unless the petitioner makes a showing of cause and prejudice." *Atkinson*, 2013 WL 5477576, at *1 (citing *Carmona*, 243 F.3d at 634). This failure may be excused for cause "when such exhaustion would be futile or where the agency has predetermined the issue before it." *Garcia v. Shanahan*, 615 F. Supp. 2d 175, 180 (S.D.N.Y. 2009) (internal quotation marks omitted). In this case, the defendant has not exhausted any potential administrative remedies, which alone would require denial of the motion to the extent it is based on alleged constitutional violations, rather than the statutory provisions governing bail.

April 15, 2020
Page 12

to reasonably assure the well-being of those in their charge: "[p]rison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel." *Id.* The Supreme Court has noted that, "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Id.* at 827. Nothing in MCC's response to date to the COVID-19 outbreak can be described as exaggerated; the approach is proportional to the potential risk presented and in accord with the guidance broadly promulgated not only by the federal government, but also by state and local governments around the United States. Despite the new restrictions, the defendant still has access to counsel. Although in-person legal visits are momentarily halted, the MCC is permitting legal calls between client and counsel. While visual observation of such calls is maintained by MCC staff from a distance for security purposes, calls are not overheard or otherwise monitored. Client and counsel can also communicate via email and on regular phone lines, although those communications are not private. The defendant can therefore remain in contact with his attorneys.

The defendant's argument is particularly unpersuasive given the posture of this case. The availability of calls and emails are a suitable alternative where, as here, no trial date or briefing schedule has been set. *See generally Pell v. Procunier*, 417 U.S. 817, 826 (1974)) ("So long as reasonable and effective means of communication remain open and no discrimination in terms of content is involved, we believe that, in drawing such lines, 'prison officials must be accorded latitude.'" (quoting *Cruz v. Beto*, 405 U.S. 319, 321 (1972)). Importantly here, the search warrants that may form the basis for any potential motions are not marked "sensitive" under the protective order and the defendant's access to them is therefore not restricted to in-person visits from his attorneys. The same health risks that have stopped the defendant's legal visits have also stopped all jury trials in this District. Thus before any trial can occur, the COVID-19 crisis will have to subside and the defendant's attorneys will be able to visit him again. Given the medical community's near-universally accepted mandate that in-person meetings should be avoided for everyone, the defendant's access to his attorneys would be limited to phone calls and emails anyway, and his ability to review sensitive discovery with his attorneys similarly limited even if he were released. *United States v. Tolentino*, 20 Cr. 7 (DLC) Dkt. 17 at 4 (S.D.N.Y. April 14, 2020) (denying defendant's Sixth Amendment claim, and observing that "[g]iven the current guidance on social distancing, it is unlikely that counsel would be conducting in-person meetings with the defendant in any event."). To the extent defense counsel is having difficulty scheduling such calls, it has yet to address those concerns directly with the Government, which would be prepared to raise those concerns with the MCC.

The defendant relies on two cases that are readily distinguishable from this one, where the defendants were released in part because of imminent trial dates. In *United States v. Hudson*, 19 Cr. 196 (CM), Chief Judge McMahon bailed an inmate for sixty days, in part to facilitate his preparation for an upcoming "firm" trial date, which was originally scheduled for April 2020, and which was adjourned in response to COVID-19. In so ruling, the court did not rely exclusively on health concerns, the defendant's susceptibility to COVID-19, or the BOP's response to COVID-19. The Court's focus was ensuring that the defendant was adequately prepared for his impending

April 15, 2020
Page 13

trial.[8]  This is best illustrated by Chief Judge McMahon's ruling that same day during a separate bail hearing, during which the court remanded a defendant for violating the terms of his pretrial release, rejecting defense counsel's arguments that remand posed a risk to the defendant due to the COVID-19 pandemic.  *See United States v. Miguel Nivar*, 19 Cr. 902 (AT) (McMahon, C.J., sitting in Part I).  Similarly, in *United States v. Chandler*, 19 Cr. 867 (S.D.N.Y. March 31, 2020) (PAC) Dkt. No. 19, the defendant was released based on his individual circumstances, which included an impending May 11, 2020 trial date and recently disclosed *Brady* material that the defense claimed "'directly undercut[s] the prosecution's theory of the case and provide[s] evidence that Mr. Chandler did not possess a firearm'—the single criminal count with which the Defendant is charged."  *Id.* at 2.  Judge Crotty emphasized that his Order "pertains to Chandler's particular circumstances and 'should not be construed as a determination by this Court that pretrial detention is unsafe or otherwise inappropriate as a general matter or in any other specific case.'"  *Id.* at 4.

