k5t2RayC kjc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                          20 Cr. 110 (LJL)

5   LAWRENCE RAY,

6              Defendant.

7   ------------------------------x       Teleconference

8                                         May 29, 2020
                                          12:05 p.m.
9

10  Before:

11                  HON. LEWIS J. LIMAN,

12                                         District Judge

13

14                      APPEARANCES

15
    GEOFFREY S. BERMAN
16       United States Attorney for the
         Southern District of New York
17  BY:  DANIELLE R. SASSOON
         MARY ELIZABETH BRACEWELL
18       LINDSEY KEENAN
         Assistant United States Attorneys
19

20  FEDERAL DEFENDERS OF NEW YORK
         Attorneys for Defendant
21  BY: MARNE L. LENOX
        PEGGY CROSS-GOLDENBERG
22

23  ALSO PRESENT:

24  SPECIAL AGENT KELLY MAGUIRE, FBI

25

k5t2RayC kjc

1          THE COURT:  Good afternoon.  This is Judge Liman.

2    Apologies for being late for the call.  Earlier AT&T wanted to

3    put me on listen-only mode.  I didn't think that was quite

4    appropriate.

5          Who do I have on for the government?  Ms. Sassoon?

6          MS. SASSOON:  Yes.  Good afternoon, your Honor.  This

7    is Danielle Sassoon for the United States, and I am joined by

8    Mollie Bracewell and Lindsey Keenan for the United States, as

9    well as Special Agent Kelly Maguire of the F.B.I.

10          THE COURT:  Good afternoon.

11          And who do I have on for the Federal Defenders?

12          MS. LENOX:  Your Honor, good morning.  For the Federal

13    Defenders, Marne Lenox, and I am joined by my colleague Peggy

14    Cross-Goldenberg, on behalf of Lawrence Ray.

15          THE COURT:  Good afternoon, Ms. Lenox and

16    Ms. Cross-Goldenberg.

17          And is Mr. Ray on the phone?

18          THE DEFENDANT:  Yes, your Honor.

19          THE COURT:  Thank you.  Good afternoon, Mr. Ray.

20          THE DEFENDANT:  Good afternoon, your Honor.

21          THE COURT:  So before we get started and I turn it

22    over to the government to give me an update, I just wanted to

23    confirm on the record that all parties consent to this

24    proceeding taking place by telephone and that they know that I

25    am conducting the proceeding by telephone from outside of the

k5t2RayC kjc

1  district.

2          Ms. Sassoon, do you consent and do you know of any

3  reason why this proceeding can't go forward as I have

4  indicated?

5          MS. SASSOON:  Your Honor, the government consents and

6  does not know of a reason that we cannot proceed in this

7  fashion.

8          THE COURT:  Okay.

9          And, Ms. Lenox, do you and your client consent?

10          MS. LENOX:  Yes, your Honor.

11          THE COURT:  Mr. Ray, do you consent?

12          THE DEFENDANT:  Yes, your Honor.

13          THE COURT:  Thank you.

14          So, Ms. Sassoon, let me turn it over to you.  I have

15  got the government's -- the letter from the parties but that

16  was on the government's letterhead and submitted by the

17  government of May 22.  It would be helpful for me to get an

18  update on where we stand with respect to discovery and any

19  other issues.

20          MS. SASSOON:  Yes, your Honor.

21          As set forth in the letter, but just to recap since

22  our last conference, we had a massive discovery production, our

23  sixth production, that went out last week that had ten

24  terabytes of data from the premises search as well as all of

25  the scanned documents from the premises search and some other

k5t2RayC kjc

1    miscellaneous items.  I apologize.  I mean to say twelve

2    terabytes of data.

3           There was an additional two terabytes of data that

4    wouldn't fit on the drive we had from defense counsel.  We

5    requested an additional drive.  That was provided to us just

6    recently, within the past couple of days, and so now that we

7    received the drive, we are loading that remaining data that is

8    ready to be produced.

9           In addition --

10          THE COURT:  Ms. Sassoon, how long will it take for the

11   agents to download the remaining two terabytes of data and

12   provide that to Ms. Lenox and defense counsel?

13          MS. SASSOON:  They will get that drive next week.  The

14   issue is, we notified them last week of the need for a drive.

15   We didn't get the drive until the middle of this week.  Someone

16   from our office then needs to pick it up, provide it to the

17   F.B.I.  The people who load the data at the F.B.I. on to these

18   drives are not working five days a week in the office, and so

19   we now have to wait until next week for somebody to be present

20   in the office to load the drive, and then it will be ready and

21   sent out.

22          THE COURT:  Okay.

23          MS. SASSOON:  So that nearly completes discovery.

24   What is left are the phones that I have mentioned at a prior

25   conference, the additional phones seized in the premises

k5t2RayC kjc

1    search, not the primary phone belonging to the defendant, but

2    an additional bulk of phones that he had stored in his

3    residence.  My understanding of what those phones are, they are

4    primarily phones that he seized from his victims.

5         And so the process of extracting those phones is still

6    ongoing.  We are prepared to produce several of them already.

