

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 21, 2020

**BY ECF**

The Honorable Lewis J. Liman
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, N.Y. 10007

> **Re:**   ***United States v. Lawrence Ray*, 20 Cr. 110 (LJL)**

Dear Judge Liman:

The Government writes in opposition to the defendant Lawrence Ray's August 12, 2020 motion seeking release from pretrial detention and making various discovery demands.

With respect to bail, this is the defendant's third bail motion, and it should be denied because, as before, the defendant "has not rebutted the presumption of risk of flight or danger to the community, nor has he established a compelling reason for release." (4/16/2020 Order Denying the Defendant's Application for Bail, Dkt. No. 20). If anything, recent circumstances further demonstrate the ongoing danger that Ray poses if released, including ongoing efforts by Ray to influence and tamper with victims, coconspirators, and potential witnesses. Therefore, the Government seeks Ray's continued detention and a modification of Ray's detention order, to include a provision that prohibits the defendant from contacting victims and potential witnesses.

With respect to the defendant's discovery requests, they are anything but "modest." (Dkt. No. 36). As described further below, since completing discovery, the Government has nearly completed its responsiveness review, flagging for the defense the particular materials it believes are responsive to the search warrants and relevant to the case, and thus drastically reducing the universe of responsive discovery. The Government will continue to undertake efforts to assist the defense and engage in good-faith discussions with defense counsel about ways to facilitate review of discovery and preparation for trial. But the requests in the defendant's pending motion seek a breathtaking expansion of the Government's obligations under the Constitution and the Federal Rules of Criminal Procedure that is unsupported by law and unprecedented in this Circuit. Moreover, while the Government has proposed measures to expand the defendant's direct access to discovery, including access to discovery that is plainly sensitive, it is unwilling to do so in ways demanded by the defense that would unduly jeopardize victim safety and place highly sensitive material—including material that is indisputably private and potentially humiliating to Ray's victims—at unnecessary risk of improper disclosure.

For these reasons, and as further explained below, Ray's motion should be denied.

## I.      Relevant Background

Many of the relevant facts—including the pending charges, the nature of the offense conduct, and the defendant's prior history of noncompliance with court supervision—are set forth in the Government's April 15, 2020 Opposition to the Defendant's Second Bail Application (Dkt. No. 19), and those facts are incorporated by reference.

### A.  The Defendant's Communication from Prison with Potential Witnesses

The Government has obtained the defendant's jail calls and produced them in discovery. Those calls reveal that the defendant continues to communicate with the two young women who were residing with the defendant at the time of his arrest.  These women were witness to Ray's pattern of victimization of other individuals over a period of years.  The evidence, including photographs, videos, and audio recordings, also shows that these two women were themselves physically and verbally abused by Ray.  Ray also amassed videos that contain graphic sexual content of these two women, including sexual acts performed at Ray's direction that appear designed to debase and control them.

Despite Ray's incarceration, he has continued to keep these women in his orbit.  The jail calls show that Ray is using his father as a conduit to these women.  During these calls, Ray's father has provided Ray with frequent reports about the women's whereabouts, with Ray's father often using coded references to "company" or "friends" to indicate when the two women are physically present during a call with Ray.  Ray's communication with these women has only become more frequent throughout his detention.  As recently as June 9, 2020 (18:47), Ray's father communicated to Ray that the women have moved to a location close to Ray's father's house, which is information consistent with the Government's investigation.

Most troubling, the calls suggest that Ray's ongoing communications are designed to ensure the ongoing loyalty of these women and to inhibit their ability to detach from the influence he commanded over them for nearly a decade.  For example, on May 24, 2020 (15:05), Ray asked his father to let the women know that "they signed on forever."  On June 14, 2020 (15:22), the defendant made clear his intent to keep the women isolated from others (a clear means to keep them under his control).  The defendant admonished his father, seemingly in the presence of the women, "No new friends. There should be no one in anybody's life except each other."

Ray has also sought to ensure the women's continued loyalty through romantic commitments.  Prior to his arrest, Ray frequently described one of the women as his common-law wife, including in his pretrial services interview.  With respect to the other woman, he characterized her in his pretrial services interview as akin to a daughter, claiming that he had "assumed guardianship over her."  But now Ray is seeking the continued loyalty of this supposed daughter through promises of marriage.  On his jail calls, Ray described her as "special" and instructed his father to tell her that he would "marry" her and to "make sure she knows that." He further told his father to have a "conversation with her" about their being monogamous.

Page 3

These messages are plainly designed to tamper with witnesses and deter these women from cooperating in the Government's investigation.  On June 21, 2020 (15:12), Ray described to his father that the Government wanted the women to testify against him, but declared "that's never going to happen . . . just simply because what they're going on is not the truth."  On June 26, 2020 (19:18), Ray conveyed that the women should draft particular documents to ensure that their respective attorneys cooperated with the defense, and he has instructed the women to undertake certain tasks on his behalf, such as finding audio, video, and email confessions of multiple victims in which they claimed to have poisoned Ray.  (June 19, 2020 call (18:06)).  These directives are particularly inappropriate in light of Ray's awareness that the women are represented by counsel, such that any effort to seek their cooperation in his defense should be discussed between their and Ray's counsel, and not through coded jail call communications.

### B.  Discovery

As a preliminary matter, the defense already is in possession of the Government's entire discovery production, which amounts to approximately 15 terabytes of data.  As of this week, the Government has nearly completed its responsiveness review (with approximately one terabyte of data left to review out of approximately 14 terabytes), the results of which it has produced and will continue to produce to the defense.

With respect to the Government's discovery production, the defense characterizes the 15 terabytes of data that the Government has produced as "the equivalent of more than 750 million pages, or 300,000 bank boxes, of material." (Br. 1).  But this is comparing apples to oranges.  The voluminous nature of the discovery is principally attributable to the large quantity of audio and video files that the defendant generated and collected in furtherance of his crimes.  By "converting" the large size of a video file into a page amount, the defense presents a misleading picture of the amount of written material that was produced in this case and the nature of the material that needs to be reviewed.

To be sure, whether composed of written documents or audio files, 15 terabytes is a substantial amount of data.  But the defense's motion disregards the significance of the Government's responsiveness review.  The responsiveness review has identified for the defense the drastically-reduced universe of evidence within those terabytes of data that the Government deems responsive to the search warrants and relevant for trial.  While the defense retains the full 15 terabytes of data, the Government will no longer access the terabytes of data it has deemed "unresponsive."

Also, as a point of clarification as to what is included within the Government's discovery production, *i.e.*, the 15 terabytes of data, the Government extracted far fewer devices than the defense portrays.  With respect to the devices seized in the searches on February 11, 2020, the defense lists the seizure of "37 cell phones, 44 hard drives, seven computers," and numerous other devices, totaling 230 electronic items seized.  (Br. 3-4).  But many of those devices were deemed nonresponsive, were never extracted, and have been segregated for return to the defendant.[1] Specifically, the Government attempted to extract only approximately 54 of those electronic items,

---

[1] The Government has asked defense counsel for a location or custodian to whom it can return any unresponsive search material, but defense counsel has yet to provide an answer.

