# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

August 27, 2020

**VIA ECF**

Honorable Lewis J. Liman
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re:     United States v. Lawrence Ray**
         **20 Cr. 110 (LJL)**

Dear Judge Liman:

We write on behalf of Defendant Lawrence Ray in further support of Mr. Ray's Motion for Release from Pretrial Detention and for Modest Discovery Accommodations (Doc. 36, "Mot.") and in reply to the Government's Opposition (Doc. 38, "Opp'n"). For the reasons set forth in Mr. Ray's motion and below, the Court should:

- reconsider its April 16, 2020 bail determination and order Mr. Ray's release from pretrial detention or order Mr. Ray's temporary release;

- modify the Protective Order (Doc. 12) to enable the Court to resolve any disputes about whether the Government has established good cause to designate certain discovery "sensitive" and therefore unavailable to Mr. Ray for review outside the presence of counsel;

- order the Government to identify all *Brady* and *Giglio* within its voluminous production and identify the evidence the Government intends to use in its case-in-chief at least 30 days before suppression motions are filed;

- extend the pretrial motion deadline by 45 days, to October 29, 2020; and

- order the Government to provide Mr. Ray a computer to review disclosure material or expand his access to a computer at the MCC unless and until he is released.

In light of the unprecedented restrictions that have been placed on Mr. Ray and the defense, Mr. Ray objects pursuant to the Fifth and Sixth Amendments to the United States Constitution and Rules 12 and 16 of the Federal Rules of Criminal Procedure to being required to file pretrial motions or proceed to trial under circumstances where Mr. Ray is unable to review more than 95% of the discovery in his case and incapable of meaningfully participating in his own defense.

Hon. Lewis J. Liman

**I.     The Government's "Massive" Discovery Production Is Virtually Unparalleled And Mr. Ray's Access To Discovery Remains Exceptionally Limited**

The Government asserts that the defense has presented a "misleading" view of the discovery materials. Opp'n 3. Yet the Government does not dispute that it has produced more than 15 terabytes of discovery to date; that more than 95% of its disclosure materials have been designated sensitive and therefore unavailable to Mr. Ray for review for the past six months; or that Mr. Ray, while incarcerated, has access to only .3% of all disclosure material in his case— 39 gigabytes out of roughly 15,000 gigabytes of data.

To be sure, the Government did not turn over 750 million pages of documents. Instead, the Government produced tens of thousands of video files, more than 150,000 audio files, and countless other files and materials that are in many ways more burdensome than simple paper documents that can be reviewed with the assistance of key word searches. The audio and video files alone require incalculable listening hours and securing transcriptions that must then be read.

Rather than acknowledge that its discovery production is virtually unparalleled, the Government contends that the appropriate measure of its production is not the more than 15 terabytes of materials disclosed to date, but rather the data from its (ongoing) responsiveness review, which so far constitutes "less than 300 gigabytes" of data. Opp'n 4.[1] Notably, this number still far outstrips the mere 39 gigabytes of material the Government has sent Mr. Ray to date.

There are two problems with the Government's rationale. First, the Government ignores the fact that its collection of responsive material alone is extraordinary, equivalent to tens if not hundreds of millions of pages. *See Riley v. California*, 573 U.S. 373, 394 (2014) ("Sixteen gigabytes translates to millions of pages of text, thousands of pictures, or hundreds of videos."); *United States v. Cotterman*, 709 F.3d 952, 964 (9th Cir. 2013) ("The average 400-gigabyte laptop hard drive can store over 200 million pages—the equivalent of five floors of a typical academic library."). Second, while the Government is cabined to the universe of materials identified as responsive, the defense is not. To guarantee Mr. Ray his constitutional right to effective assistance of counsel, the defense must be able to review all materials produced by the Government, even those the Government deems irrelevant to its case.

Further, the Government's recasting of the unprecedented circumstances of Mr. Ray's case serves only to underscore the extraordinary violation of Mr. Ray's constitutional right to participate in his own defense. By the Government's telling, "the circumstances in this case are less bleak than the defense makes out." Opp'n 16. In support of this contention, the Government declares that Mr. Ray now has access to at least 10% of the *responsive* discovery. By the

---

[1] The Government congratulates itself for nearly completing its responsiveness review "in a matter of months." Opp'n 4. Certainly, the Government will complete its review in less than the three years that Judge Nathan found reasonable in a different case. But the Court originally ordered all discovery to be completed by May 29, 2020 and set a January 2021 trial date in this case.

Hon. Lewis J. Liman

Government's own calculations, Mr. Ray cannot access or review 90% of the discovery in a case where, if convicted, he faces life in prison.

In addition, as a practical matter, Mr. Ray cannot review the vast majority of even the limited disclosure materials he's allowed to access. In the best of times at the MCC, Mr. Ray has access to a single shared computer to review discovery two hours a week.[2] When his unit is on lockdown, as it has been and will continue to be for "weeks," Opp'n 19, Mr. Ray cannot access the computer to review discovery at all. Despite this, of the five discovery productions the Government has sent directly to Mr. Ray to date, four were sent on a hard drive or CD requiring computer access to review; only one production included hard copy materials. When defense counsel requested that the Government send Mr. Ray hard copies of files that can be printed out, the Government indicated that there are tens of thousands of pages and asked that the defense identify specific materials that could be realistically printed, which defense counsel has done. Implicit in the Government's response is acknowledgement that there is no conceivable way for Mr. Ray to review even the fraction of the disclosure materials he has when his unit is on lockdown.

