KBKQrayHG

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA,
3
            v.                      20 CR 110 (LJL)
4                                   Remote Telephonic Conference

5
    LAWRENCE RAY,
6
            Defendant.
7
    ------------------------------x
8
                            New York, N.Y.
9                           November 20, 2020
                            10:30 a.m.
10
    Before:
11
                            HON. LEWIS J. LIMAN,
12
                        District Judge
13
                            APPEARANCES
14  AUDREY STRAUSS
        Acting United States Attorney for the
15      Southern District of New York
    DANIELLE R. SASSOON
16  MARY E. BRACEWELL
    LINDSEY KEENAN
17      Assistant United States Attorneys

18  FEDERAL DEFENDERS OF NEW YORK INC.
        Attorneys for Defendant Ray
19  MARNE L. LENOX
    PEGGY CROSS-GOLDENBERG
20  ALLEGRA GLASHAUSSER

21  KRAMER LEVIN NAFTALIS & FRANKEL LLP
        Attorneys for Jane Doe 1
22  DARREN A. LaVERNE

23  SIMPSON THACHER & BARTLETT LLP
        Attorneys for Defendant JANE DOE 2
24  BROOKE E. CUCINELLA
    EAMONN W. CAMPBELL
25

KBKQrayHG

1    ALSO PRESENT:  KELLY McGUIRE, FBI

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

KBKQrayHG

| | |
|---|---|
| 1 | (The Court and all parties appearing telephonically) |
| 2 | THE COURT:    Good morning.  This the Judge. |
| 3 | Matt, are we ready to get started? |
| 4 | DEPUTY CLERK:    Looks like we are ready to get started, |
| 5 | Judge. |
| 6 | THE COURT:    Who do I have on the phone for the |
| 7 | government? |
| 8 | MS. SASSOON:    Good morning, your Honor. |
| 9 | Danielle Sassoon speaking.  I'm joined by Lindsey |
| 10 | Keenan and Molly Bracewell for the United States.  Also on the |
| 11 | line is Special  Agent Kelly McGuire with the FBI. |
| 12 | THE COURT:    Good morning. |
| 13 | Who do I have on for the defendant? |
| 14 | MS. LENOX:    Good morning, your Honor. |
| 15 | For Mr. Ray, Federal Defenders by Marne Lenox.  I'm |
| 16 | joined by my colleagues Peggy Cross-Goldenberg and Allegra |
| 17 | Glashausser. |
| 18 | THE COURT:    Good morning, Ms. Lenox.  Good morning, |
| 19 | counsel. |
| 20 | Do we have Mr. Ray on the phone? |
| 21 | THE DEFENDANT:    Yes, your Honor. |
| 22 | THE COURT:    Good morning, Mr. Ray.  Can you hear me |
| 23 | OK? |
| 24 | THE DEFENDANT:    Yes, I can. |
| 25 | THE COURT:    Do we have counsel for Jane Doe No. 1 on |

1    the phone?  Is that Mr. LaVerne?

2               MR. LaVERNE:    Yes, your Honor, good morning.

3               Darren LaVerne for Ms. Doe.  Nice to speak with you.

4               THE COURT:    Good morning, Mr. LaVerne.

5               And for Jane Doe No. 2, do we have Ms. Cucinella?

6               MS. CUCINELLA:    Yes, your Honor.

7               Brooke Cucinella on behalf of Jane Doe No. 2.  Good

8    morning.  And I believe my colleague, Eamonn Campbell, may be

9    on the line as well.

10              THE COURT:    Good morning.

11              Do we have counsel for any of the parties on the phone

12   who have not yet been introduced?

13              Hearing nobody, there are a couple of things I would

14   like to do as a preliminary matter.  The first is to make sure

15   that I have the consent of Mr. Ray and his counsel to us

16   proceeding remotely pursuant to the CARES Act.  And you should

17   know that I am outside of the district.

18              Ms. Lenox, have you had an opportunity to discuss with

19   Mr. Ray his right to be present physically in the courtroom for

20   court proceedings and whether he would want to waive that

21   right?

22              MS. LENOX:    This is Marne Lenox.  Yes, your Honor, I

23   have discussed that with Mr. Ray.  Mr. Ray understands that he

24   has the right to appear in person and agrees to waive that

25   right and consents to a remote telephonic proceeding in this

KBKQrayHG

1      matter today.

2                  THE COURT:     Mr. Ray, were you able to hear what your

3      lawyer said?

4                  THE DEFENDANT:    Yes, your Honor.

5                  THE COURT:    And do you agree with it?

6                  THE DEFENDANT:    Yes, sir.

7                  THE COURT:    Do you agree to waive your right to be

8      present?

9                  THE DEFENDANT:    Yes, sir.

10                 THE COURT:    Ms. Sassoon, anything else I should ask on

11     that front?

12                 MS. SASSOON:    No.  Thank you, your Honor.

13                 THE COURT:    Mr. Ray, let me mention to you that if at

14     any time you can't hear me or the parties or are concerned that

15     you're not being heard, you should let us know or let your

16     lawyer know.  Is that OK?

17                 THE DEFENDANT:    OK.

18                 THE COURT:    OK, good.

19                 THE DEFENDANT:    Thank you, your Honor.

20                 THE COURT:    Now, the other thing I would like to do

21     before we get to the matter of records subpoenaed for the

22     putative victims is, I believe this is my first conference in

23     this case since Rule 5(f) of the Federal Rules of Criminal

24     Procedure has been adopted.  I've issued an order pursuant to

25     that rule, but I don't think I've given the oral order.

1          Ms. Sassoon, have I given you the oral order in this

2     case?

3               MS. SASSOON:    No, your Honor.

4               THE COURT:    So I would like to do that now.  I would

5     ask you and the parties to bear with me but also listen closely

6     because what I have to say is important.

7               Pursuant to Rule 5(f) of the Rules of Criminal

8     Procedure, I remind the government of its obligation under

9     *Brady v. Maryland* and its progeny to disclose to the defense

10    all information, whether admissible or not, that is favorable

11    to the defendant, material either to guilt or to punishment and

12    known to the government.  The government must make good faith

13    efforts to disclose such information to the defense as soon as

14    reasonably possible after its existence becomes known to the

15    government.

16              As part of these obligations, the government must

17    disclose information that can be used to impeach the trial

18    testimony of a government witness within the meaning of *Giglio*

19    *v. United States* and its progeny and must do so sufficiently in

20    advance of trial in order for the defendant to make effective

21    use of it at trial.  I remind you that these obligations are

22    continuing ones, and that they apply to information whether or

23    not you credit it.

24              I further remind you that for these purposes, the

25    government includes any federal, state and local prosecutors,

1     law enforcement officers and other officials who have

2     participated in the investigation and prosecution of the

3     charged offenses whether or not such officials are still part

4     of the team, and that you have an affirmative obligation to

5     seek from these sources all information subject to disclosure.

6              Finally, I caution the government that if it fails to

7     comply with this order, any number of consequences may follow:

8              1.  I may order production of the information and

9     specified terms and conditions of such production.

10             2.  I may grant a continuance.

11             3.  I may impose evidentiary sanctions.

12             4.  I may impose sanctions on any responsible lawyer

13    for the government.

14             5.  I may discharge -- I'm sorry -- 5.  I may dismiss

15    charges before trial or vacate a conviction after trial or a

16    guilty plea; or

17             6.  I may enter any other order that is just under the

18    circumstances.

19             Ms. Sassoon, do you understand these obligations and

20    can you confirm that you have or will fulfill them?

21             MS. SASSOON:    Yes, your Honor, I do understand them,

22    and the government is fulfilling them on an ongoing basis.

23             THE COURT:    Thank you very much, Ms. Sassoon.  As

24    noted, I have entered a written order confirming the

25    government's *Brady* obligations.

1          So, with that said, I would like to now turn to the

2    matter before the Court which has to do with the records as to

3    which there are subpoenas.  Let me tell you how I would like to

4    structure this, and I should let the parties know that I have

5    another criminal proceeding on for noon, so we will have to end

6    a little bit before that.

