UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

- v. -

LAWRENCE RAY,

                    Defendant.

---

No. 20 Cr. 110 (LJL)

## MOTION FOR SUPRESSION OF STATEMENT

David E. Patton, Esq.
Federal Defenders of New York, Inc.
52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (212) 417-8742

*Counsel for Lawrence Ray*

**Marne L. Lenox**
**Peggy Cross-Goldenberg**
**Allegra Glashausser**
*Of counsel*

To: **AUDREY STRAUSS, ESQ.**
    Acting United States Attorney
    Southern District of New York
    One St. Andrew's Plaza
    New York, New York 10007

    Attn: **DANIELLE R. SASSOON, ESQ.**
        Assistant United States Attorney
        Southern District of New York

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... iii

I.     INTRODUCTION ...................................................................................................... 1

II.    FACTUAL BACKGROUND ...................................................................................... 1

    A.     Mr. Ray repeatedly asked for his medication, told the officers he did not want to talk, and almost fell over during a lengthy interrogation. ........................................................... 2

    B.     Three days after the interrogation, without contemporaneous notes or a recording of the interrogation, the FBI created a report summarizing Lawrence Ray's post-arrest statement. ................................................................................................................. 3

    C.     Law enforcement reports corroborate Lawrence Ray's account of his request for medication throughout the interrogation. ........................................................................ 5

    D.     During the interrogation, Lawrence Ray tried to stop the questioning. ........................... 6

    E.     Law enforcement officers recorded the car ride with Lawrence Ray from New Jersey to New York. ................................................................................................................. 7

III.   ARGUMENT ............................................................................................................ 8

    A.     Lawrence Ray's statement should be suppressed in its entirety because his *Miranda* rights were not effectively conveyed and Mr. Ray did not knowingly and voluntarily waive his rights……………………………………………………………………………….8

        1.  Legal Standard ................................................................................................ 8

        2.  Law enforcement did not effectively convey to Lawrence Ray his *Miranda* rights.  9

          a) The government's failure to create any contemporaneous record of the interrogation highlights that they have not met their burden with respect to the effective conveyance of Miranda. ................................................................ 13

        3.  Lawrence Ray did not knowingly and voluntarily waive his *Miranda* rights and his statement was involuntary. ........................................................................ 14

    B.     The portion of Lawrence Ray's statement made after his attempt to exercise his right to remain silent should be suppressed. ............................................................................. 17

IV.    CONCLUSION ......................................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Terhune*,
516 F.3d 781 (9th Cir. 2008) ................................................................................ 18

*Berghuis v. Thompkins*,
560 U.S. 370 (2010)........................................................................... 9, 10, 14, 17

*Dickerson v. United States*,
530 U.S. 428 (2000).............................................................................................. 15

*Johnson v. Zerbst*,
304 U.S. 458 (1938).............................................................................................. 15

*Miranda v. Arizona*,
384 U.S. 436 (1966)......................................................................................... passim

*Missouri v. Seibert*,
542 U.S. 600 (2004)........................................................................................... 9, 12

*Moran v. Burbine*,
475 U.S. 412 (1986).............................................................................................. 14

*People v. Dunbar*,
24 N.Y.3d 304 (N.Y. 2014) ................................................................................. 12

*Schneckloth v. Bustamonte*,
412 U.S. 218 (1973).............................................................................................. 15

*United States v. Andrews*,
231 F. App'x 174 (3d Cir. 2007) ......................................................................... 10

*United States v. Beckles*,
565 F.3d 832 (11th Cir. 2009) ............................................................................. 10

*United States v. Brown*,
347 F. Supp. 2d 920 (D. Or. 2004) .................................................................... 9, 11

*United States v. Duvall*,
537 F.2d 15 (2d Cir. 1976) ................................................................................... 12

*United States v. Gonzalez*,
719 F. Supp. 2d 167 (D. Mass. 2010) ................................................................. 11

*United States v. LeShore*,
543 F.3d 935 (7th Cir. 2008) ............................................................................... 10

*United States v. Monroe*,
    397 F. Supp. 726 (D.D.C. 1975) .................................................................................. 15

*United States v. Murphy*,
    703 F.3d 182 (2d Cir. 2012) .............................................................................. 14, 16

*United States v. Robinson*,
    153 F. Supp. 2d 188 (E.D.N.Y. 2001) .................................................................... 16

*United States v. Shamsideen*,
    2004 WL 1179305 (S.D.N.Y. Mar. 31, 2004) ........................................................ 17

