UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__5/6/2021__
```

------------------------------------------------------------------X
                                    :

UNITED STATES,                         :

              -v-                    :

                                      :         20-cr-110 (LJL)

LAWRENCE RAY,                    :

                                      :            <u>ORDER</u>

                     Defendant.        :

                                      :
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Defendant Lawrence Ray ("Ray") moves to suppress statements he made after his arrest on February 11, 2020, on the grounds that his Miranda rights were not effectively conveyed to him and that he did not voluntarily waive his rights. He also contends that he invoked his right to stop questioning. For the reasons that follow, the motion is denied.

## BACKGROUND

### A.    The Indictment

On February 6, 2020, a Grand Jury sitting in this District returned Indictment 20 Cr. 110 (the "Indictment"). Dkt. No. 2. The Indictment charged Ray with nine counts: Extortion Conspiracy in violation of 18 U.S.C. § 1951 (Count One), Extortion in violation of 18 U.S.C. §§ 1951, 1952 (Count Two), Sex Trafficking in violation of 18 U.S.C. §§ 1591, 1592 (Count Three), Forced Labor in violation of 18 U.S.C. §§1589, 1582 (Count Four), Forced Labor Trafficking in violation of 18 U.S.C. §§ 1590, 1592 (Count Five), Forced Labor Conspiracy in violation of 18 U.S.C. § 1594 (Count Six), Use of Interstate Commerce to Promote Unlawful Activity in violation of 18 U.S.C. § 1952(a)(3) (Counts Seven and Eight), and Money Laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2 (Count Nine). *Id.* at 10-19.

The Indictment alleges that Ray targeted a group of college students and others for indoctrination and criminal exploitation, including extortion, forced labor, and prostitution. *Id.* at 1. "Over the course of nearly a decade, between in or about 2010 through the present, RAY subjected the Victims to sexual and psychological manipulation and physical abuse." *Id.* He is accused of extracting false confessions from at least seven victims who admitted to causing harm and damage to Ray and to his family members and associations, *id.*, and then leveraging the victims' false confessions to extort money from the victims, to force some of the victims to perform unpaid manual labor, and to cause one of the female victims to engage in commercial sex acts for Ray's financial benefit, *id.* at 1-2. The Indictment includes examples of Ray's physical threats to certain of the victims, his use of the false confessions to force the victims to pay him hundreds of thousands of dollars, his use of verbal and physical threats to force the victims to perform work on a project owned by a Ray family member, and his inducement of one victim to act as a prostitute. *Id.* at 2-9. He is also alleged to have laundered the proceeds of his criminal activity. *Id.* at 9-10.

**B. Ray's Arrest and Post-Arrest Statement**

Ray was arrested by the Federal Bureau of Investigation ("FBI") pursuant to a warrant on February 11, 2020. Ray has moved to suppress statements he made to a FBI special agent immediately after his arrest. The Court held a hearing on Ray's motion to suppress his post-arrest statement on April 28, 2021. In connection with that motion, the Court received Ray's declaration in support of the motion. The Court also heard the testimony of the two officers who participated in the interview, FBI Special Agent Kelly Maguire ("Agent Maguire") and Detective Walter Harkins ("Detective Harkins") of the New York Police Department ("NYPD") and

reviewed the evidence offered and received during that testimony.  Ray chose not to testify at the hearing.  The following summarizes the evidence before the Court and the Court's findings.

Ray was arrested at his home in Piscataway, New Jersey ("Piscateway residence") on February 11, 2020.  The arrest occurred at approximately 6:00 a.m.  At the time he was arrested, law enforcement also executed a search warrant for the Piscataway, New Jersey residence.  He was interrogated in a bedroom in the home for approximately one and a half hours by Special Agent Maguire, after he signed an FBI Advice of Rights form.  Special Agent Maguire was accompanied by Detective Harkins of the NYPD.  Thereafter, Ray was transported to the FBI offices at 26 Federal Plaza in New York for processing and was ultimately presented to this Court.

The parties dispute the circumstances of the interrogation.  The evidence at the hearing consisted of the sworn declaration submitted by Ray in connection with his motion to dismiss and the testimony of Special Agent Maguire and Detective Harkins.  The interrogation was not recorded, but a recording was made of Ray's statements while he was being transported to the FBI's offices.  That recording was introduced in evidence at the hearing.

