L5AsRAYc

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4              v.                          20 CR 110 (LJL)

5  LAWRENCE RAY, et al.,

6              Defendants.

7  ------------------------------x

8                                          New York, N.Y.
                                           May 10, 2021
9                                          9:00 a.m.

10

11 Before:

12                 HON. LEWIS J. LIMAN,

                                           District Judge
13

14                    APPEARANCES

15 AUDREY STRAUSS
        United States Attorney for the
16      Southern District of New York
   BY:  MOLLIE E. BRACEWELL
17      LINDSEY KEENAN
        Assistant United States Attorneys
18
   FEDERAL DEFENDERS OF NEW YORK
19      Attorneys for Defendant Lawrence Ray
   BY:  ALLEGRA GLASHAUSSER
20      PEGGY CROSS-GOLDENBERG

21 RICHARD LIND
   DAVID K. BERTAN
22      Attorneys for Defendant Isabella Pollok

23 ALSO PRESENT:
   KELLY MAGUIRE, FBI Special Agent
24

25

L5AsRAYc

1              (The Court and all parties appearing telephonically)

2              THE COURT:  Good morning.  This is Judge Liman.

3              THE DEPUTY CLERK:  I'm going to ask, starting with

4    counsel for the government, to please state your appearance for

5    the record, and then defendants.

6              MS. BRACEWELL:  Good morning, your Honor.

7              This is Mollie Bracewell for the government.  I'm

8    joined on the line by my colleague, Lindsey Keenan, and Special

9    Agent Kelly Maguire of the FBI.

10             THE COURT:  Good morning, Ms. Bracewell.

11             DEFENDANT POLLOK:  Good morning.  This is Isabella

12   Pollok.

13             THE COURT:  Good morning, Ms. Pollok.

14             MR. LIND:  Good morning, Judge.  This is Richard Lind,

15   one of the attorneys for Ms. Pollok.

16             THE COURT:  Good morning.

17             DEFENDANT RAY:  Good morning.  This is Lawrence Ray.

18             MR. BERTAN:  David Bertan appearing along with

19   Mr. Lind for Ms. Pollok.

20             THE COURT:  Who do we have on for Mr. Ray?

21             MS. CROSS-GOLDENBERG:  For the Federal Defenders of

22   New York by Peggy Cross-Goldenberg and Allegra Glashausser.

23             Ms. Glashausser, are you still there?

24             MS. GLASHAUSSER:  I'm here.

25             Good morning, your Honor.

L5AsRAYc

1          MS. CROSS-GOLDENBERG:  Good morning, your Honor.

2          THE COURT:  Good morning, Ms. Cross-Goldenberg, and

3     good morning, Ms. Glashausser.

4          Do we have Mr. Ray on the phone?

5          DEFENDANT RAY:  Yes, your Honor.  Lawrence Ray here.

6          THE COURT:  Good morning, Mr. Ray.

7          DEFENDANT RAY:  Good morning.

8          THE COURT:  Any other counsel who I neglected to

9     recognize or who has not identified themselves?

10          (Pause)

11          Very well.  I will note for the record that we are

12     proceeding today telephonically and remotely.  We're doing so

13     pursuant to the CARES Act and the Court's standing orders.  I

14     understand, but will ask counsel to confirm, that we're also

15     doing so with the consent of all of the parties, and that that

16     consent has been provided by the defendants after consultation

17     with counsel.  Furthermore, we're proceeding telephonically

18     because a video appearance is not practically feasible under

19     the circumstances.

20          Let me first inquire of counsel for Mr. Ray and then

21     I'll inquire of counsel for Ms. Pollok.

22          Ms. Cross-Goldenberg or Ms. Glashausser, is what I

23     stated correct?

24          MS. CROSS-GOLDENBERG:  Yes, your Honor.

25          This is Peggy Cross-Goldenberg, and that is correct on

L5AsRAYc

1    behalf of Mr. Ray.

2            THE COURT:  OK.  Mr. Ray, have you consulted with your

3    attorneys and do you waive any right to physically appear

4    before me in open court?

5            DEFENDANT RAY:  Yes, I have, your Honor, and yes,

6    I do.

7            THE COURT:  OK.  Very well.

8            Mr. Lind, is what I have stated correct?

9            MR. LIND:  Correct, Judge.

10           THE COURT:  OK.  Ms. Pollok, can you hear me?

11           DEFENDANT POLLOK:  Yes, your Honor.

12           THE COURT:  And have you had an opportunity to talk

13   with Mr. Lind about your right to appear in open court

14   physically in front of me, and do you waive that right?

15           DEFENDANT POLLOK:  Yes, I have, and yes, I do,

16   your Honor.

17           THE COURT:  OK.  Very well.

18           I will find that each defendant has had the

19   opportunity to consult with counsel and have waived their right

20   to an appearance in court physically in front of me.

21           Ms. Bracewell, are there any further findings that you

22   would have the court make?

23           MS. BRACEWELL:  No, your Honor.  In our view, that is

24   sufficient.

25           THE COURT:  OK.  Very well.

L5AsRAYc

1          We're here today for two purposes.  First, I would

2     like to get a status report from Mr. Lind and his colleagues

3     regarding the case against Ms. Pollok and where we stand with

4     respect to their readiness to make motions.

5          Second, we're here for oral argument on the motion to

6     suppress evidence against Mr. Ray, some of which evidence may

7     also be offered in a joint trial against Ms. Pollok, but there

8     is no motion yet made by Ms. Pollok with respect to such

9     evidence.

10          Let me first hear from Mr. Lind, you or your

11     colleagues, with respect to the case against Ms. Pollok, and

12     then I'll hear oral argument.

13          MR. LIND:  Judge, I have received from my predecessor

14     counsel all of the discovery he has gotten from the government,

15     which consists of about, I think, 12 or 14 terabytes of

16     discovery.  It is a tremendous amount of discovery, Judge.

17     Plus some documents from Mr. Skinner and some other material.

18     It is a tremendous amount of discovery, Judge.

19          THE COURT:  I think you've mentioned that twice.

20          So, first of all, is there any discovery that remains

21     outstanding from the government in your mind?

22          MR. BERTAN:  Your Honor, this is David Bertan.

23          If I may address that issue?

24          THE COURT:  Yes.

25          MR. BERTAN:  I don't believe the government has failed

L5AsRAYc

1   to comply with any of its obligations.  Unfortunately, because

2   of the timing of my entry into the case, the government is

3   copying discovery.  It is about 12 terabytes, eight of which is

4   being copied by the FBI, and I believe another four is being

5   copied by the government in their offices now.  But because of

6   the sheer volume, it is taking a while.

7            I haven't had a chance -- I haven't seen it yet.  I

8   haven't received it, through no fault of the government.  I

9   came in the case in the last ten days, and I ordered the

10  discovery.  I haven't even had a chance to catalog or organize

11  what is outstanding, what is going to be provided, regarding

12  Ms. Pollok.

13           MS. BRACEWELL:  Your Honor, this is Mollie Bracewell.

14           If I may, I'm happy to provide a brief update for the

15  court on those drives.

16           We are preparing materials for Mr. Bertan.  The

17  drives, one is with the FBI.  We expect that to be ready today.

18  What is being prepared by our office, we also expect that to be

19  ready today.

20           We will provide Mr. Bertan an update by the end of the

21  day either with tracking information, or if our estimate of

22  time needs to be adjusted by a couple days, but we hope and

23  expect to get discovery materials to him within the week.

24           THE COURT:  Very well.

25           Ms. Bracewell, is there any discovery that remains

L5AsRAYc

1    outstanding that you have not provided to Mr. Lind?

2           MS. BRACEWELL:  There is not outstanding discovery.

3           I would note that we are awaiting a search warrant

4    return from Microsoft.  We've been in communication with

5    Microsoft and expect to receive that this week.  So when we

6    receive it, we will be producing that as expeditiously as

7    possible, but it is not yet in our possession.

8           THE COURT:  OK.  Ms. Bracewell, at either our last

9    conference or one of our last conferences, I requested that you

10   do the same for Ms. Pollok that you did for Mr. Ray's counsel,

11   which was to identify the material that, in the government's

12   mind, was the most relevant as well as the material that you

13   thought was potentially Brady.  I did not spell out with

14   respect to Ms. Pollok what I had spelled out with respect to

15   Mr. Ray.  I simply asked you to do the same.

16          Have you done so?

17          MS. BRACEWELL:  Your Honor, we produced a lengthy

18   disclosure letter to Mr. Skinner, prior counsel, which we will

19   confirm with Mr. Lind was reproduced to him, and we are

20   including it in the discovery drive going to Mr. Bertan.  We

21   had made the offer to Mr. Skinner to speak with him about

22   salient portions and to walk through and direct him to some of

23   those.

24          We will, once we get the drives to Mr. Bertan, make

25   that offer again to new counsel.  But our disclosure letter is

L5AsRAYc

1    also extensive about materials that the defense might consider

2    Brady.

3            THE COURT:  Mr. Lind or Mr. Bertan, are you prepared

4    right now to tell me motions that you're prepared to make on

5    behalf of Ms. Pollok?

