# EXHIBIT K

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        15 Cr. 643 (PKC)

 5   GARY HIRST,

 6              Defendant.

 7   ------------------------------x
                                         September 20, 2016
 8                                       9:50 a.m.

 9   Before:
                     HON. P. KEVIN CASTEL
10
                                         District Judge
11                                        and a Jury

12
                          APPEARANCES
13
     PREET BHARARA
14        United States Attorney for the
          Southern District of New York
15   BY:  BRIAN R. BLAIS
          AIMEE HECTOR
16        REBECCA G. MERMELSTEIN
          Assistant United States Attorneys
17
     SHER TREMONTE LLP
18        Attorneys for Defendant
     BY:  MICHAEL TREMONTE
19        JUSTINE A. HARRIS
          NOAM KORATI BIALE
20

21   ALSO PRESENT:
          SPECIAL AGENT SHANNON BIENIEK, FBI
22        ELLIE SHEINWALD, Paralegal
          GARY SMITH, Paralegal
23        RYAN POLLOCK, Paralegal

24

25
```

1              (In open court; jury not present)

2              THE COURT:  I don't need to know the details, but I

3    gather there is an agreement on the summary of calls; is that

4    correct?

5              MS. MERMELSTEIN:  Yes, your Honor.

6              THE COURT:  That's great.  Let's talk about a few open

7    issues.  Let's get right to the chart.  The legal principles at

8    issue are pretty well understood.  First of all, a summary

9    chart is only as good as the evidence that underlies it.  So if

10   there is not evidentiary support for what is on either a

11   summary or demonstrative, then the summary or demonstrative

12   ought not be presented before the jury.  Then again, if the

13   summary or demonstrative is a graphic demonstration of a

14   testifying witness' statements, there is nothing inappropriate

15   about it.  So if one can say it, one can draw it, so to speak.

16             Do you want to put the chart up, if you will, please?

17             MS. MERMELSTEIN:  Ms. Sheinwald, could we pull up 910?

18   It has multiple pages, your Honor.

19             THE COURT:  Let's talk about it.  Let me find out what

20   the defendant's objection is.

21             What's the objection?

22             MS. HARRIS:  Your Honor, since we filed the motion,

23   the government last night made amendments to the chart.  Some

24   of those amendments have addressed a few of our concerns.

25   There's one additional point which was not, I think,

1    highlighted in our original submission which I wanted to

2    underscore.  The fundamental objection, obviously, is to the

3    title, "Proceeds to Hirst entities" and the various labels

4    "Hirst" "Hirst" "Hirst" on three different boxes on the -- if

5    you go to the last page of the exhibit, your Honor.  It's

6    actually on each page of the exhibit, but --

7          THE COURT:  Yes.

8          MS. HARRIS:  -- the last page is the sort of

9    cumulative and final in chronological order.  The central box

10   "Global Assets/Pennine Investors, Ltd." labeled "Hirst".

11   There's question of whether or not that's our first entity and

12   what that means is actually of enormous dispute in this case,

13   and it's one of the issues that your Honor knows we have

14   offered our expert, our Cayman law expert, as a summary witness

15   and as an expert witness, and we proposed a jury charge on the

16   issue.  The documents in Defendant's Exhibit 900 that has

17   previously been given to the government indicate that Mr. Hirst

18   was merely a signatory on that account and did not have an

19   ownership interest in the funds in that account.  It's not a

20   simple, straightforward, I don't know if -- this witness who is

21   coming here today, Paul Hinton from the Brattle Group again was

22   only on as a summary witness.  This goes back to some of the

23   issues we had about expert disclosure.  The government noticed

24   him, as well as several others, as sort of expert/summary

25   witnesses.  When we had discussions about adequate disclosures,

1   they clarified and said no --

2          THE COURT:  Let me see if I can cut to the chase here

3   with one question or two of the government.

4          With regard to Global Asset/Pennine Investors Ltd, is

5   the sole basis on which the government asserts that they are a

6   Hirst entity the fact that Hirst was a signator on the account?

7          MS. MERMELSTEIN:  No, your Honor, although that's

8   obviously a significant component.  There's also an email from

9   Mr. Hirst in 2009 -- so before this, but relevant in the

10  government's view -- in which Mr. Hirst identifies those

11  entities as "my hedge funds".

12         In addition, let me say two points.  One, obviously

13  the person who controls the money flow from an account as the

14  signatory may or may not be a beneficial owner, but I think

15  that it's very significant who's controlling the money, and I

16  think that that association between Hirst and these accounts is

17  indisputable, and it's appropriate for the government to

18  suggest to the jury that Mr. Hirst is linked to these accounts

19  in that fashion.

20         I think that Defendant's Exhibit 900, the Pennine

21  documents, are much less clear about what Mr. Hirst's role

22  was --

23         THE COURT:  Well, that's not where I'm headed with

24  this.  If there is some probative evidence offered by the

25  government in support of what's on the chart, and there is some

1    evidence proffered by the defense that rebuts what's on the

2    government's chart, unless I'm misunderstanding the principle

3    of law, the government can use the chart because it illustrates

4    the point made with its testimony, and reasonable inferences

5    could be drawn from the testimony.  If there is no support or

6    no efficacious support, if your answer to my question was the

7    only thing we have is he was a signator on the account, I might

8    have a different view of this.  But based on the proffers and

9    the representations, there is evidence to support it.

10           So all that means is the defendant is welcome either

11   to cross examine the witness or to ask or offer evidence in its

12   case or in closing argument to urge the jury to draw a

13   different inference from the evidence.

14           All of those are permissible, but it doesn't seem to

15   me to affect the government's ability to use the chart with an

16   appropriate limiting instruction.

17           MS. HARRIS:  Your Honor, I guess I understand the

18   Court's ruling.  I think as long as it's clear that Mr. Hinton

19   is being offered solely as a summary witness, he's not an

20   expert offering an opinion about conclusions with respect to

21   the meaning of the email from Mr. Hirst -- and we'll make that

22   clear on cross --

23           THE COURT:  I'm counting on counsel --

24           MS. HARRIS:  Thank you.

25           THE COURT:  -- either the government or defense

 1    counsel to make that clear.  And I'm sure they will.

 2         Let's just talk about Shant Chalian for a moment.  I

 3    want to understand the privilege issue for the moment.  The

 4    trustee, or the debtor's estate, asserts the attorney/client

 5    privilege; is that correct?

 6         MS. HECTOR:  Yes, your Honor.

 7         THE COURT:  I don't know whether anyone has looked at

 8    the crime fraud exception, but you might want to take a look at

 9    Shahinian v. Tankian, 242 FRD 255, and it lays out some of the

10    relevant principles on the crime fraud exception, most notably

11    that the attorneys need not be knowing participants in any

12    crime whatsoever for the crime fraud exception to apply.  I

13    don't know whether that has any application here, but in that

14    case, it was a question of whether or not certain artwork

15    should have been disclosed in an IRS filing, or maybe it was a

16    state court tax filing, and the filing was prepared by the law

17    firm of Weil Gotchal & Manges.  And prima facie, it was shown

18    that the filing was false, or untrue at least, and there were

19    two possibilities; one is, the client failed to disclose

20    certain things to Weil Gotchal, and the other possibility is

21    Weil Gotchal received the information and determined it didn't

22    need to be disclosed.  Because the elements of the crime fraud

23    exception were met, I held that the documents in the hands of

24    Weil Gotchal on this transaction lost their privileged

25    character.  They had a privileged character and they lost it.

 1    I don't know if that has any application here, I don't know if

 2    anybody is going to rely on it, but you can take a look at

 3    that.

 4              With regard to the government's production, I take it

 5    the government is representing that it has complied with its

 6    Rule 16 obligations and, more importantly, its 3500 obligations

 7    with regard to Shant Chalian; is that correct?

 8              MS. HECTOR:  Yes, your Honor.

 9              THE COURT:  If that's correct, what is the state of

10    the law on the fact of a lawful assertion of an attorney/client

11    privilege being a basis to prohibit a witness from testifying

12    because there may be privileged areas where the witness will

13    assert the attorney/client privilege?

14              MS. HECTOR:  Your Honor, just to be clear, we don't

15    think there are any privileged materials surrounding this

16    calculation.  Mr. Chalian is not going to assert the privilege.

17    The narrow scope of the questions that Mr. Chalian will be

18    asked consist of probably something like five questions

19    about --

20              THE COURT:  That's your direct examination.

21              MS. HECTOR:  Exactly.

22              THE COURT:  Let me hear what, in the cross, would get

23    into a privileged area?

24              MS. HARRIS:  Your Honor, there's about three different

25    issues here that I think are important for us to raise.

 1          First, with respect to the notion that this is a

 2   narrow examination, we take issue with that in our letter, and

 3   I just wanted to briefly emphasize that from our point of view,

 4   no matter the length of the direct, it is by no means narrow,

 5   discrete, or collateral.  This goes to the heart of the case.

 6   The notion that Mr. Chalian will come here and take the stand

 7   to impeach the government's own hearsay testimony that it

 8   elicited on direct, to say that --

 9          THE COURT:  Well, the testimony was "Gary Hirst said

10   this".

11          MS. HARRIS:  Right.  But it was hearsay.  It was

12   hearsay evidence offered through their witness, essentially.

13   But who offered it, I think, is beside the point because the

14   central problem is that Mr. Chalian would come and say that "I

15   didn't do what this document" -- and it goes to the heart of

16   the government's accusations against Mr. Hirst.

17          THE COURT:  Yes.

18          MS. HARRIS:  So it's not limited in the sense that

19   it's not important -- the notion that it's just a little topic,

20   it's a big topic.

21          THE COURT:  What's our point?  Let's assume the

22   government stands up and says, "Your Honor, so stipulated to

23   what was just said by defense counsel."  Where does that move

24   the ball anyway?

25          MS. HARRIS:  What it does is it emphasizes the need

1    for confrontation on the part of the defense and the need to be

2    able to confront, because it's coming in -- it's accusational,

3    its testimonial --

4            THE COURT:  Okay, so the confrontation clause applies.

5    You're not moving the ball here.

6            MS. HARRIS:  Here's the issue.  Your Honor, there

7    were -- as I said, on Friday before trial after -- this is part

8    of our ongoing effort to get all these documents -- we got a

9    list of 6,000 emails, roughly, that were in the possession of

10   Hodgson Russ.  At that point, Mr. Chalian was still going to be

11   a government witness.

12           They claimed in the cover letter to the SEC that the

13   vast majority of those would be privileged, but from our review

14   it seemed that a number would not be.  We were prepared to

15   start collecting many of those documents in anticipation of

16   cross examination of Mr. Chalian.  On that list are, I think,

17   hundreds and hundreds, maybe even more, emails just between

18   Mr. Weiss or the lawyers and Jason Galanis alone -- again, who

19   was not a representative of Gerova and would not necessarily be

20   privileged -- that implicate, we believe, on face value a

21   potential of Hodgson Russ being more intricately involved with

22   Jason Galanis and with many of the facts alleged in this case.

23           The notion if Mr. Chalian were to get on the stand and

24   simply say "I didn't have anything to do with the warrant

25   calculation", we may want to plumb the depths of or the extent

1    to which he was involved or his firm was involved in other

2    aspects of the transaction, even if he didn't narrowly prepare

3    the -- because the implication of not preparing the warrant

4    calculation is we had nothing to do with this.  It's an

5    inference that the jury is going to draw, that the lawyers were

6    not involved, the lawyers were out of the loop, the lawyers

7    were deceived simply from that narrow testimony.

8                THE COURT:  You can call him on the case, can't you?

9                MS. HARRIS:  As a hostile witness to --

10               THE COURT:  Yes.

11               MS. HARRIS:  -- expand the scope, right.

12               Here's the logistical element, your Honor, which is

13   that, when we litigated this issue -- briefed this issue a

14   couple weeks ago before trial, we said there's two options

15   here.  One, we want to preclude his testimony because we don't

16   have access to the full range -- we can't subpoena all the

17   relevant prior statements because some of them are going to be

18   withheld on privilege, or he can be a witness, and we can

19   compel signing a waiver and have access to it.

20               The government chose at that point -- I mean, we could

21   have -- they could have chosen to assert the crime fraud, they

22   could have chosen to say there's been a waiver, because it's

23   been sort of a leaky sieve, frankly.  There's some documents

24   that have floated out into the productions from various

25   individuals, maybe not Gerova, that would normally constitute

1    privilege, but there's been many grounds here, the position the

2    government could have taken saying that we want Shant Chalian,

3    and we want to make sure there's a full sixth amendment right

4    to confront the witnesses, and so here's what we're going to

5    do:  Compel waiver, a signing of a waiver, crime fraud --

6    whatever it may be, we would have gone down that road, we would

7    have gotten our hundreds of thousands of email communications

8    that are relevant to the subject from Hodgson Russ.  They chose

9    not to do that.  In reliance on that, resources are limited, we

10   did not pursue getting those thousands of emails.

11           I want to make absolutely clear that if Mr. Chalian

12   comes in to testify in any capacity in this case, we are going

13   to need an adjournment to collect those documents.  It's the

14   only fair way for us to be able to proceed, to evaluate -- we

15   can't rely on this affidavit from Kevin Kearny who is saying

16   that his IT department did a diligent search, and it's the

17   general practice based on secondhand information of Mr. Chalian

18   to save all the emails to his work product folder, and we

19   didn't find anything on the server.  We need to go through the

20   chart ourselves, collect what we think are the relevant

21   documents, and make a determination on our own behalf.

22           THE COURT:  Yes, but I could put the witness on the

23   stand before he testifies, and we can find out from the witness

24   whether there are any documents regarding the calculation of

25   the warrants.

1              MS. HARRIS:  He's no longer at Hodgson Russ, your

2    Honor.

3              THE COURT:  He can testify whether he created or

4    reviewed any such documents.

5              MS. HARRIS:  Correct.  So we would want to be able to

6    explore whether that's a truthful assertion and review all the

7    documents that we think are relevant, including documents over

8    which there's been an assertion of privilege.

9              THE COURT:  In the absence of some evidence that there

10   are such documents, and in the face of affirmative evidence

11   that a search has been made and it has been determined that

12   there are no such documents, ordinarily, a court would not

13   allow a party to go further.  If there is a credible

14   presentation in affidavit form that I understand my obligation

15   to search to see whether there are any such documents, I have

16   conducted that search and there are no such documents, the

17   answer there is not to say, well, give me all the documents you

18   have and let me see whether that's true.  That, in the absence

19   of some indication that there's a reason to question the

20   voracity, would ordinarily be the end of it.

21             MS. HARRIS:  Right.  Your Honor, it's exactly the

22   notion that there's no reason to question the voracity.  Now,

23   on the defense side, obviously, we don't know that, we can't

24   take that assertion at face value.  We have to be able to do

25   our investigation and collect documents because there are

1    6,000 -- the fact that there are, I believe, over 1,000 emails

2    between Mr. Galanis and Mr. Weiss, one-on-one, that are not

3    privileged throughout this time period, and --

4              THE COURT:  That may be true.

5              MS. HARRIS:  -- also involving their emails as between

6    Mr. Weiss and Mr. Chalian that can implicate them in a much

7    greater degree of knowledge than they are now in, frankly, a

8    self-serving way may want to distance themselves from.  And the

9    fact that he might get on the stand and say "I didn't do the

10   warrant calculation" and suggests "I didn't have anything to do

11   with this", we'd want to be able to have access to the full

12   prior statements of both him and his colleagues at the firm in

13   order to challenge that assertion and the inference that is

14   drawn from that assertion.

15             You're right.  We have a compendium, a log, it's a log

16   that Hodgson Russ prepared, and we can identify for your Honor

17   later today or provide a copy to indicate to you which

18   documents we think would be relevant to this very issue.

19             THE COURT:  I'm telling you right now, as far as I'm

20   concerned, you can call him.  And if you want me to do

21   something about those documents in connection with your calling

22   him as a witness, we can talk about it.  But right now, as I

23   understand the limited scope of his testimony would be that I,

24   and to the best of my knowledge no one else at my firm,

25   participated in the calculation of the warrants.  That's what I

1    understand the testimony is.

2            Now, the government has turned over, as I understand

3    it, all 3500 material in their possession or control with

4    regard to this witness.  It's the same situation as it is with

5    the law firm.  The government gets up and says, "We've turned

6    over all the 3500 material in our possession or control.  Will

7    you raise your right hand and say that?  I'll raise my right

8    hand.  Did you do a diligent search before you did that?  I did

9    a diligent search.  You personally?  Yes, me personally."

10           In the absence of that, we don't say, well, why don't

11   you go over to 1 St. Andrews Plaza or someplace else and open

12   up your file cabinets and show them, let them go through and

13   see for themselves, that's not usually the way it's done.

14           Here, all the 3500 material has been produced, the

15   scope of the testimony is limited, you're free to cross examine

16   him, impeach his credibility, and if you want to go beyond the

17   scope of the direct, that's a different issue that we can talk

18   about, whether it's appropriate, whether there is notice,

19   whether you can do that, but that's eliciting testimony beyond

20   the scope of the direct, and that's a different standard.

21           MS. HARRIS:  I understand your Honor's point.  One

22   last issue is that we're not complaining about the government's

23   lack of -- failure to comply with turning over 3500 material,

24   but obviously, our right to confront any witness against

25   Mr. Hirst is not limited to whatever the impeachment value of

1   the limited materials that may constitute officially the 3500.

2   Here, in the SEC's possession, essentially, made available to

3   the SEC, not the U.S. Attorney's Office, but a year ago were

4   6,000 plus emails that no one -- it appears neither the U.S.

5   Attorney's Office nor us even knew been made available in that

6   format until the Friday before trial.

7          We would have subpoenaed those documents.  We would

8   have gone after, at bare minimum, the nonprivileged documents

9   to get the relevant emails.  Those are key to understanding

10  whatever this law firm did or didn't do in connection with

11  these transactions.  There is no way it would be proper of us

12  to have not done that.  But then basically the next day, or the

13  Sunday before trial, we were told that Mr. Chalian was not

14  going to be testifying.

15         So even on the limited issue of what is being asserted

16  to us, there are no prior other documents that may be relevant,

17  it just simply raises a huge fairness issue from our point of

18  view that we can't make that determination and obtain those

19  documents and have time to review them before he takes the

20  stand, even on the government's case.

21         THE COURT:  The question I have for the government

22  about this is, I've heard the acknowledgment that the testimony

23  that came out through Mr. Hlavsa was a hearsay statement.  I

24  see Ms. Hector shaking her head "no".

25         MS. HECTOR:  No, it's a statement of the defendant so

 1   it comes in for the truth.  And we think Mr. Hirst was not

 2   telling the truth when he made that statement, but it comes in

 3   for the statement that he made.

 4          THE COURT:  So it comes in for the truth of that, not

 5   for the fact that Gary Hirst -- your position is that was a

 6   truthful standard, and it comes in for the truth of its

 7   content, and the defendant may rely on the truth of Mr. Hirst's

 8   statement.

 9          MS. HECTOR:  No.  I'm misspeaking.  I'm sorry.

10          It comes in for the fact that the defendant made it.

11   We don't think that statement is a true statement, but it is a

12   statement of the defendant.  And that's why, your Honor, we

13   need to put in front of the jury that we think that was an

14   untrue statement because we have evidence that it was.

15          THE COURT:  You elicited it.  It was not a surprise,

16   correct?

17          MS. HECTOR:  We asked Mr. Hlavsa what his conversation

18   was with Mr. Hirst.  I didn't know he was going to add that

19   additional piece of information, but it is in the document that

20   we put before the jury.  It certainly is.

21          THE COURT:  All right.  So it's no surprise there.

22          Now we have an issue of, I'm hearing, about 6,000

23   documents that may have been produced to the SEC which may or

24   may not -- I don't know whether these are from the law firm?

25   6,000 documents from the law firm?

1          MS. HECTOR:  I think what Ms. Harris is referring to

2    is a privileged log, correct?

3          MS. HARRIS:  It's not a privileged log, it is simply a

4    log of emails where the law firm said to the SEC, with respect

5    to the electronic communications, we have so many, Mr. SEC

6    staff attorney, we've detailed them on the attached log, we

7    think many of them are privileged, but to be efficient about

8    this, why don't you, the SEC, tell us what you're interested

9    in, and then we can make a more discrete review.  It was not a

10   privilege log, it was simply a compendium of all the emails.

11   And we all learned about it -- the government received it, I

12   think, on midnight on Thursday, and we got it Friday morning.

13         THE COURT:  So it was a compendium of emails that were

14   given to the SEC?

15         MS. HARRIS:  No, it was a log.

16         THE COURT:  A log of emails.

17         MS. HARRIS:  A 500-page log, essentially.  I may be

18   off in my numbers.  But a log indicating sender, receipt,

19   topic, subject line.

20         THE COURT:  But what I don't get is, how does that

21   show anything?

22         MS. HARRIS:  You can tell a lot from it, your Honor.

23         THE COURT:  No, I don't mean in that sense, but how is

24   that -- or maybe you were about to tell me -- how does that tie

25   into anything to do with the proposed direct testimony or the

1    impeachment of the witness?

2            MS. HARRIS:  Your Honor, many of those emails involve

3    Mr. Chalian.  Some of them are privileged, some of them are

4    not.

5            THE COURT:  Got that part.  Got that part.  Let's say

6    it was a log of all documents ever written by Mr. Chalian.

7            MS. HARRIS:  Right.

8            THE COURT:  There's a log.  He wrote 12,000 documents.

9    So what?

10           MS. HARRIS:  So we need to -- maybe there's nothing in

11   there, maybe 90 percent of it would directly impeach him, and

12   we -- the problem from a fairness point of view is we don't

13   know --

14           THE COURT:  But what I'm saying is if there was a log

15   of 12,000 emails, or 12,000 communications from Mr. Chalian,

16   the fact that somebody troubled to put them on a log doesn't

17   help you, the same way as if somebody came in and said on the

18   server there are 40,000 emails from Mr. Chalian.  That wouldn't

19   help you, either.

20           MS. HARRIS:  It helps with respect to the notice

21   issue, your Honor, to explain why we don't already have in our

22   possession all of the nonprivileged emails from Hodgson Russ.

23   This relates a little bit back to some of the production issues

24   that we detailed in connection with other matters.  It was

25   initially, we subpoenaed Hodgson Russ, as your Honor knows,

1    back in June, there was an assertion of privilege, other issues

2    with respect to the subpoena compliance, and it's only close to

3    the weeks -- literally the weeks or 10 days before trial that

4    we started to get documents out of Hodgson Russ, and then it

5    appeared, when we pressed the government because of Bates

6    numbering problems, that then they went back to the SEC and we

7    discovered there are actual documents that had been produced to

8    the SEC in addition to the log of emails, that neither of us

9    had been aware of prior.

10           The other issue, your Honor, is that, for example, in

11   the log of emails, there are approximately a dozen emails

12   around the time in May of 2010 that have the subject line

13   "warrant" in the subject -- it's just from the log -- that

14   involve Mr. Chalian.  So that's why we need time to get those

15   documents, look at them and --

16           THE COURT:  All right.  So I asked a question of

17   Ms. Harris, and she has now answered it, which is, on the log,

18   there are a dozen or so emails with the re: line "warrants",

19   and she wants to know what's in them or have the privilege

20   issue tested on those emails.  Further, the point has been

21   asserted -- I don't know -- no one really has gotten me to the

22   bottom of the law on this, of whether the assertion of an

23   attorney/client privilege gives way to confrontation clause or

24   is an exception to the confrontation clause.  I'm sitting here

25   with very little case law help on that.

1          MS. HECTOR:  Your Honor, if I may.  First of all, the

2    compendium or the index that was provided to the SEC, our

3    understanding is that the SEC did not receive any of those

4    documents, they received the compendium.  We didn't get that

5    log until the 9th, and we turned it over to the defense.

6          But the point is that we asked Hodgson Russ to do a

7    search of all of the documents, all of the electronic documents

8    in their possession between May 21st, the date of the exercise

9    notice, and May 27th when those shares were issued, to

10   determine whether there were any, any documents whatsoever

11   concerning the warrant calculation.  Because if there were and

12   they were asserting privilege over those documents, then we

13   agreed, we would have a problem.  Okay?

14         They did that search, and no, the answer is no, none

15   of those documents have anything to do with the warrant

16   calculation at issue in this case, so there are no withheld

17   documents that are in existence on this topic to impeach

18   Mr. Chalian's testimony --

19         THE COURT:  Let me ask you.  Did the government serve

20   a subpoena on the law firm?

21         MS. HECTOR:  No, your Honor, but we asked them to do

22   the search.  Now, the SEC did serve a subpoena on the law firm,

23   just to be clear, but the government did not.  So the law firm

24   did the search, and yes, there are some documents about

25   warrants.  Because as you remember in this case, and I don't

1    remember the government exhibit number off the top of my head,

2    but there was that 8A filing with the SEC that had to do with

3    the January warrant agreement.  So there were some documents

4    about that filing and a press release about that filing, not

5    about the calculation at issue in this case.

6            THE COURT:  What my instincts tell me, and you can

7    tell me why this is wrong, is there is an outstanding subpoena.

8            MS. HECTOR:  From the SEC?

9            THE COURT:  No, from the defendant.

10           MS. HECTOR:  Sorry.

11           THE COURT:  So the defense wants to move to compel.  I

12   think, if it's a lawful subpoena, I have the power to require

13   in-camera review of the documents, and if there are documents

14   that refer to the warrant, I'll review the documents, and if

15   they relate to calculation, they'll get turned over, because I

16   think there would have been a misrepresentation, at least to

17   the defense and to the Court, or I'll bar the witness, one or

18   the other.  I have tools available to me.

19           What defense should do is prepare an order requiring a

20   response and production for in-camera review of documents that

21   you have a good faith belief relate or potentially could relate

22   to the warrant calculation and we'll find out.  I'll look at

23   them and we'll get to the bottom of that.

24           MS. HECTOR:  Thank you, your Honor.

25           MS. HARRIS:  Your Honor, we'll do that.  We'll prepare

1    an order and seek to compel.

2            Just on the legal issue.  In prior submissions, and

3    briefly in our most recent submission on September 19th, we did

4    point to I think fairly established case law Dunbar v. Harris

5    here in the Second Circuit 612 F.2d 690, noting that the

6    confrontation clause guarantees a criminal defendant the right

7    to cross examine witnesses against him, and that if a

8    defendant's cross examination is restricted by impeding

9    privilege, it may be necessary to strike the direct testimony

10   of that witness.  So we would ask that, given the importance of

11   the defense function, again, the importance of the

12   confrontation clause, that we be entitled to review the

13   documents for what could constitute possible impeachment

14   material.

15           THE COURT:  Now I tell you hypothetically.

16   Mr. Chalian has 40,000 emails on the server.  Okay?  Not just

17   the 6,000 that you referred to.  Are you now entitled to review

18   them because they could have impeachment material?  It could

19   indicate that he's involved in a bank fraud someplace, maybe

20   he's a criminal, maybe it uncovers that there's a prior

21   conviction that he's concealed from people.

22           MS. HARRIS:  Your Honor, frankly, what we normally

23   would do, and have done, is collect -- I mean, as burdensome

24   and overwhelming as that task may be, but is exactly to collect

25   all the prior statements of a potential witness that we can get

 1    our hands on, but not to review them one by one, but in this

 2    digital age, to perform word searches and find things that

 3    might be relevant.  I'm not looking to open up a Pandora's box

 4    but --

 5          THE COURT:  It's the principle that I think you are

 6    wrong about.  That you cannot serve a lawful Rule 17 subpoena

 7    on somebody saying Mr. Chalian has been a partner at the law

 8    firm, produce anything that he has ever communicated in

 9    writing, because some of those communications, I'll do some

10    search terms, like "bank" and "fraud" and "drugs" and "sex" and

11    "money" and "rock and roll", but I might hit pay dirt, and you

12    might.  But that's not lawful discovery.

13          MS. HARRIS:  No.  I didn't mean -- I mean, look.

14    Ideally, we would have that, but that's not what I propose to

15    do here, your Honor.  We're working off of the universe of what

16    Hodgson Russ, frankly, has already predetermined are relevant

17    to Gerova.  I mean, that's the list of the compendium and the

18    500 emails that are related to Gerova, as I understand it --

19          THE COURT:  In some way, shape, or form.

20          MS. HARRIS:  -- and during the relevant time period.

21    So it's already a circumscribed pool.  I'm not going on a

22    fishing expedition here for every statement ever made by

23    Mr. Chalian on every subject, we're just looking at what the

24    role of Hodgson Russ was and Mr. Chalian in connection --

25          THE COURT:  No, but that's why you're calling the

1   witness.  So if you get up and you say, well, tell me, did you

2   prepare this document for Gerova, and you show a document that

3   is not the warrant calculation, why isn't that fair ground for

4   an objection, beyond the scope of the direct?  It's not

5   impeachment material, it's eliciting a new line of inquiry

6   beyond the scope of the direct.  Objection sustained, wouldn't

7   it be?  Wouldn't that be the proper ruling?

8              MS. HARRIS:  I think it depends on exactly how the

9   testimony comes out, your Honor, and I think that my position

10  as, in the role I'm playing here, is certainly that the simple

11  statement that "I didn't prepare the warrant calculation" has

12  significance beyond the narrow face of that statement, that

13  it's essentially saying -- I mean, if I had evidence,

14  hypothetically, that while he didn't prepare the warrant

15  calculation, he had received a copy of the warrant agreement

16  that's at issue in this case, then wait a minute, that would be

17  maybe not directly, in the narrow sense, directly at odds with

18  "I didn't prepare the warrant calculation", but gosh, if you

19  got the warrant agreement on the day of, or you were in

20  communication with Gary Hirst or with anyone else around the

21  time of this signing of the warrant agreement, or the time in

22  late May at the time of the share issuance letter to

23  Continental, it would be impeachment of his statement that he

24  had nothing to do with the warrant calculation if he's actually

25  getting all the other documents in connection with this

1    transaction.  I'm not saying there are such documents, but I'm

2    just pointing to things that may not be -- you know, we have

3    perhaps a little bit broader sense of what constitutes

4    impeachment than just simply does he have that document, does

5    he not have that document.  And in fairness --

6            THE COURT:  No.  But if you're getting into some area

7    not tied into -- you're proffering to me, and I haven't thought

8    about it, you're proffering to me that there, you can tie it

9    into the direct testimony, but if you can't tie it into the

10   direct testimony but may be very interesting and helpful

11   evidence from your client's standpoint -- not impeachment

12   material but helpful evidence -- it would seem to me that

13   that's your prerogative to see whether or not you can call the

14   witness on your case.

15           MS. HARRIS:  Two things.  One is, I think there are

16   things that would tie into the warrant calculation that would

17   just be the question of whether or not such a document exists

18   in Hodgson Russ' file, so we would need time to compel the

19   subpoena, enforcement of the subpoena to obtain those documents

20   even before he takes the stand on the government's case, but

21   then regardless, make even a determination of whether or not we

22   thought it would be helpful to call him as a hostile witness.

23           THE COURT:  But that's not a problem that is presented

24   by anything the government has done, that's a problem that

25   existed for you, an issue for you, a topic for your thought and

1    discussion wholly apart from whether the government ever wrote

2    me a letter about Mr. Shant Chalian.  Wholly apart.

3            MS. HARRIS:  I think once they said they weren't

4    calling him, your Honor, it does change the calculus.

5            THE COURT:  I respectfully disagree on that one.  If

6    all of a sudden they're going to call him on something, now you

7    say, well, maybe I have something I want to call him on, I

8    don't think so.  I think that's something you've always been

9    free to do wholly apart from the government's intentions to

10   call him as a witness in this case.  Wholly apart.

11           MS. HARRIS:  As we did, and as we described for your

12   Honor, we did do, we subpoenaed in June, and through various

13   efforts it only came to light the existence and availability of

14   these documents to both the government and the defense on the

15   Friday before trial.

16           THE COURT:  Well, listen.  I haven't yet ruled on

17   whether you can call him on your case.  You haven't asked to

18   call him on your case, and I haven't heard from the government

19   on that issue, but that is a different issue than the

20   government's ability to call him on their case in a limited and

21   narrow area where any cross examination would be in the areas

22   of or cabined by the scope of the direct, or legitimate

23   impeachment materials.

24           MS. HARRIS:  Your Honor, could we consider it this

25   morning and then revert to the issue at the break?

 1          THE COURT:  I think that's wise for both sides.  We're

 2     going to get the jury in.  I think it's wise for both sides,

 3     because I think the government may be biting off quite a bit

 4     here and heading in a direction which opens issues, jeopardizes

 5     bringing this trial to conclusion, leaves it open to the

 6     possibility of collateral attacks of a year and a half from now

 7     when some emails come out.

 8          This is an 11th hour request by the government.  The

 9     government, you're big boys and girls, and you played a card,

10     you picked it up off the table, then you want to replay the

11     card, and you're doing this in the middle of trial.  And not

12     really for -- I can't really say, and there's been no claim

13     here of shock and surprise, totally unanticipated, so it's a

14     statement made by the witness, not for the truth of its content

15     but for the fact that it was said, and that's where you are.

16          You can argue whatever you want to argue to the jury.

17     It seems to me that that's the other option here, and it has a

18     lot of attractive features to it.  So I think the government

19     should do some soul searching, as the defense should, also.

20          Let's bring our jury in.

21          (Continued on next page)

22

23

24

25

```
 1                (Jury present)

 2                THE COURT:  Good morning, ladies and gentlemen.

 3                JURORS:  Good morning.

 4                THE COURT:  I don't want you to think that we were out

 5   here playing canasta, or pinochle, or anything like that, I was

 6   meeting with the lawyers in an effort to make the trial and the

 7   presentation of evidence go more smoothly.  These are pretrial

 8   matters which are not matters of your concern, nor should you

 9   speculate on, but they're the ordinary thing of what goes on at

10   trial, and so that's why we are slightly delayed in the

11   beginning of testimony.

