UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                - v. -

LAWRENCE RAY,                                          No. 20 Cr. 110 (LJL)

                        Defendant.

**Brief in Support of Admitting**
**Dr. Joseph Pierre's Expert Testimony**
**and**
**Requesting *Daubert* Hearing for Government's Rebuttal Witness**

David E. Patton, Esq.
Federal Defenders of New York, Inc.
52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (212) 417-8700

*Counsel for Lawrence Ray*

**MARNE L. LENOX, ESQ.**
**PEGGY CROSS-GOLDENBERG, ESQ.**
**ALLEGRA GLASHAUSSER, ESQ.**
**NEIL P. KELLY, ESQ.**
*Of counsel*

To: **DAMIAN WILLIAMS, ESQ.**
    United States Attorney
    Southern District of New York
    One St. Andrew's Plaza
    New York, New York 10007

    Attn: **DANIELLE R. SASSOON, ESQ.**
          Assistant United States Attorney
          Southern District of New York

# TABLE OF CONTENTS

Argument ........................................................................................................................... 1

I.   Dr. Pierre's testimony satisfies the *Daubert* Factors............................................. 1

    A.   Dr. Pierre is a highly-qualified psychiatric expert. ......................................... 3

    B.   Dr. Joseph Pierre's testimony about Mr. Ray's inflexible delusion-like beliefs and paranoid cognitive style satisfy the *Daubert* factors. ...................................... 4

       i.   The government's topics on cross-examination point to arguments that the government may make about the weight of Dr. Pierre's testimony, not its admissibility.......................................................................................................... 7

    C.   The *Daubert* factors are satisfied for Dr. Pierre to testify in rebuttal to Dr. Hughes ..... 9

II.  Dr. Pierre's testimony about Mr. Ray's delusion-like beliefs is not being offered as a complete defense under Rule 12.2, but is admissible because it undercuts the government's argument that Mr. Ray specifically intended to commit extortion, money laundering, and tax evasion. ............................................................................... 11

III. It was appropriate for the defense to withdraw the Rule 12.2 notice after learning the substance of Dr. Pierre's expert opinion. .......................................................... 15

IV.  The Court should conduct a *Daubert* hearing for the government's proffered rebuttal expert. ........................................................................................................................ 18

    A.   The Court should conduct a hearing to assess whether Dr. Schulman has sufficient experience in factitious disorder or pseudologia fantastica.......................................... 19

    B.   The Court should conduct a hearing to understand the basis for Dr. Schulman's conclusions. ................................................................................................................... 20

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Chambers v. Mississippi*,
  410 U.S. 284 (1973) ........................................................................................ 17

*Daubert v. Merrell Dow Pharms*,
  509 U.S. 579 (1993)........................................................................................... 2

*Discepolo v. Gorgone*,
  399 F. Supp. 2d 123 (D. Conn. 2005) ............................................................... 5

*Gonyea v. Irick Excavating, LLC*, No. 2:08-CV-00242,
  2010 WL 11606974 (D. Vt. Aug. 12, 2010) ..................................................... 2

*Luitpold Pharm., Inc. v. Ed. Geitstlich Sohne A.G. Fur Chemische Industrie,* No. 11-CV-681,
  2015 WL 5459662 (S.D.N.Y. Sept. 16, 2015) ............................................... 3-4

*Qube Films Ltd. v. Padell, No. 13-CV-8405*
  (AJN), 2016 WL 888791 (S.D.N.Y. Mar. 1, 2016) ......................................... 2

*Scott v. Chipotle Mexican Grill, Inc.*,
  315 F.R.D. 33 (S.D.N.Y. 2016) ...................................................................... 20

*Tardif v. City of New York*,
  344 F.Supp.3d 579 (S.D.N.Y. 2018) ......................................................... 4, 20

*Taylor v. Illinois*,
  484 U.S. 400 (1988) .................................................................................. 16, 17

*United States v. Brown*,
  326 F.3d 1143 (10th Cir. 2003) ................................................................. 11-12

*United States v. Cameron*,
  907 F.2d 1051 (11th Cir. 1990) ...................................................................... 12

*United States v. DiMartino*,
  949 F.3d 67 (2d Cir. 2020) ............................................................................... 9

*United States v. Dupre*,
  462 F.3d 131 (2d Cir. 2006) ........................................................................... 11

*United States v. Enmons*,
  410 U.S. 396 (1973) ........................................................................................ 13

*United States v. Farrah*,
  2000 WL 92349 (D. Conn. Jan. 5, 2000) ....................................................... 13

*United States v. Finley,*
   301 F.3d 1000 (9th Cir. 2002) ...................................................................... *passim*

*United States v. Gold,*
   661 F. Supp. 1127 (D.D.C. 1987) ...................................................................... 12

*United States v. Jackson,*
   196 F.3d 383 (2d Cir. 1999) ......................................................................... 13-14

*United States v. Levin,*
   2016 WL 299031 (S.D.N.Y. Jan. 25, 2016) ............................................... 11, 12

*United States v. Peters,*
   937 F.2d 1422 (9th Cir. 1991) ......................................................................... 16

*United States v. Pohlot,*
   827 F.2d 889 (3d Cir. 1987) ........................................................................... 12

*United States v. Rahm,*
   993 F.2d 1405 (9th Cir.1993) ........................................................................... 7

*United States v. Sabir, No. S4*
   2007 WL 1373184 (S.D.N.Y. May 10, 2007) ................................................ 11

*United States v. Skodnek,*
   896 F. Supp. 60 (D. Mass. 1995) ..................................................................... 12

*United States v. Sturman, No. 96 CR. 318*
   (BSJ), 1998 WL 126066 (S.D.N.Y. Mar. 20, 1998) ......................................... 5

*United States v. Williams,*
   506 F.3d 151 (2d Cir. 2007) ........................................................................... 19

*United States v. Williams,*
   2009 WL 424583 (D. Haw. Feb. 20, 2009) ................................................ 7, 12

*United States v. Worrell,*
   313 F.3d 867 (4th Cir. 2002) ........................................................................... 12

**Federal Statutes**

18 U.S.C. § 17 ...................................................................................................... 15

18 U.S.C.A. § 1951(b)(2) ..................................................................................... 12

**Other**

Charles C. Dike, MD, MPH, FRCPsych, *A Radical Reexamination of the Association
  Between Pathological Lying and Factitious Disorder*, 48 J Am. Acad. Psychiatry
  Law 431 (2020) .................................................................................................. 19

