UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

UNITED STATES OF AMERICA,

      -v-

LAWRENCE RAY,

                   Defendant.

-------------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___2/1/2022___
```

20-cr-110 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

The Government moves to exclude the testimony of defendant's proffered expert witness, Joseph Pierre, M.D., from testifying at trial.  The Government argues that Dr. Pierre's testimony is irrelevant, prejudicial, and impermissible under the Insanity Defense Reform Act of 1984, that his methods are unreliable, his opinions are not based on sufficient facts or data, and defendant's notice is deficient.  Dkt. No. 266.

For the following reasons, the motion to exclude is granted.

## BACKGROUND

Familiarity with the Court's prior opinions setting forth the charges in this case and its procedural history is assumed.  In summary, Ray has been charged in a 17-count second superseding Indictment (the "Indictment") with: Racketeering Conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One); Extortion Conspiracy in violation of 18 U.S.C. § 1951 (Count Two), Extortion in violation of 18 U.S.C. §§ 1951 and 2 (Count Three); Sex Trafficking in violation of 18 U.S.C. §§ 1591 and 2 (Count Four); Conspiracy to Commit Sex Trafficking in violation of 18 U.S.C. § 1594 (Count Five); Forced Labor in violation of 18 U.S.C. §§ 1589 and 2 (Count Six); Forced Labor Trafficking in violation of 18 U.S.C. §§ 1590 and 2 (Count Seven); Forced Labor Conspiracy in violation of 18 U.S.C. § 1594 (Count Eight); Use of Interstate

Commerce To Promote Unlawful Activity in violation of 18 U.S.C. §§ 1952(a)(3)(B) and 2
(Count Nine); Use of Interstate Commerce to Promote Unlawful Activity in violation of 18
U.S.C. §§ 1952(a)(3)(B) and 2 (Count Ten); Money Laundering in violation of 18 U.S.C.
§§ 1956(a)(1)(B)(i), (ii), and 2 (Count Eleven); Tax Evasion, in violation of 26 U.S.C. § 7201,
for the years 2015 (Count Twelve), 2016 (Count Thirteen), 2017 (Count Fourteen), 2018 (Count
Fifteen), and 2019 (Count Sixteen); and Violent Crime in Aid of Racketeering in violation of 18
U.S.C. § 1959(a)(3).  Dkt. No. 292.

The Indictment that Ray and his co-defendant Isabella Pollok "were members and
associates of a criminal organization (the 'Enterprise') whose members engaged in, among other
things, extortion, sex trafficking, forced labor, money laundering, and obstruction of justice."
Dkt. No. 292 at 1.  It alleges that, between "in or about 2010 and in or about 2020" Ray targeted
a group of college students and others for indoctrination and criminal exploitation, including
extortion, forced labor, and prostitution.  *See id.* at 3.  He is accused of extracting from victims
false confessions that they had caused harm and damage to Ray and associates.  *Id.*  He is also
alleged to have extorted money from the victims, forced some of the victims to perform unpaid
manual labor and provide sexual services, and caused one of the female victims to engage in
commercial sex acts for the financial benefit of the Enterprise.  *Id.* at 3.  The Indictment includes
examples of Ray's alleged treatment of the victims, including: his physical abuse; his extortion
of the victims to further the purposes of the Enterprise; his use of verbal and physical threats to
force the victims to perform physical labor on property in North Carolina; and his inducement of
one victim to act as a prostitute, which resulted in "millions of dollars in profits for the
Enterprise."  *Id.* at 6–17.  He is also alleged to have laundered the proceeds of his criminal

activity, *id*. at 17–18, and evaded the payment of federal income taxes on income he earned from the operations of the Enterprise, *id.* at 18–24.

On November 15, 2021, the defense filed a notice, pursuant to Rule 12.2(b) of the Federal Rules of Criminal Procedure, that the defendant "intend[s] to introduce expert testimony relating to mental disease or defect or any other mental condition of Lawrence Ray bearing on the issue of guilt." Dkt. No. 247. On November 22, 2021, the Court ordered the defense to amend its notice to reflect the specific tests that the expert administered or intended to administer to the defendant. Dkt. No. 257 at 7. The defense thereafter supplemented its notice by stating a doctor would be conducting a "psychiatric diagnostic interview" of the defendant over the course of several meetings and that he planned to "administer scales that measure and quantify delusional thinking, including the Peters Delusional Inventory and/or the Psychotic Symptom Rating Scales." Dkt. No. 261.

The defense has since withdrawn its Rule 12.2 notice. *See* Dkt. No. 266-2 at 2.

On December 6, 2021, the defense provided the Government with its expert notice, disclosing that it intended to call Dr. Joseph Pierre as an expert witness. Dr. Pierre is the Chief of Mental Health Community Care Systems at the VA West Los Angeles Healthcare Center, as well as a Health Sciences Clinical Professor in the Department of Psychiatry and Biobehavioral Sciences at the David Geffen School of Medicine at UCLA. Dkt. No. 266-1 at 3. According to the notice, Dr. Pierre "has extensive clinical experience working with individuals with psychotic disorders, substance abuse disorders, and those with 'dual diagnoses.'" *Id.* He has presented research findings and lectured to audiences worldwide; has served as a consulting expert in legal cases involving, among other things, delusion-like beliefs and conspiracy theories; and has testified as an expert witness in federal court. *Id.*

The disclosure states that Dr. Pierre is expected to testify "that Mr. Ray has longstanding persecutory beliefs that are firmly held with extreme conviction, consistent with a paranoid cognitive style"; that his "persecutory beliefs or 'conspiracy theories' are a specific type of unusual 'delusion-like beliefs' that have been shared by other individuals, including the alleged victims"; and that "his reported and documented Adderall consumption would exacerbate a preexisting paranoid syndrome."[1]  *Id.*  It also states that "Dr. Pierre will rebut Dr. Hughes's noticed testimony about coercive control," including by testifying that "the complainants' 'confessions' would not necessarily require 'coercive control' or conscious manipulation, but merely suggestibility or a willingness to please in the context of dyadic relationships."  *Id.* Finally, Dr. Pierre is expected to respond to and rebut Dr. Pleus's expert opinion on toxicology.[2] In this regard, Dr. Pierre will testify that medical evidence of Ray's elevated mercury levels at least partially supports Ray's belief that he has been exposed to mercury.  *Id.*

According to the disclosure, Dr. Pierre reviewed an array of materials.  They include Ray's medical and psychiatric records; FBI interview reports of Ray and other individuals associated with the case; an email sent by one of the alleged victims to the dean of Sarah Lawrence College; records related to the defendant's child custody dispute in 2005; a letter from 1999 pertaining to the defendant's purported assistance during the Kosovo crisis; photographs of the defendant with military figures and world leaders; and audio recordings of conversations between alleged victims, Ray, and others.  Dkt. No. 278, Ex. D.  The defense also disclosed that

---

[1] At the *Daubert* hearing, Dr. Pierre equivocated on this conclusion, explaining that "in someone who has those kinds of delusional beliefs, it's certainly possible that the Adderall could be worsening, exacerbating delusional beliefs of that nature," and that he "didn't think it was necessary [sic] the cause of the paranoia, but . . . it could be exacerbating those beliefs."  *Id.* at 54.

[2] Dr. Pleus is expected to testify that the medical records are inconsistent with Ray's exposure to mercury at levels that would cause the health effects reported or that he suffered health impairments from poisoning.  See Dkt. No. 287 at 28.

Dr. Pierre met with Ray for four hour-long interviews by video conference and interviewed one of his relatives.

On December 10, 2021, in response to questions from the Government, the defense provided further disclosure with respect to Dr. Pierre. It disclosed two cases in which Dr. Pierre testified "as an expert on conspiracy theories/delusion-like beliefs" and noted that he testified as an expert in other cases and consulted as an expert on a number of cases. Dkt No. 266-2 at 3. The defense further stated that it did not have a final report from Dr. Pierre but would provide it pursuant to Federal Rule of Criminal Procedure 16 "[i]f and when we receive one." *Id.* This supplemental disclosure repeated that Dr. Pierre had interviewed Ray for one hour on four separate occasions by video conference with the MDC and that those interviews, combined with the other information in the previously made expert disclosure, would provide the bases for Dr. Pierre's conclusions. *Id.* The defense reported that Dr. Pierre administered one psychological test to Ray, the Peters et al. Delusions Inventory ("PDI"), and Ray's responses to the PDI did not indicate that he met the criteria set forth in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5") for a paranoid delusion syndrome, but, according to the defense, Dr. Pierre would not rule out the diagnosis if he had more information. Dkt. No. 266-2 at 3–4. It explained that:

> [b]ased on the information currently available to him. Dr. Pierre concluded that he could not diagnose Mr. Ray with a mental disease or defect at this time. He concluded that Mr. Ray has persecutory believes (believes in conspiracy theories) which are a specific type of delusion-like beliefs. These firmly held beliefs are consistent with a paranoid cognitive style.

