UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:   2/8/2022
```

----------------------------------------------------------------X
                                    :

UNITED STATES OF AMERICA,         :

         -v-             :               20-cr-110 (LJL)

LAWRENCE RAY,               :

                   Defendant.    :        OPINION AND ORDER
                                  :
----------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      On motion of the defendant, the Court issued subpoenas, pursuant to Federal Rule of

Criminal Procedure 17, directed to various healthcare providers, including mental-health

providers, of the alleged victims in this case.  *See* Dkt. Nos. 214, 237.  The defense served the

Rule 17 subpoenas on the healthcare providers.  Pursuant to the procedures set by this Court, *see,*

*e.g.*, Dkt. No. 214, the records were produced by the providers to the Court and to counsel for the

alleged victims.  Counsel for the alleged victims then produced redacted records to the defense,

along with privilege and relevance logs setting forth the basis for the redactions.  Counsel based

many of the privilege redactions on the psychotherapist-patient privilege set forth in *Jaffee v.*

*Redmond*, 518 U.S. 1 (1996), and its progeny.

      By letter dated January 10, 2022, defense counsel objected to the privilege and relevance

assertions, and accompanying redactions, as overbroad and requested that the Court

independently review the records and logs.  Dkt. No. 284.  Counsel for each of the alleged

victims responded to the defense's letter explaining in further detail the bases and legal rationales

for the redactions.  *See* Dkt. Nos. 296, 299, 301, 302.  The Government also filed a letter on the

docket, writing that, "[h]aving not viewed any of the underlying records, the Government cannot

speak to the basis for, or appropriateness of, the redactions" and "[a]ccordingly . . . has no

objection to the Court's conducting a review to determine the appropriateness of the proposed redactions." Dkt. No. 297.

The Court heard oral argument on the matter on January 24, 2022. *See* Dkt. No. 321. Defense counsel made generally applicable objections to the privilege and relevance redactions asserted by counsel for the alleged victims. As to the privilege redactions, defense counsel argued that they were overbroad in multiple respects. First, the defense objected to redactions of observations of the alleged victims—including as to their mood or affect—made by treating professionals as not "communications" covered by the psychotherapist-patient privilege. *Id.* at 10–13. It similarly objected to the withholding of records reflecting the prescriptions that were made to the alleged victims, asserting that these records do not reflect or reveal a communication. *Id.* at 15. Second, defense counsel argued that hospital intake information is "not necessarily covered by the privilege" and that the relevant questions are "whether . . . statements were made in the course of diagnosis and treatment and were made specifically to a mental health provider." *Id.* at 16. In distinguishing what information would be covered by the privilege and what would not be, defense counsel appeared to agree that communications that occur at the intake at a psychiatric facility would be covered by the privilege, while maintaining that statements made to intake staff at a general hospital or emergency room would not be covered. *Id.* at 17–18.

The Court also inquired at argument whether defense counsel contended that the psychotherapist-patient privilege had been waived with respect to the healthcare records. Counsel made only one argument regarding waiver: that, with respect to Jane Doe 3, the privilege had been waived for certain records because Jane Doe 3 had sent an email to Ray with those records attached. *Id.* at 18–19. Counsel asserted that the privilege had been waived with

respect to the information disclosed by Ray in those records, but not more broadly.  Dkt. No. 321 at 19.

The defense then moved on to relevance objections.  Defense counsel argued that the records that predate 2010 are relevant to the second superseding indictment's allegations "that one of the means and methods of the alleged enterprise is exploiting the victim's mental health vulnerabilities and self-doubts to the advantage of the enterprise."  *Id.* at 20; *see also* Dkt. No. 292 ¶ 7(d) (listing as one of the "Means and Methods of the Enterprise" "[e]xploiting the Victims' mental health vulnerabilities and self-doubts to the advantage of the Enterprise").

The Court reviewed the submissions in camera.

## LEGAL STANDARD

In *Jaffee v. Redmond*, the Supreme Court recognized a "psychotherapist privilege" under Federal Rule of Evidence 501.[1]  Under the privilege, "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure."  *Jaffee*, 518 U.S. at 15.  The privilege applies to confidential communication made to licensed psychiatrists and licensed social workers, as well as to those "made to licensed social workers in the course of psychotherapy."  *Id.*

In recognizing the existence of a psychotherapist-patient privilege, the *Jaffee* Court explained that "[l]ike the spousal and attorney-client privileges, the psychotherapist-patient privilege is 'rooted in the imperative need for confidence and trust.'"  *Jaffee*, 518 U.S. at 10 (quoting *Trammel v. United States*, 445 U.S. 40, 51 (1980)).  It went on:

Effective psychotherapy . . . depends upon an atmosphere of confidence and trust

---

[1] Rule 501 provides, in relevant part, that "[t]he common law—as interpreted by United States courts in the light of reason and experience—governs a claim of privilege unless any of the following provides otherwise: the United States Constitution; a federal statute; or rules prescribed by the Supreme Court."  Fed. R. Evid. 501.

in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears. Because of the sensitive nature of the problems for which individuals consult psychotherapists, disclosure of confidential communications made during counseling sessions may cause embarrassment or disgrace. For this reason, the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment.

