UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | **S2 20 Cr. 110 (LJL)** |
| LAWRENCE RAY, | |
| Defendant. | |

**THE GOVERNMENT'S OPPOSITION
TO THE DEFENDANT'S MOTIONS *IN LIMINE***

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Mollie Bracewell
Lindsey Keenan
Danielle R. Sassoon
Assistant United States Attorneys
– Of Counsel –

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................. 2

DISCUSSION ................................................................................... 2

I.   EVIDENCE REGARDING FORCED LABOR THROUGH SEXUAL SERVICES SHOULD BE ADMITTED ..................................................................... 2

II.  LIMITED EVIDENCE ABOUT POLLOK'S SEXUAL GROOMING IS ADMISSIBLE ..................................................................................... 6

  A. Relevant Facts ........................................................................... 7

  B. Discussion ................................................................................ 8

III. DR. PLEUS'S TESTIMONY IS ADMISSIBLE ..................................... 10

IV.  MAPS FROM THE GOVERNMENT'S CELL SITE EXPERT SHOULD BE ADMITTED....................................................................................... 10

V.   ATTORNEY-LED *VOIR DIRE* SHOULD NOT BE PERMITTED................ 11

VI.  THE SCOPE OF DR. HUGHES'S TESTIMONY SHOULD NOT BE LIMITED..... 12

  A. Use of Examples or Illustrations................................................... 13

  B. Victim Anecdotes ...................................................................... 16

VII. THE PROPOSED DEFENSE EXHIBITS ARE IRRELEVANT AND NOT ADMISSIBLE TO SHOW STATE OF MIND ........................................ 17

VIII. THE USE OF THE WORD "VICTIMS," AND OTHER WORDS -- LIKE "GASLIGHTING," "GROOMING," OR "LIEUTENANT" – SHOULD BE PERMITTED ..................................................................................... 24

IX.  RELEVANT EVIDENCE THAT REVEALS THE DEFENDANT'S INCARCERATION SHOULD BE ADMITTED........................................ 29

  A. Applicable Law .......................................................................... 29

  B. Discussion ................................................................................ 31

CONCLUSION.................................................................................. 34

## PRELIMINARY STATEMENT

The Government submits the following response to the defendant's motions *in limine* dated

January 31, 2022  (Dkt. Nos. 325-328).

The defendant Lawrence Ray moved for the following *in limine* rulings: (1) excluding

evidence about ████████ forced sexual services; (2) excluding evidence that Isabella Pollok had

sex with strangers and other "grooming" evidence related to her; (3) precluding the Government's

toxicologist from opining that Mr. Ray was not intentionally poisoned; (4) excluding maps from

the Government's cell site expert; (5) permitting attorney-led voir dire; (6) precluding Dr. Hughes

from testifying about particular conduct and cases or transmitting hearsay statements to the jury;

(7) permitting the defendant to introduce state of mind evidence; and (8) precluding trial

participants from referring to the complaining witnesses as "victims" and using certain other terms.

For the reasons below, the defendant's motions should be denied.

The Government also writes in anticipation of a defense motion to preclude evidence that

certain recorded prison calls were recorded in the context of the defendant's incarceration.  Any

such motion should likewise be denied.

## DISCUSSION

## I.   EVIDENCE REGARDING FORCED LABOR THROUGH SEXUAL SERVICES SHOULD BE ADMITTED

The defense has moved to preclude evidence of ████████ forced labor, namely

videos of her performing sexual services for strangers, claiming that the evidence is irrelevant and

prejudicial. (Dkt. 325 at 1).  But this evidence is highly probative direct evidence of the charged

crimes and is not unduly prejudicial.

As set forth in the Government's motions *in limine*, Dkt. 323 at 22-24, the videos are direct

proof of Count One.  This Court recently denied the defendant's motion to dismiss the Superseding

Indictment, *see* Dkt. 334, which enumerates forced labor as a predicate racketeering act and describes sexual manipulation and the collection of sensitive material against the Enterprise's victims as means and methods of the Enterprise.[1]

The defense does not dispute that the videos are probative of ███ having sex with strangers at the defendant's direction. Instead, the defense claims that this does not amount to forced labor and that therefore this evidence has no "connection to a count" and "serves merely to try to portray Mr. Ray as a generally bad guy." (Dkt. 325 at 3-4). That is incorrect. The defendant violated 18 U.S.C. § 1589 because he "provided" the sexual "labor or services" of ███ to others "by means of force and threats of force" and "serious harm and threats of serious harm" when he forced and threatened her to have sex with various individuals. The defendant also "obtain[ed] the labor or services" of ███ by force and threat of force and serious harm by causing her to provide him with pornographic videos that she created. In addition to using force and threats of force, the defendant also provided/obtained ███ labor and services by means or serious harm and threats of harm, including psychological and reputational harm under Section 1589(a)(2) and

---

[1] Forced labor has always been a predicate racketeering act of Count One, and the Government would have been permitted to argue that ███ sexual services constituted forced labor even without the Superseding Indictment (there is no reason the Government would have been bound, as the defense suggests, to the North Carolina forced labor activity charged in separate counts of the Indictment). Without the changes that put the defendant on further notice of the Government's intended proof, the defendant may have argued that the Government's proof constituted a constructive amendment or variance from the Indictment, but such arguments would have been meritless, and in any event are mooted by the Superseding Indictment. *See, e.g.*, *United States v. Rigas*, 490 F.3d 208, 228 (2d Cir. 2007) (the Second Circuit has "consistently permitted significant flexibility in proof, provided that the defendant was given *notice* of the *core of criminality* to be proven at trial"); *United States v. Vilar*, 729 F.3d 62, 81 (2d Cir. 2013). *United States v. Agrawal*, 726 F.3d 235, 261 (2d Cir. 2013) (A "variance" occurs "when the charging terms of an indictment are unaltered, but the trial evidence proves facts materially different from those alleged in the indictment"; "A variance raises constitutional concerns only if it deprives a defendant of the notice and double jeopardy protections of an indictment, which prejudice the defendant must establish to secure relief on appeal.").

(c)(2).  *See United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010) (affirming forced labor conviction where, while victim initially engaged in a consensual BDSM lifestyle, "over time, the violence became non-consensual, the punishments became more severe and that [the victim] would not have performed services for Marcus's website had she not feared that noncompliance would result in future physical and sexual abuse").

The defendant's conduct falls within the plain terms of the statute, which the defense acknowledges has not been interpreted to require an economic benefit.  (Dkt. 325 at 2).  *See also United States v. Kaufman*, 546 F.3d 1242, 1263 (10th Cir. 2008) ("we are persuaded that the involuntary servitude and forced labor statutes apply to coerced acts other than 'work in an economic sense'"); *id.* at 1262 (citing *United States v. Udeozor*, 515 F.3d 260 (4th Cir. 2008), for the proposition that "sexual acts that have been coerced by other means are covered by the involuntary servitude statute"); *United States v. Marcus*, 487 F. Supp. 2d 289, 300 (E.D.N.Y. 2007) (describing the ordinary meaning of "labor" ("expenditure of physical or mental effort especially when fatiguing, difficult, or compulsory") and "services" ("useful labor that does not produce a tangible commodity")).

