UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                     :

UNITED STATES OF AMERICA,         :

                     -v-                :

                                       :          20-cr-110 (LJL)

LAWRENCE RAY,                :

                           :          <u>OPINION AND ORDER</u>

                       Defendant.      :

                                       :
------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__2/24/2022__

LEWIS J. LIMAN, United States District Judge:

      The Government moves for in limine rulings: (1) admitting co-conspirator statements made in furtherance of the alleged conspiracy, under Federal Rule of Evidence 801(d)(2)(E); (2) allowing testimony about threats made by the Defendant's father to Felicia after the Defendant's arrest; (3) admitting journals, notes, and other purported confessions from victims as non-hearsay statements; (4) admitting prior consistent statements of victims; (5) admitting a summary chart about sexually explicit videos, under Federal Rule of Evidence 1006; (6) precluding improper argument or evidence about the investigation; (7) precluding irrelevant and prejudicial argument or evidence about the alleged victims' parents; (8) precluding testimony from other witnesses about Claudia's credibility; (9) allowing lay identification testimony, under Federal Rule of Evidence 701; (10) admitting testimony about the Defendant's prior incarceration and the publication of an article about the Defendant; (11) limiting the scope of cross-examination for law enforcement witnesses; (12) precluding the Defendant's introduction of false exculpatory statements from his post-arrest interview; (13) admitting bank records and other similar records upon a custodial certification under Federal Rule of Evidence 803(6); (14) allowing an Internal Revenue Service ("IRS") agent to remain in the courtroom during the trial in order to compute

tax loss; and (15) allowing evidence about the Defendant's previous filing of tax returns. *See* Dkt. No. 323.

The defense makes the following in limine motions: (1) to preclude evidence that Felicia had sex with "strangers" on the grounds that it is irrelevant to the charge of forced labor and is unduly prejudicial; (2) to preclude evidence that Isabella Pollok had sex with strangers and other "grooming" evidence related to Pollok's sexual activities; (3) to preclude the Government's toxicologist from testifying that Ray was not poisoned; (4) to exclude the maps offered by the Government's cell-site expert; (5) to permit limited attorney-led voir dire; (6) to preclude Government expert Dr. Hughes from transmitting inadmissible hearsay statements to the jury or from testifying about irrelevant and unduly prejudicial conduct and about cases that have no factual connection to the case; (7) to introduce evidence reflecting Ray's then-existing state of mind during the charged racketeering conspiracy; and (8) to preclude trial participants from referring to the complaining witnesses as "victims" or from using inflammatory, confusing or unduly prejudicial language. *See* Dkt. Nos. 325–28.  In addition, the defense adds a number of additional arguments in its response to the Government's in limine motion.  Dkt. No. 371.

Familiarity with the Court's prior orders describing the Second Superseding Indictment in this case is assumed.

## DISCUSSION

A litigant has the right to request, but not necessarily to receive, an in limine ruling regarding the admissibility or inadmissibility of evidence.  Rather, the right to rule on in limine motions resides in a district court's inherent and discretionary "authority to manage the course of its trials." *Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176–77 (S.D.N.Y. 2008) (citing *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984)).  An in limine motion is intended "to aid the trial process by enabling the Court to rule in advance of trial on the relevance of

certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (internal citation omitted); *King v. Wang*, 2021 WL 5232454, at *1 (S.D.N.Y. Nov. 9, 2021). "Because a ruling on a motion *in limine* is 'subject to change as the case unfolds,' this ruling constitutes a preliminary determination in preparation for trial." *United States v. Perez*, 2011 WL 1431985, at *1 (S.D.N.Y. Apr. 12, 2011) (quoting *Palmieri*, 88 F.3d at 139).

## I.     The Government's In Limine Motions

### A.     Co-Conspirator Statements

The Government moves in limine for admission of statements made by Ray's daughter and Pollok as co-conspirator statements made in furtherance of the alleged conspiracy. The Court will receive the statements subject to connection, assuming that the statements on their face or from context show that they were made during and in furtherance of the conspiracy of which Ray's daughter or Pollok, as the case may be, was a member. *See United States v. Coplan*, 703 F.3d 46, 82 (2d Cir. 2012); *United States v. Alameh*, 341 F.3d 167, 176 (2d Cir. 2003); *United States v. Cambindo Valencia*, 609 F.2d 603, 630 (2d Cir. 1979). The Defendant may make a motion to strike if the Government has not established the connection.

Rule 801(d)(2)(E) provides that a statement should not be considered hearsay if it is "offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). To admit a statement under this rule, a district court must find by a preponderance of the evidence: (1) that a conspiracy existed that included the defendant and the declarant; and (2) the statement was made during the course of, and in furtherance of, that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *see also United States v. Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990) ("In order to admit a statement under [Federal Rule of Evidence 801(d)], the court must find (a) that there was a

3

conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of that conspiracy"). These are "preliminary questions of fact" to be resolved by the district court under a preponderance of the evidence standard. *Bourjaily*, 483 U.S. at 175. "[T]he district court may consider the hearsay statement itself" as evidence of "the existence of the conspiracy." *United States v. Padilla*, 203 F.3d 156, 161 (2d Cir. 2000). However, "'there must be some independent corroborating evidence of the defendant's participation in the conspiracy.'" *Id.* (quoting *United States v. Tellier*, 83 F.3d 578, 580 (2d Cir. 1996)). Moreover, the conspiracy in furtherance of which the statement was made does not have to be the conspiracy charged in the indictment. *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999).

The Government claims that Ray conspired with his daughter and Pollok to commit racketeering, extortion, and money laundering; conspired with his daughter to commit forced labor and forced labor trafficking; and conspired with Pollok to commit sex trafficking.

The Government has proffered evidence that, if established at trial, would support that a conspiracy existed between Ray and his daughter and between Ray and Pollok. With respect to Ray's daughter, the Government proffers evidence that she knew of Ray's conduct in extorting and in forcing labor from the alleged victims; that she participated in the collection of the incriminating information that would be used to threaten the alleged victims and ensured their continued obedience—including, notably, collecting information about "damage" done in connection with the labor on the North Carolina property; and that she profited from Ray's criminal activities. That evidence is sufficient to establish, at least by a preponderance of the evidence, that she joined in a conspiracy with Ray. With respect to Pollok, the Government has proffered evidence that she was the one who recorded the Defendant's interrogations of his

alleged victims which would later be used against the alleged victims, that the Defendant turned to Pollok for assistance during his abuse of the victims and trusted her to oversee the forced labor of one of those victims and the sex trafficking of another, that she played an active role in attempting to intimidate the alleged victims, and that she personally benefitted from the illegal conduct.  That too would be sufficient, if proved, to establish her membership in the conspiracy.

In its opposition to the Government's in limine motion, the defense does not dispute that the Government has proffered evidence that Pollok was a member of a conspiracy with Ray.  It argues that the evidence does not establish that Ray's daughter was a member of the conspiracy.[1] But the defense analyzes each piece of evidence in isolation and not as part of a whole, and it further gives that piece of evidence its most benign interpretation and not the fair interpretation it should receive in context.  However, "individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it.  The sum of an evidentiary presentation may well be greater than its constituent parts." *Bourjaily*, 483 U.S. at 180 (analyzing evidence of statements probative of the existence of a conspiracy as a whole and in the context of surrounding circumstances).  That is the case here.  Even accepting the defense's argument that no one piece of evidence would be sufficient to establish the daughter's membership in a conspiracy with Defendant, the pieces in cumulation establish it, at least by a preponderance of the evidence. The evidence establishes, at least by a preponderance, that Ray's daughter knew of the unlawful objects of the alleged conspiracy to extract forced labor from its victims and to extort them and that, knowing of the objects of the conspiracy and intending them to be accomplished, she joined with her father and others in those efforts.  Moreover, although the Government argues that

---

[1] The defense does not appear to argue that there is insufficient independent evidence of Ray's involvement in the conspiracy.  In any event, the Government's proffer demonstrates that there is such sufficient independent evidence.

Ray's daughter moved from New York in 2014 and was not present for each of the overt acts or objectives of the racketeering enterprise, the law is clear that a person need not participate in each of a conspiracy's overt acts, or even know of them, to be a member of the conspiracy. *See United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008) ("The government need not show that the defendant knew all of the details of the conspiracy, 'so long as he knew its general nature and extent.' . . . And 'a single act may be sufficient for an inference of involvement in a criminal enterprise of substantial scope at least if the act is of a nature justifying an inference of knowledge of the broader conspiracy.'" (first quoting *United States v. Rosa*, 17 F.3d 1531, 1543 (2d Cir. 1994) and then quoting *United States v. Traumunti*, 513 F.2d 1087, 1112 (2d Cir. 1975)); *Tera Grp., Inc. v. Citigroup, Inc.*, 2019 WL 3457242, at *14 (S.D.N.Y. July 30, 2019) (Sullivan, J.).  Of course, the Court will not admit statements of Ray's daughter that were not made during the course of her participation in the conspiracy.

Finally, the defense argues that a conclusion that Ray's daughter was a member of a conspiracy does not mean that each of her statements were made during and in furtherance of that conspiracy and that certain of the statements identified by the Government were not in furtherance of the conspiracy.  The point is well-taken.  At trial, the Government will have to show that a statement by the daughter or Pollok was made during and in furtherance of the conspiracy of which she was a member before the statement will be received into evidence.

### B.   Threats by Ray's Father to Felicia

The Government moves for a ruling before trial that threats that the Defendant's biological father made to Felicia should be received as evidence of the Defendant's obstruction of justice.  The Government proffers that the father conveyed certain messages to Pollok and Felicia: on May 24, 2020, the Defendant asked his father to let Pollok know that "they signed on forever," and on June 14, 2020, the Defendant admonished his father, seemingly in the presence

of Felicia and Pollok, "No new friends.  There should be no one in anybody's life except each other."  Dkt. No. 323 at 12.  The Government also proffers that on June 19, 2020, the Defendant instructed his father to undertake certain tasks on his behalf, such as finding audio, video, and email confessions of multiple victims in which they claimed to have poisoned him.  Four months later, in approximately October 2020, Ray's father is said to have communicated to Felicia, in sum and substance, "Nobody turns on my son.  I'm 82 years old.  I don't care they could give me 15 to 20 years."  *Id.*  Felicia is expected to testify about the October statement.

The defense opposes the motion but tellingly does not move at this time that for a pretrial ruling that the testimony not be received.  The Court concludes that the Government is not entitled to a pretrial ruling that the testimony is admissible.  The admissibility of the testimony will have to await a further showing by the Government of its relevance.

Two issues are presented: (1) whether testimony regarding the October statement would be hearsay; and (2) whether it is admissible against Ray as evidence of obstruction of justice.  As to the first question, the statement is not hearsay because the witness is the "percipient hearer of the command" and the statement is "offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein."  *United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999).

As to the second question, based on its motion, the Government has not established that the testimony is relevant to the charge that Ray obstructed justice.  The statement, which was made by Ray's father, not Ray, bears no indication that Ray's father was communicating to Felicia on behalf of Ray.  That Ray asked his father to assist in his case in June 2020 does not necessarily indicate that in October 2020, when Ray's father allegedly threatened Felicia, he was acting as an agent of Ray or on behalf of or in concert with Ray.  Though relevance is a

relatively low bar, a piece of evidence must still "tend to make a fact [of consequence] more or less probable than it would be without the evidence."  Fed. R. Evid. 401(a).  The Government will have to offer more evidence than it has to date before the Court admits the testimony as evidence of Ray's obstruction of justice.[2]

### C.    Notes, Journals, and Purported Confessions from Alleged Victims

The Government moves in limine for the admission of statements in the notes and journals belonging to the alleged victims and for the confessions made by the alleged victims. The documents were found during various searches by law enforcement agents.  The Government argues that the statements and evidence are not being offered for their truth and therefore do not constitute hearsay.

The defense responds that "[w]hile individual statements contained within these materials might satisfy the standards stated above, Rules 801 and 803(3) do not provide the government a blank check to introduce vast swathes of out-of-court statements based solely on its representation that these statements are not being offered for their truth."  Dkt. No. 371 at 55.  It argues that the evidence is admissible only to show the declarant's contemporaneous state of mind and that the Court should require the Government to identify each statement it intends to offer to ensure it is being offered for a proper purpose.  It further contends that the Government should not be permitted to argue that the statements were made at the direction of Ray on the theory that, because he was a participant in the conversations, the statements offered for that reason would functionally be offered for their truth.  Finally, it argues that the Court should not inform the jury that the statements cannot be considered for their truth.

---

[2] The Government offers, in a footnote, that "[Ray's father's] statements are also admissible as coconspirator statements under Rule 801(d)(2)(E)."  Dkt. No. 323 at 12, n.3.  Because the statement is not sought to be admitted for its truth, the rules regarding hearsay do not apply.

An out-of-court statement constitutes hearsay only if it is offered "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). If a statement is offered for something other than its truth, it may not be excluded as hearsay, but it still must satisfy the admissibility requirements of Federal Rules of Evidence 401 and 403. These rules require that the statement be relevant to a fact in dispute, Fed. R. Evid. 401, and the probative value of the statement not be substantially outweighed by the risk of unfair prejudice, confusion, or delay, Fed. R. Evid. 403. *See United States v. Paulino*, 445 F.3d 211, 217 (2d Cir. 2006).

