# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

February 25, 2022

**Via Email**[*]

Honorable Lewis J. Liman
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:    **United States v. Lawrence Ray**
       **20 Cr. 110 (LJL)**

Dear Judge Liman:

We write in response to the government's letter of February 24, 2022 seeking a Court order permitting five prosecution witnesses to testify using only their first names at Mr. Ray's upcoming trial. This request should be denied both because it is moot and because the government cannot carry its burden to justify such an imposition on Mr. Ray's (and the public's) right to a public and open trial.

As an initial matter, the government's request should be denied because the government has expressly waived the concerns it now purports to raise. As the Court knows, the full names of three of the complaining witnesses were used by the parties and the Court during the February 22, 2022 hearing at which members of the press were present. Before these names were used, the government was asked directly by the Court at the outset of the hearing whether the alleged victims' full names could be used in that proceeding and going forward, and (other than with respect to one witness and a then-pending motion with respect to another) the government agreed that full names could be used. *See* Ex. A, Tr. 2:23–3:8 (Feb. 22, 2022). Whatever potential concerns might have justified sealing the identities of the complaining witnesses up to that point, the government waived them by expressly agreeing to the use of the witnesses' full names at the February 22, 2022 public proceeding.

In fact, beyond the use of the complaining witnesses' full names during the February 22, 2022 proceeding, the identities and full names of these individuals have been matter of public record and widely publicized for nearly three years. The April 2019 *New York* Magazine article that prompted the government's investigation included the complaining witnesses' first names,

---

[*]    The defense files this submission under seal out of an abundance of caution pending the Court's ruling on the government's application, but believes its letter and most of its attachments can and should be filed publicly.

as well as barely obscured photographs of them as its lead cover art. *See* Ex. B. This article and cover art remain up on the website for *New York* Magazine.

After the identities of the complaining witnesses were revealed (or, at least, not obscured) by the *New York* Magazine article, many other media outlets picked up on the *New York* Magazine story and published additional articles about the complaining witnesses that included their full names and other, unobscured pictures. For example, an April 19, 2019 article in the *Daily Mail*, which is still publicly available on that publication's website, includes the full names and photographs of each of the complaining witnesses. *See* Ex. C. This article was published in "one of the largest online news destinations in the world," which in the year of the article's publication, "attracted around 218 million global unique visitors" in one month, including "85 million uniques" from the United States alone. *See* Ex. D. The *Daily Mail* has subsequently published additional content regarding this case, including a video showing and naming in full one of the complaining witnesses leaving a court hearing in this matter. *See* Ex. E at 4. Unsurprisingly, following the publication of the *New York* Magazine and *Daily Mail* articles, other publications have published articles including the complaining witness's full names and photographs or videos. *See, e.g.*, Ex. F.

Given these facts, the government's assertion that "testimony using first names will protect the victims' privacy" is plainly wrong. Gov't Ltr. at 1 (Feb. 24, 2022). All of the complaining witnesses' names have been made public by one of the most-widely viewed publications in the world, describing allegations that will be the subject of their testimony at trial, and this information has been widely disseminated since then. Moreover, even if these witness's identities had remained secret (which they have not), as the Court just recently recognized in denying the government's request to permit another alleged victim to testify using only her first name, it is "unlikely that even if [the witnesses] were able to testify only by first name but still give the full account of [their] alleged victimhood in this high-profile case [their] participation in it will not be revealed and the purported protection of testifying by pseudonym will prove to be illusory." Dkt. No. 382 at 63.[1]

Accordingly, the government's request should also be denied as moot. *Cf. United States v. Marshall*, No. 08 Cr. 50079 (VLD), 2010 WL 1409445, at *4 (D.S.D. Apr. 1, 2020) (finding that government's invocation of the "law enforcement privilege" to shield the name of a confidential informant was moot because "the identity of the former confidential information is a matter of public record," "the witness' name is widely known and is readily available to the public," and the "otherwise justifiable concern for protection of the witness identify is moot" because "there is no secret identity or anonymity to protect").

---

[1]   Indeed, the underlying events at issue have also been the subject of a widely-publicized book written by one of the other complaining witnesses and will be the subject of an in-development movie/TV series on a leading streaming service. Any temporary anonymity granted in this proceeding will be fleeting.

In addition, the "real costs" to the "integrity of the trial" that the Court identified in denying the government's previous request for witness pseudonymity are just as present here, if not more so. Significantly, "[t]here is the risk that the jury will misunderstand the reason that [the witnesses are] testifying by first name along and believe that it is because of the risk of reprisal from [Mr. Ray]." Dkt. No. 382 at 63. While the government has alleged that the complaining witnesses have been threatened and/or expressed fear of retaliation from Mr. Ray, whether the witnesses were, in fact, threatened or had such a fear, and whether such fear was well-founded will be crucial factual issues for the jury to determine in reaching their verdict. Allowing the complaining witnesses to testify using a pseudonym will communicate to the jury, no matter what limiting instruction is provided, that such a fear has been found legitimate by the Court and will improperly put the Court's imprimatur on the government's theory of the case.

Furthermore, as the Court noted in denying the government's previous request, without using the witnesses' full names during voir dire, there is no assurance that a member of the jury will not be seated who knows or is family with the witnesses. Dkt. No. 382 at 63. Such an outcome is five times more likely to occur if the Court were to grant the government's present request relating to five separate witnesses (compared to the previous individual), all of whom lived and spent decades in the New York area.

The government is also wrong when it claims that there is no particularized need to disclosure the victims' full names at trial. The government's own exhibit list is replete with potential evidence and information that can only be authenticated or admitted by the use of the witness's own names. For example, the government seeks to introduce numerous emails purportedly sent by or to the complaining witnesses, or files taken from the iCloud, Google Drive, or Microsoft OneDrive accounts purportedly belonging to the complaining witnesses. These accounts are registered in the witnesses' full names and the email addresses themselves reveal the last name the government now seeks to obscure. *See, e.g.*, Ex. G (GX 1300); Ex. H (GX 1313). Evidence from these accounts can only be authenticated and admissible if the alleged senders/recipients testify that, among other things, the accounts from which these emails or files came are in fact the theirs. Indeed, the government itself has proposed to the defense that the parties stipulate to the authenticity of these files because they came from accounts that were registered using the complaining witness's full names. *See* Exs. I, J (government proposed stipulations).

Similarly, the hundreds of email exhibits the government has included on its exhibit list can only be admitted if a proper foundation is laid—i.e., that the sender/recipient was who the email says it was. Precluding the use of the full names shown in the emails, email addresses, and subscriber information corresponding to the electronic discovery severely reduces (if not eliminates entirely) the purported circumstantial evidence establishing the foundation for this evidence, if the witness does not specifically remember sending or receiving the individual communications. The same is true for certain recorded telephone calls to financial institutions and businesses, in which the speakers used the full names of certain complaining witnesses. The circumstantial evidence supporting the authenticity and/or admissibility of these pieces of evidence (and countless others on the government's exhibit list) is eviscerated if the speakers are not using their full names.

3

The defense also anticipates that complaining witnesses will testify at this trial that they previously testified in a New York City housing court proceeding that they had harmed Mr. Ray. The case file in that matter is and remains publicly accessible and reflects several complaining witnesses' full names. Certain complaining witnesses are also co-litigants with Mr. Ray in various litigations the dockets for which are publicly accessible online, including in this District.

Finally, as the Court has already recognized, in denying the government's motion to have another alleged victim testify using only her first name, "the burden is on the Government to provide a reason why the jury should not be permitted to hear the witness's full name." Dkt. 283 at 62 (citations omitted). In denying the government's previous request, the Court distinguished the government's cases, noting that the witnesses in those cases were either minors or had a well-founded fear of one of the most notorious and violent leaders of an international drug cartel. *Id.* at 64. Because the alleged victims here were all adults during the course of the alleged conduct in this case, the concerns that animated the rulings in *Paris*, *Kelly*, and *Maxwell* are not present.[2] While the subject matter of the anticipated testimony at trial may be uncomfortable or distressing for the complaining witnesses, the defense's cross-examination will be no more intrusive than what the government will be seeking to elicit on direct examination.[3]

For all these reasons, the government's application should be denied.

Respectfully submitted,

/s/

Allegra Glashausser, Esq.
Marne L. Lenox, Esq.
Peggy Cross-Goldenberg, Esq.
Neil P. Kelly, Esq.

cc: Counsel of record

Enclosures

---

[2] If the Court denies the government's request with respect to the complaining witnesses, the request with respect to the mother of three of the complaining witnesses should similarly be denied.

[3] The defense will, of course, not pursue any line of questioning with the purpose of "humiliating" or "annoying" any witness, again with the understanding that the mere subject matter of their testimony on direct examination might evoke such feelings in the witnesses. The Court can also always rule on objections to potential questions it deems irrelevant, cumulative, intended to harass, or otherwise inappropriate. *See, e.g.*, *Smith v. Illinois*, 390 U.S. 129, 133 (1968) (emphasizing that even when anonymity is not warranted, the court has a duty to protect a witness "from questions which go beyond the bounds of proper cross-examination merely to harass, annoy or humiliate him").

4

# EXHIBIT A

M2MNRAYO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                      20 Cr. 110 (LJL)

LAWRENCE RAY,

         Defendant.         Oral Argument

------------------------------x

                           New York, N.Y.
                           February 22, 2022
                           10:30 a.m.

Before:

                 HON. LEWIS J. LIMAN,

                         District Judge

                APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
BY:  DANIEL R. SASSOON
    MOLLIE E. BRACEWELL
    LINDSAY KEENAN
    Assistant United States Attorneys

MARNE L. LENOX
PEGGY CROSS-GOLDENBERG
ALLEGRA GLASHAUSSER
NEIL P. KELLY
    Attorneys for Defendant

M2MNRAYO

1          (Case called)

2          THE DEPUTY CLERK:  Starting with counsel for the

3     government, please state your appearance for the record.

4          MS. SASSOON:  Good morning, your Honor.  Danielle

5     Sassoon, Mollie Bracewell and Lindsey Keenan, for the United

6     States.  And we're joined in the courtroom by Special Agent

7     Kelly McGuire of the FBI.

8          THE COURT:  Good morning.

9          MS. GLASHAUSSER:  Good morning, your Honor.  Allegra

10    Glashausser, Marne Lenox, Peggy Cross-Goldenberg and Neil

11    Kelly, representing Mr. Ray.

12          THE COURT:  Good morning.

13          And good morning, Mr. Ray.

14          We are here today for oral argument on the motions *in*

15    *limine*.  I previously issued an order dated February 20, 2022,

16    identifying specific motions as to which it would be helpful to

17    have argument.  With respect to those motions and the remainder

18    of the motions, I expect to be able to render a written

19    decision shortly.  As to the remainder, I don't think that I

20    particularly need argument.

21          Before we get to the motions, there are a couple of

22    preliminary things that I wanted to address.

23          One of them is that in my February 20 order I directed

24    the government to inform the Court whether the alleged victims

25    in this case needed still to be referred to by pseudonym.

1          Ms. Sassoon, why don't you address that.

2          MS. SASSOON:  Yes, your Honor.

3          I think we misread the order, so I can just put on the

4     record now that, beginning at this conference, apart from the

5     victim whose name we move to testify under a pseudonym, we

6     think it is appropriate to begin referring to victims by their

7     names, with one exception, which I alerted your deputy to, and

8     defense counsel to, given her unique present circumstances.

9          THE COURT:  And that's Jane Doe 1, is that right?

10          MS. SASSOON:  That is right.  That is correct.

11          THE COURT:  Ms. Sassoon, with respect to prior filings

12     as to which the names were omitted, the question has occurred

13     to me, having canceled those, it would be a lot of work I

14     assume right now as the parties are preparing for trial to

15     refile sets of papers.  What I had in mind was the government

16     submitting a letter that would be on ECF that would indicate

17     the proper names that correspond to the Jane Does and the John

18     Does.

19          Would that be acceptable, and what do you think of

20     that?

21          MS. SASSOON:  Yes, your Honor.  Thank you for the

22     suggestion.  That will spare us some work.

23          THE COURT:  There may be a need to engage in that work

24     at some point.

25          Ms. Lenox, what's your view on that or

M2MNRAYO

1    Ms. Glashausser?

2         MS. GLASHAUSSER:  That's fine with us, your Honor.

3    Thank you.

4         THE COURT:  Okay.

5         The second thing is that I understood from my

6    courtroom deputy the parties wanted to discuss the trial

7    calendar.  Is that correct?

8         Ms. Lenox?

9         MS. LENOX:  Yes, we do, your Honor.

10         So, we understand that your Honor's preferred schedule

11   would be 9:30 to 5 p.m. Monday through Thursday with a half day

12   on Friday.

13         The defense had been speaking with the government,

14   although their position on this may have changed so I am not

15   going to speak for them, but in the defense's perspective, I

16   think a shorter day, with Friday being not a half day, makes

17   more sense, and I'll explain why.

18         One, because Mr. Ray is incarcerated and so for

19   reasons like the delay today I think in reality he may not make

20   it to the courtroom until 9:30 or 10 in the morning, which

21   would delay things unnecessarily.

22         I think the second reason is that I don't believe that

23   shortening the day would actually have much of an effect on the

24   ability to get in as much testimony.  I don't think it would

25   cut into testimony because our proposal would be that we have a

M2MNRAYO

1    truncated day with a limited break.  So, rather than a full

2    lunch hour, it would be, for example, 10 to 3 every day with a

3    half an hour lunch break.

4         We also anticipate having, given the nature and

5    complexity of this case, a number of arguments that will

6    probably have to occur before or after the trial day.  Having a

7    more truncated day for the jury would allow the jury not to

8    have to wait during those arguments, assuming that they happen

9    in the morning.  The jury is here at 9:30, even if we started

10   argument at 9, depending how long it went, the jury may be

11   waiting unnecessarily.

12        So, for those reasons and also personal ones having to

13   do with child care in the morning, we would ask the Court for a

14   schedule that is along the lines of 10 a.m. to 3 p.m. each day

15   of the week with a half an hour lunch break.

16        THE COURT:  Ms. Lenox, let me ask you one question.

17   When you say 10 to 3, do you mean that that's when the jury

18   would be present?  I ask that question because I do have in

19   mind that there will be occasions where I will need to address

20   counsel before the jury comes in.  I won't necessarily need

21   every one of the lawyers here, just the lawyers who want to be

22   here and need to be here to address the questions.

23        MS. LENOX:  Certainly, your Honor.

24        And, yes, that is the proposal.

25        THE COURT:  Okay.  Let me hear from Ms. Sassoon.

M2MNRAYO

1          MS. SASSOON:  Yes, your Honor.  So, as defense counsel

2     accurately stated, our position has evolved on this a little

3     bit.  In prepping our witnesses, it is apparent that their

4     testimony is going to be lengthy.  We expect that the

5     cross-examinations will be lengthy.

6          We have concerns about a shorter day, which would then

7     keep some of these victims on the stand for days.  Our

8     preference is to start earlier in the morning, so start with

9     the jury at 9:30.  If there are issues to address on a

10     particular day, we could begin at 9 or earlier or tell the jury

11     that they can come a little bit later that particular day.

12          If we had a 10-to-3 schedule with a half hour break,

13     that would amount to four and a half hours of testimony; a

14     9:30-to-5 day with a one-hour break would amount to six and a

15     half hours of testimony.

16          We are not wedded to ending at 5, but I think a longer

17     day would help keep the trial going and ensure that we end

18     before April.  We are concerned with the shorter day that the

19     trial could drag into April.

20          The only other thing is, if we're going to have a

21     shorter day, I think a 9:30 start potentially makes more sense

22     if the jury has less time to eat.  If they got out at 2:30,

23     that is a little easier for them than if they get out at 3.

24          THE COURT:  I am going to take it under advisement and

25     I'll let you know I think at the time of the pretrial

M2MNRAYO

1    conference.

2          So, the last couple of things that I had have to do

3    with the defense motion for reconsideration.  And I have

4    rendered a decision on that.  I'm prepared to read that.

5          The defense moves for reconsideration of my order

6    denying its prior request for a *Franks* hearing in connection

7    with its motion to suppress materials seized pursuant to a cell

8    site location information warrant, an e-mail accounts warrant,

9    and an iCloud accounts warrant.  The motion to suppress was

10   based on the assertion that the warrant affidavits omitted

11   information calling into question the reliability of FV-1.  The

12   motion now before me is based on information turned over as

13   part of the 3500 material that a witness told a government

14   agent prior to the affidavits being prepared that he had been,

15   the witness had been told by several of Female Victim 1's

16   friends that she embellished things at times and was

17   pathological.  The witness also relayed that Female Victim 1

18   had told him, allegedly untruthfully, that she had failed her

19   driver's test when in fact she had never taken her driver's

20   test and offered an anecdote that at one time while the witness

21   and Female Victim 1 were in their sophomore year at school,

22   Female Victim 1 described seeing something that was glowing on

23   a walking path near the dorm, which the witness knew must have

24   been an embellishment because there was no way it could be

25   true.

M2MNRAYO

1          The motion also is based on Female Victim 1's

2      statements to the FBI in July 2019.  At that time Female Victim

3      1 relayed that she had concealed that she had a job working

4      with a particular named individual and -- I'm sorry.  Let me

5      start again.  Female Victim 1 relayed that she had concealed in

6      a conversation with Mr. Ray that she had a job working with a

7      particular named individual and told Mr. Ray instead that that

8      individual was a prostitution client.  In October 2021, Female

9      Victim 1 admitted to the government that the individual was a

10     prostitution client.  The defense has also offered evidence

11     that when the government met with that individual in May 2019,

12     he stated that he did not have a sexual relationship with

13     Female Victim 1, but the defense has also offered evidence to

14     suggest that the government believed that the male individual

15     was not being fully open at the time, even though the

16     government at that time also said that it did not have

17     knowledge to contradict what the individual said.

18          The motion is denied.  A motion for reconsideration is

19     not an opportunity to relitigate an issue previously decided by

20     Court, unless there is something the Court overlooked.  *Shrader*

21     *v. CSX Transportation Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).

22     In the Court's May 26, 2021, opinion, the Court considered and

23     rejected the defense's argument that it was entitled to a

24     *Franks* hearing on the basis that the search warrant affidavits

25     omitted evidence that Female Victim 1's friends reported that

M2MNRAYO

1    she stretched the truth for effect and wanted to make herself

2    more exciting and she was best at telling stories.  The

3    evidence that Female Victim 1's friends told the witness that

4    Female Victim 1 embellished things at times is not

5    qualitatively different and is to some extent identical to that

6    which the Court considered on the original motion to suppress.

7         The Court's conclusion doesn't change.  "The fact that

8    a person that a reputation for stretching the truth while in

9    high school does not raise meaningful doubts about that

10   person's credibility with respect to statements that she made

11   years later as an adult to law enforcement about a crime in

12   which she participated but of which she was also a victim."

13        Put another way, the incidents of stretching the truth

14   or even lying to friends in high school does not meaningfully

15   call into question the veracity of Female Victim 1's statements

16   to law enforcement years later that she was extorted, forced to

17   engage in labor, and sex trafficked.  I recognize that some of

18   what the witness told law enforcement relates to their

19   sophomore year in college and not to high school, but that does

20   not change my view that the omission of the information was

21   immaterial to the probable cause determination.

22        The information that Female Victim 1 concealed

23   information from law enforcement about the prostitution client

24   falls into a different category.  That information arguably

25   would have been material if it was known to law enforcement at

M2MNRAYO

1    the time.  But I need not consider that question of whether it

2    was material because there is no evidence it was known to law

3    enforcement at the time of the warrants.

4         That concludes my ruling with respect to that motion.

5         The next issue that I want to discuss is one of the

6    motions *in limine* relates to a summary chart that the

7    government anticipates offering containing factual descriptions

8    of sexually explicit video files that show one of the alleged

9    victims in this case providing "sexual services" to "strangers"

10   in various locations in and near New York City.

11        As I understand it, the defense does not object to the

12   summary chart in theory, but argues that it is premature to

13   rule on the admissibility of the chart because, number one, the

14   evidence upon which it has been based has not been received in

15   evidence and, second, the parties are still meeting and

16   conferring about the contents of the chart.

17        The defense asks that the Court consider an

18   alternative chart and hear the defense's objections to the

19   government's proposed summary judgment.

20        I am prepared to review the defense's alternative

21   chart and to hear the objections to the government's proposed

22   chart.  I am going to direct that the parties meet and confer

23   if they haven't already with respect to the summary chart and

24   that the defense submit its alternative chart --

25        February 25 for the defense?

M2MNRAYO

1            MS. LENOX:  That's fine, your Honor.

2            THE COURT:  -- by February 25 along with letter no

3    more than three pages with its objections to the government's

4    chart.  The government will then respond by the next day,

5    February 26.

6            Then, before we get to argument, and not listed on my

7    list of questions, I did receive from the government copies of

8    the cell site charts.  I wonder if the government would walk me

9    through what I should understand from those charts.

