```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                                                 :
UNITED STATES OF AMERICA,                                        :
                                                                 :
        -v-                                                      :
                                                                 :     20-cr-110 (LJL)
LAWRENCE RAY,                                                    :
                                                                 :     MEMORANDUM &
                        Defendant.                               :         ORDER
                                                                 :
-----------------------------------------------------------------X
```

LEWIS J. LIMAN, United States District Judge:

This order resolves two pending motions before the Court: (1) the Government's motion to admit out-of-court statements of Government witness Claudia Drury as co-conspirator statements under Federal Rule of Evidence 901(d)(2)(E); and (2) the defense motion to compel the production of recordings of Government witness Felicia Rosario of her conversations with her attorneys and her therapist over Ms. Rosario's claim of privilege.

I.  **Introduction of Drury's Statements as Co-Conspirator Statements**

Claudia Drury is alleged to be the victim of the sex trafficking charge in the second superseding indictment (the "Indictment"). The Indictment alleges Ray used force, threats of force, fraud, and coercion to cause Drury to engage in commercial sex acts and that he conspired to do so. Dkt. No. 292 ¶¶ 13–14. The Government also alleges that Drury was a co-conspirator in Ray's scheme to violate the Travel Act, 18 U.S.C. § 1952. Dkt. No. 446. In particular, Drury has testified that she engaged in commercial sex acts to repay the defendant for supposed harm that she caused him or was led to believe that she caused him, and evidence has been received of communications by Drury with Ray's alleged coconspirator Pollok regarding the dates of

1

Drury's prostitution appointments and the delivery of the proceeds of her commercial sex acts. The Government seeks to introduce text messages which communicate to Pollok information pertinent to the collection of prostitution proceeds, such as hotel locations, monetary amounts, and a list of her prostitution clients that she sent to Pollok as co-conspirator statements for the truth of the matters asserted in them. *Id.* The Court has previously ruled that such exhibits, or those similar to such exhibits, can be received not for the truth but for what the exhibits show of Pollok's knowledge and intent. The defense opposes the introduction of the documents as co-conspirator statements on the theory that Drury cannot be both a coconspirator and a victim. If she was caused by force, threats of force, fraud or coercion to engage in commercial sex acts, she could not have also had a commitment to the endeavor that she would engage in commercial sex acts. Dkt. No. 455 (citing *Ocasio v. United States*, 578 U.S. 282, 287–88 2016)).

Rule 801(d)(2)(E) excludes from the definition of hearsay a statement that "is offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). To admit a statement under this rule, a district court must find by a preponderance of the evidence: (1) that a conspiracy existed that included the defendant and the declarant; and (2) the statement was made during the course of, and in furtherance of, that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *see also United States v. Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990). The admissibility of the statement under Rule 801(d)(2)(E) turns upon the understanding between the declarant and the defendant at the time it was made as well as the purpose for which it was made; it does not rest upon the outcome of the prosecutor's later decision whether to charge the conspiracy in an indictment. Thus, the conspiracy in furtherance of which the statement was made does not have to be the conspiracy charged in the indictment. *See United States v. Gigante*, 166 F.3d 75, 82

(2d Cir. 1999) ("The conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment").

The Second Circuit's recent decision in *United States v. Smith Pitterson*, 2022 WL 779256 (2d Cir. Mar. 15, 2022) (summary order), is on point. There, the defendant testified that he had engaged in the drug transactions alleged in the indictment only after having been threatened to do so. *Id.* at *1. The district court instructed that the defendant was not pursuing a duress defense but that the threat evidence might be relevant to defendant's claim of entrapment. On appeal, the defendant argued that "the threat evidence was relevant also to whether he acted with the requisite *mens rea* because it could lead the jury to conclude that he did not engage in the offense conduct willfully or intentionally." *Id.* at *2. The Circuit swiftly rejected that argument as "premised on an erroneous conflation of intent and motive." *Id.* It stated that the defendant's "conscious participation in the narcotics transactions at issue, with full knowledge that such conduct was illegal, would not be any less intentional or willful for purposes of criminal law if his conduct was motivated by threats as opposed to a desire for profit." *Id.*

