

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 30, 2022

**BY ECF**
The Honorable Lewis J. Liman
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Lawrence Ray*,
              S2 20 Cr. 110 (LJL)

Dear Judge Liman:

      The Court should preclude the defendant's advice-of-counsel defense. Apart from the tax charges, such a defense should be rejected outright for the remaining charges in the Indictment, which are categorically not amenable to an advice-of-counsel defense. And even with respect to the tax charges—for which an advice-of-counsel defense is sometimes permitted—the defendant's proffer falls woefully short of what is required to present such a defense to the jury. Permitting Glen Ripa to testify to the jury about supposed conversations with the defendant, his observations of the defendant's physical condition and his perception of the victims in this case, would have no bearing on any valid defense, would mislead the jury, and would be highly and unfairly prejudicial to the Government.

      As a threshold matter, charges such as extortion, extortion conspiracy, and money laundering are not subject to an advice of counsel defense. As one district court has explained: "Hobbs Act extortion . . . and money laundering, do not require the heightened willful *mens rea* under the *Kay* rubric, instead requiring the intermediate level of willfulness . . . or the lowest level of willfulness amounting to 'knowledge,' and therefore these statutes are not among the complex statutes that may be subject to the advice of counsel defense." *United States v. Impastato*, 543 F. Supp. 2d 569, 579 (E.D. La. 2008). No lawyer, acting properly, would advise a client to violently extort or sex traffic his victims in order to seek repayment for supposed wrongdoing. And no such advice would serve to negate any knowing threats or violence carried out by the defendant, or the knowing concealment of criminal proceeds. The defense should be rejected outright for these charges.

      With respect to the tax charges, the Court should preclude the defense too, or at the very most hold a hearing to evaluate the asserted defense outside the presence of the jury in order to prevent misleading, prejudicial, and irrelevant information from coming before the jury and denying the Government a fair trial. The defense has tried to kick the can down the road, urging

the Court to permit Mr. Ripa to testify, and defer assessing the viability of the defense and the propriety of an advice-of-counsel jury instruction until afer Mr. Ripa has testified. But if it is plain that the defense is not going to satisfy the requirements of an advice-of-counsel defense even on the defense's version of the facts, this testimony should not be put before the jury at all. And it is plain that the defense cannot establish an advice-of-counsel defense even taking Mr. Ripa's statement in its most favorable light.

Defense counsel misreads *United States v. Scully* to imply that the Court must allow its presentation of evidence if it has met some nebulous burden of production. (Dkt. No. 254 ("11/22/2021 Def. Ltr.")). Not so. The quoted language from *Scully* addressed a jury instruction regarding an advice-of-counsel defense raised with respect to a fraud charge. The Circuit cautioned the district court that it must advise the jury that the "government at all times bears the burden of proving beyond a reasonable doubt that the defendant had the state of mind required for conviction on a given charge." 877 F.3d at 476. Scully addresses how the jury is instructed on the defense, not whether it hears evidence of the defense in the first instance. And, the opinion in *Scully* elsewhere makes clear that, "[t]he "burden of producing evidence simply means that the issue is not for the jury's consideration at all absent some evidence of the ***required*** facts. Whether that burden is met is thus, in the first instance, for the court to decide." *Id.* at n.5 (internal quotation marks and citation omitted) (emphasis added)); *see also United States v. Evangelista*, 122 F.3d 112, 117–18 (2d Cir. 1997) ("Thus there was no basis in the evidence for the [defendants'] reliance-on-advice defense, and they were not as a matter of law entitled to an instruction specifically apprising the jury of that theory.").

It is clear that the defense cannot satisfy the three necessary conditions of a viable advice-of-counsel defense. First, party seeking to avail himself of the defense must first show that he "honestly and in good faith" sought the advice of counsel. *United States v. Colasuonno*, 697 F. 3d 164, 181 (2d Cir. 2012) (quoting *Williamson v. United States*, 207 U.S. 425, 453 (1908)). Second, the party must establish that he "fully and honestly" put forth "all the facts before his counsel." *Id*. Third, the party must show that he followed counsel's advice "in good faith and honestly," believing it to be correct and intending that his acts be lawful. *Id.*; *see also United States v. Beech-Nut* 871 F.2d 1181, 1194-95 (2d Cir. 1989). The Second Circuit has repeatedly held the defense inapplicable when a party cannot satisfy all three elements. *See, e.g.*, *Colasuonno*, 697 F.3d at 181 (affirming the District Court's decision to reject an advice-of-counsel defense where the defendant failed to fully disclose all relevant facts); *see also Evangelista*, 122 F.3d at 117 (affirming the District Court's refusal to provide an instruction for an advice of counsel defense because, although the defendants sought the advice in good faith, they did not follow it); *United States v. King*, 560 F.2d 122, 132 (2d Cir. 1977) (affirming the district court's decision to preclude an advice of counsel defense because 1) the defendant acted before asking counsel for advice, and so could not have possibly relied on it and 2) the defendant failed to disclose all relevant facts).

