

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 6, 2022

**BY ECF**

The Honorable Lewis J. Liman
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

       Re:    ***United States v. Lawrence Ray***,
                S2 20 Cr. 110 (LJL)

Dear Judge Liman:

      The Court should adhere to yesterday's ruling denying the defense motion for a mistrial. Despite defense counsel's impassioned protestations (Dkt. 497), there was nothing improper about the Government's rebuttal arguments.

## A.  Applicable Law

      In seeking a new trial based on allegations of prosecutorial misconduct, a defendant bears "a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of [his] right to a fair trial." *United States v. Banki*, 685 F.3d 99, 120 (2d Cir. 2011) (quoting *United States v. Locascio*, 6 F.3d 924, 945 (2d Cir. 1993)). Thus, "[f]laws in the government's summation will require a new trial only in the rare case in which improper statements—and particularly rebuttal summations—are not detached expositions" and "frequently require improvisation, courts will not lightly infer that every remark is intended to carry its most dangerous meaning." *United States v. Farhane*, 634 F.3d 127, 167 (2d Cir. 2011) (internal quotation marks omitted).

      "[T]o determine whether relief is warranted, prosecutorial misconduct must be assessed 'in the context of the entire trial.'" *Miranda v. Bennett*, 322 F.3d 171, 180 (2d Cir. 2003) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 639 (1974)). This inquiry weighs several factors, including "[1] the seriousness of the misconduct, [2] the measures adopted by the trial court to

cure the misconduct, and [3] the certainty of conviction absent the improper statements." *United States v. Banki*, 685 F.3d at 120 (internal quotation marks omitted).

A district court's power to grant a mistrial should be used only "'with the greatest caution, under urgent circumstances, and for very plain and obvious causes.'" *United States v. Klein*, 582 F.2d 186, 190 (2d Cir. 1978) (quoting *United States v. Perez*, 22 U.S. 579, 580 (1824)). A district court's denial of a motion for a mistrial is reviewed for abuse of discretion. *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009); *see United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992).

## B.  Relevant Facts

### a.  Evidence of Obstruction

As alleged in the Indictment, and as the evidence showed at trial, part of the defendant's scheme was obstruction of justice.  While he was committing his crimes, the defendant tried to create a record that would discredit his victims down the road.  The Government introduced proof that the defendant created and stored recordings of his victims saying embarrassing and incriminating things.  The Government also introduced proof that the purpose of keeping these materials was to blackmail his victims, and to discredit them in the eyes of the public, the press, and law enforcement.

The defendant's purpose was clear.  In more than one recording, the defendant pressured Claudia to state that she was framing him for extortion.  (GX 3134A, GX 3163A).  That is plain consciousness of guilt—the defendant knew he was committing extortion, and he recorded his primary victim saying the exact opposite to make it more difficult for her to ever say credibly otherwise.   Other recordings of Claudia were posted on the ClaudiaDrury.com website to embarrass Claudia and get her to do the organization's bidding.  Notes recovered from the defendant's residence in Isabella's handwriting show that the organization used these recordings and Claudia's journal entries specifically to control, humiliate, and silence Claudia, including by posting excerpts on the internet.  (GX 1634 p.  13-15, 18, 20-21).  When *New York Magazine* began investigating the defendant, he emailed the reporter recordings and writings of his victims, in a plain effort to discredit them and paint them as the criminals.  (GX 1401, pp. 21-22 and cited exhibits).  At the very same time, the defendant and Isabella circulated entries from Claudia's journal, and discussed adding entries from her journal to ClaudiaDrury.com.  And when this case was actually charged, the defendant tasked his father with collecting recordings and writings of his victims saying incriminating and embarrassing things.  (GX 700-702).  A plain inference from these discussions is that these materials were part of the defendant's defense plan all along, before he was ever charged in this case, and while he was still committing his litany of crimes.  Some of these very recordings, and very writings, were highlighted in cross examination of the victims and in the defense summation, as evidence that the defendant's victims were not to be believed.

### b.  Defense Arguments about Claudia Drury

A prevalent theme of the defense cross examination of Claudia Drury was that Claudia was not sex trafficked because she was already sexually promiscuous before meeting the defendant and

that she loved being a prostitute.  The defense may not have used the word "slut"—but that was a fair, if not undeniable, implication of the arguments made on cross examination and in closing argument.

