```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
                                                                    :
UNITED STATES OF AMERICA,                                           :
                                                                    :
              -v-                                                   :         20-cr-110 (LJL)
                                                                    :
LAWRENCE RAY,                                                       :
                                                                    :         MEMORANDUM &
                          Defendant.                                :            ORDER
                                                                    :
------------------------------------------------------------------- X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/6/2022

LEWIS J. LIMAN, United States District Judge:

The defense moves for a mistrial based on statements made by the Government in its rebuttal summation. The Court denied the motion today from the bench with reasons to follow. This memorandum sets forth the Court's reasoning.

"A defendant asserting that a prosecutor's remarks warrant a new trial 'face[s] a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of [his] right to a fair trial.'" *United States v. Banki*, 685 F.3d 99, 120 (2d Cir. 2012) (quoting *United States v. Locascio*, 6 F.3d 924, 925 (2d Cir. 1993)). "'The government has broad latitude in the inferences it may reasonably suggest to the jury during summation.'" *United States v. Zackson*, 12 F.3d 1178, 1183 (2d Cir. 1993) (quoting *United States v. Casamento*, 887 F.2d 1141, 1189 (2d Cir. 1989)). However, this latitude is not unbounded—"a prosecutor's statements during summation, if improper, will result in a denial of the defendant's due process rights if the statements cause substantial prejudice to the defendant." *Id.* (quoting *Casamento*, 887 F.2d at 1189).

"When evaluating a claim of improper argument, this Court 'must consider the objectionable remarks within the context of the entire trial.'" *Banki*, 685 F.3d at 120 (quoting

*United States v. Espinal*, 981 F.2d 664, 666 (2d Cir. 1992)). "It is a 'rare case' in which improper comments in a prosecutor's summation are so prejudicial that a new trial is required." *United States v. Rodriguez*, 968 F.2d 130, 142 (2d Cir. 1992). "Remarks of the prosecutor in summation do not amount to a denial of due process unless they constitute 'egregious misconduct.'" *United States v. Shareef*, 190 F.3d 71, 79 (2d Cir. 1999). In determining whether a prosecutor's improper argument deprived the defendant of a fair trial, the Court considers "(1) the severity of any misconduct, (2) the measures taken to cure the misstatements, and (3) their likely effect on the outcome." *United States v. Forlorma*, 94 F.3d 91, 95 (2d Cir. 1996).

The defense argues that the Government's rebuttal summation "impugned Mr. Ray's exercise of his constitutional right to advance a defense and confront the witnesses against him, and in doing so denied him a fair trial." Dkt. No. 497 at 1. In particular, the defense focuses on two categories of statements made in the Government's rebuttal summation. First, the Government argued that the defense argument that the case was about "storytelling" was "an extension of the same self-serving conspiracy theories that the defendant himself recycled again and again" and that the defendant had "used these fictions to control these victims" but now was "using them to evade responsibility" and "to fool you the way that he fooled them." Tr. 2898. It also argued that the Jury "should reject the defense effort to discredit these witnesses with the very collateral the defendant created and collected for exactly this purpose, so that his victims would never have the courage to speak up," Tr. 2916, and that the defendant never thought that the victims would have the courage "to face the abuser they had been taught to revere and trained to fear, to suffer from the defense the same false insults that they had endured for years," Tr.

2

2917.[1]  Second, the Government stated that the Jury should "reject the defense effort to shame [Government witness] Claudia [Drury] as a slut who wanted to be a sex worker."  Tr. 2901.[2]

With respect to the first set of arguments, the defense argues that the Government impugned the character of defense counsel and the right of the defense to cross-examine and to challenge the credibility and veracity of the witnesses at trial, and thus undermined the defendant's constitutional right to confront the witnesses against him, by criticizing the defense's defense as an extension of the "means and methods" used by the defendant in his alleged criminal conduct.  Dkt. No. 497 at 2.  That argument misreads the Government rebuttal, which must be understood in the context of the evidence presented at trial.  Much of the evidence in this case consisted of statements made by the various alleged victims either to the defendant in which the victims made incriminating statements about themselves or in diary writings or other materials collected by the defendant.  The Government and the defense presented competing versions of that evidence.  In the Government's view, the confessions and related materials were the byproduct of an indoctrination process by which the defendant steadily took control of the lives, the thoughts, the memories, and ultimately the bodies of the victims to the point where they were no longer their own.  The "confessions" were manufactured by the defendant through a process of incessant questioning and berating to be used by him for the unlawful purposes of extortion, sex trafficking, and forced labor and to ensure adherence to the enterprise's objectives

---

[1] The defense attacks the Government use of the word "courage" as vouching, but there was evidence in the record that the witnesses feared the defendant even at trial and while on the stand.

