M451RAY1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        20 Cr. 110 (LJL)

 5   LAWRENCE RAY,

 6              Defendant.                Trial

 7   ------------------------------x

 8                                        New York, N.Y.
                                          April 5, 2022
 9                                        8:59 a.m.

10   Before:

11                      HON. LEWIS J. LIMAN,

12                                        District Judge
13                                        and a jury

14                           APPEARANCES

15
     DAMIAN WILLIAMS
16        United States Attorney for the
          Southern District of New York
17   DANIELLE R. SASSOON
     MOLLIE BRACEWELL
18   LINDSEY KEENAN
          Assistant United States Attorneys
19
     FEDERAL DEFENDERS OF NEW YORK, INC.
20        Attorneys for Defendant
     MARNE L. LENOX
21   ALLEGRA GLASHAUSSER
     NEIL P. KELLY
22   PEGGY CROSS-GOLDENBERG

23   Also Present:  Kelly Maguire, FBI
                    Claudia Hernandez, Paralegal-USAO
24                  Larissa Archondo, Paralegal-FDNY

25
```

1          (Trial resumed; jury not present)

2          THE COURT:  Anything to raise before we bring the jury

3     in?

4          MS. SASSOON:  Just quickly, I sent Mr. Fishman my

5     negative PCR.  Perhaps for the jurors, before I begin my

6     summation, if the Court could let them know I followed protocol

7     and had a negative test.

8          THE COURT:  I will let them know that.  Ms. Sassoon,

9     how long do you expect your rebuttal summation to be?

10         MS. SASSOON:  Roughly 30 minutes, but I haven't heard

11    the rest of the defense summation.

12         THE COURT:  Okay.  Let's bring the jury in.

13         (Jury present)

14         THE COURT:  Be seated.

15         Good morning, members of the jury.  We'll now continue

16    with the summation by the defense.

17         Ms. Lenox.

18         MS. LENOX:  Yesterday we ended off talking about the

19    people who the government considers conspirators in this case.

20    We're going to shift gears this morning and talk to you about

21    some of the people that the government claims are victims.

22         The witnesses in this case, they weren't vulnerable

23    individuals.  They were well-educated adults, with supportive

24    parents, who graduated from elite, private high schools, before

25    moving away to begin college.

1          Claudia testified she grew up in Pasadena, California.

2  She owned a horse.  She attended private high school.

3          Santos Rosario attended Horace Mann, a prestigious

4  private school in New York City.

5          And Felicia Rosario graduated from Harvard University

6  and Columbia Medical School.

7          When they met Larry, with the exception of Felicia,

8  who was 29 years old and a medical resident at the time, they

9  were attending prestigious universities; they were

10  well-resourced people, with agency.  Claudia, Yalitza, Santos,

11  Isabella, Dan, they were creative individuals who expressed

12  interest in conversation about life's big questions.  They

13  weren't children.  They were high-achieving, educated,

14  intelligent adults.

15          The government wants you to view its case through the

16  lens of Dawn Hughes.  They paid Dr. Hughes close to $10,000 to

17  feed you their theory of the case.  But her testimony was a bit

18  too weak.  Dawn Hughes talked about isolation.  She said

19  isolation is very important.  It's a way of creating two

20  things—dependence and eliminating outside forces.  Larry didn't

21  isolate people.  He didn't force anyone to come to his

22  apartment, and he didn't force anyone to stay.  People came and

23  left fluidly over the course of years.  Larry's apartment

24  became a crash pad for college students attending school

25  nearby.

1        Let's talk about Claudia Drury.  During the summer of

2   2011, Claudia's parents lived in New York City.  They lived

3   seven blocks away from Larry.  She could have lived with them.

4   She chose not to.  And after that summer, Claudia traveled

5   abroad.  She studied abroad at Oxford for her entire junior

6   year.  Larry encouraged Claudia to go.  And when Claudia told

7   him that she wanted to spend her six weeks' spring break at

8   Oxford, he encouraged that too.  He never went to visit her.

9   He never suggest that she return to New York to see him.  She

10  was living on her own.  She was in another country, in a dorm,

11  making friends, rowing on the crew team.

12       And when Claudia returned from her study abroad, when

13  she was hospitalized in the fall of 2012, Larry encouraged her

14  to move home to live with her dad.  And at the hospital,

15  Claudia was provided resources—resources for support

16  independent of Larry.

17       In the summer of 2013, after Claudia spent some time

18  in Pinehurst, she left Pinehurst and spent the rest of her

19  summer in New York, with her parents.  Larry wasn't there.  And

20  after her hospitalization in 2014, Claudia moved in with her

21  mother.  She was attending courses at Columbia University where

22  she had an entire network of support—new faculty, new students,

23  friends, resources.  Larry didn't discourage any of that.

24       When Claudia's mother moved out of state, Claudia

25  could have gone with her.  She didn't.  She chose to remain in

New York, even though she couldn't afford rent.  But she didn't live with Larry; she lived on her own.

Dan Levin also wasn't isolated.  Now we heard very little testimony about Dan throughout trial, but here's what we know:  Dan spent time in Larry's apartment in the summer of 2011; Dan spent his junior year studying abroad in England, like Claudia; and there is no evidence that Dan was involved in Larry's life or the lives of any of the others after 2012.  Safe to assume that around that time Dan lost contact with Larry and the others.  But despite having drifted away from Larry more than a decade ago, you heard evidence that Dan Levin published a book about his time with Larry, ten years later, right in time for Larry's trial.

The Rosario siblings, they also weren't isolated.  While Santos was dating Talia, Larry spent time at the Rosarios' home.  He shared meals with their parents.  And Larry did the same when he started dating Felicia and she moved back to New York in 2012.  After her mother picked her up from the airport and she moved in with her family, Larry would go there and spend time with them.  And when Felicia moved into Larry's apartment, they welcomed Maritza, her mother, into their home.

Santos told you that during the time that he knew Larry, he never actually lived with Larry.  He would spend time at Larry's apartment, he would sleep there some nights, but primarily Santos lived with his parents, or at Sarah Lawrence

1    College.

2         And in 2012, Santos traveled abroad.  He went to the

3    Dominican Republic to visit his family with his father.  Larry

4    didn't intervene.  And when Santos finally decided to spend

5    time away from Larry, Larry didn't go after him.  He didn't

6    chase him down and insist that Santos return.  Santos spent

7    four entire years not speaking to Larry.  He secured a job; he

8    lived on his own in his own apartment; he formed a new group of

9    friends.

10        Yalitza Rosario similarly drifted into Larry's life

11   during the period that she knew him.  After Santos introduced

12   Yalitza to Larry, Yalitza spent time in Larry's apartment with

13   her brother and his friends.  And she told you she enjoyed her

14   time there.

15        In the fall of 2013, when Felicia and Larry were in

16   Pinehurst, Felicia was unwell.  She told you that herself.  And

17   you've seen evidence and videos that she was unwell.  And Larry

18   was concerned.  So he reached out to Yalitza, her sister, and

19   told her that Felicia could benefit from her support.  This

20   wasn't the work of a man trying to break up a family.  It's the

21   effort of an individual trying to provide support for a person

22   that he loved.  And Yalitza went to Pinehurst to support her

23   sister.  Now the government argues that going to support

24   Felicia was a manipulative act on Larry's part, that when he

25   asked Felicia's sister to come and spend time with her, he was

1   manipulating her and he was preventing her from beginning a job

2   she had not yet started at a bakery.  But they also argue that

3   Larry was the cause of sibling rivalry, that Larry forced the

4   Rosario siblings against each other.  Anything Larry does, the

5   government interprets as manipulative.

6            Yalitza said she couldn't leave Pinehurst, but her

7   actions belie her words.  Yalitza did leave Pinehurst.  She

8   traveled back to New York on her own.  And she planned it ahead

9   of time.  She called her mom, she asked her mom for money, she

10   bought a train ticket, and she took the train to New York.  Her

11   mom picked her up there.  And the following year, when Yalitza

12   was hospitalized, her mother was at her bedside every day.

13            For the years that both Yalitza and Santos were not in

14   contact with Larry, they also were not in contact with their

15   parents.  Santos and Yalitza could have connected with their

16   parents.  They chose not to.

17            Larry didn't psychologically isolate the Rosario

18   siblings either.  He didn't plant the notion that Maritza and

19   Santos Sr. were bad people.  That came from the Rosario

20   siblings themselves.  When they first met Larry, each of the

21   Rosario siblings told him about the anger that they held toward

22   their parents.  Santos Sr. had affairs.  He had children with

23   women who were not his wife.  Santos Jr. didn't know about his

24   half-siblings until they moved into his home when he was in

25   high school.  Santos didn't interact much with his children

1    when they were growing up.  Their parents were largely absent

2    from their childhoods.  Yalitza testified that when she was

3    younger, her father drove drunk while she was in the car.  And

4    at one time Santos believed that his mother only paid attention

5    to him when he was sick.  He felt angry and unsupported.

6            And when Santos was in high school, before he met

7    Larry, the family turmoil led him to try to take his life.

8            Shortly after that, in 2008, Felicia was also

9    hospitalized for suicidal thoughts, also in connection with her

10   family.  And in 2008, she wrote about this in her journal.  She

11   said, "I'm really tired of it all.  I'm angry at my parents for

12   not taking more emotional responsibility.  I have enough to

13   deal with.  I'm liking a fucking single parent.  But I am so

14   used to that that I can't extricate myself from the situation

15   easily."

16           She also wrote, "I still feel bad for my family.  But

17   there is only so much I can do when I feel totally drained and

18   lifeless after being with them.  They make me so sad."

19           This was in 2008, before any of the Rosario siblings

20   had met Larry.

21           And Yalitza testified that around the time that she

22   met Larry, her relationship with her parents was strained.  She

23   said they were having trouble communicating.  And in 2010,

24   before she met Larry, Yalitza took medical leave from college

25   to process her mental health struggles.  In 2010, she

journaled, before she met Larry.

The siblings' mental health histories make clear that Larry was not the cause of their mental health struggles.  The Rosario siblings shared with Larry their thoughts and feelings about their parents.  Larry listened to them, reassured them, and provided them a space to emote.  Larry echoed the siblings' thoughts about their parents.  He didn't create them.

Throughout the years multiple people drifted away from Larry—Daniel Levin, Santos Rosario, Yalitza Rosario, Claudia Drury.  Larry didn't go after any of them.

In 2015, when Santos drifted away from Larry, by that point Santos had sent Larry photographs of his journal entries, photographs of confessions he had written, and he had given Larry some of his journals.  Larry didn't post any of this damaging information anywhere, as the government claims he threatened to do.

The same is true of Yalitza, who stopped speaking with Larry in 2016.

And when Santos reconnected with Larry in 2019, it was on his own.  Larry hadn't reached out to Santos.  Larry wasn't -- it wasn't at Larry's urging or suggestion.  Santos independently reached out.

Some of the witnesses that you heard from testified about how Larry exposed them to sex, encouraged them to be more uninhibited, to explore sexual fantasies.  The government wants

1   you to believe that this is sexual grooming.  It is not.  Dawn

2   Hughes testified about sexual grooming.  She said grooming

3   means coercing a child into sexual activity and maintaining the

4   secrecy of the abuse.  All of the witnesses were adults when

5   they met Larry.  Not a single one was a child.  They attended

6   liberal arts colleges and lived on their own before they ever

7   met Larry.  And during their freshman year of college, those

8   who attended Sarah Lawrence were exposed to Sleaze Week, a

9   week-long celebration of sexuality and body positivity.  Larry

10  didn't implant these ideas into their heads.  He didn't force

11  anyone to have sex.  He encouraged consenting adults to explore

12  their sexual identities and sexuality.  It may seem strange, it

13  may appear perverse, it may be vulgar, but it's not grooming,

14  and it's not criminal.

15          Dr. Hughes is a psychologist who routinely treats,

16  assesses, and evaluates individuals.  To be clear, she didn't

17  examine any of the witnesses who testified in this case.  She

18  has no opinion about the relationships at issue in this case.

19  For all of Dr. Hughes's discussion, she never told you whether

20  coercive control was actually used in this case.

21          Similarly, Larry's email to Felicia with erotica

22  links, that's not sexual grooming.  When Felicia Rosario met

23  Larry, she was 29 years old.  She was a medical resident with a

24  full-time job, living across the country in California,

25  3,000 miles away, in her own apartment, with friends.  Eight

1    months into their relationship, Larry sent her an email with

2    links to pornography.  This isn't grooming.  Even Dawn Hughes

3    would be hard pressed to consider sexually implicit content

4    shared between two consenting adults outside the norm.  She

5    testified that people in healthy relationships can talk about

6    sex.

7              And Felicia having sex with strangers, that's not sex

8    abuse.  Felicia testified that during her time with Larry, he

9    forced her to record herself having sex with strangers.  But

10   Larry didn't force her to do that.  How do you know that?

11   Well, the first time Larry asked Felicia to have sex with

12   strangers and record herself, Larry was living in New York, and

13   Felicia was living 3,000 miles away in California.  The notion

14   that Larry forced her to have sex with a stranger while she was

15   thousands of miles away is just absurd.

16             Felicia also testified that at one point Larry asked

17   her to begin escorting, that he repeatedly asked her to engage

18   in sex work.  But Felicia was adamant on this.  She refused.

19   Never once did she agree to accept money in exchange for sex.

20   She held firm.  And eventually Larry stopped asking.  There is

21   no reason to believe that Felicia couldn't have exercised the

22   same agency by refusing to record herself having sex with

23   strangers.  Sitting in court testifying, Felicia may have felt

24   regret over what she did, she may be embarrassed by the videos,

25   but at the time that she agreed to record them, she was over 30

1    years old, in a relationship, competing with Isabella for

2    Larry's love and attention.  In hindsight, it's easy to blame

3    Larry, but at the time, she had agency.  She chose to engage in

4    sex work.  Excuse me.  She chose not to engage in sex work.

5    But she chose to have sex with strangers.  This isn't a crime.

6    It's not sex abuse, and it's not forced labor.

7           I want to spend some time talking to you about some of

8    the more disturbing evidence that you saw and heard throughout

9    this trial.  Some of the testimony about Larry's violence could

10   be characterized as roughhousing, or method therapy, trying to

11   make people tougher, like teaching Claudia how to use bigger

12   people, a bigger person's body against themselves in a fight,

13   or using a rubber spatula, putting a rubber spatula to Iban's

14   neck and pretending it was a sharp instrument.  Some of it was

15   showing off, like putting Santos in chokeholds.  But some of it

16   was real.

17          As you're all now very well aware, Larry recorded

18   everything—the good, the bad, and the very, very ugly.  He

19   recorded himself berating people and committing acts of

20   violence.  This isn't something that you'd do if you believed

21   you were committing criminal acts.  You wouldn't keep records

22   of your own severe violent behavior.  But Larry did.  And

23   because of that, you saw Larry restraining Felicia in Pinehurst

24   when she was flailing her body and acting unwell, you saw Larry

25   hitting Dan after Dan said he had click-bombed Larry's website,

1    and you heard Larry striking Santos after Santos said he had

2    posted personal information about Larry online.

3            None of this is good.  None of it is acceptable.  But

4    you're not being asked to approve of Larry's behavior.  But to

5    be clear, this isn't a federal crime.  The violence and threats

6    that you saw and you heard were not used to get anything—not

7    money, not property.  Think about the context when you saw and

8    heard these acts.  They were completely divorced from requests

9    for money.  Larry truly believed he was entitled to repayment

10   for damages.  But he didn't resort to violence when he was

11   seeking compensation for that harm.  No matter what you think

12   or feel about what you've seen or heard, the context of these

13   acts is not proof of extortion or conspiracy to commit

14   extortion beyond a reasonable doubt.

15           I want to talk for a moment about the damages list

16   that Santos made.  Much has been made of these lists.  As he

17   testified, Santos generated these lists entirely on his own.

18   There's no evidence that Larry forced Santos to make these

19   lists.  Santos created them, he edited them, he maintained

20   them.  One of the lists is in Spanish.  It's clear that list

21   was intended for his dad.  And Maritza's testimony confirms

22   that.

23           Larry encouraged people to write their thoughts down

24   not so he could collect them, but to encourage people to

25   express their feelings.  As Felicia testified, "well, it wasn't

1    revolutionary.  Larry's journaling was one of the more helpful

2    things that Larry encouraged."  The government wants you to

3    believe that Larry collected all of these individuals'

4    journals, their belongings, their hard drives, as collateral.

5    But Larry's home and storage unit were merely a reflection of

6    the last ten years of his life—messy, complicated, and

7    completely disorganized.  There was no method to Larry's

8    madness.  It was simply madness.  The journals were relics,

9    artifacts, of people's pasts, and they were stored that way, in

10   boxes and suitcases deep in a storage unit.

11          As Felicia told you, Larry's apartment became a shared

12   space.  As various people passed through, whether they stayed

13   overnight or stayed for the day, or actually resided with

14   Larry, they brought their belongings, their books, their

15   clothing, their school notebooks.  And over time, Larry's

16   storage unit just became an accumulation of everyone's stuff,

17   things that they had just left at the apartment over the years.

18   Felicia said those who spent time at the apartment simply

19   understood that everyone's stuff would end up in storage

20   because there just wasn't enough space in Larry's tiny,

21   cramped, one-bedroom, messy, cluttered apartment to fit

22   everything.

23          Larry didn't collect people's belongings.  There's no

24   evidence that Larry forced anyone to give him their journals,

25   that he demanded to keep their schoolwork.  People treated

M451RAY1                    Summation - Ms. Lenox

1    Larry's apartment like a dumping ground, and so did Larry.

2              In the summer of 2013, Larry, Talia, and Isabella, and

3    Felicia decided to travel to Pinehurst, North Carolina, to do

4    yard work on Larry's stepdad's property.  Larry didn't trick

5    anyone into going.  Everyone who went knew why they were going

6    and wanted to go.  They didn't forgo lucrative summer jobs to

7    work in Pinehurst.  They all understood that they would be

8    spending their time there learning to do yard work.  No one was

9    forced.  In the government's telling, it was just a bunch of

10   city kids in a rural area, but they weren't kids.  Felicia

11   Rosario was 31 years old that summer, and everyone else was in

12   their 20s.  Certainly the individuals doing work in Pinehurst

13   didn't have experience doing manual labor outdoors.  As Claudia

14   testified, she had never done any yard work before Pinehurst.

15             In Pinehurst, no one paid for food and no one paid for

16   housing.  Everyone had a bedroom to sleep in.  Felicia told you

17   she didn't work every day.  She would take long walks every day

18   for an hour or two.  And they ate.  The government has tried to

19   assert that the folks who were in Pinehurst only had two meals

20   a day.  But Yalitza told you, this is simply untrue.  As she

21   testified, they ate breakfast, lunch, and dinner.

22             There was evidence of physical force in Pinehurst.

23   We're not running away from that, and we're not excusing it.

24   But these acts are not evidence of a federal crime.  There's no

25   evidence that Larry threatened to harm anyone if they didn't

1    work in Pinehurst, and there's no evidence that Larry

2    physically hurt people in order to get them to work.  The acts

3    that you saw and heard about are unconnected to the actual work

4    that was performed in Pinehurst.  Larry and Yalitza restrained

5    Felicia in reaction to her uncharacteristic behavior, trying to

6    stop her from hurting herself and others.

7            And the threat to turn people into law enforcement had

8    nothing to do with manual labor.  Just as the threats and

9    violence with respect to the extortion charge were actually

10   unconnected to the request for money and property, so too are

11   the threats of force and violence in Pinehurst unrelated to the

12   actual physical labor.  There's no indication that threats of

13   force or the use of force was used to compel people to work in

14   Pinehurst.

15           A year ago, Felicia likened her experience in

16   Pinehurst to school.  She viewed the work in Pinehurst as a

17   teaching moment, and so did Larry.  At one time, she told you,

18   she believed it was a learning environment.  To the extent that

19   people worked hard, it was an effort to compete with one

20   another for Larry's approval.  And that time seemed to be an

21   effort to prove themselves to Larry, Felicia once believed.

22           Since then, Felicia has met with the government, more

23   than 20 times, over the past 15 months.  And as Felicia

24   testified, since she started working -- since she started

25   meeting with the government, her perspective on her time with

Larry has evolved.  By the time she testified, Felicia compared
Pinehurst to an abusive, medical residency.  She said it's like
when an attending is really aggressive and expects you to know
everything and you get shamed into doing things if you do
things incorrectly.  The conditions in Pinehurst certainly
sound miserable, especially with people, four people with no
experience in yard work.  But spending days outside landscaping
falls far short of a violation of federal forced labor laws.
Claudia and Yalitza both testified that they could not leave
Pinehurst, and yet they did.  They had access to their phones,
their purses, their wallets, and, in the case of those who
drove—Yalitza and Felicia—they had access to cars.  They
weren't in the middle of nowhere.  They were in the suburbs,
surrounded by golf courses, a short drive away from the nearest
train station.

        Claudia told you a story about running off to a golf
course and sitting there and waiting for a few hours until
Isabella eventually came by and picked her up.  She told this
story when she testified on the stand.  She also told the story
to the government for the first time, after meeting with them
for more than two years, just days before her testimony.  She
made this up.

        You saw Claudia testify.  She's smart and she's
capable.  She bought her own ticket to Pinehurst, and when she
arrived, she waited for her friends to pick her up.  And when

they didn't come, she started Googling for Pinehurst cabs and taxis, 'cause that's a thing that exists in Pinehurst.  She could have purchased a train ticket back to New York, she could have called a cab, and she could have left, just like Yalitza did.

That wasn't the only lie that Claudia told about her time in Pinehurst.  She testified that Larry ripped Felicia's clothing in Pinehurst.  When asked about it on cross, she said that there's no way that Felicia would have ripped up her clothes.  That's how she knew Larry must have done it.  But when Felicia was asked about ripping her clothes in Pinehurst, she said that she did rip up her own clothes, because she was so unwell.

Claudia also testified that she truly believed that Gordon Ray would die of a heart attack if the work in Pinehurst wasn't completed.  That he would die.  This is something someone says flippantly, like, "I'll die if this trial doesn't end soon."  It's hyperbole.  Certainly Claudia didn't believe that a man would lose his life over bad yard work.  There was no conspiracy, no agreement to commit forced labor in Pinehurst.  Talia's mere presence in Pinehurst coupled with a one-sentence email to Claudia thanking her for acknowledging the damage she had done to the property, that doesn't ask for or demand any money, does not satisfy proof beyond a reasonable doubt that Talia agreed with anyone to commit forced labor.

M451RAY1                    Summation - Ms. Lenox

1   Talia spent her time inside studying and cooking meals for the

2   group.  There's no allegations that Talia forced anyone to work

3   in Pinehurst and no evidence that she agreed with anyone to do

4   the same.

5        I want to take some time to talk about the articles

6   that were found on Larry's computer.  The government argues

7   that these articles are proof of Larry's criminal intent.

8   They're just not.  For a period of time, in addition to sitting

9   around a lecture hall and listening to seminars led by

10   professors, Talia and her friends gathered at her father's

11   home, and they talked.  As Claudia testified, they spent the

12   large part of the summer in 2011 just talking about

13   philosophical concepts like honesty, choice, preferences, and

14   how do you know what a lie is.

15        And Felicia told you about the fall of 2012.  It was

16   much the same.  Felicia and Larry would sit around talking

17   about physics, atoms, molecules, history, philosophy.  Larry

18   would share and openly discuss articles about mind control and

19   critical thinking, the very types of articles the government

20   now argues is proof of Larry's criminal intent.  But the

21   articles that were found on Larry's computer, they're just

22   that, academic articles, articles that could just as easily

23   have been extracted from the hard drive of a psychology

24   professor or student or taken straight out of a college

25   syllabus.  They weren't hidden from the group.  They weren't

1    weaponized against individuals.  They were discussed.  Felicia

2    was training to be a psychiatrist.  Santos, Isabella, Talia,

3    they were studying psychology as well.  Larry shared these

4    articles with Felicia and the others.  That they were found on

5    the computer in his home does not speak to his character and

6    does not speak to his criminal intent.

7            I want to talk to you about the alleged financial

8    crimes, beginning with the tax counts.  Now buckle up, because

9    this is real boring.

10           To establish each of the tax evasion counts, the

11   government has to prove beyond a reasonable doubt that Larry

12   acted wilfully.  The Court is going to instruct you on the law,

13   which is clear.  Not filing a tax return does not equal tax

14   evasion.

15           Yesterday you heard from Larry's lawyer, Glenn Ripa.

16   During a casual conversation in the course of his

17   representation of Larry, Larry asked whether he had to report

18   the money that he was -- that Claudia was gifting him for

19   damages for physical harm.  And his lawyer told him no, that

20   money is not taxable.  Relying on this advice, Larry acted in

21   good faith when he didn't report that money to the IRS.  It was

22   of no consequence that Larry didn't tell Mr. Ripa all of the

23   details surrounding that money.  Mr. Ripa said he didn't have

24   to report it, and Larry trusted his lawyer's advice.  The

25   government now wants you to believe that in 2015, Larry asked

1    if he had to pay taxes on damages in anticipation that one day

2    he may need a defense to tax evasion.  This is absurd.  Larry,

3    as you've learned, is a man who creates a record of everything,

4    who records every conversation he deems important.  Surely if

5    Larry had asked Glenn for tax advice in anticipation that one

6    day he may need to rely on that advice as a defense, he would

7    have recorded it.  You would have heard a recording.  You

8    didn't, because that's not why Larry asked.  The government

9    can't prove Larry wilfully acted to evade his taxes beyond a

10   reasonable doubt.

11          The government also argues that Larry intentionally

12   devised a money-laundering scheme to avoid a paper trail.

13   We're talking about a man who created and maintained a

14   voluminous catalog of audio, video recordings, writings,

15   including the very detailed ledger kept by Isabella, which

16   includes Larry's initials.  Contrary to the government's

17   argument, the fact that Larry kept so many records, insisted on

18   such meticulous accounting, kept every single receipt,

19   demonstrates that he didn't believe what he was doing was

20   illegal.  And he certainly wasn't trying to hide it.  If he

21   was, he wouldn't create this paper trail.  But in a case like

22   this, where nearly the entirety of the government's case rests

23   on evidence recovered directly from Larry himself, that

24   argument simply fails.

25          The government also wants you to believe that Larry

1    spent lavishly and lived a life of opulence.  To support this,

2    they showed you seven receipts for shockingly expensive

3    clothes, and a handful of hotel receipts, over the course of

4    ten years.  While Larry certainly spent extravagantly at times,

5    he wasn't living as if he had millions of dollars.  His

6    assertion that his domain portfolio was worth $34 million is

7    dead wrong.  You heard Kyle Sliger from GoDaddy testify that of

8    the 8,000 domain names that Larry purchased over five years, he

9    sold only 12.  12.  Safe to say Larry didn't walk away with

10   millions of dollars in GoDaddy proceeds.  Indeed, no cash was

11   recovered during the search of Larry's home in Piscataway.

12          And this is where Larry lived in Manhattan.  As

13   multiple witnesses testified, it was a small, cluttered mess.

14   And when he left this home, Larry moved to a three-bedroom

15   ranch home in New Jersey, where he lived at first with five

16   other people.  As Felicia testified, while they were living

17   there, they tore up the carpets, revealing multiple black mold

18   spots resulting from water damage to the home.  Plastic

19   sheeting concealed the floors.  This is where Larry lived.  As

20   Felicia testified, the bulk of the money was spent on the

21   property in Piscataway, welding equipment, computer equipment,

22   food, and then clothes.

23          And the transfers also suggest that Larry was helping

24   to support his daughter and stepfather in North Carolina.

25          The government argues that the poisoning allegations

are an elaborate ruse, nothing but a distraction from Larry's

long con.  Nothing could be further from the truth.  This

wasn't a con.  Larry didn't act with an elaborate plan.  And

Felicia testified Larry, Isabella, and Felicia herself, they

all felt sick.  And their illness was inexplicable.  They

visited doctors and sought medical treatment.  Felicia too at

one point believed that she had been poisoned.  In 2015,

Felicia suffered from an inexplicable seizure while she was

living in Pinehurst.  Her body would inexplicably ache all over

and she would scream out in agony.  The government told you

that Larry spent a lot of money on clothes, but Felicia told

you they all just spent money on medical bills.  She said that

she spoke with Santos and told him that they needed money,

because Larry was sick and had lots of medical bills, which was

true, she said.  Even sitting in court, two years after Larry's

arrest, Felicia remains uncertain about the cause of her

physical ailment.  Even after spending 15 months talking to the

government, she continues to be uncertain about whether she was

actually poisoned.  She recognizes that it may not make logical

sense, but the physical health problems were real.  The

government shouldn't simply discredit that, and neither should

you.

        Toward the end of 2014, Claudia Drury knew that it was

only a matter of time before she would be evicted from her

apartment in New York.  She'd been living with her mother in

1   Manhattan, and her mother moved out.  She moved out of state

2   because she couldn't afford the rent.  Claudia could have moved

3   out of state with her mother.  She chose not to.  She stayed in

4   New York.  Her mother's name was on the lease; Claudia's

5   wasn't.  Claudia was taking classes at Columbia.  She had no

6   job, no source of income, and she couldn't afford the apartment

7   where she lived.  She was an adult living in New York City.

8   She needed money, and she needed money fast.  Larry suggested

9   escorting.  And it made sense.  Claudia enjoyed sex.  And

10  there's nothing wrong with that, frankly.  It's perfectly

11  healthy and natural.  Claudia attended sex parties, she worked

12  at a sex club, she engaged in BDSM.  You saw her journal.  She

13  enjoyed kink.  She wrote in explicit terms about her enjoyment

14  of kink.  She said, "I don't know how to describe it.  It's

15  amazing.  Holy wow.  A new piece of my sexuality realized.

16  It's really, really cool.  This is a whole 'nother level."  And

17  that's okay.  There is absolutely nothing wrong with that.

18          The government wants you to believe that Claudia's

19  entry into sex work was the result of Larry's grooming, but

20  there's no independent evidence to corroborate Claudia's claims

21  that Larry groomed her.  Santos didn't testify at all about

22  Claudia's sexual behavior before she started engaging in sex

23  work.  Neither did Yalitza.  And Felicia, who was living with

24  Larry from the fall of 2012 on, told you explicitly that she

25  never saw Claudia engage in sex with anyone.  Claudia decided

1    to become a sex worker.  And initially, after going through an

2    escorting service, she took control of her own business.  She

3    took pictures of herself in the beginning and then had

4    professional photographs taken.  The government showed you

5    those photographs.  She drafted advertisement content.  She

6    purchased advertisement space.  She posted about her services

7    online.  She decided which clients to see, which hotels to stay

8    in, and how much money to charge.

9         And you saw Claudia's notes on her escorting services.

10   Claudia was a shape shifter.  She conceived of personas based

11   on the wants and desires of her clientele.  Lauren I, Lauren

12   II, Ella.  She thought about what wealthy clients would want

13   and had enough control to portray herself as the person her

14   clients desired.

15        And you saw a note that Claudia wrote in her iCloud in

16   support of sex work.  She said sex work is awesome.  She found

17   sex work to be life affirming in many ways.  She said she loved

18   what she does and that her experience was not one of abuser and

19   victim.  She testified that as she earned money escorting, she

20   began giving money to Larry, not because he forced her but

21   because she believed that she had poisoned him and she wanted

22   to pay him back for the damages that she caused.  She may

23   regret that now, and she has to explain it somehow, so she says

24   she was forced.  But there is no objective credible evidence to

25   support Claudia's claims.  Certainly you've seen threats of

1    force and violence against others in this case, but you haven't

2    seen any evidence or heard any testimony about physical abuse

3    or threats against Claudia except from Claudia herself.  You

4    heard from Randy Levinson, one of Claudia's clients on a list

5    of many.  He told you that in the time that he spent with

6    Claudia, he never observed any marks on her body.  He never had

7    any reason to believe that she was trafficked.  He never saw

8    her with a handler.  He never heard about Larry Ray.

9            Claudia claimed that Larry threatened to send her to

10   jail, detailed for her the horrors of a life in prison.  She

11   claims that she was terrified of going to jail.  But during the

12   course of the time that she was prostituting, Claudia was

13   arrested three times.  Each time she could have gone to jail.

