UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------- X
                                                  :

UNITED STATES OF AMERICA,             :

           -v-                         :

                                                  :             20-cr-110 (LJL)

LAWRENCE RAY,                             :

                                 :        OPINION AND ORDER

                          Defendant.        :

                                                 :

--------------------------------------------------------------------- X

LEWIS J. LIMAN, United States District Judge:

       Defendant Lawrence Ray ("Ray" or "Defendant") moves, pursuant to Federal Rule of

Criminal Procedure 29, to dismiss all counts against him due to insufficient evidence.  For the

reasons that follow, the motion is denied.

## BACKGROUND

       Defendant was charged in a second superseding indictment returned by the grand jury on

January 13, 2022, in seventeen counts (the "Second Superseding Indictment").  Dkt. No. 292.

Count One charged Ray with racketeering conspiracy in violation of 18 U.S.C. § 1962(d).  Count

Two charged Ray with extortion conspiracy in violation of 18 U.S.C. § 1951.  Count Three

charged Ray with extortion in violation of 18 U.S.C. §§ 1951 and 2.  Count Four charged Ray

with sex trafficking in violation of 18 U.S.C. §§ 1591 and 2.  Count Five charged Ray with

conspiracy to commit sex trafficking in violation of 18 U.S.C. § 1594.  Count Six charged Ray

with forced labor in violation of 18 U.S.C. §§ 1589 and 2.  Count Seven charged Ray with forced

labor trafficking in violation of 18 U.S.C. §§ 1590 and 2.  Count Eight charged Ray with forced

labor conspiracy in violation of 18 U.S.C. § 1594.  Counts Nine and Ten charged Ray with two

counts of use of interstate commerce to promote unlawful activity in violation of the Travel Act,

18 U.S.C. §§ 1952(a)(3)(B) and 2.  Count Eleven charged Ray with money laundering in

violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), (ii), and 2.  Counts Twelve to Sixteen charged Ray with tax evasion for each of the years 2015 to 2019 in violation of 26 U.S.C. § 7201.  Count Seventeen charged Ray with committing a violent crime in aid of racketeering ("VICAR") in violation of 18 U.S.C. § 1959(a)(3).

Trial of the case began on March 10, 2022.  Dkt. No. 510.  Prior to trial, the Government agreed to dismiss one of the six tax evasion counts, which was then numbered Count Twelve of the Second Superseding Indictment charging tax evasion for the year 2015, and one of the two Travel Act violations, which was then numbered Count Ten of the Second Superseding Indictment charging extortion in violation of the Travel Act.  *See* Dkt. No. 502.  During the trial, the Government called eighteen witnesses.  Based on the Jury verdict, five of those witnesses can now be characterized as Defendant's victims[1]: Santos Rosario, Felicia Rosario, Yalitza Rosario, Maritza Rosario, and Claudia Drury ("Drury").  Santos Rosario, Felicia Rosario, and Yalitza Rosario are siblings and Maritza Rosario is their mother; Santos Rosario was a classmate of Defendant's daughter, Talia Ray, at Sarah Lawrence College.  Six of the witnesses were members of law enforcement: Mark Lubin, a forensic accountant with the Federal Bureau of Investigation ("FBI"); Special Agent Kelly Maguire of the FBI, the case agent on the matter; Special Agent Rachel Graves of the Child Exploitation and Human Trafficking Task Force; Mathew Frost, a forensic examiner with the FBI; Stephen Flatley of the FBI's Computer Analysis Response Team; and Revenue Agent Valeria Catanzaro of the Internal Revenue Service.  Four of the Government witnesses were non-victim lay witnesses: Kyle Sliger, an employee of GoDaddy.com; Julie Gonzalez, a physician and classmate of Felicia Rosario, who

---

[1] In an Order dated February 24, 2022, the Court granted in part Defendant's motion in limine prohibiting the Government from referring to the alleged victims as "victims" outside of its jury addresses.  *See* Dkt. No. 382 at 55–57.

testified to Felicia Rosario's request for money from her; Carlos Pagan, a doorman in the building where Defendant resided with his victims; and one of Drury's clients.  Finally, the Government called two expert witnesses—Dawn Hughes, a clinical and forensic psychologist, and Andrew Petersohn, a radio frequency engineer trained in cell-site analysis—and a paralegal from the United States Attorney's Office for the Southern District of New York.  The defense recalled John B. Minor as a rebuttal expert to Government expert Andrew Petersohn and recalled Glenn Ripa, Esq.

As summarized below, the evidence showed that Defendant unleashed a campaign of terror on his victims, all college classmates of his daughter.  He initially befriended them and then, once they were caught in his snare, he steadily groomed them, turned them into his slaves, forced them to engage in labor for his own benefit and the benefit of his relatives, extorted them, and tortured them.  He also sex-trafficked one of his victims, Drury.

On April 6, 2022, the Jury returned a verdict of guilty on all counts.  Dkt. No. 502.  In addition, the Jury found Defendant guilty of the special sentencing factor charged in connection with Count One.  *See id*. at 1.  In connection with the count charging VICAR, the Jury also found Defendant guilty of assault in the second degree under New York State Penal Law § 120.05 and menacing in the second degree under New York Penal Law § 120.14.  *Id.* at 4.

At the conclusion of the Government's case, the defense moved, pursuant to Federal Rule of Criminal Procedure 29, to dismiss each count of the Indictment on the grounds that there was insufficient evidence of defendant's guilt.  The motion was cursory.  At that point, the defense "highlight[ed] just one are[a] of insufficiency."  Tr. 2505.  It claimed that the Government introduced insufficient evidence to support that there was a second degree assault, which was one of the predicate crimes charged to support the VICAR count in the indictment, because there

was insufficient testimony establishing physical injury or impairment of physical condition of Ms. Drury. *Id.* The defense also argued that the second predicate crime alleged to support the VICAR count, misdemeanor menacing under New York law, was not a crime of violence under VICAR. *Id.* The Court reserved judgment on the motion. *Id.* at 2506.

On April 4, 2022, at the conclusion of all of the evidence, the defense renewed its Rule 29 motion. Tr. 2768–69. The motion was similarly cursory. The defense noted the one area of insufficiency it had "highlighted" earlier. Tr. 2768. It also addressed what it called "a second area of insufficiency related to the tax counts." *Id.* The defense argued that the Government's burden of proof to show that income was taxable for the tax evasion counts also carried with it the burden to show that exceptions do not apply. *Id.* The defense argued that the Government had not proved that the exception for payments made as restitution for damages for physical injury did not apply. *Id.* at 2768–69. The Court once again reserved judgment. *Id.* at 2769.

At the conclusion of trial, the Court invited post-judgment briefing. By letter of June 8, 2022, the defense notified the Court that it did not plan on filing any additional post-trial motions but requested a ruling on the oral Rule 29 motions it made for dismissal due to insufficient evidence. Dkt. No. 565. The Government responded by letter on July 18, 2022. Dkt. No. 575. The defense declined to reply.

On November 1, 2022, the Court invited briefing from the parties on three specific questions related to the VICAR count: (1) whether there was sufficient evidence that Female Victim-1 suffered "physical injury" as defined in New York Penal Law § 9; (2) whether the Court should apply a categorical approach to 18 U.S.C. § 1959, *see United States v. Keene*, 955 F.3d 391 (4th Cir. 2020); and (3) if the Court applies a categorical approach to 18 U.S.C. § 1959,

4

whether the crime of menacing in violation of New York Penal Law § 120.14 is broader than assault with a dangerous weapon under 18 U.S.C. § 1959.  Dkt. No. 591.  The defense submitted a letter brief on November 8, 2022.  Dkt. No. 594.  The Government submitted a letter brief in response on November 10, 2022.  Dkt. No. 595.  The Court held oral argument on November 21, 2022.

