# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

January 6, 2023

**Via ECF**

The Honorable Lewis J. Liman
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:     **United States v. Lawrence Ray**
        **20 Cr. 110 (LJL)**

Dear Judge Liman:

Lawrence Ray's fixation with poisoning is rooted in reality. While poisoning is, to most, the stuff of fairytales, for Larry Ray, poisoning is real. He believes, because he's seen it before. He knows people are capable of intentionally infecting others' food because his mother did it.

On the day of his brother's wedding, Larry's brother, and his fiancé, Martha, delivered cupcakes to Larry's biological father, Lawrence Grecco. Mr. Grecco had long been divorced from Larry's mother. Her wedding day, Martha recounts the occasion clearly. Larry's mother had directed her youngest son and his bride to bring Larry's father the cupcakes she had baked. "She told us they would give Larry's dad diarrhea," Martha recalls. She put ex-lax in the cupcakes so he would get sick and miss the wedding. Ex. A, Letter of Martha Ray. Terrified of Larry's mother, Martha delivered the baked goods. Larry's mother's plan failed, but during the reception, Mr. Grecco complained of a stomachache. He said, "My stomach feels a little funny, I don't know what I ate."

This was not an aberration. Martha remembers a carpenter who worked in their home, whose wife Larry's mother was friendly with. Upon learning the carpenter had been cheating on his wife, Larry's mother began making him food with an additive that would cause weight gain. It was retaliation. And once, Martha recounts, Larry's mother packed food for Larry and his then-girlfriend, bragging that she seasoned the food with ex-lax.

"To this day I tell my kids, she's your grandma, but be careful. I wouldn't eat anything from her." Ex. A, Letter of Martha Ray. This is Lawrence Ray's biological mother, the woman who helped raise him. A woman who poisoned people's food for fun or punishment.

I.      **Lawrence Ray's traumatic childhood bears on his adult conduct.**

Lawrence Ray's trial revealed the tortured labyrinth of his adulthood. But throughout the weeks-long affair, the Court learned nothing of Mr. Ray's childhood. The physical, sexual, and psychological abuse Lawrence Ray suffered as a child and through his young adulthood bears a striking resemblance to the conduct underlying the offenses he now stands convicted of.

Lawrence Grecco, as he was named at birth, was a small child when his parents divorced roughly 60 years ago. For nearly a year following his parents' separation, Larry and his younger brother, Carl, lived primarily with their mother in a small Brooklyn apartment. After a short period, Larry's mother became ill; they moved to their maternal grandparents' crowded home in Bay Ridge, Brooklyn. At their grandparents' home, Carl was embraced; Larry was an outcast. At night, while his brother slept in a bed between their grandmother and aunt, Larry lied on the wood floor of his uncle's bedroom. During his years with his mother's family, Larry never slept in a bed. While Larry's grandmother slept upstairs, his grandfather occupied the basement. Larry did not know why they slept separately and never asked.

The abuse began almost immediately. Physical, verbal, and eventually, sexual abuse pervaded Larry's childhood in Bay Ridge. His grandmother verbally and physically abused her grandson. *United States v. Ray*, 00 Cr. 196-17 (ILG), E.D.N.Y. Presentence Report at ¶ 73. Larry speculates, "I think it's because my mom was pregnant with me before she married my dad." Larry's mother was just a teenager when he was born. "I was told I ruined my mother's life," Larry disclosed. "She called me 'little louse.'" Larry wasn't allowed to go into the refrigerator in his grandparents' home. "I didn't think much of it at the time," Larry reflects.

Larry was just six or seven years old when his grandmother first physically abused him. She struck him with a cat of nine tails, a whip intended for severe physical punishment. The lashings became routine. After one of these recurring beatings, his grandmother instructed Larry to sleep downstairs with his grandfather. He complied. Physical torture morphed into childhood sexual assault. In the basement, a pint-size Larry slumbered on a pile of blankets on the floor while his imposing, six-foot tall grandfather penetrated him. Larry had no escape. "I remember the stairs going down to the basement had an oil tank behind them," Larry recounts. "I used to hide there because he couldn't fit back there," Larry explains. No family member, including his mother, intervened. No one discussed the abuse.

One night, Larry came down with a high fever. He began coughing uncontrollably. Enraged, Larry's grandmother beat him, chastising Larry for keeping everyone in the house awake. *Id.* She dragged him by the hair and locked him out of the house. Larry was nine or ten years old. Dressed in pajamas at the height of winter, Larry made his way from 69th Street and 8th Avenue to his father's home at the end of the bus line, where he visited on weekends. *Id.* Larry recalls ringing his father's doorbell "really late at night," his father, Lawrence Grecco, answering the door to the sick and freezing child. Larry was hospitalized overnight. *Id.*

Larry's father retrieved his belongings from his grandmother's home. From that day forward, Larry lived with his father; he never saw his maternal grandmother again. Though Larry did not disclose to his mother the sexual abuse he suffered at the hands of her father, he assumed

she knew; certainly, she bore witness to the physical and emotional abuse Larry's grandmother inflicted. Yet she turned a blind eye. Larry internalized his mother's reaction to his abuse, never forgetting her silence.

## II.    Lawrence Ray spent his early adulthood vying for his mother's affection in vain.

Larry lived with his father through the remainder of childhood into adolescence. First, with Larry's paternal grandparents in Bensonhurst, and later in an apartment of their own. Larry then moved to White Plains with his mother and stepfather, Gordon Ray. While Larry never enjoyed a close relationship with his mother, he always had an affinity for his stepfather. "I wouldn't have gone to live with my mother alone," Larry admits. "It was just never comfortable with my mother. I only went to live with them because of Gordon."

In his late teens, Larry moved to New Jersey with his mother and stepfather. There, at his mother's urging, Larry changed his last name from Grecco to Ray. His brother also changed his last name to Ray. The name change reflected Larry's mother's desire to offend Larry's father, Lawrence Grecco; it was done with malice, to hurt her ex-husband. Larry's compliance reflected his love for his stepfather and an unceasing desire to appease his mother.

Larry Ray spent his early adulthood vying for his mother's affection. This propelled his desire for financial success and access to power. For nearly a decade, Larry worked as a bond broker on Wall Street in pursuit of the money and respect he lacked growing up. He later owned his own company, which wrote surety bonds, and was part owner of a nightclub in New Jersey. For a time, he enjoyed the fruits of his labor. He befriended powerful government officials and reveled in their adoration. But he never earned his mother's approval. Unfailingly, he encountered hostility and manipulation from his maternal figure, who "was always trying to top him." Ex. A, Letter of Martha Ray. Ultimately, Larry's mother drove a wedge between Larry and his brother. "I think Larry had a rough life, in general," Larry's former sister-in-law reflects. His brother "was more sheltered." *Id.*

Larry's brother married his now ex-wife, Martha, when she was 19 years old. Martha immediately moved in with Larry's brother and his parents. There, Larry's mother abused Martha. "She is not stable," Martha states. "She is evil." Martha's portrayal of Larry's mother calls to mind trial witnesses' depiction of Larry. "[S]he was in control of everyone around her," Martha explains. "The mind games were constant." *Id.*

While Martha recalls instances of calculated maltreatment of each member of the Ray family, Martha confirms that Larry bore the brunt of his mother's ire: "She treated him like her enemy." Every interaction Martha witnessed between Larry and his mother was negative. *Id.* "The message was, 'You're nothing, I'm better than you. You'll never be more than me.'" *Id.* But Larry continuously tried to please her, to no avail.

