# EXHIBIT A

December 30, 2022

The Honorable Lewis J. Liman
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Liman,

My name is Martha C. Ray. I live in Somerset, New Jersey and I run my own distribution company. I'm the ex-wife of Carl Ray, Lawrence Ray's brother. Carl Ray and I have two sons together.

I've known the Ray family for almost forty years. I met Carl when I was nineteen years old through mutual friends. We started dating, and after three months got married. I had grown up in New York City with my four siblings and my mom. When we got married, I left my life in Manhattan and moved to New Jersey to live with Carl, his mother Ingrid, and stepfather Gordon Ray. Ingrid arranged everything, and made sure things moved quickly. My mom didn't want me to get married, she was worried that I was moving too fast, and we were so young. But Ingrid manipulated the whole thing. I remember her saying, "why bother going back and forth" between the city and Jersey.

After I moved in, things got bad at the house. At the time, I had never met anyone like Ingrid. She had me doing chores in the basement, where I polished their panel walls. She had me clean the corners between furniture with Q-tip's. She went about it so specifically, like she would say, "Oh, you do it so good, you don't mind if you do this, right? You don't mind ironing Gordon's shirt, or mending his socks?"

To this day I tell my kids, she's your grandma, but be careful. I wouldn't eat anything from her. There was a carpenter, Jesse, who helped around the house. She was friends with his wife, Nora. Nora complained that Jesse was always looking at other women. Ingrid said, "I'll fix him." She offered him food and put things in it to get him fat, so he could "blow up" she liked to say. When she tells it to you, it's almost like she takes pleasure in it. She laughs about it. When I got married, she had Carl and I go to Carl's father house, Lawrence Grecco, and bring him cupcakes. Ingrid had put Ex-Lax in the cupcakes so that he would get sick and miss the wedding. It was all so shocking to me, I didn't know what to think or make of it. It was hard to believe it was even happening.

1

Ingrid was constantly scamming to get money. She set her cars on fire, then called insurance and said they got wrecked or stolen to collect the money. When Carl was a teen, he was in a car accident with his friend Sal in the passenger seat. When Ingrid called insurance about it, she said her sister was in the accident, not Sal, to collect money.

There was a high price to pay with any of Ingrid's help. She used to have Carl Ray himself crying in the corner. She hung everything over our heads, especially money. Money always flew back and forth, to this day, over 20 or 30 thousand at a time. Carl received so much crazy, sick money from this woman. Repeatedly, she gave me clothing only to take it back after. Once she bought me a fur coat, gave it to me in front of Gordon, I thanked her. A few weeks later, she said, "Oh, you have to give it back, Gordon's upset that I bought it for you," and she took it back. This happened many times, and she did the same with her sister, Elsa. She gave her clothes and then went into her car or her closet and stole it back. She had a mean demeanor, but she got away with it because she was in control of everyone around her. The mind games were constant.

She treated everyone horrible, and Gordon went along with it too. She bossed him around, yelling at him to get her things. He would reply, "yes pet, I love you pet." It was so off the wall. But if it wasn't for him and his money, she wouldn't be where she was, and her kids wouldn't have what they do. Gordon's life was so controlled by Ingrid, she made sure he had no other connections. It's deeply sad.

A neighbor of ours, Dottie, noticed all the manipulation and how miserable I was. She pulled me aside one day and said, "Everything you're going through is sad. I feel so bad for you. If Carl really loves you, you better leave." I talked to Carl and we decided to get our own apartment. Ingrid threatened us – if we moved out, she wasn't going to give us any help anymore. I was scared, but I couldn't take it anymore. I was so alone, and it was all on me what I was going through. The whole thing gave me a nervous breakdown. Ingrid was constantly giving me cigarettes and coffee, even if I didn't want it. She pushed me constantly. All the caffeine affected me really bad. One day, my heart was racing, I felt like I was dying. I asked if I could go to the hospital, but they wouldn't take me. Ingrid said, "There's no money, who's gonna pay for that?" After begging Carl, he eventually took me. The hospital told me I was having a panic attack.

Finally, Carl and I moved out. We started our own trucking business. It was hard at first, money was very tight. One Thanksgiving, Larry called and asked what we were doing to celebrate. We told him we didn't have enough money even for a turkey. Larry came over the next day with more than enough money for us to have a nice dinner. When our car was broken, he paid for it to be fixed. His dad's parents lived in Florida, and he paid for their house to be remodeled. He even flew his grandma out here to St. Peter's hospital when she was sick, so she'd have better treatment. The Larry I knew was always kind and generous. There were no limitations to his help.

2

Ingrid just didn't like him. It seemed like because Larry was successful working in Wall Street, or making more money than his mom, it bothered her. I wish I remembered more of her actions; it was so many years ago. She had this huge jealousy. If he said, "I met this person," she said, "I met someone else." She was always trying to top him. No matter what he said, she didn't care. The message was, "You're nothing, I'm better than you. You'll never be more than me." I remember one time Larry had purchased a Mercedes; he came to Jersey to show her. She replied, "Oh, everyone has one." She was so mean, so horrible. My mom and my family aren't like that, it was behavior I wasn't used to.

But Larry continued trying to get his mom's approval. It was like watching a little kid achieve something and want to show their parents. The kid wants to hear "Oh my god, that's great!" but Larry never got that from her. Once, Larry pulled up to the house in his car and Ingrid went out to see him. He was talking to her about juicing, the big diet trend at the time. She addressed him like he was a different person. "I'm waiting for my son to come in, he's late." Then she said, "Oh my god, is that you? If that's what juicing does, I don't want any part of it." Larry looked great, there was nothing wrong with him. He was always a put together, good-looking man.

I think Larry had a rough life, in general. He tried to be accepted by his mom, his parents went through their divorce. Ingrid told me stories about Grecco, that he is crazy, that he used to show up to schools and flash children. Whether it's true or not, that's a crazy thing to say, and to put in your kids' heads about their parent.

Carl was more sheltered. It was clear from the start that Ingrid favored Carl, who was younger, over Larry. Every interaction I saw between Ingrid and Larry was negative. I see the same sickness with Carl and my kids. He prefers Chris, the younger one, to our older boy, Carl. She also made sure that Carl and Larry never got along since they were young. Carl accepted his generosity, because we needed it, but he didn't like him.

When I read or hear about what happened in this case, it's not the Larry I know. I hadn't seen anything evil or bad in him. Larry helped his grandparents, his dad, us. Carl Ray wouldn't even help his own father for a penny. Grecco himself doesn't talk to Carl. All I can think of is all the mental abuse from his mom. There was no one Ingrid treated worse than her own kids, and especially Larry.

Teresa moved into Carl's house after we were separated, but not yet divorced, when my kids were still teenagers. At first, Carl said he was taking her in because he wanted to help her with Larry, that she had nowhere to go. But then she started sleeping upstairs. Soon after, she became the parent he made decisions with. Teresa took over the whole house. The boys stayed inside their rooms all the time to avoid her. It was very hard for them to have their father to start

3

sleeping with their aunt. I know it must've felt good for Carl to have her, after he hated Larry for so long.

Gordon and Larry were both the most under her control, I always felt so bad for them. I think that's what they bonded over. I know what they've gone through, the effects of mental abuse are serious. You don't have to be hit for it to be real. What Ingrid did to me and her kids, Carl is doing to our own kids.

Thankfully, after many hard decades, I'm doing very well for myself. But I understand what Larry went through, and what my kids are going through. I wish Larry could have a second chance like me. I'm not justifying anything he did, but he was a good man at one point. He always helped me and many people around us, and all he got was hatred from her, and I could never see why. You'd think regardless of what your son does, you'd feel some sympathy for him, but Ingrid never did. Even now, she's fine letting him rot. I see his father go to the jail and support him, and Gordon stays in touch, but Ingrid and Carl have abandoned him. She just doesn't care about him.

It's all very sad. When we were down and out, Larry helped us tremendously. From what I saw firsthand, Larry was a victim, Gordon was a victim. Ingrid, Teresa, and Carl all cleaned their hands of this. I hope things go well for Larry, he's able to get out, start over, and live a normal life. He deserves that.


Thank you for your time,

Martha C. Ray

4

# EXHIBIT B

November 9, 2022

Honorable Lewis J. Liman
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Liman,

My name is Lawrence Grecco. I'm the father of Lawrence Ray, born Lawrence Vincent Grecco. I live in Staten Island with my wife of 37 years, Lucille. We're both retired. For over forty years, I worked on Wall Street, on the trading floor for the New York Stock Exchange. I grew up in Brooklyn and have been in New York all my life.

When Larry was a boy, he was always active. We lived on Cropsey Avenue in Brooklyn, at my parents' house. There was a swimming pool in the back and Larry loved to swim. He liked to be out playing. I got him a dirt bike and we used to go ride it at the baseball field. He had a lot of friends and always helped people. If you needed something, he would do it for you.

For some time, I had Larry with me, and his mother Ingrid had our younger son Carl. Then, a judge ordered her custody of him, so I had to give up Larry to her. After a while, she agreed for Larry to come back and live with me. I don't remember why he wanted to live with me instead of his mom. This was over 40 years ago, it's hard to remember things exactly. But me and Larry always got along well. Larry has a good mind, he's intelligent. When Ingrid had the kids, she raised Carl to her likings and her beliefs. But Larry wouldn't follow them, he disagreed with her on a lot. Carl went along with it and now there's a few things we don't see eye to eye on. I haven't spoken to my son Carl in quite a number of years.

When Larry grew up, he moved to New Jersey and started his own family. We always stayed in touch. Larry always had good jobs. I was never involved in any of that, but Larry knew Kerik and Giuliani well. He was the best man at Kerik's wedding. I know that they were afraid of what he knew. And they're still afraid. There were a couple of attempts on his life. They tried to poison him, but there's been no justice.

I used to go out to Jersey to visit Larry a lot. I was close with Talia and Ava. Larry was always a good father. He took care of his daughters, they came first. They're dolls, the two of them. I haven't spoken to or seen Ava since all this started. She used to see me, run, and jump to me. Talia and I still talk. She's my granddaughter, I love her. She's a good girl. This case has almost ruined her life. She's trying to get herself together and wants to put all this behind her.

My son and granddaughter have poisoning in their system. It didn't happen on its own, no matter how you twist it. Larry's been sick for years. He gets lesions on his skin. A lot of times he doesn't feel well. Larry's health is not as good as it used to be. I would say it got worse over

these last years at the jails. Where he is, they're not getting addressed properly. Whatever treatment they give, he has to take.

I spoke to a lawyer about investigating the poisoning, but he asked for one million dollars up front. If I had it, I'd give it to him. My son is going to get locked up and sentenced and there's nothing I can do. But that's the justice system.

I try to do everything I can for Larry. I go out of my way to get to the court, to get to the prison to visit him. It's hard getting there, I get an Access-A-Ride, but we sit, we get an hour, we chat. Nothing is easy as you get older, trust me. Seeing him in there is disturbing. You can take me literally how heartbreaking it is. Larry was always there for me. He'd visit me in Staten Island, he'd have me over in New Jersey. When we call, he always asks how our health is, how Lucille is doing, even earlier today. He loves and cares about both of us.


Lawrence Grecco

# EXHIBIT C

REDACTED

# EXHIBIT D

REDACTED

# EXHIBIT E



NORTHEAST NEUROPSYCHOLOGY LLC
BRAIN & BEHAVIORAL HEALTH PARTNERS

I have been asked to provide information related to psychogenic non epileptic seizures (PNES). The following opinions are based on my knowledge from clinical practice, my education and my clinical training in the fields of clinical psychology and neuropsychology.

I am a board certified neuropsychologist. I completed an internship in clinical psychology at the Yale University School of Medicine and a postdoctoral fellowship in neuropsychology at Hartford Hospital and the Institute of Living. I have practiced in the fields of clinical psychology and neuropsychology for over 20 years. I am currently the senior managing partner of a neuropsychology practice (Northeast Neuropsychology). I am also a medical director and associate vice president at Mass Mutual Financial Group. Finally, I work within the neurosurgery department at Hartford Hospital. In this setting, I provide brain mapping services for patients with epilepsy, who are being scheduled for brain surgery. I also run an outpatient clinic where I help to evaluate and treat patients with epilepsy and PNES.

