

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 13, 2023

**BY ECF**

The Honorable Lewis J. Liman
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

    Re:    *United States v. Lawrence Ray*, 20 Cr. 110 (LJL)

Dear Judge Liman:

    Lawrence Ray's crimes were heinous. Over a period of years, he intentionally inflicted brutal and lifelong harm on innocent victims that he groomed and abused into submission. Once he had established control over his victims, he exploited them for his own profit through extortion, sex trafficking, and forced labor. While the defendant's victims descended into self-hatred, self-harm, and suicidal attempts under his coercive control, the evidence showed that the defendant took sadistic pleasure in their pain and enjoyed the fruits of their suffering. He extracted millions of dollars in extortion and sex trafficking proceeds from Claudia Drury, but the money was never enough, and at times it was besides the point: the defendant displayed an insatiable desire to make his victims pay, in both body and spirit. He sought to convince his victims that they were worthless, undeserving of love, and irredeemable, and until his arrest in this case, he was succeeding. In order to maintain his control and the lifestyle it ensured, he obstructed justice and threatened his victims with retaliation. He has shown no remorse, accepted no responsibility, and impeded the prosecution of this case, including by disrupting the trial and prolonging the trauma to his victims. Through his conduct, he has shown that he is a danger to others, is incapable of contrition, and must be incapacitated.

    The Probation Office correctly calculated the applicable United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") range as life imprisonment, with a mandatory minimum of 180 months' imprisonment. The defense does not raise any legal objections to this calculation but advocates for the mandatory minimum sentence. For the reasons set forth below, and due to the uniquely egregious nature of the defendant's crimes, the Government submits that a Guidelines sentence of life imprisonment is necessary to achieve the purposes of sentencing.

## I. A Guidelines Sentence of Life Imprisonment is Justified by the Section 3553(a) Factors

The Court is familiar with the offense conduct in this case, having presided over the defendant's four-week jury trial in March of 2022. The Government relies on the lengthy factual summary of the offense conduct set forth in the Final Presentence Report dated October 5, 2022 ("PSR"), and in the Court's opinion on the defendant's Rule 29 motion. *See* Dkt. 596 ("Rule 29 Op.").

As discussed below, a Guidelines sentence of life imprisonment is justified by the Section 3553(a) sentencing factors, including to achieve just punishment for the defendant's serious crimes, to ensure adequate deterrence, and to incapacitate the defendant.

### 1. Applicable Law

In addition to the Guidelines, which are not mandatory but must be consulted prior to sentencing, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See Gall v. United States*, 552 U.S. 32, 50 & n.6 (2007).

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)    to afford adequate deterrence to criminal conduct;
> (C)    to protect the public from further crimes of the defendant; and
> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### 2. The Seriousness of the Offense and the Need for Just Punishment Support a Guidelines Sentence

#### a. *The Nature of the Offense*

As the evidence proved at trial, Lawrence Ray's crimes were calculated. The defendant arrived at his daughter's college campus and inserted himself into the lives of her college roommates. He cast himself as a father figure and mentor, and built relationships of trust. After the defendant had earned his victims' trust and after he had learned about their particular vulnerabilities, he turned to exploitation. He used his position to degrade his victims, to erode

their autonomy and self-esteem, to isolate them from their families, and to destroy their sense of reality.

The defendant's grooming and exploitation of his victims was deliberate and painstaking. After cultivating his victims' dependence on him, the defendant made a pretense of extending his love and approval only to withdraw it. He alienated his victims from their parents precisely because it left them alone, exposed, and poised for manipulation. When his victims were at their most afraid and unsure, he fed on that fear and self-doubt to enslave them and eliminate any lifeline available to them.

The defendant "unleashed a campaign of terror on his victims." Dkt. 596, Rule 29 Op., at 3. The evidence at trial showed that the defendant studied and collected articles about mind control. (GX 1403 (listing articles found in the defendant's possession, like "Mind Control: The Ultimate Terror," "The Mind has no Firewall," "Cult Membership: What factors contribute to joining or leaving")). That is what he tried to exercise over his victims. He deployed tactics and mechanisms designed to establish coercive control over his victims, including physical violence, sexual abuse, isolation, indoctrination, gaslighting, emotional abuse, deprivation, economic abuse, surveillance behaviors, and collateral. (*See generally* Tr. 480 *et seq.* (testimony of Dr. Dawn Hughes)). By the time he was finished with them, he had gained total control. As the Court summarized:

> He initially befriended [his victims] and then, once they were caught in his snare, he steadily groomed them, turned them into his slaves, forced them to engage in labor for his own benefit and the benefit of his relatives, extorted them, and tortured them. He also sex-trafficked one of his victims[.]

Dkt. 593, Rule 29 Op., at 3. And, for years, the defendant sustained these tactics of abuse and degradation.

### b. *The Impact on the Victims*

It is notable that after learning of his victims' vulnerabilities, the defendant crafted a method of torture uniquely tailored to inflict maximum control and physical and psychological suffering on each.

With Daniel Levin, the defendant exploited what he understood to be Levin's sexual insecurities. The defendant described to others that Levin was "experiencing uncertainty over his sexuality." (Tr. 872:4). The very insecurity that the defendant identified became the focus of his humiliation and abuse. The defendant sought to emasculate Levin. He belittled Levin and mocked his sexuality in front of his peers, forcing him to wear a dress and shove an oversized dildo into his mouth. The defendant photographed Levin in this degrading scenario, memorializing a moment of abject humiliation to display for others. (Tr. 827-828). That was only one incident of horrendous abuse. In yet another, the defendant fashioned a garrote out of tin foil and attached it to Levin's testicles. The defendant then interrogated Levin under the implicit threat of castration,

physically tightening the foil noose whenever Levin answered questions "incorrectly." (Tr. 829:17-24).

