N1K1RAYS

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                          20 Cr. 110 (LJL)

5   LAWRENCE RAY,

6                Defendant.              Sentencing
    ------------------------------x
7
                                         New York, N.Y.
8                                        January 20, 2023
                                         10:04 a.m.
9

10  Before:

11                    HON. LEWIS J. LIMAN,

12                                       District Judge

13
                          APPEARANCES
14
    DAMIAN WILLIAMS
15       United States Attorney for the
         Southern District of New York
16  BY:  MARY E. BRACEWELL, ESQ.
         DANIELLE R. SASSOON, ESQ.
17       LINDSEY KEENAN, ESQ.
         Assistant United States Attorneys
18
    FEDERAL DEFENDERS OF NEW YORK INC.
19       Attorneys for Defendant
    BY:  MARNE L. LENOX, ESQ.
20       ALLEGRA GLASHAUSSER, ESQ.
         PEGGY CROSS-GOLDENBERG, ESQ.
21       NEIL P. KELLY, ESQ.

22  ALSO PRESENT:  KELLY MAGUIRE, Special Agent, FBI

23

24

25
```

N1K1RAYS

1           (Case called)

2           THE DEPUTY CLERK:  Starting with counsel for the

3    government, please state your appearance for the record.

4           MS. BRACEWELL:  Good morning, your Honor.  Mollie

5    Bracewell for the government, joined by my colleagues Danielle

6    Sassoon and Lindsay Keenan, and also joined by Kelly Maguire,

7    special agent for the FBI.

8           MS. LENOX:  Good morning.  Federal Defenders of New

9    York by Marne Lenox for Lawrence Ray.  I'm joined at counsel

10   table by my colleagues Allegra Glashausser, Peggy

11   Cross-Goldenberg, and Neil Kelly.

12          THE COURT:  Good morning.

13          We're here today to impose sentence in the case of

14   United States v. Lawrence Ray.

15          On April 26, 2022, Mr. Ray was convicted by a jury

16   after trial of Counts One through Nine, Eleven, and Thirteen

17   through Seventeen of the superseding indictment S2 20 Cr. 110.

18   I'm referring today to the counts as they are alleged in the

19   superseding indictment and not as they went to the jury.

20   Counts Ten and Twelve did not go to the jury.

21          Let me tell you how I intend to proceed today.  I

22   intend, first, to identify what I have reviewed and to

23   ascertain and confirm that counsel for the government and

24   counsel for the defendant and the defendant have reviewed the

25   same materials and there are no additional materials; I also

N1K1RAYS

1    then intend to address the presentence report and determine

2    whether there are any objections to the presentence report and

3    confirm that the presentence report has been discussed by

4    defendant and his attorneys; I'll then turn to the guidelines

5    calculation; and then, if there are victims who wish to address

6    the Court, my plan is to call on the victims who wish to

7    address the Court, as is their right; I'll then turn to the

8    government for what they have to say with respect to

9    sentencing; I'll give defense counsel a chance to address the

10   Court with respect to sentencing; I'll give the defendant a

11   chance to address the Court with respect to sentencing; and

12   then it's my plan probably to take a short recess before I

13   actually impose sentence.

14           So in connection with the sentencing today, I have

15   refamiliarized myself with the trial transcript and the prior

16   proceedings in this case.  I've also reviewed and have in front

17   of me the presentence report dated August 4, 2022, and revised

18   on October 5, 2022, along with the recommendation and addendum

19   to that report.  I've also received and reviewed the following

20   additional submissions: Mr. Ray's sentencing submission, which

21   is dated January 6, 2023, including the letters submitted by

22   his stepfather and by his former sister-in-law, and various

23   medical records; and the government's submission dated

24   January 13, 2023, with FBI Form 302s of the interviews of

25   Martha Ray and Carl Ray and victim impact statements of Daniel

N1K1RAYS

1  Levin, Felicia Rosario, Santos Rosario, Jr., and Yalitza

2  Rosario, and detailed tax loss calculations.  I've also

3  reviewed the proposed preliminary order of forfeiture, which

4  was submitted on January 13, 2023, and a proposed restitution

5  order and Schedule A that was submitted on January 13, 2023.

6          I've reviewed the government's letter regarding the

7  corrected proposed restitution order, and then the defense

8  letter of January 18, 2023, asking me to schedule a separate

9  hearing on restitution.  Parenthetically, I am prepared to

10  order a separate hearing on restitution, and at the time of

11  sentencing, my plan is simply to order that there will be

12  restitution in an amount to be determined by the Court at a

13  separate restitution hearing.  I will ask counsel to discuss

14  amongst themselves a proposed schedule with respect to the

15  restitution proceedings.

16          Has the government received and reviewed each of these

17  submissions?

18          MS. BRACEWELL:  Yes, your Honor.

19          THE COURT:  And are there any additional submissions

20  of which I should be aware?

21          MS. BRACEWELL:  No, your Honor.

22          THE COURT:  And Ms. Lenox, have you received and

23  reviewed each of these submissions?

24          MS. LENOX:  Yes, your Honor, and there's nothing

25  additional from the defense.

N1K1RAYS

            THE COURT:  Okay.  All right.  Let me turn to the
presentence report.

            Ms. Lenox, have you received and read the presentence
report?

            MS. LENOX:  I have, your Honor.

            THE COURT:  And have you discussed it with your
client?

            MS. LENOX:  Yes.

            THE COURT:  And Mr. Ray, let me address myself to you.
Have you read the presentence report?

            THE DEFENDANT:  Yes, your Honor.

            THE COURT:  And have you discussed it with your
counsel?

            THE DEFENDANT:  Yes, your Honor.

            THE COURT:  Have you had the opportunity to go over
with defense counsel any errors in the report or anything else
that should be taken up with the Court?

            THE DEFENDANT:  Yes, your Honor.

            THE COURT:  Okay.  And are there any errors or any
matters to be taken up with the Court, Ms. Lenox?

            MS. LENOX:  The only objections that we have to the
presentence report are within the confines of the report
itself.  The objections are stated and addressed by probation
within the report.  We stand by our objections, but we have no
further objections to the factual portion of the report and we

N1K1RAYS

1    have no objections to the guidelines calculation.

2              THE COURT:  So are you requiring me to rule on any

3    objections with respect to the factual recitations, Ms. Lenox?

4              MS. LENOX:  I suppose, yes, your Honor.

5              THE COURT:  Okay.  And those are the ones that are

6    stated in the objections in the presentence report.

7              MS. LENOX:  That's correct.

8              THE COURT:  I'll address those in a moment.

9              From the government's perspective, has the government

10   reviewed the presentence report?

11             MS. BRACEWELL:  Yes, your Honor.

12             THE COURT:  And does the government have any

13   objections to the factual recitations in the presentence

14   report?

15             MS. BRACEWELL:  No, we do not.

16             THE COURT:  Okay.  All right.  Let me review the

17   errors, alleged errors to the probation report.

18             First, I'm going to turn to paragraph 32(c).  On

19   paragraph 32(c), I'm going to overrule the defense objection.

20   That said, I don't intend to rely on upon the factual

21   information in 32(c).

22             The objection to paragraph 34, I take it that it is

23   not based upon evidence introduced at trial.  I'm not

24   constrained, nor is probation constrained, by the evidence

25   introduced at trial, so I'm going to overrule the objection and

N1K1RAYS

1  adopt paragraph 34.  That said, again, I'm not intending to

2  rely specifically on the findings in paragraph 34.

3        Paragraph 35, I'm overruling the defense objection.

4        On paragraph 38, I'm prepared to make a change that

5  says, instead of "she was driven to the police station," to say

6  that he had her drive to the police station.

7        Paragraph 48, I'm overruling the objection.  The

8  evidence, the trial supports probation's statement.

9        Paragraph 53, I think the objection is taken care of

10  by the probation response.

11        Paragraphs 115, 125, 126, and 127, I'm overruling the

12  objection based upon probation's response.

13        And I think that takes -- paragraph 173, I'm

14  overruling the objection.  That said, I'm not relying upon that

15  information, 173.

16        Anything else, Ms. Lenox, that you need me to rule on?

17        MS. LENOX:  No.  Thank you, your Honor.

18        THE COURT:  All right.  With the edit that I

19  indicated, the Court will adopt the factual recitations set

20  forth in the presentence report, and the presentence report

21  will be made a part of the record in this matter and placed

22  under seal.  If an appeal is taken, counsel on appeal may have

23  access to the sealed report without further application to the

24  Court.

25        All right.  Let me turn to the sentencing guidelines

N1K1RAYS

calculation.  Although the Court is no longer required to

follow the sentencing guidelines, I am still required to

consider the applicable guidelines in imposing sentence.  To do

so, it is necessary that the Court accurately calculate the

guidelines sentencing range.

Probation here calculates the total offense level as

42, the criminal history category as V, for a guidelines range

of 360 months to life.  Both the government and the defense

agree to that guidelines calculation.  I've done my own

independent calculation and I too agree the 2021 guidelines

manual is applicable.  The combined adjusted offense level is

40.  There is a two-level adjustment for role in the offense,

bringing the total offense level to 42.