In cases like this one, where there is no imminent trial or hearing scheduled, judges of this District have similarly rejected bail applications raising access to counsel concerns.  *See, e.g.*, *United States v. Gumora*, No. 20 Cr. 144 (VSB), Dkt. 30 at 8-10 (S.D.N.Y. April 14, 2020) (collecting cases); *United States v. Liverman* 19 Cr. 761 (JPO), Dkt. No. 99 (S.D.N.Y. Apr. 13, 2020) (denying defendant's bail application on Sixth Amendment grounds and noting that BOP's limitation on access to in-personal legal visits is reasonable in light of COVID-19 concerns); *United States v. Guzman*, No. 20 CR. 56 (PAC), 2020 WL 1700253, at *2 (S.D.N.Y. Apr. 8, 2020) ("To accept the defendant's generalizations about impediments to access to counsel and argument that release is necessary, especially in a case where no trial, hearing, or briefing schedule has been set yet, would 'logically result in the wholesale release of pretrial inmates. The Court does not accept the proposition that such a result is either better for the inmate or for society more broadly.'" (quoting *United States v. Rudy Acosta*, 19 Cr. 848 (NRB), Dkt. No. 14 (S.D.N.Y. Mar. 25, 2020))); *United State v. Eley*, 20 Cr. 78-3 (AT), 2020 WL 1689773, at *1 (S.D.N.Y. Apr. 7, 2020) ("Defendant's request for release is not compelled under the Sixth Amendment; with trial scheduled for nine months from now, this case is distinguishable from other instances in which an imminent evidentiary hearing may support a defendant's temporary release."); *United States v. Pena*, No. 18 Cr. 640 (RA), 2020 WL 1674007, at *1 (S.D.N.Y. Apr. 6, 2020) (rejecting claim of Sixth Amendment violation and observing that defendant "retains his right to speak to his counsel by phone, which is a suitable alternative at this time in light of the generally-accepted nationwide mandate against in-person meetings"); *United States v. Landji*, No. S1 18 CR. 601 (PGG), 2020 WL 1674070, at *6 (S.D.N.Y. Apr. 5, 2020) (rejecting claim of violation of defendant's Sixth Amendment rights and declining to find that BOP's decision to suspend all legal visits for 30 days is unreasonable in light of the global pandemic and the threat it poses to inmates, residents of New York City, and the nation at large"); *United States v. Chambers*, 20 Cr. 135 (JMF), Dkt. No. 70 (S.D.N.Y. March 31, 2020); *United States v. Rosario*, 19 Cr. 807 (LAP), Dkt. No. 22 (S.D.N.Y. March 27, 2020); *United States v. Belardo*, 20 Cr.126 (LTS) (S.D.N.Y. Apr. 7, 2020); *United States v. Conley*, No. 19-CR-131 (PAE), Dkt. No. 366 (S.D.N.Y. Mar. 31, 2020); *United States v. Brown*, 19 Cr. 792 (LTS), Dkt. No. 20 (S.D.N.Y. April 6, 2020) (Swain, J.).

---

[8] The court noted that the defendant's trial had been previously delayed, and Speedy Trial time excluded, over the defendant's objection prior to the adjournment of trial, further underscoring the court's rationale for bailing the defendant.

April 15, 2020
Page 14

As in these cases, the defendant is "far too great a danger to the community to justify his release." *Chambers*, 20 Cr. 135 (JMF), Dkt. No. 70 (quoting *United States v. Conley*, No. 19-CR-131 (PAE), Dkt. No. 366, at 2 (Mar. 31, 2020)).  As Judge Cote recently observed, any complaints about ability to prepare a defense can be addressed by "ensur[ing] that the defendant is provided adequate time to participate in the preparation of his defense," and not by the release of a defendant where no set of conditions can assure the safety of the community.  *United States v. Tolentino*, 20 Cr. 7 (DLC) Dkt. 17 at 4 (S.D.N.Y. April 14, 2020).  Affording the defendant adequate time to review discovery can and should be considered when setting a trial date in this case, but it is not a proper basis for bail.

## C.  Conclusion

For the foregoing reasons, the Government respectfully requests the Court deny the defendant's request for bail.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:    /s/ Danielle R. Sassoon_____
Danielle R. Sassoon
Assistant United States Attorney
(212) 637-1115