7    Three phones, the extraction is already complete.  One phone

8    has been determined to be not viable for extraction, so that

9    will not be produced.  Two phones are currently in the F.B.I.'s

10   brute force process, and what that means is the phones couldn't

11   be readily opened, so they are attached now to an

12   encryption-breaking software, and that process of breaking into

13   the phones could take weeks, it could take months, or we might

14   end up never getting into them in advance of trial and so they

15   won't be produced in that event.

16        Beyond that, there are four iPods that remain to be

17   extracted, and those extractions will be small, and then there

18   are ten additional phones that still have to be extracted and

19   for which we still don't know.  Some of those might not be

20   viable, and some of those might require brute force to enter.

21        I want to emphasize, first of all, that the size of

22   these phone extractions is very small compared to the discovery

23   that's been produced.  My understanding from F.B.I. is that we

24   are talking in gigabytes and not terabytes, and so this will be

25   a small supplemental production on top of what's already been

k5t2RayC kjc

1    produced.  We will be producing these phones on an ongoing,

2    rolling basis as they are extracted.  We are working as quickly

3    as we possibly can under the existing constraints, and the

4    reason why this is taking some time is that it is a product of

5    the speed of the machine, the encryption levels on the phone,

6    and access to the in-office software that's required to do

7    this, again, because there is not a full-time staff currently

8    working at the F.B.I. in this department.

9            So that's all that remains other than potentially

10   other documents that come in in response to subpoenas that are

11   still outstanding.  But beyond that, discovery is complete.

12   And, in addition, we have produced the nonsensitive discovery

13   to --

14           THE COURT:  Let me, before you discuss the

15   nonsensitive discovery, because I am interested in that, let me

16   ask you a question about the cell phones and the iPods.

17           In the government's letter, the government stated that

18   the extraction took slightly longer than expected, but you

19   indicated that the F.B.I. anticipated completing the extraction

20   of the phones early next week.  That was a letter of May 22,

21   last Friday.  It's obvious that that was overly optimistic.

22   What has happened between last Friday and today that leads to

23   the revision, just so I understand?

24           MS. SASSOON:  Yes, your Honor.

25           I think that primarily boils down to just

k5t2RayC kjc

miscommunication between us, the F.B.I., and within the F.B.I.
there are the case agents and then the ones working in the lab
on the phones, and we just had a mistaken impression that we
could commit to speed, given that some of these phones are
taking a very long time to get into, and we were under a
mistaken impression that more phones had been completed.  And I
apologize for that overly optimistic assessment.

          THE COURT:  Do you have an estimate with respect to
all of the -- the remaining devices, except for those that
require brute force?  I am going to put the brute force to the
side, because I understand that that presents special issues.
But for the remaining devices, what is your best estimate
today?

          MS. SASSOON:  Yes.  The challenge is that there are
ten remaining phones, and I don't know which of those ten
phones will require the brute-force process.  For those that
don't, I think it is safe to say that those phones will only
take a matter of weeks and not much longer than that.  And
again, we are applying as much pressure as we possibly can.  I
know that this is an absolute priority to the F.B.I.  The
discovery deadline would have been tight to begin with, absent
coronavirus, and with the virus obviously created additional
hurdles, but we are applying as much pressure as we can to get
this done is the best that I can say.

          THE COURT:  "Weeks" is very general, and I understand

k5t2RayC kjc

1    that you --

2                    MS. SASSOON:  Right.

3                    THE COURT:  -- may not be able to do better than

4    something that is very general, but when you say "weeks," and

5    not "months," are you saying that it is going to be less than

6    two months or is there anything more specific you could give

7    me?

8                    MS. SASSOON:  I would be surprised if -- for the

9    phones that don't require brute force, I would be surprised if

10   it took more than two months, and I'm very optimistic that the

11   remaining phones that don't require brute force will take less

12   than two months.

13                   THE COURT:  All right.  You were going to talk about

14   providing the nonsensitive discovery to the defendant at the

15   MCC.  Where do you stand with respect to that?

16                   MS. SASSOON:  Yes.  So a hard drive that has all of

17   the nonsensitive discovery produced to date across all of the

18   productions has been provided to the prison, and we have also

19   arranged for the defendant to have access to that hard drive as

20   set forth in our letter, even though the law library is not

21   operating right now.

22                   In addition, we sent hard copies of some nonsensitive

23   discovery to the defendant as well.

24                   On top of that, it seems that the prison is developing

25   better systems for videoconferencing with defense counsel and

k5t2RayC kjc

1    that we are moving in a positive direction on ability to review

2    discovery, have access to counsel, and discuss strategy.  And

3    so all of that is a positive note.

4                THE COURT:  The letter that you sent reflects that the

5    BOP has informed you that defendants are now being given access

6    to 30-minute video conferences with defense counsel, and that

7    that provides some ability to review sensitive discovery until

8    weekly visits resume.  This may be a question better directed

9    to Ms. Lenox, but do you have any further information about the

10   ability of the defendant to review the sensitive material with

11   counsel?