10 of which were deemed nonviable for extraction, and three of which have yet to be unlocked (and which may never be successfully unlocked).

With respect to the remaining 41 devices and the terabytes of data extracted from them, the Government has reduced the relevant data *from terabytes to gigabytes* (specifically, less than 300 gigabytes) in the course of its responsiveness review. The proper metric, then, is not the size of the raw extraction reports, but the gigabytes of data that the Government has produced as responsive, and which represents the material the Government considers responsive to the search warrants and therefore potentially relevant to trial.

The defense characterizes the Government's responsiveness review as what is "required by law" and as a "meager" and insufficient step. (Br. 13-14). But the Government has undertaken a responsiveness review that goes well beyond what is required by law with an eye toward assisting the defense in its review of discovery and preparation for trial. For one, the Government expedited its responsiveness review and has nearly completed it within a matter of months—at the expense of directing investigative resources elsewhere—which is a speedy timeline for a responsiveness review of that magnitude, particularly under the constraints of the current pandemic. *See, e.g.*, *United States v. Nejad*, 436 F. Supp. 3d 707 (S.D.N.Y. 2020) (AJN) (holding that a responsiveness review that spanned three years was "reasonable under the circumstances," which included search warrant returns with a large amount of data). Moreover, the Government has narrowed the responsive material to a smaller universe of evidence than it was authorized to seize under the search warrants. For example, the Government has marked many documents, audio files, and videos contained on the hard drives as unresponsive—even if technically responsive to the search warrants as proof of the charged offenses—where the exact same files are contained elsewhere in the discovery material (such as in the defendant's iCloud account), or where the Government deems the material needlessly cumulative. Among other things, the defendant copied the contents of entire devices belonging to other people (including his victims) onto his own hard drives—the Government has not marked those copies as responsive, where the original device has also been extracted. This alone has dramatically reduced the responsive material being produced to the defense, and spared the defense the time required to undertake a similar analysis. The defense, of course, still retains the full extractions of each of these devices as part of the original discovery.

In addition, as the Government has explained to the defense, several of the devices recovered in the search are responsive as a whole because they appear to have belonged to Ray's victims, which corroborates the expected testimony of several victims that Ray seized their personal devices (which contained highly personal information) as a form of collateral against them. Nonetheless, rather than simply mark the entire device as responsive, the Government has also produced to defense counsel a report of the most responsive material on those drives (essentially a "hot document" report for those devices) to assist in their preparation for trial, and to help defense counsel distinguish between material which is responsive simply because it proves the identity of the device holder and material which is responsive because it is also independently probative of the defendant's commission of the charged offenses.[2] That is certainly more than

---

[2] For example, some of these devices contain college essays and homework in the name of Ray's victims. These files are proof that the devices belonged to those victims, but are otherwise not

what is "required by law." Thus far, the Government has identified approximately 24 of the seized devices as belonging to persons other than Ray (including to his victims); at least nine of those devices have been flagged as responsive on that basis alone but otherwise do not contain additional noteworthy material, and for the remainder, the Government is producing supplemental responsiveness reports that highlight evidence with additional, independent probative value.

Beyond the responsiveness review, the Government has also begun transcribing recordings that were produced in discovery and supplying copies of all such transcripts to the defense, well in advance of trial. This process not only facilitates the defense's review of lengthy recordings, it also provides a valuable preview to the defense of the Government's trial strategy and potential key exhibits at trial. For example, the Government produced approximately 138 recorded bank calls in discovery, but transcribed and produced transcripts for only 30 of those calls, identifying for the defense those calls that are potential exhibits at trial. The Government has also produced for the defense transcriptions of audio recordings between Ray and his victims, highlighting those recordings that the Government has begun to identify as possible exhibits for trial. The Government is not aware of any obligation that requires the Government to do this; instead, it has committed to do so in a good-faith effort to facilitate the defense's review of discovery and preparation for trial. The Government will continue to produce transcripts on a rolling basis.

In addition, the Government has produced non-sensitive discovery to Ray in prison, including hard copies of the search warrant materials for him to review in his cell, as well as discs and a hard drive with Ray's entire email account, his IRS returns, reports of his post-arrest interview, his own medical records, other non-sensitive subpoena returns (including financial records), non-sensitive documents recovered in the search of his residence, and redacted transcripts of bank calls between Wells Fargo and one of the women Ray was living with at the time of arrest. Contrary to what is stated in the defendant's motion, the Government has not produced Ray's iCloud account to the prison, which—as described further below—is laden with sensitive content.

## C. Sensitive Discovery

The defense asserts that the majority of discovery in this case is marked sensitive, but beyond a conclusory assertion that the Government "reflexively" produced materials with a sensitive designation, the defendant's motion is notable for not cataloguing examples of materials it deems improperly designated. To be sure, a substantial amount of discovery is designated as sensitive. But there is a straightforward explanation for that, and the Government has made deliberate and considered discovery designations that it is prepared to defend. As defined in the protective order entered by the Court on March 2, 2020 (Dkt. 10-1, the "Protective Order"), sensitive disclosure material refers to disclosure material that:

> contains information that affects the privacy of individuals, and identifies, or could
> lead to the identification of, witnesses who the Government believes may be subject
> to intimidation or obstruction, and whose lives, persons, and property, as well as
> the lives, persons and property of loved ones, the Government believes will be

---

probative, and would not be marked responsive for purposes of the supplemental responsiveness report for that device.

subject to risk of harm absent the protection considerations set forth in [the Protection Order].

The nature of the offense conduct elucidates why the evidence in this case is predominantly "sensitive" material.  The Government expects to prove that Ray exerted control over his victims, successfully extorted them, forced them to engage in free manual labor, and committed sex trafficking, in part by eliciting highly personal, intimate, and shameful information from his victims, and then misusing that information to exploit his victims and further the charged crimes. The evidence will show that Ray first earned his victims' trust and urged them to divulge private information that rendered them highly vulnerable—information about their mental health, their family discord, their sexual confusion, and their deepest insecurities.  Ray then exploited that information to demean and humiliate his victims.  He did this through interrogations, where victims "confessed" their supposed wrongdoings, and his methods involved a sustained campaign to document his victims' supposed transgressions in order to maintain control over them.  Thus, Ray seized his victims' journals and their personal devices.  He recorded their humiliations, including through audio and video recordings.  These recordings include the victims' "confessions" to wrongdoing, as well as verbal and physical abuse by Ray.  They also include photographs and videos of Ray's victims engaged in sexual activity at his direction, sometimes in circumstances that appear designed by Ray to degrade and debase the victim.

Ray then hoarded this material to threaten his victims, including with supposed law enforcement action.  He also disseminated it.  He sent countless emails to his associates with attachments containing sensitive information about his victims, including audio recordings and written confessions.  He created websites dedicated to some of his victims and posted defamatory and humiliating material on those sites.  With respect to a victim of Ray's sex trafficking, he used such a website to intimidate the victim and coerce further prostitution.  To this day, the content Ray posted to the internet continues to interfere with that victim's ability to find employment, make new acquaintances, and lead a normal life.