To assist with the defense's review of discovery, the Government asserts that it "has also produced to defense counsel a report of the most responsive material" on witnesses' personal devices, which is "essentially a 'hot document' report for those devices." Opp'n 4. In response to a request for clarification from defense counsel, the Government responded that it is "going to send" "an inventory of every device extracted," but is waiting for additional information from the FBI and "should be able to confirm by mid next week." In a separate email, the Government walked back the representation in its filing, clarifying that, to date, it had produced "hot document" reports for six devices, out of the more than 50 devices it has produced. These reports alone—and to be clear, the Government intends to produce more—identify more than 2,800 files of varying type.

Given the restrictions placed on Mr. Ray and the defense that were detailed in Mr. Ray's motion, it is hard to characterize the "circumstances in this case" as anything other than "bleak."

## II.    The Court Should Impose Mr. Ray's Proposed Reasonable Modification Of The Protective Order

The defense has requested a simple modification of the governing Protective Order; namely, the addition of a paragraph that would enable the Court to determine—if there is a dispute between the parties—whether the Government has established good cause to designate

---

[2] The Government asserts that MCC inmates like Mr. Ray currently have access to "electronic law libraries in their housing units for approximately two hours per day," Opp'n 19, at which they can review discovery, but ignores that, as noted in Mr. Ray's motion, MCC Legal has confirmed: (1) Mr. Ray is only allowed access to this computer two hours per week and (2) this time is not reserved exclusively for Mr. Ray (or any one inmate), but rather shared by every inmate in that unit who needs to review their discovery. Further, this is the only time during the day that Mr. Ray is allowed out of his cell to use the computer for email and speak on the phone. .

Hon. Lewis J. Liman

certain discovery "sensitive" and therefore unavailable to Mr. Ray for review outside the presence of counsel. Mot. 35–39. Due to the Government's substantial designation of disclosure materials as sensitive, Mr. Ray cannot review more than 95% of the discovery in his own case. The Government does not dispute this fact. Nor does the Government contend that it has considered whether each individual file within the sensitive material itself qualifies for the sensitive designation. Rather, it has designated entire devices and accounts sensitive merely because of whom they purportedly belong to. Anything but an "evisceration of the safeguards of a Protective Order," Opp'n 18, the proposed addendum merely reinstates the burden to show good cause for sensitive designations squarely where it belongs: on the Government. *See United States v. Johnson*, 314 F. Supp. 3d 248, 253 (D.D.C. 2018).

There can be no question that the defense has met its burden for modifying the Protective Order. There is simply no more "extraordinary circumstance or compelling need" than a defendant who has spent six months incarcerated in the midst of a global pandemic, without access to the law library, enduring repeated lockdowns during which he cannot leave his room and has no access to a computer to review discovery, without in-person visits from counsel or loved ones, and without the ability to review more than 95% of the discovery in his own case. *See S.E.C. v. TheStreet.Com*, 273 F.3d 222, 229 (2d Cir. 2001). Indeed, the Government itself characterized the conditions at the MCC as "unprecedented." Opp'n 9.

Importantly, the proposed modification of the Protective Order would not automatically alter the Government's designation of disclosure materials. Nor would the revision require the Court to provide Mr. Ray access to sensitive materials in the absence of counsel. The defense has not even requested that the Court undertake the onerous task of reviewing all of the Government's sensitive designations to maximize Mr. Ray's potential access to discovery. Far from an "inadministrable and onerous change," Opp'n 16, the defense's proposed modification to the Protective Order is a conservative one. It provides a mechanism for the Court to resolve disputes between the parties about whether certain relevant materials should be designated as sensitive, and therefore incapable of review by Mr. Ray. Despite the Government's repeated assurances—and the explicit requirement in the Protective Order, Doc. 12 ¶ 8—that it would review its sensitive designations at the defense's request, with the exception of 30 transcripts of redacted bank calls, the Government has not released a shred of material from its sensitive designation. The proposed modification is therefore necessary to ensure the Government—which has designated more than 95% of discovery as sensitive—establishes good cause for its restrictive designations.

The Government accuses the defense of "not cataloguing examples of materials it deems improperly designated." Opp'n 5. Implicit in this contention is the suggestion that the Government has properly designated all sensitive materials and the defense cannot demonstrate otherwise. While Mr. Ray's motion did not provide an exhaustive list of examples of improper designations, it is disingenuous for the Government to suggest that there is a lack of disputed materials. Indeed, the Government references examples of materials the defense explicitly requested the Government release from their sensitive designation. Opp'n 7. That the defense chose not to expound on those disputes in its brief does not mean there is no merit to its proposed modification.

Hon. Lewis J. Liman

The Government argues that "there is no indication that the Government has abused the terms of the existing Protective Order or indiscriminately marked evidence as sensitive." Opp'n 16. This is false. The fact that the Government has designated more than 95% of discovery as sensitive is itself evidence of the Government's abuse of authority. But there are specific examples as well.

For instance, it is the Government's position that "[t]he devices that belonged to persons other than Ray are sensitive for that reason alone." Opp'n 7. Accordingly, the Government reflexively designated at least 24 devices as sensitive without regard for the specific material on each device. Opp'n 4–5. It cannot be the case that all of the files on a given hard drive are "sensitive" under the terms of the Protective Order, Doc. 12 ¶ 2, merely by virtue of whose device it is. During a July 24, 2020 meet-and-confer, the Government indicated that since the contents of the premises search have been reviewed, the Government may consider whether anything previously designated sensitive may now be produced directly to Mr. Ray. This includes content from two cell phones that the Government believes belonged to Mr. Ray, but nonetheless marked sensitive in their entirety. To date, the Government has not reversed a single of these sensitive designations.