7          First, I'm going to describe the information that I

8    have in front of me just so the parties know that and also so

9    that anybody can correct me if I'm wrong.  Then I would like to

10   hear from the government and the moving parties, the counsel

11   for Jane Doe No. 1 and Jane Doe No. 2, why the subpoenas should

12   be quashed as to Jane Doe No. 1 and No. 2.  Then I will hear

13   from the defense, and then I will hear in reply either from the

14   government or from the victims or from both -- counsel for the

15   victims, I should say.  That has to do with the subpoenas for

16   the victims who have complained about subpoenas.

17          I am cognizant that the government from early on

18   raised a question as to whether there are subpoenas extant for

19   any other victims, and I've not answered that question.  To my

20   knowledge, the defense has not.  It's my view that with respect

21   to defense requests for Rule 17(c) subpoenas, just as with

22   respect to government requests for subpoenas in advance of

23   trial, those are appropriate to have proceeded ex-parte, but

24   the government does make an argument that it is entitled to

25   know about the subpoenas or that the subpoenas at least should

1    be quashed based upon the failure to give proper notice.

2               I will tell you right now my preliminary views on

3    that, and then I will hear argument at the end if anybody wants

4    to argue it.

5               My preliminary views are that to the extent that there

6    are extant subpoenas for other victims or to the extent that

7    there are in the future requests for subpoenas for the other

8    victims, I believe that I made a mistake with respect to the

9    phrasing of the subpoenas and a mistake with respect to the

10    process that I engaged in with those subpoenas.  I don't

11    believe that I made exactly the mistake that the government

12    says that I made or that I should do exactly what the

13    government has set forth, but I also don't think that what I

14    did fully satisfied the rules.

15               I think having studied the issue now that the

16    appropriate procedure is that I should review on an ex-parte

17    basis any request for a subpoena in advance of trial --

18    requested either by the defense or by the government -- to see

19    whether it satisfies the *Nixon* Standards.  If it does satisfy

20    the *Nixon* Standards, then I think I should issue an order that

21    issues a subpoena.  I also believe that that order should

22    obligate the requesting party to serve notice on the victim if

23    the subpoena calls for personal or confidential records, and

24    that such notice should be provided sufficiently in advance of

25    the service of the subpoena so that any victim or the victim at

1    issue can move to modify or quash; and that I should only

2    authorize the service of the subpoenas after the requesting

3    party has provided evidence that they have provided notice to

4    the victim.

5           That's how I read the rules right now as a preliminary

6    basis, but I would be prepared to hear argument from anybody.

7    For those reasons, my tentative view is that to the extent

8    there are subpoenas extant with respect to other putative

9    victims, my view would be that I should quash those subpoenas.

10    I would be prepared to hear from a requesting party as to

11    whether the *Nixon* Standards have been satisfied, and then

12    assuming that they are, I would follow the process that I laid

13    out just now.

14           With that said, Ms. Sassoon, I'm not sure whether you

15    would have standing in the absence of a victim complaining, but

16    there are two victims who have complained.  I will hear from

17    you in a moment.  Just so you know what I believe I've got in

18    front of me, I've got the various correspondence and the

19    motions submitted by the parties.  My understanding with

20    respect to the subpoenaed records -- and the parties have

21    provided me copies of subpoenaed records -- is that with

22    respect to Jane Doe No. 1, I have records that were subpoenaed

23    and provided to the defense from one institution.  The defense

24    has indicated to me that that came from Columbia doctors, but

25    from my glance at it, it looks like it came from New York

KBKQrayHG

1    Presbyterian.  I believe that there are only records from one

2    institution for Jane Doe No. 1 and not from the other

3    institutions who were subpoenaed for the records of Jane Doe

4    No. 1.

5           I also have records that the government subpoenaed

6    from two institutions for Jane Doe No. 1.  With respect to Jane

7    Doe No. 2, my understanding is that the defense has not

8    received documents from any institution for Jane Doe No. 2, and

9    that the government subpoenaed one institution and received

10    records from one institution for Jane Doe No. 2.

11           Ms. Lenox, does that correspond with your

12    understanding?

13           MS. LENOX:    Yes, I believe so, your Honor.

14           THE COURT:    OK.  Ms. Sassoon, I will hear from you

15    first.

16           MS. SASSOON:    Thank you, your Honor.  This is Danielle

17    Sassoon speaking.

18           As set forth in our briefing, both in our opening

19    motion and our reply brief, we think there are several bases on

20    which to quash these subpoenas, and I'm happy to direct my

21    remarks to the issues of most interest to the Court and to

22    answer any questions the Court has given how thoroughly briefed

23    this issue has been.  But I would just like to start by

24    emphasizing that the subpoenas fail to comply with Rule 17 for

25    several reasons, but, most fundamentally, in the government's

1    view they are a transparent attempt to get impeachment

2    material, and that alone is fatal to the subpoenas at this

3    stage of the case.

4            The *Nixon* Standard should apply here and under the

5    Supreme Court's *Nixon* Standards and as recognized by numerous

6    courts since, obtaining impeachment material is not a

7    permissible purpose for Rule 17 subpoena even if we were in a

8    posture where we knew that these victims were going to be

9    witnesses at trial, but at this stage we don't even know that.

10   There has been no witness list.  No victim has testified.  The

11   government has not finalized as its trial evidence or its

12   witness list, which means that the defense cannot satisfy one

13   of the core components of the *Nixon* test which is to show that

14   these records would be admissible at trial, even as impeachment

15   material.  And in the government's view the defense has not

16   proffered a basis for admissibility independent of any

17   potential impeachment value of these records.

18           THE COURT:    Ms. Sassoon, why did the government issue

19   a grand jury subpoena for the records of Jane Doe No. 1 and

20   Jane Doe No. 2, and does the government intend to use any of

21   those records?

22           MS. SASSOON:    Well, I will take your Honor's question

23   in two parts.  In terms of why we subpoenaed the records, the

24   records were subpoenaed as part of the investigation of this

25   case; namely, the government had information that Mr. Ray had

1    exploited certain vulnerabilities of several victims, and in

2    fact several victims had actually attempted suicide during the

3    course of their relationship with Mr. Ray and possibly as a

4    result of an influence he exercised over those victims, and

5    also that Mr. Ray then interfered with their care while they

6    were hospitalized.

7            So, the purpose of the subpoenas was to corroborate

8    whether in fact these victims had attempted suicide in the

9    course of their relationship with Mr. Ray, and what role, if

10   any, he played in communicating with the doctors.  And in fact,

11   the records we obtained did corroborate suicide attempts by

12   some victims, which is an unfortunate, terrible consequence,

13   among others, of Mr. Ray's crime.

14           And in the course of that, incidentally, the

15   government received -- although it has not been its intended

16   purpose -- we also received the treatment notes which included

17   some notes from psychiatrists on rotation through the hospital

18   in the course of the treatment for these suicide attempts, but

19   it was not the government's intended purpose to obtain mental

20   health treatment records, but rather to corroborate the

21   hospitalization for attempted suicide.  At this point --

22           THE COURT:    Go ahead.

23           MS. SASSOON:    At this point we have not finalized

24   what, if any, evidence we will actually use from the medical

25   records.  I do expect there will be testimony from witnesses --

KBKQrayHG

1    I'm not sure which ones yet -- about the fact, for example,

2    that they shared mental health problems with Mr. Ray; that he

3    was aware of them, which would go to his state of mind in terms

4    of how he dealt with the victims.

5              To the extent that the defense has asserted it wants

6    to emphasize further mental health issues that the claims go to

7    credibility, I do think it's a question how exactly that would

8    go to, for example, character for truthfulness or credibility,

9    but I actually think that there isn't so much daylight in terms

10    of the facts here in what would be disputed because while the

11    government and the defense might have different understandings

12    of the value of the evidence, I don't think it's going to be in

13    dispute that certain victims had mental health problems and

14    that there were suicide attempts in the course of this

15    conspiracy.

16              THE COURT:    Ms. Sassoon, let me ask you whether you

17    provided notice to the victims and got consent before you

18    issued the grand jury subpoena, specifically with respect to

19    Jane Doe No. 1 and No. 2.

20              MS. SASSOON:    Your Honor, these were not rule 17

21    subpoenas.  We did not issue notice.  I'm not aware of a notice

22    requirement for a grand jury subpoena, which is also not

23    subject to the *Nixon* requirements.