*United States v. Taylor*,
    745 F.3d 15 (2d Cir. 2014) ............................................................................... 15, 16

*Wong Sun v. United States*,
    371 U.S. 471 (1963) ............................................................................................... 18

## Other Authorities

DOJ Memo, May 12, 2014, "Policy Concerning Electronic Recording of Statements" ............ 2, 4

DOJ Press Release, May 22, 2014, available at https://www.justice.gov/opa/pr/attorney-general-
    holder-announces-significant-policy-shift-concerning-electronic-recording ............................ 4

## Constitutional Provisions

U.S. Const. Amend. V ................................................................................................... 8

U.S. Const. Amend. XIV ............................................................................................... 8

## I.    INTRODUCTION

Before dawn, around 6:00 a.m. on February 11, 2020, agents swarmed Lawrence Ray's house with an arrest warrant and a search warrant. Mr. Ray, who had been deep asleep, soon found himself being interrogated in his bedroom by a detective and an FBI agent. Rather than read him his *Miranda* rights out loud, the officers handed him a form and told him to sign it. He did so immediately, without time to read or consider his rights. He asked for his medication, but the officers would not let him take it. He said he didn't want to keep talking, but they told him that talking would help him get released by a judge later that day. He was groggy, exceedingly tired, and confused. Yet the officers questioned him for over two hours.

Mr. Ray now moves to suppress his statement in its entirety because the law enforcement officials did not effectively convey Mr. Ray's *Miranda* rights and Mr. Ray did not voluntarily waive his rights. In the alternative, he moves to suppress the portion of his statement made after he clearly attempted to exercise his right to remain silent. Otherwise, he requests an evidentiary hearing.

## II.    FACTUAL BACKGROUND

Mr. Ray has submitted an affidavit to the Court with his recollection of his interrogation.[1] The only documentation of Mr. Ray's interrogation provided to the defense by the government is a seven-page report written three days after the interrogation. US_014948-54. There are no

---

[1] Attached to this motion are:

Ex. A:    Affidavit from Mr. Ray
Ex. B:    Report by Agent Maguire, dated February 14, 2020, US_014948-54
Ex. C:    Report by NYPD Officer Harkins, dated February 13, 2020, US_036814
Ex. D:    Mr. Ray's pharmacy records, US_080306-080317
Ex. E:    FBI Advice of Rights form, US_14955

contemporaneous notes. There is no written statement from Mr. Ray. There is no audio or video recording capturing the interrogation. And that is because—in contravention of Department of Justice policy—the interrogation was not recorded. *See* DOJ Memo, May 12, 2014, "Policy Concerning Electronic Recording of Statements." This is so, despite the fact that "Det. Harkins was in possession of a recording device at the time of the interview." US_014954. Instead, the government provided an hour-long audio recording of the drive from Mr. Ray's home in New Jersey to New York, during which Mr. Ray "nodded off" and was not interrogated. US_036814.

### A. *Mr. Ray repeatedly asked for his medication, told the officers he did not want to talk, and almost fell over during a lengthy interrogation.*

The night before his arrest, Mr. Ray had been out late in New York. Ray Aff. ¶ 2. He returned to his home in New Jersey around midnight and did not go to sleep until around 2:45 a.m. or later. *Id*. He was not feeling well, and, before going to sleep, he took cold medication, a sleeping pill, and had a shot of vodka. *Id*. He was woken up approximately just over three hours later, his home teeming with law enforcement. *Id*. ¶ 3. He had been deep asleep. *Id*. He was interrogated in his bedroom, while sitting on his bed. *Id*. ¶ 5. Several times, he told the officers that he needed to take medication. *Id*. ¶ 7. For many years, he had taken Adderall four times a day. *Id*.; Ex. D (showing amphetamine prescription dated to at least 2015). He would never have chosen to speak to anyone without his medication. Ray Aff. ¶ 7. He explained to the officers that he was feeling groggy, tired, and did not want to talk. *Id*. ¶ 8, 13. Without his medication, he felt his brain was confused, cloudy, and disoriented. *Id.*

In response, law enforcement officials refused Mr. Ray's requests for medication. Det. Harkins told him more than once that it was in Mr. Ray's interest to speak to them and that the judge would only let him out on bail if he did so. Ray Aff. ¶ 11. Mr. Ray remembered that the officers gave him a piece of paper to sign, but they did not read the paper out loud. *Id*. ¶ 10. He

understood he "had" to sign it. *Id*. He understood that he "had to do what they wanted" and that was the only way he would get released by the judge. *Id*. ¶ 11, 15.