According to Ray, he was out late the night before the arrest and did not return to his home until around 1:00 a.m.; he did not get in bed until around 2:25 a.m.  Dkt. No. 109-1, Ex. A ¶ 2.  Before going to sleep, he took Nyquil and Excedrin PM, and he had a shot of vodka.  *Id.* He was asleep when the agents arrived and he woke up when he heard banging and yelling.  *Id.* ¶ 3.  He went towards the front door and one of the officers (whom he believed to be Detective Harkins) pointed his gun at Ray and said "hands up."  *Id.*  He states that at some point, officers directed him to his bedroom where two people started questioning him.  *Id.* ¶ 5.  The female officer was sitting on the bed with Ray and the male officer sat nearby in the room, which was

small and cluttered. *Id.* Ray states that the room felt very tight, that the officers were uncomfortably close to him, and that he was "exceedingly groggy and exhausted." *Id.* ¶ 6. He states that the agents had him "sign a piece of paper," that he understood he had to sign it, and that he does not remember anyone reading to him from the paper or reading him his rights before he was asked questions. *Id.* ¶ 12. Ray states that he told the officers that he "did not want to talk at the beginning and repeated this several times later, saying [he] was too groggy and didn't want to keep talking." *Id.* ¶ 8. He claims that the male officer repeated several times through the questioning that it would go well with the judge if he talked and that the faster he told the agents what they needed to know, the faster he would be released by the judge. *Id.* ¶ 9. He also states that the male officer, using an aggressive voice, complained that Ray was not answering the way the officer wanted him and that Ray stated that he did not want to talk "right now," but that it was "fruitless to complain" because "[t]hey just kept asking questions." *Id.* ¶ 10.

Ray also states that, at the time and for many years, he was taking Adderall four times a day and had grown completely dependent on it, and that without the medication, his "brain felt foggy, [his] thoughts were confusing, and [he] had difficulty concentrating." *Id.* ¶ 7. He says that he asked several times for his medication but was denied it. *Id.* He also states that as he was sitting on the bed, he fell backward a few times and that at one point he got up to go to the bathroom and almost fell. *Id.* ¶ 11. He further states that at one point, the male officer asked for the code to Ray's phone and said that if he did not provide the code, the judge would see him as uncooperative and that he would not get bail. *Id.* ¶ 13. So Ray gave the code to the agent. *Id.*

The testimony of Maguire and Harkins differs from that of Ray on many of the material events of the interrogation. Special Agent Maguire testified that she was the case agent on Ray's case. Dkt. No. 116-1 ¶ 2. At the time of Ray's arrest and interrogation, she had been a special

agent with the FBI for two and a half years.  *Id.* ¶ 1.  Before joining the FBI, she served in the Charleston Police Department in Charleston, South Carolina for approximately nine years, where she achieved the rank of detective and investigated narcotics crimes, vice-related crimes, and crimes related to children.  *Id.*

Agent Maguire spent February 10, 2020 finalizing the operational plan for Ray's arrest and was the team leader for the arrest and searches on February 11.  Hr'g Tr. at 108:16-18.  As part of her preparations on February 10, 2020, Special Agent Maguire tracked Ray's location through GPS information she obtained pursuant to a search warrant.  *Id.* at 109:5-6.  The GPS information indicated the whereabouts of a cellphone registered to Ray every ten or fifteen minutes.  *Id.* at 109:20.  It indicated that Ray returned to the Piscataway residence shortly after 11:00 p.m. on February 10, 2020, and did not leave the residence thereafter; when Agent Maguire searched the residence the next day, she located a cellphone and confirmed that it was the same cellphone she had been tracking.  *Id*. at 109:7-12.

Agent Maguire arrived at the Piscataway residence at approximately 6:00 a.m. on February 11.  She knocked, and two individuals answered the door.  *Id*. at 111:7-17.  After entering the residence with her gun drawn, she proceeded to the living room while the team conducted a protective sweep.  All occupants of the house were assembled in the living room. After the sweep was complete, she provided interview packets containing materials relating to subjects other than Ray to the interview teams who were gathered with the occupants of the residence in the living room.  *Id.* at 111:7-112:9.  By the time Special Agent Maguire had gathered the residents in the living room, no one had a gun drawn.  *Id*. at 112:15-20. She then asked Ray to follow her and Detective Harkins back to the bedroom from which he had emerged initially at the time the officers entered the home.  *Id*. at 112:5-9.

Upon entering the bedroom, Special Agent Maguire took a seat at the head of the bed, while Ray was seated at the foot of the bed. *Id.* at 113:17-21. She introduced herself to Ray as the case agent, advised him that she had a warrant for his arrest, and told him that she wanted to speak to him regarding the charges against him. She stated that she would advise him of his rights first and that it would be his decision on whether or not he spoke to her. *Id.* at 114:7-12. She then read Ray both the arrest warrant and his Advice of Rights. *Id.* She handed him the Advice of Rights form from which she had been reading and told Ray that he should sign it if he wished to talk with her without an attorney. *Id.* at 114:18-23. Ray "glanced" at the form and then signed it. *Id.* at 116:8-10. She then proceeded to ask him questions. *Id.* at 115:5-9. She characterized Ray as polite and respectful while discussing the form and attentive and engaged throughout the conversation, giving full and complete responses. *Id.* at 115:12-14. He was coherent and alert, aware of his surroundings and knew what was occurring. *Id.* at 116:17-19. The interview lasted approximately an hour and a half. *Id.* at 117:3. At no point did Ray indicate that he was feeling groggy or fall backward. *Id.* at 117:9-12. At one point, Ray asked for water; he was given it. *Id.* at 117:24-118:5. He also asked to use the bathroom; he was given that opportunity and used the bathroom twice. *Id.* Ray did not appear to have any difficulty standing, he did not need assistance walking, and he did not stumble. *Id.* 118:13-21. Special Agent Maguire testified that during the interview, Ray did not ask for medication or indicate he could not proceed without medication. *Id.* at 118:22-119:119:2. Ray did not have difficulty answering the questions and his answers were generally responsive. *Id.* at 122:5. He did not appear physically sick or psychologically unwell. *Id.* at 122:13-15.