6            MR. LIND:  To be honest with you, Judge, not really.

7    We have to discuss it between us and also with our client.  I

8    thought when the order was issued, I think it did say that we

9    didn't have to -- we just had to state the amount of time we

10   would need, not necessarily the motions we were going to make.

11           THE COURT:  Well, and that is my followup question,

12   which is how much time do you need to let me know the motions

13   that you would make and for me to set a motion schedule?

14           MR. LIND:  I think somewhere around five months,

15   Judge.

16           THE COURT:  Why do you need five months?

17           MR. LIND:  Well, because of the extent of the

18   discovery, Judge.  I mean, the amount of it.

19           THE COURT:  All right.  What is the government's

20   position, Ms. Bracewell?

21           MS. BRACEWELL:  Understanding that the discovery is

22   voluminous, I think the realm of possible motions is a little

23   bit more cabined.

24           THE COURT:  Yes.

25           MS. BRACEWELL:  We are available to guide defense

L5AsRAYc

1    counsel to the one affidavit that might implicate Ms. Pollok,

2    and we're also happy to discuss the interview conducted in

3    February 2010, at the time -- 2020, at the time of Mr. Ray's

4    arrest, but we have no objection to some amount of time.  I'm

5    not sure five months is necessary to craft motions.

6            THE COURT:  All right.  I'm not going to grant a

7    five-month period of time to tell me what motions you're going

8    to make or to actually make the motions.

9            Looking at the calendar, why don't we set, either

10   July 1 or July 2, as the date that the defense will tell me

11   what motions it is going to make and for us to set a motion

12   schedule.

13           Matt, which day is better for us?

14           THE DEPUTY CLERK:  July 1 is fine, Judge.  We can do

15   July 1 in the afternoon.

16           THE COURT:  What time?

17           THE DEPUTY CLERK:  Let's see.  Three o'clock.

18           THE COURT:  OK.  Ms. Bracewell, does that work for

19   you?

20           MS. BRACEWELL:  Yes, that's fine for the government.

21           THE COURT:  Mr. Lind and Mr. Bertan, does that work

22   for you, that timing, that date and that time?

23           MR. LIND:  Yes.

24           MR. BERTAN:  Yes, your Honor.  Just a question.  Is

25   that virtual or in person?

L5AsRAYc

1          THE COURT:  What is Ms. Pollok's preference?

2          MR. BERTAN:  I think for that conference, virtual

3    would be fine, by telephone.

4          THE COURT:  Any objection from the government to do it

5    virtually?

6          MS. BRACEWELL:  No objection, your Honor.

7          THE COURT:  All right.  Three p.m. on July 1 for the

8    next conference at which Ms. Pollok's counsel will tell me what

9    motions they expect to make.

10          I'm not going to delay, by the way, decision on

11    Mr. Ray's motions until Ms. Pollok has made the motions and

12    they are fully submitted.  So we'll proceed with argument in a

13    moment on Mr. Ray's motions.

14          Is there an application with respect to Ms. Pollok to

15    exclude time until July 1?

16          MS. BRACEWELL:  Yes, your Honor.  This is Mollie

17    Bracewell speaking.

18          We would move to exclude time until July 1 to allow

19    defense counsel time to review the discovery and to consider

20    any motions they would like to bring with regards to the

21    discovery materials.

22          THE COURT:  Mr. Lind or Mr. Bertan, what's

23    Ms. Pollok's position?

24          MR. LIND:  We have no objection, Judge.

25          MR. BERTAN:  No, Judge.

L5AsRAYc

1          THE COURT:  OK.  I will exclude time from today until

2     July 1, 2021, on Ms. Pollok's case, under the Speedy Trial Act,

3     18 U.S.C. 3161(h)(7)(A).  I find that the ends of justice

4     outweigh the best interest of the public and the defense in a

5     speedy trial in that the time from today until July 1 will

6     permit the government to continue to provide the discovery to

7     Mr. Bertan.  It will permit the parties, the defense, to

8     consider the discovery, and to consider what potential motions

9     they want to make, as well as for the defense and the

10    government to have conversations about the case.

11         Mr. Lind and Mr. Bertan, I also understand that you

12    have got an application to be able to expend CJA funds on an

13    additional counsel?

14         MR. LIND:  Yes, Judge.  We made the application.

15         THE COURT:  That request will be granted.

16         MR. LIND:  I'm sorry, Judge.  I'm sorry to cut you

17    off.

18         MR. BERTAN:  Thank you, your Honor.

19         THE COURT:  That request will be granted.  I will take

20    care of that today so you'll have the resources of that

21    additional counsel.

22         MR. LIND:  Thank you very much, Judge.  I appreciate

23    it.

24         MR. BERTAN:  Thank you, your Honor.

25         THE COURT:  Anything else, Mr. Lind or Mr. Bertan,

L5AsRAYc

1    that we should discuss with respect to Ms. Pollok at this time?

2          MR. BERTAN:  No, your Honor.

3          MR. LIND:  No, Judge.

4          THE COURT:  OK.  All right.  Very well.

5          I will now hear argument on the motion to suppress

6    evidence obtained through the execution of search warrants.

7          Who will argue that on behalf of Mr. Ray?

8          And whoever will, the floor is yours.  Then I'll hear

9    from the government.

10          MS. GLASHAUSSER:  Thank you, your Honor.  This is

11    Allegra Glashausser on behalf of Mr. Ray.

12          THE COURT:  Good mornings, Ms. Glashausser.

13          MS. GLASHAUSSER:  Good morning.

14          THE COURT:  You may proceed.

15          MS. GLASHAUSSER:  Thank you.

16          There are five warrants each relying on some false

17    inaccurate or misleading statements and omissions, and there

18    are three sources of this false and inaccurate information.

19    The first is from Ms. Drury, who is the only named source for

20    three of the affidavits.  And she is someone who has a

21    reputation of being a storyteller, someone who lied to law

22    enforcement, lied to the dean of her school, lied to parents

23    and teachers, and also told friends and others information

24    completely opposite to what was in the affidavits over a period

25    of years.  And she also testified under oath to facts that were

L5AsRAYc

1    contrary to what was in the affidavit.  So the affidavits in

2    support of these warrants ignore that.

3          The second source of inaccurate information is from

4    Piscataway records which simply do not say that Mr. Ray lived

5    at the address where they were searching.  The affidavit in

6    support of the warrant said that they did.  That just

7    incorrect.

8          And then the third source of false information is from

9    the storage locker affidavit, where Ms. Rosario gave a

10   completely different account, as reported in the 302 interview,

11   than the account that's reported in the affidavit.  The

12   interview, the 302 interview report, doesn't mention consent.

13   The affidavit does.  And the tone of her statements is

14   completely different.  In the interview, she says that she is

15   in a romantic relationship with Mr. Ray and has a positive

16   tone.  And then in the affidavit, she is called -- the

17   government is asking your Honor to --

18          (Reporter interruption)

19          THE COURT:  Everybody should be on mute except for me

20   and Ms. Glashausser.

21          Ms. Glashausser, can you pick up where the court

22   reporter lost you?

23          Are you having a difficult time hearing me, your

24   Honor?

25          THE COURT:  I hear you loud and clear.

L5AsRAYc

1          MS. GLASHAUSSER:  All right.  Great.

2          THE COURT:  Ms. Glashausser, I should say, for the

3     record, that I've been able to hear you and all other defense

4     counsel loud and clear.  I've also been able to hear each of

5     the defendants loud and clear, as well as the government, and

6     I'm satisfied from the answers that I've received that

7     everybody who has addressed me has also been able to hear me.

8          Ms. Glashausser, I want to assure you, I've been able

9     to hear you.

10          So why don't you pick up where the court reporter lost

11     you.

12          MS. GLASHAUSSER:  I will try to.  I'm not reading.

13     I'll try to say something very similar.

14          So I believe what I was saying is that the tone of the

15     report of Ms. Rosario's statement was very different in the

16     affidavit compared to how it was reported in the 302 report.

17     The affidavit in support of the warrant called her a victim,

18     while the 302 report had a more -- a very positive tone with

19     respect to Mr. Ray, explaining that they were in a romantic

20     relationship.  That is the third source of false and inaccurate

21     information.

22          The government --

23          THE COURT:  Ms. Glashausser, let me ask you about the

24     first source of information.

25          MS. GLASHAUSSER:  Yes.

L5AsRAYc

1          THE COURT:  And when you mentioned Ms. Drury, I assume

2     we're talking about the person who's identified as female

3     victim number one, is that right?

4          MS. GLASHAUSSER:  That's correct, your Honor.

5          THE COURT:  And why don't I refer to her as female

6     victim number one.  I've got two questions for you.

7          First of all, does any of this omitted information

8     pertain to lies or misleading statements after the date in

9     2019, where it is reported that female victim number one left

10    the control of Mr. Ray and "ran away?"