12                Mr. Hamels, the Court reminds you that are still under

13   oath.

14                THE WITNESS:  Yes.

15    GAVIN HAMELS,

16        recalled as a witness by the Government,

17        having been previously sworn, testified as follows:

18                THE COURT:  Ms. Mermelstein, you may continue.

19                MS. MERMELSTEIN:  Thank you, your Honor.

20   DIRECT EXAMINATION

21   BY MS. MERMELSTEIN:

22   Q.   I think the question I had asked you was, while you were

23   working with Jason Galanis on the structure of the deal, what,

24   if anything, happened to the stated or reported value of the

25   Westmoore investments?
```

1  A.  Early in July, 2010, Charles Schwab removed the Westmoore

2  values from all the client accounts.  Because of the SEC action

3  and litigation, they took the steps of removing those

4  securities from the account until there would be a resolution

5  with the SEC and they could properly put a value on those

6  investments.

7  Q.  Just so we reorient ourselves, how is Charles Schwab

8  involved in client accounts?

9  A.  So the clients have all their -- had opened accounts at

10 Charles Schwab, had all their investments in those accounts,

11 including the Westmoore investments.  So as they saw their

12 statements or looked online to see their accounts, they would

13 see all their investments, including a value for their

14 Westmoore holdings.

15 Q.  So absent the addition of Rineon and WLMG shares to the

16 accounts, clients would have seen a dramatic decrease in their

17 value?

18 A.  That's right.  So when Schwab removed those values, there

19 would be a big drop, depending on how much each client had

20 invested.

21 Q.  What did you tell clients about these purportedly free

22 shares?

23 A.  As I mentioned before, we sent out a letter to clients to

24 let them know that they'd be receiving these free shares.  This

25 would replace the lost value they would see from their

1   Westmoore investments.  And we included a little bit of

2   information about those two stocks, the Rineon and WLMG, just

3   what types of companies they were, just a couple pieces of

4   basic information.

5   Q.  Let me ask you to take a look in the folder in front of you

6   and just ask you to look at Government's Exhibit 681 for

7   identification.  Do you recognize those?

8   A.  Yes.  This is a copy of the client letters that we sent.

9   Looks like most, if not all, of the client letters.

10          MS. MERMELSTEIN:  The government offers Government's

11  Exhibit 681.

12          MS. HARRIS:  No objection.

13          THE COURT:  Received.

14          (Government's Exhibit 681 received in evidence)

15          MS. MERMELSTEIN:  Ms. Sheinwald, if we can pull that

16  up for the jury.  There we go.  Okay.

17  Q.  So in the second paragraph, here you're telling them that

18  there's not a currently ascribed value to the Westmoore

19  investments?

20  A.  Correct.

21  Q.  In bold there, what does it say?

22  A.  It says, "At no cost to you."

23  Q.  Was that true?  Was it really at no cost to the clients?

24  A.  That's not true.

25          MS. MERMELSTEIN:  You can unzoom, Ms. Sheinwald.

1   BY MS. MERMELSTEIN:

2   Q.  Did anyone else participate in drafting this letter?

3   A.  Yes.  I worked with Jared Galanis on drafting this letter.

4   Q.  Now, were there any clients who asked about the purchase of

5   Gerova shares in their accounts?

6   A.  Yes.

7   Q.  One or more than one?

8   A.  I personally had one client ask me about the Gerova

9   purchase.

10  Q.  What did you tell them?

11  A.  I told them that we were buying some individual stocks for

12  clients that had an appetite for that in their accounts and

13  thought there was some good upside to the stock over the next

14  year or so.

15  Q.  Now, you mentioned that as part of the deal with Jason

16  Galanis he offered liquidity for clients who needed immediate

17  cash?

18  A.  Yes.

19  Q.  Were there any clients who then needed immediate cash?

20  A.  Yes, we had three clients that needed funds.

21  Q.  Did Jason Galanis in fact provide the liquidity he had

22  promised?

23  A.  Yes, he did.

24  Q.  By what method did he provide it?

25  A.  By wire transfer directly to the client accounts at Schwab.

 1  Q.  Who provided him with the wire transfer information in

 2  order to do that?

 3  A.  I sent him that information.

 4  Q.  Let's just look at one example.  I don't know if it's in

 5  evidence.  Why don't you take a look at it first yourself.

 6  It's 1281.

 7           It's in so we can blow it up for everybody.

 8           I'm sorry.  That's the wrong number.  Let's take that

 9  down.

10           How did you provide wire transfer information to Jason

11  Galanis?

12  A.  I sent it by e-mail.

13  Q.  Let's come back to that.

14           Now, did you in fact follow through on your agreement

15  to purchase Gerova shares in client accounts?

16  A.  Yes.

17           MS. MERMELSTEIN:  I have got the right number.

18           Let me pull up just for Mr. Hamels, please, Government

19  Exhibit 1280.

20  Q.  Do you recognize that document?

21  A.  Yes, I do.

22  Q.  Is that an e-mail that you sent to Jason providing the wire

23  information?

24  A.  Yes.

25           MS. MERMELSTEIN:  If it is not already in evidence,

1   the government offers Government Exhibit 1280.

2        MS. HARRIS:  No objection.

3        THE COURT:  Received.

4        (Government's Exhibit 1280 received in evidence)

5        MS. MERMELSTEIN:  If we can publish it to the jury,

6   please.

7   BY MS. MERMELSTEIN:

8   Q.  What is the name of the client whose wire transfer

9   information is being provided to Jason Galanis?

10  A.  This is for Peter Valentine.

11  Q.  So let's go back then to the actual purchasing of Gerova.

12       MS. MERMELSTEIN:  We can take that down.

13  Q.  When did you first begin purchasing shares of Gerova?

14  A.  In early July 2010, I started purchasing shares on my own

15  just in the market, starting to buy blocks of stock for our

16  clients.

17  Q.  What do you mean by "on my own"?

18  A.  So part of the agreement was we were going do buy $5

19  million worth of Gerova stock.  My understanding was to go

20  ahead -- Jason at one point said go ahead and start buying it.

21  So I was following the stock myself and would enter trades and

22  buy stock just in the market, normal trading type activity.

23  Q.  Did that method of buying Gerova, that is, on your own,

24  change at some point?

25  A.  Yeah.  After about a week of doing that on my own, Jason

1    put me in touch with his brother Jared, and from that point on,

2    I started coordinated trades directly with Jared for the next

3    two months.

4    Q.  What do you mean by "coordinated trades?"

5    A.  So Jared would provide me instructions.  He would say put

6    in an order for, for example, 3,000 shares at $5.00, and I

7    would put that order in, and then it would be -- in order to

8    buy that amount, and then it would be executed.  My

9    understanding was either Jared or one of his colleagues or

10   associates was selling that stock at that price.  So matching

11   up by putting in an order to sell 3,000 shares at $5.00 so it

12   would match up exactly.

13   Q.  After that first week of the purchases you made on your own

14   initiative, was the rest of your purchasing of Gerova in that

15   same coordinated matched fashion?

16   A.  Yes.

17   Q.  Again, at the direction of, the person you spoke to was

18   Jared Galanis?

19   A.  Yes.

20   Q.  What was your understanding of why Jason Galanis wanted you

21   to buy Gerova in this fashion?

22   A.  I think a couple of reasons.  One, it was compensation for

23   Jason.  As part of the arrangement, he was giving our clients a

24   lot of free stock to help replace the lost value of our

25   Westmoore investments.  So this was a way, if we transacted

1  directly in the market and we could line up the trades as

2  closely as possible where our clients were buying from him, it

3  was a way to get him the money, that $5 million as some

4  compensation for the free stock he was giving us.

5           Then, in addition, it helped stabilize the price of

6  Gerova going forward.

7  Q.  What, if anything, did it do to the appearance of volume in

8  the trading of Gerova?

9  A.  So we spread the trades out over -- we did this $5 million

10  worth of trades over almost a two-month period, and there were

11  some days that we traded and we would be maybe 25 to even 50

12  percent of the volume transacted, and that day it would be

13  trades between myself and Jason Galanis.  Then I would notice

14  on days that we weren't trading that the volume would drop off

15  pretty steeply many of those times.  So a lot of the volume

16  over that two-month period was provided by myself and our

17  clients.

18  Q.  In other words, if you hadn't been buying Gerova at Jason

19  Galanis's direction, there would be far less trading in Gerova?

20           MS. HARRIS:  Objection.  Leading.

21           THE COURT:  Avoid leading, or reiterating, avoid that

22  that as well.

23  Q.  Other than the matched trading in Gerova, did you take any

24  steps to manipulate the price of Rineon or WLMG?

25  A.  Yes.

 1   Q.  Now let me show you Government Exhibit 1281 in evidence.

 2          Do you recognize this e-mail?

 3   A.  Yes, I do.

 4   Q.  Let's start with the bottom.  Who is sending that e-mail?

 5   A.  This is an e-mail from me to Jared Galanis.

 6   Q.  What do you say?

 7   A.  I'm asking him to move the bid price on Rineon, RIGI, up to

 8   $25.00.

 9   Q.  What is the connection between RIGI and Rineon?

10   A.  RIGI is the stock ticker symbol for Rineon.

11   Q.  Why are you asking him to move the bid price of Rineon up

12   to $25.00?

13   A.  Once we started depositing the stock into the accounts of

14   Charles Schwab, they had a policy for how they priced penny

15   stocks or stocks like this that rarely traded.

16          So, for example, the last trade on Rineon was $25.00.

17   If it didn't trade for a number of days after that, call it a

18   week or so, Schwab would adjust the price to what the bid price

19   was.  So that's the price offered by any other buyers out in

20   the market.  So that bid price was much lower.

21          So if the bid price was $5.00, Schwab would adjust the

22   price in the accounts from $25.00 down to $5.00.  So you would

23   see a big drop in account value if Schwab lowered that price.

24          So even if the stock hadn't traded and you searched it

25   and entered the ticker symbol, it would show that $25.00 was

 1   the price.  Schwab would adjust it down to 5 until there was

 2   another trade in the market, whenever that trade would occur.

 3          So in order to minimize price fluctuations in the

 4   clients' accounts, we could put the bid price at 25 and that

 5   would be reflected on the client accounts.  So they wouldn't

 6   see that volatility or drop in price, drop in value.

 7   Q.  How does Jared Galanis respond to your email?

 8   A.  He writes, "I will ask a client to buy it now."

 9   Q.  How do you respond?

10   A.  I said, "OK.  It does need to be traded today, but if there

11   is an order in with a bid of 25, that will work.  The bid price

12   will be reflected on the accounts."

13   Q.  Just so we are clear, again, why is it not necessary to buy

14   the stock and only put in the bid?

15   A.  Because Schwab would reflect that bid price if they were

16   going to adjust away from the last trading price.

17   Q.  Now, did there come a time when your purchases of Gerova

18   pursuant to your agreement with Jason were complete?

19   A.  Yes.  In early September 2010.

20   Q.  Did there come a time that you disclosed your agreement

21   with Jason Galanis and the actions you had taken to SunTrust?

22   A.  Yes.  Shortly after we had finished purchasing our Gerova

23   shares I told SunTrust.

24   Q.  What was the result of that disclosure?

25   A.  I was fired and Billy Crafton was also fired.

1    Q.  What happened to the Rineon WLMG and Gerova shares that

2    were in client accounts?

3    A.  So when SunTrust was informed, they took over the

4    situation.  They went to Schwab and disclosed everything to

5    Schwab and had those shares, the Rineon and WLMG shares,

6    removed from the client accounts and all were all sent back to

7    SunTrust, my understanding is, until they can verify where

8    those shares had come from and the Gerova ownership of those

9    shares.

10   Q.  What about the Gerova shares?

11   A.  Gerova shares they also removed from client accounts and

12   made the clients whole on those purchases.  So the clients that

13   purchased Gerova, they gave them their money back for that and

14   took the stock themselves.

15   Q.  Did there come a time when you were approached by the FBI?

16   A.  Yes.

17   Q.  Approximately when was that?

18   A.  July/August of 2013.

19   Q.  What did they want to speak to you about?

20   A.  Westmoore.

21   Q.  Did you speak to them?

22   A.  I did.

23   Q.  What was the general topic of that conversation?

24   A.  They asked a lot about our business, how we got involved

25   with Westmoore, how our clients were involved.  They asked a

1    bit about the commissions generated from Westmoore, and they

2    also asked about David Riske and how his redemption and buyout

3    transpired as well.

4    Q.  Did they ask you anything about Gerova or Jason Galanis?

5    A.  They did not.

6    Q.  Did you volunteer that information?

7    A.  No.

8    Q.  Did there come a time when you were asked to speak to

9    prosecutors in New York?

10   A.  Yes, in the fall of 2014.

11   Q.  Did you in fact speak to the prosecutors?

12   A.  I did.

13   Q.  Did thereafter come a time when you were arrested?

14   A.  Yes, in September 2015.

15   Q.  Did you ultimately decide to cooperate with the government?

16   A.  Yes.

17   Q.  As part of that cooperation, did you participate in

18   meetings with the government?

19   A.  Yes.

20   Q.  In particular, in meetings with the U.S. Attorney's Office

21   here in the Southern District of New York?

22   A.  Yes, I did.

23   Q.  What kinds of things did you have to disclose in those

24   meetings?

25            MS. HARRIS:  Objection.

1              THE COURT:  Rephrase that question.

2  Q.  OK.  What information did you disclose in those meetings?

3              MS. HARRIS:  Objection.

4              THE COURT:  Overruled.

5              Not for the truth of its content but for the fact that

6  this is what transpired.

7              Go ahead.

8  A.  I answered all their questions related to Westmoore,

9  Gerova, Jason and Jared Galanis and my activity with them, and

10  I disclosed any other bad acts or criminal activity that I had

11  done.

12  Q.  Other than the Gerova/Jason Galanis topic we have just

13  discussed here today, what if any other conduct did you

14  disclose?

15  A.  I started to disclose that for the last couple of years I

16  had not paid the appropriate employment and payroll taxes for

17  our child's nanny.

18  Q.  Have you since made that right?

19  A.  Yes, I have.  I have paid all of those.

20  Q.  Did there come a time when you pled guilty to federal

21  charges?

22  A.  Yes, I did.

23  Q.  Was that pursuant to a cooperation agreement with the

24  government?

25  A.  Yes.

1   Q.  What charges did you plead guilty to in connection with

2   that agreement?

3   A.  I pled guilty to three charges:  Conspiracy to commit

4   securities fraud, securities fraud, and investment adviser

5   fraud.

6   Q.  Did you also, as part of that agreement, agree to pay the

7   back taxes on your nanny?

8   A.  Yes I did.

9   Q.  Does your agreement require you to forfeit any proceeds of

10  the criminal conduct?

11  A.  Yes.

12  Q.  What do you understand the government will do pursuant to

13  this agreement if you comply with the terms of the agreement?

14  A.  I understand they will submit a 5K letter at my sentencing.

15  Q.  What is a 5K letter?

16  A.  It describes all of my criminal conduct as well as the

17  assistance I have provided to the government.

18  Q.  Where does that letter go?

19  A.  That's submitted to the judge and the court at sentencing.

20  Q.  With or without a 5K letter, what is the maximum sentence

21  you could receive?

22  A.  30 years.

23  Q.  What is the minimum sentence you could receive?

24  A.  Probation.

25  Q.  What sentence are you hoping to receive?

```
 1   A.  Probation.

 2   Q.  Has anyone promised you any particular sentence?

 3   A.  No.

 4   Q.  Does your sentence depend on the outcome in any way of this

 5   trial?

 6   A.  No, it does not.

 7           MS. MERMELSTEIN:  No further questions.

 8           THE COURT:  You may cross-examine.

 9           MS. HARRIS:  Thank you, your Honor.

10   CROSS-EXAMINATION

11   BY MS. HARRIS:

12   Q.  Good morning, Mr. Hamels.

13   A.  Good morning.

14   Q.  Your testimony is largely about events that took place in

15   2010 and 2011, correct?

16   A.  2010, yes.

17   Q.  And before those events, you had met Jason Galanis once

18   previously, is that right?

19   A.  That's right.

20   Q.  That was in 2008?

21   A.  Yes.

22   Q.  And at that time he had proposed certain investments to

23   you?

24   A.  Yes.

25   Q.  Including investment in Fund.com?
```

1    A.   Yeah.   That meeting was more informational.   I don't

2    remember him actually soliciting money from us at that time,

3    but we did discuss Fund.com.

4    Q.   And at that time you chose not to pursue any investment

5    opportunities with Mr. Galanis, correct?

6    A.   Correct.

7    Q.   But things were different in 2010, correct?

8    A.   Yes.

9    Q.   There were problems at Westmoore beginning in 2009,

10   correct?

11   A.   Yes.

12   Q.   And those problems got a lot more serious in 2010?

13   A.   Yes.

14   Q.   The SEC filed an action?

15   A.   Yes.

16   Q.   And seized the assets of Westmoore?

17   A.   Correct.

18   Q.   It sounds like it was a real crisis.

19   A.   Yes, it was.

20   Q.   That announcement of the SEC action was on June 17, 2010,

21   correct?

22   A.   Yes.

23   Q.   And that concerned you?

24   A.   Yes, absolutely.

25   Q.   There was a lot of your clients' money that was tied up in

1    Westmoore accounts, correct?

2    A.   Yes.

3    Q.   25 million to be precise.

4    A.   Yes.

5    Q.   And essentially that all became worthless on June 17?

6    A.   The possibility was that it would become worthless.  I know

7    there was upcoming court dates with the potential receiver and

8    how the remaining assets of Westmoore would be distributed, but

9    there was a potential for total loss.

10   Q.   Pretty serious potential for total loss, is it fair to say?

11   A.   Yes.

12   Q.   And that was enough to cause you great distress?

13   A.   Yes.

14   Q.   And you were worried about your clients?

15   A.   Yes.

16   Q.   And you were worried about your career?

17   A.   Correct.

18   Q.   And you were worried about getting sued?

19   A.   At that time I hadn't thought about getting sued.

20   Q.   You were worried about your reputation?

21   A.   Not necessarily.

22   Q.   And you really didn't know what to do at first, is that

23   fair?

24   A.   Yes.

25   Q.   And it's right around that time that you met Jason Galanis

1   again?

2   A.  That's right.

3   Q.  I think you met him actually the day afterwards, is that

4   right?

5   A.  That's right.

6   Q.  June 18?

7   A.  Right.

8   Q.  And you weren't planning to actually meet him that day?

9   A.  I was not.

10  Q.  You were just going to meet with Mr. Jennings?

11  A.  Yes.

12  Q.  And then Jason Galanis just showed up?

13  A.  Yes.

14  Q.  And Mr. Jennings said, I am going to leave, you all should

15  talk?

16  A.  That was at the next meeting.  Yes.

17  Q.  In a subsequent date after June 17, you met again with

18  Mr. Jennings and Mr. Galanis?

19  A.  Right.

20  Q.  That was just a few days later?

21  A.  Yeah.  It was the following week.

22  Q.  And that's when Mr. Jennings left the room --

23  A.  Right.

24  Q.  -- and suggested that you, Billy Crafton, and Jason all

25  talk together?

1   A.  Yes.

2   Q.  At that time before Mr. Jennings left the room, you didn't

3   have any idea of what Jason Galanis was going to propose,

4   correct?

5   A.  I did not.

6   Q.  And at that time, as you entered that meeting, after June

7   17, you didn't have in your head the kind of scheme that you

8   just testified about here today, correct?

9   A.  Correct.  I didn't know what he was going to propose.

10  Q.  You didn't have any ideas of your own, correct?

11  A.  Correct.

12  Q.  You felt sort of helpless?

13  A.  Very concerned.

14  Q.  So in that meeting with Mr. Galanis, you talked about

15  various plans, correct?

16  A.  Correct.

17  Q.  He made several different proposals.  Fair?

18  A.  Yes.

19  Q.  One plan was that you would invest $5 million in Gerova in

20  exchange for a $25 million statement value, is that correct?

21  A.  Yes.  That came a couple of weeks afterwards.  That's the

22  final agreement we had.

23  Q.  But it took several weeks to come to the final agreement,

24  correct?

25  A.  Yes.

1   Q.  There were various other ideas floating in the interim

2   correct?

3   A.  That's correct.

4   Q.  And you didn't immediately decide to join forces with Mr.

5   Galanis, correct?

6   A.  No, I think we knew very soon that we were going to do

7   something with him when he agreed to help redeem one of our

8   clients or send one of our clients money right at that initial

9   meeting.

10  Q.  But you didn't know what the plan would be exactly?

11  A.  Right.

12  Q.  In the end, the idea was you both would get something out

13  of this plan, correct?

14  A.  Yes.

15  Q.  You got stock that might grow in value for your clients?

16  A.  Correct.

17  Q.  You would solve your cash crisis?

18  A.  Yes.

19  Q.  And Mr. Galanis would have all the stock of these various

20  entities in one place?

21  A.  Yes.

22  Q.  Which would minimize the volatility of the price, correct?

23  A.  Right.

24  Q.  Now, you didn't start buying any of the Gerova shares until

25  July 2010?

1   A.  Yes.

2   Q.  I just want to talk to you a little bit more about Jason

3   Galanis.  Is it fair to say Mr. Galanis is a very personable

4   individual?

5   A.  Yes.

6   Q.  Very persuasive?

7   A.  Yes.

8   Q.  And he convinced you that he could help you, correct?

9   A.  Yes.

10  Q.  And that he could help your clients?

11  A.  Correct.

12  Q.  And save your career?

13  A.  I don't know if he convinced me of that, but he provided us

14  a solution at a time when we were desperate.

15  Q.  You were desperate because $25 million of your clients'

16  assets could be worth nothing?

17  A.  Right.

18  Q.  Fair to say that would create a professional crisis for

19  you?

20  A.  Yes, it would.

21  Q.  And Mr. Galanis, Jason Galanis, introduced you to his

22  brother Jared Galanis, correct?

23  A.  Yes.

24  Q.  By phone, though?

25  A.  Yes, by phone.

 1   Q.  You never actually met Jared Galanis in person?

 2   A.  I did not.

 3   Q.  And you spoke with Mr. Jared Galanis repeatedly by phone

 4   during this time period, correct?

 5   A.  Yes.

 6   Q.  And at the time you spoke with Jared Galanis, did you ever

 7   doubt that the person with whom you were speaking was in fact

 8   Jared Galanis?

 9   A.  No, I did not.

10   Q.  Since that time period, have you come to learn that the

11   person who identified himself as Jared Galanis was in fact

12   another individual?

13   A.  I have learned that it's possible it was not Jared, but I

14   don't know.

15   Q.  You have learned that it was possible that it was his

16   father, John Galanis?

17   A.  Yes.

18   Q.  Who was holding himself out to be Jared Galanis, correct?

19   A.  Yes.

20   Q.  But at the time you were speaking with this individual

21   identifying himself as Jared Galanis, you had no idea he was

22   anybody else, correct?

23   A.  That's right.

24   Q.  Now before this case, you had never heard of the name Ymer

25   Shahini, correct?

1   A.  Correct.

2   Q.  You had no knowledge of any shares issued to Ymer Shahini?

3   A.  Correct.

4   Q.  During this time period that we have been discussing, you

5   had absolutely no contact with Gary Hirst?

6   A.  Correct.

7   Q.  You never talked to Gary Hirst?

8   A.  No.

9   Q.  You never met Gary Hirst?

10  A.  No.

11  Q.  Jason Galanis didn't mention Gary Hirst's name to you?

12  A.  Not that I recall.

13  Q.  And this individual who held himself out to be Jared

14  Galanis never mentioned Gary Hirst's name to you, correct?

15  A.  Correct.

16  Q.  And in all of this matched trading that you talked about

17  with Jared Galanis, you didn't do any matched trading with Gary

18  Hirst, correct?

19  A.  Correct.

20  Q.  Now, Mr. Hamels, you made a lot of mistakes back in 2010,

21  correct?

22  A.  Yes, I did.

23  Q.  You took inducements to make investments?

24  A.  Correct.

25  Q.  You breached your fiduciary duties?

```
 1   A.  Yes.

 2   Q.  You lied to your clients?

 3   A.  Yes.

 4   Q.  You manipulated the market?

 5   A.  Yes.

 6   Q.  And you were charged with crimes as a result of those

 7   mistakes, correct?

 8   A.  That's correct.

 9   Q.  But you pled guilty?

10   A.  Yes.

11   Q.  And you pled guilty for the crimes that you committed with

12   Jason Galanis, correct?

13   A.  Yes.

14           MS. HARRIS:  No further questions, your Honor.

15           THE COURT:  Any redirect?

16           MS. MERMELSTEIN:  Very briefly, your Honor.

17   REDIRECT EXAMINATION

18   BY MS. MERMELSTEIN:

19   Q.  Let me start, Mr. Hamels, by asking you a little bit more

20   about your cooperation agreement with the government.

21           Let me ask you to pull out of the folder in front of

22   you Government Exhibit 3506-5 for identification.