Bahar Haji-Khamneh, *Measuring the Flexibility of Delusion-Like Beliefs in Non-Clinical*

*Samples: Development and Validation of the Windsor Belief Flexibility Scale (WBFS), electronic Thesis and Dissertations*, (2019), available at https://scholar.uwindsor.ca/cgi/viewcontent.cgi?article=8669&context=etd ..............................5

Simon R. Jones & Charles Fernyhough, *Reliability of factorial structure of the Peters et al. delusions inventory (PDI-21)*, Personality and Individual Differences, Vol. 43, Issue No. 4 (Sept. 2007)................................................................................................................................5

Simon R. Jones & Charles Fernyhough, *Thought suppression and persecutory delusion-like beliefs in a nonclinical sample*, Cognitive Neuropsychiatry, Vol. 13, No. 4 (2008)..................6

Keith R. Laws & Reena Bhatt, *False memories and delusional ideation in normal healthy subjects*, Personality and Individual Differences (2005) ..........................................................6

Robert Malcolm Ross, et al., *Jumping to Conclusions About the Beads Task? A Meta-analysis of Delusional Ideation and Data-Gathering*, Schizophrenia Bulletin, Vol. 41, No. 5 (Sept. 2015) ................................................................................................................................................6

R. Pechey & P. Halligan, *The Prevalence of Delusion-Like Beliefs Relative to Sociocultural Beliefs in the General Population*, Psychopathology, Vol. 44, No. 2 (Jan. 2011) .....................5

Pierre JM, *Assessing malingered voice-hearing*, Psychiatric Times, September 17, 2020. https://www.psychiatrictimes.com/view/assessing-malingered-voice-hearing ...........................8

Pierre JM, *Assessing malingered auditory verbal hallucinations in forensic and clinical settings*, Am. Acad. Psychiatry Law 2019; 47:448-456 ..............................................................8

Pierre JM, et al, *'Iatrogenic malingering' in VA substance abuse treatment*, Psych Services 2003; 54:253-254 ......................................................................................................................8

Rule 12.2 ............................................................................................................ *passim*

Lawrence Ray respectfully submits this post-hearing brief in support of the admissibility of Dr. Joseph M. Pierre's expert psychiatric testimony. His testimony that Mr. Ray suffers from delusion-like beliefs is admissible under *Daubert* and the Rule 702 factors and is relevant to provide evidence that could negate Mr. Ray's *mens rea* for a number of the offenses. His testimony about relational dynamics, false memories, and suggestibility is also admissible under *Daubert* and relevant to rebut the government's proffered expert Dr. Dawn Hughes, by offering a contrary set of psychiatric evidence that the jury could rely on to explain the complainants' behavior.

Given Dr. Pierre's expert conclusion that Mr. Ray suffered from delusion-like beliefs rather than a major psychiatric illness, it was proper for the defense to withdraw the Rule 12.2 notice and his testimony is admissible under the Insanity Defense Reform Act.

The Court should, therefore, permit Dr. Pierre to testify in Mr. Ray's defense; failure to do so would deprive Mr. Ray of his constitutional right present a defense and rebut the government's evidence.

**Argument**

### I.    Dr. Pierre's testimony satisfies the *Daubert Factors*

Dr. Pierre would testify that Mr. Ray has delusion-like beliefs of a persecutory nature, with a paranoid cognitive style. He would testify that Mr. Ray has "longstanding delusion-like beliefs held with significant conviction…[that] very clearly [ ] affected Mr. Ray's functioning." T. 28. Mr. Ray's "beliefs are also not simply based on subjective personal experience the way delusions typically are. They are based on the testimony of other people, what's been charted in his medical record, and a variety of other informational sources." T. 33. Additionally, these delusion-like beliefs could have been exacerbated by Mr. Ray's use of Adderall. T. 54. He would

1

also testify about false memories and how a person can be suggestible or have a willingness to please in the context of certain relational dynamics.

Under *Daubert*, the assessment of the reliability of an expert's opinions is "flexible." 509 U.S. 579 at 594.[1] "Courts have recognized that certain *Daubert* factors are less readily applied to psychological and psychiatric evidence, where 'the research, theories and opinions cannot have the exactness of [other] science methodologies.'" *Qube Films Ltd. v. Padell*, No. 13-CV-8405(AJN), 2016 WL 888791, at *2 (S.D.N.Y. Mar. 1, 2016) (internal citation omitted). *See also Gonyea v. Irick Excavating, LLC*, No. 2:08-CV-00242, 2010 WL 11606974, at *2 (D. Vt. Aug. 12, 2010) ("This court has found that the reliability of expert testimony based on psychiatric or psychological analysis [ ] does not lend itself to evaluation using the specific *Daubert* factors that more readily apply to 'hard sciences.'"). As your Honor recently wrote, quoting Judge Engelmayer:

> [S]tudying the circumstances and psychological drivers of trafficked women is not like studying diseases or potential cures in lab animals. . . . The testimony . . . necessarily uses more qualitative research methodologies. These involve interviews and case studies and clinical examinations over time.

Dkt. 287 at 21. The same is true with other psychiatric evaluations, such as Dr. Pierre's evaluation of Mr. Ray. Dr. Pierre's testimony meets the *Daubert* factors.

---

[1] As the *Daubert* standard has already been extensively briefed, *see* Dkts. 263 & 278, we will not belabor it. But, for ease of reference, the *Daubert* factors for reliability are:

> (1) whether the theory is based on scientific or other specialized knowledge that has been or can be tested;
>
> (2) whether the theory has been subjected to peer review;
>
> (3) the known or potential rate of error and the existence of standards controlling the theory's operation; and
>
> (4) the extent to which the theory is generally accepted in the relevant community.

*Daubert*, 509 U.S. at 593–94.

### A.      *Dr. Pierre is a highly-qualified psychiatric expert.*

Dr. Pierre is the Chief of Mental Health Community Care Systems at the VA West Los

Angeles Healthcare Center, a clinical psychiatrist, and a forensic consultant. T. 13-14. For over

20 years he has "work[ed] with a multidisciplinary team to discuss the diagnosis and treatment of

[psychiatric] patients." T. 14. Conducting "psychiatric assessments, psychiatric interviews, [and]

differential diagnosis" has been part of his daily professional responsibilities for over 20 years

and he has treated "thousands" of patients. T. 15. He also teaches medical students and others,

and lectures across the country and internationally. T. 16. He has written approximately one

hundred academic articles in his field. T. 16. He has provided expert testimony in two federal

criminal cases and has never been excluded as an expert. *See United States v. Diamond*, 18 Cr.