*Id.* at 4. The defense stated that Dr. Pierre's rebuttal testimony concerning toxicology is based on his "experience and training as a medical doctor including his degree in biology" and his review of Mr. Ray's medical records. Dkt No. 266-2 at 4. The defense refused to produced

Ray's responses to the PDI test because it had withdrawn its Rule 12.2 notice, and Dr. Pierre would not be offering evidence that Ray suffered from a mental disease or defect. *Id.*

After receiving the Government's motion to exclude Dr. Pierre's testimony and Ray's opposition to that motion, the Court ordered a *Daubert* hearing for Dr. Pierre. The defense produced Ray's responses to the PDI test and Dr. Pierre's notes as 3500 material in connection with the hearing. At Ray's request, and in light of concerns over an increase in COVID-19 cases in New York and in California, where Dr. Pierre is located, as well as staffing shortages at the hospital in which he works, the Court ordered the *Daubert* hearing to proceed by videoconference. Dkt. No. 286. The virtual *Daubert* hearing took place on January 19, 2022.

At the hearing, Dr. Pierre testified about his education and experience in the field of psychiatry and provided an overview of certain articles he had published about delusion-like beliefs. He explained that he has testified in two criminal cases, both of which involved allegations of tax evasion and claims that the defendant was a "sovereign citizen" and had delusion-like beliefs about the government. Dkt. No. 312 at 23–24. He also testified that he is not board certified in forensic psychiatry and is not eligible to be board certified in forensic psychiatry, which he agreed was "a distinct field with distinct training." *Id.* at 66. He explained that he had conducted "the neighborhood of five to ten" forensic examinations in his career and that "it's fairly routine to consult experts . . . in a forensic setting who don't necessarily have certification as a forensic psychiatrist." *Id.* at 67. He agreed that forensic psychiatrists receive additional training, including through fellowships, formal lectures in the field, and training on how to detect malingering in individuals who have been charged with a crime. *Id.* at 68.

Dr. Pierre testified that he interviewed Ray on four occasions through video for approximately one hour each in order to perform a psychiatric assessment and that, since the start

of the COVID-19 pandemic, it is relatively routine to use video to perform assessments. *Id.* at 24.  In forming his opinion, he consulted medical records, news articles that had been published about the case, email correspondence, psychiatric reports, and FBI interviews with people involved in the case and also interviewed Ray's father. *Id.* at 75.  He also administered a single psychiatric test, called the Peters et al. Delusion Inventory ("PDI") that is "used to detect and quantify delusion-like belief." *Id.* at 39–40   Dr. Pierre "did not find any evidence a major or formal mental disorder in Mr. Ray" and "did not find evidence that he suffered from schizophrenia, or a delusional disorder" or shared psychotic disorder, and he found insufficient evidence that Ray suffers from paranoid personality disorder. *Id.* at 27, 35, 57.  Dr. Pierre testified that when he referred to a "formal diagnosis," he meant that "one of the diagnoses of a mental disorder included in the DSM," *id.* at 76, which he distinguished from the identification of symptoms or a constellation of symptoms, *id.* at 76–78.  He also agreed that, while there may be clear terminology for symptoms, there are fewer standardized labels to summarize constellation of symptoms. *Id.* at 78.

Dr. Pierre did, however, determine that Ray has "delusion-like beliefs and belief in primarily a conspiracy theory." *Id.* at 27.  Although he believed that Ray had a paranoid cognitive style, he also opined that such a style is not a "disorder at all" but a symptom. *Id.* at 80–81.  Dr. Pierre explained that, in his view, Ray held "very longstanding delusion-like beliefs held with significant conviction" that "subject[ed] him to stress, and social function." *Id.* at 28. In particular, Dr. Pierre testified that he concluded that Ray suffers from delusion-like beliefs because he "believes that for many years he's been the victim of poisoning as well as other forms of persecution or harassment as a coordinated attack on him, not just by a few central figures, but a larger conspiracy of figures who are basically in cahoots with those individuals." *Id.* at 31–32.

He also testified that Ray's views do not qualify as delusional because "they are shared beliefs shared by people both in in his . . . inner circle, and also people outside of that inner circle." *Id.* at 33. He further testified that Ray did not have shared psychotic disorder because "rather than Mr. Ray having this belief and essentially convincing others of the belief, Mr. Ray was at least as much convinced of the belief himself based on the testimony of these other people"—a conclusion that was bolstered by the observation that when "Mr. Ray defends his beliefs, he does so in a fairly rational manner." *Id.* at 57. He concluded that the defendant had delusion-like beliefs notwithstanding the fact that a psychiatrist who previously treated Ray, Dr. Shah, had not diagnosed Ray with delusions or persecutory beliefs and had not documented the existence of Ray's beliefs. *Id.* at 139–40. Dr. Pierre did not talk to Dr. Shah to understand why Ray's beliefs were not documented in Dr. Shah's records. *Id.* at 141.

Dr. Pierre recorded his opinion and the basis for it in a draft report that was entered into evidence at the *Daubert* hearing. Dkt. No. 312 at 25. In the draft report, Dr. Pierre explained that the DSM-5 defines a delusion as "A false belief based on incorrect inference about external reality that is firmly held despite what almost everyone else believes and despite what constitutes incontrovertible and obvious proof or evidence to the contrary." Dkt. No 312, Ex. G at 9. He explained that, while Ray's beliefs "are firmly held with extreme conviction," Dr. Pierre could not conclude that Ray's beliefs were formally classified as delusional because the beliefs are supported by some evidence and also shared by others. *Id.* at 9, 12. Dr. Pierre explained that Ray's beliefs (1) become less "superficially improbable" "when considered against the backdrop of verified elements" of Ray's past, and (2) "are or have been shared with other individuals," including family members, his alleged victims, and his co-defendant, and have "been supported by various individuals . . . who have advocated professionally on Mr. Ray's behalf." *Id.* Dr.

Pierre also noted that Ray's persecutory beliefs "have been substantiated through the recorded confessions and subsequent statements" of his alleged victims, and that while Dr. Pierre himself did not believe that the evidence supported that Ray had been poisoned, Ray's belief that he has been poisoned is supported by physical symptoms and elevated mercury levels. *Id.* He explained that Ray demonstrated some cognitive flexibility and does not claim full-belief conviction for beliefs that are not supported by evidence. *Id.* at 9–10. Dr. Pierre concluded that Ray "displays no evidence of a formal psychiatric disorder beyond longstanding persecutory beliefs held with significant conviction" and that even though Ray's beliefs "cannot be formally classified as delusions[,] . . . they are consistent with a paranoid cognitive style." *Id.* at 12. He explained that, while current evidence does not show that Ray meets the DSM-5 criteria for paranoid personality disorder, "[a]dditional psychometric testing could help to clarify the presence of a personality disorder." *Id.*

At the *Daubert* hearing, Dr. Pierre agreed that persecutory beliefs are not themselves a mental illness and can exist in mentally healthy people, *id.* at 90–91, and that delusion-like beliefs are potentially present in more than half the population including in "normal people," *id.* at 89–90. They represent "a wide spectrum of belief, . . . with a considerable variation in how much they impair someone's functioning, cause distress, and that sort of thing." *Id.* at 90. According to Dr. Pierre, there is little evidence to support the proposition that belief in conspiracy theories is necessarily associated with functional impairment, and he agreed that delusion-like beliefs alone do not actually capture anything about a person's mental health. *Id.* at 119. A person with delusion-like beliefs can think rationally, follow the law, and know the difference between right and wrong and a person with delusion-like beliefs can still knowingly violate the law. *Id.* at 120–21. While he opined that Ray was not "mentally healthy," he agreed

that such a phrase is vague and provides only "pretty limited" information about Ray's mental health.  *Id.* at 91–92.