*Id.* The Court explained that such guarantees of confidentiality "serves the public interest by facilitating the provision of appropriate treatment for individuals suffering the effects of a mental or emotional problem," observing that "[t]he mental health of our citizenry . . . is a public good of transcendent importance." *Id.* at 11. The Court relied by analogy on the attorney-client privilege and the spousal privilege for the existence and the scope of the psychotherapist-patient privilege as well as on the practices on each of the fifty states and the District of Columbia. *Id.* at 12–13; *see also id.* at 10, 15 n.14; *In re Sims*, 534 F.3d at 133–34 (citing favorably *Koch v. Cox*, 489 F.3d 384, 391 (D.C. Cir. 2007), which analyzed the scope of waiver of the psychotherapist-patient privilege by looking to the scope of waiver of the attorney-client privilege); *Rosner v. United States*, 958 F.3d 163, 166 (2d Cir. 2020) (applying same rule relating to the collateral-order doctrine in the attorney-client privilege and psychotherapist-patient privilege contexts). Like the attorney-client privilege and the spousal privilege, the psychotherapist-patient relationship is absolute. When the privilege applies, it cannot be overcome by balancing "the relative importance of the patient's interest in privacy and the evidentiary need for disclosure." *Id.* at 17. As with the attorney-client privilege, for the privilege to serve its purpose, "the participants in the confidential conversation 'must be able to predict with some degree of certainty whether particular discussions will be protected [and] [a]n uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is letter better than no privilege at all.'" *Id.* at 18 (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 393 (1981)); *see also Consolidated RNC Cases*, 2009 WL 130178, at *5

(S.D.N.Y. Jan. 8, 2009) (Sullivan, J.) ("In *Jaffee*, the Supreme Court rejected the idea that the psychotherapist privilege should be subject to a balancing test—thereby implicitly recognizing it as an absolute rather than qualified privilege."); *Kerman v. City of New York*, 1997 WL 666261, at *2 (S.D.N.Y. Oct. 24, 1997).

Testimonial privileges are an exception to the "fundamental maxim that the public . . . has a right to every man's evidence." *Jaffee*, 518 U.S. at 9 (alteration in original) (quoting *United States v. Bryan*, 339 U.S. 323, 331 (1950)). "[P]rivileges generally are construed narrowly," *In re Jakubaitis*, 604 B.R. 562, 570 (9th Cir. BAP 2019), *appeal filed* (9th Cir.); *see also United States v. Nixon*, 418 U.S. 683, 709 (1974), and the psychotherapist-patient privilege, like other privileges, may be waived by the privilege holder, *In re Sims*, 534 F.3d 117, 121 (2d Cir. 2008).

"A party invoking the psychotherapist-patient privilege must establish that (1) confidential communications were made, (2) between a licensed psychotherapist and patient, and (3) in the course of diagnosis or treatment." *Cuoco v. U.S. Bureau of Prisons*, 2003 WL 1618530, at *2 (S.D.N.Y. Mar. 27, 2003). There are thus three relevant inquiries: (1) whether the redacted records represent confidential "communications"; (2) whether those communications were made between an alleged victim as patient and a mental-health professional that is covered by the privilege; and (3) whether those communications were made in the course of diagnosis or treatment, as opposed to for some other purpose or outside of the context of the therapist-patient relationship. In addition, the communications must be confidential. *United States v. Romo*, 413 F.3d 1044, 1047 (9th Cir. 2005); Proposed Fed. R. Evid., 56 F.R.D. at 241. Courts may look to Proposed Rule 504—the evidentiary rule that would have established a psychotherapist-patient privilege that was proposed to Congress by the Chief

5

Justice in 1972 and cited to favorably in *Jaffee*—as a "useful starting place," *United States v. Ghane*, 673 F.3d 771, 782 (8th Cir. 2012) (quoting *In re Bieter Co.*, 16 F.3d 029, 935 (8th Cir. 1994)), and to "add texture to these factors," *United States v. Romo*, 413 F.3d 1044, 1048 (9th Cir. 2005), but it is not dispositive, *see Ghane*, 673 F.3d at 784 (rejecting argument based on interpretation of Proposed Rule 504 as inconsistent with *Jaffee*).

There is a dearth of caselaw on the scope of "communications" covered by the privilege and, specifically, whether and to what extent it extends to nonverbal conduct.  The *Jaffee* Court based its recognition of the privilege on the need, in the psychotherapy contest, for the "patient [to be] willing to make a frank and complete disclosure of facts, emotions, memories, and fears," and a concern that if such communications were subject to later discovery, the "atmosphere of confidence and trust" which made the transmission of such confidences possible would be chilled.  518 U.S. at 10.  It explicitly drew a distinction between the conveyance of "facts, emotions, memories and fears," upon which psychiatric treatment depended, and the observation by a physician of information from a physical examination, which would not be subject to a privilege.  *Id.*

There has been little written on what constitutes "communication" in this context.  One treatise author has suggested that it reaches more broadly than verbal communication.  "[T]herapist[s] depend[] on non-verbal information sources and forms of communication in both diagnosis and treatment."  Wright & Miller, 25 Fed. Prac. & Proc. Evid. § 5330 (1st ed.).  One court noted that "psychotherapy is defined as the '[t]reatment of emotional, behavioral, personality, and psychiatric disorders based primarily upon verbal *or nonverbal communication* and interventions with the patient, in contrast to treatments utilizing chemical and physical measures.'"  *In re Grand Jury Investigation*, 405 F. Supp. 3d 643, 647–48 (W.D.