The defense implies that the Government's forced labor theory is unprecedented.  (Dkt. 325 at 3).  Not so.  It is modeled after the forced labor predicates charged in the recent prosecution of Robert Silvester Kelly ("R. Kelly"), who was convicted by a jury on all counts.  *See United States v. Robert Sylvester Kelly*, S3 19 Cr. 286 (AMD), Dkt. 43 (¶ 9 (alleging that "obtaining sensitive information about sexual partners . . . to maintain control over them" was a means and method of the Enterprise); ¶¶¶ 20, 31, 35 (alleging forced labor racketeering predicates); Dkt. 133 at 8 (explaining that forced labor predicates were based on performance of forced sexual services); Trial Tr. at 4380-81 (describing in summation that the "labor or services that the defendant

obtained from Jane was sexual conduct with other females and with Nephew . . . and also with Jane starring in the defendant's homemade sex videos").

The defendant's objections to the Government's interpretation of the forced labor statute are in any event not a basis to exclude the video evidence, but are properly directed to a motion under Federal Rule of Criminal Procedure 29.  The defense is effectively asking the Court to dismiss the Government's forced labor predicate for insufficient evidence.  But it is well settled that a facially valid indictment is not subject to challenge based on the quality or quantity of evidence. *See United States v. Williams*, 504 U.S. 36, 54 (1992). To that end, "at the indictment stage, [courts] do not evaluate the adequacy of the facts to satisfy the elements of the charged offense." *United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021). Rather, "[t]hat is something [courts] do *after* trial." *Id.* (emphasis added). This is consistent with the well-established principle that summary judgment proceedings "do[] not exist in federal criminal procedure."  *Id.*; *see also United States v. Alfonso*, 143 F.3d 772, 777 (2d Cir. 1998) (drawing inferences on matters beyond the fact of the indictment amounts to an inappropriate inquiry into the sufficiency of the evidence, which is not appropriate pretrial).

Regardless, the video evidence is also probative of the means and methods of the Enterprise, as well as proof of the defendant's forced labor of ▇▇▇ in North Carolina.  The defendant's sexual exploitation and physical abuse of ▇▇▇ preceded her forced labor in North Carolina where she was forced —under punishing and physically abusive conditions—to perform manual labor on the defendant's stepfather's property.  The coercive conditions on that manual labor can only be understood in the context of the abuse and exploitation that immediately preceded it, and which was a fundamental method of the Enterprise.

This evidence is also not unduly prejudicial.  It is direct proof of the charged crimes and no more inflammatory than the other direct evidence, which include testimony and videos of the defendant's horrific physical abuse, including against ███  The Government's proposal to offer the evidence in the form of a summary chart also minimizes the potential prejudice, while allowing the Government to prove its case.  *See also Old Chief v. United States*, 519 U.S. 172, 180-82 (1997) (the Government is entitled to prove "its case by evidence of its own choice").[2]  The evidence also does not create a risk of a trial within a trial and is fairly limited.  ███ will testify about the forced sexual services and forced creation of pornographic videos, and the proposed summary chart and underlying videos will corroborate that testimony. The Government intends to introduced limited additional corroborating evidence.  Specifically, ███ will testify that the defendant directed her to have sex with the doorman of their Upper East Side apartment building shortly after she moved into the apartment; that doorman is expected to briefly testify about an occasion when ███ propositioned him for sex and he declined.   This evidence is direct and highly probative evidence, and the defendant has not identified any undue prejudice.

## II.    LIMITED EVIDENCE ABOUT POLLOK'S SEXUAL GROOMING IS ADMISSIBLE

The defense moves to preclude evidence that Pollok "had sex with strangers and other 'grooming' evidence related to Pollok's sexual activities."  (Dkt. 325 at 4).  The defense argues that this evidence is irrelevant and prejudicial because the Government has characterized Pollok as a coconspirator.   But evidence about the defendant's sexual grooming of Pollok and her

---

[2] The Government informed defense counsel that it would be prepared to redact any inflammatory language from the file names and make limited revisions to the video descriptions, but otherwise opposes the defense requests to redact file names that refer to the video participants (such as ███ and "Iz"), to delete entries that enumerate multiple videos from a single date or incident, and to eliminate objective descriptions of the video contents, which is the purpose of the summary chart.

participation in the sexual grooming, forced sexual labor, and sex trafficking of others—including by engaging in sexual acts with the victims herself—is proof of the coconspirator relationship between the defendant and Pollok and direct proof of the charged conspiracies.

### A.  Relevant Facts

The evidence at trial will establish that at the outset of the defendant's relationship with Pollok, he slept in her dormroom.  In the summer of 2011, the defendant lived with several of his victims and Pollok in his apartment on the Upper East Side.  While the defendant's victims slept on couches and air mattresses in the living room of the one bedroom apartment, Pollok and the defendant shared a bed in his bedroom.

Over the course of that summer and afterward, Pollok and the defendant sexually groomed █████████. █████ is expected to testify about various incidents in which the defendant directed him to engage in sexual activity with Pollok and others, including numerous incidents in which the defendant participated, provided "instruction" about how to induce female sexual gratification, and provided "feedback" about Levin's sexual performance with Pollok.  The Government intends to introduce into evidence a video of one such incident that corroborates █████ testimony (the Government expects that █████ will identify a still from the video, but does not otherwise intend to play it for the jury).

█████ will testify that the the defendant and Pollok, using a combination of coercive tactics, psychological isolation, and physical violence forced █████ to perform sexual services for strangers.  She will describe how Pollok often accompanied her and either filmed █████ sexual encounters or directly participated.  Pollok's participation is corroborated by multiple videos in the Government's proposed summary chart.

Finally, █████ is expected to testify about occasions while she was being sex trafficked by the defendant and Pollok when the defendant would direct her and Pollok to engage in sexual

7

activity together.  On one such occasion, the defendant watched as ███ Pollok, and a night manager of the hotel where ███ was staying, engaged in sexual activity.

Within the discovery, there are numerous videos of Pollok engaged in sexual activity with various people, sometimes in the defendant's presence or at his direction.  Apart from one video with Levin and videos with ███ the Government does not intend to introduce these videos into evidence.

### B.  Discussion

The Government does not intend to show the jury videos of Pollok engaged in sexual activity, where those videos do not include the victims.  But limited testimony about her intimate relationship with the defendant—including that they shared a bedroom—is admissible to demonstrate the relationship of trust that developed between the defendant and his coconspirator and to explain the events leading up to Pollok's participation with the defendant in the charged crimes.  *See also United States v. Pascarella*, 84 F.3d 61, 73 (2d Cir. 1996) (holding that other act evidence is admissible "to show the background of a conspiracy or the development of a relationship of trust between the participants"); *United States v. Jones*, 738 F. App'x 13, 16 (2d Cir. 2018) (admission of prior acts evidence is proper where it is "probative of their relationship of trust, specifically how the *illegal* nature of that relationship developed over time" (emphasis in original)).

Contrary to the defense's claim, the Government does not intend to label Pollok as a "victim." (Dkt. 325 at 6).  The defendant's grooming of Pollok and her identity as a coconspirator are not incompatible.  Although they were coconspirators, the Government will argue that the defendant and Pollok did not stand on equal footing within the Enterprise.  The defendant was the leader and she was his underling.  Without some context about the defendant's grooming—sexual and otherwise—of Pollok to be his loyal deputy and about the genesis and evolution of their

relationship, it will be difficult for the jury to understand how it came to be that Pollok helped the defendant carry out the goals of the Enterprise, including the sexual manipulation of its victims, the forced labor, and the sex trafficking. *See United States v. Mercado*, 573 F.3d 138, 141 (2d Cir. 2009) (prior bad acts were admissible to show "the development of the relationship between Defendant and [the cooperating witness,] . . . enabl[ing] the jury to understand the complete story of the crimes charged, or how the illegal relationship between coconspirators developed" (quotation omitted)); *United States v. Pipola*, 83 F.3d 556, 565 (2d Cir. 1996) ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case.").