The defense is correct in part and incorrect in part. Although it may take time if the defense objects to the introduction of a particular exhibit, the Court will take the necessary time. The defense is entitled to object if it has a good faith basis and the Court will not admit all of the evidence en masse unless there is consent by the defense that it is admissible en masse.[3] To that extent, the motion in limine is premature and will be denied on that basis alone. But the defense is also incorrect in part. The Government need not establish that a statement offered for something other than its truth is relevant to the declarant's contemporaneous state of mind. The rule regarding statements of a declarant's then-existing state of mind is an exception to the hearsay rule. Fed. R. Evid. 803(3). A statement that is not offered to prove the truth of the matter asserted in the statement is not hearsay at all. Fed. R. Evid. 801. The two are apples and oranges. A statement that is not offered for the truth need only be relevant and, under Rule 403, its probative value cannot be substantially outweighed by its prejudice. Moreover, the Court intends to instruct the jury that the statements are not being offered or admitted for their truth. Such a ruling is merely a statement of the law. It does not reflect, as the defense seems to fear, a

---

[3] The Court has encouraged the parties to work together to narrow the objections to the admissibility of exhibits. The Court reiterates that exhortation.

prejudgment of a fact at issue or inform the jury that the statement is untrue any more than it informs the jury that the statement is true.  The Government has stated that it intends to argue that certain statements were false; the defense can respond that they were true.  Finally, the theory that the tapes are not hearsay and could not be offered for the fact that they were made— solely because Ray was a participant in the conversations—is nonsensical.  As the Court understands it, any statements by Ray on those tapes would be offered not for the truth of anything Ray is stating but as evidence that he made the statement or was present when other statements were being made.  To the extent it is offered for the truth of anything in his statements, the statements would be admissible as party admissions.

### D.    Alleged Victims' Prior Consistent Statements

The Government moves for an advance ruling that it be permitted to offer, during its direct examinations, evidence of prior consistent statements of witnesses whom it claims will testify that Defendant's interrogation tactics led them to make false confessions.  It claims that the Defendant is sure to attack the credibility of the "victims" and that, as a result, prior consistent statements about the nature of the abuse and the context of the false statements is admissible.

Federal Rule of Evidence 801 provides that when a declarant testifies and "is subject to cross-examination about a prior statement," a party can offer evidence of a declarant-witness's prior statement if it "is consistent with the declarant's testimony and is offered: (i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground."  Fed. R. Evid. 801(d)(1)(B).

As the language of the Rule makes clear, and as the Second Circuit has confirmed, the declarant need not actually have been cross-examined for the party to offer the prior consistent

statement.  It is sufficient that it is "clear" that the declarant would be subject to cross-examination and that at least an implied charge of recent fabrication or improper influence or motive have been levelled.  *See United States v. Flores*, 945 F.3d 687, 706 (2d Cir. 2019) (holding that the trial court had discretion to admit prior consistent statements where it was clear that witness would be subject to cross-examination); *United States v. O'Connor*, 650 F.3d 839, 862–63 (2d Cir. 2011) (upholding trial court's admission of prior consistent statements before declarant testified where the defendants "had begun their attacks on the credibility of [the witness's] expected testimony in their opening statements" and "it was clear" the declarant would testify and "could be cross-examined by the defense about the statement"), *cert. denied*, 565 U.S. 1148 (2012).  Moreover, the use of a prior consistent statement is not limited to the rebuttal of a charge of recent fabrication or improper influence or motive.  Under the 2014 amendment to Rule 801(d)(1)(B), a prior consistent statement can be offered to "rebut other attacks on a witness—such as the charges of inconsistency or faulty memory."  Fed. R. Evid. 801(d)(1)(B), Advisory Committee notes to 2014 Amendment.  At the same time, however, the Rule "does not allow impermissible bolstering of a witness" and "the trial court has ample discretion to exclude prior consistent statements that are cumulative accounts of an event."  *Id.* The prior consistent statement thus must have "some rebutting force beyond the mere fact that the witness has repeated on a prior occasion a statement consistent with his trial testimony." *United States v. Pierre*, 781 F.2d 329, 331 (2d Cir. 1986).

The Government points here to two specific sets of alleged prior consistent statements made by the proposed witness Santos.  In one, Santos recounts an incident in which Ray held a "sharp object" to the throat of a man who was one of the roommates at the time and threatened him.  Dkt. No. 323 at 18–19.  In the other, Santos told Ray in a recorded conversation that the

confessions Santos had made to poisoning Ray and to damaging Ray's property were false, and he was just "making it up." *Id.* at 19–20.  The Government expects the statements to be consistent with Santos's testimony; he will testify to being present when Ray threatened one of the roommates by holding a sharp object to his throat and that Santos made false confessions at Ray's behest.

It is premature for the Court to rule on whether the statements would be admissible under Rule 801(d)(1)(B).  Santos has not testified, and the parties have not opened.  It is not clear at this pretrial stage that Santos will testify or that his testimony would be consistent with the prior statements or that he will be attacked.  The Court thus will deny the motion in limine and decide at trial whether the statements are admissible.  *See United States v. Holwell*, 2020 WL 5995100, at *6 (D.D.C. Oct. 9, 2020).

The defense raises a separate objection.  It argues that the Government should not be permitted to introduce evidence relating to the incident as a threat of violence.  It claims that it involved Ray putting a spatula to the individual's throat and that it was intended as a practical joke which ended with Ray saying "let's make some eggs."  That motion is denied.  The conduct described is relevant; the defense can cross-examine on whether it was non-violent.  In a footnote, the defense also argues that the Government should not be permitted to offer other evidence regarding this same individual because it has not provided notice to the defense of that evidence.  That motion is denied.  Aside from under Rule 404(b) and with respect to expert evidence, the Government is not required to preview for the defense all of the evidence it intends to offer in support of the charges in the indictment.  *See United States v. Cephas*, 937 F.2d 816, 823 (2d Cir. 1991) ("[T]he government need not particularize all of its evidence."); *cf.* Fed. R. Crim. P. 16.

Finally, the individual at issue died apparently as a result of suicide two months after Ray was incarcerated.  The defense moves to exclude any evidence of the apparent suicide.  That motion is granted.  There is no evidence that the suicide was caused by Ray or that it has any other relevance to the case, and introduction of it would be prejudicial under Rule 403.  The Government is precluded from offering evidence of the suicide unless the defense opens the door to such evidence.

### E.      Summary Chart of Sexually Explicit Videos

The Government anticipates offering a summary chart containing brief, factual descriptions of sexually explicit video files that show Felicia providing sexual services to strangers in various locations in and near New York City.  The videos were recovered from devices and accounts associated with Ray and Pollok and have been turned over to the defense. The chart summarizes a total of 40 different videos, with a listing for each of the file name, the date and time listed on the recording, and a description of the contents.

Federal Rule of Evidence 1006 provides that the proponent of evidence "may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court" so long as the proponent makes "the originals or duplicates available for examination of copying, or both, by other parties at a reasonable time and place."  Fed. R. Evid. 1006.  "The district court must determine as part of the foundation that the summary charts 'fairly represent and summarize the evidence on which they are based.'" *United States v. Koskerides*, 877 F.2d 1129, 1134 (2d Cir. 1989) (quoting *United States v. O'Connor*, 237 F.2d 466, 475 (2d Cir. 1956)); *see United States v. Lasko*, 146 Fed App'x 530 (2d Cir. 2005).

The defense does not object to the summary chart in theory but argues it is premature for the Court to rule on the admissibility of the chart because (1) the evidence upon which it is based

13

has not been received in evidence; and (2) the parties are still meeting and conferring about the contents of the chart. It asks that the Court consider an alternative chart and hear the defense's objections to the Government's proposed summary chart.

The first objection is ill-founded. A summary chart may be admitted even if the materials underlying the summary is not. Weinstein's Fed. Evid. § 1006.02. It is proper and efficient for the Court to rule in limine on the chart before a decision is made on whether the underlying evidence will be admitted. The second objection is well-taken. The parties are ordered to meet and confer regarding an alternative chart that minimizes any potential prejudice. As the Court directed during oral argument on February 22, 2022, the defense shall submit its alternative chart by February 25, 2022, along with a letter no more than 3-pages with its objections to the Government's chart. The Government shall respond by February 28, 2022.

**F.      Arguments about Law Enforcement's Investigation of Defendant's Alleged Crimes**

The Government moves to preclude the defense from introducing evidence or making arguments about law enforcement's failure to take action against Defendant until 2020. Ray is charged with crimes beginning as early as 2010, but he was not indicted and arrested in this case until 2020. According to the Government, there is evidence that several victims attempted to contact or contacted various law enforcement agencies over the course of the alleged conspiracy. The Government seeks to preclude the defense from offering that evidence or from making arguments that the jury should attribute some significance to the Government's failure to act. The motion raises similar issues to the defense's in limine motion addressed later in this Opinion regarding whether Ray can offer evidence that he made contact with law enforcement during the course of the charged conspiracy.

The motion is denied in part and granted in part. To the extent that the Government seeks a ruling in advance of trial to preclude the defense from offering evidence regarding contacts with law enforcement by any witness or by the Defendant, the motion is denied. It is conceivable that there are circumstances under which such evidence may be relevant. The Court declines to offer an opinion in advance of trial that this particular area of inquiry is off-limits without knowing the context in which the defense might seek to offer such evidence.

To the extent that the defense intends to argue that some independent significance should be attributed to the Government's failure to act prior to 2020 in terms of whether the Government believed that it had evidence of a crime or that evidence is admissible on that basis alone, that motion is granted. The evidence is not relevant under Rule 401, and even if it did have any probative value, such value would be substantially outweighed by the danger of unfair prejudice, and jury confusion under Rule 403. "The length of [a government] investigation, the investigative techniques used, and the fact that [a defendant] was not initially a target of [an] investigation are all irrelevant . . . ." *United States v. Duncan*, 2019 WL 2210663, at *3 (S.D.N.Y. May 22, 2019). The question before the jury will be whether or not Ray engaged in the conduct charged in the Second Superseding Indictment and did so with the requisite intent. Whether the Government initially believed his conduct to be lawful or unlawful, or whether it believed it had enough evidence to commence an investigation, has no tendency to make the charges in the indictment more or less probable. Fed. R. Evid. 401; *see United States v. Aleynikov*, 785 F. Supp. 2d 46, 65 (S.D.N.Y. 2011) ("As a general matter, the quality and scope of the Government's investigation are not appropriate lines of examination . . . ."), *rev'd on other grounds by* 676 F. 3d 71 (2d Cir. 2012). The evidence, if admissible only for that purpose, also could only lead to jury confusion, unfair prejudice, and wasted time. There are all kinds of

15

reasons why an investigative agency might or might not commence or advance an investigation having to do not only with the quality of the evidence but also the priorities of the agency and the budget and resources it has to execute on those priorities.  Permitting the defense to offer evidence regarding the Government's "failure" to act prior to 2020 could only result in a sideshow having a relationship that is attenuated at best to the central question whether Ray is or is not guilty of the charges against him.

The Government also argues that the defense should not be permitted to impugn the judicially authorized searches or the method by which the post-arrest interview was administered (including the failure to record it).  To the extent the Government seeks to prevent the defense from eliciting evidence how the searches were executed and the interview conducted, the motion is denied.  If Special Agent Maguire intends to testify regarding her post-arrest interview of Ray, the defense may inquire that the only basis for her testimony is her recollection and her notes and that she does not have any recording of it.  *See United States v. Gallo-Roman*, 816 F.2d 76, 81 (2d Cir. 1987).  If the Government intends to offer evidence from the searches, the defense can inquire into where items were located, who conducted the search, what efforts were made to preserve chain of custody, and the like.  The defense, however, will not be permitted to argue that probable cause did not exist for the searches.  That issue has already been determined by the Court and is not relevant to any issue in dispute at trial.

### G.    Arguments about the Parents of Certain Alleged Victims

The Government seeks to preclude the defense from arguing that the parents of victims knew or should have known about Ray's relationship with and treatment of the alleged victims, consented to their children being in his care, and consented to or enabled his relationship with the victims.  According to the Government, such line of examination would be simply blaming the parents for Ray's criminal conduct.  The defense responds that its arguments and cross-

examination should not be limited.  Evidence that the parents knew of and consented to the involvement of their children with Ray, according to the defense, tends to rebut the argument that the alleged victims were coerced or forced to live with Ray.

The motion is granted for several reasons.  First, the defense has not proffered a good-faith basis to believe that the parents at issue knew of the acts alleged to constitute extortion, forced labor, or sex trafficking charged in the indictment.  The testimony that they knew that their children were living in an apartment also occupied by Ray thus has no relevance to this case.  Second, none of the "children" at issue in this case were minors; they had all achieved legal majority.  Thus, even if there was evidence that the parents somehow consented to Ray allegedly extorting and trafficking their "children" or forcing them to perform labor, that evidence would not constitute a defense to the charges in the indictment.  Indeed, even if the alleged victims were minors, a parent cannot consent to the sex trafficking of his child.  *Cf.* Restatement of the Law—Children and the Law § 2.30(1)(b) (Draft) ("A parent does not have authority to consent to medical procedures or treatments that provide no health benefit to the child and pose a substantial risk of serious harm to the child's physical or mental health.").  Finally, the line of examination is excludable under Rule 403.  The distraction to the jury and the risk of confusing and misleading the jury by engaging in an examination of the relationship between the alleged victims in this case and their parents far outweighs any minimal probative value and introduction of the evidence would lead to a lengthy sideshow that would needlessly delay the case and waste time.  *See Guidi v. Inter-Continental Hotels Grp.*, 2003 WL 190904, at *1–2 (S.D.N.Y. April 16, 2003) (excluding evidence under Rule 403 where likelihood of jury confusion is great and where there would be significant trial time wasted and jury attention diverted from material issues).