10           MS. SASSOON:  Before we move on, can I just ask for

11   clarification from the Court.  With respect to the summary

12   chart, this chart is intertwined with the evidence about forced

13   labor and the testimony of this particular victim about what's

14   happening in the chart.

15           THE COURT:  My ruling doesn't presage a decision with

16   respect to the admissibility of it.  I would like to make sure

17   that we keep all of the pieces moving.

18           MS. SASSOON:  Understood, your Honor.  Thank you.

19           THE COURT:  I haven't made a decision with respect to

20   the admissibility.

21           MS. SASSOON:  Thank you for the clarification.

22           THE COURT:  I am actually just looking for copies of

23   the cell charts you submitted to me.

24           Do you have an extra set by any chance?

25           MS. KEENAN:  I do, your Honor.

1        THE COURT:  Do you want to pass them up?

2        There are a lot of pages.  You don't have to take me

3   through every one of them.

4        MS. KEENAN:  Okay.  The first several pages of the

5   chart, your Honor, it's double sided, so the first three pages,

6   double sided, are just general information about what cell

7   sites look like so that the jury doesn't think a cell site is a

8   mysterious device and the agent will testify about, you know,

9   how he's able to identify cell sites in these locations from

10  his experience.

11       THE COURT:  Okay.

12       MS. KEENAN:  Following that, there are a couple of

13  pages of phone records extracted from the phone records at

14  issue in this case, so that the agent can describe to the jury

15  what he looks for to tell where a phone is connecting to a

16  particular cell site.

17       THE COURT:  Are these examples actually taken from the

18  records that you expect to offer into evidence?

19       MS. KEENAN:  They are, your Honor.

20       Following that there are a couple of pages with one

21  blank page where you can see a number of small dots on the map

22  and concentric circles.  The small dots reflect the location of

23  actual cell sites from the service provider during the time

24  period at issue, and the concentric circles are meant to

25  identify the distance between the various cell sites so you can

M2MNRAYO

1     see how many sites fall, for example, within 220 yards or a

2     quarter of a mile or a half a mile.

3              THE COURT:  Is there anything magical about the center

4     point on that chart, which looks like it is Park Avenue between

5     35th and 36th Streets in Manhattan?

6              MS. KEENAN:  There's nothing magical about it, your

7     Honor, except there are a number of cell site connections at

8     issue in this case around that area.  There are similar maps

9     for New Jersey.  And I noted in my e-mail to your Honor that

10    there is a blank page because we are awaiting information from

11    AT&T to complete the density issue with respect to Hoboken, New

12    Jersey.

13             Then I think if your Honor turns to the page marked

14    various times on January 9, numbered in chronological order --

15             THE COURT:  I got it.

16             MS. KEENAN:  Okay.  So the rest of the chart sort of

17    follows this pattern where there is a day of cell site

18    information from a given device on the top page and the cell

19    site connections are numbered 1, 2, 3, 4.  So those are in

20    chronological order.

21             I think what the agent would say is that these cell

22    site connections reflect a pattern of travel from somewhere in

23    the vicinity of Piscataway, New Jersey, to somewhere in the

24    vicinity of Midtown Manhattan and then back again beginning at

25    4:11 p.m. on January 9 and returning at 10:59 p.m. on January

M2MNRAYO

1    9.

2          THE COURT:  But I mean presumably there's going to be

3    something that goes before that reflects a pattern of travel.

4    I take it it is going to reflect where the phone is at

5    different points in time.

6          MS. KEENAN:  That's right, your Honor.  So these

7    numbered 1, 2, 3, 4, these are numbered cell site connections.

8    There is a cell site connection at 4:11 p.m. indicating the

9    phone is used in Piscataway at 4:11, then if you travel up, the

10   No. 2 this is a cell site connection in Midtown Manhattan at

11   5:42 p.m., another at 8:48 p.m. indicating the phone is still

12   in Manhattan and then back down at No. 4 at 10:59 p.m. a

13   connection in Piscataway.

14         THE COURT:  Maybe you can look at the next page.  I

15   take it I can use the actual names of individuals on this page?

16         MS. KEENAN:  You can, your Honor.

17         THE COURT:  What I am looking alt is the page that

18   says AT&T cell site locations utilized by Isabella Pollok's

19   device, and AT&T cell site locations utilized by Claudia

20   Drury's device, January 9, 2018.

21         What is the significance of the circle?

22         MS. KEENAN:  So the circle -- and I apologize if these

23   aren't in color.  I think it is a little bit easier to see if

24   they are in color, but the cell site that Claudia Drury's

25   device connected to is within the red circle.  The cell site

M2MNRAYO

1   that Isabella Pollok's device connected to is within the blue

2   circle.

3               THE COURT:  Does that reflect anything about where the

4   device is or something about the strength of the signal from

5   the tower?

6               MS. KEENAN:  I think, referring back to the earlier

7   maps with cell site density and knowing where various cell

8   sites are located in Manhattan during this time period, the

9   agent could say it's very likely that each of these devices are

10  being used within, you know, two to three blocks of where this

11  circle is located.

12              THE COURT:  Got it.  So this will summarize the

13  agent's testimony as to how far from a particular location the

14  device likely is?

15              MS. KEENAN:  That's right, your Honor.  So, for each

16  date in question, there is a path-of-travel map for Isabella

17  Pollok's device, and then there is a location- and

18  time-specific map for Isabella Pollok's device and Claudia

19  Drury's device.

20              If you are still looking at the January 9 map with

21  just one circle, there is also an excerpt of their call records

22  showing calls back and forth to each other on that date.

23              THE COURT:  All right.  Thank you.

24              Does the defense wish to be heard?

25              MS. GLASHAUSSER:  Yes, your Honor, because I'm

M2MNRAYO

1    concerned there might be -- maybe I have the confusion, but I

2    understood that the significance of the circles on the page we

3    are talking about, January 9 and the other pages, is not going

4    to be a summary of the agent's testimony, but that the circles

5    are not of a particular size.  They are just meant to show that

6    those cell sites, which are dots, is where the phones connected

7    to.  So on the previous pages there are dots to indicate cell

8    sites.  I see no justification to have these larger circles,

9    which are still just telling us where the cell site is.

10            So, for example, I understood the explanation for why

11   one is larger than the other to simply be because if they were

12   the same size then it would be purple.  That's not something to

13   do with the specific distance, but something else.

14            I also understood that the size of the circles does

15   not represent what the agent would testify about the -- the

16   strength of the signal or how likely the phone is to be in that

17   particular shape, it's just to show the cell site itself.  So

18   an accurate map I think would just show a dot and say this is

19   the cell site where the phone connected to.

20            THE COURT:  Let's ask the government.

21            If the defense is right, why wouldn't just a dot and

22   the arrows be sufficient?

23            MS. KEENAN:  I think a dot and arrows would be fine,

24   your Honor.  I actually think that the defense probably used to

25   a program that our office uses more regularly and that this

M2MNRAYO

1   outside expert has a different program, so the dots look

2   different.  But I certainly can ask him if he's able to make

3   smaller circles.

4          THE COURT:  I guess the question is, does the -- the

5   circle could be read to suggest something about the radius

6   within which a device was located in relationship to the cell

7   tower and that it's meaningful whether the circle is the

8   smaller circle or the larger circle.

9          MS. KEENAN:  So I think the agent's testimony will be

10  very clear that he has no way to identify that a cell phone is

11  within this circle.  It's the cell site that is within the

12  circle.

13         THE COURT:  So I guess my question in my mind still

14  remains:  Why have the circles at all?  Presumably the cell

15  tower doesn't extend from 37th Street to 33rd Street and from

16  Madison Avenue to Lexington Avenue, looking at the bigger

17  circle on the January 9 chart.

18         MS. KEENAN:  I am not sure if you mean presumably

19  literally the cell tower is not multiple blocks wide.

20         THE COURT:  Yes.  It is not multiple blocks wide.

21         MS. KEENAN:  Yes.

22         THE COURT:  So that big circle doesn't signify

23  anything as I understand what you're saying.

24         MS. KEENAN:  Not necessarily.

25         It truly is meant, your Honor, to draw the eye to

M2MNRAYO

1    where the cell site is.  So I don't think there is a problem

2    with asking the agent to make smaller circles.

3             THE COURT:  I think you need to go back and do a

4    little bit more work on these charts.

5             MS. KEENAN:  Okay.

6             THE COURT:  Let me hear argument.

7             I will hear first from the government with respect to

8    defense *in limine* motion 1, having to do with forced labor

9    through sexual services evidence.

10            MS. SASSOON:  Yes, your Honor.  I'm happy to address

11   specific questions that would be most useful to the Court, but

12   in --

13            THE COURT:  I mean, I guess the question in my mind is

14   what is the limiting principle to what labor and services is in

15   your mind.  And if I read the statute as broadly as you want it

16   to be read, what's left of any of the limitations in the sex

17   trafficking statute?  Wouldn't everything that constitutes sex

18   trafficking fall within the forced labor statute?

19            Those are the things that are on my mind.

20            MS. SASSOON:  Yes, your Honor.

21            To address the latter question, I think there are many

22   crimes in the federal code that could be charged in one or way

23   or sometimes in multiple ways.  This conduct, though --

24            THE COURT:  Sure.  There's a well established Supreme

25   Court principle to that effect.  But --

1          MS. SASSOON:  But this conduct --

2          THE COURT:  -- these statutes were passed at the same

3     time, right?

4          MS. SASSOON:  This conduct in fact is not -- we are

5     not alleging that this conduct constitutes sex trafficking.

6     She is not getting paid for the sexual services, we are not

7     alleging he was paid for the sexual services, and we are not

8     claiming that this particular conduct constitutes sex

9     trafficking.

10         The forced labor statute, though, is broad in the

11    sense that it does cover things beyond things of, you know,

12    direct economic value, and that it has multiple means by which

13    a person can obtain forced labor that we think apply to the

14    conduct here.

15         The sexual services she's providing to other people

16    falls within the definition of labor and of services.  He's

17    obtaining it from her by means of the methods described in the

18    statute.

19         THE COURT:  Help me a little bit more with your view

20    of what labor is.  I don't know that anybody in this courtroom

21    is saying that the conduct is good conduct.

22         MS. SASSOON:  Yes.  I do think --

23         THE COURT:  What is the limiting principle?

24         I have read Judge Ross' opinion in the Eastern

25    District, and you could describe all kinds of things of all

kinds of duration as being labor under that definition.  And it
is hard to imagine that Congress actually intended that or
could have even prescribed that into the Constitution.  There
has to be some limiting principle to what labor is.

MS. SASSOON:  Well, I think if it's not labor it
certainly is services.

Just one more point about the sex trafficking statute,
and I think I touched on this already, but the sex trafficking
statute is commercial sex services.  We are not alleging --

THE COURT:  I know.  But my question is, if you're
right -- and I'm still puzzling over this -- if you're right,
why couldn't the government relieve itself in every case of the
need to prove a commercial act by charging the identical
conduct as forced labor?

MS. SASSOON:  I do think in certain circumstances
there will be some overlap.  I don't have the legislative
history in front of me, but it does show that Congress did
intend to sweep fairly broadly to cover conduct constituting
involuntary servitude, of which this, you know, falls under
some of what was contemplated there.

I also don't think that this is appropriately resolved
at this particular stage, because there's no summary judgment
concept in a criminal trial.  So to the extent that our
evidence falls short of meeting the statutory definition or
creating some sort of constitutional issue, we think that is

M2MNRAYO

1    appropriately addressed at the Rule 29 stage of the trial.

2            THE COURT:  Would the evidence be relevant to the

3    charges if it did not itself constitute forced labor --

4            MS. SASSOON:  Yes.

5            THE COURT:  -- in violation of the statute.

6            MS. SASSOON:  Yes.  That's where I was going to turn

7    next.  We have a few different theories of admissibility.  The

8    first is that it is direct proof of forced labor as we have

9    just been defining it.  But it is also proof of one of the

10   means and methods of the enterprise as laid out in our brief.

11           It is also direct proof of the manual forced labor

12   that took place in North Carolina in two ways:

13           The first is the government's going to be arguing that

14   some of violence the and coercion that that was taking place in

15   advance of the trip to North Carolina is necessary to

16   understand the threats and force that these victims were under

17   that led them to perform the forced labor.  And if you look at

18   the summary chart, some of the videos actually are from June of

19   2013, which is during the time frame of the forced labor.

20           We are not in a position to say that these videos were

21   definitely taken in North Carolina, because there was some

22   travel back and forth during the period of the forced labor

23   conspiracy, but the fact that during the time that this victim

24   was performing labor in North Carolina she was subjected to

25   this serious harm within the definition of the statute we think

M2MNRAYO

1    is direct proof of the forced labor that took place in North

2    Carolina.

3         Under the statute serious harm is defined as any harm,

4    whether physical or nonphysical, including psychological,

5    financial, or reputational harm, that is sufficiently serious

6    under all the surrounding circumstances to compel a reasonable

7    person of the same background and in the same circumstances to

8    perform or to continue performing labor or services in order to

9    avoid incurring that harm.

10        So it is our argument that the fact that she is

11   incurring this serious harm is part of what's compelling her to

12   continue engaging in the forced labor in North Carolina during

13   this exact same time frame.  As we have laid out in our

14   briefing, the forced sexual services were intertwined with

15   threats of reputational harm as referred to in the statute.

16   The defendant told the victim on numerous occasions that he was

17   threatening to post this content on Facebook and to divulge it

18   to her colleagues and friends.

19        THE COURT:  How do you expect that the evidence will

20   connect that up to acts of forced labor?

21        MS. SASSOON:  Contemporaneously with these forced

22   sexual services, this victim is performing forced manual labor

23   in North Carolina for free.  So to understand why --

24        THE COURT:  I heard what you said, but do you expect

25   that the evidence will show that Mr. Ray forced the victim to

1    engage in the labor by threatening to disclose these videos?

2              MS. SASSOON:  I don't know if the connection will be

3    as direct as that.  But, as Don Hughes will testify, this

4    combination of methods is all part of a single pattern used to

5    achieve certain ends.

6              So that's true of a lot of the government's proof in

7    this case where the defendant wasn't necessary entirely

8    explicit, "I'm forcing you to do this in order to achieve this

9    particular end," but we think the evidence will connect the

10   dots that these types of tactics were designed to accomplish

11   the criminal ends, including the forced labor.

12             THE COURT:  In your chart, how -- give me the length

13   of time and the dates for the videos.

14             MS. SASSOON:  Yes.

15             So the first entry on the chart is September 11, 2012.

16             The last entry is May 2, 2014.

17             THE COURT:  When was the North Carolina visit?

18             MS. SASSOON:  That was the summer and fall of 2013.

19             THE COURT:  So how would a sexual act in September of

20   2012, a year before, almost a year before the trip to North

21   Carolina, be relevant to the forced labor in North Carolina,

22   and how would the conduct that took place afterwards?

23             MS. SASSOON:  Certainly afterwards is not going to be

24   proof of manual labor that took place in 2013.  But one of the

25   defendant's methods here was long-term grooming for particular

M2MNRAYO

1    ends, and that's true of many of the predicate racketeering

2    acts.

3              So, for example, with the sex trafficking victim, our

4    evidence is going to show that he was laying the groundwork for

5    the ultimate sex trafficking over the course of years.  And

6    here there is a continuous pattern with these videos that

7    escalates.  As Don Hughes, the expert, will also testify, it is

8    a typical coercive practice and pattern to engage in escalating

9    grooming and coercion that culminates in things like forced

10   manual labor, sex trafficking.  She will also testify that

11   sexually degrading scenarios like this eviscerate a victim's

12   sense of agency and ability to leave, you know, the coercive

13   relationship.

14             So this culminates in some ways in what happens in

15   Pinehurst, North Carolina, where the evidence will show that

16   this victim was not only being forced to perform labor on this

17   property, but was suffering intense physical abuse -- some of

18   the exhibits capture this abuse -- of her being punched and

19   beaten and captures bruises on her face.  And to understand how

20   she ended up in this scenario, why she is not leaving the

21   property and why this constitutes forced labor, this is part of

22   that necessary context that results and culminates in the

23   manual labor in North Carolina.

24             THE COURT:  Any other relevance of it?

25             MS. SASSOON:  I also think that this is corroborative

M2MNRAYO

1    of the sex trafficking victim's testimony.  It's very clear

2    that a cornerstone of the defense strategy is attacking the

3    credibility of that particular victim.

4          She is also going to describe being made to engage in

5    sexually humiliating acts.  This evidence corroborates that

6    that is the means and methods of the enterprise of the

7    defendant with respect to multiple victims.  It shows his

8    intent and --

9          THE COURT:  Is there evidence that the sex trafficked

10   victim was aware of this conduct?

11         MS. SASSOON:  She was not -- I don't think there's

12   evidence that she was aware of these videos being made.  But

13   she was subjected to some similar sexual grooming by Isabella

14   Pollok, who was a coconspirator of the racketeering enterprise.

15   So in the same way the defendant would direct Isabella Pollok

16   to go with the forced labor victim and do these videos, he

17   would sometimes direct Isabella Pollok to engage in sexual

18   activity with the sex trafficking victim so it is a similar

19   tactic being used within the enterprise to achieve the

20   predicate acts of the enterprise.

21         THE COURT:  Is there evidence that is going to refer

22   to her by name, that Claudia Drury was aware of these acts with

23   respect to the other alleged victim?

24         MS. SASSOON:  No.

25         THE COURT:  Anything else?

1          MS. SASSOON:  I would just note -- this is mentioned

2     in our brief -- that a similar theory of forced labor was

3     charged as a predicate racketeering act in the trial of Robert

4     Kelly in the Eastern District of New York.

5          THE COURT:  Let me ask you, Ms. Sassoon, in your brief

6     you do talk about a theory on which the defendant engaged this

7     victim in developing pornographic materials and that

8     constitutes forced labor.

9          Can you explain that one to me.

10          MS. SASSOON:  Yes.

11          So, if you look at the statute, the language is

12     whoever knowingly provides or obtains the labor or services of

13     a person.  So, starting with "provides," the defendant provided

14     the sexual services of this victim to other people.  But he

15     also knowingly obtained the services of this victim by

16     ultimately being a recipient of the pornographic videos.

17          THE COURT:  Let me ask you one other question before I

18     turn to Ms. Lenox.  Are you planning on opening on this

19     evidence, and when in the course of the trial would you be

20     offering it?

21          I take it it's through the first witness probably.

22          MS. SASSOON:  So, yes, we would intend to open on

23     this.

24          The victim of this particular conduct is probably

25     going to testify somewhere in the middle of the trial.  She is

M2MNRAYO

1    not the first witness.

2              Then the special agent who we intend to authenticate

3    this chart is also not going to be the first witness.

4              But we would like to open on this conduct.

5              THE COURT:  Let me hear from the defense.

6              MS. GLASHAUSSER:  Thank you, your Honor.

7              I think your Honor gets right to the point of our

8    argument by asking what the limiting principle is in forced

9    labor.  In the Second Circuit the cases do limit it by having

10   some connection to an activity that generates some sort of

11   monetary benefit.

12             So the case that the government relies on, *Marcus*, has

13   a sexual component, but the labor portion of it is that the

14   person is made to make a website that the defendant made money

15   from.  So there is not any Second Circuit case law that would

16   permit the government's theory.

17             The closest case that comes to the government's theory

18   is a Tenth Circuit case in *Kaufman*, but it's not the same.  In

19   *Kaufman* --

20             THE COURT:  Why not?

21             MS. GLASHAUSSER:  Because in *Kaufman* as well, it is a

22   broader economic enterprise that the defendants are running.

23   They're running an entire business that includes a sexual

24   component, but they have people working on their farm or their

25   property which makes their entire income.  So that is clearly

M2MNRAYO

1    an economic -- it has an economic component.

2           THE COURT:  This is sort of suggested in *Kaufman*.

3    What if there was evidence that a defendant forced somebody to

4    engage in sex that was then videotaped and the videotapes were

5    for the personal titillation and enjoyment of the defendant?

6    Under your theory that would not constitute forced labor.

7           MS. GLASHAUSSER:  Correct.  And the Second Circuit has

8    not indicated that that would constitute forced labor.

9           THE COURT:  Also, I suppose on your theory, if we take

10   it out of the sexual context, if you had a musician that you

11   forced to play music for your benefit and the benefit of your

12   friends or some, you know, sports athlete, you know, a gymnast

13   who you required to engage in gymnastic activities for your

14   benefit and the benefit of your friends, but you didn't make

15   money from it, it would constitute forced labor.

16          MS. GLASHAUSSER:  I think it would be different if

17   those people were professional musicians or professional

18   gymnasts, who were ordinarily paid for that type of activity

19   and they were being forced to do it for free.  That is exactly

20   the sort of activity that you would expect to be paid for.