The crime of conspiracy requires that a person "knowingly and willfully" enter into an unlawful agreement. Sand's Federal Jury Instructions 19-3, at 19-6. The Supreme Court has explained that "'knowingly' merely requires proof of knowledge of the facts that constitute the offense," and "willfully" "requires a defendant to have acted with knowledge that his conduct was unlawful." *Dixon v. United States*, 548 U.S. 1, 5 (2006) (internal quotation marks and citation omitted). "The duress defense, like the defense of necessity . . . may excuse conduct that would otherwise be punishable, but the existence of duress normally does not controvert any of the elements of the offense itself." *Id.* at 6. Thus, "[l]ike the defense of necessity, the defense of duress does not negate a defendant's criminal state of mind when the applicable offense requires

3

a defendant to have acted knowingly or willfully." *Id*. at 7 (holding that petitioner's argument that she engaged in illegal acts because her boyfriend threatened to kill her or hurt her daughters did not controvert the elements that she engaged in criminal conduct knowingly and willfully).[1]

The evidence establishes by a preponderance that Drury agreed with Ray that she would engage in commercial sex acts. She testified that Ray suggested that she do so. Mar. 18, 2022 Tr. At 695. Given the opportunity at argument, the defense did not dispute that Drury did so knowingly and willfully as those terms have been defined by the case law. A woman who is transported in interstate commerce for the purposes of prostitution also has the agency to be a coconspirator in her own transportation. *See United States v. Holte*, 236 U.S. 140 (1915). As in *Pitterson*, her "conscious participation in the [commercial sex act] transactions at issue, with full knowledge that such conduct was illegal, [is] not any less intentional or willful for purposes of criminal law" because her conduct was motivated by force or threats of force. 2022 WL 779256, at *2. Accordingly, her statements in furtherance of the agreement with Ray that she engage in commercial sex acts will be received under Rule 801(d)(2)(E).

## II.     Motion to Compel

Ray moves to compel the Government to produce to the defense any and all materials that Government witness Felicia Rosario provided to a documentary filmmaker, including those to which Ms. Rosario asserts a privilege.  Dkt. No. 450.

The relevant facts, which appear to be undisputed, are as follows. Prior to Ray's arrest, he introduced Ms. Rosario to Zachary Heinzerling, a documentary filmmaker associated with Hulu.

---

[1] At argument, the defense was unable to identify a case supporting its contention that a victim could not also be a co-conspirator, stating that it did not believe the circumstance had arisen where a person was both an uncharged co-conspirator and a victim.

After Ray's arrest, Ms. Rosario maintained contact with Heinzerling. Between July 2020 and January 2021, Ms. Rosario recorded six conversations with counsel on a recorder device. The first set of recordings in July 2020 reflect conversations with counsel after Ms. Rosario had been told that they would be discussing something particularly sensitive at the meeting. Mar. 18, 2022 Tr. at 786. The second set of recordings are of meetings where Ms. Rosario came to the meeting with specific questions, seeking specific advice from counsel. *Id.*[2] During this same time period, Ms. Rosario often recorded private discussions about her mental health. On May 9, 2021, she recorded a voice journal where she privately discussed her mental health, and on June 3, 2021, she recorded a private therapy session. Dkt. No. 457 at 2. During the time period of the July 2020 recordings, Ms. Rosario referred to the defendant as her "husband," was living with defendant's alleged co-conspirator Pollok, and referred to defendant's family members as "family." *Id.* at 1.[3] It apparently was only later that her feelings towards defendant changed.

In June 2021, as Ms. Rosario was in the process of moving from New York to Houston to "start a new chapter in her life and put the horror behind her," Mar. 18, 2022 Tr. 785, the filmmaker asked her for recordings she had made of herself describing her mental health healing process and she agreed to provide him the recorder that had a number of recordings on it and to download it since she was moving to Texas, but only on the condition that he not review any of the files on the recorder until she had given her expressed permission to do so. *Id.* at 785, 787. The recorder contained 70 audio files, including, as she later discovered, recordings of the six conversations with counsel and the two recordings involving her therapist. Dkt. No. 457 at 1-2.