The Second Circuit has also held that the defense is inapplicable when action is taken *before* seeking advice from counsel, negating the first element that advice was sought honestly and in good faith. *King*, 560 F.2d at 132 (finding that there was no factual predicate to the defense because defendant acted before seeking advice of counsel). This view is also shared by sister circuits. *See*, *e.g.*, *United States v. West*, 392 F. 3d 450, 447 (D.C. Cir. 2004) (listing the elements of an advice of counsel defense and applying it only to "contemplated" actions); *Liss v. United*

*States*, 915 F. 2d 287, 291 (7th Cir. 1990) (listing the five elements of an advice of counsel defense, the first is that the advice be sought before action taken); *CE Carlson, Inc. v. SEC*, 859 F. 2d 1429, 1436 (10th Cir. 1988) (listing the elements of an advice of counsel and specifically mentioning that it applies only to proposed actions).

It is apparent from Mr. Ripa's statement (the "Ripa Letter") that the defendant did not fully and honestly put forth all facts before his counsel. In representing to Mr. Ripa that the money from Claudia was restitution, he did not tell Mr. Ripa about the violence inflicted on Claudia, the wrongful threats made against her, and the extortion and sex trafficking that gave rise to her payments. In presenting Mr. Ripa with Claudia's supposed confessions to poisoning, the defendant also did not disclose the coercive circumstances that gave rise to these confessions. He also did not tell Mr. Ripa about the amount of money he was receiving from Claudia. The size of the payments alone clearly would have affected Mr. Ripa's supposed tax advice to the defendant, as his email today to the prosecution makes plain. (*See* Ex. A). The Second Circuit is scrupulous when evaluating this requirement, and the Ripa Letter—even taken at face value—falls far short. *See e.g.*, *Beech-Nut*, 871 F.2d at 1194 (defendant "required to have disclosed all pertinent information in his possession to his attorney"). It is not enough for a defendant to get most of the facts right, if he lies or misrepresents facts to his lawyer, the defense is defeated. *See*, *e.g.*, *Colasuonno*, 697 F.3d at 181 (affirming the district court's decision to reject an advice-of-counsel defense where the defendant failed to fully disclose all relevant facts). There is no mention in the Ripa Letter of hours-long interrogations, unpaid manual labor, hospitalization for mental health issues, or the years of threats, force, and violence that preceded Ms. Drury's 2015 admission in housing court that she and others poisoned the defendant. The defendant's failure to disclose material facts to Mr. Ripa about the circumstances surrounding the money he accepted as "compensation for the poisoning" precludes his reliance on an advice of counsel defense.

The notes about defense counsel's conversations with Mr. Ripa also make clear that the defense cannot establish that the defendant sought advice from Mr. Ripa before making tax decisions or before engaging in extortion, sex trafficking, and other crimes. "Inherent in the concept of advice of counsel is that the defendant sought an attorney's advice as to what he could lawfully do in the future." *Beech-Nut*, 871 F.2d at 1195; *see also Scully*, 877 F.3d at 478 (defense requires that, "[b]efore taking action, he in good faith sought the advice of an attorney"). But the Rule 26.2 material shows that Mr. Ripa doesn't remember if the defendant told him about taking money from Claudia before or after the defendant started accepting money from her, and that the defendant asked whether it was permissible to accept money from Claudia after he was already doing so. (*See* Ex. B; Ex. C). More broadly, the defendant's extortionate behavior began well before that time. In response to threats and violence, including threats conveyed by telephone, Santos Rosario began paying the defendant tens of thousands of dollars for supposed "damage" as early as 2012. *See*, *e.g.*, Government Exhibit 1711 (a recording from September 2012, in which the defendant stated "Santos just pay me for what you damaged."); Tr. 286:25 – 287:2 ("Q. How much money did your parents give you when you asked them for money? A. Over time, 100 to 100,000 more). During the same time period, the defendant was demanding written confessions from Claudia Drury related to her purported sabotage. *See*, *e.g.*, Government Exhibit 3030; Tr. 692:2-5 ("Q. What did you believe you owned him money for? A. Initially, property destruction, wasting his time, interfering with things he was doing that would have made him money."). Similarly, as early as 2013, Santos Rosario made exotortionate payments to the defendant through

Page 4 of 5

bank accounts held by Talia Ray and Isabella Pollok, Tr. 289: 20-25, a practice consistent with the defendant's stated belief that he "didn't want anything document . . . his name with the money." Tr. 1691:10-11. It cannot be shown the defendant honestly and in good faith sought the advice of counsel when his criminal conduct predates the attorney client relationship by years.