During cross examination, Claudia was asked about giving naked pictures of herself to someone during college (Tr. 1177:1-3), sleaze week at college, which included "graphic" and sexually explicit" imagery (Tr. 1173:24-1176:25), giving a guy a Skype session show in 2012 (Tr. 1177:13-15), attending sex parties and liking it (Tr. 1179:13-19),  and journaling about sexual experiences (Tr. 1182-1185:23).  Defense counsel asked Claudia about having anal sex with a police officer with a strapon, describing it as amazing and cool, writing that she couldn't wait to have sex with a strap-on again, and wanting to buy a strapon.  (Tr. 1182:3-1185:23).  Claudia described answering the questions as "super hard" and said it was "very hard for me to go back and read that in front of a room full of people and reporters."  (Tr. 1185:10-13).  Defense counsel then left the journal up on the screen and indicated that she had a few more questions about it.  (Tr. 1185).  While the transcript does not reflect this, some time passed before defense counsel indicated that she would move on without another question—the effect was that Claudia and the jury were made to read this humiliating journal entry without an actual question pending.  Giving the passage of time, Claudia asked, emotionally, "Wait. I'm sorry.  Did we just leave that up for me to read with no question?"  (Tr. 1186:4-5).  On redirect examination, Claudia described being made to read this journal entry in open court as "humiliating."  (Tr. 1234:23).

In summation, defense counsel argued that Claudia was not sexually groomed by the defendant, that she had an independent appetite for perverse and promiscuous sexual activity, and that she wanted to be a prostitute:

> And during their freshman year of college, those who attended Sarah Lawrence were exposed to Sleaze Week, a week-long celebration of sexuality and body positivity. Larry didn't implant these ideas into their heads. He didn't force anyone to have sex. ***He encouraged consenting adults to explore their sexual identities and sexuality. It may seem strange, it may appear perverse, it may be vulgar***, but it's not grooming, and it's not criminal.  Tr. 2861:7-14 (emphasis added).

Defense counsel continued to present Claudia as someone who was not victimized but rather became a prostitute because of her enjoyment of sex.

> She was an adult living in New York City. She needed money, and she needed money fast. Larry suggested escorting. And it made sense. ***Claudia enjoyed sex. And there's nothing wrong with that, frankly.*** It's perfectly healthy and natural. ***Claudia attended sex parties, she worked at a sex club, she engaged in BDSM. You saw her journal. She enjoyed kink.*** She ***wrote in explicit terms about her enjoyment of kink***. She said, "I don't know how to describe it. It's amazing. Holy wow. A new piece of my sexuality realized. It's

> really, really cool. This is a whole 'nother level." And that's okay.
> There is absolutely nothing wrong with that. Tr. 2875:7-17.

Defense counsel's argument was not just that Drury enjoyed sex, but that she enjoyed the very extreme and degrading sexual activities that the Government described as part of the defendant's grooming – for example, that she "enjoyed kink."  Only minutes prior, the defense had acknowledged how jurors might see these same behaviors as "perverse."  Defense counsel continued at length by arguing that Claudia's enjoyment of sex extended to the commercial sex acts that she performed.

> And you saw a note that Claudia wrote in her iCloud in support of
> sex work. She said sex work is awesome. She found sex work to be
> life affirming in many ways. She said she loved what she does and
> that her experience was not one of abuser and victim. She testified
> that as she earned money escorting, she began giving money to
> Larry, not because he forced her but because she believed that she
> had poisoned him and she wanted to pay him back for the damages
> that she caused. She may regret that now, and she has to explain it
> somehow, so she says she was forced.  Tr. 2876:15-24.

## C. Discussion

As a threshold matter, nothing the Government said came close to an "ad hominem attack," let alone an attack warranting a mistrial.  (Def. 497 at 1).  The defense relies on *United States v. Biasucci*, 786 F.2d 504 (2d Cir. 1986).  In that case, the prosecutor "addressed defense counsel at one point as 'you sleaze,' 'you hypocritical son-- --,' [and] as being 'so unlearned in the law.'" *Id.* at 514.  Even there, where—unlike here—the prosecutor hurled personal insults at the defense lawyers that were "needless and unwarranted" and had "no place in any court," the Circuit concluded that reversal was not warranted and that the comments were "inconsequential, isolated aberrations in a lengthy trial." *Id.* at 514-15.  The defense baldly asserts that the Government engaged in "personal insults and mockery directed at defense counsel," but fails to quote a single remark that constistuted of a personal attack on the defense lawyers.  That's because there were none.[1]  *See also United States v. Elias*, 285 F.3d 183, 190 n.3 (2d Cir. 2002) (finding "nothing inherently wrong with characterizing a defense tactic as desperate" and citing cases).