[2] At another point, the Government stated "[n]ot only has the defense suggested to you that Claudia was a slut but they told you that she's a liar."  Tr. 2903.  The defense objected to the reference to "slut," and the Court interrupted the summation to give an instruction that it was hearing argument and "[t]here's no claim in this case with respect to the good faith or bad faith of the lawyers involved."  Id.

and silence if any of the victims chose to break away. *See, e*.g., Dkt. No. 292 ¶ 7(i) (means and methods of the Enterprise included "the evasion of detection by law enforcement"). If they did so, the confessions would be used against them; they would have no choice to follow the dictates of a person who claimed close connections to law enforcement. The defense took a diametrically different view. In their view, the "confessions" represented the genuine and independent beliefs of the alleged victims. The defendant was not an evil Svengali; he was the parent figure the alleged victims were lacking.

      The Court permitted both parties to try their cases. The alleged victims testified that while they had written the confessions and the contemporaneous diary materials and believed that what they were saying at the time was the "truth," that truth had been manufactured by the defendant; they testified to the process by which that happened. The materials created under the defendant's influence and as a result of his conduct did not reflect the victim's actual conduct and their actual views. The defense challenged that allegation. It questioned the alleged victims extensively to try to establish that the alleged confessions were not the product of the defendant's influence and were consistent with views that they had before. The Court also gave the defense ample latitude to present its case, frequently over the objection of the Government. The defense was permitted to offer evidence of the alleged victims' diaries and statements before they met the defendant as well as statements that they apparently made without the defendant's influence but after they met him. The defense also was permitted to offer, as state of mind evidence, evidence that the defendant had himself written to law enforcement about the alleged poisoning and had retained counsel to do so.

      In closing, as throughout the trial, the defense continued its theme that the statements of the alleged victims during the time period of the alleged conspiracy were their own independent

uninfluenced statements and that they were genuine. It explicitly asked the Jury to consider those statements made during the course of the conspiracy as evidence of the victims' beliefs at the time and not as statements manufactured by the defendant. For example, as to the Government's critical witness Claudia Drury, the defense asked the Jury to credit writings she made while she was associated with the defendant about her purported enjoyment of sex work and sexual behaviors as expressing her true, honest, and uninfluenced views. *See, e.g.*, Tr. at 2876. It did the same with writings of the other alleged victims.

Under those circumstances, the Government rebuttal could not have been understood by any reasonable juror to be an attack on defense counsel's "means and methods" or on the right of counsel to confront the witnesses and to challenge their truthfulness, veracity, and credibility. The Government's statement in rebuttal—made directly after discussing the alleged victim's "confessions" and before explaining that "[t]he defense has failed to expose a single lie" in the testimony of the witnesses—that the "defense about storytelling" is an extension of defendant's theories" and is being used "to evade responsibility," Tr. 2898, simply offered the Government's view of the fair import of the confessions (i.e., that they were entitled to no weight as expressions of the witness's actual conduct) and why the confessions themselves did not reflect on the credibility or veracity of the testimony of the witnesses at trial. The Government's argument went to the weight that the Jury should give to the material used to question the truthfulness, veracity, and credibility of the witnesses as well as to the defense argument that the materials were created as a result of the independent exercise of free will by the witnesses/alleged victims. It was appropriate for the Government to characterize the material that the defense used on cross-examination as "the very collateral the defendant created and collected for exactly this purpose." Tr. at 2916. It was the Indictment charge and the Government theory of the case that the

material was created, in part, to ensure the continued obedience of the persons who were victims of the enterprise and to ensure that they never testified. In its summation, the defense asserted that the material reflected the genuine honest and uninfluenced innermost beliefs of the victims at the time. The Government was not required to remain silent in response. It was permitted to respond that the material was nothing of the sort. It also was appropriate for the Government to argue that the Jury should "reject the defense effort to discredit these witnesses," *id.*, with that material and that the defense argument was "an extension of the same self-serving conspiracy theories that the defendant himself recycled again and again," Tr. at 2898. The Government did not accuse the defense of being complicit in defendant's crimes. It argued that the Jury should "discredit" the claims that the materials created contemporaneously reflected the witness's honest, unimpeded, and uninfluenced views and that those materials established that the testimony at trial was the product of recent fabrication; to conclude otherwise, to "credit" the defense argument, would be to extend the theories. It did not suggest that by cross-examining and using those materials the defense was engaged in criminal conduct. In other words, that argument went to the weight that the Jury should give the attempt to discredit the witnesses— that the Jury should "reject" it—as well as to the credit it should give to the defense theory of the case—that the Jury should not credit it. It did not go to the defense's right to challenge the truthfulness, veracity, or credibility of the witnesses with whatever materials it had, to confront the accusers against the defendant, or to present its own theory of the case.