14   She kept working.  And when she was arrested, the police asked

15   her if she was being trafficked.  She said no.  If Claudia was

16   truly being forced into sex work, that was her moment to get

17   out.  Larry wasn't there when she was arrested.  He would have

18   no way of knowing that she had communicated with the police.

19   That was her safe time.  She denied it.

20           And despite her claims of being terrified of jail, in

21   her journal, documenting her fears of jail, she wrote that she

22   feared jail because she couldn't go to Columbia anymore, no

23   more academics, never joining the Marines, no more sex, no more

24   men.  This is what Claudia feared losing when thinking about

25   going to jail.

M451RAY1                    Summation - Ms. Lenox

1          Claudia said she didn't want to be an escort, that she

2     only did it because she felt she had no other choice.  She

3     claimed she couldn't stop.  She couldn't leave.  But then she

4     did.  In April of 2019, Claudia decided to stop escorting.  And

5     she testified that she bought a train ticket, she traveled to

6     Philadelphia, and she turned off her phone.  She never spoke

7     with Larry again.  The only contact, she received an email from

8     Larry wishing her a happy Easter.  Claudia characterized it as

9     an "absurdly weak attempt" to win her back.

10          And just like when Santos, Dan, and Yalitza decided to

11     stop spending time with Larry, when Claudia decided to end

12     contact with Larry, he never came after her.  He never went

13     looking for her.  Nothing actually came of the emails exchanged

14     between Larry, Isabella, and Talia in the days and weeks after

15     they lost contact with Claudia.  Larry didn't call Stuart

16     Piltch.  He didn't sue Claudia.  He didn't turn her in to law

17     enforcement.  He didn't post anything more on the website.

18          When you're deliberating about the sex trafficking

19     charge, you have to consider Claudia Drury's credibility.  You

20     have to.

21          (Continued on next page)

22

23

24

25

1            MS. LENOX:  The sex trafficking charges, and

2    specifically whether Larry forced Claudia to engage in sex work

3    and whether Isabella conspired with him to do that, rises and

4    falls on your belief of Claudia Drury.  This is a person who

5    for years has struggled with truth telling, who admitted to

6    embellishing stories for attention when she was younger.

7    Difficult to parse truth from fiction with Claudia.

8            Here is just a few of the stories that Claudia

9    admitted to telling.  She said that once after she took Ambien

10   she pretended to faint.  She once made up a story about failing

11   her driver's license test.  She testified under oath in housing

12   court about Bernie Kerik's conspiracy against Larry Ray.  After

13   the DiTomasso assault on Larry, when medical providers asked

14   Claudia what happened to her finger, instead of saying that

15   Frank DiTomasso bit it, she made up a story that a homeless man

16   having bitten her finger.

17           She told her therapist that she had thoughts of

18   harming others as a teenager when now actually claiming she

19   didn't have those thoughts.  During the hospitalization for a

20   suicide attempt she admitted that she swallowed pills in order

21   to get her parents' attention.  She crafted a months-long

22   narrative to get more money from clients.  You heard this

23   Claudia and from Randy Levinson.  And she lied to the

24   government for a year and a half about her relationship with

25   Stuart Piltch.  This is the testimony of the person the

1    government needs you to believe in order to find beyond a

2    reasonable doubt that Mr. Ray committed sex trafficking.  She

3    is not believable.

4           There was no assault in the Gregory Hotel on October

5    15, 2018.  Never happened.  The government presented a lot of

6    evidence to establish that Larry and Isabella were physically

7    present with Claudia at the Gregory Hotel that night.  They

8    showed you historical cell site evidence, they showed you text

9    messages, a diner receipt, an audio recording, but there is

10   very little relevant evidence about the alleged assault itself.

11          For that, you must rely on the word of Claudia Drury,

12   a notorious storyteller and Felicia Rosario, who wasn't at the

13   hotel that night.  This is not proof beyond a reasonable doubt.

14   There is no objective credible evidence to support the claim of

15   assault.  The claim is not supported by any objective witness

16   and it defies common sense.

17          Given the extraordinary volume of documentary evidence

18   in this case, the lack of evidence corroborating the alleged

19   assault on Claudia is striking and it's notable.  Claudia

20   claims that, over the course of eight years, Larry and Isabella

21   tied her to a chair, poured water on her, choked her, and

22   suffocated her.

23          She also claimed, and cell site records support, that

24   Isabella had her phone that night.  Claudia also had her phone.

25   During the course of the night, while Claudia was allegedly

1    tied to a chair and tortured, as you saw during Agent Maguire's

2    testimony, three calls were made from Claudia's phone,

3    including one call to the Skylight Diner.

4           Claudia testified that she didn't eat the night of the

5    incident at the Gregory Hotel.  The food ordered was not for

6    her.  But let's take a look at the diner receipt.  Stuffed

7    grape leaf, cheeseburger, another cheeseburger, chicken

8    fingers, mozzarella sticks, two cheesy omelets, two sliced

9    sausages, four soda pops.  This isn't a meal for two people.

10   Claudia ate that night and she was the one who ordered the

11   food.

12          Claudia testified that you can hear the sounds of the

13   bags used to suffocate her, the rustling towards the end of the

14   recording from that night, that you can hear Larry say, pass

15   the bag.  But they were eating.  Larry wasn't asking Isabella

16   for a bag to suffocate Claudia.  He was asking for a bag of

17   food.  The recording that you heard from that night, it's not

18   unlike any of the other hundreds of recordings that the

19   government has put in evidence:  A seeming confession, a story

20   told by a person now disclaiming the narrative, nothing more.

21          Now, Claudia also claims that Isabella that night

22   found a pair of golden seamstress scissors with a crane around

23   the handle in her purse and that Larry used these scissors to

24   cut Claudia's hair.  But these scissors, which Claudia clearly

25   prized, they are not in evidence.  Of all of the evidence that

you have in this case, you don't have those very special

scissors that were allegedly used to cut her hair that night.

Of all the photographs that you have in this case, you don't

have before and after photographs of Claudia's hair and how it

looked after Larry allegedly cut it.  Nothing to show that it

changed.

          Most significantly, there is no evidence that Claudia

suffered a serious physical injury that night.  Immediately

after the incident, Claudia said, she just cleaned her room and

went to bed.  She didn't seek medical attention.  These aren't

the actions of a person who suffered a serious physical injury

just hours prior, because she didn't.  Claudia didn't behave

the way you would expect of a person who had been tortured for

eight hours.  After Larry and Isabella left, Claudia didn't

seek help from the people who were working at the hotel.  She

didn't call the police.  She didn't immediately tell anyone,

including the clients with whom she claims she had built a

relationship, like Randy Levinson.

          What happened?  There is no evidence that when Claudia

first reported the alleged assault who she told or when she

told them.  As Claudia testified, she woke up the next day,

bought a new cell phone, checked into a hotel, saw clients, and

earned money.

          Larry didn't have her number.  Isabella didn't have

her number.  They had no way of reaching her and no way of

1    knowing where she was.  Claudia was alone with money.  She

2    could have vanished.  She didn't.

3         Felicia Rosario's testimony doesn't make Claudia's

4    story any more believable.  In fact, as the government said in

5    its closing, the stories are almost exactly identical, and you

6    have to ask yourself why.  It's a bit too neat.

7         Felicia claims that she specifically remembers Larry

8    and Isabella coming home one day in October of 2018 acting

9    gleeful, bragging about what they had allegedly done to

10   Claudia.  But in the context of Felicia's testimony it doesn't

11   make sense.  Because Felicia testified that in her experiences

12   with Larry and Isabella with respect to Claudia, they didn't

13   tell her anything about what happened with Claudia when they

14   interacted with her.  They intentionally siloed her from

15   Claudia.  They hid things from her.  She said that Isabella

16   worked on her ledgers in private, in her room behind a closed

17   door, and actually said, I don't want you to see what I'm

18   doing.  And yet, suddenly, after years of concealing their

19   behavior, Larry and Isabella come home and giddily bragged

20   about committing a heinous crime.  It doesn't make sense.

21        Felicia had a motive to come in here and tell you that

22   story.  She spent nearly a decade in a relationship with a man

23   who she referred to as her husband and who he referred to her

24   as his wife.  A man who behind closed doors shared a bedroom

25   with another woman, just like her father had.  She lived in the

shadow of Isabella and was constantly reminded of it.

When Felicia first moved to New York, she imagined a completely different life for herself. As her sister testified, Felicia wanted a fairy tale. So when you think about Felicia's testimony, think about that. When you think about Claudia's testimony about the incident at the Gregory Hotel, consider the recording that you heard of the elaborate story that Ms. Drury told to Larry in the summer of 2014. She described vividly three men emerging from a white van in broad daylight. She described each man in meticulous detail, including their height, their weight, their racial ethnicity, their facial hair, their body markings. She claimed that these men pinned her against a wall and threatened her, saying they were sent at the behest of Bernie Kerik.

(Audio played)

MS. LENOX: Her descriptions were vivid. They were detailed. She told an extraordinary story about having been victimized in broad daylight by men sent by Bernie Kerik. You could hear the tears in her voice. These weren't details that she embellished. This was a story that she invented. She told you that. Claudia Drury's testimony about October 15, 2018 is not proof beyond a reasonable doubt that Larry committed assault.

This is a case about storytellers, but it's also a federal criminal case. The prosecution must prove its case

beyond a reasonable doubt.  The judge will instruct you about

what that means.  A reasonable doubt is the kind of doubt that

would make you hesitate in an important moment in your life.

At the end of the case the judge is going to spend a

very long time, a very long time, I promise you, reading you

the instructions that you have to follow when deliberating

about this case.  Larry is charged with very, very specific

crimes, each of which has a number of elements.  The question

before you is not whether or not you approve of Larry's

actions.  You cannot convict Larry unless you find him guilty

beyond a reasonable doubt of each and every element of the

offenses charged.

Now, after I'm finished speaking, and I promise you

that will be very soon, the government is going to stand up and

talk to you again.  They get the last word.  Because it's the

government that has that burden of proof beyond a reasonable

doubt.  I urge you, when you listen to the government, please

keep my voice, keep these arguments in mind.  If you hear

something new in rebuttal, no, I won't be able to respond to

it.  Ask yourself, how would the defense respond?

If you think that Larry Ray believed that he was

poisoned, believed that he was owed money for damages, you must

find him not guilty.

You heard from different witnesses in this case:

Santos Rosario, Felicia Rosario, Yalitza Rosario, Claudia

M45MRAY2

1   Drury.  They are all storytellers.  They listened to Larry's

2   stories, they listened to his belief in a vast conspiracy

3   against him, and they began telling their own stories, adopting

4   Larry's villains as their own.  And as they told and shared

5   their stories, they believed the fiction they created, and

6   Larry believed.  At the end of this case you must find Larry

7   Ray not guilty.

8               THE COURT:  Thank you, Ms. Lenox.

9               Members of the jury --

10              MS. SASSOON:  Can we have a brief sidebar?

11              THE COURT:  Yes.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MS. SASSOON:  I did not want to interrupt the last

3     lines of Ms. Lenox's closing.  But if I heard correctly, she

4     said that if the jury believes that the defendant was not

5     poisoned or believed he was poisoned, it has to find him not

6     guilty.  That's legally incorrect.  It's inconsistent with the

7     jury instructions as we have discussed them, and we believe a

8     curative instruction is appropriate.

9          THE COURT:  I am prepared to give a curative

10    instruction along the lines of, you are going to hear from me

11    in a moment or two the law with respect to the charges at issue

12    and that it's that law, rather than the arguments that you have

13    heard from any counsel, that you are to apply.

14         MS. SASSOON:  We think it needs to be specific to the

15    idea that we heard argument that if he believed he was poisoned

16    he is not guilty.  I am going to give you the correct

17    instruction with respect to that.

18         MS. LENOX:  I don't think it needs to be that

19    specific.  This is argument.  Your Honor, I think it's enough

20    to simply say that argument is not the law, that argument is

21    argument, that you, the Court, will give the jury the

22    instructions on the law, and they are to follow your Honor's

23    instructions.  This is argument.

24         THE COURT:  I am going to add a clause that's

25    including the significance of claiming Mr. Ray believed that he

M45MRAY2

```
 1    was poisoned.
 2             MS. SASSOON:  Your Honor, we would ask that you say
 3    the significance, if any.
 4             THE COURT:  No.  It has significance, potentially, as
 5    to some of the claims.
 6             MS. GLASHAUSSER:  Your Honor, the government already
 7    has an opportunity to rebut our summation, which they are about
 8    to take.  To put a finger on the scale even before the
 9    government has --
10             THE COURT:  I don't think it puts a pinger.
11             MS. GLASHAUSSER:  -- by specifying a portion of our
12    summation, the government also spoke about the law, and both
13    sides are allowed to do that in the context of argument.
14             THE COURT:  They stated the law correctly.  Ms. Lenox
15    didn't.  So I am going to give a bit of a curative instruction.
16             (Continued on next page)
17
18
19
20
21
22
23
24
25
```

M45MRAY2

```
 1              (In open court)
 2              THE COURT:  Members of the jury, you have heard
 3   argument from both counsel where they have alluded to the law,
 4   including, most recently, arguments from the defense regarding
 5   the significance of the claim that Mr. Ray believed that he was
 6   poisoned, that assertion from the defense.
 7              Let me instruct you that it is the instructions that I
 8   am going to give you that you are to follow with respect to the
 9   law.  It is not the assertions by any counsel as to what the
10   law is or how you should treat arguments about the law.  I am
11   going to instruct you with respect to the law.
12              Now, the next step is the government rebuttal
13   summation.  We are going to take a brief break and then we will
14   resume.
15              When you come back, you will notice that the podium
16   has been moved.  Ms. Sassoon is going to deliver the rebuttal
17   summation for the government.  There are protocols that we have
18   in the courthouse to ensure your safety, including taking COVID
19   tests and the like.  The podium will be moved more closely to
20   you, and she may not have a mask on.  I want to assure you and
21   comfort you that what she does is in conformance with all of
22   the rules within the courthouse that have been scrupulously
23   designed to make sure that they will protect everybody in this
24   courtroom.
25              It's now 10:20.  We will take about a 15-minute break
```

1      and see you back here.

2                  (Jury not present)

3                  THE COURT:  See you back in about 10 minutes.

4                  (Recess)

5                  THE COURT:  Mr. Fishman, why don't we bring the jury.

6                  Ms. Sassoon, what is your estimate?

7                  MS. SASSOON:  Thirty-five minutes, 40 minutes.

8                  (Jury present).

9                  THE COURT:  Ms. Sassoon, you may proceed.

10                 MS. SASSOON:  This is not a case about storytellers

11     and this is certainly was not Alice in Wonderland.  This was a

12     violent reality that destroyed lives for that man's pleasure

13     and for his organization's profit.

14                 You know this is not a fantasy land.  You heard from

15     five victims on that stand.  You saw scores of documents

16     confirming what they told you.  You heard hours of recordings.

17     Those weren't chapters from a children's bedtime storybook.

18     That was undeniable proof of federal crimes.  You were chosen

19     as jurors to weigh the evidence, to trust what you have seen

20     with your eyes and heard with your ears throughout this trial,

21     that the defendant, Lawrence Ray, is guilty.

22                 As you know, the government has the burden of proof in

23     this case.  The defense does not have to make any arguments.

24     It does not have to say a thing.  It is the government's burden

25     of proof, and we embrace that burden.  But when the defense

M45MRAY2                    Rebuttal - Ms. Sassoon

1   makes arguments, as they just did here, it is your duty to

2   scrutinize them, to see if they match up with the evidence and

3   with your common sense.  They don't.

4           The defense lawyers might talk a lot about the looking

5   glass, but they are not magicians.  They cannot make hours of

6   the defendant's abusive recordings disappear or wish away

7   records documenting millions of dollars in profits that the

8   defendant laundered through GoDaddy and to his daughter, Talia

9   Ray, and they cannot discredit Claudia Drury, who took that

10  stand and whose testimony matched up with the testimony of the

11  other witnesses in this case and with the mountain of other

12  evidence.

13          I'm not going to respond to everything defense counsel

14  said.  I don't have to.  This has been a long trial and you

15  have paid close attention to the evidence.  I am not going to

16  play any more recordings or show any more photos.  You know

17  what happened.  But I am going to respond to some of the things

18  defense counsel said.

19          I'd like to start with the time the defense has spent

20  talking in breathy whispers about what Larry believed.  The

21  defense moments ago told you that if you find that Larry

22  believed that he was poisoned, then he is not guilty.  They had

23  the audacity to flatly misstate the applicable law.

24          Judge Liman is going to instruct you on the law and

25  what he says controls, but I expect that he will tell you that

1   what the defendant believed about poisoning is obviously not a

2   defense to violent crimes.  Imagine the world we would live in

3   if thinking you were a victim gave you license to behave like a

4   crime boss, to extort people, to sex-traffic them, to force

5   them into labor.

6         Thankfully, that's not the world we live in.  We live

7   in a country with the rule of law.  Suffocation, black mail,

8   punches to the face, a hammer to the knees, forced labor,

9   forced prostitution, that is not how you collect money, even if

10  you think you deserve it.  That's extortion.  It's sex

11  trafficking.  It's criminal.

12        What you saw in this trial was not roughhousing.  It

13  wasn't method therapy.  Give me a break.  Only in the

14  defendant's alternative looking-glass wonderland are videos of

15  Lawrence Ray engaging in violence somehow proof of his

16  innocence.  It is irrelevant under the law if he thought he was

17  entitled to beat up these young college students.  He wasn't.

18        And this notion, the suggestion that these violent

19  acts were not connected to the demands for payment, that's

20  ridiculous.  You saw in these recordings and you heard from the

21  victims how the defendant's violence was connected to demands

22  for payment, to demands for labor, to demands for prostitution.

23  The defendant created a climate of fear that drove these young

24  people to steal from their parents, to commit prostitution, to

25  work into the night in thunderstorms.  Of course that was a

M45MRAY2                        Rebuttal - Ms. Sassoon

product of the violence that they experienced, that they

witnessed, that they endured for years and years.  So you do

not need to form an opinion about what the defendant believed

about the poisoning.  It's irrelevant.

         But let's get real.  The defendant did not really

believe he was owed hundreds of thousands of dollars from the

Rosario family and millions of dollars from Claudia Drury.  The

defendant, this physically imposing middle-aged man, never once

feared for his life from this group of Ivy Leaguers.  Of course

he never believed that a Spanish-speaking immigrant mother,

Maritza Rosario, was plotting to kill him with the former

nominee of homeland security.  It's ridiculous on its face.

         But the substance of the accusations, that these young

people had tried to poison him, those are serious accusations

of attempted murder.  Do not lose sight of that.  If you really

and truly believed that someone was trying to poison you and

your daughter, that they had poisoned you with mercury, with

cyanide, with arsenic, would you sit around your living room

with them?  Would you go to dinners together?  Would you live

under the same roof?  Of course not.

         What would you do if you thought you were being

poisoned?  You would get as far away as possible from that

person.  You would report them immediately to the police.  This

isn't about keeping your enemies close.  Nobody in their right

mind would keep their attempted murderer in their house.  It

M45MRAY2                        Rebuttal - Ms. Sassoon

1    makes no sense because it is not true, it is not what Larry

2    believed.

3            The defense has made a big deal out of a single e-mail

4    sent to Preet Bharara.  The only thing that is important about

5    that e-mail is the date of the e-mail, April 21, 2016, more

6    than two years after Claudia confessed to poisoning, more than

7    one year after she started sex work, giving the defendant all

8    of the money.

9            The e-mail to the U.S. Attorney's Office is not

10   evidence the defendant believed anything.  It's evidence of how

11   far he was willing to go to scare his victims into believing

12   that they were going to jail so they would keep giving him

13   money, keep doing as he said.

14           The more time went on, the more the defendant had to

15   do something to make his victims believe that he was willing to

16   carry out his threats.

17           Claudia told you how the threats of prison escalated

18   and escalated.  The defendant cooked up this bogus e-mail to

19   the head of federal law enforcement complaining of a wild and

20   baseless poisoning scheme at the hands of a bunch of students.

21   He knew it would go nowhere and get no attention.

22           And after this e-mail that, of course, went nowhere,

23   the defendant kept up his threats to Claudia.  This wasn't the

24   defendant keeping his enemy close.  This was him doing

25   everything in his power to keep the fear alive and to keep the

1    steady stream of extortion payments flowing.

2              If you want to know what the defendant believed, look

3    no further than the chart of articles on in his computer.

4    These weren't on a professor's hard drive, like defense counsel

5    talked about.  They were on the drive of a person who's

6    extracting false confessions by force and threats.  He believed

7    he could use false accusations, brain washing, and group

8    dynamics to control the minds of his victims, and for a time it

9    succeeded.  He got them to believe anything, to admit to

10   anything, to do anything, all for his own benefit.

11             The defendant told Claudia that he was spending the

12   money on hospital bills.  He was doing no such thing.  The

13   government didn't just show you a few receipts for expensive

14   clothing.  Special Agent Maguire told you that she reviewed

15   hundreds of receipts, pages and pages of cash logs that showed

16   no meaningful medical expenses.  That is not the behavior of a

17   man trying to recover from poisoning.

18             If the defendant believed the money was restitution,

19   that he and his family deserved it fair and square, he would

20   not have kept his name off of all of the bank records, hid the

21   money in other people's banks, and laundered it to GoDaddy.

22             And not only did the defendant himself say these

23   domains were worth $34 million, you heard from Kyle Sliger, the

24   former employee of GoDaddy, who himself valued the defendant's

25   domains at $17 million.  That's at Government Exhibit 3212.

M45MRAY2                        Rebuttal - Ms. Sassoon

1              Defense counsel talked about this meeting with Mr.

2     Ripa about the tax advice, and she brought up how the defendant

3     did not record this meeting.  Of course he did not record it.

4     Because if he had, the recording would show even more crystal

5     clearly that this conversation was a sham.  I expect Judge

6     Liman will tell you that with respect to the tax charges only,

7     the government has to prove that the defendant did not have a

8     good-faith belief that he owed no taxes.

9              The defendant's conversation with Mr. Ripa, as

10    described by Mr. Ripa on the stand, does not come close to

11    showing good faith.  It's part of the exact same pattern of

12    manipulation.  The defendant gave Mr. Ripa misleading facts

13    just so he could trot him out here at this trial and say, look,

14    I really did believe that I didn't owe taxes, but he didn't

15    tell Mr. Ripa about the violence, the threats, the coercion,

16    and, as Mr. Ripa told you, he certainly did not tell him about

17    the staggering amounts of money that he was collecting from

18    Claudia.  The defendant knew that if he did, even a lawyer like

19    Mr. Ripa would not have given him the green light to evade his

20    taxes.  No lawyer, no matter how incompetent or how corrupt,

21    would ever bless that behavior.  This argument would be a joke

22    if the defendant's conduct were not so deliberately designed to

23    obstruct justice.  The defendant manipulated Mr. Ripa and now

24    he is trying to manipulate the system and to manipulate you.

25    You know better than to fall for it.

1              I would like to go back to this idea that this case is

2      about storytellers.  What that really means is the defense

3      wants you to believe that victim after victim got on that stand

4      and lied to you about the defendant's abuse, his coercive

5      control, his threats, and his criminal organization.

6              That flies in the face of the evidence.  The

7      defendant's conduct was so cruel, so extreme, it might be

8      tempting to think it was only the stuff of nightmares.  If only

9      that were so.  But, based on the documentary evidence, you know

10     that for the victims this was very much real life, that what

11     they told you was true.

12             You have videos of Felicia having sex with strangers

13     at the defendant's direction.  You saw videos of the victims'

14     grueling work in thunderstorms in North Carolina, videos of the

15     defendant punching Felicia in the face, pinning her to the

16     ground, recordings where the defendant's physical abuse of

17     Santos in front of the group and Talia's threats of jail are

18     unmistakable.  You saw the ledgers in black and white tallying

19     up millions of dollars in organizational profits.

20             The defense attacked these victims but had very little

21     to say about these pieces of evidence because they have no

22     response.  All that they said was the violence was not tied to

23     any of these crimes.  You know that these videos capture the

24     heart of the crimes, the heart of the extortion, the heart of

25     what made these victims feel forced to work, forced to pay,

1   forced to engage in commercial sex.

2           The defense wants you to ignore all of this evidence

3   because at one point these victims made false confessions.  But

4   you know that these confessions did not materialize out of thin

5   air, that these victims did not thrive on spinning falsehoods.

6   That is nonsense.  They made these confessions because the

7   defendant forced them to.

8           These confessions had common features for a reason.

9   Why?  Because each victim was pressured by the defendant to say

10  increasingly outlandish and incriminating things, often in the

11  same exact ways, and always to end relentless interrogations at

12  the hands of the defendant to ward off the defendant's verbal

13  and physical abuse.

14          This defense about storytelling, it is just an

15  extension of the same self-serving conspiracy theories that the

16  defendant himself recycled again and again.  Once again, the

17  defendant is claiming that everything and everyone is a liar

18  and a sabotage.  He once used these fictions to control these

19  victims.  Now he is using them to evade responsibility.  He is

20  trying to fool you the way that he fooled them.

21          But there is a difference this time.  When the victims

22  took the stand in court, they were no longer under the

23  defendant's coercive control.  They were under oath.  And what

24  they told you matched up in every important way with the other

25  evidence.  The defense has failed to expose a single lie.  You

M45MRAY2                          Rebuttal - Ms. Sassoon

1     have the tools to see through the defendant's con.

2              I want to talk to you about Claudia Drury.  Of all the

3     victims, the defendant has spent the most time trying to

4     convince you that Claudia as a storyteller, a liar, a sexual

5     deviant, even mentally unstable.

6              It is obvious why.  As the defense told you, if you

7     believe Claudia Drury, the defendant is guilty of all the

8     charges in the indictment.

9              I want to be clear about one thing up front.  The

10    defense has spent a lot of time on cross-examination and in

11    summation trying to convince you that Claudia wanted to be a

12    prostitute.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. SASSOON:  Aside from being absurd, that is a

2     distraction.  I expect that Judge Liman will tell you that if

3     there is just one instance in which the defendant used force,

4     threats of force, or coercion to cause Claudia to perform

5     commercial sex, then he is guilty.

6          What does that mean?  I'll give you some examples.  If

7     you find that at any point Claudia saw more prostitution

8     clients because the defendant suffocated her with a plastic bag

9     and told her to focus on work, or the defendant flogged her

10    with a crop, leaving a mark on her head, or the defendant hit

11    her in the face until she stopped flinching, or the defendant

12    threatened to expose her client list on the internet if she did

13    not make more money, or if the defendant threatened that she

14    would rot in prison with her face used as toilet paper if she

15    did not make repairs, then the defendant is guilty of sex

16    trafficking.

17         Remember Claudia's testimony about the Gregory Hotel.

18    I'll have more to say about that in a moment.  The defendant

19    subjected her to hours of physical torture and then told her to

20    behave and focus on making more money.  What did she do next?

21    She saw clients and she made more money, that she gave to the

22    defendant, because she feared for her life.  The defendant is

23    guilty of sex trafficking, extortion, assault in aid of

24    racketeering, based on that incident alone, regardless of why

25    Claudia became a prostitute.

1          But you should also reject the defense effort to shame

2     Claudia as a slut who wanted to be a sex worker.

3          MS. LENOX:  Objection.

4          MS. SASSOON:  Your Honor, that was the fair

5     implication of cross-examination.

6          THE COURT:  Members of the jury, this is just

7     argument.

8          MS. SASSOON:  Those suggestions are outrageous and

9     insulting.  Claudia, a graduate of Sarah Lawrence College, an

10    advanced mathematics student, did not wake up one morning and

11    decide that her life dream was to make money by having sex with

12    men between the ages of 18 and 85 years old, seven days a week,

13    almost 24 hours a day, and then to give nearly every cent to

14    the defendant, while she lived like a homeless person.  You

15    know from what you've seen at this trial that the defendant

16    forced her to that place, forced her to become a sex worker.

17    And I'll remind you of some of the things that you learned at

18    this trial.

19         The defendant isolated her.  He drove her to be

20    friendless, parentless, and homeless.  He convinced her that

21    she was homicidal and mentally unwell, and that paying him was

22    her only hope of redemption.  He inflicted violence on her and

23    in the presence of others.  He coerced her to confess to

24    horrible crimes that she did not commit.  He threatened to send

25    her to prison if she did not make monetary repairs, and fast.

1    And the defendant desensitized Claudia and others to

2    increasingly extreme sexual activity beginning in 2011, when

3    she was only 20 years old—20 years old, and he was the father

4    of her roommate, a middle-aged man.  He told her to have sex

5    with Dan, to have sex with a married power tool salesman, and

6    he tied her up and instructed others to put a dildo into her

7    body.  She told you why, by 2014, she was involved in horribly

8    painful and demeaning BDSM.  It wasn't because she loved kink.

9    By then, the defendant had been so successful at convincing her

10   that she was a worthless criminal, a worthless human being,

11   that she felt she deserved the abuse.

12           I just want to pause here for a moment, because

13   defense counsel talked to you a few times about the testimony

14   of Dr. Hughes.  It's been a while since she testified.  I urge

15   you in your deliberations to request the transcript of her

16   testimony if it will be useful to you, because the defense

17   misrepresented several things that Dr. Hughes said on that

18   stand.  For example, Dr. Hughes told you that sexual grooming,

19   while it happens with children, can also happen to young

20   adults.  She talked to you about isolation, but she told you

21   that isolation is not a necessary tactic if its perpetrator,

22   like the defendant, has already established total control.

23   Think about those things as you deliberate and as you consider

24   what the defendant did to Claudia and to his other victims.

25           So by the time the defendant told Claudia to be a

prostitute, he had so thoroughly convinced her that she had no

other way out, no other way to save her blackened soul.  The

defense talked about how sexually liberated Claudia supposedly

was.  You saw -- and this was one of the most difficult moments

in the trial.  You saw how humiliated Claudia was when her old

journal entry about sex with a police officer was placed in

front of her and the entire courtroom without even a pending

question from the attorney.  The entry, the incident it

described, and others just like it were the product of years of

sexual degradation and abuse.

          And where was this journal found?  In the defendant's

warehouse.  Not because he generously agreed to store people's

belongings.  Claudia told you how he would seize her journals,

including on the night of terror, and he hoarded personal

journals for precisely this purpose, to humiliate and to

intimidate his victims, including in a court of law if they

ever dared testify against him.  Not only has the defense

suggested to you that Claudia was a slut --

          MS. LENOX:  Objection.

          MS. SASSOON:  -- they told you that she's a liar.

          THE COURT:  Members of the jury, you're hearing

argument.  There's no claim in this case with respect to the

good faith or bad faith of the lawyers involved.  You're

hearing the rebuttal from the government to what it understands

to be the arguments of the defense.

1          Go ahead, Ms. Sassoon.

2          MS. SASSOON:  Thank you.

3          They've told you that Claudia is a liar.  Think about

4    that.  They're claiming a woman over 30 years old took the

5    stand in federal court, under oath, and in public, and lied

6    because when she was a teenager, she embellished a story about

7    a driving test?  This was not the high school cafeteria.  When

8    Claudia got up there and described being hit with a pipe while

9    naked, having paid to have sex with a crack addict, that was

10   hardly the testimony of someone trying to impress her friends.

11   She was humiliated.

12          The defense wants you to believe the humiliating

13   things that Claudia disclosed about herself, but to disregard

14   the things she said about the defendant.  They cannot have it

15   both ways.  And what she said about herself, those painful,

16   embarrassing facts about the most intimate details of her life,

17   and what the defendant did to her, that also shows you she told

18   you the truth about the defendant.  Claudia, just like the

19   other victims, had no motive to lie under oath in federal

20   court.  If her motive was to lie to blame her choices on the

21   defendant, she would have told much better lies.  She would

22   have said it was the defendant who took her to the BDSM club --

23          MS. LENOX:  Objection.

24          THE COURT:  Overruled.

25          MS. SASSOON:  -- that the defendant posted all of her

1    advertisements, that the defendant is the one who hit her with

2    a pipe.  But she didn't.  The defense hasn't told you what

3    benefit Claudia would get from lying under oath, from

4    disclosing humiliation after humiliation, because there isn't

5    one.