## STANDARD OF REVIEW

"A defendant challenging a conviction on sufficiency grounds undertakes a 'heavy burden.'"  *United States v. Cuti*, 720 F.3d 453, 461 (2d Cir. 2013) (quoting *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011)).  "A judgment of acquittal can be entered 'only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'"  *Id.* (quoting *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004)).  A conviction must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Persico*, 645 F.3d 85, 105 (2d Cir. 2011).  In considering the sufficiency of the evidence supporting a guilty verdict, the evidence must be viewed "in the light most favorable to the Government."  *United States v. George*, 779 F.3d 113, 115 (2d Cir. 2015).  The Court must analyze the pieces of evidence "in conjunction, not in isolation."  *Persico*, 645 F.3d at 104 (quoting *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008)).  The Court exercises an "'exceedingly deferential standard of review,' under which 'we must analyze the evidence in the light most favorable to the prosecution' and credit 'every inference that the jury may have drawn in the government's favor.'"  *United States v. Liu*, 2022 WL 14177192, at *2 (2d Cir. Oct. 25, 2022) (quoting *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008)).

## DISCUSSION

The evidence at trial was sufficient for the Jury to reach a verdict of guilty on all counts. Following textbooks that Defendant collected and studied on psychological manipulation, false confessions, and brainwashing, he turned a group of young students—his daughter's college classmates and their siblings—into his slaves.  Over a period first of months and then of years, Defendant steadily took over the minds and the bodies of his victims.  He induced them to trust him and to believe he was all powerful and all knowing.  Having gained their trust and convinced them to accept his lies as their truths, Defendant made these impressionable young individuals doubt their own memories and knowledge, cut off relations with all other adults who might otherwise have offered support and guidance, and then—having induced them to manufacture false confessions with which he could threaten them with prison or worse—he forced them to do his bidding.

Defendant does not identify any respects in which the evidence was deficient on the charges of racketeering conspiracy, extortion conspiracy, extortion, sex trafficking, conspiracy to commit sex trafficking, forced labor, forced labor trafficking, forced labor conspiracy, the Travel Act violations, or money laundering.  The Court describes below only some of the overwhelming evidence that supports the Jury's verdict.  The other evidence that is not described is no less damning, but it is unnecessary to detail this evidence to support the Court's (and the Jury's) conclusions.

### A.     Racketeering Conspiracy

The evidence supports the Jury's conviction of Defendant for racketeering conspiracy. The Court properly, and without objection, charged the Jury that to find Defendant guilty of racketeering conspiracy, it would have to conclude: (1) that there was an agreement among two or more persons to participate in an enterprise that would affect interstate commerce through a

pattern of racketeering activity; (2) that the defendant knowingly and willfully became a member

of that agreement; and (3) that the defendant or another member of the conspiracy agreed to

commit two racketeering acts.  *See United States v. Hicks*, 5 F.4th 270, 275 (2d Cir. 2021), *cert.*

*denied*, 212 L. Ed. 2d 34, 142 S. Ct. 1157 (2022); *United States v. Zemlyansky*, 908 F.3d 1, 11

(2d Cir. 2018).  The Court further instructed that "an 'enterprise' is a group of people who have

associated together for a common purpose of engaging in a course of conduct over a period of

time" and who "in addition to having a common purpose, must have an ongoing organization,

either formal or informal, and . . . must have a core of personnel who function as a continuing

unit."  *See Boyle v. United States*, 556 U.S. 938, 946 (2009).  The Court instructed the Jury on

each of the nine types of predicate acts charged in the indictment: (1) acts involving extortion

and conspiracy to commit extortion in violation of federal law, specifically the Hobbs Act, 18

U.S.C §§ 1951 and 2; (2) acts involving extortion, conspiracy to commit extortion, and attempted

extortion in violation of New York State Penal Law §§ 155.05(2)(e), 155.40(2), 110.00, and

20.00; (3) acts involving sex trafficking by force or coercion in violation of federal law,

specifically 18 U.S.C.§§ 1591 and 2; (4) acts involving forced labor in violation of federal law,

specifically 18 U.S.C.§§ 1589 and 2; (5) acts involving forced labor trafficking in violation of

federal law, specifically 18 U.S.C.§§ 1590 and 2; (6) acts involving the use of interstate

commerce to promote unlawful activity, in violation of federal law, specifically 18

U.S.C.§§  1952 and 2; (7) money laundering, in violation of federal law, specifically, 18

U.S.C.§§ 1956 and 2; (8) acts involving witness tampering, in violation of federal law,

specifically 18 U.S.C.§§ 1512 and 2; and (9) acts involving obstruction of justice in violation of

federal law, specifically 18 U.S.C.§§ 1503 and 2.  Tr. at 2977–2978.

There was evidence to satisfy each of the elements of a racketeering conspiracy.  The enterprise consisted of "the Ray Family."  It was comprised of Defendant, his daughter Talia Ray, and Defendant Isabella Pollok ("Pollok") and over time it came to include Ray's father-in-law Gordon Ray and his biological father, Lawrence Grecco ("Grecco").  The Ray Family had structure and form, had an ongoing organization, and had a singular illegal purpose, to extort and sex traffic its victims and to force them to engage in labor.  And it had longevity; the Ray Enterprise was formed as early as 2010 when the victims were first targeted, it continued through at least 2020 when Defendant sent messages as part of an effort to keep his victims silent, and—but for the investigation and prosecution—it would have had no logical endpoint.  Members of the enterprise achieved its illegal purposes through violence and threats of violence and through "collateral"—false confessions—that Defendant manufactured and that the Ray Family collected and maintained to engage in extortion and to ensure their victim's silence.  The Jury could find that each member of the Ray Family had his or her assigned role.  Defendant controlled the enterprise and was its leader.  He groomed his victims, spun the stories that resulted in false confessions, and used this material to force his victims to turn over money to him, to engage in forced labor, and to commit commercial sex acts.  Talia Ray, Defendant's daughter, introduced Defendant to her friends, helped him interrogate them and elicit the confessions that became their collateral, and participated in the victim's extortion and forced labor.  Pollok, the associate, recorded the interrogations and retrieved the confessions when needed, collected and kept track of Drury's sex trafficking proceeds, participated with Ray in the assault on Drury, and threatened the victims with humiliation and prosecution if they did not keep their silence.  The Jury could find that both Talia Ray and Pollok participated in the money laundering; the illegal proceeds were collected by them and funneled through accounts in their names.  Ray's father-in-law and

8

his biological father had lesser, but still important, roles in the Ray Family enterprise. Some of the forced labor was conducted on Gordon Ray's property. When the victims were finally able to break free from the Ray Family, Grecco made threats on behalf of Defendant in an attempt to interfere with the investigation and to convince the victims to maintain their silence. Ultimately, all of the members of the enterprise benefitted financially from its illegal activities, including Defendant who benefited to the tune of millions of dollars.

There also was extensive evidence that Defendant knowingly and willfully became a member of the agreement among the Ray Family and that Defendant and members of the conspiracy agreed to—and did—commit two racketeering acts. As noted, Defendant was the leader of the enterprise. The Jury could easily find that he agreed with each of the members of the Ray Family to engage in its illegal affairs. As laid out below, in connection with each of the substantive counts, far more than the two required by law, Defendant agreed to and did engage in the alleged racketeering acts, all to further the affairs of the enterprise. The Court now turns briefly to those substantive counts.