Though Larry lived elsewhere during the early years of his brother's marriage, Martha recalls him visiting frequently in an ill-fated attempt to win his mother's approval. On one occasion, Larry stopped by their home excited to show his mother the progress he'd made losing weight and getting in shape. his mother pretended not to recognize him. Then, she berated him.

3

"You look horrible!" Martha recalls her screaming at him. "If that is what juicing does to a person, I want no part of it." *Id.* More than thirty years later, the exchange remains seared in Martha's memory. Martha's brother similarly recalls the incident. "She was just saying it to hurt him," he explains. "Larry shrugged it off, but I felt bad for him." Martha remarks, "It was just so cruel. I never understood how a mother could treat her son like that."

Larry's mother was equally unimpressed when her son visited one day to show off his new Mercedes. "She blew him off," Martha's brother recalls. "She said, 'I don't have time for this—everybody has one!'" When asked what gave him the impression that Larry was trying to win his mother's approval, Martha's brother responded, "It was just so obvious. He always tried to brag to his mom. She never cared." Martha echoes, "She was never happy for Larry. She couldn't care less about him. She always favored Carl over Larry, I don't know why."

During her time living with her mother-in-law, Martha suffered. Barely twenty years old, Martha's life was controlled entirely by her mother-in-law. Martha's description of her time residing with Larry's mother is similar to trial testimony of individuals' experience with Larry. Larry's mother forced Martha to polish the panels on the walls and use Q-tips to clean between the crevices of the furniture. "She fed me coffee and cigarettes every day," Martha recounts. Martha soon began to suffer panic attacks. "I couldn't live there anymore," Martha discloses. Larry's sister-in-law moved back home with her parents until she and Larry's brother were able to afford a home of their own.

When Larry's brother moved out of his mother's home to join his wife, Larry's mother threatened to cut them off. She wielded money as a weapon of control. "This happened over Thanksgiving, we had nothing," Martha shares. But Larry helped. Martha distinctly remembers Larry bringing over a turkey and gifting them money for the holiday. "He was always generous," Martha reveals. "We started our own trucking business and Larry used to come help," she continues. "When we were down and out, Larry helped us tremendously." Ex. A, Letter of Martha Ray. Larry was also "always a good father." Ex. B, Letter of Lawrence Grecco. "He took care of his daughters, they came first." *Id.*

Later, Martha became pregnant; Larry's mother suddenly reemerged. She inserted herself into their lives, insisting Carl and Martha purchase a house. But they couldn't afford the down payment. Larry's mother financed the home. "My grandson is not living in an apartment," she declared. "She gave us money, but we paid a big price for it," Martha explains. "She would agree, but then she'd say she needed the money back." While Martha readily describes her former mother-in-law as "evil," "manipulative," and "a control freak" she is quick to point out that Larry's mother had her good moments. Once, out of the blue, she gifted Martha a new car. But then she'd flip. "She's like Jekyll and Hyde," Martha reflects, "very scary."

For a time, Larry was "tremendously helpful" to his family. After Martha had children, Larry would visit often to play with his nephews, making them giggle. Frequently, Larry would gift the family money when they needed it. One day, Martha needed new tires for her car, and Larry told her to go to Sears and speak with a particular salesman and said he'll take care of it. Martha's brother recalls a time Larry helped him wash his truck, saying Larry was the type of guy

4

who would take the shirt off his back for you. When Larry's paternal grandparents grew older and moved to Florida, Larry refurnished their entire house. And when his father's mother became ill, Larry paid his aunt to act as his fulltime caretaker. "He's always been generous, that's what we know of him," Martha remarks.

*    *    *

Years, later, in 2005, amid contentious divorce proceedings, Larry lost custody of his youngest daughter. He relied on Martha for updates on his child's life. "I didn't want to get involved," Martha admits. "But I felt so bad for him." Martha confirms that Larry's ex-wife began a relationship with Larry's brother before Larry and his wife separated. Larry's brother stopped speaking to Larry and their biological father and helped Larry's wife through her divorce. *See* Ex. B, Letter of Lawrence Grecco. Eventually, she moved in with Larry's brother. "My boys suffered mental abuse when Larry's wife went to live with them," Martha shares. Their aunt (Larry's ex-wife) slept in the same bedroom as their father  (Larry's brother). Larry's brother has said that he loves Larry's daughter, his biological niece, as if she were his own child. Indeed, that is how she was raised. It was confusing and destabilizing; Martha's children's aunt was now functionally their stepmother, their cousin now their stepsister. Larry's daughters also suffered. "When Larry's older daughter questioned her mom about going out with Larry's brother, Larry's ex-wife slapped her in the face," Martha reveals. "My boys saw it and told me."

Eventually, Martha and Larry lost touch. But not before Martha shared Larry's phone number with his mother. "They hadn't spoken in years," Martha explains, "but his mother asked for his number and Larry told me it was okay to give it to her." This was at the beginning of 2013. Months earlier, Larry's brother had visited their mother in North Carolina, where he witnessed her in the midst of a mental health crisis. She spoke in tongues, seemingly delusional, proclaiming to know the Queen. Larry's brother secured a court order to have her involuntarily committed. She was hospitalized but refused to take medication. It was after this that Larry's mother reached out to him for the first time in more than a decade. She would later ask Larry to help her fix up the property in Pinehurst, North Carolina, leading to the events that unfolded the summer of 2013.

During Larry's conversation with his mother over the course of two consecutive phone calls, she once again pitted her sons against each other, proclaiming Larry "the strongest man I've ever known" and relegating Carl to "your monster brother." [1] Larry's mother confirmed that she had just left the psychiatric ward of her "very own hospital," where she had been for more than two months. Larry's brother was the one who put her there. Throughout the hours-long call, Larry's mother frantically alternates between excoriating Larry's brother for his mere existence and extolling Larry for "walking at six months" and being a "genius." Jekyll and Hyde.

At the end of the erratic calls, following years of estrangement, Larry's urge to impress his mother persisted. "I'm getting married," he told her, "to a doctor, Harvard graduate." He paused to wait for his mother's approval. Instead, true to form, she spurned hid efforts. "Oh, that doesn't

---

[1]   The defense received recordings of these conversations in discovery and can provide them to the Court upon request.

5

make her important," she said. "That's only a title." Deep into adulthood, Larry's mother continued to reject him.

*      *      *

The abuse Larry Ray suffered as a child and observed in his early adulthood maps onto the conduct underlying the offenses of conviction. It also has implications for his current physical and mental wellbeing.