PNES is considered to be a complex psychological/psychiatric condition. People who suffer from PNES experience seizure-like events that can be very similar in outward appearance to true epileptic seizures. However, in their purest form, these events are not accompanied by the abnormal electrical brain activity that defines a more classic neurologic seizure. The seizure-like events or "spells" experienced by those with PNES can look very similar to actual seizures. These seizure-like events can also feel very real to patients. The gold standard for differentiating PNES from actual seizures is through simultaneous EEG and video monitoring on an epilepsy monitoring unit. In this setting, observed episodes/events can be compared on video and EEG tracings to determine if they are consistent with actual seizures or if they represent non-seizure PNES-related events.

The seizure like episodes associated with PNES are not viewed as consciously driven or intentional. Individuals with PNES are not viewed as having voluntary control over their episodes/spells. These events can be triggered by stress or other psychiatric symptomatology. They also can be associated with past psychological trauma or various psychiatric disorders. Some individuals develop PNES in adulthood when they are faced with emotional trauma, a high degree of stress or unexpected serious life events. PNES is a common condition. Approximately 30% of individuals referred for epilepsy monitoring are subsequently diagnosed with PNES.

Thank you for allowing me to consult in relation to this case.

_____
David W. Lovejoy, Psy.D., ABN
Senior Managing Partner, Northeast Neuropsychology
Ayer Neuroscience Institute, Department of Neurosurgery,  Hartford Hospital

# EXHIBIT F



# Office of the Inspector General
## U.S. Department of Justice



# Review of the Federal Bureau of Prisons' Medical Staffing Challenges

Evaluation and Inspections Division 16-02                    March 2016

# EXECUTIVE SUMMARY

## Introduction

The Federal Bureau of Prisons (BOP) is responsible for incarcerating federal inmates and is required to provide them with medically necessary healthcare. However, recruitment of medical professionals is one of the BOP's greatest challenges and staffing shortages limit inmate access to medical care, result in an increased need to send inmates outside the institution for medical care, and contribute to increases in medical costs. Additionally, medical staff shortages can impact prison safety and security. For example, according to an After-Action Report prepared after a riot at a BOP contract prison, the BOP noted that while low medical staffing levels alone were not the direct cause of the disturbance, they affected security and health services functions.[1]

As of September 2014, the BOP had 3,871 positions in its institutions' health services units to provide medical care to 171,868 inmates. Of those 3,871 positions, only 3,215 positions (83 percent) were filled.[2] Although BOP policy states that the vacancy rate shall not exceed 10 percent during any 18-month period, we found that only 24 of 97 BOP institutions had a medical staffing rate of 90 percent or higher as of September 2014.[3] Further, 12 BOP institutions were medically staffed at only 71 percent or below, which the BOP's former Assistant Director for Health Services and Medical Director described as crisis level.

Both civilian and uniformed staff hold these 3,215 filled healthcare positions. This includes 2,382 civil service employees and 833 commissioned officers of the U.S. Public Health Service (PHS), an agency of the U.S. Department of Health and Human Services, which provides public health services to underserved and vulnerable populations. The Department of Justice's Office of the Inspector General (OIG) conducted this review to assess challenges the BOP faces in hiring medical professionals and its use of PHS officers as one method of addressing those challenges.

## Results in Brief

The OIG found that recruitment and retention of medical professionals is a serious challenge for the BOP, in large part because the BOP competes with private

---

[1] Department of Justice (DOJ) Office of the Inspector General (OIG), *Audit of the Federal Bureau of Prisons Contract No. DJB1PC007 Awarded to Reeves County, Texas, to Operate the Reeves County Detention Center I/II, Pecos, Texas,* Audit Report 15-15 (April 2015), https://oig.justice.gov/reports/2015/a1515.pdf (accessed February 8, 2016).

[2] This reflects the population in BOP-managed institutions only. Inmates in contract institutions and residential reentry centers are excluded.

[3] There were 121 BOP-managed institutions as of September 2014, but the BOP considers correctional complexes (multiple institutions co-located) to be a single institution when reporting staffing levels. This reduces the number of institutions to 97.

employers that offer higher pay and benefits. We further found that the BOP has not proactively identified and addressed its medical recruiting challenges in a systemic way. Rather, it has attempted in an uncoordinated fashion to react to local factors influencing medical recruiting at individual institutions. Moreover, we found that the BOP does not take full advantage of staffing flexibilities the PHS offers that could assist in addressing some of its most difficult medical staffing challenges.

*The BOP's Compensation and Incentives Offered to Civil Service Medical Staff Are Not Sufficient to Alleviate Staffing Shortages*

Multiple factors, including the location of institutions, pay, and the correctional setting, negatively impact the BOP's ability to recruit and retain medical professionals. Civil service employee pay is governed by the General Schedule (GS) pay scale and U.S. Office of Personnel Management policies regarding how positions are classified. We found a significant gap between GS salaries and local average salaries for comparable healthcare positions; these gaps persisted across multiple medical professions and in both urban and rural communities. For example, BOP staff told us that it was particularly difficult to recruit pharmacists and we found that the average pharmacist salary in communities where BOP institutions are located was approximately double the mid-range salary the BOP can offer.[4] In an attempt to narrow these gaps, the BOP has increasingly relied on monetary and nonmonetary incentives and it plans to implement an alternative federal pay system for psychiatrists in fiscal year (FY) 2016. However, we found that these are not always sufficient to reduce the medical staffing vacancies the BOP faces. Faced with continuous understaffing, the BOP uses temporary duty (TDY) assignments and contracted medical providers to ensure that it can continue to provide inmates with necessary medical care. However, both of these options come with additional costs. Additionally, according to BOP officials, the limits of the GS pay scale mean that PHS compensation and benefits are more competitive for some professions.

*The BOP Does Not Identify or Address Recruiting Challenges in an Agency-wide and Strategic Manner*

The BOP's current method of addressing medical recruiting challenges focuses primarily on individual institutions' immediate needs. As a result, the BOP does not strategically assess which vacancies have the greatest overall impact on its ability to provide medical care to inmates. The BOP collects and maintains data that, if analyzed, could help it better assess and prioritize its needs and develop a strategy to meet those needs agency-wide. Such a process would include evaluating vacancies, the use of incentives, the use of TDY assignments, and the cost of outside medical care across all institutions. This would help the BOP identify the vacancies that are most costly to leave unfilled and to prioritize staffing in those locations.

---

[4] We compared average salaries reported by the Bureau of Labor Statistics with salaries in the middle of the range on the General Schedule salary table. For more information, see Appendix 1.

*The BOP Does Not Use the Authority It Has to Assign PHS Officers to Positions Based on Greatest Need*

The conditions of PHS officers' employment make them more mobile than civil service employees, and the PHS has created promotion incentives that benefit PHS officers who change duty stations; but the BOP does not take advantage of these flexibilities to assign PHS officers to positions based on greatest need. BOP officials expressed concerns to us that one method of using those flexibilities, involuntary transfers, could lead to unintended effects, such as PHS officers leaving the BOP for work in other agencies. However, involuntary transfers are not the BOP's only option for determining where PHS officers should work, as the BOP may alternatively require PHS officers to spend their first few years with the BOP filling high-priority positions, which could appeal to PHS officers seeking promotion. We believe the BOP should better utilize PHS officer flexibility to address medical vacancies of greatest impact.

## Recommendations

As the BOP struggles to fill its medical staffing needs, and as medical costs continue to rise, the BOP must collect better information on its priority health services vacancies and find solutions to meet the medical needs of its inmates. In this report, we make two recommendations to help the BOP improve its ability to assess the impact of medical vacancies on BOP operations and to develop a strategy to better utilize PHS officer flexibility to address medical vacancies of greatest impact.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

    The BOP's Responsibility to Provide Medical Care to All Inmates ................. 2

    Scope and Methodology of the OIG Review ............................................... 6

RESULTS OF THE REVIEW ................................................................................. 7

    The BOP's Compensation and Incentives Offered to Civil Service
    Medical Staff Are Not Sufficient to Alleviate Staffing Shortages .................. 7

    The BOP Does Not Identify or Address Recruiting Challenges in
    an Agency-wide and Strategic Manner .................................................. 16

    The BOP Does Not Use Its Authority to Assign PHS Officers to
    Positions Based on Greatest Need ........................................................ 20

CONCLUSION AND RECOMMENDATIONS ........................................................ 26

    Conclusion ........................................................................................ 26

    Recommendations .............................................................................. 27

APPENDIX 1:   EXPANDED METHODOLOGY ...................................................... 28

    Data Analysis ................................................................................... 28

    Interviews ......................................................................................... 29

    Site Visits ......................................................................................... 29

    Additional Objectives ......................................................................... 29

APPENDIX 2:   THE BOP'S RESPONSE TO THE DRAFT REPORT ........................... 31

APPENDIX 3:   OIG ANALYSIS OF THE BOP'S RESPONSE ................................... 33

# INTRODUCTION

As of September 2014, the Federal Bureau of Prisons (BOP) employed over 2,300 civil service employees and over 800 U.S. Public Health Service (PHS) officers to provide medical care to an inmate population of 171,868 in 121 institutions.[5]  However, these staffing levels fell short of the BOP's staffing goals:  from fiscal year (FY) 2010 to FY 2014, the BOP's total medical staff was approximately 17 percent less than what the BOP projected was necessary to provide what it considers to be "ideal" care.

Staffing shortages are a reflection of the BOP's challenges to recruit and retain medical staff.  Although BOP policy states that "the vacancy rate of staff positions that work directly with inmates shall not exceed 10 percent during any 18 month period," the BOP as a whole is unable to achieve this medical staffing goal, as only 24 institutions had a medical staffing rate of 90 percent or higher as of September 2014.[6]  Further, 12 institutions were medically staffed at only 71 percent or below, which the BOP's former Assistant Director for Health Services and Medical Director described as crisis level.[7]

The Office of the Inspector General's (OIG) previous report on the BOP's aging inmate population found that understaffing in institutions' health services units limits inmate access to medical care, results in an increased need to send inmates outside the institution for medical care, and contributes to increases in medical costs.[8]  Moreover, the BOP's staffing shortages continue despite significant increases in its spending on medical care.[9]  The BOP's spending on medical care increased 21 percent, from $905 million in FY 2010 to $1.1 billion in FY 2014, while

---

[5]  This reflects the pre-trial and sentenced population in BOP-managed institutions only. Inmates in contract institutions and residential reentry centers are excluded.

[6]  BOP, Program Statement 3000.03, Human Resource Management Manual (December 19, 2007).  Vacancy rates are calculated as a percentage of positions assigned to an institution.

At a meeting to discuss a working draft of this report, the BOP's Assistant Director for Human Resource Management said that while the BOP advocates for institutions to fully staff their medical positions, budgetary realities often make this unachievable.  As a result, the BOP's Central Office recognizes that institutions must balance staffing needs in all aspects of institution operations.

[7]  This official oversaw the BOP's medical care of inmates during our review, but retired in October 2015.

[8]  DOJ OIG, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, Evaluation and Inspections Report 15-05 (May 2015).  See https://oig.justice.gov/reports/2015/e1505.pdf (accessed February 8, 2016).

[9]  In 1994 the Government Accountability Office (GAO) reported that the BOP acknowledged nursing staff shortages but was unable to recruit staff to fill the positions because its salaries were well below that offered in the community.  GAO, *Bureau of Prisons Health Care:  Inmates' Access to Health Care is Limited by Lack of Clinical Staff*, GAO-HEHS-94-36 (February 1994).

In response to a working draft of this report, the BOP noted that other costs beside staffing, such as the costs of pharmaceuticals and medical procedures, also contribute to increased medical spending.

the BOP's overall budget increased 11 percent over that time, from $6.1 billion to $6.8 billion.