In addition to targeting Levin's sense of masculinity, the defendant physically abused Levin in group settings with tactics that exhibited the defendant's total domination of Levin. The defendant attacked Levin by hammering his stomach and pulling his tongue with pliers. While Levin ultimately extricated himself from the defendant's grasp, the defendant deployed similar tactics of sexual humiliation and domination against others to achieve his unlawful ends. (*See, e.g.*, Tr. 316 (Santos testifying that the defendant held a knife to his genitals); Tr. 896 (Drury testifying that the defendant had her tied up and whipped, and instructed Isabella Pollok to penetrate her with an oversized dildo)).

Santos and Yalitza Rosario were two siblings with a history of mental health struggles. The defendant elicited details about their histories of mental health struggles, only to use that information against them. (Tr. 2078). The defendant turned their depression into a weapon, taunting Santos to jump out the window and blaming Yalitza for her sister's problems until he pushed her over the brink and Yalitza intentionally overdosed on medication in a Walmart parking lot. The defendant tormented Santos and Yalitza in part by convincing them that they had inflicted harm on people they cared about, like Talia Ray, Felicia Rosario, and the defendant himself.

The defendant turned the Rosarios' love for their siblings into a tool of abuse. Yalitza described, for example, how Felicia's condition deteriorated extensively at Pinehurst – where the defendant had his victims engaged in grueling physical labor and she watched the defendant repeatedly physically abuse Felicia. According to Yalitza, Felicia's demeanor was "childlike, her tone of voice was different from when -- how I knew her as growing up, and her hygiene was not good, and she looked very confused most of the time." (Tr. 2075:4-7). The defendant blamed Yalitza for Felicia's condition, which pushed Yalitza into her own emotional decline. She described the effect that this accusation had: "It made me feel very confused, upset, and at one point in Pinehurst I had to emotionally shut down." (Tr. 2075:22-23). When asked about the effect her time with the defendant had on her, Yalitza answered simply: "It tore my world apart." (Tr. 2202).

The defendant told Santos, again and again, that he had harmed Talia, his family members, and the defendant. In person and over the phone, the defendant repeatedly insisted that Santos had harmed Talia, required him to write down confessions about it, and berated him when the confessions did not satisfy the defendant. It was a campaign of accusation through which the defendant intentionally wore Santos down, telling him repeatedly that denials and protestations were a kind of dishonesty. Santos described how if he denied harming Talia, the defendant: [c]alled me a liar; [said] that he didn't believe me; that he didn't believe I was being complete, forthcoming." (Tr. 251:10-11). Those accusations drove Santos to despair: "[i]t made me feel as if I had been untruthful and that I did something wrong." (Tr. 256).

The defendant's methods were effective at warping Santos's sense of reality:

> In the beginning I was convinced that if Larry said it wasn't true, it
> couldn't be true because he's such an honest man, and he's been my

4

> friend, so I must be confused, and I must be misremembering or I must not want to remember what I did; and then over time that shifted to where if I didn't agree, the conversation would escalate to verbal and physical abuse. (Tr. 274).

The defendant was not satisfied simply to control Santos and his mind. The defendant than pivoted to accusations about property damage. The defendant's unceasing pressure on Santos for his supposed damaging of household items sent Santos to a place of desperation. Not content to bilk Santos for everything he had, the defendant steered Santos to deplete his parents' limited assets too. Fearful that Santos would kill himself if she did not comply, Maritza Rosario gave the defendant, through Santos, more than one hundred thousand dollars. The defendant also persuaded Santos to drop out of college, which cut short Santos's otherwise promising academic and professional trajectory.

Felicia Rosario was a young woman with a promising medical career ahead of her. The defendant transformed her into a shell of herself. In Pinehurst, the Harvard graduate was babbling and incoherent as the defendant berated her and slammed her to the floor. She arrived in New York with romantic aspirations, and soon found herself locked out of the apartment and commanded to have sex with strangers on film. The defendant's mercilessness served no apparent financial end, but he was relentless in destroying Felicia's self-worth, her womanhood, and her bright future.

The defendant's threats to Felicia aimed at Felicia's desire to return to medicine, conveying that he could, and would, prevent her from doing that. As Felicia testified: "He often talked about all of his relationships, that he even knew Dean Goldman at Columbia, he knew the presidents of all the hospitals in New York City, so he was going to call them and use whatever influence he had to make sure that I never worked as a doctor." (Tr. 1550:5-9). He used her achievements against Felicia – requiring her to wear her medical school graduation cap as he humiliated her. In one video, Felicia is recorded wearing her graduation cap while the defendant's voice is audible in the background. (GX 2122). Felicia explained that she was wearing the graduation cap, something the defendant did on multiple occasions (Tr. 1482:16), while he insulted her.

The defendant's insults were particularly calibrated to wound the victim, to erode whatever remaining pride or sense of self they retained. Felicia recalled some of his insults: "Like, 'some doctor,' 'this is what a Columbia grad does?' 'This is what a Harvard graduate does?' Like, "you're not a doctor at all." (Tr. 1482:11-13). Other people participated in Felicia's abuse, at the defendant's invitation. "[H]e would tell anyone else who was in the apartment with us to go ahead and make fun of me with him and to participate in the humiliation." (Tr. 1482:18-20). The group dynamic amplified the defendant's abuse, destroying their relationships with each other and further isolating the victims. The defendant's insults were effective at destroying Felicia's confidence and sense of self, as he undoubtedly knew and designed them to be. "I felt completely humiliated, degraded, debased, like I was -- like I was nothing, like I was really just -- like I was something, not even someone; like worthless."