With respect to the criminal history, the defendant

has a 1979 conviction for possession of a weapon when he was 18

years old.  That resulted in a dismissal after completion of a

pretrial diversion program.  He was arrested in 2000 and pled

guilty in 2001 to conspiracy to commit securities fraud.  He

later violated the terms of his probation and then later

violated terms of supervised release.  In 2005, he was

arrested, and in 2008, he was sentenced for contempt.  In 2005

he was arrested, in 2010 he pled guilty to charges of

interference with custody and contempt.  He was also charged

with bail jumping.  He has a number of other arrests.  His

criminal history score is 10, resulting in a criminal history

N1K1RAYS

1    category of V.  The guidelines are 360 months to life.

2            The next subject I need to cover is departures, which

3    is to say within the sentencing guidelines framework.  I find

4    that no departure is available as a matter of law.  I will

5    discuss the appropriate sentence under the statutory factors

6    when it comes time to impose sentence.

7            All right.  Are there victims who wish to be heard,

8    Ms. Bracewell?

9            MS. BRACEWELL:  Yes, your Honor.  There are a number

10   of victims that wish to speak or their counsel will be speaking

11   on their behalf.

12           THE COURT:  Can you give me the list and the order.

13           MS. BRACEWELL:  Sure.  Ms. Claudia Drury's attorney,

14   Brooke Cucinella, will be addressing the Court on her behalf;

15   Mr. Santos Rosario will be addressing the Court.  I believe

16   that's all, but we'll confer and -- oh, also Mr. Daniel Levin

17   is also prepared to address the Court.

18           THE COURT:  Okay.  All right.  I'll hear first from

19   Ms. Cucinella.

20           MS. CUCINELLA:  Good morning.  Your Honor, I do just

21   want to clarify, I'm here as Claudia's friend and at her

22   request.  I am no longer representing her, although she is

23   still represented by my former law firm, Simpson Thacher.

24   Ms. Drury did not want to attend today, given that she is

25   attempting to move on with things, but felt very strongly that

N1K1RAYS

1    she wanted her words to be heard out loud by the Court and by

2    Mr. Ray.

3            And with that, I'm just going to read what she has

4    written, if that's all right with the Court.

5            THE COURT:  You may proceed.

6            MS. CUCINELLA:  "What Larry Ray put me through for the

7    eight years and five months that I was in contact with him was

8    unremitting, sadistic torture.  He manipulated my thoughts,

9    feelings, and actions to whatever end he chose.  The ways he

10   abused me were highly specific and based on my individual

11   vulnerabilities.

12           "In our first conversations, he lured me in with the

13   promise of being able to help make my family a happier one —

14   something that meant so much to me at 19 years old.  Later, he

15   manipulated me into believing I had poisoned him and members of

16   his family.  I would go to bed many, many nights desperately

17   praying they would all live through the night and that I would

18   not wake up a murderer.  Often this was because Larry would

19   call me late at night to tell me they were dying or about to

20   die.  I would go to bed praying that, having been forced to

21   work as a prostitute for every waking moment of the previous

22   day, to earn Larry money to repair the damage he intentionally

23   and meticulously brainwashed me into believing I was

24   responsible for.  This cycle of crushing guilt, anxiety,

25   threat, punishment, and immense pressure was truly torturous.

N1K1RAYS

Apart from this horrible context, the experiences I had while being sex trafficked haunt me today. I feel profoundly violated in a way that I can't fully communicate. The emotions and fears I am dealing with as a result are miserable and confusing and terrifying. I can't overstate how deeply I wish this had not happened to me.

"I trusted Larry Ray with everything in my life —— everything precious to me. He destroyed my life, attacked everything precious to me, broke apart my family, convinced me I was incurably evil, intentionally drove me to and orchestrated two psychiatric hospitalizations, sexually groomed me to the point that I would be able to make him millions of dollars from prostitution, enslaved me in that prostitution, made me work years on end from dawn until early hours of the morning, beat me, extorted me, threatened me, pressured me; and the first time I ever defied him in my near decade of knowing him, he stripped me naked, bound me to a chair, and suffocated me with a plastic bag over and over again to the point where I was begging for my life.

"Whenever I would experience moments of intense emotional distress, Larry would accuse me of being a 'bad actress,' or 'B list actress,' and punish me for 'acting' whenever I was visibly upset. Because of this, I came to believe every time I felt strong emotions, like fear or sadness, I was being disingenuous. He called me a 'bad

N1K1RAYS

1    actress' that night in between suffocating me with a used

2    plastic bag and hitting me as I sobbed.

3        "I have nightmares almost every night.  I have been

4    unable to hold any job for the better part of 3-¾ years.

5    Everything exhausts me.  The simplest things terrify me.

6    Putting myself back together is difficult and extremely painful

7    and slow.  My memory, attention span, and problem-solving

8    capabilities have significantly declined.  I am confronted with

9    this every day.  I barely have the energy to exist day to day.

10        "The media attention is deeply distressing, especially

11    after claudiadrury.com, the website Larry created to torture

12    and extort me.  We were named in the trial in part because of

13    that very website.  I feel that I don't have controls over

14    things I should.  I have felt hopeless and powerless and small.

15    I struggle with the feeling that there is something inherently

16    wrong with me, and I can't escape the belief that the things

17    and people I love will be taken away and I will be able to do

18    nothing but watch and feel immense pain.

19        "At the height of the abuse, I didn't speak to my

20    parents or any of my family for almost five years.  I didn't

21    see my dog.  My younger cousin and grandfather died during that

22    time, and I didn't have the choice to attend their memorials

23    because even if Larry had allowed me to reconnect with my

24    family, he would never have tolerated the several days of lost

25    profit.  This separation was so painful, and the lost time

N1K1RAYS

1    occurs to me daily.  My mother is 69 and my father is 66.  My

2    mother now has multiple serious stress-related health issues.

3    He made me hate them.  He made me say the most hateful things I

4    have ever said to the people that I love the most.  He made me

5    think that they meant nothing to me.  This is a man who prefers

6    to target families.

7                "I was berated and bullied and beaten and humiliated

8    into being so thin, I developed a very serious eating disorder.

9    I would binge on obscene amounts of food and throw it all up.

10   I would make a pile of junk food on my hotel room floor on a

11   towel and move from my pile of food to the toilet, back and

12   forth, until I had so utterly exhausted myself or until I had

13   to see a client.  I would throw it all into the closet moments

14   before having to greet them, and once they had left, drag it

15   back out and continue immediately.  I would throw up in the

16   bathrooms in clients' homes or in the trash collected outside

17   their apartment buildings.  I managed this eating disorder

18   while making Larry millions of dollars.  All the literature I

19   read said to recover, I had to stop dieting.  Multiple times I

20   told Larry I wanted to stop dieting and multiple times I was

21   punished.  I once told him I wanted to visit a therapist to

22   treat my eating disorder, and he accused me of being deceitful,

23   playing games, and not wanting to repair the damage I had

24   caused.  He literally would not allow me to recover.  I didn't

25   get my period.  I was freezing all the time.  I had to wear

N1K1RAYS

1    three layers of pants in winter to stay tolerably warm.  My

2    raised throat showed through my back.  The stomach acid ate my

3    teeth, my fillings fell out, and I was not allowed to take

4    enough time off work to fix them.  My front tooth chipped.  I

5    had seven tooth infections in one year and seven courses of

6    antibiotics.  I had severe digestive issues.

7         "The day I left New York and severed contact with

8    Larry is the day I started to recover.  Despite my strongest

9    urges, I never binged and I never purged again.

10        "Over the eight and a half years, I suffered thousands

11   of unique psychological, physical, spiritual, and sexual abuses

12   that I genuinely believe brought delight and a sense of

13   satisfaction to Larry.  I wish there were words to say how

14   painful and tormenting and cruel this period of my life was.

15   I've yet to find them.  It was hell.  It was a deliberate,

16   sustained, and educated campaign to break me.  It felt like an

17   attack upon my soul every day, seeing if I would betray myself,

18   my values, give up on the good in me.  I was just waiting for

19   the day I would feel the warmth fade from my heart, that I

20   would become the cruel, godforsaken person Larry wanted me to

21   be.  I felt myself growing colder every day.  With each lie I

22   told, every time I was forced to prostitute myself, every

23   moment with every client, I felt myself getting more and more

24   numb.  I believe Larry wanted to watch me break apart the

25   pieces of myself and give them away, step by step, growing

N1K1RAYS

closer to becoming whatever awful kind of human being he is.
He wanted to watch me give myself completely away.  Nothing was
enough.

"When he could no longer motivate me by threatening me
personally, when those nerves had died, he threatened to expose
my clients.  The thing I wanted most was to stop doing damage
to others.  But despite my frantic, terrified, miserable
efforts, everything I touched ended up broken.  My life became
entirely a lie.  I lied to everyone I knew.  Barely anyone
learned my first name.  I knew I was fragmenting.  I knew my
heart was breaking.  I knew the light inside me was growing
dimmer every day.  I knew eventually it would be extinguished.
I do not mean these things as figures of speech.  I consciously
experienced the good in me leaving, and I was helpless to do
anything but suffer it.  That feeling is beyond description.