12               MS. SASSOON:  Yes, your Honor.

13               MS. LENOX:  Your Honor --

14               THE COURT:  I'll ask you, Ms. Lenox, in a moment, but

15   let me just direct myself to Ms. Sassoon and then -- and I have

16   got one or two more questions for Ms. Sassoon, and then I will

17   turn to the defendant.

18               MS. SASSOON:  So as reflected in the letter -- this is

19   Danielle Sassoon speaking -- it's my understanding in talking

20   to defense counsel and the MCC that there will be no in person

21   legal visits until at least June 30, 2020.  Until that happens,

22   the ability to review sensitive discovery is going to be

23   limited to these videoconferences or to regular phone calls

24   discussing the content of that discovery.  I'm not aware of any

25   measures beyond that.

k5t2RayC kjc

1          THE COURT:  And the last question that I have got for

2     you relates to my request that you share with defense counsel

3     what you would anticipate presenting at trial and material that

4     you believe would be exculpatory.  I want to confirm that you

5     believe that you have now produced all of the *Brady* material

6     that would be required to be produced except for what might be

7     in the devices to which you have not had access.

8          MS. SASSOON:  Yes.  We have produced *Brady* material in

9     two different ways, both in the discovery production and we

10    have also -- and disclosure letters to defense counsel,

11    highlighting a couple of things that were not in discovery, and

12    we have also provided redacted copies of 302 F.B.I. reports

13    that contained information that could be construed as

14    exculpatory.  And so the government's position is that we are

15    in compliance with our *Brady* obligation.

16         THE COURT:  Is it correct, Ms. Sassoon, that you have

17    also made a commitment, the way you have put it is, to produce

18    a preliminary exhibit list several weeks in advance of trial.

19    The way I read "several weeks" is as "three," but you will

20    correct me.  What is the government's commitment with respect

21    to preliminary exhibit lists?

22         MS. SASSOON:  Yes, your Honor.  We are prepared to

23    commit to producing a preliminary exhibit list three weeks in

24    advance of trial subject to being able to supplement that

25    exhibit list as we continue to prepare for trial up until

k5t2RayC kjc

1    trial.

2           THE COURT:  Understood.

3           All right.  Let me now turn, Ms. Lenox, to you, to get

4    whatever you want to tell me about the state of the case.

5           Actually, before I do that, let me ask Ms. Sassoon

6    whether there is anything else that I should be aware of?  I'm

7    not going to address right now the question of a trial date --

8    I will move to that in a moment -- or the indication in your

9    letter that defense counsel does not consider the assurances

10   that you just provided to be adequate.  But aside from those,

11   is there anything else I should know about from you in the

12   case?

13          MS. SASSOON:  Yes.  I will just add that, in terms of

14   our assurances, we are also in the process of responsiveness

15   review.  As I indicated to defense counsel, we completed a

16   responsiveness review of the iCloud accounts, the phone

17   belonging to the defendant, and are nearly complete on the

18   e-mail responsiveness review, and all of that will be produced

19   to defense counsel within the next couple of weeks.  We are

20   also undertaking a responsiveness review of the twelve

21   terabytes of data that was extracted, and that is going to take

22   more time but will likely be complete within two to three

23   months.

24          THE COURT:  Can you explain to me -- I have got a

25   guess as to what you mean by a responsiveness review, but I

k5t2RayC kjc

1    would rather not guess.  What is it, and what are the

2    parameters?

3              MS. SASSOON:  Yes, your Honor.

4              So the responsiveness review basically means with

5    respect to the search warrants of electronic evidence, the

6    search warrants authorize us, for example, with the iCloud, to

7    receive from the provider the entire iCloud account over a

8    particular time period.  But when we extract an electronic

9    device, it makes a forensic image of the entire phone.  But we

10   are only permitted to then keep and use for trial the data

11   that's actually responsive to the specified list of the search

12   warrant of the things that we can seize from these devices and

13   keep, and that's generally what constitutes evidence of the

14   subject offenses or evidence that indicates that a phone or an

15   account belongs to the defendant, and so we are limited to keep

16   doing a responsiveness review that allows us to keep the

17   particular items that the search warrant authorizes us to keep.

18   And so this narrows down the universe of e-mails or the

19   universe of material from the iCloud from the entire account.

20             And with respect to the defendant's accounts, we

21   produced to him, as an initial matter, the entirety of his own

22   account.  We will now be producing to him this more limited

23   universe of what we deem responsive to the search warrant.

24             With respect to the iCloud account, that does narrow

25   it down significantly to videos and photographs that we think

k5t2RayC kjc

1    are potential evidence for the trial and that is evidence of

2    the subject offenses.

3            I wanted to be clear with the court that with the

4    e-mails, for example, it is still going to be a very large

5    universe of material.  So the responsiveness review is not

6    going to result in a set of 200 e-mails for the defense to

7    review in preparation for trial.  It is still going to involve

8    thousands of e-mails because, in the government's view, for

9    example, any e-mail sent between the defendant and one of his

10   victims is responsive because some of those e-mails are

11   extremely salient and might actually be exhibits at trial, and

12   some of them are proof of association or the relationship or

13   the history of the relationship, and even if we might not use

14   every one of them at trial, they are still proof of the

15   subject offenses and subject to seizure under the search

16   warrants.