Most of the files that contribute to the voluminous nature of the discovery are of this nature—highly personal to the victims in this case, sometimes sexually explicit, sometimes violent, and sometimes humiliating, and specifically accumulated by Ray to undermine his victims' agency, intimidate them, place them in fear of retaliation, control their behavior, and extort money. Examples of categories of evidence that the Government has designated as sensitive include:

- Medical records of Ray's victims, including records related to treatment for mental health episodes;
- Backpage records related to prostitution ads;
- Financial records for bank accounts belonging to Ray's victims to which Ray did not have access;
- Handwritten journals belonging to Ray's victims and handwritten confessions drafted by Ray's victims;
- Email accounts belonging to persons other than Ray;
- iCloud accounts belonging to persons other than Ray;
- Extractions of cellphones belonging to persons other than Ray;
- Extractions of laptops belonging to persons other than Ray;

Page 7

- IRS records related to persons other than Ray; and
- Ray's iCloud returns and phone extractions which are replete with sensitive material, including photographs of victims, sexually explicit content, and audio recordings of victims that are personal and potentially humiliating to them.

With respect to evidence seized during the premises search, the Government divided the paper documents between sensitive and non-sensitive material. The extracted devices and accompanying responsiveness reports have been produced under a "sensitive" designation. The devices that belonged to persons other than Ray are sensitive for that reason alone. The devices that belonged to Ray all contain sexually explicit content, as well as other sensitive material of the kind described above. Defense counsel has not identified to the Government a single device it contends was indiscriminately marked as sensitive.

**D.  The Scope of the Protective Order**

Defense counsel has asked the Government to remove the "sensitive" designation from certain pieces of evidence that are plainly sensitive, such as: (1) a video where Ray is physically abusing a woman by grabbing her by the hair; (2) a video where Ray is verbally abusing a woman who is sobbing and denigrating herself; (3) videos of victim "confessions"; (4) a file from Ray's child custody dispute that includes audio recordings of his underage daughter talking about domestic abuse; (5) items from another person's iCloud; and (6) the entirety of Ray's two iPhones. Defense counsel further asked the Government to remove the "sensitive" designation from the transcripts it has produced thus far, in order to produce the transcripts to Ray in prison.

In response, the Government agreed to produce some of the transcripts to Ray in prison—specifically the transcripts of approximately 30 bank call recordings—after redacting certain personal identifying information, including the caller's social security number and bank account information (the calls are primarily between the bank and one of the women who was residing with the defendant at the time of his arrest).

With respect to the remaining requests, the Government indicated that it would be prepared to produce the remaining transcripts to the defendant, and future transcripts, and to consider dedesignating some of the other items, if the defense agreed to a modification of the Protective Order. Specifically, paragraph five of the Protective Order prohibits the defense team, including the defendant, from posting (or directing anyone else to post) sensitive disclosure material to the internet, or from disclosing it to third parties, except under enumerated circumstances. The Government requested that paragraph five be expanded to cover all disclosure material, and explained that such a modification would not impede the defense's ability to review discovery, but instead prevent the defendant from misusing the discovery by disseminating it to others in the prison or posting it to the internet. The Government's concern was founded in the defendant's past practice of disseminating sensitive material about his victims, and the unfortunate prevalence of contraband cellphones in BOP facilities that can be used to post material to the internet. The Government indicated that such a modification would provide additional assurance that any evidence de-designated as "sensitive" and produced to the prison would not be misused. The remaining transcripts, for example, include an intimate conversation between a victim and her

mother, and a recording of another victim stating that he will turn himself in to the police for his alleged misconduct.

While the Government would like to facilitate access to discovery, it is unprepared to blithely produce paper copies of these transcripts to the prison (or the additional material requested by the defense) without adequate safeguards in place. This goes beyond a concern about identification of witnesses. Instead, it is rooted in the Government's duty to safeguard the privacy and integrity of Ray's victims and to protect them from the wrongful dissemination of information that is plainly personal and private, and that is ripe for misuse to intimidate witness or obstruct the prosecution of this case. That is far from a speculative concern in light of the defendant's track record of collecting and weaponizing personal information of others for precisely this purpose.

With respect to the request for Ray's two iPhones, the phones contain sensitive material, and it would therefore not be appropriate to produce them to Ray in their entirety. But the Government will review the contents of the phones for evidence that can be produced as non-sensitive, and will evaluate any requests from defense counsel related to specific items within the phones.

## II.     Discussion

### A.  The Defendant Should Not Be Released

The defendant seeks pretrial release for the third time, but the circumstances of the COVID-19 pandemic alone cannot justify Ray's release, absent a rebuttal of the presumption that Ray is a danger to the community and a risk of flight. The defendant failed to rebut that presumption in April (*see* Dkt. No 20 (order denying bail)), and he fails to do so here. For that reason, releasing Ray would run contrary to the Bail Reform Act. *See* 18 U.S.C. § 3142; Dkt. No. 19 at 2-5 (setting forth the legal standard for bail and Ray's failure to satisfy it).

Ray mistakenly relies yet again, as he did in his prior bail motion, on 18 U.S.C. § 3142(i), claiming that release is necessary for him to review discovery. While COVID-19 presents undeniable obstacles to the defendant's review of discovery materials, Section 3142(i) does not authorize the release of a defendant whose release would pose a serious danger to the community. *See, e.g.*, *United States v. Chambers*, No. 20 Cr. 135 (JMF), Dkt. No. 70 (S.D.N.Y. Mar. 31, 2020) (a "compelling reason" for release under Section 3142(i) must be "balance[d] . . . against the risks that were previously identified and resulted in an order of detention"); *see also* Dkt. No. 19 at 2, 4-5 (discussing the applicable law and why Ray's release would be contrary to the statute). Courts have not held, as Ray suggests, that a defendant can be released under Section 3142(i), despite posing a danger to the community if released and without regard for the "initial detention determination." (Br. 23). Ray relies on *Avenatti*, but there, the court actually denied the bail application without prejudice because the defendant's proposed release plan did not satisfactorily address the danger posed by the defendant. *See United States v. Avenatti*, Dkt. 128 (March 27, 2020) (noting that "Avenatti is a danger to the community," and any release under Section 3142(i) would require "specific, considered and adequate terms"). In *Dhavale*, the court allowed temporary release under section 3142(i) where a defendant's wife agreed to provide "round-the-clock monitoring" as a third-party custodian and everyone living with the defendant had agreed to

Page 9

removal of all internet-connected devices from the home—release conditions crafted to address the particular danger posed by a defendant charged with illicit online conduct with a minor. *United States v. Dhavale*, 2020 WL 1935544, at \*5 (D.D.C. Apr. 21, 2020). Contrary to the defense's argument, neither of those cases stand for the proposition that a defendant who poses a danger like Ray can be released under Section 3142(i) because of necessity alone. And the defendant's proposed bail conditions certainly do not demonstrate that the conditions of his release would assure the safety of the community; on the contrary, apart from the dangers enumerated in the Government's prior bail opposition, Ray seeks release into the custody of a random neighbor who has a job that will prevent her from keeping tabs on Ray, and whose home is often occupied by her grandchildren, whose safety the defendant cannot reasonably guarantee, in light of his track record of manipulating his own children and targeting impressionable teenage victims as part of his criminal scheme.