There is one category of materials that merits the Court's particular attention: exculpatory audio and video of alleged victims confessing to harming Mr. Ray. Defense counsel requested not only that the Government identify all of these materials within its discovery to comply with its *Brady* obligation, but also that the Government de-designate as sensitive all disclosure materials in this category. Refusing to release these materials from their sensitive designation, the Government noted that Mr. Ray already had access to some of these files to the extent that they appeared as attachments in his email account.[3]

By allowing Mr. Ray access to some, but not all, material of this type, the Government draws an arbitrary distinction between those materials that receive a sensitive designation and those that do not. The Government would have the Court believe that "[p]roviding [Mr.] Ray access to his own emails at the outset of discovery is distinct from providing him documents, drives, videos, and recordings that contain material the Government has identified as sensitive and which Ray preserved in the service of his criminal scheme." Opp'n 18. But to the extent that the materials in Mr. Ray's email, which he has access to, are the identical to materials the Government has marked sensitive on other devices or accounts, simply by virtue of whom the Government believes the device belonged to, the Government neglects to explain the distinction.

Importantly, the fact that Mr. Ray has had access to these materials—which are not deemed sensitive when they appear in Mr. Ray's emails but retain the sensitive designation when they appear in another person's device or iCloud account—and has not publicly disseminated them demonstrates the invalidity of the Government's purported concerns. Opp'n 7.

---

[3] Based on the Government's representations to the Court and on phone calls between the parties, the defense has long understood that the Government provided Mr. Ray with access to his iCloud account in addition to his email account. The Government has since made clear that it did not provide Mr. Ray access to his entire iCloud account, but rather just the emails within his iCloud. Without his iCloud account, Mr. Ray has access to even less discovery than the defense believed when it filed its motion.

Hon. Lewis J. Liman

Notwithstanding the Government's apprehension for the privacy of the alleged victims, it was the United States Attorney's Office for the Southern District of New York—not Lawrence Ray—that issued a press release and held a televised press conference to broadcast the filing of the indictment in this case and expound upon the salacious allegations contained therein. A video of the press conference still appears on the United States Attorney's Office for the Southern District of New York's Facebook page.

### III.    The Government Misrepresents Mr. Ray's Argument For Release And Misstates The Law

Mr. Ray's motion identified several changed circumstances since the Court's April 2020 order denying bail—including the spike in COVID-19 cases at the MCC and the ongoing risks to Mr. Ray's health; the resulting lockdowns and limitations on Mr. Ray's movement and access to discovery at the MCC; the extended prohibition on in-person counsel visits; the voluminous discovery production; and the Government's overbroad restriction of Mr. Ray's access to this material—which together substantially burden his Sixth Amendment rights and justify reconsideration of the Court's previous bail determination. Mot. 20–26. The Government dismisses these concerns with the claim that "the circumstances of the COVID-19 pandemic alone cannot justify Ray's release," and neither engages with these facts nor acknowledges the unprecedented hurdles faced by the defense. Opp'n 8. Instead, the Government merely suggests that "the appropriate remedy is an adjournment to allow the defense an adequate opportunity to prepare for trial." Opp'n 9. The Government's indifference to Mr. Ray's constitutional rights in favor of "the Government's duty to protect witnesses" is striking. Opp'n 16. The Government fails to recognize that an adjournment of trial to accommodate Mr. Ray's review of discovery, while likely inescapable, creates a significant tension between Mr. Ray's constitutional right to participate in his own defense and his constitutional right to a speedy trial.

The spread of COVID-19 shows no signs of abating in BOP facilities and continues to rise at a dramatic pace at the MCC (which is now reporting 37 positive inmates, up from 29 as of Mr. Ray's motion, including 6 inmates from Mr. Ray's unit) despite all of the protective and restrictive actions the BOP has taken.[4] Thus, the COVID-related restrictions that have prevented Mr. Ray from adequately participating in his own defense are likely to be reinstated regularly over the coming months, if not continue indefinitely. In these particular circumstances, the only remedy that would safeguard Mr. Ray's constitutional rights is release from pretrial detention.

The Government asserts that Mr. Ray presents a "danger to the community." Opp'n 8. But the Government does not respond to Mr. Ray's arguments that the Government's claims are empty rhetoric contradicted by its own actions. Mot. 24–25. Specifically, if the Government believed Mr. Ray posed a true danger to the community, they would not have waited more than six months to arrest him in February 2020 after interviewing alleged "Female Victim-1" in July 2019.

Moreover, contrary to the Government's conclusory statements that Mr. Ray poses a risk to potential witnesses, the Government's own sworn warrant applications reflect that when

---

[4] See Ltr. from M. Licon-Vitale & H. Tellez to Hon. R. Mauskopf (Aug. 25, 2020), *available at* https://www.nyed.uscourts.gov/pub/bop/MDC_MCC_20200825_024739.pdf.