24              Once it was highlighted that there might be some

25    privileged material in these records, we shared the records

1    with victims' counsel so that they would have an opportunity to

2    assert privilege.  We want them to have that opportunity.  To

3    the extent that ultimately it is determined that there is

4    privileged material in the records the government received and

5    produced, we don't think the solution is then to throw the baby

6    out with the bath water and just get rid of the privilege.  It

7    would be to assess any government records for privilege and any

8    defense records that are ultimately authorized for privilege.

9                THE COURT:    When did you alert the counsel for the

10   victims, or the victims that you had potentially privileged

11   information?  Was that before or after you became aware of the

12   defense subpoenas?

13               MS. SASSOON:    After.

14               THE COURT:    And you mentioned that one of the things

15   that you were seeking to corroborate was the accusation that

16   the defendant interfered with the victims' medical treatment.

17   And my question to you is, is that going to be any part of the

18   government's case?  Is it going to try to prove that up as part

19   of the case?  Is that relevant to the case?

20               MS. SASSOON:    I do think it's relevant to the case,

21   and it may be something that we prove up.  For example, the

22   records show that -- they corroborate that at Mr. Ray's

23   direction some victims cut their parents out of their care and

24   their treatment; instead, authorized Mr. Ray to talk to their

25   doctors, and that he was making suggestive -- he had a

1    suggestive influence on how they perceived their own mental

2    health and the type of care that they should receive.

3            THE COURT:    So, haven't you then put at issue the

4    medical consultations in a way that it would be unfair for me

5    then to deprive the defendant of access to information -- not

6    for impeachment purposes, but to challenge the victims'

7    accounts or anybody else's accounts of whether the medical

8    treatment was interfered with?

9            MS. SASSOON:    No, your Honor, because I think there is

10   an important distinction between conversations with Mr. Ray

11   about potential care, directions given for seeking treatment or

12   talking to a doctor, and then the substance of those privileged

13   communications between the patient and their therapist.  Those

14   are two very different things.

15           So the defense would be free to say -- to ask

16   questions to the extent otherwise admissible, do you suffer

17   from depression?  Did you suffer from depression before you

18   encountered Mr. Ray?  Didn't you have suicidal thoughts

19   independent of Mr. Ray?  However they want to pursue it.

20           But in terms of the substance of their conversations

21   with the provider, that is not something that the government

22   intends to explore.  If it did, and the witness readily

23   testified about that, that might raise questions about waiver

24   of the privilege, but that is not what the government intends

25   to do.

1              Moreover, at this point, we are speculating about the

2       scope of the government's case, and that's not enough to say

3       that at this point the privilege has been waived where nothing

4       has been admitted into evidence, where the government has not

5       finalized its proof; and to the extent that it might

6       potentially waive the privilege, that would affect how the

7       government introduces its case, and the government should have

8       the option not to introduce that evidence rather than deciding

9       now that the privilege is waived.

10             THE COURT:    I'm going -- I will have questions about

11      when the government is going to finalize its proof to the

12      extent that it bears upon the question that the parties have

13      asked me to address and to decide, but do you want to make a

14      proffer to me as to how you would prove up that the defendant

15      interfered with the victims' medical care if you're not going

16      to do it through the medical records?

17             MS. SASSOON:    Well, just to be clear, your Honor,

18      there's the possibility of witness testimony and then there's

19      also the possibility of medical records that are not privileged

20      psychotherapist records.  So privileged records would be the

21      substance of notes, the conversations between the patient and

22      their psychotherapist; it would not necessarily be information

23      about Mr. Ray conveying to the witness things to do or

24      documents showing that he spoke to the doctor at the hospital.

25      That's separate and apart from the substance of what the

1    witness confided in a medical treatment provider.  Those are

2    two totally independent things.

3                THE COURT:    Well, but just give me a little bit more

4    of a proffer.  You know, are you going to do it through the

5    victim saying Mr. Ray told the victim that the victim should

6    blame the victims' parents and inform Mr. Ray of what was going

7    on with the psychiatric treatment?

8                MS. SASSOON:    Yes, I anticipate witness testimony

9    about Mr. Ray guiding the types of revelations that the witness

10   should have with their therapist, and also guidance he gave

11   about cutting the parents off from engaging with medical

12   providers, including regular doctors, and that's reflected in

13   the medical records; that he was at the hospital; that he was

14   providing information to the doctors.  That's not covered by

15   the privilege, any conversations he might have had with the

16   doctors.  That wouldn't be covered by the privilege, but I

17   don't --

18                THE COURT:    Sorry.  Go ahead.

19                MS. SASSOON:    And even to the extent the government

20   put some of this information at issue, independent of

21   impeachment, the defense has not explained how hearsay records

22   would be admissible at trial.  They might be able to ask

23   questions on cross-examination of the witness, but the records

24   themselves would not be admissible, and that's one of the

25   criteria for a Rule 17 subpoena under *Nixon*.

1          THE COURT:    Well, I will hear from Ms. Lenox in a bit,

2     but let's assume hypothetically that you have victim number one

3     testify that Mr. Ray gave victim number one instructions about

4     what to say to victim number one's treatment providers.

5     Wouldn't it be relevant whether victim number one actually said

6     what Mr. Ray had told victim number one to say?  I mean,

7     haven't you really put at issue what was said, not for the

8     truth of the matter.  I don't understand any of these records

9     to be relevant with respect to the truth of the matter but with

10    respect to what was in fact said.

11          MS. SASSOON:    So, I think there's a difference between

12    relevance and admissibility.  To get back to the issue of if

13    these victims aren't witnesses, this would not be admissible,

14    period.  If the victim doesn't testify, there will be no

15    testimony about Mr. Ray providing instructions about what to

16    say to the therapist and therefore no basis and no relevance to

17    these records.

18          THE COURT:    So, is what you're saying that there's a

19    possibility with respect to victim number one and victim number

20    two that you won't put on any evidence whatsoever as to the

21    instructions that were given to victim number one and victim

22    number two as to what they should say to their treatment

23    provider, whether it comes from the mouth of victim number one

24    or victim number two as a witness or comes from some other

25    source?

1          MS. SASSOON:    Absolutely.  First of all, it's still

2    uncertain whether either of these victims would testify at a

3    trial, and then even if they were to testify at a trial that

4    this would be elicited.

5          THE COURT:    Well, no, Ms. Sassoon, I'm getting at a

6    little bit of a different point, which is, I understand your

7    argument, I think, about the witnesses actually testifying.

8    I'm asking a somewhat broader question.  The premise of my

9    question is that you could try to prove up interference with

10   the victims' relationship with the provider whose source is

11   other than the victims' mouth, through other witnesses, other

12   evidence.

13         My question to you is whether as things stand right

14   now, regardless of whether you call victim number one or victim

15   number two as a witness, are you saying to me that there's a

16   possibility that you might not prove up, attempt to prove up

17   interference with the relationship with the medical provider

18   with respect to those putative victims?

19         MS. SASSOON:    That's correct, in no small part because

20   we still have to make a strategic assessment about whether in

21   the event your Honor thought that would waive the privilege, it

22   would be worth it to prove that up.  And that's why in our

23   motions, the government discussed that this is something we

24   intended to explore in a motion in limine with your Honor so

25   that we would have a better understanding of what your Honor

1    would consider a waiver of the privilege which would give us

2    the necessary information to decide what we would then elicit

3    or not elicit, in part because these witnesses obviously have a

4    view on what they are willing to waive in terms of their

5    privilege protection.

6              THE COURT:    When would you be prepared to make that

7    motion?  I ask that question because it seems to me that the

8    defense is entitled to some opportunity to get documents and to

9    prepare, assuming that I were to agree that the offering of

10   certain evidence an advocacy waiver or some other form of

11   waiver.

12             MS. SASSOON:    We would be prepared do that several

13   months in advance of trial.

14             THE COURT:    How many months in advance of trial?  I'm

15   sorry, I didn't hear what you said .

16             MS. SASSOON:    Several months before trial.  We had

17   intended to include it in our motions in limine.  Obviously, we

18   don't have a schedule for that for the Court, but if your Honor

19   thought this particular issue should be briefed in advance of

20   other motions in limine, we would comply with whatever schedule

21   your Honor thought was appropriate.

22             I think the key point here is that for this purpose

23   where it's the defendant's responsibility to justify the

24   subpoenas under *Nixon*, the speculative basis for relevance and

25   admissibility at this point is still speculation and it's not

1    concrete enough to satisfy *Nixon*.