A number of times during the interrogation, Mr. Ray expressly told the agents he did not want to talk to them, saying that he "didn't want to talk right now," particularly when Det. Harkins told him, using an "aggressive tone," that he "was not answering the way [they] wanted" him to. *Id*. ¶ 10. Eventually, however, Mr. Ray concluded that "it was fruitless to complain. They just kept asking questions." *Id*.

> **B.** **Three days after the interrogation, without contemporaneous notes or a recording of the interrogation, the FBI created a report summarizing Lawrence Ray's post-arrest statement.**

Three days after the interrogation, Agent Maguire wrote a seven-page report summarizing the examination. The defense has not been provided with any notes—handwritten or otherwise—taken at the time of Mr. Ray's post-arrest statement, nor has the government furnished any other informal notes reflecting the contents of his statement. Agent Maguire's report is the government's sole memorialization of the interrogation. This report states that at 6:18 a.m., Mr. Ray "was read a copy of the arrest warrant, and subsequently read his rights utilizing" the FBI Advice of Rights form. US_014948. The report does not reveal what, if anything, Agent Maguire remembered Mr. Ray having said after seeing the FBI Advice of Rights form. The report continues, "Ray having understood his rights, signed the forms and acknowledged his willingness to answer questions." *Id.* Agent Maguire's report concludes, "Due to a miscommunication," Det. Harkins "did not turn on his [recording] device during the course of this interview."[2] US_014954. This "miscommunication" is not otherwise explained.

---

[2] In the event the Court declines to suppress the statement, Mr. Ray reserves the right to move *in limine* for the statement to be excluded as unreliable.

3

The lack of contemporaneous handwritten notes and failure to electronically record Mr. Ray's custodial interrogation is glaring. In 2014, the United States Department of Justice implemented a policy, still in effect today, that "establishes a presumption that the Federal Bureau of Investigation (FBI) [and other federal law enforcement agencies] will electronically record statements by individuals in their custody." DOJ Memo, May 12, 2014, "Policy Concerning Electronic Recording of Statements." Of course, had Agent Maguire and Detective Harkins complied with this procedure, it would be clear what the officers said to Mr. Ray and how he responded. As then-Attorney General Eric Holder stated in a press release announcing this new policy, "Creating an electronic record will ensure that we have an objective account of key investigations and interactions with people who are held in federal custody. It will allow us to document that detained individuals are afforded their constitutionally-protected rights." DOJ Press Release, May 22, 2014, available at https://www.justice.gov/opa/pr/attorney-general-holder-announces-significant-policy-shift-concerning-electronic-recording. The lack of electronic recording in Mr. Ray's case—despite Agent Maguire's acknowledgement that Det. Harkins had a recording device available during the interrogation—leaves no "clear and indisputable record[ ]" of Mr. Ray's statement to law enforcement. *Id.*

Without any contemporaneous recording, the entire interrogation from start to finish is ambiguous. Agent Maguire's report is in the form of a narrative, rather than a transcript of the interrogation. For example, the first paragraph of the report begins with a description of Mr. Ray's upbringing, "Ray grew up in Brooklyn, New York. He completed scholastic course work." Here and there, phrases appear in quotation marks, suggesting that Agent Maguire believed those phrases to be direct quotes from Mr. Ray. But, most of the information is not in quotation marks, suggesting it is paraphrased or based on Agent Maguire's memory three days after the

4

interrogation. Only sometimes does the report note a question and Mr. Ray's response. For example, on page three, the report states, "When asked if he had ever witnessed any members of the group have sexual contact with each other he stated '████ and ████ may have or ████ and ███.'" More often, it impossible to tell when the officers asked a question to which Mr. Ray agreed or when Mr. Ray provided a narrative response. It is, therefore, impossible to tell whether and when Mr. Ray merely acquiesced to leading questioning as opposite to affirmatively conveying information.

The report also neglects to indicate the length of the interrogation. The report notes that the interview began at 6:18 am. But on the seventh page, where it says "at this time the interrogation was concluded," no time is noted. According to Det. Harkins's report, Mr. Ray was transported to New York starting at 8:40 a.m., about 2 hours and 20 minutes after the interrogation began. US_036818.

### C.      Law enforcement reports corroborate Lawrence Ray's account of his request for medication throughout the interrogation.