Agent Maguire recalled that at one point during the interview, she asked Ray about whether he had asked anyone to write statements admitting that they had poisoned him and

discussing the damage they had caused him. *Id.* at 119:5-7. Ray stated, "I don't want to talk about this" and then proceeded to say that the investigation was a "smear campaign" against him and that he had been poisoned by a number of individuals at the behest of former NYPD Chief Bernard Kerik. *Id.* at 119:7-11. Agent Maguire responded that she would give him an opportunity to speak about those issues but she wanted him to answer her questions directly. *Id.* at 119:11-13. He then replied, "you need to listen to me." *Id.* at 119:14-18. At that point, Agent Maguire paused the interview, reminded him that she was conducting the questioning, and stated that if he wished to discontinue the interview, they could stop and she would proceed with the booking process. *Id.* Ray indicated that he wanted to proceed. *Id.* 119:21. At no point, before or after, did Ray say he wanted to discontinue the interview and the interview ended only when Agent Maguire had generally covered the questions she wanted to pose and believed it was time to conclude in order to meet the marshal's cutoff. *Id.* at 121:23-121:2.

The only time Agent Maguire mentioned a judge was when Ray interrupted her and, being cognizant of the time, she stated that she wanted to proceed with her line of questioning because she wanted to meet the marshal's cutoff to go before a judge for Ray's initial appearance. *Id.* Otherwise neither she nor Detective Harkins mentioned anything about a judge. *Id.* at 120:19. Nor did they say anything to Ray about his potential release on bail. *Id.* at 120:22. Neither had their guns drawn during the conversation. *Id.* at 121:1-5. Ray was not handcuffed. *Id.* at 121:6-7. No one shouted or raised their voices or threatened Ray. *Id.* at 121:8-15. Ray never said he wanted to consult an attorney.[1] *Id.* at 121:18-20.

---

[1] Special Agent Maguire's FBI Form 302 reflects that, at one point during the interview, Ray stated that he had shared with his attorney, identified by name, information on the students who allegedly damaged his property and poisoned him and his attorney had sent a complaint to the prosecutors , but Special Agent Maguire did not ask Ray whether he wanted to consult with that attorney and Ray did not at any point request during the interview to consult with counsel.

Agent Maguire had heard before the interview that Ray took the medication Adderall and she asked him if he took Adderall. *Id.* at 159:21-24. He responded that he took it four times a day, but he did not ask for it during the interview. *Id.* at 160:19-23. Agent Maguire also knew, before the interview, that Ray had made claims that he suffered from mercury poisoning and during the interview, Ray mentioned that he had been poisoned and showed his teeth to demonstrate the effect of the poisoning. *Id.* at 168:21-169:1, 173:18-23. During the interview, however, Ray did not complain that he was suffering from the effects of mercury poisoning. *Id.* at 123:3-5. Although Agent Maguire mentioned to Detective Harkins in the days leading up to the arrest that Ray might need to be medically evaluated to determine whether he was sound for housing in jail in light of his claim that he had been poisoned, she had no concerns about his physical or psychological health during the interview. *Id.* at 123:7-10.

Detective Harkins' testimony was similar to that of Agent Maguire. He testified that he was a 28-year veteran of the NYPD, currently assigned to the New York Child Exploitation and Human Trafficking Task Force and that he was working on that task force in February 2020. *Id.* at 8:18. On February 11, 2020, he was assigned to be rear security for the search of the Piscataway residence, making sure that no one exited the premises and checking for safety and tactical concerns, and to assist with the interview and subsequent transportation and processing of Ray. *Id.* at 9:14-16. He was not assigned to the investigation but was helping out for the day. *Id.* at 9:21. He arrived at the residence at approximately 6:00 a.m. and proceeded to the rear of the residence. *Id.* at 10:14. After he was given the "all clear" signal that it was safe for him to enter the house, he then entered the residence through the front door at approximately 6:02 a.m. *Id.* at 10:21-11:3. He did not have a gun drawn nor, when he entered, did he see others with their guns drawn. *Id.* at 11:4-10. He did not point his gun at Ray or say "hands up" and he did not see

other law enforcement agents point their gun at Ray or say "hands up." *Id*. at 11:19-12:1.

After entering the residence, he was directed to the rear bedroom to assist Agent Maguire in interrogating Ray. *Id.* at 12:2-6. He shut the door and Agent Maguire then read Ray his Miranda rights. *Id.* at 12:9-12. Ray signed the FBI Advice of Rights form and both Agent Maguire and Detective Harkins signed it at 6:19 a.m. attesting to his observation of Ray signing it. Dkt. No. 109-1, Ex. E. During the reading of the rights and the questioning, Agent Maguire was approximately six feet away from Ray on the bed and Harkins was approximately eight feet away. *Id.* at 13:15-20. Ray was dressed in sleepwear. *Id*. at 32:9.