11         MS. GLASHAUSSER:  Your Honor, I don't believe so, in

12    that I don't believe that we have many statements, if any, from

13    Ms. Drury after that date.  The information we have predates

14    that, but it goes back many years before she met Mr. Ray with

15    her friends, describing her in the original *New York Magazine*

16    article as someone who embellished the truth for effect and to

17    essentially kind of get attention.  So her reputation as

18    someone who is good at weaving creative stories is something

19    that seems to be long-term, definitely predating her meeting

20    Mr. Ray.

21         Also, a number of -- in particular, the testimony

22    under oath.  I know the government has argued that that was

23    done somehow at the direction of Mr. Ray.  Mr. Ray was not

24    present during that testimony, so this is not a situation at

25    all where the government can argue that he was somehow telling

L5AsRAYc

her what to do during that testimony.  That was testimony under

oath where he was not present.

What I think the wealth of information that we're able

to point to shows is not just that she had a reputation for

being a storyteller, but that she was -- that over the course

of years and to many different people and people in positions

of authority, she felt comfortable lying, changing her story,

saying different things.  That information is essential to the

affidavit in support of these warrants, when she was the only

person who was specifically not even named but referenced as a

specific person that had spoken to the agent.

That information --

THE COURT:  Let me push you on that one, because

you're quite right that the affidavits do not say that the

agents spoke to the reporter from *New York Magazine*, but aren't

they entitled to rely upon the information from that reporter

just as much, frankly, as they would be able to rely upon

information from, say, an anonymous tipster who provided

detailed and balanced information?

MS. GLASHAUSSER:  I think that the most that the

magistrate could rely on the article for would be something

like the anonymous tip.  I couldn't actually find any cases

with this sort of situation, where the affidavit in support of

a search warrant relied on such heavy part on an article in a

magazine.

L5AsRAYc

1          I don't think it can have more credibility than an

2    anonymous tip that even reached out to the journalist or the

3    authors of the article to see whether what they were saying was

4    credible.  I think crucially here what is absent.  Even if the

5    article is considered an anonymous tip is the corroboration by

6    independent police work to show that the things in that article

7    were correct.  The corroboration --

8          THE COURT:  But, Ms. Glashausser, there was

9    corroboration independent of female victim number one, even in

10   the very first warrant, wasn't there?

11         MS. GLASHAUSSER:  No, your Honor.  I think that is not

12   quite correct.

13         There is very little information that was in that

14   affidavit that isn't from the magazine article or from

15   Ms. Drury.  The only other pieces of information that the

16   government points to was that there was a domain in that

17   person's name that was registered to Mr. Ray, and that they had

18   reviewed PayPal records associated with her, and that she had

19   said that she had received proceeds from escort clients into

20   those accounts.

21         That's exceedingly thin.  And that search, that first

22   search warrant in particular is already quite thin in terms of

23   the probable cause for the crimes that are listed.  For

24   example, it discusses sex trafficking.  Prostitution is

25   actually never mentioned in the entirety of the affidavit.

L5AsRAYc

1          So that first warrant is at the very beginning of the

2     investigation and really doesn't have corroboration, and

3     certainly not substantial corroboration, aside from this one

4     person who really can't be relied upon.  I think what is

5     essential here is that the affidavit ignores all of that other

6     information about Ms. Drury.  So it didn't give the magistrate

7     the opportunity to assess it, and that what we're asking for

8     from your Honor is a hearing to assess whether or not this

9     affidavit and this warrant should be invalid.

10          What we have shown meets our burden of a substantial

11     preliminary showing of a reckless disregard for the truth,

12     because we have these three sources of false information.  I

13     recognize that for different warrants, but for each of them are

14     supported by documentary and reliable evidence.

15          So we respect --

16          THE COURT:  What facts are contained in that first

17     warrant from female victim number one that are not also in the

18     report from *New York Magazine* that are essential for the

19     finding of probable cause?

20          MS. GLASHAUSSER:  I guess, your Honor, my argument --

21     and I will try to answer your question directly -- but my

22     argument is that the magazine article cannot provide probable

23     cause, that that is not enough.  At most, it's an anonymous

24     tip.

25          THE COURT:  I've heard that argument.  So answer my

L5AsRAYc

1        question.

2                What is it that female victim number one says that is

3        material for probable cause that's not also in the *New York*

4        *Magazine* article?

5                MS. GLASHAUSSER:  So Ms. Drury is the only source of

6        information with respect to the sex-trafficking allegations,

7        for example.  So her report in that affidavit is actually about

8        escorting, not about prostitution.  But her report of that

9        information, I believe, would be essential to the probable

10       cause.

11               That's the same about her report about going down to

12       North Carolina with regard to the forced labor allegations.

13       And without her statements for those effects, we just have an

14       article that did not speak to her, which would be sort of a

15       hearsay-upon-hearsay situation, because Ms. Drury is the only

16       source of information for the sex-trafficking allegation.

17               So I think she is essential to that.  Her comments

18       are essential to the probable cause with respect to those

19       allegations, as well as the forced labor allegation.

20               THE COURT:  Let me look at that, because doesn't the

21       *New York Magazine* article report that in 2014, she began

22       working as an escort and would give her profits to Ray in order

23       to pay for the damage she had done to Ray's property?

24               I'm reading directly from the affidavit.

25               MS. GLASHAUSSER:  Correct, your Honor.  But that would

L5AsRAYc

1    not give rise to probable cause for sex trafficking.  Being an

2    escort isn't even an illegal activity.  Prostitution, they are

3    different things, one being illegal and one is not.  One can

4    give rise to a sex-trafficking allegation and one cannot.

5        THE COURT:  I hear that argument, and maybe you're

6    right, maybe you're wrong.  I really want to think about that.

7        But the question that I was asking is:  What is it

8    that female victim number one does through her direct report

9    that's not done in the *New York Magazine* article?

10       You had earlier pointed out that in her direct

11   conversations with the FBI, all it said was that in or about

12   2014, Ray suggested to her that she work as an escort and she

13   began working as an escort.  What I was suggesting is that that

14   statement doesn't do much more than is already in the *New York*

15   *Magazine* article.

16       MS. GLASHAUSSER:  I see your point, your Honor.

17       I had not been thinking about it in exactly the way

18   your Honor is asking the question.  I see your point on that.

19   But without her corroboration of that statement, the probable

20   cause, any probable cause that does exist would fall apart,

21   particularly because the *New York Magazine* article -- and I

22   believe that is noted in the affidavit itself -- had not --

23   Ms. Drury was not the source of the *New York Magazine* article.

24   Without her corroboration that that had happened, we just have

25   an article that says something and then a warrant to get many

L5AsRAYc

<table>
<tr><td>1</td><td>years of somebody's cell phone data.  That wouldn't be</td></tr>
<tr><td>2</td><td>sufficient.</td></tr>
</table>

1   years of somebody's cell phone data.  That wouldn't be

2   sufficient.

3         I do think that she provides additional information

4   with respect to the forced labor allegations as well, and does

5   corroborate or purports to corroborate what was in the article,

6   and that's what's problematic here.  Without her, without what

7   she says, this affidavit really is just a report of what an

8   article said without any substantial corroboration.  That is

9   not enough.

10        And more importantly, what we have shown is enough to

11  get a hearing on this issue.  This isn't a situation where it

12  was kind of speculative or nonspecific.  We have numerous

13  specific reasons of the one named source in the warrant,

14  numerous specific reasons why she can't, she couldn't have been

15  trusted and shouldn't have been deemed credible, which the

16  affidavit doesn't address.

17        I think one reason, your Honor --

18        THE COURT:  Ms. Glashausser, isn't all of the

19  information that you say was omitted from the first search

20  warrant affidavit contained in the *New York Magazine* article,

21  which is referenced by name in the affidavit, doesn't that lead

22  one to the conclusion that there was nothing else that the

23  agents were intentionally or recklessly trying to hide?

24        MS. GLASHAUSSER:  No, your Honor.  I don't think

25  that's a fair conclusion, particularly without any sort of

L5AsRAYc

```
1    affidavit from the agents or testimony from the agents
2    explaining their thought process.  Merely referencing the name
3    of a lengthy article and then picking out some facts, but not
4    others, doesn't mean that the magistrate judge now knows
5    everything about the article.  The magistrate judge knows that
6    the agent has picked out the information that the agent thinks
7    is important to the application and the magistrate judge is
8    reading the application.  Putting in the name of an article
9    does not change what is in the warrant application.
10             And these shouldn't, and your Honor shouldn't --
11             THE COURT:  But don't you need to make some showing of
12    intentional or reckless conduct?
13             MS. GLASHAUSSER:  Right.  We need to make a showing, a
14    substantial preliminary showing of reckless conduct.  And that,
15    I am arguing, we have well done because of the numerous
16    instances of Ms. Drury saying contradictory things, and also
17    just lying to someone in positions of authority over many
18    years.  All of those things are reasons that the magistrate
19    judge would have looked at this warrant affidavit and seen it
20    in an entirely different light.  Instead of seeing a magazine
21    article that is fully supported by the one witness that the
22    agent spoke to and thinking, OK, that is sufficient, the
23    magistrate would have seen there is a magazine article, and
24    then there is one person who has said a host of different
25    things over many years and has a reputation for making things
```

L5AsRAYc

1    up.  And that's a different scenario for that magistrate.