23           What is that document?

24           MS. HARRIS:  Objection, your Honor.

25           MS. MERMELSTEIN:  May we approach your Honor?
```

1        THE COURT:  Yes.

2        (Continued on next page)

1              (At the sidebar)

2              MS. MERMELSTEIN:  Your Honor, the government

3     intentionally did not elicit on direct the truth-telling

4     provisions of the cooperation agreement.  The defense, not

5     having an opening, accused Mr. Hamels of not telling the truth.

6              He has now been asked on cross-examination whether or

7     not he has lied in connection with this case, and I think that

8     opens the door to the truth-telling provisions of the

9     cooperation agreement, which we now intend to briefly elicit.

10             MS. HARRIS:  Your Honor, I credit largely everything

11    he said.  We were not questioning his veracity on the stand at

12    all.  We simply elicited the mistakes he had made in the past,

13    and one of those mistakes that he has pled guilty to was lying

14    to his clients.  There is nothing in our line of cross that

15    questioned his truth-telling.  In fact, just the opposite.  We

16    credited everything that he said on direct.

17             THE COURT:  What is the harm or evil -- maybe I am

18    missing something -- in bringing out the truth-telling

19    provisions in the plea agreement?  Is there some case law that

20    says it's a bad thing to do?

21             MS. MERMELSTEIN:  There is case law that says

22    generally that until there has been some kind of accusation,

23    and it can be a very broad one, that a cooperator is not

24    telling the truth that it would be improper bolstering for the

25    government to bring out the truth-telling, which is why we

 1    didn't do it in the first instance.

 2         THE COURT:  Didn't the cross intimate that this man

 3    was kind of pressured by circumstances into becoming a

 4    cooperator?

 5         MS. HARRIS:  No.  Pressured by circumstances to commit

 6    the crime and not to become a cooperator.  We barely touched

 7    upon circumstances relating to his arrest.

 8         MS. MERMELSTEIN:  I think that asking, in particular,

 9    did you lie to clients calls into question the witness's

10    veracity and makes it fair for the jury to understand his

11    actual full incentives.

12         THE COURT:  You know, cooperation takes place in a lot

13    of different types of cases -- drug cases, Hobbs Act robberies,

14    crimes that do not involve acts of dishonesty or lying, and

15    this circumstance wouldn't arise here.  But the

16    cross-examination brought out, quite appropriately, that this

17    man was a liar to his clients, and that's something that

18    defense is entitled to do, appropriate to do, but it does in my

19    view open the door now to the government eliciting testimony

20    about the provisions of the plea agreement.  That's my ruling.

21         MS. HARRIS:  Can I, just to preview, the only thing I

22    guess -- and I wasn't quite sure where we were going with the

23    line of questioning, just to anticipate, I assume the

24    government is not going to elicit any prior statements that

25    were made during the course of his cooperation.

1                MS. MERMELSTEIN:  No.

2                The standard questions about the terms of the

3    agreement.

4                THE COURT:  Thank you.

5                (Continued on next page)

1          (In open court)

2     BY MS. MERMELSTEIN:

3     Q.  Turning your attention back to 3506-5.

4          Do you recognize that document?

5     A.  Yes.  This is my cooperation agreement.

6     Q.  Is that your signature on the last page?

7     A.  Yes, it is.

8     Q.  Does that agreement encompass all of the terms of your

9     agreement with the government?

10    A.  Yes.

11         MS. MERMELSTEIN:  The government offers 3506-5.

12         MS. HARRIS:  Over our prior objections.

13         THE COURT:  Understood.

14         Received.

15         (Government's Exhibit 3506-5 received in evidence)

16    BY MS. MERMELSTEIN:

17    Q.  What are you obligated to do under the terms of that

18    agreement?

19    A.  I am required to testify in this case, tell the truth in

20    all my meetings with the government, and also tell the truth

21    here testifying, and stay out of further trouble and not commit

22    any other crimes.

23    Q.  What happens if you don't tell the truth?

24    A.  The government can tear up this agreement.

25    Q.  That is your understanding, that the government would tear

1  up the agreement?

2  A.  Yes, they would.

3  Q.  If you lose your cooperation agreement, do you get a 5K

4  letter?

5  A.  I do not get a 5K letter.

6  Q.  Are you still stuck with your guilty plea?

7  A.  Yes, I am.

8  Q.  Let's put aside the cooperation agreement.

9         Ms. Harris asked you a number of questions about your

10  initial meeting with Jason Galanis that led to the events here.

11         You didn't really have an established relationship

12  with Jason Galanis at the time that you intended --

13         MS. HARRIS:  Objection.  Leading.

14         THE COURT:  Avoid the leading.  I realize it's

15  redirect.  There is a certain amount of directing that is fine.

16         MS. MERMELSTEIN:  Thank you, your Honor.

17         THE COURT:  Rephrase.

18  Q.  At the time that you met with Matt Jennings and Jason

19  Galanis, how many times had you previously met Jason Galanis?

20  A.  Just once.

21  Q.  That was the entirety of your relationship?

22  A.  Yes.

23  Q.  Jason Galanis didn't hide the details of the scheme from

24  you, did he?

25         MS. HARRIS:  Objection.

1          THE COURT:  Overruled.

2   A.  Can you be more specific about the scheme?

3   Q.  Jason Galanis asked you if you wanted to solve your

4   financial problems by manipulating the market for various

5   stock, right?

6          MS. HARRIS:  Objection.

7          THE COURT:  Sustained.

8   Q.  Do you feel that Jason Galanis misled you about the nature

9   of the agreement that you entered into with him?

10          MS. HARRIS:  Objection.

11  A.  No.

12          THE COURT:  Overruled.

13  Q.  Did you understand at the time of that first meeting that

14  what you were being asked to do was wrong?

15  A.  Yes, absolutely.

16          MS. MERMELSTEIN:  No further questions.

17          THE COURT:  You may step down.  Thank you.

18          (Witness excused)

19          THE COURT:  Call your next witness.

20          MR. BLAIS:  The government calls Stephen Flatley.

21          THE COURT:  What we are going to do, ladies and

22  gentlemen, we will give Mr. Flatley an opportunity to get

23  settled on the witness stand and we will take our mid-morning

24  break.

25          Please do not discuss the case among yourselves or

1    with anyone.  See you in ten minutes.

2             Thank you.

3             (Jury exits courtroom)

4             THE COURT:  See you in ten minutes.

5             (Recess)

6             (Jury not present)

7             THE COURT:  Why is it relevant who produced what

8    document?

9             Let me hear from the defendant.  Do you plan to elicit

10   the source of any of the documents, the fact that defense

11   produced the document?

12            MS. HARRIS:  So, your Honor, we are not planning to do

13   anything with this witness.  We are struggling with this issue

14   a little bit internally, but I think our current state of

15   thinking is as follows.

16            We understand from both, actually -- the defense

17   expert and the government expert -- that metadata takes you

18   only so far, basically.  You need other corroborating

19   information to evaluate its trustworthiness.  It has value, and

20   I think in the margins our experts may differ a little bit in

21   the significance of that value.  It has value, but you need

22   more information.

23            We think -- and forgive us if we don't articulate this

24   in the most elegant or precise way -- that the circumstances of

25   our discovery of the information corroborates it, and I can

1   proffer a little bit on that subject.

2          THE COURT:  It doesn't come up with this witness.

3          MS. HARRIS:  No.  It's a defense case issue.

4          THE COURT:  Thank you.

5          MR. TREMONTE:  The one thing that does come up with

6   this witness, your Honor and we addressed this in our letter of

7   the 18th, is we anticipate from the 3500 that Mr. Flatley will

8   testify, among other things, that the FBI does not rely on

9   create date metadata.  We think he should be precluded from

10  offering that particular testimony because, among other things,

11  it usurps the role of the jury.  It substitutes effectively, or

12  runs the risk of substituting the FBI standard for evaluating

13  the usefulness and probative value of metadata for the jury.

14         Moreover, it appears, and we don't know because we

15  haven't debriefed this witness, but it appears that this is

16  some kind of an internal FBI policy about which we know nothing

17  other than what was referenced in the 3500.  I guess if it's an

18  official policy, that would be memorialized in the statement.

19  It might have been the product of a debate.  We know nothing

20  about that and, effectively, it's unimpeachable.

21         THE COURT:  I am going to allow the testimony.  We

22  will take it question by question.  And you should feel free to

23  object as you deem appropriate and I will rule on it on a

24  question-by-question basis.

25         MR. TREMONTE:  All right, your Honor.  We may ask for

1    a curative instruction at the end of the testimony.

2              THE COURT:  Or move to strike all the testimony.

3    That's always an option.

4              I haven't foreclosed anybody from making what

5    application they deem is appropriate with any witness.

6              THE COURT:  Bring my jurors in, please.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  You may call your next witness.

3              MR. BLAIS:  The government calls Stephen Flatley.

4    STEPHEN FLATLEY,

5         called as a witness by the Government,

6         having been duly sworn, testified as follows:

7              THE DEPUTY CLERK:  Please state your name and spell

8    your last name for the record.

9              THE WITNESS:  My name is Stephen Flatley.

10   S-t-e-p-h-e-n, F-l-a-t-l-e-y.

11             THE COURT:  You may inquire.

12             MR. BLAIS:  Thank you, your Honor.

13   DIRECT EXAMINATION

14   BY MR. BLAIS:

15   Q.  Good morning, Mr. Flatley.

16   A.  Good morning.

17   Q.  Mr. Flatley, where do you work?

18   A.  I work for the Federal Bureau of Investigation, New York

19   Division.

20   Q.  What is your job title?

21   A.  I'm a computer forensic examiner.

22   Q.  Do you work for a specific team within the FBI?

23   A.  Yes.  I work for the computer analysis response team, also

24   known as CART.

25   Q.  How long have you been with the FBI?

 1   A.  For 11 and a half years.

 2   Q.  Before you joined the FBI, what did you do?

 3   A.  I was a computer consultant.

 4   Q.  How long did you do that?

 5   A.  I did that for approximately seven years.

 6   Q.  Before you joined the FBI, how far did you go in school?

 7   A.  I received a Bachelor's in Business and Computer Science

 8   from Boston College.

 9   Q.  Have you been with the CART team, the computer analysis

10   response team, for your entire time at the FBI?

11   A.  Yes, I have.

12   Q.  What are your duties and responsibilities with the CART

13   team?

14   A.  In CART, what we do is we collect and process digital

15   evidence.

16   Q.  Do you have a specific role within the CART team?

17   A.  I'm the division coordinator, and I also do my own

18   examinations.  So I assign work to the other examiners, and I

19   do my own, as well.

20   Q.  What certifications, if any, do you have in the field of

21   forensic examinations?

22   A.  I'm certified by the FBI to process Windows machines,

23   MacIntosh machines, cell phones.  I also have a couple of

24   industry standard certifications, A+ and Net+.

25   Q.  Have you received any specialized training in the field of

1   forensic examination?

2   A.  Yes, I have.

3   Q.  Can you describe some of that for the jury?

4   A.  Some of it is industry standard classes like Net+ and A+.

5   Some of them are classes for specific tools, like AccessData's

6   Forensic Toolkit, Cellebrite's software to download to cell

7   phones, file systems, things of that nature.

8   Q.  Where did those various trainings take place?

9   A.  In various locations around the country.

10  Q.  What types of investigations have you worked on while a

11  member of the CART team at the FBI?

12  A.  We work on every violation that the FBI does.  So

13  counterintelligence, counterterrorism, crimes against children,

14  white-collar crime, overt threats.

15  Q.  Approximately how many computers or other electronic

16  devices would you estimate that you've forensically examined

17  during your tenure at the FBI?

18  A.  In excess of a thousand.

19  Q.  Taking a step back for a minute.  When we talk about a

20  forensic examination, what does it mean to forensically examine

21  an electronic device?

22  A.  So the procedure is different for the different devices.

23  So for like a computer, for instance, we would remove the hard

24  drive or make a copy and imagine of the hard drive so that we

25  could run our exam on it without changing anything.  Then run

1    it through several different tools to categorize and process

2    things, recover deleted items, things of that nature.

3    Q.  Just as a very general matter, is there any difference

4    between forensically examining an electronic device and

5    forensically examining a document?

6    A.  Not really, no.

7    Q.  We'll go into that in a bit more detail later, but when

8    you're conducting a forensic examination, are there particular

9    software products that you use to conduct that investigation?

10   A.  It depends on what we're looking for.  Generally, the

11   overall product that we use is AccessData's Lab.  It also used

12   to be known as FTK or Forensic Toolkit.  We'll also run things

13   through different tools, depending on what we're looking for.

14   Q.  These various software programs that you just mentioned,

15   have you received training on how to use this various software?

16   A.  Yes, I have.

17   Q.  What classes or coursework, if any, have you taught in the

18   past?

19   A.  I'm currently an adjunct professor at Fordham University.

20   I'm also an adjunct professor for the FBI academy in Quantico.

21   I teach digital forensics at both locations.

22   Q.  Have you written any books or articles about forensic

23   examination?

24   A.  I haven't written anything, but I have been a speaker at

25   our conference, the International Conference on Cyber Security,

 1   that is held every year and a half at Fordham.

 2   Q.  How many times, approximately, have you testified about

 3   your work as a forensic examiner?

 4   A.  To be honest, I've lost count, but it's in excess of 30

 5   times.

 6   Q.  In what districts have you previously testified?

 7   A.  Here in Southern District, also in the Eastern District of

 8   New York.

 9          MR. BLAIS:  Your Honor, at this point the government

10   would ask that Mr. Flatley be accepted and qualified as an

11   expert witness in the field of forensic examination.

12          THE COURT:  Any objection?

13          MR. TREMONTE:  No, your Honor.

14          THE COURT:  So qualified.

15   BY MR. BLAIS:

16   Q.  Mr. Flatley, as it relates to computer files, what is

17   metadata?

18   A.  Metadata, very simply put, is just information about a

19   file.  Certain things fall under that category; the file name,

20   when the file was created, when it might have been modified.

21   For certain files there's other characteristics that get put in

22   there, depending on what kind of file it is and what created

23   it.

24   Q.  Where is metadata stored?

25   A.  There is two different places overall where it could be

1    stored.  It could be stored in the computer's file system in

2    the computer itself.  So the overall creation date of the file

3    could be stored there.  Certain files also have metadata stored

4    inside them.  Things like Word documents, PDF documents, some

5    photographs, like JPEGs and a certain type called JPEG Exif

6    will have certain other aspects of metadata inside of it.

7    Q.  How is metadata generated?

8    A.  It's generated at the time the file is created, and then it

9    can be modified at later dates.

10   Q.  How can someone access metadata in a particular file?

11   A.  For the case of a Word document, for instance, you have the

12   document open, you can simply right click on the file tab, and

13   at the bottom you'll see a thing that says "properties", and it

14   will give you all the embedded metadata in that Word document.

15   Q.  What forensic tools, if any, are available to locate or

16   search metadata in a document?

17   A.  There's a great number of them.  FTK will show you a good

18   deal of that metadata, as well.  There are some other tools,

19   one for pictures, for instance, is called Exif.  JPEG Exif.

20   There's another -- or I'm sorry, Exif Tool.  There's another

21   that comes to mind, Xpdf.  But there's a bunch of them.

22   Q.  You mentioned the tool FTK.  What exactly is that?  What

23   does that tool do?

24   A.  For Forensic Toolkit will parse, pull apart any data that

25   you give into it.  If you give it an entire computer drive, if

1   you just give it a few files together, it will take that data

2   or categorize it.  It will show you, and it can show you, how

3   the computer sees it in hexadecimal, which is uninterpreted.

4   It can show you different views how that would normally be

5   viewed and categorized like that.

6   Q.  You mentioned these forensic tools allowing you to see

7   metadata in hexadecimal form.  What exactly is hexadecimal

8   form?

9   A.  So hex decimal is the shorthand, for lack of a better term,

10  that the computer uses to express all the different 1s and 0s

11  that are -- it's a coded binary.  So when we are viewing a

12  particular file through the program that normally views it,

13  it's only going to allow us to see what it wants us to see.

14          So if you're, for instance, looking at a Word

15  document, it's going to show you how it is all formatted.  If

16  we put it into FTK and we can pull it apart, we can show you

17  that the formatting is done in a different way, and the words

18  are actually kept in a different spot.

19          So with the metadata that's in there, it's generally

20  either at the beginning, and sometimes also at the end of

21  document, but that's hidden from your view unless you go

22  through the properties and it gives you the view in that way.

23  Q.  Are you familiar with documents that contain the file

24  extension "PDF"?

25  A.  Yes, I am.

1   Q.  First of all, what is a file extension?

2   A.  A file extension is a way the computer organizes the kinds

3   of data that it has.  So for some files that are like a Word

4   document, for instance, it will have the file extension .doc,

5   .d-o-c.  That tells the computer and it tells the user that

6   it's a Word document.

7   Q.  What is a PDF?

8   A.  It is a portable digital format.  It is a file format that

9   has been accepted kind of as universal for the different

10  various computing platforms.

11  Q.  What are some ways that a PDF file can be generated?

12  A.  They can be generated a great number of ways using --

13  saving a file, for instance, if you had a Word document, you

14  can save it as a PDF.  That way you would not need Word to open

15  it, you would only need Adobe Reader to open it.

16          Certain scanners, hardware will create a PDF, certain

17  browsers, if you save a file, will create it as a PDF.

18  Q.  What about scanning a document?

19  A.  Yes, sir.

20  Q.  Now, you mentioned, in answering the question about PDF,

21  you mentioned Adobe.  What is Adobe?

22  A.  Adobe is a software company that created the PDF extension

23  format.

24  Q.  Now, when a PDF file is created, is there metadata that is

25  generated that reflects the creation date of that file?

1    A.  Yes, there is.

2    Q.  How does the PDF file generate that creation date metadata?

3    A.  It takes it from the system clock on the computer.

4    Q.  What do you mean by that?

5    A.  So computers have a clock in them that let's them organize

6    things, how they -- how it comes into the computer.  It gives

7    it a timestamp, as well, and every process that runs in that

8    machine can access that clock.

9    Q.  Now, if a PDF document is created using a scanner, how is

10   the create date generated?

11   A.  It's generated by -- when -- it gets that date also from

12   the computer.

13   Q.  So just to be clear, does a scanner have an internal clock?

14   A.  Generally, no.

15   Q.  Now, Mr. Flatley, does the FBI rely on creation dates alone

16   in PDF files in determining the date on which that PDF file

17   was, in fact, created?

18   A.  No, we do not do that.  We would then go for some --

19            MR. TREMONTE:  Objection, your Honor, foundation.

20            THE COURT:  Lay a foundation, if you will.

21   Q.  Sir, what sorts of information does the FBI rely on when

22   determining the date on which any particular computer file was

23   created?

24            MR. TREMONTE:  Same objection, your Honor, no basis.

25            THE COURT:  I think the foundation has been laid in

1    the defendant's prior testimony.

2           MR. TREMONTE:  Not as to the evaluative standards that

3    the FBI uses.

4           THE COURT:  Qualify your question with "in your

5    experience".

6    Q.  In your experience, Mr. Flatley, what sorts of things does

7    the FBI rely on in determining the create date of a particular

8    computer file?

9    A.  We would require that we have some kind of corroborating

10   evidence.  For instance, if the file had been emailed, we would

11   want to see that email and be able to open up what we call the

12   long header on that email.  For instance, when you email

13   something to somebody, it goes from your computer, through a

14   number of servers, to their computer.  You can change your time

15   and date on your computer, but you will not be able to change

16   the time and date on, for instance, AT&T's computer when the

17   file passed through there.  When the file passes through there,

18   that server will give it a timestamp, and that timestamp is

19   unalterable from the user standpoint, and most users don't even

20   know it exists.  That would be a date that we would rely on.

21   So something that was not just from the standalone system that

22   would require some kind of corroboration or something outside

23   of the user's control.

24   Q.  In your experience, does the FBI rely on create dates in

25   metadata of a PDF file alone in determining the date on which a

1   document was created?

2   A.  No, we do not.

3   Q.  Now, what are some reasons that the create date in a PDF

4   file that's reflected in the file's metadata may not match the

5   actual creation date?

6   A.  A computer's clock is too easily changed.  It's very easy

7   to go down and change your time and date on the machine.  It's

8   also a standalone system.  It could just flat be wrong.  The

9   clock could be off, it could have been changed either

10  inadvertently or by, what's the word I'm thinking of, just, you

11  know, just out of habit or something of that nature that they

12  just change the time, date.

13          Also, your machine, when it's off, relies on a battery

14  to keep the clock up.  It's called the cmos battery.  If that

15  battery dies, the clock will revert to its beginning.

16  Q.  You mentioned in that answer the concept of changing the

17  clock on the computer.  How can a computer user change the

18  internal clock in the computer?

19  A.  On a Windows machine, you simply go down to where the clock

20  is displayed in the lower right-hand corner, right click on it,

21  and say adjust time and date.

22  Q.  Are there software products available that would allow a

23  user to change the create date reflected in the metadata on the

24  PDF file?

25  A.  There are a number of programs that will allow you to

1   change metadata on a PDF file or a Word file.

2   Q.  How can a computer user access such software?

3   A.  You just download it from the web.

4   Q.  What about methods inherent in the file itself that might

5   impact the nature of the file and whether it was created on

6   that particular day?

7   A.  I don't understand the question.

8   Q.  What methods, if any, could a user change the nature of a

9   file itself without impacting the create date that's reflected

10  in the metadata?

11          MR. TREMONTE:  Objection, leading.

12          THE COURT:  No, that's not a leading question.

13          THE WITNESS:  Once you have a particular file created,

14  you can go and edit that file all want, and the create date

15  will not change.

16  Q.  Now, do PDF files have metadata regarding dates of

17  modification?

18  A.  Yes, they do.

19  Q.  Sometimes I think it's referred to as a modify date; is

20  that correct?

21  A.  Yes, it is.

22  Q.  What does the modified date metadata reflect?

23  A.  It reflects the last time that a change was made to that

24  file and then that file was saved again.  So if you were to

25  change something in a file and then not save it, that date

1    would not be touched.  But if you change anything on the file

2    and then save it again, the modified date will be altered.

3              MR. BLAIS:  Ms. Sheinwald, could you please pull up

4    Government's Exhibit 509, which is already in evidence?

5    Q.  Mr. Flatley, do you see that document?

6    A.  Yes, I do.

7    Q.  You see at the bottom there's an email from Michael Hlavsa

8    to Stephen Weiss dated September 28th, 2010?

9    A.  Yes, I do.

10   Q.  Do you see that above that, there's an email from Stephen

11   Weiss --

12             THE COURT:  One second, please.

13             MR. BLAIS:  I'm sorry.

14             JURORS:  Thank you.

15             THE COURT:  Go ahead.

16   Q.  Do you see, Mr. Flatley, at the top that there's an email

17   from Mr. Weiss to an individual named Shant Chalian dated

18   September 28th, 2010?

19   A.  Yes, I do.

20   Q.  How many attachments are there to that specific email?

21   A.  There appear to be four attachments.

22             MR. BLAIS:  Your Honor, at this time, the government

23   offers, pursuant to a stipulation with defense, that we offer

24   Government's Exhibit 509A, 509B, 509C, and 509D, which are the

25   native files of the attachments that are attached to

1    Government's Exhibit 509.

2              THE COURT:  Any objection?

3              MR. TREMONTE:  No, your Honor.

4              THE COURT:  Received.

5              (Government's Exhibits 509A, 509B, 509C, 509D received

6    in evidence)

7              MR. BLAIS:  We would ask permission of the Court to

8    allow -- Mr. Flatley has a computer in front of him on which

9    these four files are saved, and we're going to ask him to open

10   the files and show things that are in the files to the jury.

11   We'd ask the Court's permission.

12             THE COURT:  Any objection?

13             MR. TREMONTE:  No objection.

14             THE COURT:  Go ahead.

15             MR. BLAIS:  Ms. Sheinwald, could you please publish

16   Mr. Flatley's screen?

17   BY MR. BLAIS:

18   Q.  Mr. Flatley, let me ask this question first.  Have you

19   analyzed the metadata in Government's Exhibits 509A through D?

20   A.  Yes, I have.

21   Q.  How did you go about doing that?

22   A.  I put them into a Forensic Toolkit, FTK.  I also viewed

23   them with Exif Tool and Xpdf.

24   Q.  You mentioned a couple of times in your testimony the tools

25   Exif and Xpdf.  Can you explain to the jury what those tools

1    are and what they allow you to do?

2    A.  The tools are made specifically to exact metadata from

3    files, embedded metadata in files.

4    Q.  Mr. Flatley, can you, for the jury, open Government's

5    Exhibit 509A?  Can you show the jury -- or can you access the

6    metadata in this document and show the jury the create date in

7    this particular document?

8    A.  Sure.  So the created date is right here.  Let's see if I

9    can highlight it.  No.  Created date is right here, the mouse

10   here.

11   Q.  What is that create date?

12   A.  That created date is September 27th, 2010, 4:21:56 p.m.

13            MR. BLAIS:  Just for clarity of the record,

14   Mr. Flatley opened Government's Exhibit 509 on his computer, he

15   went to the menu that is labeled "file" and opened that menu,

16   and then clicked on a link to "properties" in -- a window

17   popped up, and he is then reading what is after the term

18   "created" in the window that popped up.

19   Q.  Now, can you tell from the metadata that's reflected in

20   front of you how this particular document was created, how this

21   particular PDF was created?

22   A.  The application that created it is called PScript5.dll,

23   Version 5.2.2.

24   Q.  What, if anything, do you know about --

25            THE COURT:  Where are you seeing that, sir?