172 (RGK) (C.D. CA); *United States v. Joling*, 11 Cr. 60131-AA (D. OR Feb. 16, 2016), Dkt.

259. T. 23-24. In both cases he testified about the delusion-like beliefs of the defendants, just as

he proposes to do here.

This education and experience makes him extremely well-qualified to testify about the

topics proposed here: delusion-like beliefs, his psychiatric evaluation and assessment of Mr. Ray,

and the concepts of false memories, dyadic relationships and relational dynamics. Contrary to the

government's suggestion in cross examination, there is no requirement that Dr. Pierre be a board

certified forensic psychiatrist to testify about any of these topics. That would be an "overly

narrow assessment" of his expertise. *See* Dkt. 287, at 9, 27. *See also Luitpold Pharm., Inc. v. Ed.

Geitstlich Sohne A.G. Fur Chemische Industrie*, No. 11-CV-681, 2015 WL 5459662, at *2

(S.D.N.Y. Sept. 16, 2015) (finding that psychologist was qualified as an expert by his

"educational background, training, and experience" and did not need a specialization in "forensic

psychology"; noting that "no court in the Second Circuit appears to have drawn that distinction

or used it as a basis to exclude a psychologist's testimony"). *See also Tardif v. City of New York*,

3

344 F.Supp.3d 579 (S.D.N.Y. 2018) (expert qualified, even though only about 10-20% of his

patients had presented with the condition that was the subject of his testimony).

> **B.      Dr. Joseph Pierre's testimony about Mr. Ray's inflexible delusion-like beliefs and paranoid cognitive style satisfy the Daubert factors.**

Dr. Pierre is an expert in delusion-like beliefs. In a lengthy and distinguished psychiatric

career, delusion-like beliefs are his area of focus. As he testified:

> I now focus on what I like to call the gray area between clearcut
> psychopathology and psychosis and delusions and normal behavior. So now
> my academic work has focused on delusion-like beliefs, for example, things
> like conspiracy theories. And that's where I currently would consider my
> expertise lie.

Tr. 14.

He has written numerous peer-reviewed articles on this very topic. *See, e.g.,* Def. Ex. B-

F; T. 166 (explaining that peer-reviewed means that other experts in his field have read,

commented, and decided "whether or not they think it ought to be published or revised."). For

example, he authored articles in peer-reviewed journals "that help[ ] clinicians distinguish

between delusions and conspiracy theories," T. 17; DX B, and discuss "the approach to

understanding delusion-like beliefs in forensic assessment." T. 19; DX D. Indeed, he has been

writing peer-reviewed articles on delusional beliefs for decades. T. 20, DX E (describing his

article from 2001 that "addresses the difficulty of assessing delusional beliefs"). Contrary to the

government's suggestion during cross-examination, that he writes frequently on this topic at

times citing other peer-reviewed articles he has written does not undercut his expertise, but

bolsters it: he is a pre-eminent expert on delusion-like beliefs, the topic of his proposed

testimony. He is, not, however, the sole expert on the topic.[2] "Delusion-like beliefs" or

"delusion-like experiences" are "well-accepted term[s]," which Dr. Pierre did not invent. T. 29.

Each step of Dr. Pierre's process in Mr. Ray's case is generally accepted in the field. As

he testified, the evaluation of delusion-like beliefs has generally accepted standards: conducting

a psychiatric assessment, reviewing medical records, conducting any available collateral

interviews, and using the Peters et al. Delusion test (hereinafter "PDI"). A psychiatric assessment

is a "combination of patient interview…talking to a patient, observing their behavior…[and]

looking at the medical record." T. 15. Dr. Pierre has conducted these for over 20 years. Other

courts have found this to be a standard and reliable source of psychiatric testimony. *See United*

*States v. Sturman*, No. 96 CR. 318 (BSJ), 1998 WL 126066, at *2 (S.D.N.Y. Mar. 20, 1998)

(finding expert psychiatric testimony admissible where the opinion was based on hours of

interviews and a review of records, "acknowledg[ing] that psychiatrists customarily use such

information to form opinions as to an individual's current or past mental state" and noting that

psychiatry is "hardly a 'junk science'"); *Discepolo v. Gorgone*, 399 F. Supp. 2d 123, 127 (D.

Conn. 2005) (finding psychiatrist's expert testimony admissible "psychological testing, record

review, and other interviewing [ ] is a generally accepted methodology in the community of

psychiatrists and psychologists for making a medical diagnosis"). As Dr. Pierre explained, "the

PDI has been used to diagnose delusion-like beliefs. That's probably the most common scale

that's used… to detect [them]." T. 112. In Mr. Ray's case, Dr. Pierre used the PDI to supplement

his psychiatric assessment and to determine if, "beyond the delusion-like beliefs that we had

---

[2] *See, e.g.*, R. Pechey & P. Halligan, *The Prevalence of Delusion-Like Beliefs Relative to Sociocultural Beliefs in the General Population*, Psychopathology, Vol. 44, No. 2 (Jan. 2011); Bahar Haji-Khamneh, *Measuring the Flexibility of Delusion-Like Beliefs in Non-Clinical Samples: Development and Validation of the Windsor Belief Flexibility Scale (WBFS), electronic Thesis and Dissertations*, (2019), available at https://scholar.uwindsor.ca/cgi/viewcontent.cgi?article=8669&context=etd; Simon R. Jones & Charles Fernyhough, *Thought suppression and persecutory delusion-like beliefs in a nonclinical sample*, Cognitive Neuropsychiatry, Vol. 13, No. 4 (2008).

spent considerable time talking about, that there weren't other areas of delusional thinking that we hadn't covered yet." T. 45.