In response to questioning regarding the methodology he used to reach his conclusions about Ray's mental health, Dr. Pierre testified that his method was interviewing Ray for four hours and reviewing the records.  *Id.*  He also spoke to Ray's father for about 15 minutes, who agreed with Ray's statements that he was being persecuted by various individuals and was being poisoned.  *Id.* at 55–56, 74.  Dr. Pierre took what Ray's father said at face value even though he assumed that the father wanted Ray to be found not guilty. *Id.* at 151.  Notably, Dr. Pierre had already come to the conclusion that Ray suffered from the "symptom" of having "certain known persecutory beliefs" even before he conducted any psychiatric tests on Ray.  *Id.* at 103.  Even then, Dr. Pierre testified that the only test he administered was the PDI and he did not use that test to reach his diagnosis but to augment his psychiatric exam and just to make sure that there was nothing that diagnosis had missed.  *Id.* at 112–13.  He testified that "the PDI has been used to diagnose delusion-like beliefs," *id.* at 112, and that he administered the PDI to Ray "pretty near the end of [his] assessment" "to make sure [he] covered [his] basis [sic]" and "to make sure . . . that there weren't other areas of delusional thinking that [he] hadn't covered yet."  Dkt. No. 312 at 45.

Dr. Pierre admitted that the PDI is "a pretty widely used tool, *particularly in research*, . . . to estimate or get a quantification of the amount of delusional ideation that either an individual has or a population has."  Dkt. No. 312 at 41 (emphasis added).  The evidence of its clinical or forensic use for the purposes for which Dr. Pierre used it was minimal.  Dr. Pierre testified that the PDI is not designed to diagnose schizophrenia or delusion disorders and that there were other tests to diagnose those types of disorders that he did not administer to Ray.  *Id.* at 99.  He

acknowledged that the test assesses the strengths of a person's beliefs taking the subject's answers at face value, that there is no score on the PDI that tells you whether someone has a psychiatric disorder, that it has been used to measure delusional ideation in the general population, and that sometimes, healthy adults score higher on the type than a sample of adults with delusions.  *Id.* at 102.  Dr. Pierre used the results of his administration of the PDI to confirm that Ray's "delusion-like beliefs [we]re primarily confined to a single theme of prosecution or paranoia." *Id.* at 46.[3]  Dr. Pierre admitted that he could not answer with a yes or no whether there are any research studies that show that the PDI can reliably be applied to persecutory beliefs and that there is no score on the PDI that would differentiate a person with delusions or delusion-like beliefs from an average person who is not delusional. *Id.* at 106.  Ray answered yes to only three of the 21 questions on the PDI, showing no signs of delusions or strong beliefs with respect to most of the categories of possible delusions.  *Id.* at 104.

Dr. Pierre did not administer to Ray the tests that he administered to the federal defendants in the prior cases in which he testified that the defendants held delusional beliefs, such as the conspiracy mentality questionnaire, the beliefs and values inventory, and the bullshit-receptivity scale.  *Id.* at 105.  He also testified that he did not administer any diagnostic tests to assess whether Ray was deliberately fabricating because he had a motive to lie separate and apart from his mental health.  *Id.* at 135.

Dr. Pierre was aware that Ray had previously been diagnosed with narcissistic personality disorder, in 2005, and factitious disorder of Munchausen syndrome, in 2014.  He explained that factitious disorder is a psychiatric disorder that involves people lying about

---

[3] Dr. Pierre has never used the Peters Inventory in a forensic context or as a subject of expert testimony in federal court.  *Id.* at 104.

medical or physical symptoms.   In the 2005 assessment, the examiner concluded that Ray was

manipulative and controlling and "literally impossible to evaluate in the usual clinical manner."

*Id.* at 130–32.  The evaluator described Ray as a "calculating, manipulative, and hostile man who

masks his hostility presenting instead a boyish charming façade" who has tendencies which "in

his mind take him almost above the law."  *Id.* at 136.  Dr. Pierre testified that he discounted those

diagnoses in his assessment because, based on his review of the records and his examination, he

did not believe he had those syndromes.  *Id.* at 48.  He also agreed, however, that he had no

reason to dispute that it was conduced under highly standardized conditions and that the

evaluator used a standard, validated test.  *Id.* at 131.  In the 2014 assessment, the psychiatrist

concluded that there was "no way to tell if Mr. Ray telling the truth" and that "he showed

signs of pseudologica fantastica," which Dr. Pierre agreed "essentially means a compulsive urge

to lie about matters big and small." *Id.* at 137–38.  Dr. Pierre testified only, and in somewhat

conclusory terms,  that he accounted for this assessment but did not agree with it and did not

conduct additional tests in light of it.  *Id.* at 138.

Dr. Pierre admitted that while the decision what tests to administer were his alone and not

those of counsel, he did discuss with counsel the risks of conducting a test called the Minnesota

Multiphasic Personality Inventory ("MMPI"),[4] including that the test could have confirmed the

personality disorder that was described in a 2005 evaluation or identified a disorder that was

inconsistent with Dr. Pierre's psychiatric evaluation.  *Id.* at 146.  Dr. Pierre did not administer a

---

[4] At the *Daubert* hearing, Dr. Pierre agreed that the MMPI is a reliable and well-validated
diagnostic test and that it is "an objective psychological inventory that compares responses from
the subject to those of individuals from various psychodiagnosis groups in the general
population."  *Id.* at 96–97.  It is "used as a matter of both clinical and forensic assessments."  *Id.*
at 97.  It is used to assess malingering, and it has a scale for measuring paranoid beliefs.  *Id.* at
131–32.

test called the Structured Interview of Reported Symptoms, which is and is used to detect feigned symptoms, and did not administer any test to identify the presence of psychopathy. *Id.* at 149.

Notwithstanding the failure to administer these tests, in response to questions on direct about the reliability of Ray's responses, Dr. Pierre explained that he did not believe Ray was malingering—feigning or exaggerating symptoms—because he did not observe what Dr. Pierre characterized as hallmarks of malingering, including evasiveness, inconsistency, and vagueness with answering questions. *Id.* at 39. On cross-examination, however, Dr. Pierre admitted that a person could still be malingering even without the "red flags" he identified on direct examination, *id.* at 121–22, and that he did not conduct any tests to determine whether Ray was malingering.

Dr. Pierre testified that his conclusion that Ray's persecutory beliefs were shared by others was critical to his conclusions in this case. *Id.* at 90. In particular, Ray told him that his "theory" that was the victim of poisoning only "became a firm belief in 2011 when other people confessed to poisoning him" and that he based those beliefs on recorded video and audio confessions. *Id.* at 123–24. But Dr. Pierre admitted that he did not contemplate that the account Ray was giving Dr. Pierre was a self-serving narrative to minimize his criminal culpability or that this might have given him an incentive to malinger. *Id.* at 126. Dr. Pierre based his conclusions on the multi-directionality of the shared beliefs on what Ray had told him and what was in the FBI interviews of the alleged victims, which contained their alleged confessions. *Id.* at 130. Even though to reach his conclusion he had to make assumptions about the beliefs of other people besides the defendant, he did not interview any of those other people aside from the defendant's father. *Id.* at 153–54. Nor did he know or consider the circumstances under which the documents authored by the alleged victims upon which he relied were written even though he

recognized that if they were made under coercion or physical abuse by Ray, that would affect his conclusion that the beliefs expressed therein were shared.  *Id.* at 154–55, 158.  Ultimately, he also agreed that verifying the interpersonal dynamics between Ray and the victims in this case would require a more thorough evaluation and an examination of all parties involved and not just talking to Ray.  *Id.* at 157.

Dr. Pierre testified that his conclusion that Ray possessed "conspiracy theory" beliefs is not a formal diagnosis, that it is not in the DSM, and that it is not, by definition, a mental illness. *Id.* at 108.  He testified that the DSM is "a catalogue of different mental disorders," *id.* at 36, and a way to "standardize diagnoses" to provide for "inter-rater reliability," *id.* at 37.  He explained that the DSM creates standardized labels for disorders, listing the relevant symptoms and permitting mental-health professionals throughout the country to diagnose disorders along similar lines so that there is uniformity across psychiatrists with respect to how to assess individuals for disorders that are generally accepted in the professional communicated and can be evaluated and tested.  *Id.* at 37, 93–94.  Dr Pierre admitted that he did not diagnose Ray with any disorder recognized in the DSM-5.  *Id.* at 81.  He did not reach any conclusion that Ray was unable to tell the difference between right and wrong or that he lacked control over his actions. *Id.* at 82.  Dr. Pierre found no evidence that Ray had persecutory beliefs specific to the tax laws, *id.* at 84, or related to money or amounts of money that he believed he was owned, *id.* at 85.  He did not have delusion-like beliefs about compensatory damages he was owed for being poisoned or related to property damage.  *Id.* at 85–86.  Dr. Pierre saw "no gross evidence of intentional memory or other cognitive impairment" and wrote in his report that Ray was "essentially normal."  *Id.* at 86.[5]  Dr. Pierre also testified that he saw no evidence that Ray was incapable of

---

[5] At the hearing, Dr. Pierre attempted to disavow that conclusion, stating that "we're treading

forming rational thoughts that would form a basis for his subsequent behavior. *Id.* at 89.  He agreed that "delusion-like beliefs alone do not actually capture anything about a person's mental health." *Id.* at 119.  He also testified that Ray's delusion-like beliefs were not "symptomatic of a mental illness because they did not rise to the level of being a full-blown delusion and there were not other types of symptoms that would substantiate a diagnosis of a formal mental disorder. *Id.* at 174.