Va. 2019) (alteration in original) (emphasis added) (quoting STEDMAN'S MEDICAL

DICTIONARY, 1461 (26th ed. 1995)).  A leading treatise writes regarding Proposed Rule 504:

"In the case of mental health professionals, the patient's privilege should cover non-verbal acts

of the patient as well as the more traditional modes of communications."  *Id.*

There is considerably more caselaw regarding the second inquiry:  Which professionals

are covered by the privilege?  In addition to the categories of mental-health providers explicitly

called out by the *Jaffee* Court—licensed psychotherapists, psychiatrists, and social workers—

courts have held that the psychotherapist-patient privilege extends to others who are licensed to

engage in mental-health treatment as well.  *See Doe v. Sarah Lawrence Coll.*, 2021 WL 197132,

at *3 (S.D.N.Y. Jan. 20, 2021) ("Courts within this District have found that in addition to the . . .

categories [listed in *Jaffee*], communications with licensed mental health counselors arguably fall

within the privilege as well." (internal quotations and citation omitted)).[2]  The defining feature is

that the professional is engaged in licensed mental-health treatment; thus, "[c]ourts in this Circuit

have interpreted the protections outlined in *Jaffee* to apply only to psychotherapists and other

mental health professionals, and not to physicians or other non-mental health providers."

*Moroughan v. Cnty. of Suffolk*, 2013 WL 12458177, at *5 (E.D.N.Y. Aug. 13, 2013).

Courts have also held that the privilege is extended to communications made, for the

purpose of obtaining psychotherapy treatment, to paraprofessionals and staff working under the

---

[2] Some courts have also extended the privilege to those who are not licensed but are engaged in counseling.  *See, e.g.*, *Oleszko v. State Compensation Ins. Fund*, 243 F.3d 1154  (9th Cir. 2001) (extending psychotherapist-patient privilege to Employee Assistance Program counselors who were not licensed counselors but who had backgrounds in psychology or social work with relevant clinical/field experience); *United States v. Lowe*, 948 F. Supp. 97, 99 (D. Mass. 1996) (finding, "[i]n light of the policies expressed in *Jaffee*," that there is "some form of a federal privilege for communications with a rape crisis counsellor"); *Jane Student 1 v. Williams*, 206 F.E.D. 306 (S.D. Al. 2002) (extending privilege to licensed professional counselors but not to unlicensed social workers or unlicensed professional counselors).

supervision and control of such a provider.  *See* 3 Weinstein's Federal Evidence § 504.08 ("If, for example, the psychiatrist works closely with a paraprofessional who takes part of a patient's history, it should not matter whether a psychotherapist is present since the patient should treat the paraprofessional worker with the same trust.  Thus, in general, a paraprofessional working under close supervision and control of a professional should be covered."); Wright & Miller, 25 Fed. Prac. & Proc. Evid. § 5330 (1st ed.) ("Because the healing professions allow for greater use of ancillary personnel than was traditionally the case with lawyers, the sort of third person who will destroy confidentiality is often phrased in terms of 'disinterested third persons' . . . ."); *Richardson v. Sexual Assault/Spouse Abuse Res. Center, Inc.*, 764 F. Supp. 2d 736, 740 (D. Md. 2011) (extending privilege to communications made to unlicensed counselor providing mental-health treatment under the supervision of licensed social workers); *cf. Oleszko*, 243 F. 3d at 1158 ("To protect only disclosures made during psychotherapy while exposing those same disclosures to discovery when made to another member of the mental health team in order to access psychotherapy would significantly undermine the psychotherapist-patient privilege.").  The privilege's application to such persons is implicitly recognized by Proposed Rule 504, which recognizes that a communication maintains its confidentiality so long as it is "not intended to be disclosed to third persons *other than those* . . . who are [*inter alia*] participating in the diagnosis and treatment under the direction of the psychotherapist."  Proposed Fed. R. Evid., 56 F.R.D. 183, 241 (1972).  Thus, courts have recognized that the privilege extends to the "entire team" of professionals necessary for delivering mental-health treatment.  *United States v. Robinson*, 2014 WL 587850, at *3 ("[I]n *Jaffee*, the Supreme Court recognized that the privilege extends to the entire team necessary for delivering mental health treatment to a person voluntarily seeking that treatment.").  This extension tracks the scope of the attorney-client privilege, which also

recognizes that communications made in confidence to persons who are agents of the attorney or working under the supervision of the attorney may be privileged even if the communications are not made directly to the attorney as long as they are made for the purpose of obtaining legal advice from the attorney. *See United States v. Kovel*, 296 F.2d 918, 921–22 (2d Cir. 1961) (explaining that the attorney-client privilege covers communications made for the purpose of obtaining legal advice both to "non-lawyer employees with a menial or ministerial responsibility that involves relating communications to an attorney" and to a professional, like an accountant, made at the direction or in the presence of a lawyer). By the same token, and also by analogy to the attorney-client privilege, the patient-psychotherapist privilege is not waived when otherwise confidential statements are made in group therapy sessions where the presence of each patient, and the communication by each of those patients to the others of the most sensitive information of his or her life, is critical to the success of therapy session for all patients. *See United States v. Schwimmer*, 892 F.2d 237, 243–44 (2d Cir. 1989) (holding that the attorney-client privilege extends to the circumstance where multiple clients share a common interest about a legal matter and that the communication was given in confidence and the client reasonably understood it to be confidential and explaining that the protection afforded by the joint-defense privilege "extends to communications made in confidence to an accountant assisting lawyers who are conducting a joint defense on behalf of the communicating clients").