The proof of Pollok's participation in sexual activity with other victims is direct evidence of the charged crimes and her role as a coconspirator and an enforcer within the Enterprise. Sexual grooming was one of the defendant's methods of gaining control over the victims in order to carry out the Enterprise's racketeering activity, including extortion, forced labor, and sex trafficking. For example, before and while he sex trafficked ██████ the defendant encouraged ██████ to submit to BDSM, attend sex clubs, and engage in sexual activity with Pollok, in order to desensitize her to the prospect of working as a prostitute. As in other respects of the conspiracies, Pollok acted as the defendant's agent in carrying out his plan. Likewise, Pollok enforced the defendant's directives to ██████ to provide sexual services to strangers—sometimes supervising, filming, or participating in the activity to make sure the defendant's instructions were carried out. In other words, sexually explicit evidence related to Pollok is inextricably intertwined with the victimization of ████████ and ██████ and the Government is entitled to present a complete narrative of this highly probative evidence.

### III.    DR. PLEUS'S TESTIMONY IS ADMISSIBLE

The defense moves to preclude Dr. Pleus's testimony because "whether Mr. Ray was in fact poisoned is not a fact at issue." (Dkt. 325 at 7). But the defense has also indicated in its pre-trial filings that it will argue that the defendant *believed* he had been poisoned. The Government expects to make a two-pronged response: (1) even if the defendant believed he had been poisoned, that is not a defense to the charged crimes; and (2) the evidence indicates that the defendant did not in fact hold this belief, but instead used false accusations to exploit his victims. With respect to the second prong, Dr. Pleus's testimony is relevant because it exposes that the defendant's supposed beliefs were unreasonable, and therefore unlikely to be genuinely held. This testimony therefore has probative value under Rule 401, because it undermines the reasonableness and validity of the defendant's purported state of mind evidence, which—if admitted—the Government will argue simply constitutes the defendant's self-serving and calculated statements to shield himself from liability.

### IV.    MAPS FROM THE GOVERNMENT'S CELL SITE EXPERT SHOULD BE ADMITTED

The Government's cell site expert, Andrew Petersohn, prepared maps reflecting cell site connections of cellphones used by the defendant, Isabella Pollok, and ▉▉▉▉ on certain dates in 2018. The defense argues these maps are "confusing and misleading" because the shaded circles used to depict the locations of the cell site connections "incorrectly suggest that the coverage area of cell sites are of a specific, circular size and they inaccuarely imply that the phones were within the shaded areas." (Dkt. No. 325 at 8).

To the contrary, Mr. Petersohn's testimony will make clear that (i) cell site coverage areas are not necessarily circular, (ii) coverage area varies among types of cell sites, and (iii) the shaded circles on the proposed map exhibits depict the location of a cell site, not the location of a particular cellphone. Testimony of this nature, relying on maps with graphics to depict cell site locations, is

neither confusing nore misleading, and is routinely admitted in trials in this District.  *See*, *e.g.*, *United States v. Aquilino Torres*, 20 Cr. 608 (DLC) (S.D.N.Y. 2021), *United States v. Shoendale Jarrrett*, 19 Cr. 670 (LGS) (S.D.N.Y. 2021), *United States v. Jose Caban*, 19 Cr. 166 (VEC) (S.D.N.Y. 2021), *United States v. Anthony Molina*, 19 Cr. 449 (NSR) (S.D.N.Y. 2021), *United States v. Kasheen Samuels*, 18 Cr. 306 (ER) (S.D.N.Y. 2021), *United States v. Vance Collins*, 19 Cr. 395 (PKC) (S.D.N.Y. 2020), *United States. Matthew Madonna*, 17 Cr. 89 (CS) (S.D.N.Y. 2019), *United States v. Anthony Ellison and Aljermiah Mack*, 18 Cr. 834 (PAE) (S.D.N.Y. 2019), *United States v. Robert Pizarro and Juan Rivera*, 17 Cr. 151 (AJN) (S.D.N.Y. 2018), *United States v. Tyrone Felder*, 14 Cr. 604 (VB) (S.D.N.Y. 2018), *United States v. Leibys Mercedes*, 17 Cr. 419 (KMK) (S.D.N.Y. 2018); *United States v. Dean Jones*, 15 Cr. 153 (VSB) (S.D.N.Y. 2017), *United States v. Kevin Walker*, 16 Cr. 567 (JSR) (S.D.N.Y. 2017), *United States v. Kevin Sterling and Alonzo Vernon*, 16 Cr. 488 (LAK) (S.D.N.Y. 2017).

Importantly, the proposed map exhibits are highly probative in this case, as the cell site evidence depicted in the maps corroborates the Government's other significant evidence of the defendant's guilt, in particular with respect to the racketeering conspiracy, sex trafficking, sex trafficking conspiracy, money laundering, and tax evasion charges.  The proposed map exhibits will corroborate ███████ testimony that on various dates in 2018, she met with Isabella Pollok and/or the defendant, for the purpose of providing prostitution proceeds.  Because the proposed maps are relevant, probative evidence, and Mr. Petersohn's testimony will cure any confusion anticipated by the defense, the motion should be denied.

## V.   ATTORNEY-LED *VOIR DIRE* SHOULD NOT BE PERMITTED

The defendant's proposal for attorney-led *voir dire* is inconsistent with well-established practices in this District.  The defendant has not identified a persuasive basis for this departure, and it should be rejected.  As the Second Circuit has recognized, attorney-conducted *voir dire*

poses a risk of abuse, and the trial judge is more than capable of conducting *voir dire*, as nearly every court in this District has done in every criminal trial before it.

The defense asserts that jurors are more likely to be truthful with counsel, than with the Court. Dkt. 325 at 8-9. But the Second Circuit has observed that there are "many articles relating the abuses of attorney-controlled [*v*]*oir dire*, which suggest that a reasonable inquiry into the essentials raised in the particular case should be sufficient, and that the trial judge should retain the discretion to apply limits." *United States v. Barnes*, 604 F.2d 121, 142 n.10 (2d Cir. 1979); *see also United States v. Dennis*, 183 F.2d 201, 227 (2d Cir. 1950) (Hand, J.) (referring to attorney-conducted *voir dire* "sometimes extending for weeks on end"). Judge Weinfeld also indicated— based on "more than three decades of judicial service"—that he was "persuaded beyond peradventure of doubt" that court-driven *voir dire* was the appropriate way to complete jury selection "expeditiously and with full protection of a defendant's constitutional right to an impartial jury," even in cases involving "the widest publicity . . . over extended periods of time." *United States v. Wilson*, 571 F. Supp. 1422, 1428 (S.D.N.Y. 1983) (citing *Barnes*). Judge Weinfeld expressed concern that attorney questioning is sometimes used as "a calculated effort to establish a rapport with a juror or jurors in the hope of encouraging partiality in favor of the client." *Id.*

There is also a substantial risk that improper questions from attorneys will contaminate the entire venire if they are not pre-screened by the Court. The defendant's contention that the attorneys are more capable than the Court of eliciting truthful responses from potential jurors is flawed and, in any event, an unpersuasive basis for rejecting the authority and practice counseling against attorney-driven *voir dire*. This motion should therefore be denied.