### H.        Questions to Other Witnesses about the Credibility of Claudia

The Government moves to preclude witnesses from asking about specific instances of the conduct of Claudia to attack her character for truthfulness and from asking about her reputation for truthfulness among any community with which the witness is unfamiliar or does not have personal knowledge.  In particular, it focuses on a book by one of Claudia's college roommates and one of the alleged victims, Daniel Levin, in which he described hearing that Claudia had a reputation for dishonesty in high school and admitted that he dated her briefly.  That same book also describes an incident where Claudia was not truthful about her driving exam.

Rule 608(a) permits a witness's credibility to be "attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character."  Fed. R. Evid. 608(a).[4]  In addition, under Rule 608(b), "specific instances of a witness's conduct" may be inquired into on cross-examination if they are probative of the character for truthfulness or untruthfulness of the witness or another witness about whom the witness being cross-examined has testified.  Fed R. Evid. 608(b).  If a witness is to testify regarding the reputation another has in the community for truthfulness or untruthfulness, the witness must be familiar with respect to both the community and the reputation.

The defense is correct that it has the right to confront witnesses against Ray and to cross-examine them aggressively and that "[t]he court should avoid any blanket prohibition on exploration of an area that is central to an assessment of the witness's reliability."  *Maldonado-Rivera*, 922 F.2d at 955.  Still, the proponent of reputation evidence must establish that he or she has some familiarity with the community in which the witness resides in order "to speak with

---

[4] Evidence of a truthful character can only be elicited after the witness's character for truthfulness has been attacked.  *Id.*

authority of the terms in which generally [the witness] is regarded." *United States v. Whitmore*, 359 F.3d 609, 616 (D.C. Cir. 2004) (quoting *Michelson v. United States*, 335 U.S. 469, 478 (1948)). "Such impeachment is usually limited to testimony by a member of the community in which the witness lives, works or spends a substantial portion of his time, regarding the witness' community reputation for truth." *United States v. Augello*, 452 F.2d 1135, 1139 (2d Cir. 1971) (holding that it was error to admit the reputation testimony of an officer who was "probably was not a member of the communities in which [the primary witness] lived or worked"); *see also United States v. Watson*, 669 F.2d 1374, 1381 (11th Cir. 1982) ("A proper foundation must be laid before the admission of reputation testimony.").

The Government's motion is denied. "The trial court should exclude evidence on a motion in limine only when the evidence is clearly inadmissible on all potential grounds." *King v. Wang*, 2021 WL 5232454, at *2 (S.D.N.Y. Nov. 9, 2021) (*United States v. Ulbricht*, 79 F. Supp. 3d 466, 478 (S.D.N.Y. 2015)). The defense argues that Mr. Levin went on to spend a substantial amount of time with Claudia over the three years after they met in college, including living with her in New York and having a sexual relationship with her. Although Mr. Levin would not be able to testify to what he heard about Claudia's then-reputation from a handful of people who were friendly with Claudia at an earlier period in time before Mr. Levin had met Claudia if the defense does not establish that he had some contemporaneous familiarity with the community in which she held that reputation, the Court cannot say at this point that the defense will not be able to establish the appropriate foundation. Notably, the Second Circuit has recently held that a district court committed error when excluding reputation evidence when a proper foundation had been laid. *United States v. Zhong*, No. 19-4110 (2d Cir. Feb. 23, 2020) at 24

(concluding that district court committed error by not allowing witnesses to reputation for truthfulness where witnesses worked with the defendant).

The parties also agree that if a secondary witness testifies about Claudia's character for truthfulness, the defense can inquire about specific instances of conduct that are inconsistent with that character for truthfulness, but they disagree about what evidence would be inconsistent with the character for truthfulness and what type of evidence would open the door to cross-examination of a secondary witness about the specific instances of conduct.  The Government argues that the secondary witness has to testify about the character of Claudia.  The defense argues that anything that bolsters Claudia's reputation or character, including statements in the Government's opening, will open the door to the questioning of the secondary witness.  In short, the defense argues for a rule that would permit it to offer "specific instances of conduct" any time when the Government will ask the jury to believe a witness.   To the extent the parties seek a ruling on the specific instances of conduct that are inconsistent with a character for truthfulness, the motion is premature, and the Court will rule on the specific instances of conduct at trial if and when the issue arises. However, the Government is correct that only testimony by the secondary witness about the character of Claudia will open the door to inquiry of that witness about the instances of conduct.

Finally, the Government asks for an in limine ruling that it be permitted to offer statements from Mr. Levin's book *Slomin Woods 9* if his credibility is attacked.  The defense objects and argues that the book was written after his motive to fabricate arose.  The motion is premature, and it will be denied on that basis.  Mr. Levin has not testified, and he has not been cross-examined.  The question at this stage is purely hypothetical.

I.       **Video, Audio, and Handwriting Identifications under Rule 701**

The Government argues that Special Agent Kelly Maguire should be permitted to identify by voice or appearance the identities of individuals who are depicted in photographs and video recordings or heard on video or audio recordings seized from the Defendant's residence or otherwise obtained from searches.  It argues that she should be permitted to identify the Defendant in photographs, video, and audio and do the same with respect to other relevant individuals with whom she is familiar based on in-person interactions.

The defense argues that video and photo identifications of Ray should be precluded because Agent Maguire has insufficient familiarity with him, it would not be helpful to the jury which itself can observe Ray, and the Government has made no showing that her identifications would be reliable.  It argues that it is entitled to a *Wade* hearing.  It also makes the same arguments with respect to the other identifications.

The motion as to the identifications of Ray is denied.  The testimony at the suppression hearing established that Agent Maguire spent substantial time with Ray the day that he was arrested.  She spent roughly an hour and a half interviewing him and heard his voice.  Dkt. No. 180 at 117.  She also has been in Court with him on numerous occasions and has had the opportunity to hear his voice on those occasions.  As the defense has pointed out, there is no evidence that Ray's appearance has changed from the date of the recordings until now.  She thus was in a position to observe and perceive Ray, her testimony would be rationally based on those perceptions, it would be helpful to a determination of an issue in fact, and it is not based on scientific, technical, or otherwise specialized knowledge.

The defense's main argument is that the jury will be in a position to observe Ray, and thus Agent Maguire's testimony will do nothing more than what the jury itself will be able to do. There are several answers to that argument.  First, at least during the Government's case—and

perhaps throughout the trial—the jury will not necessarily have the opportunity to hear Ray's voice; even if it does, it may not be able to hear it for the concentrated and extended period of time Agent Maguire has heard it.  After the Government closes its case, the Defendant may choose not to testify, and in that event, the jury will never hear his voice.  Second, as to the video identifications, while the jury—if it chooses to look at Ray—will have the opportunity over time to observe him, that observation may be unsatisfactory.  First and foremost, given the Court's current COVID-19 protocol, Ray will be wearing a mask for the duration of the trial and would only remove it for any meaningful period of time if he were to take the witness stand.  Agent Maguire, on the other hand, arrested Ray in February 2020, when he was not wearing a mask, and Agent Maguire was able to observe his face unobstructed.  Furthermore, even if conditions change to permit Ray to remove his mask, the agent's identifications would be helpful and admissible.  To the extent the jurors will have the opportunity to observe Ray in the courtroom, the jurors would be observing him at the expense of observing the witnesses during their testimony, as is necessary to discharge their duties as fact finders.  The Court expects to charge the jurors that one of the ways that they can tell whether to credit a witness's testimony is to observe his or her demeanor on the stand.  And if the jurors were to follow that instruction, they would only be able to observe Ray incidentally, when the jurors might be otherwise occupied (e.g., in entering or leaving the courtroom) and when Ray might be obscured by counsel.  Those observations are not a substitute for Agent Maguire's testimony. Even if the jurors might be able eventually to confirm Agent Maguire's identification or—to the contrary—question identification, that later identification does not render Agent Maguire's testimony unhelpful.  The Government is entitled to put on its case, and it would be helpful to an accurate determination of the issues in fact if the jurors were to have the benefit of Agent Maguire's observations and

identifications at the time the evidence is offered and not have to rely on their later observations to determine the significance and meaning of the evidence. *See United States v. Arroyo*, 600 F. App'x 11, 15 (2d Cir. 2015) (summary order) (finding a witness's familiarity with a defendant's "manner of dress, gait, and demeanor" over the course of several encounters sufficient for their identification to be helpful to the jury) (citing *United States v. Garcia*, 413 F.3d 201, 211 (2d Cir. 2005)); *see also United States v. Suleitopa*, 719 F. App'x 233, 234–35 (4th Cir. 2018) (finding a government's witness's 8 to10 hours of surveillance video review and observation of the defendant in court to be sufficient for his identification of the defendant on the video to be helpful to the jury); *United States v. Pirk*, 2019 WL 442449, at *2–3 (W.D.N.Y. Feb. 5, 2019) (finding that witness's testimony was helpful to the jury, and therefore admissible, because the witness had "viewed the video frame-by-frame[] and reflected his observations" concerning the witness's appearance before and after the charged offenses).

The defense's citation to *Wade* is inapposite. *See United States v. Wade*, 388 U.S. 218 (1967). That case involved a pretrial line up, and Second Circuit cases applying that case have done so concerning out-of-court identification procedures facilitated by the government. As the defense quotes in their opposition, "a *Wade* hearing is generally granted where any question is raised concerning the suggestibility of the identification procedure." Dkt. No. 371at 23 (quoting *United States v. Chandler*, 164 F. Supp. 3d 368, 383 (E.D.N.Y. 2016)). The defense points to *United States v. Kahan* for the proposition that *Wade* applies to "experienced, trained government agents," but that case concerned a prior out-of-court, government facilitated identification procedure where the identifying witness happened to be a government agent. 350 F. Supp. 784, 800 (S.D.N.Y. 1972), *rev'd on other grounds* 479 F.2d 290 (2d Cir. 1973). *Kahan* explains that "[t]he *Wade* court expressed concern with the dangers inherent in lineups or show-

ups involving *any* witnesses." *Id.* (emphasis in original).  This case involves no such

identification procedure.  Unlike in the circumstances of *Wade*, Agent Maguire will identify Ray

in open court, under oath, and all circumstances of that identification will be subject to challenge

by cross-examination.

As to the other individuals, the Court denies the motion in limine and reserves on the

issue until the Government offers evidence or makes a proffer as to the opportunities of the agent

to personally observe and perceive those individuals.

The defense also argues that Agent Maguire should not be permitted to testify as to

whom certain items belonged.  The motion is granted.  Belonging is a question of ownership and

not of where an item is located.  Unless and until Agent Maguire identifies a foundation based

upon her personal knowledge (rather than upon hearsay), she will not be permitted to testify to

whom certain items belonged.

The Government further argues that Agent Maguire should be permitted to identify the

handwriting and entries in the notebooks of the alleged victims "based on her review of their

handwriting and entries in those notebooks that are signed by those victims." Dkt. No. 323 at 32.

The Government also expects to have the agent identify Ms. Pollok's handwriting.  The defense

argues that the agent has not acquired familiarity with the handwriting other than in the context

of the current litigation and thus that it should be excluded.  It relies upon Rules 701 and

901(b)(2) and *United States v. Samet*, 466 F.3d 251, 256 (2d Cir. 2006).

This issue is not amenable to resolution on a motion in limine.  For Agent Maguire to

testify regarding handwriting the Government must satisfy both Rule 701 and Rule 901(b)(2).

The Second Circuit in *Samet* held that "a lay witness who testifies as to her opinion regarding

someone's handwriting pursuant to Rule 701 must satisfy Rule 901(b)(2)'s command that that

her familiarity with the handwriting was not acquired solely for purposes of litigation."  466 F.3d at 256.  However, in *Samet*, the Circuit drew a distinction between familiarity acquired for the purposes of testifying—which is not sufficient to satisfy the Rules—and familiarity acquired over the course of an investigation.  *Id.* at 257.  It held that familiarity acquired over the course of an investigation does satisfy the "not acquired for purposes of the litigation" standard of Rule 901(b)(2).  Whether Agent Maguire can establish the requisite foundation that she acquired such familiarity during the course of the investigation and did so other than on the basis of hearsay statements from the alleged victims telling her that certain handwriting belonged to them will have to await testimony at trial or a further proffer from the Government.

**J.**      **Evidence about Prior Incarceration and *New York Magazine* Article**

The Government intends to elicit testimony at trial that the alleged victims were told by Ray's daughter before they even met Ray, that he had been wrongly prosecuted and imprisoned based on a plot by Bernard Kerik and others and that Ray repeated those claims to them, forming the basis for the conspiracy that Ray later accused the alleged victims of participating in and to which they "confessed."  It also expects to elicit testimony about the publication of a *New York Magazine* article in approximately April 2019 and that once Ray and Pollok became aware of the impending article, they began gathering incriminating information against the alleged victims. According to the Government, the publication of the article, prior to Ray's arrest in this case led him and Pollok to undertake efforts to retaliate against the alleged victims they believed had cooperated with the authors of the article.

The defense objects to both types of evidence.  It does not dispute that in the Second Circuit "[e]vidence of uncharged criminal activity can be admitted as direct evidence under Rule 403 . . . if it is inextricably intertwined with evidence regarding the charged offenses, or if it is necessary to complete the story of the crime at trial."  *United States v. Cedeno*, 756 F. App'x 24,

28 (2d Cir. 2018) (summary order) (quoting *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000)).  It contends that Ray's prior incarceration is only marginally relevant at best; according to the defense, the alleged victims can testify that Ray told them he was the victim of a vast conspiracy by Kerik and others and, as a matter of fact, his prior incarceration was only one of a number of reasons for his falling out with Kerik; another was that Ray spoke out against Kerik when Kerik was nominated as U.S. Secretary of Homeland Security.