21          As your Honor points out, the crime, if you're forcing

22   somebody to have sex for money, is sex trafficking.  One of our

23   big concerns in raising this motion *in limine* is that the jury

24   will have a confusion between the sex trafficking and this

25   evidence, which is not forced labor and is otherwise

M2MNRAYO

1   irrelevant.

2          In the government's case we don't believe we have seen

3   any videos to support the sex trafficking charge.  So there

4   will not be traffic graphic sexual videos to support that

5   charge.  And to allow the government to introduce graphic

6   sexual videos of somebody else who is not related to the sex

7   trafficking charge at all would be incredibly prejudicial and

8   allow them to bolster a totally separate charge with evidence

9   that really is unrelated.

10          So, for the forced labor itself, I heard the

11   government today suggest that it was connected, that the sex

12   was connected to the manual labor in North Carolina.  That has

13   not been a theory the government has advanced that we have

14   heard until just now.  It's not the theory that's in the

15   indictment, which limits the forced labor count to the forced

16   labor in North Carolina.

17          I think when your Honor pushed the government you

18   could hear that there is no direct relationship between those

19   two.  These are completely separate activities.  One, that if

20   the government proves their evidence, it likely would be forced

21   labor, manual labor.  That's what forced labor -- that's in the

22   heartland of the forced labor statute, and sex, which really

23   has nothing to do with the forced labor statute.

24          THE COURT:  I mean, doesn't the indictment, though,

25   charge that one of the means and methods of the conspiracy was

M2MNRAYO

1   the sexual manipulation of the victims?

2           Isn't the government at least permitted to offer

3   evidence to, you know, support that portion of the indictment?

4   And doesn't this do that?

5           MS. GLASHAUSSER:  I think that there are ways the

6   government -- there are portions of this that would be relevant

7   under that section.  I don't hear that as what the government

8   is introducing this evidence for.  They seem to be firmly

9   introducing it for forced labor.

10          THE COURT:  I heard them to that effect also.

11          MS. GLASHAUSSER:  Right.

12          THE COURT:  But at this stage, *in limine*, the question

13  is, is this relevant to any, you know, viable charge and to the

14  charges that are in the indictment?  The indictment certainly

15  alleges that one of the means and methods of the conspiracy was

16  this sexual manipulation of the victims.

17          MS. GLASHAUSSER:  If Rosario is planning to testify to

18  the fact that she had these sexual activities and that the

19  government wants to use that as evidence of the means and

20  methods of the alleged enterprise, I think that is a different

21  question, your Honor.

22          If your Honor were to admit it for that purpose, the

23  videos themselves should still be excluded, because the videos

24  are not necessary to that presentation.  And the videos

25  themselves are not at all limited.  There are I think

M2MNRAYO

1    approximately 40 of them which the government seeks to

2    introduce.  I believe 11 of them are clips from one evening.

3    That seems to be one sexual act, but there are separate

4    individual videos on the chart.  Allowing that would be

5    exceedingly prejudicial in relationship to its probative value

6    and create a very strong risk of confusing the jury about what

7    that large body of evidence is being introduced for.

8             THE COURT:  So, Ms. Glashausser, are you saying that

9    you don't object to the facts, but just the videos themselves,

10   including the fact that these were videotaped?

11            MS. GLASHAUSSER:  We object that those would be

12   appropriate evidence of forced labor.  But if the government

13   were planning to introduce it for the other purpose that your

14   Honor suggested, we would object to the videos themselves.

15            THE COURT:  Okay.

16            MS. GLASHAUSSER:  However, I don't think that

17   conceding that small piece changes the main part of our

18   argument, which is that admitting all of this evidence either

19   through testimony or videos, depending on how much that

20   testimony is, does create this risk of confusion and the need

21   to sort of cross-examine Rosario about many instances of sexual

22   conduct, about what happened, when, and the circumstances,

23   which really are not directly relevant to anything in the case.

24            The other thing that I would like to point out is the

25   government mentioned towards the end of their presentation that

M2MNRAYO

1    this evidence should be corroborative of sex trafficking.  And

2    that should squarely be rejected.  This has nothing to do

3    with --

4              THE COURT:  You know, I may or may not ultimately

5    agree with you as to whether the evidence is sufficient to

6    establish the forced labor charge.  But if it is relevant on

7    some theory of the case, then doesn't it come in?  We can talk

8    about exactly what comes in, but it comes in.  And then at the

9    time of the charge at the end of the case, or perhaps earlier

10   than that, at the end of the government's case, I can issue a

11   ruling with respect to how it is relevant or not.  And if the

12   government doesn't convince me that it's relevant to forced

13   labor, maybe you even get an instruction that says you heard

14   this evidence about --

15             Ms. Sassoon, is this Jane Doe 1 that we are talking

16   about.

17             MS. SASSOON:  This is Felicia.

18             THE COURT:  That Felicia engaged in this activity,

19   that's not the forced labor, and you get an instruction with

20   the evidence that comes in.

21             MS. GLASHAUSSER:  Your Honor, the damage will have

22   been done by that point.  These graphic sexual videos are the

23   only ones that the government intends to introduce in a case

24   that has a sex trafficking charge.

25             THE COURT:  Let me turn to Ms. Sassoon, because I

M2MNRAYO

1    understood that they were not going to introduce the actual

2    videos or show the videos to the jury, just introduce the fact

3    that the videos were taken.

4            Ms. Sassoon?

5            MS. SASSOON:  Your Honor, our plan, if this is deemed

6    admissible, was to admit Government Exhibit 1405, admit the

7    underlying exhibits, not play them, potentially show a

8    nongraphic still or stills to Felicia and/or the agent to

9    identify who is in the video and just to give the jury

10   reassurance that this is what we are saying it is.

11           And then in closing to say to the jury:  You have this

12   chart, it describes the videos.  We have spared you seeing

13   these graphic videos.  If you feel you need to see them in

14   reaching your verdict, they are available to you.  And that's

15   in part because generally with summary charts you have a

16   witness who is describing the evidence, but the jury should

17   also have an opportunity to assure itself that what the chart

18   is describing is what it is.

19           We thought that this was the least prejudicial way of

20   introducing what is graphic inescapably graphic content.  We

21   did not want to subject the jury to watching all these videos.

22   We are attempting in a variety of ways to streamline the proof.

23           I have some other points I would like to make, but I

24   can sit until counsel --

25           THE COURT:  Ms. Glashausser?  Is there anything

M2MNRAYO

1    further.

2              MS. GLASHAUSSER:  Your Honor, with respect to

3    introducing the chart and the videos, when I said that your

4    Honor should exclude the videos, I meant the chart as well.  I

5    see that they are connected.

6              THE COURT:  You have confused me also.  Because I had

7    understood your challenge to be with respect to how graphic the

8    videos are and not with respect to the fact that Felicia will

9    testify that she was forced to engage in this activity and that

10   it was videotaped, etc.

11             MS. GLASHAUSER:  Correct, your Honor.  It --

12             THE COURT:  You don't object to that testimony,

13   correct?

14             MS. GLASHAUSSER:  If her testimony is, I engaged in

15   this activity under these circumstances, period, and if the

16   government is just admitting that for their means and methods,

17   so a different reason than they articulated today --

18             THE COURT:  Then you would have no objection?

19             MS. GLASHAUSSER:  We would not object.  We would

20   object to the videos and the chart because to us the two are

21   connected.  The chart is a way to admit the videos.  The

22   government would need to authenticate the videos in order to

23   admit the chart and the videos --

24             THE COURT:  I don't think that's right, by the way.  I

25   think that a summary exhibit can be received even if the

M2MNRAYO

1   underlying evidence is not received, but I take the

2   government's point that it is helpful for the jury to be able

3   to know that the summary chart is out there.  But go ahead,

4   Ms. Glashausser.

5        MS. GLASHAUSSER:  I understand your Honor's point, but

6   responding to the government's point that they are seeking to

7   admit both the chart and the video, it does not solve our

8   objection that they do not intend to play the whole of the

9   videos to the jury.  To have the summary chart and the videos

10  introduced as the government seeks to do would require Rosario

11  to go through each of those videos and authenticate them.  It

12  might require us to cross-examine her on the circumstances of

13  the video.

14       As the chart is now, it is quite detailed, and it

15  creates a real risk of the prejudice from this evidence, well

16  overtaking any probative value under Rule 403, because this

17  evidence isn't actually relevant to forced labor and it seems

18  the government plans to use it to bolster their sex trafficking

19  charge, which would be completely improper.  That creates a

20  risk that the jury will use this evidence to fill the gaps in

21  the sex trafficking charge to convict Mr. Ray.  That's the sort

22  of thing your Honor should exclude under Rule 403.

23       THE COURT:  Okay.  Thank you, Ms. Glashausser.

24       Ms. Sassoon.

25       MS. SASSOON:  Yes.  I would just like to clarify a

M2MNRAYO

1    couple of things.  In our opposition to the defendant's motion

2    *in limine*, I think we made pretty clear that we are seeking to

3    introduce this for a number of reasons, one being that it's

4    directly forced labor; another that it is a means and methods

5    of the enterprise and also -- and this is on page 5 -- we do

6    say that it's proof of the defendant's forced labor of Felicia

7    in North Carolina.  So we did lay out all of those theories in

8    our brief.

9            With respect to means and methods, not only --

10           THE COURT:  Let me just be a little more blunt in

11   terms of what I need to decide now.  In your opening, are you

12   going to be -- you are not going to be showing the videos,

13   right?

14           MS. SASSOON:  No.

15           THE COURT:  You are not going to be showing the

16   summary chart, are you?

17           MS. SASSOON:  No.

18           We will only be saying this took place, and I don't

19   think we will even be saying that there is a violation of 18

20   U.S.C. Section 1589.  We are going to describe what they are

21   going to hear from the witness and the evidence they are going

22   hear about, but we are not going make argument about this

23   therefore proves X.

24           THE COURT:  Right.  I assumed that you were not going

25   to say that either this proves forced labor or this, you know,

M2MNRAYO

1    this corroborates that there was the sex trafficking of Claudia

2    Drury --

3              MS. SASSOON:  Correct.

4              THE COURT:  -- or anything like that.  You are just

5    going to say the indictment charges -- maybe you won't even say

6    that.

7              MS. SASSOON:  I don't even know how much we are going

8    to get into the law on individual charges, but as we describe

9    the testimony and the evidence, we are certainly not going to

10   be linking it directly to any particular statute or

11   component --

12             THE COURT:  Is there any reason why at this stage I

13   need to -- I guess this is a question for you and Ms.

14   Glashausser -- need to reach a decision about whether the

15   videos should be received?

16             I haven't seen them, I don't know what they look like,

17   and I don't know what the prejudicial impact is.  On a 403

18   analysis I probably should look at least what the stuff is

19   before deciding whether to admit it or exclude it.

20             MS. SASSOON:  One thing I should clarify --

21             THE COURT:  I am not dying to look at it, but you

22   know --

23             MS. SASSOON:  Yes.  One thing I omitted to mention is,

24   although Felicia is going to testify about it, the agent --

25             THE COURT:  This is going to come in through the

M2MNRAYO

1   agent, right?

2             MS. SASSOON:  Yes.  So we are going to seek to

3   introduce a lot of items of evidence that came off devices in

4   one fell swoop as opposed to individually.

5             So this was a separate issue I wanted to raise with

6   the Court, but we would like to introduce basically all of our

7   electronic evidence --

8             THE COURT:  I can tell you what I am going to do with

9   respect to that, which is that I think the defense has a point

10  in saying that they've got a right to object to individual

11  pieces of evidence individually, and I will rule on them

12  individually.

13            So if there's no objection to the introduction of a

14  bunch of material en masse, then that will be received.

15  Otherwise we'll go through each different piece --

16            MS. SASSOON:  Yes.

17            THE COURT:  -- and I will rule with respect to them.

18  And we can talk about process in terms of that.

19            MS. SASSOON:  I just wanted to highlight a couple of

20  things.

21            One is that the means and methods of the enterprise

22  not only include that he -- not in these exact words, but

23  sexually groomed his victims, but also that it was a means and

24  methods to collect sensitive and humiliating materials of his

25  victims, recordings, journal, videos.  So the fact of the

1    videos is independently probative of the means and methods of

2    the enterprise separate and apart from the fact that this

3    activity happened.

4            Once the defense is acknowledging that Felicia's

5    testimony is admissible as direct proof of Count One of the

6    indictment, the government is entitled to prove its case by the

7    evidence necessary to prove up that case.  So that constitutes

8    Felicia's testimony, but it also constitutes the videos

9    themselves that are direct proof of the means and methods of

10   collecting videos of the victims.

11           I also anticipate that they will be cross-examining

12   Felicia, and we should not be hamstrung from putting in

13   evidence that directly corroborates her testimony that is

14   direct proof of Count One.

15           THE COURT:  Okay.

16           Anything more, Ms. Glashausser?

17           MS. GLASHAUSER:  Nothing further, your Honor.

18           THE COURT:  The parties should know that even if I

19   ultimately decide to receive this evidence that at the Rule 29

20   stage I may need some more help from the parties with respect

21   to the legal issues having do with the forced labor statute.

22           All right.

23           The defense *in limine* motion No. 1 having to do with

24   the sexual grooming of Isabella Pollok, I am not sure how much

25   I need with respect to that, but I will hear briefly from the

M2MNRAYO

1    government and briefly from the defense.

2              MS. SASSOON:  Yes, your Honor.

3              As set forth in our briefing, we intend to introduce

4    limited evidence about this to establish the relationship

5    between the defendant and his coconspirator, her role within

6    the conspiracy and its connection to some of the means and

7    methods of the enterprise and the execution of the forced labor

8    and the sex trafficking.

9              Just to be clear about what we are not planning to

10   introduce, we have this chart related to the sex videos of

11   Felicia.  There are countless videos depicting Isabella Pollok

12   engaged in sexual activity that do not include any of the

13   victims.  We are not seeking to introduce those videos.  We

14   have no chart related to those videos.  We are not playing

15   those videos.  But to the extent that this evidence is

16   probative, as laid out in our brief, we do think it is

17   admissible.

18             THE COURT:  Ms. Glashausser.

19             MS. GLASHAUSSER:  Thank you, your Honor.

20             The government shouldn't be allowed to use Ms. Pollok

21   as both a coconspirator and a victim.  That is what they're

22   aiming to do here, or that's the effect of what they are

23   planning to do here.

24             As the government defines the word grooming, they

25   define it as the abuser's relationship with the victim or

M2MNRAYO

1    nonviolent techniques an offender uses to gain compliance of a

2    victim.  They shouldn't be allowed to introduce anything that

3    they considered to be sexual grooming of Ms. Pollok.

4            Once they labeled Ms. Pollok as a coconspirator, it

5    gives them certain -- it reduces the evidentiary hurdles they

6    have to introduce statements by her.  It makes it easier for

7    them to introduce evidence about her.  They shouldn't then be

8    able to turn the coin and flip it on its head, which to say

9    that she was just groomed, which really just serves as

10   propensity evidence to paint Mr. Ray as a really bad person.

11   That should be prohibited.  It is not relevant to their case

12   and is prejudicial.

13           THE COURT:  Why isn't it relevant on the theory of

14   explaining how she came to be trusted and also how she executed

15   her activities on behalf of the enterprise in sex trafficking

16   Ms. Drury?  I mean, it's hard to eliminate sex from this case.

17           MS. GLASHAUSSER:  It is not that hard, your Honor,

18   because the sex trafficking charge is discrete.  It relates to

19   one person, Ms. Drury, when there are many other witnesses that

20   the government plans to introduce as on other counts that do

21   not relate to sex trafficking.

22           The bulk of what I understand the government is trying

23   to introduce as Ms. Pollok's sexual quote-unquote grooming is

24   not related to Drury's sex trafficking.  They have information

25   about Ms. Pollok having sex with Dan Levin, who is a peer of

M2MNRAYO

1    the same age, shortly after college, which is probative of

2    really nothing.

3            They seek to introduce the evidence relating to

4    Rosario, which I think really just goes with our first point.

5    It depends on how your Honor rules on the other point with

6    respect to that.

7            But with respect to the actual sex trafficking charge,

8    I understand that the government is only saying that there is

9    one or two instances well into the time period of the sex

10   trafficking charge when Ms. Pollok and Ms. Drury had sex

11   together.

12           That's well into while the sex trafficking charge is

13   allegedly already happening.  So I am not sure how that even

14   amounts to grooming.  But this evidence, the whole of it is, is

15   seeking to paint Ms. Pollok as a victim while the government

16   would still be allowed to use her as a coconspirator.  That

17   should not be allowed.

18           THE COURT:  Ms. Sassoon, how are you going link up the

19   conduct to any of the crimes that the indictment charges?  This

20   is not going to be a case about people engaged in sex and

21   videotaping themselves engaged in sex.  That is not a crime.

22           MS. SASSOON:  I think we have been very mindful about

23   that and made an effort to be thoughtful about how we can

24   present this evidence in a --

25           THE COURT:  Right.  But tell me --

M2MNRAYO

1          MS. SASSOON:  Yes.

2          THE COURT:  How can you present it in a way that is

3     least damaging but still proves up your case?

4          MS. SASSOON:  Right.

5          THE COURT:  Tell me how it proves up your case.

6          MS. SASSOON:  Your Honor, I think we have to go back

7     to the Felicia sexual services to explain to this to an extent.

8     It's Isabella who is the defendant's lieutenant in many things.

9     It is Isabella who is sent out of the house to film Felicia on

10    behalf of the defendant.  It's Isabella who's recording

11    confessions.

12         She is also the person recording the forced sexual

13    services.  It's Isabella who's sent to collect the proceeds of

14    Claudia's sex trafficking, and she was also directed by the

15    defendant to engaged in sexual activity with Claudia, which, as

16    our expert will testify, is part of the overall process that

17    the defendant engaged in to desensitize his victims and also to

18    cut them off from other friends, other family, from typical

19    everyday interactions with the everyday world.

20         There's that piece of it.  And then there's the piece,

21    as your Honor noted, it is necessary to understand how this

22    college sophomore came to play this particular role in the

23    enterprise, including in perpetuating the sex trafficking,

24    being the person who's the enforcer for the enterprise.  It's

25    very difficult to understand that if you don't understand how

M2MNRAYO

1    her relationship with the defendant evolved in the early days.

2    This is not attempting to have it both ways, treating her as a

3    victim and as a coconspirator.

4           I think a useful analogy is to many of the gang cases

5    I've prosecuted, where you have the leader of the gang and then

6    you often have individuals who are selling drugs on the street

7    corner committing shootings on behalf of the gang leaders with

8    very little financial gain, very little benefit to themselves,

9    but they have been in this environment where they've suffered

10   assaults, where they have suffered beatings, where they've

11   suffered intimidation by the group.  That doesn't mean they are

12   a coconspirator.  It helps explain the hierarchy and the

13   relationships within the particular conspiracy.

14          THE COURT:  I understand that point.

15          Tie again this testimony to the sex trafficking with

16   respect to Claudia Drury.

17          MS. SASSOON:  Yes.

18          So Claudia will testify that during the period of the

19   sex trafficking there were several occasions where the

20   defendant and Isabella came to her hotel room, and the

21   defendant directed Isabella to engage in sexual activity with

22   Claudia.  This testimony is going to be very limited.  But it

23   is our view that coercive and desensitizing activities that

24   took place over the course of the sex trafficking can still

25   constitute the continuation of the grooming and humiliation

1     desensitization process.

2              It is also probable that the jury could conclude that

3     Claudia was not being sex trafficked in 2015 when she started

4     escorting because she was being sex trafficked beginning in

5     2016 once the conditions became more coercive, or 2018 when she

6     had a plastic bag put over her head.

7              I think the *Marcus* case is illustrative of this, where

8     the Court said even if the victim at first was willingly

9     engaging in certain BDSM activity, there was a tipping point

10    where it became more coercive and forced.  I think to the

11    extent that certain things are happening along the timeline of

12    the sex trafficking, the fact that it didn't necessarily happen

13    before is not dispositive.

14             THE COURT:  Let's go to No. 3, the state of mind

15    evidence.

16             Ms. Sassoon, are you arguing this one also?

17             MS. SASSOON:  Yes.

18             THE COURT:  All right.  I will hear from you and then

19    I will hear from the defense.

20             My basic question is why isn't all of this evidence

21    squarely probative of Mr. Ray's belief at the time of the

22    substance of what's contained in those letters?

23             As I understand the defense, it is not offering the

24    letters for the truth of what's reported in the letters, but

25    for the fact that Mr. Ray believed it, because why else would

M2MNRAYO

1    he have written to the U.S. Attorney and to the DA's office

2    relaying that information?

3            Ms. Glashausser, I take it that is your theory?

4            MS. GLASHAUSSER:  Correct, your Honor.

5            THE COURT:  Ms. Sassoon.

6            MS. SASSOON:  Yes.

7            So there are a few questions embedded in what your

8    Honor said, and I can take them out of order.

9            Why else would he do it?

10           There are plenty of reasons, and I think the proof at

11   trial is going to show that throughout the time frame of the

12   conspiracy the defendant was deliberately obfuscating,

13   deliberately sending his victims to say things to law

14   enforcement or to write confessions or to make these recorded

15   confessions with false information to throw people off his

16   trail, to protect himself.  So, why else?  That's the why else.