---

[2] Ms. Rosario's counsel provided general descriptions of the calls so as not to disclose the content of any privileged communications.
[3] Ms. Rosario was never legally married to defendant, and his family members are not her relatives.

Ms. Rosario told the filmmaker not to review any of the recordings because she recalled that the recorder contained files that were sensitive and that she might not want him to review but she did not recall what. Ma. 18, 2022 Tr. at 787. The filmmaker agreed. *Id.* at 787. The filmmaker returned the recorder the next day, Ms. Rosario decided to download the files herself, and in the process of downloading them herself, she discovered that they contained recordings with counsel and with her therapist. Id. at 787–88. She immediately called the filmmaker and told him that the recorder accidentally included conversations with her counsel and her therapist and she did not want the filmmaker to review them. *Id.* at 788. The filmmaker agreed. *Id.*

The Government first learned of Ms. Rosario's participation in the Hulu documentary production on March 8, 2022 and disclosed notes of its conversations with Ms. Rosario's counsel on the same day. Dkt. No. 456 at 1. Over the period from March 8, 2022 to March 12, 2022, the Government learned and disclosed to the defense that Ms. Rosario had created and provided audio and video recordings to the production team. *Id.* The Government requested that Ms. Rosario's counsel gather and produce the materials, which the Government did on March 15, and 16, 2022, withholding only the eight audio files at issue on this motion and a ninth audio file containing a conversation among defendant, his father, and defendant's counsel as to which the defense has a potential claim of privilege. *Id.* at 2.[4]

Ms. Rosario maintained communications with the filmmaker until March 7, 2022, facilitated his interviews with other members of the Rosario family as late as February 2022, has received gifts from him and shared meals with him; he has also travelled to visit her out of state. Although Ms. Rosario signed a release expressly permitting the filmmaker to use material and

---

[4] The Government has not reviewed any of the nine audio files. It has agreed to provide the ninth audio file to the defense so it can determine whether to assert a claim of privilege.

information he received from her, the filmmaker has represented he was not going to review the files and Hulu has stated that they will destroy the files when permitted to do so and will not use them. *Id.* at 789.[5]

"A party invoking the attorney-client privilege must show (1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *In re Cty. of Erie*, 473 F.3d 413, 419 (2d Cir. 2007). Similar principles apply to the psychotherapist-patient privilege. *See United States v. Ray*, 2022 WL 374367, at *3 (S.D.N.Y. Feb. 8, 2022) ("A party invoking the psychotherapist-patient privilege must establish that (1) confidential communications were made, (2) between a licensed psychotherapist and patient, and (3) in the course of diagnosis or treatment") (internal citations and quotations omitted).

Ray argues that Ms. Rosario waived both privileges by virtue of the disclosure of the audiotapes to the filmmaker. Dkt. No. 450 at 2. Ms. Rosario responds that her disclosure was inadvertent and does not operate as a waiver. Dkt No. 457 at 5.

The relevant factors were laid out by Judge Sweet, first in *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 104 F.R.D. 103, 105 (S.D.N.Y. 1985), and then in *BNP Paribas Mortg. Corp.*, 2013 WL 2322678, at *10 (S.D.N.Y. Mar. 7, 2013). *See Amica Mutual Ins. Co. v. Coan,*, 2020 WL 3396733, at * 6 (D. Conn. June 19, 2020) (applying *Lois Sportwear*); *United States v. Inniss*, 2019 WL 6999912, at *18 (E.D.N.Y. Dec. 30, 3029) (same); *United States v. Nunez*, 2013 WL 4407069, at *3 (S.D.N.Y. Aug. 16, 2013) (same). The factors, which go to whether an alleged inadvertent

---

[5] The record is not clear whether the release supersedes the filmmaker's oral agreement not to review any specific files without Ms. Rosario's express permission.

disclosure should result in a waiver, "include (1) 'the reasonableness of the precautions to prevent inadvertent disclosure'; (2) 'the time taken to rectify the error'; (3) 'the scope of discovery'; (4) 'the extent of the disclosure'; and (5) 'an overreaching issue of fairness.'" *BNP Paribas Mortg. Corp.*, 2013 WL 2322678, at *5 (quoting *Lois Sportswear*, 104 F.R.D. at 105).[6]