Finally, the defendant did not follow counsel's advice in good faith and honestly, intending that his acts be lawful. According to the Ripa Letter, Mr. Ripa advised "it was acceptable [] to accept money from Claudia as repayment for poisoning regardless of the source . . . [and] they did not need a formal legal agreement or anything from a court if they could work it out informally between themselves." Far from working it out informally, the defendant used threats and violence to extract payment from Ms. Drury over a period of years. This conduct speaks to the defendant's failure to follow counsel's advice, not a good faith effort to follow it. Clearly, the third element also fails.

With respect to the tax charges in particular, the Ripa Letter is plainly insufficient to support an advice-of-counsel defense. According to the Ripa Letter, Mr. Ripa did not "know exactly how much money" the defendant received "as repayment for poisoning." Notably absent from the Ripa Letter is a representation from the defendant about the amount or nature of damages he suffered, or the intended purpose of the repayment. Seeking tax advice without identifying the value of potentially taxable funds demonstrates that the defendant did not seek the advice in good faith, or have any intention of relying on it.

To the extent the Court is inclined to permit the defendant to present evidence related to Mr. Ripa's advice on tax-related matters, the Government respectfully requests the Court hold an evidentiary hearing outside the presence of the jury to determine whether the advice of counsel defense fails as a matter of law. *See United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997) ("it is appropriate for a court to hold a pretrial evidentiary hearing to determine whether a defense fails as a matter of law"). "If, after the hearing, the court finds that the defendant's evidence is insufficient as a matter of law to establish the defense, the court is under no duty to give the requested jury charge or to allow the defendant to present the evidence to the jury." *Id*. (citing *United States v. Bailey*, 444 U.S. 394, 416-17 (1980)).

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: __/s/__Mollie Bracewell___
    Mollie Bracewell
    Danielle R. Sassoon
    Lindsey Keenan
    Assistant United States Attorneys
    Southern District of New York
    (212) 637-2218

cc:    Defense Counsel (by ECF)

# EXHIBIT A

| | |
|---|---|
| **From:** | Glenn Ripa |
| **To:** | Sassoon, Danielle (USANYS) |
| **Subject:** | Re: [EXTERNAL] Re: Call - time sensitive |
| **Date:** | Wednesday, March 30, 2022 3:38:32 PM |
| **Attachments:** | Ray Poisoning Drury stmt Pt 1.pdf |
| | Ray Poisoning Drury stmt Pt 2.pdf |

Dear Danielle:

    Attached are documents from Claudia Drury who admitted that she poisoned Larry Ray.  Larry Ray had mentioned to me that Claudia was giving him money as restitution for the poisoning and I did mention to him that money received as restitution is non taxable. Nevertheless, I have read in the papers that Larry was getting millions of dollars from Claudia and I had no idea that we were talking about that kind of money. Let's talk.

Glenn H. Ripa, Esq.
305 Broadway, Suite 301
New York, NY 10007
Tele # 212 732 5310
Fax # 888 453 0788


-----Original Message-----
From: Sassoon, Danielle (USANYS) <Danielle.Sassoon@usdoj.gov>
To: Glenn Ripa <ghripaesq@aol.com>
Sent: Wed, Mar 30, 2022 1:28 pm
Subject: RE: [EXTERNAL] Re: Call - time sensitive

Please call me back at 646-300-4895. Thank you!

**From:** Glenn Ripa <ghripaesq@aol.com>
**Sent:** Wednesday, March 30, 2022 12:12 PM
**To:** Sassoon, Danielle (USANYS) <DSassoon@usa.doj.gov>
**Subject:** [EXTERNAL] Re: Call - time sensitive

Dear Danielle:

    Call me I am in my Office.

Glenn H. Ripa, Esq.
305 Broadway, Suite 301
New York, NY 10007
Tele (212) 732-5310
Fax  (888) 453-0788
In a message dated 3/30/2022 10:53:41 AM Eastern Standard Time, Danielle.Sassoon@usdoj.gov writes:

> Hi Glenn,
> Are you available for a call at 1pm today? Lawrence Ray is attempting to raise an advice of counsel defense and has now waived privilege, so we'd like to speak with you as soon as possible.

> Thank you in advance,
> Danielle

# EXHIBIT B

# MEMORANDUM

To: Team Lawrence Ray
From: Marne Lenox
Date: January 12, 2021
Re: Phone Call with Glenn Ripa

On January 12, 2021, I spoke with Glenn Ripa by phone. He was pleasant as always. I spoke with him about his litigation work for Mr. Ray and contracts he may have drawn up for Mr. Ray.