More generally, the rebuttal did not impugn the defendant's exercise of his constitutional rights or deny him a fair trial.  (Dkt. 497).  On the contrary, the Government did precisely what was approved in *United States v. Friedman*, 909 F.2d 709 (2d Cir. 1990), cited by the defense.

---

[1] At sidebar, the defense complained that the Government referred to defense counsel's "breathy whispers" in describing what "Larry believed." This was a response to a deliberate and strategic rhetorical style adopted by the defense throughout the trial, including as early as opening, to emphasize the supposed fantasyland that the victims were living in (*see, e.g.*, Tr. 89:11-13, Tr. 90:5-12), and it was appropriate for the Government to comment on it.

Specifically, "[t]he prosecutor [is] entitled in rebuttal to provide an answering argument, based on the trial evidence, to any argument that defense counsel advanced in summation." *Id.*

The Government did not, as defense counsel insists, accuse the defense of perpetuating the defendant's alleged criminal conduct. Instead, the Government properly responded to the repeated defense argument that the victims are storytellers who invented false confessions out of thin air— rather than at the defendant's direction—and that the recordings and journals establish them as such.

In light of the allegations in the Indictment (*see* S2 10 Cr. 110 (LJL) (¶ 7(c) (means and methods of Enterprise included "creating and collecting sensitive, humiliating, and incriminating material against the Victims to further the purposes of the Enterprise, including . . . the evasion of detection by law enforcement"; ¶ 8 (alleging obstruction of justice and witness tampering as predicates of the racketeering enterprise), and this defense theme and the reliance on the recordings/journals, it was perfectly appropriate for the Government to offer its interpretation of that evidence. In the Government's view, part of the defendant's crime was his obstruction, and his methodical staging of his eventual defense. The Government never claimed that defense counsel was part of a criminal conspiracy. It asserted that the evidence used to confront the victims was created as part of the crime. The Government did not accuse defense counsel of being complicit in the crime, or intending to further it—but the Government was permitted to point out that the material the defense interpreted as proof of the victims' lack of credibility was material that the *defendant created or stored*, and to elucidate the obvious significance of that fact. Foreclosing the Government from making this point would be tantamount to allowing the defendant to get away with a part of his crime.

By the same token, the Indictment alleges that the humiliating and incriminating material was created and maintained in part to secure the continued obedience of the victims. (*See* S2 20 Cr. 110 (LJL) ¶ 7). The defense attacked the credibility of the victims and claimed they had a motive to lie under oath. It was perfectly appropriate to point out that far from having a motive to come into court to lie, the victims actually had to overcome significant obstacles created by the defendant for the purpose of silencing them, including being confronted with their former incriminating and embarrassing writings made while they were under his control and being subjected to such accusations by the defendant himself as part of the criminal scheme.

The Government did not "invent things that did not happen and use such fabrications to impugn the character of defense counsel." (Dkt. 497). This is not just hyperbole. This is contradicted by the record. The defense focuses specifically on the Government's assertion that the victims were accused of being "liars, a rapist, a scorned lover, and delinquent mother, and more." Each of these accusations against the victims during this trial is well documented in the record. Beyond calling the victims storytellers who lied repeatedly under oath, the following was elicited on cross examination:

- **Rapist:** The defense suggested on cross examination that Santos Rosario was a rapist. Tr. 422:20-423:4. ("Q: Mr. Rosario, you wrote to your professor that you wanted to physically hurt her, right? A: Correct. Q: You wrote that you had thoughts about cutting her with knives? A: Correct. Q: Strangling her? A: Correct. Q: Even raping her? A: Yes."). This

questioning was based on an email that Santos wrote to his professor at the defendant's direction, and while he was under the defendnt's coercive control.

- **Scorned Lover:** The defense questioned Felicia about being devastated that her relationship with the defendant was not what she had dreamed of, and about her supposed jealousy of the defendant's relationship with Isabella. (Tr. 1806:2-7, 1800:22-1801:12, 1801:19-23, 1803:24-1804:8). In closing argument, the defense picked up this theme, saying "Felicia had a motive to come in here and tell you" a false story because she was a jealous lover: "Felicia had a motive to come in here and tell you that story. She spent nearly a decade in a relationship with a man who she referred to as her husband and who he referred to her as his wife. A man who behind closed doors shared a bedroom with another woman, just like her father had. She lived in the shadow of Isabella and was constantly reminded of it." Tr. 2883:21-2884:3. The defense alluded to the same explanation for the forced labor with respect to Felicia's creation of sex videos. See Tr. 2862:23 – 2863:2 ("There is no reason to believe that Felicia couldn't have exercised the same agency by refusing to record herself having sex with strangers. Sitting in court testifying, Felicia may have felt regret over what she did, she may be embarrassed by the videos, but at the time that she agreed to record them, she was over 30 years old, in a relationship, competing with Isabella for Larry's love and attention.").