     In any event, the Court instructed the Jury that the means and methods of counsel during the cross-examinations in this case were proper. Before reading the Jury Charge and directly after the rebuttal summation and at the request of the defense, the Court told the Jury, as relevant here, that "[y]our opinions of the lawyers in this case and their behavior is to have no role in your

deliberations. Each lawyer was doing his or her own job. The tactics and methods of counsel during the examinations in this case were proper. Each lawyer was simply doing their job." Tr. at 2936.

With respect to the "slut" and "delinquent mother" comments in the Government's rebuttal summation, those comments also were a fair response to what a juror could have taken from the defense argument, particularly when taken against the context of the evidence at trial that the defense invoked during its summation. Although the defense did not use the word "slut," a member of the Jury could have been left with the impression that that was what the defense was implying given the content of the defense summation. "Slut" is an offensive and derogatory term for a person, generally a woman, who has many sex partners. *See Slut*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/slut (last visited April 6, 2022) (noting that the term "slut" is disparaging and offensive and is generally used for a woman with many sexual partners); *Slut*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/slut (last visited April 6, 2022) (noting that the tern is used in slang disapprovingly to mean "a woman who has sexual relationships with a lot of men without any emotional involvement"). While this characterization might not be the one the Court would adopt, it was reasonable for the Government to conclude that the Jury (or members of it) would have heard the defense's description of Ms. Drury as someone who "enjoyed sex," "attended sex parties," "worked at a sex club," "engaged in BDSM," and "enjoyed kink," and understood it to suggest that Ms. Drury was a "slut." In this respect, the Government's argument that the defense suggested "that Claudia [Drury] was a slut," Tr. at 2903, and "shame[d] Claudia [Drury] as a slut," Tr. at 2901, while the defense did not use those words, was a fair response to what the Jury (or some in the Jury) may have taken to be the

7

implication of the defense argument. The defense cannot inoculate itself from that fair response by calling all of Ms. Drury's sexual conduct during the time period when she was allegedly being as "perfectly healthy and natural." Tr. at 2875; *see also id.* (stating, in the context of Ms. Drury's writing "in explicit terms about her enjoyment of kink," that "[t]here is absolutely nothing wrong with that"). The Government need not restate an argument to which it is responding in the guarded and euphemistic way the defense has put it but can respond to what it reasonably believes that the Jury would take away from that argument.

In any event, the Court gave an instruction to the Jury that clarified that the Government's argument was in response to *what it understands* to be the defense's argument. The Court thus dispelled any notion that the defense actually labelled Ms. Drury a "slut." The Court's instruction, given immediately after the second time the Government argued that "the defense suggested . . . that Claudia [Drury] was a slut" stated: "Members of the jury, you're hearing argument. There's no claim in this case with respect to the good faith or bad faith of the lawyers involved. You're hearing the rebuttal from the government to what it understands to be the arguments of the defense." Tr. at 2903.

It is true that the defense did not refer to Maritza Rosario as a "delinquent mother" using that term, but it did not have to use the same words. The theory of the defense throughout was that the Rosario parents were absent from the lives of their children, and that was what forced the children into the hands of the defendant and kept them there. In its summation, the defense stated that the Rosario parents "were largely absent from their [children's] childhoods" and pointed to evidence that Felicia Rosario felt she was a "single parent" and was "angry at [her] parents for not taking more emotional responsibility." Tr. 2859. In characterizing the defense

8

argument before responding to it, the Government was not required to use the precise words of the defense. It was permitted to characterize the defense argument and then to respond to it.