6           MS. LENOX:  Your Honor, misstating the burden of

7    proof.

8           MS. SASSOON:  Your Honor, they suggested she lied

9    under oath and --

10          THE COURT:  This is proper summation.

11          Members of the jury, you understand that the

12   government has the burden of proof beyond a reasonable doubt.

13   And nothing that Ms. Sassoon is saying is intended to suggest

14   that the government has anything less than the full burden of

15   proof.

16          MS. SASSOON:  However much the defense has tried to

17   shame Claudia, to paint her as unlikeable, as untrustworthy,

18   none of those things can change the fact that every key part of

19   her testimony was heavily corroborated and consistent with

20   photos, videos, audio, text messages, emails, ledgers,

21   financial analysis, and other witness testimony.  The question

22   for you as jurors is not whether you like Claudia, it's not

23   whether you approve of her behavior or her sex life; it is

24   whether she told you the truth about the defendant's crimes,

25   and you know that she did.  She told you she worked as a

M451RAY3                      Rebuttal - Ms. Sassoon

1   prostitute.  You saw the Backpage ads.  She told you she gave

2   nearly every cent to the defendant and Isabella.  You saw the

3   text messages that confirmed this.  You saw the ledgers from

4   the defendant's house and Mark Lubin's financial analysis that

5   showed the staggering amount of money going through accounts

6   controlled by the defendant and coming from Claudia.  She told

7   you about the defendant's sexual grooming.  And you can reject

8   this argument from the defense that this is not corroborated.

9   It's corroborated by the fact that the defendant sexually

10  groomed the other victims, including Santos, who was directed

11  to get oral sex by the shed from Isabella, by the grooming of

12  Felicia, and by Claudia's own journal entries, and emails,

13  including the email from 2012 where she refers to the incident

14  with Sam the Festool salesman, and the incident where the

15  defendant tied her up and committed an act of BDSM against her.

16  It's also confirmed by the photographs of her horrific injuries

17  to the back of her naked body that was found in the defendant's

18  iCloud.  She told you that the defendant proudly showed her the

19  photo of Dan Levin in a dress with a dildo in his mouth, and,

20  as she put it, a pained expression on his face.  You saw that

21  exact photograph that Claudia had not seen since 2013.

22          She told you that she lied to clients in desperation

23  to get more money to meet the defendant's ever-growing demands

24  for money.  And you heard from Randy Levinson, who confirmed

25  just that.  And you saw the email where she sold off her body

M451RAY3                    Rebuttal - Ms. Sassoon

1   to Randy in perpetuity, just to get money for the defendant.

2   She told you about the defendant's relentless pressure, and you

3   saw video after video of interrogations.  She told you that

4   Isabella and the defendant came to pick up the money, and you

5   saw the cell site maps that show the defendant and Isabella

6   meeting Claudia at her midtown hotels and at the White Castle

7   in New Jersey.

8         She told you that the defendant and Isabella targeted

9   her where it hurt her the most—her client information, her

10  relationship with her mother, her binge eating.  And you saw

11  just those things on a list Isabella drafted for the Claudia

12  Drury website, and you saw screenshots from the website itself.

13        I want to pause here for a moment because there was so

14  much violence in this case that that has been a big focus of

15  the government's summation, but I expect you will hear from

16  Judge Liman that extortion can be committed through other ways.

17  Sex trafficking can be committed through other ways, such as

18  wrongful threats, just like those that were put up on the

19  website, threats to expose sexual indiscretions, threats of

20  reputational harm.  If you find that these threats were made,

21  then the defendant is guilty of extortion and of sex

22  trafficking.

23        But Claudia also told you about the defendant's brutal

24  violence.  The defense suggested to you that this was just

25  based on Claudia's say-so, that her testimony about violence is

1    uncorroborated.  That just doesn't align with the evidence in

2    this case.  You heard the recording from March 9, 2014, and I

3    believe these are Government Exhibits 4176A and 4175, where the

4    defendant is brutally beating Santos with a hammer.  Claudia

5    was there.  Claudia witnessed those horrific acts and those

6    horrific threats.  That contributed to her own climate of fear,

7    her own fear of what the defendant was capable of and what he

8    might do to her.

9           She told you about many instances of violence,

10   culminating in the incident at the Gregory Hotel.  The rustling

11   of the plastic bag is not the defendant eating a hamburger.

12   You can hear the fear in Claudia's voice immediately after the

13   rustling of the bag.  She is terrified.  Go back to the

14   recording.  You'll hear it.  And you'll hear, at 20 minutes and

15   about 18 seconds, Claudia gasping for air.

16          The defense boldly asserted that there was no assault

17   at the Gregory Hotel, but they can't get around the fact that

18   Felicia corroborated Claudia in every important respect.  So

19   what did they tell you?  They suggested that Felicia's

20   testimony was completely fabricated.  Think about that.

21   Felicia Rosario got on that stand and made up a story about

22   Claudia that somehow matched up to everything Claudia said?

23   What the defense is suggesting is that the government planted

24   Felicia's story.  There's no other explanation.  And that is

25   outrageous, and there is nothing to support such an improper

M451RAY3                         Rebuttal - Ms. Sassoon

1      and offensive suggestion.

2             Felicia's testimony was consistent with Claudia's

3      because you know they were both telling the truth—Felicia in

4      the defendant's own words.  And Claudia's behavior the next

5      day, it is exactly the behavior you would expect from someone

6      who feared for her life and who thought the only way to put off

7      more violence and more threats was to get money for the

8      defendant, and fast.

9             The defense argued—and this was mostly yesterday—that

10     the defendant did not run a criminal enterprise, that he was

11     just sending money to loved ones and communicating with his

12     dad.  Well, "the Ray family" was the defendant's own turn of

13     phrase, but you can call this criminal organization whatever

14     you want.  Racketeering is a big word, but the concept is

15     simple.  The bottom line is that the defendant was the leader

16     of a group that shared the common goal of committing crimes for

17     their own power and profit—crimes like extortion, forced labor,

18     sex trafficking, and obstruction.

19            Judge Liman I expect is going to give you a copy of

20     the indictment in this case.  I encourage you to read Count

21     One, the racketeering conspiracy.  The indictment lays out the

22     details of the defendant's criminal organization—its purposes,

23     its methods, and its pattern of crimes.  I also expect Judge

24     Liman will instruct you that a person does not have to

25     participate in every aspect of an illegal scheme to be a

M451RAY3                    Rebuttal - Ms. Sassoon

1   co-conspirator, and that criminals generally, as you might

2   expect, don't sit around a table signing a written contract of

3   their criminal agreement.  Much is often left to unexpressed

4   understanding.  What does that mean?  Lawrence Grecco and Talia

5   Ray did not have to further Claudia's prostitution to have been

6   the defendant's co-conspirators in the enterprise.  Sex

7   trafficking, that was Isabella's domain.  And I would just

8   point out that the defense didn't question that Isabella was

9   part of this conspiracy.  The proof of her involvement is

10  overwhelming.  But for Talia and for Lawrence Grecco, it's

11  enough that they played a role, however big or however small,

12  in advancing some of the aims of the enterprise.  They clearly

13  did.

14          Talia Ray, she was more than a mean girl.  Mean girls,

15  they don't let you sit at the lunch table.  They don't extort

16  you for tens of thousands of dollars.  Talia's conduct

17  establishes that she was a member of this criminal

18  organization.  She brought her friends into her dad's orbit and

19  she enforced the hierarchy of the group.  She, her dad, and

20  Isabella were the chosen few.  Her other former roommates were

21  the criminals.  She participated in the extortion.  Look at her

22  handwritten letters, her emails to Claudia.  She accused her

23  friends of wrongdoing, and then she collected the money.  She

24  participated in the defendant's wrongful threats that were

25  designed to get victims to pay.  Just listen to her telling

1    Santos that he's going to prison for life.

2              She collected the profits, she funneled the money to

3    GoDaddy and into her own bank account.  She helped with and she

4    benefited from the forced labor.  She was there, and while her

5    roommates toiled inside, she enjoyed the benefits of the house.

6    She threatened Claudia about damages, she collected money from

7    Santos, and she helped obstruct justice, giving input on the

8    threats to Claudia after Claudia ran away.  Loving her dad,

9    that doesn't change the fact that these are crimes that were a

10   core part of the criminal enterprise's mission.

11             The same is true of Lawrence Grecco.  Any family tie

12   doesn't change the fact that he advanced the defendant's

13   efforts to obstruct justice.  He joined the effort to discredit

14   potential witnesses, and he ultimately delivered an

15   unmistakable threat to Felicia Rosario, that her loyalty was

16   required, that he would risk jail to secure it.  That is

17   obstruction of justice, and that was one of the goals of the

18   defendant's enterprise.

19             But I want to remind you that to find the defendant

20   guilty of racketeering conspiracy, you don't even need to find

21   that Talia Ray and Lawrence Grecco both participated or even

22   that the enterprise obstructed justice, even though it did.

23   One co-conspirator is enough.  Isabella Pollok.  Two acts of

24   criminal activity are enough.  It would be enough, for example,

25   if you concluded that Isabella was the defendant's partner in

1     crime for the racketeering activity, and that together they

2     committed two acts of money laundering, or two acts of

3     extortion, or two of each.  These are just examples, but you

4     have countless racketeering acts to choose from.

5            I want to talk to you about this argument that these

6     are not crimes because the victims could have or should have

7     left.  This is besides the point, and it's not true.  I expect

8     Judge Liman will tell you that the crimes like forced labor,

9     forced sexual services, and sex trafficking don't require that

10    a victim be locked up in a basement or acting with a gun

11    pointed at their head.  A victim has no affirmative duty to

12    escape if the defendant placed them in fear of leaving or if

13    the victim felt as though she could not leave.  That's exactly

14    what happened here.

15           And let's just take Yalitza as an example.  Defense

16    counsel, during her summation, complains that the government is

17    describing everything Larry does as a manipulation and that he

18    called Yalitza and he really wanted her to come help her sister

19    and -- I wrote it down -- that Larry really wanted Yalitza's

20    support for the person he loved.  That's defense counsel's

21    phrase.  Of course this was a manipulation.  Yalitza came down

22    to Pinehurst, concerned for her sister, and what she

23    encountered, in her words, was a living hell.  This person who

24    told her that he wanted her to support her sister, then

25    brutally assaulted that sister in front of her eyes, day in and

1    day out, and then he blamed Yalitza for the fact that her

2    sister was childlike, mentally unwell, falling apart.

3            The defendant did things to and in front of his

4    victims to ensure that they were afraid to disobey, afraid to

5    leave, that any lifeline they had was destroyed.  By the time

6    the extortion, the forced labor, and the sex trafficking were

7    underway, the defendant had cut off these victims from their

8    parents.  You heard that.  Yes, they may have had dinner in

9    2011.  By 2014, Claudia wasn't speaking to her parents.

10   Maritza Rosario told you that she did not see her children for

11   seven years.  This was not a neglectful mother.  This was a

12   woman desperate to find a way to help her children, who plunged

13   herself into debt because her son told her that he would kill

14   himself if she did not come up with more money for the

15   defendant.  Each of these victims came to a desperate place

16   where they felt they had nowhere to turn, nowhere to go, no way

17   to leave.  And Yalitza, she only left because she was ready to

18   take her own life.  She didn't have an exit plan.  Her exit

19   plan was to take a bottle of Tylenol in the parking lot of a

20   Walmart.

21           It's also irrelevant that when the time came, when

22   they found the courage, when they were extended a helping hand,

23   that the victims did leave.  The defense talked about how the

24   defendant didn't stop Yalitza, he didn't stop Santos.  Well, by

25   the time they left, he could not care less about them, because

1   Claudia was independently turning over hundreds of thousands of

2   dollars.  He did not need Santos's ten grand anymore.  Santos

3   was expendable to him—expendable until Claudia ran away and he

4   needed money again.

5          But when the defendant felt that Claudia, his prized

6   cash cow, was slipping from his grasp, he did act.  He did try

7   to stop her.  That was the Gregory Hotel.  That night was his

8   effort to send a message that if Claudia ever broke away, she

9   would end up dead.  And she got that message.  And for a time,

10  it worked.  But once Claudia left New York City, there was

11  little the defendant could do.  He was no dummy.  This is

12  someone who avoided a paper trail in his emails, in his

13  financials, but he was so desperate that he sent her a coded

14  threat.  He and Isabella updated the Claudia Drury website with

15  a barrage of threats meant to make Claudia do anything to have

16  the content taken down.  Remember the calendar entry,

17  April 6th, "Claudia runs away," and then all the notes that

18  followed with ideas for the website, drafts of threats to

19  Claudia.  This was their effort to get her back in line.  And

20  when the website didn't work, when his coded threat didn't

21  work, he had Isabella and Talia send one final threat to

22  Claudia, saying she was a vile criminal who belonged in prison.

23  They tried.  But the organization's effort to bring Claudia

24  back into line simply failed.  And why at that point did he not

25  turn her in to the police?  Because he knew she was not a

M451RAY3                    Rebuttal - Ms. Sassoon

1    criminal; he knew she was his victim.

2              I'd like to say a word to you about Felicia.  Defense

3    counsel stood up and used words like "agency," "she was a

4    29-year-old woman," "she chose to have sex with strangers."

5    The defendant was trying to support her when he physically

6    restrained her and assaulted her in Pinehurst.  Ignore these

7    euphemisms.  Let's call it what it was—abuse, force.  If the

8    defendant was concerned about Felicia, about supporting her,

9    why did he punch her in the face?  Why did he make her have sex

10   with strangers?

11             The defense wants to ignore the consequences of the

12   violence that the defendant repeatedly inflicted.  Of course

13   there was a connection between the abuse and the forced labor.

14   Look at the evidence.  Yalitza was going to go down for two

15   days.  She stayed for months, in a living hell, as violence was

16   inflicted, as she was brought to the police station, all in the

17   service of the defendant's constant demands that the work was

18   not done, that the work was being sabotaged, that there was

19   more work to do.  And the fact that the defendant told Felicia

20   to be an escort, again, what stronger proof of the defendant's

21   sex trafficking of Claudia than that he tried to do the same

22   thing with someone else?  The only reason it did not succeed is

23   not because Felicia had agency; it's because she made herself

24   so unhygienic, so undesirable, as she told you, so that there

25   was no way for her to continue with the defendant's sexual

M451RAY3                    Rebuttal - Ms. Sassoon

1    demands.

2            You heard the jail calls, where the defendant asked

3    his dad to gather recordings of his victims, the emails of Dan

4    and Claudia describing violent thoughts, the recordings of

5    Claudia trying to set him up.  That tells you everything.  The

6    defendant made these recordings and he kept them precisely so

7    he could try to discredit his victims if they ever exposed him,

8    precisely because he knew he was extorting them, he was

9    victimizing them.  You should reject the defense effort to

10   discredit these witnesses with the very collateral the

11   defendant created and collected for exactly this purpose, so

12   that his victims would never be believed, so that his victims

13   would never have the courage to speak up.

14           You saw these victims on the stand, their gentle

15   demeanors, their soft-spokenness.  You heard them talk about

16   their insecurities at the start of college.  The mental health

17   issues of these young people does not show that they're

18   unreliable.  It shows that the defendant decided that they were

19   perfect targets.  He moved into his daughter's college dorm

20   when these young people were at their most vulnerable, at a

21   time when they had moved away from their parents and were

22   trying to figure out what kind of adult to be.  He saw the

23   self-doubt that came with being a teenager.  He capitalized on

24   their depression and the loneliness that comes from being away

25   from home for the first time.  He took all of these natural

M451RAY3                        Rebuttal - Ms. Sassoon

feelings of growing up and then he convinced them that they

weren't normal young adults trying to find their way but

irredeemable criminals, just so he could better exploit them

for his benefit and the benefit of his criminal organization.

          But the defendant, he underestimated the young men and

women who took the stand at this trial.  He never thought they

would have the courage to take the stand and relive the darkest

moments of their lives, to face the abuser they had been taught

to revere and trained to fear, to suffer from the defense the

same false insults that they had endured for years—that they

are liars, a rapist, a scorned lover, a delinquent mother, and

more.  But you saw their courage.  You heard about the

suffering the defendant inflicted on them, how he tore their

world apart, treated them like slaves, made life a living hell.

          The defendant did not commit these crimes because he

thought he was poisoned.  He did it because he enjoyed being

cruel, because he has a unique appetite for stoking fear and

exerting control.  He did it to build his criminal organization

and to cement his place at the top of it.  The architecture of

the defendant's scheme, the scaffolding that held it up, was

control, manipulation, fear, and power.  The organization's

lifeblood was the work of these victims, whether it was digging

trenches, having sex for money, or plunging the Rosario family

business into debt.  But when the victims overcame the

defendant's control at different times and in different ways,

M451RAY3

the defendant's criminal organization fell apart.  The
overwhelming evidence you have seen has finally exposed the
defendant's crimes—the extortion, the sex trafficking, the
forced labor, the money laundering, the obstruction, and the
decades-long leadership of a criminal organization.  That's why
we're here today.

         Time to deliberate, without fear, favor, sympathy, or
prejudice.  There has been so much evidence.  Take your time
with it.  Don't lose sight of it.  As you deliberate, let your
common sense be your compass, let that evidence be your north
star.  If you follow that path, you will reach the only verdict
consistent with the evidence, consistent with justice—find him
guilty.

         MR. KELLY:  Your Honor, can we have a brief sidebar.

         THE COURT:  I was actually going to tell the members
of the jury that in a moment, I'm going to instruct you as to
the law.  You've now heard the summations of the parties, and
each of the lawyers has made various statements of the law.
I'm going to remind you now, as I'll tell you in the
instructions that will follow in a minute, that the law that
you are to apply is what I state in my instructions and not
what any counsel has said.

         My instructions will take some time for me to deliver,
so I'm going to meet with the parties at sidebar now for a
minute or two.  I would suggest that you all take a stretch

M451RAY3

1    break, and if anybody needs a bottle of water, my courtroom

2    deputy will get it for you.

3            I'll see the parties at sidebar.

4            (At the sidebar)

5            MS. GLASHAUSSER:  Your Honor, we have a number of

6    objections to the rebuttal defense that I would like your Honor

7    to give a curative instruction to.

8            First, the rebuttal argument at numerous points

9    denigrated the defense and defense counsel personally.  At the

10   beginning, it started by making fun of defense counsel by

11   imitating her "breathy whisper."  I now can't remember the

12   contents of that particular statement, but that was towards the

13   beginning.

14           MS. SASSOON:  Larry believes.  That was the context.

15           THE COURT:  Is there more on this particular issue?

16           MS. GLASHAUSSER:  Yes.  About denigrating the defense.

17           THE COURT:  We can go through each of your separate

18   objections, and then I'll hear from Ms. Sassoon.

19           MS. GLASHAUSSER:  Thank you.  So I'll go through the

20   list.

21           THE COURT:  Just go through the denigration, make your

22   points so I can hear them all, and then I'll hear from

23   Ms. Sassoon.

24           MS. GLASHAUSSER:  That sounds good.  Thank you.

25           Our defense arguments were called ridiculous and a

M451RAY3

distraction.

The government said that defense counsel had the "audacity" to misstate the law.

It was suggested that we did something improper by showing Ms. Drury her journal entries, which had been admitted into evidence, after lengthy argument and your Honor ruling that it was appropriate to reference those.

The government stated that Ms. Lenox had misrepresented Dr. Hughes's testimony, while Ms. Lenox had clearly shown that testimony to the jury and was reading from the actual testimony.

It was suggested that we had made an improper and offensive suggestion by suggesting that Ms. Rosario had tailored a portion of her testimony.

The government said that the defense "tried to shame Ms. Drury" and later suggested at some length that the defense had revictimized the people who were testifying.

I think there were actually more.  I had a hard time writing them all down.  The tone of the argument was to criticize defense counsel and the defense in a way that is completely inappropriate.

MR. KELLY:  To add on that one specific point, we were told that the defense was a furtherance of the criminal conspiracy, that merely cross-examining, questioning these witnesses about their prior recollections and their prior acts

M451RAY3

1   was a furtherance of Mr. Ray's criminal activity towards these

2   witnesses.

3           THE COURT:  I don't recall Ms. Sassoon saying that.

4           MR. KELLY:  She said defense counsel not only

5   revictimized but forced them to relive through these instances

6   in the same way that Mr. Ray did.

7           THE COURT:  I actually don't recall, Mr. Kelly, that

8   particular argument.  I do recall the argument being made that

9   they had to relive it by going on the stand and that that tied

10  into the credibility.  But we'll hear from Ms. Sassoon.

11          Is there more on this particular point?

12          MS. GLASHAUSSER:  There were a number of instances

13  that I wrote down.  I did a request for a curative instruction,

14  if you'd like to hear that portion now.

15          THE COURT:  Sure.

16          MS. GLASHAUSSER:  So I think a curative instruction is

17  appropriate, something to the effect of, that the jury has

18  heard the government's comment on the defense or defense

19  counsel's methods, that the Court instructs that defense

20  counsel's arguments and methods were appropriate, or proper or

21  consistent with what the defense is.  I don't know.  I'll stop

22  there.  I don't have precise language, but something to that

23  effect.

24          MS. SASSOON:  Your Honor, this is rebuttal summation.

25  It is standard and commonplace to describe arguments as

M451RAY3

ridiculous, as a distraction, to poke holes in arguments, to

point out where testimony was provided selectively.  And those

instances, for example, with Dr. Hughes, I urged the jury to

simply go back and look at the transcript.

         With respect to what happened with Claudia Drury and

the journal entry, I merely described accurately what happened

in court, which was she was made to read the journal entry and

then there was no question.

         I don't think I mischaracterized anything the defense

has said.  I've made impassioned arguments.  I think that's

appropriate for rebuttal.  And I don't think the curative

instruction is proper.  At most, if your Honor wanted to, at

most, the government would agree to a curative instruction that

simply says, you know, the arguments of counsel are not

evidence and your recollection of what happened controls.  But

I don't think I said anything objectionable.

         THE COURT:  I did give that curative instruction

during Ms. Sassoon's summation, interrupting her and saying

that good faith or bad faith of the lawyers is not an issue in

this case.  I'm also going to give a jury instruction with

respect to whether you like or dislike the lawyers.  So --

         MS. SASSOON:  I'll also note that defense counsel

repeatedly interrupted my rebuttal with what I considered

meritless objections, and we did not object during her

summation to what was a legally impermissible statement of the

M451RAY3

1     law.

2               THE COURT:  I'll go back to this in a moment.

3               MS. GLASHAUSSER:  So with respect to the objections,

4     the government, a number of times, said that the defense called

5     Claudia a slut, a sexual deviant.  Ms. Lenox literally said the

6     exact opposite in her summation.  I don't have the --

7               THE COURT:  Well, she said that she enjoyed sex.  I

8     mean, this is argument.  It's characterization of an argument.

9               MS. GLASHAUSSER:  Your Honor, I have more to say on

10    that point.  She said that precisely.  She said that is a

11    normal, appropriate thing.  She said it was not sexual

12    deviancy.  She said that this was -- at numerous points, that

13    these conversations about sex --

14              THE COURT:  You can respond, but make sure your points

15    are good ones.

16              What's your response?

17              MS. SASSOON:  My response is this:  Summation is

18    permitted to respond not just to -- the rebuttal is permitted

19    to respond not just to summation but what happened at this

20    trial.  The cross examination of Claudia Drury plainly involved

21    what the government considered over-the-line slut shaming.  And

22    the jury was here to hear the summation.  They know you did not

23    use that exact word.  To the extent that I described it in a

24    different way, there's no need for a curative instruction,

25    because the jury heard the summation.

M451RAY3

1         THE COURT:  What's your next point?

2         MS. GLASHAUSSER:  I apologize, your Honor.  I have a

3    specific request with respect to that one.  "Slut shaming" is

4    a -- the reason that the government is now saying it directly

5    to us, because it has power, and we did the opposite of that,

6    and --

7         THE COURT:  Just tell me what your request is.

8         MS. GLASHAUSSER:  Our request is to add to the defense

9    theory of the case that your Honor will read during the jury

10   instructions that the defense theory -- I can write out

11   specific language, but that there's nothing wrong or sexually

12   deviant related to sex work.

13        THE COURT:  Your request is denied.  It's belated, and

14   even if it weren't belated, I don't need to say that, because

15   it was perfectly appropriate rebuttal to make.

16        What's your next argument?

17        MS. GLASHAUSSER:  The next argument is the government

18   vouched for evidence that did not exist and told the jury what

19   it would show.  The government said that if a recording of

20   Glenn Ripa existed, it would show that the meeting was a sham.

21        THE COURT:  That was a perfectly appropriate comment

22   because it was a comment with respect to the witness's

23   testimony, and you can each argue with respect to what the

24   witness testified, what you should take from the witness's

25   testimony.  But it was a perfectly permissible inference to the

M451RAY3

1    jury to conclude that that meeting was a sham, just like it's a

2    perfectly appropriate inference for them to draw that it wasn't

3    a sham.  That's argument.

4              MS. SASSOON:  And the defense specifically made the

5    point in summation that it was somehow significant that there

6    was no recording.  The government's entitled to respond to

7    these arguments and give an alternative interpretation.

8              THE COURT:  The government didn't suggest that there

9    was evidence out there that wasn't presented in court.

10             So what's next?

11             MS. GLASHAUSSER:  The next one is the government made

12   an argument that there was just one single email to Preet

13   Bharara and said that that showed that that undermined our

14   argument with respect to Mr. Ray reaching out to law

15   enforcement.  The government knows that there are more emails.

16   Your Honor kept them out from the case.  So for the government

17   to suggest that there is just one email misstates the factual

18   record that we all know here and implies to the jury that we're

19   making a mountain out of one little thing when in fact we all

20   know that that's not true.

21             MS. SASSOON:  Your Honor, this is rebuttal.

22             THE COURT:  The government is permitted to say, here's

23   the evidence, all the evidence that was received.  The defense

24   has every opportunity to put on a witness who could support, in

25   the form of Mr. Ray -- Mr. Ray could have testified, listen, I

M451RAY3

1  did the following.  They didn't put on Mr. Ray.  You know, if

2  you had a basis for putting in the evidence, then you could

3  have put in other evidence.  I ruled that there wasn't.  That's

4  not an appropriate objection.  The government is permitted to

5  argue what's in the evidence, and this is all that's in the

6  evidence.

7           What's next?

8           MS. GLASHAUSSER:  But just to be clear, the government

9  did not limit itself to what was in the evidence.  The

10  government said that that was the only thing that existed --

11           MS. SASSOON:  That misstates the rebuttal.

12           MS. GLASHAUSSER:  -- contrary to what --

13           MS. SASSOON:  I said the defense has made much of a

14  single email.  I didn't say this was the only email.  I said

15  they were making a big deal of a single email, and then I

16  talked about that email.

17           MS. GLASHAUSSER:  I believe there are other instances

18  of the government misstating the evidence.  For example, there

19  was reference to videos of Mr. Ray punching Ms. Rosario in the

20  face.  I do not believe that was something that any of us saw.

21  And --

22           MS. SASSOON:  That's in evidence, your Honor.

23           THE COURT:  Okay.

24           MR. KELLY:  Mine was just -- there's a reference to:

25  Read the indictment.  It lays out how he did this.  We think

M451RAY3

1    there should be a curative instruction that the indictment is

2    not evidence.

3           THE COURT:  I'm going to give that instruction.  I

4    give my jury charge in a moment.  They're going to hear that

5    precise thing in a moment.

6           MR. KELLY:  Understood, but they also will be told

7    that the arguments of counsel are not the law, and the Court

8    issued that curative instruction after Ms. Lenox's summation,

9    so we think this is an important one and needs to be reiterated

10    twice.

11           MS. SASSOON:  I didn't say --

12           MR. KELLY:  You said it lays out how he --

13           THE COURT:  They would be permitted to say, here's the

14    following way in which this was carried out.

15           MR. KELLY:  Not in the indictment.  They can say how

16    it's alleged in the indictment.  They cannot say the indictment

17    lays out how it happens.

18           THE COURT:  Okay.  What's next?

19           MS. GLASHAUSSER:  Those are all the things I've

20    written down.  I just want to make clear that my request here,

21    other than a curative instruction, is for a mistrial.

22           THE COURT:  Okay.  One moment.

23           MS. SASSOON:  Your Honor, can we have a brief recess,

24    to talk to a supervisor?

25           THE COURT:  Sure.  Let's take a 10-minute recess.

M451RAY3

1          (In open court)

2          THE COURT:  Ladies and gentlemen, I'm going to give

3    you a brief recess before I give you my charge.

4          THE DEPUTY CLERK:  All rise.

5          (Jury not present)

6          THE COURT:  Be seated.

7          There is one change that I intend to make to the

8    charge in response to some argument that I heard from the

9    defense.  It's on page 3 of the charge where I say:  "Remember

10   that it's the duty of the lawyer to object when the other side

11   offers testimony or other evidence that the lawyer believes is

12   not properly admissible."  Give me a moment.  I'm going to tell

13   you the sentence that I'm going to read.

14          I intend to instruct the jury along the following

15   lines.  This would be after I make the point that, "Because I

16   have permitted certain evidence to be introduced doesn't mean

17   that I've decided it's important or it's significant.  That is

18   for you to decide."  I intend to instruct the jury along the

19   lines of, "Likewise, it is the duty of each lawyer to present

20   the evidence that it believes best supports its arguments, even

21   if that evidence might be difficult to hear or difficult for

22   the witness.  You are to draw no negative inference from a

23   lawyer presenting such evidence.  She or he is simply doing

24   their job."

25          Does the defense have any objection to me adding that

M451RAY3

1  kind of language?

2          MS. LENOX:  No, your Honor.

3          THE COURT:  Okay.  What about from the government?

4          MS. KEENAN:  No, your Honor.

5          THE COURT:  Okay.  All right.  Well, it's now 11:49.

6  We'll reconvene at noon, and I'll try to get through as much of

7  the jury charge as I can.

8          With respect to the motion for a mistrial that was

9  made at the sidebar a moment ago, I'm denying that motion.  I

10  will hear from -- Ms. Sassoon said she wanted to consult with

11  somebody.  I'll hear from the government if there's a different

12  view with respect to the curative instructions, and I'll inform

13  the parties of my views when we reconvene.

14          THE DEPUTY CLERK:  All rise.

15          (Recess)

16

17

18

19

20

21

22

23

24

25

M45MRAY4

1          THE COURT:  I am prepared to give something of a

2    curative instruction, but I'll also hear from the government if

3    there is anything that they want me to know about their

4    consultations.  Then I will tell you the form of the curative

5    instruction I am going to give.

6          Ms. Sassoon.

7          MS. SASSOON:  Our view is that no instruction is

8    necessary, so we will wait to hear what the proposal is.

9          THE COURT:  I don't view it as a proposal necessarily,

10   but I will hear the views of the parties.

11         MS. SASSOON:  Understood.

12         THE COURT:  The instruction I intend to give is along

13   the lines of the following:  You heard the government use

14   strong language in its rebuttal summation.  You should

15   understand that such language was in response to what the

16   government perceived to be the arguments made by the defense in

17   summation.  It was not a comment about the lawyers in this

18   case.  Your opinions of the lawyers in this case and their

19   behavior is to have no role in your deliberations.

20         In that regard, you heard the suggestion that the

21   defense called Ms. Drury a slut and engaged in slut shaming.

22   It did not and I instruct you to disregard that argument.

23         MS. SASSOON:  We strongly object to that, your Honor.

24   We did not use the word slut shaming in the rebuttal or in the

25   summation.  That was no way said by the government, for

M45MRAY4

1    starters.

2            THE COURT:  Does somebody have the language of the

3    summation?

4            MS. SASSOON:  I have the language.  That was never

5    said.