### B.      Extortion and Extortion Conspiracy

Count Two charged Ray with extortion conspiracy in violation of 18 U.S.C. § 1951 and Count Three charged Ray with extortion in violation of 18 U.S.C. §§ 1951 and 2. The elements of Hobbs Act extortion are (1) the defendant wrongfully obtained the property of another; (2) the defendant obtained the property with his victim's consent, but that the consent was compelled by the wrongful use or threat of force, violence, or fear; and (3) as a result of the defendant's actions, interstate commerce, or an item moving in interstate commerce, was delayed, obstructed, or affected in any way or degree. *See United States v. Coppola*, 671 F.3d 220, 238 (2d Cir. 2012). The elements of extortion conspiracy are (1) there was an agreement or understanding among two or more persons to extort money from the victims; and (2) the defendant unlawfully,

intentionally, and knowingly became a member of the conspiracy.  *See United States v. Mulder*, 273 F.3d 91, 109 (2d Cir. 2001).

The evidence of extortion and extortion conspiracy was overwhelming.  The Jury heard evidence from several victims about how Defendant used psychological manipulation, violence, and the threat of violence to induce them to make false confessions.  The Jury also heard evidence that Defendant used these false confessions, and the threat that he would either make them public or report them to law enforcement, to force his victims to turn over hundreds of thousands of dollars obtained from their parents and, in the case of one of Defendant's victims, from the proceeds of commercial sex acts.  To take one example, Defendant psychologically and physically coerced Drury to make false confessions that she poisoned Ray and her college roommates.  Ray then used these confessions, and the threat that he would make the confessions public or report Drury to law enforcement, to induce Drury to engage in acts of prostitution and to turn over the proceeds to him.  Defendant's extortion did not stop there.  Defendant collected further incriminating information about Drury and those to whom she became close, including the identities of her clients.  He then used this information, and the threat that he would expose the information on "claudiadrury.com," a domain name he purchased and a website that he created, if Drury did not continue to engage in acts of prostitution for his benefit.  Additionally, as discussed below in connection with Drury's assault at the Gregory Hotel, Defendant used physical and violent force to extort money from Drury and to force her to continue to engage in prostitution.

Drury was just one of Defendant's many victims.  To give just one more example, the Jury also heard from the Rosario siblings.  One of them was Santos Rosario.  He testified that Defendant physically and psychologically coerced him into making false confessions that he

caused significant property damage to Defendant's and Talia Ray's property, including to a refrigerator, tools, cookware, and a purse. Defendant then used Santos Rosario's confessions, and the threat that he would use the videotaped confession against him, to force Santos Rosario to pay him hundreds of thousands of dollars. The Jury saw a video of Defendant acting violently towards Santos Rosario in front of his other victims, Felicia Rosario and Drury. The Jury saw videos and heard audio of Defendant threatening further violence and threatening to post the false confessions if Santos Rosario did not do as Defendant wished. The message to Defendant's victims was unmistakable: Defendant was capable of extreme violence and cruelty and his victims would suffer the same if they did not cater to his wishes. The record contains other examples.

At Defendant's request, the Court gave a charge on the theory of the defense. Specifically, the Court instructed the Jury that the defense had "asserted that Mr. Ray believed that he was entitled to the property at issue." Tr. 2983. The Court further instructed the Jury that if it concluded "the actual or threatened use of force or violence or the fear of injury" was "inherently wrongful" then Defendant's actions would not be justified by a claim of right to the property. *Id.* The Jury was also to consider whether Defendant obtained the property through other wrongful means, such as threats of reputational or financial harm. *Id.* But the Court instructed the Jury that "[a] defendant cannot be found to have acted wrongfully on the basis that he obtained property by fear of economic or reputational harm if the defendant had a good faith and plausible entitlement to the property demanded and if there is a nexus between the threat and the claim of right." *Id.* at 2983–84; *see United States v. Zappola*, 677 F.2d 264, 267–269 (2d Cir. 1982); *United States v. Clemente*, 640 F.2d 1069, 1077 (2d Cir. 1981).

The Jury had sufficient evidence to decisively reject Defendant's theory of the defense because Ray obtained the property through the actual or threatened use of force or violence. Specifically, and not by way of limitation, the Jury heard evidence that on the night of October 15, 2018 into the morning of October 16, 2018, Ray and his co-conspirator Pollok broke into Drury's room at the Gregory Hotel in Manhattan.  Ray and Pollok expressed anger that Drury was becoming close to one of her clients and physically and psychologically abused her: They forced Drury to undress, tied her to a chair, poured water over her while she was blasted with cold air from an air conditioning unit, held a plastic bag over her head repeatedly so that she had trouble breathing, and threatened her life.  Ray and Pollok took these actions to force Drury to "focus on work"—*i.e.*, generating sex trafficking proceeds to satisfy their extortion demands. The Jury heard an audiotape of this encounter.  It then heard testimony and saw evidence that a day later, Drury was forced to hand over an additional $4,000 in prostitution proceeds.

It also heard testimony from Santos Rosario that Defendant physically assaulted him and threatened him with further violence if he did not turn over what Defendant falsely claimed was restitution for damage that Santos Rosario caused to his property.  Defendant's other victims, Felicia Rosario and Drury, watched Defendant's violent behavior while it was happening.  The Jury saw video of these encounters in the courtroom.  Defendant's acts did instill, and naturally would have instilled, terror in the minds of Defendant's victims of the consequences that would follow if they did not comply with Defendant's demands to find money for him.

There also was evidence that Defendant used the threat of reputational harm to extort money from his victims without any good faith and plausible entitlement to that property and without a nexus between the threat and Defendant's claim of right.  *See United States v. Jackson*, 180 F.3d 55, 70 (2d Cir.), *on reh'g*, 196 F.3d 383 (2d Cir. 1999).  The evidence in this area was

extensive.  For example, and as noted above, Defendant set up a website in the name of one of

his victims, Drury, and threatened to publish—and eventually did publish—information that was

embarrassing to her and to those she cared about unless she continued to engage in sex work and

make payments to him.  The Jury could conclude Defendant had no good faith or plausible

entitlement to Drury's prostitution earnings.  Defendant did not offer any affirmative evidence

that he was harmed by any of his victims—much less by the extraordinary amounts he

received—and thus entitled to restitution.  There was no nexus between his threats and his

alleged claim of right.

### C.      Forced Labor, Forced Labor Trafficking, and Forced Labor Conspiracy

The evidence at trial was also sufficient to convict Defendant of forced labor, forced

labor trafficking, and forced labor conspiracy.  Forced labor is a crime under 18 U.S.C. § 1589.