## III.   The Court should sentence Lawrence Ray to 180 months in prison.

After a weeks-long trial, Lawrence Ray was convicted of 17 counts, including extortion, sex trafficking, forced labor, money laundering, and tax evasion, among others. None of the conduct involved minors. Section 1591 of Title 18 carries a mandatory minimum sentence of 15 years in prison, which may run concurrently to any other prison term, and a mandatory minimum term of supervised release of five years. The remaining counts have no mandatory minimum sentence.

The Court must consider each of the factors set forth in 18 U.S.C. § 3553(a) to make an individualized sentencing determination. *See, e.g.*, *Gall v. United States*, 552 U.S. 38, 59 (2007). A sentencing court begins by calculating the advisory Sentencing Guidelines. However, "[t]he Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009).

Rather than simply deferring to the Guidelines, a sentencing court must make an individualized decision based on all of the factors set forth in Section 3553(a). This includes considering the history and characteristics of the offender; the nature and circumstances of the offense; sentences for similarly-situated defendants; and the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment, deterrence, protection of the public, and rehabilitation of the offender. 18 U.S.C. § 3553(a). The Court must impose a sentence that is "sufficient, but not greater than necessary." *Id.* Overall, sentencing "requires a court to consider, with great care and sensitivity, a large complex of facts and factors. . . . [T]his complicated analysis, and moral responsibility" cannot be "reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables." *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012).

The United States Probation Office calculates an advisory Guidelines range of life based on an offense level of 42 and a criminal history category of V. Presentence Report at 44. Probation recommends a substantial downward variance of 300 months' incarceration. *Id.* The defense has no legal objections to the Probation Office's calculation but urges the Court to impose a below-Guidelines sentence of 180 months' incarceration based on all of the statutory factors.

A sentence of 180 months in prison, followed by a substantial period of community supervision is the most just and appropriate sentence considering: (1) Mr. Ray's personal history and characteristics, including his abusive childhood, advanced age, and medical needs, and (2) the unprecedented conditions of confinement Mr. Ray has endured for the last three years. For Mr.

6

Ray, now 63 years old with myriad documented physical ailments, 180 months is effectively a life sentence, "sufficient, but not greater than necessary" to achieve the sentencing aims of deterrence, incapacitation, and punishment.

> **A.    *Lawrence Ray's traumatic childhood is a reason to impose a substantially below-Guidelines sentence.***

Mr. Ray's traumatic childhood experience of physical, emotional, and sexual abuse at the hands of his own family members undeniably shaped his adulthood. Psychiatrists recognize that "[e]arly family relationships are the psychological foundations in which children derive emotional security and formulate cognitive working models of the self and others." Lin HC et al., *Individual Differences In Attachment Anxiety Shape The Association Between Adverse Childhood Experiences And Adult Somatic Symptoms*, CHILD ABUSE NEGL. (2020).[2] "[W]hat happens in childhood—like a child's footprints in wet cement—commonly lasts throughout life. Time does not heal; time conceals." Vincent J. Felitti, MD, *Adverse Childhood Experiences And Adult Health*, ACADEMIC PEDIATRICS 2009; 9:131–32 at 131. This applies with great force to Larry Ray.

"[A]dverse childhood events are potentially traumatic experiences that occur in childhood, including overt forms of abuse (e.g., sexual trauma), as well as more covert and chronic forms of adversity (e.g., emotional neglect)." Pamela D. Pilkington, *Adverse Childhood Experiences And Early Maladaptive Schemas In Adulthood: A Systemic Review And Meta-Analysis*, 28 CLIN. PSYCHOL. PSYCHOTHER. 569, 570 (Nov. 2020). These events "cause harm or distress, thereby disrupting the child's physical or psychological health and development. ACEs have been associated with chronic health conditions, risky health behaviors, developmental disruptions, and increased healthcare utilization." Karen A. Kalmakis et al., *Health Consequences Of Adverse Childhood Experiences: A Systemic Review*, 27 J. OF THE AM. ASSOC. OF NURSE PRACTITIONERS 457, 458.

Throughout his early childhood, Larry experienced adverse childhood events. His grandmother verbally and physically abused him; his grandfather abused him sexually. This was in the 1960s, well before the phrase "adverse childhood experiences" emerged in academic literature and experts recognized the lifelong damage inflicted by childhood trauma. Growing up, Larry did not have the opportunity to engage in counseling or therapy to process his complex emotions; it simply wasn't the ethos of the times or of his family. Larry's mother never acknowledged the abuse she witnessed firsthand, and his father preferred to keep the past concealed; ignorance was bliss. Larry grew up believing his experience was normal. It was not.

This was the volatile foundation on which Lawrence Ray constructed his life and developed his values. "Experiencing traumatic events early in life, particularly harmful interpersonal encounters, may bring about a child's perceptions of the self as unworthy of love and lack of a sense of control over the surrounding world." Lin HC et al., *Adverse Childhood Experiences And Adult Somatic Symptoms*, *supra* n.2. Raised by abusive grandparents and a callous mother who made known her displeasure with her son, it is likely Mr. Ray internalized interpersonal challenges,

---

[2]    https://doi.org/10.1016/j.chiabu.2019.104325 (last visited Jan. 6, 2023).

culminating in undiagnosed psychological stress on top of the cumulative stress occasioned by childhood trauma. *Id.* Mr. Ray reacted in kind, asserting dominance where he could. It is not an excuse. But he knew no other way.

Mr. Ray's endless tales of his relationships with government officials, his connections to Russia, his work for CIA can all be traced back to an attempt to impress his mother, to make himself worthy of love. When he couldn't impress her, Larry became determined to inspire others. In a rare moment of vulnerability and unvarnished candor, Mr. Ray expressed, "In all of this horrible things people are saying about me, I just wish they knew what good I have done in my life for this country. I'm never going to get recognition for that."

**B.     The retributive and deterrent aims of sentencing have been achieved, in part, by Lawrence Ray's incarceration at the Metropolitan Correctional Center and the Metropolitan Detention Center throughout a global pandemic.**

Even in "normal" times, courts in this District have acknowledged that "it is no small thing to deprive a person of his or her freedom" because prison "is a harsh environment, in which fear and misery are never far from the surface, boredom is endemic, and privacy is nil." *United States v. Sayoc*, 388 F. Supp. 3d 300, 301 (S.D.N.Y. 2019). Mr. Ray's three years of incarceration, however, have been defined by conditions that far exceed the punitiveness of what prison should be in "normal" times, compounded by understaffing and years of mismanagement at MCC Manhattan and MDC Brooklyn, and the Bureau of Prisons' response to the COVID-19 pandemic. As this Court and numerous others in this District have recognized while imposing lower sentences and granting compassionate release applications, we respectfully submit that the Court should take into consideration that the unduly harsh conditions of Mr. Ray's confinement have made every day he has served in prison more punishing than it should be. *See United States v. Phillibert*, No. 15 Cr. 647 (PAE), 2021 WL 3855894, at *4 (S.D.N.Y. Aug. 27, 2021) ("Long before the current pandemic, courts had recognized that periods of pre-sentence custody spent in unusually arduous conditions merited recognition by courts in measuring a just sentence." (citing, *inter alia*, *United States v. Carty*, 264 F.3d 191, 196–97 (2d Cir. 2001) (holding that that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures," and vacating and remanding the defendant's sentence "so that the district court [could] reconsider the defendant's request for a downward departure"))); *e.g.*, *United States v. DeJesus*, 20 Cr. 464 (LJL) (S.D.N.Y. Dec. 1, 2021), Dkt. No. 41, Tr. 23:23–25, 24:1–6.