We conducted this review to build on our previous report's findings by further examining the BOP's medical staffing challenges, as well as its use and management of PHS officers as one means to address these challenges.  In this section, we describe the BOP's responsibility to provide medical care to inmates in its custody, the government-wide mission and role of the PHS, and the role of PHS officers who provide medical care inside BOP institutions.  In addition, we outline the memorandum of understanding (MOU) between the BOP and the PHS and the process used by BOP institutions to hire medical staff.

## The BOP's Responsibility to Provide Medical Care to All Inmates

The BOP is responsible for confining offenders in environments that are safe, humane, cost-efficient, and appropriately secure.  As part of this mission, the BOP provides medical care to federal inmates.[10]  Federal inmates receive medical care through institution health units or outside medical providers.  In FY 2014, the BOP employed 3,215 medical staff, including 2,382 civil servants and 833 PHS officers, to meet this need.  However, many institutions remain understaffed, limiting the amount of care that an institution can provide.  Specifically, in FY 2014, 20 BOP institutions had a medical staff vacancy rate of 25 percent or higher and 3 institutions had a vacancy rate of 40 percent or higher.  Hiring the medical professionals necessary to maintain the care that institutions must provide has proved challenging for the BOP.  We discuss these challenges later in this report.

*Established Health Units in Each BOP Institution Provide Medical Care*

To provide medical care to inmates, every BOP institution operates a health services unit.  Most units have examination rooms, treatment rooms, dental clinics, radiology and laboratory areas, a pharmacy, and administrative offices.  The BOP staffs these health units with medical professionals who provide urgent and routine medical care on an ambulatory or observation basis.  These medical professionals, who may be either civil service employees or PHS officers, include physicians, dentists, nurses, pharmacists, and mid-level practitioners.[11]  (See Figure below.) For inmates who require more intensive, specialty care than the health services units can provide, the BOP seeks care outside the institution.[12]

---

[10]  We conducted a broad review of the BOP's management of inmate medical care in 2008. See DOJ OIG, *The BOP's Efforts to Manage Inmate Healthcare,* Audit Report 08-08 (February 2008), https://oig.justice.gov/reports/BOP/a0808/final.pdf (accessed February 8, 2016).

[11]  The BOP also contracts with medical providers to offer clinics and specialty services inside the institutions to complement the primary care offered by the civil service and PHS-employed staff.

[12]  For outside medical care, the BOP signs contracts with community hospitals and physicians with close proximity to the institution.  The BOP negotiates rates with community hospitals using comprehensive medical contracts whenever possible.  The OIG is currently conducting a related review of the effect of these rates on the BOP's budget.

**Figure**

**BOP Medical Staff, Fiscal Year 2010 to Fiscal Year 2014**



Source:  BOP staffing data

Civil service employees constitute the majority of health services staff.  The BOP uses recruitment, retention, and relocation incentives to entice civil service medical professionals to join the BOP.  Typically, the BOP uses incentives for positions that are critical for the operation of health services units or for those that are difficult to fill, allowing the BOP more flexibility in compensation.  For example, the BOP can use a recruitment bonus to increase an employee's annual rate of pay up to 25 percent, in exchange for a 2-year service commitment.[13]  The BOP also uses retention bonuses, relocation bonuses, student loan repayments, annual leave credits, and "above the minimum rate" pay to incentivize employment.[14]  When using any incentive, an institution must prepare a narrative showing that it has a great need for the employee, and that without the incentive the institution would lose an existing employee or be unable to fill a vacancy.[15]  Officials in the BOP's Central Office must approve all incentives before they can be paid to employees.[16]

---

[13]  In response to a working draft of this report, the BOP noted that the BOP Director may approve a shorter service agreement for recruitment bonuses.

[14]  Relocation bonuses are offered to current BOP employees who relocate to a hard to fill location.  Student loan repayment can be awarded up to $10,000 annually for loans covering education required for a position, such as a loan to pay for medical school.  Annual leave credit increases the rate at which one earns annual leave each pay period.  "Above the minimum rate" pay allows an agency to pay a new employee above the initial grade and step that would normally be required by the GS scale to meet the superior qualifications of a candidate.

[15]  The narrative includes information such as the qualifications needed for the position, the qualifications of the candidate, labor market factors that that affect the ability to recruit, and recent turnover, if any.

[16]  The type of incentive determines whether BOP officials in the Health Services Division or Human Resource Management Division approve the incentive.

*PHS Officers Compose the Remainder of the Health Services Staff*

In FY 2014, 833 of the BOP's 3,215 health services staff at the institutions (26 percent) were PHS officers.[17]  The PHS is led by the Surgeon General and is an agency of the U.S. Department of Health and Human Services.  The PHS has commissioned over 6,500 officers who are assigned to 23 federal agencies and the District of Columbia.[18]  PHS officers serve in a variety of positions, treating underserved and vulnerable populations in the areas of public health.  The underserved communities that PHS officers treat include populations such as federal inmates or Native American communities living on remote tribal lands.  Most PHS officers are involved in medical care delivery, disease control and prevention, biomedical research, treatment of mental health and drug abuse, or disaster response efforts.  Within the BOP, PHS officers work both in positions that provide direct clinical care to inmates and in medical care management.

The PHS is part of the uniformed service rather than the civil service.  As such, PHS officers operate under a separate personnel system with additional obligations, and they are paid according to the Uniformed Service Compensation table used for the military rather than the General Schedule table used for civil service employees.  In exchange for their willingness to serve, PHS officers also receive uniformed service benefits, including health insurance at no expense, tax-free housing and subsistence allowances, and access to military base facilities.  The PHS also offers 30 days of vacation per year, financial support for education through the Post-9/11 GI Bill, access to the U.S. Department of Veterans Affairs' home loan program, and retirement eligibility benefits after 20 years of service.

With these benefits come additional responsibilities, such as being on call at all times and deploying on critical public health missions.  PHS officers are considered available for duty at any time and are therefore not eligible to earn overtime pay.  The PHS has several types of response teams that can immediately deploy to regional, national, and international public health emergencies, such as Hurricane Katrina or the Liberian Ebola crisis.  Additionally, PHS officers must continue medical education and maintain professional competence through additional training and certifications.

The BOP's partnership with the PHS to provide medical care to underserved inmate populations dates back to the BOP's creation in 1930.  In 1991, the BOP and the PHS signed an MOU to establish the conditions, responsibilities, and procedures

---

[17]  The BOP also employs both civil service and PHS officer health services staff in its Regional Offices and Central Office.  However, for this review we focused only on health services staff in the institutions.

[18]  Some of these agencies include the BOP, the U.S. Marshals Service, the Food and Drug Administration, the Indian Health Service, the Centers for Disease Control and Prevention, the National Institutes of Health, the Department of Defense, and the District of Columbia Commission of Mental Health Services.

that would guide PHS officers working throughout the BOP.[19]  Under the terms of the MOU, the BOP annually notifies the PHS of the number of PHS officers it needs and is responsible for the cost of PHS officer compensation and benefits.  The BOP transfers funds to the PHS for this purpose quarterly, and the PHS in turn pays and manages PHS officer benefits using these funds.

*Civil Service Employees and PHS Officers Are Considered Equally for Vacant Positions, and Fill the Same Duties Once Hired*

The BOP delegates the hiring of health services staff, including PHS officers, to each BOP institution, with selection authority for most BOP institution staff delegated to the institution's Warden.[20]  Consequently, individual institutions advertise vacancies and institution staffs focus their recruitment efforts primarily on the local community surrounding each institution.[21]  Although civil service employees and PHS officers have two separate personnel systems, their position duties and responsibilities at the BOP are the same.  Hiring officials told us they select and hire qualified candidates without differentiating between the civil service and the PHS, primarily because the need for such staff is greater than the availability of candidates from either type.  One institution's Human Resource Manager told us, "Whoever comes to us, however we get that person, if they are a civilian, and we can meet their needs, we're taking them.  If they are PHS, and we can meet their needs, we are taking them.  Medical is so hard for us to recruit and hire.  If you bring us your credentials and say you're willing to work here, we'll figure it out."

During our review, BOP officials also described the challenges that can arise from having to integrate these two separate personnel systems into their health services operations to provide inmates with medical care.  Among the relevant differences we identified were leave policies, awards, drug testing, and training opportunities.  BOP officials also described how this problem is exacerbated by what they see as discordant legal decisions in response to grievances from unionized BOP employees on the one hand, and PHS officers on the other hand, over issues relating to relative seniority between the two groups.  While we did not focus our review on these challenges, we did note that several BOP officials described the inevitable tensions that can arise in a workforce where staff members share the

---

[19]  The relationship between the BOP and the PHS is also defined by statute.  See 18 U.S.C. § 4005 and 42 U.S.C. § 250.  In response to a working draft of this report, the PHS noted that these two statutes underpin the MOU.

[20]  The Warden has selection authority for all institution staff below the assistant department head level and for medical officers and dental officers in consultation with the BOP Medical Director.  This encompasses all staff members who provide medical care to inmates.  See BOP, Program Statement 3000.03, section 250.1.

[21]  The BOP also advertises nationwide job announcements for some positions, such as nurses.  However, applicants select their preferred locations as part of the online application process.  When institutions have vacancies in positions that were advertised under a nationwide job announcement, the institution receives only the names of applicants who selected as a preferred location the institution.

same jobs, workplace, and mission, yet can receive meaningfully different compensation and benefits.[22]

**Scope and Methodology of the OIG Review**

Our review examined the BOP's medical staffing challenges and its use of PHS officers to address those challenges.  We also evaluated the BOP's ability to transfer PHS officers to different locations based on staffing needs.  We analyzed BOP staffing data for both civil service employees and PHS officers from FY 2010 through FY 2014.  Specifically, our review focused on medical professionals and those employees who help the BOP provide direct care inside BOP institutions.  For the purposes of this review, we excluded all other staff.  We also analyzed the cost data associated with BOP civil service.

Our fieldwork, which we conducted from April 2015 through October 2015, included interviews, data collection and analyses, and document reviews.  We interviewed BOP Central Office officials in the Administration, Human Resource Management, and Health Services Divisions, as well as an official in the BOP's union.  We also interviewed an official in the PHS Division of Commissioned Corps Personnel and Readiness.  We used video teleconference to conduct site visits to five BOP institutions and to interview institution officials.  A detailed description of the methodology of our review is in Appendix 1.

---

[22] In Appendix 1, we describe the extent to which we examined these issues, and our decision to focus the review on medical staffing challenges, in more detail.

# RESULTS OF THE REVIEW

## The BOP's Compensation and Incentives Offered to Civil Service Medical Staff Are Not Sufficient to Alleviate Staffing Shortages

Despite the BOP's increased use of incentives for civil service employees, the BOP remains challenged to recruit and retain medical professionals.  Specifically, we found that the salaries and incentives the BOP offers are not competitive with those of the private sector, particularly given the need for the BOP to compensate its employees for the safety and security factors intrinsic to working in a correctional setting.  As of September 2014, the BOP was operating at an 83 percent medical care staffing level, 7 percent below its goal of 90 percent.  As a result, health services units are left understaffed, with increased workloads that limit the amount of medical care that can be provided inside an institution.  The BOP's resulting need to rely on temporary duty (TDY) assignments shifts its staffing resources among institutions, and its reliance on contractors to augment the medical care it can provide contributes to the BOP's overall spending on outside medical care.

*The BOP is Disadvantaged in Its Efforts to Recruit Civil Service Medical Professionals*

While recruitment is a challenging area for many healthcare organizations, it is particularly challenging for the BOP because of its geographic locations and local market competition, the limits on the pay it can offer its medical staff, and its correctional setting.[23]  The BOP's Assistant Director for Human Resource Management said that recruitment is also difficult because the recruiting challenges the BOP faces vary across institutions.  As of September 2014, there were 121 BOP-managed institutions located across the United States, in both urban and rural areas.