With Claudia Drury, the defendant's grooming was a years-long project, taking advantage of her impressionable and self-exacting nature. The defendant met Drury when she as a 19-year-

old college sophomore with an interest in math and a plan to take the LSAT. Had the defendant suggested to her then that she become a prostitute, she would have been horrified. But he bided his time. For years, the defendant methodically eroded Drury's self-esteem, self-respect, sexual autonomy, familial support system, and sense of reality, and gradually moved the line of deviancy inch by inch until Drury found herself submitting to horrendously painful acts of BDSM. (Tr. 489 (Dr. Hughes testimony describing the line of deviance, and how perpetrators "slowly desensitize the victim to more extreme forms of sexual behavior")). At the time Drury and the defendant met, Drury was "uncomfortable" in her body and sexually insecure. (Tr. 723). The defendant was quick to begin sexually grooming his daughter's friend. Drury described the defendant touching her body, encouraging her to have sex with Daniel Levin in his presence, directing her to masturbate, and telling her to have sex with a married tools salesman in his truck. (Tr. 722-23, 750-51). The defendant belittled Drury for being sexually inhibited (Tr. 871-72), subjected her to BDSM (Tr. 896), repeatedly suggested that she try sex clubs to become more sexually liberated (Tr. 884), and positively reinforced her behavior as she became more sexually experimental (including by collecting photos of her bruised body, Tr. 897), at a time when he otherwise exhibited only disapproval of her (Tr. 885-87).

In parallel with grooming Drury sexually, the defendant physically threatened and psychologically tormented her. Among other things, the defendant forced Drury to labor in Pinehurst; Drury lost 40 pounds during that period, she worked outside during thunderstorms and with limited food and sleep, and she labored while the defendant physically abused her and others, and accused her of constant sabotage. (Tr. 860-63). Reflecting on her time there, Drury recalled being "starving and hungry, and completely, completely overwhelmed by the chaos of the situation," which included Felicia "deteriorating psychologically before my eyes everyday," the "whole thing was insane, and I did not feel at all that I had any ability to leave whatsoever." (Tr. 866). The accusations of sabotage in Pinehurst progressively gave way to the defendant blaming Drury for an elaborate poisoning scheme against the defendant and his family, to which Drury was made to confess again and again. (*See, e.g.*, Tr. 873-78). Using graphic imagery, the defendant convinced Drury that she would suffer a terrible fate in prison for her crimes and left her feeling so hopelessly "trapped" that she attempted suicide. (Tr. 881-82). The sexual grooming and the psychological abuse went hand in hand: Drury submitted herself to BDSM that involved physical harm that was "quite severe" (Tr. 887-94) because the defendant encouraged it and she had "buil[t] up a lot of self-hate that [she] had no outlet for" (Tr. 895). By 2014, when the defendant "suggested" Drury work as a prostitute to repay her debts and to avoid prison, he had therefore already—through his well-honed playbook of coercive control—eliminated the barriers of resistance and convinced Drury that her body and mind were worthless because she was a lying, murderous poisoner.

The trial evidence left no doubt that Drury worked as a prostitute because the defendant coerced her to do it, and that this period of her life was nightmarish. In addition to the daily degradations of having sex for money during most of her waking hours, Drury described being choked, robbed, forced to administer oral sex for hours on end, and being offered money to have sex in a hotel room in the presence of a one-year-old child. She testified about physically painful sexual experiences and a client who smoked crack during their appointments. (Tr. 1239-40). She explained that she endured these traumatic experiences because the defendant relentlessly

pressured her to earn money and made a variety of threats to ensure her continued obedience and prostitution. Drury summarized some of the threats:

> He would threaten to blackmail my clients. He would threaten me physically. He would threaten to put me in prison because I wasn't even trying to make repairs for this horrible crime. A lot of the time he—on several occasions he would tell me—he literally said, We are dying, Claudia. Referring to the people I had poisoned.

(Tr. 1007).

The defendant not only convinced Drury that she should go to prison, but also that her soul would be beyond repair if she did not satisfy his endless thirst for more money. (Tr. 903; Tr. 936 (the defendant told Drury that "if he stopped accepting [her] repairs . . . [her] soul would deteriorate for everything that [she] had done" and she would not be "able to make amends for it")). He flogged her with BDSM props (Tr. 910-11), destroyed her belongings (Tr. 925), instructed her to have sex with Isabella Pollok (Tr. 928), interrogated her for hours (Tr. 934-38), blackmailed her with a website in her name (Tr. 938-40), and incited her to develop, and then mocked, her "horrific binge bulimia eating disorder" (Tr. 943). Among other names, he called her "fat," "deformed," a "criminal," a "murderer," a "liar," and a "poisoner." (Tr. 1011). And he interspersed his threats with merciless violence. (*See, e.g.*, Tr. 1014-16). That violence culminated at the Gregory Hotel when the defendant targeted Drury for a night of torture and humiliation. As Drury told the jury, over the course of 7 to 8 hours, the defendant tied her naked to a chair, suffocated her multiple times with a plastic bag, smothered her with a pillow, threatened to waterboard her, and choked her to the point of passing out with a leash and collar. (Tr. 1033-34). This incident epitomized the depraved and brutal nature of the defendant's treatment of his victims. As Drury gasped for air, he accused her of being overdramatic and a faker, even as he threatened to kill her. (Tr. 1037). Drury internalized the violent directive to make more money and returned to work within hours. Within a day of their vicious assault, the defendant and Pollok spent hundreds of dollars in cash on a shopping spree. (GX 1624 at 133-134 (cash receipts from October 17, 2018 for approximately $415 from UGG store, and approximately $497 from Paige)). Over the course of the defendant's sex trafficking, she provided the defendant approximately $2.5 million.