"I've never worked harder or been more dedicated to
anything in my life than earning Larry money —- not before and
not since.  I pushed myself past every limit.  I didn't think I
deserved boundaries or rest or choice or privacy or care.  The
exhaustion I experienced was extreme and indescribable.  My
soul was completely depleted.  It was a tangible feeling.

"Towards the end, there were several times I was
nearly catatonic with clients.  I began to mouth 'Get off of
me' over their shoulders in the midst of sessions.  I
frequently had to sit and work up the energy to animate my face

N1K1RAYS

with normal expressions.  Out of the presence of clients, I was too tired to move my features.

     "I am often disgusted with myself.  I feel so sorry for bringing this travesty into the lives of my loved ones.  I feel like a burden.  I feel backwards and unnatural.  I try to tell myself it isn't my fault, but I feel responsibility.  I am still so sorry, just like I was when I believed I had poisoned my closest friends.  I am so deeply sorry for all of it.  Larry forced me to abject desperation, forced me to experience things no one should —— things I would never even wish upon him.  No one deserves to know such a twisted, empty, and broken version of life.  I did not deserve that.

     "Larry is a malevolent, violent, deceitful shadow of a man.  I don't know what happened to make him this way and do these things, but to me, it will never matter.  I have no forgiveness in my heart, but I hesitate to condemn him to this because he himself forced me to know what it feels like to be irrevocably worsened by ill deeds and with no possibility of absolution.  He forced me to experience a part of what it must be like to be him.  He forced us to hold his evil for him, to internalize it, to try to reconcile it.  It is utterly irreconcilable.  Each time we tried to put it down, he brutalized us.  It was as if he was experimenting on our very souls, like lab mice.  His evil withered us.  It ate our spirits.

N1K1RAYS

```
1         "But I believe it's time he finally is made to face
2    the kind of person he somehow permitted himself to become.
3    Larry will continue to hurt people if given even the slightest
4    freedom to do so.  And even with no freedom at all, he will
5    never stop scheming and attempting.  He will bide his spite and
6    unleash it on everyone who has spoken against him and our loved
7    ones —- especially our loved ones.  He once told me that the
8    root of true evil is cowardice.  I think it may be the only
9    honest thing he ever said to me.
10        "I have one thing to say to him directly:  You are
11   still a human being.  You will never be able to escape that or
12   escape the fact of your soul.  However, you have tarnished it.
13        "Despite painstaking and vicious attempts, I did not
14   lose the ability to see and to value the good in this world.  I
15   did not lose the good in me.  I am rebuilding.  I have a loving
16   family and friends.  I believe in god.  I have a different
17   future, but it is as bright as the future I had before I ever
18   met him.  I'm looking forward to that future.  I'm looking
19   forward to my life."
20        Your Honor, I have a copy of her statement, if I can
21   hand it up to the Court.
22        THE COURT:  You can, and make sure you provide a copy
23   to the defense and to the government as well.
24        Okay.  Next I'll hear from Mr. Santos Rosario, if he
25   wishes to be heard.
```

N1K1RAYS

1              Is there any objection, by the way, Ms. Cucinella, to

2       me filing the letter on the docket?

3              MS. CUCINELLA:  I believe that's fine, your Honor.

4              THE COURT:  Okay.

5              MR. ROSARIO:  Hi, your Honor.  I'm Santos Rosario.

6              In 2010, I was 19 years old and a sophomore in

7       college.  I was doing well in my classes.  I had friends.  My

8       oldest sister was in medical school and my other sister was in

9       college as well.  I was happy.  It was an exciting time, and it

10      felt like me and my family's future was bright and hopeful.

11             Then I met Larry Ray, and all of that went up in

12      smoke.  Instead, the next decade was one of absolute misery.

13      My family was ripped apart.  Larry made us believe there was

14      something deeply wrong with us.  I saw my brilliant sister

15      Felicia reduced to a shell of her former self, my sister

16      Yalitza committed to a state institution, and my mother and

17      father wept for years in confusion and helplessness.  He used

18      me as a tool to drain the little money my family had.  I lost

19      all of my friendships.  I burned every relationship I ever had

20      on his behest —— acquaintances, friends, cousins.  He

21      systematically cut me off from everyone I ever cared about.  He

22      drove me to attempt suicide more than once, and by a certain

23      point, I was contemplating it daily.  I lost my education from

24      one of the top colleges in the country.  He engineered my exit

25      from college and actively worked to prevent my return.  He

N1K1RAYS

physically abused, degraded, humiliated and blackmailed me to

cement his control.  He took away everything that made me me --

my family, my friends, my education, my dignity, my pride, my

hopes and my dreams.

        By the middle of 2012, I had lost my sense of self.  I

got to the point where I could not distinguish fact from

fiction.  I lost trust in my own thoughts, my own memories, and

my own desires and intentions.  He put me in a pit of

self-hatred and self-loathing.  He had me falsely believing

that I hurt my friends and family, that I was the lowest of the

low.  I became convinced that I was unsafe to be around.  I was

homeless for months, unable to conceive of a future for myself,

waiting to eventually kill myself, because that's all I

believed I deserved.

        He took ten years of my life away from me, permanently

changing my life for the worse.  I have perpetual anxiety these

days, and I'm constantly expecting the worst.  I have trouble

remembering things in general.  I find it difficult to connect

with others as it's hard to relate and even harder to trust.

Getting therapy is difficult, as I find it similar to my time

under Larry's control.

        Writing these few lines for this statement took me

weeks.  Revisiting all the ways my family and I suffered was

stressful and traumatic.  And despite my efforts, I don't think

I can fully convey how this man's crimes derailed my life.  All

N1K1RAYS

1    I know is that I wish I never met him.

2             Your Honor, I ask that he be given a life sentence.

3             THE COURT:  Thank you.

4             And I think the next one is Mr. Levin.

5             MR. LEVIN:  Thank you, your Honor.

6             My name is Daniel.  I'm a writer and a teacher.

7             When I was 19 years old, I met my friend Talia's dad,

8    the man who was introduced to me as Lawrence Ray.  What that

9    man went on to do to me and my friends, there isn't language

10   for.  How do you explain to a parent, to a new friend, to a

11   partner, one day to my children, that when I was 19, my

12   friend's dad moved into my dorm and what followed were years of

13   torture and abuse —— psychological, physical, sexual?  Because

14   there was no language for this period of my life, what came

15   afterwards was a well of silence, a chasm that opened between

16   me and other people that I could never bridge.  I'll never be

17   able to explain what Lawrence Ray did to me.  I've never been

18   able to explain what his actions made me into.  But I'm going

19   to try now.

20             Inside of this courtroom all sorts of people, from law

21   enforcement agents to lawyers and judges, to the folks sitting

22   on the jury, were subjected to watching some of the most

23   heinous acts ever committed to video.  None of those people

24   will ever again get to live a life in which they haven't seen

25   those images.  None of them will ever get to live again in a

1  world where such horrible things seem impossible.  Imagine not

2  just seeing those videos but living those experiences.  Imagine

3  living in a world where what you think doesn't matter, what you

4  believe doesn't matter, you can't go outside, you can't go to

5  the bathroom, you can't stand up from where you're sitting.

6  You've learned that the second you move without asking, you

7  might do something that warrants punishment.  And maybe the way

8  you ask will be wrong anyway so you'll be punished for that.

9  Eventually you'll learn that you don't have to move or speak at

10 all, you can just think anything and you'll be caught and

11 tortured for it.

12         I will for the rest of my life be on the ground,

13 kitchen tile digging into my knees, sobbing while Lawrence Ray

14 brandishes a knife over me asking Isabella to go line the

15 bathtub with plastic to catch my blood and the pieces of my

16 body he's about to cut off.  I will never truly be able to

17 stand up from the living room carpet while Lawrence Ray forces

18 me to choke down a dildo, asking me if I still think I'm gay.

19 I am right now standing in front of my friends while Lawrence

20 Ray holds a garrote around my testicles, twisting it tighter

21 and tighter, trying to get me to confess to something I never

22 did.  There will not be a single day I don't live inside the

23 impact of Larry Ray's sledgehammer hitting my ribs as he pulls

24 my tongue with pliers.

25         Lawrence Ray made me disbelieve myself, so when I

thought that something hurt, when something felt wrong, when I felt scared, he said none of that was true, that I didn't understand myself as well as he understood me, which is to say he knew better than I did whether he should be allowed to continue putting his hands on me.  For the rest of my life I will struggle with doubting what I believe, what I think, what I feel.  All my joy will be tinged with pain.  All my ambition will be tinged with shame.  All my hope will be tinged with fear.  Outside of this room, people will grasp at words and phrases to describe what happened to me and my friends. They'll call it a sex cult.  But if I learned one thing from my experience with Larry Ray, it's that language can be used to obfuscate, language can be used to dumb down and to confuse and to flatten out and to replace the hard reality of what is actually happening right in front of you.

Some will call me or my friends stupid or weak or naive because of what Larry did to us.  I challenge you to look directly at the reality instead.  Look at all of us —— intelligent, capable young people full of promise and hope and possibility —— people just like you at 18, 19, 20 years old. What happened here was not because of a set of circumstances with the vulnerability of a group of young people; what happened was because of one man —— a man who would beat and rape and torture and berate me and my friends and call it helping, call it healing, and would call our fear and our pain

N1K1RAYS

1  resistance to progress, would call it weakness leaving the

2  body.