17           So I just didn't want the court to have a

18   misimpression of the responsiveness review substantially

19   narrowing down the e-mails to a very small universe that are

20   easily digestible for the defense counsel.  It is still going

21   to be a large volume of documents that they obviously are

22   capable of searching in the same way that we are capable of

23   searching.

24           THE COURT:  And can you give me the time table again

25   with respect to the responsiveness review?  You mentioned it,

k5t2RayC kjc

1    but I want to make sure I get it right.

2              MS. SASSOON:  For the e-mails, the iCloud, and his

3    primary phone that's going to be produced, if we get the

4    necessary hard drives, within the next few weeks.

5              With respect to the twelve terabytes of data, given

6    that that was only recently extracted and we only recently

7    gained access to it and we have been focused on producing all

8    of the discovery, that responsiveness review is going to take

9    more time, and I would estimate that that's going to take about

10   three months.

11             THE COURT:  Thank you.

12             All right, Ms. Lenox, I will now hear from you with

13   respect to the status of the case and the status of discovery

14   and anything else that I should address or be aware of.

15             MS. LENOX:  Thank you, your Honor.  So I want to begin

16   by -- this is Marne Lenox.

17             I want to begin by discussing the government's

18   proposal that the sensitive material in this case can be

19   reviewed effectively with Mr. Ray over videoconferencing

20   capability at the MCC.  We have, over the past several weeks,

21   engaged in videoconferences with Mr. Ray that last

22   approximately a half an hour each time.  We are able to do this

23   about once a week.

24             Ms. Cross-Goldenberg has been present for all of

25   these videoconferences, so I'm going to let her talk more to

k5t2RayC kjc

1   the concern about and the reality of sharing sensitive

2   discovery material effectively using the videoconference

3   technology.

4          So I will do that now, and then I will come back to

5   speak to the rest.

6          THE COURT:  Ms. Cross-Goldenberg.

7          MS. CROSS-GOLDENBERG:  Thank you, your Honor.  This is

8   Peggy Cross-Goldenberg.

9          So the way that the process works -- I'm not sure how

10  much familiarity your Honor has with this, but we have to put

11  in requests several days in advance to request any kind of

12  audio or video call with our clients.  The unit that Mr. Ray is

13  on, there happens to be a particularly high demand, I think

14  because many people have been ill and have special needs and so

15  a great need to be speaking with their counsel.  We can't pick

16  the exact day or the exact time, and in fact we can't be told

17  in advance exactly what time the call will happen, although we

18  find out the night before what day the call will be.  So the

19  time range is supposed to be from 1:00 to 3:30 in the

20  afternoon, although calls sometimes come in early or late.

21         As you can imagine, that makes it very hard to sort of

22  block out the time and plan ahead of time.  I have put in -- I

23  think on the 27th I put in a request for a call for next week,

24  but essentially that means trying to leave open every day from

25  1 to 3:30, hoping that a call will be scheduled.

k5t2RayC kjc

1          Mr. Ray is brought to a pretty large and echoey room

2     at the MCC and sits in front of the computer for the

3     videoconference.  It is, as I said, very echoey.  The court can

4     recall when we tried to do the last conference in the case via

5     video how hard it was between the, you know, just the echos and

6     the feedback and all that.  It is very hard to communicate.

7          Mr. Ray doesn't have control of the computer, so he

8     can't, for example, mute the volume, right?  So if I'm -- if I

9     were to play him an audio recording, for example, the feedback

10    loop in terms of the volume picking up again on his end, it

11    makes it extremely difficult.

12         You know, many of the audio recordings and video

13    recordings that we have been able to review so far exceeds the

14    30-minute time block in length.  So even if we get the call

15    right on time and jump right in, a call, an entire week's worth

16    of contact with Mr. Ray could be limited to just reviewing one

17    partial audio recording.  And that's not to mention any time

18    that we need to discuss with him his health concerns or our

19    investigative efforts or anything else happening in the case or

20    on our end.  So it is a huge challenge.  It is, I think,

21    impossible to overstate how big of a challenge it is.

22         You know, the video is much better than audio,

23    obviously, in terms of having to review things, but the -- as

24    of now, there isn't a way for us to share our screen the way

25    that there is when you are doing, for example, a zoom or a

k5t2RayC kjc

Skype conversation.  So I couldn't pull up on my computer, for

example, a sensitive document and have us both review it.  I

would have to have a hard copy of the document and hold it up

to my computer's camera, which, you know, I think if you can

imagine doing that, would make it very hard for the -- not only

for the person on the other end to read it on their computer

screen, especially when they can't control, like, you know, the

size of the image or anything like that, but also just hard to

just sort of review the words on the page together.  So it is a

challenge.

        We have been very diligent in terms of requesting a

call every week.  We haven't always gotten them, and we are

doing our best, but the system is -- it is better than nothing,

but it is far from effective.