Furthermore, the defendant has not demonstrated that his release is necessary to protect his Sixth Amendment rights. This Court properly rejected Ray's Sixth Amendment argument in his last motion for "substantially the same reasons stated in the orders of other judges in this District, as set forth . . . [in] the Government's submission." Dkt. 20 at 1. The in-district cases cited by the defendant here presented situations where merits proceedings were mere weeks away and the COVID-19 pandemic, then in its infancy, was forcing substantial containment efforts at BOP facilities. *See United States v. Chandler*, No. 19 Cr. 867 (PAC), 2020 WL 1528120, at \*2 (S.D.N.Y. Mar. 31, 2020); *United States v. Stephens*, No. 15 Cr. 95 (AJN), 2020 WL 1295155, at \*3 (S.D.N.Y. Mar. 19, 2020). In a more recent decision, Judge Oetken denied bail and temporary release despite an upcoming motion deadline approximately one month away. *See United States v. Ramirez*, No. 18 Cr. 669 (JPO), 2020 WL 3000982, at \*2 (S.D.N.Y. June 4, 2020). Judge Oetken found that the suspension of in-person visits at the MCC was "reasonable under the present circumstances," especially given the availability of remote communications between inmates and their counsel. Similarly, in *United States v. Gilmore*, No. 19 Cr. 724 (JGK), Dkt. No 59 (S.D.N.Y. Aug. 10, 2020), Judge Koeltl denied the defendant's motion for bail and temporary release despite a scheduled trial date of September 21, 2020. There the Court found that "[p]retrial detention has existed for complex cases expected to last months involving extensive discovery and the opportunity for defendants to review extensive discovery should they so desire. There is no showing that the conditions imposed by the MCC to protect inmates are unreasonable." (8/10/2020 Tr. at 116).[3]

As judges in this District have recognized, the conditions imposed by the MCC are a reasonable response to unprecedented circumstances. We are still five months away from trial. To the extent the pandemic continues to impede Ray's preparation for trial as the trial date nears, the appropriate remedy is an adjournment to allow the defense an adequate opportunity to prepare for trial. It is not to release a dangerous defendant into the community.

---

[3] The out-of-circuit cases cited by the defendant are also unavailing. In *United States v. Pimentel*, No. 19 Cr. 300 (EJF), 2020 WL 2064046, at \*2-3 (D. Utah Apr. 29, 2020), the district court overturned the magistrate judge's decision to order a temporary release and ordered the defendant's continued detention. And, in *United States v. Kennedy*, No. 18 Cr. 20315 (JEL), 2020 WL 1493481, at \*4-5 (E.D. Mich. Mar. 27, 2020), the defendant had pled guilty such that any bail determination should have been made under Section 3143, rather than under Section 3142(i).

Moreover, the Government seeks a modification of the defendant's detention order in light of Ray's jail calls.  The defendant's jail calls illustrate the danger that the defendant would present if released, where he would have even greater access to potential witnesses and victims about whom he has amassed a trove of private and humiliating materials.  But they also demonstrate that he is attempting to tamper with witnesses even from prison.  The Government therefore requests that the detention order be amended to include a condition that the defendant is prohibited from contacting, or directing anyone else (other than his lawyers) to contact on his behalf, any victim or witness, other than his father, stepfather, and daughter.  *See, e.g.*, 18-MJ-5570 (JCM), Dkt. No. 2 (imposing detention condition that the "defendant is prohibited from contacting any victim or witness in this case").  To be clear, the Government in no way seeks to limit defense counsel's prerogative to speak with potential witnesses on Ray's behalf, but to the extent any witness is represented by counsel, any outreach should be made through the witness's attorney.

## B.  Ray's *Brady* Demand is Meritless and Should be Denied

The defendant claims that "[j]ustice, in this case, requires the Government to timely identify all *Brady* material in its voluminous discovery production," and that a "'document dump' without identification of *Brady* material contained therein does not satisfy the Government's constitutional obligations."  (Br. 26-27).  The Government, however, is aware of its *Brady* obligations and is complying with them.  The defendant's exhortations have no basis in law and seek a breathtaking expansion of the Government's constitutional obligations.  It is well established in this Circuit that the Government is not required to single out *Brady* and *Giglio* material that is provided to the defense within an already-produced Rule 16 production.  The Supreme Court's decision in *Brady* held that the Government has a constitutional duty to timely disclose material, exculpatory evidence to criminal defendants.  *Brady v. Maryland*, 373 U.S. 83 (1963).  But as this Circuit has held: "The government's duty to disclose generally does not include a 'duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence,'" absent a showing that the Government has deliberately buried exculpatory material within a voluminous production.  *United States v. Kirk Tang Yuk*, 885 F.3d 57, 86 (2d Cir. 2018) (quoting *United States v. Skilling*, 554 F.3d 529, 576 (5th Cir. 2009)).  The Court in *Kirk Tang Yuk* rejected outright the demand, made by Ray here, that the "government should bear the full burden of reviewing and characterizing each document within a voluminous evidentiary record" or be required to "characterize and tag each image" for purposes of identifying *Brady* material.  *Id.* at 87.

Other Circuits have similarly rejected the notion that *Brady* requires the Government to single out exculpatory evidence within already-produced discovery.  *Skilling*, 554 F.3d at 576; *Rhoades v. Henry*, 638 F.3d 1027, 1039 (9th Cir. 2011) (declining to require the prosecution to direct the defendant to exculpatory evidence when it has already been disclosed); *United States v. Warshak*, 631 F.3d 266, 297 (6th Cir. 2010) (rejecting claim that the government has to "sift fastidiously through [seventeen million pages of] evidence . . . in an attempt to locate anything favorable to the defense" to comply with *Brady*); *United States v. Morales-Rodriguez*, 467 F.3d 1, 15 (1st Cir. 2006) (open file discovery of all documents does not violate *Brady* when the prosecution did not point the defendant to the alleged exculpatory evidence); *United States v. Pelullo*, 399 F.3d 197, 212 (3d Cir. 2005)("*Brady* and its progeny permit the government to make

information within its control available for inspection by the defense, and impose no additional duty on the prosecution team members to ferret out any potentially defense-favorable information from materials that are so disclosed."); *United States v. Parks*, 100 F.3d 1300, 1307 (7th Cir. 1996) (*Brady* was not violated when the government provided 61 hours of taped recording and did transcribe or direct the defense to *Brady* material).