Hon. Lewis J. Liman

purported victims in this case no longer wished to associate with Mr. Ray, they were able to distance themselves from him without consequence. For example, the lead FBI agent in this matter swore that, in 2013, "Male Victim-1" moved out of the residence where he was living with Mr. Ray and others and "stopped communicating" with them. Agent Aff. in Supp. of App. for a Search Warrant for Stored Elec. Commc'ns (Sept. 23, 2019), US_000077 at -87. The agent and Government have not alleged that Male Victim-1 was subjected to any threats or harassment after he voluntarily ceased communicating with Mr. Ray. Similarly, the agent swore that "Female Victim-1," who the Government asserts was the primary victim of the alleged offense conduct, "cut off" communication with Mr. Ray in October 2018 and has since received one email from him attempting to "reestablish contact"—far from harassing or threatening behavior. *Id.* at -94. The Government's own actions and sworn submissions to the Court thus undermine its assertion that Mr. Ray poses a "danger to the community."

With respect to Mr. Ray's application for temporary release under Section 3142(i), the Government misstates the law and misrepresents the cases cited in the defense motion. Opp'n 8–9. The Government wrongly asserts that "[c]ourts have not held, as Ray suggests, that a defendant can be released under Section 3142(i), despite posing a danger to the community if released and without regard for the 'initial detention determination.'" Opp'n 8. This assertion is contradicted by the very case quoted in Mr. Ray's motion and (without attribution) in the Government's opposition:

> *Notwithstanding a defendant's pretrial detention pursuant to 18 U.S.C. § 3142(e)*, a "judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). *Section 3142(i) "provides a distinct mechanism for temporarily releasing a detained defendant, in a manner that has nothing to do with a revisiting of the initial detention determination*," *United States v. Lee*, 19-cr-298 (KBJ), 2020 WL 1541049, at *3 (D.D.C. Mar. 30, 2020), but "[a] defendant has the burden of showing that temporary release is 'necessary,'" *id.* at *3 (alteration in original) (internal quotation marks omitted) (quoting *United States v. Stephens*, No. 15-cr-95, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020)).

*United States v. Dhavale*, No. 19 MJ 92 (BAH), 2020 WL 1935544, at *2 (D.D.C. Apr. 21, 2020) (Howell, Chief Judge) (emphasis added); *see* Mot. 23.

In *Dhavale*, Chief Judge Howell found that, "upon assessment of the § 3142(g) factors . . . [Mr. Dhavale's] pretrial detention is warranted, under § 3142(e)." *Id.* at *3. Specifically, the court found that the defendant had not rebutted the presumption that he presented a danger to the community under Section 3142(g)(4) or that no pretrial release condition or combination of conditions could be imposed to assure the safety of the community. *Id.* at *4. "Nonetheless," *i.e.*, notwithstanding the determination that the defendant was not entitled to bail and presented a danger to the community, Chief Judge Howell ordered temporary release under Section 3142(i) in light of a showing of "necessity" (for Mr. Dhavale, particular vulnerability to COVID-19). *Id.*

7

Hon. Lewis J. Liman

The Government similarly misstates the *Avenatti* case in the Central District of California. As Mr. Ray showed, Mot. 23, the District Court in *Avenatti* found that it had the authority to temporarily release the defendant pursuant to Section 3142(i), despite the fact that both it and the Ninth Circuit had concluded the defendant was a danger to the community:

> [T]he Court finds that it has the authority to grant temporary release pursuant to 18 U.S.C. 3142(i). . . . The Court has not lost sight and neither should the parties of this Court's finding, and the Ninth Circuit's affirmance, that Avenatti is a danger to the community. *United States v. Avenatti*, United States Circuit Court of Appeals for the Ninth Circuit, No. 20-50017, Mar. 6, 2020, p. 2. That remains the case, and requires the Court to craft specific, considered and adequate terms for any release under Section 3142(i).

*United States v. Avenatti*, No. 19 Cr. 61 (JVS) (C.D. Cal. Mar. 27, 2020), Doc. 128.

The court initially did not grant Mr. Avenatti's application because it was "not satisfied with the proposed particulars," *id.*, but once satisfactory conditions were proposed, the District Court ordered Mr. Avenatti's release under Section 3142(i) notwithstanding its finding of his "danger to the community." *United States v. Avenatti*, No. 19 Cr. 61 (JVS) (C.D. Cal. Apr. 10, 2020), Doc. 140. Despite Mr. Ray's motion citing both of these orders, the Government's opposition conspicuously omits reference to the release order and misleadingly represents the District Court's ruling on its authority to order temporary release under Section 3142(i).[5]

The Government further dissembles when it claims Mr. Ray "seeks release into the custody of a random neighbor," implying it has no information about Olga Bahet, the defense's proposed third party custodian. Opp'n 9. In truth, the Government has interviewed and spoken with Ms. Bahet and knows that she is a long-time family friend and former neighbor of Mr. Ray's. *See* App. and Aff. for Search Warrant (Feb. 11, 2020), US_000307 at -321.

In opposing temporary release under Section 3142(i), the Government even attempts to distance itself from the cases it previously relied on, claiming that these cases, which ordered temporary release under Section 3142(i) in light of substantial concerns about defendants' Sixth Amendment rights and upcoming proceedings, were issued in the "infancy" of the pandemic, when "substantial containment efforts at BOP facilities" were being imposed. Opp'n 9. But the same "containment efforts"—including the suspension of in-person visits, widespread lockdowns, and the closure of common areas like law libraries where defendants can access discovery—remain in place at the MCC, as the Government's own submission acknowledges.