2            THE COURT:    Let me ask you one other question before I

3    turn to counsel for the victims.  It is prompted by a comment

4    that you made.

5            I think I heard you say that the victims may have

6    confided in Mr. Ray the contents of their conversations with

7    some of the providers.  Am I wrong about that?

8            MS. SASSOON:    So, there is some evidence that they

9    shared with Ray some contents of their discussions with

10   providers.  Again, I don't know the full scope of which

11   victims' records were subpoenaed, but, for example, for another

12   victim who is not Jane Doe 1 or Jane Doe 2, just to provide one

13   example, there is an email where that victim describes a

14   therapy session to Mr. Ray.

15           Now, putting aside whether or not that waives the

16   privilege, to the extent that makes certain sessions with a

17   therapist relevant or to the extent there are certain sessions

18   where victims did or did not say things at Mr. Ray's direction,

19   these subpoenas are not tailored to capture just that material.

20   They're much broader than that, and they include records that

21   are subsequent to any relationship with Mr. Ray and therefore

22   can't be relevant for that narrow or particular purpose.

23           So, even if your Honor were to determine that these

24   records might somewhere within them contain something relevant

25   to this particular point, even if not for impeachment value,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    these subpoenas sweep much more broadly than that and are not

2    specifically tailored enough to obtain only that information.

3    And that's particularly troubling when it comes to seeking

4    records from medical providers for victims who are deeply

5    traumatized and whose even most intimate mental health

6    treatment was interfered with by the defendant.

7                    THE COURT:    So, I should say something right now, and

8    I should have said it at the beginning, which is, I take very

9    seriously the issues -- the concerns on all sides of this

10   issue, including the interest of the victims and the

11   allegations that they were traumatized and their interest in

12   the privacy of their communications and any injury that they've

13   suffered.

14                   I also take very seriously the defendant's rights

15   confronted with very serious charges.  So I appreciate your

16   comments, Ms. Sassoon, and I want to assure everybody that I'm

17   paying a lot of attention to this because I understand how

18   serious it is to everybody.

19                   With that said, do you have a position as to whether

20   if a victim shared information about a communication with a

21   psychotherapist with Mr. Ray whether that affected waiver at

22   least as to that communication?

23                   MS. SASSOON:    I don't have authority on hand on this

24   point, your Honor, but I don't think it would necessarily

25   affect a waiver, particularly under the circumstances here

KBKQrayHG

1    where those intimate details might have been shared with

2    Mr. Ray; but at a particular point in time where these victims

3    were incredibly vulnerable, at the mercy of Mr. Ray, being

4    abused by him verbally and sometimes physically, one of them

5    being sexually groomed and ultimately sex trafficked, I don't

6    think that's a circumstance of a voluntary and knowing waiver,

7    and I think the victims today with the benefit of

8    representation of counsel have the ability to make informed

9    decisions about whether they want their intimate records put in

10    the hands of someone with the potential to abuse them and who

11    has used this type of information in the past to harass and

12    manipulate them.

13            THE COURT:    So, let me ask you a hypothetical now, Ms.

14    Sassoon, and counsel for the victims.  Let's assume that this

15    was a different case involving a different privilege where the

16    accusation against the defendant involved a claim that the

17    defendant had made lies to -- actually, I'll change it a little

18    bit.  The accusation against the defendant is that the

19    defendant caused somebody else to make lies to a lawyer in the

20    confines -- you know, in the context of an otherwise privileged

21    communication, and the putative victim shared with the

22    defendant what the victim shared with the lawyer.  Would it be

23    the government's position in that circumstance that the

24    defendant knowing what the communication was to the lawyer,

25    knowing that it's relevant to the case still can't use the

1    communication in the trial?  It seems to me that would be an

2    odd position for the government to take.

3                MS. SASSOON:    I think it's one thing to forward a

4    communication with an attorney, for example.  I think there's

5    law that if you share the communication with a third party

6    that's not part of the privileged relationship, that that might

7    be a waiver.

8                But here that's not really what's going on.  The

9    victims are relaying certain information from Ray, but they're

10   not sharing notes from the sessions, recordings from the

11   sessions, and I think the substance of what was actually

12   discussed with the therapist, I'm not quite sure what the

13   relevance of that is, if there's evidence just showing that

14   Mr. Ray is involved in the relationship.

15               THE COURT:    OK.  Let me hear from counsel for the

16   victims.

17               Mr. LaVerne, do you want to go first or is it

18   Ms. Cucinella?

19               MR. LaVERNE:    I'll start, your Honor.  Thank you.

20   This is Mr. LaVerne for Jane Doe 1.

21               I will try, your Honor, to supplement rather than

22   repeat any of the points that Ms. Sassoon very capably made --

23               THE COURT:    You might focus on the questions that I

24   asked her about, including -- well, focus on the questions that

25   I asked her about.  You may make any other points you want.

1          MR. LaVERNE:    OK.  On Rule 17, a couple points I just

2    wanted to make there, one of which is -- and I know we focused

3    on the *Nixon* Standard, which we obviously think should apply

4    here, but I do think it is relevant that even under *Tucker*, a

5    far more permissive standard which no court sends --

6          THE COURT:    Mr. LaVerne, if it wasn't clear already,

7    I've rejected the defendant's argument that I should apply

8    *Tucker*.  I think that *Nixon* is the right standard, and I agree

9    with you that every judge in this district, other than Judge

10   Scheindlin early on in *Tucker* which involved a case at a

11   different posture, has applied the *Nixon* Standard.

12         MR. LaVERNE:    Thank you.  My point is simply with

13   respect to *Tucker* that even under *Tucker* the subpoenas would

14   fail because *Tucker* specifically said that if the subpoenas had

15   been served six months prior to trial, they would not be

16   permissible.  They would essentially constitute a fishing

17   expedition.  That's the only point I wanted to make there.

18         THE COURT:    Are you making a motion in order to

19   retrieve from the government the information that the

20   government obtained of your clients that you claim is

21   privileged?

22         MR. LaVERNE:    Your Honor, as soon as I received the

23   records from the government, we reviewed them and then alerted

24   both parties that we thought there was privileged information

25   there and sent them redacted copies of the records and ask that

1    they sequester unredacted records until your Honor had an

2    opportunity to rule on this issue.

3                    So, effectively, yes.  We haven't made a motion, but

4    to the extent your Honor agrees that this information is

5    privileged, it should be privileged, we ask that the redacted

6    copies be substituted for the unredacted copies.

7                    THE COURT:    Go ahead, Mr. LaVerne.

8                    MR. LaVERNE:    I was going to simply say, your Honor,

9    that I do want to emphasize -- and I know this is important --

10   that I obviously represent a third party here who, you know,

11   while the government may possibly call her as a witness, does

12   not want her privileged information disclosed to anyone.

13   You're talking about the most sensitive of records regarding a

14   period of time in her life that was incredibly difficult, and

15   she has not waived privilege.  She has no intention of waiving

16   privilege.  She has not put anything at issue, and I do not

17   believe that the government, even if it took some action that

18   revealed privileged information unbeknownst to my client or put

19   at issue some issue in the course of the presentation of the

20   evidence, I do not believe that could waive a privilege held by

21   a third party who has not assented to that action by the

22   government.

23                    THE COURT:    Do you have any authority with respect to

24   that issue?  To be precise, whether if the government puts at

25   issue an otherwise privileged communication that can affect a

1    waiver with respect to the person who made that communication;

2    or put another way, whether there is any duty that's incumbent

3    upon the person who made the communication to take any action

4    to prevent the communication from being put at issue, what that

5    action would be?

6                MR. LaVERNE:    Well, your Honor, we did look at this

7    issue a bit in our briefing and did not find a lot of authority

8    either way, but what we did find made its way into our letter,

9    and I'm referring to -- sorry -- a letter dated October 19,

10   2020.  At the bottom of page 7, we cite to a case, a district

11   court case in Oregon, *United States v. Doyle*, which

12   specifically found that the government could not waive the

13   psychotherapist-patient privilege by, in effect, putting it at

14   issue in the course of the proceeding at issue in that case.