The first paragraph of Agent Maguire's report notes that Mr. Ray "relayed that he took Adderall approximately four (4) times a day for a diagnosis of Attention Deficit Hyperactivity Disorder (ADHD) and had also suffered from Mercury poisoning." US_14948. The report does not indicate that the officers asked any follow-up questions about Mr. Ray's need for medication. Instead, this sentence about Mr. Ray's medical needs appears as a non-sequitur in the narrative, sandwiched between a sentence about Mr. Ray's "professional career" and one about his prior criminal conviction. The report reads:

> Ray was never enlisted nor commissioned by the Marine Corps. Ray relayed that he took Adderall approximately four (4) times a day for a diagnosis of Attention Deficit Hyperactivity Disorder (ADHD) and had also suffered from Mercury poisoning. In approximately 2000, Ray was charged with stock fraud. US_14948.

5

On page three, the report notes Mr. Ray's health again, recording that he said he did not want to keep talking and that he had "been poisoned." US_014953, Page 3. On page six, the report states that Mr. Ray said that his "health had deteriorated due to being poisoned," and then showed his teeth to the agent, apparently so she could see how they had been affected by the poisoning. *Id.* at 6.

Det. Harkins's report about the events after the interrogation and Mr. Ray's transport to New York also makes clear that Mr. Ray continued to request medication after the interrogation concluded. US_036814. According to Det. Harkins's report, Mr. Ray "asked if he could take several Adderall pills from a prescription bottle in the name of his daughter [because his bottle was empty]" but was told he could not. *Id.* In an apparent internal inconsistency in the report, the document claims that Mr. Ray was asked "several times if he required any daily or immediate medical, psychological attention, to which Ray responded several times, 'No.'" *Id.*

### D.    *During the interrogation, Lawrence Ray tried to stop the questioning.*

The third page of Agent Maguire's report included an "agent note." This note states that after Mr. Ray was "asked if he ever had anyone write statements about the damages they caused," Mr. Ray stated that he "did not want to talk about this and stated that he had been poisoned by Kerik." US_014950. The agent told him that she "would like him to answer the questions directly asked." Neither Mr. Ray's attempt to stop the interrogation, nor Agent Maguire's response is in quotation marks, suggesting that Agent Maguire was paraphrasing. Without a recording, it is unknown exactly what each said.

The agent note continues, saying that Mr. Ray responded, "'No you need to listen to me.'" The agent "reminded Ray that she was conducting the questioning and should he not want to continue, they could discontinue the interview and Ray would proceed through his arrest

6

processing." It then states that "Ray indicated that he wanted to continue answering questions." US_014951. The report does not say how Mr. Ray "indicated" that he still wished to speak.

Questioning apparently resumed on the same topic after the "agent note." The report states that Mr. Ray "relayed that ████ and ████ had written statements about the damages they caused." *Id.* Most of the statements the government has already used against Mr. Ray were made after Mr. Ray tried to stop the interrogation. *See* Transcript of March 2, 2020, at 20-21 (at bond hearing, the government relied on statements made after Mr. Ray tried to stop the interrogation).

### E.    Law enforcement officers recorded the car ride with Lawrence Ray from New Jersey to New York.

While law enforcement neglected to record their interrogation of Mr. Ray, they did record the one hour and four minute car ride from New Jersey to New York, *after* Mr. Ray's post-arrest statement. The lengthy recording of the car ride illustrates that law enforcement had the ability to record the interrogation and that their recording device was fully operational. It is inexplicable that the interrogation was not recorded, while the car ride, during which Mr. Ray was not interrogated but "appeared to nod out," was. *See* US_036814.

In the car, someone explained to Mr. Ray the process of getting fingerprinted, going to pretrial, and eventually seeing a judge. The person concludes this explanation by saying, "That's our hope today, to try to streamline this for you." Mr. Ray responded, barely audible, "Yeah. If it's possible, if you could." Time stamp: 4:22.[3] This is followed by a long pause. The officer adds, "Like I said, I've been through so much of this" "anyways people are like, [ ] straighten this out. Have you outta here." Mr. Ray does not respond. The recording goes quiet, except for the noise of the car moving.

---

[3] Transcript based on counsel's interpretation of audio recording provided in discovery.

About 15 minutes into the ride, one of the officers says, "You alright Larry?" and again, "You okay?" he says "Yeah." (15:45). Later, the person says "What's the matter?" and there are some vocalizations that are not audible words and a low groan. (22:34).