Detective Harkins recalled that after Ray signed the Advice of Rights form, Agent Maguire began to ask Ray questions. *Id.* at 14:14-18. Like Agent Maguire, Detective Harkins characterized Ray as alert and attentive when he was read his Miranda rights, and described him as alert, coherent, engaged, and fully awake throughout the interview. *Id.* 14:21-15:9. He testified that Ray's answers were generally responsive and he had no difficulty responding to questions. *Id.* He recalled that at one point during the interview, Ray went on several lengthy tangents in response to Agent Maguire's questions. *Id.* at 50:11-15, 51:5-7. Detective Harkins also recalled that, at one point, Ray attempted to ask him and Agent Maguire questions. *Id*. at 18:17-18. Agent Maguire responded that it was her interview and she would be asking the questions. *Id.* That was the only time Agent Maguire raised her voice ever so slightly. *Id*. at 20:2-3.

Ray did not fall back on the bed. *Id.* at 15:17-18. He asked to use the bathroom and was permitted to use it. *Id.* at 16:1-4. He did not need assistance getting up to go to the bathroom or walking to the bathroom and he did not stumble. *Id.* at 16:5-7. He was not handcuffed. *Id.* at 19:20-21. No one threatened him. *Id.* at 20:6-7. While both Agent Maguire and Detective

Harkins were armed, their weapons were concealed.  *Id.*  Ray did not at any point state that he did not want to continue answering questions.  *Id.* at 18:1-3.  He did not say that he wanted to consult with his attorney.  *Id.* at 20:10-12.  He did not appear physically sick or psychologically unwell, and Detective Harkins had no concerns about Ray's physical or psychological health.  *Id.* at 21:17-19.  Detective Harkins did not recall Ray appearing groggy or saying he was tired.  *Id.* at 35:6-7.  He denied saying anything to Ray, or hearing Agent Maguire say anything to Ray, about how a judge would view his participation in the interview.  *Id.* 18:22-19:4.  The only time he said anything to Ray about his potential release on bail was during the arrest processing when he said that he had no authority in that.  *Id.* at 19:1-4.

Like Agent Maguire stated, Detective Harkins testified that he did not ask Ray questions during the interview.  *Id.* at 45:25-46:3.  Only at the conclusion of the interview did he ask Ray one or two questions.  *Id.* at 46:4-5.

Detective Harkins recalled that at one point, either when the interview ended or toward the end of the interview, Ray asked for his Adderall medication.  *Id.* 17:13-18.  Although there was a prescription bottle of Adderall in the room with Ray's name on it, it was empty and the only other bottle was in the name of Ray's daughter.  *Id.* at 16:19-17:12.  As a result, and because he believed it was illegal to provide drugs prescribed for one person to another person, Detective Harkins did not give Ray the drugs in the name of his daughter.  *Id.* at 17:16-18.  However, Ray did not say he could not continue answering questions without medication or that he felt groggy.  *Id.* at 17:23-25.

During the interview, Ray did say that he suffered from mercury poisoning and that he was the victim of a poisoning campaign that had disrupted his life.  *Id.* at 35:15-23.  Ray said he could not work due to some health concerns and at one point opened his mouth wide to show

how the poisoning had affected his teeth. *Id.* at 37:14-21. However, Ray did not appear physically sick or psychologically unwell. As is his practice with all persons who are arrested, Detective Harkins asked Ray during the interview, in transit, and during processing, whether he needed immediate medical or psychological attention. *Id.* Ray denied that he needed medical or psychological attention. *Id.* at 39:5-25. The only complaint Ray had from the time he was arrested until he was presented was that his stomach was bothering him. *Id.* at 40:23-41:1.

While Detective Harkins was transporting Ray to 26 Federal Plaza for processing, Ray was recorded. The recording was played for the Court and in it Ray stated that he had been through the arrest process in the past. *Id.* at 25:11-13.

The interrogation of Ray was not recorded. Agent Maguire assigned Detective Harkins to record the interrogation but he misunderstood the assignment and did not turn on his recording equipment. The Court finds the explanations provided by both Agent Maguire and by Detective Harkins to be credible. Before the interrogation, Agent Maguire asked Detective Harkins whether he had his recording equipment and asked him to turn the equipment on. *Id.* at 111:23-112:9. Detective Harkins did not do so. *Id.* at 125:7-9. On prior occasions, when he had been asked to record the transport of a suspect after he or she was arrested, he had not been assigned to record the interview itself. *Id.* at 72:22-73:8. Detective Harkins misunderstood the instruction and believed that he should follow his past practice, recording the transport only. *Id.* at 73:10-1. He believed that Agent Maguire was going to record the interrogation. *Id.* at 73:14-19. It was not until the following day when Agent Maguire attempted to download the recordings from the recording devices that she learned that Detective Harkins had failed to record the interrogation; at the same time, Detective Harkins recognized his mistake and realized that he was supposed to have recorded the interrogation. *Id.* 125:17-22. Agent Maguire was in the process of preparing

her memorandum of the interrogation and observed that there were not two recordings of Ray—one for the interrogation and one for the transport. *Id.* She confronted Detective Harkins who admitted that he had not recorded the interrogation and to his misunderstanding regarding whether he was to record it. *Id.* Both were surprised and Harkins was embarrassed. *Id.* at 125:23-126:1.