2         I think what is important about why the other two

3    sources of false information are important, even when your

4    Honor is considering this first affidavit, is that this is a

5    pattern.  It is a pattern that should be troubling to the

6    court, that over the course of many months, important things

7    are reported in these affidavits for search warrants that are

8    false, misleading or inaccurate.  And it keeps happening.

9         I think that that is something that your Honor should

10   consider when assessing whether we have made our preliminary

11   showing in order to get the hearing.

12        THE COURT:  OK.

13        MS. GLASHAUSSER:  The government hasn't put in any

14   sort of affidavit that would explain how these so many errors

15   could have happened over the course of this case and in asking

16   for these warrants.

17        THE COURT:  OK.  Well, why don't you move on to your

18   other arguments?

19        MS. GLASHAUSSER:  OK.  Thank you, your Honor.

20        I would like to move on next to an argument related to

21   the Piscataway records, because I think that weaves in with

22   that, explaining why those records are also important to us

23   getting a hearing.

24        In particular, for the warrant for 40 Holly Lane,

25   that warrant was insufficient because there wasn't enough

L5AsRAYc

1    information to connect that address to Mr. Ray, to that address

2    being Mr. Ray's home.

3            THE COURT:  Ms. Glashausser, have you done enough with

4    respect to that warrant to establish standing from the

5    declaration?  All that appears is that at some point prior to

6    his arrest in this case, and I suppose after his release from

7    imprisonment, he lived at 40 Holly Lane.  But it is equally

8    possible from what you have put in that he had abandoned that

9    property by the time that the warrant was executed.

10           MS. GLASHAUSSER:  I guess I'm confused about that,

11   your Honor.  He was arrested in that home, so he --

12           THE COURT:  Well, I understand that.  But what you put

13   in is, Before I was arrested and incarcerated, I lived at

14   40 Holly Lane.  That may be true, but that doesn't say, you

15   know, at the time I was arrested, I lived there.  And there is

16   a long period of time and it is, you know, quite possible to

17   read that language, I think -- in fact, a better reading of it

18   is just, you know, at some point before that time, I lived

19   there, not that I was living there at the time.

20           Now, it may be that the government's evidence would

21   show that he was.  You know, he slept there the night before.

22   But, you know, you haven't exactly put forward that evidence as

23   your own.

24           MS. GLASHAUSSER:  So, your Honor, I apologize.  I had

25   not understood that that was the section of the affidavit the

L5AsRAYc

1    government was concerned about as far as timing.  I had drafted

2    this affidavit for Mr. Ray and intended the phrase before I was

3    arrested and incarcerated to mean immediately before.  I don't

4    think we would have any trouble amending it to say that.

5           The affidavit is meant to say that Mr. Ray was living

6    at the residence at the time the warrant was executed.  I also

7    don't believe that anything -- I do think that the affidavit is

8    sufficient to say that, as written, and that there is no case

9    law suggesting that more than this would be necessary.  I think

10   Mr. Ray, his affidavit has shown standing overall of the

11   accounts and areas that we are disputing as far as the

12   affidavits.  But to the extent your Honor is concerned that it

13   does not say immediately before I was arrested and

14   incarcerated, I don't see any problem with changing that in the

15   affidavit.

16          THE COURT:  OK.  All right.

17          MS. GLASHAUSSER:  I'm happy to address the case law as

18   far as standing, if your Honor would like, but I do not

19   think --

20          THE COURT:  Why don't you proceed with your

21   substantive argument.

22          MS. GLASHAUSSER:  Sure.

23          With respect to that warrant, one of the strongest

24   pieces of information that is actually in the affidavit

25   connecting Mr. Ray to that residence is that the agent says

L5AsRAYc

1    that she reviewed the Piscataway police records and they said

2    that Mr. Ray lived there.

3            But the records just don't say that, and we have

4    submitted them to your Honor and the government has come up

5    with a creative response saying that it is a reasonable

6    deduction from the records that he lived there.  But that is

7    not what they say and that is not what the affidavit reports.

8            THE COURT:  Don't they say something like, you know,

9    there were three or four residents, and then they go on and

10    they talk about Mr. Ray in a way that makes it apparent that he

11    was residing there?

12           MS. GLASHAUSSER:  No, your Honor.

13           THE COURT:  Maybe you've got the language in front of

14   you.  I obviously have it with me and will study it, but why

15   don't you review it with me.

16           MS. GLASHAUSSER:  Sure.

17           So what the records say is that they spoke to the

18   "residents," one being Isabella Pollok, and then there is

19   discussion about Isabella and what she said.  And then it has

20   Ms. Pollok and Ms. Rosario listed as the residents of 40 Holly

21   Lane.  He is not listed, and that is in the document that goes

22   into detail about the residents.

23           There is then a different report that says -- that

24   does not discuss the residents.  It just says there are three

25   females and one male inside the house, and then it talks about

L5AsRAYc

1    parents.  It states Isabella has a history, and it goes into

2    some of her history, her age, and then it has four -- excuse

3    me -- three other names.  It says Lauren Ray, Lawrence Ray, and

4    Felicia Rosario.

5         That section doesn't mention residents at all, and

6    there is no reason to believe that it is about the residents,

7    as it actually includes somebody that I don't believe was

8    living at the home.  That is sort of a factual matter.  But the

9    point is that the report doesn't say that Mr. Ray lived there.

10   It only says that Ms. Pollok and Ms. Rosario live there.

11        In the affidavit in support of the warrant, the agent

12   doesn't report that in an equivocal manner.  It is clearly

13   stated that the Piscataway police department records say that

14   Mr. Ray lived there, and that is just not what they say.  The

15   government may have a response that the agent surely can come

16   up for a reason why that error got into the affidavit, but that

17   is something that the agent should need to do in an affidavit

18   or at a hearing.  It is not something that your Honor should

19   speculate about how this error got in here.  And this is a

20   direct error.  It is not what the report said.

21        Without that, and even with that, your Honor, the

22   evidence is quite thin connecting Mr. Ray to that residence or

23   otherwise connecting the evidence that the affidavit discusses

24   to 40 Holly Lane.  There is nothing in the affidavit that says

25   that 40 Holly Lane was connected to any sort of crime.  The

L5AsRAYc

1     connection all comes through Mr. Ray.

2              What is surprising about this is that the government

3     had a wealth of information at that point, including realtime

4     GPS data from Mr. Ray's phone.  And despite that, they don't

5     seem -- they don't report any evidence in the affidavit that

6     Mr. Ray had spent the night there ever or recently.  The

7     closest they get is saying that he was 660 meters away from

8     that home one time the day before.  The other information is

9     old.

10             So the lack of nexus between the home and Mr. Ray is

11    important in its own right and is its own reason why that

12    warrant should be found invalid.  But it also marries into the

13    reasons why we need a hearing because of the error in the

14    report of that information.

15             THE COURT:  OK.

16             MS. GLASHAUSSER:  I would now like to move on to our

17    overbreadth argument and with respect to what the government

18    actually seized here.

19             Looking at the evidence they got, both the paper

20    evidence and the electronic evidence, they really seized all of

21    the minutia of Mr. Ray's life going back many decades to the

22    1980s.  A search of electronic information and paper

23    information, but particularly electronic information, must be

24    reasonable.  And there are a number of cases in which

25    evidentiary hearings were ordered by the Second Circuit or were

L5AsRAYc

1    conducted prior to the cases getting to the Circuit on how

2    search warrants are executed.

3         So the government --

4         THE COURT:  I mean, what is your best case that a

5    hearing should be conducted with respect to how the government

6    reviewed the electronic evidence?

7         MS. GLASHAUSSER:  Well, I think that there are three

8    cases that are our best three.  That's U.S. v. Wey, U.S. v.

9    Ganais, and U.S. v. Galpin.  All of those have lengthy, I

10   think, two-day evidentiary hearings on how the search warrants

11   were executed.

12        The Second Circuit -- the government is right that the

13   Second Circuit hasn't yet said that there needs to be specific

14   search terms in the warrant to show that the warrant is

15   reasonable.  That is not what we're arguing.  But the

16   government does have to show that however they conducted the

17   search, that the search was reasonable, and that is what is

18   discussed --

19        THE COURT:  Don't you have to put forward some

20   evidence to suggest that what the government did was not

21   reasonable before you get a hearing?

22        MS. GLASHAUSSER:  Well, it is the government's burden

23   to show that their search was reasonable, and I think that the

24   evidence that we have is the exact quantity of information that

25   was taken here and the lack of any information about how the

L5AsRAYc

1    search was conducted.

2            The government hasn't put in an affidavit to explain

3    that the search was conducted in a reasonable manner.  They

4    have just used sort of phrases like they did a careful review,

5    it was meticulous, but haven't explained that at all.