```
 1            THE WITNESS:  I'm sorry, your Honor.  It's two lines
 2    down from the created date where it says "application".
 3            THE COURT:  I see.  Okay.  What you may not realize,
 4    but I think the jury realizes, the print doesn't have the crisp
 5    clarity that you might otherwise have on something projected.
 6            JURORS:  It's a little blurred.
 7            THE COURT:  You said it better, blurry.  That's right.
 8    It's a simple word.  Why did I go for the difficult?  Go ahead.
 9    Typical lawyer.
10            MR. BLAIS:  We apologize for the blurriness.
11    Q.  Mr. Flatley, what, if anything, do you know about the
12    application that you just named, PScript5.dll?  What is that?
13    A.  I really couldn't tell you, but it is -- a DLL is an
14    executable file, which is called by another -- a DLL is a
15    dynamic link library.  When you have an executable file, you'll
16    have several -- or could have several DLLs behind it.  If the
17    publisher of the software wanted to change part of the program,
18    he wouldn't have to change the entire thing, he would just have
19    to change that one DLL.  That's the architecture they use for
20    that.
21    Q.  If you could close Government's Exhibit 509A, please.
22    Actually, just if you could actually just open 509A again for a
23    minute.
24    A.  I'm sorry?
25    Q.  If you could open 509A for a minute.
```

1    A.  Yes, sir.

2    Q.  Just, if you could just scroll down just to show the

3    jury -- maybe maximize the screen -- maximize the file and show

4    the jury what this document is.  Stop right there for a second.

5    A.  Sure.

6    Q.  Actually, go up a little bit.

7    A.  This way?

8    Q.  Yes.  Okay.  Just hold it there.

9            So if you can close this document, please, 509A, and

10   open Government's Exhibit 509B.

11           Again, for the jury's benefit, if you can just scroll

12   down for a minute in this document just so they can see what it

13   is.

14           This appears to be a letter from Mr. Barry Feiner

15   dated May 27th, 2010, correct?

16   A.  Yes, it does.

17   Q.  Now, can you access the metadata in this particular file,

18   please?

19           MR. BLAIS:  I would note for the record that

20   Mr. Flatley is accessing the metadata in the same method that

21   was previously described with respect to Government's

22   Exhibit 509A.

23   Q.  Now, Mr. Flatley, what is the created date, create date for

24   this particular document?

25   A.  The created date is May 27th, 2010, at 3:52:28 a.m.

1   Q.  Can you tell from the metadata how this particular document

2   was created?

3   A.  This particular document was created by a MacIntosh

4   computer, Mac OS-10, Version 10.5.8.

5   Q.  What do the letters and words that you just read, what does

6   that mean?

7   A.  That it was created by a MacIntosh computer.

8   Q.  If you can close down Government's Exhibit 509B, please,

9   and if you could open Government's Exhibit 509D, please.  If

10  you could scroll down for a minute just so the jury can get a

11  sense of what this document is.

12          It appears to be, if you could just stop there,

13  appears to be a warrant agreement dated March 29th, 2010.

14  That's what it says on the face of the document, correct?

15  A.  Yes, sir.

16  Q.  Can you access the metadata in this document?

17          MR. BLAIS:  Again, I'd note for the record that

18  Mr. Flatley is accessing the metadata using the same

19  methodology that's been previously described and is popping up

20  a window that lists the document properties.

21  Q.  Mr. Flatley, what is the create date reflected in this

22  particular document's metadata?

23  A.  It is April 9th, 2010, 11:05:03 p.m.

24  Q.  Can you tell from the metadata how this particular document

25  was created?

1   A.  It was created with the ScanSnap Manager.

2   Q.  And are you familiar with ScanSnap?

3   A.  Yes, I am.

4   Q.  What is that?

5   A.  It is a software package that Hewlett Packard makes for

6   their scanners.

7   Q.  Were you able to ascertain from the metadata anything about

8   the title of this document?

9   A.  Only the title that was originally given.

10   Q.  What tools, if any, did you use to reach that conclusion?

11   A.  I looked through it with FTK, and with Xpdf, and the Exif

12   Tool.

13   Q.  I know you've explained before the Exif and Xpdf tool, but

14   how do those tools let you see the metadata in a particular

15   document?

16   A.  They simply go into the portion of the file that holds the

17   metadata and parse it out, brings it out.

18   Q.  If you would close this document down.  Finally, if you

19   could open Government's Exhibit 509C, please.  Just scroll down

20   for a minute.

21        This appears to be a consulting agreement dated

22   January 22nd, 2010?

23   A.  Yes, sir.

24   Q.  Again, can you access the metadata on this particular

25   document?

1          MR. BLAIS:  I once again note for the record that

2   Mr. Flatley is accessing the metadata using the same

3   methodology that's been described.

4   Q.  Mr. Flatley, what is the create date reflected in this

5   document's metadata?

6   A.  This particular screen is not reflected.

7   Q.  Is there another place that you can go in the metadata to

8   find a create date?

9   A.  In this tab here.

10         MR. BLAIS:  I would note for the record that

11  Mr. Flatley is clicking on the tab in the window that's on the

12  screen, the tab labeled "Custom".

13  Q.  Having clicked on that particular tab, Mr. Flatley, what

14  does this particular window state is the create date of this

15  particular document?

16  A.  It says Thursday, July 1st, just after midnight, 19 minutes

17  37 seconds after midnight on 2010.

18  Q.  Can you tell from the metadata of this document how this

19  particular document was created?

20  A.  It says "PDF Producer, Pixel Translations, Pix PDF, Version

21  5.1.2.

22  Q.  Do you know what that is?

23  A.  I have never encountered that before, no.

24  Q.  Based on your training and experience, would the FBI rely

25  on the create dates alone that we've just gone through?

1              MR. TREMONTE:  Objection, asked and answered.

2              THE COURT:  I think he did ask that.

3              You're asking with regard to the specific document

4    here?

5              MR. BLAIS:  That's correct, your Honor.  I think I've

6    asked generally, and I'm asking specifically now.

7              THE COURT:  I'll allow it.  Go ahead.

8    Q.  I'll ask the question again, Mr. Flatley.

9              Based on your training and experience, would the FBI

10   rely on the create dates alone in the metadata of Government's

11   Exhibits 509A through D in determining the dates on which these

12   documents were created?

13   A.  No, we would not.

14             MR. TREMONTE:  Objection.

15             THE COURT:  Basis?

16             MR. TREMONTE:  Foundation, rely.

17             THE COURT:  Rely?

18             MR. TREMONTE:  The question is, does the FBI rely on

19   this.

20             THE COURT:  Rephrase your question.

21   Q.  Based on your training and experience, Mr. Flatley, would

22   the FBI conclude on the create dates alone in the metadata of

23   Government's Exhibits 509A through D that those documents were,

24   in fact, created on those dates?

25   A.  No, we would not.

1    Q.  What other information would you need to make that

2    determination?

3    A.  Some other kind of corroborating evidence.

4    Q.  So Mr. Flatley, in your opinion, can you conclude that

5    Government's Exhibits 509A through D were created on the dates

6    reflected in the metadata in those documents?

7    A.  I cannot.

8              MR. BLAIS:  No further questions.

9              THE COURT:  Cross examination.

10             MR. TREMONTE:  Thank you, your Honor.

11   CROSS EXAMINATION

12   BY MR. TREMONTE:

13   Q.  Good afternoon.

14   A.  Good afternoon.

15   Q.  You testified at the beginning of the direct that you've

16   been with the FBI for some time, correct?

17   A.  Yes, sir.

18   Q.  So you've testified only for the government, correct?

19   A.  Yes, sir.

20   Q.  That's part of your job, right?

21   A.  Yes, it is.

22   Q.  Now, you testified that you are familiar with a number of

23   programs that allow you to view the metadata in a document,

24   correct?

25   A.  Yes, sir.

1    Q.  One of those is FTK, right?

2    A.  Yes, sir.

3    Q.  Another is, I think you called it, Exif?

4    A.  Exif Tool, yes, sir.

5    Q.  And third is Xpdf, right?

6    A.  Yes, sir.

7    Q.  These are commercially available programs; is that right?

8    A.  Yes, they are.

9    Q.  None of this is sort of proprietary FBI technology, right?

10   A.  No, sir.

11   Q.  This is not software that is specifically designed for the

12   purpose of law enforcement forensic analysis, right?

13   A.  That is correct.

14   Q.  But in your view, these are adequate for the purpose of

15   gaining access to and viewing the information contained in the

16   metadata in a document, right?

17   A.  Yes, sir.

18   Q.  There's no other special tool that you could use to get

19   more information, right?

20   A.  Not that I'm aware of, no, sir.

21   Q.  Right.  Because if there were such a tool, you surely would

22   have used it, correct?

23   A.  Yes, sir.

24   Q.  You ran an analysis of the information presented to you by

25   the government through each of these three programs, right?

1   A.  Yes, I did.

2   Q.  You just walked us through what you found?

3   A.  Yes, sir.

4   Q.  You didn't find anything more than that about any of these

5   documents, correct?

6   A.  No, sir.

7   Q.  Nothing about any of those analyses indicated to you that

8   those dates that are reflected in those documents are

9   inaccurate, correct?

10  A.  No, sir.

11  Q.  All right.  And nothing about the analyses that you ran

12  indicated that any of the metadata had been intentionally

13  altered, correct?

14  A.  I could not be able to tell that just by looking at those

15  documents, no, sir.

16          MR. TREMONTE:  I have no further questions.

17          THE COURT:  Any redirect?

18          MR. BLAIS:  No, your Honor.

19          THE COURT:  Thank you.  You may step down.

20          THE WITNESS:  Thank you.

21          THE COURT:  Call your next witness.

22          MS. MERMELSTEIN:  Your Honor, the government calls

23  Special Agent Adam Fascio.

24          THE COURT:  All right.

25          MS. MERMELSTEIN:  Excuse me, your Honor.  I'm so

1    sorry.  The agent is actually just going to read from the

2    emails, so I don't actually think an oath is technically

3    necessary, but we have no objection.

4              THE COURT:  All right.

5              Ladies and gentlemen, there are certain emails that

6    are in evidence.  The government or the defense can publish

7    these to you by passing out the email and you pass it down the

8    aisle and read it, or they could publish it by putting it up on

9    the screen, or they could publish it in this instance by having

10   an individual read it.  So this individual is not offering

11   testimony, he's not a witness.  Please don't take this the

12   wrong way, but just as a projector projects the image of a

13   document, this is a reading from the document, and that's all

14   it is.  It has no additional weight because this individual is

15   reading it aloud.

16             Please be seated.

17   DIRECT EXAMINATION

18   BY MS. MERMELSTEIN:

19   Q.  Good afternoon.

20   A.  Good afternoon.

21   Q.  Where do you work?

22   A.  The United States Postal Inspection --

23             THE COURT:  Well, no.  This is not appropriate.

24   Either this individual is not a witness or they are a witness.

25   If they are a witness, then they have to take an oath.  I don't

 1    allow people to come in and identify where they work or what

 2    they do, et cetera, if they're not a witness.

 3                MS. MERMELSTEIN:  Your Honor, I take your point.  I

 4    think it's probably helpful just for the jury to understand the

 5    very, very basic who this is, so why don't we administer an

 6    oath.

 7                THE COURT:  Pardon me?

 8                MS. MERMELSTEIN:  I think if your Honor feels that's

 9    necessary, we should administer the oath so we can give those

10    five questions.  Thank you.

11                THE COURT:  All right.  So just for this portion, the

12    individual is a witness.  Go ahead.

13     SPECIAL AGENT ADAM FASCIO,

14         called as a witness by the Government,

15         having been duly sworn, testified as follows:

16                THE DEPUTY CLERK:  Please state your name and spell it

17    for the record.

18                THE WITNESS:  Adam Fascio.  A-d-a-m, F-a-s-c-i-o.

19    DIRECT EXAMINATION

20    BY MS. MERMELSTEIN:

21    Q.  Good afternoon.

22    A.  Good afternoon.

23    Q.  Where do you work?

24    A.  United States Postal Inspection Service.

25    Q.  What is your title?

1    A.  Postal inspector.

2    Q.  How long have you been a inspector with the Postal

3    Inspection Service?

4    A.  Approximately six years.

5    Q.  Today you're just going to go through some of the emails

6    that are in evidence in this case; is that right?

7    A.  Yes.

8    Q.  So let's start with Government's Exhibit 1210 in evidence.

9           MS. MERMELSTEIN:  If you can pull it up for the jury,

10   please.  If we can zoom in on the bottom half of that page, and

11   wait for it to come up.  It doesn't seem to be coming up, and

12   in the event of this possibility we have binders of these

13   emails for the jury, if that's acceptable to everyone.

14          THE COURT:  You may publish with hard copy if you

15   choose.  It's entirely up to you.

16          MS. MERMELSTEIN:  Thank you, your Honor.  Let's give

17   it --

18          THE COURT:  I say it's entirely up to you.  It's not

19   entirely up to you, it's up to me entirely, but that's an

20   acceptable way of proceeding.

21          MS. MERMELSTEIN:  That's why I asked.  Let's pass out

22   the binders, and if it comes up, we'll switch back to the

23   technical version, but just in case.

24          MR. TREMONTE:  Your Honor, may we take a minute to

25   confer?

1          THE COURT:  Yes.

2          (Pause)

3    BY MS. MERMELSTEIN:

4    Q.  So let's pull down what's on the screen, because we're

5    going to start with the first email in that binder.  Before I

6    direct your attention, Agent Fascio, to Government's

7    Exhibit 1003, it should be the first exhibit in those

8    binders --

9          JURORS:  The first one is 1002.

10         MS. MERMELSTEIN:  Okay.  We are going to start with

11   1003.  Let me ask you to all turn the page.  Okay.

12   Q.  So before we talk about 1003, Agent Fascio, let me ask you,

13   had you reviewed the result of an email search warrant on the

14   email account Ymer@europe.com?

15   A.  Yes, I have.

16   Q.  That's an account subscribed in the name Ymer Shahini,

17   pursuant to the stipulation?

18   A.  Yes.

19   Q.  Have you also reviewed the results of a search warrant on

20   an email account Galanis2008@gmail.com?

21   A.  I have.

22   Q.  Again, by stipulation, that's an account subscribed in the

23   name Derek Galanis?

24   A.  Yes.

25         MS. MERMELSTEIN:  Let's pull up Government's

1    Exhibit 250 for the moment, if the screens are working.  If

2    not, let me just remind the jury, that's the Shahini consulting

3    agreement dated January 22nd, 2010.

4              MR. TREMONTE:  Your Honor --

5              THE COURT:  Yes.

6              MR. TREMONTE:  -- I have a housekeeping issue of some

7    recourse, if we may approach?

8              THE COURT:  All right.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (At sidebar)

2           MR. TREMONTE:  One of the documents in the binder that

3    the jury currently has, which is the first one that went up on

4    the screen, it's not in evidence, and we did not --

5           THE COURT:  Which one?

6           MR. BIALE:  1210.

7           MS. MERMELSTEIN:  It actually wasn't shown to the

8    jury, but we asked for it to be called up.

9           MS. HECTOR:  I don't know that it's --

10          THE COURT:  One at a time, everyone.  This does not

11   relate to the binder, is that what you're saying?  Is this a

12   binder issue?

13          MR. TREMONTE:  I haven't seen the binder until now.

14          THE COURT:  Here's the binder.

15          MR. TREMONTE:  What I do know is that one of the

16   documents in the binder that the jury currently has is not in

17   evidence.  Beyond that, I don't know if there are additional

18   problems.

19          THE COURT:  Can you show me what the document is, just

20   so I have it?

21          MR. BLAIS:  I don't think that's accurate, I think it

22   came in yesterday pursuant to a stipulation.

23          THE COURT:  Let Mr. Tremonte first find the document

24   for me.

25          MS. MERMELSTEIN:  The confusion is --

1          THE COURT:  Stop.

2          Did you find the document?

3          MR. TREMONTE:  It's not in this binder.

4          THE COURT:  This is the binder -- I understand -- let

5   me now turn around.

6          Is this an exact copy of the binder that has been

7   given to the jury?

8          MS. MERMELSTEIN:  Yes, your Honor.

9          THE COURT:  Okay.  I go back to you now.

10          MR. TREMONTE:  So then my question is, and I apologize

11   for the interruption, Judge, I just want to make sure that all

12   the documents we all agree in the binder currently in the

13   possession of the jury are in evidence.

14          THE COURT:  Well, here is the binder.  Look at it and

15   tell me if there is some document that is not.  You're

16   representing they're all in evidence?

17          MS. MERMELSTEIN:  Yes, and I think the government's

18   used 1210, which is not in the binder, but which the government

19   does intend to publish to the jury with respect to this witness

20   is in fact in evidence pursuant to stipulation.  So perhaps we

21   need to confer on that.  But it's not in the binder, I do think

22   it's in evidence.

23          THE COURT:  All right.  As to 1210, please check your

24   stipulation and --

25          MR. TREMONTE:  So is there another binder with the

1    1200 series?

2              MS. MERMELSTEIN:  There is not, and this is going to

3    take us for sure until through lunch so I won't reference 1210,

4    we can talk at lunch and get back to you.

5              MR. TREMONTE:  Thank you, your Honor.  I apologize

6    again for the interruption.

7              THE COURT:  Okay.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (In open court)

2             THE COURT:  I have a note from one of our jurors.

3    "Your Honor, may we write on the exhibits?"  Implicitly, the

4    ones that have been handed out in the notebook with the

5    understanding that they will not be retrieved by any party, the

6    government or the defense, but will remain with the jurors, it

7    seems to me that, since they're allowed to take notes, I don't

8    see the problem in their taking notes on an exhibit.

9             Any objection from the government?

10            MS. MERMELSTEIN:  No, your Honor.

11            THE COURT:  From the defendant?

12            MR. TREMONTE:  No, your Honor.

13            THE COURT:  Okay, that's fine.

14            MS. MERMELSTEIN:  May I suggest from a recordkeeping

15   standpoint that everyone write their juror number or name on

16   the front?

17            THE COURT:  Very good idea.  Very good idea.  Thank

18   you, Ms. Mermelstein.  The housekeeping period is over.  We're

19   back to -- go ahead.  On the label would be best.  On the

20   label.  That way, you'll see it right away.  Right?

21            JURORS:  True.

22   BY MS. MERMELSTEIN:

23   Q.  We seem to be back in action with the electronics for the

24   moment.  We just pulled up Government's Exhibit 250, the

25   Shahini consulting agreement dated January 22nd, 2010.