Dr. Pierre also testified at length about the validity of the PDI, explaining that it is a "pretty widely used tool" to get a "quantification of the amount of delusional ideation that either an individual has or a population has." T. 41. *See also* T. 99-100 (explaining that the PDI was originally designed to assess delusion-like beliefs, and referencing Dr. Peters's paper on the topic). The "validity of the PDI has also been demonstrated in research" and the "inter-rater reliability for the PDI…is good; that's been accomplished in studies." T. 41. Additionally, "academic papers have actually equated delusion-like beliefs with responses or scores on the PDI." T. 39-40. It is a "scale" "used often in research to get an estimate of the amount of what's called delusional ideation." T. 40.[3]

That delusion-like beliefs are not in the DSM does not make Dr. Pierre's testimony about them any less reliable. As Dr. Pierre testified, "delusion-like beliefs" is "still consider[ed] [ ] to be a diagnosis; it's just not a diagnosis of a formal DSM disorder." T. 78. It is "pretty routine" in clinical practice that people are diagnosed with conditions that are not in the DSM. T. 37, 78. The absence of a "formal" DSM-V diagnosis does not make an expert's testimony unreliable. *See United States v. Finley*, 301 F.3d 1000, 1004, 1012 (9th Cir. 2002) (holding defense psychiatrist expert testimony admissible where the defendant "has an atypical belief system, a

---

[3] *See also* Robert Malcolm Ross, et al., *Jumping to Conclusions About the Beads Task? A Meta-analysis of Delusional Ideation and Data-Gathering*, Schizophrenia Bulletin, Vol. 41, No. 5 at 1184 (Sept. 2015) (describing the PDI as "by far the most widely used measure of delusional ideation…. It is a self-report questionnaire that asks people if they have ever had particular delusion-like experiences…. [Research] findings suggest that the PDI is a valid measure of thoughts that lie on a continuum with delusional beliefs"); Keith R. Laws & Reena Bhatt, *False memories and delusional ideation in normal healthy subjects*, Personality and Individual Differences (2005) (administering the Peters et al. Delusions Inventory in a controlled study); Simon R. Jones & Charles Fernyhough, *Reliability of factorial structure of the Peters et al. delusions inventory (PDI-21)*, Personality and Individual Differences, Vol. 43, Issue No. 4 (Sept. 2007).

system which is very rigid" but "is not suffering under any mental condition which is reported in the DSM-IV") (quoting *United States v. Rahm*, 993 F.2d 1405, 1411 (9th Cir.1993)).[4] On the contrary, numerous federal courts allow just this type of testimony, including from Dr. Pierre himself. *E.g., Diamond*, 18 Cr. 172; *Joling*, 11 Cr. 60131-AA; *United States v. Williams*, 2009 WL 424583, at *10 (D. Haw. Feb. 20, 2009) (admitting expert testimony on "borderline intellectual functioning" despite the fact that it is "not a clearly defined mental disease, disorder, or defect that has attained sufficient acceptance and recognition within the mental health community," noting that it is "not the 'junk science' of which the *Kuhmo* court was concerned").

As this Court wrote, "it is sufficient that the expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Dkt. 287, at 14. Dr. Pierre has demonstrated that he has done so.

     i.     <u>The government's topics on cross-examination point to arguments that the government may make about the weight of Dr. Pierre's testimony, not its admissibility.</u>

The government cross-examined Dr. Pierre about a number of topics that do not relate to *Daubert* or the admissibility of his testimony, but are arguments that it could present to the jury as affecting the testimony's weight. For example, the government questioned Dr. Pierre's use of video conferencing with Mr. Ray. But, as Dr. Pierre testified, since the pandemic, use of video conference has become "routine[]" in the psychiatric field and is the "standard these days." T. 24. The government also questioned his lack of collateral interviews in addition to Mr. Ray's father. This too is not a reason to exclude Dr. Pierre's testimony, especially as he was unable to

---

[4] "[Courts] have recognized that concepts of mental disorders are 'constantly-evolving conception[s]' about which 'the psychological and psychiatric community is far from unanimous' and a 'district court may not exclude proffered expert psychological testimony simply because the defendant's condition does not fit within the expert's— or the district court's own—concept of mental 'disorder.'" *Finley*, 301 F.3d at 1004, 1012.

conduct collateral interviews with the other key figures as they are represented by counsel and the defense has not had access to them.

Similarly, the government's questioning about the lack of a "peer-reviewed study" about delusion-like beliefs, as opposed to the numerous peer-reviewed articles, is another argument that goes to the weight rather than the admissibility of the evidence. As your Honor recently wrote, "the Second Circuit has squarely held that an expert need not back his or her opinion with published studies that unequivocally support his or her conclusions." Dkt. 287, at 12. Your Honor continued, quoting the Second Circuit, explaining that: "A contrary requirement 'would effectively resurrect a *Frye*-like bright-line standard . . . by excluding expert testimony not backed by published (and presumably peer-reviewed) studies' [and] would be at odds with the liberal admissibility standards of the federal rules and the express teachings of *Daubert*." *Id.* at 12-13. Here, of course, Dr. Pierre has backed up his opinion with numerous peer-reviewed articles: there is no *Daubert* requirement that there be a specific study.

Likewise, the government's questions about how Dr. Pierre accounted for the possibility of malingering also go to the weight rather than admissibility of the evidence. Contrary to the government's implication, Dr. Pierre is well-versed in assessing malingering, having published articles about the "assessment of malingering" "in a clinical…[and] forensic venue," T. 38, done "assessments of malingering on many occasions," T. 39, and given "lectures, including to forensic fellows, about the detection of malingering." T. 68.[5] Dr. Pierre also explained red flags

---

[5]  *See, e.g.,* Pierre JM, "Assessing malingered voice-hearing." Psychiatric Times, Sept. 17, 2020. https://www.psychiatrictimes.com/view/assessing-malingered-voice-hearing; Pierre JM, "Assessing malingered auditory verbal hallucinations in forensic and clinical settings," Am Acad Psychiatry Law 2019; 47:448-456; Pierre JM, et al, "'Iatrogenic malingering' in VA substance abuse treatment," Psych Services 2003; 54:253-254.

Defense Exhibit A also lists Dr. Pierre's lectures relating to malingering, including, "Malingered psychosis," Santa Clara County Medical Center; San Jose, CA, Aug. 2, 2016; "'If I'm not crazy now, I may be shortly:' Causes and conundrums of malingered psychosis," Department of Psychiatry Grand Rounds, Harbor-UCLA Medical Center,

he generally looks for that point to malingering, T. 39, 121, 163-64, and the specific red flags he

would look for in the PDI, noting that someone who is lying "typically over-endorse[s]" when

answering the questions. T. 45. *See also Finley*, 301 F.3d at 1011 ("[W]e refuse to require that

mental health experts prove themselves infallible lie detectors before accepting their

psychological diagnoses.").