When asked whether were standardized criteria that were agreed upon in the field to identify whether someone has a "delusion-like belief," Dr. Pierre was evasive.  He agreed that there had been no peer-review study about how to identify delusion-like beliefs. *Id.* at 109.  He pointed to one of his short articles, which had been published in a peer-reviewed journal but was not itself peer-reviewed and that was entered into evidence at the *Daubert* hearing, which offers instructions as to how to assess whether an individual possesses delusion-like beliefs. *Id.* at 111–12. He agreed that there are no specific criteria or a checklist based on a study that shows how to diagnose a delusion-like belief but explained that this was akin to the diagnostic strategy for "a cough or a sore throat or a backache," which he also explained could be established either by evidence of redness in the throat or by a patient saying she had a sore throat even in the absence of redness. *Id.* at 113–14.  He further agreed that there is "no discrete set of agreed-upon criteria in [his] field of psychiatry to look for in making your determination of what is or is not a delusion-like belief." *Id.* at 114.  In response to a question regarding how one could design a study to validate the method he used to determine that Ray had delusion-like beliefs, he said

---

into philosophical territory here" and that his report contained "a poor choice of words." *Id.* at 87–88.  But he could not identify anything that had occurred between the time he wrote the report and the time of his testimony that would affect his conclusion other than that he was asked about the language on cross-examination.  *Id.*  The Court discredits Pierre's hearing testimony on this point and credits his carefully drafted report.

that it was a "difficult question, which goes back to my analogy of a sore throat:  how would you design a study to somehow prove that diagnosing a sore throat is— reflects a sore throat?  I think, we are talking about people's subjective experiences in this case, their beliefs, you know there are limits to that," adding "beliefs are inherently subjective." *Id.* at 116–17.  Nonetheless he testified that "a psychiatric interview is a standard and valid way to arrive at diagnoses—not only of disorders, but of symptoms." *Id.* at 119.

## LEGAL STANDARD

Several bodies of law are relevant to the Court's decision.

### I.  Admission of Expert Testimony

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)); *see also Bourjaily v. United States*, 483 U.S. 171, 175 (1987).  Thus, the proponent must establish, and the trial judge must find "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).  This "gatekeeping obligation" applies "to all expert testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

"The objective of [the gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony.  It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Id.* at 152. Relevancy is determined by whether the proffered evidence "has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  *Amorgianos v. Amtrak*, 303 F.3d 256, 265 (2d Cir. 2002) (internal quotation marks and citation omitted) (alteration adopted); *see also* Fed. R. Evid. 401.  Reliability is determined by considering if (1) "the testimony is based on sufficient facts or data;" (2) "the testimony is the product of reliable principles and methods;" and (3) "the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702; *see also Amorgianos*, 303 F.3d at 266 (citing this standard).

Courts are to adhere to a "liberal standard of admissibility for expert opinions," *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005), and begin with "a presumption that expert evidence is admissible," *Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 115 (S.D.N.Y. 2015) (citing *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995)).  "'[T]he inquiry envisioned by Rule 702 is a flexible one'" and "many factors 'will bear on the inquiry' of whether Rule 702 is satisfied."  *Jones*, 965 F.3d at 161 (quoting *Daubert*, 509 U.S. at 593–94) (alteration omitted).

Not every expert admissible under *Daubert* need rely on a method that conforms with "the exactness of hard science methodologies."  *E.E.O.C. v. Bloomberg, L.P.*, 2010 WL 3466370, at *13–14 (S.D.N.Y. Aug. 31, 2010) (quoting *United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006)).  However, a court still must determine that the evidence is

"sufficiently reliable so as to be admissible," *Amorgianos*, 303 F.3d at 268, and "it is critical that an expert's analysis be reliable at every step," *id.* at 267.  "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."  *Id.* at 267.  Even "[i]f the witness is relying solely or primarily on experience," rather than formal training, "[he still] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *Alto v. Sun Pharmaceutical Industries, Inc.*, 2021 WL 4803582, at *2 (S.D.N.Y. Oct. 13, 2021) (internal quotation marks omitted) (quoting *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 473 n.148 (S.D.N.Y. 2010)).  "In short, the district court must 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'"  *Amorgianos*, 303 F.3d at 265–66 (quoting *Kumho Tire*, 526 U.S. at 152).

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by *ipse dixit* of the expert."  *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  In such cases, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Id.*  And "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."  *Amorgianos*, 303 F.3d at 266.

Under Federal Rule of Evidence 703, an expert's opinion may be based on facts or data that are not themselves admissible, so long as "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject."  Fed. R. Evid. 703. The expert is not permitted to simply transmit otherwise inadmissible facts to the jury but "must form his own opinions by 'applying his extensive experience and a reliable methodology' to the inadmissible materials."  *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (quoting *United States v. Dukagjini*, 326 F.3d 45, 58 (2d Cir. 2003). "[I]f the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect."  Fed. R. Evid. 703.

In any event, an expert witness is not permitted to "state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charges or of a defense."  Fed. R. Evid. 704(b).  Nor can an expert witness opine on the credibility of other witnesses.  *See United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1988) ("The credibility of witnesses is exclusively for the determination by the jury, and witnesses may not opine as to the credibility of the testimony of other witnesses at the trial."); *see also United States v. Jones*, 2018 WL 1115778, at *7 (S.D.N.Y. Feb. 27, 2018).  However, "expert witnesses possessed of medical knowledge and skills that relate directly to credibility . . . may be permitted to testify to relevant physical or mental conditions."  *See Scop*, 846 F.2d at 142; *see also Jones*, 2018 WL 1115778, at *7.

## II.  Evidence Regarding Mental Disease, Defect, or Condition

The Insanity Defense Reform Act of 1984 (the "IDRA"), 18 U.S.C. § 17, puts limits on the admissibility of mental-health evidence in criminal cases in federal court.  The statute provides in relevant part as follows:

It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts.  Mental disease or defect does not otherwise constitute a defense.

18 U.S.C. § 17(a).

In passing the IDRA, "Congress sought to place a number of limitations on a criminal defendant's ability to introduce mental health evidence." *Jones*, 2018 WL 1115778, at *4.  It did so by: (1) eliminating "any form of legal excuse based on a defendant's lack of volitional control"; (2) eliminating "affirmative defenses such as 'diminished capacity,' 'diminished responsibility,' 'mitigation,' and 'justification,'" (3) limiting "the use of expert psychological testimony on ultimate legal issues," (4) altering "the burden of proof to require the defendant to prove the affirmative defense of insanity by clear and convincing evidence," and (5) creating "a special verdict of 'not guilty by reason of insanity,' which triggers federal civil commitment proceedings." *Id.* (citing *United States v. Cameron*, 907 F.2d 1051, 1061 (11th Cir. 1990); *United States v. Sabir*, 2007 WL 1373184, at *5 (S.D.N.Y. May 10, 2007)).

While Congress intended to bar "alternative 'affirmative defenses' that 'excuse' misconduct," it does not bar mental disease "evidence that disproves an element of the crime itself." *United States v. Pohlot*, 827 F.2d 889, 897 (3d Cir. 1987); *see Jones*, 2018 WL 11115778, at *4.  This conclusion is supported by "the text, structure, and legislative history of the IDRA, along with persuasive authority from other circuits." *United States v. Dupre*, 339 F. Supp. 2d 534, 537 (S.D.N.Y. 2004).  Thus, notwithstanding the IDRA, a defendant may "submit[] mental health evidence for the purpose of rebutting the prosecution's proof of the *mens rea* element of a specific intent crime." *United States v. Dupre*, 462 F.3d 131, 137 (2d Cir. 2006); *see also United States v. Melhuish*, 6 F. 4th 380, 394 (2d Cir. 2021) (same).