As to the third inquiry, it is clear that not all communications made to mental-health providers fall within the privilege. In *United States v. Romo*, the Ninth Circuit explained that "[w]hether a meeting occurred 'in the course of diagnosis or treatment' is a factual determination that rests upon consideration of the totality of the circumstances." 413 F.3d 1044, 1047 (9th Cir. 2005). There, the court held that a confession made by a prison inmate to a licensed professional

counselor in a private visitation room did not fall within the privilege. *Id.* In so holding, the court explained that, even though the statement was made to a counselor whose job included providing inmates with psychological counseling and who had previously provided the inmate with mental-health treatment during voluntary counseling sessions, the counselor—whose job title was "program director"—also had other duties that were not related to mental-health counseling, and the circumstances of the meeting did not suggest that the inmate was seeking counseling or that the counselor provided, or even intended to provide, mental-health care. *Id.* at 1048–49.

It is also important to state that the privilege applies, and the interests it serves are protected, regardless whether the party seeking the information is the prosecutor who wants to use a communication as evidence that the defendant has committed a grievous crime or the defendant who seeks evidence to use in defense against a serious charge. Thus, while the party seeking the records here happens to be the defendant, the principles the Court articulates would be equally applicable if the party seeking the information was the Government, and it asserted a need for it for a prosecution to be successful. *See, e.g.*, *Ghane*, 673 F.3d at 775, 781–82 (upholding admission against defendant of statements made by defendant with a documented history of significant mental illness made to crisis hotline and to emergency room physician's assistant that he had cyanide in his apartment that he "might want to use . . . later").

At issue is also the relevance of the redacted records. At this stage, in order to require production of records prior to trial, the defense must show that the records are, among other things, evidentiary and relevant. *United States v. Nixon*, 418 U.S. 683, 699 (1974). The defense need only make a sufficient preliminary showing of admissibility and relevance. *See id.* at 700 (concluding that there was "a sufficient likelihood that [subpoenaed material] contains

conversations relevant to the offenses charged in the indictment").  Admissibility is governed by the Federal Rules of Evidence.  Under Rule 401, "[E]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  "To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency."  *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997).  Thus, "the trial court may admit evidence that does not directly establish an element of the crime charged, in order to provide background for the events alleged in the indictment.  Background evidence may be admitted to show, for example, the circumstances surrounding the events . . . ."  *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988).  The question at this stage is not whether the evidence will be admissible at trial.  The answer to that question will turn on the relevance at the trial of trial as well as an analysis of the factors under Federal Rule of Evidence 403, among others.  The question simply is whether the defense is entitled to see the documents to be able to make a proffer at the time of trial.

## DISCUSSION

I.     **Defense Objections**

In its letter motion, Dkt. No. 284, and at oral argument, Dkt. No, 321, the defense raised several objections that were each applicable to sets of records produced for multiple of the alleged victims.

### A.  Privilege

As referenced above, the defense objects to privilege redactions to the extent that they reflect observations made by mental-health providers as opposed to the content of verbal communications from those individuals. *See* Dkt. No. 321 at 10.  In the defense's view,

information that indirectly reveals something about a communication—such as that a certain medication is prescribed or a particular test is administered—is not covered by the privilege because it does not reflect a "communication." *Id.* at 13.

The Court agrees with the defense in part and disagrees in part. Although the *Jaffee* Court spoke in terms of the interest in protect the "'willingness and ability [of the patient] to talk freely,'" 518 U.S. at 10 (quoting Advisory Committee's Notes to Proposed Rules, 56 F.R.D. 183, 342 (1972)), there are many ways that a patient can communication information. *See* Communication, Oxford Reference, https://www.oxfordreference.com/view/10.1093/oi/authority.20110803095627847 (describing communication as "[t]he result of any action (physical, written, or verbal) that conveys meanings between two individuals"). An individual may communicate his feelings in response to a question or set of questions by making a facial expression or a physical gesture. That a patient, in the course of treatment, chooses to express his emotions by nonverbal conduct rather than verbal conduct does not make it inherently non-communicative. *Cf.* Restatement (Third) of the Law Governing Lawyers § 69, cmt. e (stating that in the context of the attorney-client privilege, "[t]he privilege extends to nonverbal communicative acts intended to convey information. For example, a client may communicate with a lawyer through facial expressions . . ."). The Restatement (Third) of the Law Governing Lawyers, for instance, gives the example of a client who has a tattoo on his arm consistent with a police report stating that the perpetrator of the crime had a tattooed right forearm. The client's conduct in rolling up his sleeve to demonstrate the tattoo would be communicative if taken in response to the lawyer's question whether the client has a tattoo; it would not be communicative if the lawyer merely observes the tattoo without the client taking any action to show it. *Id.*

12

Mental-health professionals, likewise, "depend[] on non-verbal information sources and forms of communication in both diagnosis and treatment."  Wright & Miller, 25 Fed. Prac. & Proc. Evid. § 5330 (1st ed.).  Thus, the fact that a patient chooses to communicate by gesture rather than words does not deprive the communication of protection.  But the patient's act must be a volitional act by which the patient communicates information for the purposes of treatment. The *Jaffee* Court specifically distinguished information that a physician might obtain from a "physical examination" or as "the resul[t] of a diagnostic test" which is not privileged from information conveyed by the patient to a licensed therapist regarding "emotions" and "fears" which is protected by the privilege.  *Jaffee*, 518 U.S. at 10.  That distinction was not based on any notion that psychiatric medical care for conditions of the mind should enjoy in our society greater priority than non-psychiatric care for conditions of the body or by a bare desire to encourage patients to seek psychiatric care.  The Court noted that "[t]he mental health of our citizenry, *no less than its physical health*, is a public good of transcendent importance."  *Id.* at 11 (emphasis added).  The distinction was based on the nature of the observation and the conduct that resulted in it.  Although a psychotherapist may need to conduct physical examinations as well as conduct counseling sessions in order to make an effective diagnosis, the latter—which requires "an atmosphere of confidence and trust"—is what is protected by the privilege.  *Id.* at 10.