## VI.   THE SCOPE OF DR. HUGHES'S TESTIMONY SHOULD NOT BE LIMITED

The defendant attempts to police the illustrations or examples which Dr. Hughes can reference during her testimony, claiming that she should not be able to use examples from cases

that have "no factual connection" to this case.  (Dkt. 326 at 1).  The defendant also attempts to

relitigate the admissibility of Dr. Hughes's testimony arguing that it will be vehicle to transmit

hearsay statements from victims of interpersonal violence and coercive control.  (Dkt. 326 at 2).

The defendant's motion should be denied.  It is entirely appropriate for an expert to try to explain

relevant concepts or phenomena in terms that a juror can understood and comprehend.  Indeed,

that is the purpose of expert testimony.  Furthermore, narrow and occasional references to her

observations of victims – and if appropriate, victims' statements – is similarly permissible given

the substantial probative value and minimal risk of prejudice.

To clarify, the fact of Dr. Hughes's prior expert testimony would only be mentioned in

qualifying her as an expert witness and the Government does not expect to elicit the particular

cases (by name) in which she has been qualified as an expert (that is, unless the defendant opens

the door to her prior experience through its cross-examination).  Because the defendant has

strenuously objected to her expert qualifications in pre-trial briefing, and will likely question her

qualifications during cross examination, it is relevant to establish that Dr. Hughes has been

previously qualified as an expert on the same topics.  Similarly, the Government does not expect

that Dr. Hughes will testify about irrelevant and prejudicial conduct or cases that have "no factual

connection" to this prosecution.

### A.   Use of Examples or Illustrations

Based on transcripts of her prior testimony, Dr. Hughes may use real-life examples in

describing and explaining tactics of coercive control.  The defendant repeatedly references Dr.

Hughes's testimony about the Boy Scouts or the Catholic Church and suggests that her use of such

examples is problematic, prejudicial, and irrelevant to this case.  To the contrary, Dr. Hughes's

prior testimony in fact shows why such examples are appropriate and useful.  The Government has

not yet discussed with Dr. Hughes the particular examples that she will use.  But given the topics

13

that she is expected to address, the Government expects that brief references to those cases may be similarly appropriate in her testimony as set forth below.

Dr. Hughes has referenced cases involving the Boy Scouts and the Catholic Church in testimony about grooming and how the context of the abuser's relationship with the victim informs what tactics are employed.  For example, in *United States v. Kelly*, Dr. Hughes defined grooming as nonviolent techniques that an offender would use in order to gain compliance of a child victim, or, as she later clarified, an adolescent or young adult victim. See Ex. A, Tr. of *United States v. Kelly* (hereinafter "*Kelly* Tr.") at 3919 (describing how  individual pepetrators can "use the vulnerabilities or the interest of the child [or adolescent or young adult] in order to perpetrate the abuse."); *Id.* at 3923 (clarifying that grooming can be used with adolescents and young adults as brain development continues until age 25).  Dr. Hughes then used a handful of examples to show how the existing relationship between perpetrator and victim might inform the nature of the grooming.  *Id.* at 3919 ("The type of grooming techniques usually mirror what the relationship is between the two individuals. We know that the overwhelming majority of child sex abuse is by someone known by the victim.  If it was a Boy Scout leader, it will be I can help you do your Eagle Scout.  If it's a gymnastics coach, I will help you get to the Olympics.")

This topic is relevant to the fact of this case.  With respect to grooming, and as set forth in the Government's Enterprise Letter, the Government expects the victims to describe how the defendant initially earned the victims' trust.  The Enteprise Letter details that the defendant, with the assistance of his daughter, targeted vulnerable victims.  *See* Def. Ex. A at 2 ("His daughter assisted him in targeting victims who were vulnerable both because of their impressionable age (they were mostly college students) but also because they believed each suffered from mental health issues"). The victims are expected to describe how the defendant spent time with victims

14

individually, and as a group, having in-depth conversations about their most intimate issues and about his general philosophy about life.  Def. Ex. A at 4.  In other words, the Government expects to prove that the defendant exploited the vulnerabilities of his victims to perpetuate the abuse.  *See Kelly* Tr. at 3919 (describing how, with grooming, pepetrators can "use the vulnerabilities or the interest of the [victim] in order to perpetrate the abuse.");  Govt. Expert Notice Ltr. (describing that Dr. Hughes was also expected to testify about the common elements of abuse and coercive control in victimization situations, including "exploitation of preexisting psychological, developmental, traumatic, or financial vulnerability").

In addition, Dr. Hughes has invoked the examples of the Boy Scouts and Catholic Church in describing how an abuser's position relative to the victim can influence a victim's ability to process or report abuse.  As Dr. Hughes has testified, victims often are intimidated by a perpetrator in a position of authority or a part of a larger institution.  *See* Ex. B, Tr. of *United States v. Keith Raniere* (hereinafter "*Raniere* Tr.") at 3700 ("[W]here sometimes in telling about the abuse, then sort of the whole group is going to come down. And, of course, the issue of fearing being believed that somebody who's in high esteem, your Scout Master, could do this to you."); *id.* (explaining a victim's concern of "how can I, the victim, be believed and take down a priest?").  The perpetrator's supposed authority and esteem, such as a priest, a Scout leader, or a coach, can discourage reporting and also induce psychological confusion for the victims.  *Id..* at 3702.

That an abuser's position of authority can facilitate and further a victim's exploitation is relevant to this case.  As the evidence will otherwise make clear, the defendant was introduced to his victims as the father of their college roommate, which automatically situated him in a position of authority and trust vis-à-vis his victims.  As witnesses will testify, the defendant repeatedly emphasized his authority, including, among other things, his connections to Government officials

or to law enforcement and his prior experience in national security or with the Marines.   The defendant's presentation of himself as a well-connected former Marine and intelligence operative is relevant to the victims' experience of coercive control, including how they reacted to it and perceived their ability to leave.

There is no undue prejudice from describing relevant topics with relevant examples.  As will be made clear in her direct testimony, Dr. Hughes is not testifying about the specifics of this case.  She has not interviewed the defendant or the victims in this case, nor reviewed any evidence or reports.  To the contrary, she will be testifying from her general knowledge on the topic of coercive control and, where useful, illustrating concepts with examples that might be familiar or comprehensible to a jury to facilitate her explanation.  It will be clear from her testimony about this case and from the nature of these examples that they do not involve the defendant or his victims.  .

## B.  Victim Anecdotes

The defendant, with a broad brush, objects to "hearsay anecdotes and stories from witnesses whom Mr. Ray will not have the opportunity or ability to cross-examine."  Dkt. 326 at 3.  As noted, the defendant previously made this motion on December 6, 2021, *see* Dkt. No. 263 at 36-39, and the Court denied it.   As this Court has already recognized, expert witness may base opinions on inadmissible facts or data . . . of a type reasonably relied upon by experts in the particular field," including "research methodology . . . that involve[s] listening to the statements of domestic abuse victims, but her testimony will involve the synthesis and interpretation of those statements, rather than the mere conveyance of those statements to the jury." Dkt. 287 at 24 (quoting *United States v. Torres*, No . 20 Cr. 608 (DLC), 2021 WL 1947503, at *7 (S.D.N.Y. May 13, 2021)); *see* Fed. R. Evid. 703.