The defense argument as to the prior incarceration is without merit.  That Defendant had been imprisoned prior to meeting many of the alleged victims is relevant to the Government's theory of the case.  It is not being received for the fact that Ray was incarcerated but for the effect that the narrative of his "unjust" imprisonment had on the alleged victims and his ability to assert control over them.  It also provides helpful context for relevant pieces of evidence that the Government has represented that it intends to offer for admission at trial, including e-mails sent by Claudia that reference Ray's past imprisonment.[5] *United States v. Diaz*, 176 F.3d 52, 79-80 (2d Cir. 1999) (evidence of "uncharged acts may be admissible as direct evidence of the conspiracy itself" (quoting *United States v. Miller*, 116 F.3d 641, 682 (2d Cir. 1997))).  There is no unfairness in the receipt of the evidence.  According to the evidence proffered by the Government, Ray injected the fact of the imprisonment into this case when he used it as part of the narrative to impress them with the harm that he had suffered and to convince them that they were part of a group that caused that harm.  Moreover, the evidence is not "'significantly more sensational and disturbing than the charged crimes.'" *Zhong*, slip op. at 19 (quoting *United States v. Curley*, 639 F.3d 50, 62 (2d Cir. 2011) (explaining that Rule 403 analysis applies even to

---

[5] The Government has offered to redact a portion of Claudia's e-mail that references that she Ray was imprisoned for a child-custody matter.

evidence necessary to "complete the story").  The evidence is no more inflammatory or powerful than the evidence that is even more directly relevant to the charged crimes.

The defense argues that the conviction and imprisonment should be excluded because the period of incarceration ended more than a decade ago.  It argues that for the same reasons that it is presumed prejudicial to admit evidence of a defendant's prior convictions under Rule 609(b) when more than ten years has passed since the conviction or release from confinement, so too is it prejudicial to introduce the fact of Ray's prior incarceration at the outset of the case.  The analogy is inapt.  Old convictions are presumptively excluded under Rule 609(b) not because they are more prejudicial than recent convictions but because they are of more marginal value and relevance.  *See* Rule 609(b) Advisory Committee notes ("The Committee was of the view that after ten years following a person's release from confinement (or from the date of his conviction) the probative value of the conviction with respect to that person's credibility diminished to a point where it should no longer be admissible."); *see also United States v. Garcia*, 291 F.3d 127, 138 (2d Cir. 2002) (explaining that "[t]he length of time between the events . . . detract from any potential probative value of the prior conviction"); *United States v. Brown*, 2009 WL 728448, at *4 (E.D.N.Y. Mar. 10, 2009) (noting that the probative value of convictions over ten years old "is considered so minimal that such convictions are subject to the more stringent balancing test under Rule 609(b).")

When convictions that are more than ten years old are introduced for non-impeachment purposes, a court measures admissibility under Federal Rule of Evidence 403, whereby evidence is admitted unless its probative value is substantially outweighed by the risk of prejudice, rather than the other way around.  *See Scotto v. Brady*, 410 F. App'x 355, 360 (2d Cir. 2010) (summary order).  The release from imprisonment here occurred more than a decade ago, but the alleged

criminal activity in the Second Superseding Indictment took place over the course of a decade, and Ray was released from his imprisonment shortly before he is alleged to have committed the instant crime. Notably, the fact of his prior incarceration is relevant: the Government proffers that he used the fact of his prior imprisonment as part of his narrative to the victims in order to convince them that he was the subject of a conspiracy, of which they became a part. Any prejudice that Ray would suffer as a result of introducing evidence related to his prior conviction would not substantially outweigh this probative value.

The defense argues that evidence regarding the *New York Magazine* article is irrelevant and unduly prejudicial under Rules 401, 402, and 403, and depending on how the Government intends to elicit evidence regarding the article, it might constitute inadmissible hearsay under Rules 801 and 802. The defense also raises the concern that mere publication of an article in a respected national magazine chronicling the events at issue at trial, as well as the fact that the article sparked a federal investigation, might lend credence to the Government's version of those events and improperly bolster the Government's case.

Evidence regarding the drafting and publication of the *New York Magazine* article is relevant, and Defendant has not established that its probative value is substantially outweighed by any prejudicial effect. The indictment alleges predicate acts of the racketeering conspiracy including acts "indictable under Title 18, United States Code, Section 1512 and 2." Dkt. No. 292 ¶ 8(i). As pertinent here, that provision makes it a crime if a person (1) "knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to . . . influence, delay, or prevent the testimony of any person in an official proceeding," 18 U.S.C. § 1512(b)(1), or (2) "corruptly … obstructs, influences, or impedes any official proceeding, or attempts to do so," *id.* § 1512(c)(2).

Significantly, for purposes of Section 1512, "an official proceeding need not be pending or about to be instituted at the time of the offense." *Id.* § 1512(f)(1).  Nor need the Government prove that such a proceeding was or would be federal.  *See United States v. Pugh*, 945 F.3d 9, 21 (2d Cir. 2019).  It is sufficient that the Government prove that the proceeding was reasonably foreseeable to the Defendant.  *Id.* (quoting *United States v. Martinez*, 862 F.3d 2223, 237 (2d Cir. 2017), *vacated on other grounds by Rodriguez v. United States*, 139 S.Ct. 2772 (2019)).

Assuming the jury credits the evidence proffered by the Government, it would tend to prove the predicate acts alleged in the indictment.   Specifically, the evidence on its face shows Defendant and his alleged co-conspirator undertook efforts to retaliate against individuals who described to the magazine author evidence that, if credited, would implicate Ray in crimes and could reasonably be believed to lead to some form of an official proceeding.  The evidence on its face also tends to suggest efforts to influence the testimony of those individuals—to prevent it or at least change it.  Assuming the jury further finds that the existence of an official proceeding would be reasonably foreseeable to Ray at the time, the evidence thus would tend to inculpate Ray in the crime of witness tampering under Section 1512.   The conduct of Ray and his co-conspirator in response to the drafting and the publication of the article is also relevant to show the means and methods of the Enterprise, and how its members would assert control over its alleged victims.

The defense offers that the introduction of the article would be unduly prejudicial and could give rise to a risk of juror misconduct.  It raises the concern that a juror, hearing about the article, would be tempted to do research on her own into the article.  The Government states, however, that it does not intend to offer the article itself into evidence and that the testimony and exhibits regarding the drafting and the publication of the article is directly relevant and essential

to the crime with which Ray was charged by the grand jury.  The force of the evidence is in the alleged efforts by Ray and his co-conspirators to prevent the alleged victims from reporting what they believed had happened to them (and which, if believed, could inculpate Ray in crimes).  As to the risk of juror misconduct, it is purely speculative.  This is a high-profile case that, as the defense has argued, has attracted media attention in the past and is likely to attract media attention during the trial.  The Court will instruct the jurors not to conduct any independent investigation or read or listen to the case and to report to the Court if they have been exposed to any information about the case.  Jurors are presumed to follow such instructions.  *United States v. Pforzheimer*, 826 F.2d 200, 205 (2d Cir. 1987) ("It is a fundamental proposition that a jury is presumed to follow the instructions of the trial judge.").  There is no reason to believe that a juror who follows that instruction will still look up the *New York Magazine* article or that the risk of jurors being exposed to extrajudicial information will be any greater with the introduction of information about the article into the case than it will be without introduction of information about the article into the case.  And to the extent that there would be any residual incremental risk, the Court can address that risk by limiting instructions and other measures such as directing that the title of the article not be received into evidence.  The Government has not, at this time, moved to offer the title of the article into evidence.  To the extent that it does, the Court will consider whether any probative value of the title is substantially outweighed by the prejudicial effect that may come with it.

### K.     Cross-Examination of FBI Witnesses

The Government moves to limit the cross-examination of the three FBI law enforcement witnesses who are expected to testify at trial to the scope of their direct testimony and matters affecting their credibility.  The three witnesses are Special Agent Kelly Maguire who led the team that executed the search warrants in this case and participated in the post-arrest interview of

Ray, who will testify about the execution of the search and relevant materials found during it and will offer summary charts which will contain timelines prepared from other exhibits in the case; Forensic Examiner Stephen Flatley, who will testify about his forensic examination of digital evidence in the case; and Forensic Accountant Mark Lubin, who will testify about relevant bank transactions and summary exhibits that show the flow of funds at issue in the case as well as about receipts seized from Ray's residence that show his expenditure of what the Government claims are criminal proceeds.

Federal Rule of Evidence 611(b) states that "[c]ross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility" but then goes on to make clear that "[t]he court may allow inquiry into additional matters as if on direct examination." Fed. R. Evid. 611(b). "The district court has broad discretion to determine the scope of cross-examination." *United States v. Koskerides*, 877 F.2d 1129, 1136 (2d Cir. 1989).

The Government expresses concern that the defense will use cross-examination to inquire into the nature of the investigation and the manner in which evidence was gathered. It also expresses concern that the defense will ask Special Agent Maguire about other events not depicted in her charts or mentioned in her testimony that support their view of the case.

The Government's motion is denied as premature. *See United States v. Wagner*, 2022 WL 19179, at *4 (S.D.N.Y. Jan. 3, 2022). "[T]he Government's witnesses have yet to testify and thus the scope of the witnesses' direct examination regarding the investigation of the defendant is still unknown." *Id.*; *see also United States v. Sampson*, 2015 WL 2066073, at *15 (E.D.N.Y. May 4, 2015). The Second Circuit case it cites for the proposition that the defense may not inquire into how evidence was gathered did not relate to cross-examination of an agent

who conducted a search regarding the very search she testified about on direct examination.  *See*

*United States v. Malpeso*, 115 F.3d 155, 162–63 (2d Cir. 1997) (holding that district court

properly limited scope of cross-examination when defense sought to use it to divert the jury's

attention from the conduct of the defendants to the conduct of the FBI, an FBI informant, and the

United States Attorney's Office).  It very well may be that the defense will seek to ask questions

that exceed the scope of direct examination and that therefore should be limited.  But whether it

seeks to do so, and whether the Court will have to sustain an objection will have to await the

direct testimony of the witnesses and the Government's objection to any line of examination it

deems exceeds the scope of Rule 611.

### L.      Alleged False Exculpatory Statements During Post-Arrest Interview

The Government intends to offer certain of Defendant's admissions during his post-arrest

interview through the testimony of Special Agent Maguire.  It contends that, during the same

interview, Ray made false self-exculpatory statements, and it seeks to prevent the defense from

introducing those statements under Rule 801(d)(2).  The defense argues that the Government

should not be permitted to offer Agent Maguire's notes of the interview as recorded on FBI Form

302 or, in the alternative, it should be permitted to offer the remainder of the statements (save for

references to Ray's prior criminal history) under the rule of completeness.

To the extent that the defense seeks a ruling in limine in advance of trial that under no

circumstances will the Form 302 be admitted even in part, that motion is denied.  The FBI Form

302 is hearsay and does not qualify as a party admission; nor is there evidence that it constitutes

an adoptive admission under Federal Rule of Evidence 801(d)(2).  *See United States v. Felix-*

*Jerez*, 667 F.2d 1297, 1299–300 (9th Cir. 1982).  The Government's motion is therefore granted

to the extent that it seeks to prevent the defense from introducing the statements under Rule

801(d)(2).  However, depending upon how the evidence is developed at trial, there may be

circumstances under which the notes can be admissible as a past recollection recorded or be used to refresh recollection.

Ruling on admission of particular statements made by Ray under the rule of completeness is premature. Under the rule of completeness, "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." Fed. R. Evid. 106. "The rule of completeness provides that 'even though a statement may be hearsay, an omitted portion of the statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion.'" *United States v. Kopp*, 562 F.3d 141, 144 (2d Cir. 2009) (quoting *United States v. Johnson,* 507 F.3d 793, 796 (2d Cir. 2007)).

Until the Court sees the statement and the portions that the Government seeks to offer as well as the portions that the defense seeks to offer, the Court cannot make a ruling as to the offer under the rule of completeness. The Court will address the issue after the direct examination of Agent Maguire.

### M.   Bank Records and Recorded Bank Calls, Telephone Records, and Records from GoDaddy

The Government intends to offer certain records at trial, such as bank records and recorded bank calls, telephone records, and records from GoDaddy (including paper records and calls) as business records under Rule 803(6) certified as authentic with a certification of a custodian or another qualified person. Under Federal Rule of Evidence 902(11), "[t]he original or a copy of a domestic record that meets the requirements of [the business record exception] as shown by a certification of the custodian or another qualified person that complies with a federal

statute or a rule prescribed by the Supreme Court" is self-authenticating and requires no extrinsic evidence of authenticity to be admissible.  Fed. R. Evid. 902(11).  Business record certifications are not testimonial, and therefore the Defendant enjoys no right of confrontation against the person who prepares such a certification.  *See United States v. Clotaire*, 963 F.3d 1288, 1296 (2d Cir. 2020).

The defense does not object to the motion in limine and the parties indicated that they have reached an agreement on authenticity.  Therefore, this motion is moot.

### N.      Presence of Revenue Agent Catanzaro

The Government seeks an order that IRS Revenue Agent Valerie Catanzaro may remain in the courtroom during the testimony of other witnesses to be able to calculate the tax loss caused by Ray's conduct based on witness testimony.  Witnesses will testify about the prostitution proceeds and extortion proceeds.  Based on the evidence at trial, the Government will have the agent calculate tax due during each of the calendar years 2015 to 2019 and the resulting tax liability.  She is also expected to testify concerning her creation of summary charts reflecting the courses of income otherwise presented in the trial.