17           And Judge McMahon noted that in a case raising a

18   similar issue that the idea that this is necessarily is proof

19   of an innocent state of mind is logically fallacious.

20           THE COURT:  The cases that you cite are arising in

21   different contexts.  The cases that you cite are cases where,

22   after the crime is committed, the defendant says that he wants

23   to cooperate or works with law enforcement.  In that context

24   courts exclude the evidence really on the theory that it is

25   not, to the extent that it is probative of a contemporaneous

M2MNRAYO

1    state of mind, that contemporaneous state of mind, I'm not

2    guilty of what I did in the past, is tantamount to testifying.

3    It is not relevant to the contemporaneous state of mind at the

4    time of the crimes.

5         MS. SASSOON:  Respectfully, your Honor, we think that

6    that's exactly what these exhibits are.  A letter sent in 2016

7    saying I was poisoned is not contemporaneous with the time

8    period of the alleged poisoning, the force that was going on at

9    the time of those confessions.

10        This letter is setting out, look back a year to when I

11   was assaulted in 2015 a.  Bunch of people have confessed that

12   they are responsible for that.  Look back to this time period

13   in 2013 when I was in North Carolina and everybody was

14   poisoning me.  The attachment are confessions related to the

15   time period earlier in the charged conspiracy.

16        THE COURT:  Ms. Sassoon, I don't know exactly what the

17   defense is going to be.  I don't know exactly what you are

18   going to argue.  But the indictment does charge that the

19   confessions were garnered as a means and method of the

20   enterprise in order ultimately to obtain things of value, to

21   extort the victims, to force them to engage in labor and sex

22   trafficking.

23        Isn't this evidence consistent of a different and more

24   benign theory, which is that those confessions were gathered

25   because Mr. Ray at the time he was gathering the confessions

M2MNRAYO

1      believed that what the people said had happened did happen and

2      that he was wanting them to be prosecuted?

3            MS. SASSOON:  Then I think the appropriate state of

4      mind evidence is the recorded confessions themselves, where in

5      the moment he's saying to the victim, Didn't you use mercury to

6      poison me?  Didn't you use cyanide?  Perhaps that reflects his

7      belief in that moment in conversation with a victim.

8            His selective sharing of information years or months

9      after the supposed incident is not contemporaneous, even if it

10     falls within the overall time frame of the conspiracy.  I think

11     we have to take a narrower view of what it means to be

12     contemporaneous with the event.

13           If you look at the letter that is actually written by

14     Mr. Ray, he's describing things that have happened in the past

15     and his beliefs about the past.  If we opened up the hearsay

16     exception to include that, then it would basically swallow the

17     rule.

18           Anything a defendant said prior to being arrested, if

19     it's self-exculpatory, would come in, and that's not the rule

20     and that's not how the cases have interpreted the rule.  And

21     that doesn't even get to the issue, which is many of the

22     exhibits that the defense is proposing are not the defendant's

23     own statements.

24           THE COURT:  No.  The letter to Preet Bharara is the

25     defendant's statement.  I thought the communications with the

M2MNRAYO

<pre>
 1   DA's office and with the EPA, the underlying information is not

 2   his statements, but the act of conveying that are his

 3   statement, correct?

 4            MS. SASSOON:  So, sending an e-mail to Robert Mutto at

 5   the EPA, that is the defendant's statement.  But the attachment

 6   is its own hearsay statement.  So it would be inappropriate to

 7   admit that underlying statement, and without it the fact of

 8   sending an e-mail to the EPA is contentless.

 9            THE COURT:  How do you explain why the rule makers in

10   803(3) actually drafted a provision that said that a statement

11   of memory or belief is not admissible to prove the fact

12   remembered or believed unless it relates to the validity or

13   terms of the declarant's will unless the rule makers

14   contemplated that statements of memory or belief could under

15   some circumstances be admissible not for the underlying fact

16   but for the fact of the memory or belief.

17            MS. SASSOON:  My recollection of the rule, and I don't

18   have the language in front of me -- give me a moment, your

19   Honor.

20            So the rule says then existing state of mind, but not

21   including a statement of memory or belief to prove the fact

22   remembered or believed unless it relates to the validity of the

23   declarant's will.

24            I think here there is a risk, first of all, that

25   sharing the evidence of his memory or belief without him
</pre>

1  testifying risks confusing the jury about it being offered for

2  the truth of the matter.  But I think all the cases on this

3  rule say that it has to be a belief contemporaneous with what

4  is taking place.

5          If you look at this letter to Preet Bharara, which is

6  the only exhibit that has any statement from the defendant

7  about his state of mind, he's describing an assault that took

8  place in 2015; a trial that took place months before.

9          The letter is dated April 23, 2016.  We don't know

10  that it is actually sent.  There is no evidence in this case of

11  the receipt of that letter by the U.S. Attorney's Office.  But

12  he's describing an assault, September 17, 2015.  They are in a

13  poisoning conspiracy involving all of these people.  There is

14  no indication that this belief is contemporaneous with anything

15  that's occurring in that moment.

16          This is a classic instance of someone after the fact

17  drafting something to give their gloss on events in a very

18  self-serving way.  The defendant is not attaching here the

19  videos of his abuse or a full picture of what's going on.  He's

20  writing an after-the-fact self-serving statement which perhaps

21  isn't after his arrest in the case but it is akin to somebody

22  coming after the fact, after their conduct and saying here's my

23  self-serving, benign explanation for what transpired.

24          THE COURT:  Let me hear from the defense.

25          MS. GLASHAUSSER:  Thank you, your Honor.

M2MNRAYO

1              All of these statements are not being admitted for the

2       truth of what is in the documents.  So we are not trying to

3       prove what is written there.  They are solely being introduced

4       for Mr. Ray's state of mind, his state of mind when he sent

5       those that he thought that was information that was relevant to

6       his belief that he was poisoned and targeted.  The target of a

7       conspiracy is both relevant and admissible.  It's

8       contemporaneous, it's showing his state of mind at the time, it

9       is during the ongoing criminal conduct, and it is directly

10      responsive to the government's theory of the case.

11              THE COURT:  All right.  I understand.

12              Next is the government's *in limine* motion regarding

13      the coconspirator statements of the defendant's father.

14              Ms. Sassoon, are you on the firing line on all of

15      these?

16              MS. SASSOON:  Ms. Bracewell will be addressing the tax

17      issues.  I will try to be brief.

18              THE COURT:  Maybe I should just frame my question for

19      you, which is -- you can stand if you want -- but the

20      defendant's father's conduct is bad conduct.  The defendant's

21      father would have had a lot of reason, you know, not lawful

22      reasons to make the kinds of threats that he made, and I accept

23      your notion and it's plainly right that the threat is not

24      hearsay.  It is not being admitted for the truth of the matter.

25              But how do you pin the defendant with that conduct?  I

M2MNRAYO

1   mean, it's his son, and his son is facing serious charges where

2   he could go away for a long time.  Maybe they believe, and

3   maybe they're right, that the testimony is made up.

4           So how do you tie it back to Mr. Ray?

5           MS. SASSOON:  So --

6           THE COURT:  Excuse me for a second.

7           Mr. Ray, are you able to hear.  I noticed you put your

8   hand by your ear.

9           THE DEFENDANT:  Yes, it helps.  Thank you.

10          MS. SASSOON:  I think, your Honor, that is an argument

11  that goes to the weight of the evidence, not to its

12  admissibility.  The defense has not disputed that this

13  constitutes a nonhearsay threat and therefore should be

14  admissible as long as it has some probative value under Rule

15  401, which is a pretty low threshold.

16          Given that we are going to introduce calls between the

17  defendant and his father where they are discussing his defense,

18  gathering incriminating material against the victims to

19  discredit them, the fact that during these jail calls Felicia

20  will testify that she and Isabella were present so that they

21  could hear what the defendant was saying even though he was not

22  allowed to contact them directly.

23          So there is the context of them being together as a

24  group listening to these calls, the father repeatedly conveyed

25  messages of ongoing loyalty, and then it was when Felicia moved

M2MNRAYO

1    and separated herself from the father and from Isabella that

2    she received this threat.  Obviously it is circumstantial to

3    infer that this is coming from the defendant, but that is an

4    argument that goes to the weight of the evidence, not to its

5    admissibility, your Honor.

6              THE COURT:  Ms. Glashausser.

7              MS. GLASHAUSSER:  Your Honor, unless you have

8    questions, I don't have anything to add on that point.  I think

9    your Honor understands our argument.

10             THE COURT:  No, it would be helpful to hear your

11   response to Ms. Sassoon, because in her brief, Ms. Sassoon just

12   mentioned a couple of conversations from June and then -- my

13   recollection is it's June and then the threat is in October.

14   Now she's embellished it a little bit or added to the proffer.

15             MS. GLASHAUSSER:  I don't believe that there is

16   anything more concrete than what the government has written in

17   their brief in relationship to the calls, the relationship

18   between the calls and whatever the defendant, Mr. Ray's father

19   says in October.

20             It is just not factually true that Mr. Ray, at least

21   as far as we know, wasn't allowed to contact Ms. Pollok or

22   Felicia Rosario directly.  There was no ban on his calls in any

23   sort of way.  So I think your Honor is right in pointing out

24   that there is no clear connection between what Mr. Ray's father

25   allegedly says to Rosario and anything that Mr. Ray has said on

M2MNRAYO

1   the phone calls.

2           If I may, your Honor, though, I have one additional

3   thing to mention about the previous argument that I just want

4   to make sure was not missed because I didn't start with that

5   portion.

6           Because we did find some additional cases relating to

7   admitting not Mr. Ray's letter but also the EPA letters

8   relating to when somebody expressly adopts somebody else's

9   statement, your Honor.  If your Honor is already familiar --

10          THE COURT:  You can give me the citations.

11          MS. GLASHAUSSER:  Sure.  There is a Second Circuit

12  case, *United States v. Kadir*, 718 F.3d 115, that's from 2013,

13  explaining that statements would have been admissible if

14  Mr. Kadir could have shown that he had adopted the other

15  person's statements, which in this case by Mr. Ray's sending

16  the e-mail he indicated that he adopted that statements and it

17  reflected his state of mind.

18          Additionally, with respect to the EPA e-mail that

19  Mr. Ray received from the EPA, that's also admissible to show

20  its effect on Mr. Ray.  It is actually quite similar to how the

21  government plans to use other e-mails that Mr. Ray received to

22  show their effect on him.  So that also would be admissible.

23          So I just wanted to make sure that I didn't leave

24  those out.  I have a few district court cites with respect to

25  admitting the effect on the person receiving the e-mail, but I

M2MNRAYO

am not sure if the government disputes that, because it seems

to be their theory of admissibility for other e-mails as well.

MS. SASSOON:  So we do dispute that for two reasons:

One, I think the prejudice here is particularly acute

because the defendant sent very limited information to this law

enforcement officer and to his lawyer and to the U.S.

Attorney's Office and then wants to cloak himself in the

approval of these people.  Oh, look, Robert Mutto of the EPA

said that I was a victim.  Therefore, it was reasonable for me

to think that I was a victim.  Look, my lawyer Glen Ripa is

writing a letter on my behalf.  Therefore, because I had a

lawyer who was sympathetic to my cause, it was reasonable for

me to do what I did.

Given that that implicates the advice-of-counsel

defense in particular, I think it's particularly problematic

here to admit that and permit that misleading impression to be

given to the jury without any idea of what led Glen Ripa to

write that letter, what led Robert Mutto to write that e-mail,

what other information he had apart from a couple of e-mails

sent to him by the defendant to reach that conclusion.

We also don't know the effect on the listener because

we don't have the defendant's responses to those e-mails,

whereas with the evidence we are seeking to introduce, that the

defendant received these e-mails, we are then also putting in

proof of his subsequent actions, and they are explained by the

M2MNRAYO

1      fact that he had this knowledge or he had this information from

2      the person who had said these things.

3             THE COURT:  Ms. Glashausser, why, if you are offering

4      a letter that was sent by Mr. Ray's lawyer, that's what I

5      understand the issue to be, why --

6             Is that right, Ms. Sassoon?  This letter --

7             MS. SASSOON:  Yes.  Exhibit H contains several letters

8      from Glen Ripa, supposedly written by Glen Ripa.

9             THE COURT:  Why, if you're offering the underlying

10     letters purportedly from Mr. Ripa, wouldn't that result in a

11     waiver of the privilege?

12            MS. GLASHAUSSER:  Well, your Honor, the underlying

13     letters are -- those particular letters were attached, Mr. Ray

14     attached them to the letter that he sent himself.  So he

15     adopted those statements and sent that along to the U.S.

16     Attorney's Office, and he did that after having sent the

17     information to the EPA and having been rebuffed by the EPA.

18            The letters themselves, to address your Honor's

19     privilege question, the letters from Mr. Ripa are not

20     themselves privileged information.  They were letters that were

21     sent to the U.S. Attorney's Office previously that Mr. Ray is

22     then attaching.

23            So this does not address a privilege issue.  It's a

24     hearsay issue, and it is an exception to -- it is not hearsay

25     if a statement is admitted to establish the recipient's state

M2MNRAYO

1   of mind as a result of receiving the communication.  I have two

2   examples of district court cases for that proposition, *United*

3   *States v. Thurman*, 915 F.Supp.2d 836.  That is a Western

4   District of Kentucky case as well as *Velez v. QVC*, 227

5   F.Supp.2d 324.  I apologize.  I didn't write the district that

6   that came from.  Both of them explain that if you are trying to

7   introduce the statement to show the state of mind of the

8   recipient, not for the truth, then that is not hearsay.

9           Again, the government is planning to use this very

10   theory of admissibility for other e-mails that Mr. Ray received

11   in the presentation of their case.

12           MS. SASSOON:  I do think this implicates the

13   privilege, your Honor, because to the extent that he is relying

14   on a letter from Glen Ripa to say this gave me an innocent

15   state of mind, it's relevant what information Glen Ripa was

16   relying on to generate this letter.

17           THE COURT:  Let's ask the defense -- I am not sure I

18   need to resolve this particular issue now -- but are you

19   planning to suggest to the jury that there's some significance

20   to the fact that the letter comes from counsel or that --

21           MS. GLASHAUSSER:  No, your Honor.  Not unless we do

22   raise the advice-of-counsel defense, which would be a totally

23   separate defense.

24           So, no, we would not be suggesting that to the jury

25   based on these letters.  These letters are merely to show

M2MNRAYO

1     Mr. Ray's belief that he had been poisoned and was a target of

2     the conspiracy.

3                    MS. SASSOON:  Your Honor, can I say one more thing?

4                    THE COURT:  No, Ms. Sassoon.  I need to move on.

5                    Let's go to No. 5, the prior incarceration and the New

6     York Magazine article.  I think you have given me some exhibits

7     with respect to the New York Magazine article.  So just walk me

8     through how all of fits together.

9                    MS. SASSOON:  Yes, your Honor.  I submitted the

10    exhibits to help illustrate what exactly it is we are talking

11    about here.

12                   So if you start with Government Exhibit 3002 and

13    Government Exhibit 3103, these are two e-mails written by

14    Claudia Drury to a number of recipients, including the dean of

15    Sarah Lawrence College for the first e-mail and to the

16    defendant for both e-mails.

17                   In these e-mail she describes, for example -- and

18    these are lengthy, so I will just quote.  This is the second

19    paragraph of 302:  "Talia Ray's father, Larry Ray, was

20    imprisoned unjustly for three years for interfering with the

21    transfer of child custody.  He got out of jail on September 21,

22    2010."

23                   This is the next exhibit, toward the bottom of the

24    first page, "When I met Larry he had just been released from

25    prison and reunited with Talia."

M2MNRAYO

1        The bottom of the next page, "He did all these things

2   for us even if it threatened to put him back in jail."

3        This is just to give an example of how the victims'

4   understanding that the defendant had been unjustly imprisoned

5   is interwoven in the evidence at trial, which will also include

6   testimony from the victims that as part of this narrative

7   coming from the defendant and his daughter that he was unjustly

8   imprisoned, he would talk about how he had been targeted by

9   Bernard Kerik by Frank DiTommaso and other individuals who were

10  out to get him and who were responsible for him being in prison

11  in the first place.  And these are the same names that then

12  reappear in the confessions that come from the victims.

13       For example, many of the victims on the recordings and

14  in their e-mails confess to things like plotting to poison the

15  defendant at the direction of Bernard Kerik and Frank

16  DiTommaso.

17       So we are not offering it for the truth of the matter,

18  but I think it's necessary to understand the evolution of the

19  victim's confession, their understanding of the defendant when

20  they first met him, and his arrival on campus as this mythic

21  figure who been unjustly imprisoned at the hands of these

22  various public figures.

23       So that is the way we intend to introduce that

24  information at trial.  To the extent it is admitted, we would

25  be comfortable with a limiting instruction saying it is not

M2MNRAYO

1   being offered for the truth of the matter but to explain the

2   victim's understanding at the time and the source of their

3   confessions.

4           THE COURT:  Okay.  And explain how New York Magazine

5   fits into this.

6           MS. SASSOON:  Yes.

7           So we do not intend to offer the article itself into

8   evidence, but the fact that there was a reporter at New York

9   Magazine writing about the defendant is necessary to explain

10   some of the subsequent actions of the conspiracy.

11           So, for example, Government Exhibit 3225 the defendant

12   gets an e-mail from the reporter at New York Magazine, he

13   immediately forwards it to the two central coconspirators of

14   the racketeering enterprise, his daughter and Isabella Pollok.

15   Then that prompts the coconspirators to engage in some

16   subsequent activity, including gathering incriminating material

17   against the victim as a bulwark against this article.

18           So Government Exhibit 3228, several days later

19   Isabella Pollok is sending Larry Ray journal confessions of

20   Claudia Drury that were made years before, but that are being

21   circulated for the purpose of defending this article.

22           Skip ahead to Government Exhibit 3235.  This is Larry

23   Ray sending to the New York Magazine reporter incriminating

24   information shared with him by Santos Rosario four years

25   before.

M2MNRAYO

1           And then if you look at the last exhibit, 3244, this

2     is a threatening e-mail sent by Isabella Pollok to Claudia

3     several months later, threatening her and saying, among other

4     things:  It's clear to us that you are the perpetrator of this

5     article.  You belong in prison.  You are a criminal.

6           So we are not seeking to introduce the content.  We

7     certainly think it would be appropriate to give the jury a

8     limiting instruction that they should not independently look

9     for this article, but we do think it's necessary to explain the

10    events that took place in the spring of 2019.

11          THE COURT:  A couple of questions for you.

12          First of all, with respect to the jury, if that was

13    the only issue, is there any reason why you need to have in

14    evidence the magazine, the title of the article, the name of

15    the author?

16          MS. SASSOON:  No.  As long --

17          THE COURT:  The name of the author may be in the

18    e-mails.

19          MS. SASSOON:  As long as there is a clear way to

20    convey the connection between the e-mail from James Walsh in

21    New York Magazine to the threat against Claudia several months

22    later related to the same magazine, no.

23          THE COURT:  And I guess the e-mails do refer to

24    nymag.com.  So it's going to be a challenge but you may be able

25    to figure it out.  Explain to me again -- I understand now how

M2MNRAYO

1    it fits into the story.

2              MS. SASSOON:  I think it's --

3              THE COURT:  Isn't this sort of at the tail end of the

4    activities of the enterprise, and how is this in furtherance of

5    the activities of the legal, the illegal activities of the

6    enterprise?

7              MS. SASSOON:  So it shows in practice, illustrates one

8    of our theories of obstruction.  So, for example, we are

9    introducing jail calls where the defendant talks about

10   gathering incriminating information about the victims to

11   discredit them for trial.

12             The defendant is gathering all these recordings

13   throughout the time frame of the conspiracy, and part of the

14   question is, to what end?  This is a prime example of how when

15   he's kind of under scrutiny this is when they wield all of that

16   material they have been collecting against the victims to

17   obstruct justice and to obfuscate what's really going on with

18   the defendant's criminal activity.

19             THE COURT:  At this point in time are you going to

20   offer evidence that he has some belief that there is an

21   investigation of him by law enforcement going on?

22             MS. SASSOON:  My understanding of the obstruction of

23   justice statute is that you don't have to show that that there

24   is an active investigation but that the defendant could be

25   engaging in this activity in anticipation of an investigation.

M2MNRAYO

1    And it's certainly reasonable to say if there is an article

2    exposing his activity that is going to lead to an

3    investigation.  In fact, that's exactly what happened in case.

4              At the time of the New York Magazine article, the

5    defendant also reengages with one of the victims, Santos,

6    enlists him to right comments on the article praising the

7    defendant, and at that point Santos starts sending money to the

8    defendant again, which we will argue is further extortion

9    proceeds.