The Court finds *Lois Sportswear* to be satisfied here. First, at the time Ms. Rosario turned over a large number of files, she explicitly told the filmmaker that the files might contain sensitive material and secured his agreement not to look at any of them until she gave her permission. She turned over the files only because she was moving. Ms. Rosario also acted without the benefit of counsel. In form, her action was no different than that of a lawyer who turns over a large document production which the lawyer knows contains privileged communications but turns it over only on the promise that the recipient will not review any of the materials until it obtains consent. The lawyer is not required to do so because of legal compulsion; she does so for the convenience of the parties. Indeed, in one sense, Ms. Rosario's action may have been as or more protective of the privilege than the conduct of the hypothetical lawyer, as it appears she secured the filmmaker's agreement not to review any of the files until she gave consent.

Second, the time it took Ms. Rosario to rectify the error was extremely short. Upon realizing her error after turning over the recorder, she immediately demanded, once again, that the

---

[6] The Court rejects the defense's argument that Federal Rule of Evidence 502 displaces *Lois Sportswear* and limits the doctrine of inadvertent waiver to circumstances where disclosure is "made in a federal proceeding [or] to a federal office or agency" or in a "state proceeding." Dkt. No. 458 at 1 (citing Fed. R. Evid. 502). *See BNP Paribas Mortg. Corp.*, 2013 WL 2322678, at *10 (stating that courts have continued to follow *Lois Sportswear* even after adoption of Rule 502); *see also* Rule 502, Advisory Comm. Note to subdiv. (b), Explanatory Note (Rev. 11/28/2007).

filmmaker not review the files and once again obtained his agreement.  *See BNP Paribas Mortg. Corp.*, 2013 WL 2322678, at *7 (six days is reasonable period of time).

The scope of discovery and the extent of the disclosure are related to one another.  Ms. Rosario turned over a thousand files to the filmmaker that have been produced to the Government.  Dkt. No. 457 at 5.  The eight audio recordings at issue were among the seventy audio files turned over to the filmmaker.  The facts do not suggest a conscious or even reckless decision to turn over privileged materials.  *See United States v. Rigas*, 281 F. Supp. 2d 733, 740 (S.D.N.Y. Sept. 22, 2003)  ("Courts generally decline to find waiver when 'a relatively small number of privileged documents were disclosed in comparison to the total number of documents produced.'" (quoting *Asian Vegetable Rsch. & Dev. Center v. Institute of Int'l Educ.*, 1995 WL 491491, at *7 (S.D.N.Y. Aug. 17, 1995)).  When combined with the agreement she secured from the filmmaker, the facts suggest a person who was jealously guarding her privileged communications, albeit without the skill or sophistication of a lawyer.

Finally, as to the fairness factor, the defense argues that fairness weighs in its favor because Ms. Rosario failed to disclose to the Government for more than a year that she had been sharing with a member of the media hundreds of files, including hours of audio and video recordings, directly related to the events in this case and that the defense is only receiving the information midtrial.  Dkt. No. 458 at 3.  But those factors go only to the timing of production and not to whether the documents are required to be turned over at all.  When pressed at oral argument on the relevance of Ms. Rosario's conversations with her counsel and her psychotherapist, the defense stated that the communications would show how Ms. Rosario had changed her thinking about defendant after working with the Government.  Mar. 18, 2022 Tr. at 781.  But the defense did not dispute that it has ample evidence to make that point with the information it already

has—including, presumably, from the Government's notes of Ms. Rosario's conversations with it, as well as from the admission contained in the letter of Ms. Rosario's counsel that at the time of defendant's arrest, she considered him her husband and members of his family to be members of his family. *Id.* In these circumstances, any unfairness to defendant by "the deprivation of information to which it was not originally entitled" is far outweighed by the unfairness to Ms. Rosario in not honoring the attorney-client and psychotherapist-patient privileges. *Nunez*, 2013 WL 4407069, at *3.

The motion to compel is denied.

SO ORDERED.

Dated: March 20, 2022
New York, New York

_____
LEWIS J. LIMAN
United States District Judge