I read Glenn the "Agreement of Settlement of Reparations" contract between Claudia Drury and Mr. Ray dated May 15, 2014 (unsigned), US_088122. He said he has no memory of preparing a reparations contract and this contract certainly doesn't sound like anything he prepared. I asked if he remembers advising Mr. Ray that he could accept that Claudia owed him. Glenn admitted he remembered speaking with Mr. Ray about this in passing, but he thought Claudia was giving him a small amount of money. He said he now understands that it was a lot of money. He said any conversation he and Mr. Ray had about money exchanged between Claudia and Mr. Ray would have been very brief, nothing of substance in terms of the kind of money involved. When I asked if Glenn knew what Claudia owed Mr. Ray money for he said he'd have to look at his file. Glenn didn't remember going into detail with Larry about where Claudia's money was coming from. I asked Glenn if he remembered Mr. Ray saying anything about Claudia prostituting herself. Glenn said he was aware of that and assumed Larry told him. I asked if Larry talked to Glenn about taking money from Claudia before or after he actually started accepting money from her; Glenn didn't remember, said he had to look through his files.

I asked Glenn if he drafted the contract for services between Mr. Ray and Cleo Beletsis. He said he doesn't recognize that name at all. I asked if he drew up any contracts between Mr. Ray and anyone else—he doesn't remember, needs to look at his files.

It sounds like Glenn just represented Larry on issues stemming from his eviction from Lee Chen's apartment. Specifically, this includes: (1) housing court trial (at which Claudia and Yalitza Rosario testified; we have transcript); (2) SDNY case that Glenn ended up arguing (and losing) in 2d Cir. (Mr. Ray sued Lee Chen + Marshals + NYPD for their handling of his eviction), we have some of this paperwork from discovery; (3) New York Supreme Court civil suit against Lee Chen (Mr. Ray sued Lee Chen for damages for taking Mr. Ray's belongings).

I asked Glenn if he remembered speaking with the Government the day Mr. Ray was arrested. He got an email from Danielle Sassoon at 11:40 AM on February 11, 2020 (the day of his arrest) asking if they could speak by phone (he forwarded the email to me). He thinks that during that call she asked if he represented Mr. Ray and Glenn told her he is not representing Mr. Ray on this case. I asked if he had called the clerk's office or the Government to say he had/was representing Mr. Ray; he didn't. I asked if he knew why Danielle had gotten in touch with him or how she knew he was involved with Mr. Ray. Glenn assumed that the AUSA knew who he was because the Government had spoken with Claudia and Claudia knew about Glenn's involvement with Mr. Ray. Possible that Mr. Ray told the agents who then told the AUSA, but Glenn doesn't know. He doesn't remember speaking directly with Mr. Ray the day he was arrested. I asked if he learned of Mr.

1

2

Ray's arrest after speaking with Danielle; he said he thinks it may have broken on the news before he spoke with Danielle.

Bottom line is that Larry owes him a lot of money. He always liked Larry, they had a good relationship, and Glenn was friendly with all of the people involved in the case, but he wasn't going to represent Larry in this case. Glenn feels badly for Larry and says he's in his corner. I asked Glenn if he'd send me his file on Larry. He didn't commit to doing this but said he'd look through his file for things that could be helpful for this case.

2

# EXHIBIT C

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

**STATEMENT**

*United States v. Lawrence Ray*, 20 Cr. 110 (LJL)
Attorney: Marne Lenox
Statement From: Glenn Ripa, Esq. | Given to: Anna Finkel
305 Broadway, Suite 310, New York, NY

I first represented Larry Ray on a New York State housing court matter against Lee Chen in or about 2014 and continued representing him for several years. There is still a case pending where I represented Larry. In the course of my representation of Larry, I met Claudia Drury, who testified as a witness in the housing court case in 2015. She testified under oath in court that she had poisoned Larry. Yalitza Rosario and maybe other people also testified in court under oath that they poisoned Larry.

At some point I learned that Claudia was working as a prostitute. I believe I learned this from Larry. Claudia mentioned it too. Larry asked me if it was okay for him to accept money from Claudia and others as compensation for the poisoning. I said it was permissible to accept money from them as valid compensation for a tort that they committed. I assumed the money Claudia paid him was from prostitution because that's how she was making money. I said it was acceptable for Larry to accept money from Claudia as repayment for poisoning ~~even if the money was prostitution proceeds~~ Regardless of the Source. I said they did not need a formal legal agreement or anything from a court if they could work it out informally between themselves. I do not remember drafting any contract for Claudia to pay reparations to Larry. I do not know exactly how much money Claudia gave Larry as repayment for poisoning.

Dated: February 9, 2022

*Glenn Ripa*
Glenn Ripa, Esq.

DEFENSE 26.2-011