- **Delinquent Mother:** The defense repeatedly suggested that Mrs. Rosario was a delinquent mother. Santos was questioned about his parents being absent from his childhood, Tr. 412:4-5, about going to the hospital in 2014 after a fight with his mother, Tr. 427:21-24, and about trying to kill himself for his mother's attention, Tr. 428:20-22. Felicia Rosario was asked about being angry at her parents for not taking emotional responsibility for the family dynamics and about feeling like a single parent to her siblings. Tr. 1836:14-19, 1839:6-7. Julie Gonzalez was asked about Felicia being hospitalized for her family dynamics. Tr. 2093:20-23. Yalitza Rosario was cross examined about her tense home environment and being taken care of principally by her sister. Tr. 2168-2169:15. The defense pursued this theme in closing argument, claiming in various ways that the Rosario parents were deficient, as well as responsible for the woes of their children. See Tr. 2858:17-2859:15. The defense implied repeatedly that the Rosario parents were neglectful and absentee, and that it was the Rosario children, not the defendant, who originated the notion that their parents were bad people and bad parents. Defense counsel then continued to quote from a 2008 journal drafted by Felicia Rosario, describing that she felt like a single parent and that she was angry at her parents for not taking more emotional responsibility with respect to her siblings. Tr. 2859:8-15.

The Government was entitled to respond to the obvious subtext and clear implication of the defense arguments about Claudia's sexual behavior. Beginning with cross examination, the tone, nature, frequency, and probing detail of the questions was plainly designed to shock and disgust the jurors with Claudia's sexual activity. While the defense may now claim that such behavior is "natural," the plain effect on a jury of questions about anal sex and strap ons was to paint Claudia as a sexual deviant. And the obvious effect of these questions was to shame Claudia for her behavior. She described explicitly the difficult she had reading her explicit journal entry in open court and became visibly choked up in the witness box, prompting the Court to say, "Why

don't we all just take a minute? Take some water." (Tr. 1186:9-1)  She later characterized the experience of being made to answer these explicit and graphic questions as "humiliating."

The effect of this questioning, on March 24, 2022, was not undone by the defense's offhand remark in summation that this behavior was healthy.   While the defense may have said in summation that Claudia's behavior was healthy, the bottom line is that the defense in the same breath described this behavior as perverse, and was asking the jury to believe that Claudia enjoyed having sex with hundreds of men for money, activity that is not only illegal, but that is also plainly conduct that many average jurors would disapprove of, even if defense counsel personally would not.  Having anal sex, having sex with a strapon, having sex with hundreds of men, having sex for money—the conduct emphasized by the defense, which they claimed Claudia "loved" and thought was "awesome"—is plainly conduct that is deemed promiscuous and deviant in the mainstream (and likely in the view of at least some jurors), which the defense understood had the power to shame Claudia (as it did) and to inflame the jury against her.  Any insistence by the defense about embracing "sex positivity" does not change that.  Just like the defense was entitled to employ whatever tactics it chose to try to discredit a lead witness in the case, the Government was entitled to push back, to call it like it was, and to redirect the jury's attention to the powerful evidence of grooming and coercion, regardless of whether the jury ultimately disapproved of the conduct Claudia participated in.

This is not, as defense counsel argues, "one of those rare cases where the improper comments in a prosecutor's [rebuttal] summation were so numerous and, in combination, so prejudicial that a new trial is required."  *Floyd v. Meachum*, 907 F.2d 347, 348 (2d Cir. 1990); *Friedman*, 909 F.2d 709 (improper for prosecutor to tell jury that defense lawyer was defending criminals for "high fees" and thereby undermine presumption of innocence).  In *Meachum*, the prosecutor asked the jurors to decide between her personality integrity and the defendant's innocence, referred to the defendant as a liar and his lies over forty times, and referenced the Fifth Amendment in a manner that undermined the presumption of innocence.  *Id.* at 354.  The Government here did nothing of the kind and the motion for a mistrial should be denied.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:__/s/__Danielle R. Sassoon___
    Mollie Bracewell
    Danielle R. Sassoon
    Lindsey Keenan
    Assistant United States Attorneys
    Southern District of New York
    (212) 637-2218

cc:     Defense Counsel (by ECF)