Moreover, assuming that some portion of the argument was improper, there would be no basis for a mistrial in this case. The portions of the summation that are arguably the most problematic are those in which the Government characterized the defense as accusing Ms. Drury of being a "slut." The word is charged and offensive, and it is conceivable that in isolation some members of the Jury could have taken the use of the term in the Government's argument to be a comment about the conduct of the defense lawyers. But jury addresses are not read in isolation, highlighting the most arguably problematic language and ignoring all of the rest that surrounds it. In the scheme of the rebuttal summation as a whole, which lasted over half an hour and spanned nearly thirty transcript pages, any misconduct would not have been severe. The Government did not improperly refer to the defendant taking the Fifth Amendment, vouch for the credibility of witnesses, suggest it had access to evidence or information that the Jury had not seen, attempt to shift the burden of proof, or improperly appeal to the passions and emotions of the Jury. It was steadfast in stating that it embraced the burden of proof, Tr. at 2890, that the Jury should take its time with the evidence, Tr. at 2918, and that the evidence should be the Jury's "north star," *id.*

Furthermore, the Court took measures to cure any misstatements. In addition to the standard charge that the jurors' views of the lawyers were to have no role in deliberations, the Court gave a curative instruction in two respects.[3] First, after the Government's rebuttal

---

[3] The defense mistakenly asserts that the Court rejected the defense request for a curative instruction. Dkt. No. 497 at 1. The Court did no such thing. It rejected the motion for a mistrial and reserved on the application for curative instructions. Tr. 2929. After a recess and after considering arguments from the parties, it gave a curative instruction.

summation, and in response to a defense request that the Court instruct the Jury that defense counsel's methods or tactics were proper, *see* Tr. at 2935, the Court followed the defense request; it gave substantially that curative instruction and instructed the Jury:

> [Y]ou heard the government use strong language in various adjectives in its rebuttal summation just now. You should understand that such language was in response to what the government perceived to be the arguments made by the defense in summation. It was not a comment about the lawyers in this case. Your opinions of the lawyers in this case and their behavior is to have no role in your deliberations. Each lawyer was doing his or her own job. The tactics and methods of counsel during the examinations in this case were proper. Each lawyer was simply doing their job.

Tr. at 2936. Second, the Court added to the Jury Charge the language that:

> It is the duty of each lawyer . . . to present the evidence that it believes best supports its argument, even if that evidence might be difficult to hear or difficult for the witnesses. You are to draw no negative inference from a lawyer presenting such evidence. She or he is just doing their job.

Tr. at 2940.

The curative instruction did not highlight the Government rebuttal summation for particular criticism. It did not need to. If there was any juror who (mis)understood the Government rebuttal to be a comment on the right of the defendant to challenge the witnesses or on the methods it used to do so rather than on the weight accorded the material used to challenge the witnesses, the message and the implication of the curative instruction would have been unmistakable. It came immediately after the Government rebuttal, it was delivered minutes after the jurors heard the Government rebuttal, and the curative instruction began with an explicit reference to the Government rebuttal. Tr. 2936.

Finally, there is little to no chance that the comments—even if no curative instructions had been given—would have had any effect on the outcome of the trial. With the curative instruction, there is no chance. Without prejudging any post-verdict motions that may follow,

there is substantial evidence from which the Jury found against the defendant in this case. A central question in the case, as stated, is how the jurors understand the alleged confessions. If they understood the confessions to have been manufactured based on the defendant's berating and threats, it will follow that they would not have given those confessions much weight either in the cross-examination of the witnesses or in the defense theory of the case. To the contrary, if they had understood the confessions to constitute the honest, independent views of the witnesses at the time, and not to have been based on what the witnesses believed they needed to say in order to satisfy the defendant, the jurors would have given the confessions weight in the cross-examinations and in the defense theory of the case. Arguments were made on both sides of the issue; the Jury apparently happened to believe the evidence offered by the Government rather than the argument of the defense. It is the Court's judgment that the Government singling that out as a central issue in the case—in the manner in which it did—had no effect on how the Jury resolved that issue.

SO ORDERED.

Dated: April 6, 2022
      New York, New York

                                      LEWIS J. LIMAN
                                 United States District Judge