6            You should also reject the defense's effort to shame

7    Claudia as a slut who wanted to be a sex worker.

8            It is the government's view that that was completely

9    appropriate.  Before I delivered this rebuttal, I had that

10   language approved by multiple people.  And rebuttal is not just

11   an opportunity to react to defense summation.  It's also to

12   react to the cross-examinations and argument made by

13   insinuation throughout the trial.  Claudia Drury was in tears

14   during her cross-examination when being asked questions about

15   her sexual history, including before the defendant, that she

16   engaged in Skype sessions, that she had engaged in sexual

17   activity before she met the defendant, while she knew the

18   defendant, but was not with him, that she went to kink clubs

19   and BDSM.

20           The way the victim reacted to that, the way it landed

21   in court, the way the questions were asked, however much the

22   defense now wants to say they were so careful in summation, the

23   insinuations were made weeks ago and left lingering in this

24   trial for weeks and also was left as an attack on Claudia's

25   credibility.

M45MRAY4

1          MS. LENOX:  Your Honor, may I respond?

2          MS. SASSOON:  I'm still talking.

3          The defense also showed her a note that she wrote in

4    2016 extolling the virtues of sex work.  Sex work is a crime.

5    The idea that the defense is simply celebrating Claudia's

6    sexuality is just not how this was elicited at trial and the

7    tone of the cross-examination.

8          So to the extent that there is an instruction about

9    how people made passionate arguments or how there should be no

10   insinuation of an attack on the lawyers personally, I have no

11   objection to that, but I think it absolutely was fair argument

12   based on the cross-examination.

13         THE COURT:  Do you have the language from the

14   summation, Ms. Glashausser?

15         MS. GLASHAUSSER:  I believe Ms. Sassoon read out one

16   of the relevant portions where she did use the word shame and

17   slut in the same sentence.  She didn't say shut shaming.  She

18   said they shamed Claudia by saying she was a slut.  I think

19   your Honor's instruction on that point is appropriate.

20         I just want to briefly correct the record with respect

21   to the questions on cross-examination.  The government just

22   talked about various sexual topics that Ms. Drury testified

23   about.  Those were topics that were brought out by the

24   government on direct.  The government brought out that she had

25   engaged in BDSM, that she worked at a sex club and various

M45MRAY4

1    other sexual -- that she worked at a sex club, and they went

2    into great detail about the BDSM.

3           We, in fact, objected to that detail, but the

4    government drew it out from Ms. Drury about what her manager

5    had done to her, various different things he had used.  Those

6    were not questions asked by the defense.

7           With respect to the journal entry that your Honor had

8    approved us asking questions about, Ms. Lenox did ask Ms. Drury

9    some questions about that journal entry.  Ms. Lenox then

10   perceived that Ms. Drury was uncomfortable with it there and

11   said that she would take it down and asked if she needed a

12   moment, so Ms. Lenox cut off her cross-examination in that

13   respect to be sensitive to the witness' reaction to that entry.

14          I think it is completely inappropriate to suggest that

15   the defense slut-shamed Ms. Drury when we did the exact

16   opposite, and Ms. Lenox's summation was very clear that we did

17   not view any of the things that Ms. Drury had testified about

18   relating to sex as deviant, that consenting adults could engage

19   in a wide range of sexual activity, that that is normal, and

20   Ms. Lenox specifically said that it is normal.  We definitely

21   did not suggest that Ms. Drury was in any way a slut.  We

22   suggested the exact opposite.

23          I think your Honor's instruction with respect to that

24   is appropriate.

25          THE COURT:  What I will do is, I'll say, you heard the

M45MRAY4

1   government use strong language in various adjectives in its

2   rebuttal summation, and I'll cut the specific reference to the

3   slut.

4           MS. LENOX:  Your Honor, that specific reference is

5   directly what was said in rebuttal.

6           THE COURT:  It actually was a comment with respect to

7   the general thrust of some portion of the defense argument.

8   But I am going to give the instruction.  With respect to the

9   important part of the instruction, it is that your opinion of

10  the lawyers in this case and their behavior is to have no role

11  in your deliberations in that each lawyer is doing -- they are

12  just doing their job.

13          MS. GLASHAUSSER:  Your Honor, respectfully, with

14  respect to that portion of the instruction, it does not get at

15  the problem with the rebuttal summation, which is that the

16  government said numerous times, in various different ways, that

17  the defense was acting improperly.

18          THE COURT:  It didn't.  And the thrust of the

19  summation was to characterize arguments that were made by the

20  defense as being ridiculous arguments and to point out how thin

21  the evidence was that the defense was arguing.  It is up to the

22  jury, at the end of the day, to determine whether the evidence

23  is in or not.  It's perfectly appropriate rebuttal summation.

24          Is there a further curative instruction you want me to

25  give?  Tell me what it is, and I will consider it, and then we

M45MRAY4

 1    will bring the jury in.

 2           MS. GLASHAUSSER:  Yes, your Honor.

 3           Instruct the jury that they heard the government's

 4    comment about defense counsel's tactics, but defense counsel's

 5    methods or tactics were proper.

 6           We are not objecting to the government pointing out

 7    things that related to the evidence or lack of evidence.  We

 8    are objecting to the way the government made it a personal

 9    attack on defense counsel.  It implied that the defense had

10    revictimized the victim simply by doing our job.

11           THE COURT:  I understand that point.  What I am going

12    to do is, I am going to highlight that the tactics and methods

13    of counsel on both sides of this case were proper.  I'll leave

14    that to the jury.  They were each representing their client

15    vigorously.

16           MS. SASSOON:  Your Honor, I think Ms. Glashausser used

17    the language of, the arguments were proper.  We don't think

18    it's appropriate for the judge --

19           THE COURT:  I am referring to the tactics and the

20    methods of counsel, and the tactics and the methods of counsel

21    during the examinations were proper.  Where they were not

22    proper I sustained objections.

23           Let's bring the jury in.

24           MS. SASSOON:  I would just note, your Honor, that the

25    defense in their summation insinuated that the government

M45MRAY4

1    suborned perjury from Felicia Rosario.  That was the only fair

2    inference from the suggestion --

3         THE COURT:  I agree with that, and it was a totally

4    improper argument.

5         MS. SASSOON:  To the extent that we are talking about

6    that, we think that the curative instruction goes both ways.

7    In the same way that the original curative instruction was not

8    directed at the defense, although they were the ones to

9    misstate the law, we think it would be inappropriate to single

10   out the government.

11        THE COURT:  I'm going to give it.  You've got your

12   record.

13             (Jury present)

14        THE COURT:  Members of the jury, you heard the

15   government use strong language in various adjectives in its

16   rebuttal summation just now.  You should understand that such

17   language was in response to what the government perceived to be

18   the arguments made by the defense in summation.  It was not a

19   comment about the lawyers in this case.  Your opinions of the

20   lawyers in this case and their behavior is to have no role in

21   your deliberations.  Each lawyer was doing his or her own job.

22   The tactics and methods of counsel during the examinations in

23   this case were proper.  Each lawyer was simply doing their job.

24             Now it is my privilege to instruct you with respect to

25   the law.

1          You have now heard all of the evidence in the case, as

2     well as the final arguments of the lawyers for the parties.

3          My duty at this point is to instruct you as to the

4     law.  It is your duty to accept these instructions of law and

5     apply them to the facts as you determine them, just as it has

6     been my duty to preside over the trial and decide what

7     testimony and evidence is relevant under the law for your

8     consideration.

9          On these legal matters, you must take the law as I

10    give it to you.  If any attorney has stated a legal principle

11    different from any that I state to you in my instructions, it

12    is my instructions that you must follow.

13         You should not single out any instruction as alone

14    stating the law, but you should consider my instructions as a

15    whole when you retire to deliberate in the jury room, and you

16    should know that you're going to be able to take a copy of

17    these instructions into the jury room.

18         Your final role is to pass upon and decide the fact

19    issues that are in the case.  You, the members of the jury, are

20    the sole and exclusive judges of the facts.  You pass upon the

21    weight of the evidence; you determine the credibility of the

22    witnesses; you resolve such conflicts as there may be in the

23    testimony; and you draw whatever reasonable inferences you

24    decide to draw from the facts as you have determined them.  I

25    will later discuss with you how to pass upon the credibility,

or believability, of the witnesses.

In determining the facts, you must rely upon your own recollection of the evidence.  The evidence before you consists of the answers given by the witnesses, the testimony they gave, as you recall it, and the exhibits that were received in evidence.  The evidence does not include questions.  Only the answers are evidence.  But you may not consider any answer that I directed you to disregard or that I directed be struck from the record.  Do not consider such answers.

You may also consider the stipulations of the parties in evidence.

Since you are the sole and exclusive judges of the facts, I do not mean to indicate any opinion as to the facts or what your verdict should be.  The rulings I have made during the trial are not any indication of my views of what your decision should be as to whether or not the guilt of the defendant has been proven beyond a reasonable doubt.

I also ask you to draw no inference from the fact that upon occasion I asked questions of certain witnesses.  These questions were only intended for clarification or to expedite matters and certainly were not intended to suggest any opinions on my part as to the verdict you should render or whether any of the witnesses may have been more credible than any other witness.  You are expressly to understand that the Court has no opinion as to the verdict you should render in this case.

1              As to the facts, you are the exclusive judges.  You

2    are to perform the duty of finding the facts without bias or

3    prejudice as to any party.

4              As I said, in determining the facts, you must rely

5    upon your own recollection of the evidence.  What the lawyers

6    have said in their opening statements, their closing

7    statements, in their objections or in their questions is not

8    evidence.  If your recollection of the facts differ from the

9    lawyers' statements, you should rely on your recollections.  If

10   a lawyer made a statement during his or her opening or

11   summation and you find that there is no evidence to support the

12   statement, you should disregard the statement.

13             Again, you should bear in mind that a question put to

14   a witness is never evidence.  It is only the answer that is

15   evidence.  Nor is anything I may have said during the trial or

16   may say during these instructions with respect to a fact matter

17   to be taken in substitution for your own independent

18   recollection.  What I say is not evidence.

19             Relatedly, do not conclude from any of my questions or

20   any of my rulings on objections or anything else I have done

21   during this trial that I have any view as to the credibility of

22   the witnesses or how you should decide the case.

23             In addition, remember it is the duty of the lawyer to

24   object when the other side offers testimony or other evidence

25   that the lawyer believes is not properly admissible.

M45MRAY4                        Charge

 1    Therefore, you should draw no inference from the fact that

 2    there was an objection to any evidence.  Nor should you draw

 3    any inference from the fact that I sustained or overruled an

 4    objection.  Simply because I have permitted certain evidence to

 5    be introduced does not mean that I have decided on its

 6    importance or significance.  That is for you to decide.

 7              Likewise, it is the duty of each lawyer is to present

 8    the evidence that it believes best supports its argument, even

 9    if that evidence might be difficult to hear or difficult for

10    the witnesses.  You are to draw no negative inference from a

11    lawyer presenting such evidence.  She or he is just doing their

12    job.

13              The personalities and conduct of counsel are also not

14    in any way at issue.  If you formed any opinions of any kind

15    about any of the lawyers in the case, favorable or unfavorable,

16    whether you approved or disapproved of their behavior, those

17    opinions should not enter into your deliberations.

18              The fact that the prosecution is brought in the name

19    of the united States of America entitles the government to no

20    greater consideration than that accorded to any other party to

21    a litigation.  By the same token, it is entitled to no less

22    consideration.  All parties, whether government or individuals,

23    stand as equals at the bar of justice.

24              Now I will instruct you on the presumption of

25    innocence and the government's burden of proof in this case.

M45MRAY4                    Charge

The defendant has pleaded not guilty.  By doing so, he denies
the charges in the indictment.  Thus, the government has the
burden of proving the charges against the defendant beyond a
reasonable doubt.  The defendant is presumed innocent.  A
defendant does not have to prove his innocence.  The
presumption of innocence was in the defendant's favor at the
start of the trial, continued in his favor throughout the
entire trial, is in his favor even as I instruct you now, and
continues in his favor during the course of your deliberations
in the jury room.

        The government has the burden of proof in this case.
The presumption of innocence is removed as to the defendant if,
and only if, you, as members of the jury, are satisfied that
the government has sustained its burden of proving the guilt of
the defendant beyond a reasonable doubt.

        The question that naturally arises is, what is
reasonable doubt?  A reasonable doubt is a doubt based on your
screen, your judgment, your experience, and your common sense.
It is a doubt that a reasonable person has after carefully
considering all of the evidence.  It is a doubt founded in
reason and arising out of the evidence in the case or the lack
of evidence.

        Proof beyond a reasonable doubt does not mean proof
beyond all possible doubt.  It is practically impossible for a
person to be absolutely and completely convinced of any

M45MRAY4                         Charge

disputed fact that, by its nature, cannot be proved with
mathematical certainty.  The government's burden is to
establish guilt beyond a reasonable doubt, not all possible
doubt.

If, after a fair and impartial consideration of all
the evidence, you can candidly and honestly say that you do
have an abiding belief of the defendant's guilt, such a belief
as a prudent person would not hesitate to act upon in important
matters in the personal affairs of his or her own life, then
you have no reasonable doubt and, under such circumstances, it
is your duty to convict.

On the other hand, if, after a fair and impartial
consideration of all the evidence, you can candidly and
honestly say that you are not satisfied with the guilt of the
defendant, that you do not have an abiding belief of the
defendant's guilt, in other words, if you have such a doubt as
would reasonably cause a prudent person to hesitate in acting
in matters of importance in his or her own affairs, then you
have a reasonable doubt, and in that circumstance it is your
duty to acquit.

Now, there are two types of evidence that you may
properly use in deciding whether the defendant is guilty or not
guilty of the crimes with which he is charged.

One type of evidence is called direct evidence.
Direct evidence of a fact in issue is presented when a witness

1   testifies to that fact based on what he or she personally saw,

2   heard, or otherwise observed through the five senses.  The

3   second type of evidence is circumstantial evidence.

4   Circumstantial evidence is evidence that tends to prove a

5   disputed fact indirectly by proof of other facts.

6           There is a simple example of circumstantial evidence

7   that is often used in this courthouse.  Assume that when you

8   came into the courthouse this morning the sun was shining and

9   it was a nice day outside.  Also assume that the courtroom

10   shades were drawn and you could not look outside.  Assume

11   further that as you were sitting here, someone walked in with

12   an umbrella that was dripping wet and then a few minutes later

13   somebody else walked in with a raincoat that was also dripping

14   wet.

15           Now, because you could not look outside the courtroom

16   and could not see whether it was raining, you would have no

17   direct evidence of that fact.  But on the combination of facts

18   that I have asked you to assume, it would be reasonable and

19   logical for you to conclude that it was raining.

20           That is all there is to circumstantial evidence.  You

21   infer on the basis of your reason, experience, and common sense

22   from one established fact the existence or the nonexistence of

23   some other fact.

24           The matter of drawing inferences from facts in

25   evidence is not a matter of guesswork or speculation.  An

1    inference is a logical, factual conclusion that you might

2    reasonably draw from other facts that have been proved.

3            Many material facts, such as a person's state of mind,

4    are not easily proved by direct evidence.  Usually such facts

5    are established by circumstantial evidence and the reasonable

6    inferences you draw.  Circumstantial evidence may be given as

7    much weight as direct evidence.  The law makes no distinction

8    between direct and circumstantial evidence.  The law simply

9    requires that before convicting a defendant, you must be

10   satisfied of the defendant's guilt beyond a reasonable doubt,

11   based on all of the evidence in the case.

12           Now, some of the exhibits admitted into evidence

13   include redactions of certain information.  Redacted means that

14   part of the document or audio recording was taken out.  There

15   is nothing unusual or improper about such redactions.  You are

16   to concern yourself only with the part of the item that has

17   been admitted into evidence.  You should not consider any

18   possible reason why the other part of it has been deleted.

19           Some of the exhibits that were admitted into evidence

20   were in the form of charts or summaries.  I decided to admit

21   these charts and summaries in addition to the underlying

22   documents that they represent in order to save time and avoid

23   unnecessary inconvenience.  But it is up to you to decide

24   whether the summary exhibits fairly and correctly reflect the

25   underlying testimony and documents they purport to summarize.

M45MRAY4                    Charge

1   To the extent that the summary exhibits conform to your

2   understanding of the underlying evidence, you may accept them.

3   To the extent that they do not, you should set them aside and

4   rely on the underlying evidence instead.

5           Audio and video recordings have been admitted into

6   evidence.  You were provided with transcripts as an aid, but it

7   is the recordings that are the evidence.  Whether you approve

8   or disapprove of the recording or interception of those

9   conversations may not enter into your deliberations.  I

10  instruct you that these recordings were made in a lawful manner

11  and that no one's rights were violated and that the

12  government's use of this evidence was entirely lawful and it

13  was properly admitted into evidence at this trial.  You must

14  therefore, regardless of any personal opinions, give this

15  evidence full consideration along with all the other evidence

16  in the case in determining whether the government has proved

17  beyond a reasonable doubt the guilt of the defendant.

18          If you wish to hear any of the tapes again or see any

19  of the transcripts of those recordings, they will be made

20  available to you during your deliberations.

21          In this case you have heard evidence in the form of

22  stipulations.  A stipulation of testimony is an agreement among

23  the parties that, if called, a witness would have given certain

24  testimony.  You must accept as true the fact that the witness

25  would have given the testimony.  However, it is for you to

determine the effect or weight to be given that testimony.  You

also heard evidence in the form of stipulations that contain

facts that were agreed to be true.  In such cases, you must

accept those facts as true, but it is also for you to determine

the effect or weight to give those agreed-upon facts.

If certain testimony or evidence was received for a

limited purpose, you must follow the limiting instruction I

have given and use the evidence only for the purpose I have

indicated.

You, as jurors, must decide this case based solely on

the evidence presented here within the four walls of the

courtroom.  As I told you at the beginning of this case, you

must not conduct any independent research about this case, the

matters in this case, and the parties involved in the case.  In

other words, you should not consult dictionaries or reference

materials, such as the Internet, websites, blogs, social media

outlets or look any other electronic tools to obtain

information about this case or to help you decide the case.

Please do not try to find out information from any source

outside the confines of this courtroom.

You must not talk to anyone about this case or use

these tools to communicate electronically with anyone about the

case.  This includes your family and friends.  You may not

communicate with anyone about the case on your cell phones,

through e-mail, instant messaging, text messaging, through any

M45MRAY4                    Charge

blog or websites, through any Internet chat room, or by way of
any other social networking platforms, including Facebook,
Twitter, Instagram, LinkedIn, Snapchat, and YouTube.  If you
become aware that any other juror is violating this
instruction, you should immediately bring it to my attention
through my courtroom deputy, Mr. Fishman, but please do not
make it known to any other jurors.

        I will repeat the instruction that I have given you
throughout the trial that you are to avoid all media coverage
of this case.  Your verdict must be based solely on the
evidence presented in this courtroom in accordance with my
instructions.  You must completely disregard any report that
you have read in the press, seen on television, heard on the
radio, or seen on the Internet.  Indeed, it would be unfair to
consider such report, since they are not evidence, and the
parties have no opportunity of contradicting their accuracy or
otherwise explaining them away.  In short, it would be a
violation of your oath as jurors to allow yourselves to be
influenced in any manner by such publicity.

        You have heard testimony about evidence seized in
connection with certain searches conducted by law enforcement
officers.  Evidence obtained from these searches was properly
admitted in this case and may be properly considered by you.
Such searches were entirely appropriate law enforcement
actions, and no one's rights were violated.

M45MRAY4                          Charge

1         Whether you approve or disapprove of how the evidence

2    was obtained should not enter in your deliberations, because I

3    instruct you that the government's use of the evidence is

4    entirely lawful.

5         Your verdict must be based solely upon the evidence

6    developed at trial or the lack of evidence.

7         It would improper for you to consider, in reaching

8    your decision as to whether the government has sustained its

9    burden of proof, any personal feelings you may have about the

10   defendant's race, religion, national origin, sex, or age.  As I

11   have explained to you, all persons are entitled to the

12   presumption of innocence, and the government has the burden of

13   proof.

14        It would be equally improper for you to allow any

15   feelings you might have about the nature of the crimes charged

16   to interfere with your decision-making process.

17        To repeat, your verdict must be based exclusively upon

18   the evidence or the lack of evidence in the case.

19        I also caution you that, under your oath as jurors,

20   you cannot allow to enter in your deliberations any

21   consideration of the punishment that may be imposed upon the

22   defendant if he is convicted.  The duty of imposing sentence in

23   the event of conviction rests entirely with the Court, and the

24   issue of punishment may not affect your deliberations as to

25   whether the government has proven the defendant's guilt beyond

1    a reasonable doubt.

2              Under your oath as jurors, you are not to be swayed by

3    sympathy.  You are to be guided solely by the evidence in this

4    case and the crucial question you must ask yourselves as you

5    sift through the evidence is, has the government proven the

6    guilt of the defendant beyond a reasonable doubt?

7              It is for you alone to decide whether the government

8    has proven the defendant is guilty of the crimes charged,

9    solely on the basis of the evidence and subject to the law as I

10   charge you.  It must be clear to you that once you let fear or

11   prejudice or bias or sympathy interfere with your thinking,

12   there is a risk that you will not arrive at a true and just

13   verdict.

14             If you have a reasonable doubt as to the defendant's

15   guilt, you should not hesitate for any reason to find a verdict

16   of acquittal.  But, on the other hand, if you should find that

17   the government has met its burden of proving the defendant's

18   guilt beyond a reasonable doubt, you should not hesitate,

19   because of sympathy or any other reason, to render a verdict of

20   guilty.

21             Now, the defendant, Lawrence Ray, is formally charged

22   in an indictment.  An indictment is not evidence.  As I

23   instructed you at the outset of the case, the indictment is a

24   charge or accusation.  It merely describes the charges made

25   against a defendant.  An indictment is a formal method of

M45MRAY4                          Charge

1   bringing a case into court for trial and determination by a

2   jury.  It creates no presumption that a crime was committed,

3   and no inference of any kind may be drawn from an indictment.

4   You may not consider an indictment as any evidence of a

5   defendant's guilt.  The fact that a defendant is the subject of

6   this indictment and is on trial here may not be used against

7   him in any way whatsoever.

8          Before you begin your deliberations, you will be

9   provided with a copy of the indictment.  I will not read the

10  entire indictment to you at this time.  Rather, I will first

11  summarize the offenses charged in the indictment and then

12  explain in detail the elements of each of the offenses.

13         The indictment contains 15 counts or charges.  Each

14  count charges a separate offense or crime.  Each count must

15  therefore be considered separately by you, and you must return

16  a separate verdict on each count.

17         Count One charges that:  From at least in or about

18  2010, up to and including in or about 2020, Mr. Ray conspired,

19  or agreed with others, to conduct and participate, directly and

20  indirectly, in the conduct of the affairs of an enterprise

21  through a pattern of racketeering activity, which pattern of

22  racketeering activity included multiple acts involving

23  extortion, sex trafficking, forced labor, forced labor

24  trafficking, the use of interstate commerce to promote unlawful

25  activity, money laundering, witness tampering, and obstruction

1   of justice, in violation of Title 18, United States Code,

2   Section 1962(d).

3            Count Two charges that:  From at least in or about

4   2011, up to and including in or about 2019, Mr. Ray conspired

5   with others to commit extortion by using force and threats of

6   force to collect money from persons for supposed wrongdoing, in

7   violation of Title 18, United States Code, Section 1951.

8            Count Three charges that:  From at least in or about

9   2011, up to and including in or about 2019, Mr. Ray and others

10   committed extortion by using force and threats of force to

11   collect money from Claudia Drury, for supposed wrongdoing, in

12   violation of Title 18, United States Code, Sections 1951 and 2.

13            Count Four charges that:  From at least in or about

14   2011, up to and including in or about 2019, Mr. Ray committed

15   sex trafficking of Claudia Drury by force, threats of force, or

16   coercion, or any combination of such means, in violation of

17   Title 18, United States Code, Sections 1951 and 2.

18            Count Five charges that:  From at least in or about

19   2011, up to and including in or about 2019, Mr. Ray conspired

20   with others to commit sex trafficking of Claudia Drury by

21   force, threats of force or coercion, or any combination of such

22   means, in violation of Title 18, United States Code, Section

23   1594.

24            Count Six charges that:  From at least in or about May

25   2013, to at least in or about December 2013, Mr. Ray obtained

M45MRAY4                          Charge

1   forced labor from multiple persons, in violation of Title 18,

2   United States Code, Sections 1589 and 2.

3          Count Seven charges that:  From at least in or about

4   May 2013, to at least in or about December 2013, Mr. Ray

5   trafficked multiple persons for the purpose of obtaining their

6   forced labor, in violation of Title 18, United States Code,

7   Sections 1590 and 2.

8          Count Eight charges that:  From at least in or about

9   May 2013, to at least in or about December 2013, Mr. Ray and

10  others conspired to obtain forced labor from multiple persons,

11  in violation of Title 18, United States Code, Section 1594.

12         Count Nine charges that:  From at least in or about

13  2014, to at least in or about 2019, Mr. Ray used facilities of

14  interstate commerce and traveled in interstate commerce to

15  promote, manage, and carry on a criminal business engaged in

16  sex trafficking and prostitution, in violation of Title 18,

17  United States Code, Sections 1952 and 2.

18         Count Ten charges that:  From at least in or about

19  2011, to at least in or about 2019, Mr. Ray and others

20  laundered the proceeds of extortion and sex trafficking, in

21  violation of Title 18, United States Code, Sections 1956 and 2.

22         Counts Eleven through Fourteen charge that Mr. Ray

23  committed tax evasion in 201, 2017, 2018, and 2019, in

24  violation of Title 26, United States Code, Section 7201.

25         Count Fifteen charges that:  From on or about October

16, 2018, at a hotel in Manhattan, Mr. Ray committed an assault
with a dangerous weapon, at least in part to gain entrance to
and maintain any previous position in an enterprise engaged in
racketeering activity, in violation of Title 18, United States
Code, Section 1959(a)(3).

The indictment alleges that certain conduct occurred
on or about various dates or during various time periods.  It
is not necessary, however, for the government to prove that any
conduct occurred exactly when the indictment alleges.  As long
as the conduct occurred around any dates or within any time
periods the indictment alleges it occurred, that is sufficient.

You must return a separate verdict of guilty or not
guilty for each count charged.  Whether you find the defendant
guilty or not guilty as to one offense should not affect your
verdict as to any other offense.  You must analyze and evaluate
the evidence separately as to each count.

Now, I am going to give you the general definitions
for knowingly, intentionally, and unlawfully, conspiracy, and
aiding and abetting, terms that you will hear throughout this
instruction.

Before I instruct you on each of the counts
specifically, I will define some terms and concepts that will
come up repeatedly in these instructions.  Specifically, I will
be discussing the concepts of both conspiring to commit various
crimes and aiding and abetting various crimes, so it makes

1    sense to explain these concepts at the outset.  Similarly, we

2    will discuss whether certain actions are taken knowingly,

3    intentionally or unlawfully, so I will also define these terms

4    before we discuss the counts.  You can take these explanations

5    and definitions and apply them as I instruct you on each of the

6    counts.

7              One note.  As you will learn, although the defendant

8    is charged with federal crimes in a federal court, some of the

9    counts incorporate some state penal laws as well.  I will

10   discuss them in more detail later.

11             For now, you should be aware that Count One, which

12   concerns racketeering activity, incorporates some state penal

13   laws as well.  They are called racketeering acts, and I will

14   discuss them in more detail later.  However, I raise this

15   because there are slight differences between the definitions of

16   conspiracy in state law and federal law.  I will provide you

17   with both.  Please apply federal conspiracy law when

18   considering violations of federal law and state conspiracy law

19   when considering violations of state law for certain

20   racketeering acts alleged in Count One.

21             Throughout these instructions I will use the terms

22   unlawfully, knowingly, intentionally, and willfully.

23             Unlawfully simply means contrary to law.  A defendant

24   does not need to have known that he was breaking any particular

25   law, but he must have been aware of the generally unlawful

M45MRAY4                    Charge

1    nature of his acts.

2            A person acts knowingly when he acts intentionally and

3    voluntarily, and not because of ignorance, mistake, accident,

4    or carelessness.  Whether a defendant acted knowingly may be

5    proved by his conduct and by all the facts and circumstances

6    surrounding the case.

7            A person acts intentionally when he acts deliberately

8    and purposefully.  That is, Mr. Ray's acts must have been the

9    product of his conscious, objective decision rather than the

10   product of a mistake or accident.

11           A person acts willfully when he acts intentionally and

12   purposely with the intent to do something that the law forbids;

13   that is, with the bad purpose to disobey or disregard the law.

14   It is not necessary that the person knew he was violating a

15   particular law; it is enough if he was aware that what he was

16   doing was in general unlawful.  For the tax evasion counts,

17   willfully means something slightly different.  I will instruct

18   you on that later.

19           Knowledge is a matter of inference from the proven

20   facts.  Science has not yet devised a manner of looking into a

21   person's mind and knowing what that person is thinking.  You

22   must consider the evidence and lack of evidence in making a

23   determination as to Mr. Ray's state of mind.

24           Before I move on to the counts of the indictment, I

25   want to instruct you on the concept of aiding and abetting.

M45MRAY4                    Charge

1          In connection with Counts One, Three, Four, Six,

2    Seven, Nine, and Ten, Mr. Ray is charged with committing

3    certain criminal acts and also with aiding and abetting the

4    commission of those acts.  Aiding and abetting is its own

5    theory of criminal liability.  In effect, it's a theory of

6    liability that permits a defendant to be convicted of a

7    specific crime if the defendant, while not himself committing

8    the crime, assisted another person or persons in committing the

9    crime.

10         Thus, Mr. Ray may be guilty of a substantive offense

11   if he aid and abets, which means essentially that he assists

12   another person in committing the offense.  The principle that

13   an aider and abettor of a crime is also liable applies both

14   under federal law, where it is contained in a statute called

15   Title 18, United States Code, Section 2, and under New York

16   State law.  The standards under federal and state law for

17   aiding and betting liability are the same.

18         Under the federal aiding and abetting statute, whoever

19   aids, abets, counsels, commands, induces, or procures the

20   commission of an offense is punishable as a principal.  You

21   should give these words their ordinary meaning.  A person aids

22   or abets a crime if he knowingly does some act for the purpose

23   of aiding or encouraging the commission of that crime, with the

24   intention of causing the crime charged to be committed.  To

25   counsel means to give advice or recommend.  To induce means to

M45MRAY4                    Charge

lead or move by persuasion or influence as to some answer or
state of mind.  To procure means to bring about by unscrupulous
or indirect means.  To cause means to bring something about, to
effect something.

          As you can see, the first requirement is that another
person has committed the crime charged.  Obviously, no one can
be convicted of aiding and abetting the criminal acts of
another if no crime was committed by the other person.  But if
you do find that a crime was committed by another person, then
you must consider whether Mr. Ray aided or abetted the
commission of the crime.

          I emphasize, however, that to aid and abet another to
commit a crime, it is necessary that Mr. Ray willfully and
knowingly associated himself in some way with the crime, and
that he willfully and knowingly sought by some act to help make
the crime succeed.  Participation in a crime is willful if
action is taken voluntarily and intentionally or, in the case
of a failure to act, with the specific intent to fail to do
something the law requires to be done, that is to say, with a
bad purpose either to disobey or disregard the law.

          An aider and abettor must have some interest in the
criminal venture and must take some action to assist or
encourage the commission of the crime.  The mere presence of a
person where a crime is being committed, even coupled with
knowledge by that person that a crime is being committed, or

1   the mere acquiescence by a person in the criminal conduct of

2   others, even with guilty knowledge, is not sufficient to

3   establish aiding and abetting.

4           To determine whether Mr. Ray aided and abetted the

5   commission of the crime with which he is charged, ask yourself

6   these questions:  First, did he participate in the crime

7   charged as something he wished to bring about?  Second, did he

8   associate himself with the criminal venture knowingly and

9   willfully?  Third, did he seek by his actions to make the

10  criminal venture succeed?

11          If he did, then Mr. Ray is an aider and bettor and

12  therefore guilty of the offense.  If he did not, then Mr. Ray

13  is not an aider and abettor and is not guilty as an aider and

14  abettor.