The elements of the crime of forced labor under § 1589 are, (1) the defendant obtained or

provided the labor or services of another; (2) the defendant did so through one of the following

prohibited means: (a) through force, physical restraint, or the threat of either against a person or

another person; (b) through serious harm or threats of serious harm to the person or another

person; (c) through abuse or threatened abuse of the legal process; or (d) through the use of a

scheme, plan, or pattern intended to cause the person to believe that the non-performance of such

labor or services could result in serious harm to or physical restraint against that person or

another person; and (3) the defendant acted knowingly.  *See United States v. Kelly*, 2022 WL

2316177, at *35 (E.D.N.Y. June 29, 2022); *United States v. Sabhnani*, 539 F. Supp. 2d 617, 629

(E.D.N.Y. 2008), *aff'd*, 599 F.3d 215 (2d Cir. 2010).[2]  The elements of forced labor trafficking

---

[2] 18 U.S.C. § 1589 provides in part:

> Whoever knowingly provides or obtains the labor or services of a person by any one of,
> or by any combination of, the following means–

under 18 U.S.C. § 1590 are, (1) the defendant recruited, harbored, transported, provided, or obtained an individual; (2) the defendant did so for the purpose of providing or obtaining the labor or services of an individual in violation of the forced labor statute, *i.e.*, the defendant "trafficked" an individual with the purpose of providing or obtaining her labor or services by means of serious harm, or threats of serious harm, to that individual or another person, by means of the abuse or threatened abuse of law or legal process, or by means of any scheme, plan, or pattern intended to cause an individual to believe that, if the individual did not perform such labor or services, the individual or another person would suffer serious harm or physical restraint; and (3) the defendant acted knowingly. *See* 18 U.S.C. § 1590; *Adia v. Grandeur Mgmt., Inc.*, 933 F.3d 89, 94 (2d Cir. 2019) ("Section 1590 employs the disjunctive 'or' in delineating the ways in which a defendant can violate the statute.  Therefore, if a defendant violates section 1589, he also violates section 1590 if he recruited the person to perform forced labor.").

The Jury heard and saw evidence that Defendant forced his victims to come to Pinehurst, North Carolina in the summer of 2013 to perform grueling physical labor on the property of Defendant's stepfather, Gordon Ray.  It also saw evidence of the physical force that Defendant

---

(i)   by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

(ii)  by means of serious harm or threats of serious harm to that person or another person;

(iii) by means of the abuse or threatened abuse of law or legal process; or

(iv)  by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, shall be guilty of a crime.

employed to get his victims to do manual labor.  And it saw evidence of the threats of further physical force—that Defendant conveyed through the violence that he inflicted—if his victims did not work as commanded.  The evidence represents paradigmatic forced labor.  The Jury also heard evidence of Defendant's abuse or threatened abuse of law or legal process to compel his victims to perform physical labor on his behalf and on behalf of his stepfather.  For example, he drove Felicia Rosario to a police station to be booked and held in jail, using the confessions that he extracted as leverage.  These actions conveyed that Ray had both the ability and the will to use legal process to imprison Felicia Rosario if she did not continue to work on his behalf.  He conveyed the same threat to use the law or legal process to compel Yalitza Rosario to perform physical labor.

The fact that Defendant recruited his victims from New York City and arranged for their transportation to North Carolina supports the conviction for forced labor trafficking.  The conviction for forced labor conspiracy was supported by, among other things, evidence of Talia Ray's involvement in and agreement to the crime of forced labor.

### D.    Sex Trafficking, Sex Trafficking Conspiracy, and Travel Act

The evidence before the Jury was easily sufficient to convict Defendant of sex trafficking and sex trafficking conspiracy and of the Travel Act charge in connection with sex trafficking and prostitution.  The crime of sex trafficking by force, threats of force, or coercion, or any combination of such means under 18 U.S.C. § 1591 has three elements: (1) a person knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited the victim or knowingly benefitted, financially or by receiving anything of value, from participating in a venture that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited the victim; (2) the person knew or recklessly disregarded the fact that force, threats of force, or coercion, or any combination of such means,

would be used to cause the victim to engage in a commercial sex act; and (3) the person's acts were in or affecting interstate or foreign commerce.  *See* 18 U.S.C. § 1591(a); *United States v. Shine*, 2022 WL 761520, at *1–2 (2d Cir. Mar. 14, 2022).  To prove the crime of sex trafficking conspiracy, the Government had to establish that: (1) from in or about 2011 to on or about 2019, there was an agreement or understanding among two or more persons to sex traffic a person, and (2) the defendant unlawfully, intentionally, and knowingly became a member of the conspiracy. *See United States v. Vanier*, 2021 WL 5989773, at *10 (S.D.N.Y. Dec. 17, 2021) (elements of conspiracy).  To prove a violation of the Travel Act, the Government must prove (1) the defendant used or caused someone else to use an interstate facility; (2) the use of an interstate facility was done with the intent to promote, manage, establish, or carry on an unlawful activity; and (3) after this use of an interstate facility, such person performed or attempted to perform an act in furtherance of this same unlawful activity.  *See United States v. Salameh*, 152 F.3d 88, 152 (2d Cir. 1998); *United States v. Jenkins*, 943 F.2d 167, 172 (2d Cir. 1991).  The Indictment charged as the unlawful activity (i) prostitution, in violation of New York Penal Law § 230.00; (ii) promoting prostitution in the fourth degree, in violation of New York Penal Law § 230.20; (iii) promoting prostitution in the third degree, in violation of New York Penal Law § 230.25; or (iv) promoting prostitution in the second degree, in violation of New York Penal Law § 230.30.

There was sufficient evidence for the Jury to find Defendant guilty of these crimes from Drury's and Felicia Rosario's testimony and the ample documentary evidence offered at trial. Defendant groomed Drury to engage in prostitution by normalizing deviant and commercial sex acts.  He then induced her to engage in sex acts for his financial benefit by causing her to make additional incriminating "confessions" through his campaign of physical terror and psychological coercion.  Then, when Drury was unable to meet his financial demands, Defendant suggested

that she engage in commercial sex acts.  But Drury could not satisfy Defendant's insatiable demands for more and more money, so he pushed her to engage in more and more commercial sexual activity—every day, weeks on end, for years.  Defendant's use and threats of force reached its pinnacle but not its conclusion in the attack at the Gregory Hotel where Defendant tortured Drury so that she would "focus on work" and engage in ever more commercial sexual activity for his benefit.  In sum, through force, threats of force, and coercion, Defendant forced Drury to engage in commercial sexual activity solely for his financial benefit.

In sex trafficking Drury, Defendant did not act alone.  He acted with his confederate Pollok who collected the money, kept track of Drury's activity, and assisted in laundering the proceeds.  The evidence establishes sex trafficking conspiracy.

Moreover, this activity, which was the direct result of Defendant's violence and threats, occurred across state lines.  Drury traveled from New York to New Jersey for the purposes of engaging in commercial sex acts and Defendant used the facilities of interstate commerce to communicate with Drury and to further her commercial sexual activity.  *See also United States v. Ray*, 2022 WL 842254, at *6 (S.D.N.Y. Mar. 20, 2022) (discussing Travel Act evidence).

### E.    Money Laundering

The crime of money laundering under 18 U.S.C. § 1956(a)(1)(B) has four elements: (1) that the defendant conducted a "financial transaction," which must in some way or degree have affected interstate or foreign commerce; (2) the financial transaction at issue involved the proceeds of an unlawful activity; (3) the defendant knew that the property in the financial transaction involved the proceeds of some form of unlawful activity; and (4) the defendant knew that the transaction was designed in whole or in part either to conceal or disguise the nature, location, source, ownership or control of the proceeds of the unlawful activity or to avoid a transaction reporting requirement under State and Federal Law.  *See United States v. Gotti*, 459

F.3d 296, 334 (2d Cir. 2006).  The Second Superseding Indictment charged sex trafficking and federal extortion as the "specified unlawful activity."  The evidence was sufficient to support that charge.

Defendant and Pollok collected the proceeds of Drury's prostitution activities, which they obtained through extortion, and then, what money they did not spend on expensive items for themselves, they laundered through a series of bank accounts in Pollok's, Talia Ray's and his victims' names.  This money was then used to purchase a portfolio of almost 8,000 GoDaddy domain registrations with a total value of between $17 million and $34 million.  Defendant knew the source of the proceeds; he was the one who extorted the money and coerced Drury to engage in prostitution.  The Jury also could readily conclude that the purpose of the transactions was to conceal the source of the proceeds.  Indeed, the evidence at trial demonstrated that Defendant went to great lengths to avoid a paper trail that might tie him to the money.  He purchased the GoDaddy domain names, but he did not do so because of his interest in domain names or for the investment value the domain names represented.  The money went in only one direction:  into GoDaddy domain names and never out; many were purchased but they were not sold.  The Jury could conclude that he funneled the money through nominee accounts and purchased the domain names for the sole purpose of concealing the proceeds of Drury's prostitution activities and his connection to them.