The horror of Mr. Ray's confinement starts with the deplorable baseline conditions at the two institutions where he has been detained since his arrest. As Judge Berman has noted, MCC and MDC are notoriously "dirty," "infested with drugs," and there is a prevalence of "violence." *United States v. Morgan*, No. 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020), Dkt. No. 90, Tr. 12:25– 15:21, 37:15–18. Judge McMahon has described the conditions at these facilities "as disgusting [and] inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be better than that." *United States v. Days*, No. 19 Cr. 619 (CM) (S.D.N.Y. Apr. 29, 2021), Dkt. No. 35, Tr. 19:17–20. As Judge McMahon explained:

[T]he MCC and the MDC, two federal correctional facilities located in the City of New York[,] are run by morons, which wardens cycle repeatedly, never staying for longer than a few months or even a year. So there is no continuity, there is no leadership, there is no ability to get anything done. They lurch from crisis to crisis, from the gun smuggling to Jeffrey Epstein, none of which is the fault of . . . any of the other inmates I have sentenced or will sentence. *Id.* 19:8–16.

One such "crisis" at the beginning of Mr. Ray's detention in early 2020 set the tone for his confinement over the next three years. Mr. Ray was initially detained at the MCC on February 11, 2020. From February 27 through March 11, 2020, the entire facility was on complete lockdown due to a loaded firearm that had been smuggled into the facility. *See* Stephen Brown, *Strip Searches, Frozen Bologna Sandwiches, and Wrecked Cells: MCC Inmates Detail Lockdown Due to Smuggled Gun*, N.Y. Daily News (Mar. 6, 2020). As a result, Mr. Ray could not receive routine medical care. Ex. C, Ray BOP Medical Records at FDNY-014, FDNY-039 (Mar. 3, 2020). With the exception of individuals who were shuttled among various housing units as officers searched for a loaded gun smuggled into the facility by a correctional officer, no one, including Mr. Ray, was allowed out of their cell. No visits, social or legal, were permitted for an entire week.

Outrage followed. At the time, this was an aberration. No one in recent memory had gone a week without the ability to visit with their lawyer. Days later, COVID-19 struck, and the already deplorable conditions of confinement were exacerbated exponentially by the BOP's response to the COVID-19 pandemic. For the greater part of the next three years, Mr. Ray would be subject to some form of lockdown or lock-in—the functional equivalent of solitary confinement. *See United States v. Gonzalez*, 18 Cr. 669 (JPO) (S.D.N.Y. Apr. 2, 2021), Dkt. No. 250, Tr. 17:17–18:3 (describing the "extraordinarily harsh" conditions of frequent lockdowns during COVID-19 as "basically like solitary confinement"). During these lockdowns, which were instituted frequently for weeks at a time in response to outbreaks and surges of COVID-19, Mr. Ray could not leave his cells for visits, calls, showers, or exercise; was provided cold food; and was unable to access the already limited services in the facility.

Such treatment began when Lawrence Ray first entered the MCC, when he was held in the Special Housing Unit (SHU), a location within the jail typically reserved for individuals facing disciplinary sanctions, in which detainees are deprived of even the meager comforts of "general housing," like social contact with others. Mr. Ray was never accused of committing a single infraction. Presentence Investigation Report at ¶ 22. Nonetheless, Mr. Ray was subject to solitary confinement for three months, until April 2020. During his time in the SHU, no one cleaned the unit. "Some wear masks, some don't," Mr. Ray reported at the time. He was not allowed to communicate by email and, like those among him, was only permitted to use the phone once every 30 days.

After the first month, the conditions in the SHU were mirrored in the rest of MCC, which responded to the outbreak of the COVID-19 pandemic by imposing facility-wide lockdowns. But MCC could not employ even the most basic CDC recommendations for preventing the spread of the coronavirus. Maintaining six feet of distance from other detainees is impossible in a correctional setting where most individuals (including Lawrence Ray when he was released to

general housing), are double-bunked, sharing a toilet and sink with their cellmate and a common shower with at least sixteen other people. When the commissary was closed, Mr. Ray relied on a single bar of soap to wash his hands, shower, and wash his clothing. Routine medical and dental visits were suspended because of the COVID-19 outbreak. At one point in April 2020, when Mr. Ray spoke with medical staff at the MCC about his diabetes medications and informed the physicians that he was feeling unwell, he was told, candidly, "sometimes people have medical needs that can't be met here."

Mr. Ray was transferred out of the SHU and into a dormitory unit in mid-April 2020. But the impact of unceasing lockdowns continued. In an email with the MCC legal department in July 2020 concerning Mr. Ray's discovery review, defense counsel was informed that Mr. Ray was only permitted out of his cell for two hours each day (and could review discovery then); otherwise, he was locked in for 22 hours a day. In early August 2020, Mr. Ray reported having been on lockdown for a week with no movement whatsoever, confined to his dorm 24 hours a day, 7 days a week as a result of a spike in reported COVID cases. Mr. Ray was tested for COVID as multiple people in his unit tested positive and were moved out. Later in August, Mr. Ray reported that his unit was again on lockdown due to COVID, with no word on when it might end. On August 19, 2020, to protest the horrific conditions of their confinement, Mr. Ray's unit began a hunger strike—no one in the unit accepted their food trays. Even on "normal" days, Mr. Ray would commonly eat only packets of peanut butter because the facility lacked proper kosher meals.

Shortly after Labor Day in 2020, Mr. Ray's unit converted to modified lockdowns, with slightly more movement afforded. But just a few short weeks later, his unit was again completely locked down, this time because a staff member tested positive for COVID and the facility was short staffed.

In early November 2020, Mr. Ray was taken to New York Presbyterian Hospital after experiencing what medical professionals believed to be a seizure. When he returned from the hospital, Mr. Ray was held in isolation for nearly three weeks, from November 6, 2020 through November 25, 2020, despite having tested negative for COVID-19 upon his return to the facility. By December 2020, Mr. Ray was transferred to a general unit where he was able to leave his cell for only 30 minutes three times a week. Put differently, he spent four of seven days each week locked in a cell 24 hours a day, and three days a week locked in a cell 23.5 hours a day. Mr. Ray endured either complete or partial lockdowns for the duration of his time in the MCC. Even when lockdown conditions were not in place, Mr. Ray was still subjected to extraordinarily harsh conditions as the BOP resorted to "modified operations" to attempt to control the unmitigated spread of COVID-19 inside detention facilities. This meant that, even when the least restrictive conditions of confinement were imposed, Mr. Ray had at most two hours out of his cell each day during which he could call loved ones, take a shower, or review discovery. This cycle of repeated lockdowns and modified operations continued throughout Mr. Ray's detention at MCC.