We found that in major metropolitan areas, the BOP's greatest recruiting challenge is attracting candidates that are also qualified to work in private organizations, such as hospitals and local medical centers.  For example, at one institution with several major universities in the surrounding area, the BOP has been unable to attract recent graduates who are willing to occupy entry-level positions.  The Human Resource Manager of that institution told us that the major universities have more prestigious medical facilities and offer higher pay.

At the BOP's more rural locations, we found that the remoteness of the institution often deters medical professionals.  A Warden at a more remote institution said that because the area is isolated, most medical professionals are in the area only to work at a particular, respected community hospital.  Staff at another institution told us that being in close proximity to a respected community

---

[23]  In response to a working draft of this report, the BOP noted that there are shortages of medical professionals in a variety of fields, making its challenges not unlike those the general medical community faces.

hospital is both good and bad overall, but definitively unhelpful to recruiting.  While the institution can use the hospital for services that cannot be provided inside the institution, it becomes nearly impossible to compete with the hospital for staff, because of the hospital's favorable reputation and higher pay.  An Associate Warden at another institution told us that when competing with other organizations, the institution is often unable to attract candidates.  He said that when the institution is able to hire employees, they typically leave shortly after they are hired for more lucrative offers.

*Position Grades and Compensation, Even with Incentives, Are Not Competitive with Local Markets*

In many instances, regardless of location, the federal limits on pay and incentives that hiring officials can offer potential employees pose a significant challenge for BOP institutions.  BOP hiring officials we interviewed told us that the compensation offered is not enough to competitively attract or retain medical professionals.  We found that this is especially true for the positions, such as doctors, pharmacists, and dentists, which are necessary to operate health units.

The BOP is required to classify positions according to the General Schedule (GS) pay scale, and, for physical therapists and pharmacists especially, we found the BOP struggles to offer competitive pay because the assigned grade of the positions limits the salaries they can offer.[24]  According to the BOP's Chief of Health Services Staffing and Recruitment, the current grade of physical therapist and pharmacist positions on the GS scale makes it very difficult to hire individuals into civil service positions.[25]  Rather, as of September 2014, the majority of medical professionals in those positions at BOP institutions are PHS officers.  According to BOP officials, this is because the GS grade levels the Office of Personnel Management (OPM) assigned to these civil service positions are too low and the PHS compensation and benefits are more attractive in comparison.  A Warden told us that if the BOP could offer more competitive pay through the civil service, it would be in a much better position when it comes to recruitment.

The BOP's Chief of Health Services Staffing and Recruitment said that attracting candidates for most medical positions in a correctional setting already requires the use of incentives.  However, we found that even with incentives, the BOP cannot offer competitive salaries because of the limitations imposed by the current GS pay scale.  Using data from the BOP, OPM, and the Bureau of Labor Statistics (BLS), we found that there is a large gap between the salaries the BOP pays its medical employees and those offered for similar positions in the local areas

---

[24]  The General Schedule is the position classification and pay system governing the majority of salaried personnel positions within the civil service.  OPM is responsible for administering the GS classification standards, qualifications, and pay structure.

[25]  Further, he said that most physical therapist positions are at the doctorate level and the BOP's current classification of this position does not account for that.  In response to a working draft of this report, the BOP said that this is because the BOP must follow OPM's Classification Standards, in accordance with 5 U.S.C. Chapter 51.

surrounding institutions.[26]  For example, the BLS reports that the average salary for a nurse in the local area is 34 percent higher than step 1 of the highest grade for a BOP nurse.  We found that the gap widens for other positions, with a 60 percent difference for physicians, a 102 percent difference for pharmacists, and a 133 percent difference for dentists.[27]  We also found that the salary gap was significant in both rural and metropolitan areas.  (See Table 1 below.)

**Table 1**

**OPM and the BLS Salary Comparison in Rural and Metropolitan Areas, FY 2014**

| Rural Area | Top GS Grade, Step 1 | BLS Average | Percent over BOP | Metropolitan Area | Top GS Grade, Step 1 | BLS Average | Percent over BOP |
|---|---|---|---|---|---|---|---|
| Nurse | $47,923 | $61,110 | 28% | Nurse | $51,723 | $77,468 | 50% |
| Physician | $114,872 | $187,734 | 63% | Physician | $123,981 | $192,476 | 55% |
| Pharmacist | $57,982 | $120,241 | 107% | Pharmacist | $62,579 | $120,034 | 92% |
| Dentist | $69,497 | $170,508 | 145% | Dentist | $75,008 | $159,368 | 112% |

Note:  This table does not include special pay.  See footnotes.

Sources:  BOP spending data, BLS occupational employment statistics, and OPM classification standards and locality pay tables

The BOP's Assistant Director for Human Resource Management told us that the GS scale does not meet the BOP's current needs because the assigned grades of many medical positions are too low.  The BOP's former Assistant Director for Health Services and Medical Director told us that the system is antiquated and no longer reflects today's reality or position requirements.  The BOP's Personnel Director told us that OPM convened a workgroup to rewrite the classification standards for nurses across the federal government.  However, we found that the BOP's discussions with OPM to restructure position classifications have not produced results.  The Assistant Director for Human Resource Management said that the lack of change was frustrating because nurses, for example, qualify only for a GS-5 classification, which is not competitive.[28]

---

[26]  For this analysis, we used the GS scale and step 1 of the position's highest grade to balance the variance in staff pay based on their status as a new versus more experienced employee. For example, OPM classification standards state that a non-supervisory pharmacist can be grade 7, 9, or 11, so we used grade 11, step 1 for our analysis.  Neither the OPM data nor the BLS data includes the value of benefits in their calculations.  See Appendix 1 for more information.

[27]  This analysis does not include special pay.  OPM establishes special pay at a rate higher than basic pay for a group or category of positons in certain geographic locations where there are significant hiring challenges.  We found that even when accounting for salary increases from special pay, the gap between the BOP and the local area remains large.  For example, in Lexington, Kentucky, a dentist with special pay can earn $78,000 in the BOP while the BLS average is $176,000.  The BOP's Assistant Director for Human Resource Management said, "OPM works with the BOP on special salary rates but it's a Band-Aid on a much bigger issue."

[28]  According to the 2015 GS pay table, the base salary of a GS-5 position is $27,982.  This figure does not account for locality pay.

Position classifications are also problematic for mid-level practitioners such as physician's assistants and nurse practitioners.  The BOP's former Assistant Director for Health Services and Medical Director said that mid-level practitioners are significantly underpaid and that even incentives do not address the pay disparity.  For example, the Health Services Administrator at one institution in need of a nurse practitioner told us it has been unable to fill the vacancy because the salary is not commensurate with the education and experience required.  Specifically, she said that one of the nurse practitioner applicants to her institution had 6 years of education, but the BOP could offer only a GS-9 salary.[29]  In comparison, she further said that the BOP could offer a similar salary to a paramedic even though, in her state, paramedic qualifications can be obtained with less education.  Citing anomalies such as these, the BOP's Assistant Director for Human Resource Management described the GS scale as a one-size-fits-all system that does not always fit everyone.

In addition, we found that the private sector pays medical professionals who are not working in correctional settings significantly more than BOP civil service employees in the same positions, indicating that the salaries the BOP offers do not factor in the fact that its employees face inherent security risks associated with working in a correctional setting.  The BOP's Assistant Director for Human Resource Management said that many medical professionals do not find working in a correctional setting appealing because it is vastly different from a hospital.  The BOP's former Assistant Director for Health Services and Medical Director agreed, saying not everyone wants to work in a place that could present a threat to his or her well-being.  Despite this challenge, the BOP tries to market the benefits associated with working in a correctional setting.  As law enforcement officers, all BOP employees gain access to the law enforcement federal retirement system, health benefits, and annuity.  Still, the compensation offered to the BOP's medical professionals is less than what is offered in the local community hospitals and medical centers where there are fewer safety risks.

*Since FY 2010, the BOP Has Increased Its Use of Incentives to Recruit and Retain Civil Service Medical Employees*

Like most other federal agencies, the BOP must operate within the GS scale and is limited in what it can offer potential employees by the grade and classification of the position.  However, when the requirements and responsibilities of a position warrant more compensation than its grade and salary, the BOP can supplement compensation with various incentives.  According to BOP data, from FY 2010 to FY 2014, the BOP consistently used incentives for positions for which it had the greatest needs, including clinical nurses, general practice medical officers, and mid-level practitioners.  The BOP's Assistant Director for Human Resource Management, who has been with the BOP for 27 years, said that the BOP did not regularly need to use incentives until approximately 2000.  He said that now the BOP encourages institutions to be aggressive in recruiting for positions that have

---

[29]  According to the 2015 GS pay table, the base salary of a GS-9 position is $42,399.  This figure does not account for locality pay.

been difficult to staff and to offer as much as they can for an acceptance.  We found that more institutions have been requesting incentives to help attract medical employees who provide direct clinical care.  For example, in FY 2010, 70 percent, or 65 of 93 BOP institutions, requested incentives for their medical employees.[30]  We found that this increased to 89 percent in FY 2014, when 87 of 98 institutions requested incentives.

Consequently, from FY 2010 to FY 2014, the number of BOP medical employees receiving at least one incentive increased 74 percent.  Specifically, during FY 2010, the BOP awarded 409 incentives to medical employees, including 219 monetary incentives that were valued at $2.7 million.[31]  During FY 2014, the BOP awarded 712 incentives, including 342 monetary incentives that were valued at $4.5 million.[32]  (See Table 2 below.)

**Table 2**

**Incentives Awarded by Fiscal Year and Type, in Thousands**

| Fiscal Year | Recruitment Bonus | Relocation Bonus | Retention Allowance | Student Loan Repayment | Above Minimum Rate | Annual Leave Credit | Total |
|---|---|---|---|---|---|---|---|
| 2010 | 104 | 4 | 80 | 31 | 93 | 97 | **409** |
| | $1,445 | $60 | $932 | $279 | — | — | **$2,716** |
| 2014 | 101 | 5 | 140 | 96 | 146 | 224 | **712** |
| | $1,752 | $77 | $1,793 | $900 | — | — | **$4,522** |

Notes:  Monetary totals are in thousands.  As noted above, "above the minimum rate" pay allows an agency to set higher pay to meet the superior qualifications of a candidate or the special need of an agency.

Source:  BOP incentives data

According to BOP data, institutions frequently use recruitment and retention bonuses as incentives.  Table 3 below shows our analysis of the incentives offered to employees in positions with the greatest pay disparity when compared to the BLS average.  As noted above, special pay and incentives can help lessen the gap; but overall, BOP salary averages remain low in comparison for recruitment.

---

[30]  The BOP maintains data on correctional complexes in the aggregate, rather than separately for each institution within the complex.  As a result, the total number of locations requesting incentives is less than the overall total of 121 institutions.

[31]  Of the 409 incentives the BOP awarded, 190 were for annual leave credit or above the minimum rate pay.  The BOP does not assign monetary value for these incentives because they vary substantially by employee rate of pay.  For example, hiring officials can increase an employee's leave accrual rate from 4 hours per pay period to either 6 or 8, but the monetary value of that leave would depend on his or her salary.

[32]  Of the 712 incentives the BOP awarded, 370 were for annual leave credit or rate of pay above the minimum.

**Table 3**

**Incentives Awarded by Position, FY 2014, in Thousands**

| FY 2014 | Recruitment Bonus Total | Relocation Bonus Total | Retention Allowance Total | Student Loan Repayment Total | Incentives Total | Average Monetary Incentives per person |
|---|---|---|---|---|---|---|
| Nurse | $603 | — | $227 | $102 | **$932** | $7 |
| Physician | $414 | $25 | $480 | $63 | **$982** | $15 |
| Pharmacist | $10 | — | $59 | — | **$69** | $12 |
| Dentist | $196 | — | $280 | $40 | **$516** | $20 |

Notes:  Totals are in thousands.  For analysis, the category "Physician" combines data for general practice medical officers, internal medicine medical officers, and general medical officers.