These examples of abuse are staggering but provide a glimpse of an existence that was truly beyond comprehension. Even a four-week trial provided only a snapshot of conduct that his victims experienced daily and over years. For every incident captured, the victims recalled many more similar experiences, more abuse, more humiliation. What did become clear through the trial evidence is that the defendant's capacity for cruelty towards his victims was limitless. His victims are still struggling with the scars of what they endured. (*See* Ex. C, Victim Impact Statements).

    c. *The Defendant's Motives*

Part of the defendant's motive was profit. He collected tens of thousands, and then hundreds of thousands of dollars from the Rosarios. When he finally succeeded in trafficking Claudia Drury as a high-end escort on a nearly 24/7 basis, he lost interest in Santos Rosario, and focused his efforts on extorting Drury for millions of dollars. When Drury ran away, he set his sights back on Santos, once again using him as a source of income.

But greed alone does not explain the defendant's unspeakable conduct. He also enjoyed being cruel. It is obvious, for example, that his victims, without any experience with physical labor or construction equipment, had no real chance of making productive financial improvements to the property in North Carolina—and yet the defendant forced them to toil senselessly under punishing conditions for weeks on end simply to revel in their Sisyphean struggle. When his victims expressed anguish or guilt, he feigned sympathy and twisted the knife in deeper. He baited his victims to attempt suicide and then stymied their recoveries, while pretending to be the only one concerned with their wellbeing.

For this reason, any supposed explanation from the defense that the defendant believed he was being poisoned rings deeply hollow. The evidence demonstrated that the defendant manufactured accusations against his victims to control them—and he escalated those accusations in step with the advancement of his scheme. Regardless, no purported belief—however strong—in a poisoning plot could ever justify the defendant's sustained, coldhearted destruction of his victims' lives. The defendant's silence on this score is damning, indefensible, and entirely unexplained by his mother's supposed experiment in baking with ex-lax.[1]

The defendant collected trophies from his reign of terror. As corroborated by the numerous photographs, videos, and audio recordings introduced at trial, the defendant documented his sexual, physical, and psychological abuse of his victims. The documentary evidence proved what otherwise sounded too nightmarish to be real, or that which was too painful for the victims to recall and to relive: among other things, the defendant twisting Daniel Levin's tongue with pliers, the defendant crushing Felicia Rosario with his body while she writhed on the floor or sending her to engage in degrading sexual escapades with strangers, Claudia Drury with a welt on her forehead after the defendant whipped her with a crop, and the defendant directing Santos Rosario to slap himself over and over again in the face. The defendant preserved these episodes to further extort and threaten his victims, and to cement his control over them. But the sheer volume of material he amassed suggests that he derived sadistic pleasure from the misery and degradation of his victims.

The defendant requests a sentence of 15 years, the mandatory minimum for the sex trafficking count, and a significant departure below the Guideline sentence. Such a sentence would not reflect the particularly cruel and sustained nature of his sex trafficking conduct, which involved a sociopathic plot to turn a promising college student into his highly profitable slave. The sex trafficking alone demands a sentence far above the mandatory minimum. And such a sentence would not address or account for the racketeering conspiracy, the extortion, the forced labor, the money laundering, and the financial crimes, or the pain and trauma that the defendant caused to his other victims. A 15-year-sentence would be wholly inadequate to reflect the seriousness of the offense and provide just punishment.

Drury described at trial the lasting damage inflicted by the defendant:

---

[1] The Government has interviewed both Martha Ray, who indicated that she did not know whether Ingrid Ray had, in fact, put anything in the cupcakes, and Carl Ray, who has no recollection of the incident. *See* Ex. A, B.

> [The defendant] has severely damaged my life and my ability to think, my ability to interact with people, my ability to believe in the good in the world. I am in debt that I have no way to pay back. My credit score is very low. I can't really hold down a job, normal job. I have to live with and try and reconcile with, you know, having been a prostitute for many years and all of the experiences I had, not to mention all the publicity.

(Tr. 1237-38). As Drury's words illustrate, the defendant's campaign of terror—uniquely tailored to each victim's vulnerabilities—was utterly, devastatingly effective. This is made most clear in the spate of suicide attempts by his victims while enduring his abuse. He brought his victims to such despair that they tried to end their lives, including Felicia hospitalized in Washington DC in the fall of 2012 (GX 545), Yalitza hospitalized in Pinehurst in 2013 (GX 542), Santos hospitalized in New York in February 2014 (GX 1401), Drury hospitalized in New York in April 2014 (GX 540), and Yalitza hospitalized in New York also in April 2014 (GX 539). The defendant treated the victims' suicide attempts as another kind of collateral—something to be catalogued and used against them at an opportune moment. Even from jail, the defendant was instructing his associates on the outside to gather what he saw as helpful material, including tallying his victims' suicide attempts. (*See* GX 702-T ("Then I want to also know- we need to build like a chronology. When was Dan at the apartment? When was Claudia at the apartment? Santos, Yali, so on, okay? […] And then also we wanna- how many suicides were there between the three of them- attempts?")).