3          Lawrence is a man who is not so special really.  He

4  is, unfortunately, not unlike many, many others.  This is a

5  petty man who seeks power.  We know men like this.  To control

6  people with less authority than them, to feel strong and big,

7  confirms his existence.  A petty man, a small man; a man who,

8  because he could not stand what was broken inside of him,

9  convinced me and my teenage friends that our brokenness, our

10  sadness, our fears, our vulnerabilities, our angst, that all of

11  these were freakish, dire problems, problems only he could

12  solve.  In front of you is a man who claims to value logic, but

13  his version of the facts is an incoherent house of cards; a man

14  who claims to value truth and honor, but who gains illness and

15  weakness in order to garner control and your sympathy; a

16  hypocrite, a liar, an abuser, like any other abuser.

17          Larry would often say truth wins.  So what is the

18  plain truth?  Lawrence Ray tortured me and my friends,

19  verbally, physically, emotionally, and sexually.  That is a

20  fact, as is the fact that there is simply no situation,

21  absolutely no circumstance, in which treating or touching

22  another person in the way Lawrence Ray routinely did is ever

23  acceptable.

24          I would like to hear Lawrence Ray say that he's sorry

25  for what he's done and mean it, but I know he never will.  In

1    front of you is a man who shows no remorse for his actions,

2    who, unless he thought there were some utility in tricking you

3    into believing otherwise, would tell you himself that he does

4    not think he did a single thing wrong.  A remorseless man, a

5    shameless man.

6              From my experience knowing Lawrence Ray, I'm confident

7    that he will spend every day in prison plotting how to hurt the

8    people he believes wrongfully hurt him —— the very victims who

9    are speaking against him today.  Plotting revenge is precisely

10   what he did the last time he was incarcerated —— wrongly, he

11   claimed.  And he will do it again.  He's given us no reason to

12   believe otherwise.  I am confident he will attempt to find ways

13   to hurt me from confinement.  I believe with little doubt that

14   because of what I am saying now, because I am refusing to

15   continue to live in silence, as I did for years, the moment

16   Lawrence Ray is released from prison is the moment my death

17   warrant will have been signed.  I will live the rest of my life

18   with what he did to me.  It's true.  The throbbing pain may

19   lessen and grow, but I can never live a life where this didn't

20   happen at all.  I can never live in a world that didn't allow

21   this to happen.  Lawrence Ray stole my youth from me.  He

22   irrevocably harmed me and my friends.  Given the opportunity,

23   he would do it again, and if he could, he would find a way to

24   cause even more harm.

25             That being said, this morning, I opened my front door

N1K1RAYS

```
1    and I stepped outside, because I can.  I went for a walk.  I
2    talked to a friend about whatever I wanted, because I can.  I
3    get this inconceivable, beautiful privilege; I get to live,
4    really live.  I've experienced love and wonder, devastating
5    sadness, and overwhelming joy of the kindness of others.
6    Because of my trauma, I'm more able to understand and empathize
7    with the countless other people in this world who have been
8    subjected to harm by people who are similar to Lawrence Ray —
9    abusers; small, petty men.  Tonight I can go back home, I can
10   walk through the door, and, if I like, I can lock it behind me,
11   because I have the key.  That's a right Lawrence Ray took away
12   from me and my friends and one he does not deserve — not
13   today, and not until the day he dies.
14            Thank you, your Honor.
15            THE COURT:  Thank you, Mr. Levin.
16            All right.  Does the government wish to be heard?
17            MS. BRACEWELL:  Yes, your Honor.  And for the record,
18   I would just also like to note that both Yalitza and Felicia
19   Rosario are here at the sentencing proceeding, and their victim
20   impact statements were submitted previously to the Court.
21            THE COURT:  And I have them and I've reviewed them.
22            MS. BRACEWELL:  Your Honor, the government is seeking
23   a sentence of lifetime imprisonment.  I want to be clear.  That
24   is not a recommendation we take lightly.  It's reserved often
25   for cases involving murder.  We are making that request because
```

N1K1RAYS

of the extraordinary facts of this case, of the conduct, and of
this defendant.  Anything less than life is simply inadequate.

     I want to start with what the defendant did to these
victims.  The evidence of what he did is overwhelming.  This
Court sat through a four-week-long trial and heard from victim
after victim, but their testimony cannot capture what the
defendant himself recorded in videos and photographs and audio
recordings.  That conduct strains the imagination.  What the
Court saw and the jurors saw and heard was the defendant's
unspeakable cruelty.

     It's been almost a year, so I want to reflect on a few
of many examples.

     The testimony about the defendant putting Santos and
Felicia Rosario in diapers, requiring them to wear pacifiers;
the defendant requiring Santos to slap his face repeatedly
until it was so swollen he was unrecognizable to keep his
sister Felicia captive on the couch; the stories of Claudia
engaging in horrible BDSM, sharing that with the defendant,
sending photographs of the physical injuries she was
sustaining; the images of Dan Levin with pliers around his
tongue; the photographs of Dan Levin in a dress, being forced
to have a dildo in his mouth; the defendant's suggestion to
Claudia that she engage in casual sex with a tool salesman who
was married; threatening Yalitza and Claudia with prison,
describing horrible incidents of abuse that they could be

N1K1RAYS

confident would happen were they imprisoned as he indicated

they would be; the image of Yalitza's suicide attempt in

Pinehurst after sustaining constant abuse and physical labor

under the defendant's direction; the image of her walking

through the night to get to a store to buy Life cereal that had

been deprived from her and then trying to commit suicide.

            These are a few examples of what was constant for the

victims.  The defendant used physical abuse, sexual

degradation, psychological manipulation, interrogations,

gaslighting, isolation, indoctrination, and he took away these

victims' lives.  He left them with what Claudia just described

as a twisted, empty, broken version of life.  Santos just said

he "took away everything that made me me."  Santos was left

with a pit of self-hatred.  He felt like the lowest of the low.

As evidenced by these suicide attempts that so many of these

victims engaged in, again and again, the defendant made his

victims feel their lives were not worth living.  He turned

these promising, vulnerable young people into slaves under his

complete control.  He isolated them, he abused them, he shamed

them, he took away their planned futures, their careers, their

hopes for family; he went after their very desire to live.  And

he did it constantly, for years, day in and day out.  He did it

for his profit, the millions of dollars he gained, but he did

it just as obviously for his own pleasure.

            This case is unique because we're seeking life, but

N1K1RAYS

what he did, how he destroyed these victims' lives, is not so

dissimilar from a murder case.  The effect on these victims was

total, traumatic, and irrevocable.

       For this conduct that I've described, the defendant

has accepted no remorse, he's acknowledged no responsibility.

The PSR describes that he still appears to continue to blame

the victims for poisoning him.  If the defendant is still

talking about poisoning as if it's an explanation for this

conduct, for this campaign of torture, for the labor that he

demanded of them, the damages payment, the sex trafficking, it

shows that he has absolutely no remorse, and even more so, he

has no understanding of what he did to his victims and has

accepted absolutely no responsibility for it.  Even now the

defendant is casting himself as the victim and he's casting his

victims as the victimizers.  It's the same story and the same

fiction that he fed to those victims over a decade.  And it

tells this Court that this defendant's manipulations are still

underway.

       As is clear from what the defendant did to these

victims, this defendant is uniquely dangerous.  This is a

defendant who will remain dangerous at any age.  We can see

that from how he committed these crimes.  He used psychological

tools to whittle away his victims' sense of self.  There was

physical abuse, but his psychological tools were just as

effective.  He recruited his daughter and her best friend,

N1K1RAYS

young people, to commit crimes on his behalf, and he inspired

such loyalty that they did that against their friends, their

former roommates.  He didn't need to exercise physical force.

His psychological tools were just as, if not more, effective.

You can see this too from how he has responded to the

prosecution in this case.  He has, in his prior history,

demonstrated a pattern of disregarding court orders and court

directives, as evinced in his criminal history.  He's

repeatedly endeavored to obstruct the prosecution of this case.

His manipulation is ongoing.  It hasn't stopped.  The

suggestion that his age will provide any protection to the

community is flawed.  It's refuted by the decade of criminal

conduct that he engaged in here that began when he was in his

50s.  The defendant was just out of prison when he was

introduced to the Sarah Lawrence students, when he was invited

by his daughter to come and live among them.  And his grooming

started almost immediately.  His efforts to build their trust,

to gain information about them, about their mental health

histories, their families, that started within months of his

release from prison, and he was already in his 50s.  It

continued for over a decade.  And that decade illustrates why

his dangerousness will not cease.  When the defendant assaulted

Claudia in the Gregory Hotel in October of 2018, when he tied

her up and choked her, he was a month shy of his 59th birthday.

His capacity for cruelty, his ability to engage in it, was

N1K1RAYS

1    unceasing.  When the defendant was amassing materials from

2    jail, trying to find and locate audio and video recordings of

3    his victims, many of whom have spoken here today, he was 61

4    years old.  And even from jail, he was directing his

5    80-something-year-old father to deliver threats to Felicia

6    Rosario, conveying threatening messages about the importance of

7    remaining loyal.