        THE COURT:  What is the volume of recorded calls or

audiotapes that you have had to listen to?  There is not a

wiretap in this case, right?

        MS. SASSOON:  Your Honor, this is Danielle Sassoon.  I

can explain the nature of the audio and video evidence.

        The defendant made a number of lengthy recordings of

his interrogation sessions or of his victims giving false

confessions, and so there are a lot of those in his e-mail and

also in his iCloud and in the iClouds of other people.

        One thing I can add on this point is that now that

discovery has been produced and we are focused on preparing for

k5t2RayC kjc

1    a trial, we are going to start transcribing some of these

2    recordings.  Now, that's going to take time, and it is not

3    something that's going to be complete in the next few weeks or

4    even months, but we can produce those transcripts to defense

5    counsel on a rolling basis as an aid to their preparation of

6    their defense.

7          THE COURT:  Thank you.  That's a very helpful

8    explanation.

9          Let me turn back to you, Ms. Cross-Goldenberg.

10         MS. CROSS-GOLDENBERG:  If your Honor has --

11         THE COURT:  Was there more that you had to report?

12         MS. CROSS-GOLDENBERG:  No.  I think that pretty much

13   summarizes the videoconferencing and our ability to confer with

14   Mr. Ray.

15         I will just also say, in addition to the time in

16   question, the call often just gets ended without any warning or

17   ability to wrap up, so then necessarily the next call has to

18   sort of loop back to where we were the previous week.  So it is

19   just incredibly inefficient.

20         THE COURT:  So I don't know if there is an application

21   now with respect the issues that you have raised or if there is

22   much that I can do about it.  I will hear from you.

23         I will say that I thought Ms. Sassoon's interjection

24   was valuable in that I would assume, from the government's

25   perspective, they would understand the need for the defense to

k5t2RayC kjc

1    have time to prepare and that the challenge that you have

2    mentioned is a particular concern obviously for the defendant,

3    but it is a concern that the government, I would assume, has an

4    interest in making sure is addressed in one way or another.

5           But I will turn it over to you, Ms. Cross-Goldenberg,

6    or you, Ms. Lenox, about whether there is an application.

7    Again, it is very helpful background information.

8           MS. LENOX:  This is Marne Lenox.

9           Your Honor, we don't have an application at this time,

10   but we do want to make clear to the court and to the government

11   that this presents a tremendous hurdle for Mr. Ray's

12   participation in his defense and for our preparation for trial

13   and for motion practice in this case.

14          The reality is that even if the government begins to

15   start transcribing some of these recordings, it sounds as

16   though that won't happen for at least a couple of months, and

17   even if and when that does happen, certainly the

18   transcriptions will not be a replacement for the actual video

19   and audio recordings themselves insofar as Mr. Ray will have to

20   review those in order to participate effectively in his own

21   defense.

22          In addition, the government has indicated that there

23   is still a number of materials outstanding and that its

24   responsiveness review will not substantially narrow the

25   universe of materials with respect to, for instance, the e-mail

k5t2RayC kjc

1  communications between the alleged victims and Mr. Ray, which

2  comprise, you know, terabytes worth of data -- literally

3  thousands and thousands of pages -- for review, most of which

4  have been marked sensitive.

5          So while the government has certainly taken steps to

6  try to ameliorate these challenges, they still very much exist

7  and are very real while Mr. Ray remains incarcerated at the

8  MCC.

9          The government indicated that last week, on May 21, it

10 sent hard copies of the nonsensitive discovery to Mr. Ray, and

11 it also sent a hard drive of nonsensitive discovery to Mr. Ray

12 the following day, on May 22.  I spoke with Mr. Ray briefly

13 before this status conference this morning, and he indicated

14 that he has not yet received any hard copy material nor the

15 hard drive from the government.

16         So unfortunately we don't have anything to report on

17 how effective it will or will not be for Mr. Ray to review

18 these nonsensitive materials on his own.  Certainly the hard

19 copies will be helpful.  But to the extent that the hard copies

20 make up only a very small portion of -- the hard copies of

21 nonsensitive discovery make up a very small portion of the

22 total amount of discovery to be reviewed in this case, I think

23 it is extraordinarily difficult to foresee a scenario in which

24 Mr. Ray can effectively participate in his defense even if he

25 is able to review hard drive -- materials on the hard drive,

k5t2RayC kjc

1    nonsensitive materials on the hard drive for three hours a

2    week.

3                As Ms. Cross-Goldenberg alluded to, some of the audio

4    and video that we have reviewed so far from the government's

5    production last far longer than the half-hour videoconference.

6    Some of the audio recordings last even longer than the

7    hour-long session that the government has come to an agreement

8    with the Bureau of Prisons that the Bureau of Prisons would

9    provide Mr. Ray while he is incarcerated to review his

10   discovery materials.