While the defendant claims that "justice" and "fundamental fairness" demand his sought-after relief (Br. 26, 31), there is good reason to hew to the well-established understanding of the Government's constitutional obligations. As Judge Rakoff explained in rejecting a similar *Brady* demand:

> Placing a higher burden on the Government to uncover such evidence would place prosecutors in the untenable position of having to prepare both sides of the case at once. Indeed, the adversarial system presumes that the defense will be more highly motivated to uncover exculpatory evidence, so if anything the onus is on defense counsel to conduct a more diligent search for material potentially favorable to his client.

*United States v. Ohle*, No. 08 Cr. 1109 (JSR), 2011 WL 651849 (S.D.N.Y. Feb. 7, 2011), *aff'd*, 441 F. App'x 798 (2d Cir. 2011). Judge Rakoff therefore adhered to the well-accepted view that *Brady* "does not place any burden upon the Government to conduct a defendant's investigation or assist in the presentation of the defense's case." *Id.* (quoting *United States v. Marrero*, 904 F.2d 351, 261 (5th Cir. 1990)); *see also Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002) ("When evidence is equally available to both the defense and the prosecution, the defendant must bear the responsibility of failing to conduct a diligent investigation.").

Judge Rakoff recognized that "exceptions to these general principles may exist if it is found that the Government deliberately hid documents within a larger mass of materials or somehow purposefully confounded the defendant's search for exculpatory materials," *id.* (citing *Skilling*, 554 F.3d at 577), but the defendant makes no such claim here. The record establishes quite the opposite. Far from being a "document dump," the Government has produced indexed discovery, produced email returns in a format that can be loaded into a searchable database, conducted a tailored responsiveness review of the search warrant returns, and—as the defense concedes (Br. 28)—affirmatively highlighted for the defense the existence of certain material within its production that the Government considers inculpatory, but which it nonetheless recognizes the defense might deem exculpatory (such as the "confessions" by Ray's victims).[4] Far from burying this evidence from the defense, the Government has begun producing transcripts for audio recordings that include some of the material the defense characterizes as "exculpatory." (Br. 28).

The defense does not cite any authority within this Circuit where a court has directed the Government to single out *Brady* material within already-produced discovery. Instead, Ray relies on a handful of out-of-Circuit district court cases that are out of step with the law in this Circuit

---

[4] The defense dismisses the utility of the Government's responsiveness review in part because the Government "has yet to complete its review." As of the filing of this letter, the review is nearly complete, approximately five months before trial.

and numerous courts of appeal.  District courts in the Second Circuit have uniformly rejected requests to expand *Brady* in the manner the defendant seeks here (even as a matter of "case management" (Br. 26)) absent a showing of bad faith by the prosecution, even where the discovery is extremely voluminous.  *See, e.g.*, *Ohle*, 2011 WL 651849, at \*4; *United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 825 F. Supp. 2d 451, 455 (S.D.N.Y. 2011) ("The cases in this area tend to draw the same distinction: Absent prosecutorial misconduct—bad faith or deliberate efforts to knowingly hide *Brady* material—the Government's use of 'open file' disclosures, even when the material disclosed is voluminous, does not run afoul of *Brady*."); *United States v. Nordlicht*, No. 16 Cr. 640 (BMC), 2017 WL 4797829, at \*3 (E.D.N.Y. Oct. 23, 2017); *United States v. Faux*, No. 3:14 Cr. 28 (SRU), 2015 WL 1190105, at \*7 (D. Conn. Mar. 16, 2015); *United States v. Weaver*, 992 F. Supp. 2d 152, 156 (E.D.N.Y. 2014); *United States v. Healey*, 860 F. Supp. 2d 262, 269-70 (S.D.N.Y. 2012) ("the Government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence, even when that larger mass is enormous") (internal quotation marks and citation omitted); *United States v. Alvarado*, No. 01 Cr. 156 (RPP), 2001 WL 1631396, at \*4 (S.D.N.Y. 2001) ("The Defendants have pointed to no authority for the proposition that where there is a large mass of material that has been made available to the Defendants, it is the Government's duty to root out Brady material for the Defendants. Indeed the only authority is to the contrary.").  The Court should do the same here.

Ray's *Giglio* demand is equally untenable.  For one thing, the Government's *Giglio* obligations have not ripened yet.  *See, e.g.*, *United States v. Coppa*, 267 F.3d 132, 146 (2d Cir. 2001) (*Giglio* must be produced "in time for its effective use at trial," and not immediately upon request by a defendant).  Courts in this District routinely require only that *Giglio* be produced days before trial or before a witness's testimony,[5] and the Government intends to produce remaining *Giglio* material in advance of trial on a date set by the Court that takes into account, among other things, witness safety concerns.  Moreover, the discovery is replete with evidence that could be deemed *Giglio*, including entire devices belonging to potential witnesses, entire email accounts belonging to potential witnesses, as well as emails, photographs, financial records, medical

---

[5] *See, e.g.*, *United States v. Rodriguez-Perez*, No. 10 Cr. 905 (LTS), 2012 WL 3578721, at \*10-11 (S.D.N.Y. Aug. 16, 2012) (Swain, J.) (declining to order early disclosures under the *Jencks* Act and *Giglio* where the Government intended to make such material available to defense counsel one week before trial); *United States v. Davis*, No. 06 Cr. 911 (LBS), 2009 WL 637164, at \*14 (S.D.N.Y. Mar. 11, 2009) (Sand, J.) ("Impeachment material ordinarily need not be disclosed until the witness is called to testify at trial"); *United States v. Tranquillo*, 606 F. Supp. 2d 370, 382-83 (S.D.N.Y. 2009) (Robinson, J.) ("Impeachment material ordinarily need not be disclosed until the witness is called to testify at trial"); *United States v. Noble*, No. 07 Cr. 284 (RJS), 2008 WL 1990707, at \*9 (S.D.N.Y. May 7, 2008) (Sullivan, J.) (denying request for early disclosure of *Giglio* and 3500 material where the Government agreed to turn over such materials the Friday before trial); *United States v. Greyling*, 2002 U.S. Dist. LEXIS 4502, at \*15-16 (S.D.N.Y. Mar. 18, 2002) (Casey, J.) (production of *Giglio* material by the Wednesday before the week in which a witness will testify is appropriate); *United States v. Trippe*, 171 F. Supp. 230, 237-38 (S.D.N.Y. 2001) (Kram, J.) ("The usual practice in this district is that the Government agrees to make impeachment information available to the defense at the same time as Jencks Act Material, that is, at least one day before the Government witness is called to testify.").

records, writings, audio recordings, and videos associated with potential witnesses across the entire discovery production. Some of this material is arguably not even Rule 16 material, but was produced to provide the defense with early *Giglio* disclosures. Reorganizing and reproducing these files with a *Giglio* designation in order to assist the defense in the presentation of their case is not among the Government's responsibilities, and Ray's *Giglio* demand should be denied as well.