The Government's disregard for what these lockdowns, restrictions, and limitations mean for individuals, like Mr. Ray, who are incarcerated at MCC (let alone the impact on inmates' constitutional rights) is striking. The Government notes in passing that "there are *occasional*

---

[5] The Government notes that the Magistrate Judge's decision in *Pimentel* was reversed by the District Judge without prejudice, Opp'n 9 n.3, but the record is unclear as to the basis for this determination, *i.e.*, if the District Judge disagreed with the legal reasoning about the court's authority under 3142(i) or the factual determinations the Magistrate Judge made about the conditions for release. *See United States v. Pimentel*, No. 19 Cr. 300 (EJF) (D. Utah), Doc. 47.

Hon. Lewis J. Liman

lockdowns to protect inmates from contracting COVID-19" and declares that the current lockdown of Mr. Ray's unit is "expected to lift *in a matter of weeks*." Opp'n 19 (emphasis added). The Government expresses no concern for Mr. Ray's wholesale inability to review electronic discovery for weeks on end. (Indeed, the inability of Mr. Ray to access this material effectively makes the Government's limited efforts to provide him certain electronic discovery a nullity.) Nor does the Government's submission evince any understanding that the present lockdown—one in a long series of lockdowns Mr. Ray has endured since entering the MCC— will surely not be the last because, as this Court has recognized, even the BOP's best efforts cannot prevent the reintroduction and spread of the coronavirus through the captive and crowded population at the MCC. *United States v. Gluzman*, No. 96 Cr. 323 (LJL), 2020 WL 4233049, at *17 (S.D.N.Y. July 23, 2020); *United States v. Schaefer*, No. 07 Cr. 498 (LJL) (S.D.N.Y. Apr. 6, 2020), Doc. 73.

Thus, even if the lockdown of Mr. Ray's unit is eventually eased, there is no scenario on the horizon in which the other restrictions on Mr. Ray (like access to the law library) will be lifted any time soon. Rather than engage with the concrete harms described in Mr. Ray's motion, the Government relies on the non-sequitur that the restrictions imposed at the MCC are "are a reasonable response to unprecedented circumstances." Opp'n 9. The reasonableness of the MCC's restrictions are of no consequence here, where Mr. Ray's constitutional rights are at risk. In particular, the Government conspicuously fails to even mention this Court's ruling in *United States v. Baker*, No. 20 Cr. 288 (LJL) (S.D.N.Y. Aug. 10, 2020), Doc. 38, which discussed how some of the very same restrictions placed on the defense here may threaten defendants' Sixth Amendment rights.

Accordingly, for the reasons set forth in Mr. Ray's motion and this submission, the Court should order Mr. Ray's release from pretrial detention to allow him to meet with counsel, review discovery, and participate in his own defense, as the Sixth Amendment mandates.

## IV.    The Government's Application For Modification Of Lawrence Ray's Detention Order Is Without Merit

The Government's opposition is replete with uncharged accusations of attempted witness tampering. Yet even in the absence of an order directing Mr. Ray to refrain from contact with certain individuals, Mr. Ray has not spoken directly to any alleged victim in this case since his incarceration six months ago. Nor does the Government allege as much. Rather, the Government relies on inferences gleaned from recorded Bureau of Prisons calls—the only moments Mr. Ray is able to communicate with loved ones during the pandemic—to argue for an unwarranted modification of Mr. Ray's detention order. The Court should not grant the Government's exceptional application.[6]

The Government seeks to prohibit Mr. Ray from contacting, broadly, "any victim or witness" to this case apart from his father, stepfather, and daughter. Opp'n 10. In support, the

---

[6] In support of its unconventional application, the Government cites to one case, 18 Mag. 5570 (JCM), which charges the defendant with violation of 18 U.S.C. § 2251(a) & (e), sexual exploitation of children, for "engag[ing] in sexual intercourse . . . with a 16-year-old girl for purpose of producing a video of the sexual intercourse." Doc. 1.

Hon. Lewis J. Liman

Government relies exclusively on recorded Bureau of Prisons calls between Mr. Ray and his 81-year-old father. Conspicuously absent from the Government's argument is any discussion of calls placed by Mr. Ray directly to the two women at the heart of the witness tampering allegations. There is also no mention of calls placed to any other alleged victims or witnesses in his case. That is because in the past six months, Mr. Ray has not called a single person from the MCC other than his father. The Government cannot dispute this fact.

Indeed, Mr. Ray has not had any contact with the vast majority of the alleged victims in his case for years. This is borne out by the Government's own disclosure materials. As the Government affirmed in a search warrant application, shortly after October 2018, Female Victim-1 "cut off communication" with Mr. Ray. In re App of the United States of Am. for an Order to Disclose Non-content Info. Pursuant to 18 U.S.C. § 2703(d) (Aug. 28, 2019), US_000048 at -60. In April 2019, when the New York *Magazine* article related to the purported events here was published, "Female Victim-1 received an email from RAY trying to reestablish contact, but Female Victim-1 did not respond." *Id.* They have not spoken since. There is no indication that Mr. Ray has attempted to contact this alleged victim in more than a year, and certainly not while incarcerated. Similarly, Mr. Ray has not had contact with the individual referred to as "Male Victim-1" in the Indictment for years. Another of the Government's search warrant applications avows, "During the 2013 spring semester, Male Victim-1 left the Condo, secured on-campus housing, and stopped communicating with RAY, … and other residents of the Condo." Agent Aff. in Supp. Of App. for a Search Warrant for Stored Elec. Commc'ns (Sept. 23, 2019), US_000077 at -87. In other words, it has been more than seven years since Mr. Ray's last contact with the primary alleged male victim. When he decided to stop communicating with Mr. Ray, he was no longer in his life. The same is true for nearly all of the alleged victims.