15   And we found cited in the footnote, these are cases that are

16   decided in the context of the attorney-client privilege, which

17   as we said, and which I believe the Supreme Court has treated

18   the same effectively and that the psychotherapist-patient

19   privilege should be viewed on the same plane as the

20   attorney-client privilege.  That case cited in footnote ten is

21   *United States v. Camacho* from the Southern District here, which

22   went as far as to say that even if a witness's attorney has

23   repeated to the government statements that had been made to him

24   by his client, if the client himself had not assented to

25   disclose those communications, the privilege could not be

KBKQrayHG

1    waived.

2              So, that's the authority we found, but I do believe

3    that, you know, it flows naturally just from the basic

4    principle that there has to be a knowing and voluntary waiver

5    of a privilege, and, you know, the at-issue cases don't change

6    that with respect to a third party.

7              THE COURT:    So, I agree with that general proposition,

8    obviously, that there has to be the knowing and willing waiver

9    of a privilege, but help me with what you have to do to make

10   sure that you are preserving the privilege if somebody else is

11   putting it at issue.

12             One analogy one could think of -- which is not all

13   that different from this case -- is that if you become aware

14   that a third party has obtained information about a

15   communication, it's usually the case of the attorney-client

16   privilege that you have to take some action to get the

17   information back.  You have to do something.  Otherwise, if you

18   are silent, you can be viewed as almost complicit in putting

19   the privileged communication at issue.

20             MR. LaVERNE:    I think that's right, your Honor.  I

21   think that if, you know, if my client became aware that

22   privileged information had been disclosed and took no action to

23   advise those who had received the information, that she

24   believed it to be privileged and effectively sat on her hands

25   and allowed it to be used, there would be an argument that, you

KBKQrayHG

1    know, she in fact waived the privilege.  But that is

2    specifically why, you know, we took care to not do that, and

3    notify the government as soon as we understood that among the

4    materials that they had received was privileged information.

5             So, I think your Honor is right, I agree with you that

6    it is incumbent at some point for the party to do something and

7    to notify those who received privileged information of their

8    position, but I don't think it goes so far down the spectrum

9    for the ample -- you know, that we would have to sort of -- if

10   the government was taking various positions at trial, that we

11   would sort of have to monitor its positions and advise when we

12   believed that it is putting something at issue.  I think that's

13   a different question conceptually than the question --

14             THE COURT:    Why?  How do you draw that distinction?

15             MR. LaVERNE:    Because I don't think the government can

16   waive the privilege for my client, which is effectively what

17   the at-issue doctrine is all about.  It's different from a

18   situation where my client's actual privileged communications

19   have come into the hands of the government or another party,

20   and they're in possession of such information.  A party cannot

21   come back later and say, "hey, that's privileged," having known

22   about it for months.  I would not extend that principle.  I

23   think it is conceptually distinct from the idea of simply

24   making an argument or putting on non-privileged evidence that

25   the defense subsequently argues affected an at-issue waiver,

1    and I would draw that distinction.

2            THE COURT:    Do you have any authority that supports

3    that or is it just the authority that you cited in the letter?

4            MR. LaVERNE:    It's the authority I mentioned.  I

5    haven't looked, to be honest, you know, specifically at this

6    question of at-issue -- you know, making an at-issue waiver on

7    behalf of a third party, but --

8            THE COURT:    It's obviously something that conceptually

9    is troubling me, and I welcome your thoughts in terms of how to

10    think about it.  What's troubling me is the consequences of

11    your argument.  There may be consequences on the other side.

12    This is a tricky issue, but the consequences of your argument

13    could be, you know, a victim prompts the government to bring up

14    a lawsuit, effectively, on the victim's behalf knowing that the

15    victim can both get the satisfaction of the defendant being

16    appropriately punished, and restitution, and if your argument

17    is right, not suffer the consequences of an at-issue waiver

18    because the person nominally bringing the claim is not the

19    victim herself.

20            MR. LaVERNE:    Your Honor, I could see an issue, you

21    know, if the facts were that the government is effectively

22    acting as a cat's paw for the victims, and the victim is

23    effectively using a civil case or otherwise to advance their

24    own interests and claims, but I think that is a far cry from

25    what's happening here.

1              Ms. Doe, of course, did not initiate this prosecution.

2      She is not in charge of it.  She has no control, I should say.

3      Even if the government were taking some action that your Honor

4      or the defense believed put her communications at issue, I

5      don't know that her directing the government not to do so would

6      prevent the government from doing so.  And I suppose that if

7      the government felt strongly enough about it, they would go

8      forward anyway.  And if that is the reality of the situation, I

9      don't know how the government taking that action could

10     effectively waive a privilege that Ms. Doe has guarded and

11     protected at every course.

12             I did want to say -- and if your Honor has further

13     questions about that, I'm happy to answer them, but just

14     cognizant of time, I just wanted to make a few additional

15     points with respect to the issue of privilege.

16             You know, having looked and spent some time now with

17     *Jaffe* and the cases that followed it and read the language in

18     *Jaffe* carefully, I really do feel like, while of course that

19     was a civil case, the way that the court stated the principle,

20     the reason for recognizing a testimonial privilege in the

21     context of psychotherapist-patient, its comparison of those

22     reasons for the attorney-client privilege and the spousal

23     privilege and other testimonial privileges, it's policy reasons

24     creating uncertainty as to whether or not the privilege could

25     subsequently be waived or abrogated by a balancing test are

1    incredibly clear that the privilege should apply in the same

2    fashion in the criminal context.

3             I think that if a Court holds that the privilege can

4    be waived, or, I'm sorry, not waived, but balanced away,

5    effectively, it would create an extraordinary chilling effect

6    on anyone who is seeing a psychotherapist and at that point

7    will know the possibility, at least, that their communications

8    could subsequently become exposed, and particularly if they're

9    victims like my client, who, in the midst of and in the wake of

10   an incredibly traumatic experience, consulted with

11   psychotherapists knowing, I suppose, that one day it could

12   become a part of litigation.

13            And I don't know how she then or even now, as she

14   continues to get help, could feel confident in speaking freely

15   with a psychotherapist if there is this possibility of her

16   communications being balanced away, particularly in a case

17   where, again, there's been no specific showing that there's

18   exculpatory information in those communications, and, you know,

19   we're dealing again with a victim of psychological harm

20   allegedly whose records are being sought by the alleged

21   perpetrator eight months prior to trial.

22            So, I again say I think that the law is clear.  The

23   one post *Jaffee* appellate decision that had dealt with this in

24   the Fourth Circuit is crystal clear, we cited in our papers,

25   *Kinder v. White*, that there is no balancing test that should be

1    applied to the psychotherapist-patient privilege in criminal or

2    civil context alike, and I would ask your Honor to find the

3    same here.

4           THE COURT:    Ms. Cucinella, I will hear next from you.

5    You need not repeat, obviously, things that Mr. LaVerne said.

6           MS. CUCINELLA:    And so I don't know that I have much

7    to add.  We agree that our client's privilege should not and

8    cannot be waived by the government putting things at issue in

9    this case.  I think with respect to whether there are certain

10   records where they would argue or someone else may argue

11   there's a waiver, I think we need to take those one at a time

12   and probably closer in time to trial.  But at this point, and

13   given for the reason we are here in terms of the overbreadth of

14   the subpoenas that were issued and the fact that through the

15   present there's no argument there's waiver for any of the

16   recent records.

17          So, other than that, I, quite frankly, think

18   Mr. LaVerne covered most of the arguments.  So unless your

19   Honor has specific questions for me, I'm happy to wait until

20   after the defense makes arguments and may have more to add in

21   reply.

22          THE COURT:    I do have couple of questions for you that

23   just occurred to me.

24          Wouldn't the prudent course for me to be, if you are

25   right, at least to have the subpoenaed records delivered to me

1   for my in camera review so that I have an opportunity to assess

2   whether the documents are relevant or not.  I am going to have

3   at some point a criminal case that I am going to have to try,

4   and, you know, there's a value to having the records in advance

5   so that I can make difficult decisions.

6            MS. CUCINELLA:    And I, frankly, your Honor, think some

7   sort of mechanism along those lines may make sense.  The only

8   thing that I would say is with respect to privileged

9   communications with her therapist, we don't think those should

10  be produced at all for at least the current time period.  And,

11  you know, perhaps there is an argument that during the course

12  of the criminal conduct, if there's a waiver argument there or

13  if there are communications in particular where we think the

14  privilege would not apply, then I think that is appropriate for

15  the Court.  But in terms of those confidential communications

16  for all of the reasons that Mr. LaVerne said, I don't think

17  those should be produced to your Honor, but the issues around

18  it I could see.