## III.    ARGUMENT

### A.    *Lawrence Ray's statement should be suppressed in its entirety because his* Miranda *rights were not effectively conveyed and Mr. Ray did not knowingly and voluntarily waive his rights.*

Lawrence Ray had taken cold and sleeping medications and alcohol fewer than four hours before he was startled awake by agents swarming his house. He had been dependent on a prescription amphetamine, Adderall, for years, but his interrogators refused to allow him to take his medication. As he recalls it, the officers did not read his *Miranda* rights to him, instead instructing him to sign a written waiver of his rights. He did so one minute after the officers presented the form to him, believing that he "had" to sign it. Federal law enforcement officers then questioned him for over two hours, continuing when he said he did not want to answer their questions, and telling him that answering their questions was how he was going to get released by the judge. At least twice during the interrogation, he almost fell over or backward. He was groggy, disoriented, and confused. His statements should be suppressed because his *Miranda* warnings were not effectively provided and he did not knowingly and voluntarily waive his rights.

### 1.    Legal Standard

The *Miranda* procedure protects the Fifth Amendment privilege against self-incrimination. It prevents an individual from being compelled to talk to interrogators and is "the essential mainstay of our adversary system." *Miranda v. Arizona*, 384 U.S. 436, 442-43, 460 (1966) (citation omitted); *see* U.S. Const. Amends. V, XIV. The now-familiar *Miranda* case

created a bright-line per se rule: no custodial interrogation may proceed until *Miranda* warnings are "adequately and effectively" conveyed and the defendant has knowingly, intelligently, and voluntarily waived his rights. *Miranda*, 384 U.S. at 467.

The prosecution bears a "heavy burden" to show compliance with *Miranda* by "at least the preponderance of the evidence." *Missouri v. Seibert*, 542 U.S. 600, at 608 n.1 (2004); *Miranda*, 384 U.S. at 475. To meet this burden, the prosecution must demonstrate that Mr. Ray "knowingly," "intelligently," and "voluntarily" waived his rights with a "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Berghuis v. Thompkins*, 560 U.S. 370, 382–83 (2010) (citation omitted); *Miranda*, 384 U.S. at 467–69, 472–73. The prosecution's heavy burden to show that Mr. Ray's rights were "adequately and effectively" conveyed is not met merely by a "talismanic" showing that *Miranda* warnings were provided. *Seibert*, 542 U.S. at 613 (plurality opinion). In fact, it would be "absurd to think that mere recitation of [*Miranda* warnings] suffices" in every circumstance. *Id*. The prosecution has not met this burden here.

### 2.   Law enforcement did not effectively convey to Lawrence Ray his *Miranda* rights.

The government has not shown that the *Miranda* warnings were ever effectively conveyed to Mr. Ray. Rather than giving Mr. Ray time to hear his rights and make an informed decision about whether to waive them, what Mr. Ray remembers is that he was only handed a *Miranda* form that he understood he "had" to sign. The *Miranda* warnings were, thus, not "recited" at all, but simply written down. This procedure made waiving the *Miranda* warnings a mere formality and a necessary administrative step towards his release by a judge. It did not adequately and effectively convey to Mr. Ray his *Miranda* rights. *See id.* at 613 (plurality opinion). *See also United States v. Brown*, 347 F. Supp. 2d 920, 923 (D. Or. 2004) (the agent's

9

"procedure of requiring <u>defendant</u> to read the advice of rights form aloud was not adequate to provide defendant with an effective appraisal of his rights") (emphasis added).

The oral reading of *Miranda* is a standard procedure that conveys both the importance of the rights and that the officers understand their importance. Indeed, law enforcement often provides the warnings both orally and in writing, so that the suspect has the opportunity to hear and read the rights, and is forced to take the time to listen and comprehend them. *See e.g., Thompkins*, 560 U.S. at 375 (suspect provided written *Miranda* warnings and time to read them; detective had him read one sentence out loud to ensure he could read and understand English; detective then read the rest of his rights out loud); *United States v. Beckles*, 565 F.3d 832, 836 (11th Cir. 2009) (suspect "was not only read his *Miranda* rights," but was then provided a "written copy of those rights after they were read aloud to him," "initialed each line of [the] written copy" "to indicate his understanding," and then signed the entire *Miranda* rights form); *United States v. LeShore*, 543 F.3d 935, 938 (7th Cir. 2008) (officer provided suspect "a form explaining his *Miranda* rights, and then [officer] read them aloud," before suspect signed the form); *United States v. Andrews*, 231 F. App'x 174, 176 (3d Cir. 2007) (detective read the *Miranda* warnings and provided suspect with a written copy; the suspect then read some of the warnings aloud and put his initials after each warning).