There is no evidence that the failure to record the interview was anything other than a mistake—one that may prove costly when the Government may be unable to establish Ray's post-arrest statements at trial through anything other than Agent Maguire's testimony and perhaps her notes. There is no evidence that Agent Maguire and Detective Harkins somehow set out to conduct an illegal interview and decided in advance not to turn on the recorder. Nor is there evidence of a recorder being stopped in midstream or a gap in the recording—an "18.5 minute gap."[2] Detective Harkins simply failed in his assignment to turn on the recorder as a result of negligence and not as a result of any intentional misconduct.

## DISCUSSION

Ray argues that he did not knowingly and voluntarily waived his Miranda rights on February 11, 2020, and that, after questioning began, he invoked his right to silence. Accordingly, he contends that his statements should be suppressed and that the Government should not be able to offer them in its case-in-chief at trial.

The Court applies standards that are well-traveled. Under the Fifth Amendment to the Constitution, a defendant in custody must be read his Miranda rights before he is interrogated.

---

[2] The reference is to a gap in the White House tapes that were turned over in the Watergate inquiry. *See* George Lardner Jr., *Haig Tells of Theories on Erasure*, Wash. Post (Dec. 7, 1973), available at: https://www.washingtonpost.com/wp-srv/national/longterm/watergate/articles/120773-1.htm

U.S. Const. amend. V.  The police can continue questioning only if the defendant has knowingly and voluntarily waived his right to be silent.  A knowing waiver is made when the defendant agrees to speak "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *see also United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011); *United States v. Gomez*, 199 F. Supp. 3d 728, 748 (S.D.N.Y. 2016).  A waiver is "voluntary" if "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception."  *Moran*, 475 U.S. at 421.

The Government bears the burden of demonstrating a knowing and voluntary waiver. *Berghuis v. Thompkins*, 560 U.S. 370, 383-84 (2010).  "The question of waiver must be determined on the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused."  *Plugh*, 648 F.3d at 127 (quoting *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1993) (per curiam)).  Likewise "[w]hen evaluating voluntariness," *United States v. Gaines*, 295 F.3d 293, 298 (2d Cir. 2002) (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)), a court must "make a case-by-case determination based upon the totality of the circumstances[.]"  *Id.* at 298-99 (citing *Tankleff v. Senkowski*, 135 F.3d 235, 244-45 (2d Cir. 1998)).  These circumstances include "the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials."  *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991); *see United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018) (same); *United States v. Rodriguez*, 2019 WL 112621, at *7 (E.D.N.Y. Jan. 4, 2019) (same); *see also United States v. LaPorte*, 779 F. App'x 63, 65 (2d Cir. 2019) (holding that a court should assess such factors as "the accused's age, his lack of education or low intelligence, the failure to give Miranda warnings, the length of detention, the nature of the interrogation, and any use of physical punishment") (quoting *Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir.

1989)).

The Court finds that the Government has sustained its burden of establishing that Ray knowingly and voluntarily waived his right to remain silent both at the commencement of the interview and throughout the interview.  The Court also finds that Ray never unequivocally requested that questioning cease.

Ray and the Government present conflicting accounts of whether Ray was read his Miranda rights and understood them.  Ray states that the agents just had him "sign a piece of paper" that he understood he had to sign and that he does not recall being read his rights.  Both Agent Maguire and Detective Harkins testified that Ray was read his Miranda rights and was given an FBI Advice of Rights form to read and sign before any questioning began.  They further testified that Ray appeared to understand those rights.  The Court has considered Ray's declaration but gives it less weight both because it was not tested by cross-examination and because it is not credible and is contradicted in numerous respects by the other evidence before the Court.  *See United States v. Rico*, 2019 WL 4014826, at *9 (S.D.N.Y. Aug. 26, 2019) (noting that defendant has the right to present evidence through a declaration while choosing not to testify at a hearing but nonetheless giving the declaration less weight). The Court credits the testimony of Agent Maguire and Detective Harkins which was credible and persuasive.  Neither overstated the evidence.

Agent Maguire offered that after being read his rights and being given the Advice of Rights form, Ray only glanced at the form before signing it.  The evidence that Ray was read his rights and thereafter agreed to speak alone supports that the waiver of his right to remain silent was knowing.  *See Butler*, 441 U.S. at 373 ("[W]aiver can be . . . inferred from the actions and words of the person interrogated.").  That is because "the law can presume that an individual

who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Berghuis*, 560 U.S. at 385; *see also United States v. Scarpa*, 897 F.2d 63, 68 (2d Cir.1990) (same); *Plugh*, 648 F.3d at 127; *Spencer*, 995 F.2d at 11-12 (finding knowing and voluntary waiver where defendant testified that he "was presented with an FBI waiver form describing his Miranda rights, . . . he read the form, and . . . he understood all his rights"); *Rodriguez*, 2019 WL 112621, at *7 ("A signed waiver form is strong, but not conclusive proof that a defendant knowingly and voluntarily waiver his Miranda rights."). Ray "was in his own apartment and not handcuffed when he signed the form, and he was given adequate time to review and consider it." *Rico*, 2019 WL 4014826, at *24.