6            The fact that they only came up with one percent of

7    the vast quantity of data that they took as being responsive

8    doesn't show that they did a careful reasonable review.  It

9    just shows that they took a huge amount of data that was not

10   responsive, and we just have no idea how they determined which

11   things, how they moved through that data to determine what was

12   reasonable and what was not.

13           I think that <u>Ulbricht</u> in the Second Circuit also is

14   supportive of our case, because that case, although the court

15   found that the search was reasonable then, that case is related

16   to one computer that was searched.  It related to a

17   sophisticated computer user and it was a really unusual case

18   that had to do specifically with computer crime.

19           In that case, although the Second Circuit said that

20   the search was reasonable, it also said that another case in

21   the future might require more limitation, and that is

22   because -- and the Circuit has been clear on this -- we need to

23   have a heightened sensitivity to digital searches because there

24   is a very high chance of privacy violations and the chance that

25   searches can just become general, general warrants, in the

L5AsRAYc

 1    digital context.

 2             Our case is not like Ulbricht both because Mr. Ray is

 3    not a sophisticated computer user and the case isn't about

 4    computer crime.  But also, there was a vast quantity of more

 5    information searched in Mr. Ray's case than was searched in

 6    that one.

 7             Also, in Ulbricht, the search warrants themselves were

 8    more limited than the search warrants that we have here.  In

 9    that case, the data that was authorized to be seized was all --

10    all had to be connected to the Silk Road website, and while

11    that did return a large amount of information, it was still

12    cabined by the crimes that the government was looking for.

13             Here, we don't have that.  So, for example, in the

14    premises of 40 Holly Lane and the storage unit search warrants,

15    there is no limitation.  It says that electronic devices can be

16    seized without limitation.  The same is true for cell phones.

17    The only limitation is cell phones that can store numbers.

18             I've never seen --

19             THE COURT:  I mean, what would you have the government

20    do, I mean, to say that the warrant has to list iPad version

21    five as the electronic device that can be seized or iPhone

22    version number five, but not other phones?

23             I don't understand what would be achieved in terms of

24    Fourth Amendment values by that.

25             MS. GLASHAUSSER:  Well, I think there are two

L5AsRAYc

1    different ways that the government can make sure that their

2    warrant is particular and not overbroad.  The first would be to

3    specify devices.  For example, they had spoken to witnesses.

4    They had already reviewed a lot of other information.  They say

5    that they saw Mr. Ray using a particular device.  They could

6    specify the devices that they believed were connected to the

7    crime.

8          So a witness might say Mr. Ray always used his, you

9    know, blue phone when texting about whatever thing that they

10   believe is connecting to the crime.  So yes, that would be one

11   way to make --

12         THE COURT:  But would that be required if you know

13   that Mr. Ray or there is probable cause to believe that Mr. Ray

14   used electronic devices in a commission for crimes to which

15   there is also probable cause?

16         What case says that they are required to limit the

17   acts to precisely the devices that the witness may remember

18   being used and ignore the other devices that are in that

19   location that would be the reason precisely from the fact that

20   their electronic device in that location were used in the

21   commission of an offense?

22         MS. GLASHAUSSER:  There isn't a case that says

23   precisely how the government needs to meet its Fourth Amendment

24   obligation.  It doesn't have to do the same thing in each case

25   either.  So in Ulbricht, they were able to meet their

L5AsRAYc

1    obligation by saying this is the computer that we believe he

2    uses for the thing we have probable cause for, and then once

3    you're in the computer, only search for information connected

4    to the Silk Road website.  They were able to cabin in both

5    areas, first with what device to search and then with what to

6    search the device for.

7              Here, they didn't do either.  They didn't limit what

8    devices to look on or how to look within the device to only

9    find information that was connected to the probable cause.

10   There is not a requirement -- the government doesn't have to do

11   specific things to meet these obligations, but it has to do

12   something to meet their obligations.  And the Fourth Amendment

13   case law got overbreadth in particularity is -- it goes back to

14   the creation of the Fourth Amendment and the reason for the

15   Fourth Amendment to not have general warrants.

16             Then the Circuit and district courts have recognized

17   that, particularly in the digital age, there is a risk that all

18   warrants will become general warrants if, as your Honor

19   proposed, warrants can just say, We believe that the person

20   used electronic devices to commit crimes, and then that is

21   that, and they can search all devices for anything.

22             That is a general warrant and that is what we have

23   here.  It is possible that in this case, the government did use

24   reasonable search terms or reasonable ways to move through the

25   electronic devices to meet their obligations, but right now we

L5AsRAYc

don't know, because the warrant didn't limit them in how they
needed to look through the devices and we don't know how they
did it.

THE COURT:  Would there be any Fourth Amendment
restriction in the government taking a quick peak at every
e-mail in a device just to see whether it was consistent with
and was evidence of the subject offenses, taking a quick look
and then moving on if it wasn't?

MS. GLASHAUSSER:  I would argue no, that that would
not be a reasonable way to do the search.  They would need to
look at the areas of the computer or the types of files that
meets their probable cause, just as if they come into a home --

THE COURT:  Do you have a case that says that they
can't take a quick peek at every e-mail?

MS. GLASHAUSSER:  Well, with respect to e-mail in
particular, your Honor, there is an Eleventh Circuit case,
U.S. v. Blake, that discusses how the government should be
limited in connecting their probable cause in e-mail to only
getting the e-mails that have messages from particular people
or messages relating to particular web pages, when those are
the things that are connected to the probable cause.

That is an Eleventh Circuit case that specifically
puts the burden on the government in asking a service provider
to provide e-mails to only ask for the e-mails that are
connected to their probable cause.

L5AsRAYc

1          THE COURT:  I have read it.  I'm aware of that case

2    and it is helpful for you to remind me of it.

3          What else do you have before I turn to the government?

4          MS. GLASHAUSSER:  Sure, your Honor.

5          We may have mostly covered it, but if I can just sum

6    it up a little bit here.

7          THE COURT:  Yes.

8          MS. GLASHAUSSER:  I think there are numerous reasons

9    why your Honor should order a hearing here.  Obviously, there

10   are a number of different warrants and affidavits, and each of

11   them has problems and numerous problems that should be explored

12   at a hearing, particularly where we have no affidavit from the

13   government.

14         We have our three sources of incorrect, false or

15   misleading information.  We don't know how their search was

16   conducted, but we do know that a vast amount of unresponsive

17   information was seized and searched.

18         The government also has argued that they have good

19   faith for all of these errors.  That is something that is also

20   their burden and something that is the appropriate subject of a

21   hearing.

22         The last thing that we didn't touch on, and I only --

23   I'm happy to address that if your Honor has questions, is with

24   respect to their argument that they had consent of the storage

25   area.  We have argued in our papers that they didn't, but that

L5AsRAYc

1    too is something that they would need to show at a hearing if

2    your Honor were going to consider it.

3            We have met our burden to show that there were errors

4    with these warrants, and there is a heightened sensitivity to

5    constitutional concerns, particularly for the digital evidence.

6    That is why your Honor should order a hearing here.

7            THE COURT:  Thank you very much.  Excellent argument.

8            Who will argue for the government?

9            MS. BRACEWELL:  Good morning, your Honor.  This is

10   Mollie Bracewell.

11           My plan is just to respond in turn to the arguments

12   raised by defense counsel, and then I'm happy to answer any

13   questions that the Court had.

14           With respect to the defense's allegation that there

15   were falsehoods and omissions in these affidavits, that claim

16   really falls apart when you scrutinize the warrants themselves.

17   When we're talking, for example, about female victim one, the

18   government's theory of the case is that the defendant, over a

19   period of years, extracted false confessions from female victim

20   one, that she made false confessions, and that she did so both

21   in his immediate presence and outside of it, and that she paid

22   damages to him as a result.

23           So the idea that she said things consistent with those

24   false confessions is not exculpatory in our view, nor is it a

25   material omission.  It is encapsulated in the merit of the

L5AsRAYc

1    offense that we have set forth.

2           THE COURT:  Doesn't the friend who is reported in the

3    *New York Magazine* make points about stretching the truth

4    earlier to when female victim one met Mr. Ray?

5           MS. BRACEWELL:  Your Honor, yes.  There is a

6    description about the defendant having -- female victim one

7    having a reputation as a storyteller.  That is what the defense

8    has alluded to before.

9           I would just like to point out that what we're

10   discussing here is female victim one, who was recruited in the

11   defendant's way while a college student, while a sophomore in

12   college.  So what the defense is describing is, as I understand

13   it, a high school reputation for being a creative storyteller.

14   That is simply not material.  It may or it may not be a proper

15   subject for cross-examination, but it certainly doesn't rise to

16   the level of materiality that the government had to include it.

17          And I would just note that the case law about

18   omissions and what kind of omissions satisfy the substantial

19   preliminary showing to require a Franks hearing is high,

20   particularly because there is an element of selectivity in

21   setting forth an account in a warrant.

22          So, for example, there are bound to be certain

23   details, certain facts omitted, and the law recognizes that.

24   So we have to pay special attention to what kinds of facts are

25   omitted, and we submit that the female victim one's reputation

L5AsRAYc

1    in high school for, you know, being, perhaps, a storyteller

2    just simply can't be material.