```
1          Have you reviewed the emails in the Ymer@europe.com
2     and Galanis2008@gmail.com accounts for the month of January,
3     2010?
4     A.  Yes.
5     Q.  Any emails between Derek Galanis and Ymer Shahini in
6     January of 2010?
7     A.  No.
8     Q.  Any emails between Ymer Shahini and Jason, Jared, or Derek
9     Galanis?
10    A.  No.
11    Q.  Excuse me, or John Galanis?
12              MR. TREMONTE:  Objection, your Honor.
13              THE COURT:  Basis?
14              MR. TREMONTE:  I was under the impression that the
15    witness was a projector.
16              THE COURT:  Well, I was, but now we've gone beyond
17    that.  This is testimony.  I'm a little bit puzzled that I was
18    told it's not necessary to swear the witness, he's not going to
19    be testifying, maybe he is.  I'm going to allow it.  Go ahead.
20              MS. MERMELSTEIN:  Thank you, your Honor.
21              Government's Exhibit 251, if we can pull that up in
22    evidence, please.
23    Q.  That's the warrant agreement dated March, 2010.  Have you
24    similarly reviewed those two email accounts belonging to Derek
25    and Ymer for the month of March, 2010?
```

1    A.  Yes.

2    Q.  Any emails between them in that month?

3    A.  No.

4    Q.  Same question with regard to Jason, John, or JMG at

5    Sentinel Law Group email accounts.

6    A.  No.

7            MS. MERMELSTEIN:  Then let's turn now to Government's

8    Exhibit 1003, which I believe the emails in your binder are in

9    the order of the government's exhibit number, so we may jump

10   around a little.

11   Q.  But here's Government's Exhibit 1003.  Who is this email

12   from?

13   A.  Galanis2008@gmail.com.

14   Q.  And who is it to?

15   A.  Ymer Shahini.

16   Q.  What is the subject line?

17   A.  "A deal awaits".

18   Q.  What is the date of that email?

19   A.  Friday, May 21st, 2010.

20   Q.  Are there any emails in May of 2010 between Galanis2008 and

21   Ymer Shahini prior to this email we're looking at now?

22   A.  No.

23   Q.  Any emails between Ymer Shahini and Jason, John or

24   JMG@SentinelLaw?

25   A.  No.

1    Q.  If you'll read the content of the email itself.

2    A.  "We should talk my friend."

3    Q.  Let's turn to 1004, please.  What is the date of this

4    email?

5    A.  Saturday, May 22nd, 2010.

6    Q.  So the day after the email we just looked at?

7    A.  Yes.

8    Q.  Again, who is it from?

9    A.  Galanis2008@gmail.com.

10   Q.  That's the account that's subscribed to Derek Galanis?

11   A.  Yes.

12   Q.  Who is it to?

13   A.  Ymer Shahini.

14   Q.  What is the subject of that email?

15   A.  "It's a huge deal with huge cash flow".

16   Q.  What is the content?

17   A.  "All we need is a foreign national we trust which is where

18   you come in my friend.  Call me ASAP, 415 830 0997 any time day

19   or night."

20   Q.  Let's turn to Government's Exhibit 1005.  Again, who is

21   that to and from?

22   A.  It is to Ymer Shahini and from Galanis2008@gmail.com.

23   Q.  What is the subject line?

24   A.  "Meeting time".

25   Q.  Let me ask you to read just the first sentence of the first

1    paragraph.

2    A.  "It would be best if we could speak as early as possible."

3    Q.  Then if you could read the second paragraph.

4    A.  "If you have any brokerage information or banking

5    information of relationships you have for personal or business

6    accounts that would help."

7    Q.  Let me ask you to read the remainder.

8    A.  "This is it my friend.  A way for us to help each other and

9    our families.  Look forward to tomorrow.  Best, Derek."

10   Q.  Let's turn to Government's Exhibit 1012 in evidence.

11   Again, let's start with the TO/FROM.

12   A.  It is to Ymer Shahini and from Galanis2008@gmail.com.

13   Q.  What is the date of that email?

14   A.  Wednesday, May 26th, 2010.

15   Q.  What is the subject line?

16   A.  "Ymer sign and get back to me asap".

17   Q.  If we can turn to the next page, the attachment, what is

18   the date on this letter that's attached?

19   A.  May 26th, 2010.

20            MS. MERMELSTEIN:  If we can pull this up,

21   Ms. Sheinwald, side-by-side with the consulting agreement

22   that's Government's Exhibit 250.

23   Q.  Again, what was the date on the consulting agreement?

24   A.  January 22nd, 2010.

25            MS. MERMELSTEIN:  If we can pull that down,

1  Ms. Sheinwald.  Can you leave up, please, Government's

2  Exhibit 1012, and turn to the second page.

3  Q.  I'm going to ask you to read the first paragraph of that

4  letter.

5  A.  "Mr. Ymer Shahini (the "Seller") has acquired 10 million

6  warrants (the "Warrants") each exercisable for one Ordinary

7  Share (collectively, the "Shares") of GEROVA Financial Group.

8  Ltd (the "Company") at $7.00 per share.  The Seller has

9  exercised the Warrants pursuant to their cashless exercise

10  provision resulting in the issuance of an aggregate of

11  5,333,333 Shares to the Seller and the Seller is now selling

12  the Shares (the "Sale").

13  Q.  Let's turn to 1014, please, and let's start at the bottom

14  of this email chain, please.  If you can start with the email

15  on May 27th, 2010 at 4:04 a.m.  That's the email that we were

16  just looking at in the prior exhibit?

17  A.  It is.

18  Q.  How does Ymer respond to that email from Derek Galanis?

19  A.  "I forgot to mention according to this I'm rich!"

20  Q.  If we can go up to the top part of that email.  If you can

21  continue reading the back and forth between the two

22  participants, beginning with "if we do this right my friend".

23  A.  Right.  So at May 27th at 5:02 a.m.  Galanis2008@gmail.com

24  responded, "If we do this just right, my friend, we all may

25  be!"

 1          Then later on that day at 3:13 p.m. he also responded

 2   again, "If we do it wrong...well, let's not think about it."

 3          Then going further up there's a response from

 4   Ymer@europe.com on Thursday the 27th of May.  "You may make

 5   sure on your end and I'll do everything from my end as always.

 6   This might be the right moment?"

 7          Finally, from Galanis2008@gmail.com to

 8   Ymer@europe.com, again on Thursday, May 27th, "Indeed my friend

 9   everything its everything it looks like.  If you take care of

10   your end I will guarantee mine.  Together we cannot fail this

11   time."

12   Q.  Let's turn to Government's Exhibit 1024, please.  Who is

13   this email from?

14   A.  J Galanis.

15   Q.  Who is it to?

16   A.  Ymer.

17   Q.  What is the subject of the email?

18   A.  "Information on acquisition you brought".

19   Q.  Can you read the content of that email, please?

20   A.  "Weston Capital Management, LLC, an originator and

21   distributor of hedge funds.  Founded in 1993 and headquartered

22   in West Palm Beach, Florida, Weston Capital earns fees on

23   assets exceeding $1 million under management.  It has three

24   lines of business.  It originates and markets fund of funds; it

25   originates and markets single manager hedge funds; and it

1   raises capital to seed new hedge funds.  In the 2010, Weston

2   Capital and Harcourt AG formed a strategic alliance for

3   investment manager identification and fund seeding.  Harcourt,

4   a $4.5 billion alternative investments manager that is majority

5   owned by Vontobel Group, the $70 billion Swiss banking group,

6   is a leading global advisor of alternative investments for

7   institutional advisors."

8           THE COURT:  Look at the last word.

9           THE WITNESS:  I'm sorry.  "For institutional

10  investors."

11          MS. MERMELSTEIN:  Can we pull up government's

12  Exhibit 251 side-by-side with be 1024, please, Ms. Sheinwald?

13  Q.  Agent Fascio, let me ask you to read the first paragraph in

14  the warrant agreement that begins "whereas".

15  A.  "Whereas, the Gerova Financial Group. Ltd., the Company,

16  and Ymer Shahini, the Holder, agreed to a fee payable upon

17  performance pursuant to which the holder would be paid a fee,

18  the Fee, of 2 percent of the transaction value in connection

19  with the acquisition by the company of certain assets acquired

20  from affiliates of Weston Capital Management."

21  Q.  How long after the date on the warrant agreement is this

22  information about Weston being emailed to Ymer Shahini?

23  A.  A little over two months.

24  Q.  Let's move on to Government's Exhibit 1026, please.  If you

25  can run through the TO and FROM, please.

 1    A.  To Ymer Shahini and from Galanis2008@gmail.com.

 2    Q.  What is the subject?

 3    A.  "Today is a $60 K direct to you my friend".

 4    Q.  What is the content of that email?

 5    A.  "Send me your banking details."

 6    Q.  Let's move on to 1027, please.  Who is the sender and

 7    recipient of this email?

 8    A.  It is from Galanis2008@gmail.com and to Ymer Shahini.

 9    Q.  What is the subject?

10    A.  "Very important".

11    Q.  Let me ask you to read all the way down to the end of the

12    second paragraph.

13    A.  "Ymer.  Please download this onto your hard drive and

14    reattach it to your email.  Send it to:

15    Ginger.duran@cantone.com.  The brokerage house is our only sure

16    bet to liquidity BUT you cannot attach anything with my or

17    Jared's name to it.  The forms are already fully processed by

18    me (I took the liberty my friend, I hope you do not mind.  Time

19    is of the essence.)"

20    Q.  Let's turn to the next page which is the attachment.  What

21    is that document?

22    A.  It's a document entitled "Securities Account Agreement

23    Margin Account".

24    Q.  Whose name is at the top of that agreement as the signatory

25    of that?

 1  A.  Ymer Shahini.

 2  Q.  Now we're going to have to flip a couple more pages to get

 3  past that document.  We're going to go to Government's

 4  Exhibit 1028, please.  Who is sending that email?

 5  A.  It is from Galanis2008@gmail.com.

 6  Q.  Let me have you to read just the first two sentences.

 7  A.  "It has been a difficult day, my friend.  The original

 8  broker has refused the account.  These are the type of people

 9  Jason counts as friends and why our friendship is so

10  important."

11  Q.  Let me ask you to read one more sentence.

12  A.  "We are scrambling now to open several accounts that have

13  margin."

14  Q.  Let's turn to 1088.

15       MS. MERMELSTEIN:  If we can, Ms. Sheinwald, pull this

16  up side-by-side with the attachment to this email, which is the

17  second page of Government's Exhibit 1088.

18  Q.  While we're doing that, Agent Fascio, who is the sender and

19  recipient of Government's Exhibit 1088?

20  A.  The sender is from Jared M. Galanis to Derek Galanis.

21  Q.  What is the subject?

22  A.  "This is the power of attorney I had in mind".

23       MS. MERMELSTEIN:  If we can zoom back out, please.

24  Q.  What is attached to that email?

25  A.  It appears to be a power of attorney.

1   Q.  What is the date of the email that Jared Galanis sends to

2   Derek Galanis?

3   A.  June 17th, 2010.

4   Q.  What is the date on the uniformed statutory form power of

5   attorney that's attached to that email?

6   A.  May 25th, 2010.

7   Q.  Let's go to 1089.  Again, at the bottom, we're looking at

8   the same email we just looked at?

9   A.  Correct.

10  Q.  What does Derek Galanis do with that email from Jared

11  Galanis?

12  A.  I'm sorry.  Can you repeat that?

13  Q.  Sure.  Looking in the middle of the page, Galanis2008

14  forwards that email to Ymer Shahini; is that right?

15  A.  Yes.

16  Q.  What does he say in that email?

17  A.  "Do me a favor and sign and fax this back to Jared below.

18  It will give him comfort as a lawyer."

19  Q.  Then if we can turn to the attachment of that email.  Is

20  that just a signed version of that?

21  A.  Yes.

22  Q.  Let's go to 1090, please.  Who is this email from?

23  A.  J Galanis.

24  Q.  Who is it to?

25  A.  Ymer.

1   Q.  What is the subject?

2   A.  "Important".

3   Q.  What is the content of that email?

4   A.  "Can you be in Los Angeles on Monday?  Important.  All

5   good."

6   Q.  Just so we've gotten the dates right, Friday, June 25th, is

7   the date of that email.  That Monday is June 28th?

8   A.  Correct.

9   Q.  Let's go to 1091, please.  Who are the TO, FROM, and CC of

10  this email?

11  A.  It is to Derek Galanis, from Jared M. Galanis and CCd to

12  Sean Davis.

13  Q.  What is the subject?

14  A.  "Consulting agreement".

15  Q.  What is the date of this email?

16  A.  Tuesday, June 29th, 2010.

17  Q.  So one day after the Monday that was discussed?

18  A.  Yes.

19  Q.  What is attached to this email, if we can turn to the

20  attachment?

21  A.  It's the Shahini consulting agreement.

22          MS. MERMELSTEIN:  If we can go to the last page of the

23  consulting agreement, please, Ms. Sheinwald, and ladies and

24  gentlemen.

25  Q.  Who has signed that agreement?

1  A.  Ymer Shahini.

2  Q.  Has it been countersigned by anyone else?

3  A.  It has not.

4  Q.  Let's go to Government's Exhibit 1092, please.  Let's start

5  from the bottom of this email.  Who is the sender of email at

6  the bottom?

7  A.  Jason@holmbycompanies.com.

8  Q.  Who is it to?

9  A.  DG.

10 Q.  What is the content of that email?

11 A.  "Bro, great seeing you.  Your friend is a prince.  I am

12 comfortable.  Still have to deal with the other issue but I am

13 coming at that via Jared who has to stop participating and

14 wants to."

15 Q.  What is the date of that email?

16 A.  July 1st.

17 Q.  Then if you can read the back and forth up the chain.

18 A.  The next email is from Galanis2008@gmail.com to

19 Jason@holmbycompanies.  "Thanks Bro.  I knew he was the man.

20 He says thanks for everything."

21       THE COURT:  For the record, it literally says "Thx",

22 and then "Bro", but the jury understands.  The jury has the

23 document.

24       THE WITNESS:  Sorry.

25 A.  The next message in the chain is from DG to Jason Galanis.

1    "He's really hoping to be involved in the future deals.  Very,

2    very excited."

3    Q.  And then the last response?

4    A.  Again, it's from Jason@holmbycompanies.com to DG.   "I

5    suspect he will be."

6            MS. MERMELSTEIN:  Let's move to 1060, please.  Let me

7    ask everyone to do this one on the screen because it's in

8    color.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  So let's start with the e-mail that starts sort of in the

2    middle of the page.

3            Who is sending that e-mail?

4    A.  Ymer Shahini and the e-mail address is

5    ymershahini@hotmail.com.

6    Q.  Who are the recipients of that e-mail?

7    A.  Jimbelenis@raymondjames.com and irish_sd@yahoo.com.

8    Q.  Let me ask you to read the first question and answer in

9    that e-mail.

10   A.  "Does the hedge fund have a name?  Yes.  The Asia Special

11   Situation Acquisition Corp. acquired $540 million of the

12   Stillwater hedge funds."

13           THE COURT:  No.

14   A.  I'm sorry.

15           "Of the Stillwater funds.  I helped facilitate that

16   transaction.  My fee for this was 5 million shares of new corp.

17   GFC.  Transaction was in January 2010.  Asia Special Situation

18   became GFC."

19   Q.  Let me ask you to skip down to the question that begins,

20   "Does Mr. Shahini have any documentation?," and read from there

21   to the bottom of that e-mail.

22   A.  "To support this transaction?  I have the shares from the

23   fee.

24           "Is he holding the shares in certificate form or are

25   they currently held with another B/D (Edward Jones)?

1          "No certificates.  They are being held at CK Cooper.

2    I would like to diversify my assets instead of holding them all

3    in one place.  Also look for better commissions on my

4    transactions.  I heard Jim Belenis was good stock guy.  I hope

5    this helps.  Ymer Shahini."

6    Q.  Then if we can zoom back out, what does irish_sd@yahoo.com

7    do with that with e-mail chain?

8    A.  It looks like he forwarded it to Sammy Galanis,

9    galanis2008@gmail.com.

10   Q.  Then what does galanis2008 do with it?

11   A.  He sends it to Ymer Shahini.

12   Q.  We are going to skip 1062, which is in your binder, and go

13   to 1093.

14          If you can give us the to/from and the date, please.

15   A.  It's to galanis2008@gmail.com and jmg@sentinellawgroup.com.

16   And it's from ymer@europe.com.

17   Q.  Let's start with the top of that e-mail and read beginning

18   with "OK."

19   A.  "OK.  Some of the things that I believe would be

20   necessary/useful to have:

21          "1.  Prepare necessary paperwork/amendments register

22   partnership with Jason as legal entity in USA (followed with

23   necessary documents, charter, board of directors ...), it would

24   be nice to capitalize this partnership including a bank

25   account, etc.

1             "2.  Decision from me/Jason to put/invest/transfer

2    shares into this partnership (the legal entity should own the

3    shares and not an individual).

4             "3.  Written suggestions from Jason about investments

5    made to me.

6             "4.  Agreement with Sentinel Law about services

7    performed and to be performed (covering wires to SL).

8             "5.  A short plan to what we want to do with the rest

9    and how we will go forward."

10   Q.  Let me ask you to finish the section from "this side I

11   suggest."

12   A.  "1.  Incorporation of local company with your suggested

13   name to make the partnership both two ways.

14           "3.  Incorporation of company in Albania with same

15   name, same thing.

16           "2.  A bank account on partnership name – Jason would

17   have to come in for joint signatory account, Jason can

18   afterwards get a credit card and similar access to funds

19   locally that are transferred from USA or other countries, while

20   I can share my card with Derek."

21   Q.  Let's go to 1094.

22           THE COURT:  Ladies and gentlemen, this is a good

23   juncture to break for lunch.  Don't discuss the case among

24   yourselves.  Keep an open mind.  There is more to come.  See

25   you at 2:00.  Thank you.

1                (Jury exits courtroom)

2                THE COURT:  See you after lunch.

3                (Luncheon recess)

1          AFTERNOON SESSION

2               2:15 p.m.

3          THE COURT:  Bring our jurors in, please.

4          (Jury present)

5    ADAM FASCIO, resumed.

6          THE COURT:  Ms. Mermelstein, you may continue.

7          MS. MERMELSTEIN:  Thank you, your Honor.

8    BY MS. MERMELSTEIN:

9    Q.  I think when we broke we were just about to turn to

10   Government Exhibit 1094.

11         So who is this from and who is this to?

12   A.  It's from JMG to Ymer.

13   Q.  What is the subject of that e-mail?

14   A.  "Update on formalizing agreements."

15   Q.  If we can turn to the attachment to that, it should be the

16   next two pages, this is the same questions, or the same

17   comments that were listed in the prior Government Exhibit,

18   1093, in black, and in the blue is the answers.

19         So let's not reread the statements, but if you can

20   read the blue that's been added to this document.

21   A.  "Pursuant to the instructions from both you and Jason the

22   BHNR general partnership is being reformed in the State of

23   Wyoming with each of you assigning your right to a limited

24   liability company.  The paperwork will be sent electronically

25   to you by Tuesday morning with hard copies, if acceptable, to

1    you for execution in Frankfurt."

2    Q.  Then skipping down to the response to number 2.

3    A.  "I am consulting with Richard Reichler (I believe you have

4    met him) former chief tax counsel to Ernst & Young on the most

5    tax efficient manner to accomplish the partnership's

6    reorganization."

7    Q.  Then number 3, the response.

8    A.  "The investments were made pursuant to the partnership

9    agreement whereby Jason invested the funds for the partnership.

10   Included in the disbursements were secured loans for Jason."

11   Q.  Let's turn to the next page of this document, if you can

12   read the response.

13   A.  "Sentinel Law acted primarily as an intermediary on

14   instructions from the partners."

15   Q.  We are going to go to Government Exhibit 1063 now.  We are

16   going to go in chronological order.  The binders are in

17   government exhibit order.  Maybe it's easier to use the screen

18   but people have choices.

19         MS. MERMELSTEIN:  Let's pull up 1063, and if we can

20   start on the second page of that document.

21         If we can pull it side-by-side with the third page of

22   the document, I think that would make it easier.

23   Q.  Agent Fascio, let me direct your attention to the bottom of

24   the second page, the e-mail beginning with, "So a wire should

25   hit your account."

1        Who is sending that e-mail?

2   A.  Galanis2008@gmail.com.

3   Q.  Who is the recipient of that?

4   A.  Ymer Shahini.

5        THE COURT:  Stop.  We have a disconnect between what

6   is up on the screen, I think, and what you're directing the

7   jurors' attention to.

8        You are at Government Exhibit 1063, correct?

9        MS. MERMELSTEIN:  I am, your Honor.

10       THE COURT:  You're calling our attention to the second

11  page at the bottom where it says "So a wire should hit your

12  account," is that it?

13       MS. MERMELSTEIN:  Yes, your Honor.

14       THE COURT:  Under the date of July 9, 2010?

15       MS. MERMELSTEIN:  Exactly.

16  Q.  Now that we are all on the same page, who is sending that

17  e-mail?

18  A.  Galanis2008@gmail.com.

19  Q.  Who is receiving the e-mail?

20  A.  Ymer Shahini.

21  Q.  If you can read that e-mail, which goes from the bottom of

22  page 2 onto page 3?

23  A.  "Ymer, so a wire should hit your account today for USD

24  $85,000.  Please wire US $75,000 of it back to the account

25  below.  Please keep USD 5,000 to give me in Frankfurt.  And

 1  send the last $5,000 back to me Western Union today if you can.

 2  Thanks my friend.

 3          "We have much to talk about in Prague.  We need more

 4  internationals like yourself; loyal, fearless and wanting to

 5  move ahead.  I can't wait until I get there.  Let's talk on

 6  Skype in the morning.  Best, Derek."

 7          MS. MERMELSTEIN:  We can take down page 3.

 8  Q.  And then let's look at the next e-mail up in the chain, in

 9  the middle of page 2, beginning, "First, the wire is not in

10  yet."

11          Who is sending that e-mail?

12  A.  Ymer@europe.com.

13  Q.  Who is it to?

14  A.  Galanis2008@gmail.com.

15  Q.  Let me ask you to read that e-mail until the last paragraph

16  that begins "not to mention."

17  A.  "First, the wire is not in yet.  Second, there are two

18  issues with this one.

19          "As you know, we have the whole world monitoring us to

20  what we are doing in Kosovo, getting wire from U.S. and sending

21  it back right away would look fishy (and it money laundering).

22  However, I will do it, but I need a reason to why I am sending

23  this money to U.S.  They will ask for invoice number or some

24  other proof.

25          "All wires from Kosovo are strictly monitored by EU.

1          "Also, I would suggest I bring you 10-K to Frankfurt

2     rather than use Western Union, which is also very closely

3     monitored and I will be flagged."

4     Q.  How does Galanis 2008 respond?

5     A.  "All very good with the 10-K to me.  The other money must

6     come back.  You can say it's an investment or whatever.  Needs

7     to come as soon as it is in."

8     Q.  How does Ymer respond?

9     A.  "You will get your money.  I have no reason to keep it, but

10    need to give more concrete material so I can pass it to them

11    and avoid any potential issues and flagging as 'money la.'  You

12    know what I'm talking about."

13    Q.  Let's turn to the first page of this e-mail, please.

14          Picking back up at the bottom of that, how does

15    Galanis 2008 respond?

16    A.  "What do you suggest as a reason?"

17    Q.  Does Galanis 2008 send a follow-up e-mail?

18    A.  He does.

19    Q.  What does he say?

20    A.  "This is not a large transaction.  We had this discussion

21    before.  You told me the large NGOs in the region gave more

22    than enough cover for wires under a million.  It's how I

23    convinced Jason to hire you for this job.  I can't tell him

24    what you are telling me.  He will throw it in my face."

25    Q.  I am going to ask you to start that sentence one more time.

1    A.  "I can't now tell him what you are telling me.  He will

2    throw it in my face."

3    Q.  Let's jump to the very top e-mail from Derek Galanis to

4    Ymer Shahini starting, "I asked about this very point."

5            I am going to ask you to read it.

6    A.  "I asked about this very point ahead of time.  But no

7    problem.  You shall have an invoice.  I recommended you for

8    this job, Ymer.  It is my ass on the line.  John tells me you

9    tried to keep him from talking to the brokers at Raymond James.

10   Do you realize what this means?  You personality has always

11   done this.  It comes second nature to you.  You push people out

12   of the way for control.  You did it in the insurance business

13   and you are trying it now.  I was on the phone when you were

14   trying to say Jared shouldn't be giving you legal advice only

15   investment advice.  That was very embarrassing for me and the

16   trust that I convinced everyone to put in you.  Don't you

17   understand that there are three more of these planned in the

18   near future?  How do you expect these people to trust you if

19   you act like this?  You must contain your natural impulses to

20   control and trust in me, in our friendship.  It's why you are

21   at this deal in the first place."

22   Q.  Now let's go to Government Exhibit 1096, please.

23           Let's start at the bottom of that e-mail.  What is the

24   date of that e-mail?

25   A.  Tuesday, July 13, 2010.

1   Q.  Who is it sending it?

2   A.  Ymer@europe.com.

3   Q.  Let me ask you to read the first few sentences stopping at

4   "I will try to."

5   A.  "The wire is through, urgent, high priority.  It will hit

6   your account today.  I would need a copy of passport for Jason

7   to proceed with registration partnership here and in Albania.

8   You have to confirm the name of each entity.  Please do that

9   today.  I hope you're following up with John on the rest of

10  things as discussed."

11  Q.  How does Derek respond to that e-mail?

12        Let me ask you to read just the first sentence.

13  A.  "Thank you for your attention to the wire.  Everyone is

14  thankful."

15  Q.  Let me ask you to read the last paragraph of that e-mail

16  beginning "the partnership agreements."

17  A.  "The partnership agreements from here and the LLCs I will

18  be bringing with me.  I will have Jared working on the account

19  for the partnerships.  As to your concerns about the past

20  investments Jason will be creating an e-mail to you with the

21  instructions of what should be done and briefly citing the

22  reasons."

23  Q.  Then what is the top e-mail?

24  A.  "Jason just responded.  Passport is on the way."

25  Q.  Let's go to Government Exhibit 1098, please.

1          Let's focus on the bottom e-mail there.

2          Who is that e-mail from?

3    A.   Galanis2008@gmail.com.

4    Q.   Who is it to?

5    A.   Jason@holmbycompanies.com.

6    Q.   If you can read the content of that e-mail, please.

7    A.   "So Ymer is creating the partnerships in Albania and

8    Kosovo.  It gives him things to do and seem prudent in any

9    event.  He needs a copy of your passport to finalize them.  Is

10   that OK?"

11   Q.   How does jason@holmbycompanies respond?

12   A.   "Yes."

13   Q.   Let's move to Government Exhibit 1099, please.

14          Who is sending that e-mail?

15   A.   Ymer@europe.com.

16   Q.   Who is it to?

17   A.   Galanis2008@gmail.com.

18   Q.   What is the content of that e-mail?

19   A.   "Back."

20   Q.   I'm sorry.  The content of the e-mail.

21   A.   "My friend, I hope you're back home by now and I hope you

22   had no problems.  It was nice seeing you again and having some

23   fun.  I hope this trip was a refresh for you and will help you

24   to see a bigger picture for future deals.  As agreed, please

25   ensure that John and Jason are doing the paperwork.  Thanks,

1    Ymer."

2    Q.  Let's now go to Government Exhibit 1065, please.

3         We are going to start on the second page, please, in

4    the middle of the page.

5         Who is that e-mail from?

6    A.  Jim Belenis and it's marked jimbelenis@raymondjames.com.

7    Q.  Who is it to?

8    A.  Ymer@europe.com.

9    Q.  What is the content of that e-mail?

10   A.  "Have sold 8032 shares at average price $5.72 so far.  JB."

11   Q.  How does Ymer respond?

12   A.  "Dear Jim, once complete you can send copies of trade

13   reports to me and my attorney, Barry Feiner, at

14   gepfeiner@optonline.net.  You may also sell at 5.65.  Thanks."

15   Q.  Let's jump to the first page, please.

16        Looking at the bottom of the page, at that e-mail from

17   Jim Belenis to Ymer, if you can read that e-mail.

18   A.  "I will send you both the trade reports.  There are not a

19   bunch of shares out there.  Doing our best.  We don't want to

20   tip our hand.  15,552 traded at $5.71 so far."

21   Q.  Let's jump to the top of that e-mail from Jim Belenis to

22   Ymer.  What does that e-mail say?

23   A.  "Ymer, we sold 310,000 shares at 5.66 average price.  I did

24   not enter the additional 115,000 shares after you verbally told

25   me not to.  Thanks a bunch, Jim."

 1  Q.  Now let's go to Government Exhibit 1068, please.

 2          We are going to jump around in this one a little bit,

 3  but let's start on page 3.

 4          Let me direct your attention about a third of the way

 5  down the page where it says, "On Tuesday, July 20."

 6          Let me ask you the read the paragraph beginning

 7  "nevertheless."

 8  A.  "Nevertheless, I did get a copy of passport and an e-mail

 9  which is two lines long."

10  Q.  Let me interrupt you for a second.  Who is actually sending

11  this e-mail?

12  A.  Ymer@europe.com.

13  Q.  And now let me ask you to read the e-mail.

14  A.  "Nevertheless, I did get a copy of the passport and an

15  e-mail which is two lines long.  I am afraid such e-mail is not

16  enough.  The basic question, Why these wires were made?, is not

17  answered.  Wires in excess of 1.7 mil cannot be covered with

18  two sentences.  I believe that, especially for large amounts in

19  Stanwich Absolute Return, Taurus Global Opportunities Fund and

20  Emerging Markets Global Fund, there must be an additional paper

21  trail.  Was this a due, investment, shares, stock, loan or

22  whatever?  If you say OK, all this is covered by your and

23  Jason's partnership, actually is not as in agreement says."

24  Q.  Then let's jump to page 2, so up the e-mail chain.

25          In the e-mail from Wednesday, July 21, who is sending

1   that e-mail?

2   A.  Galanis2008@gmail.com.

3   Q.  Let me ask you to start reading from "I am glad you are

4   pushing" to the bottom of that e-mail.

5   A.  "I am glad you are pushing as far as deal structure goes.

6   It gives the necessary impetus to finalize everything.  I would

7   also like to remind you of the vast paper trail we have

8   accumulated towards the partnerships.

9        "Jason:  Credit facility at CK Cooper to margin your

10  stock for investments; the investment vehicles used including

11  Emerging, Stanwich, etc.

12       "Ymer:  White Energy deal in Kosovo.  Vast due

13  diligence about Lignite opportunities in Kosovo, the Wimax deal

14  for Kosovo.

15       "These things have been completed, my friend.  These

16  are concrete things that have occurred which are not able to be

17  disputed.

18       "I understand you want more of a paper trail for the

19  investments in Stanwich and the like.  Instructions to send the

20  money there.  I will get on that for you, my friend."

21       MS. MERMELSTEIN:  Ms. Sheinwald, if we can now blow up

22  the first page of this e-mail side-by-side with the second

23  page.

24  Q.  Let's look now in the middle of page 1 at the e-mail from

25  Galanis 2008 to Ymer on July 22.

1          Let me ask you to read the first three sentences of

2     that e-mail.

3     A.   "There is one thing I would like to say regarding all of

4     this.  You saw what happened from the unwinding of the margin

5     account.  From there you made the conclusion that things were

6     rushed, and indeed things were rushed."

7     Q.   Then let's continue on that e-mail on the second page, and

8     I am going to ask you to read the paragraph beginning, "I bring

9     this up only to express my final point."

10    A.   "I bring this up only to express my final point.  You have

11    asked for some things that you think will protect you that

12    will, in fact, actually harm you.  Paper trails are fine but

13    getting boxed into a situation we cannot explain is not the

14    thing to do.  You have asked to know information you really

15    shouldn't even want to know; not for anyone else's protection

16    but your own.  Let Jason have the difficulty of explaining the

17    wire allocations and where they were to go.  You earned this

18    fee out of a relationship with Jason cultivated over many

19    years of documented work:  White Energy, Lignite, Wimax, etc.

20    Jason got you a credit facility to borrow against CK Cooper

21    with the shares that were an unexpected windfall."

22    Q.   Then let me ask you to go down to the paragraph that begins

23    "you have asked for partnerships" and read that paragraph.

24    A.   "You have asked for partnerships and they are being

25    constructed with the best tax advantages for all.  But I need

1   you to trust in the fact that we have done these transactions

2   before and that we are doing everything necessary.  Some of the

3   things you have been asking for would be equivalent to me

4   telling you how to write software code.  It hurts you.  It does

5   not help.  When you make reasonable demands we have accepted

6   them, but there are moments where you lose yourself in

7   instinct.  For that, my friend, you need to trust me."

8   Q.  Let's jump back to the first page, and if I can direct your

9   attention to the top e-mail in the chain and ask you to read

10  that.

11  A.  "Ymer, sounds great, my friend.  Jason has identified a

12  buyer for 300,000 shares.  We need to act on this immediately

13  as this cash flow will see us through the rest of summer (in

14  addition to getting you paid and the partnership money for over

15  there).  The sale will be to long-term investors who look to

16  hold positions, meaning it will be people who will not run the

17  stock down.  But we need to be ready today to give Raymond

18  James instructions.  These friendly trades are rare and we need

19  to take advantage.  Talk to you soon, Derek."

20  Q.  Let's jump to 1103, please.

21        Looking at the e-mail that's on the bottom of the

22  page, who is sending that e-mail?

23  A.  Barry Feiner.

24  Q.  Who is it to?

25  A.  Ymer Shahini.

1   Q.  Let me give the jurors the chance to find the page.

2        Let me ask you to read the first paragraph down to the

3   end of the list of monetary amounts.

4   A.  "Ymer, as Jason will be traveling, he has requested that he

5   convey the following to you:

6        "It was fortuitous that there was sufficient interest

7   in GFC to create approximately $1,750,000 of liquidity.  Below

8   is a schedule of payments to be made from the aforementioned

9   proceeds.  In order to maintain the accounts in proper order I

10  request you send the funds from Raymond James & Co. to Barry's

11  escrow account with instructions that he disburse the funds at

12  my direction according to the schedule below.

13       "Investments:  $1,175,000 Noble/Gerova.

14       "325,000, 1920 Bell Air LLC.

15       Legal fees:

16       $100,000 Murphy.

17       25,000 Sentinel Law, PC.

18       50,000 B.B. Feiner, Esq.

19       Partner's draw:  $75,000 Ymer Shahini."

20  Q.  Let me ask you just to read the sentences that begin "in

21  addition, there is a smaller investment."

22  A.  "In addition, there is a smaller investment in 1920 Bell

23  Air LLC, which should be made.  This company owns a single

24  piece of real estate, which you saw on your last visit.  The

25  last appraisal placed a value of $8,250,000 on the property."

1   Q.  Then let's jump up to the e-mail above that, on July 26,

2   and if you can read Ymer's response -- excuse me.  Ymer is

3   sending that e-mail to Derek Galanis.  What does he say?

4   A.  "Deks, this is what I got from Barry, send me the text that

5   I need to send to Jim (instructions/wording) and I will do so."

6   Q.  Let's jump to 1002, please, which should be the very first

7   e-mail.

8           Starting at the bottom of that e-mail chain, who is

9   that e-mail from?

10  A.  Galanis2008@gmail.com.

11  Q.  Who is it to?

12  A.  Ymer Shahini.

13  Q.  What is the subject?

14  A.  "No word yet?"

15  Q.  And then jumping up to the response from Ymer, let me ask

16  you to read just the last sentence beginning "you stay cool."

17  A.  "You stay cool and whatever agreement you make with John, I

18  want out once for all, no more ties and use of my identity as

19  proxy."

20          MS. MERMELSTEIN:  The last e-mail, which is not in the

21  binders, but I understand the defense has withdrawn the

22  objection, is Government Exhibit 1210.

23          THE COURT:  Is it offered into evidence?

24          MS. MERMELSTEIN:  It's actually in evidence.  Thank

25  you.

```
 1                    Let's zoom in on the bottom portion of that e-mail.

 2                    Who is that e-mail from?

 3   A.   Gary Hirst.

 4   Q.   What e-mail address is reflected for Gary Hirst?

 5   A.   Gary@axiat.com.

 6   Q.   Let me ask you to read that e-mail.

 7   A.   "Dave, it was pleasure speaking to you.  As we just

 8   discussed, my two Cayman Islands hedge funds are expecting

 9   stock certificates for Jupiter Resources as follows:

10                    "Global Asset Fund Ltd., 6,250 shares.

11                    "Taurus Global Opportunities Fund Ltd., 100,000 shares

12   (two certificates, 50,000 shares each).

13                    "Attached are the certificates of incorporation for

14   these two companies."

15                    MS. MERMELSTEIN:  Nothing further, your Honor.

16                    THE COURT:  Any cross-examination?

17                    MR. TREMONTE:  Yes, your Honor.

18   CROSS-EXAMINATION

19   BY MR. TREMONTE:

20   Q.   Good afternoon.

21   A.   Good afternoon.

22   Q.   So I just want to make sure we have the e-mails right.

23                    Ymer@europe.com you understand, based on your

24   investigation, that's Ymer Shahini, correct?

25   A.   Yes.
```

1   Q.  And galanis2008@gmail, that's Derek Galanis?

2   A.  Yes.

3   Q.  Jmg@sentinellawgroup.com, who is that?

4   A.  The subscriber info comes back to Jared Galanis.

5   Q.  And jason@holmbycompanies.com, that's Jason Galanis,

6   according to your investigation, correct?

7   A.  That's my understanding, yes, sir.

8   Q.  You testified at the beginning of this session that you had

9   reviewed certain documents looking for communications involving

10  those e-mails and certain time frames, is that correct?

11  A.  Yes.

12  Q.  You found nothing in, I think it was January through, was

13  it April of 2010?

14  A.  Yes, sir.

15  Q.  But isn't it true, in fact, that there are e-mail

16  communications among the Ymer Shahini e-mail address and the

17  Galanis '08 e-mail address and others from the year before,

18  correct?

19  A.  The review I did was for that year, and I saw e-mails in, I

20  think, April of 2010, yes, sir.

21  Q.  I'm not sure --

22  A.  I'm not sure if I am answering the question.

23  Q.  Let me break it down.  I'm sorry.

24          These are not the only e-mails that you have reviewed

25  in connection with your investigation, correct?

1   A.  No, sir.

2   Q.  You have reviewed a great many, isn't that true?

3   A.  Not in these e-mail accounts.  My review was limited on

4   these e-mail accounts.

5   Q.  But isn't it true that there are e-mails that you reviewed

6   in connection with your investigation between these e-mail

7   accounts from '09, isn't that true?

8   A.  Not that I reviewed, sir.

9   Q.  You're sure that you didn't review any e-mails from '09?

10  A.  In the e-mail accounts you just referenced, no.

11  Q.  Let me show you something to see if it refreshes your

12  recollection about that.

13  A.  Sure.

14          MS. MERMELSTEIN:  Objection, your Honor.  He hasn't

15  said that he doesn't remember.

16          MR. TREMONTE:  He says he doesn't remember in these

17  e-mail accounts.

18          THE COURT:  I am going to allow Mr. Tremonte to do it.

19          Show just the witness, the attorneys and the Court

20  what has been marked for identification as Defense Exhibit

21  1700.

22  Q.  I will actually show you three exhibits.  Just look at

23  each.  Don't read aloud.  Let me know when you're done and we

24  will do the next two.  OK?

25          I don't know if you can see down at the bottom of each

1     page there is a Bates stamp.  I am going to ask you about

2     those.

3     A.  The way it comes up on my screen, I can't see the Bates

4     stamp.  It has to be raised a little bit.

5     Q.  Do you see it now?

6     A.  Yes.

7     Q.  You're familiar with the Bates stamp?

8     A.  Seeing it here, yes.

9     Q.  Go ahead.  Look at the document.  When you're done, I just

10    want to show you two more, and then I am going to ask you a

11    question.

12    A.  Yes, sir.

13    Q.  That was 1700.  Now I am going to show you Defense Exhibit

14    1701.

15            All set?

16    A.  Yes, sir.

17    Q.  And now I will show you Defense Exhibit 1702.

18            I am sure you were told before the court reporter

19    can't record a nod.

20    A.  Yes, I am finished.

21    Q.  Looking at these, does that refresh your recollection that

22    you reviewed e-mail communications between Shahini and the

23    Galanis e-mail accounts from 2009?

24    A.  It does not.

25    Q.  OK.  Turning back to the documents that you read from, I am

 1  not going to ask you to look at them all again, but I'm

 2  assuming that you know that Gary Hirst's e-mail address does

 3  not appear on any of these documents, correct?

 4  A.  Correct.

 5  Q.  Directing your attention to Government Exhibit 1014.

 6  A.  It's up.

 7  Q.  I think you actually read this passage from the second

 8  e-mail from the top:  "You make sure on your end and I'll do

 9  everything on my end as always."

10          Do you see that?

11  A.  Yes, sir.

12  Q.  The phrase "as always" suggests to you there has been a

13  history of a connection between the parties in the past,

14  correct?

15  A.  It does.

16  Q.  Directing your attention to Government Exhibit 1027.

17          Is it up?

18  A.  Yes, it's up.

19  Q.  You see there is a reference there to "once I'm awake we

20  can Skype"?

21  A.  Yes.

22  Q.  Do you have an understanding as to what Skype is?

23          MS. MERMELSTEIN:  Objection.

24          THE COURT:  I will allow it.

25  A.  I know Skype to be a method of communication.

1    Q.  It's a method of digital communication, is that right?

2    A.  It can be, yes.

3    Q.  Directing your attention to Government Exhibit 1063.

4            I am going to ask you to turn to the last page.

5            You see there is another reference to Skype there?

6    A.  Yes.

7    Q.  Again, as far as you know from reviewing this document,

8    it's referring to the same thing, a form of digital

9    communication?

10   A.  Yes, sir.

11   Q.  Directing your attention to Government Exhibit 1097.

12           MR. TREMONTE:  Sorry, your Honor.  I am going to have

13   to put it up on the elmo because I don't have additional

14   copies.

15           THE COURT:  All right.

16           MR. TREMONTE:  That's in evidence so everybody can see

17   it.

18   Q.  You see that on your screen?

19   A.  Yes.

20   Q.  There is a reference down at the bottom of the page, very

21   bottom, very end of the page, bottom right, to SMS.  Do you see

22   that?

23   A.  Yes.

24   Q.  What does that refer to?

25   A.  My understanding of it is that it is a messaging system.

1    Q.  What kind of a messaging system?

2    A.  I believe it's text.

3    Q.  In connection with your investigation, did you attempt to

4    obtain either the Skype messages referred to here or the SMS

5    messages referred to here?

6              MS. MERMELSTEIN:  Objection, your Honor.

7              THE COURT:  Wait till the end of the question.

8              MS. MERMELSTEIN:  I apologize.

9              THE COURT:  Sustained.

10             MS. MERMELSTEIN:  Thank you.

11             MR. TREMONTE:  Can I have a moment, your Honor?

12             THE COURT:  You may.

13             MR. TREMONTE:  Your Honor, may we approach?

14             THE COURT:  Sure.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1                    (At the sidebar)

2          MR. TREMONTE:  Your Honor, I think it's plain what I

3   would like to do.  The government has put this particular

4   witness's efforts in connection with the investigation in play.

5   I want to explore very minimally whether or not he followed up

6   on certain leads that, I think it's fair to suggest, would have

7   occurred to him in connection with the Skype, the SMS, and one

8   other document.  There is a copy of the consulting agreement

9   here that's signed by one party.

10         The argument that's go going to be made from these

11  documents has to do with the dating.  It is clear as day, the

12  reason why this witness has been asked these questions about

13  these particular documents is to show the participation of Ymer

14  Shahini did not begin until May, and from that the government

15  is going to argue, I expect, that the documents were backdated

16  and that is something our client participated in.

17         It's clear -- we will be able to show -- that there

18  were communications between the people on these e-mail

19  addresses dating back to early and mid-2009 on related topics.

20  They also put the metadata issue in play by putting on their

21  witness.  I think it's fair to ask a limited number of

22  questions about investigative techniques with respect to

23  follow-ups on Skype, SMS, and the metadata of the one document

24  that they had him read from, which attaches a copy of the

25  consulting agreement signed by an Ymer Shahini and no one else.

1    THE COURT:  You asked a question.  I sustained an

2  objection.  You asked for a sidebar.  Nothing you have said

3  changes my ruling on the last question.

4    (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                (In open court)

2                MR. TREMONTE:  I have no further questions, your

3    Honor.

4                THE COURT:  All right.  Any redirect?

5                MS. MERMELSTEIN:  No, your Honor.

6                THE COURT:  You may step down.

7                (Witness excused)

8                THE COURT:  Call your next witness.

9                MS. HECTOR:  The government calls Nazan Akdeniz.

10    NAZAN AKDENIZ,

11          called as a witness by the government,

12          having been duly sworn, testified as follows:

13                THE DEPUTY CLERK:  State your name and spell it for

14    the record, please.

15                THE WITNESS:  My name is Nazan Akdeniz, N-A-Z-A-N,

16    last name is spelled A-K-D-E-N-I-Z.

17                THE COURT:  You may inquire.

18                MS. HECTOR:  Thank you, your Honor.

19    DIRECT EXAMINATION

20    BY MS. HECTOR:

21    Q.  Good afternoon, Ms. Akdeniz.

22    A.  Good afternoon.

23    Q.  Where do you work?

24    A.  Roth Capital Partners.

25    Q.  What is Roth Capital Partners?

```
1   A.  An investment banking firm.

2   Q.  How long have you worked there?

3   A.  For 19 years.

4   Q.  What do you do?

5   A.  I am the director of corporate services as well as the

6   director of operations, and I am also in equity capital

7   markets.