Finally, the government questioned why Dr. Pierre did not do a variety of other tests. As

Dr. Pierre testified, there are "hundreds and hundreds of different psychological tests," but

"based on" his "psychiatric interview" he did not "think that any specific additional testing was

warranted to help me arrive at my conclusions." T. 40.

Notably, the government has not pointed out some core portion of Mr. Ray's beliefs that

Dr. Pierre ignored. *Cf. United States v. DiMartino*, 949 F.3d 67, 75 (2d Cir. 2020) (expert not

reliable when he failed to consider person's membership in sovereign citizen movement "in

determining whether his beliefs are delusional"). Dr. Pierre's testimony about Mr. Ray's

delusion-like beliefs meets the liberal *Daubert* requirements and should be admitted.

### C.    The Daubert factors are satisfied for Dr. Pierre to testify in rebuttal to Dr. Hughes.

Dr. Pierre would also testify about false memories and how a person can be suggestible

or have a willingness to please in the context of dyadic relationships. Dr. Pierre is an expert in

these topics, which also meet the *Daubert* factors. As he explained, it is "well-known" in

psychiatry that suggestibility and false memories can occur without coercion. T. 60-61. People

"might report things…because [they] think that's what the [other person] wants them to say." T.

60. He provided two common examples: children reporting false abuse through accidental

---

Torrance, CA, Mar. 30, 2010; "Case Conference: Psychiatric and psychological aspects of malingered psychosis,"
Grand Rounds, VA West Los Angeles Healthcare Center, Los Angeles, CA, Sept. 4, 2008.

suggestion by investigators, and "mental health professionals" getting false answers if they "are not careful about the way they're asking their questions." T. 60-61. That is why mental health professionals receive training about how to conduct interviews to avoid this problem. T. 61. Dr. Pierre himself is well-versed in this topic; he just "recently wrote a book chapter that includes a section on false memories." T. 59. As with Dr. Hughes, Dr. Pierre's testimony on this topic could be admitted without reference to the facts of this case.

This is a separate and independent reason to admit Dr. Pierre's testimony. Just as Dr. Hughes will offer the jury a framework to interpret interpersonal dynamics, so too will Dr. Pierre. Dr. Pierre would posit an alternative framework to Dr. Hughes, thus providing the jury a competing explanation for the complainants' behavior in this case. The government will have expert testimony that will allow them to explain why the complainants' seemingly unusual behavior wasn't unusual. Our expert should be permitted to do the same. It would be for the jury to decide which explanation better applied to the facts that they heard about the case.

For this reason too, Dr. Pierre's testimony should be admitted.[6]

After the *Daubert* hearing the Court asked if Dr. Pierre's testimony is "just another way of funneling to the jury a theory of the defense and having the expert parrot to the jury the theory of the defense." T. 180. Of course, Mr. Ray made that argument with respect to Dr. Hughes, arguing her testimony should be excluded as it would improperly bolster the complainants' testimony, but this Court rejected that argument, explaining that "there is nothing wrong with testimony that corroborates the testimony of a party's fact witnesses and thereby makes that testimony more credible or believable to the jury." Dkt. 287, at 25. This Court continued, saying

---

[6] Finally, the defense noticed Dr. Pierre as a rebuttal expert to Dr. Pleus in an abundance of caution, in the event that Dr. Lugo was not permitted to testify. Dr. Pierre's testimony demonstrated his expertise in the topic of mercury toxicity, *see* T. 50-51, and he should be permitted to testify on this topic if Dr. Lugo's testimony is excluded.

"Presenting expert testimony that is consistent with lay witness testimony is the permissible

building block for any case, whether it be presented by the plaintiff or by the defendant." Dkt.

287, at 26. Allowing Dr. Hughes to provide expert testimony that will bolster the testimony of

the government's fact witnesses with the imprimatur of an expert opinion, while prohibiting Dr.

Pierre from doing the same for the defense would be fundamentally unfair.

II.     **Dr. Pierre's testimony about Mr. Ray's delusion-like beliefs is not being offered as a
        complete defense under Rule 12.2, but is admissible because it undercuts the
        government's argument that Mr. Ray specifically intended to commit extortion,
        money laundering, and tax evasion.**

Mr. Ray is not planning to introduce Dr. Pierre's testimony to show insanity, diminished

capacity, or justification. He is not planning to argue that he is incapable of forming a criminal

intent, or understanding right from wrong. He is not trying to elicit sympathy by introducing

information about his troubled childhood. *Cf. United States v. Sabir*, No. S4 05 CR. 673 (LAP),

2007 WL 1373184, at *9 (S.D.N.Y. May 10, 2007) (excluding expert evidence that would have

provoked sympathy … because of his troubled childhood); *United States v. Levin*, 2016 WL

299031, at *7 (S.D.N.Y. Jan. 25, 2016) (same; excluding testimony that defendant was

"distracted" by a medical condition). Instead, Dr. Pierre's testimony would provide relevant

information to the jury in their assessment as to whether the government has proved Mr. Ray's

specific intent of a number of the charged offenses beyond a reasonable doubt.

Using mental health evidence for this purpose is well-established: mental health evidence

that is not a "mental disease or defect" under Rule 12.2 is still admissible if related to

undercutting government's *mens rea* evidence. *See, e.g., United States v. Dupre*, 462 F.3d 131,

137 (2d Cir. 2006); *United States v. Brown*, 326 F.3d 1143, 1147 (10th Cir. 2003) (noting "the

distinction between psychiatric evidence that provides a justification or excuse for criminal

conduct and psychiatric evidence that assists the trier of fact in determining whether the

prosecution has satisfied its burden of proving each element of the crime"); *United States v. Worrell*, 313 F.3d 867, 873 (4th Cir. 2002) (this defense "goes specifically to whether the prosecution has carried its burden of proving each essential element of the crime."); *see also United States v. Pohlot*, 827 F.2d 889, 897 (3d Cir. 1987); *United States v. Cameron*, 907 F.2d 1051, 1067 (11th Cir. 1990) (IDRA permits expert testimony about a defendant's mental health in circumstances where the psychiatric evidence "focuses on the defendant's specific state of mind at the time of the charged offense"); *see also Levin*, 2016 WL 299031, at *7 (explaining the differences between a defense under Rule 12.2 and a defense related to a mental health condition undercutting the government's proof related to *mens rea*); *Williams*, 2009 WL 424583, at *10 (D. Haw. Feb. 20, 2009) (admitting expert testimony on "borderline intellectual functioning"; not mentioning Rule 12.2); *United States v. Skodnek*, 896 F. Supp. 60, 63 (D. Mass. 1995); *United States v. Gold*, 661 F. Supp. 1127, 1132 (D.D.C. 1987) ("Defendant shall be allowed to introduce testimony and evidence otherwise admissible on the factual issue of defendant's mental state or condition during the relevant time."). The claim is not "not guilty but excused or justified" because of mental illness or defect; the claim is simply, "not guilty." *Skodnek,* 896 F. Supp. at 63.