The district court, in the first instance, must police the boundaries between permissible expert evidence that goes to negating the intent element of a crime and impermissible evidence that seeks to "excuse" the crime. *Cf. Dupre*, 339 F. Supp. 2d at 537–59; *Cromitie v. United States,* 2017 WL 1383982, at *5 (S.D.N.Y. Apr. 7, 2017); *Jones*, 2018 WL 11115778, at *5. That is, the court must guard against the risk "that [mental-health] evidence—even if characterized as strictly relevant to negate intent—will result in the resurrection of precisely the kinds of defenses that the IDRA was enacted to prohibit." *Cromitie*, 2017 WL 1383982, at *5. At the same time, the court must also ensure that the defense is afforded its Sixth Amendment right to call witnesses and to present the best defense. In balancing those considerations, courts require the defendant to "demonstrate a direct link between [the proffered expert] evidence and the *mens rea* that the Government is required to prove." *Id.* Put another way, the evidence must, "'if believed, support a legally acceptable theory of lack of *mens rea*.'" *Jones*, 2018 WL 11115778, at *5 (emphases omitted) (quoting *Dupre*, 339 F. Supp. 2d at 541); *see also United States v. Pirro*, 76 F. Supp. 2d 478, 485 (S.D.N.Y. 1999) ("Mental disease evidence is generally excluded where no link is demonstrated between the evidence and the defendant's *mens rea* or where the defendant could not demonstrate that he actually lacked *mens rea* at the time of the offense because of any psychological defect."). "'Conclusory statements by a defendant about the link between psychiatric evidence and the defendant's *mens rea* at the time the alleged crime was committed do not render the evidence admissible.'" *United States v. Sabir*, 2007 WL 1373184, at *6 (S.D.N.Y. May 10, 2007) (quoting *United States v. Baxt*, 74 F. Supp. 2d 436, 440 (D.N.J. 1999)).

In addition to not being barred by IDRA, any proffered expert mental disease evidence must also meet the standards of the Federal Rules of Evidence, including Rules 702, 704(b) and

403.  As explained above, Rule 702 allows an expert to testify if the expert's specialized

knowledge will be helpful to understand the evidence or determine a fact in issue and the

testimony meets certain indicia of reliability.  *See* Fed. R. Evid. 702.  Rule 704(b) prohibits an

expert witness from testifying about whether the defendant did or did not have a mental state or

condition that constitutes an element of the crime charged or an element of a defense.  Fed. R.

Evid. 704(b).  And under Rule 403, a court may exclude evidence even if it is relevant "if its

probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the

issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative

evidence."  Fed. R. Evid. 403.

> As one court in this District has observed:
>
> There are special concerns for relevance and potential jury confusion in the case of
> expert testimony regarding mental disease evidence offered in an attempt to negate
> the intent element of an offense.  Testimony about mental disease should not be
> allowed where it is offered to support the conclusion, or will mislead the jury into
> concluding, that the disease caused the defendant to commit the crime or otherwise
> impaired her ability to exert volitional control, or that the disease impaired the
> defendant's ability to reflect on the consequences of her conduct.

*Dupre*, 339 F. Supp. 2d at 540–41.  Thus, "if the risk that the jury will interpret the evidence to

support an affirmative defense that is impermissible under the IDRA rather than to negate the

*mens rea* element of the offense substantially outweighs the probative value of the evidence, it

must be excluded."  *Jones*, 2018 WL 1115778, at *5.

Finally, under Federal Rule of Criminal Procedure 12.2(b), a defendant who "intends to

introduce expert evidence relating to a mental disease or defect or any other mental condition of

the defendant bearing on . . . the issue of guilt" must provide written notice to the government

that he intends to do so.  Fed. R. Crim. Pro. 12.2(b).  "If the defendant provides notice under

Rule 12.2(b) the court may, upon the government's motion, order the defendant to be examined

under procedures ordered by the court."  Fed. R. Crim. Pro. 12.2(c)(1)(B).  If a defendant does

not give the notice required under Rule 12.2(b) or submit to an examination when ordered to

under Rule 12.2(c), "[t]he court may exclude any expert evidence from the defendant on the

issue of the defendant's mental disease, mental defect, or any other mental condition bearing on

the defendant's guilt."  Fed. R. Crim. Pro. 12.2(d)(1); *see also United States v. Young*, 213 F.3d

627, 2000 WL 687750, at *3 (2d Cir. 2000) (affirming exclusion of expert testimony offered to

show defendant did not act willfully where the expert testimony diverged from analysis

presented in Rule 12.2 notice and "thus could have been excluded for failing to comply with

Rule 12.2.").

## DISCUSSION

The Government argues that Dr. Pierre's testimony should be excluded for multiple

reasons.  With respect to Dr. Pierre's proffered testimony regarding Ray's "longstanding

persecutory beliefs" and "paranoid cognitive style," the Government contends that it is: (1)

irrelevant, prejudicial, and otherwise inadmissible under the IDRA and Rule 12.2(b), including

because of a deficient notice; (2) irrelevant and inadmissible under the Federal Rules of

Evidence; and (3) based on unreliable methods and not based on sufficient facts or data.  With

respect to Dr. Pierre's rebuttal testimony, the Government contends that he is not qualified to

offer an opinion regarding the alleged victim's confessions and whether they would require

coercive control and that any opinion about the state of mind of the alleged victims would be

improper and unreliable and intrude upon the jury's domain of factfinding and evaluating

credibility.  It also argues that Dr. Pierre is not qualified to give an opinion on toxicology and

that any such opinion would be redundant of the testimony that the Government will offer

regarding defendant's exposure to mercury.  *See* Dkt. No. 266.

## I.     Testimony Regarding Ray's Beliefs and Cognitive Style

The Government contends that Dr. Pierre's proposed testimony that Ray "has longstanding persecutory beliefs that are firmly held with extreme conviction, consistent with a paranoid cognitive style" is not being offered for a permissible purpose under the IDRA or Federal Rule of Criminal Procedure 12.2(b) and should be precluded as irrelevant and unduly prejudicial.  Dkt. No. 266 at 9.  Ray responds that Dr. Pierre's proposed testimony is permissible under the IDRA because the testimony does not speak to a diminished-capacity defense but rather "focuses on the defendant's specific state of mind at the time of the charged offense." Dkt. No. 278 at 3 (quoting *United States v. Cameron*, 907 F.2d 1051, 1067 (11th Cir. 1990)).

The IDRA prevent as defendant from offering a "diminished responsibility" or other defense that would excuse the defendant's conduct. *Dupre*, 339 F. Supp. 2d at 539; *see also* *Sabir*, 2007 WL 1373184, at *5.  It does not, however, prevent a defendant from offering mental-health evidence offered to "rebut[] the prosecution's proof of the *mens rea* element of a specific intent crime," *see Dupre*, 462 F.3d at 137, which is what the defense contends Dr. Pierre's testimony will do.  "[S]uch evidence is permitted only in rare and narrowly defined circumstances because of the high likelihood that it will result in the resurrection of precisely the kinds of defenses that the IDRA was enacted to prohibit."  *Sabir*, 2007 WL 1373184, at *5.  "To ensure that mental health evidence is introduced for the permissible purpose of negating *mens rea* rather than as an affirmative defense to excuse the defendant's conduct, courts must satisfy themselves that the evidence 'would, if believed, "support a *legally acceptable* theory of lack of *mens rea*."'"  *Jones*, 2018 WL 1115778, at *5 (quoting *Dupre*, 339 F. Supp. 2d at 541). "Accordingly, in determining whether evidence of a mental impairment is admissible for this purpose, a defendant is required to demonstrate clearly, in advance of trial, that there is a direct

link between such evidence and the specific *mens rea* that the Government must prove."  *Sabir*,

2007 WL 1373184, at *5.

The question whether there is a "direct link" between Dr. Pierre's testimony and the

elements of the offenses that the Government must prove is relevant not only to the admissibility

of Dr. Pierre's testimony in light of the IDRA but also the degree of helpfulness of the opinion to

the factfinder, *see* Fed. R. Evid. 702, and the relative value of its relevance compared against its

risk of confusing the jury, *see* Fed. R. Evid. 403.  The defense argues that Dr. Pierre's testimony

about Ray's delusion-like beliefs could (1) "negate the 'wrongful' element of extortion and

extortion conspiracy," Dkt. No. 278 at 10; (2) "negate the specific intent required to establish

money laundering," *id.* at 11; and (3) help a jury to find that "Ray did not know [the income he

obtained from his alleged victims] was taxable income, and consequently did not 'willfully'

commit tax evasion," *id.* at 12–14.[6]  The Government responds that Ray's argument for why Dr.