The Court thus agrees with the defense that the results of tests like bloodwork and urinalysis or the description of a patient's gait or general disposition would not fall within the psychotherapist-patient privilege.  Such information may be useful for treatment and may be obtained for the purposes of treatment but it does not reflect the communication of information dependent upon an atmosphere of confidence and trust.  It is of the same character as bloodwork

and urinalysis that may be taken by an orthopedist or a cardiologist; the only difference is that the care being provided is for the mind and not for a bone or the heart. *Cf. Schmerber v. California*, 384 U.S. 757, 761, 765 (1966) (holding in Fifth Amendment context, that "the withdrawal of blood and use of the analysis" is not communicative and an individual's communicative "capacities [are] in no way implicated"); *United States v. Dionisio*, 410 U.S. 1, 7 (1973) (holding that voice exemplars that are taken for a physical characteristic and not for their content are not protected by Fifth Amendment).[3] So too, information about medications prescribed in the course of treatment would not be privileged.  Save in perhaps the extremely rare case where the prescription would reveal the content of the patient's communication (for example, in the analogous context, if an attorney were to give the client the advice to plead to second degree murder) or where an existing prescription was communicated to the therapist in confidence in the course of a therapy session, the prescription does not constitute or reveal a communication but constitutes a reflection of the therapist's judgment on how to treat the diagnosis.  At the same time, however, where the information being sought would convey the content of what the patient tells the treatment provider—whether in words or nonverbal acts—or where it is inextricably intertwined with such information, it would enjoy the protection of the privilege.  To take affect for example, while a treatment provider's observation of a patient's affect as a general matter (for example in the waiting room) might not be privileged, that same information would enjoy the protection of the privilege if it is conveyed in the course of a session with the treatment provider during which information is being elicited.

The Court's orders will reflect those distinctions. For example, information regarding an

---

[3] Thus, the verbal act of a patient who throat is being examined of saying "ah," would not be privileged regardless whether the physician giving the instruction was trained in psychiatry or general medicine.

alleged victim's "appearance" in an examination may not be redacted, while that alleged victim's "mood" and "affect" during an assessment may be redacted based on the privilege.

The defense also objects to the breadth of providers covered by the privilege redactions. At oral argument, defense counsel conceded that the psychotherapist-patient privilege "include[s] members of a medical team that are ultimately providing mental health care." Dkt. No. 321 at 11. The defense agreed that a nurse at a psychiatric institution collecting information for a psychotherapist would be covered by the privilege, *id.* at 17–18, but argued that intake notes from a general hospital reflecting communications made to a non-mental health care provider, for the purposes of admission or to determine what type of medical professional a patient should see would not necessarily be covered by the privilege. *Id.* at 16–17. In defense counsel's view, "[a]n individual going into a psychiatric facility and intake in a psychiatric facility is distinct from an individual seeking treatment, let's say, at a general hospital or an emergency room for a specific physical harm." *Id.* at 18.

Given defense counsel's concession that the psychotherapist-patient privilege extends to "members of a medical team that are ultimately providing mental health care," Dkt. No. 321 at 11—a reading of the law with which the Court agrees—the Court need not consider whether records made by professionals supporting a patient's mental-health treatment, and reflecting communications made in the course of that treatment, are properly redacted. Under defense counsel's own reading of the law, they are. What is still in dispute is whether intake records from a psychiatric facility are covered by the psychotherapist-patient privilege and such records from an emergency room at a general hospital are not. The Court agrees with defense counsel that general-hospital intake records are not covered by the privilege when they reflect communications not made to a mental-health provider and before a mental-health provider has

been engaged and not made by the patient for the purpose of obtaining psychotherapy treatment. On this front, the Court is persuaded by the Eighth Circuit's analysis in *United States v. Ghane*, 673 F.3d 771 (8th Cir. 2012).

In *Ghane*, a suicidal defendant called a crisis hotline, which in turn notified the local police department, who then dispatched officers to the defendant's apartment. When the officers arrived, the defendant requested to be transported to a medical center, where he checked himself into the emergency room. At the emergency room, a physician's assistant conducted a routine intake examination, but used a specific intake form based on the defendant presenting with depression and suicidal ideation. In the course of the intake interview, the defendant informed the physician's assistant that he had cyanide in his apartment; the defendant then sought to suppress the cyanide-related statements.