16

Here, Dr. Hughes's expertise in coercive control is based, at least in part, on her treatment of victims over many years.  Given that such victim-encounters inform her expertise, it may be useful or helpful to reference certain key or typical examples to illustrate her opinions.  The probative value of such anecdotes is not "minimal" as the defendant contends, in light of the fact that such victim interviews are a regular and routine source of facts and data in this context.  *See, e.g.*, *United States v. Randall*, 19 Cr. 131 (PAE) (S.D.N.Y.), Feb. 25, 2020 Tr. at 29-30, Dkt. No. 335 (describing that expertise on trauma bonding and coercive control "necessarily uses more qualitative research methodologies," including "interviews and case studies and clinical examinations conducted over time"); *United States v. Kidd*, 385 F. Supp. 3d 259, 263-264 (S.D.N.Y. 2019) (describing that expertise on coercive control in sex trafficking context was based upon writing about, treating, and speaking to prostitutes).  To unmoor Dr. Hughes's expertise from its sources would make it incredibly difficult for her to explain and elucidate the concepts that she is presenting to the jury, and it is certainly not required by Rule 703.

## VII.  THE PROPOSED DEFENSE EXHIBITS ARE IRRELEVANT AND NOT ADMISSIBLE TO SHOW STATE OF MIND

The defense seeks to offer several exhibits that it claims are admissible as non-hearsay and under Federal Rule of Evidence 803(3) as circumstantial evidence of the defendant's state of mind, namely that he had a "contemporaneous belief that he was the target of a wide-ranging and years-long conspiracy that involved law enforcement personnel, senior political figures, and the alleged victims in this case."  Dkt. 327 at 2.  The proposed exhibits should be excluded because they are irrelevant, unfairly prejudicial, and do not constitute proper state of mind evidence.

### A.  Applicable Law

"Generally, a statement made by a person while not testifying at the current trial, offered by that person to prove the truth of the matter asserted in his statement, is hearsay." *United States*

*v. Gupta*, 747 F.3d 111 (2d Cir. 2014), 747 F.3d at 131 (citing Fed. R. Evid. 801(a)-(c)). "Hearsay generally is inadmissible if it does not fall within an exception provided by Rule 803 or 804." *Id.* (citing Fed. R. Evid. 802). Rule 803(3) of the Federal Rules of Evidence recognizes a hearsay exception in limited circumstances for:

> [a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Fed. R. Evid. 803(3).

By referring to the declarant's "then-existing" state of mind, Rule 803(3) incorporates a "contemporaneity requirement." *United States v. Farhane*, 634 F.3d 127, 171-75 (2d Cir. 2011) (Raggi, J., concurring). The contemporaneity requirement reduces the declarant's chance for reflection and, therefore, misrepresentation. *See United States v. Cardascia*, 951 F.2d 474, 488 (2d Cir. 1991) ("the reasons for the state of mind exception focus on the contemporaneity of the statement and the unlikelihood of deliberate or conscious misrepresentation"); *Farhane*, 634 F.3d at 171 (Raggi, J., concurring) ("the statement must evidence the declarant's '*then* existing state of mind,' a circumstance presumed to reduce a declarant's chance for reflection and, therefore, misrepresentation"). Thus, statements of the declarant's state of mind in the past are not admissible under Rule 803(3). *See, e.g., United States v. Taubman*, 297 F.3d 161, 164-65 (2d Cir. 2002); *United States v. Harwood*, 998 F.2d 91, 98 (2d Cir. 1993); *Cardascia*, 951 F.2d at 487-88. "The exclusion of 'statements of memory or belief proffered to prove the fact remembered or believed' is necessary to prevent the exception from swallowing the hearsay rule." *Id.* at 487.

**B.  Discussion**

18

As a threshold matter, the defendant's proposed exhibits should be excluded as irrelevant. As this Court already determined with respect to the defendant's proposed expert witness, Dr. Pierre, whether the defendant genuinely believed that he was being poisoned, or the target of a conspiracy comprising his victims and others, has no bearing on the *mens rea* of the charged crimes. *See* Dkt. 329 at 27 ("[W]hether or not Ray believed that the alleged victims actually poisoned him or injured his property and that they therefore owed him something to compensate for that harm is irrelevant to the ultimate question of if he committed extortion."); *id.* at 28-29 (same for money laundering and tax evasion). Because the defendant's "beliefs that he was entitled to the money he gained through extortion and sex trafficking have no bearing on his mindset regarding the legality of the method he used to obtain that money," *id.* at 29, the defendant cannot establish the relevance of these exhibits under Rule 401. *See, e.g.*, *United States v. Solano*, No. 05 CR. 563 (LTS), 2010 WL 2718973, at *1 (S.D.N.Y. July 8, 2010) (excluding state of mind evidence that was "irrelevant" under Rule 401); *United States v. Mendlowitz*, No. S2 17 CR. 248 (VSB), 2019 WL 6977120, at *9 (S.D.N.Y. Dec. 20, 2019) (even assuming statement was admissible as state of mind evidence, finding that the defendant's argument about his state of mind was "of limited relevance and probative value"); *United States v. Lesniewski*, No. 11 CR 1091, 2013 WL 3776235, at *5 (S.D.N.Y. July 12, 2013), *aff'd sub nom. United States v. Rutigliano*, 614 F. App'x 542 (2d Cir. 2015) (finding that only one of the proffered statements was "actually representative of [the defendant's] then-existing state of mind and thus admissible under Rule 803(3), and that statement is inadmissible because it is not relevant to any fact or issue in this case").

Even if the defendant could demonstrate relevance, the exhibits still constitute impermissible hearsay because they are not statements made by the defendant contemporaneously

with the events being described, and therefore constitute the type of self-serving, post-hoc statements that Rule 803(3) specifically excludes. *See Farhane*, 634 F.3d at 171 ("the statement must evidence the declarant's *then* existing state of mind, a circumstance presumed to reduce a declarant's change for reflection and, therefore, misrepresentation") (emphasis in original); *Cardascia*, 951 F.2d at 487 (distinguishing between statements that are the "product of a contemporaneous state of mind" and a "self-serving post conspiratorial statement").

For example, the defendant's purported letter to the U.S. Attorney's Office on April 23, 2016, is a backward-looking description of a supposed plot that included prior poisoning and an assault in September 2015. *See* Def. Ex. H. That is precisely what is beyond the scope of Rule 803(3). *See Cardascia*, 951 F.2d at 488 ("To admit statements of one's state of mind with regard to conduct that occurred eight months earlier . . . would significantly erode the intended breadth of this hearsay exception."); *United States v. Netschi*, 511 F. App'x 58, 61 (2d Cir. 2013) ("[T]o the extent that the declarations excluded by the trial court's rulings were not statements exhibiting Lawal's then existing state of mind, but were instead statements of what he or someone else had done in the past, they would be properly excludable as inadmissible hearsay not within the terms of Rule 803(3)." (quoting *United States v. Lawal*, 736 F.2d 5, 8 (2d Cir. 1984)); *Taubman*, 297 F.3d at 164-65 (affirming exclusion of statement about "past memory or belief"); *United States v. Harwood,* 998 F.2d 91, 98 (2d Cir. 1993) ("statement must face forward, rather than backward").

As the Second Circuit explained—in an example that could not be more apt:

> This exclusion from the state of mind exception grew out of Justice Cardozo's opinion in *Shepard v. United States,* 290 U.S. 96 (1933), where the Supreme Court refused to admit, under the state of mind exception to the hearsay rule, a statement by the defendant's wife that "Dr. Shepard has poisoned me." The Court said, "[t]he testimony now questioned faced backward and not forward ... What is even more important, it spoke to a past act, and even more than that, to an act by some one not the speaker." *Id.* at 104, 106.