The defense objects that Agent Catanzaro is testifying as an expert and asks that she be precluded.  In the alternative, it asks that Agent Catanzaro's testimony be limited to subjects that do not require expertise (unlike tax computation).  It notes that the agent in *United States v. Cadet*, 2009 WL 2959606 (E.D.N.Y. 2009) cited by the Government was noticed as expert testimony.  Although the defense identifies numerous cases in which a government agent testified as an expert in this area, these cases do not discuss the ultimate issue of whether such a designation is *required* in order for the witness's testimony to be admissible.

The Second Circuit has not directly addressed the issue whether an IRS agent may testify as a summary witness in a tax evasion case.  However, many other circuit courts have addressed

the issue and they have concluded that an IRS agent may do so. *See United States v. Stierhoff*, 549 F.3d 19, 28 (1st Cir. 2008) ("We hold, therefore, that in a tax evasion case, a summary witness may be permitted to summarize and analyze the facts of record as long as the witness does not directly address the ultimate question of whether the accused did in fact intend to evade federal income taxes."); *United States v. Pree*, 408 F.3d 855, 869–70 (7th Cir. 2005) (concluding that an IRS agent properly testified as a summary witness where he analyzed stock sales at issue and described income tax consequences); *United States v. Nicholson*, 961 F.3d 328, 336 (5th Cir. 2020) (affirming admission of summary witness testimony of an IRS agent where the agent's testimony and summary charts were "derived from the evidence that had already been introduced, namely, earlier testimony, tax return documents, and bank account records"); *United States v. Sabino*, 274 F.3d 1053, 1067–68 (6th Cir. 2001), *opinion amended and superseded*, 307 F.3d 446 (6th Cir. 2002) (affirming IRS agent testifying as a summary witness where she "analyzed the multitude of documents and testimony admitted into evidence and properly testified as to the government's calculation of tax due from the [defendants]"). Those conclusions are consistent with the rulings by a number of judges in this District. *See United States v. Barnwell*, 2017 WL 1063457, at *2 (S.D.N.Y. Mar. 20, 2017) (allowing an IRS agent to testify to a defendant's tax liability as a summary witness); *United States v. Ariel Jimenez*, 18 Cr. 879 (SHS) (S.D.N.Y.) (Agent Catanzaro provided summary non-expert testimony in February 2022); *United States v. Rebecca Bayuo*, 15 Cr. 576 (JGK) (S.D.N.Y.) (Agent Catanzaro provided summary non-expert testimony in October 2018); *United States v. Joseph Scali*, 16 Cr. 466 (NSR) (S.D.N.Y.) (Agent Catanzaro provided summary non-expert testimony in February 2018).

The result follows logically from the Second Circuit's conclusion, on a related issue, that "[a] witness's specialized knowledge, or the fact that he was chosen to carry out an investigation

because of this knowledge, does not render his testimony 'expert' as long as it was based on his 'investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise.'" *United States v. Rigas*, 490 F.3d 208, 224 (2d Cir. 2007) (quoting *Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 181 (2d Cir. 2004)).  In *Rigas*, the Second Circuit found that an accountant testifying to his calculations concerning what a company would have owed if they had not, as other fact witnesses testified, fraudulently reclassified their debt was properly considered summary testimony.  *Id.* at 224; *see also United States v. Blakstad*, 2021 WL 5233417, at *4–6 (S.D.N.Y. Nov. 9, 2021) (finding an accountant properly testified as a summary witness where the witness had reviewed voluminous financial records and produced summary exhibits tracing payments between different financial accounts in a securities fraud prosecution); *Barnwell*, 2017 WL 1063457, at *2 (allowing IRS agent to testify to a defendant's tax liability as a summary witness).  It follows that Agent Catanzaro may testify without being qualified as an expert.  The Court has no reason to doubt the Government's assertion that they intend for Agent Catanzaro's testimony to be limited to that properly offered by a summary witness.

In any event, even if Agent Catanzaro's testimony were to be considered expert, the defense suffered no prejudice from the Government's failure to designate the agent as an expert pursuant to Federal Rule of Criminal Procedure 16.  The defense has known since the Defendant was indicted for tax evasion that the Government would offer evidence that there was tax due and owing and it knew through the Government's disclosure of the documents recovered from Defendant's residence what that evidence would show. The Government has represented that by the end of this week, and thus well before trial, it will provide the defense drafts of Agent Catanzaro's charts based on what he expects the evidence will establish.  The defense therefore

will not be surprised by "unexpected testimony." *United States v. Cruz*, 363 F.3d 187, 196 (2d Cir. 2004) (quoting *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997)).  The defense has both the methodology by which the agent will determine the amount of tax due and owing and the documents to which the agent will apply that methodology.

The Government has satisfied Federal Rule of Evidence 615's sequestration exception for a witness "whose presence a party shows to be essential to presenting the party's claim or defense." Fed. R. Evid. 615(c).  Agent Catanzaro's summary testimony must be based on the evidence. *United States v. Koskerides*, 877 F.2d at 1134.  Her presence therefore is essential.

### O.   Evidence of Defendant's Earlier Filing of Tax Returns

The Government seeks an order approving its offer of evidence that the Defendant previously filed tax returns in 1998 as evidence to show that his failure to file returns in the tax years 2015 to 2019 was not an innocent error but was "a voluntary, intentional violation of a known legal duty." *Cheek v. United States*, 498 U.S. 192, 196 (1991).  The Government argues that evidence that Ray filed returns supports that he knew of the obligation to file returns and to report all of his taxable income and tends to prove the ultimate fact that he knew he had tax due and owing. *See United States v. Scali*, 2018 WL 461441, at *5–6 (S.D.N.Y. Jan. 18, 2018) (evidence of defendant's filing history admissible to prove "willfulness and corrupt intent"); *United States v. Gilmartin*, 684 F. App'x 8, 11 (2d Cir. 2017) (summary order) ("[C]ertain facts can support an inference that a defendant willfully violated his duty to obey tax laws, including the defendant's prior taxpaying record").

The defense responds that the evidence of Ray's 1998 tax return would be prejudicial.  It does not intend to argue that Ray believed that the tax laws did not apply to him.  It intends to argue that Ray did not believe the money received as repayment for poisoning constituted taxable income and thus did not willfully commit tax fraud by failing to report it.  It points out

that evidence that Ray last filed a tax return in 1998 would only invite the jury to speculate he is a tax fraud who has not filed returns for years.  It identifies no other prejudice than the date of the tax return.

Rule 401 defines relevant evidence as that which "has any tendency to make a fact more or less probable than it would be without the evidence," so long as "the fact is of consequence in determining the action."  Fed. R. Evid. 401; *see also Old Chief v. United States,* 519 U.S. 172, 178 (1997).  "The fact to which the evidence is directed need not be in dispute." *Old Chief,* 519 U.S. at 179 (quoting Federal Rule of Evidence 401 advisory committee's note) (internal quotation mark omitted).

The previously filed tax return is relevant regardless whether Ray intends to argue that the tax laws do not apply to him.  The prejudicial impact can be readily addressed.  The Government has represented that it would be prepared to stipulate with the defense that the Defendant has filed a federal tax return prior to the 2015 tax year.  If the parties are unable to reach an agreement on such a stipulation, the Court is prepared to address any prejudice to Ray that could result from evidence showing he filed a tax return in 1998 by issuing a limiting instruction—absent objection by the defense—that the jury should not ascribe any significance to the choice of tax year prior to 2015 for which the Government has offered a tax return.  *See Pforzheimer*, 826 F.2d at 205; *United States v. Downing*, 297 F.3d 52, 59 (2d Cir. 2002) ("Absent evidence to the contrary, we must presume that juries understand and abide by a district court's limiting instructions.").  The motion therefore is granted.  The Court will receive either a stipulation or the tax return.

## II. Defense In Limine Motions

### A. Motion to Preclude Evidence that Felicia had Sex with "Strangers"

The defense moves to preclude evidence that Ray forced Felicia to "provide sexual

services, including to strangers." Dkt. No. 325 at 1.  According to the Government, it has

evidence that Ray "often would lock Felicia out of their residence and not allow her to come

back inside until and unless she provided a recording showing that she had had sex with a

stranger.  The defendant often directed Pollok to accompany Felicia to ensure that Felicia

complied." Dkt. No. 323 at 22.  The Second Superseding Indictment charges such conduct in

connection with the "forced labor" predicate racketeering act, and the Government argues that it

violates the Trafficking Victims Protection Act, 18 U.S.C. § 1589(1).  The defense argues that

"sex with strangers" does not constitute a "service" and does not fall within the purview of

"forced labor" because it does not confer a benefit on anyone and that, in the absence of any

connection between the evidence and charged conduct, the evidence would be confusing and

unduly prejudicial and serve "merely to try to portray Mr. Ray as a generally bad guy."  Dkt. No.

325 at 3.

The Government responds that the evidence would tend to establish that Ray violated 18

U.S.C. § 1589 because he "provided" the sexual "labor or services" of Felicia to others "by

means of force or threats of force" and "serious harm and threats of serious harm."  It also argues

that the evidence shows that Ray "obtain[ed] the labor or services" of Felicia by force and threat

of force and serious harm by causing her to provide him with pornographic videos that she

created.  Dkt. No. 367 at 3.  Finally, the Government argues that, even apart from the forced

labor charge, the video evidence is probative of the means and methods of the Enterprise and that

it is relevant to the charges of forced labor in North Carolina because the coercive conditions on

that manual labor can only be understood in the context of the abuse and exploitation that immediately preceded it, and which was a method of the Enterprise. *Id.* at 5.

The Trafficking Victims Protection Act of 2000 ("TVPA"), a subset of the Victims of Trafficking and Violence Protection Act of 2000, Publ. L. No. 106-386, 114 Stat. 1464 (2000), makes it illegal to "knowingly provid[e] or obtai[n] the labor or services of a person by any one of, or by," among other things, "means of force, threats of force, physical restraint or threats of physical restraint to that person or another person," or "means of serious harm or threats of serious harm to that person or another person." 18 U.S.C. § 1589(a)(1), (2). The statute does not define "labor" or "services." The parties have raised the question whether the conduct would constitute "forced labor" as that term should be understood in Section 1589. The Second Circuit has held that the terms "labor" and "services" in the TVPA are to be interpreted in accord with their ordinary meanings. *See United States v. Marcus*, 628 F.3d 36, 44 (2d Cir. 2010). At the same time, however, the Circuit has not considered whether and how far the language of the statute extends beyond conduct from which the defendant derives "pecuniary gain." *Id.* Judge Ross has defined "labor" as the "expenditure of physical or mental effort especially when fatiguing, difficult, or compulsory" and "services" as "useful labor that does not produce a tangible commodity." *United States v. Marcus*, 487 F. Supp. 2d 289, 300 (E.D.N.Y. 2007) (internal citations omitted).[6] The Government has not yet identified a limiting principle to its

---

[6] Other circuits have generally considered the question: the Tenth Circuit has explained that, in affirming a conviction, the Fourth Circuit stated that "sexual acts that have been coerced by other means are covered by the involuntary servitude statute," *United States.* v. *Kaufman*, 546 F.3d 1242, 1262 (10th Cir. 2008) (citing *United States v. Udezor*, 515 F.3d 260 (4th Cir. 2008)), and that the statute applies to "coerced acts other than 'work in an economic sense,'" *id.* at 1263. But in that case—which also considered whether the conduct constituted involuntary servitude— the alleged victims provided a benefit to the defendants both in the form of work on a farm and in the form of creating pornography for the presumed enjoyment of the defendants. *See also Bistline v. Parker*, 918 F.3d 849, 873 (10th Cir. 2019) (holding that plaintiffs who were ordered

argument.  Washing the dishes may also be considered to require the expenditure of physical

effort that is fatiguing, but it is not clear that a parent who threatens force if his child does not do

the household chores would be guilty of a federal crime under the Government's theory.

The Court need not decide, at this juncture, whether the Defendant directing Felicia to

have sex with strangers constitutes forced labor within the meaning of federal law because it

finds that it is relevant to the means and methods of the Enterprise.  The defense has conceded

that testimony that the Defendant directed Felicia to have sex with strangers is relevant to the

means and methods of the Enterprise and, to that extent, has abandoned the most aggressive form

of its in limine motion.

The evidence would be relevant in any event.  The Second Superseding Indictment

alleges that the means and methods of the Enterprise included "[s]ubjecting the Victims to sexual

.and psychological manipulation," Dkt. No. 292 ¶ 7(c), and "[c]reating and collecting sensitive,

humiliating, and incriminating material against the Victims to further the purposes of the

Enterprise, including the continued obedience of the Victims, the enrichment of the Enterprise,

and evasion of detection by law enforcement," *id.* ¶ 7(i).  The "sexual . . . manipulation" is

alleged to be a method by which, among other things, Ray "exract[ed] purported confessions for

the Victims that they had caused harm and damage to members and associates of the Enterprise."

*Id.* ¶ 5.  Evidence that Ray forced Felicia to have sex with strangers and to record those

encounters—and that there is video of such encounters—is relevant to these allegations.  The

relevance of evidence related to this directive and these encounters are not outweighed by unfair

prejudice to Ray.  To the extent the evidence is troubling, that would be because the allegations

---

into sexual relationships were victims of forced labor); *Gilbert v. United States Olympic Comm.*,
2019 WL 1058194, at *8 (D. Colo. Mar. 6, 2019) (holding that sexual acts that are compelled as
a condition of being permitted to compete in sporting events constituted forced labor).

are troubling.  The prejudice that would result from the jury learning about the means Ray used to assert control over Felicia would not be "unfair."