10             THE COURT:  Say that again.

11             MS. SASSOON:  Yes.

12             So one of the victims is Santos, who provided the

13   defendant tens of thousands of dollars early on in the

14   conspiracy.  Then there is a lull where the defendant is

15   focused on the sex trafficking.

16             This article is published, the defendant reinitiates

17   contact with Santos, enlists him to write comments on the

18   article in the defendant's favor and also starts collecting

19   money from Santos again, which we will argue are extortion

20   proceeds.

21             THE COURT:  Okay.  Do you have handy the case citation

22   for the proposition that you just need to anticipate that there

23   will be --

24             MS. SASSOON:  I can provide that to the Court.  And I

25   am speaking from memory.  I may be --

M2MNRAYO

```
 1              THE COURT:  No need for you to provide it.  In fact, I
 2     don't want you to provide it unless you think there's some
 3     reason we can't find it on our own.  But I understand the -- I
 4     think I understand the theory now.
 5              Is there any other basis of the relevance of the New
 6     York Magazine story?
 7              MS. SASSOON:  No, your Honor.
 8              THE COURT:  I say that Ms. Sassoon with all due
 9     respect to the wonderful writings I've gotten from you and from
10     the defense.  They have been very helpful.  But there is a time
11     also where the Court just needs to do the work itself.
12              Ms. Glashausser, do you want to address these?
13              MS. GLASHAUSSER:  Thank you, your Honor.
14              Yes, your Honor.
15              Starting first with Mr. Ray's prior incarceration,
16     that is not relevant to the government's case and is
17     exceedingly prejudicial.  Just as the government presented
18     these e-mails to the Court, just because Drury used clauses
19     referencing Mr. Ray being in prison is not a reason to admit
20     it.  These can simply be redacted, and they should be.
21              There's not any dispute that Mr. Ray went to Sarah
22     Lawrence College in the fall of 2010, that he hadn't seen his
23     daughter for a long time, that he was excited to see her.
24     There is also no dispute that he believed that he was the
25     subject of a conspiracy relating to Bernard Kerik.  All of
```

1   those facts can come in.

2          THE COURT:  Doesn't, though, the fact of the

3   imprisonment sort of tend to make more credible the witnesses'

4   testimony about what Mr. Ray was saying and the impact on them?

5   That it was not just a fight with Mr. Kerik, but a fight that

6   had the grave consequences of sending Mr. Ray to prison?

7          MS. GLASHAUSSER:  No, your Honor.

8          I think first there is a bit of factual fuzziness

9   here, because the genesis of the fight with Bernard Kerik is

10  not the incarceration that the government is trying to admit.

11  So that incarceration happened in the late -- Mr. Ray was

12  incarcerated in the late '90s, early 2000s.  That's where the

13  dispute with Mr. Kerik originated.

14         The easier way to start the dispute, just for our

15  purposes to exclude prior incarceration, is with Mr. Ray

16  preventing effectively Bernard Kerik from being made Homeland

17  Security secretary.

18         That is the place where the dispute really, really

19  takes off.  That is a nonprejudicial spot to explain the

20  conspiracy plot.  It does not need reference to prison.  That

21  Mr. Ray was incarcerated on a separate offense right before he

22  went to Sarah Lawrence College is simply not relevant, and it's

23  not related to the Kerik dispute.

24         THE COURT:  Ms. Glashausser, let me ask Ms. Sassoon a

25  question as I look at Government Exhibit 3002 closely.  It

M2MNRAYO

refers to Mr. Ray being imprisoned unjustly for three years for

interfering with the transfer of a child's custody.

             MS. SASSOON:  Yes.

             THE COURT:  Isn't there something quite powerful to

the defense's point that that is pretty prejudicial and doesn't

tie it to Mr. Kerik?

             MS. SASSOON:  So it does in the sense that, yes, the

defendant's disagreement or falling out with Bernard Kerik

began with his cooperation, but that is not what was

transmitted to the victims.  What they were told in

anticipation of the defendant's arrival on campus was that he

had cooperated -- I don't even know if they were told about

this cooperation.  What's salient in their mind is that he at

that point was imprisoned because Bernard Kerik targeted him

unfairly and had a vendetta against him.  I don't know that

that's true.  And the defendant was imprisoned for this child

custody matter, but that was the understanding of the victims.

             I think it would be appropriate to redact, for

example, for interfering with the transfer of child custody or

language referencing specifically why he might have been in

prison.  But the victims' understanding was that he was coming

out of prison because of something that Bernard Kerik and a few

others had done against him.

             And this resurfaces again in 2015.  This letter we

were just talking about that the defendant supposedly sent to

1   the U.S. Attorney's Office references an assault by Frank

2   DiTommaso against the defendant in 2015.  This ties in again to

3   the defendant's involvement in these legal disputes with

4   Bernard Kerik and Frank DiTommaso.  And if that is not

5   elicited, it is going to be very difficult for the jury to

6   understand why Frank DiTommaso comes up to the defendant at a

7   hotel in 2015 and punches him in the face on video.

8         THE COURT:  Is there any documentary evidence that the

9   alleged victims were told that Mr. Ray was in prison as a

10   result of something having do with Mr. Kerik, because the 2011

11   e-mail that you gave me as 3002 just talks about transfer of

12   child custody?

13         MS. SASSOON:  I believe so.  I don't know that it's

14   reflected -- yes.  So if you look at 3103, the second full

15   paragraph right in the middle, so this does confirm what the

16   defense said about the exposure of Bernard Kerik as homeland

17   security adviser.  But it says, "One day I met my housemate

18   Talia's dad, Larry Ray.  He had just gotten out of prison.  He

19   is the man who exposed Bernard Kerik as corrupt.  Because of

20   this he was prosecuted by their own government in an effort to

21   prevent Larry from exposing Kerik.  At the same time he was in

22   the process of exposing him, he was also getting divorced from

23   his wife," and on and on.

24         THE COURT:  Ms. Glashausser, I am going to turn to you

25   in a second.

M2MNRAYO

1          MS. SASSOON:  This was part of a broader narrative.

2          THE COURT:  I get it, Ms. Sassoon.  Just give me a

3     moment.

4          Ms. Glashausser?

5          MS. GLASHAUSSER:  Yes, your Honor.

6          All of these references to prior incarceration can

7     simply be redacted because they're overly prejudicial and not

8     necessary to the government's narrative.

9          When there is other evidence that is probative of the

10    same topic, the Court should not allow the more prejudicial

11    evidence instead of the less prejudicial evidence.  That is

12    something that the Second Circuit -- I believe we cited these

13    in our brief, but says regularly, for example, in *Curley* and

14    *McCallum*.

15         Here the fact of his incarceration is only -- as your

16    Honor started to see, it is complicated, and tangentially at

17    most related to the government's theory of the case.  Redacting

18    it would have no impact on the government being able to present

19    evidence relating to Mr. Ray's belief in the conspiracy theory.

20         Obviously, we do not dispute that evidence and that it

21    is admissible.  But imprisonment is a specific thing that the

22    Court needs to take and consider differently.  For example, the

23    evidentiary rules contemplate that prior incarceration that's

24    more than ten years old is even less probative and more

25    prejudicial.  Evidentiary rule 609(b) isn't directly relevant

M2MNRAYO

1    to what we are talking about right now because it's for

2    impeachment, but I think it's relevant in spirit that for

3    incarceration that is that old, the probative value has to

4    substantially outweigh the prejudice before you it can be

5    admitted.  Here that's just not so.

6              THE COURT:  OK.  All right.

7              I've got the argument.

8              MS. SASSOON:  Your Honor, can I just note one thing

9    about these exhibits?

10             THE COURT:  Yes.

11             MS. SASSOON:  So these were offered to your Honor just

12   to show how that was the victims' understanding of the

13   defendant when they first met him.  But there are countless

14   exhibits that we intend to introduce where this plot led by

15   Bernard Kerik is part and parcel of the victims' confessions

16   and explanation of their conduct.

17             So it would be very difficult to segregate that from

18   our evidence.  And this is information the defendant injected

19   into his relationship with the victims.  It is not something we

20   are trying to introduce extrinsic of that.

21             THE COURT:  Ms. Glashausser, you can respond to that,

22   but also the New York Magazine article.

23             MS. GLASHAUSSER:  Thank you, your Honor.

24             First, briefly to respond to that, we are not talking

25   about the plot related to Bernard Kerik as something that

M2MNRAYO

1    should be excluded, merely the prior incarceration and the fact

2    that Mr. Ray had just been released from prison when he came to

3    Sarah Lawrence College, which is not related to the plot, the

4    Bernard Kerik conspiracy.

5         Turning to the article, it is simply irrelevant.  The

6    fact that a magazine wrote an article about Mr. Ray and these

7    other people is not relevant to the proof in the government's

8    case.

9         The government is saying today that it's related to

10   obstruction, but there's no evidence here that Mr. Ray is

11   trying to obstruct justice.  It is normal, if the news writes

12   an article about you, to engage with them and to want to make

13   sure that it is accurate.  That is not evidence of obstructing

14   an investigation that had not started at that point.

15        Mr. Ray in fact voluntarily participated in the

16   article as quoted in the article.  There's just no indication

17   that he was obstructing even the journalist's process of

18   writing the article, no less justice.

19        It's not relevant for that, and it's not otherwise

20   relevant.  It's simply prejudicial, not least of which because

21   the jurors will sort of be invited to look up this article once

22   they start hearing testimony that the government believes this

23   is central to the case.  That would be something that should be

24   avoided at all costs.  That would be exceedingly prejudicial

25   even if the jury just learned the name of the article itself.

M2MNRAYO

1                THE COURT:  Give me one moment.

2                Ms. Sassoon, where does the obstruction of justice

3        appear in the indictment?

4                MS. SASSOON:  Predicate acts of the racketeering

5        enterprise in Count One.

6                THE COURT:  Do you want to give me a paragraph number?

7                MS. SASSOON:  I'm working on it, your Honor.

8                THE COURT:  I see it.  It's 8I.

9                Okay.  I've got it.

10               All right.

11               The similar acts evidence regarding the defendant's

12       ex-wife and two ex-girlfriends.  I think this is the first I

13       have heard of it in the defense reply to the *in limine* motions.

14               Tell me about that, Ms. Sassoon and whether you are

15       gilding the lily with respect to that.

16               MS. SASSOON:  Yes.

17               Our enterprise letter on page 11 described violence

18       against three women.  The third woman described, whose first

19       name is Nacine, we do not intend to introduce that evidence.

20               With respect to the other two women, I think it

21       depends a little bit on cross-examination, but I do think that

22       this is probative of the defendant's modus operandi of sexual

23       degradation of women in the service of the racketeering

24       conspiracy here.

25               So, for example, Claudia is going to testify that in

M2MNRAYO

1   the Gregory Hotel, when she was assaulted, he put a plastic bag

2   over her head and also smothered her with a pillow.  We will

3   have victims testify about being choked.

4          This is part of his process of sexual degradation and

5   humiliation, and it is his pattern.  To the extent that

6   Claudia's credibility on this is challenged or she's accused of

7   fabricating this episode, we think that this is admissible as

8   404(b) evidence.

9          THE COURT:  You are not planning to open on it,

10  correct?

11         MS. SASSOON:  No.

12         THE COURT:  Ms. Glashausser, is there any reason why I

13  can't wait on until I get letters from the government and from

14  you and the government intends to offer it, expresses an intent

15  to offer it?

16         MS. GLASHAUSSER:  No, your Honor.  Although the

17  government has expressed intent to offer it in their enterprise

18  letter, which is why we wrote to the Court about it.

19         THE COURT:  I understand why you brought it to my

20  attention.  I appreciate you bringing to it my attention.  It's

21  very, very helpful.

22         I'm just trying -- you've presented me with a lot of

23  issues, and I'm prepared to rule on as many on the ones that

24  you need rulings on.  It strikes me that this one is better

25  addressed when and if the government now says they intend to

M2MNRAYO

1    offer it.  They said in the letter that they were going to

2    offer it.  Now they are saying to me it depends on

3    cross-examination.

4              MS. GLASHAUSSER:  I guess from our perspective these

5    women are also on their witness list, and just as a practical

6    matter it would be difficult for us to sort of brief the issue

7    mid trial, and we are prepared to argue it now, but if your

8    Honor wished to defer ruling --

9              THE COURT:  Well, I will hear the argument.

10             MS. GLASHAUSSER:  Okay.

11             The situations with these other two women are not

12   similar to what the government is alleging here.  One of the

13   people is Mr. Ray's ex-wife.  He met her in 1981.  They were

14   then married for a number of decades.  They had a very

15   complicated relationship, as your Honor knows, that eventually

16   involved a large custody dispute.

17             Introducing her testimony would derail the case.  It

18   would just open up a whole other trial within a trial about

19   these other issues that really have nothing do with this case.

20   There's no allegation that there was some sort of ongoing

21   organization that Mr. Ray was running in relationship to his

22   ex-wife.  She was not a particularly vulnerable person.  And

23   there's no sort of criminal charges like sex trafficking

24   extortion, money laundering.  They are just not the same at

25   all.

M2MNRAYO

1      Those things are also true about the other woman,

2  which it seems to be there is one allegation of violence within

3  the partnership.  That is not also not similar to what the

4  government is presenting here.  Instead it's completely

5  unrelated to any of the 404(b) factors and would just serve as

6  propensity evidence from a very long time ago, from 2004 and

7  2005 or earlier.

8      THE COURT:  Thank you.  That is very helpful.

9      I do think what I am going to want with respect to

10  this is for the government to submit to me a three-page

11  single-spaced letter, and then for the defense to have an

12  opportunity to respond and for that to be done pretrial.

13      I don't know whether I will rule on it pretrial, but I

14  take Ms. Glashausser's point that there's an efficiency in

15  trying to get the issue resolved quickly.  And I also take

16  Ms. Glashausser's point that, particularly with respect to the

17  ex-wife, it could result in a sideshow.

18      So how quickly can the government put in a letter?

19      MS. SASSOON:  Within a couple of days, and perhaps we

20  can even limit what we're seeking to introduce.

21      THE COURT:  Okay.  How about either Thursday, the

22  24th, or Friday, the 25th?

23      MS. SASSOON:  Yes, your Honor.  Either is fine.

24      THE COURT:  Why don't we make it the 24th.

25      And then by 5 p.m. on the 28th, a reply, both single

M2MNRAYO

1    spaced, three pages.

2         All right.  The last issue that I have identified is

3    the relevance of testimony by or about the witness whose first

4    name is Cleo.

5         MS. SASSOON:  Yes, your Honor.  The indictment alleges

6    a racketeering and extortion conspiracy against college

7    students and others.  She is among the others who is

8    specifically alleged in the indictment.  She was extorted

9    alongside the other victim within the same time frame using the

10   same methods and with the same participants.

11        She was subjected to interrogations alongside the

12   other victims in the case.  The extortion was perpetuated by

13   the defendant with the assistance of Isabella Pollok, his

14   coconspirator with respect to the other victims.  And the fact

15   that the defendant knew Cleo for a longer period of time

16   doesn't change the fact that he did not extort her until in or

17   about 2012, which is within the time frame of the conspiracy.

18   And she was extorted using the same means and methods of

19   interrogations and coercion.

20        I provided the Court with a couple of exhibits.  The

21   first letter from Cleo is very long, but the reason I provided

22   it to the Court is because within that lengthy letter she

23   apologizes for damaging the defendant, ruining his property,

24   the same types of confessions you will see from the other

25   victims.  She apologizes for interfering with his summer with

M2MNRAYO

1    his daughter and her friends.  There are e-mails where she is

2    clearly spending time with the defendant and the other victims.

3          The last attachment that I sent to the Court shows

4    that Isabella was assisting with this extortion.  She transmits

5    to the defendant the contract for Cleo's Riverside Drive

6    apartment from which they were trying to take the proceeds.

7    And so this is direct evidence and if not it's also admissible

8    404(b).

9          Thank you.

10          THE COURT:  Thank you.

11          Ms. Glashausser.

12          MS. GLASHAUSSER:  Yes, your Honor.

13          The time seems to have shifted just now in the

14    government's extortion -- excuse me, in the government's

15    enterprise letter.  It explains that the extortion occurred

16    between 2010 and 2011, which is relevant because that is

17    outside of the time period of the alleged enterprise, that the

18    government was saying that the extortion began about a year

19    before the government believes the alleged enterprise began.

20          It also has no fact nexus to the alleged enterprise.

21    The story between Cleo and Mr. Ray starts in the '90s.  They

22    were colleagues and old friends.  They then reconnected after

23    Cleo's ex-husband -- it's kind of a complicated story, but

24    ended up committing fraud that caused her to lose her job.  He

25    then was accused of murder and she turned to Mr. Ray for help.

M2MNRAYO

1        So the connection between Mr. Ray and Cleo is nothing

2    like any of the other complainants in this case.  Cleo herself

3    is nothing like the other people in this case.  She is not

4    quote-unquote vulnerable due to her age.  She is decades older

5    than the other complainants with her own successful career who

6    lived in her own apartment.  There is no allegation that she

7    ever lived with Mr. Ray or the others.

8        And she describes in the 3500 her relationship to the

9    other people involved here as really people that she knew

10    casually.  She said they were cordial.  They spoke

11    intermittently.

12        That is not enough to connect this standalone

13    allegation to the enterprise.  It's really something different,

14    and it would be just 404(b).  And it shouldn't be admitted as

15    404(b).  There is enough going on in this case without

16    introducing other standalone crimes that are not part of the

17    allegations here.

18        THE COURT:  Thank you, Ms. Glashausser.

19        All right.

20        The Court is going to take all of these issues under

21    advisement.

22        Before we recess, is there anything else from the

23    defense that I should address today?  I have your briefing on

24    all the other *in limine* issues.

25        MS. GLASHAUSSER:  The only thing we wanted to note,

M2MNRAYO

1    your Honor, is that we have received about 1400 potential

2    exhibits from the government and do anticipate that we will

3    have a number of objections to various exhibits either in whole

4    or in part.  We just wanted to flag that for the Court because

5    usually that happens in the *in limine* process, but because of

6    the timing of when we received them it could not.

7         THE COURT:  Let me ask the government, with respect to

8    the number of exhibits, first of all, is there any way to pare

9    it down.

10        And, second, the issue was raised early in this

11   argument about the exhibits to be offered through Agent

12   McGuire.  I think in terms of efficiency it would be helpful

13   for you to provide the defense the specific exhibits you intend

14   to offer through Agent McGuire so that any issues can be teed

15   up.

16        MS. SASSOON:  Yes, your Honor.

17        So our exhibit list was due three weeks before trial.

18   We definitely erred on the side of being overinclusive as

19   opposed to, you know, adding a bunch of things on the eve of

20   trial.  We are now in already in the process of removing

21   exhibits and updating the defense as we remove exhibits.

22        Many of these exhibits also are summarized in several

23   summary charts that we have provided to the defense and are

24   continuing to create as a way of again streamlining the

25   presentation of proof.

M2MNRAYO

1      So, for example, we have summary charts that

2  summarize, you know, dozens of e-mails in one chart that

3  captures a bunch of exhibits all in one.  So we don't intend to

4  play or read all 1400 exhibits to the jury, and as we're

5  preparing our witnesses we continue is to winnow the proof and

6  streamline our presentation.

7      THE COURT:  When are you going to get them a revised

8  exhibit list?

9      MS. SASSOON:  We are providing on a rolling basis

10  updated exhibit lists every couple days.

11      THE COURT:  I think the only remedy, unless

12  Ms. Glashausser can tell me otherwise, is if you so overwhelm

13  them with exhibits and hide the good stuff within a bunch of

14  other stuff there's always an order of preclusion that I can

15  issue.

16      MS. SASSOON:  No.  We are not hiding anything.

17  Everything on there was added in good faith.

18      Just to give you an example, you know, we included

19  photographs from the search.  As we meet with the witness who

20  is going to testify about the search, we are going to reduce

21  the number of photographs from the search.  But we included

22  about, you know, a few hundred e-mails.  We intend to introduce

23  most of them in some form or fashion, even if we are not

24  reading all of them, some of them through summary charts.

25      We have a bunch of bank records.  Those are going to

M2MNRAYO

1    be conveyed to the jury through summary exhibits from a

2    forensic expert.  So we have not buried our trial exhibits

3    within an overproduction of too many documents.

4              THE COURT:  One thing I am going to do --

5    Ms. Glashausser, remind me when the defense exhibit list was

6    due.

7              MS. GLASHAUSSER:  I believe it's next Tuesday, your

8    Honor.

9              THE COURT:  You are going to have more time with

10   respect to that.

11             MS. SASSOON:  We do expect most of these exhibits,

12   your Honor, to the extent we are pulling things, it is to

13   streamline the trial but, there's a basis to offer all of the

14   exhibits that are currently on the list.