15          The law of conspiracy applies to Count One, the charge

16  of conspiracy to violate the RICO statute, and to Counts Two,

17  Five, and Eight, the charges of conspiracy to commit extortion,

18  sex trafficking, and forced labor.

19          A conspiracy is a kind of criminal partnership, an

20  agreement of two or more persons to join together to accomplish

21  some unlawful purpose.

22          Conspiracy simply means agreement, and the crime of

23  conspiracy to violate a federal law is an independent offense,

24  separate and distinct from the actual violation of any specific

25  federal laws.  Such actual violations are called substantive

M45MRAY4                      Charge

1    crimes.  You may find a defendant guilty of the crime of

2    conspiracy even if you find that the substantive crimes which

3    were the objects of the conspiracy were never actually

4    committed.

5            To find Mr. Ray guilty of participating in a

6    conspiracy, you must find the government has proven beyond a

7    reasonable doubt the following two elements:

8            First, that two or more persons entered the unlawful

9    agreement charged in the conspiracy count that you are

10   considering.

11           Second, that Mr. Ray unlawfully, intentionally, and

12   knowingly became a member of the conspiracy, that is, he

13   knowingly joined in the conspiracy and intentionally

14   participated in it.

15           To prove the existence of a conspiracy, the government

16   is not required to show that two or more people sat around a

17   table and entered into a solemn pact, orally or in writing,

18   stating that they have formed a conspiracy to violate the law

19   and spelling out all of the details.  Indeed, it would be

20   extraordinary if there were such a formal document or specific

21   agreement.

22           Common sense tells you that when people agree to enter

23   into a criminal conspiracy, much is left to unexpressed

24   understanding.  It is rare that a conspiracy can be proven by

25   direct evidence of an explicit agreement.  Conspirators do not

M45MRAY4                         Charge

1    usually reduce their agreements to writing, nor do they

2    publicly broadcast their plans.  By its very nature, a

3    conspiracy is almost always secret in its origin and execution.

4            It is enough if two or more persons in some way or

5    manner, through any contrivance, impliedly or tacitly, come to

6    a common understanding to violate the law.  Express language or

7    specific words are not required to indicate assent or

8    attachment to a conspiracy.  Nor is it required that you find

9    that any particular number of alleged coconspirators joined in

10   the conspiracy in order to find that a conspiracy existed.  You

11   need only find that two or more people entered into an unlawful

12   agreement in order to find that a conspiracy existed.

13           In determining whether there has been an unlawful

14   agreement, you should consider the proven acts and conduct of

15   the alleged coconspirators that were taken to carry out the

16   apparent criminal purpose.  The old adage, actions speak louder

17   than words, is applicable here.  Often the only evidence that

18   is available is that of disconnected acts that, when taken

19   together in connection with one another, so a conspiracy or an

20   agreement to secure a particular result, such as

21   satisfactorily -- let me start again.  Often the only evidence

22   that is available is that of disconnected acts that, when taken

23   together in connection with one another, show a conspiracy or

24   an agreement to secure a particular result just as

25   satisfactorily and conclusively as more direct proof.

1              In deciding whether the conspiracy charged in the

2    indictment existed, you may consider the evidence of the acts,

3    conduct, and statements of Mr. Ray along with the evidence of

4    the acts, conduct, and statements of those you determine the

5    government has proven were coconspirators of Mr. Ray, and the

6    reasonable inferences to be drawn from that evidence.  When

7    people enter into a conspiracy to accomplish an unlawful end,

8    they become agents or partners of one another in carrying out

9    the conspiracy.  Accordingly, the reasonably foreseeable acts

10   or statements of any member of the conspiracy committed in

11   furtherance of the common purpose of the conspiracy are deemed,

12   under the law, to be the acts and statements all members of the

13   conspiracy, and all members of the conspiracy are responsible

14   for such acts or statements.  This rule applies even though

15   such acts or statements were not made or committed in Mr. Ray's

16   presence or were made or committed without his knowledge.

17              (Continued on next page)

M451RAY5

1      THE COURT:  Before you may consider the acts or

2  statements of a co-conspirator in deciding the guilt of

3  Mr. Ray, however, you must first determine that the acts were

4  committed or statements were made during the existence of, and

5  in furtherance of, the alleged unlawful scheme.  If the acts

6  were done or the statements were made by someone whom you do

7  not find to have been a member of the conspiracy, or if they

8  were not in furtherance of the charged conspiracy, they may not

9  be considered by you in deciding whether Mr. Ray is guilty of

10  conspiracy.

11      Proof concerning the accomplishment of the object of a

12  conspiracy may be persuasive evidence that the conspiracy

13  itself existed, but it is not necessary, as I have said, that

14  the conspiracy actually succeeded for you to conclude that it

15  existed.  In deciding whether the conspiracy charged existed,

16  you may consider all the evidence of the acts, conducts, and

17  statements of the alleged co-conspirators and the reasonable

18  inferences to be drawn from that evidence.

19      It is sufficient to establish the existence of the

20  conspiracy if, after considering all of the relevant evidence,

21  you find beyond a reasonable doubt that the minds of at least

22  two alleged conspirators met in an understanding way, and that

23  they agreed, as I have explained, to work together to

24  accomplish an object or objective of the conspiracy.

25      It is not necessary for the government to show that an

M451RAY5

alleged co-conspirator was fully informed as to all the details

of the conspiracy for you to infer knowledge on that person's

part.  To have guilty knowledge, a person need not know the

full extent of the conspiracy, or all of the activities of all

of its participants.  It is not necessary for a person to know

every other member of the conspiracy.  In fact, a person may

know only one other member of the conspiracy and still be a

co-conspirator.  Nor is it necessary for a person to receive

any monetary benefit from his or her participation in the

conspiracy or to have a financial stake in the outcome.  It is

enough if that person participated as a conspirator unlawfully,

intentionally, and knowingly, as I have defined those terms.

          The duration and extent of a person's participation

also has no bearing on the issue of that person's guilt.  An

alleged co-conspirator need not have joined the conspiracy at

the outset but may have joined it for any purpose at any time

in its progress and will still be held responsible for all that

was done before he or she joined and all that was done during

the conspiracy's existence while he or she was a member.  Each

member of a conspiracy may perform separate and distinct acts

and may perform them at different times.  Some conspirators

play major roles, others play minor roles.  An equal role is

not what the law requires.  Even a single act may be sufficient

to draw a person within the ambit of the conspiracy.

          I want to caution you, however, that the mere

M451RAY5

1    association by one person with another does not make that

2    person a member of the conspiracy, even when coupled with

3    knowledge that a conspiracy is taking place.  Mere presence at

4    the scene of a crime, even coupled with knowledge that a crime

5    is taking place, is not sufficient to support a conviction.  In

6    other words, knowledge without participation is not sufficient.

7    What is necessary is that a defendant has participated in the

8    conspiracy with knowledge of its unlawful purposes and with

9    intent to aid in the accomplishment of its unlawful objectives.

10        The defendant, with an understanding of the unlawful

11   character of the conspiracy, must have intentionally engaged,

12   advised, or assisted in the conspiracy for the purpose of

13   furthering an illegal undertaking.  The defendant thereby

14   becomes a knowing and willing participant in the unlawful

15   agreement—that is to say, he becomes a conspirator.

16        A conspiracy, once formed, is presumed to continue

17   until either its objective is accomplished or there is some

18   affirmative act of termination by its members.  So, too, once a

19   person is found to be a member of a conspiracy, that person is

20   presumed to continue being a member in the venture until the

21   venture is terminated, unless it is shown by some affirmative

22   proof that the person withdrew and disassociated himself from

23   it.

24        Now I have one more short instruction before I take

25   our lunch break.  It has to do with the state law of

M451RAY5

conspiracy, and it's a short instruction, but it's an important one.

          As I told you earlier, we will also discuss some state penal laws.  The state law of conspiracy in New York differs from the federal law of conspiracy.

          In particular, in order for the government to prove beyond a reasonable doubt that a person conspired to commit a crime under New York State law, the government must show the following:

          First, that the individual agreed with one or more other persons to engage in or cause the performance of the crime;

          Second, that the individual did so with the intent that such crime be performed; and

          Third, that the individual, or one of the people with whom he agreed to conspire or cause the performance of the conduct committed an overt act in furtherance of the conspiracy.

          The term "intent" under New York conspiracy law has its own special meaning.  "Intent" means conscious objective or purpose.  That is, a person acts with intent that crime be committed when his conscious objective or purpose is that the crime should occur.  Under New York law, the government must also prove that one of the conspirators committed an overt act in furtherance of the conspiracy.  The agreement to engage in

M451RAY5

or cause the performance of a crime is not itself an overt act.
The overt act must be an independent act that tends to carry
out the conspiracy.  The overt act can be, but need not be, the
commission of the crime that was the object of the conspiracy.

Note that under state law, unlike the federal law that
I have described to you, an overt act is an element of
conspiracy.  Accordingly, when considering an intended
racketeering act that is alleged to be a violation of state
conspiracy laws, consider whether Mr. Ray agreed that he or a
co-conspirator would commit an overt act in furtherance of that
racketeering act and that an overt act in furtherance of the
racketeering act took place.  However, when considering either
an intended racketeering act that is alleged to be a violation
of federal conspiracy laws—or considering the conspiracies
charged in Counts One, Two, Five, and Eight—you need not find
an overt act.

Members of the jury, that concludes some of my general
instructions.  We're going to take a lunch break now and then
we'll return for instructions with respect to racketeering, the
substantive crimes, and some remaining instructions.

It's now 1:10.  What I'd like to do is take a break
until 1:45.  That will ensure that I get through my
instructions before we break for the day.  If any of the jurors
has a problem with that short a lunch break, just let my deputy
know and we'll take a little bit of a longer lunch break, but

M451RAY5

1    I'd like the lunch break to be that short because I also want

2    to give you some stretch breaks during the remainder of my

3    instruction.

4               THE DEPUTY CLERK:  All rise.

5               (Jury not present)

6               THE COURT:  Be seated.

7               Anything further from the government before we take

8    our lunch break?

9               MS. SASSOON:  No.  Thank you, your Honor.

10              THE COURT:  From the defense?

11              MS. LENOX:  No.  Thank you.

12              THE COURT:  All right.  Everybody should try to get

13   here, please, by 1:40, because if the jury is ready, I'm

14   bringing them in even if counsel is not at their table.

15              (Luncheon recess)

16

17

18

19

20

21

22

23

24

25

                              AFTERNOON SESSION

                                 1:45 p.m.

          (In open court; jury present)

          THE COURT:  Be seated.

          I will now start with some general instructions

regarding the charge of racketeering conspiracy.

          Count One alleges that Mr. Ray conspired to violate

Section 1962(c) of Title 18 of the United States Code, commonly

known as the RICO statute, which stands for "Racketeering

Influence and Corrupt Organizations."  This means that the

defendant has been charged with conspiracy to conduct or

participate in the affairs of an enterprise through a pattern

of racketeering activity.  "Racketeering," as used in this

statute, is a purely technical term that is defined

specifically for this statute.  The word "racketeering" has

certain implications in our society.  Use of that term in that

statute and in this courtroom should not be regarded as having

anything to do with your determination of whether the guilt of

this defendant has been proven.  The term is only a word used

by Congress to describe the statute.  You should put out of

your mind whatever meaning the term may have for you in

ordinary English, and the term should not influence your

determination of whether the government has proven Mr. Ray

guilty beyond a reasonable doubt on Count One or any other

count.  All that matters is whether the government has proved

M451RAY5

beyond a reasonable doubt each of the elements that make up a
violation of this statute, as I'm going to define them for you.

The statute that the indictment charges that Mr. Ray
conspired to violate provides, and I quote:

"It shall be unlawful for any person employed by or
associated with any enterprise engaged in, or the activities of
which affect, interstate or foreign commerce, to conduct or
participate, directly or indirectly, in the conduct of such
enterprise's affairs through a pattern of racketeering
activity."

Mr. Ray is charged in Count One with participating in
a conspiracy to violate this substantive RICO statute, in
violation of Title 18 of the United States Code,
Section 1962(d), which states:  "It shall be unlawful for any
person to conspire to violate any of the provisions of the RICO
laws."

Count One charges that Mr. Ray participated in a
conspiracy whose object was to conduct and participate in the
conduct of the racketeering enterprise through a pattern of
racketeering activity.  Count One defines the enterprise as a
criminal organization whose members and associates engaged in,
among other things, acts involving extortion, sex trafficking,
forced labor, force labor trafficking, the use of interstate
commerce to promote unlawful activity, money laundering,
witness tampering, and obstruction of justice, in and around

M451RAY5

1   the Southern District of New York and elsewhere.

2              In order to prove that Mr. Ray is guilty of the

3   racketeering conspiracy charged in Count One, the government

4   must establish beyond a reasonable doubt each of the following

5   elements of the offense:

6              First, that there was an agreement among two or more

7   persons to participate in an enterprise that would affect

8   interstate commerce through a pattern of racketeering activity;

9              Second, that Mr. Ray knowingly and wilfully became a

10  member of that agreement; and

11             Third, that Mr. Ray or another member of the

12  conspiracy agreed to commit two racketeering acts, as I will

13  define that term for you.

14             The first element the government must establish beyond

15  a reasonable doubt is that there was a conspiracy among two or

16  more persons to participate in an enterprise that would affect

17  interstate commerce through a pattern of racketeering activity.

18             As I previously instructed, a "conspiracy" is an

19  agreement among two or more persons to achieve an unlawful

20  object.  To show a conspiratorial agreement, the government is

21  not required to prove that two or more persons entered into a

22  solemn pact, but only that two or more persons explicitly or

23  implicitly came to an understanding to achieve the specified

24  unlawful object, whether or not they were successful.

25             In this case, the alleged unlawful object is the

M451RAY5

formation of an enterprise whose activities would affect

interstate commerce through a pattern of racketeering activity.

Let me define these terms for you.

          For the purposes of this case, an "enterprise" is a

group of people who have associated together for a common

purpose of engaging in a course of conduct over a period of

time.  This group of people, in addition to having a common

purpose, must have an ongoing organization, either formal or

informal, and it must have a core of personnel who function as

a continuing unit.  This group of people does not have to be a

legally recognized entity, such as a partnership or

corporation.  This group may be organized for a legitimate and

lawful purpose, or it may be organized for an unlawful purpose.

          The definition of "interstate commerce" is the

movement of goods, services, money, and individuals between

states, or between states and the District of Columbia or a US

territory.

          Although the government must prove that the enterprise

did or would affect interstate commerce, the effect need not be

substantial.  A minimal effect is enough.  It's sufficient, for

example, that in the course of the racketeering activities,

members of the enterprise traveled interstate, or used

telephone facilities interstate.  Interstate commerce includes

the movement of goods, services, money, and individuals between

states.  The commerce affected or potentially affected need not

M451RAY5

1    be lawful commerce.  Thus, if you find that the alleged

2    racketeering enterprise engaged in, for example, sex

3    trafficking that affected interstate commerce, you may find

4    that the government satisfied this element, even if the primary

5    activities of the enterprise all occurred within a single

6    state.

7          The government is not required to prove that Mr. Ray

8    knew that interstate commerce was or would be affected.  All

9    that is necessary is that you find beyond a reasonable doubt

10   that the activities of the enterprise affected or would affect

11   interstate commerce in some minimal way.

12         Finally, to prove that the acts constituted a pattern

13   of racketeering activity, the government must prove that the

14   acts of racketeering are related to each other and that they

15   amount to or pose a threat of continued criminal activity.  It

16   is not sufficient for the government to prove only that two of

17   the racketeering acts I will describe were committed.  A series

18   of disconnected acts does not constitute a pattern, and a

19   series of disconnected crimes does not constitute a pattern of

20   racketeering activity, nor do they amount to or pose a threat

21   of continued racketeering activity.  To prove that the acts of

22   racketeering are related, the government must prove that the

23   acts had the same or similar purposes, results, participants,

24   victims, or methods of commission, or that they are otherwise

25   interrelated by distinguishing characteristics and are not

M451RAY5

1   isolated events.  To prove that the racketeering acts amount to

2   or pose a threat of continued racketeering activity, the

3   government must establish either that there were a series of

4   related predicate acts that extended over a substantial period

5   of time or that there is a threat of continued activity, for

6   example, because the acts are part of a long-term association

7   that exists for criminal purposes, or that they are a regular

8   way of conducting the affairs of the enterprise.

9         The second element that the government must prove

10  beyond a reasonable doubt with respect to Count One is that at

11  some point defendant knowingly and wilfully became a member of

12  the conspiracy charged in the indictment.

13        If you are satisfied that the conspiracy charged in

14  the indictment existed, you must next ask yourselves who the

15  members of that conspiracy were.  In deciding whether Mr. Ray

16  was, in fact, a member of the conspiracy, you should consider

17  whether Mr. Ray knowingly and wilfully joined the conspiracy.

18  Did he participate in it with knowledge of its unlawful purpose

19  and with the specific intention of furthering its objectives as

20  an associate or worker?

21        In that regard, it has been said that in order for a

22  defendant to be deemed a participant in a conspiracy, he must

23  have had a stake in the venture or its outcome.  You are

24  instructed that, while proof of a financial interest in the

25  outcome of a scheme is not essential, if you find that Mr. Ray

1    had such an interest, that is a fact that you may properly

2    consider in determining whether or not Mr. Ray was a member of

3    the conspiracy charged in the indictment.

4           As I mentioned a moment ago, before Mr. Ray can be

5    found to have been a conspirator, you must first find that he

6    knowingly joined in the unlawful agreement or plan.  The key

7    question, therefore, is whether Mr. Ray joined the conspiracy

8    with an awareness of the basic aims and purposes of the

9    unlawful agreement.

10          It is important to note that Mr. Ray's participation

11   in the conspiracy must be established by independent evidence

12   of his own acts or statements, as well as those of the other

13   alleged conspirators, and the reasonable inferences that may be

14   drawn from them.

15          A person's knowledge is a matter of inference from the

16   facts proved.  In that connection, I instruct you that to

17   become a member of the conspiracy, that person need not have

18   known the identities of each and every other member, nor need

19   he have been apprised of all of their activities.  Moreover,

20   that person need not have been fully informed as to all of the

21   details, or the scope, of the conspiracy in order to justify an

22   inference of knowledge on his part.

23          I want to caution you that mere knowledge or

24   acquiescence, without participation, in the unlawful plan is

25   not sufficient.  Moreover, the fact that the acts of a person,

M451RAY5

without knowledge, merely happen to further the purposes or objectives of the conspiracy, does not make that person a member.  More is required under the law.  What is necessary is that the person must have participated with knowledge of at least some of the purposes or objectives of the conspiracy and with the intention of aiding in the accomplishment of those unlawful ends.

In sum, Mr. Ray, with an understanding of the unlawful character of the conspiracy, must have intentionally engaged, advised, or assisted in it for the purpose of furthering the illegal undertaking.  If you find that the government has proven beyond a reasonable doubt that he has done so, then he thereby becomes a knowing and willing participant in the unlawful agreement—that is to say, a conspirator.

The third element the government must prove beyond a reasonable doubt is that Mr. Ray or another member of the conspiracy agreed to commit two racketeering acts.

The focus of this element is on Mr. Ray's agreement to participate in the objectives of the enterprise to engage in a pattern of racketeering activity and not on Mr. Ray's agreement to commit the individual criminal acts.  For a racketeering activity, the government must prove that Mr. Ray participated in some manner in the overall objectives of the conspiracy, and that the conspiracy involved, or would have involved, the commission of two racketeering acts.  The government is not

M451RAY5

required to prove either that Mr. Ray agreed to commit two

racketeering acts or that he actually committed two such acts,

although you may conclude that he agreed to participate in the

conduct of the enterprise from proof that he agreed to commit

or actually committed such acts.

For the purposes of this count, the indictment alleges

nine types of racketeering acts, which I will instruct you on

shortly.  Again, the government must prove that two

racketeering acts were, or were intended to be, committed as

part of the conspiracy, although it need not prove that Mr. Ray

committed or agreed to commit any of these acts, as long as the

government proves that he knew about and agreed to facilitate

in some manner the overall objective of the conspiracy.

I will now explain the law governing the nine types of

racketeering acts that the government has alleged.  In order to

convict Mr. Ray of the racketeering conspiracy offense, your

verdict must be unanimous as to which type or types of

predicate racketeering activity Mr. Ray agreed, explicitly or

implicitly, would be committed, either by himself or a

co-conspirator.  For example, at least two acts of the

following types: extortion, under either federal or state law;

sex trafficking; forced labor; forced labor trafficking; the

use of interstate commerce to promote unlawful activity; money

laundering; witness tampering; obstruction of justice.  If you

find that the conspiracy did not exist, or that it did not

M451RAY5

1    affect interstate commerce, or that Mr. Ray was not a member of

2    the conspiracy or enterprise, you should not consider whether

3    the government has established any of the racketeering acts.

4         Continuing on with Count One, I'm now going to explain

5    to you the specific types of racketeering acts that are alleged

6    in the indictment.  I'm going to go through them one by one.

7         As to the racketeering activity alleged here, Count

8    One alleges that the following categories of acts and offenses

9    were committed, or were intended to be committed, as part of

10   the conspiracy:

11        Acts involving extortion and conspiracy to commit

12   extortion in violation of federal law, specifically the Hobbs

13   Act, Title 18, United States Code, Sections 1951 and 2;

14        Acts involving extortion, conspiracy to commit

15   extortion, and attempted extortion, in violation of New York

16   State Penal Law Sections 155.05(2), 155.40(2), 110.00, and

17   20.00;

18        Acts involving sex trafficking by force or coercion in

19   violation of federal law, specifically Title 18, United States

20   Code, Sections 1591 and 2;

21        Acts involving forced labor in violation of federal

22   law, specifically Title 18, United States Code, Sections 1589

23   and 2;

24        Acts involving forced labor trafficking in violation

25   of federal law, specifically Title 18, United States Code,

M451RAY5

Sections 1590 and 2;

Acts involving the use of interstate commerce to promote unlawful activity, in violation of federal law, specifically Title 18, United States Code, Sections 1952 and 2;

Money laundering, in violation of federal law, specifically, Title 18 United States Code, Sections 1956 and 2;

Acts involving witness tampering, in violation of federal law, specifically Title 18, United States Code, Sections 1512 and 2; and

Acts involving the obstruction of justice in violation of federal law, specifically Title 18, United States Code, Sections 1503 and 2.

In a moment, I will instruct you on the substantive law of each of these offenses.  Before I do, let me remind you that the government must prove beyond a reasonable doubt that Mr. Ray agreed that either he or a co-conspirator would commit two acts in violation of these statutes within 10 years of each other as part of the charged RICO conspiracy.  As I have said, the government need not prove that Mr. Ray himself committed or agreed to personally commit any of these offenses.

You will also note that for some of the charged categories of predicate offenses, the indictment charges a violation of more than one statute.  I instruct you that, in order to find that a given predicate offense was an object of the charged RICO conspiracy, you need not find that the object

M451RAY5

of the conspiracy involved violations of all the listed

statutes; rather, you need only find that the object of the

conspiracy involved the violation of at least one of the

specified statutes, but you must be unanimous as to which one

or ones.

You'll also note as to some of these offenses, I'm

going to use the term "aiding and abetting," which I have

already defined for you.

The indictment alleges that one of the categories of

criminal violations that was committed or was intended to be

committed as part of the RICO conspiracy charged in Count

One—that is, one of the predicate acts—was violations of the

Hobbs Act, Title 18, United States Code, Section 1951.  The

Hobbs Act makes it illegal to interfere with commerce through

extortion.  Section 1951 provides, in relevant part:

"Whoever in any way or degree obstructs, delays, or

affects commerce or the movement of an article or commodity in

commerce, by . . . extortion or attempts or conspires so to do,

or commits or threatens physical violence to any person or

property in furtherance of a plan or purpose to do anything in

violation of this section [commits a crime]."

In order to meet its burden of proving that Mr. Ray or

a co-conspirator committed extortion, the government must

establish beyond a reasonable doubt each of the following

elements:

M451RAY5

1          First, that the individual—that is, Mr. Ray, or a

2     co-conspirator—wrongfully obtained the property of another;

3          Second, that the individual obtained this property

4     with the victim's consent, but that this consent was compelled

5     by the wrongful use or threat of force, violence, or fear; and

6          Third, that as a result of the individual's actions,

7     interstate commerce, or an item moving in interstate commerce,

8     was delayed, obstructed, or affected in any way or degree.

9          Now let me explain these elements in more detail.

10         The first element that the government must prove

11     beyond a reasonable doubt is that Mr. Ray or a co-conspirator

12     wrongfully obtained or took the personal property of another,

13     or from the presence of another.  The term "property" includes

14     money and other tangible and intangible things of value that

15     are capable of being transferred from one person to another.

16         The second element the government must prove beyond a

17     reasonable doubt is that Mr. Ray or a co-conspirator wrongfully

18     took this property by actual or threatened force, violence, or

19     fear of injury or economic harm, whether immediately or in the

20     future.

21         It is not necessary that force, violence, and fear all

22     were used or threatened.  It is enough if any of them were used

23     or threatened.

24         Now let me turn for a moment to the concept of threat.

25     Threats need not be direct.  They may be veiled threats made by

M451RAY5

suggestion, implication, or inference, though such inference on
the part of the person extorted must be reasonable.  You may
also consider whether the implicit threat of violence permeated
the relationship.  Whether an implied or veiled reference
amounts to a threat is a matter for you to decide under all the
circumstances.

          In considering whether force, violence, or fear was
used or threatened, you should give those words their common
and ordinary meaning and understand them as you normally would
in conversation.  The threatened violence does not have to be
directed at the person whose property was taken.  The use of a
threat of force or violence might be aimed at a third person,
or at causing economic, rather than physical harm.  A threat
may be made verbally or by a physical gesture, or, as I
explained earlier, a threat may be veiled or implied.  Whether
a statement or physical gesture actually was a threat depends
on all of the circumstances.

          Fear exists if at least one victim experiences
anxiety, concern, or worry over expected personal harm, or
loss, or financial security.  The existence of fear must be
determined by the facts that existed at the time property was
taken.  Your decision whether fear or injury has been used or
threatened involves a decision about people's state of mind at
the time the property is taken.  It is obviously impossible to
ascertain or prove directly what a person actually felt.  You

cannot look into a person's mind to see what his state of mind

actually was, but a careful consideration of the circumstances

and the evidence should enable you to decide whether fear

reasonably would have been the person's state of mind.

Fear of physical or economic injury or personal harm

may be found to be reasonable if, considering the demand for

money, the person who would have made the demand, and the

nature of the conduct, a reasonable person would get the

message clearly.  There need not be an explicit demand for

money; the demand may have been implicit in the perpetrator's

conduct or other statements.

Looking at the situation and the actions of people

involved may help you determine what their state of mind was.

You have also heard the testimony of some witnesses describing

their state of mind—that is, how they felt—in giving up the

property.  You can consider this kind of testimony in deciding

whether the property was obtained or sought through the use of

fear.

It is not necessary that the fear be a consequence of

a direct threat.  It is sufficient that the surrounding

circumstances render the person's fear reasonable.  You must

find that a reasonable person would have been fearful in the

circumstances.  If you find that the defendant, or the alleged

enterprise, cultivated a reputation for violence and

intimidation, you may consider that reputation in assessing

M451RAY5

whether payments were induced by the exploitation of existing fear without an explicit or implicit threat.

As part of this element, the government must also prove beyond a reasonable doubt that Mr. Ray or a co-conspirator wrongfully took this property by actual or threatened force, violence, or fear of injury or economic harm, whether immediately or in the future.

Here, the defense has asserted that Mr. Ray believed that he was entitled to the property at issue. If you decide that the actual or threatened use of force or violence or the fear of injury was used to obtain the property, then that is inherently wrongful, and you need not consider Mr. Ray's claim of right to the property. In short, the law recognizes that you cannot use violence or threats of violence against someone to collect a debt, even if you believe that person owes it to you.

If, however, you determine that the government has not proven beyond a reasonable doubt that Mr. Ray obtained property through the actual or threatened use of force or violence, you are to consider whether he obtained the property through other wrongful threats, like threats of reputational or financial harm. A defendant cannot be found to have acted wrongfully on the basis that he obtained property by fear of economic or reputational harm if the defendant had a good faith and plausible claim of entitlement to the property demanded and if

there is a nexus between the threat and the claim of right.  In
that circumstance, you may not convict Mr. Ray unless the
government proves beyond a reasonable doubt either (1) that
Mr. Ray lacked a good faith claim of entitlement to the
property demanded; or (2) that Mr. Ray lacked a plausible claim
of entitlement to the property demanded, or (3) there was no
nexus between the threat and the claim of right.

          In determining whether the government has proved
beyond a reasonable doubt that the defendant lacked a good
faith claim of entitlement, you should consider, among other
things, the amount of property demanded and the basis for the
claim of entitlement.  In determining whether the government
has proved beyond a reasonable doubt that there is a nexus
between the threat and the claim of right, you should consider
what relation, if any, the threat has to the claimed
entitlement.  For example, threatened disclosures of sexual
indiscretions that have no nexus with any plausible claim of
right are inherently wrongful.  By contrast, a threat to
complain to a consumer protection agency about a claim to which
the threatener has a plausible claim of right is not wrongful,
where the disclosures themselves (and not just the threats)
have the potential to cause payment of the money demanded, and
where the person actually and plausibly believes he is owed the
money demanded.

          As to the third element, I have already instructed you

M451RAY5

on the definition of interstate commerce.  I further instruct
you that money is obtained in a manner that affects interstate
commerce if the money is the proceeds of an illegal business
that operated across state lines.

     The second category of predicate acts the indictment
alleges was committed or was intended to be committed as part
of the RICO conspiracy was extortion, and aiding and abetting
the same, in violation of New York State law.

     In order for the offense of state law extortion to be
considered as a racketeering act, the government must prove
that Mr. Ray or a co-conspirator agreed to or committed each
element of second degree grand larceny under New York State
Penal Law Section 155.40(2), beyond a reasonable doubt.

     Under New York Penal Law Section 155.40(2), a person
is guilty of grand larceny in the second degree when that
person steals property and when the property, regardless of its
nature and value, is obtained by extortion committed by
instilling in the victim a fear that the actor or another will:

     Cause physical injury to some person in the future; or
     Cause damage to property.

     The term "steals property" used in this definition has
its own special meaning in our law.  I will now give you the
meaning of that term.

     A person steals property and commits larceny when,
with the intent to deprive another of property or to

appropriate the same to himself or herself or to a third

person, such person wrongfully takes, obtains, or withholds

such property from an owner of the property.

The following terms used in that definition have a

special meaning:

"Property" means any money, personal property, or

thing of value.

"Owner" means a person having a right to possession of

the property superior to that of the person who takes it.

"Intent" means conscious objective or purpose.  Thus,

a person acts with intent to deprive another of property or to

appropriate property to himself or herself or to a third party

when such person's conscious objective or purpose is:

1.  To withhold the property or cause it to be

withheld permanently, or

2.  To exercise control over the property permanently.

A person wrongfully takes, obtains, or withholds

property from an owner when that person obtains such property,

regardless of its nature or value, by extortion.

A person obtains property by extortion when that

person compels or induces another person to deliver such

property to himself or herself or to a third person by means of

instilling in that person a fear that, if the property is not

so delivered, the actor or another will:

Cause physical injury to some person in the future;

M451RAY5

1          Cause damage to property.

2          A violation of New York Penal Law Section 155.40(2)

3     thus requires evidence, beyond a reasonable doubt, of the

4     following two elements:

5          1.  A person wrongfully obtained property from its

6     owner by extortion; and

7          2.  The person did so with the intent to deprive

8     another of the property or to appropriate the property to

9     himself or to a third person.

10          I'll now instruct you with respect to the predicate

11     act of sex trafficking by force or coercion.

12          The third category of predicate acts the indictment

13     alleges was committed or was intended to be committed as part

14     of the RICO conspiracy was the crime of sex trafficking by

15     force, threats of force, or coercion, or any combination of

16     such means, and aiding and abetting the same.  This crime is

17     set forth in Title 18, United States Code, Section 1591.