### F.     Tax Evasion

The Jury also convicted Defendant of four counts of tax evasion for each of the tax years 2016, 2017, 2018, and 2019.  The Jury had ample evidence to support that verdict.  There are three elements of tax evasion under 26 U.S.C. § 7201: (1) the defendant owed substantially more federal income tax than was declared due on his income tax return; (2) the defendant committed an affirmative act constituting tax evasion; and (3) the defendant acted willfully.  *See United*

*States v. Litwok*, 678 F.3d 208, 215 (2d Cir.2012); *United States v. Josephberg*, 562 F.3d 478, 488 (2d Cir. 2009).

There was ample evidence of each of these elements for each of the tax years charged. The Government presented evidence that there was a substantial amount of income tax due and owing from Defendant for each year in question.  An IRS agent testified, based on the evidence admitted at trial, Defendant had taxable income of $142,290 for tax year 2019 and owed federal income taxes of $28,276 for that year, taxable income of approximately $1,070,521 for tax year 2018, taxable income of $702,520 for tax year 2017 and tax due and owing of $234,017 for that year, and taxable income for 2016 of at least $73,790 and a resulting tax deficiency of $14,215. In total, for the years 2016 through 2019, Defendant's total unpaid tax liability was $638,290. Tr. 2430.  Defendant did not file federal income tax returns for any of the tax years 2016, 2017, 2018, or 2019.

There also was extensive evidence that Defendant took actions that constituted evasion of or attempted evasion for each of the tax years in question.  *See Spies v. United States*, 317 U.S. 492, 499 (1943) ("[A]ffirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal.").  Defendant conducted his affairs so that he received his income in cash; he was steadfast in ensuring that the proceeds of these affairs could not be traced to him; he laundered his income through a series of accounts in names other than his own but over which the Jury could conclude he had control; and he ultimately held this income in domain names purchased through and held at GoDaddy, an entity

that he would have basis to believe would be unlikely to be subject to IRS audit.  The Jury easily could have concluded that Defendant's desire to avoid paying taxes played a part in this conduct.

Finally, there was evidence of willfulness.  The parties stipulated that prior to the 2015 tax year, Defendant had filed ten Form 1040 United States individual income tax returns. Defendant thus knew of his obligation to file income tax returns and to pay federal income taxes. He had done so many times in the past.  But he did not do so for the millions of dollars he received from his extortion and sex trafficking because he did not want to pay taxes on those extraordinary sums.  This change in behavior is sufficient to show willfulness.

When the defense renewed its Rule 29 motion, it identified a purported deficiency in the evidence as to these counts.  *See* Tr. 2768–69.  Defendant argued that the Government did not offer evidence sufficient for the Jury to conclude that the payments from Drury constituted taxable income based on a provision of the Internal Revenue Code ("IRC") that excludes from gross income "the amount of any damages (other than punitive damages) received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal physical injuries or physical sickness."  26 U.S.C. § 104(a)(2).  Defendant contends that the proceeds he obtained from Drury represented income he received from her for poisoning him.

The Jury had a basis to reject this defense.  Under that provision of the IRC, "damages" is defined as an amount that is received "through prosecution of a legal suit or action, or through a settlement agreement entered into in lieu of prosecution."  26 C.F.R. § 1.104-1(c)(1).  A settlement agreement is for damages "on account of personal physical injuries or physical sickness" as long as it is to compensate for damages actually incurred on account of personal physical injuries or personal physical sickness and regardless of whether the legal claim is viable or the claim's validity is doubtful because of uncertainty about the facts or the law.  *See* 26

C.F.R. § 1.104-1(c).  This provision applies to damages paid pursuant to a written binding agreement, court decree, or mediation award.  *Id.* § 1.104-1(c)(3).

In this case, the evidence before the Jury supports the conclusion that Defendant did not incur damages in relation to a physical injury or sickness and there was sufficient evidence for the Jury to conclude that he was not physically injured or sick at all.  When Defendant was arrested, law enforcement recovered records of his expenditures.  They included expensive meals and gifts.  They did not include any expensive medical treatments.  Defendant told his victims that he was sick, and he convinced them to acknowledge that they poisoned him, in order to leverage their confessions against them.  But there was no evidence, other than that the evidence that the Jury could conclude was manufactured, that he was sick or had been poisoned by Drury or the Rosario siblings.  The defense suggested that such evidence did exist in the form of his victims' confessions, highlighting Defendant's retention of an attorney, who sent a letter to the United States Attorney reporting the purported poisoning.  But putting aside the falsity of these confessions which were extracted by Defendant through force and threats of force, Defendant's conduct—and his relationship with the victims—was entirely inconsistent with the notion that Defendant was also a victim.  Defendant was in a position of power to Drury and the Rosario Siblings.  He coerced them and extorted them.  When they attempted to break free of his sway, he lured them back in and forced them to remain close to him.  The Jury could conclude that that conduct was not consistent with him being their victim.  And, he only sent the letter to the U.S. Attorney *after* he had convinced his victims to make false confessions and when he was using the threat of imprisonment to extort, traffic, and enslave his victims.  In other words, the evidence would support that the letter was a tool of his extortion.  The Jury could readily have concluded that the notion that Defendant was a victim in this situation was risible.  Finally, and

on the most elementary level, there could not have been a settlement agreement; Defendant did

not forbear from asserting a claim based on Drury's payment to him of her prostitution proceeds.

Every demand for payment that was satisfied begot another, sometimes even greater, demand for

payment with no prospect that the demands would ever end.

The Jury also could have rejected the testimony of Defendant's attorney, Glenn Ripa,

Esq. ("Ripa"), or concluded that the evidence Ripa presented was the product of a ruse.  Ripa

was retained to represent Defendant in connection with a housing court matter.  He did not have

a retainer or engagement letter with Defendant.  Ripa testified that at some point during the

course of his representation of Defendant, he told Defendant that if he was receiving restitution

from Drury for the physical damage she caused by poisoning him, those proceeds would not be

taxable.  Ripa did not recall precisely when he made the statement to Defendant and was not able

to say with confidence that the date of the conversation preceded Defendant's decision to stop

paying taxes and to launder Drury's prostitution proceeds through nominee accounts and domain

names.  Ripa also testified that he did not discuss Defendant's taxable income with him for any

of the years from 2016 to 2019, and that Defendant did not come to him for tax advice.  Indeed,

what the Jury could have concluded was notable from Ripa's testimony was what Defendant did

not share with him or say to him.  Defendant never told Ripa that he was collecting millions of

dollars from Drury; in fact, Ripa assumed Defendant was referencing a few hundred dollars.

Defendant never showed Ripa a written agreement with Drury to collect damages and Defendant

never told Ripa the terms of any oral agreement that he entered into with Drury to collect

damages.  Defendant did not provide any information about his costs relative to the millions of

dollars of "damages" he was receiving.  Defendant did not provide records of his expenditures or

22

any medical bills, and Ripa did not estimate the value of any potential claim related to Defendant's alleged "poisoning."