As an unprecedented global pandemic raged, Mr. Ray remained incarcerated at MCC until the facility shuttered as a consequence of its notoriously inhumane conditions of confinement. Benjamin Weiser, *Justice Dept. to Close Troubled Jail Where Jeffrey Epstein Died*, N.Y. Times (Aug. 26, 2021) ("Conditions at a high-security federal jail in Lower Manhattan have deteriorated

so much that federal officials said . . . that they planned to close the facility, at least temporarily."). Mr. Ray was transferred to another facility notorious for equally flagrant violations of human rights: the Metropolitan Detention Center. There, he continues to endure extraordinarily punitive conditions of confinement.

Mr. Ray's reports of the inhumane conditions of incarceration over the past three years have been echoed by other detainees. During facility-wide lockdowns, detainees must remain inside of their cells for 24 hours a day, without daily access to showers. Detainees could not submit sick calls electronically while on lockdown, and they reported that when they tried to hand in their sick call requests to officers on the units, officers refused to accept the request. The unending lockdowns also caused the conditions in the units at the MDC to severely deteriorate beyond their already awful state. Trash piled up inside individual cells because detainees were required to eat all of their meals inside of their cells and lacked access to adequate waste disposal. Cells were not regularly cleaned.

The general conditions at the MDC are abhorrent in other ways. Detainees frequently report delays or the total unavailability of commissary, which individuals rely on for access to over the counter medication—often the only pain relief available when one felt ill—and basic hygiene products like toothpaste and deodorant. The food is cold and often rotten. The water is often brown or shut off entirely; detainees do not have consistent access to fresh drinking water. Even when the facility or a unit is not formally locked down, there are many days that detainees are not allowed out of their cells or given only 30 minutes outside of their cells to shower, wash their clothes, exchange emails with loved ones, or make a phone call. This is simply not enough time to accomplish each of these tasks, especially when every other incarcerated person is trying to do the same things at the same time. Mail frequently never arrives.

In an effort to protect himself from COVID, Mr. Ray received a vaccination while incarcerated. But in September 2022, he nonetheless tested positive for coronavirus. Consequently, Mr. Ray was again held in isolation for days before being transferred back to the general population, where his freedom of movement marginally improved. When he returned to his unit, he discovered his locker had been broken into; all of his belongings—including his legal paperwork and personal hygiene products—were missing, a common complaint among individuals at MDC who return to their unit after quarantine or isolation.

\*     \*     \*

As numerous courts in this District have recognized in imposing downward variances at sentencing, Your Honor should consider the excessively punishing conditions of Mr. Ray's incarceration at the MCC and the MDC over the past three years. As Judge Engelmayer declared at a sentencing in July 2020, mere months into the pandemic,

> [Y]ou have served most of your time in prison so far during the worst pandemic in this country during the past 100 years. I'm mindful that you may have contracted COVID-19 while in prison. I'm mindful that your experience in prison as a result of the pandemic, the preceding lockdown, the ensuing lockdown, and your own illness was frightful. Prison is supposed to be

punishment, but it is not supposed to be trauma of that nature or close. My colleagues and I commonly informally credit prisoners who have served time awaiting extradition in dreadful prisons overseas with more time served than measured by the calendar. The same logic applies here, and then some. Your time in the MCC was way harder than anyone intended when you were detained following your arrest.

*United States v. Aracena de Jesus*, 20 Cr. 19 (PAE), Dkt. 29, Tr. 36:10–23 (S.D.N.Y. July 1, 2020).

That month, Judge Rakoff observed, "conditions in the prison system now result in a harshness that is not the norm and that ought to be recognized by the court as a mitigating factor. In effect, you are serving harder time every day you are in the federal prisons." *United States v. Cirino*, No. 19 Cr. 323 (JSR) (S.D.N.Y. July 17, 2020), Tr. 11:11–1. Indeed, courts in this district have "repeatedly found that the COVID-19 pandemic presents an extraordinary and unprecedented threat to incarcerated individuals." *United States v. Tucker*, 13 Cr. 378 (AJN), 2021 WL 37227450, at *2 (S.D.N.Y. Aug. 23, 2021) (citations omitted). "It is beyond dispute that the pandemic has made incarceration harsher and more punitive than would otherwise have been the case. This is because the federal prisons, as 'prime candidates' for the spread of the virus, have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal." *United States v. Rodriguez*, 492 F. Supp. 3d 306, 311 (S.D.N.Y. 2020) (citations omitted); *see also United States v. Henareh*, 11 Cr. 93 (JSR), 2021 WL 119016, at *5 (S.D.N.Y. Jan. 13, 2021) ("[T]he heightened restrictions imposed upon all prisoners during the pandemic may enhance the deterrent effect of prison sentences served during the pandemic by making the conditions of confinement harsher, both physically and psychologically, than they would otherwise normally be.").

Acknowledging that COVID hardship is a basis for downward variance, courts in this district routinely give additional credit for each day of pretrial detention served during the pandemic. As this Court has recognized, when an individual is incarcerated "while the country is still suffering from the pandemic and while the Bureau of Prisons is still struggling with the pandemic, [ ] that will make the time that he is serving harder than it would be if the pandemic had been addressed and we didn't have the pandemic." *DeJesus*, 20 Cr. 464 (LJL) (S.D.N.Y. Dec. 1, 2021), Dkt. No. 41, Tr. 23:23–25, 24:1–6; *see also e.g.*, *United States v. Crispin*, 19 Cr. 323 (JSR) (S.D.N.Y. Aug. 21, 2020), Dkt. 124, Tr. 9:2–4 ("[T]he existence of COVID-19 has created harsher conditions, and that's a fact that the Court should take into account."); *Gonzalez*, No. 18 Cr. 669 (JPO) (S.D.N.Y. Apr. 2, 2021), Dkt. 250, Tr. 17:17–18:3 (noting that "because it's been harsher than a usual period that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served"); *United States. Brissett*, 19 Cr. 153 (KMW) (S.D.N.Y. Sept. 22, 2021), Dkt. 56, Tr. 26:10–20 (giving 31 months extra time-served credit for every day "spent in deplorably brutal conditions" during COVID); *United States v. McRae*, 17 Cr. 643 (PAE), 2021 WL 142277, at *5 (S.D.N.Y. Jan. 15, 2021) ("[A] day spent in prison under extreme lockdown and in well-founded fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing.").

As noted above, even "before the current pandemic, courts had recognized that periods of pre-sentence custody spent in unusually hard conditions merited recognition by courts in measuring the just sentence." *United States v. Romero*, 15 CR. 445-18 (PAE), 2021 WL 1518622, at *4, *6 (SDNY Apr. 16, 2021) (considering defendant's "13 months of incarceration during a once-in-a-century pandemic" as part of defendant's "history and characteristics" in granting motion for compassionate release); *see also Phillibert*, 2021 WL 3855894, at *4.