Source:  BOP incentives data

For many nurses and medical doctors, student loan repayment is also an attractive incentive.  However, the BOP's Assistant Director for Human Resource Management said that for the BOP, student loan repayment is limited to $10,000 per employee each year.[33]  An additional incentive the BOP can use for some positions is accelerated promotion, which shortens the amount of time between salary increases.  Yet, these incentives, while helpful, have not resulted in bringing BOP medical staffing to sufficient levels.  A Health Services Administrator told us that her institution recently hired a Chief Dentist after 4 years of vacancy and was able to do that only by offering multiple incentives.  The Human Resource Manager at another institution told us that he uses a combination of incentives but even with multiple incentives, recruitment is still difficult.

We also found that institution efforts to obtain approval to use incentives are time-consuming, which sometimes results in the BOP losing candidates to other employers; but Central Office and institution staff do not agree on the reason for the delays.  Central Office staff attributes the long approval process to institution Human Resource Managers' lack of information and knowledge of the requirements for processing incentives.  The BOP's Chief of Health Services Staffing and Recruitment said that institution Human Resource Managers deal with labor relations issues, grievances, performance, and the Union, and that medical recruitment is just one small piece of the puzzle.  However, an institution Health Services Administrator told us that the paperwork required to process each one is extremely cumbersome.

The BOP's incentive approval process requires that each incentive be processed separately, even when a single employee will be receiving multiple incentives.  BOP officials told us that institution staffs wait for incentives to reach the final stages of approval at the BOP's Central Office before offering them to

---

[33]  Federal law imposes a $10,000 annual cap per employee and an overall cap of $60,000 per employee.  See 5 U.S.C. § 5379(b)(2).  The BOP's Assistant Director for Human Resource Management also noted that medical school loans are often in the range of six figures and that the amount of student loan repayment the BOP can offer does not compare to that of the private sector.

potential candidates because they are unsure which incentives they can authoritatively present to candidates prior to confirmation. For example, a Human Resource Manager told us that because incentives are not final until approved, he has little room for negotiation and that what he can offer in competition with the local market is initially hypothetical. The BOP's Personnel Director acknowledged that institution hiring officials lack confidence that incentives will be approved. But, he told us, institutions should offer all they can because in practice incentives are rarely denied. The BOP has considered automating the incentive approval process by creating a standard template for every incentive. According to the BOP's Personnel Director, through automation, incentives would be approved more quickly and more information regarding incentive availability would be accessible. However, the BOP has not yet implemented this change.

*Because Incentives Are Not Always Enough, the BOP Has Sought Other Alternatives to Attract Medical Professionals*

The BOP supplements its use of incentives with other alternatives that also have the effect of increasing pay. One of these is the Physicians and Dentists Comparability Allowance Program (PCA Program).[34] The PCA Program allows the BOP to adjust physician and dentist compensation up to $30,000 when it faces difficulty in recruiting.[35] The adjustment for each employee is determined through negotiation with that employee and the BOP Medical Director's approval of the employee's credentials. Eligible physicians or dentists must also enter a 1- or 2-year service agreement with the BOP. The BOP's former Assistant Director for Health Services and Medical Director told us that this program generally makes the civil service a more lucrative option for physicians.[36] However, the higher salary potential under the PCA Program is not always lucrative enough for other positions, such as psychiatrists.

The BOP recently received approval from the Justice Management Division and OPM to determine pay for psychiatrists using the laws governing medical professional compensation in the U.S. Department of Veterans Affairs (Title 38).[37] Under Title 38, the BOP can increase an individual's compensation package up to a maximum of $260,000 per year, based on his or her rating from an approval

---

[34] 5 U.S.C. § 5948(a).

[35] Recruitment difficulty is determined by a number of factors, including length of position vacancy, number of unqualified applicants, number of interviewed but underqualified applicants, and number of physicians rejecting offers of employment and citing inadequate compensation as the reason.

[36] Physicians and dentists can earn up to $203,000 in annual salary under the PCA Program.

[37] The Justice Management Division provides senior management guidance as it relates to DOJ policy for all matters pertaining to organization, management, and administration.

A majority of employees of the federal government are employed under personnel laws contained in Title 5 of the United States Code, which covers administrative law. Title 38, the section of federal law covering veterans' benefits, includes an alternate personnel system for specific occupations such as medical professionals. Under Title 38, employees are paid under separate pay schedules and pay is determined under rules separate from Title 5.

panel.[38]  The panel will determine the salary for each individual from tiers that the Department of Veterans Affairs has established based on resume, tenure, and certifications.  The BOP is also working with the National Finance Center to modify the system for salary payment processing and anticipates implementing Title 38 authority in the spring of 2016.  If the initiative is successful, the BOP told us it will consider expanding Title 38 to other positions that are difficult to staff, such as pharmacists.  BOP officials said that initially there would be minimal budgetary impact because the BOP employs relatively few psychiatrists, but that future budgets would need to incorporate increased costs if the principles of Title 38 were extended to more professions.[39]

Another benefit available to some BOP medical personnel is the opportunity to convert to the PHS from the civil service.  A PHS officer we interviewed told us that she originally took a pay cut when she joined the BOP as a civil service employee, but did so with the prospect of converting to the PHS for greater uniformed service benefits.[40]  She said that she also began her career as a civil service employee and converted to the PHS because the compensation package was more lucrative.[41]  For positions such as registered nurses and pharmacists, for which the BOP is not able to offer competitive salaries within GS constraints, we found PHS officers are likely to fill these positions.  In particular, the BOP's Assistant Director for Human Resource Management said that the BOP staffs a high number of PHS pharmacists because the BOP cannot offer a comparable salary for pharmacists.  In FY 2014, 145 of 194 pharmacists (75 percent) at BOP institutions were PHS officers, rather than civil service employees.[42]

The PHS accepts applications for a commission during defined periods throughout the year, which vary by profession.  The PHS accepts applications from physicians and dentists at any time, but accepts applications from other professions only during limited windows during the year.[43]  The PHS allows agencies employing

---

[38]  The panel will include representatives from the BOP's Health Services Division, the BOP Union, and medical doctors.

In response to a working draft of this report, the BOP estimated that typical compensation packages would not exceed $240,000 per year based on individual factors.

[39]  The BOP reported that, as of November 2015, it employed 25 psychiatrists.

[40]  The BOP allows qualified and eligible employees to convert to the PHS personnel system as long as their application for a commission is approved by the PHS.

[41]  We attempted to compare compensation in the GS and PHS systems but determined that we could not do so because the process of setting PHS officer pay is more individualized than the process of setting civil service employee pay.  For additional information, see Appendix 1.

[42]  We also found that the appeal of joining the PHS is lower when civil service salaries become more competitive.  The Chief of the BOP's Staffing and Recruitment Section told us that a majority of BOP dentists used to be PHS officers until the BOP decided to increase the position grade for dentists.  Since that change, he said, he has seen an increase in the number of BOP dentists who are civil service employees.

[43]  In previous years, the PHS application process was open to all professions at all times.  In 2010, the PHS streamlined the application process to allow applications only from certain professions at certain times throughout the year.  For example, in 2015, the PHS opened its application process to
(Cont'd.)

its officers a limited number of waivers that can be submitted outside of the normal application window for applicants that are deemed critical by the agency.  However, the BOP's PHS Liaison told us that if an employee stationed at an institution that is already well-staffed wants to convert to the PHS, he or she must transfer to a location where there is a shortage of medical staff.  The BOP's former Assistant Director for Health Services and Medical Director said that because the PHS does not commission many new officers during the regular application windows, waivers are consequently very valuable tools.  However, the number of waivers the PHS allocates to the BOP each year remains limited:  15 in 2014 and 17 in 2015.  At institutions with several vacancies, or at new institutions, the BOP will offer conversions to the PHS as an incentive to transfer between institutions or to stay with the agency.  Institution staff we interviewed acknowledged that being able to offer the option to convert to PHS is a recruitment tool they could use for hard to fill positions.  We discuss the BOP's management of PHS officers in more detail below.

*Institutions Must Rely on TDY Assignments and Contracted Medical Care because of Continuous Understaffing*

The BOP's inability to recruit and retain medical professionals has led to institutions operating at unfavorable staffing levels.  Institution staff told us that when staffing levels are low they depend on TDY assignments and medical contractors for assistance.  The BOP uses TDY and Regional Medical Assistance Support Teams to provide additional resources to its six regions.  These teams were created in 2011 to assist institutions with critical medical staffing needs.  According to BOP officials, these teams are used when institutions' health services units are 30 to 40 percent understaffed.  Both civil service employees and PHS officers serve on Regional Medical Assistance Support Teams and enlist on weeklong TDY assignments to assist.  An official at one institution in particular told us that even with PHS officers on staff, it relies on TDY from other institutions to accomplish its mission.  In FY 2014, this institution had a vacancy rate of 21 percent for medical professionals.  However, according to institution staff, relying on TDY for support is a temporary fix and should not replace a permanent solution for staffing shortages.  The BOP's Assistant Director for Human Resource Management told us that rather than continuous TDY, it would be more beneficial for the BOP to pay an incentive to hire a full-time employee.  With this approach, fewer long-term expenses would stem from the repetitive use of TDY.

We found that staffing shortages lower staff morale, increase staff workload, and ultimately can reduce inmates' access to routine medical care.  A Human Resource Manager told us that because correctional settings require around-the-clock staffing, all vacancies affect staff morale.  He said that because operations never cease, the lower the staffing levels, the greater the need to use mandatory overtime and double shifts.  Additionally, staffing shortages increase the workload of those remaining staff.  The BOP's PHS Liaison told us that when there are vacancies, the existing staff becomes overworked.  A Physician's Assistant told us

---

pharmacists only during the month of August.  The BOP PHS Liaison told us that the new application process limits the number of applications the PHS processes each year.

that increased workloads can easily drain staff, which, for him, makes some of the routine care a lower priority.  A Health Services Administrator also told us that when health units do not have the staff to see inmates, they have to send them outside the institution for basic medical care because they are unable to meet their needs inside the institution.  The Warden at the same institution agreed, stating that staffing shortages greatly increase outside medical trips, subsequently resulting in an increase in outside medical spending.

Staff vacancies have an adverse impact on institution health services units and ultimately increase the BOP's outside medical spending when care cannot be provided inside the institution.  In FY 2014, the BOP spent $60 million in overtime payments to salaried employees to transport inmates outside the institution for medical care, an increase of 22 percent from the $49 million spent in FY 2010.  While acknowledging that the BOP faces many challenges to recruit and retain medical staff, particularly because of the geographic locations of institutions, the limitations of the GS scale, and the prison work environment, we believe the BOP could be doing more to proactively identify and address its medical staff vacancies.  In the remainder of this report, we discuss strategies the BOP could adopt to address these challenges.

## The BOP Does Not Identify or Address Recruiting Challenges in an Agency-wide and Strategic Manner

The BOP delegates many of the actions necessary for recruiting and hiring medical staff to its individual institutions.  These actions include conducting recruitment activities in the local labor market, advertising vacancies, interviewing candidates, preparing incentive request paperwork, and managing the institution's staffing budget.  As a result, the BOP's actions to address its recruiting challenges tend to involve reactively addressing specific problems faced by individual institutions rather than proactively identifying, prioritizing, and responding to regional or national trends in a coordinated fashion across all of its institutions.

At the Central Office level, the BOP's Health Services Division has a Staffing and Recruitment Section that has both short-term and long-term responsibilities.  In the short term, the section is responsible for understanding institutions' immediate medical staffing needs, explaining to institution human resources staff the incentives available for medical professionals, and guiding medical professionals through the BOP's hiring process.  In the long term, the section is responsible for increasing the pool of medical professionals who are interested in BOP vacancies.  The section does not advertise vacancies or make hiring decisions; these actions are delegated to each institution.  Further, the Chief of Health Services Staffing and Recruitment told us that institutions must request the section's assistance in addressing recruiting challenges.  Even when an institution requests assistance, it is not required to follow the section's guidance.  This reactive, locally delegated response to recruitment challenges has prevented the BOP from assessing which vacancies have the greatest negative impact on its ability to adequately provide medical care to inmates.