With the defendant's arrest and conviction, his victims are left to sort through the wreckage and reckon with the lasting damage from the defendant's crimes. But one victim has no prospect of rebuilding a life. Iban Goicoechea, one of the students over whom the defendant asserted control, committed suicide in May 2020. While the precipitating cause is unknown, around the time of his suicide, Goicoechea was still in touch with the defendant and convinced—as other victims were at the time of their suicide attempts—that the defendant was a positive influence on his life. It is plain that the defendant harmed Goicoechea and exploited his mental health vulnerabilities, just as he did with his victims who were able to put their experiences into words on the stand. Santos and Drury testified about an incident when the defendant threatened Goicoechea with a sharp object to his throat as a supposed therapeutic intervention that involved requiring Goicoechea to disavow his parents. (GX 3001). The defendant treated the incident as if he had done Goicoechea a service and "freed iban from the web of hate and anger that his mother created." (*Id.*) The incident illustrates the very same tactics described by testifying victims: isolation that involved villainizing family members, physical violence, threats, and deprivation.

  d. *Comparable Cases*

There are few comparable cases where a defendant's conduct is as calculated, as brutal, as sustained, and as effective.

One similar case is NXIVM leader Keith Raniere in the Eastern District of New York. Raniere was convicted after trial of offenses including racketeering conspiracy and sex trafficking, and continued to show no remorse through the time of sentence. Raniere, too, groomed victims, gained control over their lives, and, with the help of a loyal inner circle, then exploited that control for his own ends. He received a sentence of 120 years, effectively, a life sentence. *See United States v. Raniere*, 18 Cr. 204 (NGG).

### 3. A Guidelines Sentence is Necessary to Afford Adequate Deterrence

The defendant's conduct in this case, both for what he did and for how long he did it, shows an acute need for specific deterrence, particularly because he has not accepted responsibility for his crimes. The need for deterrence is also made clear by the defendant's prior conduct, which demonstrates that his crimes of conviction are an outgrowth of a pattern of abusive behavior.

The defendant has a history of using violence, abuse, and deceit to victimize others. He has followed the same playbook, going back for years. For example, as proffered in pre-trial briefing, long before the charged conduct, the defendant used sexual abuse, physical violence, and financial exploitation to dominate women with whom he had relationships, including Teresa Ray, his ex-wife, and Valerie Lederman, an ex-girlfriend. With Teresa, the defendant used physical violence and degradation, including banging Teresa's head into a cabinet requiring stitches, choking her during a fight, and throwing food at her during a fight, which he then required her to clean up naked. As noted in the PSR, Teresa has an active restraining order against the defendant. (PSR ¶ 123). With Lederman, the defendant used physical violence, sexual abuse, isolation, and collateral. The defendant isolated her from other sources of support, brought strangers home and instructed her to have sexual encounters with them, and then used these encounters as leverage against her. Against this backdrop, the defendant asked Lederman for money, borrowed money from her father, and then later threatened to never repay her father and to destroy her. In one encounter, the defendant held her in a choke-hold position. As noted in the PSR, Lederman has an active restraining order against the defendant. (PSR ¶ 122).

The defendant's criminal history also includes a pattern of fraud, deceit, and disregard for the judicial system that echoes in the present offense conduct. The defendant was convicted of conspiracy to commit securities fraud in 2001. (PSR ¶ 116). Between December 2005 and January 2006, the defendant had a variety of violations while he was on supervised release, including failing to provide requested documentation to the probation office, possessing ammunition and the barrel of a rifle, and leaving the district without permission, which led to the imposition of a six-month sentence. (*Id.*) In February 2007, the defendant was accused of still other violations while on supervised release, with the supervising officer reporting that the defendant has "proven himself to be uncooperative with the simplest of conditions." A warrant issued and the defendant was apprehended by the U.S. Marshals after resisting arrest and using his daughter as a human shield. (*Id.*)

The defendant has violated other court directives, which resulted in a contempt charge for violation of a restraining order in 2005 (PSR ¶ 117), interference with custody and a contempt charge in 2010 for failing to abide by a court order regarding custody of his two daughters (PSR ¶ 118), and a bail jumping charge in 2008 in the same incident described above in which he wielded his daughter as a human shield (PSR ¶ 119). He evidently believes himself to be above the law, brazenly indifferent even to those court orders directed specifically to him.

Finally, it is worth noting that the defendant had a series of medical episodes during trial that caused substantial interruptions and threatened a mistrial. Drury, in particular, remained on the stand from March 18, 2022 through March 25, 2022. At least one doctor observed that aspects

of the defendant's presenting symptoms were inconsistent with "legitimate medical causation," and, in other words, fake. Dkt. No. 561. These mid-trial interruptions came after the defendant sought to delay the trial by, as this Court found, causing a rupture of his relationship with counsel shortly before trial began. (Tr. 964:16-23.) This conduct was consistent with his actions in prior judicial proceedings. The defendant used claims of illness to obtain delays in his sentencing in his criminal case in EDNY, to delay his testimony as a witness in a Bronx criminal trial, and when he delayed a deposition in a civil proceeding in New York Supreme Court in which he was the plaintiff. Dkt. 557. The defendant's use of claims of physical illness to manipulate the pace of judicial proceedings is well-documented and further illustrates his disregard for the courts.

### 4. A Guidelines Sentence is Necessary to Protect the Public

The defendant has shown a total lack of remorse for his conduct. The defendant's submission nowhere mentions the defendant's victims, the abuse that he inflicted upon them, or the trauma that they are still trying to overcome. Its silence on this score is telling. To the extent it reflects the defendant's inability to reckon with what he has done, it serves as a warning that the public would not be safe were the defendant to be released.

The defense submission focuses on the defendant's beliefs that he was poisoned, his difficult childhood, and an allegation that the defendant was the victim of sexual abuse by his maternal grandfather. (PSR ¶133).