8            This defendant will not age out of cruelty.  And age

9    will not prevent him from inflicting the exact kinds of harm

10   that he did to these victims over a decade.  Mr. Levin's victim

11   impact statement just described him as a petty man that seeks

12   power.  He said he will do it again.  Claudia Drury's victim

13   impact statement describes that Larry will continue to hurt

14   people if given even the slightest freedom to do so.  And even

15   with no freedom at all, he will never stop scheming and

16   attempting.

17           The defendant here must be incapacitated to protect

18   the public.  Nothing less than lifetime imprisonment will

19   accomplish that.

20           Thank you, your Honor.

21           THE COURT:  Thank you.

22           All right.  I'm prepared to hear from the defense.

23           MS. LENOX:  Your Honor, I generally begin sentencing

24   arguments by recognizing the individuals who are in the

25   audience to support their loved one, my client.  Today there's

N1K1RAYS

1   no one.  There's no one for me to acknowledge.  At Mr. Ray's

2   original bail hearing three years ago, his father and his

3   stepmother were in the audience.  At trial last year, his

4   father was here.  Today there's no one.  Over the holidays,

5   Mr. Ray lost his closest family members —- some of the only

6   people that he has communicated with in the past three years.

7   His father, his stepfather, and his stepmother all passed away

8   within a week of each other.  This is but one of the

9   consequences that Mr. Ray has suffered as a result of his three

10  years of incarceration at two federal correctional facilities

11  recognized by most courts in this district to be among the most

12  notoriously inhumane detention centers in the country.  One of

13  these facilities, the MCC, closed while Mr. Ray was

14  incarcerated there because of the atrocious conditions.

15          Mr. Ray has been punished, and he will continue to be

16  punished.  The question for the Court today is not whether

17  Mr. Ray will go home.  It's not whether he'll leave this

18  courtroom today or even within the next few months or years.

19  Mr. Ray has been incarcerated for the last three years and will

20  remain in jail for at least the next decade.  The question for

21  the Court is how much time is sufficient but not greater than

22  necessary to achieve the aims of sentencing.  And the answer is

23  15 years.

24          The government compares this case to a murder case.

25  This case is serious, but that comparison is incorrect.  The

N1K1RAYS

1    government argues that a life sentence is necessary in part

2    because Mr. Ray has not expressed remorse for his actions.  He

3    does so on the advice of counsel to protect his appeal.

4            THE COURT:  And I'm not holding that against him, by

5    the way.

6            MS. LENOX:  It is true that Mr. Ray maintains his

7    innocence, but that does not mean that his experience of

8    incarceration as a result of this offense has had no impact on

9    him.  Incarceration has and will continue to affect Mr. Ray in

10   profound ways.  Mr. Ray was arrested in February 2020,

11   immediately before the onset of the global COVID pandemic.  He

12   has spent the entirety of the pandemic incarcerated in the

13   precise living conditions then known to make individuals the

14   most susceptible to a deadly virus.  While medical

15   professionals and government officials urged people to isolate

16   at home to protect themselves, Mr. Ray lived in a petri dish.

17   Maintaining 6 feet of distance between individuals who are

18   incarcerated is simply impossible at the MCC, and the MDC.

19   This was a highly contagious and deadly virus, about which we

20   knew very little, for which there was no cure and, for a year,

21   no vaccine.  Everyone was frightened, including Mr. Ray.  At

22   the height of COVID, the deplorable conditions of confinement

23   at the MCC were exaggerated exponentially by the BOP's response

24   to the pandemic.  For the greater part of three years, Mr. Ray

25   has been subjected to some form of lockdown, the functional

N1K1RAYS

1    equivalent of solitary confinement.  And in fact, he spent the

2    first few months of his period of incarceration at the MCC in

3    solitary confinement, unrelated to disciplinary infractions,

4    for which over this past three years he has had none.  For

5    weeks at a time, Mr. Ray could not leave his cell.  He had no

6    visits, no calls, no showers, and no exercise.  On the best

7    days, he was allowed out for two hours a day.  On the worst, he

8    remained in his cell for 24 hours a day, several days at a

9    time, for stretches on end for years.  This happened with

10   regularity at both the MCC and the MDC throughout the pandemic,

11   and even continues today, largely because of staffing

12   shortages.

13          Mr. Ray's first social visit during his incarceration

14   came from his father, about two years into Mr. Ray's

15   incarceration —- the first time that he was able to see anyone

16   who he loved.  These extraordinary conditions of confinement

17   are tantamount to presentence punishment and counsel in favor

18   of a downward variance.

19          On top of this, Mr. Ray is sick.  He is attending

20   specialist follow-up appointments at local hospitals.  In 2022,

21   he was hospitalized or had visits at local hospitals on at

22   least nine different occasions.  One of these hospitalizations

23   occurred in May of last year, just weeks after his trial ended.

24   Mr. Ray was sent to Brooklyn Hospital, an occlusion was found,

25   and he was transferred to Mount Sinai for more specialized

N1K1RAYS

1    medical care.  For years Mr. Ray has suffered physically.  That

2    he suffered two medical incidents during an extraordinarily

3    stressful weeks-long trial doesn't come as a shock to those

4    familiar with the frequency of his seizure-like episodes.  The

5    MDC and medical professionals continue to schedule follow-up

6    medical appointments for Mr. Ray.  And he has long been

7    prescribed an antiseizure medication and has been observed,

8    including by counsel during trial, to have red welts that

9    suddenly appear on his body.  He will continue to be sick for

10   the remainder of his time incarcerated.  This is a punishment

11   the guidelines don't account for.

12           The government has essentially asked the Court to

13   ignore Mr. Ray's traumatic childhood, citing his tendency to

14   stretch the truth and the lack of corroboration as reasons to

15   disbelieve.  But attached to the government's sentencing

16   submission were reports of conversations with two of Mr. Ray's

17   family members which, when read together, corroborate the

18   extraordinary family dynamics that are at play here.

19   Regardless of whether Mr. Ray's mother actually poisoned

20   people's food, it's clear that she bragged about having done

21   so, not once but on multiple occasions.  She gave Mr. Ray a

22   reason to believe that this was something people are capable

23   of.  In a world where most people couldn't even fathom the

24   laughable notion of poisoning, Mr. Ray's past told him this was

25   something a person might actually do.  It was real to him.  He

N1K1RAYS

believed he was poisoned and continues to believe he was

poisoned because poisoning to Mr. Ray, who grew up with a

mother who bragged about such things, it's not absurd.  And not

just to Mr. Ray, to his former sister-in-law, who told her

children not to eat their grandmother's food in an abundance of

caution because she too believed that his mother was capable of

poisoning people's food.

In a world where, to most, the notion of poisoning is

inconceivable, Mr. Ray continues to believe.  While Mr. Ray's

younger brother, who was about 3 or 4 years old at the time,

has no memory of the abuse that he suffered as a small child

doesn't mean that Mr. Ray wasn't abused.  Mr. Ray's brother,

whom he's been estranged from for 15 years, in no small part

because he's been in a long-term relationship with Mr. Ray's

ex-wife, tells about how Mr. Ray used to talk about having been

physically and sexually abused as a child in their maternal

grandmother's home.  This isn't a new story that Mr. Ray

concocted to gain sympathy at sentencing.  He was abused.

His brother's report goes on to say that when he was

young, Larry didn't want to live with their mother.  He made

clear his preference to live with their father.  Larry's

brother claims not to know why.  But we do.  Larry didn't want

to live in a home where he was being physically, emotionally,

and sexually tortured, and he made that known.

Larry's brother also makes clear that some of Larry's

N1K1RAYS

bizarre paranoid behavior is shared by members of his family.
Carl discusses recording a conversation between his ex-wife and
Larry and considering DNA testing items to determine whether
they were having an affair, when in fact Larry's brother was
involved with Larry's ex-wife.  Like Larry, his brother is
quick to label people he is estranged from, including his
mother, the mother of his children, who he calls a narcissist.
Whatever the Court chooses to believe about Larry's childhood,
the Court cannot ignore this dysfunctional family dynamic —— a
dynamic that so perfectly maps onto the conduct underlying
Larry's conviction.  It's simply not a stretch that a person so
deeply invested in the witnesses' personal family histories,
determined to intervene, convinced that they had suffered
childhood traumas at the hands of their parents, was himself
the victim of childhood sexual assault and abuse.  This isn't
an excuse for Larry's behavior; it's an explanation of its
genesis.

          I want to take a moment to talk about comparable
cases.  The presentence report from probation specifically says
that there are very few cases that are comparable to this one,
and yet probation still recommends against a life sentence.
The government has urged the Court to look to the NXIVM case in
the Eastern District of New York, where the functional
equivalent of a life sentence was imposed.  This case is
nothing like that one.  In NXIVM, for 15 years, Mr. Raniere

N1K1RAYS

recruited and exploited dozens of victims for his personal

benefit.  He worked with others to recruit and groom sexual

partners, including a 15-year-old minor.  He created child

pornography of a 15-year-old.  He imprisoned a young woman in

her room for two years with no outside human contact for months

at a time.