11               So we just want to be perfectly clear that while we

12   understand and appreciate that the government is making efforts

13   and working with the Bureau of Prisons to allow Mr. Ray to

14   review the discovery in this case, without a more pointed

15   responsiveness review from the government, without a greater

16   narrowing, a more specific narrowing of the truly relevant and

17   salient materials for Mr. Ray's trial, I don't think there is

18   any conceivable way in which, given the current

19   circumstances -- and even not with the current circumstances --

20   Mr. Ray will be able to review the 15-plus terabytes of

21   discovery that the government has turned over and is continuing

22   to turn over in this case.  I think that the government -- the

23   government's representation that it will provide a preliminary

24   exhibit list three weeks in advance of trial does very, very

25   little for the defense in terms of its preparation for this

k5t2RayC kjc

1    case.

2            I also want to note that because of the global

3    pandemic, which is of course in no one's control, the

4    investigation of the defense case has been largely stymied.  We

5    can't effectively investigate this case while there is an

6    ongoing pandemic and stay-at-home orders are in effect.  We

7    can't speak to witnesses at their homes.  We can't go to speak

8    to witnesses at their places of business.  We can't go out and

9    speak to other people who may help us communicate better with

10   witnesses in this case.

11           It is simply not realistic to expect that Mr. Ray

12   while incarcerated and the defense counsel while this pandemic

13   is ongoing, and long afterwards, will be able to effectively

14   review and prepare for Mr. Ray's trial, given all of the

15   constraints that have been imposed on us, and that also

16   includes our ability to meet with Mr. Ray in person and develop

17   a relationship with Mr. Ray, which is necessary, again, to

18   effectively represent him in this case.

19           Mr. Ray was indicted in early February.  Between then

20   and late February, when the MCC went on a lockdown for the

21   search of a gun in the facility for eight days, during that

22   period of time, we were only able to meet with Ray a couple of

23   times in person apart from his appearances in court.  We were

24   able to meet with him one time in person between the lockdown

25   that ended at the MCC for the search of the gun and the time

k5t2RayC kjc

1    that the lockdown began because of the coronavirus on March 13.

2    So that means that over the past several months we have not

3    been able to engage thoroughly with our clients and develop a

4    relationship that is necessary to effectively represent Mr. Ray

5    going forward.

6              So these are just some of the myriad hurdles that we

7    have been contending with in preparing for trial in this case.

8              So while we do not have an application for your Honor

9    at this time, we will likely make an application at some point

10   in the future, depending on what happens once Mr. Ray receives

11   the discovery materials that the government has sent and his

12   ability to review those materials as the government has laid

13   out based upon their agreement with the Bureau of Prisons.

14             THE COURT:  Let me make an inquiry of Ms. Sassoon.

15             Ms. Sassoon, I'm not going to order you to provide an

16   earlier witness list or to pare back your responsiveness review

17   because, number one, that formal application has not been made

18   to me and, number two, I'm not aware of any law that would give

19   me the authority to do that, but what defense counsel has

20   presented is concerning.  I'm sure it is also concerning to

21   you.

22             And so my question to you is what can you do to help

23   address those issues?  Can you been in touch with the MCC, for

24   example, to make sure that the nonconfidential material --

25   nonsensitive material makes its way to Mr. Ray?  Recognizing

k5t2RayC kjc

1    that there are rights of victims involved and there is law that

2    gives those victims protection, and I am not asking that

3    anything be done that would undermine the rights of the

4    victims, is there a way to review the material to make sure

5    that what is held back as sensitive is truly sensitive and that

6    there is more material that's deemed nonsensitive?  Are there

7    any other things that you can come up with right now that would

8    help address this issue, which is an issue?

9            MS. SASSOON:  Yes, your Honor.

10           I hope the court and defense counsel can both

11   appreciate that the government is trying to be creative here

12   and is trying to be helpful.  I do want to clarify something

13   about that defense counsel said that could potentially be

14   misunderstood.

15           In terms of the discovery that's been marked

16   nonsensitive, despite the fact that the defendant's e-mail

17   account includes e-mails with victims, we produced as

18   nonsensitive the entirety of his own e-mail accounts, of which

19   there are several, whereas we have marked the e-mail accounts

20   of his victims and associates as sensitive because those are

21   not his own e-mail accounts and contain sensitive material.

22           So he will have access, once we sort out getting him

23   this hard drive, which I will do after this call, he will have

24   access to his e-mail accounts on this hard drive within the

25   prison which is a substantial portion of the evidence.  And so

k5t2RayC kjc

1  he will be able to review that even separate and apart from

2  calls with counsel.

3          Some of the other difficulties that defense counsel

4  highlights -- I don't want to minimize them, but some of those

5  things are a feature of any case, absent a pandemic, that

6  involves this volume of discovery.  It is a lot of material to

7  go through.  It is a lot to prepare for trial.  And that is the

8  nature of these cases.

9          And there is a possibility that as soon as the end of

10  June they will be able to resume visits and review this

11  material with their clients, and there is certainly a good

12  prospect that they will be able to start doing that well in

13  advance of the trial, which our proposed date is many, many

14  months away still.  So some challenges are just by virtue of

15  having a case with a lot of evidence.