### C. Ray's Demand that the Government Identify Its Exhibits Before the Suppression Motion Deadline is Meritless and Should be Denied

Ray further demands that "pursuant to Federal Rule of Criminal Procedure 12(b)(4)(B) and the Court's inherent authority to regulate the timing and nature of discovery, the Court should order the Government to identify the specific evidence it intends to use in its case-in-chief at least 30 days prior to the suppression motion deadline." (Br. 31-32). This demand rests on a gross misinterpretation of Rule 12 that has never been accepted in this Circuit. Requiring the Government to produce an exhibit list five months before trial would dramatically deviate from discovery practices in this Circuit and is unwarranted here.

Rule 12(b)(4)(B) provides that: "At the arraignment or as soon afterward as practicable, the defendant may, in order to have an opportunity to suppress evidence under Rule 12(b)(3)(C), request notice of the government's intent to use (in its evidence-in-chief at trial) any evidence that the defendant may be entitled to discover under Rule 16." Rule 12(b)(4)(B) thus permits a defendant to request such notice from the Government for a limited purpose: namely, "in order to have an opportunity to move to suppress" evidence that the Government intends to use in its case-in-chief at trial. Fed. R. Crim. P. 12(b)(4)(B). The rationale for this rule is to "make it possible for [a defendant] to avoid the necessity of moving to suppress evidence which the government does not intend to use" at trial, and to inquire about "what types of evidence the government intends to use so that he can make his motion to suppress prior to trial[.]" Fed. R. Crim. P. 12 advisory committee notes (1974).

The defense did not make an enumerated request under Rule 12, "[a]t the arraignment or as soon afterward as practicable." Fed. R. Crim. P. 12(b)(4)(B). Instead, for the first time in its current motion, the defendant provides a list of demands thirty-three days before the motions deadline, and requests a response "at least 30 days before the defense's suppression motion is due." (Br. 34). The list essentially seeks an inventory of any evidence the Government intends to use at trial that was obtained from a variety of searches and seizures, that is derived from statements made by Ray to law enforcement, and that involves communications between Ray and others (not limited to telephone calls). But the Government has already satisfied what is required under Rule 12 by producing Rule 16 discovery, telling the defendant that (at this point) it intends to introduce at trial evidence produced in discovery and obtained from each search warrant issued in this case and statements made by Ray to law enforcement, and by generating responsiveness reports for accounts and devices whose contents were obtained through search warrants. That satisfies Rule 12 and fulfills its purpose, which is to spare the defendant the effort of challenging the lawfulness of a search or of a law enforcement interview where the Government has no intention of using the fruits of that search or interview. *See, e.g.*, *United States v. Conyers*, No. 15 Cr. 537 (VEC), 2016 WL 7189850, at \*10 (S.D.N.Y. Dec. 9, 2016) (holding that under Rule 12(b)(4)(B), "[n]otice from

the Government that it intends to rely on some or all of the evidence gleaned from a search warrant would adequately inform the defense that a motion is worth making—identification of specific evidence is unneeded").

Rule 12 is plainly not a mechanism to force the Government to assemble its trial exhibits "at the arraignment" or soon thereafter, and it is not a workaround for forcing the Government to commit to its "evidence in chief before the suppression motion deadline" (Br. 31), and months before trial.  The U.S. Supreme Court, which promulgates the Federal Rules of Criminal Procedure, no less than Congress, does not "hide elephants in mouseholes."  *Whitman v. American Trucking Associations*, 531 U.S. 457, 468 (2001); *see also United States v. Ishak*, 277 F.R.D. 156, 158-59 (E.D. Va. 2011) ("[D]efendants cannot invoke Rule 12(b)(4)(B) to force the government to decide precisely which documents provided in discovery it will offer at trial and to prevent it from using any that it does not so designate as a matter of trial tactics.") (internal citation and quotation marks omitted).  As Judge Sullivan explained in *Vilar*, Rule 12(b)(4)(B) refers to "any evidence that the defendant may be entitled to discovery under Rule 16," and Rule 16, in turn, "does not *require* the Government to identify specifically which documents it intends to use as evidence . . . It merely requires that the Government produce documents falling into the three enumerated categories."  *United States v. Vilar*, 530 F. Supp. 2d 616, 636 (S.D.N.Y. 2008) (internal quotation marks and citations omitted).  Judge Sullivan therefore "reject[ed] Defendants' assertion that Rules 12 and/or 16 require the Government to comply with their requests for specific disclosures listing the evidence the Government intends to use at trial."  *Id.* at 637.[6]  Judge Caproni rejected a similar request in *Conyers*, finding that a request for "'any and all' evidence that the Government may use at trial . . . goes far beyond what would be necessary to facilitate efficient motion practice" under Rule 12(b)(4)(B).  2016 WL 7189850, at *10.

In support of his motion, Ray cites *United States v. de la Cruz-Paulino*, 61 F.3d 986, 994 (1st Cir. 1995), but that case only reinforces the limited purpose of Rule 12, holding that "Rule 12(b)(4)(B) is not designed or intended to be used to obtain more specific discovery than that provided by Rule 16" and it "was not designed to aid the defendant in ascertaining the government's trial strategy, but only in effectively bringing suppression motions before trial, as required by Rule 12(b)(3)."  Indeed, several district courts have held that Rule 12 imposes no additional obligation on the government once it has complied with Rule 16.  *See Ishak*, 277 F.R.D. at 159 n.2 (collecting cases); *Conyers*, 2016 WL 7189850, at *11 ("Given that the Government has and continues to fulfill its discovery obligations, there is no need for the Court to further order early disclosure.").  Similarly, in *United States v. Fell*, 2015 WL 8481854, at *1, *3 (D. Vt. 2015), relied on by Ray, the district court simply ordered notice of intent to use material that was "subject to disclosure under Rule 16" and "relevant to a potential suppression issue," where Rule 16

---

[6] Rule 12 also lends no authority to Ray's demand for: "[a]ny information or evidence, including recordings, of any communications purportedly between Mr. Ray and other persons, including, but not limited to, telephone calls between Mr. Ray and other persons" (Br. 34), which encompasses information that goes well beyond evidence obtained from suppressible searches, such as emails and text messages between Ray and some of his victims provided to the Government by those victims.  *See, e.g.*, *Conyers*, 2016 WL 7189850, at *10 (rejecting defendant's request that the Government identify evidence that is "unlikely to be derived from searches and seizures that could implicate Fourth Amendment considerations").

discovery had otherwise not been completed.  Contrary to Ray's characterization, *Fell* did not require an early identification of "trial exhibits," but a disclosure of "evidence" in advance of the suppression deadline, *i.e.*, certain Rule 16 material.  *Id.* at *2.  And in *United States v. Koschtshuk,* 2010 WL 584018 (W.D.N.Y. 2010), cited by Ray, the district court specifically rejected a claim like Ray's here, finding that the Government satisfied its obligations by producing hundreds of hours of audio and video intercepts in discovery and was not required to provide greater specificity about which portions it intended to use at trial.  *Id.* at *10 ("[G]iven the purpose of the rule, I find no basis for the government to more specifically identify the evidence that it intends to use in its case in chief at trial.").  The sole Second Circuit authority that Ray cites is simply inapposite: *Bortnovsky* concerned error in the district court's failure to grant a bill of particulars and had nothing to do with Rule 12.  *See United States v. Bortnovsky*, 820 F.2d 572, 574 (1987).