Mr. Ray's Bureau of Prisons phone calls do not violate an existing order or the law. The Government has never before requested and the Court has never ordered Mr. Ray to refrain from speaking with any alleged victims while incarcerated; nonetheless, he has not called any alleged victims. Certainly, Mr. Ray's discussions with his father do not denote his intent to "intimidate[e], threaten[ ], or corruptly persuade" any potential witnesses or alleged victims. 18 U.S.C. § 1512(b). Indeed, the Government has not proffered evidence that these women ever felt threatened or intimidated by Mr. Ray's words to his father. The Government has not identified a single call during which Mr. Ray requested or instructed either of the women to perjure themselves or falsify evidence. To the contrary, the calls reflect Mr. Ray's confidence in his case, as he assures his father—not the women—that the women will not cooperate with the prosecution because the Government's case against him "is not the truth." Opp'n 3. Further, the Government misconstrues Mr. Ray's cries for help as witness tampering. In reality, Mr. Ray's requests for help defending his case reflect little more than his own inability to review more than 95% of the relevant discovery in his case and identify exculpatory evidence therein, because of the conditions of his confinement.

The Government argues that Mr. Ray's purported communication with the women with whom he lived at the time of his arrest is "particularly inappropriate in light of Ray's awareness that the women are represented by counsel, such that any effort to seek their cooperation in his defense should be discussed between their and Mr. Ray's counsel." Opp'n 3. This statement is absurd on its face. Unlike defense counsel, Mr. Ray is under no legal or ethical obligation to refrain from communication about his case with individuals who are represented by counsel.

Hon. Lewis J. Liman

Accordingly, the Court should deny the Government's application. There is no cause to prohibit Mr. Ray from speaking with *any* alleged victims or witnesses (even with the exception of his father, step-father, and daughter) in the absence of a shred of evidence that Mr. Ray has spoken directly to anyone other than his father since his case began or that he has attempted to "intimidate[e], threaten[ ], or corruptly persuade" anyone. This is especially so given Mr. Ray's current conditions of confinement, which has stripped him of any social contact for the entirety of his incarceration. The Government's application reflects nothing more than a thinly veiled attempt to ratchet up the immense pressure on Mr. Ray due to his conditions of confinement and do precisely what the Government accuses Mr. Ray of: isolate and control alleged victims and witnesses who have refused to cooperate with the prosecution.

## V.     The Government's Boilerplate Response To Mr. Ray's *Brady* Request Ignores The Unique Circumstances Of This Case That Warrant The Court's Intervention

In his motion, Mr. Ray also argued that the particular facts and circumstances of this case—including the voluminous and unique discovery record; the Government's scant *Brady* disclosures; the ongoing detention of Mr. Ray and the COVID and Protective Order-related restrictions placed on him; the inability of counsel to review discovery with Mr. Ray; the limited resources of the defense; and the rapidly approaching motion and trial dates—warranted the Court exercising its wide latitude to ensure fundamental fairness and ordering the Government to identify the *Brady* and *Giglio* material within its productions. Mot. 26–31. Again, rather than engage with this argument and the unique situation presented here, the Government resorts to a boilerplate response and generic caselaw to contend that the Government is not obligated to take this step in each and every case. Opp'n 10–13. Certainly, that is true. But the Government's *pro forma* opposition (which it might have filed in any case) does not meaningfully respond to, let alone rebut, the argument the defense made based on the facts of this case, nor the caselaw the defense cited in support.

As the defense recognized in its motion, courts have held that the Government is not ordinarily required to identify *Brady* material in its production in run of the mill cases. Mot. 31. But, as the Government fails to acknowledge, in complex cases where defendants faced voluminous records and significant pretrial obstacles, like here, courts have also found that the Government's pretrial identification of *Brady* material is a necessary accommodation to ensure fundamental fairness. *Id.* (citing *United States v. Saffarinia*, 424 F. Supp. 3d 46, 86 (D.D.C. 2020); *United States v. Cutting*, No. 14 Cr. 139 (SI), 2017 WL 132403, at *8–10 (N.D. Cal. Jan. 12, 2017); *United States v. Salyer*, No. 10 Cr. 61 (GGH), 2010 WL 3036444, at *6 (E.D. Cal. Aug. 2, 2010)). Indeed, in *United States v. Rubin/Chambers, Dunhill Ins. Servs.*, one of the cases cited by the Government, the court noted, "[i]n certain circumstances and acting under their discretionary authority to manage the cases before them, some courts have required prosecutors to identify *Brady* material contained in a previously disclosed but 'voluminous' production of documents and data." 825 F. Supp. 2d 451, 454 (S.D.N.Y. 2011). Mr. Ray's case presents such circumstances. The Government's cut and paste string citations to cases with dissimilar facts does not support their opposition. *Cf. Smith v. Sec'y of New Mexico Dep't of Corr.*, 50 F.3d 801, 828 (10th Cir. 1995) ("While an 'open file' policy *may* suffice to discharge the prosecution's *Brady* obligations in a particular case, it often will not be dispositive of the issue.").

11

Hon. Lewis J. Liman

Similarly unpersuasive is the Government's position that the Court should not entertain any defense requests for additional *Brady* information because the Government "is aware of its *Brady* obligations and is complying with them." Opp'n 10. As several cases in this District have recently made clear, despite this oft-repeated refrain, the Government's view of its *Brady* obligations frequently differs greatly from the courts', with profound implications for defendants, necessitating proactive management of the Government's *Brady* disclosures.