19           THE COURT:    And, Ms. Cucinella, did you have a view as

20  to whether if there was evidence that your client communicated

21  the contents of her conversations with a treatment provider or

22  a therapist to Mr. Ray, that would waive a privilege, and, if

23  so, what the scope would be?

24           MS. CUCINELLA:    So, I do not believe that she is of --

25  that she was of sound mind to make a knowing and voluntary

1    waiver at that time.  I think that there may be certain

2    communications that she would consider waiving now based on

3    sort of looking back at those records; and again during the

4    time period to the extent that they reflected something of

5    relevance to the defense or to the government, I think she

6    would potentially consider to make that waiver now.  But I

7    think that to the extent there is an argument that there was a

8    waiver at the time without knowing more, I would say no, that

9    that was not a knowing waiver considering the control that

10   Mr. Ray exerted over her at the time.

11            THE COURT:    Ms. Lenox, I will hear from you.  I'm also

12   cognizant of the time.  It is 11:33 on my clock.  If we run out

13   of time, I'm prepared to adjourn this hearing.  If there are

14   still things people have to say, I will either receive writings

15   or have arguments, but I'll hear from you.

16            MS. LENOX:    Thank you, your Honor.

17            I think hear the bottom line is that their allegations

18   of Mr. Ray's psychological manipulation, threats, coercion in

19   this case that are fundamental to the case.  This isn't a case

20   that is like in *Kinder* about something other than its deep

21   connection to the mental health issues.

22            The very first paragraph of the indictment against

23   Mr. Ray says, "Ray subjected the victims to sexual and

24   psychological manipulation and physical abuse," and the

25   indictment goes on to suggest that Mr. Ray used psychological

1    coercion and harm to extort money from the alleged victims, and

2    this has been a thread that has continued throughout the

3    litigation.

4             And in Ms. Sassoon's remark today, the vulnerabilities

5    of these alleged victims is really at the heart of this case.

6    Ms. Sassoon spoke about the fact that the government had

7    information that Mr. Roy exploited victims' vulnerabilities,

8    and that several victims attempted suicide as a result of the

9    influence that he exercised over these individuals, and that is

10   the reason they sought the records that they sought.

11            To my mind, this is the case.  These records are the

12   case.  This is the case that the government is putting forward.

13   And to the extent that the government knew which records to

14   subpoena and knew which providers to subpoena and for what

15   periods of time and had information that Mr. Ray exploited

16   these vulnerabilities, it's likely that these alleged victims

17   informed the government of conversations that they had with

18   therapists that may otherwise have been privileged, but that in

19   the making of the government's case it's quite likely that

20   these victims revealed information to the government that

21   waived their privilege, and then the government used that

22   information to make it an issue in the case against Mr. Ray.

23            This isn't a case where --

24            THE COURT:    Ms. Lenox, let me interrupt you on that.

25   Do you have yet copies of the statements that the victims made

1    to the government?

2                    MS. LENOX:    No, your Honor.  That is 3500 material.

3    That has not been disclosed.

4                    THE COURT:    OK.  You may continue.

5                    MS. LENOX:    Your Honor, these records are not just an

6    attempt by the defense to impeach the credibility of these

7    alleged victims.  We are not looking for these records so that

8    we can say, as Ms. Sassoon argued we would be able to say, you

9    know, you were depressed at this period of time before having

10   met Mr. Ray.  You were depressed during this period of time

11   when you were spending time with Mr. Ray, and you were suicidal

12   during this period of time.  That's not the crux of the issue

13   here.

14                   The crux of the issue is actually the very statements

15   that these individuals are making to medical providers about

16   the reason that they are seeking the treatment.  The

17   government's theory is that they are seeking this treatment

18   because -- or harming themselves because of Mr. Ray's

19   psychological abuse.  And these records from what we have

20   gathered based on what we've reviewed that the government has

21   subpoenaed indicate statements have been made quite contrary to

22   what the government's position is in this case with respect to

23   the harm that Mr. Ray has caused, and Mr. Ray being the reason

24   that these victims had entered treatment facilities or

25   hospitals after having tried to commit suicide.

1          If the government elects not to have these witnesses

2     testify in their case in chief, certainly that doesn't preclude

3     the defense from calling these witnesses and introducing their

4     medical records to assert an affirmative defense on Mr. Ray's

5     behalf.

6          THE COURT:    What would the affirmative defense be?

7     Help me with the hypothetical; that the government doesn't call

8     these victims to testify?  What are your concerns about and why

9     would the records still be relevant?

10          MS. LENOX:    I hesitate only because I don't want to

11     get too in the weeds of the records.  I want to be respectful

12     of the contents of the records, and so I don't want to -- I

13     want to be careful about what I share here.

14          But, for instance, the government has in its response

15     to the defense discovery motion, the government has argued that

16     Mr. Ray created a website in victim one's name and posted

17     information on that website that was untrue, and that has

18     affected the victim's life to this day.

19          And in the medical records that the government has

20     provided, for instance, there are statements from this victim,

21     Jane Doe 2, indicating quite the opposite with respect to this

22     website and the contents of the website.  And that's just one

23     example.

24          THE COURT:    Let me interrupt you with respect to that

25     example, and I am going to frame it in terms of a hypothetical.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    But assume that somebody is charged with, you know, I don't

2    know, make up a crime -- robbery -- and it turns out that there

3    are psychotherapist records where the person who is robbed is a

4    putative victim who is now saying, "Look, this property was

5    taken away from me by force," says to the therapist, "No, I

6    gave it away.  There was no force whatsoever."  Makes a

7    diametrically opposite statement to what the person is

8    testifying to at trial, and that's critical to the government's

9    case.

10           In that hypothetical, is it your view that you would

11   still be entitled to the psychotherapist's records containing

12   the inconsistent statement?

13           MS. LENOX:    No.  In that type of hypothetical, the

14   crux of that case is not the victim's mental health.  The crux

15   of that case, and the issue underlying that case, assuming the

16   government did not put at issue the victim's mental health and

17   the reasons that the victims sought mental health treatment,

18   that is not akin to what we are talking about here.

19           Perhaps a better example -- I'm trying to be careful

20   because I don't want to reveal too much about what's in the

21   records, but a better example is the government has alleged

22   that these victims sought treatment in response to or became

23   suicidal in response to Mr. Ray's psychological manipulation.

24   There are in the records that were subpoenaed by the government

25   for both Jane Doe 1 and Jane Doe 2, there are indications that

KBKQrayHG

1    both of these individuals made statements to medical providers

2    that they were there not because of abuse caused by Mr. Ray,

3    but because --

4              MR. LaVERNE:    Your Honor, I'm sorry.  I really have to

5    take --

6              THE COURT:    Yes.  Let me figure out whether there is a

7    way that I can probe this without getting into the contents of

8    the records.  Let's just say hypothetically, and not with

9    respect to these victims, but the government's case is that a

10   person says that they were victimized by the defendant, that's

11   the government's case at trial, but it turns out that the

12   person has said to a medical provider that the defendant was,

13   in fact, their savior and that there was somebody else who was

14   victimizing them.  Is it your position then that that would

15   become -- has that now been put at issue?  Is a privilege

16   waived as to that?

17             MS. LENOX:    Well, if -- so, it depends.  The

18   government's theory of this case is quite broad and covers

19   psychological manipulation writ large.  And so it would depend

20   in your scenario I think on how brought the theory of the case

21   went in that particular case.  I think in this case it's quite

22   different and distinguishable from most others because of the

23   extent to which the government has relied and continues to rely

24   on this aspect of psychological harm that Mr. Ray allegedly

25   imposed upon these alleged victims, and it is this

1    psychological harm that resulted in extortion and sex

2    trafficking.  And so when the government makes it the part of

3    its case that this is how the abuser caused manipulation, then

4    yes, I do think that it is relevant, the privilege has been

5    waived, and it should be admissible.

6            THE COURT:    So let me ask you this question:  The

7    government and counsel for the victims have made a big point of

8    the fact that we're a long way off from trial.  And I think

9    there is some force to that, and the government said, "Well,

10    why don't you, Judge, help us work this out in terms of what it

11    is that would result in an at-issue waiver, if there's anything

12    that results in an at-issue waiver."