While no specific method of oral and written *Miranda* warnings is "constitutionally required," the method law enforcement uses to convey *Miranda* is relevant to this Court's assessment of whether that conveyance was effective. If law enforcement does not follow standard procedures, the "absence [of those procedures] means that the government … has not presented the type of evidence that has been relied upon by some courts in finding that defendants actually understood *Miranda* warnings that had been administered." *United States v.*

*Gonzalez*, 719 F. Supp. 2d 167, 180 (D. Mass. 2010) (finding that the "*Miranda* warnings administered were inadequate," in part, because they were "given in a manner likely to minimize the risk that they would be understood and exercised").

Thus, suppression may be required if law enforcement conveys the warnings in a manner designed to result in a waiver. In *Gonzalez*, for example, a district court suppressed a statement when the officer "read the warnings quickly, in a way designed to minimize the risk that [the suspect] would exercise his *Miranda* rights." *Id.* at 177. Similarly, in *Brown*, a district court suppressed a statement when the agent had a suspect himself read the *Miranda* warnings aloud, but "made no effort to review the advice of rights form with defendant after defendant read it aloud in order to ensure defendant comprehended what he read aloud." *Brown*, 347 F. Supp. 2d at 924.

As in *Gonzalez* and *Brown*, Mr. Ray's *Miranda* warnings were not adequately and effectively conveyed. On the contrary, there is no indication Mr. Ray carefully read the *Miranda* form, or that he was even given adequate time read and consider it. He was not asked to and did not initial each line, or otherwise convey that he understood each right. Indeed, he apparently signed the form immediately. Only one minute elapsed between Mr. Ray being handed the form, signing it, and Det. Harkins writing his own name and signing it. Ex. E (the top is marked 6:18, and the bottom of the form, under Harkins's printed name and signature, is marked 6:19). That leaves exceedingly little time – seconds – for Mr. Ray to have actually read and considered his rights.

This lack of time to consider his rights was particularly important when considering that the circumstances of the interrogation were already so disorienting and chaotic. Mr. Ray had been in deep sleep when it suddenly seemed that his home was under "invasion," with many law

11

enforcement officers swarming in. He had a gun pointed at him before being moved to a cramped room, where he was sitting on his bed uncomfortably close to an FBI agent. During the interrogation, other officers were turning his home upside down, searching and seizing all the electronics and papers in the house.

The officers also conveyed to Mr. Ray before he signed the form that he "had" to sign it. This undercut the choice he was supposed to have about whether or not to waive his rights. While Mr. Ray does not recall word for word what the officers said to him, he clearly remembers that the officers conveyed to him that signing the form was a necessary part of the process leading to his release. This was the completely wrong message. Speaking to the officers was *not* helpful to his release, signing the form was not a necessary part of any process, and whether or not to sign was completely up to him.

Contrary to what Det. Harkins told Mr. Ray, whether he spoke to the officers also had no bearing on his pretrial release. Conveying this type of false information further undercut any possibility of Mr. Ray understanding and voluntarily waiving his rights. *Miranda*, 384 U.S. at 476 ("any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege"); *see also United States v. Duvall*, 537 F.2d 15, 25 (2d Cir. 1976) (statement should have been suppressed when prosecutor incorrectly told the defendant that the charges carried a possible sentence of a hundred years and that he would not be released unless he cooperated). That this incorrect information was conveyed to him before he saw the *Miranda* form undercut the intended impact of the *Miranda* warnings themselves. *See Seibert*, 542 U.S. 600 (procedure of interrogating the suspect, then providing *Miranda* warnings, and re-interrogating the suspect, undercut effectiveness of *Miranda* warnings); *People v. Dunbar*, 24 N.Y.3d 304, 316 (N.Y. 2014) (pre-

12

*Miranda* remarks were "at best confusing and at worst misleading" and "rendered the subsequent *Miranda* warnings inadequate and ineffective").

Finally, by failing to read Mr. Ray the *Miranda* form out loud, and presenting it as a mere administrative step, the officers did not adequately convey that they would honor his rights. This too is problematic. The *Miranda* warnings are designed not just to inform a suspect of his rights but also to "show the individual that his interrogators are prepared to recognize his privilege should he choose to exercise it." *Miranda* 384 U.S. at 468.