Moreover, at the time Ray was read his rights and then interviewed, he was hardly new to the criminal justice system. He was an educated adult. He was in a position to understand the words that he was read and the form that he was given and to appreciate the significance of the interview. Agent Maguire testified that Ray had previously been arrested ten times, and the Court heard the recording of Ray where he indicated that he had been processed before. Ray's "background and experience" corroborate that he knew what he was being told on February 11, 2020 and knew he had a right to remain silent and, knowing those rights, he chose not to exercise them. *See Plugh*, 648 F.3d at 128 (holding that evidence that defendant was advised of his Miranda rights before he began speaking with the custodial agents and that he understood those rights and was familiar with his rights because of his experience as a state corrections officer was supportive of the conclusion that defendant knowingly and voluntarily relinquished his rights).

The evidence does not support Ray's claim that he was too groggy, tired, or in need of medication to understand what he was being told on the morning of his arrest. In the first

instance, the evidence does not support Ray's self-serving claim that he arrived at the Piscataway residence only at approximately 1:00 a.m. on the morning of February 11.  Agent Maguire credibly testified that cellphone location data indicated that he returned to the residence at 11:00 p.m. the night before.  In any event, whether he arrived at 11:00 p.m. the night before the interview or at 1:00 a.m. the morning of the interview, and whether or not he went to sleep at 2:30 a.m., he was sufficiently alert at 6:00 a.m. when he was read his Miranda rights.  The police are not foreclosed from conducting a custodial interview if, as is commonly the case, they make an early morning arrest or the defendant happens to be in pajamas.  Ray answered the questions directly and comprehensibly.  He was alert and coherent enough to ask for water, which he was given.  He was alert and coherent enough to ask to use the restroom—and he was given that opportunity.  He was alert and coherent enough to answer questions throughout an hour and a half interview, which ended only when Agent Maguire chose to end it.  Finally, he was alert and coherent enough to—at one point—try to take over the interview and steer it in the direction he wanted it to go.  The Court finds he knew he could have stopped answering questions at any time and nonetheless and knowingly chose not to do so.

The evidence does not support the claim that the effects of the condition for which Ray was taking Adderall or his claimed mercury poisoning somehow prevented him from understanding his rights.  Besides the statements that he took Adderall four times a day and that he claimed to have suffered mercury poisoning, there was no evidence of Ray's medical condition or that the condition somehow prevented him from appreciating and understanding what he was being told.  The subject of Adderall came up for the first time only when Special Agent Maguire asked him whether he had been prescribed the drug.  Ray did not introduce the topic.  Ray did not submit evidence indicating that his claimed medical conditions prevented him

from understanding the questions he was asked or directly responding to them.  If he understood the questions, there is no reason to doubt he also understood his rights.  Ray was asked several times whether he needed medical or psychological attention, and each time he responded that he did not.  His only complaint was that his stomach was bothering him.

The defense argues that the Government has failed to meet its burden to demonstrate a knowing waiver, because it has no recording of the agents reading Ray his rights and because Agent Maguire did not take contemporaneous notes describing how the Miranda rights were read.  But notes were not taken because of the belief that the interview was being recorded. While the absence of a recording may be unfortunate for the Government when and if it presents Ray's statements to a jury, the lack of a recording alone does not entitle Ray to suppression of the statements or to prevent the Government from presenting them.  That Ray was read his rights and given a form listing his rights before questioning began is supported by the credible testimony of two law enforcement agents, which is further corroborated by a copy of the form Ray himself signed.

Courts have held that the Government can demonstrate a knowing and voluntary waiver of the privilege and the defendant's understanding even in the absence of the defendant's signature on a form signifying that understanding and that such a signature is "not a necessary condition for establishing a knowing and voluntary waiver."  *United States v. Ashburn*, 76 F. Supp. 3d 401, 440-41 (E.D.N.Y. 2014) (citing cases).  It follows that the credible testimony of two law enforcement agents plus a signed waiver form is sufficient to satisfy the Government's burden even in the absence of a recording or notes contemporaneously corroborating that the defendant was read and understood his rights.  *See Gaines*, 295 F.3d at 298 (holding that "[w]hile it would be preferable to have physical evidence supporting [the officer's] testimony,

such as [the defendant's] signature of acknowledgment," it was not necessary to satisfy the

Government's burden); *United States v. James*, 415 F. Supp. 2d 132, 153 (E.D.N.Y. 2006)

(holding that waiver was knowing and voluntary even when there was no "written confirmation

of the waiver either through a signed waiver form or in the interview report").