3        THE COURT:  What is your answer to the argument that

4    all the first search warrant affidavit talks about is

5    escorting, and escorting is, you know, different from sex

6    trafficking?

7        MS. BRACEWELL:  So escorting, in my understanding and

8    in discussions with the agent, escorting is another term used

9    to describe prostitution.  So paragraph 7J and K in the

10   affidavit, the first affidavit, describe what the article set

11   out about escorting.  In particular, it set out both that

12   female victim one was engaged in escorting and that she was

13   providing those proceeds to Mr. Ray, who was pleased with her

14   efforts to pay him back for the damages he says she did.

15        So with respect to that, we think its very clear that

16   the affidavit and its summary of the article alluded to female

17   victim one's engaging in prostitution and that the funds were

18   routed back to the defendant.  It doesn't set forth the entire

19   theory of trafficking that the government has.  It doesn't

20   entirely set forth the extent of the coercion, but it certainly

21   gives you the exoskeleton that is how the trafficking offense

22   was committed.

23        And then --

24        THE COURT:  It certainly would have been better for

25   the agents to say that escorting is a euphemism for sex

L5AsRAYc

trafficking.  I understand that is what you're now saying.

Don't I need a statement like that or didn't the magistrate judge need a statement like that?

Isn't that a problem for you?

MS. BRACEWELL:  I'm not sure it's a problem.  I mean, I understand what your Honor is saying.  And in recapitulating the article, it would have made sense to, perhaps, out an added agent training and experience remark.  The fact is whether she was escorting and gaining proceeds from escorting, that is in some way different from prostitution, it is still consistent with our theory of control, and our theory that the defendant was coercing her into this line of business.  You know, whether there is some light between escorting and prostitution that we didn't make clear, that those are one in the same in our view.

THE COURT:  I suppose it is also a form of forced labor; is that your view?

MS. BRACEWELL:  Yes, your Honor.

It is also -- you know, it's also an example of the defendant's control over female victim one.  You know, regardless of the specifics of the sexual acts that were being undertaken or if it was just companionship on some occasions, it still goes to show that he was exacting money from her.  And it is consistent as well with the idea that he had leverage that enabled him to force her into doing things that generated money for him.

L5AsRAYc

1          THE COURT:  OK.

2          MS. BRACEWELL:  I want to go towards -- unless your

3     Honor has any more questions about, you know, the alleged

4     omissions with respect to female victim one, I would like to

5     cover briefly the Piscataway records.

6          THE COURT:  Yes, please.

7          Where in the records do you see Mr. Ray being

8     described as a resident?

9          MS. BRACEWELL:  So the affidavit itself describes

10    Piscataway police records.  There is both a narrative of the

11    offense, without reference to the individuals named, but there

12    is also a computer-aided dispatch, a computer document that

13    identifies individuals who are interviewed.

14         So the sum total of the records is not just to unnamed

15    residents, it also includes identified individuals.  It's

16    perhaps an inferential step that was not spelled out in the

17    warrant, in the warrant affidavit, but it is not an error or a

18    false statement.  The agent, reading the Piscataway police

19    department records in their totality, reasonably came to the

20    conclusion that the residents who were not identified were the

21    individuals that were named in the computer-aided dispatch.

22         So, in fact, that is what transpired.  Who, in fact,

23    was living there, I don't think that --

24         THE COURT:  I suppose what you're saying is that

25    somebody who happens to be present, and is interviewed and is

L5AsRAYc

1    described as somebody who is present and was interviewed, is

2    residing or is there more --

3        MS. BRACEWELL:  I'm sorry to interrupt.  I was just

4    going to say that the language in the affidavit says that I've

5    reviewed records from the Piscataway Police Department.  The

6    PPD, reflecting that law enforcement officers from the PPD

7    conducted a welfare check at the subject premises in May 2019

8    and learned that Ray resides at the subject premises with the

9    victim, female victim two, and associate one.

10       What the defense alleges is false, that one of the

11   documents, the narrative that was written by one of the agents

12   didn't include the names of those residents, but the

13   computer-aided dispatch, which was also included in the

14   Piscataway police records, identified the various individuals

15   who had been interviewed during that welfare check.  And it

16   identified both Mr. Ray and it identified certain females that

17   had been present at the time.

18       So the idea that there is -- that the welfare check

19   and the narrative had no reference to the resident's name and

20   that the agent just made a misstatement about what was included

21   in the Piscataway police records is not true.  There is, in

22   fact, a second document that was created in conjunction with

23   the welfare check that includes Mr. Ray's name as an individual

24   who was interviewed.

25       THE COURT:  OK.

L5AsRAYc

1          MS. BRACEWELL:  Does that make sense?

2          Can I answer any more questions to the court about

3    that document?

4          THE COURT:  I don't think so.  If there is anything

5    else you want to let me know about it, you know, now would be

6    the time.

7          MS. BRACEWELL:  No.  I just wanted to make sure I had

8    not -- my description of the two documents is clear.  I mean,

9    I would just note that a welfare check is inherently related to

10   the residents.  So the idea that these are the individuals they

11   were interviewing in connection with the welfare check, it's

12   not a deductive leap to conclude that those are one in the same

13   as the residents.

14          I think there may have been an inferential step that

15   could have been articulated in the affidavit, but it doesn't

16   rise to the level of a misstatement because, in fact, there is

17   a very sound basis for concluding that the computer-aided

18   dispatch was referring to the residents.

19          THE COURT:  All right.  What is it that you have got

20   to say about Ms. Rosario and the storage unit?

21          MS. BRACEWELL:  So with respect to the storage unit,

22   to be clear about our argument, we believe that the warrant

23   itself is sufficient.  But in the alternative, if the court

24   deems the warrant invalid for some reason, we would argue that

25   we had consent, in the alternative, to enter into the storage

L5AsRAYc

1    unit.

2              THE COURT:  No, I understand that that is your

3    argument.  But let's assume that we're looking at the -- let's

4    assume that I don't think that there is enough to establish

5    consent and so you have to rely upon the warrant.  I understand

6    the defense to be making the argument that they are entitled to

7    a Franks hearing with respect to the storage unit warrant

8    because the storage unit warrant recites facts relating to

9    Ms. Rosario providing consent that are inconsistent with the

10   information from the 302 of Ms. Rosario.

11             That is the argument that I would like to hear your

12   response to.

13             MS. BRACEWELL:  Understood, your Honor.

14             I would just note that their argument is largely

15   speculation, and for that reason alone, does not satisfy the

16   substantial preliminary showing.  They conclude that because

17   the 302 is in a particular tone and that the consent is not

18   memorialized there, that there is a falsehood in the later

19   affidavit.  The affidavit was also drafted essentially

20   contemporaneously.  So the idea that the two documents have

21   some daylight is also reflective of the circumstances in which

22   the warrant affidavit was obtained, expeditiously, and in

23   response to realtime events.  I think that it is purely

24   speculation that there is some falsehood in the affidavit

25   because the 302 does not have the same facts.

L5AsRAYc

1          There is no requirement that the FBI memorialize, you

2     know, in every document it creates the same facts.  It would

3     have been preferable if they did, but it certainly doesn't

4     create an inconsistency.  It's just that one document, the

5     affidavit, including additional facts.

6          THE COURT:  What do you say about the argument that

7     all of that should have been laid out in an affidavit from

8     Agent Maguire or one of the agents?

9          MS. BRACEWELL:  I think that a factual affidavit would

10    only be necessary if the defense meets its substantial

11    preliminary showing to submit a factual statement.  You know,

12    I think it is unnecessary and it is a dangerous precedent to

13    create factual questions when they are legally unnecessary to

14    reach.

15         So I think if the defense had met its preliminary

16    showing, then it would be appropriate to submit additional

17    facts.  But I don't think that's been met here, and as a

18    result, the government doesn't have a responsibility to start

19    narrating facts separate and apart from the warrant.  We think

20    the warrant affidavits stand on their own and that they satisfy

21    the requirements of the Fourth Amendment.

22         THE COURT:  OK.  Do you want to move on to the other

23    defense arguments?

24         MS. BRACEWELL:  So yes, I do want to cover the method

25    of review.

L5AsRAYc

1          THE COURT:  Yes.

2          MS. BRACEWELL:  So just a couple of points about that,

3    trying to order them as the defense went through them.

4          You know, the breadth of the warrant is a reflection

5    of the scope of the crimes here.  We're talking about years and

6    years of criminal conduct that occurred on a 24/7 basis, where

7    numerous victims were involved, were living with the defendant,

8    where a vast amount of electronic evidence was generated, and a

9    vast amount of electronic evidence was horded by the defendant

10    for the purposes of having leverage over his victims.

11          The defense points to all direct, for example, as only

12    involving one laptop and that what the focus of the

13    investigation.  Those aren't our facts.  We have very different

14    set of facts and the probable cause maps on to the scope of the

15    search appropriately.  To the extent that the defense is

16    claiming that we should have identified with specificity the

17    various devices we were going to be searching or seizing,

18    that's an impossibility here, and I would guess in almost any

19    case.