8   Q.  Ms. Akdeniz, did there come a time in May 2010 when you

9   learned of a brokerage account that had been opened at Roth in

10  the name Ymer Shahini?

11  A.  Yes, I did.

12  Q.  Are you familiar with the contents of that account?

13  A.  Yes, I am.

14  Q.  What was held in that account when it was opened?

15  A.  5,333,333 shares of Gerova Financial.

16  Q.  At the time, do you know approximately what those shares

17  were worth?

18  A.  Approximately, $70 million.

19  Q.  Were any shares of Gerova sold from that brokerage account?

20  A.  No, they were not.

21  Q.  What happened to that account?

22  A.  The account was closed.

23  Q.  I am going to ask you more questions, Ms. Akdeniz, about

24  that account.  First let me talk about your personal

25  background.
```

1    Did you complete a bachelor's degree?

2  A.  Yes, I did.

3  Q.  When did you complete it and from what school?

4  A.  December of 1999, Chapman University.

5  Q.  When did you say you joined Roth Capital?

6  A.  In 1997.

7  Q.  So you completed your degree while you were working at

8  Roth?

9  A.  That is correct.

10  Q.  So what were you doing for employment immediately prior to

11  joining Roth Capital?

12  A.  I worked at Sutro & Co.

13  Q.  What kind of company is that?

14  A.  An investment banking firm.

15  Q.  Now, when you joined Roth in 1997, what was your title at

16  that time?

17  A.  Director of operations.

18  Q.  Could you just briefly describe for us how your role

19  changed or your title changed from 1997 up until the summer of

20  2010, which is the period we are going to be focused on.

21  A.  When I first joined the firm in 1997, I was asked to come

22  in and help provide policies, procedures and processes to add

23  some more structure to the firm.  Shortly after that, in 1999,

24  I was asked to be the head of compliance, which I did for the

25  following seven years.  And then after that, in 2006, I moved

1  into the director of corporate services, and I continued to

2  oversee operations, but I also moved into the equity capital

3  markets department.

4  Q.  Could you just briefly describe, what does compliance mean?

5  A.  Compliance is setting policies and procedures.  The firm

6  has to follow Securities and Exchange Commission as well as

7  FINRA rules and regulations.  And it's ensuring that there are

8  policies and procedures and processes within the organization

9  to make sure that we are following those rules and regulations.

10  Q.  So when you talked about your role in 2010, you gave your

11  titles, I just want to focus in on one portion of that.  Was

12  part of your supervisory role supervision over retail brokerage

13  accounts?

14  A.  Yes, it was.

15  Q.  What is a retail brokerage account?

16  A.  A retail brokerage account is an account opened by an

17  individual as opposed to, let's say, an institutional account,

18  which might be that run by a portfolio manager of a mutual

19  fund, or a hedge fund manager of a hedge fund, where the level

20  of sophistication might be higher in an institutional account.

21          (continued on next page)

22

23

24

25

1    BY MS. HECTOR:

2    Q.  If John Smith walked in off the street and wanted to open a

3    brokerage account at Roth would that be a retail brokerage

4    account?

5    A.  That is correct.

6    Q.  Now let's turn back to the Ymer Shahini account.  How did

7    that account first come to your attention?

8    A.  One of the retail brokers at Roth Capital, John Weber,

9    brought it to my attention.

10   Q.  Approximately when is it that he brought it to your

11   attention?

12   A.  In May of -- sometime in May of 2010.

13   Q.  Did he bring to your attention every single retail account

14   that would be opened at Roth?

15   A.  No, he did not.

16             MR. BIALE:  Objection.

17             THE COURT:  Overruled.

18   Q.  Did you have an understanding as to why Mr. Weber brought

19   this account to your attention?

20             MR. BIALE:  Objection.

21             THE COURT:  Sustained, at least as to form.

22   Q.  What did Mr. Weber tell you about the account?

23             MR. BIALE:  Objection.

24             THE COURT:  I'll allow it, not for the truth of its

25   content.

1          MS. HECTOR:  Thank you, your Honor.

2          THE WITNESS:  He told me that a large amount of shares

3    had been electronically delivered into the account.

4    Q.  Did you understand from what he told you whether those

5    shares were restricted or free trading?

6          MR. BIALE:  Objection.

7          THE COURT:  Let me see you at sidebar.

8          (Continued on next page)

1       (At sidebar)

2       THE COURT:  If not for the truth of its content, then

3   why is it admissible at all?

4       MS. HECTOR:  Well, now I'm not asking about what

5   Mr. Weber told her, I'm asking did she have an understanding as

6   to whether the shares in the account were free trading or not

7   free trading.

8       THE COURT:  Based on what?

9       MS. HECTOR:  I can ask her what the basis of that is.

10      THE COURT:  Yes.

11      MS. HECTOR:  But my understanding is because they were

12  electrically transferred into the account by DWAC, she

13  understood them to be free trading shares.

14      MR. TREMONTE:  Just a precautionary point, your Honor,

15  which may ripen into a request for a curative instruction.  We

16  had testimony from Professor Laby as to the meaning of Reg S,

17  which I generally understood to mean that if you had Reg S

18  shares, and you're an offshore person, they may be free trading

19  in Kosovo or somewhere outside of the United States, but not

20  here.  This is a distinction that I fear is getting lost on the

21  jury every time a witness who doesn't appreciate that answers

22  "yes" to the question "were the shares free trading".  So I

23  think it's appropriate to elicit a more secure foundation for

24  this testimony which is central to the case.

25      MS. HECTOR:  Your Honor, the fact is, the shares came

1    into the account in a free trading status.  How they came to be

2    free trading is not for this witness.

3              MR. TREMONTE:  Your Honor, that is not true.  The

4    documents show that is not true.  In this account and in the

5    account to which they are transferred, those shares have a

6    designation next to them on each and every page where they

7    appear that says "Reg S".  So if the brokerage firm was corrupt

8    and permitted those shares to be freely traded, that is

9    importantly different from their actually being freely

10   tradeable.

11             THE COURT:  This is something to be sorted out in the

12   testimony.

13             MR. TREMONTE:  Thank you, your Honor.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  Go ahead.

3   BY MS. HECTOR:

4   Q.  Ms. Akdeniz, do you know how those shares were traded into

5   the account?

6   A.  The Roth Capital account?  Yes, I do.

7   Q.  How were they transferred in?

8   A.  They were electronically transferred into the DWAC system

9   from the company's transfer agent.

10  Q.  When shares are transferred via DWAC, what form do they

11  come into the account; electronic or in some sort of paper

12  form?

13  A.  Electronic form.

14  Q.  What is your understanding as to whether shares in

15  electronic form are restricted or unrestricted?

16          MR. BIALE:  Objection.

17          THE COURT:  I'll allow it.

18          THE WITNESS:  Okay.  My understanding is when they

19  come in in electronic form, they are freely tradeable.

20  Q.  I'd like to call your attention to what is in evidence as

21  Government's Exhibit 302.

22          MS. HECTOR:  Ms. Sheinwald, we can pull that up on the

23  screen for both the jurors and Ms. Akdeniz.

24  Q.  Ms. Akdeniz, I also have paper copies in front of you in

25  case you prefer to look at the documents in that form.

1    　　　　Do you see this document?

2    A.  Yes, I do.

3    Q.  What is this document?

4    A.  It's a statement for Ymer Shahini that covers the month of

5    May, 2010.

6    Q.  Who does it indicate this account belongs to on this form?

7    A.  Ymer Shahini.

8    Q.  Who is indicated as the Roth representative for the

9    account?

10   A.  John Weber.

11   Q.  Does this document indicate the total value of the equities

12   in the account?

13   A.  Yes, it does.

14   Q.  What is that total value?

15   A.  $68,373,329.06.

16   Q.  Could we turn to the second page of this document?  Does

17   this document indicate the contents of the account?

18   A.  Yes, it does.

19   Q.  What are the contents as indicated on this document?

20   A.  5,333,333 shares of Gerova Financial.

21   Q.  Does this document indicate the date that they were

22   received into the account?

23   A.  Yes, it does.

24   Q.  What is that date?

25   A.  May 27th, 2010.

1   Q.  Is there an indication for "via DWAC" on this statement

2   under the description of Gerova Financial?

3   A.  Yes, there is.

4   Q.  Is that the method of transfer that you were just

5   discussing?

6   A.  Yes, it is.

7   Q.  To your knowledge, at the time that this account came to

8   your attention, did the client Ymer Shahini have a previous

9   relationship with Roth Capital?

10  A.  No, it did not.

11  Q.  Did you know at the time how the client came to Roth

12  Capital?

13              MR. BIALE:  Objection, foundation.

14              THE COURT:  No.  Perfectly fine question.  Did you

15  know at the time how the client came to Roth Capital?  You may

16  answer.

17              THE WITNESS:  Thank you.  It was -- my understanding

18  is it was --

19              THE COURT:  Well, no -- how did you know?

20              THE WITNESS:  I'm sorry.  I didn't mean to say that.

21              THE COURT:  Okay.

22              THE WITNESS:  The account was referred in by the

23  investment banking department of Roth Capital, because Roth

24  Capital had completed an investment banking transaction for

25  Gerova Financial, and this account was referred in by the

1   company to Roth Capital Partners.

2   Q.  By "the company", are you referring to Gerova?

3   A.  Yes, I am.

4   Q.  Are you familiar with the nature of that investment banking

5   transaction in general?

6   A.  Generally, I am, yes.

7   Q.  Generally, what was the nature of that transaction?

8   A.  It was a SPAC, which is a special purpose acquisition

9   corporation is what it stands for, for the company to acquire

10  assets and become a business combination and merge with another

11  to create a company.

12  Q.  I understand you were generally aware of what that

13  transaction was.  Were you involved in that transaction on

14  behalf of Roth Capital?

15  A.  No, I was not.

16  Q.  When you learned that this account had been opened and that

17  there were over 5 million shares of Gerova in the account, what

18  was your reaction?

19  A.  I wanted to learn more about where -- who the customer was

20  and how the shares were acquired.

21  Q.  Why was it important for you to understand who the customer

22  was and how the shares had been acquired?

23          MR. BIALE:  Objection, your Honor.

24          THE COURT:  Overruled.

25  Q.  You may answer.

1  A.  Thank you.  It was important because relative to the

2  size -- I don't remember exactly what the market cap -- the

3  value of Gerova Financial was at that time, but $70 million

4  worth of securities of a company is a lot of securities, and as

5  an investment banker brokerage firm --

6          MR. BIALE:  Objection.

7          THE WITNESS:  -- you have to follow rules and

8  regulations.  If you have an individual who owns, for example,

9  more than 10 percent of a security, we have to follow certain

10  manner of sale provisions and make sure that we have company

11  approval and different things like that.  So it was just

12  important that we also knew who this person was and also made

13  sure that we were going to sell the securities within the

14  regulatory rules.

15  Q.  Could you just outline for us, what are the various steps

16  that you took to try to obtain information about who this

17  person was and how they obtained their shares?

18  A.  I asked our, at the time, the person who was the head of

19  compliance to run a background check on the account through our

20  clearing firm.  I also reviewed the new account file, just to

21  see if there may be anything in the file that may be helpful to

22  me in making the determination.  I also looked at SEC.gov for

23  the company Gerova Financial's public filings.  Since I was

24  dealing with a public company, I wanted to do a name search, a

25  keyword search within some of the filings just to see if I can

1    locate this individual's name within the filings to see if

2    maybe he was -- or she, I'm not sure -- oh, he, I know it's a

3    he -- to see if he was somehow affiliated to the company and

4    obtain information through that method.

5    Q.  We're going to walk through each of the things you did.

6    Let's start with, you mentioned you looked at the account

7    opening documents.  I'd like to draw your attention to what's

8    in evidence as Government's Exhibit 301.  Let's just look.

9    You're only seeing the first page of this document, but in

10   front of you in the folder marked 301 is several documents.

11           What is this collection of documents?  Do you know?

12   A.  Yes.  It's a new account application.

13   Q.  Let's just focus in on the top portion of this application,

14   the "account information" section, a little further down.  Just

15   that first box.

16           Is this the documentation that Roth received for

17   opening the account in the name of Ymer Shahini, or at least

18   part of the documentation?

19   A.  Yes, it is.

20   Q.  What is the account name we have?

21   A.  Ymer Shahini.

22   Q.  Is a home address provided?

23   A.  Yes, it is.

24   Q.  In what country is that home address?

25   A.  Czech Republic.

1  Q.  Does this document ask if the person is a U.S. citizen?

2  A.  Yes, it does.

3  Q.  What is the answer reflected in the document?

4  A.  "No".

5  Q.  What country is provided for the country of citizenship?

6  A.  Kosovo and Canada.

7  Q.  Then does this document ask for the employer?

8  A.  Yes, it does.

9  Q.  In what country is the employer of this individual

10 indicated to be in?

11 A.  In Greece.

12 Q.  Did Roth Capital also receive a copy of the passport of

13 Ymer Shahini in connection with the opening documents?

14 A.  Yes, we did.

15 Q.  Let's look at Government's Exhibit 305 that's in evidence.

16 I mean 306.  I'm sorry.  Is this a copy of the passport that

17 Roth received?

18 A.  Yes, it is.

19 Q.  What is the country of citizenship listed on the passport?

20 We can blow it up for you if that's helpful.  The country of

21 nationality?

22 A.  Canada.

23 Q.  And the country of birth?

24 A.  Kosovo.

25 Q.  So what was your reaction to, first, your review of the

1    account opening documents in connection with this account?

2    A.  I felt like I needed to do some more diligence because,

3    when I looked at the new account application, I learned that it

4    was a foreign account.

5    Q.  Why did that cause you to think that you needed to do some

6    more diligence?

7    A.  Well, for foreign accounts, they're sometimes used as ways

8    to --

9            MR. BIALE:  Objection.

10           THE WITNESS:  -- for anti-money laundering or

11   cleansing securities.

12           MR. BIALE:  Objection.

13           THE COURT:  I'm sorry?

14           MR. BIALE:  Objection.

15           THE COURT:  Okay.  Overruled.

16   Q.  You may answer.

17   A.  And so within the financial institutions, we have a

18   heightened level of diligence that's required for foreign

19   accounts so that, as I mentioned, for anti-money laundering or

20   the cleansing of securities, we just want to make sure that we

21   do more diligence on the person that's going to be selling the

22   securities.

23   Q.  Ms. Akdeniz, you mentioned also that you ran a background

24   check.  Do you recall what the results of that background check

25   were?

 1   A.  Yes, I do.

 2            MR. BIALE:  Objection.  I'm sorry.  Withdrawn, your

 3   Honor.

 4   Q.  What were the results of that background check,

 5   Ms. Akdeniz?

 6            MR. BIALE:  Objection.

 7            THE COURT:  Overruled.

 8   Q.  You may answer.

 9   A.  There were no negative findings.

10   Q.  You mentioned that you reviewed public filings.  What do

11   you mean by "public filings"?

12   A.  As I mentioned, a public company is required to file their

13   financial quarterly filings, as well as annual filings, with

14   the SEC, with the Securities and Exchange Commission.  They

15   also file registration statements with the Securities and

16   Exchange Commission, and all of these documents -- there might

17   also be a prospectus -- and all of the documents would be

18   publicly available for anyone to look at on the SEC's website.

19   Q.  Did you look at what was publicly available for Gerova at

20   the time?

21   A.  At the time, yes, I did.

22   Q.  What was the purpose of looking at those things?  What were

23   you looking for?

24   A.  I was just searching through the documents to basically do

25   a keyword search and looking at the documents to see if I can

1    locate Ymer Shahini's name within any of the documents.  Again,

2    to see if I can find out if he's either an affiliate of the

3    company, or somehow had some type of other affiliation other

4    than being a part of management, or on the board, or anything

5    of that nature.

6    Q.  What were the results of your review?

7    A.  I was not.

8            MR. BIALE:  Objection.

9            THE COURT:  You have to keep your voice up because

10   it's not clear whether you're objecting or not.  So that was an

11   objection, right?

12           MR. BIALE:  Yes, your Honor.  I apologize.

13           THE COURT:  One second, please.  Overruled.

14   Q.  You may answer, Ms. Akdeniz.

15   A.  Can you repeat the question, please?

16   Q.  I'm sorry.  What was the result of your review of those

17   materials which you described as searching for the name Ymer

18   Shahini?

19   A.  I was not able to locate his name in the filings.

20   Q.  I believe you also said that you spoke to people internally

21   at Roth to see if you could discern additional information

22   about Ymer Shahini.  Do you recall that?

23   A.  Yes, that is correct.

24   Q.  Were you able to obtain any additional information as a

25   result of those conversations that satisfied your concerns?

 1    A.  I spoke to Ted Roth, who is the president of Roth Capital

 2    Partners, who is one of the people in investment banking who

 3    had a relationship with the company, to see if he could either

 4    call the company or, maybe if he himself had additional

 5    information or knew of this person, and who could help provide

 6    some information to us regarding this account.

 7    Q.  Were you able to obtain information as a result of that

 8    conversation that satisfied your concerns?

 9    A.  I know he called the company and as a result of his --

10            MR. BIALE:  Objection, your Honor.

11            THE COURT:  Sustained.

12    Q.  Ms. Akdeniz, did you reach out to Ymer Shahini yourself?

13    A.  No, I did not.

14    Q.  Did you reach out to the company yourself?

15    A.  No, I did not.

16    Q.  Why didn't you reach out?

17    A.  Since the firm had an investment banking relationship with

18    this company, Gerova Financial, it's pretty customary for a

19    firm like ours to have accounts opened as a result of an

20    investment banking relationship with a public company.  So it

21    was customary in these types of instances, if I needed

22    additional information, for me to go to the investment banker,

23    or the head of investment banking, Ted Roth, for that

24    additional information.

25    Q.  Is that because Mr. Roth had the relationship, not you?

 1   A.   That is correct.

 2   Q.   Now, in addition to the brokerage account that was opened,

 3   did there come a time when a request was made by or on behalf

 4   of Mr. Shahini for a margin account?

 5   A.   Yes, there was.

 6   Q.   What is a margin account?

 7   A.   A margin account is an account where you borrow funds

 8   versus securities in your account from an account that you own.

 9   Q.   So when you said "versus securities", do you mean that the

10   loan would be secured by those securities?

11   A.   That is correct.

12   Q.   In those instances, who is the entity that actually loans

13   the money?  Is it Roth Capital?

14   A.   No, it is not.

15   Q.   Who is it?

16   A.   Ridge Clearing at the time was Roth Capital's clearing

17   firm, and they are the ones who are responsible for custodying

18   assets for customers, as well as providing the loans, although

19   the ultimate liability and responsibility still lies with Roth

20   Capital Partners as the introducing broker.

21   Q.   To your knowledge, did Ymer Shahini request an actual loan

22   backed by his Gerova shares?

23   A.   Yes, he did.

24   Q.   How much money did he request?

25   A.   $500,000.

1    Q.  Do you recall to whom he asked that those funds be wired?

2    A.  Yes, I do.

3    Q.  Who was that?

4    A.  Sentinel Law, Jared Galanis.

5    Q.  Did Roth Capital, via its clearing firm, loan that money on

6    that account?

7    A.  No, we did not.

8    Q.  Why not?

9    A.  The account was closed.

10   Q.  In response to your concerns or your questions about the

11   origin of these shares, did Roth receive any additional

12   documentation regarding the Shahini shares?

13   A.  Yes, we did.

14   Q.  From whom did Roth receive that additional documentation?

15   A.  Jared Galanis.

16          MS. HECTOR:  Let me call your attention to

17   Government's Exhibit 304, if we could pull that up on the

18   screen.  This is already in evidence.

19   Q.  Ms. Akdeniz, what are we looking at here?

20   A.  An email from Jared Galanis to the Roth Capital retail

21   representative, John Weber.

22   Q.  Just to be clear, we're focused on the email in the middle

23   of this page.

24   A.  Yes.

25   Q.  What is the date of that email?

1   A.  June 8th, 2010.

2   Q.  This is just a couple weeks after the account is opened in

3   late May, right?

4   A.  That is correct.

5   Q.  Maybe not even a couple weeks, by my math.  What is the

6   subject of this email?

7   A.  "Gerova stock documentation".

8   Q.  And there's a CC on this email, Meghann Moser.  Who is

9   that?

10  A.  John Weber's assistant.

11  Q.  If we look at the top of this email, what does John Weber

12  do with this email he received from Jared Galanis?

13  A.  He forwarded the email to me.

14  Q.  With attachments?

15  A.  That is correct.

16  Q.  After you received this email, did you review the

17  attachments?

18  A.  Yes, I did.

19  Q.  Let's look at the first attachment, I think it's page 3 of

20  this document.  Who is this letter from?

21  A.  Dr. Gary T. Hirst.

22  Q.  What does it indicate his title is?

23  A.  President.

24  Q.  Of what entity?

25  A.  Gerova Financial Group.

1    Q.  Who is it to?

2    A.  Barry Feiner, Esquire.

3    Q.  Prior to receiving this letter, were you familiar with

4    Barry Feiner?

5    A.  No, I was not.

6    Q.  When is this letter dated?

7    A.  May 26th, 2010.

8    Q.  Focusing in on the first paragraph of this letter, what

9    does this letter state about how Mr. Shahini obtained his

10   5 million plus shares of Gerova?

11   A.  It's basically saying that he exercised 10,000 warrants on

12   a cashless exercise basis which yielded him with 5,333,333

13   shares of stock.

14   Q.  Focusing on the last sentence there, after the comma, what

15   does this letter explain is Mr. Shahini's intentions with

16   respect to these shares?

17   A.  That he's informing the company that he is selling his

18   shares.

19   Q.  Let's look at the second paragraph of this document.  Just

20   focusing on that first sentence.  What does this say is the

21   request from the seller with respect to Mr. Feiner?

22   A.  It's asking that a legal -- I'm sorry.

23           MR. BIALE:  Objection.

24   Q.  What is Gary Hirst requesting --

25           THE COURT:  There's no question pending.  Okay.  Go

1    ahead.

2    Q.  Focusing on the second paragraph, what is Mr. Hirst

3    requesting from the lawyer, Barry Feiner?

4              MR. BIALE:  Objection.

5              THE COURT:  Overruled.

6    Q.  You answered that question.  What is requested in the first

7    sentence of this paragraph, please?

8    A.  That an opinion -- a legal opinion be issued to the

9    company's transfer agent.

10   Q.  That what?  What is the opinion that's being requested?

11   A.  It's being requested that shares be issued without a

12   restrictive legend.

13             THE COURT:  Let me ask you.  Are letters of this type

14   letters that you see in the ordinary course of your work with

15   Roth, when you were with Roth Capital?

16             THE WITNESS:  Yes.  Typically, I see --

17             THE COURT:  No.  You've answered my question.

18             Go ahead.  Next question.

19   Q.  Are you familiar with what Continental Stock Transfer &

20   Trust Company is?

21   A.  Yes.

22   Q.  What is that?

23   A.  It's a transfer agent that -- companies use transfer agents

24   to handle their books and records with respect to shareholders,

25   and who holds shares either electronically, investment banks,

1    or at the individual name level in certificate form.

2    Q.  As you just described it, the sentence asked for an opinion

3    that the shares can be issued without a restrictive legend.

4    Did you understand what the phrase "restrictive legend" means?

5    A.  Yes, I did.

6    Q.  What was that?

7    A.  That there was some type of restriction on the security.

8    Typically, the restrictive legend means that it's not covered,

9    meaning it's not registered or covered on an effective

10   registration statement and there needs to be some type of

11   either exemption or registration in order for that restriction

12   to be lifted.

13                MR. BIALE:  Objection.

14                THE COURT:  Overruled.

15   Q.  In your experience, are transfer agents able to remove

16   restrictive legends?

17   A.  Yes, with the proper documentation.

18   Q.  Once a restrictive legend is removed, what can happen to

19   the stock now?

20   A.  They're freely tradeable.

21   Q.  Again, focusing on this paragraph, could you walk us

22   through by reading what Gerova or the company is representing

23   in this letter with respect to the shares that are issued to

24   Mr. Shahini starting with (i)?

25                THE COURT:  Ladies and gentlemen, I hate to hold you

1    in suspense on the answer to that question, but it's time for

2    our mid-afternoon break.  Please do not discuss the case among

3    yourselves or with anyone.  Keep an open mind.  See you in 10

4    minutes.

5           (Recess)

6           THE COURT:  We'll end the suspense.  You can repeat

7    the question.

8           MS. HECTOR:  Okay.

9           Ms. Sheinwald, could we call back up Government's

10   Exhibit 304?  And we were on page 3 of that document.  We were

11   focusing in on the second paragraph, second sentence.

12   BY MS. HECTOR:

13   Q.  Ms. Akdeniz, I think I asked you to read for us after, "in

14   support thereof, the company herewith represents and warrants

15   to you that," and I asked you, could you walk us through what

16   the six items are that the company represented in connection

17   with this letter?

18   A.  "(i), It is a reporting foreign issuer and it is current in

19   all reports, it is required to file with the Securities and

20   Exchange Commission pursuant to the Securities and Exchange Act

21   of 1934.  (ii), the shares are equity securities of a reporting

22   foreign issuer."

23          THE COURT:  That's not a speech impediment, it

24   literally says (ii).  Correct?

25          THE WITNESS:  Yes.

1    THE COURT:  Okay, thank you.

2    A.  "(iii), the seller purchased and fully paid for all of the

3    warrants outside of the United States more than 40 days prior

4    to the date hereof in a transaction exempt from the

5    registration provisions of the Securities Act of 1933, in

6    accordance with the applicable provisions of Regulation S

7    promulgated under the 1933 Act."

8         And then "(iv), the seller acquired the shares

9    pursuant to a cashless exercise of the warrants.

10        And then "(v), no commission or other remuneration was

11   paid or given directly or indirectly for soliciting such

12   exercise.

13        And "(vi), the seller is not an affiliate of the

14   company (as defined in Rule 405 under the 1933 Act.)"

15   Q.  We can stop there.

16        MS. HECTOR:  Just remove the call-out, please.

17   Q.  That's the first attached letter.  Could we turn now to the

18   second attached letter, which is at page 4 of this document?

19   Who is this letter from?

20   A.  Barry Feiner, Esquire.

21   Q.  If we could just maybe look at page five, we can see the

22   signature line so that's clear.  So Barry Feiner?

23   A.  That is correct.

24   Q.  Toggling back to page 4, who is the letter to?

25   A.  Continental Stock Transfer & Trust Company.

1  Q.  And the date of this letter?

2  A.  May 27th, 2010.

3  Q.  What, in general, is this letter?  What do you understand

4  it to be?

5  A.  It's a legal opinion to the company's transfer agent for

6  the removal of the restrictive legend from Ymer Shahini's

7  Gerova shares.

8  Q.  Could we focus in on that first paragraph?  In the middle

9  of that paragraph, the second sentence that begins, "the seller

10  has asked", what is it that the seller has asked for, as stated

11  in this opinion?

12  A.  It says, "The seller has asked me to issue an opinion to

13  the company."

14  Q.  And an opinion that what?

15  A.  I'm sorry.  An opinion -- did you want me to read -- I'm

16  sorry.

17  Q.  Sure.  What is the opinion he's seeking?

18  A.  He's seeking an opinion to remove the restrictive legend,

19  for the shares to be transferred without a restrictive legend.

20  Q.  Let's go to page 5, the second page of this document.

21  Starting with the paragraph that says "the company has

22  represented and warranted to me that".  Is that the same

23  representations that we just reviewed in the first letter?

24  A.  Yes, it is.

25          MS. HECTOR:  We can unhighlight that.  Now flipping

1   back to the page 4, the first page of this letter, the second

2   paragraph, if we could pull that out.

3   Q.   According to the first sentence of this paragraph, what is

4   contained in this paragraph now?

5   A.   These are representations by the seller.

6   Q.   As opposed to the representations by the company that we

7   just reviewed, right?

8   A.   That is correct.

9   Q.   Could you walk us through the representations that are made

10  here by the seller?

11  A.   "The seller has represented and warranted to me that (i)

12  the seller is a non-U.S. person as referred to in Regulation S

13  promulgated under the Securities Act of 1933; (ii) the seller

14  purchased and fully paid for all of the warrants outside of the

15  United States more than 40 days prior to the date hereof in a

16  transaction exempt from the registration provisions of the 1933

17  Act in accordance with the applicable provisions of Regulation

18  S; (iii) the seller acquired the shares pursuant to a cashless

19  exercise of the warrants; (iv) no commission or other

20  remuneration was paid or given directly or indirectly for

21  soliciting such exercise; (v) the sale of the shares is being

22  made in reliance on Rule 904 of Regulation S; (vi) the seller

23  is not an affiliate of the company as defined in Rule 405 under

24  the 1933 Act or a distributor as defined in Regulation S;

25  (vii) the seller will not offer the shares to a person in the

1    United States and either at the time the buy order is

2    originated, the buyer will be outside of the United States or

3    the seller and any person acting on the seller's behalf will

4    reasonably believe that the buyer was outside the United

5    States; (viii) neither the seller nor any affiliate of the

6    seller nor any person acting on any of their behalf has engaged

7    or will engage in any "directed selling efforts" in the United

8    States in connection with the offer and sale of the shares;

9    (ix) the sale will be bona fide and not for the purpose of

10   "washing off" the resale restrictions imposed because the

11   securities are "restricted securities" as such terms is defined

12   in Rule 144(a)(3) under the 1933" -- I'm assuming it says "Act"

13   after that.

14   Q.  We can just turn to the next page.  Sorry.

15   A.  Okay.  That's okay.  "Act.  (x) the seller does not and at

16   the time of the sale of the shares will not have a short

17   position in the shares to be sold in reliance of Rule 904 of

18   Regulation S and does not intend to replace the shares with

19   fungible unrestricted securities; and (xi) the sale will not be

20   a transaction or part of a series of transactions which,

21   although in technical compliance with Regulation S, is or will

22   be part of a plan or scheme to evade the registration

23   provisions of the 1933 Act."

24   Q.  Then, if we could just turn now to the last paragraph of

25   this opinion letter.  Does the attorney, Barry Feiner,

1  ultimately provide an opinion regarding whether the shares can

2  be issued without a restrictive legend?

3  A.   Yes, he does.

4              (Continued on next page)

1  Q.  What is that conclusion?

2  A.  I'm sorry.  Did you want me to read it?

3  Q.  Ultimately, could they be issued without the restrictive

4  legend?

5          MR. BIALE:  Objection.

6          THE COURT:  I will allow it.

7  Q.  What was your understanding?

8  A.  The shares were being issued without restrictive legend.

9  Q.  Finally now, can we turn to the third document, which is

10  now page 6, I believe.

11          When is this document dated?

12  A.  May 26, 2010.

13  Q.  Who is it from?  Let's just turn to the next page, page 7.

14          Who has signed this document?

15  A.  Ymer Shahini.

16  Q.  Now, turning back to page 6, the first page of this letter,

17  we are not going to go through them again, but looking at that

18  second paragraph, are these the same representations by the

19  seller that we just reviewed in the attorney opinion letter?

20  A.  Yes, they are.

21  Q.  So, Ms. Akdeniz, now stepping back, you testified that when

22  you received these you reviewed these letters.  What, if

23  anything, about these letters caused you any concern?

24          MR. BIALE:  Objection.

25          THE COURT:  I will allow it.

1    A.  First, I noticed that the opinion to remove the restrictive

2    legend was written by an attorney that I didn't recognize.

3    Customarily, the opinion is issued to remove restrictive

4    legends from public company securities by that company's

5    outside counsel, or if they have in-house counsel, sometimes

6    from their in-house counsel.

7              MR. BIALE:  Objection.

8              THE COURT:  You don't have any legal training, do you?

9              THE WITNESS:  No, I do not.

10             THE COURT:  So what is the basis for the testimony

11   you're giving now?

12             THE WITNESS:  I don't understand the question.

13             THE COURT:  How do you know what is done in other

14   cases and what motivates people to do things certain ways?

15             THE WITNESS:  Just based on my experience, and I have

16   processed lots and lots -- I don't know if I want to say

17   thousands, but definitely hundreds of restricted stock sales

18   over the years in my experience.  And typically you have --

19             THE COURT:  You have answered the question.  You may

20   answer.  Overruled.

21   Q.  Given your experience having processed restricted stock

22   transactions, in your experience, what about this attorney

23   struck you as cause for concern?

24   A.  As I mentioned, the one concern that I had was the fact

25   that it wasn't the company's counsel issuing the opinion, it

```
 1    was third-party counsel issuing the opinion.