Here, Dr. Pierre's testimony has a direct link to Mr. Ray's *mens rea* for the counts of extortion, money laundering, and tax evasion, each of which require a specific intent. The government does not dispute that money laundering and tax evasion require specific intent. *See* Dkt. 289, at 5. As already discussed in oral argument, extortion too requires specific intent. A person commits extortion if s/he "obtain[s]… property from another with his consent, induced by **wrongful** use of actual or threatened force, violence, or fear." 18 U.S.C.A. § 1951(b)(2) (emphasis added). A "threat," however, is not necessarily "wrongful" if threatener believes he is

entitled to the property. *See, e.g., United States v. Enmons*, 410 U.S. 396, 406 (1973) (extortion requires an intent "to obtain that which in justice and equity the party is not entitled to receive"); *United States v. Jackson*, 180 F.3d 55, 70 (2d Cir.), on reh'g, 196 F.3d 383 (2d Cir. 1999) ("[A] threat to cause economic loss is not inherently wrongful; it becomes wrongful only when it is used to obtain property to which the threatener is not entitled."); *United States v. Farrah*, 2000 WL 92349, at *2 (D. Conn. Jan. 5, 2000), aff'd, 11 F. App'x 34 (2d Cir. 2001) (same; noting that a threat to go to authorities is not a crime if the person believes they are owed the money). The government plans to present just this type of argument to the jury: that Mr. Ray extorted various individuals by, *inter alia*, threatening them that he would go to the police if they did not provide property. *See, e.g.,* Dkts. 289, at 3; 292 (superseding indictment)*.* This type of threat would not be wrongful, and therefore, would not meet an element of extortion if Mr. Ray believed he was entitled to the property. Thus, the jury could find that Mr. Ray firmly believed the complainants were harming him and damaging his property, so he understood they were repaying him money owed, and that he, therefore, was not guilty of extortion. Dr. Pierre's testimony about Mr. Ray's delusion-like beliefs is, therefore, directly relevant to the jury's assessment of this element.

 Mr. Ray has also already explained the link between his intent and the counts at length in earlier briefing, Dkt. 278, so writes here in response to the government's newly raised arguments in its pre-hearing reply brief.[7] First, the government argues that they do not need to prove Mr. Ray's specific intent for the alleged threats because they are "embedded" or "intertwined" with violence. Dkt. 289, at 3. The government cites nothing that would support this conclusion. The statute and case law relating to extortion clearly require the government to prove Mr. Ray's specific wrongful intent. The government can make this assertion to the jury in support of its

---

[7] Additionally, as your Honor noted at oral argument, to the extent the government relies on a fraud theory of sex trafficking, this too is a specific intent crime, for which evidence of Mr. Ray's mental state would be relevant.

argument that it has proved Mr. Ray's wrongful intent, but it is not a reason to exclude Mr. Ray's rebuttal to that argument.

Next, the government argues that the amounts of money are too large to reasonably be related to the harm caused. Dkt. 289, at 4-5. In support, it cites *Jackson*, 196 F.3d at 385 (2d Cir. 1999), in which the Circuit analyzed whether an error in failing to appropriately charge the jury about the specific intent required for a threat was harmless. Here, of course, unlike in *Jackson*, the government has not yet introduced evidence about the amount of money involved in any of the alleged crimes and, as the government admits, the reasonable repayment for poisoning someone is "not readily quantifiable." Dkt. 289, at 5.[8] The government may argue to the jury at trial that the amount of money was not reasonably related to the harm; this is not a reason to exclude the evidence.

Finally, with respect to tax evasion, the government argues that only evidence of delusional belief related to the tax code is admissible. Dkt. 289, at 7. It points to no such limitation in the case law. As with extortion and money laundering, if Mr. Ray believed the money was owed to him and did not constitute taxable income, the jury could find that undermined the government's proof that he intended to evade taxes. Nothing more is required.

Mr. Ray's delusion-like persecutory beliefs are infused in the criminal case against him and negate the *mens rea* element of many of the offenses charged. Mr. Ray is charged with extracting "confessions[9] from the [complainants] that they had caused harm and damage … including by poisoning [Mr. Ray] and others" and claims that Mr. Ray "leveraged" these

---

[8] That the Second Circuit in *Jackson* ultimately found the charging error to be harmless after reviewing all the proof at trial, including the amount of money involved, does not change that the Circuit found it to be error. This Court should, of course, endeavor not to create error in the first place, rather than rely on the hope that the government's proof will be strong enough to make any error harmless.

[9] After calling these confessions "false" for about two years, the new superseding indictment removes the word false and calls the confessions "purported." Dkt. 292.

"confessions" to commit the charged crimes. *See* Dkt. 292. These so-called "confessions" reflect Mr. Ray's—and the complainants'—then-existing delusion-like conspiracy beliefs. Dr. Pierre's testimony is directly relevant to Mr. Ray's *mens rea* to commit extortion, money laundering, and tax evasion.

### III.   It was appropriate for the defense to withdraw the Rule 12.2 notice after learning the substance of Dr. Pierre's expert opinion.

Mr. Ray's defense, as described above in Point II, is related to undermining the government's proof related to his specific intent. The defense will not argue that Mr. Ray suffers a mental disease or defect that affects his overall culpability. As Dr. Pierre testified, his examination did not make any conclusion about Mr. Ray's ability to tell "right and wrong." T. 82. He did not find that he was "incapable of forming rational thoughts." T. 88. Delusion-like beliefs are not a "severe mental disease or defect" as required for an affirmative insanity defense. 18 U.S.C. § 17. Because the evidence here rebuts intent and does not meet the Rule 12.2 requirements, it was appropriate for the defense to withdraw the Rule 12.2 notice.