Pierre's testimony is relevant to negating the *mens rea* of crimes essentially "rests on the

mistaken premise that the Government must prove . . . that the defendant knew that the

confessions [of the alleged victims regarding property damage and poisoning Ray] were false."

Dkt. No. 289.

The Indictment charges that Ray was involved in a conspiracy to commit extortion and

that he committed extortion by "extort[ing] money from Female Victim-1 to repay supposed

wrongdoing against Ray and others."  Dkt. No. 292 ¶ 12.  It also charges that Ray agreed with

---

[6] The Indictment also charges that Ray engaged in sex trafficking and a sex-trafficking
conspiracy, but the defense does not argue that the expert testimony is relevant to the mens rea
for those crimes except to note, in a footnote in its supplemental brief, that "to the extent the
government relies on a fraud theory of sex trafficking, this too is a specific intent crime, for
which evidence of Mr. Ray's mental state would be relevant." Dkt. No. 309 at 13 n.7.  In any
event, the Government has represented that it "does not intend to argue a fraud theory of sex
trafficking to the jury."  Dkt. No. 289 at 8, n.5.

his co-defendant Pollok "to extort money from the Victims to repay supposed wrongdoing against Ray and others." *Id.* ¶ 11. The theory of the Indictment is that Ray "extract[ed] purported confessions from the Victims that they caused harm and damage to members and associates of the Enterprise, including by poisoning Ray" and that he "extorted money from the Victims, forced some of the Victims to perform unpaid manual labor and to provide sexual services." *Id.* ¶ 5. The Indictment outlines the "means and methods" of the Enterprise to include Ray "[t]hreatening to turn the Victims in to law enforcement in light of their purported confessions," *id.* ¶ 7(j), and "pressuring Female Victim-1, through force, threats of force, fraud, and coercion, to engage in frequent prostitution and collecting nearly all the proceeds of that prostitution," *id.* ¶ 7(i).

18 U.S.C. § 1951 makes it illegal for an individual to "in any way or degree obstruct[], delay[], or affect[] commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do." *Id.* at (a). It defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." *Id.* at (b)(c). Ray argues that Dr. Pierre's testimony is relevant to whether Ray's use of actual or threatened force, violence or fear was "wrongful" and, if believed by the jury, could negate that element of the extortion and extortion conspiracy charges. *See* Dkt. No. 278 at 9–10.

The Supreme Court has suggested that, in this context, "'wrongful' has meaning . . . only if it limits the statute's coverage to those instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property." *United States v. Enmons*, 410 U.S. 396 at 400 (1973). Thus, the Second Circuit has explained, the statute prohibits the "actual or threatened force, violence, or fear" "employed to obtain

property to which the alleged extortionist has no lawful claim." *United States v. Clemente*, 640 F.2d 1069, 1076 (2d Cir. 1981) (internal quotation marks and citation omitted). The defense argues that Ray believed that the alleged victims "conspired in a vast, complicated plot to physically harm him and his loved ones and damage their property" and "firmly believed" that the alleged victims "sought to repay Mr. Ray and his family for the damage they had caused." Dkt. No. 278 at 10. Drawing on the principle in *Enmons* that an extortionist cannot act wrongfully if he has a lawful claim to the property sought, the defense argues that Dr. Pierre's opinion could help the jury conclude that Ray's delusion-like beliefs led him to reasonably believe he was entitled to repayment by the complainants and that his extortionate actions were thus "wrongful." *Id.* at 10–11.

Ray's argument suffers from a fatal flaw: The Second Circuit has expressly "declined to extend the *Enmons* defense to non-labor cases." *United States v. Markle*, 628 F.3d 58, 62 (2d Cir. 2010). Indeed, the Circuit has declined to extend *Enmons*'s construction of "wrongful" "where two businessmen beat and threatened a third businessman to coerce the payment of an alleged debt." *United States v. Zappola*, 677 F. 2d 264, 270 (2d Cir. 1982). In *Zappola*, the Circuit found no error in a jury instruction that charged:

> If you find that the government has proved beyond a reasonable doubt that a particular defendant used or threatened force or violence or attempted to induce fear for the prohibited purpose of obtaining money with his victim's consent, then the element of wrongfulness has been satisfied and in that circumstances it makes no difference whether the defendant was actually owed any money by the victims or thought he was. *That is because the law does not permit the use or threat of force or violence or fear induced thereby to collect debts.*

*Id.* at 268 (emphasis added). Thus, whether or not Ray believed that the alleged victims actually poisoned him or injured his property and that they therefore owed him something to compensate for that harm is irrelevant to the ultimate question of if he committed extortion. There is

therefore no "direct link" between Dr. Pierre's proffered testimony and a *mens rea* element of the crime of extortion.

There is also no "direct link" between Dr. Pierre's expert opinion and the *mens rea* required to commit money laundering or tax evasion. Under 18 U.S.C. § 1956(a)(1)(B)(i) and (ii), regarding money laundering, a person is subject to criminal penalties where he:

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—knowing that the transaction is designed in whole or in part—to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or to avoid a transaction reporting requirement under State or Federal law.

The predicate unlawful activity for money laundering identified in the Indictment is extortion and sex trafficking. Dkt. No. 292 ¶ 20. The defense argues that Ray's "firmly held persecutory beliefs negate the specific intent required to establish money laundering . . . [because] he understood the complainants to be paying him money they owed for damages they admitted causing." Dkt. No. 278 at 11. Similarly, the defense argues that, as a result of Dr. Pierre's testimony that Ray's conspiracy-theory beliefs led him to believe that the alleged victims were intentionally harming him, "a jury could find that Mr. Ray did not know this was taxable income, and consequently did not 'willfully' commit tax evasion." *Id.* at 13; *see also* 26 U.S.C. § 7201 ("Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony . . .").

Ray's argument is unconvincing. Dr. Pierre is not expected to testify anything regarding Ray's understanding of the legality of his actions; rather, he would testify that Ray possesses delusion-like beliefs, including a belief that he was poisoned by the alleged victims. Ray's beliefs that he was entitled to the money he gained through extortion and sex trafficking have no

28

bearing on his mindset regarding the legality of the method he used to obtain that money; A person can simultaneously believe that he is owed money and know that it is illegal to commit murder to obtain that money. Nothing in Dr. Pierre's testimony would suggest that Ray did not know that is illegal to use or threaten force, violence, or fear, or that it was illegal to traffic someone, to receive repayment for a debt, even if he rightfully believed he was owed that debt. Nor would it suggest anything about Ray's knowledge regarding his tax obligations—as the Government points out, Dr. Pierre has not opined on how or if Ray's delusion-like beliefs pertain to his tax liabilities. Dkt. No. 289 at 7. Dr. Pierre's testimony would thus be irrelevant to the question whether Ray possessed the requisite *mens rea* to commit the offenses of money laundering or tax evasion. Belief in a conspiracy theory does not relieve one of an obligation to follow the law.

The mismatch between Dr. Pierre's proffered testimony and the elements that would need to be proven for Ray to be found guilty of the crimes charged makes exclusion appropriate. *See United States v. Pohlot*, 827 F.2d 889, 905–06 (3d Cir. 1987) ("District courts should admit evidence of mental abnormality on the issue of mens rea only when, if believed, it would support a legally acceptable theory of lack of mens rea."); *see also Pirro*, 76 F. Supp. 2d at 85. Not only does the opinion lack the "direct link" to the *mens rea* required to render it permissible mental-health evidence under the IDRA, but, even if it was relevant to the issue of Ray's *mens rea*, it would be excludable under Rule 403. *See Sabir*, 2007 WL 1373184, at *7. Under that rule, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . confusing the issues, [or] misleading the jury. . . ." Fed. R. Evid. 403. "Courts have cautioned that there are 'special concerns for relevance and potential jury confusion in the case of expert testimony regarding mental disease evidence,' and that, as a result, 'psychiatric

evidence must be weighed carefully.'" *Jones*, 2018 WL 1115778, at *5; *see also Sabir*, 2007 WL 1373184, at *7; *Pohlot*, 827 F.2d at 890.