The Eighth Circuit determined that the statements made to the physician's assistant were not subject to the psychotherapist-patient privilege, reasoning that the privilege "contemplates treatment. It does not encompass 'care' provided by an ER physician's assistant whose job is to assess incoming patients and conduct intake interviews and evaluations." *Ghane*, 673 F.3d at 783. The court explained that the physician's assistant did not provide any therapy, diagnosis, or treatment to the defendant but was completing a form as part of a protocol and not to determine treatment. *Id.* While he facilitated the defendant's placement as a psychiatric patient, he was not working under the direction of, nor did he consult with, a psychiatrist during the relevant time period. *Id.* at 783–84.

The Court agrees that communications made to intake staff at a hospital who are not agents of a mental-health provider, and before a mental-health provider is engaged, are not covered by the privilege. At the time of admission to a general hospital, the patient enjoys the

expectation of privacy that prospective patients generally enjoy—those conveyed by laws such as the Heath Insurance Portability and Accountability Act of 1996, 42 U.S.C. § 1320d *et seq.*, and its state counterparts.  The same holds true for records of EMS providers responding to 911 calls.  In both cases, the patient does not yet have the reasonable understanding that the communication will be protected by the psychotherapist-patient privilege, *cf. Schwimmer*, 892 F.2d at 244 (patient must have reasonable understanding that information will be kept confidential), because no decision has been made to involve a mental health provider.[4]  If the emergency room intake personnel were to determine that the patient did not need psychotherapist treatment and no mental health provider were involved, no conceivable psychotherapist-patient privilege could be invoked.  The purposes of the privilege in ensuring that communications to a licensed mental health-provider are not chilled would not be implicated.  The same result necessarily follows when, after-the-fact, a mental health professional is involved.  At the time of the intake at the general hospital, the patient has no reasonable expectation that the communication will be protected by the psychotherapist-patient privilege.[5]

## B. Relevance

There are a limited number of documents that are not protected by the psychotherapist-

---

[4] In the latter circumstance, as well, the person receiving the communication may not be a licensed mental-health professional or one working under the supervision of a licensed mental-health professional.

[5] This conclusion accords with Judge Friendly's application of the attorney-client privilege in cases where a non-lawyer professional—in *Kovel*, an accountant—is consulted by a client.  In *Kovel*, Judge Friendly explained that the attorney-client privilege would attach for conversations a client made with an accountant at the direction of or after consulting with his lawyer and made for the purpose of obtaining legal advice, but it would not apply "where the client communicates first to his own accountant . . . even though he later consults his lawyer on the same matter."  296 F.2d at 922.  In much the same way, the staff member handling intake at a general hospital's emergency room is not yet working at the direction of or under the control of a psychiatrist— indeed, the patient and intake staff member may not yet know that mental-health treatment is required, and their exchange is not yet for the purpose of such treatment.

patient privilege and that are potentially relevant.

The defense objects to the relevance redactions of the alleged victim's medical records that predate the indictment period of 2010 through February 11, 2020.  It argues that these records are relevant to the Government's theory that Ray "chose to befriend the complainants because of their fragile mental health states," Dkt. No. 284 at 4, and "targeted the complainants who were vulnerable because of mental health illness," Dkt. No. 321 at 20.  It points out that the second superseding indictment and the Government's enterprise letter belie any assertion by the Government that "it didn't intend to ask the complainants questions about their mental health before meeting Mr. Ray."  Dkt. No. 321 at 19–20.  The defense specifically points out that the second superseding indictment "alleges that one of the means and methods of the alleged enterprise is exploiting the victim's mental health vulnerabilities and self-doubts to the advantage of the enterprise" and that the "enterprise letter states that it will introduce evidence that Mr. Ray was aware that John Doe had attempted suicide in high school."  *Id.* at 20.

At oral argument, the Government responded that the alleged victims "will testify about vulnerabilities that they had and communicated to the defendant," *id.* at 23, but not about vulnerabilities that they did not report to Ray, *id.* at 24.  It also noted that it "expect[s] witness testimony to be [that] over the course of their relationship with Mr. Ray, their mental health was tremendously exacerbated, worsened," meaning that "they had emerging conditions, instability, things like that that [it] will elicit as well."  *Id.* at 25.

Rule 401 imposes a "relatively low bar" of relevance.  *Boykin v. Western Express, Inc.*, 2016 WL 8710481, at *2 (S.D.N.Y. Feb. 5, 2016); *see also United States v. Jones*, 2018 1115778, at *9 (S.D.N.Y. Feb. 27, 2018) (finding testimony "satisfies the low bar of relevance").  The Government alleges that, as part of his criminal activity, Ray "[e]xploit[ed] the Victims'

mental health vulnerabilities and self-doubts." Dkt. No. 292 ¶ 7(d). Evidence that the alleged

victims did, in fact, have mental-health vulnerabilities prior to meeting Ray would tend to

support the proposition that they had the vulnerabilities they reported to Ray and thus would

make that fact—of the mental health vulnerabilities and self-doubts—"more . . . probable than it

would be without the evidence." Fed. R. Evid. 401(a); *Gonzalez*, 110 F.3d at 941. Records

related to mental-health care that predates the time period covered by the second superseding

indictment is therefore relevant at least at this stage of the proceedings and, to the extent that

those records tend to show that the alleged victims suffered from mental-health issues, may not

be redacted. Records related to general physical health issues, such as a common cold, that

predate the time period of the indictment are, however, not relevant to the crimes charged in the

second superseding indictment.