*Cardascia*, 951 F.2d at 487.  Likewise here, the defense is seeking to admit statements about past misdeeds by people other than the defendant.  But the "plain text of [Rule 803(3)] does not cover the admission of statements regarding conduct or events that occurred earlier in time." *Mendlowitz*, 2019 WL 6977120, at *9.  *See also Solano*, 2010 WL 2718973, at *1 ("backward-looking statements by out-of-court declarants are inadmissible").[3]

The defense asserts that the "likelihood that the declarant is misrepresenting his state of mind is not an additional qualification to the admissibility of state of mind hearsay statements." Br. at 8 (citing cases).  But that is only because the rule is *already* limited to statements contemporaneous with the event being described: the "reasons for the state of mind exception focus on the contemporaneity of the statement and the unlikelihood of deliberate or conscious misrepresentation."  *Cardascia*, 951 F.2d at 487; *see also Farhane*, 634 F.3d at 171 ("The special assurance of reliability for statements of present state of mind rests upon their spontaneity and resulting probable sincerity.")

The defendant's proposed exhibits are also inadmissible as evidence of the defendant's state of mind simply because the defendant is not the declarant.  *See, e.g.*, *United States v. Quinones*, 511 F.3d 289, 312 (2d Cir. 2007) (holding that "the mere utterance of a statement,

---

[3] It is not dispositive that the defendant sent these emails during the timeframe of the charged conspiracy.  The rule is focused on whether the statement is contemporaneous with the event being described.  *See, e.g.*, *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2005 WL 375315, at *9 n. 9 (S.D.N.Y. Feb.17, 2005) (statement must "be contemporaneous to the event sought to be proved"); *United States v. Davidson*, 308 F. Supp. 2d 461, 480 (S.D.N.Y. 2004), *aff'd*, 220 F. App'x 5 (2d Cir. 2007) (excluding letter "which is no more than [the defendant's] version of what took place months earlier" because it was "not reliable evidence of [the defendant's] state of mind at the time when the allegedly criminal acts were taking place" and the passage of time left "ample time for fabrication, which renders the 'state of mind' exception inapplicable")

without regard to its truth, may circumstantially evidence the state of mind of the *declarant*" and be admitted as non-hearsay) (emphasis added). Defense Exhibits B through F are emails from the defendant to Robert Mutto, but each email has an attachment with the statements of someone else, specifically text messages and audio files of the defendant's victims. The emails contain no expression from the defendant about his then-existing state of mind—they contain no message from the defendant *at all* apart from the attachments, which constitute the hearsay statements of others. Defense Exhibit G is an email to the defendant *from* Robert Mutto, providing contact information for the Department of Justice and expressing sympathy about the defendant's health issues. *See* Def. Ex. G. Defense Exhibit H contains a letter signed "Lawrence Ray," but also includes a variety of either documents, including two letters seemingly written by attorney Glenn Ripa about the "serious criminal allegations" being raised by Lawrence Ray. *See* Def. Ex. H. The defendant is not the declarant of these communications and they are therefore not a permissible source for inferring the defendant's state of mind. Moreover, Mutto's and Ripa's states of mind are completely irrelevant, except to mislead the jury that Mutto and Ripa were approving of the defendant's conduct and shared his point of view, or that the defendant acted in good faith reliance on their approval. This is particularly misleading without any information to understand what facts about the defendant's conduct Mutto and Ripa were, and were not, privy to.

The defense argues that "statements made by Mr. Ray are relevant to show that he was actively reaching out to law enforcement and others, demanding that they investigate his poisoning, and was not seeking to obscure or hide his conduct from law enforcement." Dkt. 327 at 8. Courts in this District have rejected such arguments and recognized that this is not non-hearsay state of mind evidence, but evidence impermissibly offered for the truth of demonstrating the defendant's supposed innocence. *See, e.g.*, *Davidson*, 308 F. Supp. 2d 461, 480-81 (S.D.N.Y.

2004), *aff'd*, 220 F. App'x 5 (2d Cir. 2007) ("To the argument that the very sending of the letter proves [the defendant's] innocent state of mind—because why would a man guilty of fraud have congress with the FBI and the IRS?—the response is . . . the argument is logically fallacious").  As Judge Rakoff explained in excluding similar evidence offered for a similar purpose:

> It's really an act that's intended to convey a statement. It's really a way of saying, I am innocent and I'm going to prove it by making myself available to you [law enforcement], which is an out-of-court statement offered for its truth and inadmissible hearsay. That's what it really amounts to, when you unpack it. But putting aside even the hearsay problem, I don't see how a jury is in a position to evaluate his action in that regard without his taking the stand and being subject to cross-examination about what his motives were in doing that. I mean, his motives could be, well, I thought I could talk my way out of it[.]

*United States v. Lumiere*, 16 Cr. 483-01 (JSR), Dkt. No. 62, 1/6/2017 Tr. at 11; *see also United States v. Benalcazar*, No. 09 CR 144, 2011 WL 4553027, at *14 (N.D. Ill. Sept. 29, 2011) (a defendant's interaction with law enforcement agents, offered to negate criminal intent, is not only irrelevant but also confusing and misleading to the jury).

Finally, any minimal probative value from this evidence is substantially outweighed by the risk of unfair prejudice.  *See* Fed. R. Evid. 403.  By admitting emails that the defendant sent to the U.S. Attorney's Office and a Special Agent with the EPA, as well as an email sent by Special Agent Mutto to the defendant, and letters written by the defendant's attorney on his behalf to the U.S. Attorney's Office, the evidence risks creating a misleading impression with the jury that the defendant had a good faith basis for his actions because he had the approval and support of lawyers and government agents.  *See United States v. Certified Env't Servs., Inc.*, 753 F.3d 72, 89 (2d Cir. 2014) ("In this case, the proffered evidence was not offered for its truth but to show that the statements occurred and that, given their effect on the defendants' state of mind, they provided a good faith basis for the defendants' actions."). That would be improper in this case, where the

defendant has yet to establish a basis for raising an advice-of-counsel defense, and has not—and very likely cannot—demonstrate that he provided his attorney or government agents with the complete picture of his conduct and the circumstances giving rise to his victims' confessions. It is unlikely, for example, that either Mutto or Ripa was aware of the defendant's violence against his victims.

It is also improper for the defense to backdoor evidence about the defendant's supposed motive and conspiratorial beliefs without subjecting him to cross examination. In this case in particular, the defendant made allegations directly against his victims, and about his victims to law enforcement, in a manner meant to obstruct, not to elucidate. The recorded confessions he sent to government agents, and the details he shared with the U.S. Attorney's Office were deliberately selective and omitted information about his brutal violence, psychological abuse, forced labor, and sexual grooming of his victims. The proposed exhibits do not directly reflect the defendant's existing state of mind about simultaneous events, but a calculated effort to shade the past in an effort to protect himself. The rules of evidence do not permit the admission of such evidence.[4]

## VIII.   THE USE OF   THE WORD "VICTIMS," AND OTHER WORDS -- LIKE "GASLIGHTING," "GROOMING," OR "LIEUTENANT" – SHOULD BE PERMITTED

The defendant seeks an order precluding all trial participants from using the term "victims" until summations, claiming that the use of the word is unnecessary, improper, and prejudicial. *See* Dkt. 328 at 1. The defendant also moves to preclude numerous other terms, like "gaslighting,"

---

[4] To the extent the defendant is permitted to introduce evidence of his supposed state of mind, the Government intends to call Dr. Julie Schulman as a rebuttal fact witness, who will describe her observations of the defendant during a hospital stay and his statements about his alleged poisoning, her concern that he was fabricating and enjoyed controlling the flow of information, and her conversation with him about the dangers of "factitious disorder with intentional ingestion of toxic substances," and his declination of a psychiatric referral.