The thrust of the defense argument is that, while the fact that videotapes were made might be admissible, the videotapes themselves should not be received.  The defense asserts that the content of the videotapes themselves is extraordinarily prejudicial and that prejudicial impact far outweighs any probative value.  At argument, the Government stated that it intended only to offer a limited number of still photographs and did not intend to play the videotapes for the jury. But whether even the limited number of still photographs would survive a Rule 403 review and whether the tapes should be received cannot be decided in the abstract.  The Court will have to evaluate the particular pieces of evidence that may be presented and hear argument before it can decide whether each piece is admissible under the applicable Federal Rules of Evidence; nothing in the Court's Opinion should be read to prejudge the admissibility of particular pieces of evidence with respect to Felicia's sexual conduct with strangers.

> **B.    Motion to Preclude Evidence that Isabella Pollok had Sex with Strangers and Other Grooming Evidence Related to Pollok's Sexual Activities**

In its disclosure letters, the Government claims it has evidence of Ray's co-defendant Pollok having sex with numerous different people and that Ms. Pollok would "teach" an alleged victim how to give a "blowjob."  The Defendant moves to exclude the evidence on the grounds that it is irrelevant, unduly prejudicial, and confusing.  It argues that neither Ray nor Pollok are charged with sexual misconduct related to Pollok and that evidence of Ray allegedly sexually "grooming" Pollok and Pollok's other sexual activities is not directly relevant to the charged crimes.

The Government responds that the evidence is admissible to demonstrate the relationship of trust that developed between Ray and Pollok and to explain the events leading up to Pollok's

participation with Ray in the charged crimes. According to the Government, Ray's "grooming" of Pollok is necessary to show she came to be his loyal deputy and to help him carry out the goals of the Enterprise, including the sexual manipulation of its victims, the forced labor, and the sex trafficking. Dkt. No. 367 at. 8–9. Sexual grooming was one of Ray's methods of gaining control over the victims in order to carry out the Enterprise's racketeering activity, including extortion, forced labor, and sex trafficking. For that reason, the Government contends that proof of Pollok's participation in sexual activity with other victims is direct evidence of the charged crimes. It further points out that a person can be both a conspirator as well as in a relationship where she is dominated by her co-conspirator. *Id.* at 9.

Ray reads the Second Superseding Indictment's allegations and Rule 401 too narrowly. It is the theory of the indictment that "Ray, with the assistance of Pollok and others, subjected the Victims to sexual and psychological manipulation, physical abuse, and threats of violence, in order, among other things, to extract purported confessions from the Victims that they had caused harm and damage to members and associates of the Enterprise," which were then used to extort the alleged victims. Dkt. No. 292 ¶ 5; *see also id.* ¶ 7(c). It is the Government's theory that Pollok was "sexually groomed" both to enlist her trust in the conspiracy and also to help give her the tools to carry out the objectives of the Enterprise. As noted, the Second Circuit has held that the Court can admit even "'prior acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between conspirators.'" *United States v. Pascarella*, 84 F.3d 61, 73 (2d Cir. 1996) (quoting *United States v. Rosa*, 11 F.3d 315, 334 (2d Cir. 1993), *cert. denied*, 511 U.S. 1042 (1994)); *see also United States v. Jones*, 738 F Appx 13, 16 (2d Cir. 2018) (same). "'The trial court should exclude evidence on a motion *in*

*limine* only when the evidence is clearly inadmissible on all potential grounds.'"   *United States v. Ulbricht*, 79 F. Supp. 3d 466, 479 (S.D.N.Y. 2015) (quoting *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 164–65 (S.D.N.Y. 2006)).   The evidence at issue here falls within that category which is necessary and helpful to understand the background of the conspiracy, how the relationship between Ray and Pollok developed, and the mutual trust that existed between them. Nothing in the proffered evidence is more inflammatory or sensational than what is already in the Second Superseding Indictment.

While the Court will not grant the defense motion to preclude generally evidence related to Pollok's sexual acts, this decision should not be read to prejudge the admissibility of particular pieces of evidence.   If the Government offers evidence related to Pollok's sexual acts the probative value of which is substantially outweighed by the risk of unfair prejudice, jury confusion, or another consideration enumerated in Rule 403, the Court will not admit that evidence.

### C.     Motion to Preclude the Government's Toxicologist from Testifying that Ray was not Poisoned

Ray moves to preclude Government expert Dr. Richard Pleus's testimony that Ray has not suffered a health impairment from intentional poisoning.   In support, the defense contends that the relevant question is whether Ray believed he was poisoned and because "whether Mr. Ray was in fact poisoned is not a fact at issue," Dkt. No. 325 at 7, testimony on this point is irrelevant.

The Government responds that it expects to respond to evidence of Ray's belief that he had been poisoned in two ways, one of which implicates testimony that Ray was not, in fact, poisoned.   Specifically, the Government submits that it will seek to show that "the evidence

indicates that the defendant did not in fact hold this belief, but instead used false accusations to exploit his victims."  Dkt. No. 367 at 10.

Evidence is relevant if it tends to make a fact of consequence more or less probable.  Fed. R. Evid. 401.  Relevance is a "very low standard," *United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012) (quoting *United States. v. Al-Moayad*, 545 F.3d 139, 176 (2d Cir. 2008) and, "unless an exception applies, all '[r]elevant evidence is admissible,'" *id.* (quoting Fed. R. Evid. 402). *See also United States v. Quattrone*, 441 F.3d 153, 188 (2d Cir. 2006) ("[S]o long as a chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry.").  The Government has explained that evidence relating to whether Ray was, in fact, poisoned—a category to which Dr. Pleus's testimony belongs—is relevant to its theory of the case insofar as it tends to prove that Ray did not actually believe that he was poisoned but made such claims solely to extort his alleged victims.  The Court finds that this satisfies the "low bar" of relevance. The motion is denied.

### D.      Motion to Exclude the Maps Offered by the Government's Cell-Site Expert

Ray moves to exclude the maps offered by the Government's cell-site expert, arguing that the maps are misleading because they incorrectly suggest that the coverage areas of cell sites are a specific size and that the subject phones are in the shaded areas.  The Government responds that its expert's testimony will explain the maps and make clear that the shaded circles on the map depict a cell-site location, that coverage is varied among cell-site types, and that the cell-site coverage areas are not necessarily circular, thus curing any anticipated confusion.

A summary exhibit must "be based on foundation testimony connecting it with the underlying evidence summarized."  *Fagiola v. Nat'l Gypsum Co. AC & S.*, 906 F.2d 53, 57 (2d Cir. 1990).  "[W]hen summaries are used . . . the court must ascertain with certainty that they are

based upon and fairly represent competent evidence already before the jury. . . ." *United States v. Conlin*, 551 F.2d 534, 538 (2d Cir. 1977) (quoting *Gordon v. United States*, 438 F.2d 858, 876 (5th Cir. 1971)).  Furthermore, "[a] chart which for any reason presents an unfair picture can be a potent weapon for harm, and permitting the jury to consider it is error." *Conlin*, 551 F.2d at 539 (citing *Steele v. United States*, 222 F.2d 628, 630 (5th Cir. 1955)).

Since oral argument on these motions, the Government has submitted revised summary maps.   Dkt. No. 379.  The maps address the Court's concern that the circles could be read, misleadingly, to suggest a cellphone was located within them rather than to identify the location of a cell site.  The expert will explain the summary maps.  They are not misleading.  The motion is denied.

### E.        Motion to Permit Limited Attorney-Led Voir Dire

Ray moves the Court to permit each side thirty minutes of attorney-conducted voir dire as a complement and in addition to the Court's voir dire during the jury selection process.  The motion is denied.

Federal Rule of Criminal Procedure 24(a)(1) provides that "[t]he court may examine prospective jurors or may permit the attorneys for the parties to do so."  Fed. R. Cr. P. 24(a)(1).  The Court has "ample discretion in determining how best to conduct the *voir dire*" because ultimately it falls to the trial judge in the first instance to "impanel an impartial jury ... and he must rely largely on his immediate perceptions." *Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981).  The general view, at least among judges, is that "examination by the court is the preferable practice and . . . it results in great savings of time and improves the character of the examination."  Wright & Miller, Federal Prac. & P. §380.

The defense argues that jurors are more likely to be truthful and forthcoming when questioned by advocates with an in-depth knowledge of the issues in the case than by the Court

alone.  Dkt. No. 325 at 8.  But, as Judge Weinfeld opined, "based on more than three decades of judicial service," that he was "persuaded beyond peradventure of doubt" that court-led voir dire "without exception, has resulted in the empanelling of fair and impartial juries … selected expeditiously and with full protection of a defendant's constitutional right to an impartial jury" even in cases involving "the widest publicity in the news media over extended periods of time." *United States v. Wilson*, 571 F. Supp. 1422, 1428 (S.D.N.Y. 1983).   The defense has offered no reason in this case to depart from the wisdom of Judge Weinfeld.  With respect to knowledge of the issues in the case, the Court will rely on counsel to suggest additional questions to pose to the jurors and will pose them if it considers them to be proper and not repetitive.  Fed R. Cr. P. 24(a)(2).

### F.     Motion to Preclude Government Expert Dr. Hughes from Transmitting Inadmissible Hearsay or Testifying about Irrelevant and Unduly Prejudicial Conduct and Cases

Ray moves in limine to preclude Government expert Dr. Dawn Hughes from transmitting, through her expert testimony, statements that would constitute inadmissible hearsay; and from testifying about conduct and cases that have no factual connection to this case and that are therefore irrelevant and also unduly prejudicial.

Rule 703 allows an expert to base her opinion on facts or data that other experts in the field would reasonably rely on in forming an opinion on the subject.  Fed. R. Evid. 703.  As the Court has previously recognized in concluding that Dr. Hughes' testimony is admissible under Rule 702, such data may include statements that would otherwise be inadmissible as hearsay. *See* Dkt. No. 287.  However, if those underlying facts or data would be inadmissible, an expert may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs the prejudicial effect of the facts or data.  Fed. R. Evid. 703.

The defense argues that allowing Dr. Hughes to transmit hearsay on which she has relied in forming her opinion would "inflame the jury and unduly prejudice Mr. Ray by associating him in the jury's mind with" abusers of the individuals whose statements Dr. Hughes may transmit. Dkt. No. 326 at 4.  It also contends that the probative value of such statements is minimal at best. Relatedly, the defense contends that Dr. Hughes should be precluded from testifying about "notorious sexual abuse scandals involving minors that will be well known to members of the jury, but which are entirely unrelated to the alleged conduct at issue in this case."  *Id.*

The Government replies that the use of "real-life examples" to explain tactics of coercive control are appropriate and useful because they will help the jury to understand how individuals in positions of authority—like, the Government submits, Ray was—can facilitate the exploitation of a victim and affect her ability to process or report abuse.  The Government further submits that Dr. Hughes regularly and routinely gathers data from victim interviews in her practice, and to disallow reference to information gained from that interview would make it difficult for her to transmit her expertise to the jury.

The motion is denied. The Government has represented that Dr. Hughes will not be testifying about the specific facts of this case but rather will be testifying from her general knowledge and using examples that may be familiar to the jury to underscore her generalized testimony. The Court agrees that if Dr. Hughes were not permitted to use generalized examples or refer to limited number of anecdotes and statements that informed her expert opinion, it could be very difficult for her to convey her expert opinion in a manner that the jury will understand. *Cf.* Fed. R. Evid. 702 (allowing an expert to testify if her knowledge will help the trier of fact to understand the evidence).  That is particularly the case where, as here, the defense has challenged her expertise and testimony.  As the Second Circuit explained in an opinion issued yesterday,

*Zhong*, portions of expert testimony that bear "at best, tangential relevance to [a defendant's] case" are not permissibly admitted.  Slip op. at 29.  Thus, an expert cannot "provide a detailed commentary on the specific facts" of a defendant's allegedly criminal operation, so as to avoid coming "'dangerously close to usurping the jury's function' by effectively 'providing an overall conclusion of criminal conduct.'" *Id.* at 4 (quoting *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003)); *see also id.* at 27, 29.  But, as the Circuit noted, expert testimony may be useful in explaining why victims would be relatively unlikely to seek help or fear the consequences of leaving the control of their abuser.  *See id.* at 26–27 (explaining that "forced-labor enterprises . . . may involve complex activities that jurors would not readily understand as aspects of a forced-labor scheme," including that "perpetrators of forced labor may encumber workers by involving them in crimes, making the workers less likely to seek help and more likely to fear the consequences of leaving their company's employ.").  In so noting, the Circuit cited favorably to a case where expert testimony "'could have helped the jury' better understand, *inter alia*, 'the relationship between pimps and their prostitutes,  . . . how pimps recruit prostitutes, and how pimps control prostitutes." *Id.* at 27, n.11 (quoting *United States v. Brinson*, 772 F.3d 1314, 1319 (10th Cir. 2014)).

The Government submits that Dr. Hughes will use only generalized examples to explain her expertise.  Additionally, and as noted in the Court's prior opinion denying the defense challenge to Dr. Hughes' testimony on Rule 702, 401, and 403 grounds, Dr. Hughes will be testifying not about Ray's intent, "but to help a jury understand a common set of conduct experience[d] by victims or the actions normally taken by those committing certain crimes to seduce their victims . . . and to explain 'seemingly counterintuitive behavior' of victims or 'conduct not normally familiar to most jurors.'"  Dkt. No. 287 at 21 (quoting *United States v.*

*Torres*, 2021 WL 1947503, at *7 (S.D.N.Y. May 13, 2021)).  Given that Dr. Hughes will not

testify about Ray, his allegedly criminal conduct, or any statements made by the alleged victims,

and given the lack of similarity of background (other than the alleged offense conduct) between

Ray and the generalized examples that Dr. Hughes may use, there is little, if any, chance that the

jury will "hold Mr. Ray responsible for these other people and their actions."  Dkt. No. 326 at 7;

*see also Zhong*, slip op. at 29–31 (concluding that it was error for the district court to admit

expert testimony that "improperly risked prejudicing the jury against [the defendant]" where the

testimony "highlighted China's poor record with respect to forced labor" and where the

defendant was "a Chinese man who was associated with the Chinese government.").   Because

there is minimal prejudice associated with Dr. Hughes' use of hearsay and demonstrative

examples, the Court concludes that the probative value in helping the jury evaluate Dr. Hughes'

opinion substantially outweighs the prejudicial effect, if any, that would result from her use of

such facts and data.  Fed. R. Evid. 703.