15             THE COURT:  The defense exhibit list will be due on

16   March 7.

17             Then with respect, Ms. Sassoon, to providing a list of

18   the exhibits that you intend to offer through Agent McGuire, is

19   there any --

20             MS. SASSOON:  I just want to clarify.  There's Agent

21   Flatley who did the extractions.  We have already provided a

22   chart to defense counsel that lists every single one of those

23   exhibits grouped by device.

24             So the chart says, you know, Government Exhibit 500 is

25   is this device.  These are the 20 exhibits we are offering from

M2MNRAYO

1  that device.  So they have that from the day our production was

2  due.

3          THE COURT:  Okay.

4          What are you going to put in through Agent McGuire?

5          MS. SASSOON:  So through Agent McGuire we are

6  introducing a number of summary charts, most of them, drafts of

7  them have been provided to the defense.  As we are prepping our

8  other witnesses we expect to create some additional summary

9  exhibits that will be timeline slides that will be based on

10  exhibits that are already on the exhibit list.

11          THE COURT:  A little while ago in this argument you

12  told me that you wanted to offer a whole bunch of exhibits, I

13  thought through Agent McGuire en masse.  If I am mistaken --

14          MS. SASSOON:  Through Agent Flatley, your Honor.

15  Perhaps I misspoke.  She is going to testify about some of

16  those exhibits.  Agent Flatley is going to be the witness who

17  admits those exhibits.

18          THE COURT:  Is that where the bulk of your exhibits

19  are going to come in, through Agent Flatley?

20          MS. SASSOON:  So I can explain.

21          We expect to enter stipulations with the defense to

22  admit exhibits coming off of the e-mails and the iCloud

23  accounts, and we are in discussions about those proposed

24  stipulations.

25          We also expect to introduce a number of exhibits

M2MNRAYO

coming off the extracted device that's coming in through Agent
Flatley.

         We also have exhibits coming in from the FBI agents
who led the search teams of the two search locations, and this
is principally the paper scanned documents.  And we have
identified those witnesses and those exhibits.

         THE COURT:  Who are those witnesses?

         MS. SASSOON:  Rachel Graves of the FBI and Christopher
Serra of the FBI.

         THE COURT:  Have you told the defense which exhibits
are going to come in through those two witnesses?

         MS. SASSOON:  We can make that clear to the extent it
is not already clear.  It is the paper-scanned exhibits
principally, and the fact that they seized the electronic
devices, but we can provide them a list that divides it between
the two individuals.  We can do that today.

         THE COURT:  Is that the bulk of the exhibits in this
case?

         MS. SASSOON:  Yes.

         The last big category are records like bank records,
records from GoDaddy, from the phone companies.  We already had
discussions with the defense where we identified the exhibits
we intend to introduce by way of certification, to say here's
the certification.  These are therefore self-authenticating
records.

M2MNRAYO

1          Apart from a few hotel records that the defense still

2     has to review, we have come to an agreement that those records

3     can be admitted by certification without waiving any defense

4     arguments that on a call, let's say, from a bank between

5     Felicia and the bank operator it's going to be up to us that

6     establish that it is in fact Felicia on the call.

7          THE COURT:  How far into trial do you expect the three

8     law enforcement agents to testify through whom you will be

9     offering this evidence?

10          MS. SASSOON:  So that's one question I wanted to raise

11     with the Court.  I expect Rachel Graves will testify very early

12     on in the trial because she is in her third trimester.

13          With respect to Agent Flatley, we are not exactly sure

14     when he will testify, but we wanted to offer the exhibits

15     subject to connection and wanted to know if the Court had an

16     issue with that.

17          THE COURT:  I don't think I will have an issue with

18     that.  But that anticipated one of the issues that I was going

19     to raise, which is if you were not going to put them in through

20     the agent, were you going to try to offer them subject to

21     connection.  What I'm getting at is how quickly are the

22     exhibits going to be in front of the jury either through the --

23          MS. SASSOON:  Yes.  Our hope would be to introduce

24     most of the stuff at the very outset through stipulation.  For

25     example, if we have the e-mail stipulation, to read it and to

1   offer our e-mails and resolve objections and not do it on a

2   one-by-one basis.

3          We tried in our motion *in limine* to flag the major

4   categories of potential hearsay and those types of objections

5   so that if your Honor makes a ruling hopefully that will

6   resolve objections to many of these exhibits.

7          THE COURT:  All right.  So are you saying that by the

8   end of the week you will be able to tell the defense through

9   which witness you are intending to offer which category of

10  documents?

11         MS. SASSOON:  Yes.  Sooner than the end of the week,

12  your Honor.

13         THE COURT:  Okay.  Mr. Kelly?

14         MR. KELLY:  For the record, this is Neil Kelly.

15         On the certifications and the stipulations, your

16  Honor, the government is correct in terms of the

17  self-authenticating certifications.

18         I think we've largely reached agreement on those.  I

19  did want to clarify, in terms of the e-mails and files on the

20  iCloud, I think what we are working towards is a stipulation to

21  the authenticity of these documents so that they might be

22  what -- you know, they might be files from X iCloud account or

23  X e-mail address.  We are not stipulating to their

24  admissibility.  So I don't think the government was trying to

25  overstate there, but I do want to correct the record.

M2MNRAYO

1          I don't anticipate that we are going stipulate writ

2     large that all the e-mails could come in for the truth of the

3     matter therein.  There might still be hearsay objections.

4     There might be other objections to the individual files, which

5     sounded like it was animating the court's original question,

6     which was, when are certain of these exhibits going to be

7     offered.

8          To the extent there are objections like this, they

9     will need to be resolved.  So, again, I don't think the

10    government was overstating our discussions.  I just wanted to

11    clarify for the record that what we are stipulating to for

12    individual files within the larger collection on the iCloud

13    accounts, for example, is somewhat different than the

14    government stated.  We are not stipulating to their

15    admissibility.

16          THE COURT:  That's very helpful.

17          Ms. Sassoon, it really has to do with the presentation

18    of your case and you working it out with the defense to isolate

19    the exhibits that I am going to have to rule on.  The sooner

20    you are able to do that the more smoothly your case goes in.

21          So what I propose is that --

22          MS. SASSOON:  Yes.

23          THE COURT:  -- you address issues with respect to the

24    pretrial conference.  You tell me if you've got another

25    approach.  I understand what the defense is saying when they

M2MNRAYO

1    say they have got a lot of exhibits to deal with.

2         MS. SASSOON:  Yes, your Honor.  We will continue to

3    think about ways to resolve as much as possible before trial.

4         On that front, I did have a question about your

5    Honor's preferences.  Some judges in this district permit and

6    some do not permit the publishing of exhibits without a witness

7    on the stand.  We are interested in knowing your position on

8    that, not to put you on the spot, whenever your Honor is

9    prepared to let us know.  And we do intend to use a summary

10   paralegal witness who will read e-mails on the stand that are

11   not being introduced through other witnesses.

12        THE COURT:  Tell me one other thing, Ms. Sassoon.  Are

13   you intending to ask that the jurors have binders with the

14   exhibits in addition to publishing them through the monitor, or

15   have you worked that out yet?

16        MS. SASSOON:  I could see two potential categories for

17   a binder, transcripts as an aid to the jury.  And we are

18   working on finalizing those, but we have provided drafts to the

19   defense.

20        Then one thing to work out with the Court and defense

21   counsel is publishing sensitive exhibits that if the Court

22   decides they remain under seal I think that can be done through

23   the monitors without publishing it on the public monitor.  So

24   that's what we would propose for that.

25        THE COURT:  Yes.  As to that, we are going to have

M2MNRAYO

1     address that at the pretrial conference, and then maybe, as it

2     comes up, because the victims have interests, the defendant's

3     rights are paramount obviously, the public also has an

4     interest.  So even if you and the defense agreed, I need to

5     take into account the public interest, which I am not going to

6     do right now.  But I understand the issue.

7          Does the defense have a position with respect to

8     exhibits to the jurors, any of these issues, here now?

9          MS. GLASHAUSSER:  Our concern right now is that we do

10    not anticipate having our prepared objections to all 1400

11    exhibits by the pretrial conference.  So just going back to

12    where we started today --

13         THE COURT:  I am not going to require you at the

14    pretrial conference --

15         MS. GLASHAUSSER:  I appreciate that, your Honor.

16    Where we started today was talking about scheduling.  We do

17    anticipate that we'll probably have to litigate a number of

18    these issues mid trial, which is why having time either in the

19    morning, when Mr. Ray will already be here, or in the afternoon

20    I think would be helpful to the smooth presentation of the

21    trial in front of the jury.

22         THE COURT:  I understand that.  But just to give you a

23    preview of my thinking, I haven't decided how long the trial

24    day is going to be.

25         It's been my experience that it's most helpful to

M2MNRAYO

1    address issues at the end of the trial day rather than at the

2    beginning of the following trial day for two reasons:

3              First of all, if the issue ends up taking longer than

4    any of us anticipate, I don't want to run into the jury's time

5    in the morning.

6              And second, I think it would be better for all of you

7    if you get rulings at the end of a trial day that you are able

8    to then prepare for the next day.

9              So that's my thinking.  I understand that there are a

10   lot of issues in this case, and you are going all to be busy

11   briefing them, arguing them to me, and I am going to be busy

12   trying to decide them.

13             Anything else, Ms. Sassoon, from your perspective?

14             MS. SASSOON:  Either today or at the next conference,

15   we can make a record of plea discussions with the defendant.

16             THE COURT:  That would be helpful.

17             MS. SASSOON:  Would you prefer today or at the next

18   conference?

19             THE COURT:  Next conference.

20             Ms. Glashausser?

21             MS. GLASHAUSSER:  Yes, your Honor.

22             Mr. Ray still has not received the drive with the

23   government's exhibits or the stamped 3500.

24             MS. SASSOON:  That's the first --

25             THE COURT:  Are you giving it to Ms. Bracewell to deal

M2MNRAYO

1    with, Ms. Sassoon.

2                MS. SASSOON:  No.

3                MS. BRACEWELL:  We are having to address that.  We had

4    a drive hand delivered by an intern, as far as we understood, a

5    week and a half ago.  This is the first we have heard that it

6    was not successfully received.  We don't have any other

7    information to offer right now, but certainly can follow up

8    immediately.

9                THE COURT:  Okay.  Why don't you send me a letter by

10   the end of the day today.

11               MS. SASSOON:  What I do know is that the MDC received

12   your Honor's order over the weekend and was giving him the

13   three hours a day with the laptop, but I guess that doesn't

14   address the issue of what was available to him.

15               THE COURT:  Ms. Glashausser, I appreciate you raising

16   this issue.

17               Any others?

18               MS. GLASHAUSSER:  No, your Honor.

19               Although with respect to timing, we received the

20   government's exhibits just last week.  So perhaps there's some

21   confusion about dates that the government will address in their

22   letter.

23               THE COURT:  Okay.  You can all discuss after we break

24   today what you are missing, and the government will let me know

25   the status with respect to information to Mr. Ray.

M2MNRAYO

1           All right.  We will take -- Ms. Sassoon?

2           MS. SASSOON:  The last thing, I just wanted to alert

3      the Court that the last document we transmitted this morning

4      was a draft tax loss computation from the IRS agent.

5           And I also just wanted to put on the record the

6      government did not intend to mislead the Court about the

7      discussions with the defense counsel.

8           Ms. Lenox put in a letter after ours recounting a

9      conversation that happened after the last conference.  She is

10     correct that we did have a discussion related to summary

11     exhibits, including of the tax witness.

12          The government did not intend to create a misleading

13     impression there, only to convey that we had not received any

14     sort of written or clear communication that we had not provided

15     expert notice or that we were not complying with the legal

16     requirement to provide tax loss amount.

17          THE COURT:  Thank you, Ms. Sassoon.

18          Ms. Bracewell, I hope I didn't disappoint that you are

19     not arguing the tax witness.

20          MS. BRACEWELL:  You certainly did not.

21          THE COURT:  Thank you all for excellent argument.

22          We are adjourned.

23          (Adjourned)

24

25

# EXHIBIT B

2/25/22, 12:11 PM
Case 1:20-cr-00110-LJL   Document 402   Filed 03/01/22   Page 97 of 131
Larry Ray Accused of Stealing Lives of Sarah Lawrence



**FEATURE** | UPDATED FEB. 26, 2020

**EXHIBIT C**

2/25/22, 12:25 PM     Conman, 59, who set up a cult in his daughter's college apartment and divided her group of friends | Daily Mail Online

Case 1:20-cr-00110-LJL    Document 402    Filed 03/01/22    Page 99 of 131



Privacy Policy | Feedback    Follow 21.4M

Friday, Feb 25th 2022 1PM 43°F ☁ 4PM 42°F ☀ **5-Day Forecast**

# News

| Home | U.K. | **News** | Sports | U.S. Showbiz | Australia | Femail | Health | Science | Money | Video | Travel | Shop | DailyMailTV |

| Latest Headlines | Covid-19 | Joe Biden | Kamala Harris | Donald Trump | US Economy | Prince Harry | Meghan Markle | World News | Most read | | Login |

ADVERTISEMENT

AD

DailyMail.com

# Conman, 59, who set up a cult in his daughter's college apartment and divided her group of friends then 'forced them to have sex with each other in front of him'

- Lawrence Ray, 59, moved in to his daughter Talia's apartment in 2010
- She was studying at Sarah Lawrence College and living with friends
- Gradually, he manipulated them with a so-called self-improvement program
- Some escaped but some attempted suicide, sodomized themselves at his instruction and cut off ties with their families
- One family, whose three children became involved, say they gave him $200,000
- Ray was previously convicted of securities fraud and was given a probation sentence
- He was jailed for breaching a court order about his custody agreement afterwards
- He is still living with some of the former students in New Jersey and denies any wrongdoing
- He was once best friends with Bernie Kerik but they had a famous falling out and he believes he is the victim of a conspiracy

By JENNIFER SMITH FOR DAILYMAIL.COM

PUBLISHED: 12:19 EST, 29 April 2019 | UPDATED: 07:41 EST, 13 February 2020

 Share        **531** shares  **130** View comments

○Site ○Web [Enter your search] Search

ADVERTISEMENT

DailyMail.com

Follow Daily Mail
Follow @DailyMail
Follow @dailymailuk

NEW ARTICLES +99 ↑ Top

Share

A conman has been accused of turning his daughter's group of college friends into a cult by moving in with them once he got out of prison then dividing them with disturbing control tactics which included forcing them to have sex with each other, convincing them they had poisoned him and driving some to multiple suicide

Case 1:20-cr-00110-LJL   Document 402   Filed 03/01/22   Page 100 of 131

attempts.

Lawrence Ray, 59, who goes by Larry, is a well-known New York scammer who has strong ties to disgraced former NYPD commissioner Bernie Kerik.

His past is murky but, in addition to spending times behind bars for his role in a securities fraud scam, he has worked on Wall Street, owned nightclubs, been an FBI informant and inserted himself in into powerful networks by brokering meetings.

After being released from prison in 2010 following a six month incarceration for breaching the terms of his custody agreement with his ex-wife, he moved in to his daughter Talia's college apartment while she was studying at Sarah Lawrence College in Bronxville, New York.



© NBC    +10 View gallery

**Lawrence Ray, who goes by Larry, is shown in a 2016 interview where he described being assaulted by a mafia boss. He is accused of manipulating his daughter's friends by turning them into a cult-like group**

Over the next four years, he drove her and her friends apart by manipulating them into disturbing alleged scenarios which include multiple suicide attempts, lawsuits, sex in front of him and self-harming.

The allegations were laid out in a lengthy article by **The Cut** on Monday which includes testimony from some of the group.

Ray lives in New Jersey with two of the former students; Isabella Pollok and Felicia Rosario, both of whom he calls his wife.

He believes that they, along with his daughter Talia, have been poisoned by three others - Santos Rosario, Claudia Drury and Yalitzia Rosario - and that their health has suffered as a result.

It is unclear where Santos, Claudia and Yalitzia are living now.

Claudia fled New York after a recent encounter with Ray where he 'strapped her to a chair and tied a bag over her head'.

She was bought a ticket out of the city by a former boss who became worried after she told them the story and said she needed $50,000 to give him.

## FEMAIL TODAY


**Kim Kardashian pours her curves into a rubber gown after donning a suit and latex gloves - as she continues a 24 hour style parade after revealing Kanye West is causing her distress**


**Kanye West completely guts interior of his newly purchased Malibu beach house just five months after purchasing it for $57.3M**


**Kendall Jenner poses NAKED before slipping into a tiny black bikini for a jaw-dropping i-D shoot as she details her struggles with panic attacks**


**Victoria's Secret beauty Devon Windsor shows off her knockout figure in a gold bikini.... five months after welcoming her first baby Enzo**


**Shailene Woodley and Aaron Rodgers REUNITE for first time since calling off engagement... on same day NFL star apologized for pulling her into his anti-vaxx scandal**


**The celebrity beauty secret that you need to know about costs just $2.50 and is full of skin-calming super-ingredients like hemp seed oil and Moroccan rose water**
SPONSORED


**'My alter ego!': Kaia Gerber holds her bare chest as she goes NUDE for the cover of Perfect magazine while flashing several temporary tattoos**


**'My fine lines are a lot less noticeable!' This celebrity-approved skincare brand loved by Margot Robbie and Victoria Beckham is taking the beauty world by storm - and you can save 20%**
PROMOTED


**Styled by Kanye? Kim Kardashian and her ex-husband's former flame Julia Fox step out in near IDENTICAL outfits during Milan Fashion Week**

+99 NEW ARTICLES    Top

Share

EXCLUSIVE  Bachelor alum Hannah Ann Sluss


In September 2010, Ray moved in to his daughter Talia's student apartment in Sarah Lawrence College, New York. They are shown when she was a teenager



Two others - Daniel Barban Levin and a woman who gave her name only as Juli Anna - escaped years ago and spoke to The Cut.

The issues began in September 2010 when Ray was released from prison after six months. He was jailed for contempt of court for disobeying a judge's order regarding his custody agreement with his ex-wife.

He had previously been sentenced to five years of probation for his role in a securities fraud scam.

Ray moved in to the roommates' home and at first charmed them by cooking meals and occasionally taking them out for dinner, paying for the outings with a wad of cash that he carried in a backpack.

'He did all of our cleaning and definitely took on the dad role in the house,' Juli Anna, said.

At first, he slept on an air mattress in Talia's room but before long, he was sleeping in the same room as Isabella, his daughter's 19-year-old best friend who was going through a break-up and was coaching her, claiming she 'needed' him.

Gradually, he began to exert control over the group, they said.


Isabella Pollok (shown) was Talia's best friend. In 2010, Ray started sleeping in her room, claiming she needed him because she was going through a break-up. She is still living with him in New Jersey

turns up the heat in sequin bikini as she vacations in Cabo San Lucas with LA Rams beau Jake Funk after his Super Bowl win


▶ Angelina Jolie says it is vital that 'everything possible is done' to support those fleeing their homes in Ukraine: 'I'm praying for the people'

ADVERTISEMENT
AD

▶ From 40% off UGG loungewear to $80 off a Tory Burch crossbody bag, our top picks from Nordstrom's HUGE winter sale
PROMOTED

▶ Dancing With The Stars vet Julianne Hough and hockey player Brooks Laich 'agree to the terms of their divorce'... almost two years after split





Casey Affleck, 46, wraps his arm around girlfriend Caylee

According to some of the former roommates, Ray roped them all into what he framed to be a 'self improvement' program.

It soon involved them taking part in group 'sessions' in the living room where he would counsel them and tell them they had been brought together by their shared obsession with suicide, one recalled.

One involved them having to explain their past behavior and, at times, apologize to him for things he told them they had done to him.



This is the student housing where Ray lived with the students in 2010. He at first charmed them by cooking them meals and taking them out but soon started controlling them with 'group' therapy and counselling sessions




Felicia Rosario (left) and her sister Yalitzia were brought into the group by their brother, Santos (right). They are now estranged from their parents

It was such an effective form of brainwashing, they recalled, Daniel once agreed to have Ray tie a 'garrote' of aluminium foil around his penis and testicles and tighten it.


Cowan, 23, as they settle down to an alfresco lunch in Los Angeles


Nicole Scherzinger wows in a skimpy bikini while shirtless beau Thom Evans shows off his ripped torso as they soak up the sun in Mexico


Kanye West enjoys a day of shopping with new flame Chaney Jones in Miami... as Kim Kardashian files new docs pleading to be declared single


Pregnant Rihanna flashes her bump in a leather crop top and Cleopatra-style headdress with A$AP Rocky in Milan - after vowing to ramp up her sexy maternity outfits


Bella Hadid cuts a sporty figure in a white polo shirt and leather slacks as she heads out with beau Marc Kalman on a break from Milan Fashion Week


'I'm worried about my trip to Italy': While the world watches Putin's invasion of Ukraine in terror, The View's Joy Behar complains it could ruin her trip to Western Europe


For ALL the showbiz news on the internet, go to Newzit.com

SPONSORED


'She wasn't so generous towards her': Amy Winehouse's father Mitch reveals the late singer 'IGNORED' Adele when they crossed paths

Case 1:20-cr-00110-LJL Document 402 Filed 03/01/22 Page 103 of 131

He forced Daniel, who was confused about his sexuality, to have sex with Isabella, in front of him on multiple occasions and once invited a friend to watch, Daniel claimed.