18          Section 1591 provides, in pertinent part:

19          "Whoever knowingly . . . in or affecting interstate

20     . . . commerce, . . . recruits, entices, harbors, transports,

21     provides, obtains, advertises, maintains, patronizes, or

22     solicits by any means a person; or: benefits, financially or by

23     receiving anything of value, from participation in a venture

24     which has engaged in [such] an act . . ., knowing, or, except

25     where the act constituting brackets [such] . . . violation

M451RAY5

. . . is advertising, in reckless disregard of the fact, that means of force, threats of force . . . coercion . . ., or any combination of such means will be used to cause the person to engage in a commercial sex act [is guilty of a federal crime]."

The crime of sex trafficking by force, threats of force, or coercion, or any combination of such means has the following three elements:

First, a person knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited the victim;

Or

The person knowingly benefited, financially or by receiving anything of value, from participating in a venture that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited the victim;

Second, the person knew or recklessly disregarded the fact that force, threats of force, or coercion, or any combination of such means, would be used to cause the victim to engage in a commercial sex act; and

Third, the person's acts were in or affecting interstate or foreign commerce.

The first element of the crime of sex trafficking is that a person either (1) knowingly recruited, enticed, harbored, transported, provided, obtained, advertised,

maintained, patronized, or solicited the victim; or (2)
knowingly benefited, financially or by receiving anything of
value, from participating in an enterprise that recruited,
enticed, harbored, transported, provided, obtained, maintained,
advertised, patronized, or solicited the victim.

Therefore, there are two different ways for the
government to satisfy the first element.  The first way is by
proving that the defendant or a co-conspirator knowingly
engaged in one of the prohibited trafficking acts.  This is by
recruiting, enticing, harboring, transporting, providing,
obtaining, advertising, maintaining, patronizing, or soliciting
a person.  The second way is by proving that the defendant or a
co-conspirator knowingly took part in a venture that engaged in
one of those trafficking activities and benefited, financially
or by receiving a thing of value, from that venture.  The
government does not have to prove that the defendant or a
co-conspirator violated the statute both ways.

With respect to your consideration of whether the
defendant or a co-conspirator knowingly recruited, enticed,
harbored, transported, provided, obtained, advertised,
maintained, patronized, or solicited a person, I instruct you
to use the ordinary, everyday definitions of those terms.
"Recruit" means to seek to enroll.  "Entice" means to attract,
induce, or lure using hope or desire.  "Harbor" means to give
or afford shelter to, such as in a house or other place.

M451RAY5

1    "Transport" means to take or convey from one place to another.

2    "Provide" means to furnish, supply, or make available.

3    "Obtain" means to gain possession of or acquire.  "Advertise"

4    means to publicize.  "Patronize" means to visit or obtain

5    services in exchange for money.  "Solicit" means to seek out.

6    "Maintain" means to keep in an existing state or support.  I

7    instruct you, however, that you may not consider conduct that

8    occurred before May 29, 2015, when determining whether Mr. Ray

9    or a co-conspirator "advertised," "solicited" or "patronized"

10   another person.

11          The second, or alternative, way to prove the first

12   element of sex trafficking is for the government to show that

13   there was a venture that engaged in recruiting, enticing,

14   harboring, transporting, providing, obtaining, advertising,

15   maintaining, patronizing, or soliciting a person; that the

16   defendant or a co-conspirator knowingly participated in some

17   way in that venture; and that the defendant or a co-conspirator

18   knowingly benefited, financially or by receiving anything of

19   value, from that venture.  Again, you may not consider conduct

20   that occurred before May 29, 2015, when determining whether

21   Mr. Ray or a co-conspirator benefited from a venture that

22   engaged in "advertising," "soliciting," or "patronizing"

23   another person.

24          In considering whether the defendant or a

25   co-conspirator participated in such a venture, I instruct you

M451RAY5

that a venture is defined as "any group of two or more

individuals associated in fact, whether or not as a legal

entity."  You may find that the defendant or a co-conspirator

participated in a venture prohibited by the sex trafficking law

if the defendant or a co-conspirator took part in that venture

in any way.  The defendant or a co-conspirator may be, but need

not be, responsible for forming that venture.  Likewise, the

person need not be the organizer or main participants in the

venture, and need not have participated throughout the length

of the venture.  It is enough if the defendant or a

co-conspirator took some part in the venture for any period of

time while the venture was still ongoing, even if the parts

they played were minor, and even if they were not related to

the actual recruiting, enticing, harboring, transporting,

providing, obtaining, advertising, maintaining, patronizing, or

soliciting of a person for commercial sex.

To benefit, financially or by receiving anything of

value, from a venture, the defendant or a co-conspirator must

receive some form of profit, benefit, value, or advantage, no

matter how minor or intangible, from the venture.

If the defendant or a co-conspirator himself or

herself recruited, enticed, harbored, transported, provided,

obtained, maintained, advertised, patronized, or solicited a

person, you need not consider whether or not that person

benefited from doing so.

M451RAY5

1         The government must prove that Mr. Ray or a

2    co-conspirator acted knowingly in either the prohibited

3    trafficking activity or joining in a venture that engaged in a

4    prohibited trafficking activity.  I have already instructed you

5    regarding what it means to act knowingly.  You should apply

6    that instruction here.

7         In deciding whether or not the first element of the

8    sex trafficking statute has been satisfied, you need not all

9    agree that the government has proven the element the first way

10   or the second way.  Stated differently, you need not all agree

11   the defendant or a co-conspirator actually recruited, enticed,

12   harbored, transported, provided, obtained, advertised,

13   maintained, patronized, or solicited a person, or also all

14   agree that the defendant or a co-conspirator participated in a

15   venture that did one of those things and benefited thereby.

16   You need only all agree that the government has proven beyond a

17   reasonable doubt that the defendant or a co-conspirator did one

18   or the other of those two alternatives that I described for

19   you.

20        The second element of sex trafficking requires the

21   government to prove beyond a reasonable doubt that the

22   defendant or a co-conspirator knew, or recklessly disregarded,

23   that force, threats of force, or coercion, or any combination

24   of such means, would be used to cause the victim to engage in a

25   commercial sex act.

M451RAY5

           This element speaks to the state of mind of the
defendant or a co-conspirator while engaging in any of the
actions I described in connection with the first element.  Like
the first element, this second element can be proven in two
different ways.

           One way to prove the second element is to demonstrate
that the defendant or a co-conspirator engaged in any of the
actions I described in connection with the first element
knowing that force, threats of force, or coercion, or any
combination of such means, would be used to cause the victim to
engage in a commercial sex act.  Here, I instruct you to apply
the definition of "knowing" that I have previously provided to
you.

           In the alternative, this second element can be proven
for all of the actions I described in connection with the first
element, except for advertising, if it is demonstrated that the
defendant or a co-conspirator acted in reckless disregard of
the fact that force, threats of force, fraud, or coercion, or
any combination of such means, would be used to cause the
victim to engage in a commercial sex act.

           "Reckless disregard" means that the defendant or a
co-conspirator acted with reckless indifference to facts that,
if considered and weighed in a reasonable manner, indicate the
highest probability that force, threats of force, or coercion,
or any combination of such means, would be used to cause the

M451RAY5

victim to engage in a commercial sex act.  In order to prove

beyond a reasonable doubt that a defendant or a co-conspirator

"recklessly disregarded" this fact, the government must prove

that such person deliberately closed his or her eyes to what

would otherwise have been obvious to him or her.  No one can

avoid responsibility for a crime by deliberately ignoring what

is obvious.  A finding beyond a reasonable doubt of the intent

of the defendant or a co-conspirator to avoid knowledge or

enlightenment would permit the jury to find that this element

has been satisfied.  Stated another way, a person's reckless

disregard of a particular fact may be shown from a deliberate

or intentional ignorance or deliberate or intentional blindness

to the existence of that fact.

      With respect to advertising, as I noted, if you find

that Mr. Ray himself advertised a person for a commercial sex

act or joined a venture doing the same, you must find Mr. Ray

acted with knowledge that force, threats of force, or coercion,

or any combination of such means, would be used to cause the

victim to engage in a commercial sex act.

      For any of the other actions I described in connection

with the first element of substantive sex trafficking—that is,

a defendant who recruited, enticed, harbored, transported,

provided, maintained, patronized, or solicited the victim—you

need not find that the defendant or co-conspirator acted

knowingly and instead may find that the person acted in

M451RAY5

reckless disregard of the fact that force, threats of force, or

coercion, or any combination of such means, would be used to

cause the victim to engage in a commercial sex act.

        To help you in determining whether Mr. Ray or a

co-conspirator acted with knowledge, or in reckless disregard

of, the fact that force, threats of force, or coercion, or any

combination of such means, would be used to cause the victim to

engage in a commercial sex act, I need to instruct you on the

meanings of "force," and "coercion," as well as on the meaning

of "commercial sex act."

        I will start with the term "commercial sex act."  That

term means any sex act on account of which anything of value is

given to or received by any person.  The term "sex act" should

be given its plain meaning, which is ordinarily understood to

be an act performed with another for sexual gratification.

        The term "force" means any form of power, violence, or

physical pressure directed against another person.

        The term "coercion" has three meanings.  It means any

threat of serious harm to or physical restraint against any

person; or any scheme, plan, or pattern intended to cause a

person to believe that failure to perform an act would result

in serious harm to or physical restraint against any person; or

any abuse or threatened abuse of law or the legal process.

        The term "serious harm" includes threats of any harm,

whether physical or nonphysical, including psychological,

M451RAY5

financial, or reputational harm, that is sufficiently serious,

under all the surrounding circumstances, to compel a reasonable

person of the same background and in the same situation as the

trafficked person, to perform or continue performing commercial

sex acts in order to avoid incurring that harm.  The repeated

physical, verbal, and emotional abuse of a person by the

defendant or a co-conspirator can rise to the level of serious

harm.

          Abuse or threatened abuse of law or legal process,

means the use or threatened use of a law or legal process,

whether administrative, civil, or criminal, in any manner or

for any purpose for which the law was not designed, in order to

exert pressure on another person to cause that person to take

some action or refrain from taking some action.  Abuse or

threatened abuse of law or legal process includes threats to

send a person to jail or to deport a person that are

sufficient, under all the surrounding circumstances, to compel

or coerce a person to perform a commercial sex act that the

person would not have otherwise been willing to perform.

          (Continued on next page)

M45MRAY6                    Charge

1           THE COURT:  If you find that any of these prohibited

2      means was used, or any combination of these means, you must

3      then determine whether such force was sufficient to cause the

4      victim to engage in a commercial sex act against the victim's

5      will.  In making that determination, you may consider the

6      cumulative effect of the conduct of the defendant or a

7      coconspirator on the victim.

8           You may also consider the special vulnerabilities, if

9      any, of the victim.  By this I mean that you may consider any

10     aspect of the victim's age, background, station in life,

11     physical or mental condition, experience or education, or any

12     inequalities between the victim and the defendant.

13          Simply put, you may ask whether the victim was

14     vulnerable in some way such that the use of force, threats of

15     force, or coercion, or any combination of such means, even if

16     not sufficient to compel another person to engage in a

17     commercial sex act, would have been enough to compel a

18     reasonable person in the same circumstances and with the same

19     background as the victim to engage in a commercial sex act.

20          To prove sex trafficking, the government does not need

21     to link any specific commercial sex act to any particular

22     threat made, or any particular action taken, on the part of

23     Mr. Ray or a coconspirator.  If the use of force, threats of

24     force, or coercion, or any combination of such means, was

25     sufficient to give rise to a climate of fear that would compel

M45MRAY6                     Charge

1    a reasonable person in the victim's situation to comply with

2    the demands of Mr. Ray or a coconspirator, in light of the

3    totality of the conduct of Mr. Ray or a coconspirator, the

4    surrounding circumstances and any vulnerabilities of the

5    individual, then you likewise may find that the second element

6    has been met.

7         The government also need not prove physical restraint

8    in order to establish the offense of sex trafficking.  The

9    government can establish this element if it proves beyond a

10   reasonable doubt that the defendant or a coconspirator placed

11   the person in fear of leaving or created circumstances such

12   that the person did not reasonably believe that he or she could

13   leave.

14        Further, whether a person is paid or is able to keep

15   some of their earnings is not determinative of the question

16   whether that person has been compelled to engage in sex

17   trafficking.  In other words, if a person is compelled to

18   engage in a commercial sex act, through force, threats of

19   force, or coercion, or any combination of such means, such

20   service is involuntary, even if the person is paid or

21   compensated for the work.

22        Finally, the victim does not need to have been

23   subjected to force, threats of force, or coercion, or any

24   combination of such means, for the entirety of the period in

25   which the victim engaged in commercial sex acts.  If there is

just one instance that establishes the use of force, threats of

force or coercion, or any combination of such means, to cause

the victim to perform a commercial sex act, that is sufficient.

Therefore, the fact that a person may have initially acquiesced

or agreed to perform a commercial sex act, or voluntarily

engaged in commercial sex acts apart from the defendant or a

coconspirator, does not preclude a finding that the person was

later compelled to engage in a commercial sex act through the

use of force, threats of force, or coercion, or any combination

of such means.

For example, if a victim willingly engaged in a

commercial sex act, either with the defendant or otherwise,

then later wanted to cease engaging in such acts, but was

compelled to continue to perform such acts through force,

threats of force, or coercion, or any combination of such

means, then you may find that the victim's later acts were

compelled by force, threats of force, or coercion, or any

combination of such means.

To satisfy the third and final element of the crime of

sex trafficking, the government must prove beyond a reasonable

doubt that the sex trafficking activities were in interstate

commerce or affected interstate commerce in any way, however

minimal.  The government need not prove both that the

activities were in interstate commerce and affected interstate

commerce.  I previously defined the interstate commerce

element, and you should use that instruction here.

The fourth category of predicate acts that the government alleges was committed or was intended to be committed as part of the RICO conspiracy was obtaining or providing forced labor by various unlawful means, in violation of Section 1589 of Title 18 of the United States Code, and aiding and abetting the same.  That section provides in part:

Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means:  (I) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (II) by means of serious harm or threats of serious harm to that person or another person; (III) by means of the abuse or threatened abuse of law or legal process; or (IV) by means of any scheme, plan, or pattern intended to cause the person to believe that if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, shall be guilty of a crime.

In order for the offense of forced labor to be considered as a racketeering act, the government must prove that Mr. Ray or a coconspirator agreed to commit or committed each of the following elements of forced labor beyond a reasonable doubt:

First, that Mr. Ray or the coconspirator obtained or

M45MRAY6                         Charge

 1    provided the labor or services of another;

 2              Second, that such person did so through one of the

 3    following prohibited means:  (1) through force, physical

 4    restraint, or the threat of either against a person or another

 5    person; (2) through serious harm or threat of serious harm to

 6    the person or another person; (3) through abuse or threatened

 7    abuse of the legal process; or (4) through the use of a scheme,

 8    plan, pattern intended to cause the person to believe that the

 9    nonperformance of such labor or services could result in

10    serious harm to or physical restraint against that person or

11    another person.

12              Third, that Mr. Ray or the coconspirator, whichever

13    the case may be, acted knowingly.

14              I have already instructed you generally as to the

15    meaning of aiding and abetting under federal law, and you

16    should apply those instructions here.

17              I will now explain each of these three elements in

18    greater detail.

19              The first element of the offense that the government

20    must prove beyond a reasonable doubt is that Mr. Ray or a

21    coconspirator obtained or provided the labor or services of

22    another person.

23              To obtain means to gain or acquire.  You should give

24    labor and services their ordinary meanings.  Labor means the

25    expenditure of physical or mental effort, especially when

fatiguing, difficult, or compulsory.  Services is defined as
the performance of work commanded or paid for by another.

The government does not have to prove that a victim
performed work for the defendant or a coconspirator in the
economic sense, although that would satisfy this element.  All
the government must prove is that a victim provided labor or
services as I have just defined them.

As to the second element, if you find that Mr. Ray or
a coconspirator obtained the labor or services of the
individual, then you must determine whether Mr. Ray or the
coconspirator did so through one of the four prohibited means;
that is, through (1) force, physical restraint or threats to
either -- to the person or to another person; (2) serious harm
or threats of serious harm to the person or another person; (3)
abuse or threatened abuse of the legal process; or (4) the use
of a scheme, plan or pattern intended to cause the person to
believe that serious harm would result if the person did not
perform the labor or services required of that person.

I will now define for you some of the terms you will
be considering in determining whether this second element of
the forced labor predicate has been satisfied.

Physical restraint means being confined by being tied,
bound, or locked up.

A threat is a serious statement expressing an
intention to inflict harm, at once or in the future, as

distinguished from idle or careless talk, exaggeration, or

something said in a joking manner.  For a statement to be a

threat, the statement must have been made under such

circumstances that a reasonable person who heard or read the

statement would understand it as a serious expression of an

intent to cause harm.  In addition, Mr. Ray or the

coconspirator must have made the statement intending it to be a

threat, or with knowledge that the statement would be viewed as

a threat.

        The term serious harm includes both physical and

nonphysical types of harm, including psychological, financial,

or reputational harm.  A threat of serious harm includes any

threat that is initial under all of the surrounding

circumstances to compel a reasonable person of the same

background and in the same circumstances to perform or to

continue performing labor or services in order to avoid

incurring that harm.

        In determining whether Mr. Ray or a coconspirator made

a threat of serious harm that could reasonably be believed, you

should consider the individual's particular station in life,

physical or mental condition, age, education, training,

experience, and intelligence.  A threat of serious harm must be

sufficient in kind or degree to completely overcome the will of

an ordinary person having the same general station in life as

that of the individual, causing a reasonable belief that there

M45MRAY6                          Charge

1   was no reasonable choice except to provide labor and services

2   to Mr. Ray or the coconspirator.

3           The term abuse or threatened abuse of law or legal

4   process has the meaning I have previously instructed you on.

5   It includes threats to send a person to jail or to deport a

6   person that are sufficient, under all the surrounding

7   circumstances, to compel or coerce a person to perform labor or

8   services that the person would not have otherwise been billing

9   to perform.

10          You should give the words scheme, plan, and pattern

11  their ordinary meanings.  A scheme is a plan or program of

12  action.  A plan is a method for achieving an end or detailed

13  formulation of a program of actions.  A pattern is a mode of

14  behavior or series of acts that are recognizably consistent.

15          If you find that the individual was threatened with

16  serious harm, the government does not have to prove physical

17  restraint in order to establish the offense of forced labor.

18  The fact that the individual might have had an opportunity to

19  escape is irrelevant if Mr. Ray or a coconspirator placed the

20  individual in such fear or circumstances that the individual

21  reasonably believed that he or she could not leave.  A victim

22  who has been placed in such fear or circumstances is under no

23  affirmative duty to try to escape.

24          Finally, in considering whether the service performed

25  by someone was involuntary, I am instructing you that it is not

a defense to the crimes of forced labor that the person might

have initially agreed, voluntarily, to render the service or

perform the work.  If a person willingly begins work, but later

wants to cease engaging in such acts, and then is forced to

remain and perform the work against their will by threats of

serious harm or physical restraint, or by scheme, plan, or

pattern intended to cause them to believe that nonperformance

will result in serious harm or physical restraint to them or

another person, then their service becomes involuntary.

          Also, whether a person is paid a salary or wage is not

determinative of the question whether that person has been held

in forced labor.  In other words, if a person is compelled to

labor against their will by any one of the means prohibited by

the forced labor statute, such service is involuntary, even if

she is not paid or compensated for the work.

          The third element I have already described to you

requires that Mr. Ray or a coconspirator acted knowingly.  I've

already instructed you as to the meaning of knowingly, and you

should apply that definition here.

          The fifth category of predicate acts the government

alleges was committed or was intended to be committed as part

of the RICO conspiracy is forced labor trafficking, in

violation of Section 1590 of Title 18 of the United States

Code, and aiding and abetting the same.

          The relevant portion of that statute provides:

M45MRAY6                          Charge

1    "whoever knowingly recruits, harbors, transports, provides, or

2    obtains by any means, any person for labor or services in

3    violation of this statute shall be guilty of a crime.

4            In order for forced labor trafficking to be considered

5    as a racketeering act, the government must prove that Mr. Ray

6    or a coconspirator agreed to or committed each of the following

7    elements of forced labor trafficking beyond a reasonable doubt:

8            First, that Mr. Ray or the coconspirator recruited,

9    harbored, transported, provided, or obtained an individual;

10           Second, that such person did so for the purpose of

11   providing or obtaining the labor or services of an individual

12   in violation of the forced labor statute, Section 1589.  That

13   is, that Mr. Ray or the coconspirator, whichever the case may

14   be, trafficked an individual as I have just described, with the

15   purpose of providing or obtaining her labor or services by

16   means of serious harm, or threats of serious harm, to that

17   individual or another person, by means of the abuse or

18   threatened abuse of law or legal process, or by means of any

19   scheme, plan, or pattern intended to cause an individual to

20   believe that, if the individual did not perform such labor or

21   services, the individual or another person would suffer serious

22   harm or physical restraint; and

23           Third, that Mr. Ray or the coconspirator, whichever

24   the case may be, acted knowingly.  I have previously instructed

25   you on the definition of knowingly, and you should apply that

1  definition to the third element here.

2           With respect to the first element, the word harbor

3  means simply to provide shelter to that person.  To obtain

4  someone means to acquire, control, or possess that person, even

5  if only for a short period of time.

6           With respect to the second element, the government

7  must prove beyond a reasonable doubt that Mr. Ray or the

8  coconspirator recruited, harbored, transported, provided, or

9  obtained an individual for the purpose of providing or

10 obtaining that individual's forced labor.  That is, labor or

11 services provided or obtained by one of the prohibited means I

12 described a moment ago.

13          The crime prohibited by Section 1590 is trafficking a

14 person for this unlawful purpose.  To establish this element,

15 the government does not need to prove that Mr. Ray or

16 "coconspirator actually obtained or attempted to obtain the

17 individual's forced labor, only that Mr. Ray trafficked the

18 individual for the purpose of providing it or obtaining it.

19          I have already defined the terms labor, services,

20 threat, serious harm, and scheme, plan, or pattern, recruit,

21 transport, and provide, and abuse of legal process.  You should

22 apply those definitions here.

23          If you find that Mr. Ray or a coconspirator trafficked

24 an individual for the unlawful purpose I have described, the

25 fact that the individual may have had an opportunity to escape

1    is irrelevant if Mr. Ray or the coconspirator placed an

2    individual in such fear or circumstances that the victim

3    reasonably believed that he or she could not leave.

4           The sixth category of predicate acts that the

5    indictment alleges was committed or was intended to be

6    committed as part of the RICO conspiracy was the use of

7    interstate facilities to promote unlawful activity and aiding

8    and abetting the same.

9           The relevant statute for this charge, which is also

10   known as the Travel Act, is Title 18, United States Code,

11   Section 1952(a)(3), which provides that "whoever travels in

12   interstate commerce or foreign commerce or uses the mail or any

13   facility in interstate or foreign commerce, with intent to

14   otherwise promote, manage, establish, carry on, or facilitate

15   the promotion, management, establishment or carrying on of any

16   unlawful activity and thereafter performs or attempts to

17   perform an act to promote, manage, establish, carry on, or

18   facilitate the promotion, management, establishment, or

19   carrying on of any unlawful activity, is guilty of a federal

20   crime."

21          To prove a violation of the Travel Act, the government

22   must establish beyond a reasonable doubt each of the following

23   elements of the offense:

24          First, that Mr. Ray or a coconspirator used or caused

25   someone else to use an interstate facility; second, that this

use of an interstate facility was done with the intent to

promote, manage, establish, or carry on an unlawful activity;

and

      Third, that after this use of an interstate facility,

such person performed or attempted to perform an act in

furtherance of this same unlawful activity.

      I have already instructed you generally as to the

meaning of aiding and abetting under federal law.  You should

apply those instructions here.

      The first element that the government must prove

beyond a reasonable doubt is that Mr. Ray or a coconspirator

used or caused someone else to use an interstate facility.

      An interstate facility is any vehicle or instrument

that crosses state lines in the course of commerce.  For

example, a freight carrier that carries items from one state to

another is an interstate facility.  Any use of the Internet or

mails constitutes the use of an interstate facility, regardless

of whether the mailed item crossed a state line.  Making a

telephone call from one state to another is also the use of an

interstate facility.

      To meet its burden of proof on the first element, it

is not necessary for the government to prove that Mr. Ray

himself, or one or more coconspirators themselves, used an

interstate facility.  The Travel Act also applies to a person

who causes another person to use an interstate facility.

Therefore, if the government has proved beyond a reasonable doubt that Mr. Ray or a coconspirator caused another person to use an interstate facility, then you may find that the government has proven the first element of the offense.

The government does not have to prove that Mr. Ray or a coconspirator knew that the use of an interstate facility would occur.  It is sufficient that defendant's unlawful activity caused the use.  Further, it does not matter whether Mr. Ray or a coconspirator knew he was using interstate facilities or intended to use interstate facilities or agreed that another would use interstate facilities.  All the government must prove with respect to the first element is that Mr. Ray did in fact use interstate facilities or that a coconspirator did.

The second element that the government must prove beyond a reasonable doubt is that the use of an interstate facility was done with the intent to promote, manage, establish, or carry on an unlawful activity.

It is not enough for the government to prove only that Mr. Ray or a coconspirator used an interstate facility.  The government must also prove beyond a reasonable doubt that Mr. Roy or a coconspirator used or would use the interstate facility for the purpose of facilitating the unlawful activity.

The government does not have to prove that the furtherance of the unlawful activity was the sole purpose in

M45MRAY6                          Charge

1   using an interstate facility.  It is sufficient if the

2   government proves that one of the reasons for using an

3   interstate facility was to further the unlawful activity.

4   Thus, if you find that Mr. Ray or a coconspirator used or would

5   use interstate facilities with the intent to facilitate the

6   unlawful activity, and you also find that such person undertook

7   this same use of interstate facilities from other reasons that

8   have nothing to do with the unlawful activity, you may still

9   find that the government has met its burden on the second

10  element of the offense.

11          You may determine Mr. Ray's or a coconspirator's

12  purpose of using interstate facilities, and thus their intent,

13  from the evidence that has been placed before you, including

14  the statements of Mr. Ray or a coconspirator, and such person's

15  conduct before and after the use of the facilities.

16          As I have instructed you, the government must prove

17  that Mr. Ray or a coconspirator intended the use of interstate

18  facilities to facilitate or further the unlawful activity.  The

19  government does not, however, have to prove that use of

20  interstate facilities was essential to the unlawful activity or

21  fundamental to the unlawful scheme, or that the unlawful

22  activity could not have been accomplished without the use of

23  interstate facilities.

24          So long as the government proves that Mr. Ray or a

25  coconspirator used or would use interstate facilities with the

1    necessary unlawful intent, the government may rely on any use

2    of interstate facilities by such person that made the unlawful

3    activity easier to accomplish.  The government must prove that

4    Mr. Ray or a coconspirator used an interstate facility with the

5    intent to facilitate an activity that such person knew was

6    real.  The government does not have to prove that Mr. Ray or a

7    coconspirator knew that the use of facilities was illegal.

8    However, the government must prove beyond a reasonable doubt

9    that Mr. Ray or a coconspirator knew that the activity intended

10   to be facilitated was illegal.

11        With respect to that charge of using an interstate

12   facility to facilitate prostitution, the government must prove

13   beyond a reasonable doubt that the activities Mr. Ray or a

14   coconspirator intended to facilitate were in fact unlawful

15   under New York law.

16        In order to prove this, the government must prove

17   beyond a reasonable doubt that Mr. Ray or a coconspirator

18   performed or attempted to perform an act in furtherance of (I)

19   prostitution in violation of New York Penal Law Section 230;

20   (II) promoting prostitution in the fourth degree, in violation

21   of New York Penal Law, Section 230.20; (III) promoting

22   prostitution in the third degree, in violation of New York

23   Penal Law Section 230.25; or (IV) promoting prostitution in the

24   second degree, in violation of New York Penal Law Section

25   230.30.

1            The element of prostitution in violation of New York

2      Penal Law Section 230 is as follows:  That an individual

3      engaged or agreed or offered to engage in sexual conduct with

4      another person in return for a fee.  The element of promoting

5      prostitution in the fourth degree in violation of New York

6      Penal Law Section 230.20 is as follows:  That an individual

7      knowingly advances or profits from prostitution.

8            The element of promoting prostitution in the third

9      degree, in violation of New York Penal Law Section 230.25, is

10     as for that:  That an individual knowingly advances or profits

11     from prostitution by managing, supervising, controlling, or

12     owning, either alone or in association with others, a house of

13     prostitution or a prostitution business or enterprise involving

14     prostitution activity by two or more prostitutes.

15           The element of promoting prostitution in the second

16     degree, in violation of New York Law Section 230.30, is as

17     follows:  That an individual knowingly advances prostitution by

18     compelling a person by force or intimidation to engage in

19     prostitution or profits from such coercive conduct by another.

20           The following terms used in that definition have a

21     special meaning.

22           Prostitution means the act or practice of engaging, or

23     agreeing or offering to engage, in sexual conduct with another

24     person in return for a fee.

25           A person advances prostitution when, acting other than

M45MRAY6                    Charge

1    as a person in prostitution, or as a patron thereof, he or she

2    knowingly causes or aids a person to commit or to engage in

3    prostitution, procures or solicits patrons for prostitution,

4    provides persons or premises for prostitution purposes,

5    operates or assists in the operation of a house of

6    prostitution, or prostitution enterprise or engages in any

7    other conduct designed to institute, aid, or facilitate an act

8    or enterprise of prostitution.

9         A person profits from prostitution when acting other

10   than as a person in prostitution receiving compensation for

11   personally rendering prostitution services.  He or she accepts

12   or receives money or other property pursuant to an agreement or

13   understanding with any person whereby he or she participates or

14   is to participate in the proceeds of prostitution activity.  A

15   person knowingly advances prostitution when that person is

16   aware that he or she is doing so.

17        The government must also prove that the unlawful

18   activity that the interstate facility was used to facilitate

19   was a business enterprise.  That is, the government must prove

20   that the unlawful activity was part of ape continuous course of

21   criminal conduct and not simply an isolated criminal incident.

22   If you find that the unlawful activity was an isolated incident

23   and is not part of an ongoing course of criminal conduct, you

24   must find Mr. Ray not guilty.

25        However, to prove that the unlawful activity was a

business enterprise, the government does not have to show that the alleged illegal activity was engaged in for any particular length of time.  Nor must the government prove that such activity was a primary pursuit or occupation that it actually turned to profit.  What the government must prove beyond a reasonable doubt is that Mr. Ray or a coconspirator engaged in a continuous course of criminal conduct for the purpose of profit rather than casual sporadic or isolated criminal activity.

        The third element that the government must prove beyond a reasonable doubt is that Mr. Ray's or a coconspirator's use of an interstate facility was filed by such person's performance or attempted performance of an act in furtherance of the unlawful activity.  This act need not itself be unlawful.  However, this act must come after the use of an interstate facility.  Any act that happened before the use of an interstate facility cannot satisfy this element.

        Members of the jury, let's take a two or three-minute stretch break now, and then I'll have more instructions for you.

        Let me now instruct you with respect to the predicate activity having to do with money laundering.

        The seventh category of predicate acts that the indictment alleges was committed or was intended to be committed as part of the RICO conspiracy was money laundering,

M45MRAY6                          Charge

1    in violation of Title 18, United States Code, Section 1956, and

2    aiding and abetting the same.

3         Money laundering occurs when a person conducts a

4    financial transaction knowing that the transaction was

5    designed, in whole or in part, to conceal or disguise the pride

6    of specified unlawful activity.  Here, the specified unlawful

7    activity is sex trafficking and extortion.