The Jury, however, was instructed on Defendant's theory of defense: that he believed he was permitted to accept payment from Drury and the other victims as repayment for being poisoned and for other harm without reporting the payment as taxable income. The Jury was instructed that if the Government did not prove beyond a reasonable doubt that Defendant acted willfully in violation of a known legal duty and with the specific intent to defeat or evade the assessment of taxes that he knew it was his duty to pay, it was required to acquit Defendant. Tr. 3048. The Jury rejected the defense and concluded that the Government proved beyond a reasonable doubt that Defendant acted with the specific intent to evade the assessment of taxes he knew it was his duty to pay. The Court cannot say that the Jury was wrong.

## G.    VICAR

Defendant's only serious challenge is to the sufficiency of the evidence of Count Seventeen of the Second Superseding Indictment, which charged Ray with a violent crime in aid of racketeering in violation of 18 U.S.C. § 1959. Specifically, the indictment charged that Ray, "as consideration for the receipt of, and as consideration for a promise and agreement to pay, a thing of pecuniary value from the Enterprise, and for the purpose of gaining entrance to and maintaining and increasing position in the Enterprise . . . knowingly assaulted an individual with a dangerous weapon, to wit, RAY assaulted Female Victim-1 by placing a plastic bag over her head and interfering with her ability to breathe, at a hotel in midtown Manhattan, New York, in violation of New York Penal Law §§ 120.05 and 120.14." Second Superseding Indictment at 25–26. The Jury found Defendant guilty of Count Seventeen and also found that Defendant had committed violations of both New York Penal Law §§ 120.05(2) and 120.14. The defense argues that there was insufficient evidence that Defendant committed the crime of assault in the

23

second degree under New York Penal Law § 120.05(2) and that the crime of menacing under New York Penal Law § 120.14 is not a crime of violence under VICAR.  The Court accepts the first argument.  However, it rejects the second argument and sustains the Jury verdict.

Section 1959 "was enacted to complement RICO," "by allowing the government not only to prosecute under RICO for conduct that constitutes a pattern of racketeering activity in connection with an enterprise but also to prosecute under § 1959 for violent crimes intended, *inter alia*, to permit the defendant to maintain or increase his position in a RICO enterprise." *United States v. Concepcion*, 983 F.2d 369, 380–81 (2d Cir. 1992).[3]  The provision addresses "violent crimes committed or sanctioned by high ranking leaders of the enterprise for the purpose of protecting the enterprise's operations and furthering its objectives or where the defendant, as a leader within the enterprise, was expected to act based on the threat posed to the enterprise and that failure to do so would have undermined his position within that enterprise."  *United States v. Dhinsa*, 243 F.3d 635, 671 (2d Cir. 2001)  In order to establish a violation of Section 1959, the Government is "required to prove beyond a reasonable doubt: (1) . . . a RICO enterprise, (2) that the enterprise was engaged in racketeering activity as defined in RICO, (3) that the defendant in question had a position in the enterprise, (4) that the defendant committed the alleged crime  of

---

[3] 18 U.S.C. § 1959 reads in part:

> Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, *assaults with a dangerous weapon*, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do shall be punished . . . .

18 U.S.C. § 1959(a) (emphasis added).

violence, and (5) that his general purpose in so doing was to maintain or increase his position in the enterprise." *Concepcion*, 983 F.2d at 381.  The violent acts that can support a § 1959(a) violation include: murder, kidnapping, maiming, assault with a dangerous weapon, and assault resulting in serious bodily injury upon an individual, or the threat or attempt or agreement to commit a crime of violence against any individual in violation of any state or federal law.  *See* 18 U.S.C. § 1959(a).

The Second Superseding Indictment charged that Ray's conduct violated New York Penal Law § 120.05(2) and § 120.14.  New York Penal Law § 120.05(2) defines assault in the second degree not by the gravity of the physical injury threatened by the defendant but by the physical impairment or pain the defendant inflicts.  It states that a person is "guilty of assault in the second degree when[,] [w]ith intent to cause physical injury to another person, he causes such injury to such person or to third person by means of a deadly weapon or a dangerous instrument."  N.Y. Penal Law § 120.05(2).  A "deadly weapon" is "any loaded weapon from which a shot, readily capable of producing death or other serious physical injury, may be discharged, or a switchblade knife, pilum ballistic knife, metal knuckle knife, dagger, billy, blackjack, plastic knuckles, or metal knuckles." *Id.* § 10.00(12).  And a "dangerous instrument" is "any instrument, article or substance, . . . which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or other serious physical injury."  *Id*. § 10.00(13); *see Singh v. Barr*, 939 F.3d 457, 462 (2d Cir. 2019).

The term "physical injury" is defined as "[(1)] impairment of physical condition or [(2)] substantial pain."  N.Y. Penal Law § 10.00(9).  For a victim to have sustained a physical injury, she need not have sustained a lasting disability.  *Vasquez v. Ercole*, 2009 WL 2432364, at *3 (S.D.N.Y. Aug. 7, 2009).  But the physical injury "must be more than 'petty slaps, shoves,

kicks and the like.'" *People v. Mack*, 755 N.Y.S.2d 437, 439 (3d Dep't 2003) (quoting *Matter of Philip A.*, 400 N.E.2d 358, 359 (N.Y. 1980)); *People v. Henderson*, 708 N.E.2d 165, 166 (N.Y. 1999) (same).

The evidence at trial establishes that Defendant subjected Drury to what can only be described as physical and psychological torture.  Defendant wanted to punish her for developing a relationship with a client that presented a threat to the Ray Family enterprise and to force her to continue to engage in commercial sex acts for his financial benefit.  Defendant covered Drury's mouth with a pillow and threatened to suffocate her.  He forced her to strip, tied her naked to a chair, and then placed the chair next to the hotel room air conditioning unit while pouring cold water over her body.  He strangled her with a collar and leash he placed around her neck.  He repeatedly put a plastic bag over her head to prevent her from breathing, and Drury almost passed out.

However, even construed favorably to the Government, the evidence does not support the conclusion that Drury experienced "physical injury" as that term has been interpreted under New York law.  New York courts have not precisely defined "impairment of physical condition," but their rulings have begun to establish the boundaries.  While a victim's "incapacitation" is not necessary, *People v. Franklin*, 540 N.Y.S.2d 288 (2d Dep't 1989), impairment requires more than some momentary limitation of bodily functions, no matter how grave, *see People v. Almonte*, 424 N.Y.S.2d 868, 869 (Sup. Ct. 1980) ("An impairment of physical condition is a weakening or diminution of some physical state of being or health and has also been described as affecting a physical condition in an injurious manner."); *Impairment*, Black's Law Dictionary (10th ed. 2014) ("[A] condition in which a part of a person's mind or body is damaged or does not work well, esp. when the condition amounts to a disability.").  For the assault to have caused

an impairment of physical function, the impairment must outlast the assault.  Thus, in *People v. Franklin*, the court found that there was no physical impairment when the "complainant was hit on the head and 'passed out', but regained consciousness 'a minute' later."  The complainant there experienced a limitation of bodily function during the assault itself (the loss of consciousness) and he felt a continuing effects from the assault in the form of dizziness and aches "for about 'four or five hours', and experienced slight bleeding from the head."  540 N.Y.S.2d at 288.  But the court found as a matter of law that the assault caused no impairment of physical function.  *Id.*; *see also People v. Goins*, 514 N.Y.S.2d 494, 494 (2d Dep't 1987) (finding "no evidence in the record to support" physical impairment when the victim "sustained bruises to his right eye and left wrist as a result of his physical encounter with the defendant" and "suffered headaches for two or three days and missed a day of work as a result of his injuries"); *People v. Prosser*, 516 N.Y.S.2d 559, 559 (4th Dep't 1987) (finding that "hoarseness of voice" from assault did not constitute impairment of physical condition because "the record was insufficient to establish whether the [degree of victim's] hoarseness").  In contrast, in *People v. Tejeda*, 578 N.E.2d 431, 432 (N.Y. 1991), the court found that the victim did suffer physical impairment when as a result of the assault he had a visible scar four months after being hit with barrel of a pistol.  The assault caused an impairment—a physical injury—that outlived the attack itself.  *See also People v. Rivera*, 583 N.Y.S.2d 520, 520 (2d Dep't 1992) (noting that "[t]he scar alone is impairment sufficient to constitute physical injury." (internal citations omitted)).