Having been incarcerated since the inception of the pandemic, and been subject to solitary confinement and isolation even before then, Mr. Ray deserves no less consideration. Because his extraordinary conditions of confinement are tantamount to pre-sentence punishment, he is entitled to an additional significant downward variance from the applicable guidelines. As Judge Engelmayer has observed, "Any mature system of justice, any thoughtful judge in imposing the reasonable sentence here would have to recognize the unexpected and regrettable ardors that you experienced since your arrest in December [2019]." *Aracena de Jesus*, 20 Cr. 19 (PAE), Dkt. 29, Tr. 37:8–11 (S.D.N.Y. July 1, 2020). These concerns militate in favor of a downward variance in this case.

### C.    Lawrence Ray suffers from chronic medical conditions that the Bureau of Prisons is unequipped to handle.

The global pandemic notwithstanding, the Metropolitan Detention Center is notorious for its mistreatment of detainees and the abhorrent medical treatment it provides. Sadly, the poor medical care Mr. Ray has received while incarcerated at the MDC is endemic to the Bureau of Prisons and recognized by the Department of Justice's own Inspector General. This deficient care has harmed Mr. Ray, who has now been held at Bureau of Prisons facilities for nearly three years, and is unaccounted for by the Sentencing Guidelines. *See* 18 U.S.C. § 3553(a)(2)(D). The Court should take this into consideration when imposing Mr. Ray's sentence.

### 1.    The Metropolitan Detention Center

Judges in the Eastern District of New York have collectively expressed alarm and outrage over the dearth of medical care at the MDC, where Mr. Ray has been held for more than a year. In *United States v. Sternquist*, Magistrate Judge Bloom decried, "it should[n't] be a death sentence to be put into MDC's care and that people are having to go to the hospital doesn't surprise anyone." 22 Cr. 473 (DLI) (E.D.N.Y. Oct. 19, 2022), Tr. 16:19–21 (referencing the lawsuit has been pending against the facility for "several years" as a result of the appalling conditions of confinement). "[I]t's gotten to the point where we [magistrate judges] are all afraid of the medical care that people are being given at MDC." *Id.* at 23:9–11. "My bottom line is we've had these problems at MDC. They continue. People's lives are at stake and we have to take it seriously." *Id.* at 24:9–11.

The Bureau of Prisons routinely disregards court directives ordering medical care for individuals in custody. Judge Bloom observed that in two separate cases in a two day period, the government requested to "stay orders of the Court regarding medical attention at BOP." *Id.* at 6:18–20. She continued, "I think it's fair to say that this is a matter of great concern to the magistrate judges." *Id.* at 6:21–22. Reviewing the history of the case before her, Judge Bloom

remarked, "the order to show cause that was issued by my colleague, Judge Bulsara, in this case is scathing and talking about the BOP not complying with orders of the Court and, again, threatening contempt proceedings." *Id.* at 8:10–14. Addressing MDC legal counsel, the Court warned, "Ms. Papapetru, you're going to be at some point the one on the witness stand under oath with sanctions taken against you or your employer." *Id.* at 11:9–11. The Court made clear "these issues and difficulties" with the MDC are not a "one-time occurrence." *Id.* at 24:4–5.

As the Court made clear, Mr. Ray's grievances about the medical care he has received while incarcerated are echoed by many. And courts take them seriously. For good reason. The MDC is simply not equipped to handle inmates' medical concerns. Despite this, the facility is loath to send people to the hospital, frequently determining that an individual's needs do not require that level of care. Yet the Bureau of Prisons has taken Mr. Ray to a hospital nearly a dozen times over his three years of incarceration.

| Admitted | Discharged | Facility |
|----------|-----------|----------|
| 11/5/2020 | 11/6/2020 | New York Presbyterian |
| 12/3/2021 | 12/6/2021 | Maimonides Medical Center |
| 2/7/2022 | 2/7/2022 | NYU Langone |
| 3/15/2022 | 3/17/2022 | New York Presbyterian |
| 3/22/2022 | 3/23/2022 | New York Presbyterian |
| 5/3/2022 | 5/3/2022 | Brooklyn Hospital Center |
| 5/12/2022 | 5/26/2022 | Brooklyn Hospital Center/ Mt. Sinai – Beth Israel |
| 10/4/2022 | 10/4/2022 | NYU Langone |
| 11/2/2022 | 11/2/2022 | Brooklyn Hospital Center |
| 11/15/2022 | 11/21/2022 | Brooklyn Hospital Center |
| 1/4/2023 | 1/4/2023 | Brooklyn Hospital Center |

Whatever the Court believes about Mr. Ray's medical complaints, there is objective evidence that Mr. Ray has been suffering physically while incarcerated. The MDC does not send inmates to the hospital absent a compelling need. And a hospital does not admit someone for multiple days unless essential for an individual's care. *See generally* Ex. D, Ray Brooklyn Hospital Medical Records (May 2022) (reflecting that medical professionals located an "occlusion" and the neurology doctor recommended a transfer to Mr. Sinai hospital, which occurred). On multiple occasions, including while Mr. Ray was on trial, defense counsel has observed large, circular, dark red welts or lesions that appear without notice on Mr. Ray's fingers, legs, and other parts of his body. *See generally, e.g.*, Ex. G, Ray BOP Medical Records (Aug. 2022). Mr. Ray has been prescribed Kepra, an anticonvulsant commonly used to treat seizures; certainly, medical professionals would not have prescribed this medication to Mr. Ray absent cause to believe he

needs it. Whether the seizures being treated are true epileptic seizures or seizure-like events that appear outwardly similar to epileptic seizures, "seizure-like events can also feel very real to patients." Ex. E, Dr. David W. Lovejoy, Psy.D., ABN, Letter. That doctors have struggled to identify the medical cause of Mr. Ray's ailments does not mean that he has not been suffering.

Indeed, the literature on adverse childhood experiences suggests that Mr. Ray's traumatic childhood contributes to his physical ailments. Research "reveals a powerful relation between our emotional experiences as children and our adult emotional health, physical health, and major causes of mortality in the United States…. [T]ime does *not* heal [these] adverse experiences." Vincent J. Felitti, *The Relation Between Adverse Childhood Experiences and Adult Health:* Turning Gold into Lead," 6 PERMANENTE J. 1, 44 (2002). "Adverse childhood experiences (ACEs), including exposure to abuse and household dysfunction, are associated with leading causes of adult morbidity and morality and premature death." Leah K. Gilbert et al., *Childhood Adversity and Adult Chronic Disease*, 48 AM. J. PREV. MED. 3, 345 (2010). "Numerous studies have shown that early adverse experiences, particularly those involving interpersonal traumas (including sexual abuse, physical and emotional abuse or neglect), are linked to various forms of somatic symptoms. Sansone et al. (2001), for example, reported that childhood trauma exhibited a direct effect on somatic preoccupation during adulthood—a disorder characterized by spending excessive amounts of time and energy on physical symptoms and health concerns." Lin HC et al., *Adverse Childhood Experiences And Adult Somatic Symptoms*, *supra* n.2.