We further found that, even when the BOP has taken steps to address recruitment challenges across all of its institutions, these efforts have not resulted in a uniform approach to the issue.  For example, officials throughout the BOP have designated medical vacancies as hard to fill to justify their use of incentives to enhance recruiting.  However, we found that the BOP does not have a clear definition of this term.  As a result, it cannot easily describe the degree to which any one position is hard to fill and it cannot use this designation to help it set priorities among medical vacancies.  To illustrate, BOP policy identifies the length of time a position has been vacant as one factor that would justify using the Physicians and Dentists Comparability Allowance Program (PCA Program), but it does not give any guidance as to when the length of a vacancy should be considered problematic.[44]  The Assistant Director for Human Resource Management said that a position is considered hard to fill once the Human Resource Manager has communicated to Central Office that all recruitment efforts, absent incentives, have made hiring challenging.  Yet one institution's Human Resource Manager told us that *any* position requiring an incentive is considered hard to fill, while a different Human Resource Manager at another institution said that he considers a position hard to fill if he does not receive any applications after two or three advertisements.  A third Human Resource Manager said that, on paper, none of the positions at her institution is hard to fill; but she went on to tell us that they experienced such difficulty trying to fill a psychiatrist vacancy that the BOP's Central Office eventually reallocated the position to a different institution.

We found that one primary obstacle to the BOP developing a truly proactive, coordinated approach to addressing recruitment challenges is that it does not analyze the data it already collects to assist it in identifying and prioritizing these challenges across all of its institutions.  For example:

- *Vacancy Data:*  The Central Office Staffing and Recruitment Section monitors medical vacancies, but the Chief of Health Services Staffing and Recruitment said that the data they monitor does not differentiate between positions that are vacant because of recruitment challenges and positions that are vacant for other reasons.[45]

- *Incentive Data:*  Although the BOP collects data on the use of recruitment and retention incentives, which could help the BOP identify locations in which institutions have difficulty filling medical vacancies, the BOP does not analyze any of the data it collects on incentives for this purpose.  The BOP's Personnel Director told us that the BOP reserves for Central Office officials final approval authority for recruitment and retention incentives, instead of

---

[44]  BOP, Program Statement 6010.05, Health Services Administration (June 26, 2014), paragraph 17f.

[45]  The Chief of Health Services Staffing and Recruitment explained that, because hiring decisions are decentralized to the institution level, institutions sometimes freeze vacancies instead of filling them to ensure that funds are available in the institution's budget to cover overtime, outside medical expenses, and other costs.  He said that if an institution is not actively attempting to fill a vacancy, he would not consider that position difficult to fill.

delegating that authority to Wardens, in part so that the BOP can collect data on the use of these incentives.[46]  However, she also said that the BOP tracks the use of incentives only to ensure that spending remains within budgetary limits, and not for the purpose of helping to identify the hardest to fill vacancies in the BOP system.

- *TDY Assignment Data:*  The former Assistant Director for Health Services and Medical Director told us that when an institution resorts to requesting TDYs, it is usually because it cannot find anyone to fill the vacancies it is advertising.  Data on institution requests for support through TDY assignments could therefore help the BOP's Central Office identify institutions that are struggling to find permanent staff; but this information is not available at the Central Office level because the Regional Offices manage TDY requests and assignments.

- *Outside Medical Care Cost Data:*  Our May 2015 review of the impact of an aging inmate population found that understaffing in health services units increases the need for outside care.[47]  The cost of this care varies because the BOP signs a separate contract for each institution with local medical providers.[48]  Further, the BOP's care level system means that inmates with more significant medical needs are concentrated in a handful of institutions, with the result that staff vacancies at these institutions can have a more significant impact.[49]  A Health Services Administrator at a BOP

> **Budgetary Impact of Understaffing on Outside Medical Costs**
>
> We identified one complex for which medical staffing dropped from 35 of 46 positions filled (76 percent) in FY 2010 to 25 of 42 positions filled (60 percent) in FY 2014.  Of all BOP institutions, this institution paid the highest rates for outside medical care, with contract costs more than triple the Medicare rate.  We looked at BOP spending data and found that spending on outside medical care at this complex increased 47 percent from FY 2010 to FY 2014 (double the 23 percent increase in this spending seen by the BOP as a whole during that same time).  Given the relatively high cost of obtaining outside medical care in this location, a more proactive assessment of staffing needs could be beneficial to the BOP.
>
> Source:  OIG analysis of BOP staffing data, contract data, and spending data

---

[46]  In response to a working draft of this report, the BOP noted that the Department's Human Resources Order, DOJ 1200.1, states that approval of these incentives may not be delegated below the Personnel Officer level.  The BOP further noted that it is required to collect data on incentives to fulfill reporting requirements to the Department and OPM.

[47]  DOJ OIG, *The Impact of an Aging Inmate Population,* 18.

[48]  These costs also vary depending on whether an inmate requires inpatient or outpatient care.

[49]  The BOP assigns each inmate a care level from 1 to 4 based on documented medical history, with Care Level 1 being the healthiest inmates and Care Level 4 being inmates with the most significant medical conditions.  The BOP also assigns each institution a care level from 1 to 4, based on the institution's level of medical staffing and resources.  For more information about the BOP's care level system, see OIG, *The BOP's Efforts to Manage Inmate Healthcare.*

medical center said that by assessing only staffing levels, the BOP overlooks the needs of high care-level institutions.  We believe this causes the BOP to underestimate the value of filling priority vacancies at high care-level institutions where a greater proportion of inmates are very ill.  The Health Services Administrator emphasized, "The Bureau [of Prisons] is sending us the sickest of the sickest guys to take care of, and if we don't have the staff on board here to do even some of the basics that we need to do with them, then we end up having to send them into the community to get it done." Because the BOP does not take these variations in medical need or medical cost into account, it does not optimally prioritize filling the positions that cost the most to leave vacant.

We found that the BOP has been aware for some time that its locally delegated, reactive approach is ill suited for the medical staffing challenges it faces. Yet it has also declined opportunities to establish a more coordinated, proactive approach.  Specifically, in June 2009, a BOP working group established to examine the BOP's medical recruitment challenges recommended that the BOP centralize medical recruitment into the BOP's Consolidated Employee Services Center in Grand Prairie, Texas.[50]  The working group recommended centralization to improve customer service to applicants and to manage many functions, such as preparing incentive requests, that are the responsibility of institution staff.  In support of its recommendation, the working group wrote:  "A dedicated section would allow the agency to aggressively recruit and retain employees in an attempt to proactively address staffing concerns, rather than reactively, which continues to hinder effective operations and negatively impacts existing staff."[51]  At its July 2009 meeting, however, the BOP's Executive Staff decided not to approve any of the options the working group developed.

The working group's June 2009 findings included a section for comments from the BOP divisions most likely to be affected by the working group's proposals. In its comments, the Health Services Division said that it could not support any of the working group's proposals for several reasons, including a belief at the time that recruitment was improving and could be further enhanced through additional resources rather than through reorganization.  Instead, it recommended hiring someone to verify the professional credentials of candidates for medical vacancies, ensuring that they would be qualified to practice if offered a position.  The former Assistant Director for Health Services and Medical Director confirmed that the BOP now employs a nurse for this purpose.  The Health Services Division also recommended hiring one medical recruiter for each of the BOP's six regions to target hard to fill locations, and the BOP reported that it hired the six regional recruiters in the fall of 2015.

---

[50]  The Consolidated Employee Services Center centralizes some aspects of the hiring process and provides guidance to the institutions on hiring procedures.

[51]  Facilitator, National Health Care Staffing and Recruitment Workgroup, BOP, Executive Staff Paper, National Health Care Staffing and Recruitment Enhancement, June 9, 2009, 14.  In addition to its recommended option, the working group also researched and presented two other options in its report.

Since the 2009 comments, however, we found that the health services vacancy rate has actually risen at BOP institutions, from 15 percent in FY 2010 to 17 percent in FY 2014.  The BOP's decision to continue addressing its struggles with medical recruitment by reacting to individual institution requests rather than by developing a strategic, coordinated plan, has not led to improved results.  Meanwhile, spending on outside medical care has increased 23 percent, from $351 million in FY 2010 to $434 million in FY 2014.

This lack of strategic planning also means that the BOP cannot fully take advantage of an annual opportunity it has to articulate its staffing priorities to the PHS.  The memorandum of understanding (MOU) between the BOP and the PHS requires the BOP to "notify PHS at least annually, and more frequently if necessary, of the number of PHS Commissioned Officers, by training and experience, needed to fulfill the requirements of BOP."[52]  BOP officials told us that, while they respond to the PHS annually with this information, they do not base their response on a systemic assessment of the BOP's medical staffing needs.  Instead, they simply report the number of PHS officers already employed in BOP positions.  The former Assistant Director for Health Services and Medical Director told us that he did not think increasing the number reported would make a difference.  However, we note that the PHS already knows how many of its officers work for the BOP because it pays PHS officers and manages their benefits using BOP funds.[53]  The PHS's Deputy Director of the Division of Commissioned Corps Personnel and Readiness (PHS Deputy Director, DCCPR) told us that the PHS requests this annual projection of need in order to help shape the Commissioned Corps' annual recruitment plan and support limited force planning.

We believe that the BOP is missing an important opportunity by providing the PHS with data it *has* rather than conducting a robust analysis to determine what kind of medical staffing its institutions *need*.  If the BOP analyzed its recruitment challenges and prioritized vacancies based on the impact those vacancies have on the BOP's ability to care for its inmate population, this could help the BOP articulate specific numbers and types of PHS officers that would be of greatest benefit to address its staffing challenges.

**The BOP Does Not Use Its Authority to Assign PHS Officers to Positions Based on Greatest Need**

Both PHS policy and the PHS officers' sworn oath give the BOP the authority to place PHS officers in positions where they are most needed.  PHS officer appointees swear an oath that they are "willing to serve in any area or position or wherever the exigencies of the Service may require."  However, the BOP does not

---

[52]  MOU between the BOP, DOJ, and the PHS, Department of Health and Human Services, September 1991, paragraph III.B.

[53]  The BOP's Chief of Budget Execution told us that every month the Department of Health and Human Services generates a payroll report of PHS officers employed at the BOP, which the BOP's Budget Execution Office reconciles to ensure they transfer the appropriate amount of funds to the PHS to pay for these salaries and benefits.

take full advantage of this flexibility because, as noted above, it does not address recruitment challenges in a strategic, coordinated way and therefore does not place PHS officers in positions that maximize their benefit to the BOP.  In the section below, we discuss options that the BOP might consider to increase the efficiency of its assignment of PHS officers.

The PHS encourages its officers to pursue diverse work experiences throughout their careers.[54]  To incentivize transfers, PHS promotion boards place value on an officer's mobility, with multiple moves expected of officers seeking promotion to the higher ranks.  The PHS's Commissioned Corps Personnel Manual, which governs human resources policy for PHS officers, gives the BOP authority to initiate voluntary transfers to meet its needs or the needs of PHS officers.  It also gives the BOP the authority to initiate involuntary transfer of PHS officers at any time to meet the BOP's needs.  We found that the BOP does not currently manage these positions in ways that would encourage PHS officers who are interested in responding to the PHS incentives to transfer in ways that also benefit the BOP.

Specifically, we found that the BOP does not currently use involuntary transfers of PHS officers to address its staffing needs.  BOP officials said that they initiate involuntary PHS transfers only for disciplinary reasons or for instances in which an officer needs to be moved to a location where he or she can receive additional training and oversight.  PHS officers we interviewed at BOP institutions recognized that their status as Commissioned Officers meant that they were potentially subject to a change of duty station, but they also told us that such transfers were not actually used.  Instead, both PHS officers and civil service employees control their own duty stations in the same way:  by deciding whether to apply to an advertised vacancy at a particular institution.[55]  The BOP's Personnel Director told us, "they know where the vacancies are so if they wanted to apply to there, they easily could."  Once hired, PHS officers may also stay in a position for as long as they like, assuming satisfactory performance, just like civil service employees.