The defendant's supposed belief that his victims poisoned him does not withstand scrutiny and flies in the face of his actual behavior. The defendant kept his supposed poisoners close, shared space, and shared meals. He never—in any of the audio or video recordings that he captured — showed even a flash of fear. He deployed accusations when convenient, when profitable, and regardless of their plausibility. And finally, he monetized these accusations as a way to profit off of his abuse. The legitimacy of his beliefs is debunked by the greed and opportunism with which he promulgated them. His accusations became a basis for claimed damages, and the claimed damages only grew. He received millions of dollars from Drury and kept meticulous ledgers about her payments towards an unlimited, unshrinking debt. He spent the money on fancy hotels, construction equipment, and other luxury goods—but the ledgers and receipts showed no significant spending on medicine or medical treatment. He wielded accusations when and where they were most profitable—for example, renewing claims against Santos after several years of absence and only after Claudia had escaped his control and he had lost his source of proceeds. (See Tr. 1709:1-5 (Felicia describing the defendant returning to Santos as a source of funds only after Claudia escaped)).

With respect to the defendant's claims of childhood abuse, there is no way to corroborate this account. The defendant does not recall whether he disclosed the sexual abuse to anyone. (PSR ¶133). That, of course, is not dispositive, but given the defendant's flexible approach to the truth and his habit of lodging accusations of terrible sexual or physical abuse against others, his statements about his own childhood experiences cannot simply be taken at face value. Where it suits his ends, the defendant has demonstrated no compunction about accusing other individuals of terrible sexual or physical violence. He used allegations of sexual abuse to try to obtain custody of his children, falsely accusing his ex-wife, his ex-wife's father, and his nephew of sexually

abusing their daughter. (*See* Ex. A). He convinced Felicia that she was sexually abused as a child, and similarly convinced his other victims that they had been abused, neglected, or mistreated by their parents. The defendant has a long history of wielding accusations where it suits him without regard to the truth.

No person is deserving of sexual abuse. By the same token, whatever the defendant's childhood experience, the trial evidence shows that he inflicted abuse that far surpasses that which he now claims to have experienced, and against innocent teenagers and young adults who he forced into his path. The defendant shows absolutely no sympathy and expresses no contrition for the experience of his victims, despite asserting that he was personally damaged by sexual abuse. The Final Presentence Report notes that the defendant "brutally traumatized these victims over a period of years," but still blames his victims, as if they bear responsibility for the harm that he inflicted upon them. "The defendant took this case to trial and does not appear to have shown any remorse. In fact, he appears to continue to blame the victims for poisoning him." (PSR at p. 46). The harm that the defendant inflicted upon others and his inability to accept responsibility or express contrition show that incapacitation is an overwhelming consideration. Nothing less than life imprisonment would assure the safety of the community.

The defendant's prior experience on supervised release, and his repeated violations of court orders also show that community supervision would be ineffectual. His prior probation officer, following his fraud conviction in EDNY, observed that the defendant has "proven himself to be uncooperative with the simplest of conditions." (PSR ¶ 116). There is no reason to think the defendant will abide by the restrictions of his supervision given his track record. There is no reason to think he has changed, and every reason to think that his brazen disregard for the law and the community continues through the present.

An adult man perpetrated unspeakable harm over a period of years. Unfortunately, the defendant's treatment of his victims had a prelude in his mistreatment of his ex-wife and his ex-girlfriend. It was also echoed in his treatment of the many others that had the misfortune of crossing his path during the charged conspiracies. During his extended course of criminal conduct, the defendant took advantage of and used many others, like Cleo Beletsis whom he tried to con out of her Riverside Drive apartment and Lee Chen, whom he did force out of the Upper East Side apartment where Ray and his victims resided. But no one, not even the defendant's own children, have been spared from the defendant's abusive and self-serving conduct. The defendant convinced Talia Ray, his daughter and co-conspirator, that her own mother had abused her. He used her as a human shield to avoid arrest when she was just a teenager. The defendant then enlisted her in the abuse, extortion, and forced labor of her own college roommates.

The defendant was also convicted of a racketeering conspiracy and of leading a criminal enterprise. There is particular danger posed by a defendant who is able to indoctrinate others, recruit them into his belief system, and deploy them as his tools in victimizing others. This was chillingly exhibited in the evidence at trial, which included recordings in which Pollok and Talia laugh and joke at their former roommates are humiliated and threatened. (*See* GX 4175 (Talia laughing as she tells Santos that he could go to jail for life as a violent criminal; Pollok being instructed to make a recording)). The defendant's recruitment of his co-conspirators and his

unique power to create an enterprise that carried out his criminal directives, further demonstrates the real and constant danger that the defendant poses.

Furthermore, given the manner in which the defendant inflicted his harm and his demonstrated ability to wield psychological tools to establish coercive control, the defendant's age does not provide any reassurance that the defendant's crimes would stop. The defendant is 63 years old, and defendant embarked upon this campaign of terror when he was already in his 50's. His relatively advanced age offered no protection to his victims here; indeed, he used his age to insinuate himself into his victims' lives as a mentor and figure of authority. A sentence at the mandatory minimum would return the defendant to the community in his early 70's, and there is every reason to believe that the defendant would return to the violence and exploitation and fraud in which he has so consistently engaged. Even a longer sentence would not adequately assure the safety of the community. The Probation Office's recommendation of a 300-month sentence purports to "recognize the defendant's age, health, and difficult upbringing." For the reasons described above, the Government disagrees that the defendant's self-serving account of his health conditions and difficult upbringing should be accepted without scrutiny. But more troublingly, the defendant committed this conduct while in his 50's, suggesting that advanced age did not and will not stop continued criminal conduct. There is every reason to conclude that he will not age out of his potential and capacity for violence and victimization. Indeed, the defendant deployed his own father, while in his 80's, to deliver threats against Felicia Rosario after his arrest and to demand her continued loyalty. (GX 1685). Even while incapacitated, even when relying on elderly people, the defendant has found a way to abuse and exploit others. Only lifetime incarceration will protect the public and send the appropriate message to the defendant and others who would commit similar offenses about the consequences of such conduct.