Even the recent and unusual sex trafficking cases in

both the Southern and Eastern Districts, with the aggravating

factor of minors and multiple trafficking victims, do not

suggest that a life sentence is appropriate here.  Ghislaine

Maxwell was sentenced to 240 months, after having been found to

have played an integral role in the sexual abuse of multiple

underage girls as young as 14 years old, for ten years.

R. Kelly in the Eastern District was sentenced to 360

months.  He was convicted of racketeering and for decades,

assisted by a wide circle of supporters, engaged in the

systematic enticement and sexual abuse of dozens of minors as

young as 12 years old.  He personally manipulated and forced

victims to engage in sexual activity with him and recorded that

activity.  He forced minors to engage in labor, and knowingly

infected minors with genital herpes.  He didn't get a life

sentence.

In Mr. Ray's case, the individuals involved were all

adults.  There were no children involved.  This case is

unquestionably serious, but the government is simply incorrect

N1K1RAYS

1    to compare it to a murder case.

2            I want to talk very briefly about forfeiture, just to

3    note that while the government argues the Pinehurst property at

4    issue in trial should be subject to forfeiture, under the

5    law —— and I'm quoting from *United States v. Lester*, 85 F.3d

6    1409, Ninth Circuit case from 1996 —— under the law, unlike

7    civil forfeiture, which is an *in rem* action, criminal

8    forfeiture is an *in personam* action in which the only

9    defendant's —— in which only the defendant's interest in the

10   property may be forfeited.  In other words, the government has

11   to show that Mr. Ray actually has an interest in the Pinehurst

12   property in order for it to be subject to forfeiture.  To the

13   extent that they have not done so —— and I don't believe that

14   they have —— that property should not be subject to forfeiture.

15           I want to turn to the risk of recidivism, because the

16   government has argued that a life sentence is necessary for his

17   past conduct.  But you know from this case and the testimony at

18   trial that when individuals separate themselves from Mr. Ray,

19   he does not pursue them.  At varying points individuals like

20   Dan Levin, who spoke here today, Santos Rosario, Yalitza

21   Rosario, decided they no longer wanted to spend time with

22   Mr. Ray, and stopped visiting him and stopped returning his

23   calls.  Mr. Levin, who spoke today, has not heard from Mr. Ray

24   in upwards of ten years.  There's no reason to believe that

25   will change once Mr. Ray is released from prison.  In fact,

since his arrest, three years ago, he has had no direct contact
with any of the witnesses in this case.  For well over two
years, he has had no contact with any of them whatsoever.  He
misses the people he loves, but he has not even attempted
contact with any of these individuals in years.

By the time Mr. Ray is released from prison, he will
be at least in his 70s and sick.  Through the course of the
trial, he has lost all support.  The only people that he had ——
his biological father, his stepfather, and his stepmother ——
died within a week of each other in December.  He has no one.
Mr. Ray will never again be in the unique situation that he was
when the witnesses in this case first met him.  And because of
the extraordinary media attention this case has garnered and
the ubiquity and ease of Google searches, it's almost certain
that anyone who comes into Mr. Ray's orbit at any point in the
future will be aware not only of his conviction but the conduct
underlying it.  It's in fact quite likely that they've already
read a book about it, watched a documentary on it, or seen news
articles about it.  That Mr. Ray has no one willing to come to
court to support him at a sentencing where he faces life in
prison speaks volumes.  The crimes that Mr. Ray was convicted
of required other people's support.  The conduct underlying the
offenses relied on individuals who trusted Mr. Ray, who were
willing to speak on his behalf, to vouch for him.  Today, and
every day moving forward, Mr. Ray will have no one to serve in

N1K1RAYS

1    that role.  When he is released from prison, at least a decade

2    from now, he will have no one to broker relationships necessary

3    for the type of conduct that he was convicted of.  These crimes

4    will simply not be replicable years from now.

5            A life sentence is unnecessary to accomplish the aims

6    of incapacitation.

7            Over the past three years, when Mr. Ray was able to

8    make calls, he spoke almost exclusively with his biological

9    father and stepfather.  They've both now passed.  No one is

10   arguing that Mr. Ray should not be punished for the crimes he

11   was convicted of.  He will be punished.  The law requires it.

12   But Mr. Ray's conduct at the MCC and the MDC demonstrates his

13   ability to comply with the law.  Over the past three years, in

14   the face of extraordinary conditions of confinement akin to

15   solitary confinement, Mr. Ray has received not a single

16   disciplinary infraction.  He has followed the rules and

17   complied with directives.  There is no reason to believe --

18   there is every reason to believe that he will continue to do so

19   while serving his sentence, and if and when he is released,

20   under supervised release.  The question for the Court is how

21   much time is sufficient but not greater than necessary.  For

22   Mr. Ray, who is 63 years old, sick, and recently lost his

23   closest relatives, anything greater than 15 years is

24   effectively a life sentence.  Thank you.

25            THE COURT:  Thank you, Ms. Lenox.

N1K1RAYS

1          Does the government wish to be heard with respect to

2     the forfeiture of the Pinehurst property?

3          MS. BRACEWELL:  Yes, your Honor.  Just briefly.  Our

4     understanding is that the statute allows for the forfeiture of

5     property that was used as an instrumentality of the relevant

6     offense, including the forced labor offense.  The statute is

7     broadly worded.  It's not constrained to property that is owned

8     by or in which the defendant has an ownership interest.  And

9     the --

10          THE COURT:  Tell me what section you're referring to

11     specifically.

12          MS. BRACEWELL:  The proposed -- let me pull it from

13     our sentencing submission.  Just to note as well, the proposed

14     forfeiture order sets out a process after entry of the order of

15     forfeiture by which third-party interests in the property can

16     be adjudicated and so --

17          THE COURT:  I'm aware of that.

18          MS. BRACEWELL:  The relevant statute that we'd cite is

19     from the TVPA, Trafficking Victim Protection Act, which covers

20     the forced labor offenses.  18 U.S.C. 1963(a)(2)(D).  Oh,

21     that's the racketeering.  Excuse me.

22          18 U.S.C. 1594(e)(1)(A) provides for the forfeiture of

23     any property, real or personal, involved in, used, or intended

24     to be used to commit or to facilitate the commission of any

25     violation of this chapter, and any property traceable to such

N1K1RAYS

1  property.

2          THE COURT:  Okay.  I have it.

3          Okay.  I'm going to take a brief recess.  I will note,

4  as I have before in this case, that the quality of the advocacy

5  has been excellent on both sides.

6          MS. LENOX:  I'm sorry, your Honor.  Mr. Ray would like

7  to make a statement to the Court.

8          THE COURT:  I'm sorry.  Thank you for correcting me.

9          Mr. Ray, I'm prepared to hear from you.  It's not

10  necessary for you to address the Court, but now would be the

11  time.

12          THE DEFENDANT:  Okay.  Thank you, your Honor.

13          These three years I've spent in jail have been hard.

14  I have had COVID twice.  I'm in pain all the time.  It is hard

15  to describe -- to describe how awful it is to be in pain all

16  the time, every day.

17          My health conditions are getting progressively worse.

18  In addition to the pain, I experience numbness and tingling

19  into my extremities.  It's very uncomfortable and progressing.

20  I can't sleep because of the pain and also because of the

21  ringing in my ears, a terrible screeching, which is

22  progressing.  My vision changes markedly, sometimes suddenly,

23  while I'm reading or even just walking around.  Some days I can

24  read, some days I can't.  The experience of sudden and abrupt

25  visual changes is alarming.

N1K1RAYS

1          The lesions I keep getting are frightening —- very

2    frightening.  I keep getting them.  I don't know why.  They are

3    progressing in severity and in the number of lesions I get and

4    the areas that I get them in.  The doctors tell me the scans

5    show new spots on my brain, but they haven't been able to tell

6    me what is wrong.  They keep telling me I need to see other

7    specialists —- a rheumatologist, pathologist, dermatologist,

8    audiologist, a specialty neurologist, cardiologist —- but I

9    can't take myself to see these specialists while I'm in jail.

10   The MDC keeps sending me to Brooklyn Hospital, but they just

11   don't have the types of specialists that I need, as they tell

12   me.  In fact, Brooklyn Hospital sent me to Mount Sinai.

13          It's frightening to feel this bad, alarming to feel

14   progressively worse, and do not —- and to not know why and to

15   not get the treatment I need.

16          Being in jail has been horrible, especially the

17   lockdowns.  MCC was infested with mice and roaches.  We are

18   isolated —- when we are isolated, we don't get showers.

19   Sometimes we don't even get our meals, let alone hot meals.  It

20   was really frustrating to not be able to review all my

21   discovery, or to meet with my lawyers as much as necessary.

22   And it is so difficult to be isolated and has been so difficult

23   to be isolated from family members.  It took more than a year

24   before my dad was allowed to visit me in jail, almost two

25   years.  Now he's gone.  Both my dads are gone.  In a matter of

N1K1RAYS

1   days, I lost both dads and my stepmother.  All died within one

2   week.  I spoke with them as much as I was allowed, sometimes

3   multiple times a day.  I still haven't processed it.  I haven't

4   wrapped my head around it.  How do I get closure?  Just last

5   week I went to call a friend and dialed my dad's number

6   instead.  This has happened three or four times.  I just can't

7   believe he's gone.  They all are.  I didn't get to say

8   good-bye, to any of them.