16          With respect to the twelve terabytes of data, we have

17  made a decision to do a more -- to do a narrower responsiveness

18  review.  So whereas with the e-mails, like I said, still, it's

19  going to be high volume of e-mails with the twelve terabytes of

20  data.  We really are trying to substantially narrow that volume

21  of material in the course of the responsiveness review.  I

22  can't represent right now whether we will be able to reduce it

23  from twelve terabytes to one or twelve terabytes to seven

24  because that review is ongoing and I don't have a firm handle

25  on everything that's in that electronic material.  But we have

k5t2RayC kjc

1    decided to do a narrower responsiveness review in part to make

2    the volume of evidence more manageable for the defense and for

3    us, candidly.

4              THE COURT:  Okay.  All right.  Thank you.

5              Let me turn now back to you, Ms. Lenox.  Is there

6    anything else that you would like to raise today or that I

7    should address?

8              MS. LENOX:  Yes, your Honor.

9              I am not making -- well, your Honor, to the extent

10   that Ms. Sassoon has represented that the government is going

11   to narrow its responsiveness review of the premises search

12   material in large part out of concern for the issues raised by

13   defense counsel, I would ask that your Honor order the

14   government to narrow its responsiveness review of the

15   electronic materials in the same manner.  I'm not sure what is

16   preventing the government -- if it is able to narrow its

17   responsiveness review of the twelve terabytes from the premises

18   search, I'm not sure why that same narrowing cannot also be

19   applied to the electronic materials that have been provided,

20   which I think would help, at least in part, to alleviate some

21   of the burden of Mr. Ray's review of all of the material.

22             THE COURT:  Do you have authority for the proposition

23   that I can impose that order on the government?

24             MS. LENOX:  I do not offhand have authority for that.

25   I am happy to write on this if your Honor is not inclined to

k5t2RayC kjc

1    order the government to do so today, but I would note that on

2    our last -- at our last status conference in April your Honor

3    did order the government to identify for the defense the most

4    significant part of discovery, both what the government would

5    anticipate presenting at trial and material that it believes to

6    be exculpatory.

7            To the extent that the government has noted that the

8    e-mails between Mr. Ray and his alleged victims are varying

9    degrees of relevance or salience as far as trial evidence goes,

10   I think it would be helpful for the government -- given the

11   order that your Honor made at the last status conference, it

12   would be helpful for the government to identify the specific

13   e-mails within the larger swath of responsive e-mails between

14   Mr. Ray and the alleged victims that it finds particularly

15   salient for trial.

16           THE COURT:  So I'm not going to enter an order today.

17   If you want to make a motion, you can make the motion at any

18   time, and the government will respond to it.  I'm not telling

19   you whether you should make the motion or not, but I am telling

20   you that, you know, my inbox is open for a motion any time you

21   think you have got a meritorious motion to make.  So --

22           MS. SASSOON:  This is Danielle Sassoon.  May I

23   respond, your Honor, briefly?

24           THE COURT:  Sure.

25           MS. SASSOON:  So, first of all, just to clarify the

k5t2RayC kjc

1   government's understanding, the government did not come away

2   from the last conference with an understanding that the court

3   had ordered us to do anything beyond a responsiveness review

4   and a production of *Brady* material.

5           THE COURT:  In fact, Ms. Sassoon, I will cut you off.

6   I did not enter an order that went beyond that, and I took

7   Ms. Lenox's characterization of what I said not to be binding

8   on me, and so I did not enter an order to -- that was narrower

9   than what you have just stated.

10          I did make a request that I thought it would be

11  helpful to move the case along that if, to the extent you

12  identified material that was particularly salient and that you

13  intended to use at trial, that you identify that for the

14  defense, because that is one way of helping to alleviate some

15  of the issues that Ms. Lenox was describing.  But that request

16  should not be misconstrued as an order.

17          MS. SASSOON:  Thank you, your Honor.  And the

18  government took that to heart, and that is why we are taking

19  the steps we are taking and also has decided to proceed with

20  this narrower review of the twelve terabytes of data.  But we

21  are going to be reluctant to do that if, then, these steps,

22  which we don't think are required by law, are then used against

23  us to force us to do things that are similarly not required by

24  law.

25          The e-mail responsiveness review is nearly complete.

k5t2RayC kjc

| | |
|---|---|
| 1 | That is done.  And we are now moving forward to the twelve |
| 2 | terabytes of data.  And with respect to both, we are going to |
| 3 | do it in a manner that we think is consistent with the law, and |
| 4 | I just wanted to put that on the record. |
| 5 | THE COURT:  Ms. Sassoon, the only thing that I think I |
| 6 | ordered or permitted was for the defense to make a motion any |
| 7 | time they thought they had a meritorious motion.  I take it you |
| 8 | have no quarrel with that. |
| 9 | MS. SASSOON:  Yes, your Honor. |
| 10 | THE COURT:  I should say, up until the end date for |
| 11 | making motions, the motion date that I have set in October. |
| 12 | Beyond that, we can figure out some orderly way to do it and I |
| 13 | will do that. |
| 14 | Ms. Lenox, anything else that I should address today? |
| 15 | MS. LENOX:  I don't believe so, but I'm going to leave |
| 16 | it to Ms. Cross-Goldenberg in case there is anything else I |
| 17 | have forgotten that she thinks needs to be said. |
| 18 | MS. CROSS-GOLDENBERG:  I don't think so, your Honor. |
| 19 | This is Peggy Cross-Goldenberg.  Thank you. |
| 20 | THE COURT:  Okay. |
| 21 | So I have in the letter in front of me the proposal of |
| 22 | the parties that trial in this case start on January 19 of |
| 23 | 2021, with the trial expected to last approximately three |
| 24 | weeks.  I will schedule a trial for that date, beginning on |
| 25 | that date, and lasting approximately three weeks. |