Here, Ray has received Rule 16 discovery, as well as responsiveness reports for Ray's accounts and devices, and has been placed on notice of the Government's intent to use responsive material obtained in these searches at trial.  That is sufficient under Rule 12.  Put simply, "Rule 12 does not require the government to disclose its exhibit and witness list at this time [in advance of trial]."  *Ishak*, 277 F.R.D. at 159; *see id.* n.2 (rejecting the view that Rule 12 requires disclosure of the government's exhibit list as "ignor[ing] the Rule's text, purpose, and proper relationship to Rule 16"); *see also United States v. Mendoza*, 09 Cr. 292 (E.D.N.Y.), Dckt. Nos. 144, 148, 149 (denying motion for Rule 12(b)(4)(B) notice of Government's intent to use certain evidence in its case-in-chief at trial).

To the extent the defense is asking the Court to impose an exhibit deadline in advance of the pretrial motions deadline simply as a matter of its "inherent authority to regulate the timing and nature of discovery" (Br. 31), that request is unwarranted and premature.  The Government has only recently completed discovery and is nearing completion of its responsiveness review.  It is far too early for the Government to commit to an exhibit list where it is only in the earliest stages of trial preparation, and has yet to complete its investigation and review of the evidence, let alone prepare its witnesses for testimony.  Indeed, in this Circuit, "[i]t is well established that witness lists and exhibit lists need not be provided in advance of trial."  *United States v. Robles*, No. 04 Cr. 1036 (GEL), 2005 WL 957338, *2 (S.D.N.Y. Apr. 22, 2005).  Nonetheless, the Government has already committed to producing an exhibit list three weeks in advance of trial.

Ray relies on *Vilar*, but there the court held that "no statute or rule specifically mandates disclosure of an exhibit list."  530 F. Supp. 2d at 639.  Instead, the court found that it was "reasonable, under the circumstances of this case, to order production of the Government's exhibit list prior to trial."  *Id.* at 639-40.  That determination was based in part on the unique circumstances of the case, which was a complex securities case that involved an illegal search and potential exhibits that were tainted and obtained as fruits of the poisonous tree; Judge Sullivan explained that an early exhibit list would "permit[] Defendants to evaluate [in advance of trial] whether any of the Government's proffered exhibits raise issues of taint" and "narrow[] the number of documents and/or witnesses that may be the subject of inquiry at a pre-taint hearing in this action."  *Id.* at 640.  On those unique facts, Judge Sullivan ordered the Government to produce an exhibit list 60 days prior to trial, unless it could demonstrate that disclosure of certain evidence would "endanger any witness or other person, or would otherwise be significantly prejudicial to the orderly prosecution of the Government's case."  *Id.*

Those unique circumstances are not present here, and even in that case, Judge Sullivan's order was entered *a year and a half* after the suppression motions had been filed in the case. The Government has already committed to producing a preliminary exhibit list three weeks before trial, which is well before what is typically required. The Government is also not categorically opposed to making that list available sooner. But it is too soon to make that determination. For one, the Government is only in the early stages of trial preparation. The pretrial motions have not been litigated and thus it is not clear what universe of evidence will be eligible for use at trial. The specter of a trial adjournment looms in light of the ongoing pandemic, and such an adjournment would change the nature of trial preparation for both parties. Finally, the Government's preparation of an early exhibit list depends in part on the cooperation of defense counsel. The Government, for example, asked the defense if it expected to be amenable to stipulations, including to obviate the need to prepare and call innumerable records custodians at trial, and the defense demurred. If the Government is busy locating and preparing dozens of records custodians in the weeks before trial, that will certainly interfere with the preparation of an early exhibit list.

For all these reasons, the Court should deny the defendant's request for an exhibit list in advance of the pretrial motions deadline, and defer on a decision about modifying the Government's existing exhibit list deadline.

### D. The Defendant Has Not Made the Showing Necessary to Justify His Proposed Amendment to the Protective Order

The defendant seeks a modification of the protective order to require that at the defendant's prompting, the Government defend in writing to the Court, with a "particularized showing," why "disclosure material subject to defense counsel's request merits restriction." (Br. 39). But the defendant has failed, by his own standard, to demonstrate an "extraordinary circumstance or compelling need" (Br. 36) for this inadministrable and onerous change, where this case plainly involves copious amounts of sensitive discovery and where there is no indication that the Government has abused the terms of the existing protective order or indiscriminately marked evidence as sensitive.

To be sure, the current pandemic is an unprecedented and unforeseeable circumstance that has substantially hindered countless defendants from reviewing discovery. As it is, however, the circumstances in this case are less bleak than the defense makes out. The defendant has more than ".3%" of the discovery (Br. 11); now that the terabytes of data have been substantially reduced, the defendant has access to at least 10% of the responsive discovery, including all of the search warrants and underlying applications, and hundreds of thousands of his own emails, which constitute an important part of the evidence in this case. In any event, the pandemic in no way does away with the protections that must be afforded to witnesses and victims, in no way mitigates the damage that would be caused by improper disclosure of sensitive discovery material, and in no way eliminates the Government's duty to protect witnesses and victims from harassment, embarrassment, loss of privacy, threats, and intimidation. These are far from speculative or unfounded concerns in this case. *See* Part I.C. The defendant has already misused the personal information of his victims to severe ill effect, including coercing one victim into prostitution and others to contemplate and attempt suicide. Ray targeted some of his victims precisely because of

their precarious mental health, and then he exploited their conditions to his own criminal gain. As set forth above, he has disseminated the personal information of his victims to others, including on the internet. He created a website in the name of one victim where he posted incriminating and humiliating content that he used to threaten that victim and coerce further prostitution, and content from that website remains on the internet to this day. Even now, he is communicating with the two young women he was living with at the time of arrest in an ongoing effort to influence their behavior. The damage from Ray's conduct has been harsh and long-lasting, interfering with his victims' ability to find employment, make friends, and repair family relationships.

The purpose of the Protective Order, therefore, is not simply, as the defense characterizes it, to protect the "identities" of Ray's victims. (Br. 37). Of course Ray knows full well who he victimized for nearly a decade. But the sensitive discovery contains information much more personal and ripe for abuse than simply his victims' identities. As laid out in detail above, the sensitive disclosure material includes pornographic content, intimate mental health information, personal family information, personal financial information, diary entries, and false confessions to crime. And it is some of these types of materials that the defense is claiming should be de-designated as "sensitive" and provided to Ray in prison, without a common-sense, corresponding change to the Protective Order that would forbid the misuse of non-sensitive disclosure material and the dissemination of such material on the internet or to third parties (including to fellow prisoners or coconspirators). *See* Part I.D. That is not a risk that should be taken lightly—once something is posted to the internet, it is typically not within the Government's control to have it taken down, and it can remain there in perpetuity. Unfortunately, that is true for some of the content the defendant already publicized to damage his victims, including a video that the defendant is now requesting be de-designated, a portion of which is still available on the internet despite efforts by the victim to have it removed.