The defense's concern that *Brady* or *Giglio* material is buried within the Government's voluminous production is not speculative. Only a few weeks ago, the United States Attorney's Office conceded that prosecutors in a separate case had at least discussed, if not agreed to, "burying" in a larger production of unrelated materials an exculpatory document that the Government provided to the defense for the first time mid-trial. *See* Ltr. to Hon. A. J. Nathan from Assoc. U.S. Att'y J. McEnany (July 2, 2020), *United States v. Sadr*, No. 18 Cr. 224 (AJN) (S.D.N.Y.), Doc. 354 at 11. This concession followed on the heels of "a number of developments" that, according to Judge Nathan, "raised serious concerns," including "a conceded *Brady* violation during the course of the trial[,]" "Government counsel's efforts to conceal that late disclosure from defense counsel," and their effort to "then mislead the Court about that effort." Order, *United States v. Sadr*, No. 18 Cr. 224 (AJN) (S.D.N.Y. June 9, 2020), Doc. 350 at 2. Given these actions, "including the failure to disclose what the Government now concedes was exculpatory information," the indictment in *Sadr* was dismissed with prejudice and Judge Nathan has ordered a hearing regarding the Government's compliance with *Brady*. Order, *United States v. Sadr*, No. 18 Cr. 224 (AJN) (S.D.N.Y. July 8, 2020), Doc. 357 at 2–3; Order, *United States v. Sadr*, No. 18 Cr. 224 (AJN) (S.D.N.Y. July 17, 2020), Doc. 362.

The Government's admission in *Sadr* came only days after it was forced to concede in another case that it had not disclosed, and had made inaccurate statements to the court and defense about, *Brady* material that it was required to provide the defense under Second Circuit caselaw and the court's orders. *See* Ltr. to Hon. K. P. Failla from AUSA J. Naftalis *et al.* (June 19, 2020), *United States v. Ahuja*, No. 18 Cr. 328 (KPF) (S.D.N.Y.), Doc. 368. The Government's acknowledgement of its misstatements about this undisclosed *Brady* material— which only came to light by virtue of the exhaustive work of defense counsel—came after incantations similar to those here that the Government was aware of its *Brady* obligations and in compliance with them. *See* Ltr. to Hon. K. P. Failla from R. Tarlowe (July 6, 2020), *United States v. Ahuja*, No. 18 Cr. 328 (KPF) (S.D.N.Y.), Doc. 385. As in the *Sadr* matter, Judge Failla has ordered additional discovery and proceedings on the Government's compliance with *Brady*.

These recent *Brady* violations came to pass notwithstanding that the U.S. Attorney's Office for the Southern District of New York committed itself to additional *Brady* "training and other remedial measures throughout the Office" in 2018 after yet another conceded *Brady* violation—this time, the disclosure three days before trial of a murder confession by someone other than the defendants being prosecuted for that death. *See* Ltr. to Hon. A. J. Nathan from J. Swergold *et al.* (May 16, 2018), *United States v. Pizarro*, No. 17 Cr. 151 (AJN) (S.D.N.Y.), Doc. 128 at 1. And these *Brady* violations are in addition to the instances of the Government's "inadvertent" late disclosure to the defense of 3500 and other materials that have severely prejudiced defendants. *See, e.g.*, *United States v. Russell*, No. 16 Cr. 396 (GHW), 2018 WL 2088282 (S.D.N.Y. May 4, 2018).

Hon. Lewis J. Liman

        To be clear, the defense does not accuse the prosecutors in this case of intentionally burying *Brady* material. But the Government's intentions are of no consequence with respect to *Brady*. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."). Given the troubling frequency with which the Government does not live up to its boilerplate representation that it knows its *Brady* obligations and is complying with them, the Court should not defer to such pronouncements here. *See also United States v. Naegele,* 468 F. Supp. 2d 150, 152 n.2 (D.D.C. 2007) (stating that the court "no longer accepts conclusory assertions by [DOJ] that it 'understands' its *Brady* obligations and 'will comply' or 'has complied' with them"); *see also Saffarinia*, 424 F. Supp. 3d at 86–87. Rather, the Court should consider Mr. Ray's application in light of the particular facts presented here. For the reasons set forth in Mr. Ray's motion, the Court should exercise its broad discretion to manage its cases and ensure fundamental fairness and order the Government to identify the *Brady* and *Giglio* material contained in the Government's voluminous production.[7]

## VI.    The Government's Opposition To Mr. Ray's Request For Identification Of Its Evidence In Chief Is Divorced From The Law And The Facts Of This Case

        As with its response to Mr. Ray's *Brady* request, in its opposition to Mr. Ray's request that the Court exercise its well-established authority to order the Government to identify its evidence in chief before the suppression deadline, the Government misstates the law and entirely ignores the unprecedented circumstances surrounding this case. Opp'n 13–16.[8]

---

[7] Contrary to the Government's unfounded claim, the defense has never requested that the Government "reorganize and reproduce" material with a *Giglio* designation. Opp'n 13. All the defense has requested is the identification of where such material can be found in the voluminous production the Government has already made. Given the Government's response, it clearly has a view as to which material "could be deemed *Giglio*," *id.* 12, so it should be no burden for the Government to point the defense to where such material can be located in the discovery record.