13            You know, I think there is some force also to the

14    arguments that if the government limits its proof, there may be

15    ways that it doesn't make these communications relevant.  How

16    do you suggest I sort that out?  Isn't it better that I get

17    some form of briefing either from an in limine motion or a

18    motion of some kind to exclude evidence?

19            MS. LENOX:    Yes, we actually agree with the government

20    on that point.  We agree that if ultimately the issues that are

21    raised and the psychological harms that the government has

22    raised and the specter of that harm is not made a part of its

23    case and these medical records are not used or referenced, and

24    that witnesses are not -- the government does not elicit

25    witnesses to speak about any treatment that they received or to

1  allege that Mr. Ray in any way interfered with their treatment,

2  then yes, absolutely, the records become moot, and that would

3  apply with equal force to the records that were subpoenaed by

4  the government and to the government's case in chief.

5           And so if the Court is inclined to do that, the

6  defense would ask for a hearing well in advance of trial.

7  Given the excessive discovery that we are already pouring over

8  and the fact that these medical records are in some cases

9  thousands of pages, I do think it would make sense then to have

10  a hearing where it was laid out for the Court what the

11  government proposes is the scope of its case with respect to

12  psychological evidence.

13           THE COURT:    Can you remind me what I've set as the

14  motion schedule in this case and also the trial schedule?

15           MS. LENOX:    Yes.  So, I believe trial is in mid July.

16  I believe it's July 12.  And as to motions, I believe defense

17  motions are due December 7, and I believe -- Ms. Sassoon may

18  have a better idea when the reply is due, but I believe it is

19  at some point -- January 8, is that right, Ms. Sassoon?

20  January 8?

21           MS. SASSOON:    Yes, the government's response is

22  January 8, but that's pretrial schedule.  I don't believe we

23  have a motion in limine schedule for this case.

24           MS. LENOX:    We do not.

25           THE COURT:    No, I understand that.

KBKQrayHG

1        Ms. Sassoon, I'm going to turn to you in a moment with

2    respect to schedule because I do think that briefing in terms

3    of what's going to be at issue, which I think was your

4    suggestion, is a wise one, and that it's begun on an early

5    basis, which is Ms. Lenox's suggestion because there are a lot

6    of records that are at issue.

7        But let me ask Ms. Lenox another question.  Ms. Lenox,

8    maybe I detected it in your papers or maybe I saw it in

9    somebody else's papers, but do you have a theory that there was

10    a waiver by the victims mentioning the communications to your

11    client?  And if so, how would you prove up that that was the

12    case so as to establish there has been a waiver?

13        MS. LENOX:    So, I think Ms. Sassoon addressed it quite

14    briefly earlier and referred to victims neither as Jane Doe 1

15    nor Jane Doe 2, but for whom there is discovery and an email

16    was sent to Mr. Ray detailing a therapy session.  I think that

17    the way to prove that up would likely be in part through the

18    medical records that we are now discussing; I think also in

19    part from the discovery that's been provided to see if there

20    are any written communications between alleged victims and

21    Mr. Ray that lay out the the, you know, communications with their

22    therapist.  There's also extensive videos of alleged -- of two

23    sessions that these alleged victims have made, and to the

24    extent that those discuss any conversations with therapists,

25    that may be another way to probe the issue.  You know, I

1  suppose one way, if the defense so elected -- and I'm not

2  suggesting that we are -- but one way would be to have Mr. Ray

3  testify about that.  So, I think there are a variety of ways

4  that that could be proven up.

5          THE DEFENDANT:    Your Honor, this is Mr. Ray.

6          THE COURT:    Mr. Ray, I will hear from you if your

7  counsel is fine with me hearing from you.

8          THE DEFENDANT:    OK.  Because I had a question.

9          MS. LENOX:    Mr. Ray, it's Marne.  I think it is best

10  if you direct your question to us.  Your Honor, I know that

11  we're running short on time.  I know that in a regular court

12  proceeding in person, Mr. Ray would have the opportunity to ask

13  counsel questions or consult with counsel.  I don't know that

14  there's time to do that in this moment, but I would ask,

15  Mr. Ray, if you don't mind, if we could perhaps move along and

16  then address your questions privately?

17          THE DEFENDANT:    OK, sure.

18          THE COURT:    Ms. Lenox, before I turn to Ms. Sassoon, I

19  mentioned at the beginning my intended approach with respect to

20  either any outstanding subpoenas for other victims or any

21  future subpoenas with respect to other victims, but do you

22  have -- I know it's not exactly the process that you suggested,

23  but do you have an objection to it?

24          MS. LENOX:    I do not have an objection to it, your

25  Honor.

1          THE COURT:    OK.  Ms. Sassoon, what would your

2     suggestion be in terms of how quickly you could make a motion

3     in limine with respect to the evidence that you might want to

4     offer and whether it would put at issue any psychiatric

5     communications or psychotherapy communications?

6          MS. SASSOON:    Yes, your Honor, I'd like to address

7     that question, and I'm very mindful of the clock.  I'm hoping

8     to just have a couple of minutes to respond to a couple points

9     that have been raised since I last spoke if your Honor would

10    indulge me.

11         THE COURT:    That's fine.  Actually, let me ask my

12    courtroom deputy, Mr. Fishman, what happens?  Does the other

13    defendant get on this call at noon?

14         DEPUTY CLERK:    My guess is that they don't get on

15    until we're done with this conference.

16         THE COURT:    You might email those lawyers and say

17    we're running a couple minutes late.

18         DEPUTY CLERK:    Sure.  Will do.

19         THE COURT:    Ms. Sassoon.

20         MS. SASSOON:    Yes.  Thank you, your Honor.

21         So, very quickly, I just want to emphasize in the

22    government's view the Court does not need to reach the

23    privilege issue and can quash these subpoenas under *Nixon*

24    alone.  We maintain that the defense hasn't established

25    relevance or admissibility.  Your Honor had raised with the

KBKQrayHG

1    government the possibility that these records might be

2    admissible for non-hearsay purpose if they were offered not for

3    the truth of the matter.

4           Ms. Lenox's remarks established very clearly that the

5    purpose for which the defense intends to use these records are

6    both for impeachment and, alternatively, for the truth of the

7    matter.  As Ms. Lenox said repeatedly, their purpose for these

8    records is to show that although the victims might say now or

9    might have said then that Mr. Ray --

10          THE COURT:    Ms. Sassoon, let me urge you to be -- I

11   get your point.  You don't have to go further because I'm

12   cognizant of trying to protect the confidentiality of the

13   records.

14          MS. SASSOON:    Yes, your Honor.

15          THE COURT:    I get your point.

16          MS. SASSOON:    And also your Honor had asked some

17   questions about how the government might use such records, and

18   I think I might have created some confusion with my statements.

19          At this point the government is not intending to put

20   at issue the reasons why victims sought treatment but the fact

21   of treatment during the course of this conspiracy, we are not

22   going to be -- I don't expect we are going to be putting at

23   issue the substance of what Mr. Ray told them to tell medical

24   providers and then what they told those providers and whether

25   those things align or not but simply that he was exercising

1   influence over them during this time period.  So that is with

2   respect to the subpoenas.

3           Briefly, with respect to the subpoenas regarding any

4   potential other victims, obviously the government agrees that

5   those subpoenas should be quashed and notice be given.  The

6   government maintains that at this point not every pretrial

7   subpoena coming down the road should automatically be ex-parte,

8   but that there needs to be a compelling reason to proceed

9   ex-parte, and simply being pretrial is not enough in the

10  government's view.  And given that we're now aware of the

11  defense's interest in these issues, we don't think the fact

12  that these are related to defense strategy alone would justify

13  proceeding ex-parte.  We think there is important value of

14  giving the government an opportunity to weigh on the *Nixon*

15  factors with respect to each subpoena, their scope, their

16  relevance, particularly because the government is in a unique

17  position to describe the evidence it expects to put on in the

18  case which bears on the admissibility of the records by the

19  defense.

20          And now unless your Honor has questions about that, I

21  can turn to scheduling.