Here, Mr. Ray was not effectively informed of his rights, and it simply was not conveyed to Mr. Ray that these interrogators would abide by his rights. Indeed, they did not stop questioning him when he asked them to. *See*, Section III, B, *infra.* For this reason alone, his statement should be suppressed.

a)      ***The government's failure to create any contemporaneous record of the interrogation highlights that they have not met their burden with respect to the effective conveyance of Miranda.***

Because the FBI did not electronically record Mr. Ray's interrogation, what exactly was said to Mr. Ray and how he responded is ambiguous. Agent Maguire's report says only that Mr. Ray "was read a copy of the arrest warrant, and subsequently read his rights utilizing" the FBI Advice of Rights form. US_014948. This sentence is unclear, but lends support to Mr. Ray's recollection that he was merely given a piece of paper to read to himself and never heard his rights read out loud. It is the government's burden to show that *Miranda* has been adequately and effectively conveyed. The lack of record here further underscores that they have not met that burden.

Recording of the interrogation should have been a priority. This was not a causal interview with a suspect; the officers knew that the grand jury had already returned a nine-count

13

indictment against Mr. Ray and Agent Maguire had been investigating Mr. Ray over the course of many months. She had submitted numerous affidavits in support of many search warrant applications related to Mr. Ray, she had spoken to witnesses, and she had gathered a huge quantity of electronic evidence and subpoena returns. Agent Maguire, therefore, knew that Mr. Ray's statements would be important in his criminal case and that the circumstances of the interrogation were likely to be litigated. Agent Maguire's failure to ensure the interrogation was recorded is inexcusable and supports suppression.

### 3. Lawrence Ray did not knowingly and voluntarily waive his *Miranda* rights and his statement was involuntary.

A knowing and voluntary waiver of *Miranda* rights has two requirements:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (internal citations omitted).

The government has not shown that Mr. Ray's waiver was made with the required "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *See, e.g., Berghuis v. Thompkins*, 560 U.S. 370, 382–83 (2010) (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *United States v. Murphy*, 703 F.3d 182, 194 (2d Cir. 2012) (suppressing statements because government did not prove defendants understood their rights or knowingly waived them). On the contrary, Mr. Ray's waiver and subsequent statements were involuntary as Mr. Ray was without necessary medication, and so exceedingly tired and groggy that he almost fell over more than once.

Whether a statement may be used as evidence against an accused may be determined only after a careful analysis of the totality of all the surrounding circumstances, which include the person's individual characteristics. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir.1991); *see also Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). Statements must be suppressed if they are involuntary under the totality of the circumstances. *See, e.g.*, *Dickerson v. United States*, 530 U.S. 428 (2000). The relevant question is this: "Is the confession the product of an essentially free and unconstrained choice by its maker?" *Bustamonte*, 412 U.S. at 225–26.

Mr. Ray's statements were not the "product of an essentially free and unconstrained choice." On the contrary, at the time of the interrogation, he was beginning to withdraw from Adderall, a prescription amphetamine that he had taken four times a day for many years. The officers knew that he needed medication because Mr. Ray "asked them several times for my medication, but they would not let [him] take it." Ray Aff. ¶ 7. The officers' refusal to allow him to take needed medication, while repeatedly questioning him "took undue advantage" of Mr. Ray's diminished condition. *See United States v. Taylor*, 745 F.3d 15, 25 (2d Cir. 2014) (holding that officer's question took "undue advantage" of individual's "diminished mental state.").

Not having that medication prevented Mr. Ray from thinking clearly, and made his brain foggy, his thoughts confused, and him disoriented. He almost fell when standing, and, while sitting, fell backward a few times. He had barely slept and had taken two different kinds of medications followed by a shot of vodka less than four hours beforehand. As Mr. Ray explains in his affidavit, he "would never choose to talk to anyone without taking my medication" because "[t]alking to anyone without medication just isn't something [he] would do." Ray Aff. ¶ 7. *See, e.g.*, *United States v. Monroe*, 397 F. Supp. 726, 731 (D.D.C. 1975) (finding that "the evidence

15

clearly indicates that [the defendants] were undergoing withdrawal at the time of their interrogation and that their waivers and statements were not the product of a rational intellect and a free will.") (internal citation and quotation marks omitted).

There is objective, credible corroboration of Mr. Ray's memory of his mental and physical state during his interrogation. For example, on the audio recording of the car ride from New Jersey to New York, you can hear Mr. Ray groaning, establishing his exhaustion that day. Mr. Ray's pharmacy records affirm his high daily dosage of Adderall. Ex D. And the government's own report notes that Mr. Ray "nodded off" during the car ride to Manhattan and references Mr. Ray's need for medication.