The evidence also does not support Ray's claim that his statements were involuntary.  In

considering Ray's claim, the court examines "the totality of the surrounding circumstances,"

including "the age of the accused, education level, intelligence, extent of advice regarding

constitutional rights, length of detention, repeated and prolonged nature of the questioning, and

the use of physical punishment, such as the deprivation of food or sleep."  *United States v.*

*Gomez*, 2018 WL 501607, at *2 (S.D.N.Y. Jan. 19, 2018) (internal citations and quotations

omitted).  Moreover, "[c]oercive police activity is 'a necessary predicate' to finding that a waiver

of Miranda rights was not voluntary."  *Gomez*, 199 F. Supp. 3d at 748 (quoting *Coronado v.*

*Lefevre*, 748 F. Supp. 131, 139 (S.D.N.Y. 1990)).  The question thus is not whether, as a result of

the defendant's physical or psychological condition, he is able to exercise free will but rather

whether the statements are the product of "coercive tactics" or "police overreaching"—i.e,,

whether the police "exploited [the defendant's condition] with coercive tactics."  *Colorado v.*

*Connelly*, 479 U.S. 157, 164-65 (1986).  A statement is coerced if the circumstances demonstrate

that "the government agents' conduct 'was such as to overbear a defendant's will to resist and

bring about confessions not freely self-determined.'"  *United States v. Kaba*, 999 F.2d 47, 51 (2d

Cir. 1993) (alteration omitted) (quoting *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir.

1987)); *see also United States v. Walia*, 2014 WL 3563426, at *12 (E.D.N.Y. July 18, 2014)

("The critical inquiry is whether 'under the totality of the circumstances the defendant's will was

overborne by the agent's conduct.'") (quoting *United States v. Broccolo*, 797 F. Supp. 1185,

1195 (S.D.N.Y. 1992); *United States v. Mendonca*, 2020 WL 854584, at *4 (E.D.N.Y. 2020).

Ray is a sophisticated adult, who was able to answer questions articulately and intelligently.  He was informed of and knew his constitutional rights, and he was not subject to lengthy detention.  At the time of his waiver, he had been in custody for between 15 and 20 minutes—enough time for him to appreciate the gravity of the situation but not so much time that his will was overborne.  He was not subjected to repeated or prolonged questioning; the interview lasted one hour and a half.  Nor was he threatened with physical punishment.  He was given water and a bathroom break when he requested them.

The evidence does not support Ray's claim that Detective Harkins or any other member of law enforcement pointed a gun at him or said "hands up" when he went to answer the door. Ray did not even answer the door.  Two other occupants of the apartment did.  Ray was in his bedroom.  More to the point, after the protective sweep was concluded, no member of law enforcement raised their gun at Ray or made any threatening sounds.   He was interviewed in his own bedroom by two members of law enforcement who were at a suitable distance from him, who did not display their firearms, and who did not threaten him.  He was not handcuffed or restrained in any way.  Although the room may have been somewhat small and cluttered, it was his bedroom and those facts do not demonstrate that Ray's will was overborne or that his statements were involuntary.  The agents chose to interview Ray in his bedroom because it afforded the agents and Ray more privacy while the premises search warrant was being executed. It was not an effort to overbear his will to resist; it was an effort to find a space where he would be comfortable freely making statements.

The evidence also does not support Ray's claim that the agents made threats to Ray or offered false or misleading promises to him about how he would be treated by the court system

to overcome his will either before he signed the waiver form and began to answer questions or during the course of questioning. *Cf. Anderson*, 929 F.2d at 99 (ruling that a defendant's waiver was involuntary, even where the defendant signed a waiver form, because law enforcement used "false and/or misleading" statements to coerce him).   There is no evidence that Ray's waiver or his statements were the product of "intimidation, coercion, or deception." *United States v. Rosa*, 2018 WL 722857, at *3 (S.D.N.Y. Feb. 6, 2018) (quoting *United States v. Medunjanin*, 752 F.3d 576, 586 (2d Cir. 2014)).[3]   Both witnesses credibly denied that they told Ray that the court would view him favorably if he made statements or that they promised him he would receive bail if he participated in an interview.   They offered Ray the choice whether to speak and left it to Ray to decide the implications of speaking, whether positive or negative.   There is no evidence that Ray was subject to any type of coercion, was threatened physically or psychologically abused or that he was made any type of promises such that his will was overborne. The best evidence for Ray in support of this claim is Agent Maguire's testimony that when Ray attempted to volunteer his own statements or refused to answer her statements, she responded that the choice to answer was his and that, if he did not answer, the officers could proceed to having him processed.   But the statement that Ray would be processed after his interview ended was not a threat.   It was a statement of a consequence that would follow regardless whether Ray spoke or how or when the

---

[3] For that reason, *United States v. Outland*, 2021 WL 1399280 (7th Cir. Apr. 14, 2021), upon which Ray relies, is distinguishable.  *Outland* stands for the unexceptional proposition that where the Government seeks to use a defendant's custodial statements it must establish both that the defendant received and validly waived his Miranda rights and that his statements themselves were voluntary.  *Id.* at *2.  In that case, the district court conducted no hearing and made no finding that the defendant knowingly and voluntarily waived his Miranda rights, which were read to him shortly after he recovered from having arrived unconscious in the emergency room from a drug overdose.  In this case, by contrast, the Court has had the opportunity to consider the testimony of law enforcement and finds from that testimony both that Ray knowingly and voluntarily waived his rights before he began answering questions and that his subsequent statements were voluntary and not the product of police coercion.