20          To require the government to, before it's executed a

21    search warrant, to determine what computer devices, what phones

22    are being used, are being employed by the defendant, is simply

23    not -- it's not a realistic standard and it's certainly not

24    required by the Fourth Amendment.

25          We set forth how we knew electronic devices to be

L5AsRAYc

used.  The warrant was broad in identifying the electronic

devices that could be ceased and reviewed, and then the

government appropriately undertook that review.  And we know

that this did not become a general warrant because the fruits

of the search have been produced.  And as we said repeatedly,

the responsiveness reviews are vastly smaller than the general

size of the devices that were seized.  That doesn't indicate

that there is a flaw in the warrant.  It indicates that the

search process was consistent, was necessarily within the

bounds of that search warrant.

I looked through all the cases that the defense set

out in its supplemental submission from April 12, and across

those cases, a couple of points become clear.  Evidentiary

hearings are appropriate where there is a contested issue of

fact that goes to the validity of the search.  We don't have

that here.  Where the execution of a valid warrant is at issue,

there is a hearing.  Where there is a showing that the warrant

has not been executed in accordance with the warrant.

So where, in effect, the executing officers executed a

widespread seizure of items that were not within the scope of

the warrant, they were treating the warrant as a general

warrant.  That is just not the facts that we have here, as has

been made clear.  Our responsiveness reviews, the return on the

searches has been confined in scope, and as we have noted, the

defense has, you know, notably not identified vast swaths of

L5AsRAYc

1    data that are outside of the warrant.

2            The only situations that come close to requiring an

3    evidentiary hearing on execution, they are situations where the

4    defense has pointed to, for example, hundreds of files outside

5    the scope of the warrant.  In those instances, there is a

6    sufficient factual question raised about how the warrant was

7    executed that necessitates a factual hearing.  We just don't

8    have that here.

9            How we executed the warrant was in accordance with

10   the affidavit, with the warrant.  There were not, you know,

11   restrictions.  We were allowed to undertake a file-by-file

12   review.  And even if the court finds that a file-by-file review

13   is somehow problematic, we would submit that good faith would

14   still save it, given the fact that as recently as Ulbricht, the

15   Second Circuit has indicated that that kind of search method is

16   appropriate under the Fourth Amendment.

17           So I'm happy to answer any other specific questions

18   the court has, or if I failed to respond to a particular

19   argument, I'm happy to do that.

20           THE COURT:  I do have a couple of questions for you.

21           I had asked the defense questions about reliance on

22   the report from New York Magazine.  Do you have any authority

23   or any thinking with respect to the extent to which the agents

24   and the magistrate judge can permissibly rely upon the report

25   of the New York Magazine?

L5AsRAYc

1          MS. BRACEWELL:  I don't have a perfect analogy for

2     when a court had a published report or published document

3     incorporated within the affidavit.  But I would note that the

4     court's analogy to an anonymous tip seems to me it should be at

5     least as persuasive as that, and in the event of an anonymous

6     tip -- the question is, are there corroborated details.

7          I note that female victim one, who was not a source

8     for the article, is largely corroborative of the information in

9     the article.  Female victim one, her account is, in turn,

10    corroborated by cell phone records, by PayPal records, I

11    believe.  So even if we say that a published article is only

12    as, you know, only as persuasive, only entitled to the same

13    weight as an anonymous tip, there is some weight due there.

14    And upon corroboration, which here there was extensive

15    corroboration, it is appropriate to give some weight to the

16    allegations that come from that tip, from that article.

17          THE COURT:  OK.  Then you also previously had told me

18    that I should not rely upon Mr. Ray's declaration or Mr. Ray's

19    declaration is not sufficient to establish standing in some

20    respect.  But I don't think I've ever asked you on what

21    respects or what is wrong with Mr. Ray's declaration.

22          MS. BRACEWELL:  Your Honor, I think a couple of points

23    on that.  There is no time frames referenced with regards to

24    paragraph two, three, or four.  So I'm not sure if this is an

25    accidental omission or an intentional evasion, but we don't

1    know at what point the phone number ending in 9122 belonged to

2    the defendant, at which point he asserts ownership over that.

3    And with respect to the e-mail and iCloud accounts, is he just

4    broadly stating that those belonged to him since their

5    creation.  I think the absence of a timeline is important here.

6            With respect to two, I lived at Holly lane is a

7    little -- it's a little unclear as to what kind of expectation

8    of privacy he had, whether he was living, renting -- we know he

9    wasn't owning it -- but what kind of ownership interest he is

10   asserting here.

11           THE COURT:  But if you combine that declaration

12   with -- isn't it appropriate for the defense to rely upon, you

13   know, what really is an undisputed fact before me, which is

14   that when he was arrested, he was in his pajamas at 40 Holly

15   Lane?

16           Isn't it, first of all, appropriate for me to rely

17   upon and for the defense to rely upon the fact that he was

18   arrested in his pajamas at 40 Holly Lane, and putting the two

19   of them together, doesn't that establish at least that he is an

20   overnight guest, which the last I checked gives him Fourth

21   Amendment standing?

22           MS. BRACEWELL:  I certainly think that would be

23   relevant if the court was evaluating, as a factual matter, for

24   example, whether he had the authority to consent to a search.

25   The fact that he is in pajamas there certainly suggests that he

L5AsRAYc

1    has some sort of entitlement to be there and something else.

2           I'm hesitant to say, though, it satisfies the

3    requirement to show standing, especially since the defendant

4    has put in an affidavit about his living there.  So I agree

5    that there is some factual conclusions that are appropriate to

6    draw from his presence there on the day of the search, but if

7    someone had just been an overnight guest, you would not

8    necessarily think they had control over the entirety of the

9    premises.  It might be that they had control over their bedroom

10   and their overnight bag.

11          So I think it would be a stretch to conclude, just

12   from the fact of his pajama-clad presence that he had an

13   ownership interest in the entirety of the interest given the

14   fact that there were other people there in pajamas on the

15   scene.

16          THE COURT:  The part that I thought you were going to

17   focus on is the statement with respect to the storage unit,

18   which from my reading -- and I'm going to permit

19   Ms. Glashausser to respond -- but doesn't say that he had any

20   dominion or control with respect to the particular storage

21   unit, which I think was -- which was the subject of the search

22   as opposed to some other unit within that same facility?

23          MS. BRACEWELL:  Yes, your Honor.  I was focused on the

24   residents.  But I agree, with respect to the storage facility,

25   it is equally inadequate.  We know that the storage facility

L5AsRAYc

1    was owned by someone else.  I don't think he could assert

2    ownership or a standing over the entirety of the facility.  So

3    sort of a nebulous claim that he had some area that he expected

4    to remain private fall short of showing that the particular

5    area that was searched is the portion which he had an ownership

6    interest in.

7              THE COURT:  OK.  All right.  Let me turn to

8    Ms. Glashausser.  I'm going to end this hearing right around 11

9    o'clock, so I want to give Ms. Glashausser an opportunity to

10   respond.

11             But I also want to address Ms. Glashausser with

12   respect to that last point.  Thank you very much, counsel.

13   Very helpful argument.  Excellent argument.

14             Ms. Glashausser, with respect to the storage unit, why

15   isn't what Mr. Ray put in akin to saying, I've got an

16   expectation of privacy with respect to a safe deposit box at

17   Citibank without saying, safe deposit box 312, which was the

18   subject of the search?

19             MS. GLASHAUSSER:  Yes, your Honor.  This is Allegra

20   speaking.

21             I feel that your Honor's questions about the affidavit

22   are putting more of a burden on Mr. Ray than the law requires.

23   I don't think that there is any dispute about which storage

24   area we're talking about in the facility.  Just as your Honor

25   can look at the fact that Mr. Ray was in pajamas when he was

L5AsRAYc

1    arrested, we can also look at the fact that we're all talking

2    about the same space in the storage area.

3         I think it is telling that the government isn't

4    disputing, or wasn't until your Honor asked the question, that

5    we had met our burden with respect to the storage area.  There

6    is no reason --

7         THE COURT:  You know, the government's affidavit

8    establishes that this is a storage facility and that there are

9    different areas in the storage facility and they've got a

10   warrant with respect to unit J.  I mean, you're a very

11   sophisticated counsel.  It does read like you're studiously

12   avoiding saying that he had -- and for reasons I would

13   understand -- that he had dominion and control over J.

14        What you say is -- let me just pull it up.

15        MS. GLASHAUSSER:  I have it, your Honor.  It says, I

16   kept a storage area in a locked facility at the address, which

17   I expect to remain private.

18        That is the burden for reasonable expectation of

19   privacy.  There is an additional one.

20        THE COURT:  Would the same thing be true with respect

21   to if it was a bank, if he said I kept a safe deposit box at

22   Citibank and I expected it to be kept private, and it was

23   apparent to everybody that there was a safe deposit box that

24   was the subject of a search that had Mr. Ray's stuff in it?