 2    Q.  In your experience, are you used to receiving opinion

 3    letters from certain kinds of law firms?

 4              MR. BIALE:  Objection.

 5              THE COURT:  That I will sustain.

 6    Q.  Anything else, Ms. Akdeniz, about these letters cause you

 7    any concern?

 8    A.  Yes.  It was just the fact that it was an opinion to remove

 9    restrictive legend from shares that were pursuant to Regulation

10    S struck me as odd.  You wouldn't issue electronic shares into

11    a brokerage account --

12              MR. BIALE:  Objection.

13              THE COURT:  Overruled.

14    Q.  You may continue.

15    A.  If the shares are supposed to meet an exemption of being

16    sold, either outside a country or some other different type of

17    exemption, in this case it was Regulation S, in order to have

18    restrictive legend removed, you wouldn't have the shares just

19    automatically electronically be deposited into an account and

20    have them be freely tradeable, especially the magnitude, size

21    of the shares.  Again, it just struck me as being odd.

22    Q.  You received these documents on June 9, according to the

23    e-mail, correct?

24    A.  I don't have the e-mail in front of me.

25              MS. HECTOR:  If we can just pull up 304 for a second,
```

1    the cover page.

2    A.   Correct.

3    Q.   When the shares came into Roth's account at the end of May,

4    were you aware that there were restrictions on how they could

5    be sold?

6    A.   No, we were not.

7    Q.   Now, did your receipt of these documents answer the

8    concerns that you had articulated at the beginning of your

9    testimony regarding the origin of these shares and who Mr.

10   Shahini was?

11   A.   No.  We had asked that additional information, or I had

12   asked Ted Roth to ask the company for additional information as

13   to how the securities were or how the shares were acquired, and

14   while this documentation answered the fact that he had 10,000

15   warrants that he exercised, and that's how he ended up

16   receiving the shares, it still didn't answer the question of

17   how he acquired his securities, and in this case it would be

18   the warrants.

19   Q.   So what did Roth ultimately decide to do in response to

20   these concerns?

21   A.   Roth ultimately decided to close the account.

22   Q.   Can I pull up for you what is in evidence as Government

23   Exhibit 300.

24          Ms. Akdeniz, are you familiar with this documentation?

25   A.   Yes, I am.

1    Q.   What is this?

2    A.   This is a checklist used by the operations department at

3    Roth Capital Partners.  It's an internal document used to check

4    various items that are needed for the account opening process.

5    Q.   There is a column marked "operations review" with yeses and

6    nos and the initials TK.  Do you know who TK is?

7    A.   Yes, I do.

8    Q.   Who is TK?

9    A.   Tori King.

10   Q.   In what department at Roth does Tori King work?

11   A.   In the operations department.

12   Q.   There is a column marked "supervisor review."  Who is the

13   supervisor who is responsible for reviewing this?

14   A.   That would be me.

15   Q.   And there's initials in the row under supervisor review,

16   and then sort of again all the way at the bottom of that

17   column.  Whose initials are those?

18   A.   Those are my initials.

19   Q.   And we see handwriting on the right side of this document.

20   Do you recognize that handwriting?

21   A.   Yes, I do.

22   Q.   Whose is that?

23   A.   That is my handwriting.

24   Q.   Can you read for us what you wrote on this form?

25   A.   "Could not determine where the warrants (ultimately stock)

 1   came from.  No disclosure in filings.  Closed account."

 2   Q.  Do you know what happened to the Gerova shares after Roth

 3   decided to close the account?

 4   A.  Yes, I do.

 5   Q.  What happened to them?

 6   A.  We received an instruction to transfer the shares to

 7   another financial institution.

 8           MS. HECTOR:  Can we look at what is in evidence as

 9   Government Exhibit 305?

10   Q.  Do you recognize this document?

11   A.  Yes, I do.

12   Q.  What is it?

13   A.  It's a signed letter of authorization to transfer Gerova

14   Financial shares to CK Cooper & Co.

15   Q.  Who is this letter directed to?

16   A.  Roth Capital Partners.

17   Q.  Who is it signed by?

18   A.  Ymer Shahini.

19   Q.  What is the date on this transfer request?

20   A.  June 14, 2010.

21   Q.  Did Roth Capital ultimately transfer these shares to CK

22   Cooper?

23   A.  Yes, they did.

24   Q.  Can we just look again at Government Exhibit 302 for a

25   moment, and just for a second, let's look at the first page.

1    What was this document again?

2  A.  This is the customer account statement for Ymer Shahini

3  covering the month of May, 2010.

4  Q.  If we can look at page 4.

5    What does it indicate at the top of this part of the

6  account statement is the time period covered here now?

7  A.  June 1, 2010 through June 25, 2010.

8  Q.  Let's look at the transaction activity.

9    What is indicated in the account activity section

10  here?

11  A.  On June 14, 2010, it shows that 5,333,333, shares of Gerova

12  Financial Group has been delivered.

13  Q.  Delivered to whom?

14  A.  It shows here to broker, BK number 52, which is the DTC

15  electronic delivery code for CK Cooper.

16      MS. HECTOR:  One moment, your Honor.

17      Nothing further.  Thank you.

18      THE COURT:  Thank you.

19      You may cross-examine.

20  CROSS-EXAMINATION

21  BY MR. BIALE:

22  Q.  Good afternoon, Ms. Akdeniz.

23  A.  Good afternoon.

24  Q.  Now, you're not an attorney, correct?

25  A.  That is correct.

1    Q.   You testified that Roth Capital had a prior relationship

2    with Gerova, correct, before the Shahini account was opened?

3    A.   Correct.

4    Q.   And that was from an investment banking transaction, right?

5    A.   Correct.

6    Q.   That was an investment banking transaction that was

7    performed Byron Roth for Gerova, correct?

8    A.   Byron Roth, Ted Roth, the banking team, correct.

9    Q.   Byron Roth is Roth Capital Partners' chairman and CEO,

10   right?

11   A.   That is correct.

12   Q.   Roth Capital was paid for that investment banking work in

13   Gerova shares, correct?

14   A.   Yes, I believe so.

15   Q.   So Roth Capital held 950,000 shares of Gerova stock, isn't

16   that right?

17   A.   That sounds about right.

18   Q.   Those shares were held in a Roth account, is that right?

19   A.   Correct.

20   Q.   You testified that you were unable to locate the name Ymer

21   Shahini in any public filings, correct?

22   A.   That is correct.

23   Q.   And you testified that an individual who holds more than 10

24   percent of a security should be listed in the public filing, is

25   that right?

 1   A.  Well, it's possible to find them in a public filing.

 2   Q.  That was your testimony?

 3   A.  Your shares would be restricted and you would be deemed an

 4   affiliate if you own more than 10 percent, or if you're an

 5   officer or director, you would be in the filing.  But I don't

 6   think a 10 percent ownership in and of itself may or may not

 7   have you in a filing.  If your shares are covered in a

 8   registration statement they would be, and if you don't have any

 9   other role within the company, they wouldn't be.  So it just

10   depends on facts and circumstances.

11   Q.  Got it.

12           There are various ways to find the public filings,

13   right?

14   A.  Correct.

15   Q.  There is the EDGAR system?

16   A.  Correct.

17   Q.  And I think you mentioned that you went on SEC.gov to find

18   the filings?

19   A.  That is correct.

20   Q.  These shares were transferred into Roth Capital's account

21   in late May 2010, right?

22   A.  That is correct.

23   Q.  And you looked for the filings sometime after that?

24   A.  Sometime after that, correct?

25   Q.  In early June 2010?

1    A.   Yes.

2    Q.   Did you see a statement 20-F of the company on EDGAR?

3    A.   Yes, I believe I did.

4            MR. BIALE:   I would like to pull up Government Exhibit

5    201, please, in evidence.

6            Let's go to page 62.

7            Sorry.   Before you go to page 62.

8    Q.   Ms. Akdeniz, is this the document that you looked at on the

9    SEC's Web site?

10   A.   As I mentioned earlier, I did keyword searches on various

11   public filings within SEC's documents, but it's been a long

12   time so --

13   Q.   This is the 20-F that was listed for the company as of June

14   2, 2010, correct?

15   A.   Correct.

16           MR. BIALE:   Now, if we can turn to page 62, please.

17           It will be just a moment until the document comes up.

18   Q.   OK.  So turning your attention to page 62 of that

19   document --

20           JUROR:   We don't have it.

21           OK.

22   Q.   You see where it says "share ownership," letter (e)?

23   A.   Yes.

24   Q.   Do you see that it says, "The following table sets forth

25   information known to the company regarding the beneficial

1    ownership of the ordinary shares as of May 24, 2010"?

2    A.  Yes.

3    Q.  And you see where it says, "Each person known by the

4    company to be the beneficial owner of more than 5 percent of

5    the ordinary shares"?

6    A.  Yes.

7    Q.  "Each of the company's executive officers and directors"?

8    A.  Yes.

9    Q.  And, "All executive officers and directors of the company

10   as a group"?

11   A.  Yes.

12   Q.  Let's turn to the next page for a moment.

13          You see footnote 2?

14   A.  Yes, I do.

15   Q.  "Based on approximately 133,400,000 ordinary shares

16   currently outstanding"?

17   A.  Yes.

18   Q.  Now, 5,333,333 shares is less than 10 percent of

19   133,400,000, correct?

20   A.  Correct.

21   Q.  And going back up, you're aware that Mr. Shahini exercised

22   his warrants and received the stock on May 27, 2010, correct?

23   A.  Correct.

24   Q.  And isn't it true that 5,333,333 shares is less than 5

25   percent of 133 million?

 1    A.   That is correct.

 2              MR. BIALE:   You can take that down.

 3    Q.   Now, you testified about the letter from Barry Feiner?

 4              MR. BIALE:   If we can pull that up, it's Government

 5    Exhibit 304.

 6              Lets turn to the next page.

 7              Sorry.   Let's turn to page 4.

 8    Q.   So this is the letter from Barry Feiner.

 9              You see at the top it says "Barry Feiner, Esq."?

10    A.   Yes, I do.

11    Q.   And you weren't familiar with Mr. Feiner, right?

12    A.   No, I was not.

13    Q.   You don't know all the lawyers in the tristate area, do

14    you?

15    A.   No, I do not.

16    Q.   And Roth doesn't accept opinion letters only from certain

17    lawyers, isn't that right?

18    A.   That is correct.

19    Q.   You don't maintain a list of lawyers or law firms from whom

20    you will only accept opinion letters from?

21    A.   That is correct.

22    Q.   And you don't know the reputation of Barry Feiner, do you?

23    A.   No, I do not.

24    Q.   You didn't look him up to see if he was a member of the bar

25    in good standing?

1    A.  No, I did not.

2    Q.  You didn't look up to see whether he had any disciplinary

3    actions or anything like that?

4    A.  No, I did not.

5    Q.  You don't know, in fact, whether or not he was the

6    company's counsel, do you?

7    A.  No, I did not.

8    Q.  Let's turn back to page 3 of that document.

9          So the government showed you this letter, and it's a

10   letter from the company to Mr. Feiner, right?

11   A.  That is correct.

12   Q.  And we talked specifically -- or you testified specifically

13   about the second paragraph, right?

14   A.  That is correct.

15   Q.  And you mentioned that the second paragraph asks for an

16   opinion that the shares can be issued without any restrictive

17   legend, right?

18   A.  That is correct.

19   Q.  You see a little further below, in Roman numeral 3, that it

20   says, "The seller purchased and fully paid for all of the

21   warrants outside of the United States more than 40 days prior

22   to the date hereof in a transaction exempt from the

23   registration provisions of the Securities Act of 1933 in

24   accordance with the applicable provisions of Regulation S."

25          Do you see that?

 1   A.  Yes, I do.

 2   Q.  And you're aware that Regulation S provides that the shares

 3   cannot be sold in the United States?

 4   A.  Correct.

 5   Q.  It's a restriction on the sale, isn't that right?

 6   A.  Correct.

 7   Q.  You see below, at the end of that paragraph it says, "Terms

 8   used herein have the meanings given to them by Regulation S,"

 9   right?

10   A.  Correct.

11   Q.  Now, turning to page 4, I just want to direct your

12   attention back to the second paragraph, "The seller has

13   represented and warranted to me."

14           If we can look at Roman numeral 7.

15   A.  OK.

16   Q.  You see that says, "Neither the seller nor any affiliate of

17   the seller nor any person acting on any of their behalf has

18   engaged or will engage in any directed selling efforts in the

19   United States."

20           Do you see that?

21   A.  Yes, I do.

22   Q.  I apologize.  That was Roman numeral 8.  We will get back

23   to 7 in a moment.

24           You understand that such directed selling efforts in

25   the United States would be barred by Regulation S, right?

 1   A.  Correct.

 2   Q.  Now, looking at number 7, it says, "The seller will not

 3   offer the shares to a person in the United States and either at

 4   that time the buy order is originated the buyer will be outside

 5   of the United States, or the seller and any person acting on

 6   the seller's behalf will reasonably believe that the buyer was

 7   outside of the United States."

 8        Do you see that?

 9   A.  Yes, I do.

10   Q.  You understand that those requirements are pursuant to

11   Regulation S, right?

12   A.  That is correct.

13        MR. BIALE:  Let's bring up Government Exhibit 302.

14   Q.  Just for your convenience, I am going to give you a paper

15   copy because there are multiple pages.

16        MR. BIALE:  If I may approach.

17        THE COURT:  You may.

18   A.  Thank you.

19   Q.  So turning to the second page of that document, on

20   questioning from the government, you testified that this page

21   lists the assets in Ymer Shahini's brokerage account, correct?

22   A.  Yes.

23   Q.  And you see that it says "equities/options"?

24   A.  Yes.

25   Q.  And you see that it says "Gerova Financial Group Ltd."?

 1    A.  Correct.

 2    Q.  Then underneath that it says "USD ORD SHS Reg S," right?

 3    A.  Yes.

 4    Q.  And that denotes that these are ordinary shares subject to

 5    Regulation S, right?

 6    A.  There are foreign shares, yes.

 7    Q.  And the Reg S designation there says that they fall under

 8    Regulation S, isn't that right?

 9    A.  Correct.

10    Q.  And Regulation S shares are not freely tradeable in the

11    United States, right?

12    A.  Reg S is not freely tradeable in the U.S., correct.

13    Q.  So you could go to the stock exchange in Kosovo and trade

14    them, but you could not trade them in the United States, isn't

15    that right?

16            THE COURT:  If you know.

17    A.  I don't.

18    Q.  Now, a foreign person can hold a U.S. brokerage account,

19    isn't that right?

20    A.  That is correct.

21    Q.  And you testified that there are foreign persons who hold

22    accounts at Roth Capital, right?

23    A.  Correct.

24    Q.  Those individuals can hold restricted shares in those

25    accounts, right?

1   A.  That is correct.

2   Q.  Or they can hold freely tradeable shares in those accounts?

3   A.  That is correct.

4   Q.  And they can hold shares that are subject to Regulation S

5   in those accounts?

6   A.  That is correct.

7   Q.  But if they are subject to Regulation S, you cannot sell

8   them on the U.S. market, right?

9   A.  That is correct.

10  Q.  You testified that you are a compliance officer, isn't that

11  right?

12  A.  I was, yes.

13  Q.  You were at the time?

14  A.  I was not at the time.

15  Q.  At this time you were not a compliance officer, during

16  2010?

17  A.  I think I was -- I may have been just moving over to

18  corporate services from compliance in 2010.

19  Q.  One of the obligations of a compliance officer is to file

20  suspicious activity reports, right?

21  A.  That is correct.

22  Q.  And you file that kind of report when you have some

23  suspicions about a particular transaction, right?

24  A.  That is correct.

25  Q.  For example, if you believe the shares are the proceeds of

1   a crime?

2   A.  Correct.

3   Q.  Or if there is money laundering concerns or anything like

4   that?

5   A.  Correct.

6   Q.  And with respect to the Shahini shares, you did not file a

7   suspicious activity report, isn't that right?

8   A.  I was not the person responsible -- I confused the dates

9   earlier when you asked me.  I just want to correct that.  It

10  wasn't 2010 when I crossed over from compliance into corporate

11  services.  It was 2006.  So Katherine Blair was the chief

12  compliance officer at the time, who would have been responsible

13  for filing a SAR report.

14  Q.  Just for clarification, a SAR report stands for?

15  A.  Suspicious activity report.

16  Q.  To your knowledge, the person who was responsible at Roth

17  Capital at that time filed no such report about the Shahini

18  shares?

19  A.  I'm not aware if a report was filed.

20  Q.  In fact, as you testified, what happened is that the shares

21  were transferred to CK Cooper, right?

22  A.  That is correct.

23  Q.  CK Cooper is another domestic U.S. brokerage account,

24  right?

25  A.  That is correct.

1              MR. BIALE:  No further questions.

2              THE COURT:  Any redirect?

3              MS. HECTOR:  Extremely brief, your Honor.

4    REDIRECT EXAMINATION

5    BY MS. HECTOR:

6    Q.  Ms. Akdeniz, if Roth had handled sales of Gerova stock out

7    of this account, they likely would have been able to earn a

8    commission on those sales, correct?

9    A.  Correct.

10   Q.  But Roth decided to close the account, correct?

11   A.  Correct.

12             MS. HECTOR:  No further questions.

13             THE COURT:  You may step down.

14             (Witness excused)

15             THE COURT:  Call your next witness.

16             MS. MERMELSTEIN:  The government calls Postal

17   Inspector Ashley Borofsky.

18             MS. HARRIS:  Your Honor, may we approach?

19             THE COURT:  You may.

20             (Continued on next page)

21

22

23

24

25

1       (At the sidebar)

2       MS. HARRIS:  It came in a different order so I

3  apologize.

4       This is, I believe, the witness that the government is

5  going to use to put on the evidence with respect to the charges

6  against the other defendants.

7       THE COURT:  Yes.

8       MS. HARRIS:  Just two brief things for the record.

9       One is, while we have no objection to that information

10  coming in, we do ask that it be by stipulation rather than with

11  the witness.  Normally we can't force a stipulation with

12  respect to this kind of evidence, but given the circumstances,

13  we would ask that it come in by stipulation, not by witness.

14  That's our first request.

15       The second is that the 3500 material and other

16  information suggests that the witness was going to discuss the

17  arrests, or the arrest.  We think that would not be

18  appropriate.

19       THE COURT:  Arrest of whom?

20       MS. HARRIS:  The other defendants.

21       THE COURT:  Let's find out.

22       MS. MERMELSTEIN:  I was going to elicit from this

23  witness the fact that she was on the arrest team of Jason

24  Galanis, in particular, and that she participated in the arrest

25  operation of the defendants in this case, who were charged in

1    an indictment with the charges, and that's it.

2         THE COURT:  What relevance is the arrest of the other

3    defendants?

4         MS. MERMELSTEIN:  Your Honor, I think that the issue

5    that sort of came up was the misleading impression the jury

6    might have that Mr. Hirst was alone in this because the

7    government had not sort of moved against anyone else, and I

8    think the charge is integrally linked in that fashion with the

9    arrest.  They are not just out there and no one ever did

10   anything.  They were charged and arrested.

11        MS. HARRIS:  Your Honor, the charging is a relevant

12   fact here and that's all that needs to come in.  I think

13   between the law enforcement witness and the arrest, it adds a

14   whole different gestalt to the presentation of the evidence

15   that I don't think is necessary.

16        I will put our other request out there just so it's in

17   the mix.  Our other request is, if the evidence is coming in,

18   we think it's relevant and we would like to inquire that the

19   others pled guilty.

20        THE COURT:  You would like to inquire?

21        MS. HARRIS:  We do.  By stipulation would be our

22   preference.

23        MS. MERMELSTEIN:  I think I am confused by the

24   government shouldn't be able to elicit the charges, but we

25   should be able to elicit the pleas, but leaving that aside.

```
 1              My concern about the pleas, and we decline to

 2      stipulate on that fact, is that I think the only purpose that

 3      defense counsel has in wanting that information in is to either

 4      implicitly or explicitly argue to the jury that guilty

 5      defendants pled guilty, innocent defendants go to trial.

 6      Certainly, they can argue that their client is innocent, and

 7      that is why he has gone to trial.  But the converse inference I

 8      think is improper, and that's why I think the pleas should not

 9      come in.

10              THE COURT:  Arrests are out and pleas are out.

11              MS. MERMELSTEIN:  Understood.

12              This witness, who is a relatively new agent, has

13      knowledge of the charges principally because of her

14      participation in the arrests.

15              MS. HECTOR:  We should at least talk to her.

16              MS. MERMELSTEIN:  I want to warn her not to say that.

17      Because I worry otherwise she will not be able to tell the

18      story without slipping into it, and I don't want to run afoul

19      of your Honor's ruling.

20              We should call our next witness and we will table her

21      till tomorrow.