*Finley* is not to the contrary. In *Finley*, the Ninth Circuit did not discuss whether the expert evidence should be admitted under Rule 12.2 or to negate *mens rea*. Instead, to the extent the Court discussed Rule 12.2, it was in the context of concluding that the defense Rule 12.2 notice, coupled with defense letters explaining the nature of the testimony, were sufficient to put the government on notice of the defense, even though the testimony was not explained at length, and the expert produced no report. *See* 301 F.3d at 1004-1005 & n. 4.

Just as in *Finley*, the defense has not been engaged in any form of gamesmanship: had Dr. Pierre reached a different conclusion, for example, that Mr. Ray suffered from a formal delusional disorder, the defense would not have withdrawn its Rule 12.2 notice and would have proceeded under that rule. But Dr. Pierre did not reach that diagnosis. As Dr. Pierre testified, his

original hypothesis before meeting Mr. Ray was that he did "actually suffer a delusional disorder." T. 172. Thus, the defense put in the Rule 12.2 notice believing it was likely we would raise a Rule 12.2 defense. However, after Dr. Pierre "did a more complete evaluation" he determined that Mr. Ray's symptoms "did not rise to the level of being a full-blown delusion and there were not other types of symptoms that would substantiate a diagnosis of a formal mental disorder." T. 174. Reacting to Dr. Pierre's expert opinion, the defense withdrew the Rule 12.2 notice, which it believed was no longer appropriate and, instead, noticed Dr. Pierre to testify about Mr. Ray's delusion-like beliefs, as related to his intent.

In the event the Court disagrees, and believes that Dr. Pierre's opinion should fall under Rule 12.2, however, the result would not be an exclusion of his testimony. *See Finley*, 301 F.3d at 1018 ("exclusion is an appropriate remedy for a discovery rule violation only where "the omission was willful and motivated by a desire to obtain a tactical advantage"); citing *Taylor v. Illinois*, 484 U.S. 400, 415 (1988) (upholding trial court's exclusion of witness where defendant deliberately failed to identify witness prior to trial) (emphasis added); *see also United States v. Peters*, 937 F.2d 1422, 1426 (9th Cir. 1991) (holding district court erred in excluding testimony of forensic pathologist because no willful or blatant discovery violation occurred). The defense has, in good faith, met all of its obligations related to expert disclosures. The government had notice on November 26, 2021, that Mr. Ray was undergoing a psychiatric diagnostic interview and that the expert planned to use the PDI. *See* Dkt. 261. The government received specific notice of the defense's plan to introduce Dr. Pierre's testimony on Mr. Ray's delusion-like beliefs since December 6, 2021. *See* Dkt. 266-1 (Defense Expert Notice, Dec. 6, 2021, noting, *inter alia*, that Dr. Pierre would "testify that Mr. Ray's persecutory beliefs or 'conspiracy theories'" are a specific type of unusual 'delusion-like beliefs'"). Now, the government has heard

Dr. Pierre testify extensively at the *Daubert* hearing, had the opportunity to cross-examine him, and received his case notes and draft report. It has already engaged a rebuttal expert, *see* Point IV, *infra*. It has not been prejudiced in any way. Because Mr. Ray is not arguing that he is insane or has a diminished capacity, or any other complete defense to the charges, there is no basis for the government to evaluate Mr. Ray, and pierce his right to remain silent. However, even if the Court disagrees, the remedy would still not be to exclude Dr. Pierre's testimony, but, instead, to consider conditioning the admission of the testimony on permitting the government to evaluate Mr. Ray, under Rule 12.2 (c)(1)(B) ("If the defendant provides notice under Rule 12.2(b) the court may, upon the government's motion, order the defendant to be examined under procedures ordered by the court.").

*       *       *

Dr. Pierre's testimony is vital to Mr. Ray's defense. "Few rights are more fundamental than that of an accused to present witnesses in his own defense. Indeed, this right is an essential attribute of the adversary system itself." *Taylor v. Illinois*, 484 U.S. 400 (1988). *See also Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). As the government describes its version of events: "[Mr. Ray's] insistence to his victims that he was imprisoned based on a plot against him by Bernard Kerik, among others, is an essential part of the story of [Mr. Ray's] crimes, and is necessary to explain why several [alleged] victims made false confessions that they were conspiring against [Mr. Ray] with Bernard Kerik and others." Dkt. 274. The government also plans to argue that Mr. Ray used "psychological manipulation" to prove his intent. Mr. Ray has a right to rebut that story.

For these reasons, the Court should permit the testimony of the defense's proffered expert witness, Dr. Joseph Pierre.

17

IV.    **The Court should conduct a *Daubert* hearing for the government's proffered rebuttal expert.**

On January 11, 2022, the government notified Mr. Ray that it intends to call Dr. Schulman as a rebuttal expert witness at trial. Gov. Ltr., Ex. A. The notice indicates that Dr. Schulman is expected to testify regarding her "consultations" with Mr. Ray in August 2014, her "conversations with him, and her impressions of him, as reflected" in identified medical records. *Id. See also* Dr. Schulman's notes, Ex. B. The notice gleaned four comments from Dr. Schulman's 2014 consultation notes:  (i) Mr. Ray "has characteristics that are strongly suggestive of pseudologia fantastica, or Munchausen's disorder"; (ii) Mr. Ray's "statements and behavior raised meaningful questions about his truthfulness"; (iii) Mr. Ray "was not confabulating due to memory loss, nor is he psychotic or delusional"; and (iv) "one possibility for an elevated mercury serum level is factitious disorder with intentional ingestion of toxic substances." Ex. A. (internal quotation marks omitted). *See also* Ex. B. In response to counsel's questions about the basis of Dr. Schulman's experience, the government indicated that her opinion would be based on the "umbrella of her expertise in assessing [the] overlap between medical and psychiatric illness, and her experience in diagnosing symptoms that are not readily medically explainable." *See* Jan. 18, 2022 Email, Ex. C. The government also provided Dr. Schulman's curriculum vitae, which does not reflect any specialization or experience treating patients with factitious disorder or pseudologia fantastica. Ex. D.