Because "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it . . . ., the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (citation omitted). In this case, there is a distinct danger that Dr. Pierre's testimony will confuse the jury and cause unfair prejudice to the Government, and those dangers far outweigh any probative value that his testimony could provide. As he himself explained at the *Daubert* hearing, Dr. Pierre's opinion that Ray suffers from "specific" and "firmly-held" delusions does not reflect a clinical diagnosis but is based on his four one-hour interviews of Ray—which he accepted at face value—and his comparison of Ray's statements during the interviews with the medical records he requested, and a handful of records selected by counsel for the defense. On the basis of those interviews and that review of evidence, he is prepared to testify that Ray suffers from "delusion-like beliefs and belief in primarily a conspiracy theory" because Ray "believes that for many years he's been the victim of poisoning as well as other forms of persecution or harassment as a coordinated attack on him. Not just by a few central figures, but by a larger conspiracy of figures who are basically in cahoots with those individuals." Dkt. No. 312 at 27, 31–32. But, as further explained below, the latter testimony regarding what Ray "believes" is not expert testimony at all. It is a regurgitation of the defense uttered through the mouth of an expert. If the defense wishes to put on evidence regarding Ray's beliefs, assuming that such evidence is relevant, it can do so through lay testimony from percipient witnesses who can be subject to cross-examination. It would only confuse the jury and prejudice the defense for Dr. Pierre to reiterate what would otherwise be considered to be

hearsay and attach to it the expert label. *Cf. Sun Pharmaceutical Indus. Inc.*, 2021 WL 4803582, at *8 (excluding expert testimony where it "pertains to lay matters which a finder of fact is capable of understanding and deciding without the expert's help . . . [a]nd is no more than arguments and conclusory statements about questions of fact masquerading behind a veneer of expertise" (internal quotation marks and citations omitted and alteration adopted)); *Young*, 213 F. 3d 627 (holding that "it was not an abuse of discretion for the district court to exclude expert testimony that merely attached a clinical label to [the defendant's] condition" where the defendant testified to his mental state at the time of the offense (internal quotation marks and citation omitted)).

There also is another risk of jury confusion from Dr. Pierre's testimony: Dr. Pierre's opinion that Ray suffers from delusion-like beliefs—and, specifically, beliefs regarding retribution he was owed due to harm allegedly done to his person and property—looks strikingly like evidence of the sort of "justification" or "diminished capacity" defenses foreclosed by the IDRA. *See Dupre*, 339 F. Supp. 2d at 544.  "The presentation of such evidence to the jury creates a substantial risk that it will be used for an impermissible purpose during deliberations." *Id.*  In light of the minimal, if any, probative value that Dr. Pierre's testimony would have on the issues before the factfinder and the substantial risk that his testimony would cause unfair prejudice, confuse the issues, or mislead the jury by inviting it to consider that testimony for a purpose that is impermissible under the IDRA, exclusion is appropriate.

Dr. Pierre's proffered testimony is subject to exclusion for yet another reason: it does not meet the requirements of Rule 702.  The Government's *Daubert* objections to Dr. Pierre's proffered testimony center on the methodology he employed in reaching his conclusion that Ray has delusion-like beliefs and the sufficiency of the data used for Dr. Pierre to reach that

conclusion.  *See* Dkt. No. 266 at 14; Dkt. No. 310 at 3–7.  At the *Daubert* hearing, Dr. Pierre

testified that he reached his conclusion about Ray after conducting four hour-long video

interviews with Ray, reviewing Ray's medical and psychiatric history that he requested, and

documents related to the case that he had been given and a few that he found on his own.  He

interviewed Ray's father and administered the PDI primarily to augment the conclusion.  Dkt.

No. 312 at 26–27, 39–40, 108, 148.  He explained that conducting psychiatric evaluations has

been a part of his work "for 20-some years, or probably more than that."  *Id.* at 15.  Dr. Pierre

explained that his opinion that Ray suffered from "delusion-like beliefs" and, in particular,

"conspiracy-theory" beliefs, was not a "formal" diagnosis, *id.* at 108, nor were they

"symptomatic of a mental illness.  *Id.* at 174.

Dr. Pierre's proffered testimony is not admissible under *Daubert* and Rule 702 for three

reasons.  First, his conclusions are not based on sufficient facts or data.  Second, his conclusion

is not based on reliable principles and methods.  And third, his testimony would not be helpful to

a jury.

As to the sufficiency of the data used in reaching his opinion, Dr. Pierre testified that he

based his conclusion that Ray experienced delusion-like beliefs in part on the fact that his "core

paranoid beliefs," while self-referential, "are shared by people in his . . . inner circle," Dkt. No.

312 at 33, and that "the transmission of beliefs was not unidirectional," *id.* at 155–56; *see also id.*

at 55 ("[I]n order to diagnose or differentiate a delusion from a delusion-like belief or a

conspiracy theory, one of the factors that's important is to determine if that belief is shared by

other people.").  He gleaned much of the information that formed the basis for his conclusion on

four one-hour long video interviews of Ray, all of which took place over the course of one week.

*Id.* at 73.  Dr. Pierre also consulted records, some of which were selected by Ray's counsel based

on no discernible methodology other than that defense counsel thought that Dr. Pierre should see the documents. *See id.* at 161–62, 168. *Cf. Rowe Ent., Inc. v. William Morris Agency, Inc.*, 2003 WL 221214991, at *3 ("[A]ny expert should be aware that a party and a counsel in litigation have an interest in the outcome and that an expert study should not be dependent on the information they supply."); *Bloomberg L.P.*, 2010 WL 3466370, at *14 ("Relying solely on the information fed to [the expert] by the [plaintiff] without independently verifying whether the information is representative undermines the reliability of his analysis."). He administered only a single test, the PDI, which is used to "detect the severity of [someone's] delusion-like beliefs." *Id.* at 99–100. He did not administer any tests that would be used to diagnose delusion disorders, *id.* at 99, and he declined to administer an additional test, the MMPI, after discussing the possibility with counsel, and he noted that there were risks associated with administering the test as part of the assessment. *Id.* at 145–46. In concluding that Ray's "conspiracy-theory" beliefs were shared by other people in Ray's circle—e.g., his alleged victims—he reviewed FBI records of interviews with those individuals or other documents created by the individuals during the time of the alleged conspiracy or relied on what Ray told him. With the exception of Ray's father, Dr. Pierre did not interview personally those who allegedly shared Ray's beliefs. *Id.* 154–56. At the *Daubert* hearing, Dr. Pierre "acknowledge[d] that there could be other evidence that [he is] not privy to that might change [his] opinion," *id.* at 157, and explained that his conclusions about shareability would be influenced by information that Ray was physically abusive to people who supposedly shared or originated the conspiracy theory, *id.* at 158, or that they were under duress at the time they documented their belief in the conspiracy theories, *id.* at 155–56. In essence, Dr. Pierre based his conclusion that Ray's views were shared by other people and originated with other people—a defining feature of delusion-like beliefs and of Dr.

Pierre's testimony —without talking with anyone to determine whether the beliefs were, indeed, shared by anyone except for the 15-minute conversation with Ray's father whom he admitted might have an interest in the outcome of the case and instead relying on Ray's say so to conclude that they were. *Cf. Bloomberg L.P.*, 2010 WL 3466370, at *14 (finding that expert relied on insufficient facts and data where expert did not "independently verif[y] whether the information is representative").

Dr. Pierre's conclusions are also not drawn from a reliable methodology. While "not every expert admissible under *Daubert* need rely on a method that conforms with 'the exactness of hard science methodologies,'" *United States v. Maxwell*, 2021 WL 5283951, at *6 (S.D.N.Y. Nov. 11, 2021) (quoting *Bloomberg L.P.*, 2010 WL 3466370, at *13–14), the methodology must still have indicia of reliability. "[O]pinion evidence that is connected to the existing data only by the *ipse dixit* of the expert" should not be admitted. *Kumho Tire*, 526 U.S. at 157. Dr. Pierre admitted at the *Daubert* hearing that one of the virtues of the DSM is that it permits inter-rater reliability. Two doctors can perform the same battery of examinations and tests and reach the same conclusions so that there is uniformity across psychiatrists about how to assess individuals for disorders that are generally accepted in the community. Dkt. No. 312 at 93–94. According to Dr. Pierre, the PDI also has good inter-rater reliability in that two mental-health professionals administering the same test should get the same output of responses. *Id.* at 41. As Dr. Pierre testified at the hearing, however, "delusion-like beliefs" with a "paranoid cognitive style" is not a syndrome or formal mental disorder, but a symptom that does not itself establish a mental disorder. *Id.* at 80–81, 174. As his testimony at the *Daubert* hearing makes clear, there is no method which another psychiatrist in the field could apply and arrive at the same conclusion regarding Ray's belief system. There are no criteria to follow, no peer-reviewed study to

consult, and no score on the only test that was provided that could guide another psychiatrist in reaching the same opinion.  "Upon reviewing Dr. [Pierre's] report and deposition, the Court cannot discern any reliable method; rather, the opinions . . . are supported by what appears to be a 'because I said so' explanation."  *Bloomberg L.P.*, 2010 WL 3466370, at \*15.  Such a lack of methodology cannot satisfy the reliability prong of Rule 702 and *Daubert*.