## II.     Individual Considerations

The above principles apply to the proposed redactions as to multiple of the alleged

victims. Simultaneous with this Opinion, the Court is issuing an order identifying the redactions

it will permit and those it will not permit. Additional individualized concerns are reviewed

below.

### A. John Doe

There are three sets of responsive records regarding John Doe that were turned over to

the defense in redacted form. The defense objects to the redactions of two sets, from Four Winds

Hospital and St. Vincent's Hospital, both from 2008, on relevance grounds. For the reasons

explained in Section I.B, *supra*, those records are relevant insofar as they relate to mental-health

treatment received by John Doe.

For precisely the reason these records are relevant, they may also be subject to the

psychotherapist-patient privilege.  The defense makes relatively narrow objections to the privilege assertions made by John Doe's counsel:  It objects to the redactions to the Postgraduate Center for Mental Health records insofar as they redact a "referral information form," "initial treatment plan," "treatment plan," "treatment plan update," and "discharge information including referral source and summary notes," and communications between John Doe and authors who are not psychotherapists or social workers.  Dkt. No. 284 at 7–8.  It also objects to the privilege redactions of St. Barnabas Hospital identified as "EMS 911 Patient Call Report entries," "outpatient summary report," "Emergency Department Documents Review," "Patient lab results," and "Patient Orders."  *Id.* at 8.

The Court has reviewed the appropriateness of the privilege redactions to the Postgraduate Center for Mental Health and St. Barnabas Hospital in light of the defense's specific objections and the principles set forth in this Opinion, and the Court agrees that certain records should be unredacted.  For example, results of urinalysis do not reflect communications made by John Doe, and information recorded by EMS responding to a 911 call do not reflect communications made to a licensed mental-health provider or their staff in the course of treatment or diagnosis.  The Court will identify specifically what should be unredacted by separate order.

The defense also "reserves the right to object to the applicability of the psychotherapist-patient privilege concerning the[] records" of Four Winds Hospital and St. Vincent's Hospital in the event that the Court finds them to be relevant, Dkt. No. 284 at 7 n.7, which the Court does.  The defense may make objections to the privilege redactions of Four Winds Hospital and St. Vincent's Hospital related to those records.[6]

---

[6] To potentially limit the scope of any such objections, counsel for John Doe may wish to

**B. Jane Doe 3**

The defense argues that, to the extent the privilege applies to the set of records from 2008, that privilege is waived because Jane Doe 3 sent some of the records to Ray in an email but that any such waiver would be limited to the records that were shared.  Dkt. No. 321 at 18–19.  The Court is not in receipt of that email and, as such, is not aware of which records were shared.  To the extent that Jane Doe 3 shared records with Ray that otherwise contain privilege redactions, those communications are no longer confidential, and she has waived her privilege as to those records.  *See Jaffee*, 518 U.S. at 10 (explaining privilege protects *confidential* communications); *cf. In re Horowitz*, 482 F. 2d 72, 81 (2d Cir. 1973) ("We deem it clear that subsequent disclosure to a third party by the party of a communication with his attorney eliminates whatever privilege the communication may have originally possessed, whether because disclosure is viewed as an indication that confidentiality is no longer intended or as a waiver of the privilege.").

Jane Doe 3's attorneys have redacted two sets of intake records from a visit to an emergency room in 2008 on relevance grounds.  One set is plainly not relevant:  It covers treatment sought by Jane Doe 3 in February 2008—before she is alleged to have even met Ray—for a common cold.  The other set from April 2008, however, is claimed to be both irrelevant, because the records predate the period of the crimes charged in the indictment, as well as privileged under the psychotherapist-patient privilege.  For the reasons explained in Section I.B, *supra*, these records are relevant insofar as they relate to mental-health treatment received by

---

produce the records of Four Winds Hospital and St. Vincent's Hospital with revised redactions in light of the Court's holdings regarding relevance and the scope of the psychotherapist-patient privilege.  If it chooses to do so, it should inform counsel for the defense of its intention no later than 5 p.m. on Wednesday, February 9, 2022, and should produce any such records by February 14, 2022.

Jane Doe 3.  They may, however, contained privileged material if they contain information reflecting communications made to a licensed mental-health provider or their staff in the course of treatment (i.e., after admission, if Jane Doe 3 was admitted for psychiatric care).