"grooming," and "lieutenant."  The Court should decline to impose these burdensome, artificial, and unnecessary limitations on the language used at trial. The terms identified by the defendant, which are commonly used and easily understood, are not prejudicial and should not be precluded.

The Government expects that it will use the word "victim," particularly in jury addresses. The Government also expects its expert witness Dr. Dawn Hughes to use the word "victim," but she will testify about victims generally and not any victims in this case specifically.   The Government does not otherwise expect its witnesses to refer to themselves or other witnesses using the word "victim."  To the extent they do, however, it is not prejudicial to the defense, nor are the other references to "victims" that the Government has outlined.   The defendant's argument is without merit.

Though it is the Government's burden to prove guilt beyond a reasonable doubt, the defendant is not entitled to a trial devoid of references to the offense conduct.  *"[T]here is no basis to preclude the Government from using words that are central to the case."*   *United States v. Ahmed*, 94 F. Supp. 3d 394, 435–36 (E.D.N.Y. 2015).   As numerous courts have recognized in denying similar motions, "victim" is a word that is easily understood by jurors, which facilitates a description of the offense conduct, and which is not unfairly prejudicial.  *See, e.g.*, *United States v. Benjamin*, 18 Cr. 874 (JSR), Transcript of Final Pre-Trial Conference of May 8, 2019, Dkt. No 53 at 6 ("Then there was the motion to preclude the use of the words victims and pimp. I take it this would only come up in, at least to the victim, during either opening statements or summation. . . I don't see any problem with that term being used, that's the government's view, as a victim."); *United States v. Dupigny*, 18 Cr. 528 (JMF), Transcript Final Pre-Trial Conference of October 17, 2019, Dkt. 198 at 49-50 ("It strikes me that precluding the[] use [of "victim" or "pimp"] altogether is both unnecessary and impractical. I think the discussion that we just had is an example that it's

just hard to engage in a discussion of the charges here without using those terms"); *United States v. Maxwell*, 20 Cr. 330 (AJN), Transcript of Final Pre-Trial Conference on November 1, 2021, Dkt. No. 465 at 4-5 ("In the defendant's 12th motion in limine, the defense asked the Court to preclude use of the terms 'victim' and 'minor victim.' The motion is denied. Government counsel can use the word 'victim' if they're referring to someone alleged to be a victim of the crimes charged in the indictment . . . . It is appropriate for the government to use the terms as representative of its litigating position" (citing *United States v. Dupigny*, Dkt. 198 at 50)).

As courts have recognized, the Government cannot be expected to prove the crime without being able to describe the crime and communicate its theory of the case. Use of the term "victim" in a jury address is not an expression of counsel's opinion; it is the Government's litigating position, just like referencing someone as the "shooter" in a shooting case or the "dealer" in a narcotics case. The Government is allowed to present its theory of the case to the jury. Words that are used to describe offense conduct, like "victims," are a necessary part of explaining and narrating the offense conduct to the jury. *Cf. Ahmed*, 94 F. Supp. 3d at 435–36 ("Defendants assert that these words [including terrorist, terrorist activity, or terrorism] are prejudicial and inflammatory and amount to legal conclusions that must be left for the jury to determine. Defendants' request is unnecessary and impractical."). *United States v. White*, No. 08 Cr. 0682 (NGG), 2009 WL 4730234, at *2 (E.D.N.Y. Dec. 4, 2009) (permitting the use of the phrase "convicted felon" as a convenient shorthand," and noting "[c]ourts have routinely used it in that manner, and defense counsel has provided no reason why it would be inflammatory to use it before a jury"); *United States* v. *Kincaid*, No. 10 Cr. 160, 2013 WL 5595404, at *3 (E.D. Tenn. Oct. 11, 2013) (finding that the term "pill mill" is not unduly prejudicial in drug conspiracy case, as the term "is not a legal conclusion" but rather "a phrase used in law enforcement and in the media to

describe the activity that has been attributed to [the defendants]"); *ee also United States v. Bergman*, 813 F.2d 1027, 1029 (9th Cir. 1987) (defendant was not prejudiced by Government's references to him as a "tax protestor," where the term "accurately characterizes [the defendant's] activities").

Indeed, the only federal case that the defendant has identified precluding use of the term "victim" did not involve any crimes against a person.  See *United States v. Wagner*, No. 20-CR-410 (NSR), 2022 WL 19179, at *6 (S.D.N.Y. Jan. 3, 2022).  In that case, unlike this case, the charged offense was the unlawful possession of a firearm under 18 U.S.C. § 922(g)(1), which was dispositive in the court's own analysis.  *Id.* at *6 ("Here, in contrast, the charged violation of being a felon in possession of a firearm . . . does not involve a crime against a person. Any reference to Defendant's ex-girlfriend as a 'victim' does not provide probative value to the core elements of this charged crime.").  That case is entirely different from the offenses at issue in the defendant's trial, which involve crimes against particular victims and accordingly cannot be explained without reference to those victims.

Furthermore, other courts have repeatedly acknowledge that the Government's use of a term consistent with its theory of the case is not unfairly prejudice when the jury is clearly instructed about the Government's burden of proof. *See, e.g.*, *United States v. Edwards*, No. CR 16-103-BLG-SPW-1, 2017 WL 4159365, at *1 (D. Mont. Sept. 19, 2017) (explaining that "use of the term 'victim' is not prejudicial to the defendant's rights when the presentation of evidence taken as a whole clarifies the government's burden of proving all of the elements of the crime" and finding that the "jury will not be unduly prejudiced against [the defendant] if the government refers to certain witnesses as victims"); (citing *United States v. Washburn*, 444 F.3d 1007, 1013 (8th Cir. 2006) ("[A] number of courts have determined that the use of the term "victim" in jury

instructions is not prejudicial to a defendant's rights when, as is the case here, the instructions taken as a whole clarify the government's burden of proving all elements of the crime")); *Server v. Mizell*, 902 F.2d 611, 615 (7th Cir. 1990) ("No logical argument can be made that the mere use of the term 'victim' [in jury instructions] somehow shifted the burden of proof.").  Moreover, "[t]he term 'victim' is not inherently prejudicial. It is a term commonly used in the English language that does not by its nature connote guilt." *United States v. Lussier*, No. 18-CR-281 (NEB), 2019 WL 2489906, at *5 (D. Minn. June 15, 2019).

And just as the defense may make arguments attacking the credibility of victims, the Government is free to argue that these witnesses are, in fact, victims of a crime. *Cf. United States v. Thai*, 29 F.3d 785, 807 (2d Cir. 1994) (explaining that prosecutors may also "respond to an argument that impugns its integrity or the integrity of its case"); *United States v. Arias- Javier*, 392 F. App'x 896, 898 (2d Cir. 2010) (summary order) ("The prosecutor is permitted vigorously to argue for the jury to find its witnesses credible as long as it does not link its own credibility to that of the witness or imply the existence of extraneous proof supporting the witness's credibility.").