### G.  Motion to Introduce Evidence Reflecting Ray's Then-Existing State of Mind During the Charged Racketeering Conspiracy

Ray moves for an in limine order that certain exhibits are relevant and admissible under

Federal Rule of Evidence 803(3) to prove his then-existing state of mind.  The exhibits include

an April 2016 letter from Ray to then United States Attorney Preet Bharara in which Ray states

that "[f]our members of my family and I have been intentionally poisoned by three college

students" and reports that the "three students, from two separate families, have made repeated

statements against their interests about their involvement in the poisoning conspiracy" and that

the students "told us that Bernard Kerik, Frank DiTommaso, Gerald Speziale, and the parents of

the students were/are behind the poisoning with the intention to kill me, my daughter and others

and/or otherwise interfere with my potential testimony in the Bernard Kerik federal case and the

related perjury case against Frank and Peter DiTommaso." Ray relays that he has reported the incidents to the New York Police Department and the Manhattan District Attorney's Office without success and asks that the United States Attorney investigate. Dkt. No. 327-8. The exhibits also include "confessions" from the alleged victims admitting to poisoning Ray that Ray sent to a Special Agent of the United States APA Criminal Investigation Division after meeting with that agent in December 2015, as well as an exhibit reflecting that the EPA declined to pursue the investigation "because it does not have the jurisdiction over the chemical poisoning that occurred to you." Dkt. No. 327-2–327-7. Ray argues that his acts in sending the evidence to the EPA and in asking the United States Attorney to investigate constitute assertions that demonstrate that he contemporaneously believed the claims in the letters and, in turn, show that he lacked criminal intent. Dkt. No. 327 at 4, 6. He argues that the defense must be permitted to rebut the Government's theory that such beliefs were a mere "cover" or means by which Ray furthered his criminal enterprise by showing that he undertook significant efforts to bring attention to what he believed was his poisoning by the alleged victims in this case. The defense argues that it does not seek to introduce the documents to prove the truth of the matters in them (i.e., that he was poisoned) but to show his state of mind that he believed that he was poisoned.

The Government responds that the exhibits should be excluded because they do not constitute proper state of mind evidence and are irrelevant and unduly prejudicial. Dkt. No. 367 at 17–18. The exhibits are irrelevant, according to the Government, because whether Ray believed he was being poisoned or not has no bearing on the *mens rea* of the charged offenses. *Id.* at 19. They constitute hearsay, according to the Government, because they were not made contemporaneously with the evidence being described but constitute backward-looking statements and because Defendant is not the declarant–the "confessions" were made by someone

else.  The Government further contends that the statements are not admissible to show Ray was

actively reaching out to law enforcement because such evidence is impermissible offered for the

truth of demonstrating the defendant's innocence.  *Id.* at 22.

As already explained, out-of-court statements are not hearsay when they are offered into

evidence for something other than the truth of the matter asserted.  *See* Fed. R. Evid. 801.

Moreover, a statement that relates to a declarant's state of mind—including motive, intent, or

plan—*at the time he made the statement* is not excluded by the rule against hearsay and may be

admitted if otherwise admissible.  *See* Fed. R. Evid. 803(3); *United States v. Cardascia*, 951 F.2d

474, 488 (2d Cir. 1991); *United States v. Farhane*, 634 F.3d 127, 171–75 (2d Cir. 2011) (Raggi,

J., concurring).  Thus, statements that relate to a defendant's belief at the time the statement is

made are not excludable on the basis of hearsay.  *See United States v. Harris*, 733 F.2d 994,

1004 (2d Cir. 1984).

The Court will admit the statements.  The Government's assertion that the evidence falls

outside Rule 803(3) because it refers to earlier conduct and contains statements of others

mistakes the limited purpose for which the defense seeks to use the evidence.  The evidence is

not being offered for the truth of the statements in the letter or in the materials sent to law

enforcement (i.e., that Ray was poisoned by the alleged victims in this case).  Nor is it even

being offered for the state of mind of those individuals (i.e., that they believed that they had

poisoned Ray or told Ray that he was being poisoned), and it will not be received for that

purpose.  The hearsay exception for state-of-mind evidence under Rule 803 "specifically

excludes 'a statement of memory or belief to prove the fact remembered or believed.'  That

exclusion 'is necessary to prevent the exception from swallowing the hearsay rule.'"  *United*

*States v. Dawkins*, 999 F.3d 767, 790 (2d Cir. 2021) (internal citations omitted).  But that does

not mean that the presence of historical events in a communication renders the statement

ineligible for admission under Rule 403 when it is the belief and not the truth of the fact believed

in that is relevant.  Here, the exhibits being offered as evidence of Ray's state of mind at the time

he conveyed the information to law enforcement—as a non-verbal act in which he demonstrated

his acceptance of and in his belief in the information he was transmitting to law enforcement.  In

other words, the theory of the defense is that the fact that he sent the information to law

enforcement and asked for it to be investigated is evidence that he believed the information he

asked law enforcement to investigate.

The Government's reliance on *United States v. Benalcazar*, 2011 WL 4553027, at *14

(N.D. Ill. Sept. 29, 2011), and *United States v. Lumiere*, 16 Cr. 483-01(JSR), Dkt No. 62,

1/6/2017 Tr. at 11, is likewise mistaken.  Those cases stand for the proposition that a defendant's

interaction with law enforcement, after the commission of the crime and "offered to negate

criminal intent, is not only irrelevant but also confusing and misleading to the jury."  *Bencalazar*,

2011 WL 4553027, at *14.  In those cases, the interaction with law enforcement post-dated the

conduct alleged to be criminal.  The interaction was not relevant to, or evidence of, the

declarant's then-existing state of mind at the time the defendant was engaged in allegedly

criminal activity.  The statements and acts at issue were self-serving ones that were tantamount

to the defendant's testimony in court "I am innocent."  They had no other relevance.  To the

extent that the statements were offered to show state of mind, they failed the "then-existing"

requirement; the evidence was of a later statement offered to show an earlier state of mind.   In

*Lumiere*, for example, the Court excluded evidence that the defendant was attempting to

cooperate with law enforcement that was proffered as evidence of the defendant's innocence on

the grounds that it constituted hearsay, was of minimal relevance, and was unduly prejudicial and

confusing under Rule 403. But, in that case, even assuming that the offer to cooperate demonstrated the defendant's state-of-mind, it would only have demonstrated his state of mind after he was charged with the crime and not during his commission of the crime. Likewise in *United States v. Davidson*, 308 F. Supp.2d 461 (S.D.N.Y. 2004), the statement at issue was made not at the time of the commission of the alleged crime but months after and constituted no more than the defendant's "version of what took place months earlier," *id.* at 480. It therefore was "not reliable evidence of [the defendant's] state of mind at the time when the allegedly criminal acts were taking place." *Id.*

In this case, by contrast, the interaction with law enforcement occurred during the commission of the alleged crimes and is being offered not to show some prior state of mind but to show the defendant's state of mind contemporaneously with the commission of the alleged crimes. The indictment alleges that the defendant "[t]hreaten[ed] to turn the Victims in to law enforcement in light of their purported confessions, which threats were made to further the purposes of the Enterprise, including the continued obedience of the Victims, the enrichment of the Enterprise, and evasion of detection by law enforcement." Dkt No. 292 ¶ 7(j). Defendant is entitled to prove that he collected the confessions not to threaten the Victims and not to evade detection by law enforcement but to use the confessions with law enforcement and to invite an investigation of what he believed to be a crime against himself. The defendant may not be able to establish that defense (and it may not be a defense to some of the charges in the Indictment), but the law does not prevent him from trying. The evidence falls within the protection of 803(3). *See United States v. DiMaria*, 727 F.2d 265 (2d Cir. 1984); *United States v. Harris*, 733 F.2d 994 (2d Cir. 1984); *United States v. Lawal*, 736 F.2d 5 (2d Cir. 1984).

For the same reasons, the Court rejects the Government's argument that the Court should exclude the evidence as irrelevant.

### H.     Motion to Preclude Trial Participants from Referring to the Complaining Witnesses as "Victims" or from Using Inflammatory, Confusing, or Unduly Prejudicial Language

Ray moves to preclude the Government's lawyers and witnesses from referring to the complaining witnesses in this case as "victims." The Government opposes the motion but also states that it intends to refer to the complaining witnesses as victims only in its opening and closing statements and that its expert Dr. Hughes may refer to victims generically. The defense motion is granted in part and denied in part.

The defense cites to a number of cases in which courts have held that it constitutes improper vouching and is inconsistent with the constitutional presumption of innocence for the Government and its witnesses to refer to complaining witnesses as "victims" in a case where the defense is that no crime occurred. *See State v. Sperou*, 442 P.3d 581, 590 (Or. 2019) (holding that "the use of the term "victim" to refer to the complaining witness or other witnesses, in circumstances where the accusers' own testimony is the only evidence that the alleged criminal conduct occurred, conveys the speaker's belief that the accusers are credible" and that "where a defendant denies that any crime occurred, references to the complaining witness as a 'victim' may undermine the presumption of defendant's innocence because it assumes defendant's guilt, a fact that is necessarily not proved until the jury finds the defendant guilty"); *State v. Albino*, , 24 A.3d 602, 615 (Conn. App. 2011) ("[I]n a case where there is a challenge as to whether a crime occurred, the repeated use of the words victim, murder and murder weapon is improper"); *Jackson v. State*, 600 A.2d 21, 25 (Del. 1991) (opinion on motion for clarification of opinion and/or rehearing *en banc*) (holding that it is improper for the prosecutor to repeatedly use the term "victim" "in a case where consent was the sole defense, and the principal issue one of

credibility," because it would "suggest to the jury, that a crime necessarily had been committed" whereas "if the defense of consent were accepted by the jury, no crime would have been proven and the complaining witness would not be deemed a victim"); *State v. Devey*, 138 P.3d 90, 95 (Utah 2006) (holding that "where a defendant claims that the charged crime did not actually occur, and the allegations against that defendant are based almost exclusively on the complaining witness's testimony—the trial court, the State, and all witnesses should be prohibited from referring to the complaining witness as "'the victim'"); *Allen v. State*, 644 A.2d 982, 983 n.1 (Del. 1994) ("[W]hen, as here, consent is the sole defense in a rape case, the use of the term 'victim' by a prosecutor at trial is improper and to be avoided."); *State v. Nomura*, 903 P.2d 718, 721 (Haw. App. Ct. 1995) ("[T]he term 'victim' is conclusive in nature and connotes a predetermination that the person referred to had in fact been wronged. Because the question of whether Witness had been abused was a question yet to be decided by the jury, it was improper to refer to her as 'the victim.'"); *cf. United States v. Wagner*, 2022 WL 19179, at *6 (S.D.N.Y. Jan. 3, 2022) (precluding the Government from referring to defendant's ex-girlfriend as a "victim" where the charge did not involve a victim and the probative value of such a reference was "outweighed by the risk of unfair prejudice under Rule 403").[7]

As a general matter, the Court finds those cases persuasive.  Indeed, the Government appears tacitly to concede that there is no need for it or its witnesses to refer to the alleged victims in this case as victims outside of jury addresses.  At the same time, however, the motion sweeps too broadly.  The defense would preclude the Government from referring to the alleged

---

[7] *United States v. Lussier*, 2019 WL 2489906, at *5 (D. Minn. June 15, 2019) and *United States v. Henery*, 2015 WL 409684, at *5 (D. Idaho Jan. 29, 2015) are not to the contrary.  Neither considered whether it is proper for the Government and witnesses to refer to the complaining witnesses as victims when the defense is that no crime occurred and that there were no victims.

victims as victims even in its jury addresses.  But the Government is permitted to lay out for the

jury in its opening statement what it expects the evidence to prove, including that the

complaining witnesses are victims and in its closing statement what it believes that the evidence

has proved, again that the witnesses are victims.  *See United States v. Perez*, 144 F.3d 204, 210

(2d Cir. 1998) ("what might superficially appear to be improper vouching for witness credibility

may turn out on closer examination to be permissible references to the evidence in the case"); *see

also United States v. Arias-Javier*, 392 F. App'x 896 (2d Cir. 2010) (summary order) ("The

prosecution is permitted vigorously to argue for the jury to find its witnesses credible as long as

it does not link its own credibility to that of the witness or imply the existence of extraneous

proof supporting the witness's credibility").  There is no basis for the further restriction the

defense motion asks the Court to impose.

    Recognizing that a number of judges in this District have declined to issue an order

similar to the one the defense requests in this case, *see, e,g, United States v. Benjamin*, 18 Cr.

874 (JSR) (S.D.N.Y.), Tr. of May 8, 2019, ECF No. 53 at 6; *United States v. Dupigny*, 18 Cr.

528 (JMF) (S.D.N.Y.), Tr. of Oct 17, 2019, ECF No. 198 at 49–50; *United States v. Maxwell*, 20

Cr. 330 (AJN), Tr. of Nov. 1, 2021, ECF No. 465 at 4–5, the Court respectfully disagrees.  Each

case must be judged on its own facts.  Unless the defense opens the door, the Government is

ordered not to refer, in the presence of the jury, to the alleged victims as victims outside of its

jury addresses.[8]

    The defense also moves to preclude the Government and its witnesses from using

inflammatory terms such as "brainwash," "cult," "gaslighting," grooming," and "lieutenant."