He convinced Claudia Drury that she was schizophrenic, they said, and made her obsessed with the Marines.

**SHARE THIS ARTICLE**



**RELATED ARTICLES**

‹ • ›

 John Ramsey recalls being told he was the prime suspect in…

 'She wasn't alone in her final moments': Seattle crane…

Santos had tried to kill himself once before meeting Ray but, according to those who spoke to The Cut, his problems worsened as a result of their contact.

Even when Daniel and Claudia traveled to England to study abroad, they would Skype Ray and, according to Daniel, have sex on camera for him.

According to Juli Anna, Claudia was initially suspicious of him but 'snapped' after they started meeting privately and became obsessed with the Marines.

She would start posting on Facebook about the military, according to friends, and spoke down to her parents whenever she visited them.



**Claudia Drury was also part of the group. Initially, she was hesitant towards Ray but she was gradually won over by him. Over the course of several years, he convinced her that she owed him money and she even began working as a prostitute to pay off a debt she thought she owed him. Friends say she has been able to escape recently**

ADVERTISEMENT

AD    More frames for more faces! Our…
Warby Parker

$95

$95    $95

$95

Tort $95


Oliver Hudson posts candid video 'in the throes of intense anxiety' after stopping antidepressant medication: 'It's been crushing, debilitating, just scary honestly'


Britney Spears displays her flexibility in fun workout video - as it's claimed she's 'in talks to give Piers Morgan first interview since her conservatorship ended'


Tom Hardy looks glum as he's pictured for the first time since addressing Charlize Theron's claims that she felt threatened by his aggressive behaviour on set

The top Amazon deals on books: The mega-site is offering BIG savings on popular reads including the latest fiction, self-help and autobiographical releases
PROMOTED


Eva Herzigova, 48, wows in a figure-hugging multicoloured gown as she storms the Missoni runway at MFW



© ClaudiaDrury.com

[+10 View gallery]

**In this disturbing video obtained by DailyMail.com, Claudia is seen making what appears to be a coerced confession to 'poisoning' Ray, his daughter, Isabella and Felicia. He is behind the camera, prompting her with questions such as 'are you making this out of your own free will' to which she replies, 'yes'. Friends say Claudia was forced in to it and that she suffered almost a decade of psychological and emotional abuse by Ray**

During one summer break, the group decamped to an apartment on the Upper East Side.

It was owned by Lee Chen, a former friend of Ray's who eventually sued him to get him out of the property.

Daniel clawed his way out of the group after a disturbing alleged incident where, he claims, he was told to put on a dress and sodomize himself with a dildo in front of the group while they laughed.

Others, however, stayed.

Over the course of their friendship, three of the women - Claudia, Isabella and Yalitza (Santos' sister who he brought into the fold) - tried to kill themselves.

They all swallowed bottles of Tylenol pills and said afterwards that they felt badly about how they had treated him.

Santos, whose parents say they gave Larry $200,000 over the course of three years, went to a mental health facility and has also spent time in a homeless shelter.



after recovering from long Covid



Prince Harry and Meghan Markle say they 'stand with' the people of Ukraine and urge world leaders to join them opposing Putin's 'breach of international and humanitarian law'



Amanda Seyfried wows in blue velvet mini dress while attending the Los Angeles premiere of The Dropout



'It's iconic': FKA twigs responds after throwback snaps from her time as Peter Andre's backup dancer went viral



Harry Styles' transgender stalker shouted 'I'm not going to hurt him, I love him' at court heating after 'breaking into singer's home and assaulting a woman'



Selling Sunset's Emma Hernan sparks reconciliation rumours as she enjoys cosy lunch date with former fiancé - and rival Christine Quinn's ex - Peter Cornell

ADVERTISEMENT

AD

Case 1:20-cr-00110-LJL   Document 402   Filed 03/01/22   Page 105 of 131

Claudia was one of the worst affected. Over the course of their years-long relationship, she became convinced by Ray that she owed him money and even started working as a prostitute to repay him, according to The Cut.

Ray did not deny it, telling The Cut that she gave him her escort earnings and said he was 'pleased' she had started paying him back.

She also seems to have been convinced by him that she poisoned him, Talia, Isabella and Felicia and even made a video 'confession' where she said, after being prompted by him, that she had tried to kill them.

In the video, she appears on a bed, looking drowsily towards the camera, while Ray sits behind it asking her questions.

'I am making a video statement to say that I never stopped poisoning Lawrence Ray, Talia Ray, when she was in my proximity, Isabella Pollok, Felicia Rosario,' she said to the camera.

In the background, Ray can be heard asking if she is making the video of her own free will, to which she replied 'yes'. Friends say it was coerced.



**Ray was former NYPD commissioner Bernie Kerik's best man (shown) and was friends with him for years until a dispute led him to exposing Kerik for corruption. He believes now that he is the victim of a conspiracy led by Kerik to harm him and his family**

After their suicide attempts, neither Claudia nor Yalitzia would speak to their parents when they rushed to the hospital.

According to friends and nurses at the hospital, Ray would insist on being there for all their appointments with doctors.

In 2015, Claudia, Yalitzia and Isabella testified on Ray's behalf during a court battle with Chen who had sued them to get them out of his apartment.

Claudia, who has told publicly about being addicted to drugs before she even met Ray, said during that hearing that he had been a part of her life since she was nine and that her parents put her up to poisoning him in exchange for money from Kerik.

Santos' parents, who had to sell their home in the Bronx to give Ray money, say they have contacted the NYPD three times about their experiences with him but that because all of the youngsters are over 18, there is nothing they can do.

DailyMail.com


'It's going to be quite a wrench!' Sir Michael Caine reveals his emotion at auctioning career memorabilia as he downsizes from £3.75m mansion


Legendary boxers Vitali and Wladimir Klitschko vow to fight for Ukraine amidst Russia invasion... as the former heavyweight champions call for an end to 'senseless war'


Bella Hadid channels Morticia Addams in glamorous Gothic ensemble as she takes to the Tods runway alongside sister Gigi during Milan Fashion Week


'It dries up my blemishes overnight': This $17 spot drying lotion from Mario Badescu has transformed the skin of over 26,000 shoppers - and Gwyneth Paltrow is a fan
PROMOTED


Sally Kellerman, who starred as Margaret 'Hot Lips' Houlihan in Robert Altman's M*A*S*H*, dies at 84 after battling dementia


Alessandra Ambrosio shows off her incredible physique in a tiny orange bikini as she snorkels with her boyfriend Richard Lee during idyllic family trip to St Barts


Robert Pattinson admits he was 'looking for an exit strategy' from The Batman - after breaking his wrist on-set, battling with loneliness and 'falling out with director'.


EastEnders SPOILER: Kat Slater prepares to celebrate her engagement to Phil Mitchell with a party in the Queen Vic - but will her husband-to-be join her?

2/25/22, 12:25 PM          Conman set up a cult in his daughter's college apartment and divided her group of friends | Daily Mail Online

Case 1:20-cr-00110-LJL    Document 402    Filed 03/01/22    Page 106 of 131

Talia now lives with her father's stepfather in North Carolina. She has made repeated public appeals to reunite with her teenage sister Ava who she says she is being kept apart from by her mother, Teresa.

She alleged in the past that her mother beat her and sexually abused her - claims that were found to be false in family court.

In 2004 court documents, psychologists found it 'literally impossible' to evaluate him because he is 'able to control almost any situation in which he finds himself, including a psychological interview with a forensic examiner, no matter how experienced that examiner may be.'


© Facebook          +10 View gallery

**Talia, pictured recently, has been brainwashed by her father into thinking that she was abused by her mother from a young age, friends say**

The Cut interviewed Ray and he maintained his theory that he is being targeted as part of a wide conspiracy for exposing Kerik's corruption as the police commissioner.

'It's clear they want to kill us,' he said.

His attorney did not immediately respond to DailyMail.com's inquiries on Monday morning but he denied many of the allegations made in The Cut's piece.

His colorful past includes a brief stint in the Air Force and contract work for NATO. He claimed in interviews that he was sent to Kosovo on missions despite knowing nothing about war.

He once brokered a meeting between Mikhail Gorbachev, the final leader of the Soviet Union, and Rudi Giuliani. He also facilitated a meeting between Gorbachev and Robert De Niro in Los Angeles.


▶ Drakeo the Ruler's brother Devante Caldwell sues concert promoters over the 'vicious' backstage 'mob attack' that led to the rapper's death


▶ Keep Ma'am, and carry on: Queen cancelled two virtual engagements to rest her 'croaky voice' after catching Covid... but 95-year-old monarch is 'on the mend'


▶ Miley Cyrus and Arnold Schwarzenegger and more celebs react to Russia's invasion of Ukraine: 'This morning was heartbreaking'


▶ 'You'll find me in the bath every night!' Gwyneth Paltrow shares a glimpse of her skincare regime after 'slathering' her face in a Goop scrub


▶ Tyrese Gibson believes that COVID-19 'wouldn't have taken' his late mother if she 'lived with me'... as he encourages others to take precautions against the virus


▶ Keep up with Kate! Get the Duchess of Cambridge's look in her Blundstone Chelsea boots, H&M sweater and Seeland jacket
PROMOTED


▶ 'It was very un-Sherlock!' Benedict Cumberbatch reveals he rescued a family from a herd of COWS after learning how to wrangle cattle for The Power Of The Dog


+99 NEW ARTICLES          Top
f Share

ADVERTISEMENT

AD

Through Kerik, he became friends with FBI agents and claimed he could inform on members of the Mafia.

Among the agents he got to know was Gary Uher. He was Donald Trump's bodyguard in 2015.

Ray told Uher that he knew of a 'pump-and-dump' scheme that mafia bosses were using to scam the stock market.

Uher, however, soon realized that he was using his position as an FBI informant as a cover to get in on the scheme himself.

Ray was indicted in 2000 along with 19 others for his part in the scheme and was sentenced to five years probation.

He asked Kerik, who was by then the police commissioner, for help when it became clear that he would be convicted by Kerik turned him down.

Four years later, when Kerik was nominated by George W. Bush to Secretary of Homeland Security.

Kerik withdrew after admitting that he had once hired an undocumented worker as his nanny.

Days later, Ray lashed out against him in the press. He shared stories of his impropriety and corruption.

Afterwards, Kerik's affair with Judith Regan emerged. Years later, Kerik was convicted of tax fraud.

**Share or comment on this article: Conman who set up a cult in his daughter's college apartment and divided her group of friends**

      

**531**
shares

**MOST WATCHED NEWS VIDEOS**          Embed this



Ex-General starkly warns Britain could

Russians gather in Novosibirsk Oblast to

Moment Sky News team hear unsettling air

Civilians in eastern Ukraine live in fear as

Minister urges Russian generals to stage a

Russia's Black Sea fleet carry out military

BBC's Clive Myrie puts on bullet-proof vest

Queues of cars leaving Kiev as Vladimir Putin


Dear Evan Hansen actress and mother-of-two Jessica Phillips comes out as queer at age 50 and reveals she is in a relationship with a woman - after split from second husband


Kevin Bacon sports a moustache as he films season three of crime series City On A Hill in Brooklyn New York


Maksim Chmerkovskiy's wife Peta Murgatroyd is 'struggling' and asks for prayers for DWTS pro's safe return to US as he remains in Kyiv as Russia invades Ukraine

'I would have been too terrified to do anything': Daisy Edgar-Jones admits she 'had no idea' that Normal People would receive universal acclaim

Iris Law stuns in a black glitzy gown as she leads the Missoni runway while Romeo Beckham's girlfriend Mia Regan watches from the front row at MFW


NEW ARTICLES    Top

Share

# EXHIBIT D

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/daily-mails-online-reinvention-relieves-pressure-amid-newspaper-industry-woes-11575530597

MEDIA & MARKETING

# Daily Mail's Online Reinvention Relieves Pressure Amid Newspaper-Industry Woes

British paper's web edition, known for photo-heavy stories about vacationing celebrities and other tabloid fodder, has become one of the world's most-read news sites



The Daily Mail's London offices. The British tabloid said its website's revenue grew 15% from a year earlier.

PHOTO: JACK TAYLOR/GETTY IMAGES

By *Lukas I. Alpert*
Dec. 5, 2019 2:23 am ET

The Daily Mail's transformation from a tabloid little known outside the U.K. to one of the world's most-read news websites is playing a key role in helping its parent company weather the downturn affecting newspapers world-wide.

The site's potent mix of web aggregation and original celebrity, scandal and breaking-news reporting has long proved popular with readers and is beginning to show its impact on the balance sheet of its corporate parent, Daily Mail and General Trust PLC.

On Thursday, the company reported that revenue from its digital arm—known in the U.S. as DailyMail.com and in the U.K. as MailOnline—grew by 15% to £140 million ($183.5 million) in the fiscal year that ended Sept. 30.

The site is now "solidly profitable," DMGT Chief Executive Paul Zwillenberg said in an interview. A person familiar with the matter said the site's profit margin was greater than 10% for the year.

### Digital Boost
The Daily Mail's online unit has accounted for a growing share of its revenue in recent years



Revenue

■ Daily Mail  ■ MailOnline

£700 million

Note: Fiscal years end Sept. 30. Excludes revenue numbers from other divisions.
Source: the company

The website's revenue growth is notable because it is almost entirely driven by digital advertising, an area in which it has become increasingly difficult for many publishers to compete as big tech companies like <u>Alphabet</u> Inc.'s Google and <u>Facebook</u> have grown to control close to 60% of all digital ad spending.

Many big news outlets have sought to diversify their online revenue streams through subscription, events and affiliate sales businesses. The Mail has mainly stuck to its core model of boosting ad impressions by bringing in a large number of regular readers.

"It doesn't matter if you are going the subscription route or the free way like us, or a hybrid of the two—it won't work unless you have a substantial, committed audience willing to pay with their money or their time," Mr. Zwillenberg said.

The company has also built up a small e-commerce operation selling clothes featured in celebrity photos published on the sites.

He said about 70% of DailyMail.com's traffic comes directly to its home page or through its mobile app, a high number in a market where many sites rely on readers coming to stories through web searches, external links and social media.

"We have focused on building this great audience of really engaged users who come back to our home page and app day in and day out. We didn't chase the shiny things of [search engine optimization] or social or building studios," Mr. Zwillenberg said.

---

SHARE YOUR THOUGHTS

*Do you read the Daily Mail? What do you think about it? Join the conversation below.*

---

Launched in the U.K. in 2008, the site expanded to the U.S. in 2010 and has since become one of the largest online news destinations in the world. In October, it attracted around 218 million global unique visitors, according to the company's internal traffic figures. In the U.S., the site drew in 85 million uniques that month, up 27% compared with the same month a year earlier, and putting it on par with the New York Times, according to Comscore Inc.

The site is well known for publishing photos of bikini-clad celebrities and delving deep into scandals involving notable figures. It has broken some consequential stories, such as revealing Anthony Weiner's online relationship with a teenager in 2016. Mr. Weiner ended up in jail, and the scandal prompted the FBI to reopen an investigation into Hillary Clinton's emails.

The site has often skirted the edge of controversy. In 2016, the Daily Mail settled a defamation lawsuit with first lady Melania Trump for $2.9 million after publishing a story claiming she had once worked as a high-end escort.

In October, former U.S. Rep. Katie Hill sent a cease-and-desist letter to the site demanding it take down nude photos it published of her related to a sex scandal that led to her resignation. A spokesman for the company declined to comment.

The site employs more than 500 reporters in offices in London, Los Angeles, New York and Sydney, churning out an average of 1,700 stories, 14,000 photos and 900 videos every day.

While content from the Daily Mail newspaper does appear online, the website operates as a separate business with its own reporters.

The Daily Mail newspaper is the second-largest by circulation in the U.K., just behind the Sun, which is owned by News Corp, the parent company of The Wall Street Journal. Like all newspapers, revenue from the print edition of the Mail has been steadily declining over the past decade as readers and advertisers have moved online.

Revenue from the print operation has fallen 25% since 2014 to £406 million. At the same time, online revenue has more than doubled to £140 million. In fiscal 2019, revenue from the web accounted for 25% of the Daily Mail's revenue overall. For the year, DMGT reported adjusted operating profit for its media unit of £67 million.

On Thursday, DGMT said for the fiscal year, it recorded revenue of £1.41 billion and a pretax profit of £145 million.

While advertising revenue at the paper fell 8% year over year, it grew 12% on the Web, and advertising revenue from DailyMail.com and its related DailyMailTV operation accounted for 57% of the newspaper business' total ad revenue.

"While many others have been forced to pivot out of desperation, I'm pleased to say that the only pivot we have made in the last decade is a pivot to profit," Mr. Zwillenberg said.

**Write to** Lukas I. Alpert at lukas.alpert@wsj.com

*Appeared in the December 6, 2019, print edition as '.'*



Copyright © 2022 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

# EXHIBIT E

2/25/22, 4:05 PM
Ex-Sarah Lawrence student charged conspiring classmate's sex cult dad | Daily Mail Online

Privacy Policy | Feedback  Follow 21.4M

Friday, Feb 25th 2022 4PM 42°F ☁ 7PM 35°F ☀ **5-Day Forecast**





# News

| Home | U.K. | **News** | Sports | U.S. Showbiz | Australia | Femail | Health | Science | Money | Video | Travel | Shop | DailyMailTV |

| Latest Headlines | Covid-19 | Joe Biden | Kamala Harris | Donald Trump | US Economy | Prince Harry | Meghan Markle | World News | Most read | Login |

ADVERTISEMENT

# Ex-Sarah Lawrence student, 29, is charged with 'conspiring with her classmate's sex cult dad, 61, who moved into his daughter's college dorm before pimping out her friends, blackmailing them and extorting them out of $1 million'

- Isabella Pollok of Staten Island has been charged with racketeering, extortion and sex trafficking conspiracies, according to an indictment
- She was charged with conspiring with Lawrence Ray who has has been held without bail since pleading not guilty after his arrest last February
- Authorities say Ray started his scheme in 2010 after he moving in with his daughter Talia, Pollok and other women at private art college Sarah Lawrence
- He presented himself as a father figure, conducting 'therapy', prosecutors say
- Pollok, who has pleaded not guilty, had initially been viewed as a victim of Ray
- She was just 19 when the two met and she soon cut ties with her loved ones
- That she is now being accused of conspiring with Ray has shocked her family
- 'She has been under his spell for 10 years,' her aunt has said

By **LAUREN FRUEN FOR DAILYMAIL.COM** and **ASSOCIATED PRESS**

PUBLISHED: 10:44 EST, 1 March 2021 | **UPDATED:** 20:02 EST, 1 March 2021

 Share        **39** shares  💬**193** View comments


ADVERTISEMENT

barmax

GET THE #1-RATED BAR REVIEW FOR FREE

START NOW ➤

BAR REVIEW COURSE



Follow Daily Mail
Follow @DailyMail
Follow @dailymailuk

NEW ARTICLES +99 ▲ Top

Share

A former Sarah Lawrence student has been charged with conspiring with an alleged sex cult leader who prosecutors say moved into his daughter's college dorm before pimping out her friends.

2/25/22, 4:05 PM
Case 1:20-cr-00110-LJL Document 402 Filed 03/01/22 Page 116 of 131
Ex-Sarah Lawrence student charged conspiring with classmates in sex cult: dad | Daily Mail Online

Isabella Pollok, 29, of Staten Island has been charged with racketeering, extortion and sex trafficking conspiracies, according to an indictment rewritten to add her as defendant and unsealed in Manhattan federal court.

She was charged with conspiring with Lawrence Ray, 61, who has been held without bail since pleading not guilty to multiple charges after his arrest last February. Both could face life in prison if they are convicted.



Authorities say Ray started his scheme in 2010 after he moving in with his daughter Talia, Pollok and other women at Sarah Lawrence, a private liberal arts college outside New York City.

He presented himself as a father figure to the roommates, conducting 'therapy' sessions with them, prosecutors say. He then alienated them from their parents, persuading some of them to move into a Manhattan apartment and convincing them they were 'broken,' according to court papers.

After winning their trust, he would turn on them and accuse them of trying to poison him or damage property before forcing them to provide false confessions and make payments they couldn't afford, prosecutors have said. Authorities had said there were as many as seven victims.

Ray is said to have recruited Pollok to join his criminal scheme after moving in with her and some of their alleged victims, first at the Westchester County school and later at locations in Manhattan; Pinehurst, North Carolina; and Piscataway, New Jersey.