8         To prove money laundering, the government must

9    establish the following four elements beyond a reasonable

10   doubt:

11        First, that Mr. Ray or a coconspirator conducted or

12   attempted to conduct a financial transaction which must in some

13   way or degree have affected interstate or foreign commerce;

14        Second, that the financial transaction at issue

15   involved the proceeds of specified unlawful activity, which

16   here was sex trafficking and in extortion;

17        Third, that Mr. Ray or the coconspirator, whichever

18   the case may be, knew that the financial transaction involved

19   the proceeds of some form of unlawful activity; and

20        Fourth, that such person knew that the transaction was

21   designed, in whole or in part, either to conceal or disguise

22   the nature, location, source, ownership, or control of the

23   proceeds of the unlawful activity.

24        I have already instructed you generally as to the

25   meaning of aiding and abetting under federal law, and you

1    should apply those instructions here.

2              The first element of money laundering is that Mr. Ray

3    or a coconspirator conducted or attempted a financial

4    transaction.

5              The term conducts includes the action of initiating,

6    concluding, or participating in initiating or concluding a

7    transaction.

8              The term financial transaction means:  (1) a

9    transaction involving a financial institution which is engaged

10   in, or the activities of which affect, interstate or foreign

11   commerce in any way or degree or (2) a transaction which in any

12   way or degree affects interstate or foreign commerce and

13   involves the movement of funds by wire or other means, or

14   involves one or more monetary instruments.  I instruct you that

15   an insurance bank constitutes a financial institution.

16             A transaction involving a financial institution

17   includes a deposit, withdrawal, transfer between accounts,

18   exchange of currency, loan, extension of credit, purchase or

19   sale of any stock, bond, certificate or other monetary

20   instrument, use of a safe deposit box, or any other payment,

21   transfer, or delivery by, through, or to a financial

22   institution by whatever means.

23             The term funds includes any currency, money, or other

24   medium of exchange that can be used to pay for goods or

25   services.

I previously instructed you on the definition of interstate commerce, and you should apply that definition here. Foreign commerce means commerce between the United States and a foreign country.  As with determining whether someone is engaged in, or whether his activities affect interstate commerce, when determining whether someone is engaged in, or whether his activities affect foreign commerce, the involvement in foreign commerce can be minimal.  Any involvement at all will satisfy this element.

You do not have to decide whether the effect on interstate or foreign commerce was harmful or beneficial to a particular business or to commerce in general.  The government satisfies its burden of proving an effect on interstate or foreign commerce if it proves beyond a reasonable doubt any effect, whether it was harmful or not.  In addition, it is not necessary for the government to show that Mr. Ray or the coconspirator actually intended or anticipated an effect on interstate or foreign commerce by his actions or that commerce was actually affected.  All that is necessary is that the natural and probable consequences of the acts such person agreed to take would affect interstate or foreign commerce.

The second element of money laundering which the government must prove beyond a reasonable doubt is that the financial transactions thus involve the proceeds of specified unlawful activity.

1            Here, the specified unlawful activities are sex

2     trafficking and federal extortion.  I instruct you, as a matter

3     of law, that the term specified unlawful activity includes sex

4     trafficking and federal extortion, as I have defined those

5     crimes for you.  The term proceeds means any property, or any

6     interest in property, that someone acquires or retains as

7     profits resulting from the commission of the specified unlawful

8     activity.  However, it is for you to determine whether the

9     funds were the proceeds of that unlawful activity.  I

10    previously advised you about the elements of federal extortion

11    and sex trafficking.  You should apply those instructions here.

12           The third element of money laundering which the

13    government must prove beyond a reasonable doubt is that Mr. Ray

14    or a coconspirator knew that the financial transactions at

15    issue involved the proceeds of some form, though not

16    necessarily which form, of unlawful activity.  Keep in mind, it

17    is not necessary for such person to believe that the proceeds

18    came from sex trafficking or extortion.  It is sufficient that

19    such person believed that the proceeds came from some unlawful

20    activity that was a felony.

21           The fourth and final element of money laundering

22    concerns the purpose of the transaction.  Specifically, the

23    government must prove beyond a reasonable doubt that Mr. Ray or

24    a coconspirator conducted financial transactions with knowledge

25    that the transactions were designed, in whole or in part, to

conceal or disguise the nature, location, source, ownership, or
control of the proceeds of the specified unlawful activity.

        As I have previously instructed, to act knowingly
means to act intentionally and voluntarily and not because of
mistake or accident, mere negligence or other innocent reason.
That is, the acts must be the product of Mr. Ray's or the
coconspirator's conscious objective.

        If you find that the evidence establishes beyond a
reasonable doubt that Mr. Ray or a coconspirator knew the
purpose of the particular transaction in issue and that the
transaction was either designed to conceal or disguise the true
origin of the property in question, then this element is
satisfied.  However, if you find that such person knew of the
transaction but did not know that it was either designed to
conceal or disguise the true origin of the property in
question, but instead thought that the transaction was intended
to further an innocent transaction, you must find that this
element has not been satisfied and find Mr. Ray not guilty.

        For the fourth element to be satisfied, Mr. Ray or the
coconspirator need not know which specified unlawful activity
he or she was agreeing to help conceal.  Such person need only
know that a purpose of the financial transaction was concealing
the nature, location, source, ownership, or control of the
funds.

        The eighth category of predicate acts the indictment

alleges was committed or was intended to be committed as part

of the RICO conspiracy was witness tampering, in violation of

Title 18, United States Code, Section 1512, and aiding and

abetting the same.  The relevant statute is 18 U.S.C. Section

1512(c)(2).  It provides:  Whoever obstructs, influences, or

impedes any official proceeding, or attempts to do so, shall be

guilty of a crime.

In order for you to find that a person tampered with a

witness in violation of Section 1512, the government must prove

beyond a reasonable doubt that:  First, that Mr. Ray or a

coconspirator obstructed, influenced, or impeded an official

proceeding; and second, that such person acted corruptly.

The first element that the government must prove

beyond a reasonable doubt is that the defendant or a

coconspirator obstructed, influenced, or impeded an official

proceeding.

An official proceeding means a proceeding before a

court, judge, or federal agency.  The proceeding may be civil

or criminal.  The law does not require that a criminal

proceeding be pending at the time of the person's actions, as

long as the proceeding was foreseeable, such that the person

knew that his actions were likely to affect the proceeding.  In

addition, the government does not have to prove that the person

knew the nature of the proceeding.

The second element the government must prove beyond a

 1   reasonable doubt is that the person acted corruptly.  To act

 2   corruptly means to act with an improper purpose and to engage

 3   in conduct knowingly and dishonestly and with the intent to

 4   obstruct, impede, or influence the due administration of

 5   justice.  The government does not have to prove that Mr. Ray or

 6   coconspirator directly impeded or attempted to impede directly

 7   an efficient proceeding.  In addition, the actions need not be

 8   successful in impeding or obstructing justice so long as the

 9   acts had the natural and probable consequence of interfering

10   with an official proceeding that was foreseeable, even if not

11   pending.

12          I've already instructed you generally as to the

13   meaning of aiding and abetting under federal law, and you

14   should apply those instructions here.

15          The ninth category of predicate acts that the

16   indictment alleges was committed or was intended to be

17   committed as part of the RICO conspiracy is obstruction of

18   justice, in violation of Title 18, United States Code, Section

19   1503, and aiding and abetting the same.  The statute provides,

20   in relevant part:  Whoever, by threats or force, endeavors to

21   influence, intimidate, or impede any grand or petit juror or

22   officer in or of any court of the United States or by threats

23   or force, influences, obstructs, or impedes, or endeavors to

24   influence, obstruct or impede the due administration of justice

25   shall be guilty of a crime.

1          The due administration of justice mentioned in the

2     statute refers to the fair, impartial, uncorrupted, and

3     unimpeded investigation, prosecution, disposition, or trial of

4     any matter, civil or criminal, in the courts of the United

5     States.  It includes every step in a matter or proceeding in

6     the federal courts to assure the just consideration and

7     determination of the rights of the parties, whether government

8     or individual.

9          Thus, due administration of justice includes, but is

10    not limited to, a grand jury proceeding or investigation, or a

11    federal, civil, or criminal trial.

12         The sweep of the statute extends to any corrupt

13    endeavor or effort to interfere with a grand juror, juror, or

14    federal judge, magistrate, or other officer in the discharge of

15    his or her duties.

16         The key word in the statute is endeavor.  As used in

17    this statute, endeavor means any effort or any act, however

18    contrived, to obstruct, impede or interfere with the trial or

19    grand jury proceeding.  It is the endeavor that is the gist of

20    the crime.

21         Success of the endeavor is not an element of the

22    crime.  Any effort, whether successful or not, that is made for

23    the purpose of corrupting obstructing or impeding the

24    proceeding is condemned.

25         The word corruptly as used in the statute means simply

having the improper motive or purpose of obstructing justice.

            In order for the offense of construction of justice to
be considered as a racketeering act, the government must prove
Mr. Ray or a coconspirator agreed to commit or committed each
element of obstruction of justice beyond a reasonable doubt.

            First, that on or about the date set forth in the
indictment, there was a proceeding pending before a federal
court or grand jury; second, that Mr. Ray or the coconspirator,
whichever the case may be, knew of the proceeding; third, that
such person used threats or force against the individuals as
charged in the indictment; and, fourth, that such person's
conduct influenced, obstructed, or impeded or endeavored to
influence or obstruct or impede the due administration of
justice in the proceeding, as I have defined those terms.

            I have already instructed you generally as to the
meaning of aiding and abetting under federal law, and you
should apply that term here.

            The first element the government must prove beyond a
reasonable doubt is that on or about the date set forth in the
indictment, there was a proceeding pending before a federal
court or grand jury.

            The second element the government must prove beyond a
reasonable doubt is that Mr. Ray or a coconspirator knew that
such proceeding was in progress.  In order to satisfy this
element, you need only determine that Mr. Ray or the

1    coconspirator knew, on or about the date charged, that a

2    proceeding before a federal court or grand jury was in

3    progress.

4            The third element the government must prove beyond a

5    reasonable doubt is that Mr. Ray or a coconspirator used

6    threats or force against a witness.

7            It is not necessary for the government to prove that

8    Mr. Ray or a coconspirator personally injured anyone.  It is

9    sufficient to satisfy this element if you find that Mr. Ray

10   knowingly used force or threats.

11           I have already instructed you on the meaning of

12   knowingly, and you should apply that definition here.

13           The fourth element the government must prove beyond a

14   reasonable doubt is that Mr. Ray's or a coconspirator's conduct

15   influenced, obstructed, or impeded, or endeavored to influence,

16   or obstruct or impede the due administration of justice in the

17   proceeding.

18           As I have stated previously, the due administration of

19   justice refers to the fair, impartial, uncorrupted, and

20   unimpeded investigation, prosecution, disposition, or trial of

21   any matter in the courts of the United States.  It includes

22   every step in a matter or proceeding in the federal courts to

23   assure that just consideration and determination of the rights

24   of the parties, whether government or individual.

25           That concludes the final predicate act alleged.

1    Please remember that as to all the kinds of predicate

2    racketeering acts described above, the government must prove

3    beyond a reasonable doubt that Mr. Ray or a coconspirator

4    agreed to commit or committed at least two related acts of any

5    of these kinds as part of the continuing conduct of the

6    enterprise.  You must unanimous as to which two or more such

7    predicate acts you find they agreed to commit.

8         The government has alleged a special sentencing factor

9    with respect to Count One.  If you find Mr. Ray is not guilty

10   of Count One, then you don't need to consider this factor.  If

11   you find him guilty of Count One, you must consider whether the

12   government has proven that Mr. Ray is guilty of this special

13   sentencing factor.  I have already instructed you on the law

14   governing sex trafficking in connection with the third category

15   of predicate acts of the racketeering conspiracy charged in

16   Count One, and you should follow those instructions here.  To

17   find Mr. Ray guilty of the special sentencing factor, you must

18   find beyond a reasonable doubt that Mr. Ray engaged in sex

19   trafficking of Claudia Drury as part of his agreement to

20   conduct and participate in the enterprise through a pattern of

21   racketeering activity.

22        I will now charge you on the remaining counts of the

23   indictment, each of which charges the defendant with either

24   conspiring to engage in a federal crime or with committing a

25   federal crime.

M45MRAY6                    Charge

1           With respect to the counts that charge a conspiracy,

2    you must find that the defendant conspired to commit the

3    federal crime as I have instructed you on the law of federal

4    conspiracy.  With respect to the counts that charge commission

5    of a federal crime, you must find that the defendant either

6    committed the federal crime or aided and abetted the commission

7    of the federal crime.  I have also instructed you generally as

8    to the meaning of aiding and abetting under federal law, and

9    you should apply those instructions here.

10          Count Two of the indictment charges the defendant with

11   conspiracy to commit extortion between 2011 and 2019, by

12   agreeing with others to extort money from individuals.

13          The object of the conspiracy charged in Count Two of

14   the indictment is extortion.  I have already instructed you on

15   the law governing federal extortion in connection with the

16   first category of predicate acts of the racketeering conspiracy

17   charged in Count One, and you should follow those instructions

18   here.  To find Mr. Ray guilty of Count Two, you must find that

19   the government has proven beyond a reasonable doubt that

20   Mr. Ray agreed with at least one other person to commit

21   extortion.

22          Count Three of the indictment charges Mr. Ray with

23   extorting a person between 2011 and 2019 and aiding and

24   abetting the same.  I've already instructed you on the law

25   governing federal extortion in connection with the first

category of the predicate acts of the racketeering conspiracy

charged in Count One, and you should follow those instructions

here.  To find Mr. Ray guilty of extortion, you must find

beyond a reasonable doubt that Mr. Ray committed or aided and

abetted the commission of each of the elements of federal

extortion as to Claudia Drury.

Count Four of the indictment charges Mr. Ray with sex

trafficking between 2011 and 2019 and aiding and abetting the

same.

I have already instructed you on the law governing sex

trafficking in connection with the third category of predicate

acts of the racketeering conspiracy charged in Count One, and

you should follow those instructions here.  To find Mr. Ray

guilty of the crime of sex trafficking charged in Count Four,

you must find beyond a reasonable doubt that Mr. Ray committed

or aided and abetted the commission of each of the elements of

sex trafficking.

Count Five of the indictment charges Mr. Ray with

conspiracy to commit sex trafficking between 2011 and 2019 by

agreeing with others to sex-traffic a person.

To find Mr. Ray guilty of Count Five, you must find

that the government has proven beyond a reasonable doubt that:

(1) from in or about 2011, up to and including in or about

2019, there was an agreement or understanding among two or more

persons to sex-traffic a person, and (2) that Mr. Ray

M45MRAY6                        Charge

1    unlawfully, intentionally, and knowingly became a member of the

2    conspiracy, that is, he knowingly joined in the conspiracy and

3    intentionally participated in it.  I've already instructed you

4    regarding finding the existence of a conspiracy, and you should

5    apply those instructions here.

6           I've also already instructed you on the law governing

7    sex trafficking, and you should follow those instructions here.

8           In determining whether Mr. Ray intentionally

9    participated in that conspiracy, with knowledge of its unlawful

10   purpose and with the intent to further its unlawful objectives,

11   you must ask whether the government has proven beyond a

12   reasonable doubt that Mr. Ray knowingly and intentionally

13   entered into the conspiracy with criminal intent; that is, with

14   the purpose to violate the law and that he agreed to take part

15   in the conspiracy, to promote and cooperate in its unlawful

16   objectives.

17          Count Six of the indictment charges Mr. Ray with

18   obtaining forced labor between in or about May 2013 and in or

19   about December of 2013, and aiding and abetting the same.

20          I have already instructed you on the law governing

21   forced labor in connection with the fourth category of

22   predicate acts of the racketeering conspiracy charged in Count

23   One.  You should follow those instructions here.  To find

24   Mr. Ray guilty of forced labor charged in Count Six, you must

25   find beyond a reasonable doubt that Mr. Ray committed or aided

1    and abetted the commission of each of the elements of forced

2    labor.

3           Count Seven of the indictment charges Mr. Ray with

4    forced labor trafficking between in or about May 2013 and in or

5    about December 2013, and aiding and abetting the same.

6           I have already instructed you on the law governing

7    forced labor trafficking in connection with the fifth category

8    of predicate acts of the racketeering conspiracy charged in

9    Count One, and you should follow those instructions here.  To

10   find Mr. Ray guilty of forced labor trafficking, you must find

11   beyond a reasonable doubt that Mr. Ray committed or aided and

12   abetted the commission of each of the elements of forced labor

13   trafficking.

14          Count Eight of the indictment charges Mr. Ray with

15   conspiring to obtain forced labor between in or about May 2013

16   and in or about December 2013, by agreeing with others to

17   obtain forced labor from individuals.

18          To find Mr. Ray guilty of Count Eight, you must find

19   that the government has proven beyond a reasonable doubt that

20   between in or about May 2013, and in or about December 2013,

21   there was an agreement or understanding among two or more

22   persons to obtain forced labor from individuals; (2) that Ray

23   unlawfully, intentionally, and knowingly became a member of the

24   conspiracy, that is, he knowingly joined in the conspiracy and

25   intentionally participated in it.

1          I've already instructed you regarding finding the

2   existence of a conspiracy, and you should apply those

3   instructions here.  I have also already instructed you on the

4   law governing forced labor in connection with the fifth

5   category of predicate acts of the racketeering conspiracy

6   charged in Count One, and you should apply those instructions

7   here.

8          You must also determine whether Mr. Ray intentionally

9   participated in the conspiracy with knowledge of its unlawful

10   purposes, and with the intent to further its unlawful

11   objectives.  In connection with this, you must consider whether

12   the government has proven beyond a reasonable doubt that Mr.

13   Ray knowingly and intentionally entered into the conspiracy

14   with criminal intent, that is, with a purpose to violate the

15   law, and that he agreed to take part in the conspiracy to

16   promote and cooperate -- promote its unlawful objectives.

17          Count Nine of the indictment charges Mr. Ray with

18   using interstate facilities to promote unlawful activity, in

19   violation of the Travel Act, which we have already discussed.

20          Specifically, Count Nine charges that:  Between in or

21   about 2014 and in or about 2019, Mr. Ray used interstate

22   facilities to carry on criminal business engaged in sex

23   trafficking, in violation of federal law and prostitution, in

24   violation of New York Penal Law, Sections 230, 230.02, 230.25,

25   230.30.

M45MRAY6                    Charge

1          I've already instructed you on the law governing the

2     Travel Act and sex trafficking in connection with the predicate

3     acts of the racketeering conspiracy charged in Count One, and

4     you should follow those instructions here.

5          To find Mr. Ray guilty of the crime of using

6     interstate facilities to promote unlawful activity, you must

7     find that the government has proven beyond a reasonable doubt

8     that Mr. Ray committed or aided and abetted or attempted to

9     commit, as I have described above, the commission of each of

10    the elements of using interstate facilities to promote unlawful

11    activity.

12         The defendant has also been charged with using an

13    interstate facility to facilitate a criminal business engaged

14    in prostitution and promoting prostitution, in violation of New

15    York law.  The government must prove to you beyond a reasonable

16    doubt that the activities Mr. Ray intended to facilitate were

17    in fact unlawful under New York's penal law, as I described

18    above.

19         Count Nine alternatively charges Mr. Ray with

20    attempting to use an interstate facility to promote an unlawful

21    activity.

22         In order to find Mr. Ray guilty of Count Nine under an

23    attempt theory, the government must prove beyond a reasonable

24    doubt that:  (1) Mr. Ray intended to commit the crime charged,

25    as I have described that crime to you and (2) Mr. Ray willfully

took some action that was a substantial step in an effort to

bring about or accomplish the crime.

Mere intention to commit a specific crime does not

amount to an attempt.  In order to convict Mr. Ray of an

attempt, you must find beyond a reasonable doubt that he

intended to commit the crime charged, and he took some action

which was a substantial step towards the commission of that

crime.

In determining whether Mr. Ray's actions amounted to a

substantial step toward the commission of the crime, you must

distinguish between mere preparation on the one hand and the

actual doing of the criminal deed on the other.  Mere

preparation, without more, is not an attempt.  On the other

hand, some preparations, when taken together, may amount to an

attempt.  The act of a person who intends to commit a crime

will constitute an attempt when the acts themselves indicate an

intent to willfully commit the crime, and the acts are a

substantial step in the course of conduct planned to culminate

in the commission of the crime.

There is no requirement that the attempt be successful

or that Mr. Ray actually have carried out the crime he was

trying to commit.

If you find beyond a reasonable doubt that Mr. Ray

attempted to commit the crimes charged in Count Nine, then he

is guilty with respect to that count.

1          Count Ten of the indictment charges Mr. Ray with money

2     laundering between in or about 2011 and in or about 2019 and

3     aiding and abetting the same.

4          Specifically, the indictment alleges Mr. Ray conducted

5     and attempted to conduct financial transactions involving the

6     proceeds of extortion and sex trafficking, knowing that the

7     transactions were designed, in whole or in part, to conceal and

8     disguise the nature, location, source, ownership, and control

9     of the proceeds of sex trafficking and extortion, and to avoid

10    a transaction reporting requirement under state and federal

11    law.

12         I have already instructed you on the law governing

13    money laundering in connection with the seventh category of

14    predicate acts of the racketeering conspiracy charged in Count

15    One, and you should follow those instructions here.  To find

16    Mr. Ray guilty of money laundering, you must find that the

17    government has proven beyond a reasonable doubt that Mr. Ray

18    committed or aided and abetted the commission of money

19    laundering.

20         Counts Eleven through Fourteen of the indictment

21    charge that Mr. Ray committed tax evasion for the calendar

22    years 2016, 2017, 2018, and 2019, in violation of Section 7201

23    of Title 26 of the United States Code.

24         That section provides as follows in relevant part:

25    Any person who willfully attempts in any manner to evade or

M45MRAY6                         Charge

1   defeat any tax imposed by this title or the payment thereof

2   shall be guilty of a crime.

3            Count Eleven charges tax evasion for the calendar year

4   2016 with respect to income received in calendar year 2016 and

5   Mr. Ray's failure to make an income tax return on or before

6   April 15, 2017.

7            Count Twelve charges the same with respect to income

8   received in calendar year 2017, and Mr. Ray's failure to make

9   an income tax return on or before April 15, 2018.

10           Count Thirteen charges the same with respect to income

11  received in calendar year 2018 and Mr. Ray's failure to make an

12  income tax return on or before April 15, 2019.

13           Count Fourteen charges the same with respect to income

14  received in calendar year 2019 and Mr. Ray's failure to make an

15  income tax return on or before July 15, 2020.

16           Each of these counts, Eleven through Fourteen, involve

17  tax crimes.  It is a criminal offense for a taxpayer to evade

18  taxes, to file a false return, or to file no return under

19  certain circumstances.

20           A preliminary word about what this case is not about.

21  It has nothing to do with the actual collection of any taxes

22  that may be due to the government.  This is a criminal case.

23  We are not concerned with civil liability.  Rather, the issue

24  here is whether the government has proved beyond a reasonable

25  doubt that the defendant committed the tax crimes charged in

M45MRAY6                         Charge

the indictment.

          To sustain its burden of proof with respect to the
charges of tax evasion in Counts Eleven through Fourteen of the
time, the government must prove beyond a reasonable doubt the
following three elements:

          First, that a substantial amount of income tax was due
and owing from the defendant for each year in question;

          Second, that Mr. Ray committed an affirmative act
constituting an evasion or attempted evasion of assessment of
the tax, as described in the indictment; and

          Third, that in evading or attempting to evade the
assessment of taxes due and owing for the year in question,
Mr. Ray acted knowingly and willfully.

          As I mentioned earlier, willfully means something
slightly different in the tax evasion context, and I will
instruct you on that shortly.

          The indictment charges four separate tax evasion
counts.  Each count, and therefore each calendar year, 2016,
2017, 2018, and 2019, must be considered separately.

          The first element of the offense that the government
must prove beyond a reasonable doubt is that Mr. Ray had a
substantial tax due and owing for the year in question.

          For each of these counts, Eleven through Fourteen, the
indictment alleges that Mr. Ray failed to file a timely federal
income tax return.  This element is satisfied as to Counts

M45MRAY6                    Charge

Eleven through Fourteen if you find that Mr. Ray failed to file
a timely federal income tax return for the year in question,
despite owing a substantial amount of federal income tax for
that year.  I instruct you that the law requires the filing of
a timely return, and a tax return filed months or years late
does not constitute a timely filing.

Again, each count and, thus, each year must be
considered separately.

The government does not have to prove the exact amount
of taxes that Mr. Ray owed or evaded for these years, nor need
the computations be exact in an accounting sense.  All it has
to do is prove that there is a substantial amount of tax due.

In addition, the government does not have to prove
that Mr. Ray attempted to evade or defeat payment of all of the
taxes owed for those years.  Instead, the government need only
prove that the amount owed for each of the tax years was
substantial and that Mr. Ray attempted to evade or defeat all
or a substantial part of the taxes owed.

Whether the amount of tax due is substantial is an
issue for you to decide.  Substantiality is not measured in
terms of gross or net income or by any particular percentage of
the tax shown to be due and payable.  All of the attendant
circumstances must taken into consideration.  A few thousand
dollars of evaded tax may or may not, in a given case, be
considered substantial, depending on the circumstances.

1           To prove that a substantial tax was due, the

2    government must prove beyond a reasonable doubt two things:

3    (1) that Mr. Ray received unreported or incorrectly reported

4    income and (2) that there was a substantial tax due, or

5    substantial additional tax due, as a result of the receipt of

6    that unreported or incorrectly reported income.

7           An unlawful gain, as well as a lawful one, constitutes

8    taxable income when the recipient derives readily realizable

9    economic value from it.

10          In considering your decision on whether Mr. Ray owed

11   substantial federal income taxes in the year you are

12   considering, you should consider, along with all the other

13   evidence, the testimony and exhibits introduced during the

14   trial concerning the computation of Mr. Ray's tax liabilities.

15          If you find, based on all the evidence, that the

16   government has established beyond a reasonable doubt that

17   Mr. Ray received unreported income and, as a result of that

18   income, there was a substantial amount of tax due and owing,

19   then the first element is satisfied with respect to the year

20   you are considering.

21          The second element of the tax evasion offense the

22   government must prove beyond a reasonable doubt is that Mr. Ray

23   committed an affirmative act constituting an evasion, or an

24   attempted evasion of the assessment of the tax, as described in

25   the indictment.

1          The phrase attempt to evade or defeat an income tax

2     involves two things:  First, the formation of an intent to

3     evade or defeat a tax or the payment thereof; and, second,

4     willfully performing some act to accomplish the intent to evade

5     or defeat that tax.

6          Counts Eleven through Fourteen allege that Mr. Ray

7     knew and believed that in each of the years 2016, 2017, 2018,

8     and 2019, he had substantial taxable income upon which there

9     was a substantial amount of tax due, and he treated in some way

10    to evade a substantial portion of the tax due and owing for

11    each of those years.

12         Therefore, to prove these counts the government must

13    prove beyond a reasonable doubt that, for each year charged,

14    Mr. Ray intended to evade or defeat a substantial portion of

15    the tax due, and willfully committed some act designed to

16    misrepresent or conceal his income from the IRS.

17         (Continued on next page)

18

19

20

21

22

23

24

25

M451RAY7

1          THE COURT:  Now, the mere failure to do what the law

2     requires is not an affirmative act.  Thus, failing to file

3     income tax returns and failing to pay income taxes, standing

4     alone, are not sufficient by themselves to make out the

5     affirmative act of attempting to evade or defeat taxes.  The

6     defendant must do something more to be guilty of tax evasion.

7          There are many different ways in which a tax may be

8     evaded or an attempt made to evade it.  The statute,

9     Section 7201 of the United States Code, provides that the

10    attempt can be "in any manner."  A general rule is that any

11    conduct, the likely effect of which would be to mislead or

12    conceal for tax evasion purposes, is sufficient to establish an

13    affirmative act of attempting to evade or defeat income taxes.

14    The only requirement is that Mr. Ray must take some affirmative

15    action with that purpose in mind.

16         The defendant's conduct must be conduct that is likely

17    to misrepresent or conceal income from the IRS.  Even an

18    otherwise lawful act can constitute an attempt to evade and

19    defeat if that act is performed by the defendant with the

20    intent to evade or defeat income tax.

21         Conduct that constitutes or is sufficient to establish

22    an affirmative attempt to evade a tax includes, but is not

23    limited to:

24             The making of false statements to the IRS;

25             Using third-party or entity bank accounts;

M451RAY7

1          Transferring income, money, or property in an attempt

2     to conceal ownership;

3          Causing debts to be paid through and in the name of

4     others;

5          Dealing extensively in cash;

6          Or any other conduct, the likely effect of which would

7     be to mislead or to conceal, including directing other

8     individuals to do any of the things that I've just mentioned.

9          In this case, the government alleges that the

10    defendant committed multiple affirmative acts of evasion.  With

11    respect to the calendar years 2016 through 2019, the government

12    alleges that the defendant committed affirmative acts of

13    evasion by, among other things, routing his income through bank

14    accounts held by others, called nominees, and using the nominee

15    accounts to pay for personal expenses including to purchase

16    domain name registrations.  The government must prove that

17    Mr. Ray committed some affirmative act during each tax year

18    charged constituting an attempt to evade.  It need not prove

19    each act alleged in the indictment.  The proof of one

20    affirmative act is enough.  So, with regard to Counts Eleven

21    through Fourteen, the government must prove that Mr. Ray took

22    some affirmative step with respect to each of the years 2016,

23    2017, 2018, and 2019, with the intention of misrepresenting or

24    concealing income from the IRS.  But you, the jury, must be

25    unanimous; in other words, for each tax year charged, you must

all agree that Mr. Ray committed at least one affirmative act
that constituted the attempt to evade.

The third element that the government must prove
beyond a reasonable doubt is that Mr. Ray acted knowingly and
wilfully.

To show Mr. Ray acted knowingly, the government must
prove beyond a reasonable doubt that Mr. Ray knew that he owed
substantially more federal income tax for the year you are
considering than was declared on his income tax returns for
that year, or if no return was timely filed, that he knew he
owed a substantial amount of tax for the year.  Whether or not
Mr. Ray had this knowledge is a question of fact to be
determined by you on the basis of all the evidence.  An act is
done knowingly only if it is done purposely and deliberately
and not because of mistake, accident, negligence, or other
innocent reason.

The government must also prove beyond a reasonable
doubt that Mr. Ray acted wilfully.  A willful act in this
context is defined as a voluntary and intentional violation of
a known legal duty.  Thus, the government must prove beyond a
reasonable doubt that Mr. Ray was aware of this legal duty and
possessed the specific intent to defeat or evade the assessment
of taxes that Mr. Ray knew it was his duty to pay.

Mere negligence, even gross negligence, is not
sufficient to constitute willfulness.  If Mr. Ray actually

 1   believed in good faith that he did not owe the taxes the

 2   government claims he does, he cannot be guilty of criminal

 3   intent to evade taxes.  In other words, a defendant does not

 4   act wilfully if he believes in good faith that his actions

 5   comply with the law.  Therefore, if you find that Mr. Ray

 6   honestly and genuinely believed that he owed no additional

 7   taxes for the years in question, even if that belief was

 8   unreasonable or irrational, then you should find him not

 9   guilty.  However, you may consider whether Mr. Ray's belief was

10   actually reasonable in deciding whether he held that belief in

11   good faith.

12          The defendant does not have a burden to establish his

13   good faith.  It is the government's burden to prove that

14   Mr. Ray did not have a good faith misunderstanding of the law.

15          There are certain inferences that the law allows you

16   to make in deciding the issue of willfulness in a tax evasion

17   case.  The law does not require you to draw these inferences.

18   They are permissive, they are not mandatory, but you may draw

19   them if you wish.  I instruct you that these inferences relate

20   only to the element of willfulness and not to any other element

21   that I have discussed with you.

22          During the trial, you heard evidence that the

23   defendant filed income tax returns for certain years prior to

24   2016.  If you find that the defendant filed returns for those

25   years, you may infer that the defendant knew the law required

M451RAY7

him to make and file returns, and you may consider that as you

decide whether he wilfully failed to do so for the years

charged in the indictment.

        The government has also offered evidence that Mr. Ray

failed to timely file income tax returns for four consecutive

years—2016 through 2019.  Such a pattern of behavior, as

distinguished from a single occurrence, may be considered by

you in determining the defendant's willfulness.