The evidence at trial established that the limitations on Drury's bodily functions (her ability to breathe and her ability to move once tied to a chair), though horrifying, was transitory and lasted no longer than the assault that caused it.  Once Defendant left the room, Drury was able to exercise her full range of bodily functions; she was able to move and she was able to

breath as normal, with no lasting changes as a result of the attack.  There is no evidence, either testimonial or from medical records, that Defendant's actions had a physical impact on Drury beyond the time they spent together in the hotel room.

The evidence also did not establish "substantial pain."  "'[S]ubstantial pain' cannot be defined precisely, but it can be said that it is more than slight or trivial pain.  Pain need not, however, be severe or intense to be substantial."  *People v. Chiddick*, 866 N.E.2d 1039, 1040 (N.Y. 2007); *see also People v. Chery*, 66 N.Y.S.3d 887 (2d Dep't 2018); *People v. Stanback*, 51 N.Y.S.3d 201 (2d Dep't 2017).  The term "substantial pain" contains both an objective and a subjective component.  *See Matter of Philip A.*, 400 N.E.2d at 359 (noting that "[p]ain is, of course, a subjective mater" but "there is an objective level . . . below which the question is one of law"); *United States v. Adetutu*, 2004 WL 25241, at *3 (S.D.N.Y. Jan. 5, 2004) ("New York law requires a showing of both subjective and objective elements to establish the existence of substantial pain.").  "The subjective element is established through evidence that the victim of the assault felt 'as though she suffered substantial pain.'"  *Adetutu*, 2004 WL 25241, at *3 (quoting *People v. Plate*, 2003 WL 22976610, at *5 (N.Y. Sup. Ct. Dec. 1, 2003)).  "The objective element, while more elusive, appears to require a threshold level of evidence of a physical injury that could produce pain that was substantial in either its degree or duration."  *Id.* The New York Court of Appeals has outlined several factors relevant to the determination whether pain is "substantial": (1) whether the injury suffered "would normally be expected to bring with it more than a little pain"; (2) the victim's "subjective description of what he felt"; (3) whether the victim sought medical treatment; and (4) the defendant's motive in inflicting the harm.  *Chiddick*, 866 N.E.2d at 1040; *see Taylor v. Brown*, 2011 WL 797448, at *17 (S.D.N.Y. Mar. 8, 2011); *People v. Perez*, 965 N.Y.S.2d 702, 706–07 (N.Y. Crim. Ct. 2013).  The fact that

the defendant intended to cause substantial pain is not sufficient, *Adetutu*, 2004 WL 25241, at *3, nor is the fact that the victim did not testify to her subjective pain sufficient to establish that she did not suffer substantial pain, *see People v. Rojas*, 460 N.E.2d 1100, 1101 (N.Y. 1984) ("The subjective reaction of the victim is but one factor for the jury to consider.").  It is not always the case that the victim is available to testify at trial.  However, under the statute's plain language, the defendant must both commit the assault "with intent to cause physical injury to another person" and "caus[e] such injury to such person or to third person."  N.Y. Penal Law § 120.05(2).

The evidence was insufficient for the Jury to conclude that Drury suffered substantial pain as that term has been understood under New York law.  Drury testified to five of Defendant's actions in the hotel room: (1) Defendant covered Drury's head with a pillow and plastic bag, Tr. 1037; (2) he poured cold water over her while she was near an air-conditioning unit, *id.* at 1034–35; (3) he tied her to a chair, *id.* at 1034; (4) he choked her with a collar and a leash, *id.* at 1037–38; and (5) he cut her hair, *id.* at 1038–39.  But the Government presented no additional evidence of the pain that Drury felt.  Though Drury testified that she "became very, very cold to the point of like feeling like woozy or dizzy," *id.* at 1035, that she was "terrified," *id.* at 1036, and that she was "scared," *id.* at 1040, 1043, she did not testify to any physical pain she experienced as a result of Defendant's actions.  There was also no evidence from any other source that the sensation Drury experienced from the assault was one of pain.  *See Rojas*, 460 N.E.2d at 1101 (finding the jury could conclude pain was substantial, even though victim did not testify as to the degree of pain, in part because "the doctor [who treated him] testified that the injury could have caused pain").  From the evidence before the Jury, it would have to speculate that the nature of the assault on Drury would be one that would cause her substantial pain as

opposed to, as she testified, causing her substantial terror.  Under New York law, the fact that an

assault occurred cannot itself and without more establish that it caused substantial pain.  *See*,

*e.g.*, *People v. McDowell*, 270 N.E.2d 716, 717 (N.Y. 1971) ("[T]he incidental reference to a

blackened eye without any development of its appearance, seriousness, accompanying swelling,

or suggestion of pain was insufficient to sustain the felony conviction."); *Adetutu*, 2004 WL

25241, at *3 (complaint did not allege substantial pain where it did "not identify the nature of the

pain, where the pain was felt, the intensity of the pain, or its duration"); *Matter of Scott QQ*, 589

N.Y.S.2d 712, 712–13 (3d Dept. 1982) (evidence was insufficient to establish physical injury or

substantial pain where the claimant "neither provided evidence as to the duration of any pain nor

other objective indicia of substantial pain" (internal quotation marks and citation omitted));

*People v. Cheeks*, 555 N.Y.S.2d 433, 434 (2d Dep't 1990) ("The witnesses never elaborated on

the duration or degree of the pain, nor provided some other objective indicia of 'substantial pain'

to properly sustain" the charge.); *People v. Baum*, 533 N.Y.S.2d 598, 599 (2d Dep't 1988)

(holding the prosecution "did not adduce the minimum threshold level of proof of substantial

pain" with descriptions of the fight and punches that victim suffered to his eye because they

"failed to develop with particularly the degree and duration of the pain sustained by

complainant").

     At oral argument, the Government suggested that Drury did not testify to her pain

because years of past torture and abuse at the hands of Defendant inured her to pain.  But this

argument misconstrues the subjective component of substantial pain under New York law.  As

the New York Court of Appeals wrote, "Pain is, of course, a subjective matter.  Thus, touching

the skin of a person who has suffered third degree burns will cause exquisite pain, while the

forceful striking of a gymnast in the solar plexus may cause him no discomfort at all."  *Matter of*

*Philip A.*, 400 N.E.2d at 359.  That Defendant's conduct inured Drury to pain is not to excuse it.

But if Defendant's conduct prevented Drury from feeling pain, then that outcome would tend to

undermine the Jury's conclusion on this count and not to support it.

Drury's experiences were horrific; the Jury could find Defendant's actions were

reprehensible.  The psychological impact of these events should not be discounted.  But the

gravity of the attack does not itself establish the necessary sensation of the victim.  *Compare*,

*e.g.*, *People v. Holden*, 539 N.Y.S.2d 95, 95–96 (2d Dep't 1989) (reversing assault in the second

degree conviction for defendant who also committed rape in the first degree, sexual abuse in the

first degree and sexual abuse in the third degree because "although the complainant testified she

was struck several times prior to the rape, she did not elaborate on her injuries" and did not

testify "as to the duration of the pain"), *with People v. Greene*, 517 N.E.2d 1344, 1345 (N.Y.