Given this, Mr. Ray's ongoing physical ailments and preoccupation with his personal wellbeing may be the result of his history of never-treated childhood abuse in conjunction with the myriad dysfunctional family dynamics reported by his former sister-in-law.

As the past three years have demonstrated, the Bureau of Prisons cannot meet Mr. Ray's medical needs. And there is no promise that Mr. Ray's care will improve after he is transferred to a designated facility.

### 2.    The Bureau of Prisons

In 2016, the Department of Justice Inspector General issued an alarming report on conditions within the BOP for older, infirm individuals like Mr. Ray. Because this extensive report provides substantial detail on many conditions and aspects of BOP custody that would have a direct, negative impact Mr. Ray, we attach it to this submission as an exhibit and respectfully urge the Court to read it in its entirety. *See* Ex. F, U.S. Dep't of Justice, Office of Inspector Gen., *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (Rev. Feb. 2016). The DOJ Inspector General concluded that "BOP institutions lack appropriate staffing levels to address the needs of an aging inmate population." *Id.* at ii. These staffing issues cause acute problems when it comes to inmate medical care.

As the DOJ Inspector General described in a related report, "staffing shortages limit inmate access to medical care, result in an increased need to send inmates outside the institution for medical care, and contribute to increases in medical costs." U.S. Dep't of Justice, Office of Inspector Gen., *Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, at i (March

2016).[3] The BOP's inability to fully staff medical positions is widespread and deep. *See id.* "Understaffed health services units limit access to medical care and contribute to delays for aging inmates." Ex. F at 17. While aging inmates "have an increased need for health services. . . . BOP officials, staff, and inmates, institutions lack adequate health services staff to address these needs." *Id.* "As a result, aging inmates experience delays receiving medical care." *Id.* at ii.

A another DOJ report on the BOP's contracts for outside medical services confirmed that "BOP did not have a reliable, consistent process in place either to evaluate the timeliness of inmate healthcare or the quality of that care." U.S. Dep't of Justice, Office of Inspector Gen., *Audit of the Federal Bureau of Prisons Comprehensive Medical Services Contracts Awarded to the University of Massachusetts Medical School*, at ii (Mar. 2022).[4] Even in Federal Medical Centers, where high-needs inmates are housed for medical care, specialty positions were often unfilled. *Id.* at 13.

Overcrowding within BOP facilities also has a direct impact on inmate health because it prevents inmates from being housed in the appropriate institutions. As the DOJ Inspector General concluded, "[o]vercrowding also limits the BOP's ability to move aging inmates to the institutions that best address their medical needs." Ex. F at 25. Staffing shortages caused by the COVID-19 pandemic has only exacerbated these issues. *See* E. Ortiz, "Staffing Shortages And Deficient Training Leave First Step Act Floundering, Federal Prison Employees Say," NBCNews (July 28, 2022) (describing how programming at BOP facilities has been severely cut back while employees are diverted to other correctional officer duties during the ongoing staffing shortage).[5]

The Court must sentence Mr. Ray to at least 180 months' incarceration. But the Bureau of Prisons cannot provide adequate medical care to elderly and extremely high-needs individuals like Mr. Ray (and particularly the condition Mr. Ray will be in near the end of his mandatory 15 year sentence). Section 3553(a)(2)(D)—which requires the Court in imposing a sentence to consider how to provide Mr. Ray with needed medical care or other treatment "in the most effective manner"—overwhelmingly weighs against the imposition of any period of incarceration beyond what the statute requires.

### D.   *A sentence of 15 years serves the sentencing aim of deterrence.*

The defense is not blind to the sentencing court's responsibility to "send a message" to the community sufficient to deter others from committing similar conduct, and impose a sentence that will deter Mr. Ray from committing future crimes. Mr. Ray was convicted of serious offenses, including one that requires a 15 year period of incarceration. But any sentencing beyond 15 years is unnecessary, especially in light of the exceptionally unique circumstances underlying the offense and Mr. Ray's advanced age. As the Second Circuit has explained, if the District Court believes a

---

[3]   https://oig.justice.gov/reports/2016/e1602.pdf.

[4]   https://oig.justice.gov/sites/default/files/reports/22-052.pdf.

[5]   https://www.nbcnews.com/news/us-news/staffing-shortages-deficient-training-leave-first-step-act-floundering-rcna40210 (last visited Jan. 6, 2023).

lower sentence will be as effective as a higher sentence to serve the sentencing aims, it must choose the lower sentence. *See United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006).

To achieve the aim of general deterrence, "social science conclusively finds that certainty matters more than severity." Brian Jacobs, *The Cost of Affording Deterrence*, Forbes (Nov. 16, 2021).[6] "[T]he vast majority of people who are committing crime are not particularly forward-looking. So adding five or ten years to an already long prison sentence simply doesn't have much of an effect on their behavior today." *Id.* In a bulletin by the National Institute of Justice, the U.S. Department of Justice echoes, "Laws and policies designed to deter crime by focusing mainly on increasing the severity of punishment are ineffective partly because criminals know little about the sanctions for specific crimes." U.S. Department of Justice, Five Things About Deterrence 1, National Institute of Justice (May 2016).[7] "Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment." *Id.*

For this reason, the Court should sentence Mr. Ray to 15 years of incarceration and impose a lengthy period of supervised release to bridge the gap between the advisory Guidelines range and the mandatory minimum sentence. At minimum, the Court must sentence Mr. Ray to at least five years of supervised release. 18 U.S.C. §§ 1591, 3559(a)(1), 3583(b)(1). For Mr. Ray, a lengthy term of supervision with restrictive special conditions following more than a decade of incarceration would be no small punishment. "[S]upervised release is itself a serious sanction that imposes significant limitations of a defendant's liberty." *United States v. Brooks*, 889 F.3d 95, 101 (2d Cir. 2018). Supervised release also "comes with an increased likelihood that reoffenders will be caught, thereby providing the increased certainty of punishment that is more likely to result in specific deterrence to individuals on supervised release, and potentially general deterrence as well at least to those who may associate with individuals on supervised release." Jacobs, *The Cost of Affording Deterrence*, *supra* n.6.

Were the Court to sentence Mr. Ray to 15 years of incarceration followed by even just five years of supervised release, Mr. Ray would be nearly 73 years old when released from prison and nearly 80 years old before he could conceivably live in the community without any supervision. Over the past three years, Mr. Ray has not had any disciplinary sanctions while incarcerated. Presentence Report at ¶ 22. In fact, while incarcerated Mr. Ray completed five hours of ESJ Eat Smart and five hours of Health Journal programming at a time when limited programming was even available. *Id.* As this Court has recognized, "it is well-established that older offenders are significantly less likely to recidivate than younger offenders." *United States v. Gluzman*, No. 96 Cr. 323 (LJL), 2020 WL 4233049, at *18 (S.D.N.Y. July 23, 2020). "Among offenders released younger than age 21, 67.6 percent were rearrested compared to 13.4 percent of those released age 65 or older. . . . Older offenders who do recidivate do so later in the follow-up period, do so less frequently, and had less serious recidivism offenses on average." U.S. Sentencing Comm., The

---

[6]   https://www.forbes.com/sites/insider/2021/11/16/the-cost-of-affordingdeterrence/?sh=6f8975277bd4
(last visited Jan. 6, 2023).