We also found that the BOP has not been proactive about using PHS officers to fill vacancies where individual institutions are struggling with particularly challenging medical personnel staffing needs.  Institution staff further told us that lengthy vacancies are common.  For example, staff at one institution told us that their Clinical Director position has gone unfilled for 15 years.[56]  A PHS nurse at

---

[54]  The PHS recommends that officers have at least three different geographic or programmatic assignments during their careers, but it does not have a specific requirement for the frequency of moves.  The BOP's PHS Liaison recommends that officers seeking promotion move every 3 to 5 years and told us that the PHS revised its application process in 2013 to require officers to be more mobile.

[55]  The BOP and the union have an informal agreement that all initial vacancies will be advertised, with both civil service employees and PHS officers eligible to apply.  The former Assistant Director for Health Services and Medical Director said that the BOP made this agreement because it would be unfair to make any vacancy open only to PHS officers.

[56]  The Clinical Director is the lead physician in an institution's health services unit and is responsible for all clinical care provided at the institution.  The Health Services Administrator at this

(Cont'd.)

another institution told us that her position had been vacant for approximately 2 years by the time she was hired and that at the time of our interview her institution had been without a Clinical Director for nearly a year. The BOP Union President told us that a physician position at a third institution remained vacant for 5 years, which pushed more responsibility onto the mid-level providers who remained on the staff. He questioned why the BOP allowed that position to remain unfilled instead of transferring a PHS physician from another location.

*More Effective Use of PHS Location Assignments Could Take Multiple Forms*

Multiple BOP and PHS officials told us that the BOP could do more with voluntary and involuntary transfer authorities to better align PHS officers' duty stations with the BOP's greatest needs. In this section, we outline three options that the BOP could consider to use PHS officers as a means of addressing some of its most challenging medical staffing problems.

<u>Involuntary Transfers</u>

The use of involuntary transfers for all PHS officers would mirror the military's requirement of frequent transfers and reassignments, a process known as "force management." BOP officials acknowledge that PHS policies give them the authority to implement force management if they choose to do so, but they told us that this would require at least three changes in how BOP institutions are managed:

1. reducing the level of control that Wardens currently have over the selection of employees to fill institution vacancies,

2. matching all PHS officers with positions available, and

3. reducing the control PHS officers currently have over their duty station.

Effectively using involuntary transfers would also require changes in how the BOP as a whole is managed, because the BOP would also need to assess which vacancies are of such high priority that they should be staffed by a transferring PHS officer rather than remaining vacant. BOP officials told us that they had not implemented involuntary transfers because they were concerned that such a change could reduce employee engagement and increase medical staffing vacancies. The PHS Deputy Director, DCCPR acknowledged these concerns, recommending that agencies minimize the risk of disengagement by transferring officers for defined periods of time and by giving the officers some say in the

---

institution told us that, in the absence of a Clinical Director, they had a contract physician who visited the institution twice a week, as well as three additional contract physicians who each visited the institution once a month; the Clinical Director of a different institution participated via phone in decisions concerning whether an inmate should be referred for medical care outside the institution. We note, however, that the Clinical Director providing this assistance works at an institution that is 750 miles away from the institution we interviewed, and in a different time zone. Therefore, the lack of a Clinical Director means that onsite physician care for the 1,268 inmates at this institution is limited.

location of their subsequent transfer.[57]  Regarding the BOP's concern that involuntary transfers would cause PHS officers to leave the BOP for other agencies, he said that while the PHS encourages its officers to be mobile, it also requires a minimum 2-year commitment at each duty station and therefore will not process transfer requests for a PHS officer more frequently.

Targeted Force Management

BOP officials and institution staff suggested to us that the BOP could take better advantage of the PHS requirement for officer mobility by using force management in a targeted, rather than broad manner.  Some institution staff suggested that the BOP require PHS officers to spend their first few years with the BOP working in institutions that have the greatest difficulty filling vacancies.  A PHS Health Assistant Specialist told us that if someone was "hungry" enough for a PHS commission, he or she would go anywhere to take a position.  An institution's Human Resource Manager said that this would be preferable to transferring PHS officers who were already employed in the BOP, which would create a vacancy at the PHS officer's previous institution.  While the BOP told us that it tries to use its limited number of PHS waivers in this manner, we believe it could achieve more effective results if it also used this approach with all PHS officers who are new to the BOP.  In FY 2014, 17 BOP civil service employees converted to the PHS using waivers, but the BOP gained an additional 61 PHS officers in other ways.[58]

We also found that the BOP has a precedent of using targeted force management for some entry-level PHS officers.  Students entering their final year of school or professional training are eligible to apply to the PHS Senior Commissioned Officer Student Training and Extern Program (Senior COSTEP).  Those accepted by the PHS are sponsored by an agency such as the BOP, paid at the entry-level ensign rank while completing their education, and agree to work for their sponsoring agency as a PHS Commissioned Officer immediately following graduation.[59]

---

[57]  BOP officials said that it would be easier for the military to give officers a voice in the location of a subsequent transfer because all military personnel face transfer, making it easier to predict when particular positions and locations will have vacancies.  This would be more difficult in the BOP because medical positions can be also be filled by civil service employees, who cannot be transferred as easily as PHS officers can.

[58]  The BOP reported that in FY 2014, 15 civil service employees who already worked for the BOP converted to the PHS during regular application windows, 21 newly-commissioned PHS officers joined the BOP, and 25 experienced PHS officers joined the BOP from other agencies.

[59]  Ensign is the most junior officer rank in the PHS.  The required PHS service commitment is twice the length of time the Senior COSTEP officer received financial support while in school.  For example, the BOP's COSTEP program statement requires Senior COSTEP officers to serve a minimum of 8 months in training, followed by a minimum 16-month commitment to the BOP.  In 2015, the BOP and the National Institutes of Health were the only agencies who sponsored Senior COSTEP officers.

These officers are referred to as Senior COSTEP officers despite being entry-level because the PHS also has a Junior COSTEP program.  Junior COSTEP officers have more than 1 year left of their schooling and may temporarily work for the BOP, or other agencies that employ PHS officers, during semester breaks.

The BOP's COSTEP Program Statement specifies that assignments for entry-level officers participating in the Senior COSTEP program are based on the BOP's needs.[60]  A PHS officer working at the BOP's Central Office serves in the role of COSTEP Coordinator and is responsible for assessing the BOP's needs for Senior COSTEP officers and for assigning them to institutions.[61]  Institutions request to participate in the Senior COSTEP program with the knowledge that this would result in the assignment of an entry-level PHS officer to their institution rather than the selection of a local candidate after advertising a vacancy.  The COSTEP Coordinator considers the types of vacancies institutions are seeking to fill, whether the institutions asking to participate in the Senior COSTEP program are a good fit for an entry-level medical professional, and the location preferences of the Senior COSTEP officers.[62]  However, the BOP's former Assistant Director for Health Services and Medical Director said that because the BOP's goal with the Senior COSTEP program is to maximize the retention of these officers beyond their initial service commitment, the location preferences of the Senior COSTEP officers and the availability of mentors are often more important than institution needs when determining where the Senior COSTEP officers should be assigned.

If the BOP gave greater priority to institution needs, and broadened its assessment to include positions that should be filled by a more experienced clinician as well as entry-level positions, then its approach to staffing Senior COSTEP officers could be expanded to maximize the efficiency of PHS officer placements more broadly.  Such an expansion could accommodate either a decision to implement force management broadly for all PHS officers or more narrowly for only those PHS officers who are new to the BOP.[63]  However, in order for these assessments to be successful, the BOP would first have to be more strategic about analyzing and prioritizing its overall recruitment needs.[64]

<u>BOP Needs Aligned with PHS Promotion Incentives</u>

The BOP could also consider better aligning its needs with the PHS's promotion incentives, particularly the PHS's recent emphasis on mobility.  One long-time PHS officer told us that at the time he was commissioned, the PHS promoted as a perk the fact that its officers would not be subjected to involuntary

---

[60]  BOP, Program Statement 6021.04, Commissioned Officer Student Training Extern Program (COSTEP) (August 1, 2003), paragraphs 16, 17.

[61]  In a given year, no more than 30 Senior COSTEP officers are assessed for placement in BOP institutions.

[62]  The BOP PHS Liaison told us that because Senior COSTEP officers are entry level, it would not be appropriate to assign them to an institution where they would have to work independently or be the senior clinician.

[63]  PHS officers who are new to the BOP do not necessarily have to be entry level.  For example, civil service employees who convert to the PHS after they start work at the BOP already have some clinical experience.

[64]  In response to a working draft of this report, BOP officials noted that when making decisions concerning the effective management of PHS officers, they must consider the human resource implications when developing an approach to better utilizing PHS officers.

transfers.  However, the BOP's PHS Liaison told us that in 2013 the PHS revised its application process to require mobility and now screens out applicants who are not willing to move.  As a result of these changes, mobility has become a more important benchmark in the PHS promotion process.[65]

The BOP Union President told us that the BOP historically has not required PHS officers to move and has instead accommodated PHS officers who are promoted in rank by giving them additional responsibilities at their current institutions.  He suggested that the BOP's use of PHS officers would be more effective if PHS officers who needed to take on additional responsibilities due to a promotion were moved to a position in a different institution.  We believe that by encouraging such transfers, the BOP could better staff the locations where need is greatest, while also helping the transferred PHS officer demonstrate continued mobility in his or her next application for a promotion.

Like mobility, receipt of PHS awards is another factor that the PHS promotion board considers when making promotion decisions.  One such award is the PHS's isolated hardship award given to PHS officers who serve at least 180 consecutive days in an area designated as isolated, remote, insular, or constituting a hardship duty assignment.  The BOP has already sought to incentivize PHS officers' transfers by having successfully petitioned the PHS to designate five BOP institutions as "isolated hardship locations" eligible for the award.[66]  The BOP's PHS Liaison told us that a request for a sixth isolated hardship designation for the newly activating Administrative U.S. Penitentiary, Thomson, Illinois, is pending.  We believe the BOP should consider requesting additional isolated hardship designations in the future, although we note that according to the BOP's PHS Liaison, the PHS is in the process of revising its criteria for awarding the designation.

---

[65]  PHS officer promotions in rank are based on the extent to which an officer meets a number of benchmarks, including performance appraisals, awards, history of assuming roles of increasing responsibility, continuing education, mobility, willingness to take on collateral duties, integrity, participation in PHS advisory groups, mentoring, and maintenance of basic readiness standards to respond to public health emergencies.  PHS officers told us that promotions become more competitive at higher ranks because the higher ranks have fewer positions available.  A PHS promotion board, not the BOP, makes PHS promotion decisions.

[66]  The five institutions with the designation as of October 2015 are Federal Correctional Institution (FCI) Safford in Arizona, FCI Manchester in Kentucky, FCI Estill in South Carolina, Federal Prison Camp Yankton in South Dakota, and FCI Three Rivers in Texas.

# CONCLUSION AND RECOMMENDATIONS

**Conclusion**

In addition to the unavoidable challenges within the BOP's correctional setting, the medical staffing challenges the BOP faces stem in part from local market factors and the limitations of the General Schedule (GS) scale and position classifications that the BOP cannot adjust without approval from the Office of Personnel Management (OPM).  We found that the BOP has taken a number of steps to address pay disparities and understaffing challenges, particularly by increasing its use of incentives and obtaining approval to use an alternate compensation scale for psychiatrists.  However, the approval process for incentives is laborious, time-consuming, and requires extensive knowledge that not all institution staffs possess.  Further, we found that the continued reliance on short-term solutions such as temporary duty (TDY) assignments and contracted medical care has an adverse impact on overall medical costs.  We believe that in order to be more efficient with resources, the BOP must look at other avenues to increase medical staffing levels.