## II. Forfeiture and Restitution

The Government has attached a proposed Order of Forfeiture and a proposed Order of Restitution to the victims of his crimes. In addition to the proposed Order of Restitution, the Government requests that the defendant be ordered to pay $761,276.26 to the Internal Revenue Service ("IRS") as a condition of any term of supervised release specifying that, consistent with 18 U.S.C. §3664(i), restitution to all nonfederal victims will take precedence over restitution to the United States.

### A. Forfeiture

With respect to forfeiture, the Government is seeking a money judgment in the amount of $2,444,349, and to forfeit the following specific property: (i) the proceeds from the sale of the defendant's GoDaddy portfolio and (ii) the residence at 4 Scarborough Place, Pinehurst, North Carolina, 28374 (the "Pinehurst Property").

As the Court is well aware, "[c]riminal forfeiture statutes empower the Government to confiscate property derived from or used to facilitate criminal activity. Such statutes serve important governmental interests such as separating a criminal from his ill-gotten gains, returning property, in full, to those wrongfully deprived or defrauded of it, and lessen[ing] the economic

power of criminal enterprises." *Honeycutt v. United States*, 137 S. Ct. 1626, 1631 (2017) (citation and internal quotation marks omitted).

The forfeiture statutes at issue here authorize a money judgment representing the proceeds of the subject offense. *See, e.g.*, 18 U.S.C. § 981(a)(1)(C) (describing "property . . . which constitutes or is derived from proceeds traceable to" the crimes charged"); 18 U.S.C. § 982(a)(2) ("The court, in imposing sentence on a person convicted of a violation of, or a conspiracy to violate— (A) section . . . 1344 of this title, affecting a financial institution, . . . shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation."); 18 U.S.C. § 1963(a) (a defendant convicted of racketeering conspiracy must forfeit "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity"); *see also United States v. Peters*, 732 F.3d 93, 101-102 (2d Cir. 2013) (holding that proceeds forfeitable under Section 982(a)(2) are the gross receipts of the offense, not merely the profits); *United States v. Gotti*, 459 F.3d 296, 347 (2d Cir. 2006) (defendant liable for forfeiture of all proceeds he received from racketeering enterprise under § 1963(a)(3), even from predicates to which he did not agree).

Where forfeiture is sought in the form of a personal money judgment, the district court "must determine the amount of money that the defendant will be ordered to pay." Fed. R. Crim. P. 32.2(b)(1)(A). The court's determination "may be based on evidence already in the record," Fed. R. Crim. P. 32.2(b)(1)(B), "including testimony at the earlier trial" *United States v. Mathieu*, No. --Fed. Appx.--, 2021 WL 1783122, at *3 (2d Cir. May 5, 2021) (internal quotation marks omitted). The "calculation of forfeiture amounts is not an exact science. '[T]he court need not establish the loss with precision but rather need only make a reasonable estimate of the loss, given the available information.'" *United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011) (quoting *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009)). A court "may make reasonable extrapolations from the evidence established by a preponderance of the evidence at the sentencing proceeding." *Treacy*, 639 F.3d at 48. As "an aspect of sentencing," *Libretti v. United States*, 516 U.S. 29, 49 (1995), forfeiture amounts are determined by a preponderance of the evidence, *United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007).

As reflected in the PSR, a conservative loss amount based on the trial evidence is $2,444,349. (*See* PSR ¶¶ 35, 74). The proposed forfeiture order is amply supported by the trial evidence, which established that:

- Between 2016 and 2019, the defendant obtained at least **$2,029,821** from Claudia Drury in cash. (*See* GX 1422). That amount is drawn from ledgers maintained by the defendant and Isabella of the cash pick-ups, and does not include money that Claudia transferred to them by other means, such as wire transfers and payments to GoDaddy.
- With respect to 2016, the ledger of cash deposits only included approximately two months (or a total of $84,140). (GX 1422). A total of $242,236 was deposited into Pollok and Felicia Rosario's bank accounts that same year. (DX C29). Accordingly, the defendant received at least an additional **$158,096** into Pollok and Felicia's accounts, which, as

established at trial, were under his control.
- Claudia paid **$13,432** into Ray's GoDaddy in the fall of 2017.
- Ray received at least **$53,000** in wire transfers from clients into Pollok's bank accounts. (GX 1404 at 9 ($40,000 from Kenneth Mumma), and at 10 ($14,650 in Transfers from Clients)).
- Claudia also made some direct wire transfers to Pollok, such as **$2,000** into Pollok's account in June 2018.  (See GX 1404 at 8).
- Maritza Rosario testified that she gave her children, Santos, Yalitza, and Felicia, approximately **$150,000** for the defendant through approximately 2014, when she lost contact with her children.
- Santos Rosario paid the defendant approximately **$40,000** between May 2019 and June 2020.  (Gx 1404 at page 13.)