9             THE COURT:  Thank you, Mr. Ray.  All right.

10            THE DEFENDANT:  Thank you, your Honor.

11            THE COURT:  We will now take a brief recess.

12            THE DEPUTY CLERK:  All rise.

13            (Recess)

14            (In open court)

15            THE COURT:  Ms. Lenox, is there any reason why

16   sentence should not now be imposed?

17            MS. LENOX:  No, your Honor.

18            THE COURT:  And Ms. Bracewell, is there any reason why

19   sentence should not now be imposed?

20            MS. BRACEWELL:  No, your Honor.

21            THE COURT:  All right.  Let me start by going through

22   the law.

23            As I've stated, the guidelines range applicable to

24   this case is 360 months to life.  Under the Supreme Court's

25   decision in *Booker* and the cases that have followed it, the

N1K1RAYS

1    guidelines range is only one factor that the Court must

2    consider in deciding the appropriate sentence.  The Court is

3    also required to consider the other factors set forth at 18

4    U.S.C. Section 3553(a).  These include:

5         The nature and circumstances of the offense and the

6    history and characteristics of the defendant;

7         The need for the sentence imposed to reflect the

8    seriousness of the offense, to promote respect for the law, and

9    to provide just punishment for the offense, (b) to afford

10   adequate deterrence to criminal conduct, (c) to protect the

11   public from further crimes of the defendant, and (d) to provide

12   the defendant with needed education or vocational training,

13   medical care, or other correctional treatment in the most

14   effective manner.  The Court is also required to consider the

15   kinds of sentences available, the guidelines range, any

16   pertinent policy statement, the need to avoid unwarranted

17   sentence disparities among defendants with similar records who

18   have been found guilty of similar conduct, and the need to

19   provide restitution to any victims of the offense.

20        As Ms. Lenox has indicated, the Court is also required

21   to impose a sentence sufficient but not greater than necessary

22   to comply with the purposes set out above.  That's known as the

23   parsimony principle, and it's required by Congress.

24        I find that the sentence I'm about to pronounce is

25   sufficient but not greater than necessary to satisfy the

purposes of sentencing I've just mentioned.  I've given

substantial thought and attention to the appropriate sentence

in this case in light of the Section 3553(a) factors and the

appropriate purposes of sentencing as reflected in that

statute.  I'll lay out my view of the gravity of the offense

and its circumstances, and the character of the defendant, and

then I will tell you briefly how I apply those facts to the

statutory factors relevant to sentencing.

            Mr. Ray's conduct in this case was particularly

aggravated, his crimes particularly heinous.  Mr. Ray used his

apparent charm, his exaggerated sense of self, and his

intelligence to earn the trust of a group of impressionable

young adults —— his daughter's college classmates and their

siblings.  Then, having earned their trust, he robbed them,

first of their money, then of their relationships, self-worth,

memories, and ultimately their bodies.  He did so through

psychological terror and manipulations, skills which he

mastered through textbooks on the subject.  He convinced them

that what they knew to be true was in fact false, forcing them

to confess to a fantastic story regarding his poisoning, which

he then threatened to use against them.

            Alongside the psychological terror came physical

abuse.  He beat his victims, he tortured them, and at times he

starved them.  He degraded them sexually to the point where

they lost any sense of self-worth.

N1K1RAYS

1          Having gained control over their minds and bodies, he
2    forced them to do his bidding.  He extorted them, he forced
3    them to engage in labor, and he sex trafficked one of them, all
4    for his own profit and his sadistic and perverse pleasure.  He
5    robbed his victims of millions of dollars.  He forced one of
6    his victims to steal from his parents to satisfy his insatiable
7    demands.  He forced another to prostitute herself for his
8    benefit, multiple times a day, seven days a week, 365 days a
9    year, and then took every cent from her.  He convinced them
10   that there was no way out.  They would have to keep paying him.
11   They had to remain his slaves.  If they betrayed him, he would
12   inflict on them a worse fate —- life in prison under
13   extraordinarily degrading conditions, where they would be
14   subject to further sexual abuse.  He threatened to leverage the
15   false confessions he manufactured and the law enforcement
16   connections he claimed to have to send them to prison.  There
17   was no way out.  His victims experienced that reality
18   physically, they experienced it psychologically, and they
19   experienced it emotionally.
20          There is something distinctive about Mr. Ray's crimes,
21   but it's not quite captured in the cases that Ms. Lenox
22   mentioned.  Those cases are horrible in their own way.
23   Mr. Ray's crime is particularly horrible.  He had the evil
24   genius to take people who were young, albeit not minors, and
25   who were not broken, and he broke them, although, as this case

N1K1RAYS

showed, not beyond repair, and then he used them to his evil

ends.

His crimes spanned years and it destroyed families.

More than that, however, there was a particular cruelty in the

defendant's ways and a particular sophistication in his

actions.  He preyed on his victims' vulnerabilities and he took

pleasure in degrading them.  One victim was experiencing

uncertainty over his sexuality so Mr. Ray mocked him in front

of his peers, forced him to wear a dress, degraded him with sex

toys, and sexually abused him.  He did this in front of his

other victims to make it clear, and in a way that would make it

clear, that they were next.  He told another victim who had

finished medical school and was studying for her exams that he

would call his contacts at all the hospitals in New York City

to make sure she never worked as a doctor.  He forced her to

have sex with strangers and to deliver him the video evidence

or suffer his wrath.  And he sought to take every bit of light

from his victims' lives.  When one of his victims developed a

connection with a man she was forced to have sex with for

money, he tortured her, covered her mouth with a pillow,

covered her head with a plastic bag, and threatened to

suffocate her.  He bound her naked to a chair, poured water

over her while blasting the hotel air conditioning system, and

then, while she was naked and bound, ate a hamburger.  He

degraded her physically and psychologically so that his message

N1K1RAYS

could not be misinterpreted.  He controlled her, and she was not permitted to take refuge in even the simplest acts of kindness.

        Mr. Ray's conduct cannot be explained by profit motive alone.  It was sadism, pure and simple.  There was nothing aberrant about Mr. Ray's conduct.  It occurred over years, tracking well-honed models of grooming reflected in articles regarding psychological manipulation that he collected.

        Mr. Ray has a history of violence reflected in the restraining order another one of his victims has against him. He was a man limited by circumstances but a man who, there is very little doubt, based on the evidence in this case, would have destroyed more lives if given the opportunity.

        In addition, there is a sense in Mr. Ray's crimes that he believed that he was above the law and that he would never be restrained by the law.  This is not about Mr. Ray's decision to go to trial and his refusal to accept responsibility.  Every defendant has a right to put the government to its proof.  He's not being penalized for doing so.  But in the way in which Mr. Ray committed his crimes —— using his prior imprisonment to weave a persona of a man falsely accused, penning a letter to the United States Attorney complaining that he was poisoned and, falsely, that his victims were his victimizers, and later obstructing justice to impede his prosecution —— there is a clear sense that Mr. Ray believed and continues to believe that

N1K1RAYS

he can act with impunity, that his acts will never catch up
with him.  They now have.

Mr. Ray never believed that he would be caught.  He
went to great lengths to make sure that the names of others,
not his, was linked to the money he extorted.  He never
believed his victims would have the courage to testify against
him.  He went to great lengths to ensure that they never would.
But they did.  And with their information, the records it
helped uncover, and their testimony, they unraveled Mr. Ray's
criminal scheme.  In a sense, this trial speaks volumes to the
resiliency of the human spirit.  Mr. Ray demoralized and
brainwashed his victims.  He controlled them psychologically
and physically.  Each of his victims who took the stand
demonstrated a courage that was extraordinary.  The government
would not have had a case without their testimony, and each of
Mr. Ray's victims should be commended for ensuring Mr. Ray's
cruelty ended and that others would never again fall prey to
it.

I've considered Mr. Ray's age.  He's 62.  The defense
argues that were I to impose a sentence of 15 years of
incarceration, he would be 73 when released from prison and
nearly 80 when released from supervision.  But there is no
reason to believe Mr. Ray will age out of criminal behavior.
He engaged in these crimes in his late 50s, a time in his life
when, according to some statistics, he should have already aged

N1K1RAYS

1    out of his criminal propensities.  There's also no reason to

2    believe that his capacity for the illegal activity he engaged

3    in would diminish with age.  He committed these crimes with

4    force, but he also committed the crimes with his wits.  By

5    convincing his victims that they were less than human, that

6    they owed their lives to him, and that they would have to repay

7    him with their freedom, he may lose physical vitality as he

8    grows old, but as demonstrated in this case, he is capable of

9    manipulating others to do his bidding with his mind and words

10   alone.  Supervision also is not sufficient to protect the

11   community.  Mr. Ray has been under supervision before.  He

12   violated its terms.

13          Furthermore, a 15-year sentence would not begin to

14   capture the gravity of Mr. Ray's crimes.  I've considered all

15   of Mr. Ray's arguments.  I do not find them convincing.

16   Mr. Ray's lawyers argued that his sentence should be reduced

17   because of the harsh environment at the MCC and the MDC.  I

18   will pause to note that there is something ironic about this

19   argument.  Mr. Ray used the harsh conditions of prison to

20   threaten his victims with their false confessions.  In any

21   event, I do not find that the conditions justify a lesser

22   sentence.