k5t2RayC kjc

1          I would note that the letter notes that defense

2    counsel has raised questions about whether, given the current

3    situations with COVID in this state continue, the defense

4    potentially not being able to prepare for trial on that date.

5    I'm going to go ahead and schedule the trial, again, for

6    January 19.  But should the health conditions continue and

7    should they make it impossible for the defense to effectively

8    represent their client, I will entertain an application by you,

9    Ms. Lenox or Ms. Cross-Goldenberg.  We will address that as

10   circumstances develop.  I know these are extraordinary

11   circumstances we have now.

12          Would it be appropriate -- let me ask Ms. Sassoon in

13   the first instance.  I excluded time at our last conference

14   through the motion date.  Would it be appropriate for me to

15   exclude time up until January 19, 2021 at this time?

16          MS. SASSOON:  The government would be comfortable with

17   that.  Obviously we are covered until the motion date.  And

18   once the motions are filed, as long as they are pending, time

19   will be automatically excluded.  But excluding it until January

20   19 spares us from having to make the motion repeatedly.  It

21   really depends whether defense counsel will consent to that.

22          THE COURT:  So let me turn now to you, Ms. Lenox.

23   What's your position?

24          MS. LENOX:  I would consent to excluding time until

25   the motions date; and then, when that happens, coming back to

k5t2RayC kjc

1    the issue of excluding time until the 2021 trial date.

2             THE COURT:  Okay.  So I will not exclude time up until

3    January 19, 2021.  I would like to correct what either was a

4    misstatement by me at the last conference or a

5    mistranscription.  From my review of the transcript, it

6    reflects that time was excluded to October 29, 2020.  I believe

7    that the motion date is October 19, 2020.  So my exclusion of

8    time, pursuant to 18 U.S.C. 3161(h)(7)(A), should be to October

9    19, 2020, and that was to permit the parties to review

10   discovery, to have consultations between themselves, for the

11   defense to be able to consult with their client, and for

12   motions to be prepared and to be made.

13            Am I right -- let me ask Ms. Sassoon -- that the

14   motion date is October 19?

15            MS. SASSOON:  One moment, your Honor.

16            (Pause)

17            MS. SASSOON:  That is the date on my calendar for the

18   hearing on the motion.

19            THE COURT:  All right.  So that will be what the

20   exclusion is.

21            It does seem to me that, given the issues with respect

22   to discovery, I should have another conference in this case

23   before motions are filed.  We should have conferences on a

24   periodic basis just to make sure that any issues that come up

25   are being addressed.  I don't think I need to do it every four

k5t2RayC kjc

1    weeks, but maybe every six weeks.  Do the parties have a view

2    with respect to that?  That would put us at the beginning of

3    July.

4             MS. LENOX:  This is Marne Lenox.  That's fine, your

5    Honor.

6             MS. SASSOON:  Yes, your Honor.  This is Danielle

7    Sassoon.  That's fine to the government.  Six to eight weeks

8    from now sounds about right.

9             THE COURT:  Let me just look at the calendar for a

10   moment.

11            Matt, why don't we look at the week of July 20?

12            THE DEPUTY CLERK:  July 22 at noon?

13            THE COURT:  How does that work for the parties?

14            MS. SASSOON:  That's good for the government.

15            MS. LENOX:  This is Marne Lenox.  That's fine for the

16   defense.

17            THE COURT:  Good.  All right.  So I will speak to you

18   on July 22 at noon.  We will calendar that as a call on this

19   calling number.  The calling number will be reflected on the

20   docket.  If the courthouse becomes more accessible, we may

21   change that to an in-person conference, but I'm not going to

22   make that decision now.

23            Anything else from the government today?

24            MS. SASSOON:  No.  Thank you, your Honor.

25            THE COURT:  Anything else, Ms. Lenox, from you or from

k5t2RayC kjc

1    Ms. Cross-Goldenberg?

2            MS. SASSOON:  This is Marne Lenox.  No.  Thank you,

3    your Honor.

4            THE COURT:  Okay.  Thank you all.  Try to stay safe

5    and healthy, and we will speak to you in July.

6            THE DEFENDANT:  Thank you, your Honor.

7            MS. LENOX:  Thank you.

8            MS. CROSS-GOLDENBERG:  Thank you, your Honor.

9            MS. SASSOON:  Thank you.

10                                oOo

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25