An amendment to the protective order is particularly unwarranted here, where the Government's designations have been made with care, and where the defendant does not allege with any specificity that the Government's sensitive designations are improper. The *only* material that the defense claims was improperly designated consists of documents provided to law enforcement by Ray (in a prior investigation), for which they claim "there is no justifiable basis for the 'sensitive' designation." (Br. 6). In fact, those files include recordings of Ray's minor children where he questions them about sexual abuse, police incident reports and other records with third party personal identifying information, health records for Ray's minor children, and emails where one of his children describes sexual abuse. Ray decries that the Government has failed to honor its requests to de-designate certain video files and devices, including for example, videos that the Government used as exhibits (under seal) in opposition to Ray's initial bail motion. (Br. 6). But those two videos depict Ray physically abusing one of the women he was living with at the time of his arrest and verbally abusing the other woman he was living with at the time of arrest, while that woman sobs and denigrates herself. The other videos similarly contain content personal to third parties, and encompasses content that Ray had previously posted to the internet as part of his campaign to disgrace, control, and extort his victims.

Ray claims that because his email account includes some audio files that are arguably sensitive, the Government's remaining sensitive designations are suspect. (Br. 38). (Contrary to what is stated in the defendant's motion, the defendant does not currently have access to his iCloud

Page 18

account and the sensitive videos, photographs, and audio files contained there. (Br. 38).) But the Government should not be penalized for its decision to facilitate discovery by immediately giving Ray access to his entire email account, rather than withholding that evidence too on the basis of some potentially sensitive attachments. That would create a regime where the Government is discouraged from providing access to discovery for fear that it would forfeit the ability to protect other plainly sensitive material. Providing Ray access to his own emails at the outset of discovery is distinct from providing him documents, drives, videos, and recordings that contain material the Government has identified as sensitive and which Ray preserved in the service of his criminal scheme. Ray's access to his email account is therefore not license to strip away sensitive designations that were properly made elsewhere, or to provide Ray with hard copy transcripts of audio files, which could easily be disseminated within the prison.

On these facts, and given the nature of the sensitive discovery material, there is no justification for requiring the Government to independently establish "good cause" with a "particularized showing" for each item of evidence within the gigabytes of patently sensitive discovery material. Not only is this a case crying out for a Protective Order, the defense has not cited a *single case* with a comparable provision to what they request here, even one with a smaller universe of sensitive material or a less compelling justification to mark discovery as sensitive. Such an onerous requirement would defeat the defense's goal, which the Government shares, to make additional discovery available to the defendant, by saddling the Government with the unjustifiably time consuming process of defending each sensitive designation to the Court.

The Government recognizes the importance of finding additional solutions that would facilitate discovery review, even during a pandemic. As described above, in response to the defendant's request that Ray's two iPhones be de-designated as "sensitive," the Government will review those phones for evidence that is non-sensitive, which can be produced directly to Ray. The Government is also prepared to de-designate certain "sensitive" discovery (such as the remaining draft transcripts) with a corresponding change to the Protective Order that would prohibit the defendant from maliciously disseminating disclosure material to others, including through the use of a contraband cellphone, or by distributing paper copies of the draft transcripts within the prison. That should not be a controversial proposition, and is one the defense should be ready to embrace in order to facilitate discovery review. Indeed, it is a common provision of many protective orders in this District, and one that was initially omitted here only at the defense's insistence. *See, e.g.*, *United States v. Arguedas*, No. 20 Cr. 135 (JMF), Dkt. No 79; *United States v. Taylor*, No. 20 Cr. 227 (LTS), Dkt. No. 26; *United States v. Herrman*, 20 Cr. 215 (JPO), Dkt. No. 10; *United States v. Spencer*, No. 20 Cr. 78 (AT), Dkt. No. 58; *United States v. McBean*, No. 20 Cr. 226 (KPF), Dkt. No. 16; *United States v. Gamoneda*, No. 20 Cr. 109 (JGK), Dkt. No. 13; *United States v. Wilson*, No. 19 Cr. 625 (JMF), Dkt. No. 11; *United States v. Lawrence*, No. 19 Cr. 761 (JPO), Dkt. No. 61.

The Government's purpose is not to thwart preparation of a defense, but to protect victims. To the extent both essential goals cannot be achieved without an adjournment, then the proper remedy is an adjournment, not an evisceration of the safeguards of a Protective Order. Accordingly, the defendant's request to modify the Protective Order should be denied.

Page 19

### E. Discovery Access at the MCC

Finally, Ray requests that the Government provide him a laptop for use at the MCC, or in the alternative, that the Court order the MCC to provide Ray expanded access to a discovery computer. (Br. 40-41). The Government has conferred with an official at the MCC and has learned that measures implemented to limit the spread of Covid-19 at the MCC have included closing the facility's law library. There is, however, an electronic law library on every housing unit which inmates can access during time out of their cells. Each electronic law library has one discovery computer for viewing electronic discovery, such as the hard drive the Government provided to Ray on May 22, 2020. In addition, each electronic law library has one computer for legal research. Inmates have access to the electronic law libraries in their housing units for approximately two hours per day, and have unlimited access to paper discovery within their cells.

The defense contends that it has been "virtually impossible" for Ray to review discovery materials and that he has "only a fraction of the time the Government asserted he would to review disclosure material." (Br. 13). That is not accurate. To be sure, there are occasional lockdowns to protect inmates from contracting Covid-19. According to information provided by the MCC, an inmate within Ray's housing unit tested positive for Covid-19 on August 14, 2020. As a result, inmate movement within Ray's housing unit is currently not permitted. But these restrictions are expected to lift in a matter of weeks, as testing for Covid-19 will begin again upon the completion of a fourteen-day quarantine period. Based on information from the MCC, we understand that even before these restrictions were in place, Ray repeatedly did not take advantage of time afforded to him to use the computers when they were open and available to him. While that is Ray's prerogative, the failure to make use of time to review discovery is not a failing of the Government.

Ray requests the provision of a laptop to facilitate his review of discovery. This is an option the Government has explored in good faith, but it is not feasible under BOP safety procedures so long as the facility's law library remains closed. While laptops are occasionally permitted for discovery review in the law library, MCC policy precludes the use or possession of a laptop within a cell or housing unit for security reasons. Thus, as directed by the MCC, the Government is not permitted to provide Ray with a laptop at this time, but that may be a possibility once the law library reopens.

Page 20

## III.    Conclusion

For the foregoing reasons, the defendant's motion should be denied.  Although the defendant has had unrestricted access to the underlying search warrant materials and the opportunity to discuss them with counsel, the Government takes no position on the defendant's request for an adjournment of the pretrial motions deadline.

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney

By:    /s/ Danielle R. Sassoon
       Danielle R. Sassoon
       Lindsey Keenan
       Mollie Bracewell
       Assistant United States Attorney
       212-637-1115/914-993-1907/212-637-2218