[8] The Government impugns Mr. Ray's Rule 12(b)(4)(B) request on the grounds that the defense did not make this request "at the arraignment or as soon afterward as practicable." Opp'n 13 (quoting Fed. R. Crim. P. 12(b)(4)(B)). The defense first made this request during the parties' June 23, 2020 meet-and-confer and reiterated it in an email a week later, to which the Government responded on July 10, 2020. It is unclear when—if ever—the Government thinks a Rule 12(b)(4)(B) request should be made in circumstances where, as here, it rolls out production of disclosure material over several months. Indeed, merely a page and a half after criticizing the defense for not making its Rule 12(b)(4)(B) demand earlier, the Government seeks to avoid any obligation to identify its evidence in chief on that grounds that this would be "premature" and "[t]he Government has only recently completed discovery and is nearing completion of its responsiveness review." Opp'n 15. In the Government's view, it is apparently too late for Mr. Ray to make a request for the identification of material within a production the Government only recently completed, but too early for the Government to be asked to do anything at all. The defense is also not aware of when, prior to its response, the Government informed "that (at this

Hon. Lewis J. Liman

The Government seeks to render Rule 12(b)(4)(B) superfluous by arguing that because it has produced the required disclosure material under Rule 16, it has thus satisfied Rule 16. Opp'n 13. This is, of course, not the law because if it were, it would make Rule 12(b)(4)(B) surplusage. As the Supreme Court has cautioned many times, the rule against surplusage requires courts to give each word and clause of a statute, rule, or regulation operative effect, if possible. *Duncan v. Walker*, 533 U.S. 167, 174 (2001); *see Young v. United Parcel Service, Inc.*, 575 U.S. 206, 226 (2015) (courts should interpret statutes so that "no clause is rendered superfluous, void, or insignificant") (quotations omitted). Moreover, as the Advisory Committee statements make clear, Rule 12(b)(4)(B) is directed toward a more specific issue—the efficient litigation of suppression issues—than Rule 16's governing of discovery writ large, and so the former's specific timing requirement should not be rendered void by the general language of the latter. *See Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.") (quotations omitted). Similarly, allowing the Government to avoid the directive of Rule 12(b)(4)(B) to identify the Rule 16 evidence it intends to use in its case in chief by dismissively saying "all of it" would eviscerate Rule 12(b)(4)(B) and render it a dead letter.

The Government, which is quick to rely on the "plain language" of statutes and rules in other contexts, strains to avoid the clear import of what Rule 12(b)(4)(B) requires—"notice of the government's intent to use (in its evidence-in-chief at trial) any evidence that the defendant may be entitled to discover under Rule 16"—and that this information is required before motions are filed so that the defendant has "an opportunity to suppress evidence under Rule 12(b)(3)(C)." Fed. R. Crim. P. 12(b)(4)(B). As such, the United States District Court for the District of Vermont specifically ruled that the Government in *Fell* must provide the defense notice of its intent to use any evidence "subject to disclosure under Rule 16" and "relevant to a potential suppression issue" before the suppression motion deadline. *United States v. Fell*, No. 01 Cr. 12 (GWC), 2015 WL 8481854, at *1 (D. Vt. Dec. 9, 2015). The *Fell* court made this determination for reasons equally applicable to Mr. Ray's case, including that "the scope of this case . . . includes multiple [alleged] crime scenes and events which took place across" several states and "[t]he volume of photographs and [other evidence]" is considerable." *Id.* at *2.

In addition, the Government opposes the defense's request that the Court exercise its inherent authority—which "the overwhelming majority of district courts, in accord with Second Circuit authority," have held the District Court has—"to direct the Government to identify prior to trial the documents it intends to rely on in its case in chief." *United States v. Vilar*, 530 F. Supp. 2d 616, 639 (S.D.N.Y. 2008). It does so on the apparent basis that the precise facts of this case differ from the *Vilar* matter, ignoring that the reasoning behind Judge Sullivan's order there is equally applicable here. Opp'n 15–16. Specifically, in light of "the large number of documents at issue in this case, and the likelihood that the Government will rely to a significant extent on only a portion of those documents at trial . . . pretrial disclosure of an exhibit list best serves Defendant['s] right to a fair trial." *Vilar*, 530 F. Supp. 2d at 640. As Judge Sullivan found,

---

point) it intends to introduce at trial evidence produced in discovery and obtained from each search warrant issued in this case and statements made by Ray to law enforcement." Opp'n 13.

Hon. Lewis J. Liman

ordering such disclosure is "reasonable, under the circumstances of this case," for the reasons stated in Mr. Ray's motion and herein.[9]

***

      For the reasons set forth above and in Mr. Ray's motion, Mr. Ray respectfully requests that the Court grant the requested relief.

Respectfully submitted,

/s/ Marne L. Lenox

Marne L. Lenox, Esq.
Peggy Cross-Goldenberg, Esq.
Neil P. Kelly, Esq.

*Counsel for Lawrence Ray*

cc:    AUSA Danielle R. Sassoon, Esq.
       AUSA Lindsey Keenan, Esq.
       AUSA Mollie Bracewell, Esq.

---

[9] The Government's claim that its ability to provide an early exhibit list "depends in part on the cooperation of defense counsel" is baseless. Opp'n 16. The Government hasn't even completed its responsiveness reviews yet, and Mr. Ray hasn't been able to review the vast majority of the disclosure material it has produced, yet the Government implies the defense should be prepared to enter into stipulations about witnesses and exhibits. The illogic of the Government's argument is exemplified by its claim that it can't create an exhibit list if it is "busy locating and preparing dozens of records custodians." Opp'n 16. But before "locating and preparing" the relevant records custodians, the Government would have to know what exhibits it seeks to introduce through those custodians.

15