22          THE COURT:    Let me hear from you on scheduling.

23          MS. SASSOON:    Yes, your Honor.  So, in our view we

24  think we have to resolve -- we would like to resolve the

25  pretrial motions first.  We expect lengthy motions from the

1    defense given the amount of time that they have had to put

2    these together, and so I anticipate that throughout December we

3    are going to be tied up with responding to those motions and

4    then resolving them with the Court in January.  And then we do

5    need some time to be thoughtful about what we actually expect

6    our proof might be at trial.  So I would ask that we submit

7    something no earlier than some date in March, but I prefer

8    April.

9                 THE COURT:    Ms. Lenox, what's your view with respect

10   to the government's in limine motion with respect to any

11   psychological evidence?

12                MS. LENOX:    I think it should be sooner than that.  I

13   understand why the government wouldn't want to have a hearing

14   within the next month or two, but certainly well before March

15   given the extent of the records that were requested.  You know,

16   just based on the medical records we've been provided by the

17   government so far, we are talking about again thousands and

18   thousands of pages, and thinking through trial strategy I think

19   that those issues need to be addressed well in advance of

20   trial, and that means in a case like this where there's

21   terabytes worth of discovery and potentially outstanding

22   medical records, I think a date in February would make more

23   sense.

24                THE COURT:    Ms. Sassoon, what's your view with respect

25   to whether while I am entertaining the motion in limine I

1    should at least have the providers deliver the records to me so

2    I can make an informed decision as to whether those records

3    should be turned over to the defense or not may create a better

4    record for you.

5              MS. SASSOON:    Yes, I appreciate that, your Honor, but

6    as a threshold matter, if your Honor determines that *Nixon*

7    hasn't been satisfied, then the records should not be produced

8    at all, whether to the Court or to anyone else.  There is also

9    mixed authority on whether records that are privileged should

10   be produced even to the Court for in camera review.  Some

11   courts have said yes; some have said no.  So I would want to

12   give that more thought.  But if your Honor found that *Nixon* was

13   not satisfied, then the records should not be produced at this

14   point in time.

15              And just on the point about February, the government

16   would like to make a thoughtful submission to the Court that

17   can actually be as concrete as possible about the potential

18   contours of the government's evidence, and I just don't see

19   that realistically happening by February in light of the other

20   briefing, in light of the need to have witness meetings and

21   prepare for trial, it's just not realistic in our view.

22              THE COURT:    Mr. LaVerne?

23              MR. LaVERNE:    Thank you, your Honor.  I just wanted

24   you to have the benefit of Ms. Doe 1's position on that issue

25   of returns to the Court, and our position is, as Ms. Sassoon

1    said, that if they don't meet the *Nixon* Standard, they should

2    not be reviewed in camera or obtained otherwise.

3            THE COURT:    Ms. Sassoon --

4            MS. SASSOON:    And your Honor --

5            THE COURT:    Go ahead.

6            MS. SASSOON:    Just one more point on the schedule.

7            THE COURT:    Who is speaking?

8            MS. SASSOON:    We are really not - I'm sorry?

9            THE COURT:    Who is this speaking?

10           MS. SASSOON:    Oh, this is Danielle Sassoon speaking.

11          Yes, there is a lot of discovery in this case, but

12   this medical records issue, it's a fairly discrete amount of

13   material, and, again, because this is primarily for impeachment

14   value, even doing this in March or April is well in advance of

15   trial is well in advance of when a defense attorney would

16   typically be able to see these documents.  So we don't think

17   that February is appropriate.

18          THE COURT:    When are you prepared to turn over the

19   $3,500 with respect to Jane Doe 1 and Jane Doe 2?

20          MS. SASSOON:    I would have to talk to my team about

21   that before committing to a schedule, if your Honor would

22   permit that.

23          THE COURT:    I would permit that.  I would ask you to

24   let me know within a week.  Within a week is a court holiday,

25   but a week from this coming Monday when you're prepared to turn

1    over the 3500 material with respect to those two and your

2    position with respect to whether you would be prepared to turn

3    it over to the Court right away.

4            Ms. Sassoon, you had something say?

5            I'm sorry, Ms. Lenox, you had something to say?

6            MS. LENOX:    Your Honor, I was just going to note that

7    while I appreciate that the government will need the month of

8    December to respond to defense motions, there's nothing pending

9    between now and December 7 in this case for the government to

10   submit, although I realize that now you have given the

11   government something to file in that period of time.  If this

12   is going to happen in February or March, the government's

13   briefing of this particular issue with respect to the

14   complainant's medical records and defense's access to them, I

15   just want to note that it will take time to get those records

16   should the Court decide ultimately that the defense is entitled

17   to some part or all of them, and so I would encourage the Court

18   to review the records that the defense has subpoenaed well in

19   advance to avoid any additional time on the back end for that

20   process.

21           THE COURT:    OK.  So I'm going to set the deadline for

22   the government to make its motion in limine with respect to any

23   psychiatric or psychotherapist evidence by March 1 of 2021.  At

24   that point, Ms. Sassoon, you are going to at least know what

25   the issues are on the motions that the defense has made, and

KBKQrayHG

1    that gives you a lot of time to think about trial prep in this

2    case.  And I am concerned that if I make it any later than

3    that, it's going to interfere with the trial going forward, and

4    I'd like to keep that trial date.  But if I make it later than

5    that, I think the defendant would have a decent argument that

6    they should get or they might need a continuance, so I'm going

7    to set March 1 as the deadline.

8                With respect to the extant subpoenas, I'm going to

9    reserve on the question of whether those should be quashed.

10    The providers have all been told not to produce documents while

11    there is a motion to quash pending.  So I don't think there's

12    any harm in terms of my reserving on it.

13                Ms. Lenox, how quickly could you respond to the

14    government's motion?

15                MS. LENOX:    I would ask for three weeks.

16                THE COURT:    OK.  That's March 22.

17                And for reply, Ms. Sassoon?

18                MS. SASSOON:    Two weeks?

19                THE COURT:    That would be April 5.  Is there a chance

20    you could do it by April 2, which is the week before?  That

21    gives me a week with the papers to review.

22                MS. SASSOON:    Yes, your Honor.

23                THE COURT:    OK.  Is there anything else, Ms. Sassoon,

24    that we should address today?

25                MS. SASSOON:    No.  Thank you, your Honor.

KBKQrayHG

1      THE COURT:    Ms. Lenox, anything else we should address

2  today?

3      MS. LENOX:    No, thank you.

4      THE COURT:    All right.  I am not going to -- when I

5  say I'm not -- I'm reserving on the question of a motion to

6  quash.  It should be implicit in that that I am not requiring

7  the providers to turn the documents over to me.

8      Mr. LaVerne?

9      MR. LaVERNE:    Thank you, your Honor.  This is

10  Mr. LaVerne.

11      I mentioned earlier in response to your Honor's

12  question that we had asked the parties to sequester the records

13  the government had previously produced and use only the

14  redacted copies we provided.  I would ask your Honor just to

15  effectively approve the request pending the resolution to the

16  motions.

17      THE COURT:    Is there any objection from the government

18  as to that?

19      MS. SASSOON:    No, your Honor.

20      THE COURT:    And, Ms. Lenox, I'm not sure whether you

21  have standing, but do you have any objection?

22      MS. LENOX:    No, your Honor.

23      THE COURT:    So, Mr. LaVerne, say it to me again

24  exactly what you want me to direct the government?

25      MR. LaVERNE:    To continue to sequester the unredacted

KBKQrayHG

1    versions of the records, the hospital records they had obtained

2    by grand jury subpoena and have provided to the defense.

3            THE COURT:    I'm going to do that both with respect to

4    Jane Doe No. 1 and Jane Doe No. 2.  I'm going to direct the

5    government to sequester the unredacted copies of the hospital

6    records that were obtained pursuant to grand jury subpoena.

7            MS. CUCINELLA:    Your Honor, this is Ms. Cucinella on

8    behalf of Jane Doe 2.  We just received the records earlier

9    this week, and we will provide redacted copies to both the

10   government and defense counsel very shortly, but we appreciate

11   being included.

12           MS. SASSOON:    This is Danielle Sassoon for the

13   government.  I just want to clarify whether the order is

14   directed to the defense as well, as I thought that was the

15   original request from Mr. LaVerne.

16           MR. LaVERNE:    This is Darren LaVerne.  Yes, it is.

17           THE COURT:    Yes.  All right.  We are adjourned.

18           Thank you all very much.  Appreciate the time and

19   appreciate the argument.  Have a good weekend.  Stay safe and

20   stay healthy.

21           (Adjourned)

22

23

24

25