These severe incapacities made it impossible for Mr. Ray to make a knowing and voluntary waiver of his rights. This is particularly true when those incapacities are considered in conjunction with the fact that Mr. Ray only saw the *Miranda* form for under 60 seconds. Under the totality of the circumstances, his waiver and subsequent statement were not voluntary. For this reason too, his statement should be suppressed.

*       *       *

In the alterative, and given that no electronic recording was created of the interrogation, a hearing is necessary to determine whether *Miranda* was effectively provided and if Mr. Ray's wavier was knowing and voluntary. *See, e.g.*, *Taylor*, 745 F.3d at 20 (suppressing statements after a hearing that found defendant was "largely stupefied" during interrogation); *United States v. Murphy*, 703 F.3d 182, 194 (2d Cir. 2012) (suppressing statements because government did not prove defendants understood their rights or knowingly waived them); *see also United States v. Robinson*, 153 F. Supp. 2d 188, 192 (E.D.N.Y. 2001) (hearing required because of "disputed issues of fact regarding the voluntariness of the waiver"); *United States v. Shamsideen*, 2004 WL

1179305, at *9 (S.D.N.Y. Mar. 31, 2004) (District Courts have broad discretion to decide to hold a suppression hearing).

> **B.** **The portion of Lawrence Ray's statement made after his attempt to exercise his right to remain silent should be suppressed.**

"[I]f the individual … indicates in any manner that he does not wish to be interrogated, the police may not question him." *Miranda*, 384 U.S. at 445. Notwithstanding this Supreme Court precedent, throughout the interrogation Mr. Ray expressly told the agents he did not want to talk to them, saying that he "didn't want to talk right now," particularly when Det. Harkins told him aggressively that he "was not answering the way [they] wanted" him to. Ray Aff. ¶ 10. His requests to end the interrogation were ignored. As Mr. Ray described it, "it was fruitless to complain. They just kept asking questions." *Id*.

From the first moment Mr. Ray conveyed that he wanted to end the interrogation, questioning should have stopped. *Miranda*, 384 U.S. at 445; *see also Berghuis v. Thompkins*, 560 U.S. 370, 388 (2010) ("If the right to counsel or the right to remain silent is invoked at any point during questioning, further interrogation must cease."); *United States v. Medunjanin*, 752 F.3d 576, 585 (2d Cir. 2014) ("Once *Miranda* warnings have been given, if the individual indicates that he wishes to remain silent, the interrogation must cease.") (internal quotation marks and citation omitted).

The FBI report confirms that Mr. Ray tried to stop the interrogation at least one time. The report states that mid-way through the interrogation he said that he "did not want to talk about this." The report does not have Mr. Ray's statement in quotes, so it is not clear—without a recording—exactly what Mr. Ray said at that juncture. But it is clear that he tried to stop the interrogation. Saying that he "did not want to talk about this" was a clear invocation of his right to remain silent, and questioning should have stopped. *See Anderson v. Terhune*, 516 F.3d 781,

17

788 (9th Cir. 2008) (en banc) ("Anderson had already twice attempted to stop the police questioning using crystal-clear language [including] "I don't want to talk about this no more""). Instead of discontinuing questioning, however, the agent continued to engage with Mr. Ray, first, about whether or not he should continue speaking, and then by continuing with her questioning.

Based on Mr. Ray's memory and the FBI report, Mr. Ray told the officers he wished to stop the interrogation. Under either version, whether he said this once or numerous times, his statement that he did not want to talk was sufficient to exercise his right to remain silent. Mr. Ray's statements made after his attempt to stop the interrogation should be suppressed.

## IV.    CONCLUSION

Accordingly, for the reasons explained above, Mr. Ray's statements should be suppressed in full or in part. In addition to Mr. Ray's statements, the Court should also suppress the fruits of those statements, including evidence retrieved from his cellphone after Mr. Ray provided the passcode. *See Wong Sun v. United States*, 371 U.S. 471 (1963). Alternatively, a hearing should be ordered.

Dated:  New York, New York
        December 7, 2020

Respectfully submitted,

FEDERAL DEFENDERS OF NEW YORK, INC.

By: _____/s/_____
    **ALLEGRA GLASHAUSSER**
    **MARNE L. LENOX**
    **PEGGY CROSS-GOLDENBERG**

Attorneys for Defendant
    **Lawrence Ray**
52 Duane Street – 10th Floor
New York, New York 10007
Tel.: (212) 417-8742

18