interview ended—he would be transported for processing and ultimate presentment.  Ray knew

that.  It was not wrongful for Agent Maguire to tell Ray that if he chose not to answer her

questions, the agents would get started with the next steps in connection with his arrest nor does

her statement of that fact render any statements after the defendant is informed of those next

steps involuntary.

Ray argues that his statements were involuntary because of the effects of the mercury

poisoning and because he needed Adderall which he was denied.  He faults law enforcement for

not asking whether the effects of the mercury poisoning or the lack of Adderall affected his

ability to answer questions voluntarily.  The evidence demonstrated, however, that Ray was able

to answer questions, that he did not fall backwards on the bed, that he did not have trouble

standing, and that he did not have any trouble walking.  There was no indication that he was

medically or psychologically unwell.  The evidence thus belies any claim that he was suffering

from adverse health conditions at the time of the interview that affected his ability to answer

questions or to exercise his own will.  *See Gomez*, 2018 WL 501607, at *3.  The agents were not

required proactively to secure Adderall for Ray or to obtain a medical examination for him

before they could ask him questions.  "Courts have rejected claims that a statement was not

voluntarily made even when the defendant claims that he is physically ill or intoxicated."  *James*,

415 F. Supp. 2d at 152.  Particularly in the absence of any statement from Ray that he needed

medication in order to answer questions or any indication that his statements were involuntary,

law enforcement could accept on its face Ray's acknowledgment that he understood his rights

and his choice thereafter to answer questions, and the officers were entitled to continue to ask

him questions.  Indeed, "the Second Circuit has found statements to be voluntary despite much

more compelling circumstances of discomfort and disorientation than [Ray] alleges here."

*Gomez*, 2018 WL 501607, at \*2 (citing cases).  In any event, the evidence establishes that Ray was asked questions about whether he needed medical or psychological help and he stated that he did not.

Finally, Ray did not unambiguously invoke his right to cut off questioning.  *See, e.g.*, *Berghuis*, 560 U.S. at 381 ("an accused who wants to invoke his or her right to remain silent [must] do so unambiguously"); *Plugh*, 648 F.3d at 128.[4]  He did not attempt to stop the interview at all, whether ambiguously or not.  He attempted to evade answering a question that was potentially incriminating and that goes to the heart of the Government's case—whether he had had any of the roommates draft statements incriminating themselves.  While he stated that he did not want to answer the agent's specific question, "his concurrent statements made equally clear he was also not seeking to *invoke* his rights and thus cut offer all further questioning at that point."  *Plugh*, 648 F.3d at 125.  He did not stop talking but rather kept talking, going off on a tangent that was not relevant to the question.  Agent Maguire did not say at that point that Ray had to answer questions, as the defense argues.  She said that if he chose to answer questions, he had to answer her questions and not the questions he would pose to himself.  And she offered him a chance not to answer questions.  He then chose to continue talking—blaming the investigation on a smear campaign.  "At no point did [Ray] unambiguously inform the custodial officers that he wished to invoke his right to remain silent or his right to speak with any attorney, nor was his course of conduct such that the officers could reasonably have been put on notice that . . . no further questioning could occur."  *Id.* at 126.  Ray had a right to remain silent.  He did

---

[4] The defense does not press the argument that Ray invoked his right to counsel.  That argument would be meritless.  The evidence presented at the hearing establishes that Ray did not invoke his right to counsel much less do so unambiguously.  *See Davis v. United States*, 512 U.S. 452, 459 (1994) (right to counsel must be invoked unambiguously).

not have a right to talk and to take the agents' time addressing issues they did not want to

discuss. He was given the option either to answer the agent's questions or not to talk at all, and

he opted for the former. Having so voluntarily and knowingly elected, he has no constitutional

right to complain if the Government now chooses to use the statements he made against him.[5]

## CONCLUSION

The motion to suppress Ray's post-arrest statements is DENIED.

SO ORDERED.

Dated: May 7, 2021
     New York, New York                              LEWIS J. LIMAN
                                             United States District Judge

---

[5] Ray relies on *Anderson v. Terhune*, 516 F.3d 781 (9th Cir. 2008). In that case, the court held that a defendant who first stated "I don't even wanna talk about this no more" and "I'm through with this," and then stated: "I plead the Fifth" in response to police questioning had unambiguously and unequivocally invoked his right to stay silent and that the state court's conclusion otherwise was an unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts. *Anderson* bears no resemblance to this case. The defendant there made clear he wanted to end the interrogation. Here, the fact is clear that Ray did not want to terminate the interview, either in response to Agent Maguire's specific question or at any other time. He simply preferred not to answer her question and to answer instead a question of his own.