25        MS. GLASHAUSSER:  Correct.  I don't think that would

L5AsRAYc

1    be any different, unless there is some specific case law about

2    banks, which I have not researched. But, otherwise, I think

3    that the analogy is the same.

4         When we're not in the meaning --

5         THE COURT: What about an apartment?

6         I had an apartment in this apartment building, but you

7    don't name which apartment it is. That's OK?

8         MS. GLASHAUSSER: That wouldn't be OK for a warrant,

9    but I feel that we are splitting hairs, because we are not

10   confused about what area we're speaking about. We're speaking

11   about the area that was searched. There is no other area that

12   anyone is talking about.

13        THE COURT: Would your argument then apply if the

14   affidavit submitted by the defendant said, I had an apartment

15   in -- I am going to make up the building -- on Tremonte Avenue,

16   and there was no confusion that there is only one apartment.

17   The apartment that was searched, the defendant just doesn't say

18   through the affidavit, that's my apartment. He says, I had an

19   apartment in that building.

20        MS. GLASHAUSSER: I think that that defendant has met

21   the burden. And it may be sloppy drafting on my part in this

22   case or the case that your Honor is discussing, but because

23   there is no actual dispute about what the search, what search

24   we're talking about, there is no burden on the defense to say

25   more than that we have a reasonable -- that Mr. Ray had a

L5AsRAYc

reasonable expectation of privacy in these areas searched.

There is no cases that I'm aware of or that the government has cited that require the defense to say any more specifically than I had an expectation of privacy over this space.

With respect to the home, your Honor is 100 percent correct, that an overnight guest would also have a reasonable expectation of privacy in the home. We do not need to show anything more. Once had you a reasonable expectation of privacy in the area searched, the defense has met the burden. We don't have to show that with respect to each item searched.

The same is true for the cell phone number and the accounts. He had an expectation of privacy in those accounts. Nothing more is required. I'm not aware of any cases that go into any sort of the discussion that the government is raising with respect to timing. The one case that they cited in their initial papers before we put in the affidavit, <u>Watson</u>, just doesn't say what the government believes it says, that somehow the person had not had a reasonable expectation of privacy because of a failure to list the time that applied to this specific area.

Mr. Ray has admitted in his affidavit that these were things that he -- that all of the items searched were things that belonged to him and that he had an expectation of privacy in. Nothing more is required. I haven't seen any cases that

L5AsRAYc

1   would require anything different.

2           THE COURT:  OK.  Do you want to move on to any

3   response to the other arguments from the government?

4           MS. GLASHAUSSER:  Sure.  Just very briefly, your

5   Honor.

6           With respect to the government's response on the

7   Franks question.  It seems to me that they are going through a

8   sort of linguistic gymnastics to explain away things that are

9   clearly errors in their affidavit.  The Piscataway records just

10  do not say that Mr. Ray lived there.  They do not even say that

11  he was interviewed.  It says two other people lived there,

12  Ms. Pollok and Ms. Rosario.  That is what they say.  The

13  affidavit reported something different.

14          The same with respect to the storage locker affidavit.

15  The government says that the documents have daylight between

16  the affidavit and the interview report.  That's another way of

17  saying that they are different.  They reports thing in a

18  different way that is important to the warrant affidavit and

19  shows that there is an error.

20          And with respect to Ms. Drury, of course our argument

21  is not that the omission just for her reputation for

22  storytelling is the reason that your Honor should hold a

23  hearing, but that that reputation helps make sense of all of

24  the other things that we know that weren't included about her

25  lying to people in authority and telling people different

L5AsRAYc

1    versions of events that are materially different than what was

2    cited in the affidavit.

3         Those are all reasons to get a hearing, and they show

4    that we've met our substantial preliminary showing, and that

5    standard means that we get a hearing.  It doesn't mean that

6    when we meet that standard.  The government has to put in an

7    affidavit, which I think is what I heard the government

8    arguing.  The fact that they haven't put in an affidavit just

9    means that your Honor should not take what the government is

10   saying about what the agent did and why as if they had put in

11   an affidavit because it is not the same thing.  But we have met

12   our substantial preliminary showing already, and that that

13   merits a hearing.

14        Finally, with respect --

15        THE COURT:  That's a very helpful clarification.

16   Thank you.

17        Continue, please.

18        MS. GLASHAUSSER:  Thank you, your Honor.

19        With respect to the government's argument about the

20   good faith of the agents as well, that is something that also

21   is appropriate for a hearing and something that it is the

22   government's burden to show at the hearing.  The government

23   talked about our most recent filing on April 12, where we cited

24   a number of cases in which hearings were ordered with respect

25   to electronic searches.  We also cited a number of cases where

L5AsRAYc

1    hearings were ordered to assess whether or not the government

2    could rely on good faith.  And that, again, is something where

3    we don't have an affidavit from the agent that could give the

4    Court something to rely on about what the agent was -- why the

5    agent had made these decisions.

6          Just a last point with respect to the method of

7    review.  The government had said that we haven't pointed to

8    documents or files that were seized that shouldn't have been,

9    but that is not correct.  We pointed to many documents in our

10   opening papers -- I apologize, a truck just went by my window

11   here.

12         We pointed to many documents in our opening papers,

13   and then additional ones in our reply, particularly pointing to

14   electronic documents and indeed a whole hard drive that seemed

15   to have been seized that should not have been, and that was

16   included in the government's responsiveness report.

17         To the extent that we haven't pointed your Honor to

18   all of the things that shouldn't have been seized, that is

19   simply because we have not yet reviewed all of them.  Aside

20   from our arguments for this warrant, mostly we also are trying

21   to review the documents that are responsive rather than the

22   ones that are clearly not.  There were definitely many, many,

23   many documents and categories of documents seized and searched

24   that shouldn't have been.

25         So for all of these reasons, your Honor should order a

L5AsRAYc

 1    hearing here.

 2                THE COURT:  OK.  That's very helpful.

 3                I will take the matter under advisement.  I hope to

 4    get you a decision soon.

 5                I think it would be helpful to make the July 1 hearing

 6    a hearing both in the Pollok -- for both Pollok and for Ray.

 7                And at that time, we do have a trial date set in this

 8    case for September.  My hope is that we will still go forward

 9    in September, but I would like the parties to meet and confer

10    in advance of the July conference to determine whether that

11    date is feasible or whether the trial for Mr. Ray and

12    Ms. Pollok should be adjourned to a date either in October or

13    November.

14                My intent would still be to try the cases together.

15    They are indicted together.  There is no motion for severance.

16    The parties should meet and confer with respect to that.

17                Is there anything else from the government that we

18    should address today?

19                MS. BRACEWELL:  Your Honor, the government would just,

20    in an abundance of caution, move to exclude time through July 1

21    with respect to Mr. Ray, so as to lay out the defense to

22    continue its review of discovery and its preparation for trial.

23                THE COURT:  Any objection to that from the defense

24    standpoint?

25                MS. GLASHAUSSER:  No, your Honor.  This is Allegra.

L5AsRAYc

1       However, we are unable to do the July 1 date.  We had

2   understood earlier it was just for Ms. Pollok.  That date would

3   not work, as we understand, with MCC's schedule.  In addition,

4   Ms. Cross-Goldenberg and I are both out that date.

5       I wonder, I don't know if Ms. Pollok's counsel is

6   still on the line as far as setting another date, or perhaps we

7   could discuss it would everybody in an e-mail after today's

8   conference?

9       THE COURT:  I had not relieved them from attending,

10  but I think it would be helpful for all counsel to discuss a

11  date after, shortly after July 1, and to indicate in that

12  letter whether they consent to an exclusion of time until the

13  adjourned date.

14      I will set July 1 as the date for the Ray conference

15  as well as the Pollok conference, subject to that request to

16  adjourn it for a couple of days.

17      Hearing no objection to the exclusion of time until

18  July 1, I will exclude time until at least July 1 under the

19  Speedy Trial Act, 18 U.S.C. 3161(h)(7)(A).  I find that the

20  ends of justice outweigh the best interest of the defendant and

21  the public in a speedy trial.

22      From Mr. Ray's counsel, is there anything else we

23  should discuss today?

24      MS. GLASHAUSSER:  No, your Honor, as long as your

25  Honor understands that July 1 will not work for Mr. Ray, and

L5AsRAYc

1    that we will be asking to move the date.  That's all.

2              THE COURT:  The sooner you can put it in a letter, the

3    better.  Why don't you try to put it in by the end of this

4    week.

5              Is Ms. Pollok's counsel still on the phone?

6              MR. BERTAN:  Yes, your Honor.  Nothing for Ms. Pollok.

7              THE COURT:  OK.  So we're adjourned.

8              Excellent arguments today.  I'll take the matter under

9    advisement.

10             Good luck to you, Mr. Ray.  Good luck to you,

11   Ms. Pollok.

12             Would the government order a copy of the transcript on

13   an expedited basis?

14             And thank you to the court reporter.

15             MS. BRACEWELL:  We will do so.  Thank you, your Honor.

16             MR. BERTAN:  Thank you, your Honor.

17             (Adjourned)

18

19

20

21

22

23

24

25