22              MS. HARRIS:  A stipulation is preferable.

23              THE COURT:  How do you feel about a stipulation?

24              MS. MERMELSTEIN:  We will revisit it in light of this

25      ruling, but I think the government was inclined to call the
```

 1    witness, and I don't think that's changed.

 2              THE COURT:  How many witnesses after this one?

 3              MS. MERMELSTEIN:  In the whole trial?

 4              THE COURT:  Yes.

 5              MR. BLAIS:  I think we have three, plus potentially

 6    Mr. Chalian.

 7              THE COURT:  If you want to take a minute to talk to

 8    your witness, you can do that.

 9              MS. MERMELSTEIN:  Sure.

10              Shall I step out?

11              THE COURT:  Yes.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

 1           (In open court)

 2           THE COURT:  If you don't mind stepping down for a

 3   second.  There is an instruction I have asked the government to

 4   give to you.

 5           (Pause)

 6           THE COURT:  The government may call its next witness.

 7           MS. MERMELSTEIN:  The government calls Postal

 8   Inspector Ashley Borofsky.

 9    ASHLEY BOROFSKY,

10        called as a witness by the government,

11        having been duly sworn, testified as follows:

12           THE DEPUTY CLERK:  State your name and spell it for

13   the record, please.

14           THE WITNESS:  Ashley Borofsky, A-S-H-L-E-Y,

15   B-O-R-O-F-S-K-Y.

16   DIRECT EXAMINATION

17   BY MS. MERMELSTEIN:

18   Q.  Good afternoon.

19           Where do you work?

20   A.  For the United States Postal Inspection Service.

21   Q.  What is your title?

22   A.  I'm a postal inspector.

23   Q.  How long have you been a postal inspector?

24   A.  About three-and-a-half years.

25   Q.  In connection with your work as a postal inspector, are you

1   aware of the charges against Gary Hirst in this matter?

2   A.   Yes.

3   Q.   Just to be clear, was Gary Hirst the only person charged in

4   this matter?

5   A.   No.

6   Q.   Who else was charged?

7   A.   Jason Galanis, John Galanis, Jared Galanis, Derek Galanis,

8   Gavin Hamels, and Ymer Shahini.

9   Q.   Generally speaking, what were the nature of the charges

10  against those individuals?

11  A.   Securities fraud, wire fraud, investor adviser fraud, and

12  conspiracy related to those charges.

13           MS. MERMELSTEIN:  Nothing further your Honor.

14           THE COURT:  Any cross-examination?

15           MR. BIALE:  No, your Honor.

16           THE COURT:  Ladies and gentlemen, you may not draw any

17  inference, favorable or unfavorable, from the fact that any

18  person in addition to the defendant is not on trial here in

19  this courtroom.  You also may not speculate as to the reasons

20  why other persons are not on trial here in this courtroom.

21  Those matters are wholly outside your concern and have no

22  bearing on your function as jurors.

23           You may step down.  Thank you.

24           (Witness excused)

25           THE COURT:  Call your next witness.

 1          MR. BLAIS:  The government calls Alex Montano.

 2     ALEX MONTANO,

 3          called as a witness by the government,

 4          having been duly sworn, testified as follows:

 5          THE DEPUTY CLERK:  State your name and spell it for

 6     the record, please.

 7          THE WITNESS:  My name is Alex Montano, A-L-E-X,

 8     M-O-N-T-A-N-O.

 9     DIRECT EXAMINATION

10     BY MR. BLAIS:

11     Q.  Good afternoon, Mr. Montano.

12     A.  Good afternoon.

13     Q.  Mr. Montano, what did you do for a living in 2010?

14     A.  I was the president and CEO of CK Cooper & Co.

15     Q.  What generally did CK Cooper & Co. do?

16     A.  CK Cooper & Co. was an institutional brokerage firm and

17     investment banking firm that focused primarily on the energy

18     sector.

19     Q.  Who founded CK Cooper?

20     A.  I did.

21     Q.  When did you found it?

22     A.  In the late 1990s.

23     Q.  What does CK Cooper stand for?

24     A.  It was actually named after my oldest son Cooper.

25     Q.  What did you do for a living before you founded CK Cooper?

1    A.  I have been in the securities and brokerage industry in

2    various roles, from research analyst to institutional sales.

3    Q.  Where was CK Cooper headquartered?

4    A.  Irvine, California.

5    Q.  Did you work in that office?

6    A.  Yes, I did.

7    Q.  What were your duties and responsibilities as the chief

8    executive officer of CK Cooper?

9    A.  Well, my primary responsibility is I oversaw the corporate

10   finance and investment banking activities of the firm.  But,

11   also, in my role as CEO and president, I was responsible for

12   the general direction of the firm and its growth and those

13   types of things.

14   Q.  At its peak, how many employees did CK Cooper have?

15   A.  About 40.

16   Q.  At its peak, what was the annual revenue of CK Cooper?

17   A.  Around $10 million.

18   Q.  What ultimately happened to CK Cooper?

19   A.  It withdrew its FINRA registration and suspended doing

20   business.

21   Q.  When approximately did that happen?

22   A.  In the summer of 2013.

23   Q.  Just to be clear, you mentioned FINRA.  What is FINRA?

24   A.  FINRA is a self-regulatory organization that oversees the

25   broker-dealer community.

1  Q.  Why was CK Cooper shut down?

2  A.  Well, we had been named in a couple of arbitration cases,

3  one of them we were found to be at fault, and it was a decision

4  where we were not going to have sufficient capital to maintain

5  the business and so we decided to withdraw our membership.

6  Q.  Mr. Montano, what are you doing for the living now?

7  A.  I run the energy investment banking team at Roth Capital

8  Partners.

9  Q.  Since when have you been doing that?

10  A.  Since October of 2013.

11  Q.  Now, when CK Cooper was operational, did it offer brokerage

12  services?

13  A.  Yes, sir.

14  Q.  What is a brokerage account?

15  A.  A brokerage account is much like a banking account at a

16  regular bank.  It's an account that you can open up and within

17  that account you can buy and sell various securities.

18  Q.  How can a member of the general public go about opening a

19  brokerage account at CK Cooper?

20  A.  They would contact us, and they would have to complete a

21  new account application, similar to opening up a bank account.

22  And we would have to do certain reviews and processes, but then

23  the account can be opened.

24  Q.  Were the requirements any different for a non-U.S. citizen

25  who wanted to open a brokerage account at CK Cooper?

1   A.   Slightly different.  We would require more information

2   about their background, their proof of citizenship, their tax

3   status and that type of thing.

4   Q.   Approximately how many brokerage clients did CK Cooper

5   have?

6   A.   Between 4 and 500.

7   Q.   During your time at CK Cooper, were you familiar with an

8   individual named Matt Jennings?

9   A.   Yes.

10  Q.   How did you come to know Mr. Jennings?

11  A.   Matt and I had actually worked together at a prior firm,

12  and I considered Matt a friend.

13  Q.   Did he work for a period of time at CK Cooper?

14  A.   Yes, he did.

15  Q.   Approximately when was that?

16  A.   In 2000 to 2001.

17  Q.   Did there come a point in time when Mr. Jennings introduced

18  you to Jason Galanis?

19  A.   Yes.

20  Q.   When, approximately, did that introduction happen?

21  A.   As I recall, early 2009.

22  Q.   Did you ultimately have a meeting with Mr. Galanis?

23  A.   Yes.

24  Q.   What was the purpose of that meeting?

25  A.   It was generally introductory and to discuss what the firm

1    did, what it can do, and what his kind of business activities

2    were and how we might be able to work together.

3    Q.  Approximately when did that meeting take place?

4    A.  I don't specifically recall, but it was early 2009.

5    Q.  Where did that meeting take place?

6    A.  At the offices of CK Cooper.

7    Q.  What were the general topics of discussion?

8    A.  History of the firm, types of services we provided, deals

9    that we had done, people we knew in the industry.  And a little

10   bit of background on some of the things that he had done and

11   how there might be opportunities to work together.

12   Q.  What did you understand Jason Galanis's business to be?

13   A.  My understanding was that in many ways he was an early

14   stage business investor and would be kind of a strategic

15   adviser to help the companies grow and be successful.

16   Q.  Did you have a subsequent meeting with Jason Galanis?

17   A.  Yes.

18   Q.  How soon after the first meeting did that second meeting

19   occur?

20   A.  Probably within a couple of weeks.

21   Q.  Where did that second meeting occur?

22   A.  At CK Cooper.

23   Q.  Who attended that meeting?

24   A.  Matt Jennings, Jason Galanis, Gary Hirst, and a couple of

25   other people, I don't recall their names.

1    Q.  Again, what were the general topics of discussion at that

2    meeting?

3    A.  Similar.  You know, the background of the firm, what it was

4    doing, state of the industry, what they were doing, that type

5    of thing.

6    Q.  Did CK Cooper ultimately provide services to any companies

7    affiliated with Jason Galanis?

8    A.  Yes.

9    Q.  What services did CK Cooper provide to his company?

10   A.  It provided a fairness opinion for a company called

11   Fund.com.  And we had filed an initial public offering for a

12   company called Geotag.

13   Q.  Just for the benefit of the jury, you first mentioned a

14   fairness opinion.  What is a fairness opinion?

15   A.  A fairness opinion is many times, if corporations are doing

16   some kind of transaction, the board of directors will request

17   an opinion from a third party to basically validate or to

18   express an opinion that the transaction is fair, and it's

19   called a fairness opinion.

20   Q.  And that fairness opinion that CK Cooper provided, that was

21   in connection with Fund.com?

22   A.  Yes, sir.

23   Q.  You also mentioned that CK Cooper was working on an initial

24   public offering for a company called Geotag, is that correct?

25   A.  Correct.

1    Q.   What is an initial public offering?

2    A.   It's the primary listing when a company for the first time

3    goes out and raises capital from the public and commences

4    trading as a public company thereafter.  So it's the initial

5    public offering of its shares.

6    Q.   Just to be clear, is an initial public offering sometimes

7    also referred to as an IPO?

8    A.   Correct.

9    Q.   What, if any, did you know about any sanctions imposed on

10   Jason Galanis by the SEC?

11   A.   We knew that he had been in trouble, if you will, before.

12   There were some limitations on what he could and couldn't do.

13   Q.   How did you learn about those sanctions?

14   A.   He told us, in part, and then we did general Internet

15   searches and that kind of thing to learn more.

16   Q.   Did there come a point in time when you received a phone

17   call regarding shares of Gerova?

18   A.   Yes, sir.  Yes.

19   Q.   When did that phone call take place?

20   A.   In late April or May of 2010.

21   Q.   Who made that phone call to you?

22   A.   Jason Galanis.

23   Q.   What was said to you during this phone call?

24   A.   He had mentioned that he knew of somebody that might want

25   to open up a brokerage account with CK Cooper, that they had a

1    position in Gerova and wanted to know if it would be marginable

2    at CK Cooper.

3    Q.  Let's break that down.

4          First of all, what, if anything, was said about the

5    owner of the shares?

6    A.  On that very first call, there was not a lot said about

7    him; it was just that he was a potential referral to the firm.

8    Q.  What, if anything, was said about that individual's

9    citizenship?

10   A.  We learned that he was a foreign national; he was not a

11   U.S. citizen.

12   Q.  You mentioned there was also discussion about a margin loan

13   during this call.  What was the nature of the discussion about

14   the margin loan?

15   A.  It was, would the shares of Gerova be sufficient

16   collateral -- were they marginable is the nomenclature -- would

17   they be sufficient collateral to be able to borrow money

18   against them.

19   Q.  Just to be clear for the benefit of the jury, what is a

20   margin loan?

21   A.  A margin loan is when a brokerage firm advances money in

22   the form of a loan to somebody using the securities, the value

23   of the securities, as collateral to secure that loan.

24   Q.  What is required for someone to obtain a margin loan in

25   their CK Cooper brokerage account?

1    A.  Well, they would have to have the new account established.

2    They would have to sign a margin agreement, which gives us

3    certain rights as necessary.  And they would need to have

4    something in the account that was marginable.

5    Q.  Who determines whether a particular security is marginable?

6    A.  In our case, it would be our clearing firm.

7    Q.  What is a clearing firm?

8    A.  So we were a fully disclosed broker-dealer, which meant

9    that we didn't actually hold customer's cash or securities.  If

10   they brought them in to us, we would immediately send them to

11   another firm that would hold them on behalf of our customers.

12   And they would also provide certain clearing, back-office

13   functions, a lot of the paperwork and stuff.  So they are

14   referred to as your clearing firm.

15   Q.  What was the name of CK Cooper's clearing firm?

16   A.  It was Legent Clearing, that later became COR Clearing.

17   Q.  Who actually provided the funds for margin loans made in CK

18   Cooper brokerage accounts?

19   A.  The clearing firm does.

20   Q.  After the phone call that you just described with Jason

21   Galanis, what steps did you take regarding the requested margin

22   loan?

23   A.  Well, the first thing we did is we contacted our clearing

24   firm and we said, if we had a customer that had these shares of

25   Gerova, would we be able to loan money against them, are the

 1    shares marginable?

 2    Q.  What was the notification you received from the clearing

 3    firm regarding whether Gerova's shares were marginable?

 4    A.  The answer was, yes, we could margin those shares.

 5    Q.  Who, if at all, did you communicate that decision, that

 6    notification, to regarding the fact that Gerova's shares were

 7    marginable?

 8    A.  I contacted Jason Galanis and let him know.

 9    Q.  What did you tell him?

10    A.  That we checked with the clearing firm and that the shares

11    would be marginable and that we could take the account.

12    Q.  After this communication with Jason Galanis, was a

13    brokerage account ultimately opened at CK Cooper?

14    A.  Yes.

15    Q.  In whose name?

16    A.  Ymer Shahini.

17    Q.  Did anyone at CK Cooper meet with Mr. Shahini before his

18    brokerage account was opened?

19    A.  Yes.

20    Q.  Who was that?

21    A.  Our chief compliance officer and my brother, Adam Montano.

22    Q.  Why did that meeting happen?

23    A.  As we were getting information to open up the account, some

24    of the dots just didn't just connect right.  So we felt it more

25    appropriate to meet with him in person.

```
 1              MR. BIALE:  Objection.

 2              THE COURT:  Overruled.

 3    Q.  You can continue, Mr. Montano.

 4    A.  So we felt it appropriate to meet with him in person and be

 5    able to verify the information.

 6    Q.  Were you the broker on the Shahini CK Cooper account?

 7    A.  No, I wasn't.

 8    Q.  Who was?

 9    A.  My brother, Adam Montano.

10              MR. BLAIS:  Ms. Sheinwald, if you could publish

11    Government Exhibit 1032, which is in evidence.

12              Ms. Sheinwald, if you could just focus in on the

13    content of the e-mail.

14    Q.  Mr. Montano, do you recognize this e-mail?

15    A.  Yes.

16    Q.  What is the date of this e-mail?

17    A.  Friday, June 11, 2010.

18    Q.  Do you recognize the address of the sender of this e-mail?

19    A.  It's from Adam Montano.

20    Q.  Is that your brother you just mentioned a minute ago?

21    A.  Yes.

22    Q.  Who is the broker on the Shahini brokerage account?

23    A.  Yes, sir.

24    Q.  Who is this e-mail sent to?

25    A.  To jmg@sentinellawgroup and ymer@europe.com.
```

1   Q.  Do you recognize either of these e-mail addresses?

2   A.  I recognize the one as Ymer Shahini's, and the other I

3   believe is Jared Galanis.

4   Q.  Can you read the substance of this e-mail?

5   A.  It says, "Gentlemen, this is the paperwork we need for the

6   account.  We will also need further verification in regards to

7   the different addresses, work, citizen and living.  We left the

8   phone number blank, the numbers didn't coincide with the

9   locations.  We just need some clarity for that.  Let me know if

10  you have any further questions."

11          MR. BLAIS:  Ms. Sheinwald, could you flip to page 7 of

12  this exhibit.

13          If you can just focus on the top half of the document.

14  Q.  Mr. Montano, do you recognize this document?

15  A.  It looks like the new account application for CK Cooper.

16  Q.  Who is the account holder that's listed on this particular

17  application?

18  A.  Ymer Shahini.

19  Q.  Where is Mr. Shahini's address?

20  A.  It's in the Czech Republic.  I don't know if I can

21  pronounce it.

22  Q.  Just focusing on the very bottom of the blow-up, what was

23  Mr. Shahini's citizenship status?

24  A.  Non-resident alien.

25          MR. BLAIS:  Ms. Sheinwald, if you could please flip to

1   page 27 of this document.

2           Again, if you can actually get the CK Cooper logo and

3   the word margin agreement as well and focus on that part of the

4   page.

5   Q.  Mr. Montano, do you recognize this document?

6   A.  Yes.

7   Q.  What is this?

8   A.  This would be the margin agreement.

9   Q.  That was the agreement that you just referenced that is

10   necessary in order for someone to obtain a margin loan in a CK

11   Cooper brokerage account?

12   A.  Correct.

13   Q.  Whose name is on this particular margin agreement?

14   A.  Ymer Shahini.

15          MR. BLAIS:  Ms. Sheinwald, you can take this down.

16          Ms. Sheinwald, if you could publish to the jury

17   Government Exhibit 334, which is in evidence.

18          Turn to page 159 of that document.

19   Q.  Just focusing on the top half of this page, Mr. Montano, do

20   you recognize this document?

21   A.  Yes.  This is an account statement from CK Cooper & Co.

22   Q.  Whose account is this?

23   A.  Ymer Shahini.

24   Q.  For what time period is this particular account statement?

25   A.  This would have been for the month ending June 30, 2010.

1    MR. BLAIS:  Ms. Sheinwald, could you please turn to
2    page 165 of this document and focus on the section down at the
3    bottom that says "deposits made to your account."
4    Q.  Now, Mr. Montano, how many shares of Gerova were deposited
5    in Mr. Shahini's brokerage account?
6    A.  5,333,333 shares.
7    Q.  On what date was that deposit made?
8    A.  June 14, 2010.
9    Q.  Now, do you see under the words "Gerova Financial Group"
10   there is a series of letters, "LTD, USD, ORD, SHS, Reg S"?
11       Do you see that, Mr. Montano?
12   A.  Yes, sir.
13   Q.  What do those letters mean?
14   A.  To me, they mean -- the LTD is from Gerova.  So it would be
15   Gerova Financial Group Ltd, U.S. dollar, ordinary shares,
16   Regulation S.
17   Q.  Now, do you know where these Gerova shares were held before
18   they came to CK Cooper?
19   A.  No, I don't.
20       MR. BLAIS:  Ms. Sheinwald, if you could please turn to
21   page 166 of this document.  And focus on the section that's
22   labeled "withdrawals from your account."
23   Q.  Now, Mr. Montano, what does this section represent?
24   A.  This would have demonstrated money that was sent from the
25   account outside of the firm.  So withdrawals from the account.

1  Q.  Are these withdrawals the proceeds of share sales or from

2  the margin loans that we talked about earlier?

3  A.  These look like they are from the margin loan.

4  Q.  How much was withdrawn from Ymer Shahini's CK Cooper

5  account between June 17, 2010 and June 23, 2010?

6  A.  $13,730,000.

7  Q.  Now, did there come a point in time when you learned that

8  $13 million had been withdrawn from Shahini's CK Cooper

9  account?

10  A.  Yes.

11  Q.  When approximately did you learn that?

12  A.  Probably right at the end of this series of events,

13  probably about the 23rd or the 24th of June.

14  Q.  What actions, if any, did you take in response?

15  A.  Well, we were concerned with the large immediate

16  withdrawals from the account.  So we contacted our clearing

17  firm and we brought it up with them to discuss.

18  Q.  What was the result of those discussions?

19  A.  As a result of those discussions, it was decided to call

20  the loan.

21  Q.  What does it mean to call a margin loan?

22  A.  Well, it means that we'd like you to pay it off.  So pay it

23  down to zero.

24  Q.  How can a margin loan be paid off?

25  A.  Well, you can bring money in, basically pay off the

1    balance; you can deposit other shares that are marginable, so

2    you would just shift the collateral to something else; or you

3    sell stock to pay off the loan, the proceeds of the sales would

4    go to pay off the loan.

5            MR. BLAIS:  Now, Ms. Sheinwald, I am going to ask you

6    to put up page 163 of this document.

7            If you could just highlight the "assets sold" section

8    for a minute.

9    Q.  Now, Mr. Montano, for this period of time -- and this is

10   just the first page of the assets sold section -- were there

11   any assets sold from this CK Cooper account during the time

12   period shown here, other than shares of Gerova Financial Group?

13   A.  No, not that I can see on the screen.

14   Q.  And you will see for the sales here on June 14, there are

15   corresponding entries on the right-hand side of the page in a

16   column that's labeled "cash."  Do you see that?

17   A.  Yes, sir.

18   Q.  What would that represent?

19   A.  That would represent the proceeds of the sales are going to

20   the cash portion of the account.

21           MR. BLAIS:  Ms. Sheinwald, if could can flip to page

22   164 and just highlight the "assets sold" section.

23           Can you do the entirety of the top part of the page.

24   Q.  Again, for this time period -- and it looks like these are

25   all June 14 sales -- are there sales of any assets from the

1  Ymer Shahini CK Cooper account other than shares of Gerova

2  Financial Group?

3  A.  No.

4          MR. BLAIS:  Finally, Ms. Sheinwald, could you turn to

5  page 165, and again, focus on the remainder of the "assets

6  sold" section.

7  Q.  Again, in this time period, June 14 through June 29, are

8  there any assets sold from the CK Cooper account other than

9  shares of Gerova Financial Group?

10  A.  No.

11  Q.  Now, Mr. Montano, you see that beginning on June 25, there

12  are corresponding entries on the right-hand side of the page in

13  the margin column rather than the cash column.  What does that

14  indicate?

15  A.  That would indicate that those trades, the proceeds from

16  the sales were going to the margin side of the account or

17  reducing the margin balance.

18          (Continued on next page)

19

20

21

22

23

24

25

BY MR. BLAIS:

Q.  Who was selling these Gerova shares?

A.  I don't recall specifically.  In any instance, there's a certain point of the day where we would automatically sell them.  So we might give notice to the customer by 11:00 we're going to sell the stock, and maybe at 10:30 they would call in and sell it themselves.  But in one way it got sold that date either by the customer or by a certain point we would have sold it automatically.

Q.  To be clear, beginning on the 25th, those shares were being sold to repay the margin loan?

A.  Yes, sir.

Q.  One final question on this section.  During the time period that we looked at in June, what were the total assets sold from the Shahini CK Cooper brokerage account?

A.  $6,789,404.44.

        MR. BLAIS:  Your Honor, I see we're approaching the end, but this is a natural breaking point if it makes sense to stop here.

        THE COURT:  Do you have much more with this witness?

        MR. BLAIS:  Yes.  We're going to look through additional months of brokerage statements.

        THE COURT:  All right.  Ladies and gentlemen, we'll break nor the evening.

        How much more is there to the government's case?  When

1     he did you expect to rest, approximately?

2              MR. BLAIS:  I think we expect to rest tomorrow.

3              THE COURT:  Ladies and gentlemen, we're making

4     progress, good progress in the case.  Have a pleasant evening.

5     Don't think about the case.  Don't discuss the case.  Don't do

6     any home-grown research on the case, and we'll see you tomorrow

7     morning.  Keep an open mind.  We'll start again at 10:00.

8     Thank you very much, ladies and gentlemen.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Jury not present)

2      THE COURT:  A couple of points.  On the Cayman Islands

3   law issue, having looked at the materials that were submitted,

4   and having thought about it, it seems to me that the principle

5   under Cayman Islands law is not very different than one under

6   U.S. law, that the principal may ratify an unauthorized act of

7   the agent, but the principle also includes the proposition that

8   the principal party may also choose not to ratify the

9   unauthorized act of the agent.

10      To give you an example, the highly compensated

11  executive important to the success of a business goes out and

12  purchases a yacht at company expense for $100,000.  The yacht

13  has not been delivered yet.  It's unauthorized.  The

14  corporation may choose to say, "We don't ratify this, this

15  purchase is your personal property.  It was unauthorized and

16  you're on the hook for it."  It may also decide that it does

17  not want the publicity, it does not want the litigation, and it

18  may choose to ratify the purchase and then deduct it from the

19  highly compensated individual's compensation package.

20      In that latter situation, if that's the route that the

21  corporation chooses, it doesn't make the initial act any more

22  proper than if it had elected not to ratify, and so I'm not

23  quite sure I understand what the probative content of telling

24  the jury that an unauthorized act may be ratified or not

25  ratified.  If I were going to tell the jury that, it would seem

 1   to me that it would be appropriate to also tell the jury that

 2   the fact that the act is ratified does not mean that the

 3   original action wasn't unauthorized.  In fact, for the

 4   ratification doctrine to have any application, it must be an

 5   unauthorized act, not an authorized act.  Authorized acts don't

 6   require or need not be ratified.  That's what I'm having

 7   trouble with on that point.

 8           MR. TREMONTE:  May I, your Honor?

 9           THE COURT:  You may.

10           MR. TREMONTE:  So as we understand Cayman's law as

11   it's been explained to us, there is a slight difference between

12   the way that the principles work there and what your Honor has

13   just articulated.

14           Under Cayman's law, again secondhand, an act of an

15   executive that does not have prior authorization may not be

16   ratified by the board unless it's in the best interest of the

17   company, and therein is a distinction between the scenario that

18   the Court articulated and what's permissible.

19           THE COURT:  I respectfully disagree.  I respectfully

20   disagree.  The example I gave is precisely because it's in the

21   best interest of the corporation.  It's known as the business

22   judgment rule.  The directors, the fiduciaries who owe

23   fiduciary duties to the corporation, may conclude that the best

24   interest of the corporation lies in ratifying the act and

25   docking the executive's pay, or not reviewing his employment

1    contract, or any number of things.  They are concluding that it

2    is in the best interest of the corporation to ratify, but that

3    does not mean that the act was in the best interest of the

4    corporation.

5           MR. TREMONTE:  Then I think that's the difference.  I

6    believe under Cayman's law it may not be ratified unless it was

7    in the best interest of the corporation.  And if it was not in

8    the best --

9           THE COURT:  Where did you find that?

10          MR. TREMONTE:  If I can --

11          THE COURT:  Where do you find that from the materials

12   you submitted to me?

13          MR. TREMONTE:  As it was explained to us by the

14   lawyers at that firm, it's exactly the proposition that was

15   submitted.  And moreover, if an act is taken that's not in the

16   best interest of the corporation, it may be ratified under

17   Cayman's law, but only by a vote of the shareholders, not by

18   the board.  That's our understanding.

19          THE COURT:  But it would be appropriate to tell the

20   jury that that does not alter the fact that the act was

21   unauthorized in the first place.

22          MR. TREMONTE:  That's correct.  However, if it is

23   approved by the board, then it means that it was necessarily

24   determined to be in the best interest of the company.  The

25   board could not ratify it under Cayman's law.  If it was not,

1    it would require a vote of the shareholders.

2           THE COURT:  How am I supposed to decide this if this

3    is based on a phone call you had or a conversation you had?

4    This is why I asked for the submission of the -- and this is

5    why the rule reads -- let's see what the rule says on the

6    subject that you are now proffering.  "A party intending to

7    raise an issue of foreign law must provide the court and all

8    parties with reasonable written notice issues of foreign law or

9    questions of law, but in deciding such issues, the Court may

10   consider any relevant material or source, including testimony,

11   without regard to the Federal Rules of Evidence."

12          You will recall that earlier in this trial, I made a

13   direction, and the direction was that I wanted the specific

14   support from treatises, statutes, or otherwise.  And I pointed

15   out that it would be not satisfactory to simply say, well,

16   here's a treatise, it's someplace in here.

17          MR. TREMONTE:  Your Honor, not only did we work with

18   our expert to put together, and we communicated to the expert

19   the Court's concern that these principles could not simply be

20   articulated on say-so, but also we brought him here.  He's here

21   as of now, as I understand it, and is available first thing in

22   the morning to provide firsthand testimony, subject to cross

23   examination, on this issue.

24          THE COURT:  That's kind of matching up with my comment

25   which is, is there any support for your statement in the

1    materials proffered to the Court?

2         MR. TREMONTE:  Our understanding is that the materials

3    proffered to the Court are the best effort of Cayman's lawyer,

4    who is properly trained and has the proper experience to

5    articulate the foundation for the opinion.  We pressed the

6    expert.  He said this is it.  This is the best that -- this is

7    the basis, and that's what we transmitted to the Court, your

8    Honor.

9         THE COURT:  So what I will be basing it on is hearing

10   him, without the benefit of a citation to a case, a statute, or

11   a treatise.

12        MR. TREMONTE:  There are citations in the affidavit

13   that we submitted from --

14        THE COURT:  Well, this is what I'm asking you.  Where

15   is the support for the statement that the active ratification

16   is not what must be in the best interest of the corporation,

17   but the original act must be in the best interest of the

18   corporation?

19        MR. TREMONTE:  Your Honor, that's precisely the

20   question we posed to the expert, and I'm sorry, I don't have it

21   in front of me, but that is precisely the answer that he

22   provided, and the authorities that he cited in support are the

23   best that he could come up with, and then we brought him up

24   here to answer in person.

25        THE COURT:  All right.  When I hear him, he's going to

1    say to me, "I don't have a case for you, Judge, I don't have a

2    statute, I don't have a treatise, I have my experience."

3              MR. TREMONTE:  No, he will give you the best authority

4    that he has.

5              THE COURT:  But hasn't he done that already?

6              MR. TREMONTE:  I believe so, but we will doublecheck.

7              THE COURT:  All right.  Well, I should let you know,

8    that's part of my concern here.  And why is it relevant?

9              MR. TREMONTE:  I'm sorry, your Honor?

10             THE COURT:  Why is it relevant?

11             MR. TREMONTE:  Well, because that's what happened

12   here.  Right?  I mean, the government has charged Mr. Hirst

13   with taking an unauthorized act that was not in the best

14   interest of the company.  That's the government's charge.  The

15   proof, we believe, is to the contrary, and the legal principle

16   is important.  It's important, not least of all because the

17   government points to it erroneously in the charging instrument.

18   Right?  It's also important because, without it, we can't rebut

19   the allegation in the charging interest that the law was to the

20   contrary, and we believe it's important to the jury's

21   understanding of the relevant legal principle under Cayman's

22   law that tells you what you can and can't do as a board of

23   directors in connection with this kind of case.

24             THE COURT:  All right.  But it doesn't speak to

25   whether the act was authorized, does it?

1    MR. TREMONTE:  It speaks to whether or not the act was

2    in the best interest of the company as determined by the board

3    of directors consistent with Cayman's law.

4    THE COURT:  All right.  If the proposition of law that

5    you have proffered is, in fact, the law of the Cayman Islands.

6    Let me hear from the government on this.

7    MR. BLAIS:  Your Honor, I think, based on the

8    principles that are articulated, they may be getting it exactly

9    backwards, which is they're suggesting that, because there was

10   a board ratification, it necessarily was in the best interest

11   of the corporation.  We certainly would want to test the

12   principle of, isn't it likely the case under Cayman law that it

13   has to be in the best interest of the company as a factual

14   matter before it can even be ratified by the board?  I think

15   they're getting the legal principles backwards, and I think

16   we'd want to test --

17   THE COURT:  Well, I think what Mr. Tremonte would

18   proffer is that the fact that the board did ratify is some

19   evidence that it was in the best interest of the corporation.

20   Not conclusive, but some evidence.

21   MR. BLAIS:  Right.  But I think they also articulated

22   the principle of Cayman law that if it wasn't in the best

23   interest of the corporation, it has to go to the shareholders.

24   But who makes that decision whether it's in the best interest

25   and whether it needs to be voted on by the board first or by

1   the shareholders?  If the fact that the board approves it is

2   enough to suggest that it's in the best interest of the

3   corporation, then it seems like you may never end up in a

4   circumstance where there's a necessity for shareholder vote.

5          I also think there's a principle that we'd certainly

6   want to test with this expert as to whether, before there's a

7   vote that necessarily determines that something is, in fact, in

8   the best interest of the corporation, whether there, one, has

9   to be full disclosure to the board of all material facts

10  involving the matter that's at issue, and two, whether it's

11  necessary that that unauthorized action be taken in the absence

12  of fraud.

13         If it's hidden from the board, there's not full

14  disclosure about the nature and circumstances of the

15  transaction, of the unauthorized transaction that's at issue.

16  The mere fact that the board then votes on it doesn't seem to

17  mean that it's in the best interest of the corporation.

18         THE COURT:  I think what you outline may be something

19  that you would raise either in any examination of the witness

20  out of the presence of the jury or it may be an alternate or

21  additional principle of Cayman Islands law that you may wish to

22  ask me to charge on.

23         MR. BLAIS:  But with respect to the relevance point,

24  your Honor, which I think your Honor raised, as well, there's

25  nothing in the record that suggests that the board was aware of

1    Cayman Islands law or that they in any way relied upon Cayman

2    Islands law.

3         There was testimony from multiple witnesses about

4    their understanding of what was required under the governing

5    documents of the company.  There was no suggestion that they

6    were advised by a Cayman Island lawyer before they took the

7    ratification vote and --

8         THE COURT:  Let me hear from Mr. Tremonte.  The

9    assertion is that it is of no moment that this is what Cayman

10   Islands' law required if there is no indication that the

11   directors relied on Cayman Islands' law in voting to ratify.

12        MR. TREMONTE:  I'm a little mystified.  The government

13   puts this squarely in issue in the indictment.  Paragraph 27.

14   "Hirst affected the stock grant despite language in Gerova's

15   bylaws of which he was aware that Gerova securities, including

16   options and warrants, could only be issued or conferred by the

17   full board of directors or designated committee thereof."  It

18   puts in issue and in Mr. Hirst's head an interpretation of a

19   document that is only capable of being interpreted under Cayman

20   Islands corporate law.

21        THE COURT:  Yes.  And if there were testimony that the

22   board consulted a Cayman Islands' law expert, or Mr. Hirst

23   consulted one or relied on one, that would be a different

24   story.  But the law, in the abstract, it would be highly

25   relevant in a breach of contract action, perhaps, after the

1     fact.  If the directors got lucky and it works under Cayman

2     Islands' law, it works.  That's the way contract law works.

3     But here, when it's a question of the actions of the persons,

4     it sounds to me like a different situation.

5            I will give you all an opportunity to ponder on this

6     and we'll resume the discussion.  See you tomorrow.

7            (Adjourned to September 21st, 2016 at 9:45 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                              INDEX OF EXAMINATION

Examination of:                                           Page

GAVIN HAMELS

Direct By Ms. Mermelstein . . . . . . . . . . 897

Cross By Ms. Harris . . . . . . . . . . . . 911

Redirect By Ms. Mermelstein . . . . . . . . 920

STEPHEN FLATLEY

Direct By Mr. Blais . . . . . . . . . . . . 931

Cross By Mr. Tremonte . . . . . . . . . . . 952

Direct By Ms. Mermelstein . . . . . . . . . 955

SPECIAL AGENT ADAM FASCIO

Direct By Ms. Mermelstein . . . . . . . . . 956

Cross By Mr. Tremonte . . . . . . . . . . . 996

NAZAN AKDENIZ

Direct By Ms. Hector . . . . . . . . . . . .1005

Cross By Mr. Biale . . . . . . . . . . . . .1042

Redirect By Ms. Hector . . . . . . . . . . .1054

ASHLEY BOROFSKY

Direct By Ms. Mermelstein . . . . . . . . .1059

ALEX MONTANO

Direct By Mr. Blais . . . . . . . . . . . .1061

                              GOVERNMENT EXHIBITS

Exhibit No.                                          Received

 681    . . . . . . . . . . . . . . . . . . . 899

 1280   . . . . . . . . . . . . . . . . . . . 902

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1      3506-5     . . . . . . . . . . . . . . . 925

2      509A, 509B, 509C, 509D  . . . . . . . . . 944