Notwithstanding the government's notice, Dr. Schulman's notes do not reflect a diagnosis of factitious disorder or pseudologia fantastica. Rather, her initial consultation notes appear to show that she diagnosed Mr. Ray with narcissistic and histrionic personality disorder, and considered "factitious disorder and attention deficit hyperactivity disorder per patient." Ex. B. In fact, she appears to have ruled out a diagnosis of factitious disorder. *Id.* ("Dx: Narcissistic

and histrionic personality d/o; r/o factitious disorder; r/o attention-deficit hyperactivity disorder per patient.")[10] As part of her second consultation, Dr. Schulman diagnosed Mr. Ray with severe narcissistic personality disorder. Ex. B. She again wrote "r/o factitious disorder," and added "r/o antisocial PD." *Id.* In the narrative section of this report, she wrote that "he is not grossly delusional" and that it was "impossible to know whether there was intentional ingestion of mercury." *Id.*

Mr. Ray's records state that his "discharge" diagnoses are mercury poisoning and tachycardia (rapid heartbeat). *See* US_015382. The same discharge record reflects "acute" diagnoses of attention deficit disorder with hyperactivity, histrionic personality disorder, and narcissistic personality disorder. *Id.* None of the opinions from the government's notice are indicated in Mr. Ray's discharge paperwork.

### A.    *The Court should conduct a hearing to assess whether Dr. Schulman has sufficient experience in factitious disorder or pseudologia fantastica.*

Both factitious disorder and pseudologia fantastica "pose an enduring conundrum regarding their definition, etiology, investigation, and management." Charles C. Dike, MD, MPH, FRCPsych, *A Radical Reexamination of the Association Between Pathological Lying and Factitious Disorder*, 48 J AM. ACAD. PSYCHIATRY LAW 431 (2020). These are two "poorly understood and controversial conditions," *id.,* and only about 1% of hospital patients present with symptoms that meet the criteria for factitious disorder. DSM-V at 326. It is the government's burden to prove that Dr. Schulman's training properly qualifies her to testify about characteristics of factitious disorder or pseudologia fantastica. *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). Based on the record available, the government has not met that burden.

---

[10] "R/o" appears to be a common abbreviation that means "rule out." *See*, Medical Dictionary, https://medical-dictionary.thefreedictionary.com/R%2FO (defining "r/o" as "abbreviation for "rule out").

Based on her curriculum vitae, Dr. Schulman's training is in psychosomatic disorders, with no apparent training in factitious disorder or pseudologia fantastica. Ex. D. While a "lack of specialization is not a per se bar to qualification," an expert must have education and experiential qualifications in a general field closely related to the subject matter in question. *See Tardif v. City of New York*, 344 F.Supp.3d 579, 598 (S.D.N.Y. 2018). In *Tardif*, this court found that a licensed psychologist was "just barely" qualified to testify regarding post-traumatic stress disorder ("PTSD") based on his education and experience, even though the psychologist estimated that between 10 and 20 percent of his patient population had some form of PTSD traits or actual PTSD. *Id*. Here, the government has made no showing about how often, if ever, Dr. Schulman has encountered individuals presenting with the exceedingly rare conditions of factitious disorder or pseudologia fantastica.

Just as this Court conducted a *Daubert* hearing to assess the relevance of Dr. Pierre's expertise to his proposed testimony, so too, the Court should conduct a *Daubert* hearing to assess the admissibility of Dr. Schulman's proposed testimony. *See Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45 (S.D.N.Y. 2016) (requiring that "rebuttal experts must meet *Daubert*'s threshold standards regarding the qualifications of the expert, sufficiency of the data, reliability of the methodology, and relevance of the testimony").

> **B.**     ***The Court should conduct a hearing to understand the basis for Dr. Schulman's conclusions.***

At a *Daubert* hearing, the government should also be required to demonstrate that the subject of Dr. Schulman's testimony is based on reliable methods or sufficient facts or data. Here, Dr. Schulman's own records indicate that she did <u>not</u> diagnose Mr. Ray with either factitious disorder or pseudologia fantastica. Instead, her notes indicate that she considered those as possibilities, but reached no conclusion, writing "r/o factitious disorder" and that "<u>one</u>

possibility for an elevated mercury serum level is factitious disorder." Ex. B (emphasis added). A diagnosis of factitious disorder requires "demonstrating that the individual is taking surreptitious actions to misrepresent, simulate, or cause signs or symptoms of illness or injury in the absence of obvious external rewards." DSM-V at 325. Dr. Schulman identified no evidence that Mr. Ray was lying with respect to the cause of his elevated mercury serum levels. In fact, she repeatedly stated otherwise: "[T]here is no way for us to know which elements of the patient's stories are true and which are not"; "None of these things is proof that his stories are untrue, but it is enough to raise the question in a meaningful way"; "[S]ince we have no way of knowing which things he tells us are truthful or not, we should simply proceed as if he is a completely unreliable historian." Ex. B.

As Dr. Pierre testified, Dr. Schulman's notes about factitious disorder and pseudologia fantastica are only "speculative[ ]" diagnoses. T. 47. The record does not explain why Dr. Schulman did not reach a conclusion about those diagnoses. It could be because she did not have adequate time to meet with Mr. Ray – she met him on two occasions for a total of less than two hours while he was at the hospital, Ex. B; it could be because she believed she needed to do diagnostic testing to reach a conclusion – she did none) or it could be because, after considering those diagnoses, she found he did not meet the diagnostic criteria. Based on the information available to the defense and the Court, we can only speculate. A *Daubert* hearing is, therefore, necessary.

This Court should conduct a *Daubert* hearing to ask Dr. Schulman about the methods she applied and the facts she relied on to determine that Mr. Ray's characteristics are strongly suggestive of pseudologia fantastica or factitious disorder, and that he was not confabulating due to memory loss. In addition, it is equally important to confirm that Dr. Schulman in fact recalls

the methods she applied and the facts she relied upon to arrive at these conclusions, given that

her consultations took place over period totaling less than two hours over seven years ago. [11]


Dated: January 24, 2022                    Respectfully submitted,
       New York, New York
                                           /s/ Allegra Glashausser
                                           Allegra Glashausser, Esq.
                                           Marne L. Lenox, Esq.
                                           Peggy Cross-Goldenberg, Esq.
                                           Neil P. Kelly, Esq.

                                           FEDERAL DEFENDERS OF NEW YORK, INC.
                                           52 Duane Street – 10th Floor
                                           New York, New York 10007
                                           Tel.: (212) 417-8700

                                           *Counsel for Lawrence Ray*

---

[11] At argument today, the government noted that it may also request to call Dr. Schulman even if Dr. Pierre's testimony was excluded. The government pointed to no basis that would allow it to introduce a rebuttal expert to rebut Mr. Ray's own testimony and this Court should preclude it from doing so.