Finally, for the reasons explained above regarding the minimal, if any, relevance of Dr. Pierre's testimony to the issues in dispute, the testimony would not be helpful to the jury.  The examples Dr. Pierre gave at his *Daubert* hearing further illustrate the point.  In explaining that there is no standardized or peer-reviewed study to show how to determine when a delusion-like belief is present, Dr. Pierre likened it to diagnosing a sore throat, which would be done "by asking if a patient has a sore throat and the patient says I have a sore throat."  *Id.* at 110.  He explained that, in the end, just as in the sore-throat hypothetical, his opinion "is really about the defendant's subjective beliefs and experiences."  *Id.* at 116–17.  For proffered expert testimony to be helpful to the jury, it must "comment[] beyond what could be ascertained based on the testimony of laypeople."  *Dupre*, 339 F. Supp. 2d at 541.  Ray himself will be able to testify to his "subjective beliefs and experiences," Dkt. No. 312 at 117, whether or not they are tethered to reality.

The Ninth Circuit's decision in *United States v. Finley*, 301 F.3d 1000 (9th Cir. 2002), upon which Ray relies, does not compel a different result.  In that case, the defense offered a licensed clinical psychologist to testify regarding what he claimed was the defendant's "atypical belief system."  The defense served a Rule 12.2(b) notice on the Government that the testimony related to "a mental disease or defect or any other mental condition" relevant to guilt, but the expert admitted that the defendant was "not suffering under any mental condition which is

reported in the DSM-IV." *Id.* at 1004.  The expert explained that the "atypical belief system" was equivalent to a delusional disorder and that the defendant was vulnerable to a delusional disorder at the relevant time period. *Id.* at 1006.  The psychological tests were consistent with a diagnosis of delusional disorder; the only reason the expert did not diagnose the defendant with a delusional disorder was that such a diagnosis might have suggested that the defendant was legally incompetent whereas the expert believed the defendant could assist counsel and understand the legal proceedings.  *Id*

The district court excluded the testimony in part on *Daubert* grounds but the Ninth Circuit reversed.  The Circuit Court held that just because the expert did not use the terminology of delusion that was not basis to exclude his testimony.  The defendant's "mental condition could fit the criteria for a delusional disorder under the DSM-IV" and "the symptoms [the defendant] exhibited could be described as either a delusional disorder or atypical belief system."  *Id.* at 1012.  The expert "was initially hesitant to apply the delusional disorder terminology of the DSM-IV based on his fear that using certain terms could cause the court to question Finley's legal competence."  *Id.* at 1011.  But the expert's "diagnosis should not be deemed unreliable based on his choice of terminology to describe the diagnosis."  *Id.* at 1012.  The expert "simply chose the term, in his view, with the least potential for confusion."  *Id.*   The expert's diagnosis "incorporate[d] testing, case history, interviews with the patient and family, medical factors and expert experience applying the information contained in the DSM-IV and other mental health publications."  *Id.*   For that reason, the court held that the district court error when it excluded the psychological evidence because it did not fit within "the expert's-or the district court's own – concept of mental disorder."

In holding that the expert's testimony did not usurp the role of the jury with regard to an ultimate issue of fact, the Circuit court drew a distinction that also is relevant here. An expert can provide testimony that would not put the witness in the position of "merely recit[ing] [the defendant's] statements to the jury in the guise of a medical opinion." *Id.* at 1009. The witness would be testifying regarding his diagnosis of the defendant's medical condition based on an established methodology; the interviews of the defendant would be one of the diagnostic tools the expert would use to reach a conclusion about the state of the defendant's mind; it would not be "the very substance of the doctor's testimony." *Id.* at 1009.

Because Dr. Pierre's proffered testimony is impermissible under the IDRA, irrelevant to the issues in dispute, and inadmissible under Federal Rules of Evidence 403 and 702, he will not be permitted to testify.

## II.    Rebuttal to Dr. Hughes

The defense would have Dr. Pierre rebut Dr. Hughes's testimony about coercive control and testify that the complaints' concessions would not necessarily require coercive control as opposed to "merely suggestibility or a willingness to please in the context of a dyadic relationship. The Government argues that Dr. Hughes is not qualified to provide that opinion and that his rebuttal would intrude upon the jury's factfinding.

Dr. Pierre's resume does not reveal that he had any background or experience in victimization, coercive control, or interpersonal violence. His focus appears to be almost exclusively on psychosis, delusional thinking, and schizophrenia. At the *Daubert* hearing, Dr. Pierre testified that, in the first half of his career, he focused on "psychotic disorders, treating individuals with disorders like schizophrenia, substance-induce psychosis, delusional disorder," and in the second half of his career, he focuses on "the gay area between clearcut psychology and psychosis and delusions and normal behavior." *Id.* at 14. Thus, he testified that his expertise has

been in "psychotic disorders" and "delusion-like beliefs." *Id.* The defense's argument amounts to the claim that because a doctor is qualified to testify about psychotic disorders, substance abuse disorders, and those with "dual diagnoses," he also is qualified to testify about anything else to which a psychologist could testify.

In addition, the defense does not explain the facts or data upon which Dr. Pierre would base his opinion regarding the confessions of the complainants in this case. The defense notice reflects that Dr. Pierre spoke to Ray on four occasions for one hour each, spoke to a member of his family, and reviewed a handful of documents selected by Ray or his counsel. It does not reflect that he spoke to or tested the complainants or that he reviewed anything about the complainants. Thus, his testimony regarding the complainants and what would be required for them to make the alleged confessions amounts to nothing more than ipse dixit. The defense would have the jury accept it not because of any expertise Dr. Pierre applied to the evidence or because of his methodology but solely because, as an expert, he is saying it. That is precisely the type of *ipse dixit* that the Federal Rules of Evidence are intended to guard against.

## III.   Rebuttal to Dr. Pleus

The defense would have Dr. Pierre testify to rebut Dr. Pleus's expert testimony on toxicology and to testify that Ray's belief "that he has been exposed to mercury is at least partially supported by medical evidence of Mr. Ray's elevated mercury levels." The Government argues that, to the extent Dr. Pierre would testify regarding whether the evidence is consistent with poisoning he is not qualified and to the extent he would testify that there was mercury in Ray's blood the evidence is uncontested.

The Government is correct that Dr. Pierre cannot testify to whether the mercury levels are consistent with mercury poisoning. Dr. Pierre is not a toxicologist. His resume does not reflect that he has any expertise on the effect of chemicals on the body and on the levels of chemical

exposure that would be consistent with poisoning as opposed to environmental exposure.  The only expertise that the defense proffers is that he has "experience and training as a medical doctor including [a] degree in biology" and he reviewed Ray's medical records.  Dkt No. 266-2. But that is like saying that an orthopedist can testify to the operations of the brain.  It may be that medical training would equip a doctor to testify to whether certain levels of mercury is inconsistent with environmental exposure but there is nothing in Dr. Pierre's medical training that reflects he has those qualifications.

Whether Dr. Pierre can testify to the medical evidence of Ray's elevated mercury levels presents a closer question.  The Court will not allow him to offer the qualitative testimony that the levels of mercury reflected in the medical records are consistent with Ray's beliefs.  *See* Fed. R. Evid. 704.  It is a closer question whether he can testify to what the medical records reflect as to the level of mercury in Ray's blood.  The Court has held that medical doctors generally are competent to testify regarding the content of medical records and there is nothing in the Government's argument that would suggest that Dr. Pierre is an exception.  To the extent the records reflect measurements of mercury or measurements of mercury, Dr. Pierre would be competent to testify to what the records reflect.  However, the Government proffers that the evidence is undisputed.  Its expert will affirmatively testify to what Dr. Pierre also would testify to regarding mercury levels.  If that is so, Dr. Pierre's testimony may well not be admissible under Rule 403.  It would have the capacity to confuse the jury and whatever probative impact it would have would be outweighed by its prejudicial effect.  But the Court need not cross that bridge now.  Dr. Pleus has not testified and the defense has not had an opportunity to see precisely what he would say.  Accordingly, the Court will reserve on whether Dr. Pierre will be

permitted to testify regarding the content of the medical records and what they say about exposure to mercury until after Dr. Pleus has testified.

## CONCLUSION

The motion to exclude Dr. Pierre's testimony is GRANTED in part.

The Clerk of Court is respectfully directed to close Dkt. No. 266.


SO ORDERED.

Dated: February 1, 2022
       New York, New York

_____
                LEWIS J. LIMAN
                United States District Judge