As it does with John Doe, the defense "reserves the right to object to the applicability of the psychotherapist-patient privilege concerning the[] records" of New York-Presbyterian Hospital in the event that the Court finds them to be relevant.  The Court will reserve decision on Jane Doe 3's records from New York-Presbyterian Hospital until defense makes such objections, which it shall do on or before February 21, 2022.[7]

### C.  Jane Doe 2

In its letter motion, the defense argued that redacted portions of Jane Doe 2's medical records from Planned Parenthood—relating to her "social and substance use history," "sexual history," "medical history and medications," and "medical information"—are relevant to the case against Ray "[g]iven the anticipated scope of Jane Doe 2's testimony and the fact that she is the only alleged victim of sex trafficking in this case . . . ."  Dkt. No. 284 at 4.  At oral argument, defense counsel acknowledged that counsel for Jane Doe 2 was also invoking Federal Rule of Evidence 412, which governs the admissibility of evident relating to victims in sex-offense cases.  Dkt. No. 321 at 21–22; *see also* Fed. R. Evid. 412.  The defense explained that it was prepared to have the Court wait until it hears the testimony of Jane Doe 2 at trial to review Jane Doe 2's records and determine whether there is information relevant to Ray's right to confront

---

[7] To potentially limit the scope of any such objections, counsel for Jane Doe 3 may wish to produce the records of New York-Presbyterian Hospital with revised redactions in light of the Court's holdings regarding relevance and the scope of the psychotherapist-patient privilege.  If it chooses to do so, it should inform counsel for the defense of its intention no later than 5 p.m. on Wednesday, February 9, 2022, and should produce any such records by February 14, 2022.  The defense may file objections by February 21, 2022, after meeting and conferring with counsel for Jane Doe 3.

Jane Doe 2 and could be used for impeachment purposes. Dkt. No. 321 at 22. At argument, counsel for Jane Doe 2 agreed with the defense's proposal to wait until the trial testimony stage to discuss the redactions. *Id.* at 41–42. The Court will therefore reserve decision on the appropriateness of the redactions of Jane Doe 2's Planned Parenthood records until hearing the testimony of Jane Doe 2 at trial.

### D. Jane Doe 1

Counsel for Jane Doe 1 produced a categorical privilege log containing three categories of proposed redactions. The defense objects to these redactions on various grounds addressed above, including that the redactions cover Jane Doe 3's communications with those who are not licensed "psychotherapists" within the meaning of *Jaffee.* Dkt. No. 284 at 5. As the defense conceded at oral argument, however, the privilege extends beyond licensed mental-health professionals to those working at the direction of licensed mental-health providers and within the team of professionals providing such treatment.

The Court has reviewed the categorical privilege log provided by counsel for Jane Doe 1 and finds that the categories, as described in the privilege log, are permissible bases for redacting records to the extent that they reflect the substance of confidential communications between licensed mental-health providers, and those working under their direction, and Jane Doe 1. However, a cursory examination of the underlying records indicates that the redactions are, in fact, broader than they are described. For example, with respect to the redacted information obtained from an insurance case manager, appearing on—among other pages— JANEDOE1_00000275, the redactions reflect communications made by Jane Doe 1 only in part; the name of the case manager and the first sentence following "collateral" plainly does not reflect a communication by Jane Doe 1. Counsel for Jane Doe 1 is directed to revise its

redaction logs to contain the information for the Court to make a decision consistent with the principles set forth in this Opinion—both with respect to the records from New York Presbyterian and Harlem Bay Network.  Counsel may also wish to produce a newly revised set of documents along with the more detailed privilege log.  Any such production shall be made to the defense by February 14, 2022.[8]

## CONCLUSION

Simultaneous with this Opinion, the Court will issue an Order setting forth the portions of the produced records that should be unredacted in accordance with the principles set forth herein. Counsel for Jane Doe 1 is directed to produce a newly revised set of records from New York Presbyterian and Harlem Bay Network, along with a more detailed privilege log, to the defense and the Court by February 14, 2022, by 5 p.m.  Any objections by the defense to those redactions shall be made by February 21, 2022.

If counsel for John Doe and counsel for Jane Doe 3 choose to revise the redactions for the records from Four Winds Hospital and St. Vincent's Hospital, for John Doe, or from New York-Presbyterian Hospital, for Jane Doe 3, counsel must produce such records to the defense and the

---

[8]  The defense also objects to proposed redactions "of information obtained from an insurance case manager in the course of Jane Doe 1's mental health treatment."  Dkt. No. 284 at 6.  There is a paucity of case law regarding the effect on the patient-psychotherapist privilege of disclosure to an insurer.  The issue, however, has been addressed in the attorney-client privilege context where courts have considered the effect of disclosure to an insurance carrier of otherwise confidential information.  *See, e.g.*, *Aiena v. Olsen*, 194 F.R.D. 134, 136-37 (S.D.N.Y. 2000); *cf. Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 229 F.R.D. 441, 448 (S.D.N.Y. 2004) (finding no waiver of attorney work-product privilege where party disclosed protected material to independent auditor, which was under a general "ethical and professional obligation to maintain materials received from its client confidential.").  Jane Doe 1 has not given the Court sufficient information by which to judge whether the privilege has been waived by virtue of the disclosures to the insurer.  Counsel for Jane Doe 1 has leave to supplement its claim of privilege by a letter to the Court filed by February 14, 2022.  Counsel for Ray may have until February 21, 2022 to respond.

Court by February 14, 2022, by 5 p.m.  Any objections by the defense to the redactions to John Doe's records from Four Winds Hospital and St. Vincent's Hospital or Jane Doe 3's records from New York-Presbyterian Hospital shall be made by February 21, 2022.


     SO ORDERED.


Dated: February 8, 2022
     New York, New York

_____
LEWIS J. LIMAN
United States District Judge