The Government also expects that terms such as gaslighting, grooming, or lieutenant, will be used at trial.  For example, Dr. Hughes will describe certain characteristic coercive tactics, using relevant and applicable terminology including "gaslighting" and "grooming."  The Government might reference certain coconspirators as "lieutenant," or it is possible that witnesses will use this or similar terminology to explain what they observed about the defendant's relationship with his coconspirators.  The Government does not expect to use the words "brainwash" or "cult" in its jury addresses nor expect any particular witness testimony using those terms.  However, if a witness were to use those terms unexpectedly or unprompted, it would not be improper.

The Court does not have to accept at face value the defendant's description of a term as prejudicial.  *See, e.g.*, *United States v. Benjamin*, 18 Cr. 874 (JSR), Transcript of Final Pre-Trial Conference of May 8, 2019, Dkt. No 53 at 6 ("[P]imp, notwithstanding the arguments of counsel, is in fact a well-established Anglo-Saxon word of several centuries, at least several hundred years' duration, and its meaning is well known, and I don't think it carries any racial connotations. That will be allowed as well.")  None of the objected-to terms are in fact inflammatory or prejudicial; they are descriptive and relevant to the offense conduct.  For example,"lieutenant" is often used to reference high-ranking officials in various institutional formats.  Similarly, "gaslighting" and "grooming" are descriptive terms for particular behaviors that arise in this case.  They do not carry negative connotations that would unfairly prejudice the defendant.

The defendant's motion amounts to an attempt to sanitize the evidence and testimony by preventing the Government and its witnesses from describing it.  Such cumbersome and unworkable restrictions are routinely rejected by courts, and should not be imposed here.

## IX.   RELEVANT EVIDENCE THAT REVEALS THE DEFENDANT'S INCARCERATION SHOULD BE ADMITTED

The Government seeks to admit recorded jail calls of the defendant's that are directly relevant to the charged crimes.  The probative value of this evidence outweighs the potential for unfair prejudice.

### A.   Applicable Law

Rule 401 of the Federal Rules of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Rule 402 provides: "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority."  Relevant evidence is "not confined to that which directly

establishes an element of the crime." *United States* v. *Gonzalez*, 110 F.3d 941, 942 (2d Cir. 1997). As this Court has explained, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *Id.*; *accord United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991).

Federal Rule of Evidence 403 authorizes the exclusion of relevant evidence only if its "probative value is substantially outweighed by the danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. All evidence of guilt is, of course, prejudicial, in the sense of disadvantaging the defense, but that does not mean it is "unfairly" prejudicial. *Costantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) ("Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair."). The Supreme Court has defined "unfair prejudice" as "the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof of the specific offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). This Court has long made clear that "other act" evidence that is neither "more sensational" nor "more disturbing" than the charged crimes will not be deemed unfairly prejudicial. *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *see also United States v. Mercado*, 573 F.3d 138, 141-42 (2d Cir. 2009) (holding that evidence of uncharged sale of firearms was not unfairly prejudicial as it was "not especially worse or shocking than" than the charged drug conspiracy).

This Court and others often admit relevant evidence that reveals the defendant's present incarceration. For example, "[i]t is well settled in the Second Circuit and beyond that a defendant's recorded prison calls, where relevant, are admissible against the defendant as party opponent admissions pursuant to Rule 801(d)(2)(A)." *United States v. Estevez*, 16 Cr. 307 (CM), 2017 WL

700775, at *5 (S.D.N.Y. Feb. 16, 2017) (collecting cases).  When assessing whether the risk of

unfair prejudice from such evidence substantially outweighs its probative value, courts have

distinguished between the significant prejudice caused by making the defendant wear prison

clothes during trial and the "somewhat" and "much diminished form of prejudice" that comes from

"occasional reference to the fact that [the defendant] had at some point been in jail." *United States*

*v. Johnson*, 624 F.3d 815, 820–22 (7th Cir. 2010); *see also United States v. Owens*, 445 F. App'x

209, 218-19 (11th Cir. 2011) (also noting that a limiting instruction to the jury can "mitigate[] any

potential prejudice").

### B.  Discussion

At trial, the Government anticipates offering several pieces of evidence that refer to the

defendant's periods of incarceration after his arrest in this case.  Specifically, the Government may

seek to offer a number of the defendant's recorded jail calls with his father, previously referenced

as CC-2.[5]  The start of these recorded calls includes a notification to the participants in the call

that the call is being made from a federal prison and is being recorded.

There is no doubt that the foregoing evidence is relevant direct evidence.  The jail calls

reveal the defendant's efforts to direct his coconspirators to marshal the supposedly incriminating

collateral he amassed on his victims over a period of years.  The defendant's efforts to use such

leverage is probative of the obstruction of justice and witness tampering predicates to the

racketeering conspiracy charge.  The reference to the materials he amassed on his victims is also

proof of his extortion of these victims in that such materials were intertwined with his extortion

---

[5] The Government moved in its opening brief to admit testimony from ██████ ████ regarding
CC-2's statements to her while the defendant was detained.  The Government expects ████ will
also explain why she was communicating with CC-2 and that the defendant was then incarcerated.
This necessary and brief reference to the defendant's incarceration should be admitted for the same
reasons set forth herein.

scheme.  The defendant's references to such materials, and instructions to his associates to gather those materials, "adds context and dimension to the government's proof."  *Gonzalez*, 110 F.3d at 942.  It is also necessary for the jury to understand that these calls were recorded while the defendant was in prison.  Without that context, the jury will be left to speculate why the calls were recorded (in a case where the other recordings were made and kept by the defendant) and will not be aware that the defendant *knew* he was being recorded—necessary information to interpret and understand the language used by the defendant on these calls.  In addition, the fact that the defendant is in prison also helps explain why it is CC-2, and not the defendant himself, who delivered a message to ███████ that she understood as a threat not to cooperate with the Government.  It is critical to understanding why the defendant was directing these efforts by others rather than participating in them himself, and why the defendant was being recorded in the first instance making such statements.

This evidence is also admissible under Rule 403 because the minimal prejudice associated with telling the jury that the defendant was incarcerated does not substantially outweigh the probative value of the proffered evidence and testimony.  The prejudicial effect of this evidence is minimal given that the defendant is otherwise charged with violent criminal conduct over a period of nearly ten years.[6]  Moreover, if requested by the defendant, the Government would not object to an appropriate limiting instruction.  *See*, *e.g.*, *Rosario v. Ercole*, 582 F. Supp. 2d 541, 598-99 (S.D.N.Y. 2008) (upholding, in *habeas* context, admission of trial evidence of the defendant's incarceration where the trial judge "issued a limiting instruction to the jurors that they were not to

---

[6] The Government has offered to authenticate these recorded jail calls through a stipulation rather than a custodian from the Bureau of Prisons in order to minimize any potential prejudice. Defense counsel has indicated that they oppose reference to the defendant's incarceration in the stipulation pending resolution of cross motions in limine on the subject.

consider evidence of [the defendant]'s incarceration as evidence of a propensity to commit crimes").

## **CONCLUSION**

For the foregoing reasons, the Government respectfully requests that the Court deny the

defendant's motions *in limine* and grant the Government's motion in limine in to admit recorded

jail calls.

Dated: New York, New York
       February 18, 2022

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: ___ /s/ Danielle R. Sassoon
    Danielle R. Sassoon
    Mollie Bracewell
    Lindsey Keenan
    Assistant United States Attorneys
    (212) 637-1115