---

[8] Unless the defense opens the door, the Government experts may refer generally to victims but
not to the alleged victims in this case as victims.

It argues that such terms pose a grave risk of prejudice and also threaten to intrude upon the Court's role in instructing the jury on the applicable law and on the jury's role in applying the law to the facts before it.  It further contends that words such as "cult" and "groomer" presuppose the ultimate issue of lack of consent and will express to the jury the legal conclusion that Ray committed the conduct of which he is accused.   The Government states that it does not expect to use the words "brainwash" or "cult" but cannot preclude that a witness from using those terms unexpectedly and without being prompted.  The Government does expect to use the words gaslighting, grooming or lieutenant.  For example, Dr. Hughes will describe certain characteristic coercive tactics including gaslighting and grooming.  The defense motion is denied.  Unlike the word "victim," terms such as "gaslighting" and "grooming" do not presume the ultimate issue before the jury.  They are central to the Government's presentation of the facts of the case.  The Government is permitted to use the terms.

I.      **Similar-Incidents Evidence Regarding Ray's Ex-Wife and Two Ex-Girlfriends**

In its opposition to the Government motion in limine, the defense seeks to exclude the Government from offering evidence of prior incidents of alleged violence and financial exploitation in intimate relationships involving Ray's ex-wife and two ex-girlfriends.  Dkt. No. 371 at 37.  The Government claims that the evidence is relevant to show Ray's intent, plan, and knowledge.  The defense objects that the prior acts do not bear a similarity or connection to the charged conduct and are not relevant, and that, even to the extent the evidence is relevant, that relevance would be outweighed by the risk of unfair prejudice.

Rule 404(b) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  Evidence of other acts "may be

admissible for another purpose, such as proving . . . intent, . . . plan, [or] knowledge."  Fed. R.

Evid. 404(b)(2).  "[A] district court may not freely admit evidence of conduct simply because it

relates to the charged crimes or the government offers it for a purpose other than to demonstrate

the defendant's propensity to commit the alleged conduct."  *Zhong*, slip op. at 18.  But the

government "to offer '"other act" evidence . . . to show knowledge or intent' only when 'such

evidence [is] "sufficiently similar to the conduct at issue" to permit the jury to draw a reasonable

inference of knowledge or intent from the other act.'"  *Id.* at 18–19 (quoting *United States v.

Cadet*, 664 F.3d 27, 32 (2d Cir. 2011)).

By letter dated February 23, 2022, the Government stated that it seeks to introduce only

the testimony of one of Ray's ex-girlfriends, Valerie.  Dkt. No. 379.  As directed by the Court at

the February 22, 2022, oral argument, the defense shall respond to the Government's letter by

5 p.m. on February 28, 2022.  The Court will reserve decision on this issue until it has reviewed

the defense's submission.

### J.    Cleo

The Second Superseding Indictment specifically alleges that "Ray led the Enterprise and

targeted a group of college students and others (the 'Victims') for indoctrination and criminal

exploitation by the Enterprise."  Dkt No. 292 4.  The Government represents that the "others"

includes Cleo.  The Government moves in limine for an order Cleo be permitted to testify only

under her first name at trial and that cross-examination be limited to exclude questions regarding

her home and work address, and phone number, and the identity of her employer.  The alleged

victim Cleo is an older professional in her fifties who allegedly turned to the Defendant for help

in clearing up her regulatory paperwork after she lost her job in the financial services sector at a

large bank as a result of misconduct by her then-husband.  Instead of providing help, the

Defendant allegedly extorted her by forcing her to make confessions and then demanding

repayment for the allegedly victim's supposed wrongdoings, extracting payments of, on average, between $10,000 to $20,000. Over time, the alleged victim gave an estimated $100,000 to $200,000 to Defendant. The Defendant also tried to force the alleged victim to give him the proceeds from the sale of her co-op apartment in Manhattan in payment for the help he provided to her, but—after her attorney became suspicious and caused the proceeds to be placed into an escrow account—she ceased communications with him. Even then, the Defendant allegedly launched a website about her with her name which discussed her dishonesty.

The defense opposes that motion and also argues that evidence regarding the alleged extortion of Cleo should be excluded as irrelevant. As to relevancy, it argues that the extortion of Cleo from 2010 to 2011 is standalone uncharged crime that is outside of the time frame and scope of the alleged Enterprise and does not share a nexus with the other alleged extortions because Cleo is decades older than the other alleged victims, did not live with Ray, and had her own well-established career at the time of the alleged crime at issue. As to permitting the witness to testify by her first name, the defense argues that doing so would wrongly suggest to the jury that she feared violent reprisals from Ray as a consequence of her testimony. It points out that any professional harm caused to the alleged victim by using her full name would be purely speculative, as she uses a different last name professionally and that the planned testimony has nothing to do with sex or with particularly embarrassing information. The defense indicates it has no intention to elicit information regarding the witness's address or phone number but that it does intend to elicit evidence that she worked as a financial adviser for years, including the names of her employers, because that evidence is relevant to her anticipated testimony relating to financial transactions with Ray

The defense's motion to preclude testimony from Cleo is denied.  The testimony is not "other acts" testimony; it is charged by the Indictment.  The Indictment charges that "Ray led the Enterprise and targeted a group of college students *and others* (the 'Victims') for indoctrination and criminal exploitation by the Enterprise."  Dkt No. 292 ¶ 4 (emphasis added).  The Government has represented that Cleo is among the "others."  The Government also has proffered evidence that the extortion of Cleo falls within the scope of the racketeering conspiracy alleged in the indictment.  Contrary to the defense argument, the time frame of the alleged extortion of Cleo falls squarely within the time period of the racketeering conspiracy alleged in the indictment, which charges a racketeering conspiracy from at least in or around 2010 including in or around 2020.  Dkt. No. 292 ¶ 8.  The extortion of Cleo occurred in 2010 to 2011. It thus also falls within the scope of the conspiracy, the purposes of the Enterprise, and the means and methods of the Enterprise.  The purposes of the Enterprise are alleged to include enriching the members and associates of the Enterprise through extortion.  Dkt. No. 292 ¶ 6(a).  The means and methods of the Enterprise include "[e]xtracting purported confessions from the Victims that they had caused harm and damage to members and associates of the Enterprise," "[d]ocumenting and retaining Victims' purported confessions," and "[e]xtorting money from the Victims."  *Id.* 7(f)-(h).  It also involved the same persons who either were members of the Enterprise or other of its alleged victims.  According to the Government proffer, interrogations of Cleo were "often conducted in the presence of the Enterprise's other victims" and "sometimes with their participation."  Dkt. No. 327-1 at 7.  To the extent the predicate acts involve both Cleo and the college students, the evidence, if believed, appears to satisfy the requirements of horizonal and vertical relatedness.  *See United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992).  The evidence thus is relevant.

The Government's motion that Cleo testify by pseudonym also is denied.  The alleged victim will testify by her full name and will be subject to cross-examination regarding her employer and her employment background.  The burden is on the Government to provide a reason why the jury should not be permitted to hear the witness's full name and the identity of her employer.  *See United States v. Marti*, 421 F.2d 1263, 1266 (2d Cir. 1970).  "[T]he reason may be that the answer may subject the witness to reprisals or that the question is being used to humiliate or annoy the witness." *Id.* (citing *Alford v. United States,* 282 U.S. 687, 694 (1931)).  "The defendant is then required to demonstrate a 'particularized need' for disclosure of the relevant information, which the court weighs against the risks to the witness." *United States v. Marcus*, 2007 WL 330388, at *1 (E.D.N.Y. Jan. 31, 2007) (citing *United States v. Bennett,* 409 F.2d 888, 901 (2d Cir.1969) and *United States v. Cavallaro,* 553 F.2d 300, 305 (2d Cir.1977)).

The Government argues that Cleo should be permitted to testify under her first name because she worked as a financial advisor at a large bank and expects to suffer reputational damages and embarrassment and "severe professional consequences if the defendant's behavior towards her, including extortion, violence, and a process of interrogation and induced confessions, if publicized or disclosed to her professional colleagues and clients."  Gov't Letter (Feb. 11, 2022) at 4.  It argues that she fears that she may be fired or lose the trust (and therefore the business) of her clients if they learn about her association with the Defendant and her testimony at trial.

These generalized, speculative concerns do not demonstrate a genuine risk of reprisal or that the questioning will be used to humiliate or annoy the witness.  The concern that the financial institution or its clients may learn that Cleo was a victim of the Defendant is not sufficient to permit her to testify by pseudonym.  In our society, it is not uncommon that

individuals can end up being the victims of fraud or extortion, or claim to be so.  The Government's argument, carried to its logical limit, would permit any victim of crime (or at least of fraud or extortion) to testify by pseudonym for fear that by revealing the victim's true name the public will learn that she was "duped" by a defendant.  The risk is even more attenuated here where the alleged victim does not do business professionally under the name by which she will testify in court.  The alleged victim also has indicated that she is reluctant to testify in public and might not appear if she is not granted some degree of anonymity.  But it also is not uncommon that alleged victims are reluctant to appear in court for any number of reasons.  If it were sufficient that the Government proffer that the victim will not appear voluntarily unless she is granted anonymity, any witness could get such anonymity merely on the basis of the Government request.  If the Government really wants the testimony of Cleo and it is not able to get it voluntarily without the anonymity the Court will not grant, the Government has ways of compelling attendance.  It is not for the Court to make the Government's job easier.

The articulated concern is speculative in yet another manner.  The Government application is also based on supposition that it will not get out to the public or to colleagues and clients at work that she is a witness at trial.  There is no reason for any participant in this trial to publicize that Cleo will be testifying, but the Court views it as unlikely that even if Cleo were able to testify only by first name but still give the full account of her alleged victimhood in this high-profile case her participation in it will not be revealed and the purported protection of testifying by pseudonym will prove to be illusory.  At the same time, there are real costs to Cleo testifying by first name alone.  There is the risk that the jury will misunderstand the reason that she is testifying by first name alone and believe that it is because of the risk of reprisal from Defendant, and not from her employer.  There is also the risk to the integrity of the trial itself.

Without being able to mention Cleo's full name during voir dire, there is no assurance that a member of the jury will not be seated who knows or is familiar with Cleo.

The cases cited by the Government are inapposite. In *United States v. Paris*, 2007 WL 1484974, at *2 (D. Conn. May 18, 2007), the victim-witnesses who were permitted to testify by their first names and the first initials of their last names were minors who testified they worked as prostitutes for the defendant and who since then had made substantial progress in getting their lives on a constructive and productive course. The court found revelation of their full names would result in a "great setback" to them. In *United States v. Jacobson*, 785 F. Supp. 563, 569 (E.D. Va. 1992), the court held that the victims could testify by pseudonyms and keep their true identities secret, but that was because the charge was that the defendant had caused the artificial insemination of the victims with his own sperm rather than using sperm from an anonymous donor as was represented; revelation of the full names of the parents who were artificially inseminated would have caused harm to the psychological health and welfare of the children who were literally the product of the defendant's fraud. *United States v. Kelly*, No. 19 Cr. 286 (E.D.N.Y.), and *United States v. Maxwell*, 20 Cr. 330 (S.D.N.Y.) both involved testimony by the alleged victims that when they were children they were subject to sexual abuse by the defendant; the witnesses were expected to testify " in explicit detail about degrading and humiliating treatment in a trial that garnered a lot of media attention and where there was significant risk of humiliation and reprisals." *Kelly*, No. 19 Cr. 286 (E.D.N.Y. Nov. 4, 2021), ECF No. 255 at 20. Finally, in *United States v. Loera*, 2018 WL 2744701, at *6 (E.D.N.Y. June 7, 2018), the defendant was the leader of a large Mexican drug cartel and the witness had received protection for his testimony at trial. There was a real risk of reprisal or harassment by the defendant or those associated with him.

In this case, by contrast, the testimony of Cleo does not relate to sexual harassment or abuse; she was the subject of an alleged extortion.[9]  The Government does not claim that Cleo will be the subject of reprisal or harassment by the Defendant, or anyone associated with him. The risk that she will be the subject of reprisal by her employer for her truthful testimony is purely speculative.  And there is reason to question whether the protection that any order keeping her identity secret at trial would, in the long run, be anything other than illusory.

### K.    Information Alleged Victims Heard from Each Other During the Course of the Alleged Conspiracy

The defense objects to the introduction by the Government of statements by witnesses as to what they heard from other witnesses about an incident that they did not personally observe. The motion apparently is based on statements in the 3500 disclosures.  But interviews conducted in the course of an investigation are intended to elicit information that may go beyond what would be admissible in court.  The Government has not indicated it intends to offer any of the statements at issue.  Thus, the motion is premature.

### L.    Exclusion of Observations of Tina Sheppard and of Testimony by Julie Schulman

In its reply brief, the defense moves to exclude opinions by Government witness Tina Sheppard and the testimony of Julie Schulman, a doctor who examined Ray.  Both motions are made after the deadline for in limine motions.  The Court will not consider them in limine.  It will consider any issues at trial.

### CONCLUSION

The motions in limine are GRANTED in part and DENIED in part.

---

[9] The Court is in receipt of a letter dated February 24, 2022, requesting that other alleged victims be permitted to testify under their first names.  Nothing in this Opinion should be read to prejudge that application.  Throughout this Opinion, the Court has referred to the alleged victims by their first names only pending a decision on that application.

The Clerk of Court is respectfully directed to close Dkt. Nos. 323 and 324.


SO ORDERED.

Dated: February 24, 2022
New York, New York

LEWIS J. LIMAN
United States District Judge