## FEMAIL TODAY

**EXCLUSIVE** Linda Evangelista, 56, seen for first time without a mask on after brave supermodel said she was 'done hiding' following botched fat-freezing procedure


Amanda Bynes asks judge to terminate her conservatorship after nearly a decade ... following Britney Spears' own successful bid for freedom: 'her condition is improved'


**EXCLUSIVE** Kanye West parties with busty Kim Kardashian clone Chaney Jones until 3.30am in Miami... after reality star revealed her divorce misery

Friends vet Tom Selleck, 77, shares his 33-year marriage to Jillie Mack, 64, has become more satisfying over time: 'We are true partners'

Amelia Hamlin reminds fans she has one of the best bodies in the supermodel business as she poses in a skintight Versace dress while in Milan

The celebrity beauty secret that you need to know about costs just $2.50 and is full of skin-calming super-ingredients like hemp seed oil and Moroccan rose water
**SPONSORED**

**EXCLUSIVE** Naomi Campbell receives a rose from rumoured ex Leonardo DiCaprio as he buys '$500 worth of flowers' and hands them out

'My fine lines are a lot less noticeable!' This celebrity-approved skincare brand loved by Margot Robbie and Victoria Beckham is taking the beauty world by storm - and you can save 20%
**PROMOTED**

Gigi Hadid wears a daring red cut-out dress as she joins leggy sister Bella and glitzy Emily Ratajkowski to storm the Versace runway show at Milan Fashion Week


+99 NEW ARTICLES   Top

f Share



**Isabella Pollok (shown) was Talia's best friend. In 2010, Ray started sleeping in her room, claiming she needed him because she was going through a break-up**

Pollok, who has pleaded not guilty, had initially been viewed as a victim of Ray's crimes; she was just 19 when the two met and she soon cut ties with her loved ones to be with him.

That she is now being accused of conspiring with Ray has shocked her family. Her aunt, Liz Jeffrey, told **The New York Times** Monday that her niece is a 'victim', adding: 'I don't care what they found. It is all under duress. She has been under his spell for 10 years.'

Pollock herself had told New York Magazine after Ray's arrest: 'I'm 19, I was having a lot of difficulty making sense of things, I wasn't in a good place. He started to help me kind of process and make sense of a lot of things I just couldn't make sense of.'

Former federal prosecutor Taryn Merkl said prosecutors will look at 'where duress ends, and victimization can no longer be the understood reason for behavior that crosses the line over to more deliberate criminality.'

In March last year officials had suggested Pollock - who still lived with Ray along with another woman at the time of his arrest - was a victim.

Prosecutor Danielle R. Sassoon told the court: 'Both are women he exploited and abused for years, including physical abuse and sexual exploitation.'

**SHARE THIS ARTICLE**



**RELATED ARTICLES**



Boy, four, plunges down gap between steel walkway and lorry...



Portland doctor, 32, who became a pandemic TikTok star

Here Ye go again! Kanye West's ex Julia Fox mirrors Kim Kardashian once more as she slips into a VERY racy black PVC outfit... but pair avoid awkward run-in in Milan

From 40% off UGG loungewear to $80 off a Tory Burch crossbody bag, our top picks from Nordstrom's HUGE winter sale
**PROMOTED**

ADVERTISEMENT


Chelsea Handler celebrates her 47th birthday by skiing TOPLESS with her boyfriend Jo Koy: 'Doing all the things I love with the man I love'


Pictured: Shailene Woodley and Aaron Rodgers REUNITE for first time since calling off engagement... on same day he apologized for pulling her into anti-vaxx scandal


'My alter ego!': Kaia Gerber holds her bare chest as she goes NUDE for the cover of Perfect magazine while flashing several temporary tattoos



In September 2010, Ray moved in to his daughter Talia's student apartment in Sarah Lawrence College, New York. They are shown when she was a teenager

Isabella Pollok and Felicia Rosario leave federal court in NY



▶ Watch the full video

0:00 / 0:27


▶ Christie Brinkley, 68, looks youthful in crisp white power suit with bouncy blonde hair as she attends a cancer fundraiser in Florida



▶ Meet Schnitzel! Arnold Schwarzenegger introduces his new dog who is named after his favorite Austrian dish
His 22.1 million Instagram followers approve



▶ Mama June's ex Geno Doak reveals the reality TV star helped him get treatment after he attempted suicide by overdosing on 90 blood pressure pills



▶ Prince Harry says he was given 'insufficient information' over decision to change his tax-payer funded police bodyguards when he and Meghan are in the UK, High Court hears



▶ Kim Kardashian risks a run in with Kanye West's ex-fling Julia Fox as they step out during Milan Fashion Week... and they're both wearing rapper-inspired face coverings!


▶ For ALL the showbiz news on the internet, go to Newzit.com
SPONSORED


▶ 'Kim Air': Kim Kardashian's famous glam squad boasts about her bespoke private jet as they leave Italy after taking Fashion Week by storm


Officials have not said why they have now changed their minds. A judge ordered Wednesday that Pollok undergo a psychological evaluation.

Prosecutors earlier detailed how Ray sent messages to Pollok and another woman 'plainly designed to tamper with witnesses and deter these women from cooperating in the government's investigation'.

The prosecutor added: 'Ray also amassed videos that contain graphic sexual content of these two women, including sexual acts performed at Ray's direction that appear designed to debase and control them.

'Most troubling, the calls suggest that Ray's ongoing communications are designed to ensure the ongoing loyalty of these women and to inhibit their ability to detach

from the influence he commanded over them for nearly a decade.'

Ray, allegedly assisted by Pollok and others, subjected victims to sexual and psychological manipulation and physical abuse to extract false confessions before extorting them to perform unpaid manual labor, or, in one case, cause a woman to engage in prostitution to generate revenue, the indictment said.

The indictment said Ray pocketed nearly all of the millions of dollars generated by the woman's acts of prostitution after he and Pollok pressured her through force, threats of force, fraud and coercion.



**This is the student housing where Ray lived with the students in 2010. He at first charmed them by cooking them meals and taking them out but soon started controlling them with 'group therapy and counselling sessions**



**The home (pictured) where Lawrence Ray lived in for several years in Piscataway, New Jersey**

Prosecutors say they have tens of thousands of video files and more than 150,000 audio files among over 15 terabytes of electronic evidence against Ray.

ADVERTISEMENT

Maksim Chmerkovskiy, 42, says he is 'not trying to leave Ukraine' as men of 'fighting age' are told to remain in the country following Russian invasion


Adam Levine and wife Behati Prinsloo enjoy a night out in Miami as they plug their Calirosa tequila at the South Beach Wine And Food Festival


Ben Stiller and Christine Taylor 'never even dated other people after they separated' in 2017... before becoming a couple again during the pandemic


The top Amazon deals on books: The mega-site is offering BIG savings on popular reads including the latest fiction, self-help and autobiographical releases
PROMOTED


Inside Floyd Mayweather's SECOND 45th birthday bash: Boxer hosts epic party in Florida as bikini-clad women present giant TMT skyscraper cake


Investigators found ledgers at his residence showing that he earned an 'astonishing' amount in running the cult.

He is said to have extorted nearly $1 million from several students. He earned over $700,000 through one victim's prostitution in 2017 and more than $1million in 2018 through the same victim, Sassoon said.

Prosecutors believe the woman was seeing more and more clients to meet Ray's demands. The cash payments by this woman were collected by a female associate of Ray and deposited into bank accounts that he had access to, prosecutors said.

He took the private journals of his victims and elicited false confessions from them to keep his followers close, it is alleged.

Prosecutors say he was able to run his cult for so long because he convinced victims that they owed him money for property damage or claimed that they poisoned him.

Ray was arrested in February last year at a New Jersey property where he lived with two women, including Pollok. The other woman has not been charged.

At the time of his arrest, he was found in bed with an alleged female victim who he was the legal 'guardian' of at the time.

Ray told investigators he was like a father figure to the woman in bed with him and allegedly likened her to a daughter.

But investigators say they have evidence including videos showing how Ray 'sexually groomed' the woman and filmed her having sex with other men.



**Prosecutors say they have tens of thousands of video files and more than 150,000 audio files among over 15 terabytes of electronic evidence against Ray, pictured**

One video shows Ray calling the victim he was found in bed with a criminal and berating her as she sobbed. Another video showed him grabbing her by the hair and forcing her out of the house, prosecutors said.

A woman he described as his wife was a victim, the prosecutor said, and they lived in a residence in which Ray kept a lock on the refrigerator door, restricting their access to food, according to the indictment.

'He belittled and humiliated them. He broke their spirits,' Sassoon said describing how Ray ran his ring of followers.

Ray subjected his victims to 'sexual and psychological manipulation and physical abuse' from 2010 to 2018, indictment stated.

Ray, once convicted of securities fraud, had a history of failing to obey court orders, tampering with witnesses, had jumped bail once before and had used his daughter as a human shield as U.S. marshals arrested him years ago, Assistant U.S. Attorney Danielle Sassoon said in March last year.

 Dancing With The Stars vet Julianne Hough and hockey player Brooks Laich 'agree to the terms of their divorce'... almost two years after split

 Kendall Jenner poses NAKED before slipping into a tiny black bikini for a jaw-dropping i-D shoot as she details her struggles with panic attacks

 Kanye West completely guts interior of his newly purchased Malibu beach house just five months after purchasing it for $57.3M

 Alec Baldwin shares cryptic tweet about Buddhism and 'being truthful' the same day Halyna Hutchins' widower blasted the actor for shifting blame

 Victoria's Secret beauty Devon Windsor shows off her knockout figure in a gold bikini.... five months after welcoming her first baby Enzo

ADVERTISEMENT


Ex-Sarah Lawrence student charged conspiring with classmates in sex cult - dad | Daily Mail Online



Authorities say Ray started his scheme in 2010 after he moving in with his daughter Talia, pictured, Pollok and other women at Sarah Lawrence



A woman identified as the aunt of Isabella Pollok leaves Manhattan Federal Court after a preliminary hearing for Lawrence Ray on Wednesday, February 26, 2020 in New York



Dad who set up cult in his daughter's dorm is charged

'It's crazy!': Euphoria's breakout star Chloe Cherry says she is amazed by 'how many people talk about my lips being so big'


**EXCLUSIVE** Bachelor alum Hannah Ann Sluss turns up the heat in sequin bikini as she vacations in Cabo San Lucas with LA Rams beau Jake Funk after his Super Bowl win


Property Brothers star Drew Scott dotes on his pregnant wife Linda Phan as they enjoy a blissful babymoon ahead of arrival of first child


'It dries up my blemishes overnight': This $17 spot drying lotion from Mario Badescu has transformed the skin of over 26,000 shoppers - and Gwyneth Paltrow is a fan
PROMOTED


Shanna Moakler's boyfriend Matthew Rondeau DENIES he would ever 'lay a hand on another woman'... following 'arrest for domestic violence'


Eva Herzigova, 48, catches the eye in a cropped daisy print turtle neck as she arrives at Etro show for MFW... hours after ruling the runway for Missoni


Angelina Jolie says it is vital that 'everything possible is done' to support those fleeing their homes in Ukraine: 'I'm praying for the people'


Casey Affleck, 46, wraps his arm around girlfriend Caylee Cowan, 23, as they settle down to an alfresco lunch in Los Angeles


Styled by Kanye? Kim Kardashian and her ex-husband's former flame Julia Fox step out in near IDENTICAL outfits during Milan Fashion Week


Ciara models a Burberry trench coat while holding on to her football star husband Russell Wilson during a

2/25/22, 4:05 PM                    Ex-Sarah Lawrence student charged conspiring with classmate's sex cult dad | Daily Mail Online





Watch the full video

0:00 / 2:38

      

He seemed to smirk in court as prosecutors built their case against the alleged scammer.

The investigation was prompted by a 2019 article in New York magazine. After Ray's arrest, the magazine reported that Po[...]
Ray when he was arrested showed up [...]

Pollok was freed on $100,000 bail, w[...]
no contact with victims. Her lawyer d[...]
comment.

Ray was previously known for his role[...]
commissioner Bernard Kerik, who wa[...]

At the time, Ray, who had been the be[...]
indictment in a $40 million stock scar[...]
mobsters and intelligence officers.

Kerik told DailyMailTV that his former [...]

He said: 'He's a conman. He is somebody that's a detriment to society. Hopefully, justice will take its course and he'll be held accountable for his crimes.'



**Read more:**
Sarah Lawrence Student Seen as Cult Victim Is Now Charged - The New York Times

**Share or comment on this article: Ex-Sarah Lawrence student charged with 'conspiring with classmate's sex cult dad'**

Share      **39** shares

Taboola Feed

**date night in NYC**

▸ Nicole Scherzinger wows in a skimpy bikini while shirtless beau Thom Evans shows off his ripped torso as they soak up the sun in Mexico

▸ Neve Campbell reveals she has been 'approached' to star in Scream 6 but has not yet signed on: 'I'll read the script and see how I feel'

▸ Selling Sunset's Emma

ADVERTISEMENT

NEW ARTICLES   +99

Top


Share

# EXHIBIT F

# Lawrence Ray: 5 Fast Facts You Need to Know



**107** Views **46** Shares

By **Janet Winikoff**

**Updated** Apr 30, 2019 at 3:18pm



Youtube

Claudia Drury in a video posted on YouTube where she confesses a bizarre scheme to poison Lawrence Ray. Drury also has created a website where she maintains her guilt.

*The Cut* has published a disturbing investigation of Lawrence "Larry" Ray, 59, a former New York City entrepreneur who is accused of starting a bizarre mini-cult of college students from Sarah Lawrence College. Ray's group has been likened to NXIVM, the "self-help" organization that allegedly has brainwashed its members and turned young women into sex slaves.

Ray's devotees were mostly comprised of his daughter's college roommates. Some of the group's former members recalled how Ray humiliated them, manipulated them into fighting with each other, pressured them to have sex in front of him and caused them to



commit self-harm, including attempted suicide. One follower has confessed to trying to poison Ray.

Before these accusations, Ray was well known in New York and pleaded guilty to conspiracy in 2001 after being indicted with 18 others in a $41 million securities fraud scheme. Some of those involved in the crime included mobsters.

Here's what you need to know about Lawrence Ray.

## 1. Ray Moved Into his Daughter's Dorm After Serving a Stint in Jail

In 2010, after serving six months in jail over a child custody dispute involving his youngest daughter, Ray moved in with his oldest daughter, Talia. She was living in a two-story residence hall at Sarah Lawrence College in Bronxville, New York, where she was a sophomore.

Case 1:20-cr-00110-LJL   Document 462   Filed 03/01/22   Page 126 of 131
Lawrence Ray: 5 Fast Facts You Need to Know | Heavy.com

Ray rapidly ingratiated himself with Talia's seven dormmates. He often did the cooking and cleaning. Ray would also take everyone on outings or for dinner and pick up the tab. "He did all of our cleaning and definitely took on the dad role in the house," said one former roommate who wished only to be identified as Juli Anna. He also entertained the group by telling stories of how he had worked as a CIA operative, getting weapons on the black market and negotiating a cease-fire in Kosovo.

When Ray first moved into the group's student housing he was sleeping on an air mattress in daughter Talia's room, but eventually wound up sleeping in the room of her best friend, 19-year-old Isabella Pollok. Pollok was distraught over a recent break-up with her boyfriend.

Talia's boyfriend at the time told *The Cut* he found the arrangement troubling, especially after discovering Talia's father stroking 19-year-old Isabella's hair while both were laying on Talia's bed. The boyfriend recalled Ray saying, "You're acting like I'm going to be sleeping with her. But I'm going to be sleeping on the floor. She needs someone to help her."

Isabella Pollak's aunt said Ray contacted their family as the college co-ed was set to go home for winter break. He told them that she had been sexually abused as a child and if she came home to visit she might attempt suicide. "You let this happen to her," the aunt recalled he said to Pollak's mother.

Ray soon exhibited a Svengali-like hold over the group. Talia's boyfriend recalled how he controlled every move. The situation became so unbearable that Talia's boyfriend broke up with her in order to get away from Ray.

Legal documents show that Larry Ray, daughter Talia, Isabella and others were still living together in 2017. It's reported that Larry, Isabella and another woman named Felicia Rosario are currently living together in New Jersey. He calls both the women his wives.

## 2.Talia Described her Dad as "A Truth Teller"

Talia described her dad to friends as a "truth-teller." She said that her father had been unfairly jailed after he attempted to rescue her younger sister, Ava, from her mother's abuse and divulged that she, too, had been abused by her mother. Child welfare workers later determined that the allegations of child abuse lodged against Larry Ray's ex-wife Teresa were unfounded.

Talia came to her father's defense, saying he'd been jailed due to crooked officials trying to bring him down for exposing government corruption. One of these officials was former New York City Police Commisioner Bernard Kerik. Former roommate Claudia Drury wrote what Ray had shared with her. "The politicians who wanted to see Kerik in office teamed up with Teresa (Ray) to try to hurt Talia and Ava in order to get Larry to stop exposing their corruption. In nine months Larry was arrested 23 times and released every time."

According to *The Cut*, As the group's ninth roommate, Ray would sometimes share his ideologies by starting group discussions about social justice issues. He once screened Carl Sagan's *Cosmos* in the dorm room's common area and then held a lecture about "the nature of the universe." He also enjoyed talking with the students about the philosophy "Quest for Potential" or "Q4P" that one of his friends had developed.

The roommates didn't seem fazed by having a 50-year-old ex-con living with them in their college housing. "I don't think anyone really questioned (his presence) because it was such a huge part of Talia's life," roommate Daniel Barban Levin explained.

## 3. Ray Began "Counseling" Talia's Roommates

Some of Talia's former roommates stated that Ray began giving them advice when they needed help with personal problems. According to The Cut, Ray also told the naive college students that he could teach them mind control techniques that he'd learned from the U.S. government.

In the evenings, Ray would put one person in the "hot seat," demanding that one member of the group answer extremely personal questions. According to *The Cut*, these sessions were supposed to reveal "deep, personal truths." Afterwards, whoever had been selected for the interrogation would be applauded for his or her "breakthrough."

Roommate Claudia Drury began having "counseling sessions" with Ray. Friends remember her personality gradually changing. Those close to Drury became alarmed when she said she might be schizophrenic, a diagnosis Ray wasn't unqualified to give.

In an online essay written by Drury that's since been taken down, she recounted how she felt accepted by Ray. "Instead of distancing himself, he kept listening to me. I felt no judgement or recoil from him for these things that I had hidden from everyone else. That was the first time in my life that anyone had listened to me." Drury continued by saying how devoted Larry was to their "community." "Larry always made it clear: he would never abandon any of us because of what other people said or thought. And he didn't, even when it threatened to put him back in jail!"

Over time, the group of students became more entangled in Ray's web. Three of the women tried killing themselves and another said his family gave Larry over $200,000. Drury said she became a prostitute to try and repay Ray money she owed for damaging an apartment shared by the group. Daniel Levin claimed Ray made a "necklace" out of Saran wrap,

Case 1:20-cr-00110-LJL Document 462 Filed 03/01/22 Page 129 of 131

aluminum foil rolled into small balls and string. Ray then took his creation and began to twist it around Levin's penis and testicles until it caused tremendous pain and cut off circulation.

## 4. One Member of the Group Said She Tried to Poison Ray and Two Other Members of Their "Community"

In 2017, Ray devotee Claudia Drury created a disturbing video where she confessed to working with three others in their group to poison Ray, his daughter Talia and Isabella Pollak at the urging of her mother. "She told me to kill you," Drury said to Ray, who can be heard off-camera questioning her. Drury shares how she tried to poison him using mercury, cyanide, and arsenic while he was hospitalized in 2014. "I brought a vial of each, each time," she confessed. She described how she put the poison in his food, on doorknobs, his laptop and throughout his room. "I wanted to poison you and I didn't care about other people," she said.

At one point in video, Drury said she had told doctors at the hospital that Ray was delusional and that she had been pressured into saying "I was just trying to make it seem like you just pressured me into saying it." When Ray can be heard asking her off-camera if she poisoned him, she said "Yes, absolutely. Absolutely I did." At the end of the video, when he asks why she is confessing, Drury responded sheepishly, "So I can have access to you."

Drury has created a website where she continues to assert that she intentionally poisoned Ray.

## 5. Ray Was Close Friends With Former New York City Police Commissioner Bernard Kerik

Ray was once good friends with former New York City Police Commissioner Bernard Kerick. The two were so close that Ray served as Kerik's best man when he married Hala Matli in 1998. In 2005, UPI reported that Ray and a friend were being investigated for paying $10,000 towards wedding at the Chanticler catering hall, lavished the newlyweds with $7,000 in wedding gifts and added another $4,000 in baby gifts from when Kerik's daughter was born.

Ray also introduced Kerick to some of New York's most influential people, including several with mob ties. Many of the gifts and favors that came Kerik's way were unreported. But the friendship disintegrated when Ray was arrested for stock fraud and was denied help from his long-time police buddy. When Kerik gave him the cold shoulder, Ray began revealing improprieties that helped destroy Kerik's once seemingly stellar career.

Case 1:20-cr-00110-LJL    Document 402    Filed 03/01/22    Page 131 of 131

**Published** Apr 30, 2019 at 12:39pm