        A defendant's attitude towards the IRS, or the

reporting and payment of taxes generally, may be considered by

you in determining the defendant's willfulness.

        If you find willfulness in one year, you may consider

that as evidence of willfulness in subsequent or prior years.

        You've heard evidence that the defendant received

general information from a lawyer that monies received in

settlement of a claim for personal injury are not taxable even

if they were received from illegal activities.  I will have

more to say about that issue in a moment.  For now, I instruct

you that the fact that the defendant received that information

does not excuse his specific conduct if you find from all of

the evidence beyond a reasonable doubt that the defendant

nonetheless acted wilfully and knowingly.  There is no advice

of counsel defense in this case.  However, with respect to

conduct occurring after the date he received the information,

you are permitted to consider evidence of what Mr. Ray was told

by the lawyer, along with all the other evidence in the case,
to determine whether the defendant acted wilfully and with
knowledge.  You may not consider this evidence with respect to
any other charges or for any other purpose.

          In deciding about the defendant's state of mind, you
should consider all the evidence that in your common sense and
experience bears on this question.  You will want to consider
all of the words, acts, and conduct of the defendant in
deciding what he thought and what he intended.  You may also
consider the general educational background and expertise of
the defendant, but only as it relates to the defendant's
ability to form the required willfulness.

          To assist you in determining whether the defendant is
guilty or not guilty on Counts Eleven through Fourteen, I am
now going to instruct you concerning certain federal income tax
filing obligations.

          The law of the United States requires, and required
during the relevant time frame, that a citizen or other person
who lives or works in the United States to file a tax return,
on or before April 15, if his or her gross income exceeded a
threshold amount.  In 2020, for tax returns for the 2019 tax
year, that deadline was extended to July 15.  The Internal
Revenue Code includes all income and all benefits received from
whatever source derived, including from illegal sources, as
gross income unless expressly excluded by some other provision

of the Internal Revenue Code.

          The value of property acquired by gift or as a loan is
not considered gross income for tax purposes under the Internal
Revenue Code.  Money paid by one person to or for the benefit
of another is a gift if it is paid out of a detached and
disinterested generosity, affection, respect, admiration,
charity, or a like impulse.

          The Internal Revenue Code also excludes from gross
income the amount of any damages (other than punitive damages)
received (whether by suit or agreement and whether as lump sums
or as periodic payments) on account of personal physical
injuries or physical sickness and damages for emotional
distress attributable to a physical injury or physical
sickness, with certain exceptions.  Emotional distress itself
is not considered a physical injury or physical sickness.

          "Damages" means an amount that is received through
prosecution of a legal suit or action, or through a settlement
agreement entered into in lieu of prosecution.  This exclusion
applies to damages that are paid pursuant to a written binding
agreement, court decree, or mediation award entered into or
issued after September 13, 1995, and received after January 23,
2012.

          An agreement is a manifestation of mutual assent on
the part of two or more persons.  A settlement agreement is for
damages "on account of personal physical injuries or physical

M451RAY7

```
1    sickness" as long as it is to compensate for damages actually
2    incurred on account of personal physical injuries or personal
3    physical sickness and is to settle a tort or tort-like claim
4    even if the legal claim is not viable or if the claim's
5    validity is doubtful because of some uncertainty about the
6    facts or the law.  The claim need not have been asserted and
7    the settling party need not have released the nonsettling
8    party.  It is sufficient that the settling party have agreed to
9    forbear, for any period of time, from asserting the claim.
10   However, I also instruct you that if the claim is not even
11   doubtful, or colorable, or plausible, in that there is no
12   reason for an honest belief that it has some foundation in law
13   or in equity, then a claim to settle it is not a valid
14   settlement agreement even if it is for damages actually
15   incurred.  Thus, if the person has a good-faith belief that the
16   legal claim is valid—even if it is in fact not—the forbearance
17   is what is called consideration and is sufficient to support
18   the existence of an agreement; if he does not, there is no
19   consideration and no binding agreement.
20           It is the theory of the defense that the defendant
21   believed he was the victim of a conspiracy.  The defendant
22   asserts that he believed that he and others had been poisoned
23   and otherwise harmed as part of this conspiracy and he
24   attempted to learn the extent of this poisoning and other harm.
25   Mr. Ray asserts that he collected recordings and other writings
```

M451RAY7

for the purpose of turning these materials over to law

enforcement to investigate the poisoning.  It is the theory of

the defense that Mr. Ray believed he was permitted to accept

this repayment, even if the money he was paid was the proceeds

of prostitution, and did not need to report these funds as

taxable income.  With respect to the tax evasion counts, I

instruct you that if you find that the government has not

proven beyond a reasonable doubt that the defendant acted

wilfully, in violation of a known legal duty and with the

specific intent to defeat or evade the assessment of taxes that

the defendant knew it was his duty to pay, then you must find

the defendant not guilty of the crime of tax evasion charged in

Counts Eleven through Fourteen of the indictment.

Count Fifteen charges Mr. Ray with assault with a

dangerous weapon in aid of the racketeering enterprise charged

in Count One.  Mr. Ray is charged with violating Section 1959

of Title 18 of the United States Code.  That section reads as

follows:

"Whoever, as consideration for receipt of, or as

consideration for a promise or agreement to pay, anything of

pecuniary value from an enterprise engaged in racketeering

activity, or for the purpose of gaining entrance to or

maintaining or increasing position in an enterprise engaged in

racketeering activity, murders, kidnaps, maims, assaults with a

dangerous weapon, commits assault resulting in serious bodily

injury upon, or threatens to commit a crime of violence against

any individual in violation of the laws of any state or the

United States, or attempts or conspires to do so."

To find Mr. Ray guilty of Count Fifteen, the

government must establish beyond a reasonable doubt each of the

following elements:

First, that the enterprise charged in Count One

existed and that it engaged in or its activities affected

interstate commerce;

Second, that the enterprise was engaged in

racketeering activity;

Third, that Mr. Ray had (or was seeking) a position in

the enterprise;

Fourth, that Mr. Ray committed assault with a

dangerous weapon; and

Fifth, that Mr. Ray's general purpose in committing

this offense was to gain entrance to the enterprise or maintain

or increase his position in the enterprise.

I have already defined for you in connection with

Count One the concepts of the enterprise, racketeering

activity, and interstate commerce, and you should apply those

instructions here.

To establish the third element, the government must

establish beyond a reasonable doubt that Mr. Ray had (or was

seeking) a position in the enterprise.  To establish this

M451RAY7

element, the government must prove that Mr. Ray was actively
engaged in promoting the illegal activities of the enterprise.
It is not enough to prove that Mr. Ray was doing business with
the enterprise; the government must prove that he actually was
a member of the enterprise.

The fourth element the government must prove beyond a
reasonable doubt with respect to Count Fifteen is Mr. Ray
committed assault with a dangerous weapon.  Let me now instruct
you on the elements of an assault with a dangerous weapon.

Assault with a dangerous weapon may be committed in
two ways.

Under New York State law, a person is guilty of
assault with a dangerous instrument if the government proves
beyond a reasonable doubt:

First, that Mr. Ray caused physical injury to another
person by means of a dangerous instrument; and

Second, that he did so with the intent to cause
serious physical injury.

Assault with a dangerous weapon may also be committed
by committing menacing.  Under New York State law, a person is
guilty of committing menacing if the government proves beyond a
reasonable doubt:

First, that Mr. Ray placed or attempted to place
another person in reasonable fear of physical injury, serious
physical injury, or death by displaying a dangerous instrument;

M451RAY7

1    and

2              Second, that Mr. Ray did so intentionally.

3              Count Fifteen charges.

4              Under New York State law, a person intends to cause

5    physical injury to another person when his conscious objective

6    is to cause physical injury to another person. "Physical

7    injury" means impairment of a person's physical condition or

8    substantial pain.

9              A "dangerous instrument" is any instrument, article,

10   or substance that, under the circumstances in which it is used,

11   attempted to be used, or threatened to be used, is readily

12   capable of causing death or other serious physical injury,

13   although death or other serious physical injury need not, in

14   fact, be caused.  Almost any object which, as used or attempted

15   to be used, may endanger life or inflict great bodily harm can

16   be a dangerous instrument.

17             The fifth element the government must prove beyond a

18   reasonable doubt with respect to Count Fifteen is that

19   Mr. Ray's general purpose in committing the assault was to gain

20   entrance to the charged enterprise, or to maintain or increase

21   his position within that enterprise.

22             Your focus on this element is on the general purpose

23   of Mr. Ray.  The government does not need to prove that gaining

24   entrance to or maintaining or increasing his position in the

25   enterprise was that person's sole or principal motive so long

M451RAY7

as one of those purposes was a substantial motivating factor in

his decision to participate in the underlying crime or crimes.

In determining whether the defendant's purpose in committing

the assault was to maintain or increase his position in the

enterprise, you should give the words "maintain" and "increase"

their ordinary meanings.  You should consider all of the facts

and circumstances in making that determination.  For example,

this element is satisfied if you find that the person committed

the underlying crime because he knew it was expected of him by

reason of his membership in or association with the enterprise,

because it would maintain or enhance his position or prestige

in the enterprise, or, with respect to a high-ranking member of

the enterprise, if he committed or sanctioned the act of

violence to protect the enterprise's operations or to advance

its objectives.  This element could also be satisfied if you

find that the person committed the underlying crime to enhance

his reputation or wealth within the enterprise, or to avoid

losing power within the enterprise.  This list of examples is

not exhaustive.

        That completes my description for substantive

offenses.

        In addition to the elements that I have just described

to you, you must decide whether any act in furtherance of each

of the crimes charged occurred within the Southern District of

New York.  The Southern District of New York includes, among

other places, Manhattan and Bronxville.

I should note that on this issue—and this issue alone—the government need not prove venue beyond a reasonable doubt, but only by a mere preponderance of the evidence.  A preponderance of the evidence means that the government must prove that it is more likely than not that any act in furtherance of the conspiracy occurred in the Southern District of New York.  Thus, the government has satisfied its venue obligations if you conclude that it is more likely than not that any act in furtherance of the crime with which Mr. Ray is charged occurred within this district.

If you find that the government has failed to prove this venue requirement with respect to a particular charge, then you must acquit Mr. Ray of that charge.

I'm now going to briefly discuss evaluating the credibility of witnesses.

You have had the opportunity to observe the witnesses. It is now your job and will be your job to decide how believable or credible each witness was in his or her testimony.  You are the sole judges of the credibility of each witness, and of the importance of his or her testimony.  How do you judge the credibility of witnesses?  There is no magic formula.

You should carefully scrutinize all of the testimony of each witness, the circumstances under which each witness

1    testified, the impression the witness made when testifying, the

2    relationship of the witness to the controversy and the parties,

3    the witness's bias or impartiality, the reasonableness of the

4    witness's statement, the strength or weakness of the witness's

5    recollection viewed in light of all of the other testimony and

6    evidence, and any other matter in evidence that may help you to

7    decide the truth and the importance of each witness's

8    testimony.

9              In other words, what you must try to do, in deciding

10   credibility, is to size a witness up in light of his or her

11   demeanor, the explanations given, and all of the other evidence

12   in the case.  You should use your common sense, your good

13   judgment, and your everyday experiences in life to make up

14   credibility determinations.

15             In passing upon the credibility of a witness, you may

16   also take into account any inconsistencies or contradictions as

17   to material matters in his or her testimony.

18             If you find that any witness has wilfully testified

19   falsely as to any material fact, you have the right to reject

20   the testimony of that witness in its entirety.  On the other

21   hand, even if you find that a witness has testified falsely

22   about one matter, you may reject as false that portion of his

23   or her testimony and accept as true any other portion of the

24   testimony which commends itself to your belief or which you may

25   find corroborated by other evidence in this case.  A witness

may be inaccurate, contradictory, or even untruthful in some

aspects, and yet may be truthful and entirely credible in other

aspects of his or her testimony.

The ultimate question for you to decide in passing

upon credibility is did the witness tell the truth before you.

It is for you to say whether his or her testimony at trial is

truthful in whole or in part.

In deciding whether to believe a witness, you should

specifically note any evidence of hostility or affection that

the witness may have towards one of the parties.  Likewise, you

should consider evidence of any other interest or motive that

the witness may have in cooperating with a particular party.

You should also take into account any evidence of any benefit

that a witness may receive from the outcome of the case.

It is your duty to consider whether the witness has

permitted any such bias or interest to color his or her

testimony.  In short, if you find that a witness is biased, you

should view his or her testimony with caution, weigh it with

care, and subject it to close and searching scrutiny.

Of course, the mere fact that a witness is interested

in the outcome of the case does not mean he or she has not told

you the truth.  It is for you to decide from your observations

and applying your common sense and experience and all the other

considerations mentioned whether the possible interest of any

witness has intentionally or otherwise colored or distorted his

M451RAY7

or her testimony.  You are not required to disbelieve an

interested witness; you may accept as much of his or her

testimony as you deem reliable, and reject as much as you deem

unworthy of acceptance.

You have heard evidence that, at some earlier time,

witnesses have said or done something that counsel argues is

inconsistent with their trial testimony.

Evidence of a prior inconsistent statement was placed

before you not because it is itself evidence of the guilt or

innocence of the defendant, but only for the purpose of helping

you decide whether to believe the trial testimony of a witness

who may have contradicted a prior statement.  If you find that

the witness made an earlier statement that conflicts with the

witness's trial testimony, you may consider that fact in

deciding how much of the witness's trial testimony, if any, to

believe.

In making this determination, you may consider whether

the witness purposely made a false statement or whether it was

an innocent mistake, whether the inconsistency concerns an

important fact, or whether it had to do with a small detail;

whether the witness had an explanation for the inconsistency,

and whether that explanation appealed to your common sense.

It is exclusively your duty, based upon all the

evidence and your own good judgment, to determine whether the

prior statement was inconsistent, and if so how much, if any,

M451RAY7

weight to give to the inconsistent statement in determining

whether to believe all, or part of, the witness's testimony.

You have heard evidence during the trial that

witnesses had discussed the facts of the case and their

testimony with the lawyers before the witnesses appeared in

court.  Although you may consider that fact when you are

evaluating a witness's credibility, I should tell you that

there is nothing either unusual or improper about a witness

meeting with lawyers before testifying, so that the witness can

be made aware of the subjects that he or she will be questioned

about, focus on those subjects, and have the opportunity to

review relevant exhibits before being questioned about them.

In fact, it would be unusual for a lawyer to call a witness

without such consultation.  Again, the weight you give to the

fact or the nature of the witness's preparation for his or her

testimony and what inferences you draw from such preparation

are matters completely within your discretion.

You have heard the testimony of several law

enforcement officials.  The fact that a witness may be employed

as a law enforcement official does not mean that his or her

testimony is necessarily deserving of more or less

consideration or greater or lesser weight than that of an

ordinary witness.

It is your decision, after reviewing all the evidence,

whether to accept the testimony of the law enforcement witness

M451RAY7

1    and to give to that testimony whatever weight, if any, you find

2    it deserves.

3           You have heard the testimony of a witness who

4    testified under a grant of immunity from this Court, called

5    formal immunity.  The testimony of such a witness may not be

6    used against such witnesses in any criminal case except in a

7    prosecution for perjury, giving a false statement, or otherwise

8    failing to comply with the immunity order of this Court.  You

9    are instructed that the government is entitled to call as a

10   witness a person who has been granted immunity by order of this

11   Court.  You should examine the testimony of such a witness as

12   you would any other witness, to determine whether or not it is

13   colored in any way to further the witness's own interests.  If

14   you believe the testimony to be true, you may give it any

15   weight you believe it deserves.

16          The fact that one party called more witnesses and

17   introduced more evidence than the other does not mean that you

18   should necessarily find the facts in favor of the side offering

19   the most witnesses.  By the same token, you do not have to

20   accept the testimony of any witness who has not been

21   contradicted or impeached, if you find the witness not to be

22   credible.  You also have to decide which witnesses to believe

23   and which facts are true.  To do this, you must look at all the

24   evidence, drawing upon your own common sense and personal

25   experience.  I have just discussed the criteria for evaluating

M451RAY7

credibility.  Keep in mind that the burden of proof is always on the government and the defendant is not required to call any witnesses or offer any evidence, since he is presumed to be innocent.

Now Mr. Ray did not testify in this case.  Under our Constitution, a defendant has no obligation to testify or to present any evidence, because it is the government's burden to prove Mr. Ray guilty beyond a reasonable doubt.  That burden remains with the government throughout the entire trial and never shifts to Mr. Ray.  A defendant is never required to prove that he is innocent.

You may not speculate as to why Mr. Ray did not testify.  There are many reasons why a defendant may decide not to testify.  You may not attach any significance to the fact that Mr. Ray did not testify.  No adverse inference against him may be drawn by you because he did not take the witness stand. You may not consider this against Mr. Ray in any way in your deliberations in the jury room.

I have just a little bit more to do.

Certain witnesses were offered as experts and permitted to express their opinions about matters that are in issue.  A witness may be permitted to testify to an opinion on those matters about which he or she has special knowledge, skill, experience, and training.  Such testimony is presented to you on the theory that someone who is experienced and

knowledgeable in the field can assist you in understanding the

evidence or in reaching an independent decision on the facts.

In weighing this opinion testimony, you may consider

the witness's qualifications, his or her opinions, the reasons

for testifying, as well as all of the other considerations that

ordinarily apply when you are deciding whether or not to

believe a witness's testimony.  You may give the opinion

testimony whatever weight, if any, you find it deserves in

light of all the evidence in this case.  You should not,

however, accept the testimony of an expert merely because I

allowed the witness to testify as an expert.  Nor should you

substitute it for your own reason, judgment, and common sense.

The determination of the facts in this case rests solely with

you.

You have heard the names of several people during the

course of the trial who did not appear here to testify and one

or more of the attorneys may have referred to their absence.  I

instruct you that each party had an equal opportunity, or lack

of opportunity, to call any of these witnesses.  However, the

government bears the burden of proof.  Mr. Ray does not bear

the burden of proof.  Therefore, you should not draw any

inference or reach any conclusions as to what these persons

would have testified to had they been called.  Their absence

should not affect your judgment in any way.

You should, however, remember my instruction that the

M451RAY7

law does not impose on a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

You also may not draw any inference, favorable or unfavorable, towards the government or towards Mr. Ray, from the fact that certain persons were not named as a defendant in the indictment here.  In addition, you are not allowed to speculate as to the reasons why other people are not on trial before you now.  The fact that these persons are not on trial here must play no part in your deliberations.

Your function now is to weigh the evidence in this case and to determine if the government has sustained its burden of proof with respect to each count of the indictment.

You must base your verdict solely on the evidence, and these instructions as to the law, and you are obliged under your oath as jurors to follow the law as I have instructed you, whether you agree or disagree with the particular law in question.

The verdict must represent the considered judgment of each juror.  In order to return a verdict, it is necessary that each juror agree to it.  Your verdict must be unanimous.

Let me also remind you that you took an oath to decide this case impartially, fairly, without prejudice or sympathy, and without fear, solely based on the evidence in the case and the applicable law.

M451RAY7

1          You have been chosen to try issues of fact and reach a

2     verdict on the basis of the evidence or lack of evidence.  Both

3     sides are entitled to a fair trial.  You are to make a fair and

4     impartial decision so that you come to a just verdict.

5          Let me give you a few instructions about your

6     deliberations before I meet with the lawyers for a moment.

7          First of all, all of the exhibits will be given to you

8     near the start of your deliberations.  That includes the audio

9     and video recordings and the computer spreadsheets that have

10    been admitted into evidence, all of which have been loaded onto

11    a flash drive, or more than one flash drive.

12         If you prefer to listen to or view any evidence here

13    in the courtroom, you can request that.  If you want any of the

14    testimony read back to you, you may also request that.  If you

15    want testimony read back to you, please try to be as specific

16    as you possibly can in requesting portions of the testimony,

17    because the court reporter will have to look through the

18    transcript, and the parties will have to agree on what portions

19    of the testimony may be called for in response to your request,

20    and if they disagree, I must resolve those disagreements.

21         Your requests for exhibits or testimony—in fact any

22    communications with the Court—should be made to me in writing,

23    signed by your foreperson, and given to one of the Marshals.

24    In any event, do not tell me or anyone else how the jury stands

25    on any issue until after a unanimous verdict is reached.

M451RAY7

1      If any one of you took notes during the course of the

2  trial, you should not show your notes to, or discuss your notes

3  with, any other jurors during your deliberations.  Any notes

4  you have taken are to be used solely to assist you.  The fact

5  that a particular juror has taken notes entitles that juror's

6  views to no greater weight than those of any other juror.

7  Finally, your notes are not to substitute for your recollection

8  of the evidence in the case.  If, during your deliberations,

9  you have any doubt as to any of the testimony, you may—as I

10  just told you—request that the official trial transcript that

11  has been made of these proceedings be read back to you.

12      You will soon retire to decide the case.  Your

13  function is to weigh the evidence in this case and to determine

14  the guilt or lack of guilt of the defendant with respect to

15  each count charged in the indictment.  You must base your

16  verdict solely on the evidence and these instructions as to the

17  law, and you are obliged on your oath as jurors to follow the

18  law as I instruct you, whether you agree or disagree with the

19  particular law in question.

20      It is your duty as jurors to consult with one another

21  and to deliberate with a view to reaching an agreement.  Each

22  of you must decide the case for himself or herself, but you

23  should do so only after a consideration of the case with your

24  fellow jurors, and you should not hesitate to change an opinion

25  when convinced that it is erroneous.  Discuss and weigh your

M451RAY7

respective opinions dispassionately, without regard to
sympathy, without regard to prejudice or favor for either
party, and follow my instructions on the law.

When you are deliberating, all 12 jurors must be
present in the jury room.  If a juror is absent, you must stop
deliberations.

Again, your verdict must be unanimous, but you are not
bound to surrender your honest convictions concerning the
effect or weight of the evidence for the mere purpose of
returning a verdict or solely because of the opinion of other
jurors.  Each of you must make your own decision about the
proper outcome of this case based on your consideration of the
evidence and your discussions with your fellow jurors.  No
juror should surrender his or her conscientious beliefs solely
for the purpose of returning a unanimous verdict.

Remember, at all times, you are not partisans.  You
are judges—judges of the facts.  Your sole interest is to seek
the truth from the evidence in the case.

If you are divided, do not report how the vote stands.
If you reach a verdict, do not report what it is until you are
asked in open court.

I have prepared a verdict form for you to use in
guiding your deliberation and recording your decision.  Please
use that form to report your verdict.

The first thing you should do when you retire to

M451RAY7

1    deliberate is to take a vote to select one of you to sit as

2    your foreperson, and then send out a note indicating whom you

3    have chosen.

4            The foreperson doesn't have any more power or

5    authority than any other juror, and his or her vote or opinion

6    doesn't count for any more than any other juror's vote or

7    opinion.  The foreperson is merely your spokesperson to the

8    Court.  He or she will send out any notes, and when the jury

9    has reached a verdict, he or she will notify the marshal that

10   the jury has reached a verdict, and you will come into open

11   court and give the verdict.

12           After you have reached a verdict, your foreperson will

13   fill in and date the form that has been given to you.  All

14   jurors must sign the form reflecting each juror's agreement

15   with the verdict.  The foreperson should then advise the

16   marshal outside your door that you are ready to return to the

17   courtroom.

18           I will stress that each of you must be in agreement

19   with the verdict which is announced in court.  Once your

20   verdict is announced by your foreperson in open court and

21   officially recorded, it cannot ordinarily be revoked.

22           In conclusion, ladies and gentlemen, I am sure that if

23   you listen to the views of your fellow jurors and if you apply

24   your own common sense, you will reach a fair verdict here.

25           Let me now meet with counsel.

M451RAY7

1              (At the sidebar)

2              THE COURT:  Any objections from the government?

3              MS. KEENAN:  Judge, I just noticed that at this point

4     you said "reckless" instead of "deliberate."  It's page 47.  I

5     think you might have intended to say "reckless" and maybe it's

6     mistyped here.

7              THE COURT:  Let me look at that.  We're looking at

8     page 47 of the charge.

9              MS. KEENAN:  Seems like my page 47 is different from

10    your page 47.

11             It's discussing element two.

12             THE COURT:  Yes, I see it.  And I said "reckless."

13             MS. KEENAN:  "Reckless," yes.

14             THE COURT:  So we can correct that in terms of --

15    well, let me see what the defense says.  Do you have a position

16    with respect to --

17             MS. KEENAN:  I think it should be "deliberate."

18             THE COURT:  It should be "deliberate," and I said

19    "reckless."

20             MR. KELLY:  And I'm not seeing what everyone is

21    pointing out, so can we --

22             MS. GLASHAUSSER:  I noted it as well.

23             MR. KELLY:  Okay.  Then no objection, right?

24             MS. GLASHAUSSER:  Just correcting it in writing when

25    it goes back?  Yes, that's fine.

M451RAY7

1          MS. KEENAN:  And then, your Honor, on the next page, I

2     think you said -- if the instructions are going back, it says

3     fraud.

4          THE COURT:  I agree with that.  I did not read fraud.

5          MR. KELLY:  Correct.

6          THE COURT:  There were a couple of typos that I

7     caught.  So we'll send you a blackline version of what will go

8     to the jury.  Mr. Kelly, anything?  Your objections are

9     preserved.

10          MS. SASSOON:  I have one more thing.

11          THE COURT:  Sorry.

12          MS. SASSOON:  This is right before the special

13     sentencing factor.  In my version it's 72.  So it's right

14     before we get to Count Two and right before the special

15     sentencing factor.  So we didn't raise this objection before,

16     but it currently says, "You must be unanimous as to which two

17     or more such predicate acts you find they agreed to commit."  I

18     think that potentially suggests that if there's a juror who

19     thinks there are more than two, they would have to be unanimous

20     about that.  So we would suggest in the written version that

21     goes back to the jury it say something like, "At a minimum, you

22     must be unanimous as to two of the predicate acts you find they

23     agreed to commit."

24          THE COURT:  Any objection to that?

25          MS. LENOX:  I don't think it's confusing as written,

M451RAY7

1   but --

2           THE COURT:  Let me think about it in terms of what

3   goes back.

4           MR. KELLY:  Is that all?  Does the government have any

5   more?

6           MS. SASSOON:  No.

7           MR. KELLY:  I would just note, I wanted to be clear as

8   to why the Court read the theory of the defense only within the

9   tax counts and then moved on to the VCAR accounts.

10          THE COURT:  Because it only applies to the tax counts.

11          MR. KELLY:  Obviously we object to that.  I just

12  wanted to note that on the record.

13          MS. GLASHAUSSER:  We I think also understood, the way

14  it was written, our version of the charge, that it was going to

15  be read right before venue.

16          MR. KELLY:  Right.  After VCAR, before venue.

17          MS. GLASHAUSSER:  As written here, after venue.

18          THE COURT:  I don't know what significance that may

19  have, if this is reviewed up above, but just so the record is

20  clear, what we passed out to the government and the defendant

21  made it clear up top where this would be read and made the

22  language clear.  If you have an objection, your objection is

23  preserved.

24          MS. SASSOON:  Is there any defense contention that

25  this was relevant to the VCAR, the one charge that came after?

M451RAY7

1      MS. GLASHAUSSER:  Our contention is that our theory of

2  the defense was relevant to all the charges and should have

3  been read after the charges, which is where the place holder

4  was in the charge, and I guess what we would ask is that it be

5  placed there in the written version that's going back to the

6  jury.

7      THE COURT:  I already ruled; and the second, I don't

8  think it is relevant to the other charges, but this was the

9  subject of the charging conference.  So you've got your

10 objection.  I'm not going to move its placement.

11     MS. GLASHAUSSER:  I understand, but just so the record

12 is clear, the charging conference, we understood it was going

13 to be placed after the other charges.  But logistically, in the

14 charge itself, the placeholder for the theory of the defense

15 was after the charges.

16     THE COURT:  I will put it on the docket, but the

17 charge that I handed out said, up top, this was to be placed

18 before VCAR.

19     Okay.  So what I'm going to do is I'm going to excuse

20 the alternates and tell the members of the jury they can retire

21 and then they can decide what they're going to do.

22     (In open court)

23     THE COURT:  You may all be seated.

24     So, that concludes my charge.  Before the jurors

25 retire into the jury room, I must excuse our alternate, who is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M451RAY7

Juror No. 13, with the thanks of the Court.  Juror No. 13, you have been very attentive and very patient.  I'm sorry that you're going to miss the experience of deliberating with the jury, but the law provides for a jury of 12 persons in this case.  So before the rest of the jury retires into the jury room, if you have any clothing or objects there, you are asked to pick them up and to withdraw before any deliberations begin.  So you may, Juror No. 13, leave now.

Please do not discuss the case with anyone or research the case over the next few days, Juror No. 13.  It is possible -- and I have had this occur in a trial -- that unexpected developments, such as a juror's serious illness, may require the substitution of a deliberating juror by an alternate.  And so it's vital that you not speak to anyone about the case or research the case until you have been notified that the jury's deliberations are over and the jury has been excused.  And if you would like to be advised of the outcome of the trial, please make sure that Mr. Fishman has a phone number at which you can be reached.

(Alternate excused)

THE COURT:  And now, members of the jury, you may now retire to begin your deliberations.  The Marshal will be sworn before you retire, by my deputy.

(Marshal sworn)

THE COURT:  Members of the jury, you may now retire.

M451RAY7

1   Everybody, please stand for the jury.

2              THE DEPUTY CLERK:  All rise.

3              (At 4:16 p.m., the jury retired to deliberate)

4              THE COURT:  Be seated.

5         I will note for the record that during my charge,

6   there have been the fewest people in this courtroom than the

7   courtroom has seen in the last four weeks, and I take no

8   offense at that.

9         I think we've got an approved verdict form, so we'll

10  get that to the jurors.  And overnight we will get you a

11  blackline of the jury charge with some of the typos that we

12  caught.  I would ask the parties to let us know by email

13  whether they've got any objections to the typos that we've

14  caught or any of those changes, and we can put those objections

15  on the docket.

16        You should all make sure that you're close to the

17  courthouse tomorrow morning.

18        Is there anything else from the government that we

19  should discuss?

20             MS. SASSOON:  I just want to confirm that we're

21  sticking with the 9 a.m. schedule?

22             THE COURT:  Yes.

23             MS. SASSOON:  And can you provide your deputy our

24  cellphone numbers in the event of juror notes?

25             THE COURT:  Can you do what?

M451RAY7

|     |                                                                        |
| --- | ---------------------------------------------------------------------- |
| 1   | MS. SASSOON:  In the event of juror notes, would the                   |
| 2   | Court like to communicate with us by cell or by email?                 |
| 3   | THE COURT:  I mean, what's the quickest way to reach                    |
| 4   | you all?                                                                |
| 5   | MS. SASSOON:  Cellphone.                                                |
| 6   | THE COURT:  Okay.  Then just make sure that                            |
| 7   | Mr. Fishman has your cellphones.                                        |
| 8   | Is that the same, Ms. Lenox, for the defense?                          |
| 9   | MS. LENOX:  Yes.  I'm sorry.  My voice is going.                        |
| 10  | THE COURT:  I understand.  Mine too.                                    |
| 11  | Ms. Glashausser, is that okay for cellphones?                          |
| 12  | MS. GLASHAUSSER:  Yes, your Honor.                                      |
| 13  | THE COURT:  Just make sure that Mr. Fishman has your                   |
| 14  | cellphone.  He's left, so just email the cellphone numbers.            |
| 15  | Is there anything else, Ms. Glashausser or Mr. Kelly?                  |
| 16  | I've not called on you, Ms. Lenox.                                      |
| 17  | MS. GLASHAUSSER:  No, your Honor.                                       |
| 18  | MS. SASSOON:  I'm a little confused as to the                          |
| 19  | procedure now.  Is the jury dismissed or are they selecting a          |
| 20  | foreperson?                                                             |
| 21  | THE COURT:  I think they're selecting a foreperson and                 |
| 22  | they're going to figure out when they're done deliberating for         |
| 23  | the day, right?  It's going to be up to them.  Okay.                    |
| 24  | (Recess pending verdict, 4:19 p.m.)                                     |
| 25  | (Adjourned to April 6, 2022, 9:00 a.m.)                                 |