1987) (finding evidence of substantial pain sufficient for victim who "stopped breathing

momentarily and lost consciousness" after being choked because victim was diagnosed with

contusions at a hospital and "stated that he suffered from pain and had difficulty swallowing for

two days after the incident").

It is important to note that the fact that the assault was committed with instruments—a

bag and a pillow—that could have killed Drury is insufficient to establish that it caused physical

injury.  The New York Court of Appeals' decision in *People v. Rojas*, 460 N.E.2d 1100, is

illustrative.  There, the prosecution argued that the jury could infer that the victim of defendant's

assault suffered "substantial pain" within the meaning of the New York Penal Law because the

victim suffered infliction of an injury by a gunshot.  The court rejected that argument, ruling that

it was the injury, not the means by which the injury was inflicted, that governed.  After noting

that New York Penal Law already differentiated "the degree of the crime, and thus the

punishment, depending upon whether an instrument was used and if so what kind," it held "[t]hat the injury is by gunshot cannot . . . establish substantial pain, without more." *Id.* The court upheld the conviction only because there was "testimony that the bullet caused a laceration of the victim's back 1.5 inches in length, the result of which was still visible at the time of trial, . . . the victim returned to the hospital the day after the assault where the wound was redressed because it was still oozing, and the doctor testified that the injury could have caused pain." *Id.* The court concluded based on that testimony: "[T]he jury could infer that the pain was substantial, even though the victim gave no testimony concerning the degree of pain he felt." *Id.* In this case, there is no similar evidence, either from Drury or from any other source, for a reasonable jury to have found that Drury suffered physical injury.

The Jury, however, also concluded that Defendant violated New York Penal Law § 120.14. The evidence supports that conclusion and the law supports that Defendant's violation of New York Penal Law § 120.14 is a crime of violence under VICAR. New York Penal Law § 120.14 prohibits menacing in the second degree. It reads:

> A person is guilty of menacing in the second degree when: (1) He or she intentionally places or attempts to place another person in reasonable fear of physical injury, serious physical injury or death by displaying a deadly weapon, dangerous instrument or what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm . . . .

N.Y. Penal Law § 120.14. The evidence at trial established the elements of that offense. Defendant intentionally placed Drury in reasonable fear of serious physical injury and death by displaying a dangerous weapon. In this context, the plastic bag was a dangerous weapon. Used as Defendant deployed it, the plastic bag could asphyxiate Drury and kill her. In fact, Ray covered her head with the bag repeatedly to the point where she "was suffocating" and couldn't "breath." Tr. 1036. And there can be no doubt that there was sufficient evidence that Defendant

displayed the plastic bag to her with the intent to place her in fear of death and that such fear of death was reasonable. As Drury testified, "as soon as [Ray] put the bag over my head, [he] said, 'I am going to kill you.'" *Id.* at 1037.

The Court also concludes that Defendant's conviction is supported by evidence that he engaged in an assault with a dangerous weapon and that his actual conduct violated Section 120.14(1). Defendant's argument to the contrary turns upon whether the categorical approach used in the interpretation of certain federal criminal statutes applies to VICAR. Defendant argues that the categorical approach applies to VICAR and thus the jury verdict must be overturned because menacing in the second degree sweeps more broadly than the generic federal offense, even if Defendant's conduct does not. *See* Dkt. No. 594 at 4–5. The Government responds that the categorical approach should not apply and it is sufficient that Defendant engaged in an assault with a dangerous weapon in violation of the New York Penal Law. *See* Dkt. No. 595 at 1. It also argues that, even under the categorical approach, the elements of the New York crime of menacing are a categorical match with an assault with a dangerous weapon. *Id.* at 2–3. The Court need not consider the second of the Government's arguments, because it finds that a categorical approach does not apply to VICAR.

The Second Circuit has not addressed whether a categorical approach applies to VICAR.[4] But this Court finds the Fourth Circuit's decision in *United States v. Keane*, 955 F.3d 391 (4th Cir. 2020), compelling. There, the court considered a question nearly identical to this one: Whether the Virginia law against brandishing a firearm could be a predicate offense of

---

[4] Contrary to Defendant's contention, *United States v. Pastore*, 36 F.4th 423 (2d Cir. 2022), only held that VICAR offenses, like RICO offenses, are subject to the modified categorical approach when determining whether they qualify as "crimes of violence" that can serve as predicates under 18 U.S.C. § 924(c).

committing assault with a dangerous weapon under VICAR because the Virginia brandishing statute swept more broadly than the federal definition of assault with a dangerous weapon.  The court concluded that the conviction need not be overturned.  *Id.* at 392–93.  The Fourth Circuit held that the categorical approach did not apply to VICAR; it was sufficient that the defendant's actual conduct constituted one of the enumerated federal offenses, while also violating the Virginia brandishing statute.  *See id.* at 395.  The court started with the plain language of 18 U.S.C. § 1959 and compared the language of the VICAR statute to the language used in statutes to which the categorical approach applies.  *See id.* at 396–98.  The categorical approach "reflects the general principle that a defendant will not be subject to a detrimental legal consequence based on a past conviction unless courts can be certain that his prior offense satisfies the full contours of the federal requirement."  *Id.* at 395.  The court observed that terms such as "conviction," "offense," and "elements" "signa[l] Congress' intent to disregard a defendant's actual conduct, and instead to examine the elements of the offense generally," that is, to signal Congress's intent that a categorical approach should apply.  *Id.* at 398.

By contrast, the court concluded,

> Nothing in th[e] language [of VICAR] suggests that the categorical approach should be used to compare the enumerated federal offense of assault with a dangerous weapon with the state offense . . . .  In fact, the most natural reading of the statute does not require any comparison whatsoever between the two offenses.  By using the verb 'assault' in a present tense, the language requires that a defendant's conduct constitutes an assault under federal law, while simultaneously also violating a state law.

*Id.* at 397.  The court further concluded that the "practical and constitutional concerns underlying the categorical approach" were not present in the VICAR context.  *Id.* at 398.  "Because the VICAR language under which the defendants were charged refers only to presently charged conduct, courts are not required to reconstruct the facts underlying the previous convictions."  *Id.*

Moreover, "the jury, not the judge, will determine whether the defendant committed the offenses charged in the Indictment, eliminating any Sixth Amendment concerns." *Id.*

The Fourth Circuit decision in *Keane* is persuasive. It is faithful to the language of VICAR and the substantial differences between VICAR's language and the language used by statutes that have been interpreted to require the categorical approach. It also is consistent with the purposes of the categorical approach. The jury here was instructed on the elements of assault with a dangerous weapon under New York law. It also was instructed on the elements of menacing under the New York penal law. It concluded both that Defendant had engaged in an assault with a dangerous weapon and that such conduct was in violation of state law. The Government need not have established that the minimal requirements of that state law violation could, in theory, be satisfied by conduct that did not involve assault with a dangerous weapon. The evidence here establishes that Defendant's conduct was at the core of the crime of menacing and not at its periphery. It is sufficient to support the verdict that the Government presented evidence that supported both that Ray committed an assault with a dangerous weapon and that by such conduct he also violated state law. There thus is no basis for Defendant's motion to overturn the conviction on Count Seventeen.

## CONCLUSION

Defendant's motion under Rule 29 is DENIED.


SO ORDERED.


Dated: November 23, 2022
      New York, New York                       LEWIS J. LIMAN
                                    United States District Judge