[7]   https://www.ojp.gov/pdffiles1/nij/247350.pdf.

Effects of Aging on Recidivism Among Federal Offenders (Dec. 2017)[8]; *see also United States v. Bass*, 462 F. Supp. 3d 176, 189 (N.D.N.Y. 2020) (finding recidivism unlikely given defendant's advanced age and noting defendant's "mostly clean disciplinary record from his time in prison" and ability to "largely follow[ ] the rules while incarcerated suggests that he will do so once released, which minimizes the danger he poses to the community").

Now 63 years old, Mr. Ray has never served a term of incarceration for a prior conviction longer than the three years he has now spent incarcerated at the MCC and the MDC. And he faces at least 12 more. Whatever sentence the Court imposes will far outstrip any term of incarceration Mr. Ray has served. As the Second Circuit noted in *United States v. Mishoe*, "Obviously, a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve." 241 F.3d 214, 220 (2d Cir. 2001). Certainly, 15 years of incarceration is sufficient to achieve this effect.

Finally, the Sentencing Commission has found that "[t]he odds of recidivism were approximately 29 percent lower for federal offenders sentenced to more than 120 months incarceration compared to a matched group of federal offenders receiving shorter sentences." U.S. Sentencing Comm., Length of Incarceration and Recidivism (June 2022).[9] Given that 10 years of incarceration has a consistent preventative effect, certainly a 15 year sentence is a sufficient deterrent for a 63 year old man. Anything more is effectively a life sentence.

### E.   The public nature of Mr. Ray's trial achieved, in part, the deterrent, incapacitation, and retributive aims of sentencing.

For the past several years, the press has villainized Mr. Ray. The cascade of unflattering photographs and stories demonizing Mr. Ray began before his arrest and has continued long after his trial ended.

Throughout Mr. Ray's extremely public weeks-long trial, a variety of inflammatory trial exhibits were provided to the media. Mr. Ray was tried not only by a jury in a court of law, but also in the court of public opinion, and he has been condemned by both. As a result, Mr. Ray endured the additional punishment of derisive news articles, salacious television miniseries, and sensational documentaries, a burden unaccounted for by the Sentencing Guidelines but borne by Mr. Ray. *See, e.g.*, Nick Schager, The Evils of Larry Ray: A Creepy Dad Who Started a Sex Cult at Sarah Lawrence College, The Daily Beast (Sept. 28, 2022)[10]; Allison Crist, 'Sex, Lies and the College Cult': All the Bombshells Revealed About the Sarah Lawrence Scandal, N.B.C. New York (Sept. 30, 2022).[11] He lost contact with and the support of close family and friends. Critically, Mr.

---

[8]   https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf

[9]   https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220621_Recidivsm-SentLength.pdf

[10]   https://www.thedailybeast.com/the-evils-of-larry-ray-a-creepy-dad-who-started-a-sex-cult-at-sarah-lawrence-college (last visited Jan. 6, 2023).

[11]   https://www.nbcnewyork.com/entertainment/entertainment-news/sex-lies-and-the-college-cult-all-the-

Ray will never again be in a position to form the relationships that led to the conduct underlying his convictions. Within seconds, a routine Google search reveals his most recent conviction and the heinous accusations lodged against him. Mr. Ray has effectively been incapacitated by virtue of the very public nature of his trial. The Court should consider this when imposing sentence.

*      *      *

Just weeks ago, at the end of December, Mr. Ray lost his biological father, Lawrence Grecco. The man who sat Mr. Ray through his son's relentless trial, relying on Access-A-Ride to bring him between the courthouse and his home in Staten Island. The man who was present at Mr. Ray's very first bail hearing and remained by his side well after his son's conviction. As Larry's father noted in his letter of support shortly before his death,

> I try to do everything I can for Larry. I go out of my way to get to the court, to get to the prison to visit him. It's hard getting there, I get Access-A-Ride, but we sit, we get an hour, we chat. . . . Seeing him in there is disturbing. You can take me literally how heartbreaking it is. Larry was always there for me. He'd visit me in Staten Island, he'd have me over in New Jersey. When we call, he always asks how our health is, how Lucille is doing, even earlier today. He loves and cares about both of us.

Ex. B, Letter of Lawrence Grecco.

Mere days before losing his father, Mr. Ray's stepmother, who he has known nearly all his life, Lucielle Grecco, had also passed away. The following week, Mr. Ray learned more devastating news: his stepfather, whose name he adopted as an adolescent, Gordon Ray, died suddenly after a severe fall. These serial losses on the eve of his sentencing have delivered Mr. Ray an additional, unaccounted punishment.

As a consequence of his incarceration, Mr. Ray did not learn of his parents' deaths immediately. Instead, he continued to dial their numbers after they had died, not knowing they were gone. But he didn't hear the familiar sound of their voices on the other end of the line. When nearly everyone else had abandoned him, Mr. Ray was fortunate to have two fathers who loved him unconditionally. These were the individuals on Mr. Ray's call logs, the loved ones he would call during the brief periods when he was not locked in a cell. Yet he was unable to spend his parents' final days by their side; unable to help plan his parents' memorial; unable to attend their funerals. Mr. Ray will spend many years in jail mourning the loss of his closest relatives with virtually no other support.

"You'd think regardless of what your son does, you'd feel some sympathy for him, but [his mother] never did. Even now, she's fine just letting him rot. I see his father go to the jail and support him, and Gordon stays in touch, but [his mother and his brother] have abandoned him. [His mother] just doesn't care about him." Ex. A, Letter of Martha Ray.

---

bombshells-revealed-about-the-sarah-lawrence-scandal/3888653/ (last visited Jan. 6, 2023).

The Sentencing Guidelines do not account for this loss. The conditions of confinement were undeniably harder for Mr. Ray than those who did not suffer the loss of three parents within one week. They do not account for the emotional weight of knowing that there is nothing you can do to help your adult daughter, who will bear the immense burden of the loss.

The years Mr. Ray has spent incarcerated have illuminated the risks inherent to criminal conduct. Mr. Ray not only knows the consequences of his actions, he has lived them. Never will he violate the law and risk the brutal detention that has stripped him of substantial time with his loved ones over the past nearly three years.

## IV.    Conclusion

Thank you for your consideration of Mr. Ray's request for a sentence of 15 years of incarceration.

Respectfully submitted,

/s/

Marne L. Lenox, Esq.
Peggy Cross-Goldenberg, Esq.
Allegra Glashausser, Esq.
Neil P. Kelly, Esq.

*Counsel for Lawrence Ray*

cc:    Counsel of record