We also found that the BOP needs to take a more strategic, coordinated, and agency-wide approach to its recruitment challenges.  Such an approach should begin by improving the BOP's use of data to identify, prioritize, and address recruitment challenges and medical staffing needs.  For example, the BOP does not currently prioritize medical staffing vacancies based on the cost of leaving the vacancies unfilled.  These costs can be determined by analyzing the care level of particular institutions, the extent to which institutions rely on TDY assignments, or the cost of contracting for care that would be provided if the vacancy were filled.  Similarly, the BOP currently collects position-specific data on the use of incentives but does not analyze it for recruitment purposes.  If the BOP were to analyze this data to identify positions and locations that are heavily reliant on incentives, then it could use that information to more accurately identify pay disparities, assess how frequently supplemental pay is required, and compare the cost of applying multiple incentives for lower graded positions with the cost that the BOP would incur if medical positions were reclassified to higher grades.  We believe this data would also be valuable in helping the BOP support its position to the Office of Personnel Management that the reclassification of certain positions on the GS scale is necessary for effective recruitment.

Because the BOP has not prioritized medical staffing vacancies through a strategic, national assessment of its needs, it cannot place PHS officers more efficiently throughout its institutions.  PHS policy offers the BOP a great amount of latitude in determining where to station PHS officers, but the BOP does not currently take advantage of these flexibilities.  The BOP has several options for managing PHS officer placements on a national level, and we believe it can do so in ways that could benefit both the BOP and the individual PHS officers' needs.  Better assessment of priority medical vacancies could also help the BOP better articulate its requirements to the PHS when it responds to the PHS's annual request for information on the amount of PHS officers the BOP needs.  We acknowledge that

with approximately 6,500 total officers working across 23 federal agencies and the District of Columbia, the PHS is not a panacea for the BOP to fill all of its staffing needs.  However, a more thorough analysis of staffing needs throughout the BOP, rooted in a more strategic approach, could help the BOP better describe its challenges to the PHS and identify where additional staff are most acutely needed.

**Recommendations**

To ensure the BOP can recruit and retain the medical professionals that are necessary to provide medical care to the BOP's inmate population, and to foster a proactive, coordinated strategy that will allow the BOP to better use its PHS officers, we recommend that the BOP:

1.   Develop a plan to use available data to assess and prioritize medical vacancies based on their impact on BOP operations.

2.   Develop strategies to better utilize Public Health Service officers to address the medical vacancies of greatest consequence, including the use of incentives, assignment flexibilities, and temporary duty.

**APPENDIX 1**

# EXPANDED METHODOLOGY

## Data Analysis

*Public Health Service and Civil Service Salary Comparison*

We attempted to compare the uniformed service pay scale with the General Schedule, but we determined that we could not accurately compare the salaries because some of the factors that influence Public Health Service (PHS) officer salaries do not have an equivalent in civil service salaries, resulting in great variance.[67]  A 2013 University of Maryland study of the PHS found that the costs associated with the PHS could not be easily quantified for comparison to the civil service.[68]  Further, the PHS Deputy Director of the Division of Commissioned Corps Personnel and Readiness (PHS Deputy Director, DCCPR) confirmed that because of the variance, the pay scales are too dissimilar to compare.

*Bureau of Labor Statistics Salary Analysis*

We used publicly available data from the Office of Personnel Management (OPM) and the Bureau of Labor Statistics (BLS) to analyze the differences in salaries between medical professionals working at the BOP and the overall salary averages of medical professionals in a given geographic location.[69]  We based our selection of geographic locations on counties that were in close proximity to BOP institutions.  We then used the county of the institution to select the applicable region for BLS data and the applicable locality for OPM data.  When analyzing OPM data, we used the highest available grade, but the lowest step for the given position according to OPM's position classification standards.  For example, dentists in the BOP can be either grade 11 or grade 12, so we used the salary of grade 12, step 1 for our analysis.  We believe this allowed for a reasonable comparison with the BLS averages because it represented a salary in the middle of the allowable range for that position.  In a separate analysis, we examined special pay tables that OPM had established for dentists and pharmacists in some BOP institutions, but we concluded that special pay was not sufficient to address the wage gap we found when comparing locality pay tables with BLS data.

---

[67]  Specifically, pay for PHS officers varies based on geographic location, base pay, years of service, dependents, specialty, allowance for subsistence, and rank.  The PHS Deputy Director, DCCPR noted that some portions of PHS officer pay are also tax-exempt.

[68]  According to the University of Maryland, the effectiveness, efficiency, efficacy, and comprehensive value of the PHS cannot be determined based on cost factors alone because there exist too many variables, inconsistencies, and un-measurable attributes to make a meaningful evaluation.  Muhiuddin Haider, *The USPHS Commissioned Corps:  A Study on Value and Contributions to DHHS Mission and National and Global Health Priorities and Initiatives* (University of Maryland, 2013).

[69]  BOP salary averages are included in the data captured by the Bureau of Labor Statistics.

*Incentives Awarded by Position*

The BOP provided data on recruitment and retention incentives awarded from FY 2010 to 2014. We used this data to total the number of incentives awarded, and the cost associated with those of monetary value. Our analysis of monetary incentives compared the incentives by type and position and used position counts to calculate averages. In determining position counts, we accounted for those individuals who received more than one incentive.

**Interviews**

We interviewed Central Office officials, including the Assistant Directors of the Human Resource Management and Health Services Divisions; the BOP's Personnel Director; the BOP PHS Liaison; the Chief of Budget Execution; and the Chief of Health Services Staffing and Recruitment.

We visited five institutions via video teleconference and, during those visits, we interviewed institution senior management, as well as staff who provide direct clinical care to inmates. We interviewed four Wardens, one Associate Warden, five Health Services Administrators, five Business Administrators, five Human Resource Managers, a Leave Maintenance Clerk, and BOP and PHS clinical staff, including: an occupational therapist, a health systems specialist, four non-supervisory registered nurses, a physician assistant, a nurse practitioner, and two pharmacists.

At PHS Headquarters, we interviewed an official in the DCCPR.

**Site Visits**

The team conducted video teleconferences with the five following institutions, representing all four healthcare levels: Federal Medical Center Butner, Federal Correctional Institution (FCI) Danbury, Federal Medical Center Rochester, FCI Sandstone, and Federal Detention Center SeaTac. We selected these five institutions because they had a combination of a high number or high percentage of PHS staff in FY 2014. We were also able to use these locations to assess hiring challenges across medical, detention, and standalone institutions, in both rural and metropolitan locations.

**Additional Objectives**

At the outset of this review, we included a report objective examining the BOP's oversight of PHS officer leave, awards, drug testing, and correctional training. We reviewed BOP and PHS policies related to these topics and asked questions on these topics during Central Office interviews and site visits described above. However, during these interviews we learned about larger concerns that BOP staff had regarding medical staffing in general. We met with officials from the BOP's Program Review Division and Health Services Division in September 2015 to formally close the original objective. At that meeting, we also added a review

objective examining the challenges and limitations the BOP faces in hiring medical professionals to work in its institutions.[70]  The BOP officials we met with in September 2015 said that recruitment and retention of quality medical professionals is the BOP's biggest challenge.

---

[70]  We conducted some of our Central Office interviews after this meeting to discuss the topics raised in our new objective.

# THE BOP'S RESPONSE TO THE DRAFT REPORT

**U.S. Department of Justice**

Federal Bureau of Prisons

---

*Office of the Director*

*Washington, DC 20534*

March 15, 2016

MEMORANDUM FOR NINA S. PELLETIER
                ASSISTANT INSPECTOR GENERAL
                OFFICE OF INSPECTOR GENERAL
                EVALUATION AND INSPECTIONS DIVISION

*Thomas R. Kane*

FROM:           Thomas R. Kane, Acting Director

SUBJECT:        Response to the Office of Inspector General's (OIG)
                DRAFT Report:  OIG Review of the Impact of the
                Federal Bureau of Prisons' Medical Staffing
                Challenges, Assignment Number A-2015-005

The Bureau of Prisons (BOP) appreciates the opportunity to respond
to the open recommendations from the draft report entitled OIG Review
of the Impact of the Federal Bureau of Prisons' Medical Staffing
Challenges.

Therefore, please find the Bureau's response to the recommendations
below:

**Recommendations**

To ensure the BOP can continue to recruit and retain the medical
professionals that are necessary to provide medical care to its
inmate population, and to foster a proactive, coordinated strategy

that will allow the BOP to better use its PHS officers, we recommend that the BOP:

**Recommendation 1:** "Develop a plan to use available data to assess and prioritize medical vacancies based on their impact on BOP operations."

**Response:** The BOP agrees with this recommendation and will explore options to better assess and provide targeted strategies for medical vacancies, resulting in an identified plan that will be provided to the OIG.

**Recommendation 2:** "Develop strategies to better utilize Public Health Service officers to address the medical vacancies of greatest consequence, including the use of incentives, assignment flexibilities, and temporary duty."

**Response:** The BOP believes the history and complexity of the relationship between the civil service and Public Health Service (PHS) personnel systems is not adequately detailed in the OIG report, and has a significant impact on BOP's management of those staff. Nevertheless, the BOP agrees with this recommendation, and will explore and develop strategies to better utilize PHS officers to address the medical vacancies of greatest consequence. As discussed during the exit conference for this review, BOP will explore the OIG's proposed solutions in its report, as well as other options that may appropriately address the situation.

If you have any questions regarding this response, please contact Steve Mora, Assistant Director, Program Review Division, at (202) 353-2302.

2

**APPENDIX 3**

# OIG ANALYSIS OF THE BOP'S RESPONSE

The Office of the Inspector General (OIG) provided a draft of this report to the Federal Bureau of Prisons (BOP) for comment.  The BOP's response is in Appendix 2.  Below, we discuss the OIG's analysis of the BOP's response and actions necessary to close the recommendations.

**Recommendation 1:**  Develop a plan to use available data to assess and prioritize medical vacancies based on their impact on BOP operations.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with the recommendation and stated that it would develop a plan by assessing medical vacancies and develop more targeted strategies to fill them.

**OIG Analysis:**  The BOP's planned actions are responsive to our request.  By June 30, 2016, please provide the BOP's plan illustrating the strategies developed to fill medical vacancies.  As part of the plan, please explain how the BOP will prioritize medical vacancies based on the length of vacancies, patterns in institutions' use of incentives, patterns in institutions' use of temporary duty, the cost of outside medical care, and any other sources of data that the BOP believes demonstrate the impact of leaving the positions vacant.  Additionally, please describe how frequently the BOP plans to reassess medical vacancies and reconsider their prioritization.

**Recommendation 2:**  Develop strategies to better utilize Public Health Service officers to address the medical vacancies of greatest consequence, including the use of incentives, assignment flexibilities, and temporary duty.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with the recommendation and stated that it would explore and develop strategies to better utilize PHS officers to address the medical vacancies of greatest consequence.  The BOP further stated that it would explore the options outlined in this report, as well as other options that may appropriately address the situation.

**OIG Analysis:**  The BOP's planned actions are responsive to our request.  By June 30, 2016, please describe how the BOP plans to better use PHS officer incentives, assignment flexibilities, and temporary duty to fill the highest priority medical vacancies identified through the strategy developed in response to Recommendation 1.  As part of this response, please describe how the BOP considered the options discussed in the report.

*The Department of Justice Office of the Inspector General (DOJ OIG) is a statutorily created independent entity whose mission is to detect and deter waste, fraud, abuse, and misconduct in the Department of Justice, and to promote economy and efficiency in the Department's operations.  Information may be reported to the DOJ OIG's hotline at www.justice.gov/oig/hotline or (800) 869-4499.*



Office of the Inspector General
U.S. Department of Justice
www.justice.gov/oig

# EXHIBIT G

REDACTED