As the evidence at trial established, the sex trafficking of Drury constituted a predicate crime of the racketeering conspiracy, and the sex trafficking proceeds also constituted proceeds of the defendant's extortion scheme, which further encompassed the extortion of the Rosario family. Thus, $2,444,349 is a conservative forfeiture estimate for Count One, *see* 18 U.S.C. § 1963, and Counts Two and Three, *see* 18 U.S.C. §§ 981(a)(1)(C) and 2461(c).  (*See* PSR ¶ 35).  $2,254,349 is a conservative forfeiture estimate for Counts Four and Five, *see* 18 U.S.C. § 1594, and Count Eleven, *see* 18 U.S.C. 982(a)(1).  (*See* PSR ¶ 35).  The defense does not appear to dispute the loss amount.  (*See* PSR ¶¶ 35, 74).

In addition, the Pinehurst Property is subject to forfeiture as a result of the defendant's convictions on Counts One (racketeering conspiracy) and Six through Eight (forced labor crimes). The racketeering statute and the Trafficking Victims Protection Act of 2000 (the "TVPA") provide for the forfeiture of real property used to facilitate racketeering and forced labor, respectively.  *See* 18 U.S.C. § 1963(a)(2)(D) (providing for forfeiture of "any . . . property . . . affording a source of influence over any enterprise"); 18 U.S.C. § 1594 (e)(1)(A) (providing for forfeiture of "[a]ny property, real or personal, involved in, used, or intended to be used to commit or to facilitate the commission of any violation of this chapter, and any property traceable to such property"); *see also United States v. Rudaj*, No. 04 CR. 1110 (DLC), 2006 WL 1876664, at *3, *5 (S.D.N.Y. July 5, 2006) (forfeiting restaurant based on proof that it gave defendant influence over racketeering enterprise); *United States v. Sabhnani*, 599 F.3d 215, 262-63 (2d Cir. 2010) (affirming forfeiture of real property used to facilitate trafficking); *see also United States v. Davis*, S3 07 Cr. 11 (JCH) (D. Conn) (ordering forfeiture, pursuant to 18 U.S.C. § 1594(b), of a two-story residence used by defendant to house girls whom he physically and sexually abused and forced into prostitution). Given the overwhelming trial evidence proving that the Pinehurst property was used in the defendant's forced labor crimes, both to house the victims and as the location and object of their unpaid labor, the Government is seeking its forfeiture.

### B. Restitution

With respect to restitution, the Government is seeking restitution in the total amount of $5,398,125.32.  We are seeking the following: (i) entry of a proposed Order of Restitution, with

$4,636,849.06 to be paid to the victims identified in its Schedule of Victims[2]; and (ii) inclusion of $761,276.26 of restitution to the Internal Revenue Service ("IRS") as a condition of any term of supervised release. (*See* Ex. D (calculations of IRS Revenue Agent Valerie Catanzaro)).

With respect to the proposed Order of Restitution, five victims have submitted detailed restitution statements outlining the losses they have suffered. Relevant to their claims are two restitution statutes. First, the TVPA provides for mandatory restitution for "the full amount of the victim's losses" for crimes including sex trafficking and forced labor offenses. 18 U.S.C. § 1593(b)(1). Under the TVPA, victims are entitled to full compensation for "any costs incurred, or that are reasonably projected to be incurred in the future, by the victim, as a proximate result of the offenses involving the victim," including "medical services relating to physical, psychiatric, or psychological care," "lost income," and "reasonable attorneys' fees." *Id*. §§ 1593(b)(3), 2259(c)(2).

Second, the Mandatory Victim Restitution Act of 1996 ("MVRA") requires that defendants convicted of certain crimes, including crimes of violence or offenses against property that cause a "physical injury or pecuniary loss" to "an identifiable victim," "make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1), (c). Under the MVRA, victims of offenses "resulting in bodily injury" are entitled to recover the costs of medical care and "related professional services" relating to mental health care, the costs of "necessary physical and occupational therapy and rehabilitation," and lost income that resulted from the offense. *Id*. § 3663A(b)(2). The MVRA applies to racketeering conspiracy and extortion and extortion conspiracy.

With respect to determining the amount of restitution, the Court need only make a reasonable estimate, based on available evidence, of the amounts to be forfeited and repaid to victims. *United States v. Gushlak*, 728 F.3d 184, 195-96 (2d Cir. 2013) ("reasonable approximation" for restitution "will suffice, especially in cases in which an exact dollar amount is inherently incalculable" (internal citations omitted)). In evaluating restitution claims, the court recognizes that "the Government bears the burden of proving a victim's actual loss by a preponderance of the evidence." *United States v. Finazzo*, 850 F.3d 94, 117 (2d Cir. 2017). Both statutes make restitution mandatory.

Here, the restitution statements catalogue the types of losses suffered by the victims, for which they are entitled to mandatory restitution. In the event that the defendant wishes to litigate the restitution claims of the victims, the Government requests that the Court proceed with sentencing on January 20, 2023 and set a schedule for briefing on restitution within the 90 days allowed by statute. *See* 18 U.S.C. § 3664(d)(5) (permitting Court to defer restitution order for up to ninety days following a defendant's sentencing proceeding).

### III. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose

---

[2] Consistent with 18 U.S.C. §§3771(a)(8) & 3664(d)(4) and Federal Rule of Criminal Procedure 49.1, to protect the privacy interests of the victims, the Government is requesting that Schedule A to the Proposed Order of Restitution be filed under seal.

a Guidelines sentence of life imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: /s/
     Mollie Bracewell
     Lindsey Keenan
     Danielle R. Sassoon
     Assistant United States Attorneys
     (212) 637-2218/1115

cc:    defense counsel (by ECF and E-mail)