23          One reason for the sentence I intend to give is

24   incapacitation.  Mr. Ray's conditions of confinement do not

25   address the risk that would be created for the public if

1    Mr. Ray's is released.

2         Mr. Ray's past also does not mitigate the offense or

3    diminish his risk.  If he was subject to abuse in the past, he

4    inflicted it by orders of magnitude worse on his victims.

5         I've considered Mr. Ray's medical condition.  There is

6    some question about whether all of his complaints are genuine,

7    but for purposes of today's proceeding, I assume they are and

8    that he has gone to the hospital on numerous occasions,

9    including for either true epileptic seizures or seizure-like

10   events.  I assume he is sick and has been for some time.  The

11   Bureau of Prisons has medical facilities that can handle people

12   with serious medical conditions.  The medical conditions do not

13   mitigate the gravity of Mr. Ray's crimes or reduce the need for

14   him to be incapacitated.  He committed the crimes at issue in

15   this case while ostensibly suffering from the same or similar

16   medical conditions.  The conditions did not prevent him from

17   inflicting acts of unspeakable cruelty on his victims.  There

18   is no reason to believe that they would do so in the future.

19        The defense argues Mr. Ray should receive a

20   below-guidelines sentence because the public nature of the

21   trial achieved a deterrent or retributive effect, but the trial

22   attracted attention because of the harm Mr. Ray inflicted on

23   his victims and the way he did so.  If Mr. Ray lost

24   relationships as a result of the trial, it is because of the

25   facts that came out at trial —— in other words, because of his

N1K1RAYS

1  conduct and not because it was publicized.  There is no reason

2  or basis to think that the public nature of the trial had

3  punitive effect or specific deterrent effect on Mr. Ray.

4          Mr. Ray asks for sympathy based on the loss of family

5  members.  No one should suffer the loss of a family member.  It

6  is a horrible thing.  It would have been better had he showed

7  such sympathy on the families of his victims.

8          So far my remarks have primarily concerned the need

9  for a stern sentence as just punishment and to promote respect

10 for the law, for purposes of incapacitation and specific

11 deterrence.  A sentence far above that requested by the

12 defense, however, is also necessary from the perspectives of

13 general deterrence, which I want to pause on for a second.

14         Crimes such as the one that Mr. Ray committed are

15 difficult to detect and difficult to prosecute.  As I've

16 mentioned before, it takes the courage of victims willing to

17 subject themselves to the public glare to unravel crimes such

18 as Mr. Ray's.  It also takes the resources, expertise, and

19 commitment and dedication of law enforcement.  It is for that

20 reason that just punishment and general deterrence requires a

21 sentence of decades in prison, to send a message to others who

22 think that they might be able to get away with crimes such as

23 these.  They will not.  This case shows the strength of the

24 human spirit and the dedication of law enforcement.  And the

25 sentence will show that when criminals such as Mr. Ray are

N1K1RAYS

caught, they will not be treated with mercy.

I intend to impose a sentence that will ensure that
Mr. Ray spends the rest of his years in prison and that he is
never released.  I do not intend to impose a life sentence per
se.  It would be easy to do so.  The nature of Mr. Ray's crimes
cry out for severe punishment.  The government asked for that
sentence and not without reason or justification.  I believe,
however, that to do so would descend to the defendant's depths.
In this case, the law and the interests of just punishment and
general and specific deterrence call for a sentence that will
be extremely long but not for a "life sentence," one that, as
the government says, is commonly imposed on a person who takes
the life of another.  Mr. Ray did not take any lives, the
evidence at trial shows.  He attempted to extinguish lives.
But he did not succeed.  His victims survived, though they
suffered great trauma and will live with the effects of
Mr. Ray's torture for the rest of their lives.

The sentence I intend to impose would, in the case of
a younger man, leave some small chance of release.  It will not
leave that chance in the case of Mr. Ray.  I'm not compelled to
impose a lower sentence because he is in his 60s.  To the
contrary, the sentence I would impose for purposes of just
punishment and deterrence alone is also the sentence that in
his case is necessary to protect society, to ensure that he
will never victimize these victims or anyone else in the

N1K1RAYS

1    future.  It will be a term of years that honors what the

2    parsimony principle dictates, that I should impose a sentence

3    sufficient but not greater than necessary to satisfy the

4    purposes of sentencing; that it is an appropriate measure of

5    the gravity of Mr. Ray's crimes and that is intended to ensure

6    that Mr. Ray never again presents a risk to society.

7            I will now state the sentence I intend to impose.  The

8    attorneys will have a final opportunity to make legal

9    objections before the sentence is finally imposed.

10           Mr. Ray, I'm going to ask you to please rise.

11           Mr. Ray, after assessing the particular facts of this

12   case and the factors under Section 3553(a), including the

13   sentencing guidelines, it is the judgment of the Court that you

14   are to serve a sentence of 720 months, or 60 years, of

15   imprisonment, in the custody of the Bureau of Prisons, to be

16   followed by a term of supervised release of life.  The sentence

17   is imposed as follows:

18           On Count One, I impose a sentence of 720 months, to be

19   followed by five years of supervised release;

20           On Counts Two, Three, Six, Seven, Eight, Nine, Eleven,

21   and Seventeen, I impose the maximum sentence of 240 months of

22   imprisonment, followed by supervised release of three years, to

23   run concurrent with the sentence of 720 months on Count One.

24           On Counts Four and Five, I impose a sentence of 720

25   months, to run concurrent with the sentence on Count One, to be

N1K1RAYS

followed by supervised release of life.  Counts Ten and 12 were
not tried by the government presumably will be dismissed.  On
Counts 13, 14, 15, and 16, I impose the maximum sentence of 60
months of imprisonment on each of them, to run concurrent with
the sentence of 720 months of imprisonment on Count One, to be
followed by supervised release of three years.

As to supervised release, the mandatory conditions of
supervised release as set forth at page 47 of the presentence
report shall apply:

You must not commit another federal, state, or local
crime;

You must not unlawfully possess a controlled
substance;

You must refrain from any unlawful use of a controlled
substance;

You must submit to one drug test within 15 days of
release from imprisonment and at least two periodic drug tests
thereafter as determined by the Court; and

You must cooperate in the collection of DNA as
directed by the probation officer.

You must also comply with the standard conditions of
release as set forth at pages 47 to 48 of the presentence
report.

You must also meet the following special conditions as
set forth at page 48 of the presentence report:

N1K1RAYS

1          You will be subject to the search condition as set

2    forth at page 48 of the presentence report.  Given the nature

3    of the crime, that condition is appropriate.

4          You must also have no contact with the victims in this

5    case, including physical, visual, written, or telephonic

6    contact with such persons, and must not directly cause or

7    encourage anyone else to have contact with the victims.

8          It's recommended that you be supervised in your

9    district of residence.

10         I'm not imposing a fine because after restitution and

11   forfeiture, I don't believe you'll have the ability to pay a

12   fine.

13         Restitution will be imposed as determined at a

14   subsequent hearing on restitution.  I am imposing forfeiture

15   and will sign the preliminary order of forfeiture as to

16   specific property and money judgment.  With respect to the

17   Pinehurst property that was raised specifically, I find that

18   based upon the evidence at trial that that property was

19   involved in, used, and intended to be used to commit the crimes

20   of forced labor in that it was the subject of the forced labor

21   and was also used to facilitate the commission of that crime.

22         I'm also imposing a mandatory special assessment of

23   $1,500, which will be due immediately.

24         You may be seated, sir.

25         From the government's perspective, is there any reason

N1K1RAYS

1    why the sentence as stated should not be imposed?

2            MS. BRACEWELL:  No, your Honor.

3            THE COURT:  Ms. Lenox.

4            MS. LENOX:  No legal reason, your Honor.

5            THE COURT:  The sentence as stated is imposed.

6            Are there any open counts?

7            MS. BRACEWELL:  Yes.  We would move to dismiss any

8    open counts at this time.

9            THE COURT:  The open counts are dismissed.

10           Mr. Ray, let me advise you that you have the right to

11   appeal your conviction and your sentence.  If you are unable to

12   pay the cost of an appeal, you may apply for leave to appeal *in*

13   *forma pauperis*.  The notice of appeal must be filed within 14

14   days of the judgment of conviction.

15           And the defendant is remanded to the custody of the

16   United States Marshals.

17           Is there anything else from the government's

18   perspective?

19           MS. BRACEWELL:  We would just ask that the judgment

20   reflect that restitution will be imposed within 90 days.

21           THE COURT:  The judgment will reflect that.  The

22   restitution will be imposed within 90 days, and we'll have a

23   hearing shortly with respect to restitution.

24           MS. BRACEWELL:  Nothing further then.  Thank you.

25           THE COURT:  What about from the defense?

N1K1RAYS

1              MS. LENOX:  Nothing.  Thank you, your Honor.

2              THE COURT:  Again, I want to thank all of the lawyers

3     in this case for their excellent presentations to the Court.

4     We're adjourned.

5              THE DEPUTY CLERK:  All rise.

6                              o0o

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25